# In the United States Court of Appeals for the Fifth Circuit

———————————

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA
JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees*,

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS
LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY
AS LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL
CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS
OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA
RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO
COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER
OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER;
ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN
HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the Western District of Texas
Case No. 1:22-cv-424-RP

———————————

## APPENDIX TO MOTION FOR STAY OF PRELIMINARY INJUNCTION PENDING APPEAL AND MOTION TO EXPEDITE APPEAL (VOL. 2)

———————————

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

# Table Of Contents

Joint Notice, ECF No. 39 ................................................................ App. 276

First Declaration of Amber Milum, ECF No. 49-1 ...................................... App. 279

Second Declaration of Amber Milum, ECF No. 53 .................................... App. 289

Pls.' Proposed Order Granting Prelim. Inj., ECF No. 76-1 ......................... App. 292

Defs.' Post-Hearing Brief............................................................. App. 295

Defs.' Sur-Reply ..................................................................... App. 358

Stipulation of Undisputed Facts .................................................... App. 491

Opinion and Order Granting Preliminary Injunction................................. App. 495

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER, | § § § § § | Civil Action No. 1:22-CV-00424-RP |
| Plaintiffs, | § § § | |
| v. | § § | |
| LLANO COUNTY, RON CUNNINGHAM, in his official capacity as Llano County Judge, JERRY DON MOSS, in his official capacity as Llano County Commissioner, PETER JONES, in his official capacity as Llano County Commissioner, MIKE SANDOVAL, in his official capacity as Llano County Commissioner, LINDA RASCHKE, in her official capacity as Llano County Commissioner, AMBER MILUM, in her official capacity as Llano County Library System Director, BONNIE WALLACE, in her official capacity as Llano County Library Board Member, ROCHELLE WELLS, in her official capacity as Llano County Library Board Member, RHONDA SCHNEIDER, in her official capacity as Llano County Library Board Member, and GAY BASKIN, in her official capacity as Llano County Library Board Member, | § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**JOINT NOTICE REGARDING PLAINTIFFS'
<u>MOTION FOR EXPEDITED DISCOVERY</u>**

App. 276

On June 3, 2022, the Court ordered "the parties to participate in a meet and confer to attempt to resolve [Plaintiffs' Motion for Expedited Discovery (ECF No. 23)] without court intervention and to file a joint notice no later than June 7, 2022, identifying the issues that have been resolved and the remaining outstanding issues." (ECF No. 35.) Pursuant to the Court's June 3, 2022 Order, the parties hereby submit this joint notice informing the Court that the parties have reached an agreement and that there are no outstanding disputes over Plaintiffs' expedited discovery requests.

Having met and conferred, the parties agree to the following:

1.  Defendants hereby withdraw Defendants' Response in Opposition to Plaintiffs' Motion for Expedited Discovery (ECF No. 33);

2.  Defendants shall produce documents and respond to Plaintiffs' written discovery requests attached as Exhibits 1-3 to Plaintiffs' Motion for Expedited Discovery (ECF No. 23-1 through 23-3) by **June 21, 2022**;

3.  Defendants shall produce Defendant Jerry Don Moss, Defendant Amber Milum, and Defendant Bonnie Wallace for deposition by **June 30, 2022**, which will be limited to four hours each;

4.  Obtaining this discovery does not prejudice Plaintiffs from later seeking additional discovery or deposing witnesses during the formal discovery phase of this litigation. By entering into this stipulation, the parties do not waive, and expressly reserve, the right to take all discovery to which they are entitled under the Federal Rules of Civil Procedure.

App. 277

2

Dated: June 7, 2022                              Respectfully submitted,


By:  */s/ Ellen Leonida*                         By:  */s/ Matthew Rienstra*
Ellen V. Leonida (CA Bar No. 184194)*            Matthew L. Rienstra (TX Bar No. 16908020)
**BraunHagey & Borden LLP**                      First Assistant County Attorney
351 California Street, 10th Floor                801 Ford Street, Room 111
San Francisco, CA 94104                          Llano, Texas 78643
Tel & Fax: 415-599-0210                          Tel. 325-247-7733
leonida@braunhagey.com                           Fax. 325-247-7737
                                                 matt.rienstra@co.llano.tx.us

*Attorney for Plaintiffs*
                                                 *Attorney for Defendants*

*admitted pro hac vice*

**App. 278**

**United States District Court**
**Western District of Texas**
**Austin Division**

| | |
|---|---|
| **Leila Green Little,** *et al.*,<br>    **Plaintiffs,**<br>**v.**<br>**Llano County,** *et al.*,<br>    **Defendants,**<br>**and**<br>**The State of Texas,**<br>    **Intervenor-Defendant.** | **Case No. 1:22-cv-424-RP** |

<u>**DECLARATION OF AMBER MILUM**</u>

My name is Amber Milum, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge of the matters herein stated.

1.       I serve as Director of the Llano County Library System, a position I have held since February 2021. I manage Llano County's three library branches: the Llano Library, the Kingsland Library, and the Lakeshore Library. Library staff at each of the three branches report to me, and I report to the Llano County Judge. As Director, I ensure all aspects of the Llano County Library System run smoothly. In addition to other responsibilities, I am responsible for ensuring sufficient staffing at the libraries, ordering supplies and books, and resolving any maintenance and IT issues. I have worked in the Llano County libraries since 2013. Prior to becoming Director of the Llano County Library System, I served as the library director for the Kingsland library.

2.       As Director, I am in charge of ordering books for each of the three libraries and making sure there is room on the shelves for the new additions. We typically buy around 60 books per library per month. To determine what books to buy, I consider books and authors that are popular at the time and also acquire new books that are popular. I typically look at online lists such as the New York Times Best Sellers list. I also look at the statistics from our libraries to see which

<span style="color:orange">**App. 279**</span>

authors and topics are in high demand. I also consider feedback from our patrons about which books they would like to see in the libraries. Our patrons have a list of authors they like and can fill out a form to request that the library purchase any given book. In my selection of books, I try to make sure that our libraries have a diverse collection so that all citizens of Llano County are able to check out books that appeal to them.

3.      The Llano County libraries have a limited amount of shelf space. To make room for the new books we purchase, we must take other books off the shelves. This is a process called "weeding," which is a practice libraries use to ensure their collections remain up-to-date. Weeding involves removing books from our collection that, among other reasons, have declined in popularity, have not been checked out often, or are in poor condition. Books that have been weeded from the Llano County libraries are most often either placed in a "free bin" so that patrons can take them if they would like to, or they are made available for purchase in book sales. The proceeds from the book sales go to the Friends of the Library.  There is one Friends of the Library organization associated with each of the three libraries in the Llano County Library System, and each Friends of the Library organization donates money to its associated library branch.

4.      At the Llano County Library System, we use the "CREW" method to determine which books to weed. The "CREW" method is an established weeding guide for modern libraries that was established in 1976. It is the method taught by the Texas State Library and Archives Commission, which we look to for guidance. "CREW" is an acronym that stands for "Continuous Review, Evaluation, and Weeding." To identify prime candidates for weeding, the CREW method suggests using the "MUSTIE" factors. "MUSTIE" is an acronym that stands for:

- **M**isleading (and/or factually inaccurate)
- **U**gly (in poor physical condition)
- **S**uperseded (by a new editions or better book on the subject)
- **T**rivial (of no discernible literary or scientific merit)
- **I**rrelevant to the needs and interests of the community

- **E**lsewhere (information can be obtained expeditiously elsewhere or at no cost)

I use the MUSTIE factors in determining which books I weed from the libraries.

5. As the "CREW" acronym suggests, weeding is a continual process that is done throughout the year. At the Llano County libraries, there is a big weed that normally happens around August of each year. But I, along with the other branch librarians, am constantly on the lookout for books to be weeded so that our libraries have a current collection for our patrons. A total of 8,143 books/DVDs were weeded from the Llano County libraries from January 1, 2021, through March 31, 2022. This is a typical number of books/DVDs to be weeded from our libraries in a 15-month period.

6. In the summer of 2021, a number of patrons became concerned about two books that were on the shelves of the children's section: "*I Broke My Butt*" and "*My Butt is So Noisy*." These are illustrated books that show a child's naked buttocks. The same concerned patrons began to check these books out repeatedly. As a result, no one else was able to check out the books, although I am unaware of anyone else who actually wanted to check out these books. I weeded these two books because they were not being circulated sufficiently to warrant keeping them on the shelves, not because of the viewpoints or content expressed in either of those books.

7. Also in the summer of 2021, the library purchased some books that had not yet been put on the shelves: "*I Need a New Butt*," (which I originally discussed with patrons at the same time of the discussions referenced in the previous paragraph), "*Larry the Farting Leprechaun*," *Harvey the Heart Had Too Many Farts*," "*Gary the Goose and His Gas on the Loose*," and "*Freddie the Farting Snowman*." I decided to weed these books in July and August of 2021 because I felt they would have the same fate as the "*I Broke My Butt*" and *"My Butt is So Noisy"* books, and that they would not circulate sufficiently if added to the system.

8.      In the fall of 2021, some members of the community became concerned that there were books in the children's section that depicted nude children and sexual acts. I was asked by Commissioner Jerry Don Moss to identify books in the children's section of the library that depicted naked children and sexual acts. Two of the books identified were "*It's Perfectly Normal*" and "*In the Night Kitchen*." "*It's Perfectly Normal*" contains graphic illustrations of naked persons at various ages, including infants and adolescents. The book also contains illustrations of adults engaging in sexual intercourse. "*In the Night Kitchen*" contains illustrations of a naked toddler whose genitals are depicted throughout the book. In reviewing these two books, I noted they had been checked out too infrequently to remain on the shelves. "*In the Night Kitchen*" had been checked out only a little over once per year since it was purchased in 1999. "*It's Perfectly Normal*" had only been checked out seven times in the fifteen years it had been on the shelves. It had not been checked out at all since 2018. Since neither book appeared to be in high demand, they were weeded consistent with my normal weeding procedures. I would have weeded each of these books regardless of the viewpoints or content expressed in those books, and I would have done so even if no one in the community had ever complained about them.

9.      In October 2021, members of the community became concerned that children were able to access books that depict sexual acts through its online database of books at the time: OverDrive. I was tasked by Judge Ron Cunningham and the Llano County Commissioners to find a way to implement parental controls on OverDrive. After going back and forth with representatives from OverDrive, I learned that even if parental controls were implemented, a child using OverDrive could still easily change the settings to remove any filters. The County Judge and the Commissioners ultimately decided to terminate access to OverDrive. In January 2022, the Llano County Library System began the approval and contractual process required to partner with another online database for books, namely Bibliotheca. That process was completed on March 14,

2022. Bibliotheca (via its CloudLibrary App) significantly more content than OverDrive and is much more user-friendly. After the switch to Bibliotheca, the library was able to block minors from accessing the online server through our Apollo ILS (Integrated Library System). This had the effect of allowing a parent to permit their minor child to access any content the parent thought was appropriate via the parent's Bibliotheca/CloudLibrary account. Community feedback in response to the switch from OverDrive to Bibliotheca has been overwhelmingly positive.

10.     Each of the seven plaintiffs is able to access books and library materials on Bibliotheca through the Llano County Library System, and they have been able to do so since May 9, 2022, when the Bibliotheca/CloudLibrary system went live for library patrons. Each of the following books is currently available to the plaintiffs in at least one of the following three ways: (1) On Bibliotheca/CloudLibrary; (2) For check out from the Llano County library system through Inter Library loan; or (3) For check out directly from the Llano County library system through its "in-house checkout" system, in which a personal or donated book is made available to library patrons for check out. The following chart explains the extent to which each of the disputed books remains available to the plaintiffs for online reading or physical check out:

| Title | Author | Availability |
|---|---|---|
| *Caste: The Origins of Our Discontents* | Wilkerson, Isabel | Bibliotheca/CloudLibrary |
| *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* | Bartoletti, Susan Campbell | Inter Library loan |
| *Spinning* | Walden, Tillie | Inter Library loan |
| *In the Night Kitchen* | Sendak, Maurice | Inter Library loan |
| *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* | Harris, Robie | Bibliotheca/CloudLibrary |
| *My Butt is So Noisy!, I Broke My Butt!, I Need a New Butt* | McMillan, Dawn | Inter Library loan, Physical copies available for in-house checkout |

| | | |
|---|---|---|
| *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman, Harvey the Heart Has Too Many Farts* | Bexley, Jane | Inter Library loan, Physical copies available for in-house checkout |
| *Being Jazz: My Life as a (Transgender) Teen* | Jennings, Jazz | Bibliotheca/CloudLibrary and one physical copy (Currently checked out and overdue) |
| *Shine* | Myracle, Lauren | Inter Library loan |
| *Gabi, a Girl in Pieces* | Quintero, Isabel | Inter Library loan, and Bibliotheca/CloudLibrary |
| *Freakboy* | Clark, Kristin Elizabeth | Inter Library loan |

The Inter Library loan system allows the Llano Library System to order many books that are not directly available from the Llano libraries. Patrons ask that a librarian process the loan request, which the librarian orders using the NRE Gateway website. Most patrons are already aware of the ability to request a book via the loan process, and those patrons that request a book not currently in the library catalog are informed that a loan is an option. The loan system involves numerous libraries located in Texas and other states. Loaned books are usually subject to a nominal postage fee and on average arrive in the Llano library within a few days to several weeks.

11.     In addition to the current availability of these books described in the chart in paragraph 10, a donor who wishes to remain anonymous has pledged to me that he will donate physical copies of each of the books listed in the chart for inclusion in Llano County's "in-house checkout" if those books are not already available for checkout through that in-house checkout system. I have promised that donor that I will accept his gift and add each of those books to our collection of titles available for in-house checkout. This will ensure that each of the plaintiffs can check out physical copies of each of the disputed books from the Llano County library system without having to use Inter Library loan or Bibliotheca if they find those alternatives inconvenient.

DocuSign Envelope ID: D8E5B7E23-G9E1-456E-BF98-5ED7334AA524

I will notify the Court immediately when the donor's gift arrives and the books are added to our in-house checkout collection.

12.     In November 2021, I was forwarded an email from Judge Cunningham that he had received from Bonnie Wallace. I was not familiar with Bonnie Wallace at the time. The list attached to the Judge's November 2021 email contained a list of 59 books that were either on the library shelves or available on OverDrive. 12 books were on OverDrive and 47 books were in the physical libraries. I was not instructed to do anything with respect to the books on the list, but I decided to review them out of curiosity. I reviewed each of the 47 physical books and in the process, I discovered that 6 of the books should be weeded: "*Freakboy*," "*Shine*," "*Caste: The Origins of our Discontents*," "*Gabi, a Girl in Pieces*," and "*They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*." The remaining 41 books did not meet the criteria for weeding and seemed to be relatively popular with our patrons. I therefore decided to leave those 41 books on the shelves so our patrons could continue to check them out. My decision to weed the six books had nothing to do with the viewpoints or content expressed in any of those books. I would have weeded each of those six books regardless of the viewpoints or content expressed in those books, and I would have done so even if no one in the community had ever complained about them.  These books were either put into our book sale shelf and sold to patrons or donated to a local book resale shop.

13.     "*Freakboy*" was weeded because it had been checked out only once since it was added to the library's collection in 2015. The last and only time it was checked out was June 13, 2016. "*Spinning*" was weeded because it had been checked out only four times since it was added to the library's collection in 2018 and had not been checked out at all in the last two years. "*Gabi, a Girl in Pieces*" was weeded because it had been checked out only three times since it was added to the library's collection in 2016, and it also had not been checked out at all in over two years.

"*They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*" was weeded because it had only been checked out twice since it was added to the library's collection in 2011, and it had not been checked out at all since 2011. It is expected that books be checked out multiple times per month to avoid being weeded. I weeded these books so that we could make room for other books that would be more popular with our patrons.

14.     "*Shine*" was weeded because it had only been checked out nine times over a ten-year period. I do not recall exactly why "*Caste: The Origins of Our Discontents*" was weeded. However, given it was only in the library system for a year, it is most likely that the book was weeded due to physical damage.  Furthermore, as of May 9, 2022, this book is available for checkout via the Bibliotheca/CloudLibrary system.

15.     I did not consider the content of any of the books I weeded when I made the decision to weed them. I also did not consider any of the viewpoints expressed in any of the books I weeded. I weeded the books based on the objective criteria I always use in determining which books to weed.

16.     I was never instructed or pressured by the County Judge or any of the County Commissioners to weed or otherwise permanently remove any books from the Llano County libraries. I was also never instructed to remove any books from the libraries by the Llano County Advisory Board. The advisory board has no authority to direct me to perform any acts. The advisory board also does not have authority to pre-approve any book purchases. Those decisions are made by me only.  I am aware that the Judge referenced "pulling" books with nudity or sexual content in at least one email to me.  My understanding of "pulling" in that context was that the books were to be pulled from the shelves and reviewed to determine the appropriate section of the library in which they should be shelved, such as the adult, young adult, or children's sections.

17.     In December, the libraries were closed to the public for three days to organize the books in the libraries and re-label some of the books. As part of the organization process, my staff and I ensured that any books depicting nudity or sexual acts were properly labeled and placed in appropriate sections of the library. No book was removed based on its content or viewpoint during this process.

18.     Each of the plaintiffs claims that they "cannot check out" the books listed in the chart in paragraph 10 "because they are no longer on library shelves." Day Decl., ECF No. 22-2, at ¶ 4; Jones Decl., ECF No. 22-3, at ¶ 3; Kennedy Decl., ECF No. 22-4, at ¶ 3; Little Decl., ECF No. 22-5, at ¶ 3; Moster Decl., ECF No. 22-7, at ¶ 3; Puryear Decl., ECF No. 22-9, at ¶ 3; Waring Decl., ECF No. 22-11, at ¶ 3. Those statements are false. Each of the plaintiffs can check out physical copies of the following books through Inter Library loan: *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; (2) *Spinning* by Tillie Walden; (3) *In the Night Kitchen* by Robie Harris; (4) *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt* by Dawn McMillan; (5) *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman* by Dawn McMillian; (6) *Shine* by Lauren Myracle; (7) Gabi, a Girl in Pieces by Isabel Quintero; and (8) *Freakboy* by Kristin Elizabeth Clark. Each of the plaintiffs can also check out physical copies of the following books directly from the Llano County libraries: (1) *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt* by Dawn McMillan; (2) *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman* by Dawn McMillian.

19.     In addition, each of the plaintiffs will be able to check out physical copies of *every* book listed in in paragraph 10 as soon as we receive the promised gift from the anonymous donor mentioned in paragraph 11.

20.     All the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___7/15/2022_____ in Llano, Texas.

DocuSigned by:

*Amber Milum*

24504D1FCF0449A...

AMBER MILUM

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al.,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>　　　　　　Defendants. | Case No. 1:22-cv-00424-RP |

### SUPPLEMENTAL DECLARATION OF AMBER MILUM

1.  My name is Amber Milum. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  On Thursday, July 21, 2022, I received physical copies of each of the following nine books from a donor who wishes to donate these books to the Llano County Library System:

- *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti

- *Gabi, a Girl in Pieces* by Isabel Quintero

- *Shine* by Lauren Myracle

- *Caste: The Origins of Our Discontents* by Isabel Wilkerson

- *It's Perfectly Normal: Changing Bodies, Growing Up, Sex, Gender, and Sexual Health* by Robie H. Harris

- *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings

- *Spinning* by Tillie Walden

**App. 289**

- *In the Night Kitchen* by Maurice Sendak

- *Freakboy* by Kristin Elizabeth Clark

4.  I am adding each of these nine books to the Llano County Library System's "in-house checkout" system, in which a personal or donated book is made available to library patrons for check out. Each of these books will be made available to the plaintiffs (and other library patrons) for check out by no later than Wednesday, July 27, 2022.

5.  This means that the plaintiffs can check out physical copies of each of the disputed books from the Llano County Library System without having use Inter Library loan or Bibliotheca if they find those alternatives inconvenient.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/23/2022

DocuSigned by:

*Amber Milum*

24504D1FCF0449A...

AMBER MILUM

## CERTIFICATE OF SERVICE

I certify that on July 23, 2022, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendants*

App. 291

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER, | § § § § § | Civil Action No. 1:22-cv-00424-RP |
| Plaintiffs, | § § § | |
| v. | § § § | **[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| LLANO COUNTY, RON CUNNINGHAM, in his official capacity as Llano County Judge, JERRY DON MOSS, in his official capacity as Llano County Commissioner, PETER JONES, in his official capacity as Llano County Commissioner, MIKE SANDOVAL, in his official capacity as Llano County Commissioner, LINDA RASCHKE, in her official capacity as Llano County Commissioner, AMBER MILUM, in her official capacity as Llano County Library System Director, BONNIE WALLACE, in her official capacity as Llano County Library Board Member, ROCHELLE WELLS, in her official capacity as Llano County Library Board Member, RHONDA SCHNEIDER, in her official capacity as Llano County Library Board Member, and GAY BASKIN, in her official capacity as Llano County Library Board Member, | § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § § § | |

The Court, having reviewed all materials submitted in support of and in opposition to Plaintiffs' Motion for a Preliminary Injunction, held a hearing regarding Plaintiffs' Motion, and reviewed all other pleadings and arguments by counsel properly before the Court, and after careful consideration, hereby **GRANTS** Plaintiffs' Motion as follows:

1

**App. 292**

1.      Within twenty-four hours of the issuance of this Order, Defendants shall return to publicly visible and accessible shelves the following print books that were removed or concealed from the Llano County Libraries in 2021 or 2022 because of their viewpoint or content:

a.      *Caste: The Origins of Our Discontent* by Isabel Wilkerson;

b.      *They Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti;

c.      *Spinning* by Tillie Walden;

d.      *In the Night Kitchen* by Maurice Sendak;

e.      *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie Harris;

f.      *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!* by Dawn McMillan;

g.      *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Had Too Many Farts* by Jane Bexley;

h.      *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings;

i.      *Shine* by Lauren Myracle;

j.      *Under the Moon: A Catwoman Tale* by Lauren Myracle;

k.      *Gabi, a Girl in Pieces* by Isabel Quintero; and

l.      *Freakboy* by Kristin Elizabeth Clark.

2.      Within twenty-four hours of the issuance of this Order and immediately after returning the books to publicly visible and accessible shelves as ordered in (1) above, Defendants shall update the Llano County Library System's searchable catalog to reflect that these books have been returned to library shelves and are available for check out.

App. 293

3.      During the pendency of this action, Defendants may not remove or conceal any book from the Llano County Library System's publicly visible and accessible shelves and/or searchable catalog without documenting (a) the individual who decided to remove or conceal the book and (b) the reason or reasons for that removal or concealment.

4.      During the pendency of this action, before Defendants remove or conceal any book from the Llano County Libraries' publicly visible and accessible shelves and/or searchable catalog, Defendants must provide Plaintiffs with the documentation described in (3) above.

5.      During the pendency of this action, Defendants are hereby enjoined from restricting access to any book on Bibliotheca's online platform due to the book's viewpoint or content.

6.      During the pendency of this action, Defendants are hereby enjoined from closing future meetings of the Llano County Library Board to members of the public.


**IT IS SO ORDERED.**


Dated: _____


_____
Hon. Robert Pitman
United States District Judge

App. 294

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.,

                Plaintiffs,

v.

**Llano County**, et al.,

                Defendants.

Case No. 1:22-cv-00424-RP

**RESPONSE TO PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of contents ...................................................................................................i

Table of authorities ...............................................................................................ii

Response to the plaintiffs' statement of facts.....................................................2

    A. All 17 of the disputed books are available for the plaintiffs to check out from the Llano library's in-house checkout system...............................................3

    B. The Llano library's in-house checkout system is not "secret" and each of the plaintiffs knows about it ...............................................................................6

    C. The decision to weed the 17 disputed books belonged solely to Amber Milum, and Milum decided to weed each of those 17 books for reasons unrelated to viewpoint or content ...................................................................7

        1. Only Amber Milum's motivations are relevant in determining whether any of the 17 books were weeded because of their content or viewpoint ........ 9

        2. Ms. Milum weeded the 17 disputed books because she believed that each of them met the library's criteria for weeding ....................................11

Argument ................................................................................................................19

    I. The plaintiffs have not made a "clear showing" of likely success on the merits.......19

        A. The in-house checkout system does not and cannot violate the plaintiffs' First Amendment right to access information ...................................................19

        B. A public library's weeding decisions are subject only to rational-basis review...... 22

        C. Amber Milum did not engage in viewpoint or content discrimination when weeding the 17 disputed books .......................................................................25

    II. The plaintiffs have not made a "clear showing" of irreparable harm .....................28

    III. The Court should deny out of hand the requested relief in paragraphs 3 through 6 of the plaintiffs' proposed order ...........................................................29

    IV. If the Court awards a preliminary injunction, it should be directed only to Amber Milum ...................................................................................................30

Conclusion ..............................................................................................................30

Certificate of service ..............................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
  557 F.3d 1177 (11th Cir. 2009) ........................................................2

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) ......................................6

*Board of Education v. Pico*, 457 U.S. 853 (1982) ...................................8, 22, 23, 24

*Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995)....22, 23

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005).........................................21, 24, 25

*CK-W by and through TK v. Wentzville R-IV School District*,
  --- F. Supp. 3d ----, 2022 WL 3138989 (W.D. Mo.) ...........................22, 23, 28

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986)...................................20

*Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003) .........20

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998)......................................20

*In re Gee*, 941 F.3d 153 (5th Cir. 2019)...............................................1

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) .......................28

*Roe v. Cypress-Fairbanks Independent School District*,
  53 F.4th 334 (5th Cir. 2022)...........................................................29

*Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988).........23

*Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000)..............20, 21

*Texas Medical Providers Performing Abortion Services v. Lakey*,
  667 F.3d 570 (5th Cir. 2012) ..........................................................19

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)........................................1, 2

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) ....21, 22, 24, 25

*Valley Forge Christian College v. Americans United for Separation of Church
  and State, Inc.*, 454 U.S. 464 (1982) ................................................28

*Virgil v. School Board of Columbia County, Florida*,
  862 F.2d 1517 (11th Cir. 1989) .......................................................23

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ..........................28

**Statutes**

42 U.S.C. § 1983 .............................................................................1, 20

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ....................20

**App. 297**

Every one of the 17 disputed books is currently available for the plaintiffs to check out at the Llano library—just as they were before the books were weeded. The only difference is that the books are available through the library's in-house check-out system rather than on the shelves and in the catalog. But none of that inflicts any First Amendment injury on the plaintiffs, because all of the plaintiffs are fully aware of the library's in-house check-out system and know that the disputed books remain available for them to check out. So each plaintiff has the same "right to access information" that they had before the books were weeded.

The plaintiffs cannot show a violation of their First Amendment rights when they *know* that the disputed books remain available for check out at Llano library. And they certainly cannot establish "irreparable harm" when they can check out the disputed books with the same ease as before. The plaintiffs have produced no evidence or testimony showing how they would be "irreparably harmed" by obtaining these books through the in-house check-out system rather than the catalog and shelves. And they present no argument for how the defendants have deprived them of their supposed "right to access information" when the defendants have fully preserved the plaintiffs' ability to check out the disputed books.

The plaintiffs complain that the in-house checkout system is insufficient because *other* library patrons might not be aware of it.[1] But the plaintiffs have no standing to assert the First Amendment rights of non-parties, and neither 42 U.S.C. § 1983 nor the Declaratory Judgment Act allows the plaintiffs to sue over their alleged violations of someone else's constitutional rights. The plaintiffs appear to have forgotten that courts exist to resolve disputes between named litigants, not to act as "roving commissions"[2] empowered to pass judgment

---

1. *See* Pls.' Br., ECF No. 91, at 12–13; *id.* at 21–22.
2. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *see also id.* ("Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."); *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) ("'[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)).

on the conduct of the Llano public-library system. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." (citation and internal quotation marks omitted)). So the plaintiffs must make a "clear showing" that the defendants are violating *the plaintiffs'* First Amendment rights by offering the disputed books through an in-house checkout system of which the plaintiffs are fully aware. And the plaintiffs must make a "clear showing" that *they* will suffer irreparable harm if they obtain books through the in-house checkout system. They have come nowhere close to making any showing—let alone a "clear showing"—on either of these requirements, so they are not entitled to the "extraordinary remedy" of a preliminary injunction.

## RESPONSE TO THE PLAINTIFFS' STATEMENT OF FACTS

The plaintiffs' recitation of the facts is incomplete and (in many places) demonstrably false. Throughout their brief, the plaintiffs deploy imprecise terminology (such as "remove" books, which is unclear whether to refers to a temporary decision to pull the book from the shelves for review or permanent decision to weed the book from the library's shelves and catalog) and tiresome hyperbole. Saying that the 17 disputed books have been "banned" or "censored" is histrionic when each of those books remains available for patrons to check out through the library's in-house system and (for most of the books) through additional means such as Bibliotheca or InterLibrary Loan. Books that have been weeded from the shelves yet remain available to library patrons through other means have not been "banned" or "censored"—any more than the thousands of books that the Llano library system weeds each year. The plaintiffs apparently think they gain a rhetorical advantage from throwing around terms like "banned" or "censored," but candid advocacy requires one to accurately describe the actions of an opposing litigant. *See, e.g., ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1218 (11th Cir. 2009) ("Book banning takes place where a

government or its officials forbid or prohibit others from having a book. . . . [R]emoving a book from [library] shelves is not book banning.").

The Court deserves an accurate recitation of the facts before it rules on the motion for preliminary injunction—especially when the Court's ruling is likely to be reviewed on appeal. So we must begin by addressing the outright falsehoods that appear throughout the plaintiffs' brief before considering the relevant legal standards and applying the law to the facts.

### A.   All 17 Of The Disputed Books Are Available For The Plaintiffs to Check Out From The Llano Library's In-House Checkout System

The plaintiffs repeatedly and falsely claim that Llano library's in-house check-out program includes only nine of the 17 disputed books. *See* Pls.' Br., ECF No. 91, at 22 (complaining that "only nine" of the books are available through in-house checkout); *id*. at 13 ("The [nine] donated books make up the entirety of the Llano Library's in-house checkout program."). Those statements are demonstrably untrue and misrepresent the factual record.

The plaintiffs' "only nine books" claim appears to be derived from Amber Milum's declaration of July 23, 2022, which reports that the library had accepted a donation of nine books, and that Milum added those donated books to Llano library's already existing in-house checkout system. *See* Milum Supp. Decl., ECF No. 53, at ¶¶ 3–4. But Ms. Milum's declaration of July 15, 2022, makes clear that the three "butt" books and the four "fart" books were already part of the library's in-house checkout system, which is why they were excluded from the subsequent nine-book donation. *See* Milum Decl., ECF No. 49-1, at ¶¶ 10–11. Paragraph 10 of Ms. Milum's declaration provides a chart explaining how

> each of the [disputed] books is currently available to the plaintiffs in at least one of the following three ways: (1) On Bibliotheca/CloudLibrary; (2) For check out from the Llano County library system through Inter Library loan; or (3) *For check out directly from the Llano County library system through its 'in-house checkout' system*, in which a personal or donated book is made available to library patrons for check out.

*Id*. at 10 (emphasis added). And the chart itself contained the following entries for the "butt" and "fart" books:

| Title | Author | Availability |
|-------|--------|--------------|
| *My Butt is So Noisy!, I Broke My Butt!, I Need a New Butt* | McMillan, Dawn | Inter Library loan, ==Physical copies available for in-house checkout== |
| *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman, Harvey the Heart Has Too Many Farts* | Bexley, Jane | Inter Library loan, ==Physical copies available for in-house checkout== |

*Id.* at ¶ 10 (highlighting added).[3] Ms. Milum then explained that the donor would send copies only of the books that were not already available through in-house checkout:

> [A] donor who wishes to remain anonymous has pledged to me that he will donate physical copies of each of the books listed in the chart for inclusion in Llano County's "in-house checkout" *if those books are not already available for checkout through that in-house checkout system*. I have promised that donor that I will accept his gift and add each of those books to our collection of titles available for in-house checkout. *This will ensure that each of the plaintiffs can check out physical copies of each of the disputed books from the Llano County library system without having to use Inter Library loan or Bibliotheca* if they find those alternatives inconvenient.

*Id.* at ¶ 11 (emphasis added). Ms. Milum's declarations are as clear as can be: The in-house checkout system includes each of the three "butt" books and each of the four "fart" books, plus the nine additional books that were donated on July 21, 2022.

Ms. Milum also testified that each of the "butt" and "fart" books is currently available to patrons through Llano library's in-house checkout system. *See* Hr'g Tr. Vol. 1 at 132:5–7 ("Q. Are the Butt books and the Fart books currently available for checkout in the library? A. Yes."); *id.* at 114:8–23. Plaintiff Leila Little acknowledged that each of the "butt" and "fart" books, along with each of the nine books that was donated on July 21, 2022, is currently available through in-house check out. *See* Hr'g Tr. Vol. 2 at 67:21–70:8. And plaintiffs'

---

3.  *See also id.* at ¶ 18 ("Each of the plaintiffs can also check out physical copies of the following books directly from the Llano County libraries: (1) *My Butt is So Noisy!, I Broke My Butt!,* and *I Need a New Butt* by Dawn McMillan; (2) *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose, Freddie the Farting Snowman* by Dawn McMillian.").

counsel knows full well that the "butt" and "fart" books are included in the in-house check-out system, as they repeatedly elicited this testimony during their examination of Ms. Milum:

> Q. The Llano County Library System has an inhouse checkout program?
> A. Yes. . . .
> Q. In this case, the books that we talked about that you weeded in November of 2021 *and in August of 2021*, those books are not available in the Llano County card catalog system, correct?
> A. Right.
> Q. *You have those books available behind a desk in the library?*
> A. Yes.

Hr'g Tr. Vol. 1 at 114:8–23 (emphasis added).[4] For the plaintiffs to assert that "only nine" books are available through the in-house checkout system in the teeth of these declarations and this courtroom testimony is nothing short of misrepresentation.

The only one of the 17 disputed books that is unaccounted for in Ms. Milum's declarations and testimony is *Under the Moon: A Catwoman's Tale*. This book was not included in the donation of July 21, 2022, because none of the seven plaintiffs complained about the removal of *Under the Moon* or expressed any interest in checking out the book.[5] So the plaintiffs have failed to make a "clear showing" of injury in fact from the weeding of that book,

---

4. *See also id.* at 121:8–122:4 ("Q. . . . The books that were removed on November 11th, let's start with Caste, right? Caste does not appear in the online catalog at all? A. Right. Q. The only copy is in the back room where patrons can't see it? . . . Q. And *that's true of all of the books that you weeded in November of 2021 and August of 2021 that we've been talking about, correct?* A. Yes." (emphasis added)). Ms. Milum weeded the "butt" books in August of 2021. *See id.* at 63:24–25 (Q. Now, you removed the Butt books from circulation in August of 2021, correct? A. Yes.").

5. *See* Day Decl., ECF No. 22-2, at ¶ 4 (no mention of *Under the Moon*); Jones Decl., ECF No. 22-3, at ¶ 3 (same); Kennedy Decl., ECF No. 22-4, at ¶ 3 (same); Little Decl., ECF No. 22-5, at ¶ 3 (same); Moster Decl., No. 22-7, at ¶ 3 (same); Puryear Decl., ECF No. 22-9, at ¶ 3 (same); Waring Decl., No. 22-11, at ¶ 3 (same); *see also* Hr'g Tr. Vol. 2 at 28:6–70:20 (testimony of plaintiff Leila Green Little, which never mentions *Under the Moon* or expresses any desire to check it out); Third Milum Decl. ¶ 5 (attached as Exhibit 5) ("*Under the Moon: A Catwoman's Tale*, by Lauren Myracle, was not included in the original donation of July 23, 2022, because none of the plaintiffs complained about the removal of that book or expressed interest in checking out that book in their sworn declarations.").

and they cannot obtain a preliminary injunction that orders its return to the shelves. *See Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction." (citation omitted)). Out of an abundance of caution, however, the Llano library accepted a donation of *Under the Moon* on October 31, 2022, and added it to the in-house collection the next day. *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5). So all 17 of the disputed books (including *Under the Moon*) are available for the plaintiffs to check out through the in-house library system. *See id.*

**B.    The Llano Library's In-House Checkout System Is Not "Secret" And Each Of The Plaintiffs Knows About It**

The plaintiffs' claim that Llano library's in-house checkout is "secret" is equally false. Not only was this system publicly disclosed in court filings and at the hearing, but plaintiff Leila Little testified that she read about the in-house checkout system in the newspaper and was told about it by a librarian:

> I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the Daily Trib newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.

Hr'g Tr. Vol. 2 at 42:18–22; *see also id.* at 78:9–12 ("My awareness is based on, again, my viewing of the legal documents, my reading in the newspaper that reported on the legal documents referring to this inhouse system, and information given to me by librarians."). All seven plaintiffs attended the hearing at which the in-house checkout system was discussed, so they are acutely aware of its existence. *See, e.g.*, Hr'g Tr. Vol. 2 at 42:18–22, 67:3–70:8, 78:9–12, 114:23–117:7 (Milum discussing extensively the in-house library system); *see also* Hr'g Tr. Vol. 1 at 54:12–55:16 (Castelan testifying about the in-house check out system).

The plaintiffs are also aware that the disputed books in the case—including the "butt" and "fart" books—are available through Llano library's in-house system, because they heard

testimony that repeatedly referred to those books when describing the titles available through in-house checkout. *See* Hr'g Tr. Vol. 1 at 114:8–23, 121:8–122:4, 131:5–132:10 (Milum testifying that 16 of the disputed books are available for in-house check out and mentioning each by name.). The only disputed book that went unmentioned was *Under The Moon*, but that book has since been added to the in-house collection,[6] and none of the plaintiffs produced testimony or evidence that they wanted to check out that book.

### C.   The Decision To Weed The 17 Disputed Books Belonged Solely To Amber Milum, And Milum Decided To Weed Each Of Those 17 Books For Reasons Unrelated To Viewpoint Or Content

The plaintiffs' claim that the disputed books were weeded because "the defendants" disapproved of the content or viewpoints in those books is also false. Amber Milum alone made the decisions to weed each of the 17 disputed books from the library shelves.[7] And Ms. Milum has declared and testified under oath that she weeded those 17 books for reasons unrelated to their content or viewpoints.[8] Ms. Milum didn't even read the books on Bonnie

---

6.   *See* Third Milum Decl. ¶ 6 (attached as Exhibit 5).

7.   *See* Hr'g Tr. Vol. 1 at 130:23–131:3 ("Q. Were any of your ultimate decisions to weed any book from the library shelves influenced in any way by anyone on the commissioners' court? A. No. Q. Were they influenced by anyone on the library advisory board? A. No."); *id.* at 90:16–17, 92:23–93:1, 97:9–12, 98:6–8, 98:24–99:3, 100:3–5, 101:13–19, 103:10–13; Milum Decl., ECF No. 49-1, at ¶16 ("I was never instructed or pressured by the County Judge or any of the County Commissioners to weed or otherwise permanently remove any books from the Llano County libraries. I was also never instructed to remove any books from the libraries by the Llano County Advisory Board."); Third Milum Decl. ¶ 15 ("I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book. Nor has any of these individuals pressured or attempted to pressure me to weed any book from the library.").

8.   *See* Milum Decl., ECF No. 49-1, at ¶ 15 ("I did not consider the content of any of the books I weeded when I made the decision to weed them. I also did not consider any of the viewpoints expressed in any of the books I weeded. I weeded the books based on the objective criteria I always use in determining which books to weed."); *id.* at ¶ 17 ("No book was removed based on its content or viewpoint during this process.").

Wallace's list,[9] so she could not have based her decision to weed those books on content or viewpoints that she wasn't even aware of.

The plaintiffs do not claim that Ms. Milum is lying in her declarations or courtroom testimony, and none of the plaintiffs' witnesses or declarants claim to have personal knowledge of Ms. Milum's subjective state of mind. So the testimony on Ms. Milum's actual motivations for weeding the 17 books is unrebutted, and it conclusively refutes the plaintiffs' accusation that Ms. Milum engaged in "content discrimination" or "viewpoint discrimination." *See Board of Education v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op. of Brennan, J.) ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").

Instead, the plaintiffs deliberately conflate the decision to temporarily pull the books for review with the decision to permanently "weed" the books and erase them from the library catalog. The plaintiffs' brief uses the verb "remove" interchangeably to encompass each of these actions, without indicating whether "remove" is referring to the *temporary* "removal" of the hundreds of books that were placed on a cart for Ms. Milum to review—the vast majority of which were returned to the library shelves, and all of which remained available for checkout while Ms. Milum conducted her review[10]—or the *permanent* "removal" that occurred when Ms. Milum decided to weed the 17 books at issue in this lawsuit.[11]

Here is an example of the plaintiffs' obfuscation: Their assertion that Ms. Milum "knew the books were on the Wallace List, and she knew that was why she removed them." Pls.' Br.,

---

9.  *See* Hr'g Tr. Vol. 1 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

10. *See* Hr'g Tr. Vol. 1 at 30 ("[W]hile they were on the cart in Amber's office, were they available to be checked out? A. Yes. We just had to ask for them.").

11. For an example of the former meaning of "remove" in the plaintiffs' brief, *see* Pls.' Br., ECF No. 91, at 4 ("[T]he library was closed for three days, and librarians were instructed to *remove* any book that depicted nudity of any kind." (emphasis added)). For an example of the latter meaning of "remove," *see id.* at 19 ("[T]he books Defendants *removed* do not meet the Library's weeding criteria" (emphasis added)).

ECF No. 91, at 16–17. If the word "remove" refers to Milum's decision to *temporarily* pull the books for review, then the statement is truthful. Milum did pull books from the Wallace List to determine whether they met the criteria for weeding. *See* Hr'g Tr. Vol. 1 at 83:8 ("I pulled them to review them, not to weed them."). But if the word "remove" refers to Milum's decision to *permanently* remove, *i.e.*, weed the book, then the statement is false. Milum decided to weed the books because (in her judgment) they met the criteria for weeding, not because Bonnie Wallace wanted the books removed. *See* Third Milum Decl. ¶¶ 38–39. The plaintiffs elide this distinction throughout their brief to create the impression that the reasons behind the *temporary* removal of the hundreds of books that were placed on a cart for review were the same reasons behind the *permanent* removal of the 17 books that got weeded.

But there is nothing unconstitutional about taking a library book off a shelf to *review* whether it should be weeded, especially when the book remains available for checkout during the review process.[12] So the motivations behind the requests that Ms. Milum *examine* the books that were temporarily pulled are irrelevant to this lawsuit. The only injury that the plaintiffs are seeking to remedy is the injury caused by the decision to *weed* the 17 disputed books, which no longer appear in the library shelves or catalog. And the only relevant motivations are those behind the decisions to weed, *i.e.*, the decisions to *permanently* remove the 17 disputed books from the library's catalog and shelves. Ms. Milum testified that she weeded those books because (in her judgment) they met the criteria for weeding, and the plaintiffs have no evidence that Ms. Milum is lying about her motivations for weeding those books.

### 1. Only Amber Milum's Motivations Are Relevant In Determining Whether Any Of The 17 Books Were Weeded Because Of Their Content Or Viewpoint

Amber Milum is the only defendant who has authority to weed books from the Llano library,[13] and the decisions to weed the 17 disputed books were made by Ms. Milum alone.[14]

---

12.   *See* note 10, *supra*.

13.   *See* note 16, *infra*; see note 18, *infra*.

14.   *See* note 7, *supra*; Third Milum Decl. ¶ 15.

The plaintiffs' preoccupation with the motivations of Bonnie Wallace and Rochelle Wells—and their attempts to use the statements of Wallace and Wells to impute motivations to "the defendants" as a collective whole—is a sideshow. *See* Pls.' Br., ECF No. 91, at 5–6; *id.* at 11; *id.* at 16–18. Bonnie Wallace, Rochelle Wells, Rhonda Schneider, and Jerry Don Moss did not weed or temporarily remove a single book from Llano library,[15] and they have no authority to move a library book or instruct anyone to do so.[16] Ron Cunningham instructed Amber Milum to temporarily pull books from the library shelves for review,[17] but he never instructed Ms. Milum (or anyone else at the library) to permanently weed a book.[18] The plaintiffs' brief repeatedly and falsely states that "Defendants" (plural) "removed" the disputed books—apparently in an effort to make Bonnie Wallace's and Rochelle Wells's subjective motivations relevant to this case. There is only one defendant who "removed," *i.e.*, weeded the books from the Llano library.[19] And only the motivations of *that* defendant will determine whether the books were removed for content- or viewpoint-based reasons.

---

15.   *See* Third Milum Decl. ¶ 15 (attached as Exhibit 5) ("No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed a book."); Hr'g Tr. Vol. 2 at 164:20–24 (Moss) ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library.").

16.   *See* Hr'g Tr. Vol. 2 at 111:6–13 ("Q. Does Bonnie Wallace or Rochelle Wells have any authority to remove or weed a book from the Llano County libraries? A. No. Q. Does Bonnie Wallace, or Rochelle Wells, or any member of the library advisory board have authority to direct you to weed or remove a book? A. No."); *id.* at 112:24–113:5 ("Q. Does Jerry Don Moss have any authority or ability to remove or weed a book from the Llano County Library System? A. No. Q. Does Jerry Don Moss have the authority to direct you to weed or remove a book? A. No.").

17.   *See, e.g.*, Hr'g Tr. Vol. 1 at 145:8–13.

18.   Cunningham Decl., ECF No. 49-2, at ¶ 11 ("I have never instructed any library staff, including Ms. Milum, to remove any books from the Llano County library shelves. Nor have I removed any books. It is not within my duties as County Judge to either acquire or remove books from the libraries."); Hr'g Tr. Vol. 2 at 156:16–17 (testimony of Ron Cunningham) ("At no point did I instruct her to pull those books from the shelves.").

19.   *See* Third Milum Decl. ¶ 16 ("The plaintiffs' claim that the "defendants" (plural) weeded or temporarily removed books from the Llano library is false. I am the only

2.   **Ms. Milum Weeded The 17 Disputed Books Because She Believed That Each Of Them Met The Library's Criteria For Weeding**

Ms. Milum explained in her declarations and testimony why she weeded nine of the ten books that were weeded in the fall of 2021: Each of those books (in her judgment) met the criteria for weeding under the CREW and MUSTIE factors. *See* Milum Decl., ECF No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 95:16–106:20 (explaining reasons for weeding *Freakboy*, *Being Jazz:*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*).[20]

Ms. Milum also explained her reasons for weeding the "butt" and "fart" books[21] in August of 2021: (1) No one had asked for or inquired about the "butt" books that were continuously being checked out by Rochelle Wells and Rhonda Schneider;[22] (2) The actions of Wells and Schenider would render the "butt" and "fart" books inaccessible to other patrons;[23] and (3) The "butt" and "fart" books were trivial and "didn't really meet anyone's needs," and they remained available to patrons through interlibrary loans, so the books satisfied the "Trivial" and "Elsewhere" factors for weeding under the MUSTIE framework.[24]

---

defendant who weeded the 17 disputed books from the Llano library, and I am the only defendant who temporarily removed any of those books from the shelves.").

20. Ms. Milum did not previously explain her reasons for weeding *Under The Moon*. *See* note 5 and accompanying text. Ms. Milum weeded that book because it wasn't getting checked out enough. *See* Third Milum Decl. ¶ 19.

21. The plaintiffs' claim that Ms. Milum "permanently removed all seven titles from the library" is false. *See* Pls.' Br., ECF No. 91, at 2–3. Each of the books remains available for check-out through the in-house checkout system. *See* Third Milum Decl. ¶ 9.

22. Hr'g Tr. Vol. 2 at 106:24–25 ("[N]obody else asked for it."); *id*. at 108:8–9. The plaintiffs falsely claim that Wells and Schneider were checking out *all* of the "butt" and "fart" books. *See* Pls.' Br., ECF No. 91, at 3 ("[T]hey began repeatedly checking out the Butt *and Fart* Books, keeping them off the shelves and inaccessible to other library patrons." (emphasis added)). Wells and Schneider checked out only two of the three "butt" books, and the remaining "butt" book and the "fart" books were never placed on the shelves or checked out. *See* Third Milum Decl. ¶ 10.

23. Hr'g Tr. Vol. 2 at 106:21–107:24.

24. Hr'g Tr. Vol. 2 at 107:25–108:9; *id*. at 107:12 ("[I]t was just silly trivial books"); *id*. at 107:2–3 ("They were more trivial books, anyway."). The plaintiffs' claim that Judge Cunningham and Commissioner Moss "directed" Milum to weed the "butt" and "fart"

The plaintiffs do not claim and produced no evidence that Ms. Milum is lying in her declarations or courtroom testimony. And none of the other witnesses claimed to know Ms. Milum's subjective state of mind or denied that Ms. Milum believed that the books qualified for weeding. The defendants falsely claim that Ms. Milum's stated reasons were "manufacture[d] . . . after the fact,"[25] but Ms. Milum has declared unequivocally that these were her actual reasons and motivations at the time the books were weeded,[26] and the defendants have produced nothing in the way of evidence to show that Ms. Milum lied to the court.

Yet the plaintiffs insist that the *real* reason Ms. Milum weeded these books is because she disapproved of their viewpoints or content. *See* Pls.' Br., ECF No. 91, at 6–11; 16–20. They make this claim because (according to the plaintiffs) the disputed books did not meet the library's criteria for weeding, and they base his claim on the testimony of a single witness, Tina Castelan, who claimed that Milum's decisions to weed some of disputed books violated the library's weeding policies. *See id.* at 6–9; Hr'g Tr. Vol. 1 at 33:15–45:18. Castelan's accusation is false and is soundly refuted by Ms. Milum's courtroom testimony and declarations. *See* Hr'g Tr. Vol. 2 at 95:16–109:12; Milum Decl., ECF No. 49-1; Third Milum Decl.

The Llano library system's criteria for weeding appears on a chart on the first page of Plaintiffs' Exhibit 23, which we have attached to this brief as Exhibit 1. *See* Third Milum Decl. ¶ 22. According to this chart, a book's eligibility for weeding depends on its Dewey

---

books is false. *See* Pls.' Br., ECF No. 91, at 3. Judge Cunningham recommended only that Ms. Milum *temporarily* remove those books from the shelves. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). See Second Cunningham Decl. ¶¶ 3–5 (attached as Exhibit 3); Third Milum Decl. ¶ 14. Commissioner Moss never even discussed the "fart" books with Milum, and he merely expressed his opinion that the "butt" books did not belong in the children's section. *See* Second Moss Decl. ¶¶ 3–4; Third Milum Decl. ¶¶ 11–12.

25. Pls.' Br., ECF No. 91, at 20.

26. *See* Third Milum Decl. ¶ 21 ("[M]y stated reasons for weeding the books were my actual reasons and motivations for weeding the books at the moment the decision was made. . . . [N]othing in my testimony was 'manufacture[d] . . . after the fact.'").

decimal class. *See id*. If one looks at the second line on the left-half columns, for example, a book in Dewey class 020 would is accompanied by the entry 10/3/MUSTIE, where the first number stands for "age," the second number "years since last circulation," and the third category "condition." *See* Ex. 1. That means a book in Dewey class 020 (or any other category marked with 10/3/MUSTIE) becomes eligible for weeding if:

1. It is more than 10 years old;
2. It has been three years or since its last circulation; *or*
3. It qualifies for weeding the MUSTIE criteria.

Third Milum Decl. ¶ 23. Only one of the three categories needs to be met; each is a sufficient and not a necessary condition to make a book eligible for weeding.[27]

The MUSTIE criteria stand for Misleading, Ugly, Superseded, Trivial, Irrelevant, or Elsewhere, and each of these categories was explained at the hearing. *See* Hr'g Tr. 90:15–93:9. It is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in 10 years (Irrelevant). *See* Third Milum Decl. ¶ 24. But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will often (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book. *See id*. The CREW and MUSTIE factors are guidelines, not hard-and-fast rules. *See* Hr'g Tr. Vol. 2 at 108:21–23 ("[E]very librarian is just trained differently by their bosses and you use your own judgment on a lot of this.").

Every single book that Milum weeded met at least one of the MUSTIE factors, and nearly all of them satisfied two and possibly more of those factors. Milum thoroughly explained this in her courtroom testimony. *See* Hr'g Tr. Vol. 2 95:16–108:9. Castelan's testimony did not rebut any of this. To begin, Castelan *conceded* that *Freakboy* was appropriately

---

27. Sometimes a factor is marked with an "X"; that means the factor should not be considered when weeding books in that Dewey range. *See* Ex. 1.

weeded because of its poor circulation record. *See* Hr'g Tr. Vol. 1 at 38:25–39:7. With respect to the remaining 16 books, Castelan opined only that the *circulation record* of those 16 books was not, in her opinion, enough to support a decision to weed. *See id*. But Castelan was never asked whether any of the other MUSTIE factors could support Milum's decision to weed those 16 books, such as the "Ugly," "Trivial," or "Elsewhere" criteria, and Castelan did not rebut Milum's reliance (or potential reliance) on those factors. Milum, for example, testified that the "butt" and "fart" books were appropriately weeded under the "Trivial" and "Else-where" categories,[28] and that the "Elsewhere" category supported her decision to weed the other disputed books.[29] Castelan never even addressed (let alone rebutted) this. Apparently the lawyer who examined Castelan thinks that having a witness opine that a book fails qualify for weeding on the ground of insufficient check-outs eliminates any possibility that the same book could qualify for weeding under the remaining MUSTIE factors.

Castelan's testimony was mistaken in other respects. She claimed, for example, that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018,"[30] but under the Llano library's CREW chart a book in that Dewey class becomes eligible for weeding three years since its last checkout. *See* Third Milum Decl. ¶ 27. Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [it's] last checkout was 2018 and we've had it since 2016." Hr'g Tr. Vol. 1 at 44:12–14. But *Gabi* is a Young Adults book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. *See* Third Milum Decl. ¶ 28. *Gabi* qualified for weeding under either cri-terion. Castelan also claimed that *Being Jazz* was improperly weeded because the Llano li-braries "only had one or two of the books that pertained to its subject." Hr'g Tr. Vol. 1 at 42:17–18. That is untrue; there are no fewer than 10 other books on the subject of

---

28.   *See* Hr'g Tr. Vol. 2 at 108:8–9.
29.   *See* Hr'g Tr. Vol. 2 at 92:10–108:9.
30.   Hr'g Tr. Vol. 1 at 37:15.

transgender youth in the Llano library system, in addition to the copy of *Being Jazz* that remains in circulation at the Kingsland library. *See* Third Milum Decl. ¶ 29.

But Castelan's errors pale in comparison to the misrepresentations in the plaintiffs' brief. The plaintiffs claim that Castelan "explained that historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility" and that "Milum agreed with that assessment." Pls.' Br., ECF No. 91, at 7. That is a dishonest characterization of the testimony. Here is what Castelan actually said:

> Q. Does any one MUSTIE factor mean that a book is weeded?
> A. No. It's *usually* a combination.
> Q. Is there a minimum number?
> A. So *my minimum number* was always two to three.

Hr'g Tr. Vol. 1 at 21:17–21 (emphasis added). Castelan was not testifying about "historical" practices at the Llano library; she was describing her own personal application of the MUSTIE factors. She also hedged by saying that it's "usually" a combination of factors, a qualification that the plaintiffs omit in their description of Castelan's testimony. And here is the relevant testimony from Amber Milum:

> Q. You also testified previously that a book not having been checked out in three years alone is not a sufficient reason by itself to weed that book, correct?
> A. Yes.

Hr'g Tr. Vol. 2 at 125:2–5. This exchange does not remotely signify agreement with the claim that "historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility." Milum was asked about only *one* hypothetical MUSTIE factor—a book's not having been checked out in *three* years—and whether a book of that sort should automatically be weeded in that particular scenario. She did not say that two or more MUSTIE factors must always be present before a book is weeded, or that the Llano library "historically" followed such a practice. *See* Third Milum Decl. ¶ 25.

The plaintiffs are also misrepresenting evidence when they claim that "the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3–5 years.'"

Pls.' Br., ECF No. 91, at 10 (citing Pls.' Ex. 23 at 44). The document that they cite is not the CREW manual, but a slideshow produced by Dawn Volger, who is not an employee of Llano County and has no authority over the Llano library system. And the slideshow does not come anywhere close to saying that books must "remain on shelves unless they do not circulate 'for 3–5 years.'" The relevant slide is attached as Exhibit 2 to this brief; it contains unexplained bullet points with the headline "Unused Materials Specifics," and it lists "Non-circulating for 3–5 years" as one of many bullet points that appear on the slide. The most that one can infer from this slide is that a book's failure to circulate for 3–5 years is one among many factors to consider in whether a book is sufficiently "unused" to warrant weeding—not that it is forbidden to weed any book unless and until it goes uncirculated for 3–5 years. And in all events, the Llano library system's weeding chart rejects the three-year minimum rule that plaintiffs are attempting to concoct, as it specifically allows Juvenile Fiction and Young Adult Fiction to become eligible for weeding after *two* years since last circulation, and several of the 17 weeded books fall into those categories. *See* Third Milum Decl. ¶ 26; *see also* Ex. 1. And a book can *still* be weeded even if it has been checked out within the last two or three years if its overall circulation rate is low or if it meets other criteria for weeding. *See* Hr'g Tr. Vol. 2 at 133:22–24 ("Q. The MUSTIE criteria have a threshold of three years for fiction books; isn't that right? A. No. It's just a guideline.").

And this is just the beginning of the plaintiffs' falsehoods and misrepresentations. The plaintiffs, for example, claim that Castelan "review[ed] each of the Banned Books,"[31] but Castelan never testified that she "reviewed" the books that Milum had weeded, or that she based her weeding opinions on an individualized "review" of the books themselves. The plaintiffs' claim that "none" of the weeded books "met more than one MUSTIE criterion," and that "most met none"[32] is false and was refuted by Milum's testimony, which the plaintiffs do not acknowledge. *See* Hr'g Tr. Vol. 2 95:16–108:9. Their claim that "Defendants did not

---

31.  Pls.' Br., ECF No. 91, at 7.
32.  Pls.' Br., ECF No. 91, at 7.

**App. 313**

provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and *I Need a New Butt*[33] is false; Milum testified that these books qualified for weeding under the "Trivial," "Irrelevant," and "Elsewhere" criteria. *See* Hr'g Tr. Vol. 2 at 108:8–9. (Do the plaintiffs want to deny that these books fall within the "Trivial" category?) Their claim that new books cannot be "weeded" before they are placed on the shelves is false. *See* Third Milum Decl. ¶ 30.

The plaintiffs' claim that *It's Perfectly Normal* "was checked out within three years of its removal"[34] is false; plaintiffs' exhibit 52 shows that the last checkout was September 22, 2018, and it was weeded on October 12, 2021. *See* Third Milum Decl. ¶ 27. Their claim that *It's Perfectly Normal* cannot be weeded because it qualifies as a "special topic book"[35] is false and misrepresents Castelan's testimony. Castelan did not testify or opine that *It's Perfectly Normal* qualifies as a "special topic book," nor did she testify that *It's Perfectly Normal* (or special topic books) are "not eligible to be weeded." *See* Hr'g Tr. Vol. 1 at 37:15–19; Third Milum Decl. ¶ 31. The plaintiffs' claim that Moss "told Castelan he did not want the book in the library"[36] is false; Moss told Castelan only that "he wouldn't have wanted his children or his grandchildren to see it"[37] and expressed his opinion that it should be placed in a section of the library other than the children's section. *See* Second Moss Decl. ¶ 5 (attached as Exhibit 4). The plaintiffs' claim that Moss "made Milum remove"[38] *It's Perfectly Normal* is false. *See id.* at ¶¶ 5–10; Third Milum Decl. ¶ 13.

The plaintiffs' claim that Milum has "le[ft] approximately 5,800 titles" on the shelves that had not been checked out in the previous three years is false. *See* Pls.' Br., ECF No. 91, at 10. Milum became the system director on February 1, 2021, and she has not yet had the

---

33. Pls.' Br., ECF No. 91, at 8.
34. Pls.' Br., ECF No. 91, at 9.
35. Pls.' Br., ECF No. 91, at 9.
36. Pls.' Br., ECF No. 91, at 9.
37. Hr'g Tr. Vol. 1 at 29:8–9
38. Pls.' Br., ECF No. 91, at 9 (internal quotation mark omitted).

**App. 314**

opportunity to conduct a thorough weed of the library system. *See* Third Milum Decl. ¶ 32. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been. *See id*. The plaintiffs are also wrong to say that Milum admitted that there was "no need to weed books" after the Commissioners Court had suspended new book purchases. *See* Pls.' Br., ECF No. 91, at 10 (citing Hr'g Tr. Vol. 2 at 120:25–121:10). Milum was asked only whether the weeding in November of 2021 was done "to make room for new books," and she acknowledged that it was not. *See* Hr'g Tr. Vol. 2 at 121:6–10 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). Milum never said that there was "no need to weed books" at that time. Weeding is needed regardless of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts employees and patrons who must sift through unnecessary clutter; and (3) Weeding helps librarians identify holes in their collection and understand the community's desires and needs. *See* Third Milum Decl. ¶ 33.

Castelan conceded that *Being Jazz* "could have been" weeded consistent with CREW/MUSTIE criteria, even though she personally would have left it in. *See* Hr'g Tr. Vol. 1 at 42:14–19. The plaintiffs' brief, however, falsely claims that Castelan testified that the decision to weed *Being Jazz* was inconsistent with MUSTIE criteria. *See* Pls.' Br., ECF No. 9 ("According to Castelan, only one of the Banned Books—*Freakboy*— . . . was weeded consistent with MUSTIE criteria.").

\* \* \*

The Court cannot and should not trust any factual assertion that appears in the plaintiffs' brief. We have hit on the most egregious misrepresentations, but we cannot in the allotted pages unpack every one of the misstatements that permeate their filing. The adversarial process cannot function when a litigant misrepresents the factual record to this extent. We encourage the Court to carefully compare the plaintiffs' factual claims with the primary sources

before accepting or relying on any factual claim in the plaintiffs' brief. The Court may also wish to consider striking the plaintiffs' brief and instructing them to submit a replacement that accurately relates the factual record and corrects each of the falsehoods that appears in their current submission. There are too many factual errors and misrepresentations of testimony in the current submission for a court to trust anything that the plaintiffs say.

## ARGUMENT

The plaintiffs (once again) refuse to acknowledge the "clear showing" requirement, but that does not absolve them of their obligation to "clearly carr[y] the burden of persuasion on all four requirements" of the preliminary-injunction standard. *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012); Defs.' Br., ECF No. 49, at 8–9 (collecting authorities). We have already explained why the plaintiffs cannot make a "clear showing" of likely success or a "clear showing" of irreparable harm. *See id*. at 9–13 (merits); *id*. at 14 (harm). Nothing that the plaintiffs have said rebuts our previous arguments.

## I.   The Plaintiffs Have Not Made A "Clear Showing" Of Likely Success On The Merits

The plaintiffs cannot make a "clear showing" of likely success for three separate and independent reasons. First, the plaintiffs cannot establish a violation of their First Amendment rights when they can obtain each of the disputed books through the in-house checkout system. Second, a public library's weeding decisions are subject only to rational-basis review. Third, even if one were to imagine that content and viewpoint discrimination are prohibited in public-library weeding decisions, the plaintiffs have failed to make a "clear showing" that Amber Milum weeded the books because she opposed their content or viewpoints.

### A.   The In-House Checkout System Does Not And Cannot Violate The Plaintiffs' First Amendment Right To Access Information

The plaintiffs' First Amendment claims are doomed because each of the 17 books remains available for them to check out through Llano library's in-house system. The plaintiffs do not explain how the defendants are violating their "right to receive information" when

they remain able to check out and read every one of these books from Llano library. They complain that *other* library patrons may not be aware of the in-house checkout option,[39] but the plaintiffs must establish a violation of their own constitutional rights and not someone else's. *See supra* at 1–2; *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986) (plaintiffs who invoke 42 U.S.C. § 1983 are "required to prove some violation of their *personal* rights." (emphasis added)); *id.* (citing rulings from other federal courts that prohibit litigants from asserting third-party rights under section 1983); *Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

The plaintiffs made no showing that the in-house checkout system violates *their* First Amendment rights or burdens *them* in any way. They complain that there is "only one copy of each book," which is located "only at the Llano branch,"[40] but that was equally true before the books were weeded, so it does not diminish the plaintiffs' "right to receive information." *See* Third Milum Decl. ¶ 34. The plaintiffs complain that the disputed books "are not advertised," which means that *other* library patrons "have no way of knowing they exist or finding them." Pls.' Br., ECF No. 91, at 22. But that does not burden the plaintiffs, who are fully aware of the in-house checkout system and the availability of the disputed books. *See* Hr'g Tr. Vol. 2 at 42:12–15. The plaintiffs accuse the defendants of sending "a chilling message"[41] by operating the in-house checkout system, but that is an ideological grievance and has nothing to do with whether the defendants are violating the *plaintiffs'* First Amendment rights.

The plaintiffs rely on *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000), and *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), which held that public libraries violated the First Amendment by making it more burdensome for the plaintiffs (or their next friends) to obtain certain books. These cases are inapposite

---

39.  *See* Pls.' Br., ECF No. 91, at 12–13, 22.
40.  *See* Pls.' Br., ECF No. 91, at 22.
41.  Pls.' Br., ECF No. 91, at 22.

because the in-house check-out system does not burden the plaintiffs in any way, and the plaintiffs do not explain how they are burdened by the defendants' actions. It is *easier* to obtain a book by asking for it at the reference desk than by searching through the card catalog and book stacks—and each of the plaintiffs already knows that this is how they must obtain and check out those disputed books. The defendants are not burdening the plaintiffs' ability to obtain these books in the slightest, so there is no conceivable infringement of the plaintiffs' constitutional "right to receive information."

*Sund* and *Counts* are also incompatible with the Supreme Court's subsequent ruling in *United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003), and the Fifth Circuit's ruling in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). *Sund* claims that public libraries are "limited public forums" and that any content-based weeding or book-placement decision is subject to strict scrutiny. *See Sund*, 121 F. Supp. 2d at 548. The *American Library* plurality rejected that stance—a stance that *Chriras* subsequently embraced as the law of the Fifth Circuit. *See American Library*, 539 U.S. at 204 (plurality op. of Rehnquist, C.J.); *Chiras*, 432 F.3d at 614 ("'[J]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *American Library*, 539 U.S. at 204 (plurality op.))). *Counts* likewise applied strict scrutiny to a supposedly content-based restriction requiring parental consent before students could check out Harry Potter books from a school library. But neither the plurality opinion in *American Library* nor either of the concurrences applied strict scrutiny to content-based restrictions on library materials, and a six-justice majority upheld the content-based restrictions imposed by the Children's Internet Protection Act (CIPA) without any one of the six justices suggesting that strict scrutiny (or any type of heightened scrutiny) should apply. *See American Library*, 539 U.S. at 198–214 (plurality op.); *id.* at 214–15 (Kennedy, J., concurring in the judgment); *id.* at 215–20 (Breyer, J., concurring in the judgment).

Finally, Justice Kennedy's and Justice Breyer's concurrences in *American Library* make clear that "small" or non-significant burdens on a library's patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (upholding restricting given the "comparatively small burden that the Act imposes upon the library patron"). Here, there are *no* "burdens" imposed on the plaintiffs, as the in-house checkout option spares them the inconvenience of having to search for the disputed books on the library shelves. And even if the plaintiffs attempted to theorize or concoct a "burden," it would be far less of a burden than that imposed by CIPA, which required adult users to ask a librarian to unblock filtered materials before access would be allowed.

## B.   A Public Library's Weeding Decisions Are Subject Only To Rational-Basis Review

The plaintiffs claim that the First Amendment "prohibits the removal of books from libraries based either content or viewpoint discrimination." Pls.' Br., ECF No. 91, at 14. That is nonsense. No decision of the Supreme Court or the Fifth Circuit has ever held that public libraries are forbidden to make content- or viewpoint-based weeding decisions. Even Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of public-library decisionmaking taken by a Supreme Court justice,[42] acknowledges that content discrimination is permissible and inevitable in library-book selection, and it allows libraries to remove books based on content that is "pervasively vulgar" or that lacks "educational suitability." *Pico*, 457 U.S. at 871 (1982) (plurality op.); *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995) ("The Court in its plurality opinion implicitly recognized

---

42.   *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *5 (W.D. Mo.) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

. . . that an unconstitutional motivation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were 'pervasively vulgar' or on grounds of 'educational suitability.'"); *see also Pico*, 457 U.S. at 869 (plurality op.) ("[L]ocal school boards have a substantial legitimate role to play in the determination of school library *content*." (emphasis added)); *id*. at 870 (plurality op.) ("Petitioners rightly possess significant discretion to determine the *content* of their school libraries." (emphasis added)); *id*. at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection).[43] The *Pico* plurality opinion says only that school libraries may not weed books "in a narrowly partisan or political manner"[44]—a far cry from a total prohibition on viewpoint or content discrimination.

    The plurality opinion in *Pico* never received a fifth vote—so it is not law and is not binding authority.[45] The plurality opinion in *American Library is* binding authority because *Chiras* adopts it as the law of the Fifth Circuit—and it gives public libraries "broad discretion to decide what material to provide to their patrons." *See American Library*, 539 U.S. at 204

---

43.  *See Virgil v. School Board of Columbia County, Florida*, 862 F.2d 1517 (11th Cir. 1989) (acknowledging that under Justice Brennan's plurality opinion in *Pico*, the "removal of books from library would be permissible if decision were based on determination that books were 'pervasively vulgar' or not 'educational[ly] suitab[le]'"); *Serra v. U.S. General Sevices Administration*, 847 F.2d 1045 (2d Cir. 1988) ("Removal of books that were pervasively vulgar or educationally unsuitable would, even in the [*Pico*] plurality's view, be 'perfectly permissible.'" (citations omitted); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *6 (W.D. Mo.) ("[I]t is 'perfectly permissible' for a school to remove a book based upon the book's 'educational suitability.'" (quoting *Board of Education v. Pico*, 457 U.S. 853 (1982) (plurality opinion of Brennan, J.)).

44.  *See Pico*, 457 U.S. at 870 (plurality op.); *id*. at 872 ("[S]chool boards may not remove books from school library shelves simply because they dislike the ideas contained in those books.").

45.  *See Campbell*, 64 F.3d at 189 ("[T]he *Pico* plurality opinion does not constitute binding precedent"); *CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *4 (W.D. Mo.) ("Justice Brennan's plurality opinion in *Pico* . . . is not binding.").

(2003) (plurality op.) ("[P]ublic libraries must have broad discretion to decide what material to provide to their patrons."); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ("'Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.'" (citation and internal quotation marks omitted)). It is the rational-basis test, and not the plaintiffs' made-up rule against "content" or "viewpoint" discrimination, that governs a public library's weeding decisions. *See* Defs.' Resp. to Mot. for Prelim. Inj., ECF No. 49 at 11–12 (citing authorities).

The notion that librarians cannot engage in "content discrimination" when weeding books is absurd. Weeding inherently involves content discrimination, as three of the six MUSTIE factors require librarians to discriminate against content that is "Misleading," "Superseded," Or "Trivial." Even Tina Castelan endorsed content discrimination by claiming that "special topic books"—which (in her view) should include LGBTQ books—should not be weeded even when they would otherwise qualify for weeding on account of poor circulation. *See* Hr'g Tr. Vol. 1 at 22:6–19; *id*. at 42:7–43:11. So the plaintiffs are all for content discrimination in the weeding process—as long as librarians discriminate in favor of LGBTQ content and other "special topics" that they support. *See* Pls.' Br., ECF No. 91, at 9.

Viewpoint discrimination may also be appropriate, as books claiming that the earth is flat or that otherwise embrace viewpoints that have been discredited are appropriate candidates for weeding under the "Superseded" factor. *See Pico*, 457 U.S. at 871 (1982) (plurality op.); Even the slideshow on weeding produced by Dawn Vogler, which the plaintiffs falsely equate with "the CREW manual" and cite as if it were holy writ,[46] includes a slide that announces "poor *content* specifics" as a ground for weeding and lists each of the following content-based categories as factors to consider in weeding decisions:

> Trivial subject matter (outdated popular culture)
> Mediocre writing style
> Inaccurate or false information

---

46.   *See* Pls.' Br., ECF No. 91, at 10.

**App. 321**

. . .

     Materials that contain *bias, racist, sexist terminology or views*

Pls.' Ex. 22 at 45 (attached as Ex. 2). *All* of these criteria entail content discrimination, and the last one encompasses viewpoint discrimination. Do the plaintiffs think *these* weeding criteria are unconstitutional—even though they are undeniably content- and viewpoint-based?

    Of course, the government could never ban or censor a book on these grounds, nor could it use these grounds to discriminate against a writer or speaker in a traditional public forum. But public libraries are different. They are not "forums" of any sort, and they *must* impose content-based (and occasionally viewpoint-based) standards for determining which materials they will house in their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality op.); *Chiras*, 432 F.3d at 614. The plaintiffs do not claim or argue that a public library is a type of "forum" that would trigger rules against viewpoint or content discrimination. And the plaintiffs must deal with the fact that *American Library* upheld a federal statute that *mandated* content discrimination in public libraries. *See American Library*, 539 U.S. at 208 (plurality op.) (acknowledging that CIPA "exclude[s] certain categories of content"); *id*. at 202–03 (plurality op.) (noting that the district court held that CIPA was "a content-based restriction"); *id*. at 241 (Souter, J., dissenting) (criticizing the CIPA regime as "[c]ontent-based blocking and removal").

### C.    Amber Milum Did Not Engage In Viewpoint Or Content Discrimination When Weeding The 17 Disputed Books

    There is yet a third reason why the plaintiffs cannot make a "clear showing" of likely success on their First Amendment claims: Even if one were to pretend that the First Amendment prohibits content- or viewpoint-based weeding decisions, the plaintiffs have no evidence that Milum based her weeding decisions on the content or viewpoints of the 17 disputed books. Milum declared and testified repeatedly and unequivocally that her decisions to weed those books were based on her belief that the books were appropriate candidates for weeding on account of poor circulation, and that each of the books (in her judgment) satisfied multiple criteria for weeding under CREW and MUSTIE. The plaintiffs do not allege

**App. 322**

that Milum is lying in her declarations or courtroom testimony, and none of their evidence shows that Milum acted out of a desire to suppress the viewpoints or contents of those books.

Castelan never testified or opined that Milum weeded the books because she was hostile to the content or viewpoints expressed in those books. Castelan simply stated that she would have reached a different conclusion in applying the CREW and MUSTIE criteria to some of the 17 books. She never accused Milum of acting in bad faith or out of nefarious or impermissible motives. The plaintiffs also have no evidence that Milum is hostile to books containing nudity, critical race theory, or LGBTQ issues, and Milum specifically denies that she harbors any opposition to these types of books. *See* Third Milum Decl. ¶ 36. All that the plaintiffs have shown is that different librarians can reach different conclusions when applying the CREW and MUSTIE guidelines—something that both Milum and Castelan acknowledged on the witness stand. *See* Hr'g Tr. Vol. 1 at 42:16–19; *id.* at 127:6–19; Hr'g Tr. Vol. 2 at 108:21–109:12; *id.* at 145:13–15 ("[D]ifferent librarians have different, you know, views or decisionmaking skills of what they think should still be on the shelves or not.").

The plaintiffs do not even tell us what "viewpoints" are expressed in the weeded books, and there is no evidence in the record for this court to determine what those "viewpoints" are. Milum didn't read the books on Ms. Wallace's list before weeding them,[47] so she had no way of knowing what "viewpoints" or "positions" were expressed. Milum has also denied knowledge of the "viewpoints" or "positions" in those books. *See* Third Milum Decl. ¶ 38.

The plaintiffs claim that Milum "removed" those books "because they were on the Wallace list,"[48] but the plaintiffs are playing word games with "remove." Milum's decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on Wallace's list, but Milum's decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because she determined they met the criteria for weeding. The vast majority of

---

47.  *See* Hr'g Tr. Vol. 2 at 104:3–5 ("Q. Have you read any of the books that we've been talking about? A. No.").

48.  *See* Pls.' Br., ECF No. 91, at 17.

books on Wallace's list were returned the shelves after Milum determined that they did *not* meet the criteria for weeding—a fact that the plaintiffs refuse to acknowledge in their brief. *See* Hr'g Tr. Vol. 1 at 93:10–95:4 (Milum weeded only "six or seven" of the 47 books on Wallace's list that she reviewed); Hr'g Tr. Vol. 2 at 94:7–95:4; Third Milum Decl. ¶ 39.[49]

The plaintiffs' evidence of "content" discrimination is equally non-existent. They claim that the "defendants" (they never say *which* defendants) admitted to "removing" books based on content. *See* Pls.' Br., ECF No. 91, at 17–18. But the plaintiffs are (once again) conflating the decision to *temporarily* pull the books for review with the decision to *permanently* remove them. The decision to *temporarily* pull the books from the shelves for review was content-based (though not viewpoint-based),[50] as Judge Cunningham had instructed Ms. Milum to temporarily pull books "with photos of naked or sexual conduct." Pls.' Br., ECF No. 91, at 4. But this does nothing to show that Milum engaged in content or viewpoint discrimination when deciding to *weed* the books after reviewing them—especially when Milum returned the vast majority of these books to the shelves. *See* Third Milum Decl. ¶¶ 35, 39.

The plaintiffs falsely claim that Ms. Milum "removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler." *See* Pls.' Br., ECF No. 91, at 4. Milum's decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, but her decision to weed the book (*i.e.*, to "remove the book from the library system") had nothing to do with content or nudity, and Milum would have weeded *In The Night Kitchen* even if there had been no nudity or naked-toddler drawings. *See* Third Milum Decl. ¶ 35; Hr'g Tr. Vol. 1 at 93:20–94:6. The plaintiffs' claim

---

49.  The defendants never "admitted" that they "pulled" books on Wallace's list "because the books took positions with which the Defendants disagreed," and the testimony that the plaintiffs cite do not remotely support this claim. *See* Pls.' Br., ECF No. 91, at 16.

50.  The decision to temporarily pull the books was not viewpoint-based because all books containing this content were pulled for review, regardless of the viewpoints expressed, and the plaintiffs present no argument for how Judge Cunningham's directive to Ms. Milum could qualify as "viewpoint discrimination."

that Moss "ordered the removal" of *It's Perfectly Normal* is false,[51] as is their insinuation that Ms. Milum removed this book because Moss told her to.

## II.   The Plaintiffs Have Not Made A "Clear Showing" Of Irreparable Harm

The plaintiffs have failed to identify *any* harm (let alone an "irreparable" harm) that they will suffer from obtaining the disputed books through the library's in-house checkout system. *See CK-W by and through TK v. Wentzville R-IV School District*, --- F. Supp. 3d ----, 2022 WL 3138989, *9 (W.D. Mo.) (removal of library books did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). The plaintiffs do not deny that it is easier for them to obtain a book by asking for it at the reference desk rather than by searching a catalog, traipsing among the shelves, and pawing through the books.

The plaintiffs would prefer that the 12 books be returned to the library shelves and restored to the catalog so that *other* patrons can check them out, but that does not inflict irreparable harm *on the plaintiffs. See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)); *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n. 3 (D.D.C. 2016) ("[T]he irreparable harm prong . . . only concerns harm suffered by the party or parties seeking injunctive relief . . . . [A]ny alleged harm to third parties is properly addressed under the public interest prong"). And the distress that the plaintiffs may experience over the plight of other library patrons does not qualify as Article III injury, let alone "irreparable harm." *See Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 485–86 (1982).

---

51.   *See* Second Moss Decl. ¶ 5 ("The plaintiffs' claim that I 'ordered the removal' of *It's Perfectly Normal* from the Llano library is . . . false. . . . I merely expressed my opinion to Tina Castelan that *It's Perfectly Normal* should not be located in the children's section, and that it should be placed in a different section of the library.") (attached as Exhibit 4); *see also* Hr'g Tr. Vol. 1 at 28:25–29:9; Third Milum Decl. ¶ 13 ("The plaintiffs' claim that Commissioner Moss 'ordered the removal' of *It's Perfectly Normal* from the Llano library is false.").

III.   **The Court Should Deny Out Of Hand The Requested Relief In Paragraphs 3 Through 6 Of The Plaintiffs' Proposed Order**

The plaintiffs' proposed order demands far more than the return of the 17 disputed books to the library shelves. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–6. But the plaintiffs present no argument for the relief requested in paragraphs 3 through 6 of the proposed order, so they have failed to make a "clear showing" that this requested relief is needed to prevent irreparable harm or that they are likely to obtain this relief at the end of trial. They have also forfeited any request for the relief in paragraphs 3 through 6 by failing to present an argument in their brief. *See Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 343 n.5 (5th Cir. 2022) (failure to adequately brief an argument results in forfeiture). The Court should deny the relief in those paragraphs for that reason alone.[52]

The Court also cannot award the relief described in paragraphs 3 through 6 because none of the defendants are engaged in the behavior that the plaintiffs seek to enjoin. The defendants testified that they will not weed, conceal, or remove any books until this litigation concludes.[53] The defendants have never restricted and never had any intention of restricting access to any book on Bibliotheca's online platform.[54] And the library advisory board will not be holding any meetings until this litigation concludes.[55] So the plaintiffs could not have shown irreparable harm even if they had tried.

---

52.   The plaintiffs falsely assert that their proposed order "would simply preserve the status quo ante." Pls. Br, ECF No. 91, at 24. Paragraphs 3 and 4 in the proposed order impose burdensome new documentation and reporting requirements on the defendants that never previously existed. *See* Pls.' Proposed Order, ECF No. 76-1, at ¶¶ 3–4.

53.   *See* Hr'g Tr. Vol. 1 at 130:10–11 ("We are not weeding or adding anything to the system until after the litigation is finished."); Hr'g Tr. Vol. 2 at 117:8–13 ("Q. . . . Will you or your colleagues be weeding, or removing, or concealing any book in any of the libraries in the Llano County system between now and the conclusion of this litigation? A. No.").

54.   *See* Hr'g Tr. Vol. 1 at 129:7–10 ("Q. Has anyone in the Llano County Library System ever restricted access to any book on Bibliotheca due to the book's viewpoint or content? A. No."); *id.* at 130: 1–4 ("Q. Will you or any of your colleagues restrict access to any book on Bibliotheca if the motion for preliminary injunction is denied? A. No.").

55.   *See* Hr'g Tr. Vol. 1 at 164:24–165:4 ("Mr. Cunningham, when will the library advisory board have its next scheduled meeting? A. After the completion of this litigation. Q.

IV.   **If The Court Awards A Preliminary Injunction, It Should Be Directed Only To Amber Milum**

Milum is the only defendant with authority to restore books to the library shelves and catalog. So if the Court grants the relief requested in paragraphs 1 and 2 of the proposed order, the injunction should extend only to Amber Milum. The remaining defendants cannot be held responsible for the return of library books when they have no ability or authority to place books on the library shelves or restore them to the library's catalog.

## CONCLUSION

For these reasons, as well as those in our previous briefing (ECF No. 49), the motion for preliminary injunction should be denied.

Respectfully submitted.

_/s/ Jonathan F. Mitchell_

<table>
<tr><td>Dwain K. Rogers<br>Texas Bar No. 00788311<br>County Attorney</td><td>Jonathan F. Mitchell<br>Texas Bar No. 24075463<br>Mitchell Law PLLC<br>111 Congress Avenue, Suite 400</td></tr>
</table>

Dwain K. Rogers
Texas Bar No. 00788311
County Attorney

Matthew L. Rienstra
Texas Bar No. 16908020
First Assistant County Attorney

Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
dwain.rogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: December 30, 2022          *Counsel for Defendants*

---

Are you saying there won't be any meetings between now and the end of this litigation? A. No, sir."); *see also* Hr'g Tr. Vol. 2 at 26:4–6; *id*. at 75:12–24.

## CERTIFICATE OF SERVICE

I certify that on January 9, 2023, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendants*

**App. 328**

# Exhibit 1

# The CREW Method Weeding Chart:

Overview Chart for CREW Formulas Used in Library Collection Weeding

**Please see notes at bottom of page for tips in reading the chart**

| Dewey Class | | Age/Yrs. since last circ./Condition | Dewey Class | Age/Yrs. since last circ./Condition |
|---|---|---|---|---|
| **000** | 011 | 10/X/MUSTIE | **800** | X/X/ MUSTIE |
| | 020 | 10/3/ MUSTIE | **900**  910 | 5/3/ MUSTIE (geography & guide books) |
| | 030 | 5/X/ MUSTIE | | |
| | **Others** | 5/X/ MUSTIE | 920 | 10/3/ MUSTIE (personal narratives) |
| | | | Others | 15/3/ MUSTIE |
| **100** | 133 | 15/X/ MUSTIE | | |
| | 150 | 10/3/MUSTIE | B or 92 | X/2/ MUSTIE |
| | 160 | 10/3/ MUSTIE | (Biography) | |
| **200** | | 10/3/ MUSTIE or 5/X/ MUSTIE | F or FIC (Fiction) | X/2/ MUSTIE |
| | | | E Fiction (Picture Books) | X/2/ MUSTIE |
| **300** | 310 | 2/X/ MUSTIE | | |
| | 320 | 5/3/ MUSTIE (tropical) | | |
| | | 10/3/ MUSTIE (historical) | JF (Juvenile Fiction) | X/2/ MUSTIE |
| | 330 | 5/3/ MUSTIE | | |
| | 340 | 10/X/ MUSTIE | | |
| | 350 | 10/X/ MUSTIE | YA (Young Adult Fiction) | 3/2/ MUSTIE |
| | 360 | 5/X/ MUSTIE | | |
| | 370 | 10/3/ MUSTIE | | |
| | 390 | 5/3/ MUSTIE (etiquette) | J and YA Nonfiction | Use Adult Criteria |
| | | 10/3/ MUSTIE (folklore, customs) | | |
| | | | Periodicals and Newspapers | 3/X/X |
| **400** | | 10/3/ MUSTIE | | |
| **500** | 510 | 10/3/ MUSTIE | VF (Vertical File) | 1/2/MUSTIE |
| | 550 | X/3/ MUSTIE | | |
| | 570 | 10/3/ MUSTIE | College Catalogs | 2/X//MUSTIE |
| | 580 | 10/3/ MUSTIE | | |
| | | | NP (Non-print Media and AV) | WORST |
| **600** | 610 | 5/3/ MUSTIE | | |
| | 630 | 5/3/ MUSTIE | | |
| | 635 | 10/3/ MUSTIE | Videocassettes | 12/2/WORST |
| | 640 | 5/3/ MUSTIE | | |
| | 649 | 5/3/ MUSTIE | Local History | X/X/X |
| | 690 | 10/3/ MUSTIE | | |
| | **Others** | 5/3/ MUSTIE | Donations and Memorials | X/X/MUSTIE |
| **700** | 745 | X/3/ MUSTIE | | |
| | 770 | 5/3/ MUSTIE | Source: Chart is Courtesy of Library Development Division, Texas State Library (Power Tools, ALA, 1998) | |
| | 790 | 10/3/ MUSTIE | | |
| | **Others** | X/X/ MUSTIE | | |

**MUSTIE** = **M**isleading, **U**gly, **S**uperseded by new editions or better books, **T**rivial, **I**rrelevant to school community needs and interests, easily obtained **E**lsewhere via interlibrary loan.

**WORST** = **W**orn out, **O**ut of date, **R**arely used, **C**entral office/borough can supply, **T**rivial

**X** = This factor is not applicable to this specific Dewey Range—do not consider it.

MILLIKEN BERRY...
UPDA...
**Plaintiffs' Exhibit**

**23**

App. 330

# Exhibit 2

# Unused Materials Specifics

- Non-circulating for 3-5 years
- Duplicate copies no longer needed
- Periodicals that are available in full-text
- Unused volumes in sets or series
- Unneeded titles in subject areas used less frequently
- "Hot topics" popular more than 5 years ago
- More books than needed on one topic
- Formats no longer popular (VHS)
- Material that is no longer important to the collection (curricula, demographics)

MILUM 4 RFP - 0059



# Poor Content Specifics

- Outdated and obsolete (computers, law, science, space, health, technology, travel)
- Trivial subject matter (outdated popular culture)
- Mediocre writing style
- Inaccurate or false information
- Unused sets of books (keep used volumes if they meet local needs)
- Repetitious series
- Superseded editions
- Resources not on standard lists or that weren't reviewed
- Materials that contain bias, racist, sexist terminology or views
- Unneeded duplicates
- Self-published or small press titles that are not circulating, especially those added as gifts



MILUM 4 RFP - 00594

# Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.,

                    Plaintiffs,

v.                                                          Case No. 1:22-cv-00424-RP

**Llano County**, et al.,

                    Defendants.

### SECOND DECLARATION OF RON CUNNINGHAM

1.  My name is Ron Cunningham. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that I "directed" Amber Milum "to remove the Butt and Fart Books" from Llano library is false. *See* Pls.' Br., ECF No. 91, at 3. My e-mail to Amber Milum, which the plaintiffs introduced as Exhibit 2A, recommended only that Ms. Milum *temporarily* remove those books from the shelves to determine whether they should remain in the children's section of the library. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). I never directed Amber Milum or any other library employee to weed those books or any other book.

4.  The plaintiffs' claim that I "directed" the removal of books is based on an e-mail that Rochelle Wells sent on November 11, 2022, which says that Jerry Don Moss and I had "instructed" Ms. Milum to "remove certain books." The plaintiffs introduced this e-mail from Ms. Wells as Exhibit 8 at the hearing on their motion for

preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol 1 at 198:24–199:12; Pls.' Br., ECF No. 91, at 5 n.6.

5. Ms. Wells was mistaken to assume in her e-mail of November 11, 2022, that I had "directed" Ms. Milum to remove books. I merely asked Ms. Milum to *temporarily* pull certain books to *review* whether they should continue be housed in the library or stored in the children's section. I was not involved in and had nothing to do with Ms. Milum's subsequent decision to weed any of those books. I never instructed or told anyone at the library to weed or temporarily remove any book, either physical books or ebooks.


This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.


Dated: 12/30/2022

*Ron Cunningham*
19A091CC191246F...

RON CUNNINGHAM

# Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>                    Defendants. | Case No. 1:22-cv-00424-RP |

**SECOND DECLARATION OF JERRY DON MOSS**

1.  My name is Jerry Don Moss. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that I "directed" Amber Milum "to remove the Butt and Fart Books" from the Llano library is false. I never even discussed the "fart" books with Ms. Milum, let alone "directed" her to weed or temporarily remove those books.

4.  I did discuss the "butt" books (but not the "fart" books) with Ms. Milum, and when I did I merely expressed my opinion that those books should not be in the children's section of the library, and that if it were up to me I would remove those books from the library. I never ordered or directed Ms. Milum to weed or temporarily remove the "butt" books or any other book.

5.  The plaintiffs' claim that I "ordered the removal" of *It's Perfectly Normal* from the Llano library is also false. *See* Pls.' Br., ECF No. 91, at 4. I merely expressed my opinion to Tina Castelan that *It's Perfectly Normal* should not be located in the children's section, and that it should be placed in a different section of the library. I

never ordered or even suggested that the book be weeded or temporarily removed from the library.

6. I made clear in my previous declaration, in my deposition, and in my courtroom testimony that I never "ordered" or "directed" the removal of any book from the library and that I have no authority over Ms. Milum's decisionmaking, and I merely expressed my opinions that the "butt" books and *It's Perfectly Normal* should not be shelved in the children's section of the library. *See, e.g.*, Moss Decl., ECF No. 49-3, at ¶ 4 ("I made clear to Ms. Milum that I was not her boss and could not tell her what to do. . . . I never directed or suggested that any books be removed from the library based on their content."); Moss Dep. at 26:17–22 ("I told her, that in my opinion, that she needed to take them out of the children's section. I also told her she does not work for me specific, so I was there, was giving my opinion and my opinion only that these books need to—didn't—they didn't need to be in the children's section."); *id*. at 46:18–20 ("[A]ny books that I have talked to her about, which, once again was strictly my opinion, I made it very clear that she doesn't work under me"); Hr'g Tr. Vol. 2 at 164:16–19 ("I made sure and told her that I was not her supervisor . . . . I told her that I didn't think that those books should be in the children's section . . . . That was my personal opinion. Like I said, I wanted to make sure that she understood I wasn't her boss. I think she knew that. So it was just my opinion that it should not be in the children's section of the library."); Hr'g Tr. Vol. 2 at 164:20–24 ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library.").

7. The plaintiffs' claim that I "ordered" the removal of *It's Perfectly Normal* is based on an e-mail that Rochelle Wells sent to me on January 19, 2022, in which she wrote: "By the way, some of us saw the photos from the other book—they were disgusting, so thank you for making her remove *It's Perfectly Normal!*" The plaintiffs

introduced this e-mail from Ms. Wells as Exhibit 19 at the hearing on their motion for preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol 1 at 196:11–198:9; Pls.' Br., ECF No. 91, at 4.

8.  Ms. Wells was mistaken to assume in her e-mail of January 19, 2022, that I had "made" Ms. Milum or Ms. Castelan remove *It's Perfectly Normal*. I did not "make" anyone at the public library remove that book. I merely expressed my opinion to Ms. Castelan that *It's Perfectly Normal* should not be shelved in the children's section of the library. I was not involved in and had nothing to do with Ms. Milum's subsequent decision to weed that book.

9.  The plaintiffs also cite an e-mail that Rochelle Wells sent on November 11, 2021, in which she wrote that:

> Commissioner Moss and Judge Cunningham have instructed Amber, the head librarian, to remove certain books, both physical books and ebooks (via the LIBBY app). There will also be no new books coming in until this is settled. If you go into the library you will see Amber and Tina (Children's librarian) are currently going through the Children's section, labeling books, and I am assuming also removing the books Commissioner Moss has told them to remove. Amber was told to get rid of Lawn Boy and Gender Queer (physical and ebook). Commissioner Moss, we are very grateful for your help in this situation and all you have done to begin to remedy it!

The plaintiffs introduced this e-mail from Ms. Wells as Exhibit 8 at the hearing on their motion for preliminary injunction, and they have cited it in their brief. *See* Hr'g Tr. Vol. 1 at 198:24–199:10; Pls.' Br., ECF No. 91, at 5 n.6.

10.  Ms. Wells's e-mail of November 11, 2021, is mistaken in saying that I "instructed" and "told" Ms. Milum to "remove certain books." I never instructed or told anyone at the library to weed or temporarily remove any book, either physical books or ebooks, and I never instructed Ms. Milum or anyone else to remove *Lawn Boy* or *Gender Queer*.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Dated: _12-28-2022_

JERRY DON MOSS

# Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.,

                    Plaintiffs,

v.

**Llano County**, et al.,

                    Defendants.

Case No. 1:22-cv-00424-RP

### THIRD DECLARATION OF AMBER MILUM

1.  My name is Amber Milum. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  The plaintiffs' claim that the Llano Library's in-house check-out program includes only nine of the 17 disputed books is false. *See* Pls.' Br., ECF No. 91, at 13, 22. All 17 of the disputed books are available for check-out through the Llano Library's in-house check-out program.

4.  Each of the three "butt" books and each of the four "fart" books had already been added to the Llano library's in-house checkout before the donation of July 21, 2022. I made this clear in my declaration of July 15, 2022. *See* Decl. of Amber Milum, ECF No. 49-1, at ¶¶ 10–11. The donor sent copies of the nine remaining books that the plaintiffs had expressed interest in checking out at the Llano library. There was no need for the donor to provide the "butt" or "fart" books because I had already added those books to the in-house checkout system before receiving the donation of the nine additional books.

5.   *Under the Moon: A Catwoman's Tale*, by Lauren Myracle, was not included in the original donation of July 23, 2022, because none of the plaintiffs complained about the removal of that book or expressed interest in checking out that book in their sworn declarations.

6.   On October 31, 2022, I received a physical copy of *Under the Moon* from the same donor who sent the nine books on July 21, 2022. I immediately added the book to the Llano library's in-house checkout system, and it has been available for the plaintiffs (and other library patrons) to check out since November 1, 2022.

7.   Every one of the 16 remaining disputed books has been available for the plaintiffs (and other library patrons) to check out since July of 2022.

8.   This means that the plaintiffs can check out physical copies of each of the 17 disputed books from the Llano County Library System without having use Inter Library loan or Bibliotheca if they find those alternatives inconvenient.

9.   The plaintiffs' claim that I "permanently removed all seven [of the butt and fart books] from the Library" is false. *See* Pls.' Br., ECF No. 91, at 2–3. Each of the books remains available for check-out through the Llano library's in-house checkout system. They also remain available to library patrons through Inter Library loan.

10.   The plaintiffs' claim that Rochelle Wells and Rhonda Schneider "began repeatedly checking out the Butt and Fart Books, keeping them off the shelves and inaccessible to other library patrons" is false. *See* Pls.' Br., ECF No. 91, at 3. Ms. Wells and Ms. Schneider checked out only two of the three "butt" books (*My Butt Is So Noisy!* and *I Broke My Butt!*), and they never checked out any of the "fart" books. The remaining "butt" book (*I Need a New Butt*) and the four "fart" books were never placed on the shelves and were never checked out by anyone.

11.   The plaintiffs' claim that Commissioner Moss "directed" me to "remove the Butt and Fart Books" is false. *See* Pls.' Br., ECF No. 91, at 3. Commissioner Moss never even discussed the "fart" books with me and I never showed those books to him. We discussed only the "butt" books. The plaintiffs' claim that Commissioner Moss "directed" the removal of the "fart" books is an outright falsehood. And their claim that I conceded this on cross-examination when confronted with a handwritten note of my conversation with Commissioner Moss misrepresents my testimony and the contents of that handwritten note. *See* Pls.' Br., ECF No. 91, at 3–4 n.4 (claiming that I "agreed" that Moss "instructed" me to remove both the "fart" books and the "butt" books); Pls.' Ex. 2B (handwritten note); Hr'g Tr. Vol. 1 at 65:10–66:25 (cross-examination testimony concerning the handwritten note). The handwritten note of my conversation with Commissioner Moss mentions only the "butt" books and says nothing about the "fart" books. *See* Pls.' Ex. 2B ("Commissioner Moss came back in to talk to me about the 'butt' books."). Acknowledging the authenticity of this handwritten note in no way concedes that Moss "instructed" me to remove the "fart" books, as the plaintiffs claim. *See* Pls.' Br., ECF No. 91, at 3–4 n.4

12.   The plaintiffs' claim that Commissioner Moss "directed" me to remove the "butt" books is also false. Commissioner Moss merely expressed his opinion to me regarding the butt books. He did not think those books should be in the children's section and he said that if it were him he would take them out of the system and for me to pick my battles. Commissioner Moss never ordered or directed me to weed or temporarily remove the butt books (or any other book), and I never conceded on cross-examination that Commissioner Moss had "instructed" or "directed" me to remove those books. *See* Hr'g Tr. Vol. 1 at 65:7–66:25.

13.  The plaintiffs' claim that Commissioner Moss "ordered the removal" of *It's Perfectly Normal* from the Llano library is false. *See* Pls.' Br., ECF No. 91, at 4. Commissioner Moss never ordered the weeding or even the temporary removal of any book in the Llano library. Nor did Commissioner Moss suggest or recommend that *It's Perfectly Normal* be weeded or temporarily removed.

14.  The plaintiffs' claim that Judge Cunningham "directed" me to weed the "butt" and "fart" books is false. *See* Pls.' Br., ECF No. 91, at 3. Judge Cunningham recommended only that I *temporarily* remove those books from the shelves. *See* Pls.' Ex. 2A ("Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)). He never directed me to weed those books, and my decision to weed those books was entirely my own.

15.  I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed or permanently remove a book from the library. Nor has any of these individuals pressured or attempted to pressure me to weed or permanently remove any book from the library system.

16.  The plaintiffs' repeated claims that the "defendants" (plural) weeded or temporarily removed books from the Llano library are false. I am the only defendant who weeded the 17 disputed books from the Llano library, and I am the only defendant who temporarily removed any of those books from the library shelves.

17.  I have explained in my previous declarations and in my courtroom testimony my reasons for weeding 16 of the 17 the disputed books. *See* Milum Decl., ECF No. 49-1, at ¶¶ 6–8, 12–16; Hr'g Tr. Vol. 2 at 95:16–108:9. I did not previously explain my reasons for weeding *Under The Moon: A Catwoman's Tale* because the plaintiffs have not expressed any desire to check out that book in their sworn declarations or

**App. 346**

courtroom testimony. *See* Day Decl., ECF No. 22-2, at ¶ 4 (no mention of *Under the Moon*); Jones Decl., ECF No. 22-3, at ¶ 3 (same); Kennedy Decl., ECF No. 22-4, at ¶ 3 (same); Little Decl., ECF No. 22-5, at ¶ 3 (same); Moster Decl., No. 22-7, at ¶ 3 (same); Puryear Decl., ECF No. 22-9, at ¶ 3 (same); Waring Decl., No. 22-11, at ¶ 3 (same); *see also* Hr'g Tr. Vol. 2 at 28:6–70:20 (testimony of plaintiff Leila Green Little, which never mentions *Under the Moon* or expresses any desire to check it out).

18.   I weeded the 10 books that were permanently removed in the fall of 2021 because, in my judgment, these books met the criteria for weeding under the CREW and MUSTIE factors.[1] *See* Milum Decl., ECF No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 at 95:16–106:20 (explaining the reasons for weeding *Freakboy*, *Being Jazz: My Life as a Transgender Teen*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK: The Birth Of An American Terrorist Group*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*).

19.   I weeded *Under The Moon* because it wasn't getting checked out enough. Although the chart in Exhibit 52 indicates that this book was checked out four times since it was introduced in 2019, it was in reality checked out only twice: once in October of 2019, and once more in June of 2021. The two remaining "check outs" included: (1) An "in-library check in" of June 22, 2021, which occurs when library staff finds a book lying around or misplaced, and brings it to the library desk for check in to ensure that it's not currently checked out before restoring the book to its proper place on the shelves. Although this gets recorded as a "check out/check in," it does not reflect an actual check out by a library patron; and (2) A staff member (Miryam Bailey) checked out and checked in *Under the Moon* on the same day it got weeded, for reasons unbeknownst to me. This too does not signify a checkout by a library patron. So the book had been checked out only twice by library patrons in a three-

---

1.    CREW is an acronym that stands for Continuous Review, Evaluation, and Weed-
ing.

year period. In addition, *Under the Moon* remains available to library patrons through inter-library loan, so it satisfies both the "Irrelevant" and "Elsewhere" criteria for weeding.

20.   I have also explained my reasons for weeding the "butt" and "fart" books in August of 2021. First, no one had asked for or inquired about the two "butt" books that were continuously being checked out by Rochelle Wells and Rhonda Schneider. *See* Hr'g Tr. Vol. 2 at 106:24–25 ("[N]obody else asked for it."); *id.* at 107:8–9. (2) Second, the actions of Ms. Wells and Ms. Schenider would render the "butt" and "fart" books inaccessible to other library patrons if they were placed on the shelves or remained in the system. *See* Hr'g Tr. Vol. 2 at 106:21–107:24. Finally, the "butt" and "fart" books were trivial and "didn't really meet anyone's needs," and they remained available to patrons through interlibrary loans, so the books satisfied the "Trivial" and "Elsewhere" factors for weeding under the MUSTIE guidelines. *See* Hr'g Tr. Vol. 2 at 107:25–108:9; *id.* at 107:12 ("[I]t was just silly trivial books"); *id.* at 107:2–3 ("They were more trivial books, anyway.").

21.   The plaintiffs' brief claims my stated reasons for weeding the disputed books are "pretextual" and "manufacture[d] . . . after the fact." Pls.' Br., ECF No. 91, at 19–20. The plaintiffs' accusation is false and defamatory. I told the truth in my declarations and courtroom testimony, and my stated reasons for weeding the books were my actual reasons and motivations for weeding the books at the moment the decision was made. There is nothing "pretextual" about my testimony, and nothing in my testimony was "manufacture[d] . . . after the fact."

22.   The Llano library system's criteria for weeding appears on a chart on the first page of Plaintiffs' Exhibit 23, which is attached to the defendants' post-hearing brief as Exhibit 1. Under this chart, a book's eligibility for weeding depends on the Dewey class.

**App. 348**

23.   If one looks at the second line on the left-half columns in Exhibit 1, for example, a book in Dewey class 020 would is accompanied by the entry 10/3/MUSTIE, where the first number stands for "age," the second number "years since last circulation," and the third category "condition." That means a book in Dewey class 020 (or any other category marked with 10/3/MUSTIE) becomes eligible for weeding if: (1) It is more than 10 years old; (2) It has been three years or since its last circulation; or (3) It qualifies for weeding the MUSTIE criteria. Only one of these three categories needs to be met to make a book in that Dewey range eligible for weeding.

24.   The MUSTIE factors stand for Misleading, Ugly, Superseded, Trivial, Irrelevant, or Elsewhere. It is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in 10 years (Irrelevant). But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will often (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book.

25.   The plaintiffs' brief falsely claims that I "agreed" with the claim that "historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility" when testifying at the hearing last October. *See* Pls.' Br., ECF No. 91, at 7. I said nothing of the sort in my testimony, and the statement they attribute to me is false in any event. As I mentioned in the previous paragraph, it is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, and the plaintiffs are wrong to assert that Llano library "historically" has weeded books only when two or three MUSTIE criteria are satisfied.

26.   The plaintiffs' brief falsely claims "the CREW Manual" states that books are to remain on shelves unless they do not circulate 'for 3–5 years.'" The CREW Manual says no such thing, and the document that the plaintiffs cite to support this claim is not the CREW Manual. The weeding chart used by the Llano County library system specifically allows Juvenile Fiction and Young Adult Fiction to become eligible for weeding after *two* years since last circulation, and many of the 17 disputed books (including *Freakboy*, *Shine*, and *Gabi, a Girl in Pieces*) fall into those categories.

27.   At the hearing last October, Tina Castelan testified that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018." Hr'g Tr. Vol. 1 at 37:15. Castelan is wrong. *It's Perfectly Normal*'s Dewey class is 613, and books in that Dewey class become eligible for weeding after three years under our library's CREW chart. *See* Ex. 1. *It's Perfectly Normal* was last circulated on September 22, 2018, and it was weeded on October 12, 2021—more than three years after its last circulation date.

28.   Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [it's] last checkout was 2018 and we've had it since 2016." Hr'g Tr. Vol. 1 at 44:12–14. Castelan is wrong. *Gabi, a Girl in Pieces* is a Young Adults book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. *See* Ex. 1. *Gabi, a Girl in Pieces* qualified for weeding under either critierion. Castelan's claim that I violated library policy and CREW/MUSTIE criteria by weeding this book is false.

29.   Castelan also testified that she would not have weeded *Being Jazz: My Life as a Transgender Teen*, even though it hadn't been checked out since 2017, because "we only have one or two books that are about this subject." Hr'g Tr. Vol. 1 at 42:25–43:1. Castelan's statement is false. The Llano library system has no fewer than 10 books on the subject of transgender youth available to library patrons, in addition to

**App. 350**

the copy of *Being Jazz* at the Kingsland library that I did not weed. Those books include:

- *Beyond Magenta: Transgender Teens Speak Out*, by Susan Kuklin, available at Llano library

- *Some Assembly Required: The Not-So-Secret Life of a Transgender Teen*, by Arin Andrews, available at Llano library

- *Light from Uncommon Stars*, by Ryka Aoki, available at Llano library

- *Unconditional: A Guide to Loving and Supporting Your LGBTQ Child*, by Telaina Eriksen, available at Llano library

- *Far From the Tree: Parents, Children and the Search For Identity*, by Andrew Solomon, available at Llano library

- *Evolution's Rainbow: Diversity, Gender, and Sexuality in Nature and People*, by John Roughgarden, available at Llano library

- *Irreversible Damage: The Transgender Craze Seducing Our Daughters*, by Abigail Shier, available at Llano library

- *Detransition, Baby: A Novel*, by Torrey Peters, available at Kingsland library

- *When The Moon Was Ours*, by Anna Marie McLemore, available at Kingsland library

- *Cemetery Boys*, by Aiden Thomas, available at Kingsland library

30.  The plaintiffs' brief claims that "There is no Library policy, or factor under CREW or MUSTIE, by which new books may be weeded before they make it into circulation." Pls.' Br., ECF No. 91, at 8. That is false. A new book that has yet to be placed on the shelves may be weeded consistent with the CREW/MUSTIE criteria if

**App. 351**

a librarian concludes that it is "Trivial" and available "Elsewhere," as I did with *I Need a New Butt* and each of the "fart" books.

31.   The plaintiffs' brief claims that *It's Perfectly Normal* "was not eligible to be weeded" because it qualifies as a "special topic book." Pls.' Br., ECF No. 91, at 9. These claims are false. *It's Perfectly Normal* is not a "special topic book," and sex-education books such as *It's Perfectly Normal* are not considered "special topic books." And "special topic books" are not ineligible for weeding, as the plaintiffs claim. A so-called special topic book may still be weeded if it meets the CREW and MUSTIE criteria, and a librarian must use her own judgment and discretion in deciding whether to weed or retain a so-called special topic book that qualifies for weeding under CREW and MUSTIE.

32.   The plaintiffs' claim that I have left "approximately 5,800 titles" on the shelves that had not been checked out in the previous three years is false. *See* Pls.' Br., ECF No. 91, at 10. I became the system director for the Llano County library system on February 1, 2021. I have not yet had the opportunity to conduct a thorough weed of the library shelves since becoming system director, and we stopped weeding entirely in late 2021. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been. I did not make any decision to "leave" those 5,800 titles on the shelves or allow those 5,800 books to survive a weeding process, as the plaintiffs insinuate in their brief.

33.   The plaintiffs falsely claim that I admitted on the witness stand that there was "no need to weed books in November of 2021" because the Commissioners Court suspended all new book purchases a month earlier. *See* Pls.' Br., ECF No. 91, at 10 ("[B]y Milum's own admission, there was no need to weed books in November 2021 because the Commissioners Court suspended all new purchases a month earlier." (citing Hr'g Tr. Vol. 2 at 120:25–121:10)). That is a misrepresentation of my

testimony. I was asked whether the weeding in November of 2021 was done "to make room for new books," and I acknowledged that it was not. *See* Hr'g Tr. Vol. 2 at 121:6–10 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). I never said that there was "no need to weed books" at that time. Weeding is needed regardless of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts library employees and patrons who must sift through the unnecessary clutter; (3) Weeding helps librarians identify holes in our collection and understand the community's desires and needs. All of this is explained on pages 22–27 the slideshow that the plaintiffs submitted as Exhibit 23.

34.   The plaintiffs' brief complains that the in-house library system has "only one copy" of the disputed books, and that the single copy is located "only at the Llano branch." *See* Pls.' Br., ECF No. 91, at 22. That was equally true before the books were weeded—we had a single copy of each book available for checkout at the Llano library.

35.   The plaintiffs' claim that I "removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler" is false. *See* Pls.' Br., ECF No. 91, at 4. My decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, as Judge Cunningham had instructed me to pull from the shelves and review all books with nudity. But my decision to weed the book (*i.e.*, to "remove the book from the library system") had nothing whatsoever to do with the content of the book or the pictures of the naked toddler, and I would have weeded *In The Night Kitchen* even if there had been no nudity or drawings of a naked toddler.

36.   I have never in my entire career weeded a book because of its viewpoints, and I have never considered the content of a book when making a weeding decision

**App. 353**

except to the extent that the MUSTIE factors might require me to consider whether a book should be considered "misleading," "superseded," "trivial," or "irrelevant." I have no hostility, antipathy, or opposition of any type to the presence of library books discussing critical race theory or LGBTQ issues, regardless of the viewpoints expressed in those books, and the Llano library system has many books on these topics. Nor do I have any hostility, antipathy, or opposition of any type to the presence of library books containing nudity, so long as the depictions are lawful (*i.e.*, no child pornography or obscenity) and intended to serve educational rather than porno-graphic purposes. I do not ever allow my personal views or beliefs to influence my weeding decisions because a library exists to serve the community, and our patrons have diverse beliefs and tastes and reading habits. For the plaintiffs to accuse me of weeding books because I disapprove of nudity, critical race theory, or LGBTQ content is false and defamatory.

37.   I did not consider any of the 17 books that I weeded to be pornographic or in any way inappropriate for a public library. I weeded those books solely based on my application of the CREW/MUSTIE factors.

38.   The plaintiffs accuse me of weeding the books that appeared on Bonnie Wallace's list because I disagreed with the "viewpoints" or "positions" expressed in any of those books. *See* Pls.' Br., ECF No. 91, at 16. The plaintiffs' accusation is false. I did not read any of those books before weeding them, and I am not even aware of the "viewpoints" or "positions" (if any) that might be expressed in any of those books.

39.   The plaintiffs' claim that I "removed" those books "because they were on the Wallace list" is misleading. *See* Pls.' Br., ECF No. 91, at 17. My decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on the Wallace list, but my decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because I determined they met the criteria for weeding. The vast majority of books on Bonnie Wallace's list were returned to the shelves because

**App. 354**

I concluded that they did *not* meet the criteria for weeding. The plaintiffs' statement implies that I *weeded* the books because they appeared on Bonnie Wallace's list, and that is categorically false.

This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 12/30/2022

DocuSigned by:

*Amber Milum*

24504D1FCF0449A...

AMBER MILUM

**App. 355**

# Exhibit 6

App. 356

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>     Defendants. | Case No. 1:22-cv-00424-RP |

## DECLARATION OF JONATHAN F. MITCHELL

1.  My name is Jonathan F. Mitchell. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I represent the defendants in this litigation.

4.  The document attached as Exhibit 1 to this brief is an authentic copy of the CREW method weeding chart that was introduced by the plaintiffs as part of their Exhibit 23.

5.  The document attached as Exhibit 2 to this brief are authentic copies of pages 44 and 45 of plaintiffs' Exhibit 23, which a part of a slideshow on weeding assembled by Dawn Volger.


 This concludes my sworn statement. I declare under penalty of perjury that the foregoing is true and correct.


Dated: <u>December 30, 2022</u>

<u>Jonathan F. Mitchell</u>
JONATHAN F. MITCHELL

**App. 357**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Leila Green Little**, et al.<br><br>Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>Defendants. | Case No. 1:22-cv-00424-RP |

## DEFENDANTS' SUR-REPLY

The plaintiffs' reply brief, like their initial post-hearing brief, contains falsehoods and misrepresentations of the evidence and testimony. We have asked the plaintiffs to correct these inaccuracies but they refuse to do so. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) (attached as Exhibit 2). The defendants therefore wish to bring these false statements to the Court's attention so that it does not rely on them in any way.

1.  The plaintiffs' statement that "Milum . . . pulled the Banned Books off of the shelves for review because of their content and viewpoint"[1] is false in three respects: (a) The "fart" books and "*I Need a New Butt*" were never on the shelves,[2] so Ms. Milum could not have "pulled" them "off the shelves"; (b) There is no evidence that any of the 17 books was pulled off the shelves because of its "viewpoint"; and (c) Ms. Milum pulled books containing nudity (such as *It's Perfectly Normal* and *In the Night Kitchen*) from the shelves for review because of their content, per Judge Cunningham's directive,[3] but there is no evidence that Milum pulled any of the books on Bonnie Wallace's list for review because of their "content."

---

1.  Pls.' Reply, ECF No. 98, at 2.
2.  *See* Defs.' Br., ECF No. 100, at 11 n.22; Third Milum Decl., ECF No. 100-5, at ¶ 10 ("*I Need a New Butt* . . . and the four 'fart' books were never placed on the shelves and were never checked out by anyone.").
3.  Hr'g Tr. Vol. 1 at 145:8–13.

2.  The plaintiffs' statement that "The Banned Books were not eligible to be weeded under the CREW and MUSTIE criteria as those criteria had been previously applied by Milum and Tina Castelan"[4] is false. Castelan conceded that *Freakboy* was appropriately weeded under CREW and MUSTIE,[5] and she acknowledged that *Being Jazz* "could have been" weeded under CREW and MUSTIE but that she personally would have left it on the shelves.[6]

3.  The plaintiffs' claim that there was "a statewide campaign to have the same books removed because of their expressed viewpoints"[7] is not supported by the citations from the hearing transcript or by any other evidence. The cited portions of the hearing transcript[8] reveal only the existence of the so-called Krause list, but there is nothing that indicates a "statewide campaign," or that Krause (or anyone else) objected to "viewpoints" in those books.

4.  The plaintiffs' claim that "Plaintiffs only became aware of the existence of those books through this litigation"[9] is false. Leila Little testified that she also learned of the in-house checkout through the newspaper and from a librarian.[10] None of the other plaintiffs testified or provided evidence of how they learned about it.

The plaintiffs have refused our request to correct or withdraw these falsehoods and misrepresentations in their reply brief. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 9–12

---

4.  Pls.' Reply, ECF No. 98, at 3.

5.  *See* Hr'g Tr. Vol. 1 at 38:25–39:7 ("Q. Was [*Freakboy*] appropriately removed pursuant to Llano County Library policies? A. Yes. Q. Tell me about that. A. Because its last circulation was in 2016. It was only checked out once. It was added in 2015, and so, for me, this book would have been one that I would have discovered and gotten rid of.").

6.  *See* Hr'g Tr. Vol. 1 at 42:14–19 ("Q. Was [*Being Jazz*] appropriately weeded pursuant to library policy and CREW and MUSTIE criteria? A. So it could have been because it has— it was checked out in 2017. However, we only had one or two of the books that pertained to this subject and so, I would have left it.").

7.  Pls.' Reply, ECF No. 98, at 3.

8.  *See* Hr'g Tr. Vol. 1 at 30:24-32:4, 71:16-72:12.

9.  Pls.' Reply, ECF No. 98, at 3.

10. Hr'g Tr. Vol. 2 at 42:18–22 ("I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the Daily Trib newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.").

(attached as Exhibit 2). The plaintiffs are likewise unwilling to acknowledge the misstatements in their post-hearing brief of December 9, 2022, apart from their now-repudiated assertion that the in-house checkout system contained "only nine" of the 17 disputed books and their false claim that *It's Perfectly Normal* "was checked out within three years of its removal." *See id*. at 2–9. We have attached a letter from plaintiffs' counsel explaining their stance, and we believe that this letter, along with the prior correspondence that we have submitted to the Court,[11] will be sufficient to ensure that the Court will not misled by the plaintiffs' briefing.

We are also attaching to this sur-reply a copy of "the CREW Manual," which the plaintiffs continue to invoke in their briefs despite the fact that it was never introduced as evidence. *See* Pls.' Br., ECF No. 91 (asserting that "the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3-5 years,'" and falsely equating Exhibit 23 with "the CREW Manual"). This document is publicly available[12] and plaintiffs' counsel are fully aware of its existence and content. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 8 (acknowledging that "[t]here is a document called 'CREW: A Weeding Manual for Modern Libraries' available online" and citing the URL). Plaintiffs' counsel are also aware that Exhibit 23 is not "the CREW Manual," but a mere slideshow produced by Dawn Vogler,[13] yet they continue to insist on equating the two while misrepresenting the contents of both the CREW Manual and the Vogler slideshow.

Because the plaintiffs continue to invoke "the CREW Manual" and refuse to withdraw their reliance on that document, the Court should be aware of what "the CREW Manual" actually says. To begin, the CREW Manual mandates not only content discrimination but also viewpoint discrimination in weeding decisions. *See* CREW Manual at 19 (attached as Exhibit 3) (listing "poor *content*" as grounds for weeding, including "[m]aterial that contains

---

11. *See* Notice to the Court, Ex. 1, ECF No. 102-1.
12. *See* https://bit.ly/3RjyQ6y (last visited on January 30, 2023).
13. *See* Letter from Ellen V. Leonida (Jan. 17, 2023) at 7–8.

**App. 360**

biased, racist, or sexist terminology *or views*" (emphasis added)); *id.* at 21 (instructing librarians to consider "current interest in the subject matter"); *id.* at 33 ("[L]ook for books that contain stereotyping, including stereotypical images and views of people with disabilities and the elderly, or gender and racial biases."); *id.* at 65 ("Weed biased or unbalanced and inflammatory items."); *id.* ("Weed career guides with gender, racial, or ethnic bias."); *id.* at 68 ("Discard books that are MUSTIE or that reflect gender, family, ethnic, or racial bias."); *id.* ("Weed based on the quality of the retelling, especially if racial or ethnic bias is present."); *id.* at 73 ("While information may not become dated, watch for cultural, racial, and gender biases."); *id.* at 74 ("Discard books . . . that feature gender bias."); *id.* at 75 ("Watch for gender and racial bias in sports and athletics."); *id.* at 76 ("Watch for collections that feature gender or nationality bias and outdated interests and sensitivities."); *id.* at 77 ("Watch for outdated interests and collections that feature gender or race bias."); *id.* at 81 ("Weed books that reflect racial and gender bias."); *id.* at 82 ("Do not retain books that have erroneous and dangerous information simply because the book is still in great shape."). The plaintiffs need to explain how they can insist throughout their brief that content and viewpoint discrimination are constitutionally forbidden in weeding decisions while simultaneously invoking "the CREW Manual" as if it were an *ex cathedra* pronouncement.

The CREW Manual also flatly contradicts the plaintiffs' claim that books can never be weeded unless they have gone uncirculated "for 3–5 years." In many places, the CREW Manual endorses weeding after one or two years since last circulation, and explicitly states that fiction becomes eligible for weeding after *two* years of non-circulation. *See id.* at 33 ("Consider discarding older fiction especially when it has not circulated in the past two or three years."); *id.* at 77 ("F (Fiction) X/2/MUSTIE"); *id.* ("[C]onsider weeding any [graphic novel] that hasn't circulated in the past year."); *id.* at 81 ("Weed any [picture] book that has not circulated in the past two years."); *id.* ("[C]onsider weeding [juvenile fiction] that hasn't circulated in the past two years."); *id.* at 82 ("Any item [of young adult fiction] that has not

**App. 361**

circulated within two years should be considered 'dead' and removed (and anything that hasn't circulated within the past year is suspect . . .)").

Finally, the plaintiffs' reply falsely accuses the defendants of arguing that this case (and the motion for preliminary injunction) are moot. *See* Pls.' Reply Br., ECF No. 98, at 4–6. Neither the case nor the motion is moot, and it would be wrong for the Court to hold that they are moot. An Article III case or controversy continues to exist because the plaintiffs' inability to obtain or check out the disputed books from the shelves (as opposed to the in-house checkout system) supplies the "identifiable trifle" needed for injury in fact. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). The donation of the disputed books to the in-house checkout system does not moot anything, but it does eliminate any possibility of "irreparable harm" or violation of the plaintiffs' First Amendment rights that might otherwise occur between now and the end of trial. The plaintiffs have established an ongoing Article III injury, but they have *not* shown that they will suffer irreparable harm or a violation of their constitutional rights absent a preliminary injunction. The plaintiffs' "voluntary cessation" analysis is irrelevant because the defendants have not mooted the plaintiffs' Article III injury and are not attempting to moot the case by returning the books to the shelves. Voluntary cessation is an *exception* to mootness, and that exception cannot be implicated when the defendants have done nothing that could eliminate an Article III case or controversy.[14]

## CONCLUSION

The motion for preliminary injunction should be denied.

---

14. The plaintiffs falsely claim that mootness can be "waived." *See* Pls.' Reply Br., ECF No. 98, at 5 ("Defendants have thus waived any mootness argument."). Mootness can never be waived, as it goes to the subject-matter jurisdiction of the Court. *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases").

Respectfully submitted.

Dwain K. Rogers                     _/s/ Jonathan F. Mitchell_
Texas Bar No. 00788311              Jonathan F. Mitchell
County Attorney                     Texas Bar No. 24075463
                                    Mitchell Law PLLC
Matthew L. Rienstra                 111 Congress Avenue, Suite 400
Texas Bar No. 16908020              Austin, Texas 78701
First Assistant County Attorney     (512) 686-3940 (phone)
                                    (512) 686-3941 (fax)
Llano County Attorney's Office      jonathan@mitchell.law
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
dwain.rogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

Dated: January 30, 2023             *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on January 30, 2023, I served this document through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Sarah Salomon
Pratik Ghosh
Amy Senia
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
salomon@braunhagey.com
ghosh@braunhagey.com
senia@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Defendants*

# Exhibit 2

**(Letter from Ellen V. Leonida of January 17, 2023)**

# B R A U N **HAGEY** & B O R D E N LLP

San Francisco & New York

**Ellen V. Leonida, Esq.**
Partner
leonida@braunhagey.com

January 17, 2023

<u>**VIA EMAIL**</u>

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
jonathan@mitchell.law

Dwain K. Rogers
Matthew L. Rienstra
Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
drogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

Re:  *Little et al. v. Llano County et al.*, Case No. 1:22-cv-00424-RP

Counsel:

We write in reply to your emails of January 9 (10:53 a.m. PST) and January 10 (1:46 a.m. PST), 2023.

As we noted in our prior correspondence, a Rule 11 violation "is a serious thing, and an accusation of such wrongdoing is equally serious." *Intell. Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2019 WL 5784171, at *6 (E.D. Tex. Mar. 28, 2019). Rule 11 should not be made, or threatened, for "minor, inconsequential violations of the standards prescribed by subdivision (b)." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. Nor should Rule 11 be used "to test the legal sufficiency or efficacy of allegations in the pleadings," "to emphasize the merits of a party's position," or "to intimidate an adversary into withdrawing contentions that are fairly debatable." *Id*.

With respect to factual contentions—the only type of issue you raise in your various emails—Rule 11 *only* applies if it would be *objectively unreasonable* under the circumstances at

**San Francisco**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel.: (415) 599-0210
Fax: (415) 276-1808

**New York**
118 W 22nd Street, 12th Floor
New York, NY 10011
Tel.: (646) 829-9403
Fax: (646) 403-4089

**App. 366**

January 17, 2023
Page 2

the time of filing for an attorney to believe the contention has evidentiary support. Fed. R. Civ. P. 11(b)(3); *Jennings v. Joshua Indep. Sch. Dist.*, 948 F.2d 194, 196 (5th Cir. 1991). Factual assertions based on testimony that is inconsistent with other evidence or later repudiated by the self-interested testimony of a defendant does not make that contention "false," demonstrate a lack of evidentiary support, or create a Rule 11 violation. Plaintiffs are not obligated to agree that a witness is telling the truth or to accept as true one version of a witness's testimony over others.

Nor does Rule 11 prohibit parties from relying on circumstantial evidence in making factual assertions. Rule 11 "merely requires an attorney to certify that the factual contentions in a paper he presents to the court 'have evidentiary support.' 'Inferences'—which are commonly described as 'circumstantial evidence'—are as capable of providing evidentiary support as 'facts'—which are commonly described as 'direct evidence.' . . . 'The reason for treating circumstantial and direct evidence alike,' the Supreme Court has explained, 'is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Lucas v. Duncan*, 574 F.3d 772, 777 (D.C. Cir. 2009) (internal citations omitted). This is particularly true in cases like this one, where Defendants have a monopoly on access to direct evidence—and have persisted in withholding that evidence.

Fundamentally, a party cannot weaponize Rule 11 to force its opponent into accepting its preferred reading of the record. Rule 11 is instead reserved for egregious abuse of the judicial process. *See, e.g., Barrett-Bowie v. Select Portfolio Servicing, Inc.*, 631 F. App'x 219, 221 (5th Cir. 2015) (granting Rule 11 sanctions where party alleged it had not been presented with operative financial instrument when it indisputably had); *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1025 (5th Cir. 1994) (granting Rule 11 sanctions where counsel continued to advocate factual contentions despite indisputable evidence client had fabricated those claims). It is not a tool for resolving garden variety disputes over the correct inferences to be drawn from the record; courts are well equipped to resolve such disputes as part of the ordinary process of ruling on the proceedings before them. Your Rule 11 arguments have no merit.

\* \* \*

We now turn to the substance of your individual objections. Our understanding is that the parties have fully resolved your concerns with respect to claims (1), (2), and (8). For accuracy, we will quote the actual text of Plaintiffs' Post-Hearing Brief.

## CLAIM 3

Text of Plaintiffs' Post-Hearing Brief at 3: "Wells and Schneider first conducted their own personal campaign to keep these titles out of circulation because of their assessment of the content; they began repeatedly checking out the Butt and Fart Books, keeping them off the shelves and inaccessible to other library patrons. Hr'g Tr. Vol 1 at 24:20-24; Vol. 2 at 5:23-6:10; 106:23-107:3."

Defendants' complaint: "Your claim on page 3 that Rochelle Wells and Rhonda Schneider 'began repeatedly checking out the Butt and Fart books, keeping them off the shelves and

January 17, 2023
Page 3

inaccessible to other library patrons.' Wells and Schneider never checked out any of the 'fart' books, and they checked out only two the three 'butt' books. The remaining books were never placed on the shelves and were never checked out. The record is that they checked out the Butt books (no mention of which) but is silent on whether they also checked out the Fart books."

Plaintiffs' response:

In discussing specific books and their circulation, Plaintiffs clearly stated that the books about which you complain were never in circulation. Plaintiffs' Post-Hearing Brief expressly states:

As Castelan testified, and as the above chart shows, five of the books—the Fart Books and I Need a New Butt—were brand new and were weeded before they even hit the shelves. Hr'g Tr. Vol. 1 at 33:15-34:3 (*I Need a New Butt*), 34:4-13 (*Larry the Farting Leprechaun*), 34:16-18 (*Harvey the Heart Had Too Many Farts*), 34:19-35:1 (*Gary the Goose and His Gas on the Loose*), 35:2-6 (*Freddie the Farting Snowman*).

Plaintiff's Post-Hearing Brief at 8. That page also includes a chart showing zero circulations for the Fart books and *I Need a New Butt*. This passage leaves the Court in no doubt regarding the status of those books.

The emphasis of the sentence to which you object is the conduct of Wells and Schneider, rather than the location of the Fart books or *I Need a New Butt*. That their conduct was aimed at keeping these books out of circulation was acknowledged by Milum. Hr'g Tr. Vol. 2 at 106:21-107:13; First Milum Decl. ¶ 7; Milum Dep. at 39:4-14, 41:3-18. Thus the core import of the statement on page 3—that Wells and Schneider engaged in a campaign to prevent all such books from being available to other patrons—is perfectly accurate. Whether in the possession of Wells and Schneider or stored in a non-public area of the library because of their actions, the result of Wells's and Schneider's campaign was to keep *all* the Butt and Fart books "off the shelves and inaccessible to other library patrons." There is no Rule 11 violation.

## CLAIM 4

Text of Plaintiffs' Post-Hearing Brief at 7: "Tina Castelan, a former Llano County Children's Librarian, explained that historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility. Hr'g Tr. Vol. 1 at 21:17-21. Milum agreed with that assessment. Hr'g Tr. Vol. 2 at 125:2-5."

Defendants' complaint: "Your characterization of Castelan's and Milum's testimony on page 7. Castelan never said that 'historically the Llano Library looked for two or three MUSTIE criteria to be satisfied for weeding eligibility' and your claim that 'Milum agreed with that assessment' is a misrepresentation of Milum's testimony, for the reasons we explained on page 15 of our brief."

January 17, 2023
Page 4

Plaintiffs' response:

    Your contention that this statement mischaracterizes Castelan's testimony is not true. Castelan was a librarian at the Llano library; even if her view on how things had been done was based on her experience, it nonetheless remains an evidentiary basis for the assertion that this was how the library has normally done things. The historical practices of any institution are the sum of the individual practices of those constituting the organization, and Castelan's way of performing her job tasks is probative of how the library instructed and trained her to perform those tasks.[1] We note that the record does not appear to contain any testimony to the effect that Castelan was acting against library policy in requiring multiple MUSTIE criteria before weeding a book or that her procedure was inconsistent with that employed by other librarians. Indeed, if there was any evidence of the Llano Library routinely weeding books based on a single MUSTIE criterion, we would expect Defendants to have eagerly adduced that evidence in discovery and at the hearing.

    Regarding your second point of contention, whether Milum had agreed with Castelan's assessment, the citation establishes agreement that "Irrelevance," as embodied in three years without circulation, is insufficient to weed a book. Hr'g Tr. Vol. 2 at 125:2-5. This alone provides evidence of agreement, particularly as to the criterion that has been most at issue in this litigation. Milum has also agreed more broadly that a book will generally not be discarded under CREW/MUSTIE "based on only meeting one of these criteria." Milum Dep. at 23:17-24:10. To the extent Milum has provided contradictory testimony elsewhere, Plaintiffs—and the Court— are in no way bound to accept the version of her testimony most favorable to Defendants.

## CLAIM 5

Text of Plaintiffs' Post-Hearing Brief at 7: "Based on her experience as a librarian, her knowledge of the CREW factors and MUSTIE criteria, and her review of each of the Banned Books, Tina Castelan testified that all but one of the Banned Books were weeded improperly and contrary to Llano County Library policies. Hr'g Tr. Vol. 1 at 33:15-34:3, 35:7-38:16, 40:1-41:8, 41:16-42:19, 43:12-44:14, 45:5-18."

Defendants' complaint: "On page 7, your claim that Castelan 'reviewed' each of the disputed books is unsupported (as far as I can tell). I couldn't find anything in Castelan's testimony where she claims to have reviewed each of the disputed books."

Plaintiffs' response:

    You object to this, apparently because you interpret "review" here to mean having read each of the books, perhaps on the witness stand. But in the context of the entire paragraph and the following two pages of elaboration, it is clear this sentence means nothing more than that Ms.

---

[1] To the extent your objection is based on the word "historically," we note that it is defined merely as "in the past." *Historically*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/historically (last visited Jan. 17, 2023). There is no requirement that it extend into the distant past, or indeed for any set period of time.

January 17, 2023
Page 5

Castelan "reviewed" the books with respect to the MUSTIE criteria. We note that Defendants made no objection to her testifying regarding application of the MUSTIE criteria to the books at issue in this case, nor did you suggest she lacked sufficient foundation to do so. *See generally* Hr'g Tr. Vol. 1 at 33-45.

## CLAIM 6

Text of Plaintiffs' Post-Hearing Brief at 7: "Tina Castelan testified that all but one of the Banned Books were weeded improperly and contrary to Llano County Library policies. Hr'g Tr. Vol. 1 at 33:15-34:3, 35:7-38:16, 40:1-41:8, 41:16-42:19, 43:12-44:14, 45:5-18."

Text of Plaintiffs' Post-Hearing Brief at 9: "*Being Jazz* and *They Called Themselves the K.K.K.* were unique special topic titles so, even though they had not been checked out within three years, they were not eligible for weeding under the Library's historic application of the MUSTIE criteria. *Id.* at 22:6-10, 42:14-19, 43:20-25."

Defendants' complaint: "Your claim that 'Castelan testified that all but one of the Banned Books were weeded improperly and contrary to Llano County Library policies' is untrue. Castelan admitted that the weeding of Being Jazz 'could have been' weeded under Llano County Library policies but that she personally would have left in in. See Hr'g Tr. Vol. 1 at 42:14–19"

Plaintiffs' response:

    The testimony at issue is the following:

    Q. Was that book [Being Jazz] appropriately weeded pursuant to library policy and CREW and MUSTIE criteria?

    A. So it could have been because it has -- it was checked out in 2017. However, we only had one or two of the books that pertained to this subject and so, I would have left it.

Hr'g Tr. Vol. 1 at 42:14-19. Castelan's first sentence is fragmentary and does not unequivocally express the opinion that removal was appropriate under MUSTIE. Castelan testified clearly that removal based on a single criterion (here, Irrelevance) is not appropriate, based on her experience. *See* Response No. (4), *supra*. In context, Castelan was clearly attempting to convey that the book could have been considered for weeding (based on not having circulated since 2017), but that removal was not appropriate based on it being one of the few books on a subject. *See also infra*, Response No. (9). Plaintiffs are not bound by Defendants' preferred reading of testimony susceptible to multiple interpretations—and disagreeing with Defendants' interpretation of the testimony in no way violates Rule 11.

## CLAIM 7

Text of Plaintiffs' Post-Hearing Brief at 8: "And Defendants did not provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and *I Need a New Butt*."

January 17, 2023
Page 6

Defendants' complaint: "Your claim that 'Defendants did not provide a single reason under CREW or MUSTIE justifying the removal of the Fart Books and I Need a New Butt' is untrue. Milum did provide reasons for weeding under the 'Trivial,' 'Irrelevant,' and 'Elsewhere' criteria. See Hr'g Tr. Vol. 2 at 107:8–9. You can disagree with those reasons or think they're pretextual, but it's not true to say that the Defendants did not provide a reason under CREW or MUSTIE."

Plaintiffs' response:

    Your objection here focuses on two words in this sentence—"single reason"—and ignores rest of the sentence and the surrounding text. The point of this sentence is the lack of a reason *justifying the removal* of the books. While Milum eventually claimed that these books met three MUSTIE criteria (Trivial, Irrelevant, and Elsewhere), Hr'g Tr. Vol. 2 at 108:6-9, Plaintiffs are not bound to agree that this post hoc effort at justification is accurate.[2] This is particularly so because each of those things was equally true when she made the decision to purchase the books and when she placed the first two on library shelves for circulation. The record is devoid of any indication those factors changed. Defendants have thus not offered a single reason *justifying* Milum's decision to remove the Fart books and *I Need a New Butt* from the library. That Defendants read Milum's proffered reasons as sufficient to justify her action in no way forces Plaintiffs (or the Court) to believe the same, nor can Defendants compel Plaintiffs to do so under the guise of Rule 11.

## CLAIM 9

Text of Plaintiffs' Post-Hearing Brief at 9: "As for *It's Perfectly Normal*, that title was checked out within three years of its removal and it was special topic book, meaning it was the 'only book of its category that is as extensive in its information that it gives.' *Id.* at 37:15-19. Accordingly, it was not eligible to be weeded. Any testimony to the contrary is belied by the fact that Moss told Castelan he did not want the book in the library, *id.* at 29:2-9, and then made Milum "remove *It's Perfectly Normal*," *id.* at 197:8-10."

Defendants' complaint: "You claim on page 9 that *It's Perfectly Normal* could not be weeded because it qualifies as a 'special topic book.' Castelan never testified or opined that It's Perfectly Normal qualifies as a 'special topic book,' nor did she testify that It's Perfectly Normal (or special topic books) are 'not eligible to be weeded.'"

Plaintiffs' response:

    *It's Perfectly Normal* does fall within the category of "special topic book" that Castelan described. That definition is: "books that we don't necessarily have a demand for but that it is better that we have them when we don't need them than to need them and we don't have them." Hr'g Tr. Vol. 1 at 22:6-19. She gives two examples: books on grief counseling for children and

---

[2] Milum's testimony in this regard also contradicted her previous sworn statements, her deposition testimony, and her testimony on the first day of the hearing (including being questioned by you regarding the reason that she weeded the Butt and Fart Books).

January 17, 2023
Page 7

books in the LGBTQ realm. *Id.* She also notes that such books would be kept in the library even if no one had checked them out in years. *Id.* A book on puberty that is the "only book of its category that is as extensive in its information that it gives" falls squarely within this definition. As with books on LGBTQ issues, the subject matter can be highly embarrassing and also of huge personal import, such that a reader might desperately want access to the information without having a record of having checked the book out. At the very least, it is not objectively unreasonable to view *It's Perfectly Normal* as a "special topic book" under Castelan's definition.

You also assert that Castelan did not testify that "special topic books" are "not eligible to be weeded." The Post-Hearing Brief does not assert this was the case. Castelan did explicitly testify that *It's Perfectly Normal* was not appropriately weeded, however, in large part because it is the type of book that, although not checked out as often, has extensive information on important subject matter. Hr'g Tr. Vol. 1 at 36:22-37:19.

## CLAIM 10

Text of Plaintiffs' Post-Hearing Brief at 10: "First, the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3-5 years.' Ex. 23 at 44."

Defendants' complaint: "Your statement on page 10 that incorrectly equates Dawn Vogler's slideshow with 'the CREW manual.'"

Plaintiffs' response:

Despite your objection, we note that nowhere do you contend the information contained in Exhibit 23 is not an accurate representation of the guidelines set forth in the CREW manual, or that Exhibit 23 does not accurately reflect how librarians in Llano County have applied CREW even if it "has no authority over the Llano library system." Defs.' Resp. Br. at 16. The document was produced by Milum, with a "MILUM 4 RFP" Bates-stamp, and it is a perfectly reasonable inference that past library directors have relied on it even if Milum herself has not read it.

That something called a CREW manual exists appears beyond dispute. Milum and Castelan both acknowledged its existence, and Milum acknowledged it governs weeding in the Llano County Library System. Hr'g Tr. Vol. 1 at 17:18-18:5, 37:11-19, 85:10-16. It was formally adopted in the Llano Library's "Materials Selection Policy." Ex. 1. And yet, to the best of Plaintiffs' knowledge, Defendants have not produced any other document that could possibly be described as a "CREW manual" despite Defendants' decision to make its proper application the centerpiece of their defense strategy. [3]

---

[3] Please explain how you failed to do so. Plaintiffs deserve to understand why you insist that the single document containing CREW guidance produced by Defendants cannot be referenced, while you continue to withhold key evidence in this case.

January 17, 2023
Page 8

There is a document called "CREW: A Weeding Manual for Modern Libraries" available online, although Plaintiffs are of course in no position to be able to tell whether this is what Defendants purportedly used. *See* https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/ld/pubs/crew/crewmethod12.pdf (last visited Jan. 17, 2023). Of particular note, this manual repeats the contents of the slide in Exhibit 23 almost verbatim. *Id.* at 20. The manual is produced by the Texas State Library and Archives Commission, where Dawn Vogler was an employee at the time she created the presentation in Exhibit 23. *Id.* at 1; Ex. 23 at 3. If this document is indeed the "CREW manual" employed by the Llano Library, your assertion that the slide at issue in the Vogler presentation does not "equate" to the CREW manual is false, not just because it lacks any record support (which it does) but because it is objectively incorrect—a fact Defendants, unlike Plaintiffs, could have easily verified.

## Claim 11

Text of Plaintiffs' Post-Hearing Brief at 10: "First, the CREW Manual states that books are to remain on shelves unless they do not circulate 'for 3-5 years.' Ex. 23 at 44."

Defendants' complaint: "Your statement on page 10 that claims that Volger's slideshow says that books must 'remain on shelves unless they do not circulate for 3–5 years' is false and misrepresents the slide."

Plaintiffs' response:

The slide at issue unequivocally lists "Non-circulating for 3-5 years" as the temporally shortest basis for considering weeding. Ex. 23 at 44. Milum agreed with a similar description for how to judge irrelevance based on circulation time of fiction (3 years) and nonfiction (longer) books. Hr'g Tr. Vol. 1 at 86:14-25. Time since last check out was a repeated theme of the MUSTIE testimony on both sides. Because that is an essential criterion on which Milum purportedly based many of her removal decisions, the fact that guidelines for application of CREW counsel a longer period than Milum used is probative. In any case, the slide unequivocally supports the contention that, where time since last checkout is the criterion being used to determine whether a book meets the MUSTIE criteria, a longer period than that applied by Milum is appropriate. Defendants are, of course, welcome to present the Court with their own interpretation of such evidence, as they have done in their briefing, and the Court is perfectly capable of looking at the document and reaching its own conclusions as to the weight to give it.

## Claim 12

Text of Plaintiffs' Post-Hearing Brief at 10: "Second, by Milum's own admission, there was no need to weed books in November 2021 because the Commissioners Court suspended all new purchases a month earlier. Hr'g Tr. Vol. 2 at 120:25-121:10."

Defendants' complaint: "Your claim that Milum admitted on the witness stand that there was 'no need to weed books' after the Commissioners Court had suspended new book purchases is false and misrepresents Milum's testimony, for the reasons explained on page 18 of our brief."

January 17, 2023
Page 9

Plaintiffs' response:

Here, again, your argument is one of interpretation. Milum testified that "libraries need to weed books because shelf space is limited and they need to make room for new books." Hr'g Tr. Vol. 2 at 71:20-23. She further testified that the library had not purchased any new books since book purchases had been suspended in October 2021 and that her removal of the books on the Wallace list was not done to make room for new books. *Id.* at 120:25-121:10. Plaintiffs' contention that that there was no *need* to weed at that time, since no new books would be arriving and requiring empty shelf space after October 2021, is thus amply supported by the record. There is no Rule 11 violation.

\* \* \*

We further address the new issues you raise regarding Plaintiff's Reply Brief.

## Claim 1

Text of Plaintiffs' Reply Brief at 2: "Milum, in her capacity as Llano County Library Director, pulled the Banned Books off of the shelves for review because of their content and viewpoint;" (citing Plaintiffs' Post-Hearing Brief at 3-5).

Defendants' complaint: "Your statement on page 2 that 'Milum . . . pulled the Banned Books off of the shelves for review because of their content and viewpoint' is false in three respects: (a)  The 'fart' books and 'I Need a New Butt' were never on the shelves, so Milum could not have 'pulled' them 'off the shelves'; (b) There is no evidence that any of the 17 books was pulled off the shelves because of its 'viewpoint'; (c) Milum pulled books containing nudity (It's Perfectly Normal and In the Night Kitchen) from the shelves for review because of nudity, per Judge Cunningham's directive, but there is no evidence that Milum pulled the books on Bonnie Wallace's list because of 'content.'"

Plaintiffs' response:

We have already addressed objection (a) (regarding the Fart books and *I Need a New Butt*) in responding to Claim (3), *supra*, and incorporate that response by reference. The core import of this assertion is simply that the books should have been on the shelves, but were not.

To the extent they can be characterized as factual disputes, your (b) and (c) objections appear based on an incorrect reading of the sentence, which contains no assertion regarding Milum's state of mind and instead focuses on causation. Defendants have conceded, as they must, that Milum pulled the books in question because of one of the following: (1) the Wells/Schneider campaign, which was expressly based on objections to the contents of the Butt and Fart books, and its endorsement by Milum's superiors, (2) the efforts led by Cunningham to pull every book containing nudity, which also were based expressly on the content of the books, or (3) the Wallace list, which was a subset of the Krause list—a document indisputably based on antipathy toward the viewpoints expressed in books like *Caste* or *Being Jazz*—compiled by Wallace and her associates, who were perfectly clear in their viewpoint-based motivations, and

January 17, 2023
Page 10

endorsed by Milum's superiors. *See, e.g.*, Ex. 76. The books on the Wallace list were admittedly pulled because they were on the Wallace list, and they were on the Wallace list because of antipathy to their contents and/or viewpoints, not because Wallace, Cunningham, Moss, or anyone else involved in creating the list and sending it to Milum for action were concerned about whether the books were eligible for weeding under CREW/MUSTIE. The cited pages of Plaintiffs' Pre-Hearing Brief make that case explicitly (proving your interpretation of the sentence to be incorrect when placed in its full context). Those pages contain more than adequate factual support. The correct way to apply the law to any competing factual theories here is for the Court to decide, not for Defendants to unilaterally impose their preferred interpretation.

## CLAIM 2

Text of Plaintiffs' Reply Brief at 3: "The Banned Books were not eligible to be weeded under the CREW and MUSTIE criteria as those criteria had been previously applied by Milum and Tina Castelan, the only librarians with weeding authority at the Llano Library;" (citing Plaintiffs' Post-Hearing Brief at 8-11).

Defendants' complaint: "Your statement on page 3 that 'The Banned Books were not eligible to be weeded under the CREW and MUSTIE criteria as those criteria had been previously applied by Milum and Tina Castelan' is false. Castelan conceded that Freakboy was appropriately weeded under CREW and MUSTIE, and she acknowledged that Being Jazz 'could have been' weeded under CREW and MUSTIE but that she personally would have left it in."

Plaintiffs' response:

We have already addressed this objection under claims (4), (5), and (6), *supra*. We incorporate those responses by reference.

## CLAIM 3

Text of Plaintiffs' Reply Brief at 3: "Removal of the Banned Books from the Library coincided with a statewide campaign to have the same books removed because of their expressed viewpoints;" (citing Hr'g Tr. Vol. 1 at 30:24-32:4, 71:16-72:12).

Defendants' complaint: "Your claim on page 3 that there was 'a statewide campaign to have the same books removed because of their expressed viewpoints' is not supported by the citations you provide from the hearing transcript, nor is it supported by any other evidence in this case."

Plaintiffs' response:

Plaintiffs' Post-Hearing Brief (at 5) extensively discussed the Krause list, which was also mentioned 38 times during the hearing and included as an exhibit. Ex. 6. The hearing citations establish both that the Krause list was apparently sent to libraries all over Texas and that its author objected to the inclusion of the listed books in libraries. Hr'g Tr. Vol. 1 at 30:24-32:4, 71:16-72:12. Describing Krause's efforts as Plaintiffs do in the Reply Brief is hardly a factual stretch when Krause and his allies were quite public and candid about their goals. Even if the

January 17, 2023
Page 11

hearing record were devoid of evidence regarding Krause, dozens—if not hundreds—of news articles and other documents subject to judicial notice would fill the gap. The letter itself, and all official correspondence regarding it, are public records. Rule 11 is not a basis for sticking one's head in the sand.

## CLAIM 4

Text of Plaintiffs' Reply Brief at 3: "Defendants' lawyer donated new copies of the Banned Books to the 'in-house checkout program' after Plaintiffs moved for a preliminary injunction, and Plaintiffs only became aware of the existence of those books through this litigation;" (citing Hr'g Tr. Vol. 2 at 42:16-19 and ECF No. 49).

Defendants' complaint: "Your claim that 'Plaintiffs only became aware of the existence of those books through this litigation' is false and unsupported by evidence. Leila Little testified that she also learned of the in-house checkout through the newspaper and from a librarian. None of the other plaintiffs testified or provided evidence of how they learned about it."

Plaintiffs' response:

This objection is disingenuous. With respect to Little, her testimony was:

Q. How did you become aware of the inhouse checkout system?

A. I believe I first became aware of that through legal documents pertaining to this litigation. Following that, I did read about it. I believe it was in the *Daily Trib* newspaper that referred to the court filings referring to it. And following that, a librarian had told me about it.

Q. Have you ever seen anything publicly posted about it in the library?

A. I have not.

Q. Have you seen anything posted in the library's glass display case?

A. No, I've not.

Q. Have you seen anything posted on the community bulletin board?

A. No.

Q. Have you seen anything posted on the small sign display at the library?

A. No.

Q. Have you seen anything posted at the circulation desk?

January 17, 2023
Page 12

> A. No.
>
> Q. Have you seen anything about the inhouse checkout system discussed in the library newsletter?
>
> A. No, I have not.
>
> Q. Are all of those places that we've just discussed, places where information about books or programming at the library is generally placed?
>
> A. Yes.
>
> Q. Are any of the books the defendants contend are in the secret inhouse checkout system listed in the card catalog?
>
> A. No, they are not.

Hr'g Tr. Vol. 2 at 42:16-43:23. She thus explicitly testified that she first became aware of the secret repository "through legal documents pertaining to this litigation." *Id.* She then read about it in a newspaper article that covered legal filings discussing its existence. *Id.* To suggest she didn't become aware of the repository "through this litigation" is simply wrong. The declarations of the other Plaintiffs are in accord.

We note Defendants have made no contention suggesting the secret repository's existence is publicized in the library—or anywhere else for that matter. Little's testimony, *supra*, also establishes a basis for believing no library patron could have learned of the in-house checkout system without learning about it through the litigation. Indeed, the only way anyone—counsel, parties, judicial system employees, or unrelated citizens—*could* know about the existence of the in-house checkout system is through this litigation.

## CLAIM 5

Text of Plaintiffs' Reply Brief at 4: "Instead, Defendants argue that the secret repository of Banned Books rendered Plaintiffs' claims moot. Defendants scrupulously avoid using the word "moot," but their argument is plain: even though Plaintiffs did not have access to the Banned Books when the case began, they now have access to them, so they are no longer suffering any impediment to accessing the books. Defs.' Resp. Br. at 19-22. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (describing mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)") (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n. 22 (1997))."

Defendants' complaint: Defendants assert they are entitled to "a short refutation of your false claim in the reply that we are arguing or implying that this case or the motion for PI are 'moot.' (We made abundantly clear at the PI hearing that the in-house library does not 'moot' anything,

January 17, 2023
Page 13

and we are not arguing or insinuating that there is any mootness issue in our written submission.)"

Plaintiffs' response:

Your stated intention to argue that your position on the elimination of personal injury during the pendency of litigation does not sound in mootness appears to be baseless and unwarranted "by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). The substance of your argument is mootness, even if you studiously avoid using the word. The Court, of course, is well equipped to assess this issue and determine whether the arguments in Defendants' Response Brief effectively argue mootness or not. That you don't like this argument or disagree with it does not make it a Rule 11 violation—particularly when the Brief expressly notes that Defendants have been careful not to use the term mootness even while advancing the concept in defense of their position.

* * *

With regard to your proposal of January 9, 2023, we consider both pieces wholly unnecessary. The proposed "letter or errata sheet" would be, at best, inaccurate as well as superfluous to the positions you have already taken in detail in your Response Brief. Defendants already had ample opportunity to discuss those in the 30 page Response Brief—which was also supersized by virtue of your violation of the court's requirement that the brief be double-spaced—and, indeed, in your "unopposed" motion for enlargement of the page count for that brief.

Your proposed sur-reply is also unnecessary. Defendants' objections regarding the Reply Brief range from the trivial to the willfully disingenuous. The Court is perfectly capable of making up its own mind regarding the correct legal characterization of your argument that Plaintiffs have lost any claim to personal injury in this case based on events occurring after the Complaint was filed without the need for more briefing.

If you nonetheless insist on moving for a sur-reply, we trust you will include the full extent of the parties' correspondence on your Rule 11 assertions in the interest of ensuring "the court is not misled by any of the representations that appear" in your filing regarding the parties' positions. We would be happy to help you ensure all relevant factual support and legal considerations are included.

***

Your Rule 11 threats are not well taken. Plaintiffs have now spent considerable time addressing specious allegations on what are, by any objective measure, appropriate inferences drawn from a lengthy factual record that the Court is more than capable of assessing; we expect more from experienced counsel. Should Defendants persist in filing a Rule 11 motion that is frivolous both in terms of law and of fact, Plaintiffs will seek recovery of all fees and costs associated with responding to that motion and to Defendants' pre-filing threats. Fed. R. Civ. P.

January 17, 2023
Page 14

11(c)(2); *see also*, *e.g.*, *Claudet v. First Fed. Credit Control, Inc.*, No. 6:14-cv-02068-CEM-DAB, 2015 WL 7984410, at *2-3 (M.D. Fla. Nov. 17, 2015) (awarding fees to non-moving party and rejecting notion that "defense counsel's proclamation of factual conclusions was the coup de grâce"). We do hope this letter puts the matter to rest and do not anticipate having to respond to any additional correspondence on this topic.

Very truly yours,

Ellen V. Leonida

# Exhibit 3

## (The CREW Manual)



**CREW:** A Weeding Manual for Modern Libraries

Revised to include a section on e-books!

(See page 49)

Revised and Updated by:

Jeanette Larson

Texas State Library and Archives Commission
Austin, Texas — 2012



TEXAS STATE
LIBRARY
AND
ARCHIVES
COMMISSION

App 381

This document is available online at: www.tsl.texas.gov/ld/pubs/crew/index.html

# CREW: A Weeding Manual for Modern Libraries

Revised and Updated by:

Jeanette Larson

Texas State Library and Archives Commission
Austin, Texas — 2012

This document is available online at: http://www.tsl.state.tx.us/ld/pubs/crew

App. 382

TEXAS STATE LIBRARY AND ARCHIVES COMMISSION
CATALOGING IN PUBLICATION DATA


Larson, Jeanette.
    CREW : a weeding manual for modern libraries
  / revised and updated by Jeanette Larson.
--Austin, Tex. : Texas State Library and Archives
Commission, 2012.
    Rev.
    p. : ill. ; 28 cm.
    Includes bibliographical references.


    1. Discarding of books, periodicals, etc.  2. Public
libraries--Collection development.  I. Texas State
Library and Archives Commission.  II. Title.

025.216 L329 2012          L1900.8 L329 2012

© Copyright 2012 Texas State Library and Archives Commission



*CREW: A Weeding Manual for Modern Libraries* by the Texas State Library and Archives
Commission is licensed under a Creative Commons Attribution-Noncommercial-No Derivative Works
3.0 United States License.  http://creativecommons.org/licenses/by-nc-nd/3.0/


**Attribution statement:**
*CREW: A Weeding Manual for Modern Libraries  © Copyright 2012 Texas State Library and Archives
Commission*


**Permissions:**
For permissions outside of those granted by this Creative Commons license, please contact the
Texas State Library and Archives Commission, Library Development Division at lsc@tsl.state.tx.us or
512-463-5465.

Comments or complaints regarding the programs and services of the Texas State Library and Archives Commission can
be addressed to the Director and Librarian, P.O. Box 12927, Austin, Texas 78711-2927.
Telephone: 512-463-5460 or Fax: 512-463-5436.  This publication is available in alternate formats upon request.

App. 383

# Table of Contents

INTRODUCTION..............................................................................................7

ACKNOWLEDGEMENTS ...............................................................................9

BEFORE WE START THE PROCESS ...........................................................11

    THE CYCLE OF SERVICE: WHERE CREW FITS IN .................................. 12

WHY WEED?  WHY CREW? ........................................................................ 15

    THE SIX BENEFITS OF WEEDING ........................................................ 15
    HOW MUCH DO I WEED AND WHEN? .................................................. 16
    BEFORE YOU WEED .......................................................................... 17
    CRITERIA FOR WEEDING ................................................................... 18
    WHAT TO WEED: GENERAL GUIDELINES .............................................. 19
    CHECKLIST OF WEEDING FACTORS ..................................................... 20

BEGINNING THE PROCESS ....................................................................... 23

    WEEDING RESPONSIBILITY ................................................................ 23

CREW IN TEN STEPS ................................................................................. 25

CREWING CHILDREN'S MATERIALS ....................................................... 33

    GENERAL GUIDELINES ...................................................................... 33
    OTHER CONSIDERATIONS ................................................................... 35

CREWING THE REFERENCE COLLECTION .............................................. 37

    TYPES OF RESOURCES ...................................................................... 38

CREWING NONPRINT MEDIA .................................................................. 43

    COMMON NONPRINT MATERIALS ....................................................... 44
    LESS COMMON NONPRINT FORMATS .................................................. 47

CREWING E-BOOKS .................................................................................. 49

CREWING WITH COMPUTERS.................................................................. 55

THE CREW GUIDELINES FOR WEEDING YOUR COLLECTION ............. 57

CREW GUIDELINES BY DEWEY CLASS ................................................... 61

    000 (GENERALITIES).......................................................................... 61
    100 (PHILOSOPHY AND PSYCHOLOGY)................................................. 62
    200 (RELIGION AND MYTHOLOGY) ..................................................... 63
    300 (SOCIAL SCIENCES)..................................................................... 64
    400 (LANGUAGE)............................................................................... 68
    500 (NATURAL SCIENCES) .................................................................. 69
    600 (TECHNOLOGY, APPLIED SCIENCES) ............................................. 71
    700 (THE ARTS)................................................................................ 73
    800 (LITERATURE)............................................................................ 75
    900 (HISTORY AND GEOGRAPHY) ....................................................... 76

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 5 of 109*

App. 384

F (Fiction) ................................................................................................ 77
Graphic Novels ....................................................................................... 77
Periodicals (Also Newspapers) ............................................................. 78
Government Documents .......................................................................... 78
Nonprint (Audiovisual) Media .............................................................. 78
Local History .......................................................................................... 80

**CREW GUIDELINES FOR THE CHILDREN'S COLLECTION** ................... **81**
E (Easy Readers/Picture Books) ........................................................... 81
JF (Juvenile Fiction) ............................................................................. 81
YA (Young Adult) Fiction ...................................................................... 82
J and YA Nonfiction ............................................................................... 82

**WHAT TO DO WITH WEEDED BOOKS: TYPES OF DISPOSAL** ................ **83**

**EPILOGUE--ENCOURAGING THE HESITANT WEEDER** ......................... **87**

**BIBLIOGRAPHY** .................................................................................. **91**
Standard Collection Bibliographies ....................................................... 91
Recommended Lists and Best of the Year Lists ..................................... 94
Indexes ................................................................................................... 95
Electronic Databases ............................................................................. 95
Online Resources ................................................................................... 97
Further Readings .................................................................................... 99
Periodicals and Electronic Lists .......................................................... 101

**APPENDIX** ......................................................................................... **103**
Overview Chart of CREW Formulas ..................................................... 105
Disposal Slip Template ......................................................................... 107

"I know no rules for discarding that eliminate possibility of error. We all make mistakes but most of these mistakes I am convinced stand on the shelves."

**Gladys Allison**, *Suggestions on Discarding* (December 1938)

"...Weeding out requires more knowledge, forethought and power of discrimination than is ordinarily brought to bear in the selection of books."

**Thomas Aldred**, *Book Selection and Rejection* (March 1901)

"Next to emptying the outdoor bookdrop on cold and snowy days, weeding is the most undesirable job in the library. It is also one of the most important."

**Will Manley**, "The Manley Arts," *Booklist* (March 1, 1996)

"A good library collection is like a good haircut.  It's not what you cut—it's what you leave."

**Anne Felix**, Grand Prairie (Texas) Public Library System

*CREW: A Weeding Manual for Modern Libraries.*  *www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 5 of 107*

App. 386

# Introduction

For more than 30 years, *The CREW Method* has provided guidance to librarians and staff in small and medium sized public libraries about how to cull outdated and no longer useful materials from their collections. Since its inception in 1976, *The CREW Method* has become the benchmark tool for weeding library collections. It has been more than a decade since the first revised edition brought technology and online catalogs into the process. This new edition, called *CREW: A Weeding Manual for Modern Libraries*, builds on the work of Joseph P. Segal and Belinda Boon. Although much of the basic information remains the same, the impact of changes in technology and its effect on library collections has been taken into consideration. The CREW guidelines by Dewey Class have been expanded even further and updated to reflect current practices. New sections have been added that explain in more detail the MUSTIE factors and types of disposal. The bibliography has been updated to include current editions of standard works, contemporary selections, and expanded online resources.

Although it is written primarily with the needs of small and medium sized public libraries in mind, it has proven to be useful to libraries of all types and sizes. Since the release of the first revised edition in 1995, we have seen many changes in library operations.  Almost universal access to the Internet has affected every aspect of library public service by providing instantaneous access to information sources heretofore unknown. Many standard reference tools and nonfiction works that were available only in print form ten years ago are now available in electronic formats, either through free or fee-based subscription services. *CREW: A Weeding Manual for Modern Libraries* takes this into consideration, as well as changes in selection and withdrawal practices in specific areas such as reference and nonfiction materials.

As with the previous editions, this manual is designed for use primarily by librarians and staff in smaller community libraries and branches of larger systems.  We know that the CREW method is used by librarians in many other states and we beg your indulgence when the manual refers to Texas-specific resources and statewide projects.

While no librarian has enough time, space, or budget to ignore the need to weed, *CREW: A Weeding Manual for Modern Libraries* strives to make the process easier for staff that may have the most difficulty finding ways to keep the collection current and vital. The justification for weeding—to maintain a collection that is vital, relevant, and useful—and the criteria for weeding a library—physical condition, relevance of the subject, currency of the information—remain basically unchanged. However, libraries are experiencing increasing scrutiny from the public and funding sources, and may be required to justify their discard practices in more detail. Access to online library catalogs and direct requests for interlibrary loan may cause some librarians to hold on even more tightly to materials that should be discarded because 'someone' may request the item. The current edition addresses these concerns and incorporates suggestions offered by practicing librarians in public, academic, and school libraries during workshops conducted by the author and from various

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                      *Page 1 of 107*

App. 388

discussion lists. The support and input of these librarians—you know who you are—is greatly appreciated and has served to make *CREW: A Weeding Manual for Modern Libraries* an even richer resource for librarians around the world.

Although it has become easier in many ways for staff in small community libraries to obtain continuing education and training through workshops brought to their area by the Texas State Library & Archives Commission and regional systems, more training is available online and through alternative venues. However, new staff and volunteers are continually entering the profession and there is an ongoing need for information on how to effectively weed the collection. Staff and volunteers also must understand why and how materials that have passed their useful life are removed from the collection. They also should be able to articulate that understanding to others in the community who may view discarding of books as tantamount to 'book burning' or wasting tax dollars.

*CREW: A Weeding Manual for Modern Libraries* attempts to describe clearly, practically, and in a step-by-step fashion a now tried-and-true method of carrying out the five processes of 'reverse selection:' inventory, collection evaluation, collection maintenance, weeding, and discarding. Keep in mind that no single process will serve the needs of all libraries. *CREW: A Weeding Manual for Modern Libraries* offers guidelines, and attempts to explain the reasons behind the guidelines, but every library should consider the needs of their particular community and adjust the guidelines accordingly. For example, if budgets are quite tight and expected to be tight for many years, it may be necessary to lengthen the age factors a bit in favor of removing only books that are in poor condition. CREW continues to caution, however, that lack of funds to replace outdated or worn items is *never* an excuse for not weeding. Any extensive weeding will enhance the value of the collection so librarians are urged to **use professional judgment at all times**. I also welcome questions and feedback about situations that may not appear to be served by CREW and your best practices.

Jeanette Larson
Email: larsonlibrary@yahoo.com
Austin, TX

# Acknowledgements

Much of *CREW: A Weeding Manual for Modern Libraries* is based on the work of Belinda Boon, a former staff member at the Texas State Library & Archives Commission, but more importantly a colleague and friend.

I also wish to extend my sincerest thanks and appreciation to everyone who played a part in the revision process and especially to:

Alice Nixon, South Texas Library System, Corpus Christi, TX

Anne Felix, Grand Prairie Public Library System, Grand Prairie, TX

Diane Harmon, Joliet Public Library, Joliet, IL

Jim Smith, Alabama Public Library Service, Montgomery, AL

John Sandstrom, El Paso Public Library, El Paso, TX

Julie Todaro, Austin Community College, Austin, TX

Laurie Mahaffey, Central Texas Library System, Austin, TX

Lisa McColl, Montgomery County Community College, Blue Bell, PA

Mary Stanton, Houston Public Library, Houston, TX

Michele Gorman, Public Library of Charlotte & Mecklenburg County, NC

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                               *Page 9 of 107*

App. 390

# Before We Start the Process

Library work is an intricate mix of programs, services, and materials. It is important to recognize that weeding is but one part of the collection development process, which in turn is a part of the totality of work that we do to make the library an important part of the community. The library's collection is the most tangible part of any library's service.

The basis of the library's collection, as well as how it is developed and maintained, rests within its mission and the service priorities it has established through a formal or informal planning process. Many libraries use the Public Library Association's (PLA) planning process and, at least to some extent, subscribe to that process's concept of 'service responses.' Although the names of the service responses advanced by PLA were revised in 2007, the concepts behind those labels remain very similar to the older ones that may be more familiar to library staff. Whether the library describes one of its primary service responses as 'Get Facts Fast,' the new label, or the older 'General Information,' the materials in the collection will need to support the services and needs that go into the service priority. A library that strives to provide current reading resources and general information must have a collection that is up-to-date and easy to use.

Good library management principles begin with a planning process and an analysis of the needs of the community being served by the library. Whether you use a process like the Public Library Association's Planning for Results[1] or another planning process, knowing where the library is and where you want it to go is the first step in weeding. Even if you do not have a formal planning process, it is likely that you have some idea of what the community wants from the library and know what you need to do to accomplish that mission. As you make decisions about the budget, look for additional sources of funds (such as grants and gifts), and select material to add to the collection, you must also keep in mind what is already in the collection and, perhaps of equal or greater importance, what needs to be culled from the collection. As good library managers, we have a responsibility to maintain a collection that is free from outdated, obsolete, shabby, or no longer useful items. It's a little like Newton's Third Law of Motion: For every action, there is an equal and opposite reaction. For every item we put on the library shelves, we should at least be considering whether there are items that need to be removed.

Many of us work in libraries because we love books and information. We may need to overcome our own sentiments that hold us back from weeding. "In too many libraries, collection development is actually based on the book as an object. Public libraries should not be in the business of accumulating physical objects. The purpose should be to provide the content that is needed and used by the public."[2]   Even if we

---

[1] *The New Planning for Results,*
http://www.elearnlibraries.com/courses/the_new_planning_for_results/index.html

[2] "Commentary on weeding". Library Administrator's Digest. Feb 1999.  FindArticles.com. 13 May. 2008. http://findarticles.com/p/articles/mi_qa3858/is_199902/ai_n8843523


App. 392

understand that it is the information contained within the book that is important, we may have to address concerns and excuses presented by others who insist that we hold on to every item in the collection.

However, if you look at the place of the collection within the library's mission and how a poorly maintained collection negatively impacts the ability to meet that mission, it should become clear that weeding is an important part of the process. Although they should be broadened to include all types of materials, keep in mind Ranganathan's Five Laws of Library Science[3]:

1. Books are for use.
2. Every reader his book.
3. Every book its reader.
4. Save the time of the reader.
5. A library is a growing organism.

## The Cycle of Service: Where CREW Fits In

Collection development is clearly an important part of library service. It can be easy, however, to view only one or two parts of the process, focusing only on getting materials into the collection or getting them into the hands of our patrons.

The diagram below represents the flow of both direct and indirect library services; it is circular because each process leads to the next and involves ongoing routines, procedures, and practices that continuously add to, remove from, evaluate, and adjust the collection to fit the current and future needs of the library's users and potential users.

**SA** is the **S**election (usually through reading reviews, perusing catalogs, and considering patron requests) and the **A**cquisition (ordering and paying for) of the library's materials.

**CP** is the **C**ataloging (including classification) and **P**rocessing (property stamping, bar coding, entering into the online catalog, etc.) of the same materials.

**CR** is the **C**irculation and **R**eference step, in which the prepared materials are out on the shelves being used both in-house and through borrowing by patrons and the reference staff.

The method called CREW (**C**ontinuous **R**eview, **E**valuation, and **W**eeding) integrates all the processes into one smooth, streamlined, and ongoing routine that assures that *all the necessary indirect services* are accomplished in an effective way. This method makes it easier to routinely remove outdated and unused materials from the collection while also learning where the collection has gaps or needs new items.

---

[3] Ranganathan, Shiyali Ramamrita. *The Five Laws of Library Science*, Asia Pub. House, 1963.



Immediately after entering Circulation and Reference (CR) use, the library materials enter the CREW processes of inventory and maintenance. Every item has a useful life cycle. Often a new item will be very popular at first, circulating frequently in a short period of time. Then the item may sit on the shelf, going out only occasionally. Eventually, in many cases, the item becomes worn, the information becomes outdated or is superseded by new information, or the topic or the treatment of the topic simply is no longer of interest to many users. When, through evaluation and the intentional process of weeding, the librarian discovers that the material's useful life is over, the item is retired by removal from the collection. Meanwhile, CREW is generating information on the current strengths, weaknesses, gaps, and saturation points of the collection that the librarian can use for another round of Selection and Acquisition (SA).

At each step, the library professional uses special knowledge of library science and library materials, as well as information about the particular community being served, to meet the needs and demands of the library's users and potential users. CREW is a vital part of good library service. A library that does not evaluate, weed, or discard is like a cart wheel with a fourth of its rim missing (see illustration above). Is your library having a rough ride on such a broken wheel? CREW to get back on track!

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 13 of 107*

App. 394

# Why Weed?  Why CREW?

Why are these CREW functions so vital for a dynamic, useful community library? Don't many community libraries do just fine without weeding?  Isn't CREW simply a fancy name for throwing away books and impeding a library's growth? Aren't we censoring when we throw out books that someone might want to read? What if we make a mistake?

If you are asking these questions, you are not the first librarian to do so. CREW addresses these concerns and others but let us focus first on the benefits that are derived when you have a well-weeded collection.

## *The Six Benefits of Weeding*

There are six major benefits of weeding the collection.

1.  **YOU SAVE SPACE**. Shelf space costs money in a variety of ways, not the least of which is the actual cost to buy additional shelving to house more and more materials. A well-maintained collection saves the cost of dusting books that no one is using and of shifting materials to make room for more items. Patrons lose patience trying to find items that are crammed onto overcrowded shelves. The library staff will not need to fill the bottom shelves or pile books on top of the stacks, and the library will be more attractive and easier to use. Good practice says that shelves should never be more than 85% full (and 75% is even better). In addition, retaining unused material takes up shelf space that could be used to display recent items. The online catalog uses database space that may precipitate the need for more computer memory. Not having to add more shelving ranges may even allow the library to provide, or retain, space for tables and chairs for in-house study or for additional computers. Weeding allows you to maintain the open, friendly appearance that is the hallmark of a good community library.

2.  **YOU SAVE THE TIME** of patrons, staff, and best of all, yourself. Shelves crowded with ragged books with illegible markings cost time. Patrons looking for a particular book have to sort through items that are clearly not of use or that they don't want to touch. Staff trying to shelve returned items has to shift and reshift books to make space. The librarian trying to use the collection for reference or reader's advisory services must peruse outdated items to find the correct, current information. An excess of citations from the online catalog that lead to outdated or unusable materials slows searching and frustrates users. Library housekeeping, from dusting to shifting sections, is impeded and made more backbreaking by an overload of useless books and other materials.

3.  **YOU MAKE THE COLLECTION MORE APPEALING** by replacing ragged, smudged books and unattractive rebinds with attractive new books. Even perennial favorites and classics benefit from being replaced by clean copies with updated covers. Circulation can be increased by simply making the shelves look more attractive and user-friendly, even if there are actually fewer

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                    *Page 13 of 107*

App. 396

books. It is better to have fresh air and empty space on the shelves than to have musty old books that discourage investigation. Many libraries report that patrons assumed they had purchased a lot of new books when all that was done was to weed vigorously.

4. **YOU WILL ENHANCE YOUR LIBRARY'S REPUTATION** for reliability and currency and build public trust. Patrons expect that library materials are selected by experts and that the information is up-to-date and reliable.  For many users, especially younger people, the mere fact that a book is in the library lends authority to it. A section of astronomy books that include many pre-Hubble space exploration books or books that include Pluto as a planet create a credibility gap of astronomical dimensions! Nothing will discourage a student as much as writing a paper based on research performed with library materials that provided obsolete or erroneous information. The public counts on the library providing accurate information. Patrons quickly decide that the library has 'nothing' of value if they sort through a lot of outdated material.

5. **YOU WILL KEEP UP WITH COLLECTION NEEDS** because the CREW method provides a **CONTINUOUS CHECK** on the need for mending or binding, alerts the library staff to lost or stolen books in need of replacement, and guarantees a more accurate volume count. This process also allows for both on-going weeding, where shabby items, superseded items, or unused items can be removed almost without effort, and scheduled weeding where you look at specific areas of the collection on a regular basis. Library staff that weed continuously have greater knowledge of the collection.

6. **YOU HAVE CONSTANT FEEDBACK ON THE COLLECTION'S STRENGTHS AND WEAKNESSES.** This information can be helpful when soliciting donations and making decisions about purchases. For example, knowing that the business books are out-of-date, the librarian can approach an organized group or an individual and request specific assistance in building an area of special interest and usefulness to them. CREW keeps the present shape of the collection clearly in mind and helps in planning future directions for it. CREW helps the librarian see the cohesion of every task performed in the library and the purpose of every task in relation to the patrons and the collection.

These advantages of weeding, and in particular of using CREW, point out the truth of the old adage: Less is more!

## How Much Do I Weed and When?

The CREW method calls for systematic and continuous weeding of the collection, but what do these terms mean? Staff may think that it is not possible to weed a little bit every day, but in fact with a little practice, that is exactly what we can do. If staff and volunteers are trained to look for shabby and outdated items, these materials can be pulled for review by the appropriate person on a weekly basis. Reports can be generated from the online catalog on a quarterly basis to identify items that are 'shelf

sitters' and haven't circulated within a reasonable period of time. Volunteers can do a lot even if they only spend an hour a week looking for these items, as well as identifying duplicates that may no longer be needed. Monthly targets should be established for looking at specific areas of the collection and *intentionally* weeding a small area.

It's not enough to weed every couple of years or only when space is getting tight. A vital, viable library collection is reviewed on an on-going basis. *Texas Public Library Standards* [4] includes goals for collection age and frequency of weeding the entire collection. Regardless of size, the entire collection should be reviewed and weeded if necessary, at least once every five years.

But how much is enough? Can we weed too much? That is a question that has to be answered locally. In general, you should weed about the same amount as you are adding to the collection unless you are in a developing mode, such as when a library first opens or has expanded. Your available shelf space establishes the upper parameter of the collection size and every item in the collection should be useful to the community being served. Once the collection has matured, it will remain fairly stable until something changes—such as adding on to the building.

A rule of thumb held by many library professionals is that about 5% of the collection be weeded every year.[5] This allows for turnover of the collection every twenty years. While this doesn't literally mean that no book that exists in the collection in the year 2000 will still be there in 2020, even classic literature and perennially useful materials will generally become worn and tattered after twenty years of use and need to be replaced with a fresh copy. More important than raw numbers, however, is the librarian's commitment to making weeding part of the regular duties and responsibilities that are addressed every week.

## Before You Weed

Materials selection and deselection are similar activities. First, they are both necessary parts in an effective collection development program; and second, both require the same type of decision-making criteria. The same factors that lead to the decision to add an item can also lead to a decision to remove that item sometime later.

Before implementing any kind of weeding plan, carefully evaluate the library's collection development policy and goals for the collection. If you don't have a collection development policy or it is outdated and has not been reviewed in recent memory, now is the time to rectify that situation. Goals are based on the roles that the library plays in the community and the service responses or priorities that have been selected for the library. Although the mission of the library may remain constant over a long period, the goals may change from time to time. The mission, goals, and

---

[4] Texas Library Association. *Texas Public Library Standards*, 2004. http://www.tsl.state.tx.us/plstandards/

[5] Slote, Stanley J. *Weeding Library Collections*. Libraries Unlimited, 1997. p. 14.


App. 398

selection policy help to determine the weeding policy. With these factors in mind, a collection-centered evaluation will give a better idea of what the collection consists of and identify specific classes of materials that offer likely candidates for weeding.

The collection development policy (also sometimes called the materials selection policy) should provide criteria to follow for depth, coverage, and selection of the overall collection. The scope of the policy should be broad enough to include all of the materials in the collection and may include subsections, such as reference, nonprint, juvenile, large print, and adult. The policy should specify how gifts will be handled and indicate when and how to retire outdated materials. It should also list appropriate means of disposal. When developing or revising a collection development policy, keep in mind that the individual needs of the library and its users must be considered in making all policy decisions. While it is appropriate to review collection development policies developed for other libraries, it is not acceptable to simply adopt another library's policy as your own. A quick Internet search will provide many examples and books, including *The Public Library Policy Writer: a Guidebook with Model Policies on CD-ROM* by Jeanette Larson and Herman L. Totten, offer assistance in the development of a collection development policy.

## Criteria for Weeding

Several factors must be considered during the weeding process. These factors include:

- The library's selected service responses and resultant goals
- The needs and demands of the library's community of users
- The availability of more suitable material
- The ability of the budget to provide funds to purchase more satisfactory items
- The relationship of a particular item to others on that subject
- Cooperative agreements with other libraries and the ability for patrons to use other libraries in the area
- The degree to which the library serves as an archive or local history center
- The possible future usefulness of a particular item
- The availability of more current information on the Internet
- The ability of the library to borrow the item through interlibrary loan

During the weeding process, you may also wish to check the library's holdings against any centralized databases (union catalogs) to which the library belongs. It may be easier to weed titles that are not circulating if they can be easily obtained from another library through interlibrary loan. Also, consult standard bibliographic aids when evaluating the quality of a particular item if you are uncertain about its value to your collection. See the Bibliography for a list of standard collection aids, as well as subject specific guides that may help you make decisions.

## *What to Weed: General Guidelines*

More detail will be offered about weeding specific areas of the collection, types of materials, and Dewey areas later in this manual, but some general guidelines pertain to the entire collection. Some criteria are objective, but most include some degree of subjectivity that will require the professional knowledge of the librarian in making the final decision about a particular item. Keep in mind that these criteria can be used as a 'rule of thumb,' but for some criteria, recent use may be an important factor in deciding to retain an item that you might otherwise remove from the collection. If the item is outdated or contains erroneous information, weed the item and replace it with a newer title on the same subject.

For all items, consider the following problem categories and related issues:

### *Poor Content:*

- **Outdated and obsolete information** (especially on subjects that change quickly or require absolute currency, such as computers, law, science, space, health and medicine, technology, travel)
- **Trivial subject matter**, including topics that are no longer of interest or that were dealt with superficially due to their popularity at a specific point in time, as well as titles related to outdated popular culture
- **Mediocre writing style**, especially material that was written quickly to meet popular interest that has passed
- **Inaccurate or false information**, including outdated information and sources that have been superseded by new titles or editions
- **Unused sets of books** (although you may keep specific volumes if they meet local needs and are used)
- **Repetitious series**, especially series that are no longer popular or that were published to meet a popular demand that no longer exists
- **Superseded editions** (in general, it is unnecessary to keep more than one previous edition, discarding as new editions are added)
- **Resources that are not on standard lists** or that were never reviewed in standard review sources
- **Material that contains biased, racist, or sexist terminology or views**
- **Unneeded duplicates**, especially if they are worn or tattered
- **Self-published or small press materials that are not circulating**, especially if they were added as gifts

### *Materials/Books of Poor Appearance:*

- **Worn out, ragged items**
- **Poorly bound or poorly printed editions**
- **Rebound editions that are worn** and shabby or have torn pages


App. 400

- **Items that are dirty**, shabby, warped, bug infested, or otherwise marked up, mutilated, or 'edited' by patrons
- **Books with very small print or poor quality pictures**
- **Scratched CDs or DVDs**, brittle film or magnetic tape (in the case of video and audiocassettes)
- **Media that is beaten up** from wear or has broken or missing parts
- **Books with yellowed, brittle, torn, taped, or missing pages**
- **Books with dust jackets or cover art that is dated**, especially on children's and young adult books

***Unused Materials:***

- **Items that have not circulated within the past 3-5 years** and not actually used for reference or in-house research
- **Duplicate copies** that are no longer needed, regardless of condition
- **Periodicals that are not indexed**
- **Periodicals that are available** in full-text databases
- **Unused volumes** in sets or series
- **Unneeded titles** in subject areas that are less frequently used
- **Materials on the 'hot topics' that were popular more than five years ago**
- **More books than are needed** on any single subject
- **Formats that are no longer popular** in your community, especially if the technology needed to use the format is no longer owned by people in the community
- **Material that is no longer important** to the collection because of changes in local demographics, school curricula, or other factors

## *Checklist of Weeding Factors*

For all materials, consider:

- **Date**—when was the item published? When was it added to the collection?
- **Author**—is the author still read or likely to be read in the future? Is the book a lesser work?
- **Publisher**—was the book self-published or published by an 'instant' press that may not have taken care in editing and printing?
- **Physical condition**—are there any factors that make the item unattractive?
- **Additional copies**—are more copies available that may be in better condition?
- **Other books on the same subject in the collection**—if this book is discarded, what else is available?

- **Expense of replacement**—can the item be replaced? Was this an expensive item that might benefit from rebinding or refurbishing rather than replacement?
- **Shelf-time**—how long has the item sat on the shelf without circulating?
- **Relevance of the subject to the community**—is the material of interest to anyone in the community?

### *For juvenile and young adult materials, also consider:*

- **Format**—paperbacks are preferred by many young adults; board books get a lot of wear in tiny hands.
- **Reading level**—is the level too high or too easy for young patrons who would be interested in the item?
- **Current interest in the subject matter**—are young people interested in the subject? Is the treatment of the subject engaging?
- **Visual appeal**—are the illustrations in color? Are photographs clear? Is the layout of the book open (white space) and inviting?
- **Jacket art (contemporary vs. outmoded)**—does the book look like something your great-grandmother read?
- **Use in school curricula**—are books available for the grade level where the subject is studied? Are teachers assigning specific titles?

### *For periodicals, consider:*

- **Current use**—few periodicals are used five years after the publication date
- **Interest in circulating older issues**—does the library permit older issues to be borrowed? Does the community want to borrow older issues?
- **Indexing available**—is the periodical included in standard indexes?
- **Full-text availability in online databases**—will patrons find the articles needed for research in the library's online databases?
- **Space available**—does the library have space to store older issues that are not used on a regular basis?

Retain local history except when the item is shabby and beyond repair. Retain writings by local authors during their lifetime and materials with local settings unless they have not circulated within the previous five years (or if a major milestone celebration is coming up that would allow for these items to be put in the spotlight).

Sets and series often have one or two volumes of special merit or that are regularly used even when other volumes are not. Retain these volumes even though the rest of the set is discarded. Some older reference volumes, such as quotation books, should be kept unless they are in poor condition, because later editions augment rather than supersede prior editions.

It is a good idea to include in the selection policy a list of items that should not be weeded without careful consideration and deliberation (e.g., genealogy, local authors,

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 2 of 107*


App. 402

Caldecott and Newbery Book Award prize winners, etc.). Except in very special situations, usually related more to public relations than to collection development, there are very few books or other items that should be retained if not used by library patrons.

If you can't bear to let go of a beautiful book that is in good condition, consider whether it is classified properly.  Browsers might be missing an item because it is in the wrong Dewey area.  Perhaps the subject headings are not correct so it is not being found during catalog searches. It is perfectly acceptable to recatalog a book to make it more accessible to patrons.

Remember that **guidelines are not intended to act as a substitute for professional judgment calls and common sense**. For example, a sixty-year-old National Book Award Prize winner that has not circulated in more than ten years is simply taking up valuable space and should be discarded even though the library policy may encourage the retention of books that have won awards. (It will be available through ILL if someone wants it, or it will be released in a new paperback edition if Oprah or some other book club discovers it or it is made into a movie.)

# Beginning the Process

It is by far easier to add materials to the collection than to withdraw them. Every librarian can imagine a potential use for the items selected for inclusion; otherwise we wouldn't buy them. Because we can imagine users, even potential ones, it can be difficult to discard an item that is outdated or hasn't been used in recent memory.

Even though they may recognize the necessity for weeding, many librarians are uneasy about actually doing it because the weeding process seems unstructured, subjective, and even a little arbitrary—all factors which cause them to procrastinate indefinitely or to weed sporadically or indecisively. It is, of course, also difficult to find time to do everything we need to do in a day; therefore, it is easy to put off weeding while we focus on adding materials to the collection, sorting through gifts, or helping patrons find materials. To help structure the weeding process, and to help librarians and library staff feel more confident doing it, the process can be broken down into manageable steps.

The actual methodology of CREW is intentionally simple. The original procedures established in the first edition have been streamlined through field tests and careful discussions of actual situations in real community libraries. Top priority in a community library is appropriately focused on direct service with a human touch. To cut the time and effort required for indirect services, such as weeding, the CREW method has been streamlined into ten steps, in four time groups, with allowance for stopping this work to attend to patrons and administrative tasks. As you will see, the first step need only be done once, at the beginning of the process (although all library policies are subject to revision when necessary); the other nine steps form an ongoing process that may be continued forever.

## *Weeding Responsibility*

One frequently asked question is: Should weeding be done only by the head librarian, or may it properly be delegated to other staff?  A good rule of thumb is if staff is not taking part in selection of materials - then they should not make a final weeding decision. The primary responsibility in any library must be the purview of staff members who can consider the collection and the library needs from both a broad and long-range perspective. These staff members have developed expertise through many regularly scheduled hours working with and thinking about the collection; they are committed to the principles of library management in accordance with the collection development policy and goals of the library.  Rules can be used to help cull materials for consideration, but effective weeding requires using good professional judgment. For example, the rule may state that all children's picture books that have not circulated at least once in the past year will be considered for weeding. However, the children's librarian must still evaluate those books to ensure that materials used for storytimes or in-house programs are not unintentionally withdrawn from the collection.

The librarian should never delegate the weeding *evaluation* function to a volunteer, although volunteers may certainly pull worn and damaged books to be considered for



weeding. It may also be helpful to develop guidelines for volunteers and support staff to follow while shelving so they may pull potential weeds from the shelving cart. In addition to checking publication and circulation dates, volunteers and clerical staff may also pull from the stacks (1) any book with a copy number greater than two, if more than two copies are on the shelf; (2) any book superseded by more than one later edition—again, only if the later editions are on the shelf; and (3) any books in ragged or poor condition that may be candidates for mending, binding, or withdrawal. Several librarians have, in fact, suggested that volunteers and aides can help by pulling books based on a technical processing factor that provides a date for the book. For example, if the library switched from using Cutter numbers[6] using the first three letters of the author's name on spine labels in 1999, you can ask a volunteer or aide to pull all books that still have Cutter numbers on the spine label. The type of barcode used or the shape of the barcode may also indicate books that were in the collection as of a specific year. The items will still need to be reviewed by the librarian before a final decision is made, but quickly identifying books that are ten years old is a big help.

The librarian may also wish to recruit the talents of local experts for particular subject areas (e.g., high school English teachers or college instructors can evaluate the literature section, while area math and science teachers can assess the value of items in those parts of the collection) or languages (e.g., a Spanish-language instructor can help you assess the quality of translations or the relevancy of the Spanish to your community's readers). Be sure to orient these local experts about the library's mission before they start. Small and medium-sized public libraries are *not* research libraries that need to retain material for historical research.

Team weeding, where several librarians from one area join forces to cull each other's collections, is also an effective method of separating the wheat from the chaff in library holdings. Similar to the old-fashioned barn raising, this can be an invigorating and quick way to weed where many hands (and minds) make the work go faster. In each case, the final weeding decision is left to the professional judgment of the resident librarian.

---

[6] A Cutter number is an alphanumeric method for representing the author's name by using one or more letters from the last name followed by one or more numerals that also represent part of the author's name. This combination of letters and numbers follows the Dewey Decimal classification number to achieve alpha-numeric organization of materials. The numbers come from a table developed by Charles Cutter. Because of the extra step needed in processing, many public libraries have dropped this system in favor of simply using the first three letters of the author's last name.

## CREW in Ten Steps

### Step One

*Make weeding a part of policy.* Policies define actions and decisions. They also help staff deal with issues that will arise during the course of doing business. Policies are best discussed and set in place before problems occur. A weeding policy should be part of the standard policies for every public library. All policies should be approved by the library's board (whether it is a governing board or advisory board) and by the library's governing authority (if that authority is not a governing board). The approval of a written weeding and discarding policy is a powerful and necessary defense against possible controversy. If a selection policy (a highly recommended item) already exists, the weeding policy could form an amendment or appendix to it or it may be written as a separate policy statement. Policy development also allows for discussion of issues related to weeding library materials.

Check for legal regulations that may impact how discarded materials are handled. Some town charters or city codes contain rules about disposal of public property, including library materials. If a selection policy does not already exist, take the time to develop one and have it approved by the library board, city council, or other governing body. See Bibliography – Further Readings for books on issues related to the development of these policies, and many examples are also available online. While a policy from another library may serve as a model or template for your library's policy, you must still carefully consider the issues and develop a policy to meet your library's needs and fit your community.

As part of the materials selection policy, a gift policy should be established that allows the library director to accept, decline, and dispose of gift books and other items according to the collection development needs of the library. In addition to helping the library make decisions about which donated items to add to the collection, a good gift policy stipulates that items received as gifts are subject to the same decisions as items purchased with library funds. This avoids hard feelings when a donated book is later weeded.

Library staff is not usually qualified to appraise items and should not set values for tax purposes. A sentence stating that the library will not make any attempt to appraise values of donated materials for tax purposes may also be included in the gift policy. For guidance, refer patrons to the Internal Revenue Service (IRS) Publication 561, *Determining the Value of Donated Property*, http://www.irs.ustreas.gov/pub/irs-pdf/p561.pdf and also the online guide from the ACRL Rare Books and Manuscripts Section of the American Library Association, *Your Old Books*, http://www.rbms.info/yob.shtml which lists resources for the evaluation and appraisal of books, questions and answers on what makes a book rare, and suggested organizations that welcome book donations.

The Fair Market Value (FMV) of an item may be taken as a tax deduction, but it is up to the donor to establish that value. An old book is not necessarily a valuable book, and if it were a valuable, rare book, it probably doesn't belong in the library

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                          *Page 23 of 107*



collection. IRS rules now also stipulate that household goods must be 'in good used condition or better' in order to take a deduction. Therefore, some libraries now decline to accept, or at least to give a receipt for, old moldy books that will most likely be immediately discarded.

Following are sample statements that can be added to the library's selection policy regarding acceptance of gift books and weeding:

---

WEEDING: Materials that no longer meet the stated objectives of the library (including items that have become damaged or obsolete) will be systematically withdrawn according to the accepted professional practices described in the publication, *CREW: A Weeding Manual for Modern Libraries*. Disposal of withdrawn library materials will be at the discretion of the library director, subject to all relevant provisions of the Charter of the Town of _____ and the statutes of the State of Texas.

---

DONATIONS: The _____ Library is pleased to accept gifts and/or memorial gifts from patrons. Gifts are gratefully and willingly accepted as long as no restriction is placed upon their use and disposition. Acceptance of gifts (of books and other library materials) will be determined by the library director on the basis of their suitability to the library's purposes and needs in accordance with the library's stated materials selection policy. Use of all gift materials will be determined by the library director or a designated agent. The library has the right to discard any gifts that are in poor physical condition (e.g. brittle paper, water or mildew damage, torn and/or missing pages). Values will not be placed on donated items for income tax purposes but receipts will be provided for items in good or better condition.

---

### *Step Two*

*Gather usage statistics of your library's collection.*  Reports allow you to analyze and document areas of greatest usage and most need. This can be very helpful when setting budgets or looking for grant funds. If you know that the books on health and fitness circulate an average of four times per year, you know that you will need to update and replace titles more frequently than you will for another area with materials that only circulate an average of once a year.

Your circulation statistics should break down borrowing usage by classification of topic areas as well as by types and levels of materials. For example, you should be able to run a report that tells you which juvenile fiction books have not circulated in the past year. Many circulation systems also allow you to limit your query to only books that have been added to the collection prior to a certain date so that you don't generate a list of new books that have not had time to circulate. If you are not sure what reports are available from your integrated library system (ILS), check with the vendor. You may be surprised at the depth and breadth of information that is readily available to you.

Statistics on reference collection use and data on types of questions being asked in your community should also be kept on an ongoing basis or gathered through regular sampling. It is also good practice to regularly sample in-house use of materials to gather data on items that may never be checked out, although they are used in the library.

### Step Three

_Build weeding into the year's work calendar_. Set priorities and schedule the time when you will weed the collection. Those specific areas of the collection that are most in need of weeding or those that will be handled for a specific reason, such as barcoding or relocating, should be weeded first.

In a perfect world, one CREWing of an entire collection would take approximately a year, although the first, most thorough CREWing may well take longer, especially if the collection is older and has not been weeded in years. That does not mean that you physically handle every book in that year, but some thought is given to each area and, at the very least, older, worn books are removed. Some standards, including _Texas Public Library Standards_, 2004, recommend a thorough weeding every three to five years.

Allow plenty of time for the CREWing. If done in a careful manner, weeding can be a slow process requiring thought and judgment. If there is a peak season for one type of book (e.g., the 500's are heavily used just before the school science fair is held), schedule that section well before or well after that time to make the inventory more accurate. While it would be ideal to do the weeding during slack hours and slow seasons when there will be minimal distractions, in reality, few libraries experience these times. The librarian who is waiting for a slow period to weed will be waiting a very long time. Setting aside specific times to weed makes it part of your routine. Scheduling tasks also allows you to use volunteers and aides to help.

### Step Four

_Gather the following materials on a book truck at the shelves to be analyzed_:

- A computer printout of the section being reviewed
- A blank note pad and sticky notes (like Post-It Notes™)
- A pen and/or colored pencils
- A shelf marker
- This manual (or a copy of the _Overview Chart of CREW Formulas_ found in Appendix)
- An empty book cart
- Supply of disposal slips (see Appendix)

Ideally, before working on a specific section, shelves should be read to ensure proper item order. You may also want to schedule volunteers to cull shabby books and extra multiple copies. This will make the process easier and more accurate and reduce the urge to reshelve misplaced items or get distracted from weeding.

_CREW: A Weeding Manual for Modern Libraries._ _www.tsl.state.tx.us/ld/pubs/crew/index.html_
_Texas State Library and Archives Commission_                                          _Page 21 of 107_

 App. 408

### Step Five

_Study the area you will be weeding as a whole_.  Examine each item in turn, checking for physical condition, last circulation date, copyright date, and appropriateness for your collection. Allow time for breaks to stay alert. Do not do so much at one time that you lose concentration and good judgment. Refer to the CREW Guidelines by Dewey Class in this manual, to learn general subject considerations.  Do feel free to alter the formulas to fit your particular needs, using your experience and knowledge of your community. Take the time to record any guideline alterations in the margins of this manual to maintain local consistency.

If you are uncertain about your decision, check the library's holdings, any union catalogs to which the library belongs, and bibliographic aids (see Bibliography). Remember that some subjects are classified in other Dewey areas. If you are undecided about a marginal title, also check the holdings of other branches or nearby libraries. If it is readily available elsewhere, you can feel more secure about your decision to discard it.

Place a Post-it Note™ on those books needing attention or discard (marking the category of handling needed), and reshelve the books that are fine 'as is.' If you stop the work temporarily, mark the stopping point with the shelf marker and mark the last entry on the printout. As a double check, you may want to note the call number of the last book on your pad. You may also wish to make notes as you proceed for displays, booklists, or locally prepared indexes (e.g., an index to short story anthologies owned by the library).

### Step Six

_Inventory the library's holdings_. While you are weeding, you may also choose to take inventory. When examining a book for weeding, make a check mark with a colored pencil on the verso of its title page or in any consistent spot unlikely to be noticed and erased by patrons (for example, the upper right hand corner of the title page). Make a corresponding mark on the printout for that book next to the barcode number for that copy or in a column you have added for this purpose (see CREWing with Computers for additional information).

Do not consider books that are not physically on hand, unless you have included loaned items in your print out (in which case the books that are on loan, but not overdue, can be inventoried with other titles in the area on which you are working). If a book is not on loan and is not on the shelf, highlight that item for further searching at a later time. If the item is not checked out and cannot be located within a reasonable period of time, consider it to be lost or stolen and withdraw it from the collection.

In all other cases, mark all books returned after you have weeded an area, or that are located at a later time, that lack the appropriate inventory check on their title page versos and their printout entries prior to placing them back on the open shelf. Any book still unchecked on the printout six months after that area has been inventoried may safely be presumed lost or stolen, unless you know it to be at the bindery or long

overdue and in the process of being retrieved. To ensure an accurate collection count, mark these books 'missing' and delete the entry from the online catalog.

### Step Seven

_Check the pulled books against any standard indexes and bibliographic resources in the library's reference collection or in databases available to patrons_.  If you are unsure about discarding a book or replacing it if shabby, this process will alert you to an item that might be used a lot by the reference staff.  If paper indexes owned by the library, like _Short Story Index_, will continually be directing patrons and staff to the book you are considering discarding, its inclusion in the index might suggest exemption from the general rules of weeding. If the book is physically worn, then replacement, repair, or a change to non-circulating status may be warranted.

Check online databases to see if the title you are considering for discard is indexed there. Especially for poetry and literary criticism, works that are available online in full-text may make it easier to discard a book. However, keep in mind that even though some databases include full-text entries for poetry, short stories, etc., patrons may still want to borrow print copies of indexed material to browse and use at home. Even if the library subscribes to the electronic version of _Short Story Index_ and the retrospective index, which includes full-text for more than 4,000 stories, consider keeping the collections that contain the original text unless the book is in such poor condition that it cannot be saved or is of minimal interest to your community.

Volunteers, interns, and clerical staff can help with this part of the weeding process. If the title is not in the index or bibliographic aid then it can continue through the discard process. If the title is included, then the librarian or a designated staff person would need to make the final decision.

In addition, standard indexes will often include lists of possible new titles to purchase.  Often, these lists are available at the website of the index's publisher. For example, H.W. Wilson lists the dozen or so titles selected for inclusion in the January 2008 update of _Short Story Index_.

### Step Eight



_Disposal Slip_
Book Title or Call Number:_____

| | |
|---|---|
| ☐ Bindery | ☐ Discard |
| ☐ Mend/Preserve | ☐ Book Sale |
| ☐ Promote | ☐ Replacement/New Edition |
| ☐ Donate to: _____ | |
| ☐ Sent To: _____ | |
| ☐ Check Database for other locations of this title: _____ | |

Other locations of this title:_____
Title to replace this volume: _____
Authorizing Agent:_____

_Treat the books according to their slips_.

_CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html_
_Texas State Library and Archives Commission_                                    _Page 29 of 107_

App. 410

1. **Bindery:** Prepare bindery forms for books needing binding and store them for periodic bindery pickup or mailout. We'll discuss binding later, but in general, use this option very sparingly.

2. **Mending:** Do the required mending or put the books aside for a clerk or volunteer to mend. Be conservative about mending. If mending takes more than about 10 minutes, consider replacing the item with a newer copy. Be careful about mending outdated items. While a new Mylar jacket can give new life to a shabby cover, no one wants to read a book that is filled with tape and glue.

3. **Discard:** Process the discards by removing or marking through all labels or stamps identifying the library; removing copy information from the online catalog; and, tearing off book pockets, old circulation cards and barcodes, stamping an appropriate designation such as 'discard,' 'withdrawn' or 'obsolete' on the inside of the front and back covers. Put the discards aside for the booksale, store them for an annual sale or donation to another library, or box them for garbage pickup or the pulp dealer. Remember to remove or cover any barcodes or identifying marks before disposing of any materials to prevent their being returned to the library by misguided but goodhearted souls who, for instance, may have bought them at a garage sale.

4. **Replacement:** Place aside for careful consideration each book needing replacement by a new copy, new edition, or better title on the same subject.

5. **Recycling:** The library should already be a scheduled stop on any recycling pickup program for newspapers, periodicals, and other recyclable materials. If recycling a much larger amount of material than usual, let the service know ahead of time so they can plan for the extra room needed in their pickup vehicle. Use volunteers to process any items that need to have covers removed, plastic coils stripped off, etc., before recycling. Keep in mind that books may not be accepted by local recyclers unless the covers are removed. You may need to arrange for a specialty company to pick them up. Also consider recycling by allowing patrons to scavenge discards that would otherwise be placed in the trash. (See also, What to do with Weeded Books: Types of Disposal.)

### Step Nine

*Replacement checking and ordering*. At the conclusion of your work in a specific area, select and order replacements. Compare the weeded books that were set aside for replacement with titles in recent editions of collection bibliographies and indexes for possible newer titles.

Further, if the library's collection does not contain any recommended titles in a specific area, consider using collection bibliographies to locate appropriate recommended titles, unless there is little demand for that particular subject. Standard collection bibliographies, recommended lists, indexes, databases and further readings are provided at the end of this manual.

It may also be helpful to consult lists of award-winning books such as Pulitzer Prize Books, National Book Awards, Best Books for Young Adults (ALA), Notable Books (ALA), Newbery and Caldecott award winners and honor books, Bluebonnet and Lone Star reading lists (Texas Library Association awards), and Coretta Scott King Award winners, as well as bibliographies in *Library Journal*, *School Library Journal*, and *Booklist*. For children's and young adult books, as well as classics, consult local school and college reading lists. Also consider media attention, such as Oprah's Book Club picks, for titles that may enjoy a resurgence of interest for a period of time.

Check reviews of new books for the last year. Many review sources, such as *Booklist*, can be accessed in full-text through TexShare databases.[7]  *Books in Print* lists replacement or supplementary titles and new editions. Pencil in a star or some other symbol on the flyleaf of each book slated for replacement before reshelving it and mark 'TBR' (To Be Replaced) on the computer printout. This step will alert you to pull the book when the replacement comes in. Prepare the orders for the replacements with the note, 'Repl. (call number)' as another signal to pull the older book when the new copy is received.

### Step Ten

*Set up displays for low circulating, high quality books that would benefit from exposure*. Plan the displays to be colorful and relevant to current community concerns and interests or simply to provide an attractive and enticing display. If the book still does not circulate while on display, consider it as a candidate for trade or donation with another library or for discard due to lack of interest.  Try placing displays in unexpected locations, such as near the checkout desk, where patrons might be tempted to take an extra book out or pick up a book for their child.

If done routinely every day, or even every week, this review of the collection will expand your knowledge of the library's holdings, give you a pool of possible reference sources, and prepare you for informed selection of new materials on the basis of actual usage and the real strengths and weaknesses of the collection. You may even want to coordinate selection of new science books to coincide with CREWing of the 500's. In this way, the relationship between the present collection, its use, and future directions will be strong and direct. Selection by subject grouping also makes it easier to evenly allocate purchases for each area of major demand, as opposed to random selection based on casually scanning issues of journals that carry reviews of books and nonprint materials.

---

[7] EBSCO Academic Search Complete and MasterFILE Premier – *Booklist* Full-text; 1/1/2002 to present with a 14-day delay.

*CREW: A Weeding Manual for Modern Libraries.*  www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*                                                          *Page 3 of 107*

App. 412

# CREWing Children's Materials

Juvenile collections are as different from adult collections as children are from adults, and require different considerations for selection and deselection. To begin with, children as patrons often require an adult 'go-between' to find what they need for research and pleasure reading. A child browsing through the nonfiction collection may be completely lost unless he or she has been shown, and understands, how to find the materials needed. Children are even less likely than their adult counterparts to note the publication date and double check facts against other sources. They are particularly susceptible to outdated or inaccurate information since they do not always have the knowledge base to distinguish it, assuming that if it's in the library, it must be both true and current. This alone makes it critical to regularly weed outdated material from the collection regardless of how recently it last circulated. Parents often pick up everything on a topic for their child to use at home and children will take a book without considering that the information may be outdated and erroneous.

Inexperienced users of the juvenile collections can be easily misled and adult criteria cannot be applied in all cases. For example, an item may have been on the shelf for well over a year, completely ignored and unused, but if a skilled librarian matches the book to the right child, it becomes both useful and valuable to the collection. This is what makes individual guidance, use in story times, displays, and book talks so important for making materials accessible: they are what cause seemingly 'dead' collections to spring to life. Many books in the children's collection continue to be popular for decades but need to be replaced because of wear and tear.

The basic guidelines of weeding can be applied to both adult and juvenile collections. Naturally, the person who selects the materials should be the person overseeing the culling of the collection and making the final weeding decisions. As in adult collections, a weeding process that strengthens the entire collection, both in appearance and content, requires the judgment of a person who knows children's literature, as well as the audience the collection serves. The review of the collection should be **continuous**, with one full cycle ideally completed annually. In evaluating the collection, standard lists and review sources should be consulted.

## General Guidelines

### Juvenile Fiction

Be ruthless in weeding juvenile fiction. While many titles are used for class reading assignments, most fiction is leisure reading. Popular interest is the primary criteria for this section. Weed duplicate copies of past bestsellers if interest has waned, beginning by discarding the most worn copies.

Consider discarding older fiction especially when it has not circulated in the past two or three years. Also look for books that contain stereotyping, including stereotypical images and views of people with disabilities and the elderly, or gender and racial biases.

*CREW: A Weeding Manual for Modern Libraries.*  *www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                                    *Page 33 of 107*

App. 414

Replace worn editions of classics and award winners only if they are still in demand and can be replaced with attractive new editions. Unless your library serves a school of education or a library school, there may be little or no demand for decades-old award winners. Discard fiction books with drab, coarse, or heavy bindings that have dull covers, especially re-binds that replaced jackets with plain or patterned covers; they will not 'sell' to young readers. Purchase library editions sparingly; the bindings may last well beyond interest in the book.

### Young Adult Fiction

Paperbacks are often the preferred reading format for teens. This section is almost entirely leisure reading and should be kept as current as possible. Anything older than five years should be kept only if it is circulating well; classics should be replaced with newer hardback or paperback editions.

### Picture Books

Picture books receive heavy use and often are discarded due to poor condition, especially smudged or dirty pages. The content should be evaluated on the merit of the stories and illustrations. Given the wide range of possibilities to choose from in today's children's literature market, there is no reason this section should be anything less than the highest quality items, although it may also include lesser quality books of temporary popularity. Books of ephemeral interest, including those that feature trademarked characters and characters from television shows, should be withdrawn as soon as the popularity wanes. Be wary of donated books with weak bindings that do not stand up to constant use and abuse. Board books and books with moveable parts will need to be replaced more frequently, the former because they are chewed on and become soiled, the latter because the flaps, folds, and pop-ups wear out and tear.

Replace worn copies of classics and perennial favorites. Remember that parents and caregivers will visit the library, lists in hand, to find books for their children. If they don't find something after checking five or six titles, they will assume that the library has 'nothing to offer.' Purchase multiple copies of very popular books and standard titles. Use resources like the New York Public Library's "100 Picture Books Everyone Should Know," http://kids.nypl.org/reading/recommended2.cfm?ListID=61 for guidance.

### Nonfiction

This is the area where many collections face the most difficulty. The misguided belief that 'anything is better than nothing' has perpetuated the retention of many outdated and inaccurate nonfiction items, often to the detriment of the child. At best, providing a student with information that is no longer current can result in a lower grade on an assignment. Outdated information also provides a warped and inaccurate view of the subject and results in a lowered regard for the expertise of the librarian. Parents, teachers, and children will then question the validity of the collection. It is better to lack enough information on a topic than to have erroneous information. In fact, the

need for more current titles on a particular topic can be a powerful leverage tool to make the case for more funding. Use the same general criteria for each area that is provided in the *CREW Guidelines by Dewey Class*, being especially attentive to weeding material that has not been used in several years or has been superseded by new editions.

## Other Considerations

**Simplified Classics** also known as 'abridgements,' should be evaluated carefully. Although some may be useful for reluctant readers or adult beginning readers, they are often hackneyed, drab, and lifeless. Some exceptions include a few retellings of classics, like *Shakespeare's Stories* and Eric Kimmel's *The Hero Beowulf*, have received high praise and retain the spirit of the original while simplifying the text. If in doubt, check standard review sources, keeping only titles that were positively reviewed. Replace other titles with new hardcover or paperback editions of the full text.

**Series Books** may be well written and of high quality or be poorly written and without literary merit. Kids read series books for pleasure and, with guidance, often move on to better quality series and single titles. Replace low-quality series with newer editions of series favorites like the Hardy Boys, Nancy Drew, Chet Gecko, the Magic Treehouse and Junie B. Jones.

Be aware of whether the books are a series or if books are sequels or prequels to other titles. Replace missing titles in popular series if titles don't stand alone. Check resources like Mid-Continent Public Library's Juvenile Series and Sequels website, http://www.mcpl.lib.mo.us/readers/series/juv/title.cfm. Remember also that there can be series in most genres, including beginning readers and nonfiction.

**Older Titles** with shabby bindings, outdated illustrations, or torn pages should be discarded. Replace award books, such as Newbery or Caldecott, with newer editions if the books are still being read. Discard nondescript titles that were popular fifteen or so years ago in favor of newer titles with updated illustrations addressing contemporary issues.

**Older Editions** printed on thin paper with fine print or unattractive illustrations should be discarded in favor of newer titles. Old, worn classics should be replaced with new hardback or bright, attractive paperback editions. Be especially careful about keeping older titles for sentimental reasons, "But I loved that book as a child!" If children today are not reading the book, either bring it to their attention through book talks and displays or discard it.

**Geography** titles more than five years old are misleading and inaccurate and should be pulled. The older the title, the more inaccurate the content will be. Imagine how useless a title published before either of the World Wars

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                    *Page 33 of 107*

App. 416

is to a student today working on a research paper topic from the 20th century!  Although they may be interesting from an historical point of view, books on countries and states are of no value for contemporary social studies projects.

**Science, Medicine, Inventions** and other topics that change rapidly should be reviewed and updated every five years. Items more than ten years old should almost always be discarded. As in the adult collection, erroneous information about science, technology or medicine is potentially harmful to the patron who may attempt to follow instructions no longer considered safe.

**Textbooks** and material written specifically for curriculum purposes in public or private schools should be discarded, unless there is a strong demand from the community and they are updated every few years as the curriculum changes. If there is a substantial homeschooled population in the community and older textbooks are of interest to them, one alternative may be to locate textbooks in a separate section where they will be readily accessible.

Systematic CREWing of the children's collection is a necessary part of public library work, and should be done with a thorough knowledge of the collection and the literature. Children are less likely to grow up as library users and supporters if the collection holds little or nothing of interest to them or is perceived as being full of outdated stuff. When weeding is done in tandem with a strong, well-balanced book selection and purchase policy, the collection will enhance the overall library program and enrich the lives of the children and young adults it serves.

Two ideas for small libraries to keep in mind when judging the effectiveness of a juvenile collection are the 'boutique' theory and the 'bubble up' theory. A superstore-like atmosphere that offers 'everything under the sun' may be too overwhelming for young readers, especially if they have to cull through a lot of uninteresting material to find the 'good stuff.'  A smaller, boutique-like selection of quality books will serve them better.

Multiple copies of high quality, popular books are more worthwhile than having single copies of many books that are not being used. It is also better to have several copies of a book like Maurice Sendak's *Where the Wild Things Are*, which is perennially popular, than to have single copies of books on monsters that no one is reading. Additionally, superior literature, like the proverbial cream, will 'bubble up' to the top, appearing on recommended book lists, award lists and the like. Libraries with limited collection development funds may prefer to wait for annual best books lists to choose blue-ribbon titles for their juvenile collections.

# CREWing The Reference Collection

In most libraries, reference service is one of the most visible expressions of the library's mission and is key to many of the roles or service priorities selected during long range planning processes. In spite of the pervasiveness of the Internet, reference service remains vital in many libraries. Patrons find that they are frustrated by the amount of material returned in an Internet search and are often unable to determine the veracity of the information. Therefore, they turn to the public library reference staff and the collection. The community being served and the parameters of the reference service offered help to define the breadth and depth of the reference collection.

Reference collections have changed dramatically in the past decade because of the prevalence of online resources. Many reference titles that were standard in the past are no longer available in print formats or are supplemented by an online subscription that comes with the print version. Many libraries find that their reference collection is shrinking rapidly; however, a good ready-reference collection continues to be a vital component of good service. Still, "the paradox of the print reference collection is that it must be close at hand and yet openly available to users."[8] Without intervention by the librarian, many patrons don't know about the resources available.

The reference collection is an area of the collection where observation of patron use and cooperative collection development between libraries plays a role in your weeding decisions. Having ready access to reliable resources is more important than having a lot of electronic resources available that take time to access. Indeed, older titles, especially some that may be described as 'eccentric,' may be of more value than newer titles, the Internet, or electronic databases.[9] Therefore, it is vital that the reference collection be viable and useful, with outdated, inaccurate resources culled to make it easier to find useful information. This will require annual or even semi-annual evaluation of the collection.

The two basic tenets of CREWing reference collections continue to hold today: the automatic deselection of older editions that have been superseded and periodic evaluation by the librarian. Following your evaluation of how the reference tools are being used, you may determine that some items should be replaced more frequently than others or that you will retain specific types of tools longer than others. For example, if you have access to an online database that includes a good almanac, you may not need to replace the paper copy every year. Even though reliable dictionaries are now available online, you may want to purchase a new hardcover dictionary every three or four years to ensure that new words are included, transferring the older edition to the circulating collection if appropriate. Some of these items that should be updated yearly, or as new editions become available, are most useful for ready

---

[8] Lampasone, Lauren. "A Time to Weed." *Library Journal*, May 1, 2008, p. 100.

[9] Wickens, Andy. "The Need to Weed," *American Libraries*, November 2005, p. 41.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 37 of 107*

App. 418

reference services. If in doubt, consult resources like *Recommended Reference Books for Small and Medium-Sized Libraries and Media Centers* by Shannon Graff Hysell.

It is recommended that the library have a written collection development policy for the reference collection that outlines standards for selection and depth of coverage. Be sure to include information about foreign language reference materials, as more language dictionaries and other resources are being published each year. The policy should include criteria for the removal of outdated reference sources, which may involve keeping an older edition for a specific length of time, transferring the material to the circulating collection, putting it in storage, or discarding the item.  This policy should also include information about exceptions to the general guidelines. For example, local history items may be retained forever regardless of condition or recent use. Many reference titles are more expensive than other books; a good policy helps the library avoid criticism for discarding expensive items.

Library reference collections now include websites linked from the library's home page, such as directories, government resources, and other popular ready-reference tools. While there is no 'cost' for acquiring these reference tools, be sure to check them regularly and weed out the ones that no longer work or are of limited value to patrons. Check the annual Reference Supplement to Library Journal, issued each Fall. This Supplement includes "Subject Listings,"[10] a round-up of recent and forthcoming titles in various formats that might serve patrons better.  Also, each spring, *Booklist* provides updated information on current, recommended world atlases and dictionaries. Within each issue is the Reference Books Bulletin section that provides reviews of new reference resources.

## Types of Resources

Regardless of the resources that are available electronically or via the Internet, some categories of reference resources remain important to most collections.

### Encyclopedias

General comprehensive encyclopedias are quickly being replaced by online subscriptions and free encyclopedias like *Wikipedia*. Especially in smaller libraries, a set of print encyclopedias will allow multiple users to access information when all computers are in use. Generally retain at least one print encyclopedia, replacing it every five years. Texas public libraries have access to *Encyclopedia Britannica* through TexShare K-12 databases.

Subject encyclopedias, like *The Encyclopedia of Holidays and Celebrations: A Country-by-Country Guide*, should be updated when new editions become available or replaced by a similar resource every ten years.

---

[10]  "Subject Listings." In Reference 2008 Supplement to *Library Journal* v.132 no. 19 (November 15, 2007) pp. 13-58.

### Almanacs

Almanacs are by definition published annually and generally include information arranged in tabular format or in subject fields arranged chronologically. While it is tempting to think that the Internet might have replaced print almanacs, that is not happening, and almanacs remain a staple on the ready reference shelf. Although almanacs may contain historical information, timeliness is critical and they are rarely useful after two years. Specialization and ease of use are key factors for these ready reference tools. Generally, almanacs should be updated annually, with older editions transferred to the circulating collection and then discarded the next year.

Regional almanacs may be retained for historic research, depending on the needs of the community. With few exceptions, there is no reason to retain outdated copies of almanacs, including books like *Chase's Calendar of Events*. Exceptions to this include older editions of the *Texas Almanac*, which may be retained indefinitely since each contains unique features that are not found in succeeding volumes, and specialized almanacs like *The Old Farmer's Almanac*, if local interest warrants and they are used regularly. For example, the 1994 edition of *The Texas Almanac* includes a list of major motion pictures filmed around the state since 1970 and the 2008-2009 edition includes a history of minor league baseball in Texas. Be sure, however, that the spine label includes the year as part of the call number so that the date is obvious to users. Even this exception may not be valid as more information is being put on the Internet. Many of the history features are now provided on the Texas Almanac online at http://www.texasalmanac.com. If the print editions are not being used regularly, discard them or move them to the Texana or local history collection.

### Dictionaries

Unabridged dictionaries and general desk dictionaries should be updated regularly. Check to see if new words, usually mentioned in news articles each year, are included.  For example, some of the new words included in the *Shorter Oxford English Dictionary, Sixth Edition* released in 2007, include 'carbon-neutral,' 'splitsville' and 'goody bag'.

Specialized dictionaries, such as those for abbreviations, slang, and acronyms, should be updated regularly. Older editions may be retained and added to the circulating collection, but watch to ensure that they are not sitting on the shelf unused. In general, biographical dictionaries can be retained until superseded by a newer edition. If the publisher stops publishing the print version of the dictionary, then find a more current resource. Biographical dictionaries that focus on a specific period of time can be retained indefinitely.  For example, *Shapers of the Great Debate at the Constitutional Convention of 1787: a Biographical Dictionary*.

Foreign language dictionaries should be retained until a new edition is available unless they are unused. Update commonly used languages, such as Spanish and French, at least once every five years. Older editions can be moved to the circulating collection until they become shabby or cease to circulate. Be aware of changes in the needs of your community; as new ethnic groups move to town, purchase appropriate language materials.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 39 of 107*



### Directories

Directories are normally discarded when newer editions arrive, although several years' worth may be retained if space permits and usage warrants. Keep in mind that some directories, like *The Statesman's Yearbook,* include a subscription to the online service with the print version. This contains archival information and may allow older copies to be discarded without loss of historical data. Telephone and directory information is now online. If you have city directories and local telephone books, which are useful for genealogical research, keep indefinitely as space permits. Older editions should be housed separately from the current editions; many of these resources are also available on CD-ROM.

### Atlases

More maps are being made available online but good up-to-date print atlases allow patrons to peruse geographical elements or compare components of several maps. Usually revised every five years, comprehensive geographical atlases (*Oxford Atlas of the World*) should be replaced when updated. Although published in 1999, *The Times Atlas of the World* is still considered 'the pinnacle of atlases"[11] and should be retained until a new edition is available. Relatively inexpensive road atlases can be replaced every couple of years. Oversized atlases may require special handling to keep bindings intact.

Retrospective or historical atlases, such as *The Routledge Historical Atlas of Religion in America,* may be kept indefinitely as this information is unlikely to change, although new editions or recent publications may update interpretations of events or provide new information. Map books, including local street guides and atlases that deal with local areas and regions may be kept indefinitely. However, these are more appropriately placed in the local history collection, since patrons may not check copyright dates before using them.

### Handbooks

Handbooks include a wide variety of resources that pull together a compendium of information on a specific subject or technique. Designed to be easily consulted, handbooks provide quick access to information. Issues such as ease of use, indexing, and other features are frequently the decision maker in weeding questionable handbooks. Many handbooks are updated regularly, and whenever possible, the collection should include the most recent editions.

Resources that deal with health issues, such as *The Physicians' Desk Reference*, must be replaced as soon as a new edition is available. Be cautious about adding older editions to the circulating collection, as outdated information may be dangerous.

Subjects in the humanities (music, art, literature) may be retained indefinitely based on usefulness, supplemented by newer texts. Social science reference tools are

---

[11] "World Atlas and Dictionary Roundup." *Booklist*.
http://www.ala.org/ala/booklist/speciallists/speciallistsandfeatures3/worldatlas.cfm

considered outdated after ten years, by which time outmoded theories and practices are usually revised. Notable exceptions are handbooks that contain significant historical data. If local interest warrants, keep the most recent price guide for collectibles and antiques in the reference collection, moving the previous one or two editions to the circulating collection. Very rarely is there a reason to keep older price guides.

Science resources are generally outdated in five years, although texts on botany and natural history, especially those covering local areas such as *Little Big Bend: Common, Uncommon, and Rare Plants of Big Bend National Park* may be retained for longer periods. The most recent automotive repair manuals may be kept in the reference collection; older manuals should be moved to the circulating collection.

### Indexes

Many general and subject specific indexes are being replaced by electronic databases. Still, a few important and useful works are provided only in paper format at this time. The library may want to retain older indexes, like *Song Finder*, that index material not included in online indexes. In general, paper indexes should be kept only as long as the library retains the materials cited, unless the index will be used to assist in interlibrary loan. In most cases, researchers needing historical information will use a university or large public library. Do not keep older indexes as a fall back in case the database is cancelled! In general, if an index has not been used within the past three years, it is highly unlikely to be used in the next three years.

Older editions of *Granger's Index to Poetry* may be kept if they index out of print volumes that have been retained by the library. Others, such as *Bartlett's Familiar Quotations* may also be kept, since newer editions delete some items while adding others.

### Legal Forms and Information

Most libraries find that demand remains high for legal forms and sample documents in spite of the availability of materials in electronic formats. However, it is essential that these documents be up-to-date. Review annually for new editions of titles like *How to Do Your Own Divorce in Texas* (Nolo Press), titles that deal with bankruptcy and estate planning, and, of course, books on tax preparation. Older editions should be discarded as they contain too much outdated information and serve little or no purpose. If space permits and there is strong local need, keep tax preparation guides for three years to accommodate the needs of those with filing extensions, amended returns, or late filings.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                              *Page 41 of 107*

App. 422

# CREWing Nonprint Media

It's a given that libraries today house more than just books and periodicals. In fact, our periodical section may be decreasing in size as our media collections are increasing. Even the smallest libraries have at least a modest nonprint collection that may include some or all of the following: DVDs, videocassettes, Blu-Ray, CDs, audiocassettes, Playaways®[12], book and media kits, art prints, phonograph records, and computer or gaming software.

The CREW method is just as effective in keeping nonprint collections accurate, up-to-date, and attractive as it is for traditional print media. Items in nonprint collections, particularly audio and film formats may still be thought of as 'special,' or somehow more valuable than printed materials, primarily because their initial cost may be higher and the collection may be limited. Evidence of this is often seen in shorter circulation periods, higher fines for overdue media and/or restrictions on lending nonprint media to young people.

Keep in mind that the physical format of the item is less important than its usefulness as a source of information or entertainment. The availability of hardware or other technology with which to use nonprint materials is a major question to consider when weeding the nonprint collection. It is important to know your community and the saturation or dissolution of the hardware needed to use nonprint materials. Don't keep a collection of vinyl records if very few people have a turntable available for use! Many libraries provide equipment for in-house use or to check out; be sure that the community is still interested in the format so that you are not simply taking up space for a format that has dissipated. Conduct a quick survey using a tool like Survey Monkey, www.surveymonkey.com, or Zoomerang, www.zoomerang.com, to determine local interest in formats.

Although the same general principles apply to weeding AV materials as those outlined previously for print materials, there are some marked differences that present challenges in the multimedia deselection process. There are still few standard lists of recommended multimedia titles by format, and those that are available quickly become dated. There are, however, some award lists that can be consulted. Only a relatively small percentage of the multimedia titles published every year are reviewed, and in some formats, there may not be any reviews available.

If the materials were selected primarily for entertainment value, weeding decisions will be based primarily on use, popularity, and wear. If withdrawal and replacement decisions will be based on content or subject coverage, rather than simply by usage and condition, then your decisions should be based on the specific goals of the collection. For example, even though they are used a lot less than other formats, Austin Public Library retains a large collection of vinyl records due to the local music industry. It can be more difficult to review nonprint items for relevance of content and to check for wear since their formats require that someone view or listen to them.

---

[12] Playaway is a self-contained digital audiobook, which requires no additional equipment for use.


App. 424

This review can also include loading software onto computers or game players. Decisions will often be made based on a visual examination, length of time the item has been in the collection, number of circulations, or a patron's complaint about the condition of an item.

One criterion to keep in mind while evaluating nonprint media for discard is that many libraries, as a regular part of their policies, will not loan or borrow audiovisual materials through interlibrary loan. Therefore, needed audiovisual materials will not always be available through this source. Other considerations are: physical condition, factual accuracy, visual and sound quality, instructional usefulness, and inappropriate or obsolete format (e.g., 16-mm film, 35mm slide sets, microfiche, Beta video). While many nonprint formats have passed from library collections, they may still be offered to the library as gifts.

## Common Nonprint Materials

### DVDs/Other Digital Video Disc Formats

DVDs replaced VHS videos several years ago and Blu-Ray may move to the forefront quickly. There are no real standards for the lifespan of various media. Under ideal conditions, theoretically, any medium could last forever. However, library use is not 'normal' use. Variations in the quality of playback equipment and handling can mean that some media will not hold up well with even minimal use. Each media format has its own idiosyncrasies for cleaning and handling. Library staff may, for example, be able to buff or clean away minor scratches on a DVD, but Blu-Ray discs require different handling as their hard coat can easily be buffed away, destroying the data. It is generally not worth a lot of effort to clean and repair media. Good equipment that may actually repair damage is expensive and requires a great deal of time (approximately 10-20 minutes per DVD, for example). Review Jim Scholtz's article in *Library Journal*, "To Repair or Not to Repair[13]" for an overview of the technology and a comparison of disc repair machines if you are considering trying to clean and repair discs.

### Videocassettes

Fewer videocassettes are available for purchase and many libraries are only adding videos received as donations. Libraries struggling to maintain a collection in this rapidly disappearing format may be tempted to keep any videocassette regardless of interest, quality, or condition. Any video that has not circulated within the past year should be discarded regardless of its condition.

Although there are exceptions, it is probably not reasonable to expect that even under the best circumstances a videocassette can survive more than about 200 to 250 plays before experiencing problems from wear and tear. Some distributors use lower quality videotape, thus reducing the price of their titles, but ensuring a shorter tape life.

---

[13] Scholtz, James. "To Repair or Not to Repair." *Library Journal*, May 15, 2004, p22-25 [AudioVideo supplement]

While many libraries rely on patrons to let them know when a videocassette has problems, it is wise to visually examine them for condition at least every 50 circulations. If you are evaluating for content, rely on patron circulation for all entertainment videos. For nonfiction or documentary videos, consider currency of the treatment of the topic; content accuracy; relevance of themes; fairness of racial, cultural, or sex role depiction; and the continuing relevance of the material within the library's overall collection development plan.

When examining the media collection to weed, break it down into smaller subject areas that can be easily evaluated. Clearly, any video that has not circulated in the past year should be considered for weeding, especially in the entertainment and feature film categories. However, travel videos and documentaries may circulate less often, and you may want to retain titles that have enduring value but are used less frequently. Keep in mind, however, that if a title hasn't circulated in two or three years, it is unlikely to be requested in the next two years.

For help in selecting replacement videos or in judging whether to keep a marginal item, refer to the *Video Round Table's Notable Videos* list at http://www.ala.org/ala/mgrps/rts/vrt/initiatives/notablevideos/index.cfm. The titles on this list are the best of the non-feature films (that is, they are educational, documentary, or how-to films) released during the previous and current calendar year.

### DVDs

In general, the same criteria can be used in evaluating DVDs. Minor scratches may not impair usage and patrons will generally let you know if there are problems. Deep scratches usually cannot be easily repaired; the time and equipment needed to effect repairs don't make sense economically for small and medium-sized public libraries.

Discard entertainment and feature film DVDs that have not circulated at least once during the past year. There is either something wrong with the unit or patrons have lost interest in the title. Nonfiction DVDs may circulate less frequently, although certainly titles like Ken Burns' *Jazz* or The Discovery Channel's *Meerkat Manor* may rival circulation of feature films. Foreign films and films in languages other than English may also have limited circulation. However, certain communities may have more of a population of non-native English speakers.  Keep items in languages used in your community if interest warrants.

### Audiocassettes

Audiocassettes are rapidly disappearing from collections as producers are moving away from them. Music is almost impossible to find in this format and audiobook producers often charge more for audiocassettes than for compact discs. For younger children, new learners, and language courses, the format is popular because they are easier to back up and replay than other discs. If the format is still moving in your community, donations and aftermarket sellers (such as eBay) may be the only sources for acquiring items.

Content may include popular music recordings, language courses, or audiobooks and spoken word. Items in this format are somewhat fragile and easily damaged, but no


App. 426

more so than other formats. If a tape comes off a reel or breaks, there may be no way to repair it if the cassette casing is hermetically sealed. While many audiocassettes can be opened with small screwdrivers, it is not worth the time required to repair audiocassettes. Tape that has been mangled or twisted should be considered damaged and the cassette discarded. Although many publishers of unabridged audiobooks are no longer producing new titles in cassette format, they often will replace a damaged tape that is part of a set free of charge or for a nominal fee. Although you may not be able to replace them in audiocassette, sets with missing or defective language cassettes and manuals should be replaced if funds allow, regardless of the number of cassettes in the set or whether the entire set must be reordered. Incomplete sets may be included in an annual or ongoing booksale.

Weed music cassettes that have not circulated within the past year or two; CD is generally preferred. Weed audiobooks that have not circulated in the past two years, especially non-fiction titles that would be considered out of date in your book collection. Consider weeding abridged audiobooks, especially those that severely abridge the book, unless they are preferred by a large percentage of the community.

### Compact Discs

CDs are the current format of choice for musical recordings, as well as audiobooks. Ideally, the popular collection should reflect all genres, styles, time periods, composers and performers, as well as include a sampling of collections or anthologies, highlights and greatest hits. Information-based CDs should be evaluated on: physical condition, currency of information, use, and duplication of information in another format. Music CDs may be judged by their popularity with library users. Discard them once use decreases. Consider weeding audiobooks that have not circulated within the past two years, especially nonfiction titles that are outdated and would be weeded from the print collection due to copyright date (of the original book) or erroneous information.

CDs are made from the same material used to construct bulletproof windows, polycarbonate plastic. Sources disagree on the actual life span of this medium, and, of course, life span is determined by a number of factors having to do with use and care. Although they will not deteriorate appreciably if stored correctly, circulating CDs sustain damage from mishandling ranging from chips and cracks to deep scratches and warped discs. Light scratches can be polished out, but balance the time spent cleaning and attempting repairs against the replacement cost and continued usefulness of the recording. CDs are also susceptible to temperature extremes, excess humidity, and high intensity UV light. Discs should be regularly checked for signs of damage and discarded. Unabridged audiobooks are expensive; most producers will replace damaged or missing discs at no or low cost.

### Book/CD/Tape Sets (Juvenile)

Audiocassettes and compact discs in read-along sets are subject to the same evaluation criteria outlined in the previous sections. Since these items are popular and incur high usage by children, cassettes, CDs and other components are often not returned with the books. Replacements for the audio portion may be available, but be

sure that the accompanying book is also in good condition. If the cassette or CD is not being replaced and the book is in good condition, the book may easily be added to the existing juvenile or picture book collection. Replace companion books when they become worn if the cassette tapes and compact discs are still in good condition.

### Video Games

Game playing is extremely popular in many communities and many libraries offer computer or console games, including PlayStation2, Nintendo, Wii, Xbox, etc., for checkout. The major weeding decision factor frequently will have to do with platforms.  Once the platform is no longer supported by the hardware companies, interest usually rapidly declines. Of course, when the games are no longer available for purchase, the library's collection may see an increase in use by those who are holding on to the older technology. Look for damaged items or those missing parts and discard them.

While there are few core collection titles, check your collection against the "Top Fifty Gaming Core Collection Titles" from *Young Adult Library Services* online at http://wikis.ala.org/yalsa/index.php/Gaming_Lists_&_Activities#, for a list of popular games that are available for various platforms.

## Less Common Nonprint Formats

### Computer Software

Because of licensing and format considerations, fewer libraries have a circulating computer software collection. From the standpoint of physical limitations, such as problems caused by exposure to magnetic fields, circulating computer software is not as problematic as it was in the past. The physical limitations of floppy disks are not there with CD-ROMS. However, the software is still subject to damage and there are the labor-intensive chores of checking each returned item for damage. Much of the current software actually involves the purchase of a license and there is nothing, per se, to circulate. Many of the programs require permanent installation on the users' computers or will only run on hard disks. Licensing agreements prohibit multiple installations running at the same time. Be careful about adding outdated software received through donations to the collection. Discard when items are damaged or when they have not circulated within the past year, as this is an indication of lack of need or interest.

### Art Prints

Art reproductions are less prevalent now than in the past and many libraries have phased out their collections. Any prints that have not circulated in the past year should be weeded. Prints that are faded, scratched, warped, or otherwise shabby should be weeded, along with those that have worn or separating frames, or mats that are soiled or water stained. In some situations, this may mean eliminating an entire circulating collection. At times, art prints may find new homes in other libraries, or be sold in an annual book sale.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                        *Page 41 of 107*


App. 428

## *Phonograph Records*

Few libraries are purchasing vinyl phonograph records any longer. Indeed, they are nearly impossible to purchase except through second hand markets. In late 2007 Amazon.com launched a separate vinyl record section to handle newly produced recordings. As counter-intuitive as it seems to be, vinyl may make a comeback.[14] Also, some libraries have maintained archival collections or special interest collections due to local demand or for music purists. Easily warped and scratched, records should be discarded if damaged. Except for rare examples of local performers, discard any records that have not circulated within the past two years.

---

[14] Van Buskirk, Eliot. "Vinyl May Be Final Nail in CD's Coffin," *Wired* 10/29/07, http://www.wired.com/entertainment/music/commentary/listeningpost/2007/10/listeningpost_1029

## CREWing E-Books

They don't take up any shelf space and never get damaged, so why do we need to weed electronic books? The concept of weeding electronic books is very new.  In fact, many librarians are taken aback by the idea that an e-book[15] might need to be weeded. As the costs for e-books are dropping (at least on the retail level), and more devices proliferate, demand for content is rapidly increasing. In 2011 the Association of American Publishers declared that the e-book format was the leader in all categories of trade publishing. The market is vastly expanding as more writers are able to self-publish in e-book format and e-book publishers proliferate. The format creates both challenges and opportunities for libraries even as much of the technology is ever changing. Regardless of where your library falls on the e-book spectrum, there is no getting past the reality that e-books are increasing in usage and popularity. In fact, some libraries report that on any day more than 75% of their e-book collection is in circulation. Some libraries have very small collections and want to hold onto every e-book possible to have some critical mass. But things are changing, and at some point good collection management will create the need to remove some electronic items from the collection.

Production and use of electronic materials--downloadable books, audio, and video--is a rapidly growing and continually evolving field. Depending on the sources that were used to acquire e-materials and the business model used by the vendor, it may not currently be possible to "discard" some items.  Like the proverbial roach motel, the records for e-materials may check in to the library's integrated library system (ILS), but then never leave. Collections are growing to meet patron demand.  It is relatively easy to add the 39,000+ titles from Project Gutenberg, but are all of those free titles relevant to your collection? Are outdated and irrelevant titles cluttering up the catalog and distracting patrons from locating needed items?  The answer may be no for libraries that are just building a collection.  However, larger public libraries and academic libraries with substantial e-book and downloadable audio materials are already considering how to cull items that are no longer needed.

The advice provided here is based on the volatile e-materials environment, recognizing that the field is redefining itself almost daily. Libraries that are just beginning to add e-materials and are happy to have everything they can possibly obtain may not imagine weeding.  Other libraries are working on ways to add only desired records from major e-publishers like Project Gutenberg to the ILS.  Some libraries are working with new vendors to purchase e-books in a manner more in line with how libraries select and acquire print books. And vendors, e-publishers, and libraries are working on new models that we cannot currently imagine. Whatever your situation, we can reasonably assume that the specific details on how libraries acquire e-materials, where the files are housed, and the mechanics of adding and removing MARC records from the catalog will change. However, the guidance on

---

[15] The term e-book is used as a convenience but we are really talking about all forms of electronic, downloadable files.


App. 430

how librarians make the intellectual decisions about what to weed should remain more stable.

Libraries are increasingly adding e-books and dealing with a variety of issues related to their acquisition and use such as:

- How much money should be spent on print books and how much on digital content?
- What formats are available for digital content and which are needed in the community?
- Is the library making an outright purchase of the electronic content or is it a license for a specific number of circulations or a period of time?
- Are the e-books included in the online catalog or do patrons go to a vendor database to find e-books?

In addition to issues of acquisition and use, there are also many issues surrounding the administration and management of e-book collections. We have varying degrees of control over many elements of e-book acquisition and management.  Some of these aspects are also changing as competition develops within the industry and business models shift to match the needs of publishers and libraries. Whatever we are dealing with today,  may very well change next month. How we acquire e-books has an impact on how we weed.  Remember that libraries have spent decades building print collections and many years adding various physical media formats. As e-book collections grow, individual e-books will start to reach the limits of their usefulness. It will be just as important to weed e-books as it is the physical collection.

As with weeding physical items, there are two aspects involved in weeding e-books: the intellectual decision that is made regarding the content of the material and the mechanical steps required to remove the item from the library's collection. While librarians have a great deal of control over the first aspect, they may have little or no control of the second. Unlike when we weed physical books, it takes more than the decision to discard the item to actually get an e-book out of sight.

Weeding e-books involves:

1. Intellectual decisions about the content.

2. Mechanics of removing the weeded item from the collection.

With traditional book collections a major impetus for weeding is the need for shelf space. Clearly with e-books, the library's shelf space could be limitless; the e-books and downloadable audio and video materials take up no shelf space. Another major reason for discarding a physical book or other item is disrepair; it's shabby, worn, torn, has pages missing or just looks ugly. Again, e-books don't wear out in any of these ways so there is no "automatic weeding" due to condition.  These items also don't get lost; so again, there is no regular attrition to trigger the decision whether the item will be replaced or removed from the catalog.

So why would you want to or need to weed e-books? Regardless of format, you weed in order to keep the collection current and relevant. Librarians weed to separate the wheat from the chaff. We know that patrons have limited patience for looking through large collections of irrelevant material in order to find what they want (recall the 'boutique' theory mentioned on page 32 of this manual). This holds true whether that patron is looking through hundreds of physical books or entering search terms that return hundreds of electronic possibilities, many of which are obscuring the truly relevant material. While an e-book is not taking up physical real estate on a shelf, it does take space on a computer somewhere. Depending on where the electronic file actually resides, it may also take up space on library servers. Even if the file resides in the cloud or on a vendor's server, those servers must be maintained by someone so there are costs, directly or indirectly, involved.

The electronic space used to store e-books may be a non-issue for your library with minimal cost.  However, as more e-book records are included in the library's online catalog, we must consider what will show up in search results. Bringing back a list of items that displays a lot of older copyright dates is just as detrimental to the library's reputation and the patron's perception of the library's value as is having shelves that are filled with old, ugly, worn material. Patrons expect that the same care is taken in maintaining our e-book collections.  We are wasting the patron's time if we make them sift through entries for e-books that will not serve their needs.

*The two major reasons for weeding physical materials remain the two major reasons for weeding e-books:*

*1. Low use*

*2. Outdated content*

Ideally, the criteria for weeding e-books were established at the same time that the criteria for acquiring them were developed.   But of course, in the real world, that probably didn't happen. So take the time now to consider the criteria your library will use in deselecting e-books and other e-materials. If your library is still in the early stages of embracing e-books, you may make decisions now based more on the popularity of items and the interests of the early adopters in your community. You may be in a situation, such as in a consortium, where you have little or no power to weed unless most of the other parties in the consortium agree that the item is no longer useful. But as the use of e-books grows and as more e-books are added to the collection, business models will change.  You will want to revisit the criteria and adopt criteria and procedures for weeding that are more similar to, rather than vastly different from, the way you weed physical formats.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                    *Page 3 of 107*

App. 432

Consider these broad points about weeding e-books and other e-materials:

- Is the copyright date for e-books included in the calculation of the collection's average copyright age? Older material that is no longer useful should be culled. Keep in mind that the release date for an e-book is not always the same as the copyright date. Some third party vendors can't readily provide the copyright date unless that information was provided by the original producer of the electronic item so you may need to do some research.

- The library's mission is to provide the best resources possible to meet patron's needs and expectations. Outdated material in e-book format is just as detrimental to the collection as are physical books that have incorrect information or information that is no longer accurate.

- While most e-books won't be weeded due to condition, there are some MUSTIE factors to consider.  These are addressed below.

- Are multiple copies of an item available that are no longer needed? Perhaps copies of a very popular book were added when an e-book had a long reserve list or when a book was the subject of an "all city" reading program. Once this number of copies is no longer needed, some formats or versions may be weeded.

- Are there formats in the collection that are no longer compatible with the reading devices that patrons in your community are using? As the popularity of devices shift and new devices are created, some e-books in the collection may only be available in formats that are no longer used by your community. This happened with audio formats as libraries eliminated vinyl records and then audiocassettes; it may not be long before some libraries eliminate CDs in favor of all downloadable materials. It's reasonable to expect that there will be a shift in devices, much like the shakeout between VHS and Beta in the late 1970s and early 1980s.

> Accuracy of the information and the adequacy of the subject's coverage apply to e-book weeding decisions.
>
> Copyright is as important for e-books as for physical formats. Follow the same CREW formulas (starting on page 49) to remove outdated materials.

MUSTIE is the acronym for six negative factors that make books and other materials prime candidates for weeding. A few of these factors are noted as not relevant for e-books but most can be applied to them.

- **Misleading** (and/or factually inaccurate). Weed outdated editions and books that are no longer accurate. Pay special attention to areas where information has changed recently or where it changes rapidly, like in medicine and travel.

- **Ugly**: Not relevant to e-books.

- **Superseded** (by a truly new edition or by a much better book on the subject). Especially for reference materials, test guides, and travel manuals, weed older editions. Most public libraries don't need to keep older editions for research value.

- **Trivial** (of no discernible literary or scientific merit; usually of ephemeral interest at some time in the past). Weed older titles that were of fleeting interest or are about outdated popular culture.

- **Irrelevant** to the needs and interests of your community. Even e-books should be expected to circulate or be used online at least once every few years. Also weed self-published e-books that are not circulating.

**MUSTIE FACTORS**

Misleading

Ugly

Superseded

Trivial

Irrelevant

Elsewhere available

- The material or information may be obtained expeditiously **Elsewhere**. Especially for items available at no cost, such as through Project Gutenberg, don't clutter the library catalog with material that is not being used or is out of date. On the other hand, you may decide to weed some physical copies of classic literature that are infrequently used if the books are available through a free e-book source like Project Gutenberg.

Depending on where and how the e-books were acquired, weeding will primarily mean removing the item from the library's online catalog. If the library actually owns the electronic file, as opposed to paying for a subscription, the file may need to be deleted from a server somewhere. It is important to know your vendor's business model when you make purchases so that you also understand if, how, and when titles can be removed from the online catalog.

Items purchased as part of a bundle through vendors like Overdrive may require the help of that vendor to pull the item out of the bundle. If the items are licensed as part of a consortium agreement with other libraries, then you may not be able to weed from those items at all unless the other members agree to the decision.

Purchases made directly or indirectly through the publisher may automatically weed themselves after a set number of circulations, requiring the library to purchase an additional license if you want to retain the e-book. E-book vendors, and their business models, are rapidly changing; expect to see more options for the outright purchase of e-books in the future, along with more licensing for a specific period of time or number of circulations. If you have the option to do so, be cautious about adding MARC records for *every* e-book offered by a service (in essence acquiring that e-book by making it available to your patrons), especially those available through free,

*CREW: A Weeding Manual for Modern Libraries.*  www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*                                          *Page 53 of 107*

**App. 434**



E-book Business Models

Purchased

Licensed

Patron Drive Acquisition (PDA)

Subscription

Short term lease

public domain programs like Project Gutenberg; it may be very easy to add 39,000 e-books to the catalog but difficult to sort through and weed out the ones you don't want any longer. Programs are being developed that allow you to select the e-books you want to add to your catalog.  Libraries are demanding more control over content from third party vendors, who often currently bundle content.

If they are available, use your integrated library system (ILS) to run reports on the e-books in the collection to help identify items that meet specific criteria for weeding consideration. Keep in mind that you may have to ask the third party vendor to run these reports for you for materials they provide. Also, they may not be able to run every type of report that you would like. For example, you may be able to get a report that shows items that have not circulated in a specific period of time (use the CREW guidelines for various Dewey areas) or that have creation dates before a certain date. You might also look at a list of titles for areas of the collection that need updating due to changes in information, like astronomy (weed books that still include Pluto as a planet) or travel guides (weed books that are more than three years old). The same kind of attention can be paid to areas of the collection that include materials that deal with fads (for example, does the collection really need that e-book on macramé or an e-book on a no longer popular diet?).

Finally, weed the e-book collection in conjunction with physical books. Some libraries may keep an e-book version of a classic or a formerly popular fiction title while weeding physical copies, freeing up shelf space for a title that is more frequently used.

# CREWing with Computers

Almost all libraries are now fully automated and the online circulation system can provide wonderful reports that are very beneficial in weeding the collection. Lists of library holdings in specific Dewey areas can be produced that show:

- The latest checkout date for items currently being circulated
- The date each item was added to the collection (accession date)
- Previous checkout dates for items not currently circulating
- Other items the library owns with that call number

Depending on your OPAC system, you may be able to determine how many times the item circulated during a specific time period and the copyright dates for each volume in the collection. Running a report of all books in a specific classification area that have copyright dates before a specified year can make it easier to weed parts of the collection that change rapidly (such as computer technology). A 'dusty books' report lets you easily find shelf sitters, although you must still make a determination about whether the item is used in-house. This type of report also allows you to more quickly see if items in a set or series are missing (which might account for lack of use). Books that haven't circulated in some time may also be missing either because they are misshelved (or have fallen behind a shelf) or have been stolen.  Information from these automated reports can be especially useful for a 'quick weeding' that catches some of the easy weeding decisions.

If the reports generated by the integrated library system (ILS) are cumbersome or provide information you don't need, check whether you can export the information into a better format. Many systems also allow you to export a file into Excel or another spreadsheet format. For guidance, consult resources like *Analyzing Library Collection Use With Excel* by Tony Greiner and Bob Cooper.

If the system doesn't export to an Excel file, you may also be able to 'cut and paste' information into Excel. This can allow you to customize the report, adding columns to notate that a book is missing, on the shelf, etc. Take the printed report to the shelf and make notes in the appropriate column to provide the information you need for further review. For example, if the book is missing, search further before deciding whether the book is lost forever.

If you are not sure what reports your ILS can produce, or are unclear about the best way to filter the information and format the printout, ask your vendor or another library familiar with your system. Many vendors have tutorials or can field questions by phone or email.

### Items That Have <u>Not</u> Circulated in Three Years

Most collections cannot afford to continue housing items that are sitting on the shelf. For most Dewey areas, CREW recommends that you look at any item owned by the library for at least three years but has not circulated in that time period. Begin by printing a report for all these items listed on the computer for a particular Dewey area. If your report function allows it, include the author, title, barcode number, date of publication, last date of circulation, and number of copies for each item on the

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                     *Page 53 of 107*

App. 436

printout. Print out only what you can reasonably weed within a four to six week period.

Use these lists to check the shelves, noting those items that are missing and pulling books that are located. Items that have not circulated in three years can then be reviewed for a disposition decision. While probably 80% of the items that have not circulated in three years can be discarded, this is not an automatic process. The librarian must still review the items because some may be used in-house, may be candidates for inclusion in displays that bring the book back into circulation, or would benefit from recataloging to a more appropriate location. Some items may also require replacement by new editions or updated titles.

Missing items, those not located on the shelf but also not checked out, should be searched for at least twice over a period of two to three months. If the item is not located after a reasonable period of time, it can be assumed lost and removed from the library catalog. Occasionally an item will be located on the shelf that is not on the print out. Pull that item to determine whether the item is misidentified, needs a corrected spine label, or has some other problem that needs to be addressed.

Some librarians have suggested that in lean years when budgets are tight, it is possible to extend the time frame a bit in order to leave more books on the shelves. For some areas of the collection, that might be reasonable, although studies have repeatedly shown that an item that hasn't been checked out in the past three years is highly unlikely to be checked out in the next three years. Therefore, to what end is it helpful to leave unwanted, uninteresting, unused items on the shelf simply because the budget is tight?

### *Items That Have Circulated in Three Years*

After completing the first process, use the same system to create a list of all of the items in a Dewey area that **have** circulated in the past three years. Keep in mind that many items that are circulating very nicely may be in poor condition, especially if they have been subject to heavy use. You must go to the shelves to find these shabby items. Additionally, be wary of books that have been in the collection for several years but only circulated once or twice during that time. Your collection could well have books that sat on the shelf until the day before the three-year mark. Although that book will now show up on the list you run of books that have circulated within the past 36 months, use your judgment to determine whether this was a fluke or whether the book is likely to continue to be useful. A book that is in pristine condition after three years may need further evaluation.

Follow the CREWing guidelines until the entire collection has been reviewed and compared with the printouts. While it is possible, of course, to simply go to the shelves and review items that have circulated, using the print outs ensures that you have information, such as last circulation date and number of copies, needed as you make weeding decisions. The process also allows you to easily note where you left off in the process and how long it takes to weed an area. Additionally, by noting on the printout which books are being withdrawn, the physical books can be taken to a disposition area while the printout goes to someone who can remove the entry from the automated catalog system without having to handle the book again.

# The CREW Guidelines for Weeding Your Collection

The CREW formulas given here for the various Dewey classes are offered as 'rules of thumb' based on opinions in the professional literature and practical experience.

The formula in each case consists of three parts:

1. The first figure refers to the **years since the book's latest copyright date** (age of material in the book);
2. The second figure refers to the **maximum permissible time without usage** (in terms of years since its last recorded circulation and assuming that the item has been in the library's collection for at least that period of time);
3. The third refers to the presence of various **negative factors**, **called MUSTIE factors**, which will influence the weeding decision.

For example, the formula "8/3/MUSTIE" means: "Consider a book in this class for discard when its latest copyright is more than eight (8) years ago; and/or, when its last circulation or in-house use was more than three (3) years ago; and/or, when it possesses one or more of the MUSTIE factors." Remember that the period of time without use presumes that the book has been in the collection at least that long.

Most formulas include a "3" in the usage category because few libraries can afford to keep items in the collection that have not circulated on been used in-house within a three year period. Exceptions relate mainly to items with local history value. The figure in the age category will vary considerably from subject to subject (and for subcategories within subjects).

Most formulas also include the MUSTIE factors because items that are in poor condition or no longer relevant should not be kept in the collection. If any one of the three parts of the formula is not applicable to a specific subject, the category is filled with an "X". For example, in some categories, like literature or picture books, the copyright date has little influence on the weeding decision.

MUSTIE is an easily remembered acronym for six negative factors that frequently ruin a book's usefulness and make it a prime candidate for weeding:

| | | |
|---|---|---|
| **M** | = | **M**isleading (and/or factually inaccurate) |
| **U** | = | **U**gly (worn and beyond mending or rebinding) |
| **S** | = | **S**uperseded (by a truly new edition or by a much better book on the subject) |
| **T** | = | **T**rivial (of no discernible literary or scientific merit; usually of ephemeral interest at some time in the past) |
| **I** | = | **I**rrelevant to the needs and interests of your community |
| **E** | = | The material or information may be obtained expeditiously **E**lsewhere through interlibrary loan, reciprocal borrowing, or in electronic format. |


App. 438

It is helpful to understand the MUSTIE elements, as these can be the most difficult for library staff to base weeding decisions on.

**Misleading** refers to information that is factually inaccurate due to new discoveries, revisions in thought, or new information that is now accepted by professionals in the field covered by the subject. Even in fields like physics, that were once thought to be pretty settled, changes occur that radically impact the accuracy and validity of information.

**Ugly**, like beauty, is often in the eye of the beholder but the physical condition of the collection says a lot about the value we place on our collection. The ugly factor includes most of the elements related to the physical condition of the item—wear, damage, stains, tears, dirt—that make it less attractive to a library patron. Children's books, cookbooks, motor repair manuals, and other 'hands on' materials are especially prone to ugliness. If you don't want to touch the item without wearing gloves, neither will the patron. Or, as one librarian states about the condition of books, "If it's too dirty to read in bed, it's too dirty to be on your shelf.[16]" Also include in this category material that is in perfect condition but covered in dust! If the item has a quarter-inch of dust on it, of course, it also probably hasn't circulated in years. Be very cautious in repairing or rebinding items that are ugly. While a new Mylar jacket or a bit of cleaning may spruce up an item, usually it is not worth spending more than a few minutes repairing an item. Taping a small tear is worth the effort but if there will be more tape than binding after the repair is completed, discard the item. Books that smell are ugly. If the smell can be removed from an otherwise pristine book by closing it up with a bar of deodorant soap for a week, do so and keep it. Otherwise, toss.

**Superseded** items are those that sit on the shelf right next to newer editions or newer titles that update information.  Libraries don't need to keep more than one or two previous editions of almanacs, trivia books (*Guinness Book of World Records*), cookbooks, and other titles that are frequently updated. Be sure to watch for books that are still circulating but include outdated pictures, products, and ingredients. The recipes in the 1975 edition of *The Joy of Cooking* may still be accurate but the photographs and brand names on ingredients have certainly been replaced many times over in later editions.

**Triviality** implies that the material included in the item was popular for a brief period of time but interest has largely waned. Books are published, often seemingly overnight, when there is a new fad, or when a new celebrity hits the scene. Biographies of pop culture performers, games and consumer products, television shows, diets, and fiction series come and go very quickly. The interest may last a few years but usually fades fast. Many of the books are published in paperback to hit the market while the iron is hot, but when interest cools, library shelves are left full of books that hold little appeal for

[16] John Sandstrom, El Paso Public Library

anyone. Even if a fad returns, as happened after two decades with the Teenage Mutant Ninja Turtles, the lapse between periods of intense popularity means that the books from the original fad are outdated. Trivial books can also be published immediately following a major event, such as the death of Princess Diana. For topics that have lasting interest, better written books come out a year or so later and the 'instant' books that may trivialize the subject can be discarded.

**Irrelevant** means that the interests and needs of your community may have changed over time. Perhaps an issue, such as xeriscaping, mass transportation, or solar power, was very popular for a period of time but demand in your community has waned. Frequently, we purchase multiple copies of a book or a wide variety of books on a topic to meet intense local interest, only to have that interest dissipate after a few years. CREW doesn't recommend that you eliminate all items on any topic from a collection; if a particular topic is no longer as relevant to the community as it was at another time, the collection may have too many items just sitting on the shelf. Even though the last use time period may not have passed, these irrelevant items are prime candidates for weeding.

**Elsewhere** reminds us that no library is an island! We are not alone out there in the vast information wilderness. It can be difficult to let go of items that are still in good condition even though the information covered is trivial or irrelevant. Many librarians hesitate to discard an item because 'someone might need it someday.' True, many of us have had the experience of discarding an item only to have someone request it the next month. However, you can feel more secure about discarding an item if the information contained within is available elsewhere. Interlibrary loan and reciprocal borrowing are ubiquitous. Also, many books are now available online through services like NetLibrary. With the exception of local history and regional documents, almost everything is available someplace else. The Internet has reliable information on many topics; prepare bookmarks and pathfinders for your patrons on frequently used topics such as law or medicine.

*CREW: A Weeding Manual for Modern Libraries.* www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*                                              *Page 59 of 107*

App. 440

# CREW Guidelines by Dewey Class

On the following pages are the CREW guidelines arranged by Dewey classifications. *An Overview Chart of the CREW Formulas*, that you may copy and bring to the shelves with you, is included in the Appendix of this manual.

In all cases, weeding decisions are ultimately based on the professional judgments of the library staff responsible for the selection of materials. While the CREW formula may be used as a guide in making weeding decisions, these guidelines can and should be adjusted to meet the needs of the specific library. Feel free to substitute numbers that reflect the library's mission and goals. For example, a library that focuses on popular materials as a major part of its mission may need to discard fiction books and entertainment films after a shorter period without use in order to keep the collection very up-to-date.

Carefully consider all the factors involved in the weeding process, rather than automatically discarding an item with an older copyright date.

## *000 (Generalities)*

*This is a very broad category and often requires cross weeding with other Dewey areas. For example, books on running a consulting business may be classified in 001 (knowledge) or in 650 (management).*

### *004 (Computers)*

3/X/MUSTIE    *Works on computers are seldom useful after three years. Works on hardware and software have an even shorter life span (1-2 years), but may be kept on hand longer if there is strong community demand. Weed based on community interests and prevailing computer applications used locally. Retain manuals for software packages (Microsoft Word, Excel, etc.) at least one release back to accommodate people who didn't update their software immediately.*

*Series like the 'Dummies' and 'Idiot's Guide' are more useful to general computer users than in-depth tomes. Discard thick books with few illustrations in favor of slimmer volumes with color illustrations and screen images. Programming languages evolve more slowly and may be retained longer, up to ten years, if the language is still used. Consider what courses are offered at local community colleges and universities.*

### *010 (Bibliography)*

10/3/MUSTIE    *Bibliographies and reader's advisory tools maintain their usefulness as long as the items indexed remain relevant. Many of these items will be in the reference collection, but older editions may be moved to the circulating collection. In the*


App. 442

*circulating collection, consider discarding if not used within three years. Discard most bibliographies ten years from the date of copyright or when superseded by a new edition unless the bibliography remains well used either in-house or through circulation.*

### 020 (Library Science)

10/3/MUSTIE   *Discard all that do not conform to current, acceptable practice. Also weed previous editions of library science textbooks and titles that deal with obsolete services and material types or outdated library technology.*

### 030 (General Encyclopedias)

5/X/MUSTIE   *The most current encyclopedia is probably the one available online through TexShare or through your state's shared database resources, if applicable. For print encyclopedias, keep the most current one in the reference collection, moving older editions to circulate. Stagger replacement sets over a three to five year period. Older sets may be sold or circulated, but withdraw circulating sets once the copyright is more than eight years old.*

### Other 000's

5/X/MUSTIE   *Except for trivia books, which may be kept indefinitely or until no longer considered useful or interesting. Books of oddities, controversial knowledge, and the unexplained, including books on UFOS, should be weeded based on interest and MUSTIE factors more than copyright date. Quotation books (080) may be kept as long as they are useful, replacing or adding new titles to maintain currency. Directories for writers (Guide to Literary Agents or The Writer's Market, for example) should be kept no longer than two years as information becomes dated quickly.*

## 100 (Philosophy and Psychology)

*This category focuses on philosophy, psychology, parapsychology, ethics, and logic. Some topics won't date quickly but others, like paranormal phenomena, may be trivial or focus on quickly fading fads.*

### 101 (Philosophy)

15/5/MUSTIE   *Most philosophy books do not become outdated and low circulation may be of limited value in weeding decisions. Weed based on interest and use, but maintain a range of titles that explore Western and Asian philosophies. Remove scholarly treatments that have limited use unless they are part of a local*

*community college or university curriculum. Weed books that explain philosophies and introductory books that are not included in standard lists after three years without use.*

### 133 (Paranormal Phenomena)

10/3/MUSTIE     *Books on the paranormal generally receive high use and should be kept until worn. It will be necessary to replace lost and stolen titles regularly since this category includes the popular topics of witchcraft, fortune telling, dream interpretation, and astrology. High use and wear generally ensures that a fresh supply of books is available.*

### 150 (Psychology)

10/3/MUSTIE     *Other than classics of psychology that may be used in community college and university courses, most titles in this category may be weeded based on popularity and use. Replace worn classics with new editions. Replace works on clinical, comparative, and developmental psychology within five to eight years.*

*Review self-help books (158s) and discard titles that are no longer popular or of current interest or that have outdated ideas. Also consider weeding self-help books that have a copyright older than five years. Keep up with television psychology gurus and weed their books when no longer popular or on TV.*

### 160 (Logic) & 170 (Ethics and Morality)

10/3/MUSTIE     *Replace worn classics with attractive trade paperback editions. Discard if no longer of interest. Be especially aware of outdated philosophies on ethics and moral values and 'hot button' topics, such as euthanasia, genetic engineering, and sexuality.*

## 200 (Religion and Mythology)

*Spiritual and devotional materials, the Bible and other sacred texts, and introductions to the world's religions are timeless. New interpretations of religion keep patrons reading and current editions of spiritual materials encourage use.*

10/3/MUSTIE or
5/3/MUSTIE     *Try to have something up-to-date on each religion represented by a church, synagogue, or other assembly in the community or region, as well as something on the well-known modern sects such as Scientology. Include timely and comprehensive information on the six major international religions:*

App. 444


*Buddhism, Christianity, Hinduism, Islam, Judaism, and Taoism.*

*Use 10/3/MUSTIE except for areas of rapid change, which are 5/3/MUSTIE. This area can be difficult to weed because (a) many of the items are donated and librarians fear criticism from the donors, and (b) religious works SEEM like they should never go out-of-date. However, the language becomes dated, especially in books of sermons and religious thought. Keep classics by famous theologians as long as they are popular and in good condition. Weed superseded editions.*

## 300 (Social Sciences)

*This area includes a wide variety of topics, including sociology, folklore, culture, crime, and education. The collection should include information that represents various viewpoints on controversial issues and is current, accurate, and fair.*

### 306 (Culture & Institutions)

5/2/MUSTIE   *This section includes books on marriage, family life, and sexuality. Discard as interest in the author or title wanes. Unless a book has an historical approach, the topic is usually outdated within five years.*

### 310 (General Statistics)

2/X/MUSTIE   *Almanacs and statistical handbooks are seldom of much use after two years; keep only the current volume and one or two previous editions except for historical handbooks. Keep the most current copy in the reference collection, transferring superseded copies to the circulating collection. **All** public libraries in Texas should have at least one general almanac and the* Texas Almanac. *Current census information is available online but print on demand copies and print copies of related demographic information should be discarded when new decennial census data is available. It's tempting to keep statistical data that is in electronic format, such as compact disk, but unless historical use is heavy, discard when new information is available.*

### 320 (Political Science)

5/3/MUSTIE   *For books on current political topics, weed within five years of publication.*

*General guides to the political process and the electoral system may be kept longer and are judged more on the basis of use*

*rather than copyright date. Retain titles on the US Constitution and the Bill of Rights regardless of circulation as these may be used more in-house. Replace as needed based on MUSTIE factors.*

*Books of local political history may be kept indefinitely.*

*Be aware of changes in political rhetoric and discard books with outdated ideas. Be aware also of how books in this classification area interrelate with titles in other areas, such as history. Discard books that compare democracy with political systems in countries that no longer exist (ex. USSR).*

*Weed books that focus on past presidential elections when they deal with issues that are no longer relevant to current campaigns.*

### 323 (Immigration & Citizenship)

5/3/MUSTIE
*Immigration issues change although the collection may also include books that look at historical elements. Remember that study guides for citizenship and ESL tests are available through the database, LearningExpress; in Texas check with your Library System to see if you have access.*

*Update items about how to obtain citizenship and study guides for citizenship tests as new editions become available. Retain histories of immigration to the US as long as interest warrants but be cautious about discarding primary source materials and guides that may be useful for genealogical research.*

*Weed biased or unbalanced and inflammatory items.*

### 330 (Economics)

3/3/MUSTIE
*Currency of information is the most critical factor in this area; patrons want to know what is happening today when it comes to finances. Money management guides and books on personal finance and real estate investing date quickly. Books on tax return preparation and estate planning must be current to account for changes in laws. Books on careers and job hunting should be updated frequently to ensure that requirements are current, although salary information will most likely always be outdated. Weed career guides with gender, racial, or ethnic bias. Even careers that seem fairly stable have experienced significant changes in the past decade.*

*Update items available in revised editions. Be aware of major changes in state and federal statutes and regulations, or changes in the general climate for a particular type of*


App. 446

*investment. Classic books by well-known authors who are no longer writing, especially those that deal with principles and philosophies of economics, may be kept as long as interest exists or until MUSTIE factors prevail.*

*Weed books that offer advice on 'how to survive' past economic depressions or how to prosper from 'good times' that occurred in the past. Retain histories that explore and analyze important periods, such as the Great Depression, as long as interest warrants.*

### 340 (Law)

5/2/MUSTIE
*Replace when more current material becomes available.* **Never** *keep superseded editions, even for heavily used topics like divorce or bankruptcy. Keep only the current edition or the edition approved for use in your community of the* Uniform Building Code *and similar code books for specific areas of construction.*

*General guides on finding and working with an attorney or the basics of our legal system may be retained based on use. Study guides for law school should not be kept longer than 3 years; check with publishers to ensure that major changes in the test have not occurred.*

*Retain books that examine the history of major legal cases (Brown vs. Topeka) as long as interest exists or until MUSTIE factors prevail.*

*Remember that most government agencies now post the most current legal information, laws, and ordinances on the Internet.*

### 350 (Public Administration)

5/3/MUSTIE
*This section includes information about the administration of government, including civil service employment and the military. Standard books, like* The US Government Manual, *should be replaced as new editions become available. Discard older editions of reference type guides if they are available online unless intense local interest warrants keeping print copies.*

*Keep up-to-date; replace when state and federal administrations change or constitutional reforms occur. Histories of government agencies and the military may be kept as long as interest remains. Also retain classics (*The Art of War by Sun Tzu*), replacing when MUSTIE.*

*Test guides for civil service positions and entrance into the military should be discarded after 3 years or when MUSTIE factors apply.*

### 360 (Social Services)

5/3/MUSTIE

*This broad category includes drug and alcohol education, social problems and issues, true crime and criminology, and other social welfare issues.*

*Titles that deal with popular social issues should be weeded based on age (copyright) and popularity. Watch for social welfare topics that are changing rapidly, such as socialized medicine and end-of-life decisions, environmental issues, and dealing with addictions. Handbooks and guides that deal with interactions with people with disabilities, surviving cancer and other major illnesses, and long-term care needs should be scrutinized for outdated terminology and descriptors, as well as to ensure that treatment and long-term care options are current. Discard memoirs when interest in the person or subject wanes.*

*Copyright is not relevant for true crime. Classic cases, like In Cold Blood, should be replaced when MUSTIE factors are present. Cases with ephemeral interest can be weeded when circulation decreases significantly. Forensic sciences and criminology should be updated as techniques change or are improved.*

### 370 (Education)

10/3/MUSTIE

*Books in this section deal with formal and informal education at all levels, including homeschooling, ESL, and lifelong learning. Remember that current study guides and practice tests are readily available through the Learning Express database.  In Texas, check with your Library System to see if you have access.*

*Keep historical materials **only if used**. Discard all outdated theories; check with a teacher or principal if in doubt.*

*Discard books about getting an education—college guides and entrance examination books—after five years. Most of the information will be outdated. Books about the education system in general and societal issues related to illiteracy and lack of education should be discarded when interest in the writer's theories wane.*



> *Replace books on subject-specific curricula as those fields change. Visual appeal is the primary factor for books that offer ideas for lesson plans and activities.*

## 390 (Customs, Etiquette & Folklore)

### 390–394 (Costumes, Customs, Holidays)

10/3/MUSTIE  *Books of costumes and fashion history won't go out of date but discard books about specific designers or styles of dress as interest fades.*

*Books about celebrations of life's milestones, wedding planning, and holiday celebrations should be discarded as fashions and customs change. Discard books that lack clear color pictures.*

*Holiday-specific books may only circulate once or twice a year. Discard books that are MUSTIE or that reflect gender, family, ethnic, or racial bias. Discard books by celebrities after their popularity has waned.*

### 395 (Etiquette)

5/3/MUSTIE  *Basic titles can be kept until new editions are available. Discard books for specific situations, such as global etiquette, teen manners, and such, as the illustrations become dated or acceptable practices change.*

### 398 (Folklore)

X/3/MUSTIE  *Keep standard works of folklore indefinitely; weed according to use and MUSTIE factors. Folktales never go out of date, so copyright is not a factor. Weed based on the quality of the retelling, especially if racial or ethnic bias is present. Watch for collections that have become MUSTIE or that are not circulating. Replace standard collections with new, attractive editions. Most picture book versions of individual folktales will be classified in the children's collection.*

## 400 (Language)

10/3/MUSTIE  *Discard old-fashioned and unsightly textbooks and outdated books of grammar. Books that explore the history of languages and word origins should be discarded when MUSTIE.*

*Replace stock dictionaries for major foreign languages (e.g., French, Spanish, Italian, German), and any other languages being studied or spoken in the community on a rotating basis to ensure currency.*

*English language dictionaries should be replaced five years after copyright except for unabridged dictionaries. Update those when new editions are published.*

## 500 (Natural Sciences)

*This Dewey classification includes science fair projects and experiments, books on all of the areas of natural science, and books on mathematics. Some areas change rapidly, while others are more static. Recent circulation will not be a good determining factor in high interest areas, such as dinosaurs or science experiments; however, lack of circulation is a good indicator that the book is no longer useful.*

5/3/MUSTIE *Carefully evaluate anything over five years old. Pay particular attention to the physics, environment, and astronomy sections. Keep basic works of significant historical or literary value, such as Charles Darwin's classic <u>Origin of Species</u>, or Michael Faraday's <u>Chemical History of a Candle</u>. Replace worn copies with new editions. Watch for multi-volume sets; if the titles are not indexed individually it may be necessary to weed the entire set, especially if the set is cataloged as a single entry.*

### 507 (Science Experiments)

10/3/MUSTIE *Many of the science experiment books may be in the children's collection but collections of experiments for teachers will be in the general collection. While many experiments are considered to be 'classics,' examine books for outdated and unsafe practices.*

### 510 (Mathematics)

10/3/MUSTIE *Math does not change as rapidly as other subjects, so weed primarily on MUSTIE factors and lack of use.*

*Replace older materials on algebra, geometry, trigonometry, and calculus with revised editions. Discard books that focus on outdated teaching methods and techniques, such as books that feature 'new math' or that focus on slide rules as the primary method for making calculations. Also discard past fads.*

*Discard workbooks and test study guides that have been written in or that are MUSTIE. Remember that many of these tests are provided through the LearningExpress database. In Texas, check with your Library System to see if you have access.*

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission* *Page 69 of 107*

 App. 450

### 520 (Space and Astronomy)

5/3/MUSTIE     *Major changes have occurred, so weed titles that include Pluto as a planet or that don't include information on the space station and Mars expeditions. Stargazing books may be retained longer but should be attractive and mention relevant technology.*

### 550 (Earth Sciences)

X/3/MUSTIE     *This section includes earthquakes, volcanoes, and other geological topics. Weed books that do not reflect current theories and science on geological activities. Also weed books that have outdated information on major disasters, such as the eruption of Mount St. Helens and replace with recent books that examine the long-term aftermath.*

*Geology books on specific regions, especially Texas, may be kept indefinitely, or until superseded by newer editions.*

*All general materials should be replaced when new developments occur in the field (e.g., theories about continental drift and plate tectonics have been revised in recent years).*

*Field guides for amateur fossil, gem, and rock hunters can be kept for up to 10 years if physical condition allows or until circulation drops, unless the area described has changed dramatically through man-made activities or natural events. Replace with up-to-date attractive titles that include clear photographs.*

*Weed books on meteorology that do not reflect current weather technology or that include historical weather charts that are more than ten years out of date.*

### 560 (Paleontology)

5/2/MUSTIE     *Current research has changed the previously more static world of fossils. Discard materials that are not being used, as this is one indicator that the information may be out of date. The popularity of topics like dinosaurs may mean that even outdated books are checked out. Discard most books that lack color illustrations.*

*Field guides may be kept longer, especially those that cover local regions and the Southwest. Discard older editions as newer ones are received.*

### 570 (Life Sciences)

7/3/MUSTIE    *Retain indefinitely classics in the field (Darwin's <u>Origin of Species</u>) replacing with updated editions as wear warrants.*

*Use 5/2/MUSTIE for books on genetics, genetic engineering, human biology, and evolution due to rapid changes in scientific practices.*

*Weed titles on ecology that appear dated, even if the information is still accurate. Watch for books that are sensational in tone.*

### 580 (Botanical Sciences)

10/3/MUSTIE    *Botany changes less rapidly than some other areas of science. Weed books that lack color illustrations or that appear dated. Be aware of field guides that promote edible or medicinal plants and herbs to ensure that they meet safety guidelines.*

## 600 (Technology, Applied Sciences)

### 610 (Medicine & Health)

5/3/MUSTIE    *Weed ruthlessly when it comes to current medical practices. Patrons rely on up-to-date information and outdated information can be dangerous. Keep only the current year plus the previous year (one reference, one circulating) of <u>Physician's Desk Reference</u> (PDR) and other prescription and over-the-counter drug directories, replacing when new editions become available. Do not keep drug guides that are more than three years old regardless.*

*Regularly review books on fast changing topics, such as AIDS, fertility, cancer, and genetics to ensure that the information is up-to-date and accurate.*

*Anatomy and Physiology do not change as rapidly as other topics.*

*Weed unattractive titles, especially those that lack good illustrations. Retain the current edition of classics, such as <u>Gray's Anatomy</u> in the circulating collection, although historical facsimile editions may be retained in reference indefinitely.*

### 629 (Automobile Repair)

X/2/MUSTIE    *Automotive repair manuals don't go out of date, so weed primarily on use and condition. If a repair manual has not circulated in two years, it is no longer of use in your community. They get dirty quickly; discard when they are*


App. 452

*beyond hope or are falling apart. Be especially ruthless in weeding if your library has access to online databases, such as Chiltonlibrary.com, that provide repair instructions and schematics.*

### 630 (Agriculture)

5/3/MUSTIE     *Keep up-to-date; be sure to collect information on the newest techniques and hybrids if you serve farmers or ranchers. Books with current information will probably include discussion of biotechnology and genetic modification. Regardless of use, discard books with outdated and dangerous ideas, such as pest control using DDT.*

### 635 (Horticulture)

10/3/MUSTIE    *General gardening books may be useful for a long time, so circulation is the main weeding criteria. Books about propagation of specific flowers or plants are considered outdated after 10 years. Books that focus on organic gardening and the use of pesticides and chemicals should be reviewed for accuracy and currency of information after five years. Discard books with black-and-white photographs in favor of more colorful illustrations.*

### 636 (Pets)

5/2/MUSTIE     *Histories of specific breeds don't necessarily go out of date but the collection should include books with current photographs and recent 'best of show' winners. Discard titles for once-trendy breeds that are no longer popular in your community. Veterinary medicine and animal care has changed significantly in the past ten years. Discard titles that encourage outdated and cruel methods for obedience training and behavior modification.*

### 640 (Home Economics)

5/3/MUSTIE     *Be ruthless in weeding old cookbooks. Physical condition is the main criteria as cookbooks that are well used become grungy quickly. Also weed books by celebrity chefs and television cooks once their popularity has waned. Weed cookbooks that are based on popular diets (e.g., The South Beach Diet Quick and Easy Cookbook) once the diet is no longer popular. Replace classic cookbooks, such as The Betty Crocker Cookbook, with new editions when available.*

*Books on nutrition and food preparation should reflect current scientific practice. Any titles that mention the four basic food*

*groups should be replaced with titles that discuss the food pyramid.*

*Discard books on sewing when the styles reflected in the illustrations and projects are dated.*

### 649 (Child Rearing)

5/3/MUSTIE  *Keep abreast of changing trends and new theories; replace standards like <u>Dr. Spock's Baby & Child Care</u> when new editions are available. Weed books that reflect outdated ideas about gender roles in childrearing.*

### 670 (Manufacturing)

10/3/MUSTIE  *Weed based primarily on use and condition. Keep repair manuals for appliances indefinitely unless the technology is so obsolete that no one in the community is likely to repair the equipment. Some resources may contain information of historical value. Keep works on tools, farm implements, etc. that are still used in your community. Be wary of older books on desktop publishing and printing technology.*

## 700 (The Arts)

*This Dewey area includes a wide range of disciplines, including topics that change rapidly along with historical treatments that remain useful for long periods of time. Often books are oversized and may be used primarily in the library.*

### 709 (Art History)

X/3/MUSTIE  *Art histories often cover major periods and schools or specific regions of the world. While information may not become dated, watch for cultural, racial, and gender biases. Discard scholarly works that are not useful to your community in favor of materials for students and general readers. Discard books that don't include good reproductions of major works of art.*

### 720 (Architecture)

X/3/MUSTIE  *Histories of architecture may include general surveys or specific time periods and regions. Historical treatments do not date quickly.*

*Books featuring house designs and plans should reflect current building methodologies and current tastes in design. Generally discard home design books after ten years regardless of circulation. Be aware of changes in building codes. Evaluate books on trends (such as feng shui), that feature celebrity designers (*Martha Stewart's New Old House*), or that are*



*based on television shows (*This Old House*) when interest has waned.*

### 737 (Numismatics) 769 (Stamp collecting)

5/3/MUSTIE
*Keep stamp and coin catalogues up-to-date, replacing books that provide market valuations and price guides after 5 years. Keep a current edition and one previous edition of price guides that are updated yearly. Consider keeping the current edition of books like* The Official Blackbook Price Guide to US Postage Stamps *in reference, circulating the older edition if interest is high. Historical treatments of ancient, foreign, and commemorative coins and stamps may be kept indefinitely as long as interest is maintained. Many books on these topics will be used in-house.*

### 740 (Drawing & Decorative Arts)

X/3/MUSTIE
*Books that feature drawing styles and instruction should be weeded based on use and appeal. Retain basic technique books if well illustrated; replace worn and dated materials. Replace books on cartooning and compilations of popular comic strips (*Peanuts, Mutts*) as they become worn unless interest in the particular cartoon characters has waned. Consider reclassifying graphic novels not based on comic strips from 741 to a unique classification that gathers them together. Although Dewey indicates that graphic novels be placed in 741.5, many patrons prefer that they be shelved in a separate location.*

*Keep all materials on the history of interior design that are in acceptable condition. Discard books that feature general home decorating ideas after 5 years in favor of books that review established and distinct decorating styles (Southwestern, Caribbean). Discard books that feature outdated colors and patterns.*

*Keep books on antiques and collectibles, especially identification and price guides, until new editions are available. Discard books that don't have good photographs or that are simply lists of auction prices without good descriptions.*

*Skills required for most crafts don't change over time. Discard craft books based on use but watch for outdated styles and materials. Discard books on crafts that are no longer popular (macramé) or that feature gender bias.*

### 770 (Photography)

5/3/MUSTIE — *Check closely for outdated techniques, and especially outdated equipment; if in doubt, check with local photography club or buffs. Works about specific photographers, especially historical figures, may be kept as long as there is interest.*

### 791 (Public Performance)

10/2/MUSTIE — *This section can include memoirs of actors and performers writing about their craft and overviews or histories of film genres (e.g., horror film, best western movies). It also includes books of trivia based on popular movies and television shows. Weed based on interest and condition.*

### 793-796 (Games and Sports)

10/3/MUSTIE — *Discard and replace as rules and interests change. Watch for gender and racial bias in sports and athletics. Discard books that have outdated statistics.*

*Handbooks on popular electronic games may be difficult to replace; retain as long as the games are played in your community.*

## 800 (Literature)

*In most public libraries, general (or popular) fiction is cataloged in a separate area and the 800s are reserved for collections of poetry and prose, literary criticism, and, frequently, works of literature by non-Western authors. See the Fiction section (below) for works of popular fiction.*

*Copyright is not relevant for literature but older editions that are MUSTIE rarely circulate.*

X/3/MUSTIE — *Keep basic materials, especially criticism of classic writers. Discard any works of minor writers no longer read in the local schools, unless there is an established demand among the non-student population. Discard older editions of classics that have unappealing covers and yellowing pages, replacing with newer copies or paperback editions. Remember that classics that are being read won't be weeded—don't keep classics just because they are classics!*

*Check with local schools and community colleges for assignments or reading lists and check discards against these lists.*

*Discard collections of poetry and short stories that are not being used. Series that collect the 'best' short stories of the*



*year are rarely read after five years. Also consider weeding collections that are not indexed.*

*Discard books of wit and humor that are not circulating. Watch for collections that feature gender or nationality bias and outdated interests and sensitivities.*

## 900 (History and Geography)

### 910 (Geography and Travel)

3/2/MUSTIE     *Guidebooks (such as the Fodor series or Mobil travel guides) are outdated within a year or two. Keep no longer than three years. Historical travel guides, especially those that deal with local attractions (books about Route 66, for example), may be kept longer for archival purposes if interest exists.*

*Watch for changes in country names and for political changes that result in new or reformed countries. (Weed books that still refer to the USSR rather than individual countries, for example.) Atlases should be current, except for historical atlases, and replaced after major changes in political divisions occur.*

5/2/MUSTIE     *Weed personal travel narratives on use and interest, unless of high literary or historical value.*

### 930-999 (History)

10/3/MUSTIE     *Consider demand, accuracy of facts, and fairness of interpretation when reviewing histories. Carefully review histories of countries where major political and geographical changes have occurred. Discard older histories that don't reflect the unification of Germany or Vietnam or the break-up of the Soviet Union, for example.*

*Consider discarding personal narratives and war memoirs of World War II, the Korean Conflict, and the Vietnam War in favor of broader histories of these conflicts, unless the author is a local person, or the book is cited in a bibliography as having an outstanding style or insight.*

*Discard dated viewpoints (e.g., the McCarthy Era "World Communist Conspiracy" theory of modern history).*

*Retain books that collect primary documents or include archival photographs unless the reproductions are of poor quality.*

### B or 92 and 920 (Biography)

X/3/MUSTIE

*Unless the person treated is of permanent interest or importance, such as a U.S. President, discard a biography as soon as demand lessens. Replace biographies of people of ongoing interest with newer titles, at least once a decade, as interpretation of their lives and public perception of their impact will change over time. New information about their activities and accomplishments may be discovered.*

*Ruthlessly weed ghost written biographies of celebrities and biographies that were published immediately following the person's death or a major scandal. Poor quality biographies of major figures should be replaced with better ones, when available.*

*Biographies of outstanding literary value, such as Boswell's* Life of Johnson*, can be kept until worn.*

*Collective biographies usually focus on people from similar disciplines, racial, ethnic, or cultural groups, or geographic areas. Watch for outdated interests and collections that feature gender or race bias.*

### F (Fiction)

X/2/MUSTIE

*For most public libraries, circulation is the primary factor for weeding fiction. Discard works no longer in demand, especially second and third copies of past bestsellers. Retain works that are in demand and/or of high literary merit, but replace worn copies with new editions.  Discard lesser works by classic authors if they are not circulating. Consider discarding all titles in a series if you are not able or willing to replace missing titles, especially if the books do not stand alone.*

### Graphic Novels

X/1/MUSTIE

*Graphic novels are a format, not a genre, and can be classified in the adult, young adult, or children's collection depending on content appropriateness. Most are paperbacks but more and more are being released in hardcover editions. Because of their popularity, consider weeding any title that hasn't circulated in the past year. The exception would be classics or milestone titles such as* <u>Maus: A Survivor's Tale</u> *that might not circulate as heavily but will be discovered by serious graphic novel readers. Popularity is a major factor in selecting graphic novels and shelf-sitters make it harder for readers to find the graphic novels they are seeking.*

*CREW: A Weeding Manual for Modern Libraries.*  www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*                    *Page 79 of 107*


App. 458

*Condition is also a big factor in weeding. Weed titles that are falling apart, have missing pages, etc., but also consider weeding later titles in a series if you cannot or don't want to replace earlier missing titles.*

## Periodicals (Also Newspapers)

3/X/X   *Libraries used to bind most periodicals but the availability of online databases has made this an unnecessary and, in most cases, a wasteful expense. Keep in mind that most patrons rarely refer to a magazine that is more than three years old. Only bind quality periodicals that are in constant use for research (e.g., National Geographic) and that are unavailable in online databases.*

*Most popular newspapers are now available online. For the local newspaper, see section, "Local History."*

## Government Documents

3/2/X   *The federal depository library program is currently being studied and may likely change in the future. Already many government documents that were previously available in print format are only available electronically. Libraries that serve as official depositories of federal or state documents are required by law to follow established procedures governing weeding outlined in the agreement that established the depository library.*

*For non-depository libraries, documents should be discarded when superseded. Also discard documents that are not being used and are available in electronic format on the Internet. If a government document is cataloged in the general collection, weed according to the guidelines for that Dewey area. Refer to* The Federal Depository Library Handbook, *at* http://www.fdlp.gov/handbook/index.html, *for its suggested core collection by library type. This document indicates whether basic titles are available in print or electronic format.*

## Nonprint (Audiovisual) Media

*Depending on your collection, nonprint can include a wide variety of formats and the formats are rapidly changing. Except for items of local and regional history and archival materials, most nonprint material can be evaluated on the WORST formula. Current use and condition are more important than copyright date or production date. Although the CREW formula includes copyright criteria, rely more on*

*condition and circulation. Consider weeding any nonprint item that doesn't circulate several times a year.*

WORST  *__W__orn out, __O__ut of date, __R__arely used, __S__upplied elsewhere (available through ILL), or __T__rivial and faddish. Monitor statistics of use for these materials and view/ listen to them periodically to determine their condition. See the section, "CREWing Nonprint Media" for more detail on individual formats.*

### Film Formats

(DVD, videocassette, Blu-Ray)

2/1/WORST  *Videocassettes are disappearing from library collections as suppliers have mostly discontinued the format. If local interest exists, the videocassette collection may remain vital through donations. Examine closely after approximately 150 to 200 circulations. Weed videocassettes that are not circulating at least once a year. Replace worn copies of popular titles with DVD, if possible. Relocate children's videos for use in children's programs only if the library has public performance rights.*

*DVDs may or may not hold up to wear better than videocassettes. Check for scratches and discard if polishing is unlikely to repair the damage. Don't spend a lot of time trying to fix problems! It is generally not worth the time and effort and it takes special equipment to do a good job.*

*Be wary of DVDs that were not produced for use in the United States. Few patrons have players that will play DVDs created for other regions of the world.*

*New formats are developing and as of 2008 Blu-Ray appears to be the winner in the current high definition optical disc format wars. Eventually this format will replace DVDs in library collections although players are backwards compatible so patrons with Blu-Ray players can also use DVDs. Weed based on condition and popularity.*

### Audio Formats

(Music, audiobooks)

X/2/X  *Music and audiobooks are available in several formats, including vinyl, audiocassette, and compact disc or MP3 disc. Copyright date has little impact on weeding decisions.*

*Few libraries currently maintain collections of vinyl recordings. Most vinyl in public libraries is for musical*


App. 460

*recordings. If your collection includes them, weed based on use and availability in other formats. Discard when scratched or when the sleeve becomes tattered.*

*Weed music on audiocassette or compact disc formats based on condition and recent circulations. Any item that has not circulated within the past two years is most likely 'dead.' Do not spend time trying to repair audiocassettes. Compact discs are pretty durable, although they are not as indestructible as originally believed. It's probably a good idea to discard any compact disc that is more than 20 years old. If a compact disc can't be cleaned easily and quickly, then discard. Most cleaning equipment can only remove light scratches.*

*Audiobooks are available in audiocassettes and compact disc sets, although many libraries are circumventing the format decisions by subscribing to downloadable services. Weed based on circulation and condition. Discard sets if one or more component is missing unless the producer can supply a replacement (many do this free or for a small fee). It is generally not worth the time to try and repair audiocassettes; you will have limited success cleaning more than minor scratches out of compact discs.*

## Local History

X/X/X

*Your library is also the logical archives of the community, and, in many cases, of the county. Retain <u>all</u> books on the history and geography of the city and county unless worn and not repairable. Retain local newspapers for up to five years if they are not available electronically or on microfilm. If the library is the only repository for the local newspaper, consider microfilming past editions.  Brittle newspaper or fragments have little value in research. Keep local city directories. Keep <u>most</u> books by local authors (even if of minimal literary value) and genealogies of important local families.*

# CREW Guidelines for the Children's Collection

Most children's books can be evaluated in part on the guidelines provided above. However, additional considerations must be taken into account and the CREW formula may be different in some cases. Children rarely know what is on the *New York Times* bestseller list and they don't read reviews. Many older titles remain popular through many generations, and of course, parents and caregivers may seek out books that they remember fondly from their own childhood. While we all judge books by their covers, children's books may become MUSTIE more quickly due to heavy use. Unless forced to read a book for a school assignment, most children won't pick up books that look old and stodgy. Teens in particular prefer paperback formats for leisure reading. In addition to the considerations provided above, use the following guidelines when weeding the children's collection.

## E (Easy Readers/Picture Books)

X/2/MUSTIE    *Evaluate all materials <u>carefully</u> using MUSTIE as a guide. Replace popular titles that are torn and worn or that have been 'loved' too much.*

*Weed any book that has not circulated in the past two years. Picture books are so heavily used that every title should go out at least once in a two-year period.*

*Discard any books that are not suitable for library use, including those with inferior bindings. Replace as soon as possible books that have been rebound and don't have attractive covers.*

*Books that feature popular and commercial characters should be weeded when interest has faded or the television show is no longer shown.*

*Weed books that reflect racial and gender bias. Consider moving classics that may be used by children's literature classes to the adult 800s.*

*Use resources like <u>A to Zoo</u> by Carolyn Lima to determine the likelihood of continued usefulness to the collection.*

## JF (Juvenile Fiction)

X/2/MUSTIE    *Evaluate carefully for MUSTIE factors. Copyright is less important than use, but consider weeding anything that hasn't circulated in the past two years.*

*Weed based primarily on current interest except award books and those on school reading lists (e.g., Newbery Award, Coretta Scott King Award, Bluebonnet lists). Weed older award winners if they have not circulated in three years, or*


App. 462

*replace with a newer hardcover or paperback edition with contemporary cover art.*

*Evaluate closely for outdated styles, artwork, and mores, or biased viewpoints. Discard if format and reading level are not appropriate to the current interest level of the book. Discard topical fiction on dated subjects and cultural fads.*

*Discard abridged or simplified classics in favor of the original unless the particular abridgement has been very favorably reviewed.*

## YA (Young Adult) Fiction

3/2/MUSTIE

*Keep this section very current. Any item that has not circulated within two years should be considered 'dead' and removed (and anything that hasn't circulated within the past year is suspect and should be evaluated for promotion, relocation, or discard).*

*Discard YA fiction with outdated illustrations, story lines, or subjects. Classics (such as* The Pigman *by Paul Zindel or* The Chocolate War *by Robert Cormier) are not subject to the copyright guideline but should be replaced with newer paperback editions. Check for updated editions of popular classics like* Forever *by Judy Blume that have had terminology and situations updated for contemporary readers. Discard any YA fiction that has been rebound and lacks attractive cover art.*

## J and YA Nonfiction

*Use adult criteria for each Dewey category, but look especially for inaccuracy and triviality—common faults of over-simplified children's nonfiction. Discard titles that are outdated regardless of condition. Many children's books are purchased in library editions that never fall apart! Do not retain books that have erroneous and dangerous information simply because the book is still in great shape.*

*See the chapter,* CREWing Children's Materials *for additional general criteria.*

# What to do with Weeded Books: Types of Disposal

Every library will have its own method for handling books pulled for discard. Some use a printout from the online catalog to record disposition decisions. Others use a preprinted disposal slip that allows other staff to know how to process the discard.

The CREW method is well suited to using a simple, preprinted disposal slip (placed in each book when it is pulled) that indicates whether the book is to be sold, donated, destroyed, mended, transferred, rebound, or replaced. Mend sparingly! Mending should not require longer than fifteen minutes nor be so extensive as to ruin the materials' appearance. Any item that cannot be mended within this time frame should be disposed of and replaced, if use warrants, with a newer copy or edition.

Bind sparingly! Before sending a book to a bindery, determine whether the continued value and use in the collection warrants the time and expenses to bind. Compare the cost of rebinding with the cost of a new copy or edition. Often, a new copy is almost as inexpensive and is more appealing; a rebound volume is not as attractive as a new book.  For out-of-print titles and titles of important local interest, rebinding is the best option. You may wish to remove and save the plastic covered dust jacket and/or barcode label from the book before sending it to the bindery, since they might possibly be reused on the rebound volume.

There are five basic ways to dispose of print or nonprint materials:

**Sell It:** to the public, either at a large annual sale or from a continuous sale rack; or to a used book dealer or pulp dealer, usually in large lots, or through online sales.

**Donate It:** donate books to a hospital, nursing home, adult or juvenile correctional facility, charitable institution, school district, or to a small library struggling toward system membership.

**Trade It:** with another library, or with a used book dealer, for a book your library can use.

**Recycle It:** by using a local contractor, perhaps in cooperation with local government agencies.

**Destroy It:** by burning in an incinerator or by tossing it into the trash. If the latter method is used, be sure the books won't be seen by someone passing by.  Citizens might misunderstand the reasons for destroying 'valuable' books.

Each method of disposal has its advantages and drawbacks, and its own preconditions:

SELLING promotes good public relations and is potentially profitable if the materials have some residual value, and if selling is done with the clear understanding that the items may contain dated information. Mark all discards clearly to avoid donations from well-intentioned, but ill-informed, patrons who return the books to your library. Books that cannot be sold should be recycled, destroyed or sold with other hopeless cases to a pulp dealer (if one is within driving distance).

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 83 of 107*

 App. 464

Keep in mind that your governing authority (city, county, district) probably has rules about selling items that were purchased with taxpayer funds or that were donated to the collection. Be sure that you follow the rules! In some cases, it is a matter of wording the transaction properly to remain within the rules. For example, it may be okay to sell 'surplus' materials or the 'asset' may need to be transferred to a group, such as the Friends of the Library, who can then handle the sale of weeded items.

Most Friends groups hold annual or semi-annual sales that can be great community events. Others may instead, or in addition, hold ongoing sales. Most books are priced at fifty cents or a dollar, although special, collectible books may be individually priced. The idea is to generate as much money as possible without spending too much time sorting and pricing. Book sales also promote goodwill and generate publicity for the library.

Many Friends groups are beginning to use online sellers to make money for the library or donate unsellable books to organizations. No program is perfect, and none is endorsed by the writer of this manual or the Texas State Library and Archives Commission. Research for yourself options offered by each company or program before making a decision. Various online sellers such as Better World Books, http://www.betterworldbooks.com/, Cash 4 Books, http://www.cash4books.net/, and Blogistics, http://www.blogistics.com/, purchase used books directly from libraries. Each company has specific requirements related to condition (ex-library books may not be saleable but you may make money on donations that can't be added to the collection). Friends of Libraries USA (FOLUSA) offers some tips on online selling on their Web site, http://www.folusa.org/resources/selling-books-online.php.

Some governing agencies require, or offer as an option, that old books be sold as surplus through the agency's purchasing department, although rarely does the library benefit from any proceeds of the sale.

As a goodwill gesture, consider giving away books that don't sell at the book sale. If local rules permit, allow interested people to cart off the excess inventory, saving the library the expense of hauling the books to the dump. This also allows the library to avoid public relations issues that may arise if the community perceives the library as 'throwing away perfectly good books.'

DONATING is not a profitable method, but promotes good public relations if only very good discards are disposed of in this way. Giving away junk does not promote good public relations, nor does it help the recipients. A childcare center, for example, will remember kindly your donation of picture books even if the covers are shabby. You may gain a regular customer for your prettier new picture books and a dozen regular patrons for your preschool story hour by sincerely considering the wants and needs of the recipient of your discards. For good quality books that are too technical for your collection, check with local universities to see if they can use the items. Even books that include outdated

information, stereotypes, and such may be useful for a museum or history center that focuses on the population or topic.

If a book depository or branch is planned, you might store discarded second and third copies for such a purpose if they are in good condition and are likely to remain viable in a collection. Consider donating duplicates that are in good condition to a local hospital, literacy program, nursing home, or an adult or juvenile correctional facility (especially paperbacks and large type books). Do not donate books that are in poor condition or that contain dangerously outdated information! You are simply passing your junk on to someone else!

Be wary of patrons who suggest that the library donate used books to projects in other countries or outside your area. Shipping books to Africa is very costly and it does little to help developing areas if what is being shipped is old, in poor condition, and outdated. Some libraries are willing to donate materials to groups that work with such projects as they know what is useful and what is junk. See ALA's Fact Sheet 12, "Sending Books to Needy Libraries: Book Donation Programs" available online at http://www.ala.org/ala/aboutala/hqops/library/libraryfactsheet/alalibraryfactsheet12.cfm for information on organizations that do want books for specific projects.

TRADING your 'best' discards is both excellent public relations and a shrewd financial move. Trading works with only two specific classes of discard: the high quality (or, at least, well-reviewed) item that is nonetheless of no interest to your community (e.g., a shelf sitter in Del Rio might be dynamite in Pampa, and vice versa); or the occasional donated duplicate of a good book of less than two-copy demand. Inquiries about trades can be made over the phone, by email, by letter, or as part of the business of the Texas Library Association annual conference or regional system meetings. If you are interested in trading, check out the Duplicates Exchange Union, http://www.ala.org/ala/mgrps/divs/alcts/mgrps/ecoms/duplicatesexch/duplicatesexchange.cfm. Membership is free and open to libraries of all types. Members exchange lists of available materials (as well as want lists) electronically. The requesting library pays for mailing items if the cost is above a set amount. Be sure that local ordinances allow the trading of assets that have been purchased with taxpayer funds.

RECYCLING services are now widely available and many communities encourage 'going green.' Recycling not only saves resources and improves the environment; it also helps control the rising costs of new books by holding down paper prices. Many community recycling programs accept the 'slick' paper that most magazines and vendor catalogs are printed on, as well as newsprint, making it easy to recycle discarded magazines and newspapers.  Unfortunately, it is very difficult to recycle books. Paperbacks can often be recycled, but hardbacks are usually only recyclable if the covers are removed, a job that is very time consuming. Check with local recycling companies to ensure that you are not simply passing along 'garbage' that will either foul the recycling process or need to be hauled to the dump by someone else.

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                              *Page 83 of 107*

 App. 466

Children's books that are worn or damaged beyond repair may also be 'recycled' by laminating the illustrations and putting them on craft sticks to make puppets for library storytime, local child care centers, or teachers, or for creating flannelboard versions of popular stories. Many crafters have begun to 'recycle' books into works of art such as hollowed out 'book boxes' to hide valuables or store items, or turning them into purses and other items. See the Altered Book website, http://www.alteredbookartists.com/, for an amazing assortment of art made from old books.

DESTRUCTION should be reserved for materials in the worst physical condition, the absolutely hopeless cases, and then only as a last resort if the books cannot be recycled or sold for pulp. The advantage of this method is that it requires minimal time and effort. The major drawback is that the library derives no benefits, in money or public relations, from the discarded materials. Besides contributing to the already overflowing landfills, this method of disposal is likeliest to cause a 'weeding controversy,' since many people are shocked by the 'waste' of throwing 'good books' on the trash heap. Also, 'book burning' has unpleasant connotations. If you can explain that only those books and nonprint items in the worst physical condition get this treatment, you may be able to avert negative publicity. Another potentially embarrassing situation that can occur is for well-intentioned patrons to 'find' library books in the trash and assume vandals have put them there. Although this method of disposal cannot be avoided, it should be the last resort.

# Epilogue--Encouraging the Hesitant Weeder

Hopefully, this manual has already capably demonstrated the place of weeding in the cycle of library service, the benefits of regular CREWing, and the streamlined simplicity of the CREW method. However, there are several common objections to rigorous weeding often heard from librarians not comfortable with the task. Since they serve to justify keeping collections unweeded and unreviewed, they need to be considered in this manual.

**I am proud of having a large selection of books for my patrons. Besides, I need to have enough volumes in the collection to remain a system member or meet standards.**

BUT - Quality counts more than quantity, both with the patrons and with the Texas State Library & Archives Commission. While the State Library will not automatically disqualify you for system membership without taking other factors into consideration, annual statistics that show virtually no discards could indicate that the collection may be outmoded or growing in a haphazard fashion. **A good library is not necessarily a big library**. The level and quality of service the library can offer is of utmost importance. Of course, if the size of the collection is very near the minimum required for system membership, it simply cannot be weeded quite as strictly as a library collection safely over the requirement.  In such cases, libraries concerned with going below minimum requirements should check with the Texas State Library & Archives Commission for more information.  Once the volume count exceeds the library's shelf capacity, however, full-scale CREWing should be done in earnest. For service, efficiency counts more than raw size. Ask your regional system staff for help in procuring newer, higher quality books. An outdated book added to your collection today costs money (the time you spend processing the book) and will be of little or no use to your patrons.

**I don't have the staff time. We are too busy performing more critical library tasks.**

BUT - If you have the time to select new books, then you have the duty to weed those that are no longer useful to your collection. No one has all the time needed to do important tasks, but you MUST find the time to weed. Your library's image, credibility, and quality of service are at stake. To help find the needed time, make it a regular part of your routine, and use the guidelines in this manual to help make it a time-efficient process.


App. 468

**If I throw this book out, I just know someone will ask for it tomorrow.**

**BUT** - This situation seldom actually occurs and is certainly less common than a patron asking for a book you decided not to acquire for the library in the first place. A detailed weeding study conducted over a three-year period at Yale University revealed that in two years, only 3.5% of the weeded items were asked for.[17]  In fact, a book that has not been used in the past five years is unlikely to be used in the next five. The 'weeded needed' will be few, their absence is less harmful to public relations than a habitually cluttered and unreliable collection, and most likely they are still accessible through interlibrary loan. Moreover, CREW cuts down on the number of 'asked-for unacquired,' by alerting the librarian to gaps, losses, and the full range of materials available. The reality is that if no one is using the book, you are probably the only one who will miss it! Remember that the best items in your collection are the items that are being used.

**THE COLLECTION WEEDS ITSELF—WE LOSE BOOKS EVERY DAY!**

Losing books to theft or non-return doesn't count! Those are books someone wanted enough, presumably, to keep instead of bringing it back to the library. Attrition from loss and theft certainly means you need to replace some of those books with newer editions or different titles but you are putting them back on shelves that are crowded with a lot of books that aren't worth stealing, or borrowing.

**Well, this old book may be rare and valuable, even a first edition!**

**BUT** - Even if the old book dates back before 1900, chances are one in several thousand that it is worth even as much as $5.00. Ex-library books, even when they are otherwise valuable titles, are rarely of interest to collectors. Why? Because libraries mark up the books with accession numbers, bar codes, property stamps, etc., and the books have often received heavy use.

Only a handful of unique copies, authors' personal copies, or other treasures sell for more than a few dollars. Old books are overwhelmingly rubbish or cheap curios. They almost never deserve the glass-fronted cases or separate stacks they too often receive at the expense of library space, time, money, and usefulness. 'First Editions' are also worth very little, especially when 'damaged' by library markings and worn by use, except in rare cases where only a handful of copies remain. The first edition of an unimportant book is worthless, even if it is unique. A high-priced ($30.00 or more) first edition is almost always a classic or near classic that was not appreciated when it was first published. If you have never heard of the title, it almost certainly is not of this sort.

---

[17] *Weeding Library Collections: Library Weeding Methods*, 3rd edition, 1989, p. 50, 52.

If you still think you have a valuable book, check some of the online out-of-print book websites like Alibris, http://www.alibris.com/, or ABE Books, http://www.abebooks.com/, to see if there is any market for the item. (ABE Books also provides interesting articles about collectable authors—if you have ANYTHING signed by J.K. Rowling, get it off your shelf—and other topics that may help you locate saleable items in your donations and discards.) If the book is in fact worth more than a few dollars, weed it and sell it! If you are selling a large number of books that you believe to be valuable, contact a reputable antiquarian book dealer for their estimated auction value of the book. Most real rare books are sold at auctions in New York or London.

**If I discard a book because it has not been used, isn't that admitting publicly that I made a mistake in selecting it?**

**So?** You are human! Every librarian makes those kinds of mistakes. In many cases, books we select are NEVER used by a patron. Selection is not based on scientific formulas or objective measurements. To a very large extent, selection must be based on the librarian's judgment of books and expectations of what people will want to read. However, there are millions of books available, and over 50,000 new books released every year. It's impossible for even the best librarian to always 'be right." Judgment can be sharpened by training and experience, but it can never be made infallible.

**Isn't weeding really just irresponsible destruction of public property?**

**No.** As explained in the first part of the manual, weeding is a very constructive process that increases the library's ability to give a 'full service value per dollar" and that improves the appearance and comfort of the library building. As for 'irresponsibility,' the CREW method's very first step involves checking any possible legal constraints specifically to avoid violating civic responsibilities. Further, destruction by trashing or burning is not the only method of disposal; in fact, it is the last-choice option. Weeding library materials that are no longer of use is no more 'irresponsible' than discarding broken equipment from the recreation center or repaving a road that has become worn from use. Ask if the police department still has old uniforms and vehicles!

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                                      *Page 89 of 107*

App. 470

**We need to have something (or anything) on this subject. And we need every copy of this classic for the school rush.**

BUT – Is 'something' really better than 'nothing' when it is outdated and erroneous? Ask yourself if you would use the book to do your own research. Would you want your child's grade to depend on using outdated information? If 'something' is needed on a subject, then a good resource that will be used is called for. If it will not be used, even the only book on a subject, such as paleobotany, is simply cluttering the shelves. If an unused book takes up space, an inaccurate book is worse. If you really need a resource on a particular subject, acquire something new, accurate, well written, and sturdily bound. If it is within the library's mission to provide enough copies of classics to meet the needs of a class of students, then those extra copies could be kept in a storage room until the rush or replaced with clean, easy-to-store, attractive, inexpensive paperbacks.

Remember that CREWing entails a **continuous** process of **review**, **evaluation** and **weeding**. Weeding itself should be an ongoing, routine part of the work schedule, not a onetime operation or a 'once in awhile' project. Maintaining this cyclical process will prevent the buildup of unused, unwanted and damaged materials, which in turn leads to a monumental weeding task after months or years of neglect. In the long run, CREWing actually improves the quality of your library and enhances its reputation for providing accurate and dependable service in uncluttered, pleasant surroundings. In the short run, it augments the library director's professional judgment and working knowledge of the collection.

The point of weeding, and of CREWing, and of all other library functions, technical or public, is to provide your patrons with better service, clearer access to the world's knowledge, and entertainment. By streamlining your collection for efficient and reliable use, you are making it easier and faster for the people of your community to find the facts, phrases, and stories they need. Therefore, take this manual and discuss the matter with your staff, volunteers, and Board.  Think about it for a while. Then, start working toward efficient, effective service and a high quality collection.

# Don't delay—start weeding today!

# Bibliography

## *Standard Collection Bibliographies*

Note that some of these titles are expensive; check with your regional system office, the Texas State Library's Library Science Collection, or a large public library to borrow items that you do not need on-hand on a regular basis. Use them to compare your holdings to those that are highly recommended, core collection titles, or to help you make decisions about whether to replace, retain, or discard an item that has marginal circulation or is in poor condition.

Bank Street College of Education. *The Best Children's Books of the Year, 2008*. Teachers College Press, 2008.

Barr, Catherine and John T. Gillespie. *Best Books for Children: Preschool Through Grade 6, 8th Edition*. Libraries Unlimited, 2005.

Barr, Catherine and John T. Gillespie. *Best Books for Children: Preschool Through Grade 6, Supplement to the 8th Edition.* Libraries Unlimited, 2007.

*Books Out Loud: Bowker's Guide to Audiobooks 2008*.  Bowker, 2008.

*Bowker's Complete Video Directory 2008*.  Bowker, 2008.

Brice, Donaly and Bill Stein. *More Than a Lone Star:  A Texas History Selection List for the Small Public Library*. Houston Area Library System, 2003.

*The Complete Directory of Large Print Books and Serials 2008*.  Bowker, 2008.

Cords, Sarah Statz and Robert Burgin. *The Real Story: A Guide to Nonfiction Reading Interests*. Libraries Unlimited, 2006.

East, Kathy and Rebecca L. Thomas. *Across Cultures: A Guide to Multicultural Literature for Children*. Libraries Unlimited, 2007.

Fichtelberg, Susan. *Encountering Enchantment: A Guide to Speculative Fiction for Teens*. Libraries Unlimited, 2006.

Fraser, Elizabeth. *Reality Rules!: A Guide to Teen Nonfiction Reading Interests*. Libraries Unlimited, 2008.

Frolund, Tina. *Genrefied Classics: A Guide to Reading Interests in Classic Literature*. Libraries Unlimited, 2006.


App. 472

Gillespie, John T. and Catherine Barr.  *Best Books for High School Readers: Grades 9-12*.  Libraries Unlimited, 2004.

Gillespie, John T. and Catherine Barr. *Best Books for High School Readers: Grades 9-12, Supplement to the First Edition*. Libraries Unlimited, 2006.

Gillespie, John T. and Catherine Barr. *Best Books for Middle School and Junior High Readers*. Libraries Unlimited, 2004.

Gillespie, John T. and Catherine Barr. *Best Books for Middle School and Junior High Readers: Grades 6-9, Supplement to the First Edition*. Libraries Unlimited, 2006.

Herald, Diana Tixier. *Teen Genreflecting: A Guide to Reading Interests,* 2nd Edition. Libraries Unlimited, 2003.

Herald, Diana Tixier and Bonnie Kuntzel. *Fluent in Fantasy*. Libraries Unlimited, 2007.

Herald, Diana Tixier and Wayne A. Wiegand. *Genreflecting: A Guide to Popular Reading Interests*, 6th Edition**.** Libraries Unlimited, 2005.

Husband, Janet G.  and Jonathan F. Husband. *Sequels: An Annotated Guide to Novels in Series*, 4th Edition. American Library Association, 2008.

Hysell, Shannon Graff. *Recommended Reference Books for Small and Medium-sized Libraries and Media Centers, vol. 28*. Libraries Unlimited, 2008.  (The current edition reviews titles published in the previous two years.  Check earlier editions to analyze older reference tools.)

Lima, Carolyn W. and John A. Lima. *A to Zoo: Subject Access to Children's Picture Books*, 7th Edition. Libraries Unlimited, 2005.

Lima, Carolyn W. and Rebecca L. Thomas. *A to Zoo: Subject Access to Children's Picture Books Supplement to the 7th Edition*. Libraries Unlimited, 2008.

Lynn, Ruth Nadelman. *Fantasy Literature for Children and Young Adults: A Comprehensive Guide, 5th Edition*. Libraries Unlimited, 2005.

*Magazines for Libraries*, 17th Edition. Bowker, 2008.

New York Public Library. "100 Picture Books Everyone Should Know." http://kids.nypl.org/reading/recommended2.cfm?ListID=61]

O'Gorman, Jack. *Reference Sources for Small and Medium-sized Libraries*, 7th Edition. American Library Association, 2007.

Pearl, Nancy. *Book Crush: For Kids and Teens*. Sasquatch Books, 2007.

Pearl, Nancy. *More Book Lust*. Sasquatch Books, 2005.

Pilger, Mary Anne. *Science Experiments Index for Young People*, 4th Edition. Libraries Unlimited, 2005.

Schwedt, Rachel E. and Janice DeLong. *Core Collections for Children and Young Adults*. Scarecrow Press, 2008.

*The Software Encyclopedia 2008*. Bowker, 2008.

Thomas, Rebecca L. and Catherine Barr. *Popular Series Fiction for Middle School and Teen Readers*. Libraries Unlimited, 2005.

"Top Fifty Gaming Core Collection Titles." *Young Adult Library Services*. v6 no2 Winter 2008, p36-38+48.

Wadham, Tim. *Libros Essenciales: Building, Marketing, and Programming a Core Collection of Spanish Language Children's Materials*. Neal-Schuman, 2006.

Walker, Barbara J. *The Librarian's Guide to Developing Christian Fiction Collections*. Neal-Schuman, 2006. (The three titles in this set were originally published as individual volumes in 2005 covering core books and authors for adults, teens, and children.)

Wilson Standard Catalogs / Core Collections Series
(The Wilson Standard Catalog Series titles are available in two formats, print and electronic.  New editions of each print volume have Core Collection in the title, as is currently used in the online edition of each title.  See also Electronic Databases section following.)

*Children's Catalog*. 19th Edition. H.W. Wilson, 2006.
(annual supplements are published between editions)

*Senior High Core Collection*. 17th Edition. H.W. Wilson, 2007.
(annual supplements are published between editions)

*Public Library Core Collection: Nonfiction*. 13th Edition. (Public Library Catalog) H.W. Wilson, 2008.
(annual supplements are published between editions)

*Middle and Junior High School Library Catalog*. 9th Edition. H.W. Wilson, 2005.
(annual supplements are published between editions)

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 93 of 107*


App. 474

*Fiction Catalog*. 15th Edition. H.W. Wilson, 2006.
(annual supplements are published between editions)

Young Adult Library Services. "Top Fifty Gaming Core Collection Titles."
http://wikis.ala.org/yalsa/index.php/Gaming_Lists_&_Activities

Zbaracki, Matthew D. *Best Books for Boys: A Resource for Educators*.
Libraries Unlimited, 2008.

## Recommended Lists and Best of the Year Lists

The American Library Association and journals such as *Library Journal*, *School Library Journal*, and *Booklist* release notable and 'best of the year' lists annually. Check the current lists for good replacement titles and check previous lists to help you make decisions about the quality of titles that are circulating marginally or to decide whether to replace a title.

### ALSC's Children's Notables Lists
http://www.ala.org/ala/mgrps/divs/alsc/awardsgrants/childrensnotable/index.cfm
This division of the American Library Association issues annual lists of notable materials in book, film, audio, and software formats for children from birth through age 12. Usually released in January immediately following the Midwinter Meeting. Also check award lists, including the Newbery Award, the Caldecott Award, Siebert Award, the Odyssey Award, and others.

### Notable Books for Adults
http://www.ala.org/ala/mgrps/divs/rusa/awards/notablebooks/lists/index.cfm
The Reference and Users Services Division of the American Library Association issues an annual list of 25 important and highly readable books of fiction, nonfiction, and poetry for adult readers.

### Outstanding Reference Sources
http://www.ala.org/ala/mgrps/divs/rusa/awards/outstandingreferencesources/index.cfm
The Reference and Users Services Division of the American Library Association issues an annual list of outstanding reference resources, emphasizing those of most value to small and medium-sized public libraries. Issued each year in May.

### Notable Videos
http://www.ala.org/ala/mgrps/rts/vrt/initiatives/notablevideos/index.cfm
Video Round Table, a group within the American Library Association, provides an annual list of fifteen notable non-feature how-to and educational films.

*YALSA Book Awards & Booklists*

http://www.ala.org/ala/mgrps/divs/yalsa/booklistsawards/booklistsbook.cfm

This division of the American Library Association issues annual lists of notable materials in book, film, and audio formats for teens. Usually released in January immediately following the Midwinter Meeting. Also check award lists, including the Alex Award, the Printz Award, and Young Adult Nonfiction Award, as well as lists like "Outstanding Books for the College Bound" and "Great Graphic Novels for Teens."

## Indexes

While most standard indexes are now available electronically, some libraries keep older print copies. Retain works that are listed in standard indexes and are still being used by patrons. (See also Electronic Databases and Online Resources sections following.)

*The Columbia Granger's Index to Poetry in Anthologies*. 13th Edition. Columbia University Press, 2007.

*Index to Poetry for Children and Young People: 1993-1997*. H. W. Wilson, 1998. (Other Volumes: 1964-1969, 1970-1975, 1976-1981, 1982-1987, 1988-1992).

*Play Index 1998-2002*. H. W. Wilson, 2004. (Other Volumes: 1949-1952, 1953-1960, 1961-1967, 1968-1972, 1973-1977, 1978-1982, 1983-1987, 1988-1992, 1993-1997).

*\*Short Story Index, 1999-2004*. H. W. Wilson, 2005. (Other Volumes: 1900-1949, 1950-1954, 1955-1958, 1959-1963, 1964-1968, 1969-1973, 1974-1978, 1979-1983, 1984-1988, 1989-1993, 1994-1998, 2000, 2003).

## Electronic Databases

Listed here are electronic database versions of standard indexes. These are available through paid subscriptions but some may be available through the TexShare databases at no or reduced fees for your library. Link to www.texshare.edu for more information on databases available to public and academic libraries in Texas.

*Children's Core Collection*

http://www.hwwilson.com/print/childcat.cfm

Database version of *Children's Catalog*.

*The Columbia Granger's World of Poetry*

www.columbiagrangers.org/grangers/index.jsp

Electronic indexed poetry.

App. 476


*Global Books in Print*
> http://www.globalbooksinprint.com/bip/
> Comprehensive guide to books in print.

*Graphic Novels Core Collection*
> http://www.hwwilson.com/Databases/graphicnovels_core.htm
> More than 2000 recommended titles.

*Middle School and Junior High Core Collection*
> http://www.hwwilson.com/print/mjhscat.cfm
> Database version of *Middle and Junior High School Library Catalog.*

*Nonbook Materials Core Collection*
> http://www.hwwilson.com/Databases/nonbook_core.htm
> Recommended multimedia resources.

*Play Index*
> http://www.hwwilson.com/Databases/playindex_e.htm
> Database version of *Play Index*.

*Public Library Core Collection: Fiction*
> http://www.hwwilson.com/print/fictcat.cfm
> Database version of *Fiction Catalog*.

*Public Library Core Collection: Nonfiction*
> http://www.hwwilson.com/print/publibcat.cfm
> Database version of *Public Library Catalog*.

*The Reader's Advisor Online*
> http://rainfo.lu.com/
> Database version of the *Genreflecting series and other reader's advisory tools*

*Senior High Core Collection*
> http://www.hwwilson.com/print/srhscat.cfm
> Database version of *Senior High Core Collection*.

*Short Story Index*
> http://www.hwwilson.com/databases/storeindec.htm
> Database version of *Short Story Index*.

## *Online Resources*

Listed here are selected online resources which appear in the text of this manual. These websites offer free resources to help with collection development, selection, and weeding decisions.

### Adult Reading Round Table Booklists

http://www.arrtreads.org/booklists.htm

The members of this group are librarians and library staff from libraries in the Chicago area who are interested in leisure reading and promoting reading for pleasure. Check out their reading lists and genre studies.

### Alibris

www.alibris.com

If you think you have a valuable book, check it on Alibris, an out-of-print and rare book dealer.  Alibris for Libraries will help to locate used, new and hard-to-find books, movies and music. Alibris offers out-of-print, older in-print, and otherwise unavailable titles in stock, including custom tools for managing replacement and collection development projects.

### Altered Books website

http://www.alteredbookartists.com/,

The International Society of Altered Book Artists website offers an amazing assortment of art made from old books.

### Better World Books

http://www.betterworldbooks.com/

This program works with libraries across the country to sell discarded and donated material on 20 online marketplaces to generate funding for both libraries and non-profit literacy initiatives.

### Blogistics

http://www.blogistics.com/

Purchase used books directly from libraries. Note that each company has specific requirements

### Cash 4 Books

http://www.cash4books.net/

This online company offers their service to anyone that needs to sell books quickly and easily.  They buy a wide variety of books, but they specialize in textbooks, non-fiction, business, and professional/technical books.


App. 478

Determining the Value of Donated Property

http://www.irs.ustreas.gov/pub/irs-pdf/p561.pdf

This Internal Revenue Service (IRS) Publication 561 is designed to help donors and appraisers determine the value of property (other than cash) that is given to qualified organizations.

Disposal or Weeded, Discarded, and Unwanted Books

http://www.lrs.org/documents/field_stats/weeding_LP.pdf

This 2008 compilation by Maura McGrath for Library People: Friends of Colorado Libraries

Duplicates Exchange Union

http://www.ala.org/ala/mgrps/divs/alcts/mgrps/ecoms/duplicatesexch/duplicatesexchange.cfm

A group within the American Library Association, ALCTS Division, this group connects those who need materials with those who have more than they need. Members communicate by electronic discussion list to exchange usable library material. All kinds of libraries and librarians, primarily of small college and public libraries participate. Everyone is welcome.

Green Weeding: Promoting Ecofriendly Options for Library Discards

http://www.libraryjournal.com/article/CA6592668.html

This recent article by Sarah Penniman and Lisa McColl in *Library Journal* (September 15, 2008) captures some current library activities and options for environmentally friendly weeding and online selling of discards.

The Modern Library

http://www.randomhouse.com/modernlibrary/100best.html

Lists of the 100 'best' novels and non-fiction books, voted on by readers may help libraries determine a core collection of classics and important contemporary books to retain in the collection.

The New Planning for Results: A Streamlined Approach Course.

http://www.elearnlibraries.com/courses/the_new_planning_for_results/index.html

This course is based on the popular American Library Association publication, *The New Planning for Results: A Streamlined Approach* by Sandra Nelson.

Sending Books to Needy Libraries: Book Donation Programs

http://www.ala.org/ala/aboutala/hqops/library/libraryfactsheet/alalibraryfactsheet12.cfm

This American Library Association Fact Sheet 12 offers information on organizations that do want books for specific projects.

The Sunlink Weed of the Month Archives

www.sunlink.ucf.edu/weed/

Funded by the Florida Department of Education, the SUNLINK Weed of the Month program introduced a new weeding subject area each month from September 1997 to December 2005, organized by the primary Dewey classification. Although no longer adding to this website, the guidelines for weeding each topic area are very useful.

Tips for Online Book Sales

http://www.folusa.org/resources/tips.php

Friends of Libraries USA (FOLUSA) website offers "Tips for Online Book Sales," "Online Resources" and "List of Friends Selling Online."

Your Old Books

http://www.rbms.info/yob.shtml

This guide from the American Library Association, ACRL, Rare Books and Manuscripts Section, lists resources for the evaluation and appraisal of books, offers questions and answers on what makes a book rare, and suggested organizations that welcome book donations.

## *Further Readings*

Listed here are journal articles and books that provide additional information on weeding and topics related to collection development and maintenance. For those in Texas, remember that many of the articles are available through databases in TexShare.

Alabaster, Carol. *Developing an Outstanding Core Collection: A Guide for Public Libraries*. American Library Association, 2002.

Baumbach, Donna J. and Linda L. Miller. *Less is More: A Practical Guide to Weeding School Library Collections*. American Library Association, 2006.

Bazirjian, Rosann. "The Ethics of Library Discard Practices," in *Legal and Ethical Issues in Acquisitions*. Haworth Press, 1990.

Bromann, Jennifer. "Letting Go: How One Librarian Weeded a Children's Magazine Collection." *School Library Journal*  v. 48 no. 7 (July 2002) pp. 44-46.

"Commentary on weeding." *Library Administrator's Digest*. Feb 1999. FindArticles.com. 13 May 2008. http://findarticles.com/p/articles/mi_qa3858/is_199902/ai_n8843523



Doll, Carol A. and Pamela Petrick Barron. *Managing and Analyzing Your Collection: A Practical Guide for Small Libraries and School Media Centers*. American Library Association, 2002.

Dilevko, Juris. "Weed to achieve: a fundamental part of the public library mission?" *Library Collections, Acquisitions, & Technical Services* v. 27 no. 1 (Spring 2003) pp. 73-96.
http://www.moyak.com/researcher/resume/papers/weeding-pdf.pdf

"Evaluating Library Collections: An Interpretation of the Library Bill of Rights." Adopted February 2, 1973, by the American Library Association Council; amended July 1, 1981.
http://www.ala.org/Template.cfm?Section=interpretations&Template=/ContentManagement/ContentDisplay.cfm&ContentID=8537

Garcia, June and Sandra Nelson. *Public Library Service Responses 2007*. American Library Association, 2007.

Greiner, Tony  and Bob Cooper. *Analyzing Library Collection Use with Excel*. American Library Association, 2007.

Handman, Gary. *Video Collection Development in Multi-type Libraries: A Handbook*. 2nd Edition. Libraries Unlimited, 2002.

Hoffmann, Frank W. and Richard J. Wood.  *Library Collection Development Policies: School Libraries and Learning Resource Centers.*  Scarecrow Press, 2007.

Hoffmann, Frank W. and Richard J. Wood.  *Library Collection Development Policies: Academic, Public, and Special Libraries.*  Scarecrow Press, 2005.

Hogan, Cecilia. "Library Book Sales:  Cleaning House or Cleaning Up?" *Searcher*  v. 16 no. 3 (March 2008) pp. 36-46.

Larson, Jeanette and Herman L. Totten. *The Public Library Policy Writer: A Guidebook with Model Policies on CD-ROM*. Neal-Schuman, 2008.

Metz, Paul and Caryl Gray. "Public Relations and Library Weeding." *The Journal of Academic Librarianship* v. 31 no. 3 (May 2005) pp. 273-9.

Nelson, Sandra.  *Strategic Planning for Results*.  American Library Association, 2008.
This is the fully revised version of *Planning for Results* that includes *Public Library Service Responses 2007*.

Nelson, Sandra. *The New Planning for Results: A Streamlined Approach*. American Library Association, 2001.

Public Library Association. *Weeding Manual*. 2nd Edition. American Library Association, 2002.

RBMS Publications Committee. *Your Old Books (Revision 2005.2).* Rare Books and Manuscripts Section, Association of College and Research Libraries, American Library Association, 2006. http://www.rbms.info/yob.shtml#21

Slote, Stanley J. *Weeding Library Collections: Library Weeding Methods*. 4th Edition. Libraries Unlimited, 1997.

Texas Library Association. *Texas Public Library Standards*.  Texas State Library and Archives Commission, 2004. http://www.tsl.state.tx.us/plstandards/

## *Periodicals and Electronic Lists*

*Booklist*

http://www.ala.org/ala/aboutala/hqops/publishing/booklist_publications/booklist/booklist.cfm

This publication from the American Library Association includes a regular 'roundup' of reference titles and articles that focus on 'core collections' for specific subject areas, including types of novels. For example, core collections have been covered for historical sagas, graphic novels featuring women, and African American cuisine. If you don't subscribe (you should!), search for these resources through the TexShare databases when making weeding decisions.

*Collection Management*

From Haworth Press, this quarterly journal is devoted to the theories, practices, and research findings involved with the modern management of library collections.  ISSN: 1545-2549

COLLDV-L

http://serials.infomotions.com/colldv-l/
This listserv is a moderated discussion list directed primarily to those involved with library collection development. Although some discussions are rather academic and many of the postings deal with employment opportunities, subscribers can post questions regarding weeding activities and replacement of materials.

Fiction_L

http://www.webrary.org/rs/Flmenu.html
This electronic listserv is hosted by the Morton Grove Public Library and is devoted to reader's advisory topics including collection


App. 482

development issues, booklists and bibliographies. Check out the booklists for great fiction titles on a wide range of topics.

*Library Journal*

www.libraryjournal.com

Each issue includes a roundup of reference titles. Also check out the collection development calendar online, which highlights specific subject areas. Each article includes new titles and classics. For example, the January 2008 issue focused on pregnancy and childbirth, while June 2007 covered water sports.

*School Library Journal*

http://www.schoollibraryjournal.com/

Despite its name, this journal covers materials for youth in school *and* public libraries. In addition to reviews and 'editor's choice' lists of the best books and media for the year, articles may focus on important titles in particular subject areas or genres. For example, the May 2008 issue included a focus on science fiction.

# Appendix

OVERVIEW CHART OF CREW FORMULAS  .................................................................99

DISPOSAL SLIP TEMPLATE  .........................................................................101

*CREW: A Weeding Manual for Modern Libraries.  www.tsl.state.tx.us/ld/pubs/crew/index.html*
*Texas State Library and Archives Commission*                                    *Page 105 of 107*

App. 484

## Overview Chart of CREW Formulas

| Dewey Class | CREW Formula | | Dewey Class | CREW Formula |
|---|---|---|---|---|
| 000 | | | 610 | 5/3/MUSTIE |
| 004 | 3/X/MUSTIE | | 629 | X/2/MUSTIE |
| 010 | 10/3/MUSTIE | | 630 | 5/3/MUSTIE |
| 020 | 10/3/MUSTIE | | 635 | 10/3/MUSTIE |
| 030 | 5/X/MUSTIE | | 636 | 5/2/MUSTIE |
| Other 000s | 5/X/MUSTIE | | 640 | 5/3/MUSTIE |
| | | | 649 | 5/3/MUSTIE |
| 101 | 15/5/MUSTIE | | 670 | 10/3/MUSTIE |
| 133 | 10/3/MUSTIE | | | |
| 150 | 10/3/MUSTIE | | 700 | |
| 160 | 10/3/MUSTIE | | 709 | X/3/MUSTIE |
| 170 | 10/3/MUSTIE | | 720 | X/3/MUSTIE |
| | | | 737 | 5/3/MUSTIE |
| 200 | 10/3/MUSTIE or 5/3/MUSTIE | | 740 | X/3/MUSTIE |
| | | | 770 | 5/3/MUSTIE |
| | | | 791 | 10/2/MUSTIE |
| 306 | 5/2/MUSTIE | | 793 - 796 | 10/3/MUSTIE |
| 310 | 2/X/MUSTIE | | | |
| 320 | 5/3/MUSTIE | | 800 | X/3/MUSTIE |
| 323 | 5/3/MUSTIE | | | |
| 330 | 3/3/MUSTIE | | 910 | 3/2/MUSTIE |
| 340 | 5/2/MUSTIE | | Personal Travel Narratives | 5/2/MUSTIE |
| 350 | 5/3/MUSTIE | | 930 - 999 | 10/3/MUSTIE |
| 360 | 5/3/MUSTIE | | 92, 920 or B | X/3/MUSTIE |
| 370 | 10/3/MUSTIE | | | |
| 390 - 394 | 10/3/MUSTIE | | F (Fiction) | X/2/MUSTIE |
| 395 | 5/3/MUSTIE | | Graphic Novels | X/1/MUSTIE |
| 398 | X/3/MUSTIE | | E (Easy Readers/ Picture Books) | X/2/MUSTIE |
| | | | JF (Juvenile Fiction) | X/2/MUSTIE |
| 400 | 10/3/MUSTIE | | YA Fiction (Teen Fiction) | 3/2/MUSTIE |
| | | | J and YA Non-fiction | Use adult criteria (and review children's general criteria) |
| 500 | 5/3/MUSTIE | | Periodicals/ Newspapers | 3/X/X |
| 507 | 10/3/MUSTIE | | Government Documents | 3/2/X |
| 510 | 10/3/MUSTIE | | Local History | X/X/X |
| 520 | 5/3/MUSTIE | | | |
| 550 | X/3/MUSTIE | | Nonprint | WORST |
| 560 | 5/2/MUSTIE | | Film Formats | 2/1/WORST |
| 570 | 7/3/MUSTIE | | Audio Formats | X/2/X |
| 580 | 10/3/MUSTIE | | | |

*CREW: A Weeding Manual for Modern Libraries.* www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*

**App. 486**

*Page 105 of 107*

BLANK Page

## *Disposal Slips*

### *Disposal Slip*

Book Title or Call Number: _____

- ❑ Bindery
- ❑ Mend/Preserve
- ❑ Promote
- ❑ Donate to: _____
- ❑ Sent To: _____
- ❑ Check Database for other locations of this title: _____

- ❑ Discard
- ❑ Book Sale
- ❑ Replacement/New Edition

Other locations of this title: _____
Title to replace this volume: _____
Authorizing Agent: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### *Disposal Slip*

Book Title or Call Number: _____

- ❑ Bindery
- ❑ Mend/Preserve
- ❑ Promote
- ❑ Donate to: _____
- ❑ Sent To: _____
- ❑ Check Database for other locations of this title: _____

- ❑ Discard
- ❑ Book Sale
- ❑ Replacement/New Edition

Other locations of this title: _____
Title to replace this volume: _____
Authorizing Agent: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### *Disposal Slip*

Book Title or Call Number: _____

- ❑ Bindery
- ❑ Mend/Preserve
- ❑ Promote
- ❑ Donate to: _____
- ❑ Sent To: _____
- ❑ Check Database for other locations of this title: _____

- ❑ Discard
- ❑ Book Sale
- ❑ Replacement/New Edition

Other locations of this title: _____
Title to replace this volume: _____
Authorizing Agent: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### *Disposal Slip*

Book Title or Call Number: _____

- ❑ Bindery
- ❑ Mend/Preserve
- ❑ Promote
- ❑ Donate to: _____
- ❑ Sent To: _____
- ❑ Check Database for other locations of this title: _____

- ❑ Discard
- ❑ Book Sale
- ❑ Replacement/New Edition

Other locations of this title: _____
Title to replace this volume: _____
Authorizing Agent: _____

*CREW: A Weeding Manual for Modern Libraries.*  www.tsl.state.tx.us/ld/pubs/crew/index.html
*Texas State Library and Archives Commission*

**App. 488**

*Page 107 of 107*

# Exhibit 4

**(Declaration of Jonathan F. Mitchell)**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**Leila Green Little**, et al.,

                    Plaintiffs,

v.                                                          Case No. 1:22-cv-00424-RP

**Llano County**, et al.,

                    Defendants.

### DECLARATION OF JONATHAN F. MITCHELL

1.  My name is Jonathan F. Mitchell. I am over the age of 18 and fully competent in all respects to make this declaration.

2.  I have personal knowledge of the facts stated in this declaration, and all of these facts are true and correct.

3.  I represent the defendants in this litigation.

4.  The document attached as Exhibit 2 to this motion is an authentic copy of a letter from Ellen V. Leonida, counsel for the plaintiffs, which was sent to me by e-mail on January 17, 2023.

5.  The document attached as Exhibit 3 to this motion is an authentic copy of the CREW Manual produced by the Texas State Library and Archives Commission, which I downloaded from the Internet at https://bit.ly/3RjyQ6y.

Dated: January 30, 2023                        JONATHAN F. MITCHELL

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| **Leila Green Little**, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>**Llano County**, et al.,<br><br>                    Defendants. | Case No. 1:22-cv-00424-RP |

## STIPULATION OF UNDISPUTED FACTS

1.  Each of the seven plaintiffs attended the two-day preliminary-injunction hearing held on October 28, 2022, and October 31, 2022, and each of the seven plaintiffs heard Amber Milum and Tina Castelan testify at that hearing about the existence of the in-house checkout system at Llano Library.

2.  Each of the plaintiffs is aware of Tina Castelan's testimony at the preliminary-injunction hearing, where she stated that in June 2021, Amber Milum told the librarians about a collection of books that had been donated to the library and were being kept on a shelf in the back. This collection is referred to as the in-house checkout system at Llano Library and it allows library patrons to check out books that do not appear on the library shelves or in the catalog. As of March 23, 2023, neither the in-house checkout system nor its contents are listed on the library's website or displayed publicly at Llano Library.

3.  Each of the following 17 books is currently available for checkout through Llano Library's in-house checkout system:

- *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti

- *Gabi, a Girl in Pieces* by Isabel Quintero

- *Shine* by Lauren Myracle

- *Caste: The Origins of Our Discontents* by Isabel Wilkerson

- *It's Perfectly Normal: Changing Bodies, Growing Up, Sex, Gender, and Sexual Health* by Robie H. Harris

- *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings

- *Spinning* by Tillie Walden

- *In the Night Kitchen* by Maurice Sendak

- *Freakboy* by Kristin Elizabeth Clark

- *My Butt is So Noisy!* by Dawn McMillan

- *I Broke My Butt!* by Dawn McMillan

- *I Need a New Butt* by Dawn McMillan

- *Larry the Farting Leprechaun* by Jane Bexley

- *Gary the Goose and His Gas on the Loose* by Jane Bexley

- *Freddie the Farting Snowman* by Jane Bexley

- *Harvey the Heart Has Too Many Farts* by Jane Bexley

- *Under the Moon: A Catwoman's Tale* by Lauren Myracle

4. Each of the plaintiffs is aware of Amber Milum's testimony at the preliminary-injunction hearing, where she stated that each of the 17 books listed in paragraph 3, with the sole exception of *Under the Moon: A Catwoman's Tale*, had been made available for checkout through the Llano Library's in-house checkout system.

**App. 492**

5.  Each of the plaintiffs is aware that Amber Milum has subsequently informed the Court that *Under the Moon: A Catwoman's Tale* is now available for checkout through the Llano Library's in-house checkout system along with the other 16 books listed in paragraph 3, effective November 1, 2022. *See* Third Milum Decl., ECF No. 100-5, at ¶ 6.

6.  All of the 17 books listed in paragraph 3 were added to Llano Library's in-house checkout system between June 15, 2022, and October 31, 2022.

7.  The plaintiffs do not dispute the existence of the Llano Library's in-house checkout system, and they do not dispute that the 17 books listed in paragraph 3 are included within Llano Library's in-house checkout system.

Respectfully submitted.

 /s/ Ellen V. Leonida 
ELLEN V. LEONIDA*
   * admitted *pro hac vice*
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, California 94104
(415) 599-0210 (phone/fax)
leonida@braunhagey.com


*Counsel for Plaintiffs*

Dated: March 23, 2023

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 23, 2023, I served this document through CM/ECF

upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Max Bernstein
Ellis E. Herington
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com
herington@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Kayna Stavast Levy
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com
kayna@wittliffcutter.com

*Counsel for Plaintiffs*

　/s/ Jonathan F. Mitchell　
Jonathan F. Mitchell
*Counsel for Defendants*

**App. 494**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LEILA GREEN LITTLE, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:22-CV-424-RP |
| | § | |
| LLANO COUNTY, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**ORDER**

Before the Court are Defendants Llano County, et al.'s ("Defendants") Motion to Dismiss, (Dkt. 42), and Plaintiffs Leila Green Little, et al.'s ("Plaintiffs") Motion for a Preliminary Injunction, (Dkt. 22). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the motion to dismiss, (Dkt. 42), should be partially granted, and the motion for preliminary injunction, (Dkt. 22), should be partially granted. The Court will dismiss only the claims relating to the cancellation of the OverDrive online book database. The Court will also (1) order Defendants to return all the books at issue to the Library System, (2) update the Library System's searchable catalog to reflect that these books are available for checkout, and (3) enjoin Defendants from removing any more books for the pendency of this action. The Court will deny all other relief requested.

**I. BACKGROUND**

Plaintiffs are patrons of the Llano County Library System who are suing members of the Llano County Commissioners Court ("Commissioners"), members of the Llano County Library Board ("board members") and Llano County Library System Director Amber Milum for violations of their constitutional rights. Plaintiffs contend that Defendants are infringing their First Amendment right to access and receive ideas by restricting access to certain books based on their messages and content. (Compl., Dkt. 1, at 27–29). They further allege that, because the removal and

App. 495

1

restrictions happened without prior notice and without any opportunity for appeal, Defendants also violated their Fourteenth Amendment right to due process. (*Id.* at 29–30). Plaintiffs request an injunction that would, among other things, require Defendants to (1) return the books at issue to the catalog and to their original location in the physical shelves, and (2) reinstate access to Overdrive, the Library's former system for e-book access. (Mot. Prelim. Inj., Dkt. 22, at 2–3).

The Llano County Library System is comprised of three physical libraries: the Llano Library Main Branch, the Kingsland Library Branch, and the Lakeshore Library Branch. Until December 13, 2021, the Library also offered access to OverDrive, a digital e-book catalog that gave library patrons access to a curated collection of thousands of e-books and audiobooks. (Email, Dkt. 22-10, at 79). Today, after a period of unavailability, the Library offers access to e-books and audiobooks through a different service, Bibliotheca.

The Llano County Library System has used the "Continuous Review, Evaluation and Weeding" ("CREW") method to keep its collection up to date and make space for new acquisitions. (Hr'g Tr. Vol. 1 at 13:19-20, 18:12-15). The "CREW" method is an established weeding guide used by modern libraries. (*See* Milum Decl., Dkt. No. 49-1, at 2–2).  To identify appropriate candidates for weeding, the CREW method suggests using the following factors, known collectively by the acronym "MUSTIE":  Misleading; Ugly; Superseded; Trivial; Irrelevant; and Elsewhere. (*Id.*). The Library calls this process "weeding." (Hr'g Tr. Vol. 2 at 71:20-25).

In early July 2021, prior to their appointment to the New Library Board, Defendants Rochelle Wells, Rhonda Schneider, Gay Baskin, and Bonnie Wallace were part of a community group pushing for the removal of children's books that they deemed "inappropriate." (Call Log, Dkt. 59-1, at 72; Complaint Logs, Dkt. 59-1, at 77–89). For example, these Defendants objected to two series of children's picture books, the "Butt and Fart Books," which depict bodily functions in a humorous manner in cartoon format, because they believed these books were obscene and

promoted "grooming" behavior. (*E.g.,* Complaint Logs, Dkt. 59-1, at 79). Defendant Milum, the library system's director, shared the complaints with the Commissioners Court.[1] Although several commissioners and librarians stated that they saw no problem with the books, Defendants Moss and Cunningham contacted Milum to instruct her to remove the books from the shelves. (*Compare* Log, Dkt. 59-1, at 94 (describing commissioners saying they did not see a problem with the books) *and* Email, Dkt. 59-1, at 91 (same); *with* Cunningham Email, Dkt. 59-1, at 74–75 (instructing Milum to remove the books from the shelves); Mt'g Logs, Dkt. 59-1, at 76, 92 (noting the complaints and stating that Moss told Milum to "pick [her] battles.")).

By August 5, 2021, Milum informed Cunningham she would be deleting both sets of books from the catalog system. (Cunningham Email, Dkt. 59-1, at 74–75; *see also* List of Removed Books, Dkt. 22-10, at 60–61). In the following months, other books, such as *In the Night Kitchen* by Maurice Sendak and *It's Perfectly Normal*, by Robbie H. Harris, were removed because of similar complaints: that they encouraged "child grooming" and depicted cartoon nudity. (List of removed books, Dkt. 22-10, at 62–63). There was no recourse for Plaintiffs, or anyone else, to appeal these removals to the library system.

In Fall 2021, Wallace, Schneider, and Wells, as part of their community group, contacted Cunningham to complain about certain books that were in the children's sections or otherwise highly visible, labeling them "pornographic filth." (Wallace Email, Dkt. 22-10, at 68–69). On November 10, 2021, Wallace provided Cunningham with lists, including a list of "dozens" that could be found in the library. (*Id.*; *see also* Wallace List, Dkt. 22-10 at 75). The books labeled "pornographic" included books promoting acceptance of LGBTQ views. (*See, e.g.,* Wallace List, Dkt.

---

[1] The Commissioners Court is the municipal entity that controls the Llano County Library System. The Commissioners Court is led by Llano County Judge Ron Cunningham.

App. 497

22-10[2]). Other books in Wallace's list of pornographic books about "critical race theory" and related racial themes. (*Id.*[3]). In other communications, Defendants refer to them as "CRT and LGBTQ" books. (Wells Emails, Dkt. 20-10, at 71–72 (discussing book removals and planning a list of "CRT and LGBTQ book[s]")). In the email, Wallace advocated for the books to be relocated to the adult section because "[i]t is the only way that [she] could think of to prohibit future censorship of books [she does] agree with." (Wallace Emails, Dkt. 22-10, at 68).

That same day, Cunningham and Moss ordered Milum, "[a]s action items to be done immediately," to pull books that contained "sexual activity or questionable nudity" from the shelves and from OverDrive, which at the time was the Library's online e-book database. (Cunningham Emails, Dkt. 22-10, at 67; 106). Milum informed Moss and Cunningham she would pull the books, as well as books found in Wallace's lists. (*Id.*, Hr'g Tr. Vol 1, at 104:6–104:9).

Milum then ordered the librarians to pull books from an edited version of Wallace's list from the shelves. (Baker Decl., Dkt. 22-1, at 2). On November 12, 2021, Defendants removed several books on the Bonnie Wallace Spreadsheet from the Llano Library Branch shelves, including, for example, *Caste: The Origins of Our Discontents*, *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, *Being Jazz: My Life as a (Transgender) Teen*, and *Spinning*. (List of removed books, Dkt. 22-10, at 60–65). In early December, the Commissioners and Milum also discussed options to implement filters or other restrictions for books in Wallace's list that were available through OverDrive. (OverDrive Emails, Dkt. 22-10, at 8–10). Although Plaintiffs do not identify which e-book titles were at issue in their complaint, Defendants were converned that at least two of the

---

[2] For example, Wallace's list included the following titles: (1) *All out: the no-longer-secret stories of queer teens throughout the ages* by Saundra Mitchell; (2) *Beyond Magenta: transgender teen speaks out,* by Susan Kuklin; and (3) *Some assembly required: the not-so-secret life of a transgender teen*, by Arin Andrews, among others.

[3] For example, Wallace's list included the following titles: (1) *Caste, the origins of our discontents*, by Isabel Wilkerson; (2) *How to be an antiracist*, by Ibram X. Kendi, and (3) *Separate is never equal* by Duncan Tonatiuh, among others.

4

books in Wallace's list, *Lawn Boy* by Jonathan Evison and *Gender Queer* by Maia Kobabe, were accessible to library patrons though OverDrive. (Wells Emails, Dkt. 22-9, at 5).

On December 13, 2021, the Commissioners Court voted to approve three days of library closures, from December 20, 2021 to December 23, 2021 to review the library catalog. (Macdougal Emails, Dkt. 20-10, at 79–80). These tasks included "labeling books and checking [the] shelves for "'inappropriate'" books." (*Id.*, at 79–80; Hr'g Tr. Vol 1, at 151:1–152:13). The Commissioners Court did not define "appropriateness," but Milum declared that during these days, the staff mainly pulled books that the other Defendants had identified as inappropriate. (Hr'g Tr. Vol. 1, at 83:5–84:7).

On December 13, 2021, the Commissioners Court also voted to suspend all access to OverDrive. (Email, Dkt. 22-10, at 79). After the start of this litigation, the Commissioners Court voted to enter into a contract with Bibliotheca, another e-book database system. On May 9, 2022, the County began to provide access to Bibliotheca. (Milum Decl., Dkt. 49-1). Bibliotheca provides access to some, but not all, of the books at issue. (*Id.* at 6–7).

On December 13, 2021, the Commissioners Court also voted to dissolve the existing library board and to create a new one, named the "Library Advisory Board." Wallace, Wells, Schneider, and other Llano County residents who advocated for book removals were appointed to the new board. This new Board then instituted a policy that all new books must be presented to and approved by the board before purchasing them. (Hr'g Tr. Vol. 1, at 51:5–20; 107:4–21; 111:3–20).  The Commissioners Court stopped all new book purchases in November 2021, and no new acquisitions have been approved since this litigation began. (Cunningham Emails, Dkt. 22-10, at 106; Hr'g Tr. Vol. 1, at 50:21–51:8). On or around January 19, 2022, the Board asked Librarian Milum "that she not be present at all meeting [sic] and just on an as-needed basis." (Mt'g Minutes, Dkt. 22-10, at 52–53). In February 2022, Defendants banned staff librarians from attending New Library Board Meetings. (Librarians' Emails, Dkt. 22-1, at 6 ("Staff members are not to attend Advisory Board

App. 499

Meetings. You may not use your vacation time to attend.")). A month later, the meetings were closed to the public. (News Article, Dkt. 22-10, at 130–132; Mt'g Minutes, Dkt. 22-10, at 52–53 (discussing the possibility of closing meetings to the public)).

Plaintiffs filed their complaint on April 25, 2022, (Dkt. 1), and filed their motion for preliminary injunction on May 9, 2022, (Dkt. 22). Defendants filed a motion to dismiss on June 8, 2022. (Dkt. 42). After the parties submitted their respective briefing, the Court held a hearing on the preliminary injunction on October 28 and October 31, 2023. (Order, Dkt. 69; Minute Entries, Dkts. 79, 80). The parties then submitted post-hearing briefing on the preliminary injunction. (Pls.' Post-Hearing Memorandum in Support, Dkt. 91; Defs.' Corrected Resp., Dkt. 101; Pls.' Reply, Dkt. 98; Defs.' Surreply, Dkt. 117).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in

App. 500

the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B. Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*,

**App. 501**

663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### C. Rule 65 Standard

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

### III. DISCUSSION

Plaintiffs seek an injunction ordering the return of the books at issue and other removed books to the library catalog and to their original location, to restore access to OverDrive, and to prevent further book removals. Defendants have filed a motion to dismiss, asserting that Plaintiffs lack standing for most of their claims, that Plaintiffs' claims regarding access to the OverDrive database are moot, and that, to the extent that Plaintiffs have standing for their claims, Plaintiffs have failed to state either a First Amendment or a Due Process claim. The Court will first address Defendants' motion to dismiss before turning to Plaintiffs' motion for preliminary injunction.

### A. Defendants' Motion to Dismiss

Defendants' motion to dismiss proceeds in two parts. First, Defendants argue that Plaintiffs have not alleged "concrete plans" to access the books at issue, and therefore they have not alleged a cognizable injury. (Mot. Diss., Dkt. 42, at 3–5). Defendants further contend that Plaintiffs' claims regarding the OverDrive online system are moot because the library has closed that forum, and that

App. 502

in any case, Plaintiffs claims are also moot because Plaintiffs can access the books through the library's new online database or by requesting them through the "in-house" checkout system. (Reply, Dkt. 54, at 8–9). Second, Defendants argue that Plaintiffs fail to state a claim for relief because the library engaged in government speech, and because there is no liberty interest implicated in book removal. (Mot. Diss., Dkt. 42, at 8–10).

The Court will first address whether Plaintiffs have standing to bring a claim against Defendants before turning to the sufficiency of their allegations for Rule 12(b)(6) purposes. The Court finds that Plaintiffs are suffering a continuing injury, and that most of their claims are not moot. However, the Court also finds that Plaintiffs' OverDrive related claims are moot because Defendant has replaced OverDrive with Bibliotheca, a comparable online database of books. With respect to the remaining claims, the Court finds that Plaintiffs have properly alleged First Amendment and Due Process violations. As to the First Amendment claims, the Court finds Plaintiffs have sufficiently alleged that Defendants' actions do not constitute government speech and that Defendants unlawfully removed books based on their viewpoint. As to the Due Process claims, the Court identifies a liberty interest in access to information protected by the Due Process Clause of the Fourteenth Amendment.

### 1. Standing

To have Article III standing, a plaintiff must "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (citing *Lujan v. Def's. of Wildlife*, 504 U.S. 555, 560–61 (1992), *as revised* (Oct. 30, 2020)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564. "[S]ome day's intentions—without any description of concrete plans or indeed even any specification of *when* the some day will be—do

9

App. 503

not support a finding of the 'actual or imminent' injury." *Id.* However, an injury that "has already happened and is ongoing . . . fulfills the constitutional standing requirement" because it is not conjectural. *Inst. for Creation Rsch. Graduate Sch. v. Texas Higher Educ. Coordinating Bd.*, No. 1:09-cv-00382-SS, 2009 WL 10699959, at *2 (W.D. Tex. July 31, 2009) (holding that a municipal education board's denial of a license to grant degrees was an ongoing injury that fulfills constitutional standing requirements).

Plaintiffs have alleged sufficient facts to show they are suffering an actual, ongoing injury. Plaintiffs alleged that they are library users and members, that they wish to check out the removed library books, and that they have attempted and failed to check out the removed books from the library. (Compl, Dkt. 1, at 27). The removal of books initiated Plaintiffs' injuries, but the infringement on their right to access information is a "continuing, present adverse effect[]" that qualifies as an injury for Article III purposes. *Lujan*, 504 U.S. at 564; *cf. Sund v. City of Wichita Falls*, 12 F. Supp. 2d, 530, 553–54 (N.D. Tex. 2000) (finding irreparable injury where implementation of the city's resolution would have resulted in books promoting acceptance of LGBTQ families being "segregated" from the children's section to the adult section). In light of this ongoing effect, requiring Plaintiffs to engage in futile attempts to check out books that are unavailable or to attend the library board meetings that have been closed and stalled for months would be pointless. Accordingly, the Court finds that Plaintiffs have sufficiently pled an actual, ongoing injury for the purposes of standing.

### 2. Mootness

#### a. OverDrive-Related Claims

Defendants make two arguments regarding mootness. First, Defendants contend that Plaintiffs' OverDrive-related claims are moot because the contract cancellation amounts to a closing of the public forum. (Mot. Diss., Dkt. 42, at 5–7; Reply, Dkt. 54, at 8–9). Second, Defendants argue

**App. 504**

that there is no ongoing injury because Plaintiffs may access the books through Llano County

Library System's new online book database, Bibliotheca, or through the library's "in-house

checkout" system. (Reply, Dkt. 54, at 8–9; Milum's Supp. Decl., Dkt. 53, at 1–2). Defendants claim

their actions were genuine and not litigation posturing. (Mot. Diss., Dkt. 42).

Courts are skeptical of defendant induced mootness because of the risk of posturing—

attempting to escape litigation while intending to engage in the same conduct once the case is

dismissed. *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). In general, defendants cannot "evade

sanction by predictable protestations of repentance and reform after a lawsuit is filed." *Ctr. For

Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (citation omitted). But

the Fifth Circuit has cautioned that skepticism is lessened for voluntary governmental cessation

because "[g]overnment officials 'in their sovereign capacity and in the exercise of their official duties

are accorded a presumption of good faith because they are public servants, not self-interested

private parties.'" *Id.* at 910–11. "Without evidence of the contrary, we assume that formally

announced changes to official governmental policy are not mere litigation posturing." (*Id.* at 910).

As Defendants note, on May 9, 2022, the County began to provide access to Bibliotheca, a

different online book database. (Reply, Dkt. 54, at 8). In their post-hearing briefing, Plaintiffs state

that Bibliotheca provides access to some, but not all, of the books at issue. (*See* Pls.' Post-Hr'g Br.,

Dkt. 91, at 18 (citing Milum Decl., Dkt. 49-1, at 6–7)). However, Plaintiffs' complaint does not

specify which books Defendants objected to. Without allegations regarding specific books, and

given that some of the books at issue are available though Bibliotheca, the Court cannot find, based

on the pleadings, that Bibliotheca does not sufficiently replace OverDrive database. Plaintiffs' injury

appears to be the violation of their right to access information through the online book database

OverDrive. However, the evidence shows that the County replaced OverDrive with a comparable

online service. In light of Plaintiffs' current pleadings, the County's new contract with Bibliotheca

App. 505

thus moots the OverDrive-related claims. Accordingly, the Court will dismiss Plaintiffs' OverDrive-related claims without prejudice.

### b. Physical Books

However, the Court does not conclude that Plaintiffs' claims are moot as to the physical books. The physical books at issue in this case, although "available" for checkout are hidden from view and absent from the catalog. Their existence is not discernible to the public, nor is their availability. An injury exists because the library's "in-house checkout system" still places "a significant burden on Library Patrons' ability to gain access to those books." *Sund*, 12 F. Supp. 2d at 534.

Furthermore, Defendants' creation of an "in-house checkout system" comprises precisely the type of posturing the voluntary cessation exception is meant to prevent. Defendant Milum received the books in July, three months into this litigation and shortly after the parties had filed responses to their motions to dismiss and for preliminary injunction, respectively. (Milum Supp. Decl., Dkt. 53, at 1). But the books were not donated by a neutral benefactor with the intent of making them available to library patrons. Defendants' Counsel, Jonathan Mitchell, provided these books ostensibly anonymously. Upon questioning, Counsel repeatedly to avoid the disclosure of his donation by asserting attorney-client privilege. The Court concluded, however, that his actions, clearly designed his clients' litigation position, were not so privileged.

Furthermore, even if Counsel Mitchell's actions were not calculated to promote his clients' litigation position, the Library's protocols making access to the books virtually impossible do not deserve the type of solicitude the Fifth Circuit has instructed. Making books "available" in a back room, only upon specific request by a patron who has no way of knowing that the books even exist, is hardly a "formally announced change[] to official governmental policy" deserving less scrutiny. *Bunton*, 905 F.3d at 910.

**App. 506**

The Court thus finds that the rest of Plaintiffs claims are not moot. Accordingly, the Court will dismiss Plaintiffs' OverDrive-related claims without prejudice but allow the remaining claims to proceed.

### 3. First Amendment Claim

Next, Defendants argue that Plaintiffs have not stated a First Amendment claim upon which relief can be granted. Defendants contend that First Amendment protections do not apply to the public library's content and collection decisions, because libraries are afforded broad discretion over these decisions. (Mot. Diss., Dkt. 42, at 9).[4]

The Supreme Court has recognized that public libraries should be afforded "broad discretion" in their collection selection process, in which library staff must necessarily consider books' content. *See U.S. v. Am. Library Assn., Inc.*, 539 U.S. 194, 205 (2003) (plurality). But this discretion is not absolute, and it applies only to materials' selection. In fact, the Fifth Circuit, adopting the Supreme Court's plurality in *Pico*, has recognized a "First Amendment right to receive information" which prevents libraries from "remov[ing] books from school library shelves 'simply because they dislike the ideas contained in these books.'" *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality)).

---

[4] Defendants also argue that Plaintiffs have not alleged that the library is a public forum, and that any First Amendment claim should fall based on that fact alone. (Reply, Dkt. 54, at 8–9). This argument is unavailing. The Fifth Circuit has recognized that there is a First Amendment right to access information, and that First Amendment protections apply to the removal of materials in public libraries. *See, e.g.*, *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995)). As the following paragraphs make clear, courts have almost uniformly held that public libraries are subject to First Amendment limitations, even as limited public forums. *See, e.g.*, *Sund v. City of Wichita Falls*, 12 F. Supp. 2d, 530, 534 (N.D. Tex. 2000) ("The Wichita Falls Public Library, like all other public libraries, is a limited public forum for purposes of First Amendment analysis."). *American Library*, which Defendants cite for the contrary proposition, simply states that "*Internet access* in public libraries is neither a 'traditional' nor a 'designated' public forum." *See U.S. v. Am. Library Assn., Inc.*, 539 U.S. 194, 205 (date) (emphasis added).

App. 507

"The key inquiry in a book removal case" is whether the government's "substantial motivation" was to deny library users access to ideas with which [the government] disagreed." *Id.* at 190. Here, Plaintiffs have sufficiently pled that Defendants' conduct was substantially motivated by a desire to remove books promoting ideas with which disagreed. They plainly allege that Defendants removed, ordered the removal, or pursued the removal of the books at issue "because they disagree with their political viewpoints and dislike their subject matter." (Compl., Dkt. 1, at 3, 7–9).

Defendants do not argue otherwise. Instead, they contend that Plaintiffs have not stated a claim because the removal decisions were "government speech to which the First Amendment does not apply." (Mot. Diss., Dkt. 42, at 8–9).  But as Plaintiffs' note, the cases Defendants cite mostly involve the initial selection, not removal, of materials. *See, e.g.*, *Am. Library*, 539 U.S. at 205 ("The principles underlying [the precedent] also apply to a public library's exercise of judgment in selecting the material it provides to its patrons."); *PETA v. Gittens*, 414 F.3d 23, at 28 (analogizing the discretion afforded to library's book collection decisions to the commission's art selection decisions). As the Fifth Circuit held in *Campbell*, removal decisions are subject to the First Amendment and are evaluated based on whether the governments' "substantial motivation in arriving at the removal decision" was discriminatory. *Campbell*, 64 F.3d at 190. Here, Plaintiff has clearly pled that Defendants had this motivation.

Defendants contend that *Campbell* and *Pico* do not apply to this context because those cases dealt with book removals from public school libraries, which may be subject to unique constitutional rules. (Reply, Dkt. 54, at 8). At the same time, Defendants urge us to follow *Chiras*, even though *Chiras* also involves book selection at a public school library. (*Id.* at 10 (citing *Chiras v, Miller*, 432 F.3d 606, 614 (5th Cir. 2005). In any case, the Court agrees that the precedent indicates public school libraries are a unique environment for constitutional analysis. *See Pico*, 457 U.S.  at 868 (plurality) ("First Amendment rights accorded to students must be construed 'in light of the special

characteristics of the school environment'" (citation omitted)). *Campbell*, *Pico*, and *Chiras* suggest that school officials' discretion is particularly broad for book selection in public school libraries because of schools' unique inculcative function. *See also Sund*, 121 F. Supp. 2d at 548. However, the right to access to information first identified in *Pico* and subsequently adopted by the Fifth Circuit in *Campbell* has "even greater force when applied to public libraries," since public libraries are "designed for freewheeling inquiry," and the type of discretion afforded to school boards is not implicated. *Id.* (omitting citations).

Defendants, like other government officials implicated in maintaining libraries, have broad discretion to select and acquire books for the library's collection. But the Fifth Circuit recognizes a First Amendment right to access to information in libraries, a right that applies to book removal decisions. Plaintiffs have clearly stated a claim that falls squarely within this right: that Defendants removed the books at issue to prevent access to viewpoints and content to which they objected.

### 4. Due Process Claim

Finally, Defendants argue that Plaintiffs have not alleged a due process claim because Plaintiffs do not have a protected property or liberty interest involved in library books. Defendants point to a single Second Circuit case, *Bicknell v. Vergennes Union High School*, 638 F.2d 438, 442 (2d Cir 1980). In *Bicknell,* plaintiffs challenged a school board's decision to remove two books based on their content. *Id.* at 440–41. The Second Circuit found that, even assuming that there was a deprivation of rights at play, such a deprivation did not entitle plaintiffs "to a hearing before that removal takes place." *Id.* at 442. According to the court, the rights involved were not particularized nor personal enough to require a hearing. *Id.*

But many courts have held that access to public library books is a protected liberty interest created by the First Amendment. *See Doyle v. Clark Cnty. Pub. Libr.*, No. 3:07-cv-00003-TMR-MRM, 2007 WL 2407051, at *5 (S.D. Ohio Aug. 20, 2007); *see also Miller v. Nw. Region Libr. Bd.*, 348 F. Supp.

**App. 509**

2d 563, 570 (M.D. N.C. 2004) (denying defendants' motion to dismiss plaintiff's Fourteenth Amendment due process claim, holding that access to public library computers was a protected liberty interest); *Hunt v. Hillsborough County,* No. 8:07-cv-01168-JSM-TBM, 2008 WL 4371343, at *3 (M.D. Fla. 2008) ("Plaintiff had a fundamental right to access the Law Library and receive the information provided therein."); *Dolan v. Tavares*, No. 1:10-cv-10249-NMG, 2011 WL 10676937, at *13 (D. Mass. May 16, 2011) ("[P]laintiff has a liberty interest in being able to access the law library"); *cf. Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 592 (6th Cir. 2003) (referring to the First Amendment right to receive information in public library books as a "fundamental right"); *Armstrong v. Dist. of Columbia Pub. Libr.,* 154 F. Supp. 2d 67, 82 (D.D.C. 2001) (recognizing that "access to a public library [ ] is at the core of our First Amendment values"). And even if this Court were to follow the Second Circuit's rationale, *Bicknell* only states that the right involved could not sustain a hearing requirement. *Bicknell*, 638 F.2d at 442. The court's analysis does not foreclose the possibility that Plaintiffs could be entitled to some form of post-removal appellate or review process.

The Court follows our many sister courts in holding that there is a protected liberty interest in access to information in a public library. Accordingly, the Court finds that Plaintiff has sufficiently stated a due process claim.

### B. Plaintiffs' Motion for Preliminary Injunction

Having addressed Defendants' motion to dismiss, the Court will now evaluate whether Plaintiffs are entitled to a preliminary injunction. Plaintiffs seek an injunction ordering Defendants to: (1) return the physical books at issue to their original locations and (2) update the Library Service's catalog to reflect that the books have been returned and are available for checkout, and enjoying Defendants from: (1) removing any books from the Llano County's physical shelves during the pendency of the action, and (2) closing future Library Board meetings to members of the public.

**App. 510**

(Proposed Ord., Dkt. 22-12). Plaintiffs originally requested a preliminary injunction regarding access to OverDrive, but the Court will not address this relief because it has dismissed those claims. Furthermore, Plaintiffs request relief related to their Due Process claim but do not actually present any arguments on the issue. Accordingly, the Court will deny the motion as to their request for access to the library board meetings.

For the rest of the preliminary injunction, Plaintiffs must show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012). Plaintiffs have carried their burden on each of these elements.

### 1. Likelihood of Success on the Merits

#### a. Viewpoint Discrimination

As the Court stated earlier, the First Amendment "protect[s] the right to receive information." *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 547 (N.D. Tex. 2000) (citing *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997)). In a book removal case, "the key inquiry . . . is the school officials' substantial motivation in arriving at the removal decision." *Campbell*, 64 F.3d at 190.

Plaintiffs have made a clear showing that they are likely to succeed on their viewpoint discrimination claim. Although libraries are afforded great discretion for their selection and acquisition decisions, the First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination. *See Pico*, 457 U.S. at 871. "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v.*

**App. 511**

*Tam*, 137 S. Ct. 1744, 1763 (2017). In a book removal case, plaintiffs must show that an intent to deny library users access to viewpoints with which they disagreed was a "substantial factor" in making the removal decision. *Id.* at 188 n.21 (citing *Pico*, 457 U.S. at 872); *id.* at 190.

Here, the evidence shows Defendants targeted and removed books, including well-regarded, prize-winning books, based on complaints that the books were inappropriate. For example, between early and mid-July 2021, Wells and other citizens contacted Milum to complain about the appropriateness of the "Butt and Fart Books." (Call Log, Dkt. 59-1, at 72; Complaint Logs, Dkt. 59-1, at 77–89). By August 5, 2021, Commissioners Cunningham and Moss had contacted Milum to recommend removing them from the shelves. Milum then deleted these books from the catalog system. (Cunningham Email, Dkt. 59-1, at 74–75; Mt'g Logs, Dkt. 59-1, at 76, 92).

Similarly, between October 28, 2021, and December 22, 2021, a span of two months, Wallace and Wells had contacted Defendants Cunningham and Moss with a list of books they considered inappropriate, labeling them "pornographic filth" and "CRT and LGBTQ books" and advocating for their removal and relocation. (Wallace Emails, Dkt. 22-10, at 67–69; Wells Emails, Dkt. 22-10, at 71–72; Hr'g Tr. Vol 1, at 89:23–90:4; 97:2–100:2). Cunningham and Moss then instructed Milum, the library director, to pull out these books. (Wallace Emails, Dkt. 22-10, at 67; Wells Emails, Dkt. 22-10, at 71–72). Milum, in turn, removed some of the books and soon thereafter the library was closed for three days at the direction of the Commissioners Court, for the purpose of "checking [the] shelves for 'inappropriate' books." (Macdougall Emails, Dkt. 22-10, at 79–80; Hr'g Tr. Vol 1, at 151:1–152:13).

Admittedly, Wallace, Wells, and other complainants were members of the public, not library board members, at the time. (Hr'g Tr. Vol. 2, at 25:2–25:13). Furthermore, at least one Defendant admitted in his testimony that he did not have personal knowledge of the content of the books at issue. (Hr'g Tr. Vol. 1, at 170:23–172:1; 174:21–175:7). But by responding so quickly and uncritically,

**App. 512**

Milum and the Commissioners may be seen to have adopted Wallace's and Wells's motivations. The Court finds that Plaintiffs have clearly shown that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells objected.

Defendants aver that any cataloguing and removal that occurred was simply part of the library system's routine weeding process, for which Milum was ultimately responsible. (Hr'g Tr. Vol. 1, at 82:8–82:16). Yet Milum testified that the books that she pulled were books that Wallace, Wells, or the Commissioners identified as "inappropriate." (Hr'g Tr. Vol. 1, at 83:5–84:7). The Commissioners, her superiors and final policymakers with power over the library system,[5] instructed her to review the books—and even to remove some of them—based on people's perception of their content or viewpoints. (Hr'g Tr. Vol. 1 at 68:15-18). The short amount of time between the complaints, commissioners' actions, and Millum's removal strongly suggests that the actions were in response to each other.  . Plaintiffs have made a clear showing about what Defendants' substantial motivations may have been and how these may have led to the book removals.

Finally, Defendants argue, as they did in their motion to dismiss, that even if their actions amount to viewpoint discrimination, the library's weeding decisions are only subject to rational-basis review. Not so. The Fifth Circuit's precedent recognizing a right to access to information is not "nonsense." (Post-Hr'g Corr. Resp., Dkt. 100, at 25); *see also Campbell*, 64 F.3d at 189–90 (finding that the "decision to remove [books] must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter."). Defendants' attempts to convince the Court otherwise simply confirm what the Court already addressed in Defendants'

---

[5] Tex. Const. art. 5, § 18(b) ("[T]he County Commissioners Court . . . shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State[.]"); Tex. Loc. Gov't Code. § 323.006 ("The county library is under the general supervision of the commissioners court."); *see also Doe AlW v. Burleson Cnty.*, No. 1:20-CV-00126-SH, 2022 WL 875912, at *4 (W.D. Tex. Mar. 24, 2022) (holding county commissioners court has final policymaking authority over all areas entrusted to them by the state constitution and statutes).

App. 513

motion to dismiss: that "content discrimination is permissible and inevitable in library-book selection." (Post-Hr'g Corr. Resp., Dkt. 100, at 25). It does not follow from this proposition that such discrimination is equally permissible in removal decisions. To hold otherwise would be to entirely disregard *Campbell*.

b. Content Discrimination

Even if Plaintiffs had not shown a likelihood of success on their viewpoint discrimination claim, the Court finds that Plaintiffs clearly met their burden to show that these are content-based restrictions that are unlikely to pass constitutional muster. Content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). A restriction is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. But, as discussed above, multiple Defendants acknowledged during the hearing that each of the books in question were slated for review (and ultimately removal) precisely because certain patrons and county officials complained that their contents were objectionable.[6]

Although Defendants now argue that each of these books were subject to routine "weeding" from the library's catalogue based on content-neutral factors, Plaintiffs have offered sufficient evidence to suggest this post-hoc justification is pretextual. Whether or not the books in fact qualified for "weeding" under the library's existing policies,[7] there is no real question that the

---

[6] Hr'g Tr. Vol. 1 at 127:24-128:5; *see also* Ex. 52 at 1-2; Ex. 2A; Ex. 2; Hr'g Tr. Vol. 1 at 66:9-14 (Butt and Fart books); Hr'g Tr. Vol. 1 at 70:13-18, 71:9-15; Ex. 19 (*In the Night Kitchen*, and *It's Perfectly Normal*); Hr'g Tr. Vol. 1 at 82:3-10, 82:24-83:3, 84:12-21, 94:23-25 (LGBTQ and CRT books).

[7] The record contains competing testimony on this point. Milum stated in her declarations and testimony that she weeded the 17 disputed books because she believed that each of them met the library's criteria for weeding under the CREW and MUSTIE factors. *See* Milum Decl., Dkt. No. 49-1, at ¶¶ 8, 12–16; Hr'g Tr. Vol. 2 95:16–106:20.  In contrast, Tina Castelan stated that Milum's decisions to weed some of disputed books violated the library's weeding policies. *See id.* at 6–9; Hr'g Tr. Vol. 1 at 33:15–45:18. It appears to be

App. 514

targeted review was directly prompted by complaints from patrons and county officials over the contents of these titles. Defendants' contemporaneous communications, as well as testimony at the hearing, amply show this. For example, Ms. Wells testified at the hearing that "if there was any book that [in her opinion] was harmful to minors that was in the library, I would speak with the director, [Milum] to have it removed." (Hr'g Tr. Vol. 1 at 205:9-14). In turn, Milum acknowledged that "the reason that [the books] were selected to be weeded and reviewed to be weeded, as opposed to other books, w[as] because Ms. Wallace had them on her list" of objectionable books. (*Id.* at 82:24-83:3). And, notably, there is no evidence that any of the books were slated to be reviewed for weeding prior to the receipt of these complaints; to the contrary, many other books eligible for weeding based on the same factors appear to have remained on the shelves for many years.[8]

Defendants' insist that "[t]he notion that librarians cannot engage in 'content discrimination' when weeding books is absurd" because "[w]eeding inherently involves content discrimination." This is unavailing. In the context of weeding, the test the Fifth Circuit stated in *Campbell* provides flexibility for the type of content considerations Defendants warn about. In a book removal case, "the key inquiry . . . is the [library] officials' substantial motivation in arriving at the removal decision." *Campbell*, 64 F.3d at 190. Although some of the MUSTIE criteria consider content, overall, the library weeding process appears to be directed towards managing the size and quality of the library collection. That is, the Llano County Library System has discretion to weed books, using professional criteria, when its "substantial motivation" is to curate the collection and allow space for new volumes. As long as its motivation remains as such, the library system may cull and curate its collection as needed.

---

undisputed that, given its subjective nature, reasonable minds may disagree over how to apply the CREW and MUSTIE criteria. *Id.* at 127:6-8.

[8] *Compare* Ex. 52 *with* Ex. 79A; *see also, e.g.,* Hr'g Tr. Vol. 2 at 127:21-25, 136:4-7.

App. 515

Conversely, when the governments' "substantial motivation" appears to be a desire to prevent access to particular views, like in this case, Defendants' actions deserve greater First Amendment scrutiny. The Court finds that Plaintiffs made a clear showing that the "substantial motivation" for Defendants actions appears to be discrimination, as opposed to mere weeding.

Under the strict scrutiny analysis, the Defendants bear the burden of proving that the removals are narrowly tailored to serve a compelling interest. *Reed*, 135 S. Ct. at 2226; *Turner Broad. Sys.*, 512 U.S. at 664–65. Applying this standard, the Court finds it substantially likely that the removals do not further any substantial governmental interest—much less any compelling one. Indeed, the Defendants' briefing doesn't argue that their actions can survive heightened scrutiny, nor have they set forth any governmental interests that are served by the removals. On this record, the Court will not endeavor to guess what interests Defendants may eventually proffer. As content-based restrictions on Plaintiffs' right to receive information, Plaintiffs have clearly shown the removals are likely to be constitutionally infirm because they are not narrowly tailored to serve a compelling state interest.

### 2. Irreparable Harm

The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church*, 697 F.3d at 295. Because Plaintiffs have clearly shown Defendants actions likely violate their First Amendment right to access to information, they have clearly shown they are suffering irreparable harm.

Attempting to deny this harm, Defendants contend that Plaintiffs can access every one of the books through either the InterLibrary Loan system, Bibliotheca, or the library system's in-house checkout system. None of these options mitigate the constitutional harm Plaintiffs are suffering. First,

App. 516

the InterLibrary Loan system is not a replacement for access to books within the Llano County Library System. Patrons must pay for postage and wait for weeks for books to arrive. (Milum Decl., Dkt. No. 49-1, at 10; Hr'g Tr. Vol. 2 at 124:24-125:1). Furthermore, to allow the InterLibrary loan system to stand in for purported "access" to the books would absolve any government official from liability for unconstitutional book removals, no matter how egregiously unconstitutional their intent, as long as the official could find, *ex post facto*, a library or network from which it could secure a loan.

Likewise, access through Bibliotheca is not a replacement for access to the physical books at issue. E-books and physical books are tangibly different. Using Bibliotheca requires access to a compatible device, and most of the books are not available through Bibliotheca at all. (Milum Decl., Dkt. 49-1, at 6–7; Hr'g Tr. Vol. 2 at 47:2-4). Furthermore, as early as March 2022, Defendants were trying to remove books they had already purchased through Bibliotheca, due to concerns about their appropriateness. (Wallace Depo., Dkt. 59-1, at 114:4-10, 126:12-15; Bibliotheca Emails, Dkt. 59-1, at 104–107). Even if the Court were to find that access to these e-books is equivalent to access to the physical books, there is sufficient evidence to raise concerns that the books would not remain in place without an injunction.

The Court's reservations about Defendants' in-house checkout system are even greater. As noted above, the books that are supposedly "available" for checkout are absent from the library's catalog. They are, to the extent they exist, not accessible from the library shelves. A patron must, notwithstanding the fact that the books' existence is not reflected in the library catalog, know that the books can be requested. They must then make a special request for the book to be retrieved from behind the counter. This is, of course, an obvious and intentional efford by Defendants to make it difficult if not impossible to access the materials Plaintiffs seek. This ongoing infringement warrants an interim remedy precisely because the harm is ongoing and irreparable.

3. Balance of Equities and Public Interest

App. 517

As to the last two factors, Defendants once again insist that the balance of equities and public interest cannot support an injunction because Plaintiffs have not, will not, and could not have suffered constitutional harm. This Court found otherwise. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). As Plaintiffs request an injunction protecting their First Amendment Freedoms, and there is no evidence that the equities tilt in Defendants favor, the Court finds Plaintiffs have clearly shown these factors are in their favor.

### 4. Remedy

Although Plaintiffs have demonstrated they are entitled to a preliminary injunction, their evidence cannot sustain some of the remedies they seek. The evidence demonstrates that, without an injunction, Defendants will continue to make access to the subject books difficult or impossible. Defendants must therefore be prevented from removing the books, and the books at issue be made available for checkout through the Library System's catalogs. (Proposed Ord., Dkt. 22-12[9]).

However, Plaintiffs focused on book removals, not on relocations. Therefore, the Court cannot find that they are entitled to their request to return the physical books to their original locations. The Court will not invade the prerogative of the Library with regard to proper placement of books or restrictions on access.

Although Plaintiffs originally requested a preliminary injunction regarding access to OverDrive, the Court will not grant the relief because it has dismissed those claims. Finally, Plaintiffs requested relief related to their Due Process claim but did not actually present any arguments or evidence on the issue. Accordingly, the Court will deny the motion as to their request for access to the library board meetings.

---

[9] Librarian Milum testified at the hearing that the Library System does not plan to weed or add any books to the Library for the pendency of this litigation; therefore, an injunction preventing book removals is unlikely to be burdensome. (Hr'g Tr. Vol. 1, at 130:5–15).

24

**App. 518**

### IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Defendants' motion to dismiss, (Dkt. 42), is **GRANTED. IN PART** and **DENIED IN PART.** Plaintiffs' OverDrive related claims are dismissed **WITHOUT PREJUDICE**. Defendants' motion is denied as to all other claims.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (Dkt. 22), is **PARTIALLY GRANTED**. **IT IS ORDERED THAT**:

1. Within twenty-four hours of the issuance of this Order, Defendants shall return all print books that were removed because of their viewpoint or content, including the following print books, to the Llano County Libraries:

    a. *Caste: The Origins of Our Discontent* by Isabel Wilkerson;

    b. *Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti;

    c. *Spinning* by Tillie Walden;

    d. *In the Night Kitchen* by Maurice Sendak;

    e. *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie Harris;

    f. *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!* by Dawn McMillan;

    g. *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Has Too Many Farts* by Jane Bexley;

    h. *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings;

    i. *Shine* by Lauren Myracle;

    j. *Under the Moon: A Catwoman Tale* by Lauren Myracle;

App. 519

     k.   *Gabi, a Girl in Pieces* by Isabel Quintero; and

     l.   *Freakboy* by Kristin Elizabeth Clark.

2.   Immediately after returning the books to the Libraries as ordered in (1) above, Defendants shall update all Llano County Library Service's catalogs to reflect that these books are available for checkout.

3.   Defendants are hereby enjoined from removing any books from the Llano County Library Service's catalog for any reason during the pendency of this action.

**SIGNED** on March 30, 2023.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

App. 520

## Certificate Of Service

I certify that on April 25, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Max Bernstein
Ellis E. Herington
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com
herington@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs-Appellees*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on April 25, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*