# In the United States Court of Appeals for the Fifth Circuit

---

Leila Green Little; Jeanne Puryear; Kathy Kennedy; Rebecca Jones; Richard Day; Cynthia Waring; Diane Moster,

*Plaintiffs-Appellees*,

v.

Llano County; Ron Cunningham, in his official capacity as Llano County Judge; Jerry Don Moss, in his official capacity as Llano County Commissioner; Peter Jones, in his official capacity as Llano County Commissioner; Mike Sandoval, in his official capacity as Llano County Commissioner; Linda Raschke, in her official capacity as Llano County Commissioner; Amber Milum, in her official capacity as Llano County Library System Director; Bonnie Wallace, in her official capacity as Llano County Library Board Member; Rochelle Wells, in her official capacity as Llano County Library Board Member; Rhoda Schneider, in her official capacity as Llano County Library Board Member; Gay Baskin, in her official capacity as Llano County Library Board Member,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 1:22-cv-424-RP

---

## Appendix To Motion For Stay Of Preliminary Injunction Pending Appeal And Motion To Expedite Appeal (Vol. 3)

---

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

# Table Of Contents

Transcript of Preliminary-Injunction Hearing (Day One) ..........................................

Transcript of Preliminary-Injunction Hearing (Day Two)..........................................

<pre>
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  LEILA GREEN LITTLE, ET AL) Docket No. A 22-CA-424 RP
                             )
 4  vs.                      ) Austin, Texas
                             )
 5  LLANO COUNTY, ET AL      ) October 28, 2022

 6
                    TRANSCRIPT OF MOTION HEARING
 7           BEFORE THE HONORABLE ROBERT L. PITMAN
                       Volume 1 of 2
 8

 9  APPEARANCES:

10  For the Plaintiff:       Ms. Ellen V. Leonida
                             Braun, Hagey & Borden, LLP
11                           351 California Street, 10th Floor
                             San Francisco, California 94104
12
                             Mr. Max B. Bernstein
13                           Braun, Hagey & Borden, LLP
                             118 West 22nd Street, 12th Floor
14                           New York, New York 10011

15                           Mr. Ryan A. Botkin
                             Ms. Maria Amelia Calaf
16                           Ms. Katherine P. Chiarello
                             Wittliff Cutter, PLLC
17                           1209 Nueces Street
                             Austin, Texas 78701
18

19  For the Defendant:       Jonathan F. Mitchell
                             Mitchell Law, PLLC
20                           111 Congress Avenue, Suite 400
                             Austin, Texas 78701
21
                             Mr. Dwain K. Rogers, Jr.
22                           Munsch, Hardt, Kopf & Harr
                             111 Congress Avenue, Suite 2010
23                           Austin, Texas 78701

24

25
</pre>

**(Appearances Continued:)**

For the Defendant:          Mr. Matthew L. Rienstra
                            Llano County Attorney's Office
                            801 Ford Street, Room 111
                            Llano, Texas 78643


Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                            501 West 5th Street, Suite 4153
                            Austin, Texas 78701
                            (512)391-8792

Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

**I N D E X**

|                      | Direct | Cross | Redirect | Recross |
|----------------------|--------|-------|----------|---------|
| Witnesses:           |        |       |          |         |
| Martina N. Castelan  | 10     |       |          |         |
| Amber Milum          | 58     | 123   | 132      | 134     |
| Ron Cunningham       | 135    | 164   |          |         |
| Jerry Don Moss       | 166    |       |          |         |
| Rochelle Wells       | 176    |       |          |         |

# E X H I B I T S

| | Offered | Admitted |
|---|---|---|
| Plaintiffs' | | |
| #1 | 13 | 14 |
| #2A | 139 | 139 |
| #2B | 65 | 65 |
| #2C | 64 | 64 |
| #2F | 68 | 68 |
| #5 | 147 | 147 |
| #7 | 96 | 96 |
| #8 | 199 | 199 |
| #10 | 73 | 73 |
| #13 | 150 | 150 |
| #14 | 152 | 152 |
| #17 | 160 | 160 |
| #19 | 198 | 198 |
| #22 | 112 | 112 |
| #23 | 19 | 19 |
| #29 | 112 | 112 |
| #32 | 14 | 14 |
| #35 | 162 | 162 |
| #38 | 112 | 112 |
| #52 | 32 | 32 |
| #59 | 153 | 153 |
| #60 | 69 | 69 |

**E X H I B I T S** (Continued)

|  | Offered | Admitted |
|---|---|---|
| Plaintiffs' | | |
| #76 | 183 | 183 |
| #79 | 104 | 104 |
| #87 | 96 | 96 |

Defendants'

(None)

| | | |
|---|---|---|
| 11:04:03 | 1 | THE COURT: Call the case. |
| 11:04:05 | 2 | THE CLERK: Court calls: A 22-CV-424, <u>Leila</u> |
| 11:04:09 | 3 | <u>Green Little, Et Al vs. Llano County, Et Al</u>, for |
| 11:04:11 | 4 | preliminary injunction hearing you. |
| 11:04:16 | 5 | THE COURT: For the plaintiff. |
| 11:04:17 | 6 | MS. LEONIDA: Good morning, your Honor. |
| 11:04:18 | 7 | Ellen Leonida for the plaintiffs from Braun, |
| 11:04:20 | 8 | Hagey & Borden, along with Max Bernstein. And from |
| 11:04:22 | 9 | Wittliff Cutter, we have Katherine Chiarello, Maria Calaf |
| 11:04:27 | 10 | and Ryan Botkin. Also present today are the plaintiffs |
| 11:04:30 | 11 | themselves, Leila Green Little, Jeanne Puryear, Rebecca |
| 11:04:34 | 12 | Jones, Kathy Kennedy, Richard Day, Diane Moster and |
| 11:04:38 | 13 | Cynthia Waring. |
| 11:04:39 | 14 | THE COURT: Good morning. |
| 11:04:41 | 15 | And for the defendant. |
| 11:04:43 | 16 | MR. MITCHELL: John Mitchell on behalf of the |
| 11:04:47 | 17 | defendants, your Honor, and with me is Dwain Rogers, Matt |
| 11:04:50 | 18 | Rienstra. |
| 11:04:50 | 19 | THE COURT: Good morning. |
| 11:04:52 | 20 | MR. MITCHELL: Good morning. |
| 11:04:53 | 21 | THE COURT: And we are here for a combined |
| 11:04:55 | 22 | hearing on the plaintiffs' petition for a preliminary |
| 11:04:57 | 23 | injunction as well as defendants' motion to dismiss. I |
| 11:05:01 | 24 | have reviewed both your pleadings and your briefs on these |
| 11:05:04 | 25 | topics, and so, what I would propose as the most efficient |

11:05:08  1  way forward would be for us to launch directly into the

11:05:12  2  evidence in the case, put on whatever witnesses, introduce

11:05:17  3  whatever evidence you'd like to to complete the record.

11:05:20  4  We will get in as much as we can today and then, we will

11:05:23  5  pick up again on Monday morning and complete whatever is

11:05:27  6  undone at that point.

11:05:29  7       We -- I anticipate today that we will -- starting

11:05:33  8  now at little after 11:00, we will go to a natural

11:05:36  9  stopping point sometime between 12:30 and 1:00, take a

11:05:41  10  45-minute break for a quick lunch, and then, we will

11:05:43  11  continue on until 4:00, which will be our hard stop today.

11:05:47  12  Again, we'll pick up at 9:00, then, on Monday morning for

11:05:51  13  the completion of the hearing.

11:05:54  14       Does that work for the plaintiff?

11:05:56  15       MS. LEONIDA:  Yes, your Honor.

11:05:56  16       THE COURT:  Mr. Mitchell?

11:05:59  17       MR. MITCHELL:  Yes, your Honor.

11:05:59  18       THE COURT:  So with that, are there any

11:06:02  19  agreements with regard to preadmission of any evidence

11:06:05  20  that you'd like to go ahead and get into the record?  Or

11:06:06  21  is that something that you can perhaps talk about at

11:06:10  22  lunch?  Has that been anticipated?

11:06:13  23       MS. LEONIDA:  So we sent over a list of exhibits

11:06:16  24  to counsel.  I understand that he may not have received

11:06:18  25  the e-mail.  We don't anticipate there's going to be much

11:06:21  1   dispute about the admissibility of exhibits, but I'll let

11:06:24  2   defense counsel speak to that.

11:06:26  3          MR. MITCHELL:  Yeah.  We received the exhibit

11:06:28  4   list.  I'm the process of actually looking at the exhibits

11:06:31  5   itself, but I agree with my colleague that we don't expect

11:06:34  6   there to be any disagreements.

11:06:36  7          THE COURT:  Okay.  That's great.  We'll just take

11:06:36  8   it as it comes in.

11:06:36  9          MR. MITCHELL:  All right.  Thank you.

11:06:38  10         THE COURT:  Thank you very much.  All right.

11:06:39  11         Then taking then the plaintiff since the initial

11:06:45  12  hearing was set for a hearing on the motion -- the

11:06:50  13  petition for a preliminary injunction, than I'll let the

11:06:53  14  plaintiffs present first.  And so, Ms. Leonida, I'll be

11:06:57  15  happy to hear your first witness.

11:07:00  16         MS. LEONIDA:  Thank you, your Honor.  We call

11:07:10  17  Martina Castelan.

11:07:20  18         MR. MITCHELL:  Your Honor, may I invoke the rule?

11:07:23  19         THE COURT:  Yes.  So the rule has been invoked.

11:07:25  20  For those of you who are potential witnesses who have been

11:07:29  21  designated as witnesses in this case, invoking the rule

11:07:31  22  simply means that you are not allowed to be in the

11:07:33  23  courtroom during testimony of other witnesses.  And so,

11:07:36  24  any of you who have been designated or have been informed

11:07:42  25  that you are going to be witnesses in this case, I would

| | | |
|---|---|---|
| 11:07:45 | 1 | ask you now to be excused from the courtroom to remain |
| 11:07:48 | 2 | excused until you are called, and to refrain from |
| 11:07:52 | 3 | communicating with anyone about the testimony that is |
| 11:07:56 | 4 | introduced in the hearing today.  And I'll ask the lawyers |
| 11:07:59 | 5 | on each side to inform the witnesses about the |
| 11:08:03 | 6 | implications of invoking the rule as well maintaining an |
| 11:08:07 | 7 | awareness of who is in the courtroom, to the extent you |
| 11:08:09 | 8 | can, so that if we have late-coming witnesses who haven't |
| 11:08:14 | 9 | been instructed, then you can keep an eye out for them. |
| 11:08:17 | 10 | So any of you who are potential witnesses, if you |
| 11:08:20 | 11 | could now excuse yourself from the courtroom. |
| 11:08:21 | 12 | MS. LEONIDA:  Your Honor, we would ask that the |
| 11:08:24 | 13 | Plaintiff Leila Green Little be exempted from that order. |
| 11:08:26 | 14 | THE COURT:  Sure and that will be granted.  Any |
| 11:08:28 | 15 | representatives of the parties are allowed to remain in |
| 11:08:31 | 16 | the courtroom.  All right.  Very good. |
| 11:08:34 | 17 | If you'll come forward, please.  Before you're |
| 11:08:47 | 18 | seated, if you could please raise your right hand to be |
| 11:08:55 | 19 | sworn. |
| 11:08:55 | 20 | THE CLERK:  You do solemnly swear or affirm that |
| 11:08:55 | 21 | the testimony you will give in this cause now before the |
| 11:08:55 | 22 | Court will be the truth, the whole truth, and nothing but |
| 11:08:58 | 23 | the truth, so help you God? |
| 11:08:58 | 24 | THE WITNESS:  Yes. |
| 11:09:03 | 25 | THE COURT:  You may proceed. |

| | | |
|---|---|---|
| 11:09:04 | 1 | MARTINA N. CASTELAN, called by the Plaintiff, duly sworn. |
| 11:09:04 | 2 | DIRECT EXAMINATION |
| 11:09:05 | 3 | BY MS. LEONIDA: |
| 11:09:05 | 4 | Q.   Ms. Castelan, can you tell us your full name? |
| 11:09:09 | 5 | A.   Yes.  My full name is Martina Nickole Castelan. |
| 11:09:13 | 6 | Atypical spelling of the middle name, it's N-I-C-K-O-L-E. |
| 11:09:18 | 7 | Q.   Where do you live, Ms. Castelan? |
| 11:09:19 | 8 | A.   So I live in Llano. |
| 11:09:23 | 9 | Q.   How long have you lived in Llano? |
| 11:09:25 | 10 | A.   My entire life.  I was born in Fredericksburg, but I |
| 11:09:28 | 11 | was moved to Llano. |
| 11:09:28 | 12 | Q.   Did you go to high school there? |
| 11:09:30 | 13 | A.   I did. |
| 11:09:30 | 14 | Q.   Do you have any advanced degrees? |
| 11:09:32 | 15 | A.   Yes.  I have a Bachelor's of Science in Psychology |
| 11:09:35 | 16 | with an emphasis in child development. |
| 11:09:40 | 17 | Q.   What kind of work have you done since getting your |
| 11:09:43 | 18 | degrees? |
| 11:09:43 | 19 | A.   So I have tried to open and run my own daycare.  I've |
| 11:09:47 | 20 | also worked at a previous licensed daycare.  I worked at |
| 11:09:50 | 21 | Early Childhood Intervention at Bluebonnet Trails in Round |
| 11:09:54 | 22 | Rock.  And then, let's see, I've worked at Baylor Scott & |
| 11:10:01 | 23 | White and I've worked for Llano County. |
| 11:10:04 | 24 | Q.   In what capacity did you work for Llano County? |
| 11:10:06 | 25 | A.   So I worked as the children's librarian for two years |

11:10:09 1 and then, I was promoted to head librarian.

11:10:12 2 Q.   How did you come to work at the Llano County Library?

11:10:15 3 A.   So I was updating my resume one day and the current

11:10:19 4 director, she saw me updating my resume, asked if this was

11:10:23 5 a position -- a position was open, the children's

11:10:26 6 librarian, she asked if I wanted it and I said yes, let me

11:10:29 7 try for it.  And so, I submitted it and I got the job.

11:10:32 8 Q.   How did you know her?

11:10:34 9 A.   So she was my librarian since I was five.  She used

11:10:37 10 to be the children's librarian and I went every day after

11:10:40 11 school for the summer reading program.  I've known her for

11:10:43 12 a very long time.

11:10:43 13 Q.   Okay.  Have you ever testified in court before?

11:10:47 14 A.   I have not.

11:10:47 15 Q.   A little nervous?

11:10:48 16 A.   A little bit.

11:10:50 17 Q.   I'm going to ask you to slow down a little bit so the

11:10:52 18 reporter can write down what you're saying.

11:10:55 19         How often would you go to the library when you

11:10:59 20 were growing up?

11:10:59 21 A.   It was a weekly thing.  Sometimes it was multiple

11:11:02 22 times a week.  During the summer, I was there at least

11:11:05 23 four days out of the week.  I helped run the summer

11:11:08 24 reading program.  I was a volunteer at the Llano Library

11:11:13 25 as a teen.  I was in the teen program, and then, I kind of

11:11:15  1  put it off during high school.  Just had other things

11:11:18  2  going on and then -- but I always came back to it and so,

11:11:21  3  it was a large part of my life.

11:11:23  4  Q.   How did you feel when you were told about the

11:11:26  5  possibility of working at the Llano County Library?

11:11:28  6  A.   It was a dream come true.  Of course, when you first

11:11:32  7  start, you don't know what a library does.  So it was just

11:11:35  8  really fun and I was like I'm going to get to read all the

11:11:39  9  books in the world.  And so, it was very exciting to be

11:11:41  10  able to get that job.

11:11:43  11  Q.   What did your duties include as the children's

11:11:45  12  librarian?

11:11:46  13  A.   So as a the children's librarian, I was responsible

11:11:48  14  for all the kids from newborn up to 18 years old because I

11:11:52  15  was actually -- I was children's, slash, a youth, also,

11:11:57  16  and so, I had elementary, middle school and high school,

11:12:00  17  and I was responsible for outreach programs, story times,

11:12:04  18  after-school programs, the summer reading program, and any

11:12:07  19  other special programs that we did for holidays or other

11:12:11  20  things like that.

11:12:12  21  Q.   Did your duties include ordering books?

11:12:14  22  A.   Yes.

11:12:15  23  Q.   How did you decide which book to order?

11:12:18  24  A.   So it was a variety of things.  We had patron

11:12:23  25  requests, slips that people would fill out; so we used

11:12:26  1  those.  I would pull those every month.  And then, also,

11:12:29  2  we had the Ingram catalog and Amazon, we would go and

11:12:32  3  scroll through there, see what was new and upcoming.  And,

11:12:35  4  of course, anything that was an ongoing series, those were

11:12:37  5  usually stuck on the list to be ordered.

11:12:39  6  Q.   What's the Ingram catalog?

11:12:41  7  A.   So Ingram is the -- it's the database that we use

11:12:45  8  that has all of the books available for us to purchase.

11:12:49  9  Q.   You have a binder there in front of you, I'm going to

11:12:52  10  ask you to open it to Exhibit 1.

11:12:57  11  A.   Okay.

11:12:57  12  Q.   Do you recognize what that is?

11:12:59  13  A.   Yes.

11:13:00  14  Q.   What is?

11:13:01  15  A.   So that is our Materials Selection Policy.  It's how

11:13:04  16  you decide what to add into the collection.

11:13:06  17  Q.   Let me take a step back.  How long did you work at

11:13:08  18  the library?  When did you start and when did you end?

11:13:11  19  A.   So I started June 29th of 2019 and then, I left

11:13:16  20  September 21st of 2022.

11:13:18  21  Q.   During your time as a Llano County librarian, was

11:13:21  22  this the policy that was in effect?

11:13:23  23  A.   Yes, ma'am.

11:13:23  24  Q.   Plaintiffs move Exhibit 1 into evidence.

11:13:25  25          THE COURT:  Any objection?

11:13:26    1                MR. MITCHELL:  No.

11:13:27    2                THE COURT:  Without objection, so admitted.

11:13:30    3    Q.   (BY MS. LEONIDA) Can you turn to Exhibit 32 in that

11:13:32    4    binder.  Do you recognize that?

11:13:43    5    A.   Yes.

11:13:43    6    Q.   What is that?

11:13:44    7    A.   So this is our Llano County Library System policy.

11:13:47    8    Q.   Were those policies the policies in effect the entire

11:13:50    9    time that you worked at the Llano County Library?

11:13:52   10    A.   Yes.

11:13:52   11    Q.   Plaintiffs move Exhibit 32 into evidence.

11:13:55   12                MR. MITCHELL:  No objection.

11:13:56   13                THE COURT:  So admitted.

11:13:58   14    Q.   (BY MS. LEONIDA) Did you also as the children's

11:14:01   15    librarian receive any training in what was age appropriate

11:14:04   16    for children to read?

11:14:06   17    A.   So not from the county or from the library system

11:14:11   18    itself, but we were given the opportunity to go onto Web

11:14:14   19    Junction, which is where a lot of the Zoom and online

11:14:17   20    e-classes were at.  And so, we were given the opportunity

11:14:20   21    to go on there and to do classes as time permitted.

11:14:24   22    Q.   And did you take advantage of that opportunity?

11:14:25   23    A.   Yes.

11:14:27   24    Q.   Did your degree or your knowledge about child

11:14:30   25    development also factor into how you picked books for the

11:14:33 1 children's section?

11:14:33 2 A. Oh, yes.

11:14:34 3 Q. Did you pick any books that in your opinion were

11:14:38 4 inappropriate for the children's section?

11:14:39 5 A. No.

11:14:41 6 Q. I want to talk to you about the process for ordering

11:14:43 7 books. How did -- if you can just start from the

11:14:46 8 beginning and tell me how a book comes from an idea in

11:14:48 9 your mind to a book on the library shelf?

11:14:49 10 A. Yes. So we go through the catalogs, we go through

11:14:54 11 Amazon, we look for what we want, and then, from there,

11:14:57 12 depending on if it's available in Ingram, we would go to

11:15:00 13 Ingram, put it into the cart. Each month had a cart and

11:15:03 14 then, each section of the library has a cart.

11:15:06 15 Q. Let me just pause for a minute. Is that cart a

11:15:08 16 digital cart?

11:15:09 17 A. A digital cart, yes. And then, from there, we put

11:15:11 18 those in and then, it would go to the director and the

11:15:14 19 director had to sign off on saying that yes, these are the

11:15:17 20 books that we can order.

11:15:18 21 Q. Who was your director for majority of the time that

11:15:21 22 you worked at the library?

11:15:22 23 A. It was Tommi Myers.

11:15:24 24 Q. When did Ms. Myers retire or leave?

11:15:26 25 A. I believe it was in February of 2021.

11:15:30　1　Q.　So from when you started in 2019 to February of 2021,

11:15:34　2　you would put these books in the cart.　Then did you

11:15:37　3　submit the cart to Ms. Myers' review?

11:15:41　4　A.　Yes.

11:15:42　5　Q.　Did she generally take any issue with the books that

11:15:43　6　you were ordering?

11:15:44　7　A.　No.　Not typically.

11:15:46　8　Q.　In February of 2021, who replaced Ms. Myers?

11:15:49　9　A.　So there was a month lull where there was some, I

11:15:56　10　guess, situations going on.　So then, in March, I believe,

11:15:58　11　is when Amber Milum became our director.

11:16:01　12　Q.　Did you know Ms. Milum?

11:16:03　13　A.　No.

11:16:04　14　Q.　How was your relationship with Ms. Milum when she

11:16:07　15　first became the director?

11:16:08　16　A.　I was very excited.　She was new, it seemed like we

11:16:12　17　were going to really become a better system as a whole and

11:16:15　18　be able to work together better and share more ideas.　It

11:16:19　19　was an exciting time.

11:16:21　20　Q.　Did your process for ordering brooks change at all?

11:16:24　21　A.　At the beginning, no.

11:16:27　22　Q.　So let's just go until January of 2022 and that time

11:16:31　23　period between, I guess it was, March of 2021 and January

11:16:35　24　of 2022, did the book-ordering process change?

11:16:38　25　A.　Yes.　So we were told to stop ordering books.　We

11:16:42  1  could not add to the Ingram digital cart and there was a

11:16:47  2  indefinite pause put.

11:16:49  3  Q.   I think maybe my question wasn't clear.  Up until

11:16:52  4  January of 2022.  So during 2021, did the process for

11:16:58  5  buying books change when Ms. Milum took over?

11:17:01  6  A.   No.

11:17:01  7  Q.   Okay.  So up through the end of 2021, would it still

11:17:07  8  be the case that you would look for appropriate books,

11:17:10  9  judge them by a criteria set out in your policy manual,

11:17:14  10  put them in your cart, and she would look at them to

11:17:16  11  approve them?

11:17:16  12  A.   So we stopped doing that in October of 2021.

11:17:18  13  Q.   Okay.  Before you stopped in October, did Ms. Milum

11:17:22  14  ever disapprove of any books that you wanted to order?

11:17:24  15  A.   No.

11:17:25  16  Q.   Did she sometimes order children's books herself?

11:17:29  17  A.   Yes.

11:17:30  18  Q.   So we'll talk a little bit later about what changed

11:17:33  19  in October and then, January.  I want to talk to you now

11:17:37  20  about how books leave the library other than being checked

11:17:40  21  out.  How does a book get taken out of circulation?

11:17:43  22  A.   So there are several ways a book can get taken out.

11:17:46  23  Because I do work in the children's section, the number

11:17:48  24  one is that if they just get gross, that they get boogers,

11:17:53  25  markings, the dirt, if they just get gross, that's the

| | | |
|---|---|---|
| 11:17:56 | 1 | number-one way for the children's section that books get |
| 11:17:58 | 2 | taken out. |
| 11:17:59 | 3 | The other way is if they haven't been checked out |
| 11:18:01 | 4 | within a certain amount of time according to the CREW |
| 11:18:05 | 5 | manual. |
| 11:18:05 | 6 | Q.   Okay.  Can you turn to Exhibit 23 in that binder. |
| 11:18:20 | 7 | What is that first page? |
| 11:18:21 | 8 | A.   So that is our CREW method of weeding and it's got |
| 11:18:26 | 9 | all of the kind of the breakdown for each section of how |
| 11:18:31 | 10 | we would weed them based on each of the different |
| 11:18:36 | 11 | categories for weeding. |
| 11:18:37 | 12 | Q.   And is this the policy that was applicable to the |
| 11:18:39 | 13 | Llano County Library System the entire time that you |
| 11:18:41 | 14 | worked there? |
| 11:18:41 | 15 | A.   Yes. |
| 11:18:42 | 16 | Q.   Can you turn to the next page? |
| 11:18:48 | 17 | A.   Yes. |
| 11:18:52 | 18 | Q.   Do you know what that is? |
| 11:18:53 | 19 | A.   Yes.  So that is part of the library system policies. |
| 11:18:58 | 20 | Q.   Is it also policies that relate to weeding books from |
| 11:19:02 | 21 | the library system? |
| 11:19:02 | 22 | A.   Yes. |
| 11:19:03 | 23 | Q.   And was that also in effect the entire time that you |
| 11:19:06 | 24 | worked for the Llano County Libraries? |
| 11:19:10 | 25 | A.   No.  That is a section of an updated policy. |

11:19:13  1    Q.    Okay.  When did that take effect, if you know?

11:19:16  2    A.    I don't know.

11:19:17  3    Q.    Was it in effect in 2021?

11:19:21  4    A.    No.

11:19:23  5    Q.    Okay.  The CREW manual, I want to back you up a

11:19:29  6    little bit.  You talked about certain circulation dates.

11:19:34  7    What is weeding?

11:19:36  8    A.    So weeding is the process by which a library takes

11:19:39  9    all of their identifying characteristics off of the book,

11:19:43  10   and then, it is then taken out of the library, out of the

11:19:46  11   system, and it goes on to its new life.

11:19:50  12   Q.    And is CREW a weeding method?

11:19:52  13   A.    Yes.

11:19:53  14   Q.    Okay.  Plaintiffs move Plaintiffs' Exhibit 23 into

11:19:57  15   evidence.

11:19:58  16          MR. MITCHELL:  No objection.

11:19:59  17          THE COURT:  Without objection, so admitted.

11:20:01  18   Q.    (BY MS. LEONIDA) So what's the first cut, if you

11:20:08  19   will?  What makes you look at a book for potential

11:20:11  20   weeding?

11:20:12  21   A.    So the first cut typically is if a patron brings us

11:20:16  22   the book and says, hey, I'm sorry I damaged this or

11:20:20  23   stuff's falling out of it, things like that.  That's

11:20:22  24   usually the first line of cuts.

11:20:25  25   Q.    Are there rules about a book that hasn't been checked

| | | |
|---|---|---|
| 11:20:28 | 1 | out for a certain number of years, say, a fiction or |
| 11:20:31 | 2 | nonfiction book? |
| 11:20:32 | 3 | A.   Yes, and it's different for each section. |
| 11:20:34 | 4 | Q.   Okay.  So how long does a nonfiction book have to |
| 11:20:38 | 5 | have not been checked out to be eligible for weeding? |
| 11:20:41 | 6 | A.   It depends on the section of the Dewey decimal system |
| 11:20:44 | 7 | it comes from. |
| 11:20:45 | 8 | Q.   What's the range? |
| 11:20:47 | 9 | A.   So it could be anywhere from a year if it's a |
| 11:20:50 | 10 | technology book, it gets outdated very quickly, all the |
| 11:20:53 | 11 | way up to pretty much indefinite, things like the bible. |
| 11:20:57 | 12 | Q.   What about a history book? |
| 11:20:59 | 13 | A.   History it can be indefinite until it is proven to |
| 11:21:04 | 14 | otherwise be in accurate or misleading. |
| 11:21:07 | 15 | Q.   What about fiction?  Is there a rule for how long a |
| 11:21:10 | 16 | fiction book has to have not been checked out to be |
| 11:21:13 | 17 | removed? |
| 11:21:13 | 18 | A.   Yes. |
| 11:21:13 | 19 | Q.   Or to be considered for removal? |
| 11:21:15 | 20 | A.   Yes, and typically it's about three years. |
| 11:21:19 | 21 | Q.   Every book that -- every fiction book, say, that |
| 11:21:22 | 22 | hasn't been checked out in three years, is that book |
| 11:21:24 | 23 | automatically weeded or do you apply more factors? |
| 11:21:26 | 24 | A.   So you apply more factors to it after that. |
| 11:21:28 | 25 | Q.   Can you tell us about those? |

| | | |
|---|---|---|
| 11:21:30 | 1 | A.   Yes.  So if it is a fiction book that say it's a |
| 11:21:38 | 2 | how-to-get-dressed book.  Even if it's never been checked |
| 11:21:43 | 3 | out or it hasn't been checked out in a couple of years, if |
| 11:21:45 | 4 | we don't have another book that has similar information to |
| 11:21:47 | 5 | it, then we would keep it.  We just keep it indefinitely. |
| 11:21:53 | 6 | Q.   Does the word MUSTIE mean anything to you? |
| 11:21:55 | 7 | A.   Yes. |
| 11:21:56 | 8 | Q.   What is that? |
| 11:21:58 | 9 | A.   Oh, so it's -- |
| 11:22:01 | 10 | Q.   If you want to look at Exhibit 3 to refresh your |
| 11:22:03 | 11 | recollection. |
| 11:22:04 | 12 | A.   So it's misleading, ugly, superseded by a new |
| 11:22:08 | 13 | edition, trivial, irrelevant, or available elsewhere. |
| 11:22:11 | 14 | Q.   Are those criteria that you used to determine whether |
| 11:22:13 | 15 | a book should be weeded? |
| 11:22:14 | 16 | A.   Yes. |
| 11:22:16 | 17 | Q.   Does any one MUSTIE factor mean that a book is |
| 11:22:19 | 18 | weeded? |
| 11:22:20 | 19 | A.   No.  It's usually a combination. |
| 11:22:22 | 20 | Q.   Is there a minimum number? |
| 11:22:24 | 21 | A.   So my minimum number was always two to three. |
| 11:22:28 | 22 | Q.   If a book falls into one of these two or three MUSTIE |
| 11:22:32 | 23 | factors, does that automatically mean that it's taken out |
| 11:22:35 | 24 | of the library, or are there other options at that point? |
| 11:22:37 | 25 | A.   No.  So there's other options.  It's up to the |

11:22:41 1 librarian and the library system. I, myself, put it onto

11:22:45 2 a kind of last-chance cart to give it one more chance, one

11:22:48 3 more year to circulate. Maybe it's just an ugly cover and

11:22:52 4 it wasn't as noticed, so sometimes bringing it to the

11:22:54 5 forefront kind of livens it.

11:22:59 6 Q. Are there -- do you know what special topics books

11:23:03 7 are?

11:23:03 8 A. Yes.

11:23:03 9 Q. What are those?

11:23:04 10 A. So special topic books are books that we don't

11:23:07 11 necessarily have a demand for but that it is better that

11:23:09 12 we have them when we don't need them than to need them and

11:23:12 13 we don't have them. And so, books like grief counseling

11:23:16 14 for children, anything in the LGBTQ realm that even though

11:23:23 15 nobody's asking for them, it's good to have them available

11:23:25 16 when we need them.

11:23:27 17 Q. So are those books then that you would keep in the

11:23:30 18 library even if nobody had checked them out in years?

11:23:32 19 A. Yes.

11:23:33 20 Q. Are you familiar with a series of books by Dawn

11:23:40 21 McMillin called My Butt is So Noisy, I Broke My Butt and I

11:23:44 22 Need a New Butt?

11:23:45 23 A. Yes.

11:23:46 24 Q. If I call them the Butt books, you'll know what I'm

11:23:48 25 talking about?

| | | |
|---|---|---|
| 11:23:48 | 1 | A.   Yes. |
| 11:23:50 | 2 | Q.   Were those ever ordered for the Llano County Library |
| 11:23:54 | 3 | System? |
| 11:23:54 | 4 | A.   So I did not order them, but they were, yes. |
| 11:23:56 | 5 | Q.   Who did order them? |
| 11:23:57 | 6 | A.   Amber Milum ordered them. |
| 11:24:00 | 7 | Q.   In your opinion, were they appropriate for kids in |
| 11:24:03 | 8 | the age range that they were written for? |
| 11:24:05 | 9 | A.   Yes. |
| 11:24:09 | 10 | Q.   Based on your experience as a children's librarian, |
| 11:24:11 | 11 | was there anything dangerous about those books? |
| 11:24:13 | 12 | A.   Not to me. |
| 11:24:16 | 13 | Q.   Were those books eventually removed from the library? |
| 11:24:19 | 14 | A.   Yes. |
| 11:24:19 | 15 | Q.   Do you know when? |
| 11:24:21 | 16 | A.   I do not. |
| 11:24:22 | 17 | Q.   Do you know why? |
| 11:24:24 | 18 | A.   There was some community outrage about them and so, |
| 11:24:27 | 19 | they got removed. |
| 11:24:29 | 20 | Q.   Do you know who removed them? |
| 11:24:31 | 21 | A.   So Amber removed them. |
| 11:24:33 | 22 | Q.   And how do you know that? |
| 11:24:34 | 23 | A.   So because Amber and I are the only ones that were |
| 11:24:38 | 24 | approved -- well, and they had the other head librarians |
| 11:24:40 | 25 | at the other branches were the ones that were approved to |

11:24:43 1 be able to remove and weed items out of the system.

11:24:49 2 Q.   Was there ever a time, to your knowledge, that people

11:24:51 3 were checking those books out of the libraries to remove

11:24:54 4 them from circulation?

11:24:55 5 A.   Yes.

11:24:55 6 Q.   Tell me about that.

11:24:57 7 A.   So they were put on the shelf -- they were processed

11:25:00 8 and placed on the library shelves very briefly, and once

11:25:04 9 they were put on the shelves, some patrons came in and

11:25:07 10 they just continually checked them out just again and

11:25:10 11 again and again.

11:25:12 12 Q.   How do you know they weren't just reading them over

11:25:15 13 and over?

11:25:15 14 A.   So they're very short books.  It is -- they could

11:25:20 15 have been reading them just over and over again, but

11:25:25 16 they're very short and the checkout period is six weeks.

11:25:29 17 And so, unless you're reading them every night and your

11:25:32 18 kid is just obsessed with those, it's a little strange to

11:25:37 19 have them out for that long.

11:25:38 20 Q.   And who were those patrons that kept checking them

11:25:40 21 out repeatedly?

11:25:41 22 A.   So it was Rhonda and then, I believe, Rochelle.

11:25:44 23 Q.   And what are their last names?

11:25:46 24 A.   Rhonda Schneider and Rochelle Wells.

11:25:49 25 Q.   Do you know Jerry Don Moss?

| | | |
|---|---|---|
| 11:25:52 | 1 | A. Yes. |
| 11:25:52 | 2 | Q. How long have you known him? |
| 11:25:54 | 3 | A. So I went to school with his kid. I was a grade |
| 11:25:58 | 4 | above her. And so, I've known of him my entire school |
| 11:26:02 | 5 | career. |
| 11:26:03 | 6 | Q. What's his job in Llano County? |
| 11:26:05 | 7 | A. He is the Llano County Precinct 4 Commissioner. |
| 11:26:11 | 8 | Q. During the time that you worked at the Llano County |
| 11:26:15 | 9 | Library, how often would Mr. Moss could in? |
| 11:26:18 | 10 | A. Very rarely. I would see him during voting and |
| 11:26:21 | 11 | that's about it. |
| 11:26:24 | 12 | Q. At some point in 2021, did Mr. Moss come in to talk |
| 11:26:28 | 13 | to you about library books? |
| 11:26:30 | 14 | A. Yes. |
| 11:26:30 | 15 | Q. Was that in the fall of 2021? |
| 11:26:33 | 16 | A. Yes, ma'am. |
| 11:26:34 | 17 | Q. And can you tell me what he said to you? |
| 11:26:37 | 18 | A. Yes. So he came in and he asked me to show him the |
| 11:26:42 | 19 | worst possible book that I thought that we had on the |
| 11:26:44 | 20 | shelves in the children's section. |
| 11:26:45 | 21 | Q. What did you take that to mean, the worst possible |
| 11:26:48 | 22 | book? |
| 11:26:48 | 23 | A. So pretty much the one that would, I guess, be the |
| 11:26:53 | 24 | most shocking to like parents and the patrons that they |
| 11:26:57 | 25 | had seen them. |

| | | |
|---|---|---|
| 11:26:58 | 1 | Q.   And why did you think that's what he meant by the |
| 11:27:00 | 2 | worst book as opposed to worst written or be elitist? |
| 11:27:04 | 3 | A.   So because of the previous things that had been going |
| 11:27:07 | 4 | on with everyone coming in and saying that we had |
| 11:27:09 | 5 | inappropriate materials in the library. |
| 11:27:12 | 6 | Q.   So let back up then and tell me about that.  Who was |
| 11:27:16 | 7 | coming in and saying you had inappropriate materials? |
| 11:27:18 | 8 | MR. MITCHELL:  Objection.  Hearsay. |
| 11:27:22 | 9 | MS. LEONIDA:  Your Honor, I don't believe the |
| 11:27:24 | 10 | rules of evidence apply to this hearing and the witnesses |
| 11:27:28 | 11 | -- the fact that the witness heard these statements goes |
| 11:27:30 | 12 | to explain her interpretation of what Defendant Moss |
| 11:27:33 | 13 | subsequently said to her. |
| 11:27:34 | 14 | THE COURT:  I'll overrule the objection. |
| 11:27:35 | 15 | MR. MITCHELL:  Thanks. |
| 11:27:36 | 16 | A.   Will you repeat the question. |
| 11:27:37 | 17 | Q.   (BY MS. LEONIDA) Yes.  Tell me about the incidents |
| 11:27:39 | 18 | you're talking about people coming into the library and |
| 11:27:42 | 19 | saying there were inappropriate things. |
| 11:27:44 | 20 | A.   Okay.  So we had several patrons come in and asked to |
| 11:27:47 | 21 | talk to Amber.  I got to talk to one of them and they were |
| 11:27:50 | 22 | complaining about the Butt books and that they were |
| 11:27:53 | 23 | grooming and various things of that nature.  And so, there |
| 11:27:58 | 24 | was about five or six people that came in and I did get to |
| 11:28:03 | 25 | sit in on some of the meetings with these patrons. |

11:28:05  1    Q.   Do you know what grooming means?

11:28:08  2    A.   I didn't, but now I do.

11:28:10  3    Q.   What is it?

11:28:12  4    A.   I don't know the actual definition of it, but it is

11:28:15  5    acting in a way that encourages a child to do

11:28:20  6    inappropriate things with an adult.

11:28:23  7    Q.   As a children's librarian with a degree in child

11:28:26  8    development and training in picking children's books, in

11:28:29  9    your opinion, are the Butt books grooming children for

11:28:32  10   anything inappropriate?

11:28:32  11   A.   No.

11:28:38  12   Q.   Was there -- during this period where people were

11:28:40  13   coming into the library and complaining about

11:28:42  14   inappropriate content, was there anything that in your

11:28:45  15   professional opinion was inappropriate and in the

11:28:47  16   children's section?

11:28:48  17   A.   No.

11:28:48  18        MR. MITCHELL:  Your Honor, she's not been

11:28:50  19   designated as an expert witness and these questions are

11:28:53  20   asking for her opinion on matters which she has not been

11:28:56  21   qualified as an expert.  We object.

11:28:59  22        MS. LEONIDA:  Your Honor, I believe that this

11:29:00  23   witness as a librarian -- as a children's library can

11:29:03  24   offer an opinion, a lay opinion as to the appropriateness

11:29:05  25   of books in the children's section.  She's also testified

| | | |
|---|---|---|
| 11:29:07 | 1 | she has training in picking those books and actually has a |
| 11:29:10 | 2 | degree in child development. |
| 11:29:11 | 3 | THE COURT:  I'll allow the testimony.  Go ahead. |
| 11:29:14 | 4 | Q.   (BY MS. LEONIDA) Was there anything inappropriate in |
| 11:29:16 | 5 | the children's section? |
| 11:29:17 | 6 | A.   No. |
| 11:29:20 | 7 | Q.   So let's go back to this conversation that you had |
| 11:29:22 | 8 | with Mr. Moss.  So how did you respond when he asked for |
| 11:29:26 | 9 | the worst book in the library? |
| 11:29:28 | 10 | A.   So I went and I showed him our potty |
| 11:29:33 | 11 | training/puberty, maturity books, and so, of course, the |
| 11:29:37 | 12 | one that comes up is It's Perfectly Normal book. |
| 11:29:39 | 13 | Q.   Tell me about that book. |
| 11:29:42 | 14 | A.   So it is a general health book that is for children |
| 11:29:44 | 15 | 10 to 12 that are starting to go through puberty and it |
| 11:29:49 | 16 | just explores all versions and all aspects of puberty from |
| 11:29:54 | 17 | menstruation to masturbating to keeping ourselves safe on |
| 11:29:58 | 18 | the internet. |
| 11:29:59 | 19 | Q.   How long has that book been in the Llano County |
| 11:30:02 | 20 | Library? |
| 11:30:02 | 21 | A.   Since 2006. |
| 11:30:03 | 22 | Q.   How do you know that? |
| 11:30:04 | 23 | A.   Because I actually read that book whenever I was in |
| 11:30:07 | 24 | middle school. |
| 11:30:07 | 25 | Q.   What was Defendant Moss' response to being shown that |

| | | |
|---|---|---|
| 11:30:12 | 1 | book? |
| 11:30:12 | 2 | A.   So he seemed to be very taken aback by it.  It does |
| 11:30:16 | 3 | have some, I wouldn't say, graphic illustrations, but it |
| 11:30:19 | 4 | does have some illustrations of adults in adult |
| 11:30:21 | 5 | situations.  But that is just one section of the book. |
| 11:30:25 | 6 | Q.   Did he express an opinion as to whether that book |
| 11:30:28 | 7 | belonged in the library? |
| 11:30:31 | 8 | A.   He said that he wouldn't have wanted his children or |
| 11:30:33 | 9 | his grandchildren to see it. |
| 11:30:36 | 10 | Q.   Did you remove that book after your conversation with |
| 11:30:39 | 11 | Mr. Moss? |
| 11:30:39 | 12 | A.   I did not. |
| 11:30:40 | 13 | Q.   At some point, was that book removed from the Llano |
| 11:30:44 | 14 | County Library? |
| 11:30:44 | 15 | A.   Yes. |
| 11:30:45 | 16 | Q.   Who removed it? |
| 11:30:46 | 17 | A.   Amber. |
| 11:30:47 | 18 | Q.   And again, how do you know that? |
| 11:30:49 | 19 | A.   Because we're the only ones that are allowed to weed |
| 11:30:52 | 20 | materials. |
| 11:30:56 | 21 | Q.   Moving ahead a little bit in December of 2022, was |
| 11:31:00 | 22 | there a period when the library was shut down? |
| 11:31:02 | 23 | A.   Yes.  We were closed for three days. |
| 11:31:05 | 24 | Q.   Why were you closed for three days? |
| 11:31:07 | 25 | A.   So we were told that we needed to review the kids' |

11:31:10 1 section for any material that was deemed inappropriate.

11:31:13 2 Q. Who told you that?

11:31:15 3 A. So the directives came from Amber.

11:31:18 4 Q. Did you ask what inappropriate meant?

11:31:20 5 A. I did.

11:31:21 6 Q. And what was the response?

11:31:22 7 A. So we ended up getting back a response that anything

11:31:25 8 that pertained to nudity and anything that we deemed

11:31:29 9 inappropriate.

11:31:30 10 Q. What did you do with those directives?

11:31:33 11 A. So I did ask for further clarification because we had

11:31:37 12 books about Indians and they wore loin cloths, or we have

11:31:42 13 the potty training books or the getting dressed books, and

11:31:45 14 so, I questioned whether we were supposed to be pulling

11:31:47 15 those, as well. We were told yes, so we collected all of

11:31:51 16 the books that fell under that category, we stuck them on

11:31:55 17 a cart and we pushed them into Amber's office.

11:32:01 18 Q. Do you know approximately how many books ended up on

11:32:04 19 that cart in Amber's office?

11:32:06 20 A. Hundreds.

11:32:07 21 Q. And while they were on the cart in Amber's office,

11:32:09 22 were they available to be checked out?

11:32:12 23 A. Yes. We just had to ask for them.

11:32:14 24 Q. Do you know what the Krause list is?

11:32:21 25 A. Yes.

| | | |
|---|---|---|
| 11:32:22 | 1 | Q.   What is it? |
| 11:32:23 | 2 | A.   So it is a list of hundreds of books that Matt Krause |
| 11:32:30 | 3 | e-mailed -- it seemed like he e-mailed them to all of the |
| 11:32:33 | 4 | libraries in Texas. |
| 11:32:36 | 5 | Q.   Did the existence of this list ever impact your job |
| 11:32:39 | 6 | as a librarian? |
| 11:32:40 | 7 | A.   Yes. |
| 11:32:41 | 8 | Q.   Tell me how. |
| 11:32:42 | 9 | A.   So we had patrons that were coming in with print-offs |
| 11:32:45 | 10 | of that list looking for the books on the list that we had |
| 11:32:48 | 11 | in the library. |
| 11:32:52 | 12 | Q.   Were you given any instructions about how to respond |
| 11:32:54 | 13 | to those patrons? |
| 11:32:57 | 14 | A.   Yes. |
| 11:32:59 | 15 | Q.   What were they? |
| 11:33:01 | 16 | A.   So we were given a statement that we needed to say, |
| 11:33:05 | 17 | but I cannot remember verbatim. |
| 11:33:08 | 18 | Q.   That's fine.  Who gave you the statement? |
| 11:33:10 | 19 | A.   So it was e-mailed to us from the judge. |
| 11:33:13 | 20 | Q.   Who is the judge? |
| 11:33:14 | 21 | A.   So Judge Cunningham. |
| 11:33:16 | 22 | Q.   What was the gist of the statement? |
| 11:33:21 | 23 | A.   To pretty much say that we are reviewing all of our |
| 11:33:23 | 24 | policies and procedures and that nothing would be |
| 11:33:28 | 25 | purchased, nothing would get removed or added until |

11:33:32 1 everything had gone through its review process and then,

11:33:34 2 looked at.

11:33:36 3 Q. All of these events that we're talking about were in

11:33:39 4 fall of 2021.

11:33:41 5 A. Yes.

11:33:42 6 Q. How did you feel during that time being a librarian

11:33:45 7 in Llano County?

11:33:47 8 A. So at first, it wasn't too bad, but with Facebook,

11:33:52 9 social media and I live in the city of Llano, and so, I

11:33:56 10 see these patrons on a daily basis. It was just a little

11:34:00 11 disconcerting to have people constantly coming up and

11:34:02 12 asking: What's going on with the library? Did y'all have

11:34:07 13 this in there? Why would y'all allow that? And so, it

11:34:11 14 became difficult.

11:34:17 15 Q. We talked about the meeting criteria that applies to

11:34:21 16 Llano County. Can you open your exhibit binder to No. 52.

11:34:31 17 Mr. Cantu, if we could have that up on the screen.

11:34:38 18     Do you recognize this document?

11:34:40 19 A. I do.

11:34:40 20 Q. What is it?

11:34:41 21 A. So it one of the many reports that a librarian can

11:34:44 22 pull in our system.

11:34:48 23 Q. Plaintiffs move Exhibit 52 into evidence.

11:34:52 24     MR. MITCHELL: No objection, your Honor.

11:34:54 25     THE COURT: So admitted.

| | | |
|---|---|---|
| 11:34:55 | 1 | Q.   (BY MS. LEONIDA) What does the report reflect? |
| 11:35:00 | 2 | A.   So it reflects all of the books that we have |
| 11:35:03 | 3 | currently in the system, why they were -- if they were |
| 11:35:06 | 4 | weeded or not, when they got added, what their copyright |
| 11:35:10 | 5 | dates are, when they got deleted, what branch they're in, |
| 11:35:13 | 6 | and how many times they've circulated, and when the last |
| 11:35:15 | 7 | time they were circulated. |
| 11:35:18 | 8 | Q.   Are those factors that you would consider when |
| 11:35:21 | 9 | deciding whether a book is appropriately weeded? |
| 11:35:22 | 10 | A.   Yes. |
| 11:35:23 | 11 | Q.   So I'd like to take you through the highlighted |
| 11:35:27 | 12 | portions and hoping we can load them up or maybe you can |
| 11:35:34 | 13 | see them in your binder easier.  That first highlighted |
| 11:35:37 | 14 | book is what? |
| 11:35:39 | 15 | A.   So I Need a New Butt. |
| 11:35:41 | 16 | Q.   Based on the information from the Llano County |
| 11:35:44 | 17 | report, was this book -- when was this book weeded? |
| 11:35:47 | 18 | A.   So this book was weeded in July of 2021. |
| 11:35:53 | 19 | Q.   Was the book weeded pursuant to Llano County Library |
| 11:35:58 | 20 | policies? |
| 11:35:58 | 21 | A.   No. |
| 11:35:58 | 22 | Q.   Was it weeded pursuant to the CREW and MUSTIE |
| 11:36:02 | 23 | guidelines? |
| 11:36:03 | 24 | A.   No. |
| 11:36:03 | 25 | Q.   Why not? |

| | | |
|---|---|---|
| 11:36:04 | 1 | A.   Because this is -- it's a brand-new book and it had |
| 11:36:07 | 2 | only been in the library.  It got added in June of 2021, |
| 11:36:12 | 3 | so it was less than a month old. |
| 11:36:16 | 4 | Q.   You could turn to the next page.  Do you see there a |
| 11:36:20 | 5 | book called Larry The Farting Leprechaun? |
| 11:36:26 | 6 | A.   Yes. |
| 11:36:26 | 7 | Q.   Is that book currently in the Llano County Library |
| 11:36:29 | 8 | System? |
| 11:36:29 | 9 | A.   No. |
| 11:36:29 | 10 | Q.   Was it ever ordered for the library system? |
| 11:36:31 | 11 | A.   Yes. |
| 11:36:32 | 12 | Q.   Did it make it into circulation? |
| 11:36:34 | 13 | A.   No. |
| 11:36:35 | 14 | Q.   Do you know why not? |
| 11:36:36 | 15 | A.   I do not. |
| 11:36:40 | 16 | Q.   What about the one after that that's highlighted |
| 11:36:42 | 17 | Harvey The Heart Had Too Many Farts? |
| 11:36:48 | 18 | A.   Same thing. |
| 11:36:49 | 19 | Q.   Gary The Goose And His Gas On The Loose.  Is that a |
| 11:36:51 | 20 | book that was ordered for the Llano County Library? |
| 11:36:54 | 21 | A.   Yes. |
| 11:36:55 | 22 | Q.   Is that a book that in your opinion was appropriate |
| 11:36:57 | 23 | for the age range that it was targeted to? |
| 11:36:58 | 24 | A.   Yes. |
| 11:36:59 | 25 | Q.   Did that book ever make it into circulation? |

| | | |
|---|---|---|
| 11:37:02 | 1 | A.   No. |
| 11:37:05 | 2 | Q.   Freddie The Farting Snowman, is that a book that was |
| 11:37:09 | 3 | ordered for the Llano County Library System? |
| 11:37:11 | 4 | A.   Yes. |
| 11:37:11 | 5 | Q.   Did that book ever make it into circulation? |
| 11:37:14 | 6 | A.   No. |
| 11:37:16 | 7 | Q.   The next highlighted book, I Broke My Butt.  Was that |
| 11:37:24 | 8 | book ever in circulation? |
| 11:37:25 | 9 | A.   Yes. |
| 11:37:25 | 10 | Q.   When was it removed? |
| 11:37:27 | 11 | A.   So it was removed August of 2021. |
| 11:37:34 | 12 | Q.   Did that book meet any of the criteria for removals |
| 11:37:37 | 13 | set out in Llano County Library System policies? |
| 11:37:40 | 14 | A.   No. |
| 11:37:40 | 15 | Q.   Was that book appropriately eligible for removal |
| 11:37:43 | 16 | under the CREW and MUSTIE criteria? |
| 11:37:45 | 17 | A.   No. |
| 11:37:46 | 18 | Q.   In your opinion, was that book appropriately removed? |
| 11:37:48 | 19 | A.   No. |
| 11:37:55 | 20 | Q.   And My Butt Is So Noisy, the next one on the list. |
| 11:37:59 | 21 | Is that a book that was ever in circulation at the Llano |
| 11:38:02 | 22 | County Library? |
| 11:38:02 | 23 | A.   Yes. |
| 11:38:03 | 24 | Q.   For how long? |
| 11:38:04 | 25 | A.   So very briefly, it went on the shelves and, like I |

| | | |
|---|---|---|
| 11:38:09 | 1 | mentioned before, it just kept getting checked out.  And |
| 11:38:11 | 2 | so, it was on the shelves but checked out. |
| 11:38:14 | 3 | Q.   Was it at some point removed from circulation? |
| 11:38:16 | 4 | A.   Yes. |
| 11:38:17 | 5 | Q.   When was that? |
| 11:38:18 | 6 | A.   So in August of 2021. |
| 11:38:22 | 7 | Q.   Was it appropriately removed from circulation |
| 11:38:25 | 8 | pursuant to Llano County Library policy? |
| 11:38:27 | 9 | A.   No. |
| 11:38:28 | 10 | Q.   Was it a book that would have been appropriately |
| 11:38:30 | 11 | removed pursuant to CREW and MUSTIE criteria? |
| 11:38:33 | 12 | A.   No. |
| 11:38:33 | 13 | Q.   Why not? |
| 11:38:35 | 14 | A.   Because it was bought in June of 2021 and so, it was |
| 11:38:39 | 15 | still a fairly new book. |
| 11:38:42 | 16 | Q.   Based on the circulation records, would the fact that |
| 11:38:47 | 17 | it had been checked out multiple times also counseled |
| 11:38:51 | 18 | against removing it? |
| 11:38:53 | 19 | A.   Yes. |
| 11:38:53 | 20 | Q.   Because it was popular? |
| 11:38:54 | 21 | A.   Yes. |
| 11:38:55 | 22 | Q.   Turning to the next page, I think it's next page.  At |
| 11:39:05 | 23 | the bottom of the next page, there's the book that we |
| 11:39:07 | 24 | talked about, It's Perfectly Normal.  Do you see that? |
| 11:39:11 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:39:13 | 1 | Q. Was that book removed from the Llano County Library |
| 11:39:17 | 2 | System? |
| 11:39:17 | 3 | A. Yes. |
| 11:39:18 | 4 | Q. When was that book removed? |
| 11:39:19 | 5 | A. So it was removed in October of 2021. |
| 11:39:22 | 6 | Q. Do you know who removed it? |
| 11:39:24 | 7 | A. Yes, Amber Milum. |
| 11:39:26 | 8 | Q. Was that book appropriately removed from the library |
| 11:39:29 | 9 | system based on library system policies? |
| 11:39:32 | 10 | A. No. |
| 11:39:33 | 11 | Q. Was that book appropriately removed from the library |
| 11:39:36 | 12 | system based on CREW and MUSTIE criteria? |
| 11:39:38 | 13 | A. No. |
| 11:39:39 | 14 | Q. Why not? |
| 11:39:40 | 15 | A. So because its last checkout was in 2018. This is a |
| 11:39:44 | 16 | nonfiction book, so it falls under different criteria for |
| 11:39:48 | 17 | the CREW manual. It is a little bit older, but it is the |
| 11:39:51 | 18 | only book of its category that is as extensive in its |
| 11:39:57 | 19 | information that it gives. |
| 11:40:00 | 20 | Q. Turning to the next page, do you see the book In The |
| 11:40:07 | 21 | Night Kitchen? |
| 11:40:08 | 22 | A. Yes. |
| 11:40:08 | 23 | Q. Was that book removed from the Llano County Library |
| 11:40:11 | 24 | System? |
| 11:40:11 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:40:12 | 1 | Q.   When was it removed? |
| 11:40:13 | 2 | A.   So in November of 2021. |
| 11:40:16 | 3 | Q.   By whom? |
| 11:40:17 | 4 | A.   By Amber. |
| 11:40:19 | 5 | Q.   Was that book appropriately removed pursuant to Llano |
| 11:40:25 | 6 | County Library policies? |
| 11:40:25 | 7 | A.   No. |
| 11:40:26 | 8 | Q.   Was that book appropriately removed pursuant to CREW |
| 11:40:29 | 9 | and MUSTIE criteria? |
| 11:40:30 | 10 | A.   No. |
| 11:40:31 | 11 | Q.   Why not? |
| 11:40:31 | 12 | A.   Because its last checkout was in 2020.  It is a very |
| 11:40:35 | 13 | old book, but it is also considered a classic; and so, |
| 11:40:37 | 14 | even if we had removed it, we would have replaced it with |
| 11:40:40 | 15 | a newer copy of it.  And then, also, I mean, it's been |
| 11:40:45 | 16 | checked out 33 times. |
| 11:40:50 | 17 | Q.   Turning to the next page, there's a book called |
| 11:40:56 | 18 | Freakboy.  Was that book removed from the Llano County |
| 11:41:00 | 19 | Library System? |
| 11:41:00 | 20 | A.   Yes. |
| 11:41:00 | 21 | Q.   When was it removed? |
| 11:41:01 | 22 | A.   So it was removed in November of 2021. |
| 11:41:04 | 23 | Q.   By whom? |
| 11:41:05 | 24 | A.   By Amber. |
| 11:41:06 | 25 | Q.   Was that book appropriately removed pursuant to Llano |

11:41:10　1　County Library policies?

11:41:10　2　A.　Yes.

11:41:13　3　Q.　Tell me about that.

11:41:14　4　A.　Because its last circulation was in 2016.  It was

11:41:17　5　only checked out once.  It was added in 2015, and so, for

11:41:22　6　me, this book would have been one that I would have

11:41:24　7　discovered and gotten rid of.

11:41:27　8　Q.　When was this book removed?

11:41:29　9　A.　So it was removed in November of 2021.

11:41:33　10　Q.　Is there a time that the library normally weeds books

11:41:37　11　to see what should be removed?

11:41:39　12　A.　Yes.  So we do our like annual weed in August and

11:41:44　13　that's just because there's more down time, but it is a

11:41:46　14　continuous process that we do all throughout the year.

11:41:49　15　Q.　Other than the annual weed where you look through

11:41:52　16　books on the shelves, how does it happen throughout the

11:41:55　17　year that books are weeded?

11:41:56　18　A.　So just typically when patrons come in and they've

11:41:59　19　accidently damaged it, if they are just very old books

11:42:03　20　that we need to get new editions of, especially technology

11:42:07　21　books and then, anything that's kind of new and a fleeting

11:42:13　22　type of book, we're not going to keep books that no longer

11:42:16　23　hold interest, especially ones that are about like certain

11:42:20　24　people, athlete, things like that.  Those would end up --

11:42:23　25　after their interest has waned, we remove them.

| | | |
|---|---|---|
| 11:42:28 | 1 | Q.   So would it be fair to say that August is the only |
| 11:42:31 | 2 | time that the librarians would go to the shelves and pull |
| 11:42:35 | 3 | books to see if they were eligible for weeding? |
| 11:42:37 | 4 | A.   Yes. |
| 11:42:38 | 5 | Q.   The next book on that list, Shine.  Do you see that |
| 11:42:43 | 6 | book?  When was that book removed from the library system? |
| 11:42:45 | 7 | A.   Also in November of 2021. |
| 11:42:47 | 8 | Q.   How many times had that book been checked out? |
| 11:42:50 | 9 | A.   Ten times. |
| 11:42:51 | 10 | Q.   In your opinion, was that book appropriately weeded? |
| 11:42:53 | 11 | A.   No. |
| 11:42:54 | 12 | Q.   Why not? |
| 11:42:55 | 13 | A.   Because it had just been checked out four months |
| 11:43:00 | 14 | prior to it being weeded. |
| 11:43:04 | 15 | Q.   Do you see the book Spinning? |
| 11:43:11 | 16 | A.   Yes. |
| 11:43:11 | 17 | Q.   Was that book removed from the Llano County Library |
| 11:43:14 | 18 | System? |
| 11:43:14 | 19 | A.   Yes. |
| 11:43:15 | 20 | Q.   When was that removed? |
| 11:43:15 | 21 | A.   Also in November of 2021. |
| 11:43:19 | 22 | Q.   Did Ms. Milum also remove that book? |
| 11:43:23 | 23 | A.   Yes. |
| 11:43:24 | 24 | Q.   How many times had that book been checked out? |
| 11:43:26 | 25 | A.   Four. |

11:43:27  1   Q.   In your opinion, was that book properly removed from

11:43:31  2   the Llano County Library System pursuant to its policies

11:43:35  3   and weeding criteria?

11:43:36  4   A.   No.

11:43:36  5   Q.   Why not?

11:43:38  6   A.   Because it had still been checked out.  It had been

11:43:41  7   checked out in 2019.  We only had it for three years and

11:43:45  8   so, it's still fairly new.

11:43:49  9   Q.   Just to go back because I think I may have been

11:43:52  10  asking you bad questions.  For all of the books we've

11:43:54  11  talked about so far in Exhibit 52, did you weed any of

11:44:00  12  those books?

11:44:00  13  A.   No.

11:44:01  14  Q.   Did Ms. Milum weed all of those books?

11:44:03  15  A.   Yes.

11:44:03  16  Q.   Turning back to the exhibit, do you see the book

11:44:11  17  Caste?

11:44:11  18  A.   Yes.

11:44:11  19  Q.   When was that book removed from the library system?

11:44:14  20  A.   November of 2021.

11:44:15  21  Q.   Who removed that book?

11:44:16  22  A.   Amber.

11:44:17  23  Q.   Was that book appropriately weeded pursuant to

11:44:20  24  library policies and the CREW and MUSTIE criteria?

11:44:23  25  A.   No.

| | | |
|---|---|---|
| 11:44:24 | 1 | Q.   Why not? |
| 11:44:24 | 2 | A.   Because it had just gotten checked out in January of |
| 11:44:28 | 3 | 2021, we had just bought that book in December of 2020, |
| 11:44:33 | 4 | and so, it wasn't even a whole year old yet. |
| 11:44:35 | 5 | Q.   How many times had it been checked out? |
| 11:44:38 | 6 | A.   Three times. |
| 11:44:40 | 7 | Q.   Do you see underneath there the book Being Jazz? |
| 11:44:45 | 8 | A.   Yes. |
| 11:44:46 | 9 | Q.   When was that book removed from the Llano County |
| 11:44:49 | 10 | Library System? |
| 11:44:49 | 11 | A.   November of 2021. |
| 11:44:51 | 12 | Q.   Who removed that book? |
| 11:44:52 | 13 | A.   Amber. |
| 11:44:52 | 14 | Q.   Was that book appropriately weeded pursuant to |
| 11:44:55 | 15 | library policy and CREW and MUSTIE criteria? |
| 11:44:58 | 16 | A.   So it could have been because it has -- it was |
| 11:45:01 | 17 | checked out in 2017.  However, we only had one or two of |
| 11:45:06 | 18 | the books that pertained to this subject and so, I would |
| 11:45:08 | 19 | have left it. |
| 11:45:09 | 20 | Q.   What's the subject the book pertains to? |
| 11:45:12 | 21 | A.   So it is about a transgender teen and just her life |
| 11:45:15 | 22 | story and how her family has helped her transition. |
| 11:45:18 | 23 | Q.   Why would you have kept that book even though it |
| 11:45:21 | 24 | hadn't been checked out in a little bit longer? |
| 11:45:24 | 25 | A.   Well, we only have one or two books that are about |

| 11:45:27 | 1 | this subject, and so, it goes back to I would rather have |
| 11:45:30 | 2 | a book that we don't need than to need a book and we don't |
| 11:45:34 | 3 | have it.  Also, teens are very finicky, they might not |
| 11:45:39 | 4 | want to tell you that they are questioning their gender. |
| 11:45:42 | 5 | And so, who am I do not have this subject available to |
| 11:45:48 | 6 | those patrons. |
| 11:45:50 | 7 | Q.   Is one of your considerations that a teen who's going |
| 11:45:53 | 8 | through questioning their gender identity or sexuality |
| 11:45:57 | 9 | might not be comfortable asking for a library for books on |
| 11:46:00 | 10 | the subject? |
| 11:46:00 | 11 | A.   Correct. |
| 11:46:03 | 12 | Q.   Going down the list some more, there's a book called |
| 11:46:06 | 13 | They Called Themselves The KKK.  Do you see that? |
| 11:46:10 | 14 | A.   Yes. |
| 11:46:11 | 15 | Q.   Do you know what kind of book that is? |
| 11:46:13 | 16 | A.   Yes.  So it's a nonfiction book for young adults. |
| 11:46:19 | 17 | Q.   Had that book -- when was that book removed from the |
| 11:46:25 | 18 | library? |
| 11:46:25 | 19 | A.   So November of 2021. |
| 11:46:27 | 20 | Q.   Were there other books like that in the library? |
| 11:46:29 | 21 | A.   No. |
| 11:46:30 | 22 | Q.   In your opinion, was that book appropriately weeded |
| 11:46:33 | 23 | pursuant to library policies and CREW and MUSTIE criteria? |
| 11:46:37 | 24 | A.   No, because it is the only one of that subject |
| 11:46:40 | 25 | matter. |

| | | |
|---|---|---|
| 11:46:42 | 1 | Q.   You could turn to the next page, do you see the book |
| 11:46:48 | 2 | called Gabi, A Girl In Pieces? |
| 11:46:50 | 3 | A.   Yes. |
| 11:46:51 | 4 | Q.   When was that book removed from the library? |
| 11:46:54 | 5 | A.   November of 2021. |
| 11:46:56 | 6 | Q.   Who removed that book? |
| 11:46:57 | 7 | A.   Amber. |
| 11:46:58 | 8 | Q.   Was that book appropriately weeded pursuant to |
| 11:47:02 | 9 | library policy and CREW and MUSTIE criteria? |
| 11:47:05 | 10 | A.   No. |
| 11:47:05 | 11 | Q.   Why not? |
| 11:47:06 | 12 | A.   Because last checkout was 2018 and we've had it since |
| 11:47:15 | 13 | 2016.  It's kind of a cusp one, but because it had been |
| 11:47:19 | 14 | checked out recently, I would have left it. |
| 11:47:22 | 15 | Q.   What were the options that you were talking about |
| 11:47:25 | 16 | earlier if a book hadn't been checked out in a while but |
| 11:47:27 | 17 | you want to give it another chance? |
| 11:47:28 | 18 | A.   So I call it kind of a last-chance shelf.  So all of |
| 11:47:32 | 19 | the books that I feel like they could be weeded but I want |
| 11:47:35 | 20 | to give them one more chance, maybe they were just hidden, |
| 11:47:37 | 21 | I pull them and I put them on a new shelf with a sign and |
| 11:47:41 | 22 | just gives them another opportunity to be seen and maybe |
| 11:47:44 | 23 | somebody wants it and they just didn't realize that we |
| 11:47:47 | 24 | have it. |
| 11:47:47 | 25 | Q.   And is that something that you do or do all |

| | | |
|--|--|--|
| 11:47:50 | 1 | librarians do this? |
| 11:47:51 | 2 | A.   So I'm sure there are more than just me doing it.  It |
| 11:47:55 | 3 | is not a standard procedure by any means, but it is |
| 11:47:58 | 4 | something that many librarians I've talked to do. |
| 11:48:01 | 5 | Q.   One last book I want to ask you on this list, Under |
| 11:48:06 | 6 | The Moon: A Catwoman's Tale.  Do you see that book? |
| 11:48:10 | 7 | A.   Yes. |
| 11:48:11 | 8 | Q.   When was that book removed? |
| 11:48:12 | 9 | A.   November of 2021. |
| 11:48:13 | 10 | Q.   Who removed that book? |
| 11:48:14 | 11 | A.   So I believe Amber. |
| 11:48:16 | 12 | Q.   Was that book appropriately weeded pursuant to |
| 11:48:20 | 13 | library policy and weeding criteria? |
| 11:48:23 | 14 | A.   No. |
| 11:48:23 | 15 | Q.   Why not? |
| 11:48:24 | 16 | A.   And so, from what the data reflects, it actually |
| 11:48:28 | 17 | shows that its last checkout was the day that it got |
| 11:48:30 | 18 | weeded.  And so, that's a little confusing to me. |
| 11:48:38 | 19 | Q.   When a book is weeded, what happens to it? |
| 11:48:41 | 20 | A.   So we have to go in and we have to take off the spine |
| 11:48:44 | 21 | label, our barcode, any identifying characteristics that |
| 11:48:48 | 22 | tell you it's a library book, we have to take all of that |
| 11:48:51 | 23 | off and remove it, so that way, it can be taken out of the |
| 11:48:55 | 24 | system. |
| 11:48:56 | 25 | Q.   Then what happens to it once it's stripped of all its |

| 11:49:00 | 1 | library identification? |
| 11:49:00 | 2 | A.   So that goes into a banana box and we have an |
| 11:49:03 | 3 | unofficial agreement with one of the antique stores in |
| 11:49:06 | 4 | town that once we have enough boxes of books worth them |
| 11:49:10 | 5 | coming over to pick them up, they come over and pick them |
| 11:49:13 | 6 | all up and take them back to their resale shop. |
| 11:49:15 | 7 | Q.   Do you know what happens with the proceeds from that |
| 11:49:19 | 8 | resale? |
| 11:49:20 | 9 | A.   No. |
| 11:49:22 | 10 | Q.   The books that we've just been discussing, all the |
| 11:49:25 | 11 | highlighted books in Exhibit 52, do you know whether those |
| 11:49:28 | 12 | books ended up in the banana box at the resale shop? |
| 11:49:32 | 13 | A.   They did not. |
| 11:49:33 | 14 | Q.   How do you know that? |
| 11:49:34 | 15 | A.   Because I had asked Amber if we needed to send those |
| 11:49:36 | 16 | over to the resale shop and she suggested that we not |
| 11:49:39 | 17 | because even though we've taken all of the identifying |
| 11:49:43 | 18 | characteristics off of it, if you know what you're looking |
| 11:49:46 | 19 | for, you can still clearly tell that it was a library book |
| 11:49:49 | 20 | and it came from the library.  And so, we just didn't want |
| 11:49:52 | 21 | to cause any more issues.  We didn't want anyone being |
| 11:49:56 | 22 | able to say that, hey, this book is out in the community |
| 11:50:00 | 23 | now and anybody can come and get it. |
| 11:50:03 | 24 | Q.   What would have been the problem with that? |
| 11:50:05 | 25 | A.   I think it just would have caused more issues. |

| | | |
|---|---|---|
| 11:50:09 | 1 | Q.   What do you mean by more issues?  More issues like |
| 11:50:13 | 2 | what? |
| 11:50:13 | 3 | A.   So, you know, more patrons would have been coming in |
| 11:50:17 | 4 | and asking us why did we give this book to the community, |
| 11:50:21 | 5 | why did we put it out in there instead of just throwing it |
| 11:50:24 | 6 | in the trash or getting rid of it. |
| 11:50:26 | 7 | Q.   So what happened to that box of books? |
| 11:50:28 | 8 | A.   So that box -- it got boxed up and when I left the |
| 11:50:32 | 9 | library system, it was currently in one of the back |
| 11:50:36 | 10 | cabinets in the back hallway. |
| 11:50:38 | 11 | Q.   When did you leave the library system? |
| 11:50:40 | 12 | A.   September 21st of this year. |
| 11:50:46 | 13 | Q.   All of these books that we've been discussing that |
| 11:50:49 | 14 | are now in a box in the hallway of the library, if you |
| 11:50:52 | 15 | look through them in the library card catalog, do they |
| 11:50:56 | 16 | show up? |
| 11:50:56 | 17 | A.   No. |
| 11:50:59 | 18 | Q.   I want to talk to you a little bit about the Llano |
| 11:51:02 | 19 | County advisory library board.  Do you know what the |
| 11:51:07 | 20 | library advisory board is? |
| 11:51:08 | 21 | A.   Yes. |
| 11:51:09 | 22 | Q.   What is it? |
| 11:51:10 | 23 | A.   So they are a board of people that they come together |
| 11:51:13 | 24 | and they review things that we're doing and they offer us |
| 11:51:18 | 25 | advice on how to make the library work better.  Usually it |

11:51:21  1  consists of friends, members, the Llano Women's Culture

11:51:27  2  Club, and the head librarians, and it's just a way for us

11:51:29  3  to kind of all get together and make sure we're all on

11:51:32  4  same page and we're all doing what we feel is best for the

11:51:34  5  county.

11:51:34  6  Q.   What are friends?

11:51:35  7  A.   So the friends of the Llano Library, each branch has

11:51:39  8  a separate friends group and these friends groups, they

11:51:44  9  volunteer their time, they have a book sale in the back

11:51:47  10  room.  They do an election bake sale.  They're pretty much

11:51:53  11  fundraising group and they help us, like they supported --

11:51:55  12  they donated the moneys for the summer reading programs.

11:51:59  13  Q.   And what's the Women's Culture Club?

11:52:01  14  A.   So the Women's Culture Club is the group that first

11:52:04  15  established the library system.

11:52:07  16  Q.   In January of 2022, were you informed that there was

11:52:11  17  a new library advisory board?

11:52:12  18  A.   Yes.

11:52:13  19  Q.   Tell me about that.

11:52:15  20  A.   So the previous board got dismantled and then, the

11:52:21  21  commissioners and the judge decided to appoint a new

11:52:23  22  advisory board and that each precinct would get a select

11:52:28  23  amount or a representative.  The judge got a

11:52:31  24  representative and I believe that was it.

11:52:36  25  Q.   Were you -- how did you feel about the new library

| | | |
|---|---|---|
| 11:52:39 | 1 | board? |
| 11:52:39 | 2 | A.    So I didn't approve of it because it didn't have any |
| 11:52:43 | 3 | of the -- didn't have the Women's Culture Club in it, and |
| 11:52:46 | 4 | it didn't have any of the friends group, and it also |
| 11:52:48 | 5 | didn't include any of the librarians. |
| 11:52:51 | 6 | Q.    Where did the library board meet? |
| 11:52:53 | 7 | A.    So they met in the library meeting room at first. |
| 11:52:58 | 8 | Q.    Their first meeting was going to be in January of |
| 11:53:01 | 9 | 2022, right? |
| 11:53:02 | 10 | A.    Uh-huh. |
| 11:53:02 | 11 | Q.    So what did you do to prepare for the first meeting |
| 11:53:04 | 12 | of the new library advisory board? |
| 11:53:06 | 13 | A.    So because I wasn't well acquainted with what the |
| 11:53:09 | 14 | advisory board did, I went and I just did a simple Google |
| 11:53:14 | 15 | search of the Texas Library Advisory Board Handbook.  I |
| 11:53:17 | 16 | found that there is a handbook.  I also went and found the |
| 11:53:20 | 17 | Marble Falls Advisory Board, some of their previous |
| 11:53:23 | 18 | meeting minutes, printed those out, printed out handbooks |
| 11:53:26 | 19 | for all of the new advisory board members, and just kind |
| 11:53:30 | 20 | of gave them an example of like how other advisory boards |
| 11:53:34 | 21 | in our system or like in our -- not our system but in our |
| 11:53:40 | 22 | area function. |
| 11:53:40 | 23 | Q.    Do you know -- and this is not a test.  It's if you |
| 11:53:43 | 24 | know who the new library advisory board members were? |
| 11:53:46 | 25 | A.    I know some of them, yes. |

| | | |
|---|---|---|
| 11:53:47 | 1 | Q.   Who do you know? |
| 11:53:48 | 2 | A.   I know Rochelle Wells, Rhonda Schneider, Leila.  No. |
| 11:53:54 | 3 | Leila's not on there.  Those were the only ones I |
| 11:54:01 | 4 | personally know. |
| 11:54:03 | 5 | Q.   So you're setting up for the first library advisory |
| 11:54:07 | 6 | board meeting in January.  You put all your printouts on |
| 11:54:10 | 7 | the library advisory board tables.  Did you attend that |
| 11:54:13 | 8 | meeting? |
| 11:54:13 | 9 | A.   No. |
| 11:54:13 | 10 | Q.   Did you want to? |
| 11:54:14 | 11 | A.   I was interested, yes. |
| 11:54:16 | 12 | Q.   Why didn't you attend? |
| 11:54:18 | 13 | A.   Because we were told that we weren't supposed to. |
| 11:54:21 | 14 | Q.   Who told you that? |
| 11:54:22 | 15 | A.   And so, we believe that directive came from the Judge |
| 11:54:26 | 16 | Cunningham, but Amber is the one that told us personally |
| 11:54:29 | 17 | that we couldn't go. |
| 11:54:32 | 18 | Q.   Were you ever allowed to attend a library advisory |
| 11:54:35 | 19 | board meeting? |
| 11:54:36 | 20 | A.   No. |
| 11:54:40 | 21 | Q.   In early 2022, did the process for ordering books |
| 11:54:45 | 22 | change? |
| 11:54:45 | 23 | A.   Yes. |
| 11:54:46 | 24 | Q.   Actually, before I ask you about that, you said you |
| 11:54:51 | 25 | stopped ordering books in October of 2021.  Why? |

11:54:54   1   A.   So because we got a purchasing statement from the

11:54:58   2   judge saying that we needed to stop acquiring and reading

11:55:02   3   any new materials until everything had been reviewed and

11:55:07   4   approved again.

11:55:12   5   Q.   Between that time and October of 2021 and when you

11:55:15   6   left the library less than a month ago, were any new books

11:55:21   7   ordered?

11:55:21   8   A.   No.

11:55:22   9   Q.   So go back again to early 2022. How did the process

11:55:27   10   for ordering books change early '22?

11:55:32   11   A.   So really, we weren't just -- we weren't ordering

11:55:35   12   anything. We weren't putting anything into the Ingram

11:55:37   13   carts. We weren't really taking patron suggestions

11:55:42   14   anymore. And so, there just wasn't any kind of

11:55:47   15   acquisitions happening.

11:55:49   16   Q.   As far as you know, did the new library board want to

11:55:52   17   approve any books that were purchased?

11:55:54   18   A.   Yes. They wanted to review all of the books that we

11:55:57   19   wanted to purchase and not officially approve them but

11:56:01   20   give us advice on what we should get.

11:56:05   21   Q.   Are you aware of any instances where the new library

11:56:10   22   board vetoed or rejected a book order?

11:56:13   23   A.   Yes.

11:56:13   24   Q.   Tell me about that.

11:56:14   25   A.   So when we were setting up the cloudLibrary, which is

| | |
|---|---|
| 11:56:17 | 1 |

the new e-book system, we had the librarians, we had asked

cloud libraries collections development team to put a list

of books together that they thought would be good for our

area.  And then, when she got us back that list, we just

went ahead and we ordered them, we purchased them.  Then

when the advisory board got a hold of the list of books,

they had messaged or they somewhat got a hold of Amber and

said they disagreed with some of the materials that were

on there and that they wanted them removed.

Q.   Then what happened?

A.   So then, we kind of explained -- Amber kind of

explained that that's not how most e-book systems work,

that we'd already bought them, they were already in the

system, ready to go, and that we wouldn't be asking for a

refund.

Q.   Did it end there?

A.   It did not.  We found out later that, I believe,

Bonnie called our representative at the cloudLibrary and

strongly encouraged him that we did, indeed, want a refund

on these books.

Q.   Did you get the refund?

A.   Yes.

Q.   Were the books added to the catalog?

A.   Yes.

Q.   Are you familiar with the interlibrary loan program

| 11:57:34 | 1 | in Llano County? |
| 11:57:35 | 2 | A.   Yes. |
| 11:57:35 | 3 | Q.   Are there two interlibrary loan programs?  One for -- |
| 11:57:40 | 4 | between the Llano libraries and one for outside? |
| 11:57:42 | 5 | A.   Yes.  There's the interlibrary loan and there's the |
| 11:57:44 | 6 | inner system loan.  So the inner system is between our |
| 11:57:46 | 7 | three branches and then, the interlibrary is just all the |
| 11:57:50 | 8 | other libraries. |
| 11:57:51 | 9 | Q.   To get a book through the interlibrary system that's |
| 11:57:56 | 10 | not in any of the three branches, what's the process for |
| 11:57:58 | 11 | that? |
| 11:57:58 | 12 | A.   So if you're savvy enough and you've done it before, |
| 11:58:02 | 13 | you can do it yourself through our catalog system.  But |
| 11:58:05 | 14 | most people, they have to come in and we have a slip that |
| 11:58:08 | 15 | we fill out and then, we go into a separate system to |
| 11:58:12 | 16 | order them, and then, they get shipped to us and it costs |
| 11:58:15 | 17 | the patron $3.15 to get the book. |
| 11:58:18 | 18 | Q.   Are there factors that affect how long it would take |
| 11:58:21 | 19 | the book to get to Llano? |
| 11:58:22 | 20 | A.   Definitely.  Postage is finicky, the mail, and so, if |
| 11:58:27 | 21 | it's just coming from like Marble Falls, we would probably |
| 11:58:30 | 22 | advise the patron like, hey, go see if you can pick it up. |
| 11:58:33 | 23 | Or if it's coming from like El Paso, it could take a |
| 11:58:37 | 24 | while.  There's also the weather and if we ordered it on a |
| 11:58:40 | 25 | Friday, well, then they might not see the request until |

11:58:44  1  Monday or Tuesday, and so, then it might not make it until

11:58:47  2  another additional week later.

11:58:50  3  Q.   Are there reference books at the Llano County

11:58:56  4  Library?

11:58:56  5  A.   Yes.

11:58:56  6  Q.   How would one normally access a reference book?

11:59:00  7  A.   So reference books, they're shelved just like all the

11:59:01  8  other books.  They just have an R on them and when you

11:59:04  9  come to check them out, when you scan them, they go boop,

11:59:07 10  boop, boop, boop and they tell you, you can't check them

11:59:08 11  out; they're for inhouse.

11:59:10 12  Q.   What is inhouse?

11:59:11 13  A.   So inhouse is where you can look at a book all you

11:59:13 14  want and it just can't leave the library.

11:59:16 15  Q.   Does inhouse mean anything else to you now?

11:59:22 16  A.   Now it does, yes.

11:59:23 17  Q.   When were you told that there was a different

11:59:25 18  inhouse?

11:59:26 19  A.   So June 27th, I believe, is when we were told of a

11:59:30 20  kind of a newer inhouse checkout procedure.

11:59:34 21  Q.   Who told you about this new procedure?

11:59:36 22  A.   Amber.

11:59:37 23  Q.   What did she tell you?

11:59:39 24  A.   So she said that this is a collection of books that

11:59:43 25  has been donated so that they're available, but that they

11:59:47 1 were going to be put on a shelf in the back, that they

11:59:51 2 would be checked out like an ISL would, which is an inner

11:59:56 3 system loan. They have a due date in them but they are

11:59:58 4 not -- you would not recognize them as a library book if

12:00:03 5 -- not knowing that they were a library book.

12:00:06 6 Q. What do you mean you wouldn't recognize them as a

12:00:08 7 library book?

12:00:09 8 A. Because they don't have the barcode. They don't have

12:00:13 9 a spine label, they don't have a genre label. A lot of

12:00:18 10 the kids' books have AR or reading levels, it doesn't have

12:00:21 11 any of that on it. The only identifying characteristics

12:00:24 12 in it are the due date slip and written in the corner in

12:00:27 13 the front page, it just says Llano County System.

12:00:31 14 Q. What books were part of this new program?

12:00:33 15 A. So it was all of the books that are highlighted on

12:00:35 16 this list.

12:00:38 17 Q. How was this program advertised to patrons?

12:00:40 18 A. It was not.

12:00:43 19 Q. Does the Llano County Library System have a

12:00:45 20 newsletter?

12:00:45 21 A. Yes.

12:00:46 22 Q. Was there any information in that newsletter about

12:00:48 23 this new inhouse checkout system?

12:00:50 24 A. No.

12:00:52 25 Q. If somebody looked at the online catalog for Llano

| | | |
|---|---|---|
| 12:00:58 | 1 | Library System, would these books appear there? |
| 12:01:00 | 2 | A.    No. |
| 12:01:01 | 3 | Q.    After showing my age, is there a physical card |
| 12:01:05 | 4 | catalog in Llano? |
| 12:01:06 | 5 | A.    No. |
| 12:01:07 | 6 | Q.    How would people then find out about this new inhouse |
| 12:01:12 | 7 | checkout system? |
| 12:01:12 | 8 | A.    So you just have to know that they're there. |
| 12:01:15 | 9 | Q.    How would you know? |
| 12:01:16 | 10 | A.    So we were told that people would know because they |
| 12:01:18 | 11 | are part of the lawsuit. |
| 12:01:24 | 12 | Q.    You've been going to the Llano County Library System |
| 12:01:27 | 13 | your whole life and worked there for a number of years. |
| 12:01:30 | 14 | A.    Yes. |
| 12:01:31 | 15 | Q.    What do you think of this new inhouse checkout system |
| 12:01:33 | 16 | for books -- for the books on the list? |
| 12:01:35 | 17 | A.    I really think that it is pointless. |
| 12:01:37 | 18 | Q.    Why? |
| 12:01:37 | 19 | A.    Because you can't find the books.  Even if you know |
| 12:01:41 | 20 | where they're at, you have to ask for them, which, once |
| 12:01:45 | 21 | again, goes back to what teenager wants to go up to an |
| 12:01:48 | 22 | adult and ask for books that are about sensitive topics. |
| 12:01:53 | 23 | It makes you not want to go and get them, and therefore, |
| 12:01:57 | 24 | they're not going to be checked out because people don't |
| 12:01:59 | 25 | know that they're there, and if they do know, they don't |

```
12:02:02  1   want to check them out.
12:02:04  2   Q.   Thank you, Ms. Castelan.  I have no further
12:02:07  3   questions.
12:02:19  4           MR. MITCHELL:  No cross, your Honor.
12:02:20  5           THE COURT:  Okay.  Thank you, ma'am.  You may
12:02:21  6   step down.  Next witness.
12:02:31  7           MS. LEONIDA:  Next, we call Amber Milum.
12:02:52  8           THE COURT:  For those of you who are standing, I
12:02:55  9   apologize that we don't have accommodations for you, but
12:02:58  10  our IT folks are working on a patch to put the audio from
12:03:04  11  this courtroom into the jury assembly room on the first
12:03:07  12  floor.  As soon as that is live, I will let you know that
12:03:10  13  so you can make your way, if you wish to, to go to the
12:03:13  14  first floor so you can hear what we're doing here and not
12:03:17  15  have to stand in the back.  So thanks for your patience.
12:03:21  16          Before you're seated, if you could take the oath
12:03:24  17  by raising your right hand, please.
12:03:27  18          THE CLERK:  You do solemnly swear or affirm that
12:03:27  19  the testimony you will give in this cause now before the
12:03:27  20  Court will be the truth, the whole truth, and nothing but
12:03:33  21  the truth, so help you God?
12:03:33  22          THE WITNESS:  Yes.
12:03:35  23          THE COURT:  Please be seated.  Before you begin,
12:03:37  24  I believe we -- Mr. Mitchell.
12:03:38  25          MR. MITCHELL:  Ms. Castelan is still in the
```

| 12:03:40 | 1 | courtroom.  Could we ask for her to leave? |
| 12:03:42 | 2 | MS. LEONIDA:  I would ask that she be excused. |
| 12:03:44 | 3 | There was no cross and we have no intention of recalling |
| 12:03:46 | 4 | her. |
| 12:03:46 | 5 | THE COURT:  Okay. |
| 12:03:47 | 6 | MR. MITCHELL:  Okay. |
| 12:03:51 | 7 | MR. ROGERS:  She may be recalled by the plaintiff |
| 12:03:54 | 8 | and we don't want to hear her -- have her hear all this |
| 12:03:56 | 9 | testimony as rebuttal. |
| 12:03:58 | 10 | THE COURT:  I think based on the representation |
| 12:04:01 | 11 | that she's not going to be recalled, she's not going to be |
| 12:04:03 | 12 | recalled. |
| 12:04:05 | 13 | MR. ROGERS:  Okay. |
| 12:04:05 | 14 | THE COURT:  Thank you. |
| 12:04:07 | 15 | AMBER MILUM, called by the Plaintiff, duly sworn. |
| 12:04:07 | 16 | DIRECT EXAMINATION |
| 12:04:07 | 17 | BY MS. LEONIDA: |
| 12:04:08 | 18 | Q.  Can you tell us your name? |
| 12:04:09 | 19 | A.  Amber Milum. |
| 12:04:10 | 20 | Q.  Ms. Milum, what do you do for living? |
| 12:04:12 | 21 | A.  I'm the Llano County Library System Director. |
| 12:04:15 | 22 | Q.  I'm sorry, can you speak up a little? |
| 12:04:17 | 23 | A.  Oh, the Llano County Library System Director. |
| 12:04:21 | 24 | Q.  You've been doing that since the summer of 2021? |
| 12:04:25 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:04:27 | 1 | Q.   Your employers as the Llano County Library System |
| 12:04:31 | 2 | director are the judge and the county commissioners; is |
| 12:04:34 | 3 | that right? |
| 12:04:34 | 4 | A.   Yes. |
| 12:04:36 | 5 | Q.   So one of your employers is Judge Cunningham? |
| 12:04:39 | 6 | A.   Yes. |
| 12:04:39 | 7 | Q.   And one of your employers is Jerry Don Moss? |
| 12:04:42 | 8 | A.   Yes. |
| 12:04:43 | 9 | Q.   Ms. Milum, you're familiar with the books My Butt Is |
| 12:04:53 | 10 | So Noisy, I Broke My Butt, and I Need A New Butt by Dawn |
| 12:04:57 | 11 | McMillin? |
| 12:04:57 | 12 | A.   Yes. |
| 12:04:58 | 13 | Q.   If I call those the Butt books, you'll know what I'm |
| 12:05:01 | 14 | referring to? |
| 12:05:01 | 15 | A.   Yes. |
| 12:05:01 | 16 | Q.   Are you also familiar with Larry The Farting |
| 12:05:05 | 17 | Leprechaun, Gary The Goose And His Gas On The Loose, |
| 12:05:07 | 18 | Freddie The Farting Snowman, and Harvey The Heart Had Too |
| 12:05:10 | 19 | Many Farts? |
| 12:05:10 | 20 | A.   Yes. |
| 12:05:11 | 21 | Q.   And if I refer to these as the Fart books, you'll |
| 12:05:13 | 22 | know what I'm talking about? |
| 12:05:14 | 23 | A.   Yes. |
| 12:05:14 | 24 | Q.   You ordered the Butt books for the Llano County |
| 12:05:17 | 25 | Library System? |

| | | |
|---|---|---|
| 12:05:17 | 1 | A.   Yes. |
| 12:05:17 | 2 | Q.   You did that because you thought that they would be |
| 12:05:20 | 3 | valuable for children. |
| 12:05:22 | 4 | A.   I thought they would be funny. |
| 12:05:24 | 5 | Q.   You read the reviews about those books? |
| 12:05:27 | 6 | A.   Yes. |
| 12:05:27 | 7 | Q.   Everything you saw about the books was positive, |
| 12:05:30 | 8 | correct? |
| 12:05:30 | 9 | A.   Yes. |
| 12:05:30 | 10 | Q.   Other librarians also agreed with you that those |
| 12:05:34 | 11 | books were silly but valuable for the library, correct? |
| 12:05:36 | 12 | A.   Yes. |
| 12:05:38 | 13 | Q.   The same is true of the Fart books? |
| 12:05:40 | 14 | A.   Yes. |
| 12:05:41 | 15 | Q.   So you picked the Fart books yourself? |
| 12:05:43 | 16 | A.   Yes. |
| 12:05:43 | 17 | Q.   You picked the Fart books because you thought they |
| 12:05:46 | 18 | were appropriate. |
| 12:05:47 | 19 | A.   Yes. |
| 12:05:48 | 20 | Q.   You did that based on your training as a librarian. |
| 12:05:52 | 21 | A.   Yes. |
| 12:05:53 | 22 | Q.   You did that based on reviews. |
| 12:05:55 | 23 | A.   Yes. |
| 12:05:56 | 24 | Q.   And part of your job is actually picking books for |
| 12:06:01 | 25 | the Llano County Library System, right? |

| | | |
|---|---|---|
| 12:06:03 | 1 | A.   Yes. |
| 12:06:04 | 2 | Q.   In order to pick those books, you look at magazines? |
| 12:06:09 | 3 | A.   I look at the iPage because they will also have, you |
| 12:06:15 | 4 | know, what's up and coming, Amazon reviews, the -- yes, |
| 12:06:20 | 5 | the magazines that we get into the library, the reviews |
| 12:06:24 | 6 | and everything. |
| 12:06:24 | 7 | Q.   The Ingram magazine -- |
| 12:06:26 | 8 | A.   Yes. |
| 12:06:26 | 9 | Q.   -- is one of those things.  And you've had training |
| 12:06:29 | 10 | over your years as a librarian on how to choose |
| 12:06:33 | 11 | appropriate books, correct? |
| 12:06:33 | 12 | A.   Yes. |
| 12:06:34 | 13 | Q.   You are also bound by the Materials Selection Policy? |
| 12:06:37 | 14 | A.   Yes. |
| 12:06:40 | 15 | Q.   And that Materials Selection Policy, if you could |
| 12:06:43 | 16 | look at Exhibit 1, actually, that's been previously |
| 12:06:45 | 17 | admitted.  That's the library Materials Selection Policy, |
| 12:06:56 | 18 | correct? |
| 12:06:57 | 19 | A.   Yes. |
| 12:06:58 | 20 | Q.   And that applies throughout the Llano County Library |
| 12:07:01 | 21 | System? |
| 12:07:01 | 22 | A.   Yes. |
| 12:07:02 | 23 | Q.   And it did throughout 2021 and up until today; is |
| 12:07:05 | 24 | that right? |
| 12:07:05 | 25 | A.   Correct. |

12:07:06  1  Q.   Can you go to where it says general principles.  Can

12:07:20  2  you read that first paragraph?

12:07:22  3  A.   Selection is based on the merits of a work in

12:07:25  4  relation to the needs, interest and demands of the Llano

12:07:29  5  County Library System.  Basic to this policy is the

12:07:32  6  library bill of rights, as adopted by the American Library

12:07:35  7  Association.  This states in part, in no case should any

12:07:38  8  book be excluded because of race or nationality or the

12:07:42  9  political or religious views of the writer.  There should

12:07:45  10  be the fullest practical provision of material presenting

12:07:49  11  all points of view concerning the problem and issues of

12:07:52  12  our times, international, national and local; and media or

12:07:57  13  other reading material of sound factual authority should

12:08:04  14  not be proscribed or removed from the library shelves

12:08:08  15  because of partisan or doctrinal disapproval.  The library

12:08:12  16  does not promulgate particular beliefs or views, nor is

12:08:16  17  the selection of any given media equivalent to endorsement

12:08:20  18  of the viewpoint of the author expressed therein.

12:08:22  19  Q.   And that is as you said, the current policy of the

12:08:24  20  Llano County Library System?

12:08:26  21  A.   Yes.

12:08:26  22  Q.   And what you just read is an accurate reflection of

12:08:31  23  the selection criteria that you as a librarian -- all you

12:08:34  24  librarians are supposed to employ, correct?

12:08:35  25  A.   Yes.

| 12:08:36 | 1 | Q.   Can you read the next paragraph? |
| 12:08:39 | 2 | A.   Responsibility for the reading of children rests with |
| 12:08:43 | 3 | their parents or legal guardians.   Selection should not be |
| 12:08:46 | 4 | inhibited by the possibility that media may inadvertently |
| 12:08:49 | 5 | come into possession of children. |
| 12:08:51 | 6 | Q.   That is also a current policy of the Llano County |
| 12:08:55 | 7 | Library System? |
| 12:08:55 | 8 | A.   Yes. |
| 12:08:55 | 9 | Q.   And one that librarians like yourself need to abide |
| 12:09:00 | 10 | by even today, correct? |
| 12:09:02 | 11 | A.   Yes. |
| 12:09:02 | 12 | Q.   Fair to say that that's because it's a parent's job |
| 12:09:05 | 13 | to control what their children read? |
| 12:09:07 | 14 | A.   Yes. |
| 12:09:09 | 15 | Q.   And no parent has the authority in a library system |
| 12:09:12 | 16 | to control what somebody else's children read.   Also true? |
| 12:09:15 | 17 | A.   True. |
| 12:09:17 | 18 | Q.   You had all of these principles in mind when you |
| 12:09:20 | 19 | ordered the Butt books, correct? |
| 12:09:22 | 20 | A.   Yes. |
| 12:09:22 | 21 | Q.   And also, the Fart books? |
| 12:09:24 | 22 | A.   Yes. |
| 12:09:25 | 23 | Q.   Now, you removed the Butt books from circulation in |
| 12:09:29 | 24 | August of 2021, correct? |
| 12:09:32 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 12:09:33 | 1 | Q.   And the Fart books were never circulated, correct? |
| 12:09:37 | 2 | A.   Correct. |
| 12:09:39 | 3 | Q.   And again, you had ordered all of those books because |
| 12:09:42 | 4 | you thought they were appropriate for the age range that |
| 12:09:44 | 5 | they were targeted to, right? |
| 12:09:45 | 6 | A.   Yes. |
| 12:09:46 | 7 | Q.   You never changed your mind about that. |
| 12:09:48 | 8 | A.   No. |
| 12:09:56 | 9 | Q.   Can you turn to Exhibit 2C in that binder.  Is that a |
| 12:10:16 | 10 | note that you wrote for yourself? |
| 12:10:17 | 11 | A.   Yes. |
| 12:10:18 | 12 | Q.   Plaintiffs move Exhibit 2C into evidence. |
| 12:10:23 | 13 | MR. MITCHELL:  No objection. |
| 12:10:24 | 14 | THE COURT:  So admitted. |
| 12:10:25 | 15 | Q.   (BY MS. LEONIDA) You wrote this note because you |
| 12:10:29 | 16 | looked up the definition of grooming? |
| 12:10:31 | 17 | A.   Correct. |
| 12:10:32 | 18 | Q.   You did that because people had complained to you |
| 12:10:34 | 19 | that the Butt books and the Fart books were grooming |
| 12:10:39 | 20 | books? |
| 12:10:40 | 21 | A.   Yes. |
| 12:10:40 | 22 | Q.   So you looked up grooming, correct? |
| 12:10:42 | 23 | A.   Yes. |
| 12:10:44 | 24 | Q.   You did not agree that those books were grooming |
| 12:10:46 | 25 | books? |

| 12:10:47 | 1 | A. I did not. |
| 12:10:48 | 2 | Q. So your opinion of the appropriateness of these books |
| 12:10:51 | 3 | as the head librarian never changed. |
| 12:10:53 | 4 | A. Correct. |
| 12:10:57 | 5 | Q. But you removed the books, anyway, correct? |
| 12:10:59 | 6 | A. Yes. |
| 12:11:00 | 7 | Q. You did that at least in part because Commissioner |
| 12:11:04 | 8 | Jerry Don Moss told you to, correct? |
| 12:11:06 | 9 | A. No. |
| 12:11:08 | 10 | Q. I'd like to turn your attention to Exhibit 2A. I'm |
| 12:11:17 | 11 | sorry, 2B. That's a mandatory written note that you |
| 12:11:28 | 12 | wrote, correct? |
| 12:11:29 | 13 | A. Yes. |
| 12:11:29 | 14 | Q. You wrote it to yourself? |
| 12:11:31 | 15 | A. Yes. |
| 12:11:34 | 16 | Q. Plaintiffs move Exhibit 2B into evidence. |
| 12:11:38 | 17 | MR. MITCHELL: No objection. |
| 12:11:38 | 18 | THE COURT: So admitted. |
| 12:11:39 | 19 | Q. (BY MS. LEONIDA) You wrote the note at the time that |
| 12:11:42 | 20 | you had the conversation reflected in the note, correct? |
| 12:11:44 | 21 | A. Yes. |
| 12:11:46 | 22 | Q. So the conversation was fresh in your mind? |
| 12:11:49 | 23 | A. Yes. |
| 12:11:49 | 24 | Q. You made the note so that you would remember what |
| 12:11:52 | 25 | happened? |

| | | |
|---|---|---|
| 12:11:52 | 1 | A.   Correct. |
| 12:11:55 | 2 | Q.   You didn't intend to lie to yourself when you wrote |
| 12:11:58 | 3 | this note, did you, Ms. Milum? |
| 12:12:00 | 4 | A.   No. |
| 12:12:00 | 5 | Q.   So the note is an accurate reflection of the |
| 12:12:02 | 6 | conversation that you had with Commissioner Moss on August |
| 12:12:05 | 7 | 3rd, correct? |
| 12:12:06 | 8 | A.   It is bits and pieces of our conversation, yes. |
| 12:12:09 | 9 | Q.   Okay.  In the note that you wrote to yourself, you |
| 12:12:15 | 10 | wrote that Commissioner Moss told me that I should take |
| 12:12:19 | 11 | them out of the system, right? |
| 12:12:21 | 12 | A.   Yes. |
| 12:12:22 | 13 | Q.   And they are the Butt books in that sense, correct? |
| 12:12:29 | 14 | A.   I believe so.  Yes. |
| 12:12:31 | 15 | Q.   Okay.  He told you to pick your battles. |
| 12:12:36 | 16 | A.   Yes. |
| 12:12:36 | 17 | Q.   He told you that he was going to tell everyone it's |
| 12:12:39 | 18 | over. |
| 12:12:40 | 19 | A.   Yes. |
| 12:12:40 | 20 | Q.   And he told you that if you didn't do that, the next |
| 12:12:43 | 21 | step would be to take this to commissioners' court and if |
| 12:12:47 | 22 | that happens, they would vote to take the books off the |
| 12:12:50 | 23 | shelf and it would be bad publicity for the library, |
| 12:12:54 | 24 | correct? |
| 12:12:54 | 25 | A.   Yes. |

| 12:12:59 | 1 | Q.   Judge Cunningham also directed you to remove the |
| 12:13:01 | 2 | books, correct? |
| 12:13:06 | 3 | A.   Yes. |
| 12:13:07 | 4 | Q.   One of the people who advocated the removal of the |
| 12:13:18 | 5 | Fart books and Butt books from the library was Rochelle |
| 12:13:22 | 6 | Wells, correct? |
| 12:13:22 | 7 | A.   Yes. |
| 12:13:23 | 8 | Q.   She advocated their removal in the summer of 2021, |
| 12:13:25 | 9 | right? |
| 12:13:26 | 10 | A.   I believe so. |
| 12:13:27 | 11 | Q.   She was not yet on the library board at that point, |
| 12:13:29 | 12 | was she? |
| 12:13:30 | 13 | A.   Right. |
| 12:13:30 | 14 | Q.   But she did want the books removed? |
| 12:13:32 | 15 | A.   Yes. |
| 12:13:33 | 16 | THE COURT:  Excuse me, can I interrupt real |
| 12:13:34 | 17 | quick.  I've just been informed that the feed has gone |
| 12:13:37 | 18 | live.  So if you wish to be a little more comfortable and |
| 12:13:42 | 19 | seated, feel free to go to the first floor and courtroom |
| 12:13:47 | 20 | security officers on the first floor will direct you to |
| 12:13:50 | 21 | the jury assembly room, and hopefully the audio is live |
| 12:13:58 | 22 | and you'll be able to hear both the questioner and the |
| 12:14:01 | 23 | witness there.  So feel free to stay if you want to stand, |
| 12:14:04 | 24 | but thank you very much. |
| 12:14:06 | 25 | Q.   (BY MS. LEONIDA) One thing that Ms. Wells did in |

12:14:13  1  order to prevent anybody from checking those books out is

12:14:15  2  to check them out herself, correct?

12:14:17  3  A.   Yes.

12:14:17  4  Q.   Can you turn to Exhibit 2F in your binder.  Exhibit

12:14:28  5  2F is a record from the Llano County Library System of Ms.

12:14:32  6  Wells' book checking-out history in August, correct?

12:14:37  7  A.   Yes.

12:14:39  8  Q.   Plaintiffs move 2F into evidence.

12:14:43  9       MR. MITCHELL:  No objection.

12:14:43  10      THE COURT:  So admitted.

12:14:45  11 Q.   (BY MS. LEONIDA) And it reflects what you just

12:14:50  12 confirmed that she was checking those books out to prevent

12:14:53  13 other people from getting access to them.

12:14:55  14 A.   That's what I believe.

12:14:57  15 Q.   Now, you said that Judge Cunningham was one of the

12:15:01  16 people that told you to remove the Butt books from the

12:15:03  17 library, correct?

12:15:04  18 A.   Yes.

12:15:05  19 Q.   That's not the only time that he told you remove

12:15:12  20 books from the library, is it?

12:15:16  21 A.   No.

12:15:21  22 Q.   When else did Judge Cunningham tell you to remove

12:15:25  23 books from the library?

12:15:26  24 A.   When we were reviewing about the nudity and

12:15:30  25 sexuality.

| 12:15:31 | 1 | Q.   I'm going to turn your attention to Exhibit 60. |
| 12:15:48 | 2 | That's an e-mail that Judge Cunningham sent to you? |
| 12:15:52 | 3 | A.   Yes. |
| 12:15:53 | 4 | Q.   On November 8th of 2021. |
| 12:16:03 | 5 | A.   Yes. |
| 12:16:06 | 6 | Q.   Plaintiffs move Exhibit 60 into evidence. |
| 12:16:10 | 7 |      MR. MITCHELL:  No objection. |
| 12:16:11 | 8 |      THE COURT:  So admitted. |
| 12:16:12 | 9 | Q.   (BY MS. LEONIDA) In that e-mail, he refers to items |
| 12:16:17 | 10 | of action that he wants done immediately, correct? |
| 12:16:19 | 11 | A.   Yes. |
| 12:16:20 | 12 | Q.   Among the things that he orders you to do immediately |
| 12:16:23 | 13 | are pulling all books with naked content in them, correct? |
| 12:16:26 | 14 | A.   Yes. |
| 12:16:27 | 15 | Q.   He says to pull those books until further notice, |
| 12:16:31 | 16 | correct? |
| 12:16:31 | 17 | A.   Right. |
| 12:16:32 | 18 | Q.   He also directs you that you're not allowed to |
| 12:16:35 | 19 | purchase any more books, correct? |
| 12:16:37 | 20 | A.   Right. |
| 12:16:37 | 21 | Q.   And you actually haven't bought any books for the |
| 12:16:41 | 22 | Llano County Library System since then, have you? |
| 12:16:43 | 23 | A.   No. |
| 12:16:44 | 24 | Q.   So fair to say, there's some empty shelf space in the |
| 12:16:49 | 25 | library system right now. |

| 12:16:51 | 1 | A.   Yes. |
| 12:16:52 | 2 | Q.   When Judge Cunningham ordered you to immediately pull |
| 12:16:57 | 3 | any book off the shelf that depicted nudity, you did that? |
| 12:17:01 | 4 | A.   Yes. |
| 12:17:04 | 5 | Q.   He also instructed you to tell him when that task was |
| 12:17:07 | 6 | completed, right? |
| 12:17:08 | 7 | A.   Yes. |
| 12:17:09 | 8 | Q.   He also instructed you to tell him and Commissioner |
| 12:17:13 | 9 | Moss when that task was completed, right? |
| 12:17:14 | 10 | A.   Yes. |
| 12:17:15 | 11 | Q.   And you did that. |
| 12:17:16 | 12 | A.   Yes. |
| 12:17:17 | 13 | Q.   One of the books that you pulled off library shelves |
| 12:17:27 | 14 | in the summer-fall of 2021 was In The Night Kitchen, |
| 12:17:31 | 15 | correct? |
| 12:17:31 | 16 | A.   Yes. |
| 12:17:32 | 17 | Q.   And you pulled that book because of its content, |
| 12:17:34 | 18 | right? |
| 12:17:35 | 19 | A.   Yes, because that's what we were looking for. |
| 12:17:38 | 20 | Q.   Would you agree that that was a popular children's |
| 12:17:41 | 21 | book? |
| 12:17:42 | 22 | A.   Yes. |
| 12:17:43 | 23 | Q.   It had been checked out a lot? |
| 12:17:49 | 24 | A.   It had been checked out regularly. |
| 12:17:52 | 25 | Q.   It had won awards? |

| | | |
|---|---|---|
| 12:17:54 | 1 | A.   Yes. |
| 12:17:55 | 2 | Q.   Nobody complained to you about In The Night kitchen, |
| 12:17:58 | 3 | correct? |
| 12:17:58 | 4 | A.   No. |
| 12:17:59 | 5 | Q.   No children complained to you? |
| 12:18:01 | 6 | A.   No. |
| 12:18:01 | 7 | Q.   No adults complained to you? |
| 12:18:03 | 8 | A.   No. |
| 12:18:03 | 9 | Q.   Yet, you pulled the book off the shelf because of its |
| 12:18:07 | 10 | content. |
| 12:18:07 | 11 | A.   Yes.   When we were reviewing. |
| 12:18:11 | 12 | Q.   And that was part of the directive that we just |
| 12:18:14 | 13 | talked about that Judge Cunningham gave you to pull off |
| 12:18:16 | 14 | the shelf any book that depicted any type of nudity. |
| 12:18:19 | 15 | A.   Yes. |
| 12:18:20 | 16 | Q.   I want to turn your attention to Exhibit 10.   Exhibit |
| 12:18:40 | 17 | 10 is a list of books that you received in early November |
| 12:18:43 | 18 | of 2021, correct? |
| 12:18:45 | 19 | A.   Yes. |
| 12:18:47 | 20 | Q.   And it's a list of books that are on the Krause list |
| 12:18:52 | 21 | that also appeared in the Llano County Library System, |
| 12:18:55 | 22 | correct? |
| 12:18:55 | 23 | A.   Yes. |
| 12:19:01 | 24 | Q.   Just so we're all on the same page, the Krause list |
| 12:19:03 | 25 | is a list of books compiled by state Senator Krause that |

| | | |
|---|---|---|
| 12:19:07 | 1 | he objected to being in public libraries? |
| 12:19:09 | 2 | A.   Yes. |
| 12:19:13 | 3 | Q.   This list was in an e-mail that you received from |
| 12:19:16 | 4 | Judge Cunningham, correct? |
| 12:19:18 | 5 | A.   Yes. |
| 12:19:23 | 6 | Q.   The books that are targeted or that are identified on |
| 12:19:25 | 7 | this list are books that deal with critical race theory, |
| 12:19:29 | 8 | correct? |
| 12:19:32 | 9 | A.   I'm not sure. |
| 12:19:36 | 10 | Q.   You are aware that the list also contains a number of |
| 12:19:39 | 11 | books that deal with LGBTQ issues? |
| 12:19:45 | 12 | A.   Yes. |
| 12:19:45 | 13 | Q.   The e-mail where -- the e-mail that Judge Cunningham |
| 12:19:50 | 14 | forwarding you this list was an e-mail that he received |
| 12:19:52 | 15 | from Bonnie Wallace, correct? |
| 12:19:55 | 16 | A.   Yes. |
| 12:19:55 | 17 | Q.   So if I referred to this list as the Bonnie Wallace |
| 12:19:58 | 18 | list, you'll know what I'm talking about? |
| 12:19:59 | 19 | A.   Yes. |
| 12:20:00 | 20 | Q.   You added to this list, correct? |
| 12:20:02 | 21 | A.   Yes. |
| 12:20:03 | 22 | Q.   You added a couple of columns to it? |
| 12:20:06 | 23 | A.   I did. |
| 12:20:06 | 24 | Q.   And in the columns that you added to the list, you |
| 12:20:09 | 25 | noted who had purchased the book or who had added it to |

| 12:20:13 | 1 | the library system, right? |
| 12:20:15 | 2 | A.  Yes. |
| 12:20:15 | 3 | Q.  And how often the book had been checked out. |
| 12:20:19 | 4 | A.  Yes. |
| 12:20:19 | 5 | Q.  So when you received this list, you knew that it was |
| 12:20:23 | 6 | a list of books that people had problems with, fair to |
| 12:20:27 | 7 | say? |
| 12:20:27 | 8 | A.  Yes. |
| 12:20:28 | 9 | Q.  Including Bonnie Wallace? |
| 12:20:30 | 10 | A.  Yes. |
| 12:20:31 | 11 | Q.  And the list of books that Bonnie Wallace and others |
| 12:20:35 | 12 | had problems with had been e-mailed to you by your boss, |
| 12:20:39 | 13 | Judge Cunningham, right? |
| 12:20:40 | 14 | A.  Yes. |
| 12:20:43 | 15 | Q.  We move Exhibit 10 into evidence. |
| 12:20:45 | 16 | MR. MITCHELL:  No objection. |
| 12:20:46 | 17 | THE COURT:  So admitted. |
| 12:20:48 | 18 | Q.  (BY MS. LEONIDA) In the summer and fall of 2021, |
| 12:20:54 | 19 | would you agree that there was a lot of controversy around |
| 12:20:57 | 20 | the Llano County Library System? |
| 12:20:59 | 21 | A.  Yes. |
| 12:21:01 | 22 | Q.  There was a lot of controversy around the contents of |
| 12:21:05 | 23 | books in the library system? |
| 12:21:06 | 24 | A.  Yes. |
| 12:21:07 | 25 | Q.  People wanted to remove books from the library |

| 12:21:10 | 1 | system? |
| 12:21:10 | 2 | A.    Yes. |
| 12:21:10 | 3 | Q.    There was enough controversy around removing books |
| 12:21:15 | 4 | based on content that you cancelled Banned Book Week, |
| 12:21:19 | 5 | correct? |
| 12:21:19 | 6 | A.    Yes. |
| 12:21:20 | 7 | Q.    Banned Book Week is normally in September? |
| 12:21:24 | 8 | A.    Yes. |
| 12:21:25 | 9 | Q.    And that's when the library system does a display of |
| 12:21:28 | 10 | books that had been historically banned? |
| 12:21:30 | 11 | A.    Correct. |
| 12:21:31 | 12 | Q.    One of the reasons that libraries celebrate Banned |
| 12:21:34 | 13 | Book Week is to celebrate freedom of information, right? |
| 12:21:38 | 14 | A.    Yes. |
| 12:21:39 | 15 | Q.    Because books that have been banned could be |
| 12:21:41 | 16 | valuable? |
| 12:21:42 | 17 | A.    Correct. |
| 12:21:43 | 18 | Q.    They're protected by the First Amendment, correct? |
| 12:21:47 | 19 | A.    Yes. |
| 12:21:48 | 20 | Q.    And so, Banned Book Week is sort of a ceremony that |
| 12:21:52 | 21 | the library does to celebrate the availability of books, |
| 12:21:56 | 22 | regardless of what people's opinions are of them, correct? |
| 12:21:59 | 23 | A.    Right. |
| 12:22:01 | 24 | Q.    But because of the controversies swirling around the |
| 12:22:06 | 25 | library system in the end of 2021, censorship, you |

| | | |
|---|---|---|
| 12:22:08 | 1 | cancelled Banned Book Week. |
| 12:22:10 | 2 | A.   Yes. |
| 12:22:13 | 3 | Q.   In October of 2021, you removed It's Perfectly Normal |
| 12:22:19 | 4 | from the library system catalog, correct? |
| 12:22:21 | 5 | A.   Yes. |
| 12:22:22 | 6 | Q.   That's a sex education book? |
| 12:22:24 | 7 | A.   Yes. |
| 12:22:26 | 8 | Q.   Fair to say that that was also partly a reaction to |
| 12:22:29 | 9 | all of the controversy around book content in the library |
| 12:22:33 | 10 | system? |
| 12:22:33 | 11 | A.   Finding it, yes.  Weeding it, no. |
| 12:22:37 | 12 | Q.   At one point, you put a book How To Be An Antiracist |
| 12:22:43 | 13 | behind your desk, correct? |
| 12:22:44 | 14 | A.   No.  I put it behind the Kingsland's desk. |
| 12:22:49 | 15 | Q.   You put it behind the circulation desk. |
| 12:22:51 | 16 | A.   Yes. |
| 12:22:51 | 17 | Q.   So it was not visible? |
| 12:22:52 | 18 | A.   Correct. |
| 12:22:53 | 19 | Q.   You did that because a lot of people had an issue |
| 12:22:56 | 20 | with it? |
| 12:22:56 | 21 | A.   No. |
| 12:23:04 | 22 | Q.   Can we play No. 5. |
| 12:23:04 | 23 | (Audio and video filed played.) |
| 12:23:12 | 24 | Q.   "Is there a reason why critical race theory was put |
| 12:23:15 | 25 | behind the desk? |

| 12:23:16 | 1 | A.   I think a lot of people had an issue with it, as |
| 12:23:16 | 2 | well." |
| 12:23:19 | 3 | (End of audio/video file.) |
| 12:23:19 | 4 | Q.   That was you? |
| 12:23:20 | 5 | A.   Yes. |
| 12:23:20 | 6 | Q.   Saying that the critical race theory book was put |
| 12:23:25 | 7 | behind the desk because a lot of people had an issue with |
| 12:23:27 | 8 | it, correct? |
| 12:23:28 | 9 | A.   Yes. |
| 12:23:28 | 10 | Q.   What we just saw was a clip of your testimony under |
| 12:23:31 | 11 | oath, yes? |
| 12:23:32 | 12 | A.   Yes. |
| 12:23:32 | 13 | Q.   Same oath you took today? |
| 12:23:34 | 14 | A.   Yes. |
| 12:23:34 | 15 | Q.   To tell the truth? |
| 12:23:35 | 16 | A.   Yes. |
| 12:23:35 | 17 | Q.   Was your testimony truthful? |
| 12:23:37 | 18 | A.   I don't recall.  Yes, it was truthful, but I don't |
| 12:23:41 | 19 | recall that book or people talking about it. |
| 12:23:44 | 20 | Q.   Okay.  So if you had testified -- well, as you did |
| 12:23:48 | 21 | testify.  You saw yourself testify. |
| 12:23:50 | 22 | A.   Yes. |
| 12:23:50 | 23 | Q.   That you put the critical race theory book behind the |
| 12:23:55 | 24 | circulation desk because people had an issue with it, were |
| 12:23:58 | 25 | you lying when you said that? |

| | | |
|---|---|---|
| 12:23:58 | 1 | A. No. |
| 12:23:59 | 2 | Q. Once it was behind the circulation desk, there was no |
| 12:24:03 | 3 | way for a patron to find it, who had been looking for it, |
| 12:24:06 | 4 | on the shelf, correct? |
| 12:24:07 | 5 | A. No. |
| 12:24:11 | 6 | Q. That was a bad question. Did you put a note on the |
| 12:24:13 | 7 | shelf where the book belonged saying if you want this |
| 12:24:15 | 8 | book, come find it behind the circulation desk? |
| 12:24:18 | 9 | A. No. |
| 12:24:19 | 10 | Q. It was not a reference book. |
| 12:24:20 | 11 | A. No. |
| 12:24:21 | 12 | Q. At some point in October of 2021, Judge Cunningham |
| 12:24:28 | 13 | specifically asked you about that book, correct? |
| 12:24:30 | 14 | A. I believe so. |
| 12:24:32 | 15 | Q. I could direct your attention to Exhibit 7. Exhibit |
| 12:24:46 | 16 | 7 is an e-mail from you to Judge Cunningham, correct? |
| 12:24:50 | 17 | A. Yes. |
| 12:24:51 | 18 | Q. An e-mail that you sent on October 28 of 2021? |
| 12:24:54 | 19 | A. Yes. |
| 12:24:55 | 20 | Q. Can you read that e-mail? |
| 12:24:57 | 21 | A. Good morning. I wanted to let you know before it |
| 12:24:59 | 22 | came up in any of your meetings, the Kingsland Library |
| 12:25:02 | 23 | does have the book. The book is still in the system, but |
| 12:25:05 | 24 | it is behind the front desk. If anyone wants to check it |
| 12:25:07 | 25 | out, they have to ask a librarian. It is no longer on the |

12:25:10  1  shelf.  Have a good day, Amber.

12:25:12  2  Q.  And what's the subject line of your e-mail to Judge

12:25:15  3  Cunningham?

12:25:15  4  A.  Critical race theory book.

12:25:18  5  Q.  So you had obviously talked to Judge Cunningham

12:25:21  6  before about the book.

12:25:22  7  A.  Yes.

12:25:22  8  Q.  Correct?  And he wanted you to not have it on the

12:25:27  9  shelf, correct?

12:25:28  10  A.  No.

12:25:30  11  Q.  So you had talked to him about the book before?

12:25:32  12  A.  Yes.

12:25:33  13  Q.  He knew that you were referring to the book, How To

12:25:35  14  Be An Antiracist?

12:25:36  15  A.  Yes.

12:25:37  16  Q.  And you wrote this e-mail assuring him that it's not

12:25:40  17  on the shelf?

12:25:41  18  A.  Yes.

12:25:41  19  Q.  And that somebody who wanted to check it out would

12:25:43  20  have to ask the librarian?

12:25:44  21  A.  Yes.

12:25:49  22  Q.  The following month in December of 2023 or a little

12:25:55  23  over a month, you shut down the library to look for books

12:25:59  24  depicting nudity; is that right?

12:26:01  25  A.  Yes.

| | | |
|---|---|---|
| 12:26:01 | 1 | Q. You shut it down for three days? |
| 12:26:03 | 2 | A. Yes. |
| 12:26:03 | 3 | Q. You did that because Judge Cunningham told you to. |
| 12:26:08 | 4 | A. Yes. To keep reviewing what was in the collections. |
| 12:26:14 | 5 | Q. Judge Cunningham told you to review what was in the |
| 12:26:16 | 6 | collection and remove anything depicting nudity, correct? |
| 12:26:21 | 7 | A. Yes. |
| 12:26:26 | 8 | Q. The library system used to have a service called |
| 12:26:31 | 9 | OverDrive, correct? |
| 12:26:31 | 10 | A. Yes. |
| 12:26:32 | 11 | Q. And that was a way for people to read electronic |
| 12:26:34 | 12 | books? |
| 12:26:35 | 13 | A. Yes. |
| 12:26:35 | 14 | Q. Some people with vision problems, right? |
| 12:26:38 | 15 | A. Yes. |
| 12:26:39 | 16 | Q. People that needed larger print. |
| 12:26:41 | 17 | A. Yes. |
| 12:26:41 | 18 | Q. Elderly people used OverDrive a lot? |
| 12:26:45 | 19 | A. Yes. |
| 12:26:45 | 20 | Q. The library system terminated its contract with |
| 12:26:49 | 21 | OverDrive, correct? |
| 12:26:51 | 22 | A. Yes. |
| 12:26:52 | 23 | Q. That was in December of 2021? |
| 12:26:54 | 24 | A. I believe so. |
| 12:26:55 | 25 | Q. The reason that the library terminated its contract |

12:26:59 1 with OverDrive was because of the inability to remove the

12:27:03 2 book Gender Queer from OverDrive's catalog, correct?

12:27:06 3 A.   It was the inability to not have minors see that, to

12:27:11 4 have the parent judge what the children could see.

12:27:15 5 Q.   OverDrive had filters that could prevent children

12:27:18 6 from accessing OverDrive, correct?

12:27:22 7 A.   No.  They had filters to direct you to what you

12:27:29 8 wanted to see when you opened it up, but there wasn't a

12:27:33 9 password to lock it in place; so anyone could get on and

12:27:38 10 change it very easily.

12:27:42 11 Q.   Again, the reason -- not again, let me ask you the

12:27:45 12 reason you terminated your contract with OverDrive was

12:27:49 13 because you were concerned about the book Gender Queer

12:27:51 14 being seen, correct?

12:27:54 15 A.   Because they would not put filters on, yes.

12:27:59 16 Q.   The reason that you terminated Llano County Library's

12:28:02 17 contract with OverDrive was because you were concerned

12:28:05 18 about the book Gender Queer being seen by patrons,

12:28:10 19 correct?

12:28:11 20      MR. MITCHELL:  Objection.  Asked and answered.

12:28:12 21      THE COURT:  I'll allow the question.

12:28:16 22 A.   I'm sorry, one more time.

12:28:17 23 Q.   (BY MS. LEONIDA) The book that caused your concern

12:28:21 24 about OverDrive that caused you to cancel the library's

12:28:24 25 contract with OverDrive was Gender Queer, specifically,

| | | |
|---|---|---|
| 12:28:26 | 1 | correct? |
| 12:28:27 | 2 | A.   Yes. |
| 12:28:29 | 3 | Q.   That book Gender Queer never existed.  There's no |
| 12:28:38 | 4 | physical copy of it in the library system, was there? |
| 12:28:47 | 5 | A.   Correct. |
| 12:28:48 | 6 | Q.   I want to go back to November 10th of 2021 when you |
| 12:28:55 | 7 | got that list of books, the Bonnie Wallace list from your |
| 12:28:59 | 8 | boss, Judge Cunningham.  Do you remember that? |
| 12:29:01 | 9 | A.   Yes. |
| 12:29:03 | 10 | Q.   When you got that list, you pulled those books off |
| 12:29:06 | 11 | the shelves for weeding, correct? |
| 12:29:10 | 12 | A.   No. |
| 12:29:11 | 13 | Q.   Can we play clip 6? |
| 12:29:18 | 14 |          (Audio and video file played.) |
| 12:29:20 | 15 | Q.   "So it looks like a number of books that were removed |
| 12:29:24 | 16 | and weeded on November 12 in that same range, when you |
| 12:29:27 | 17 | were editing Ms. Wallace's list.  Those books are: |
| 12:29:31 | 18 | Freakboy by Kristin Elizabeth Clark, Shine by Lauren |
| 12:29:37 | 19 | Myracle, Spinning by Tillie Walden, Caste: The Origins Of |
| 12:29:42 | 20 | Our Discontents by Isabel Wilkerson, Being Jazz: My Life |
| 12:29:46 | 21 | As A Transgender Teen by Jazz Jennings, They Called |
| 12:29:49 | 22 | Themselves the KKK:  The Birth of an American Terrorist |
| 12:29:53 | 23 | Group by Susan Campbell Bartoletti.  These books were all |
| 12:29:58 | 24 | removed on the same day, November 12th, 2021, and they all |
| 12:30:05 | 25 | -- apologies.  They all were on Ms. Wallace's list. |

12:30:12  1         Would you agree with that statement?

12:30:17  2   A.  Yes.

12:30:18  3   Q.  Okay.  Is there a connection between Ms. Wallace

12:30:22  4   sending you this list, sometime in early November, and you

12:30:26  5   then removing it, a few days later from the library?

12:30:30  6   A.  Yes.

12:30:31  7   Q.  What is that connection?

12:30:33  8   A.  When I received Bonnie's list, we went and pulled all

12:30:41  9   of those books to see what everybody was talking about,

12:30:44  10  why these books would be on her list, or the list.  And

12:30:49  11  once we got them and was going through them, we were

12:30:53  12  noticing that none of them were -- well, not none of them,

12:30:57  13  but a lot of them weren't getting checked out.

12:31:00  14        So we went ahead and did the CREW weeding and

12:31:06  15  decided since they're not even getting checked out, it was

12:31:09  16  just brought to our attention."

12:31:11  17        (End of audio/video file.)

12:31:14  18  Q.  So let me ask you again.  You pulled the books on Ms.

12:31:17  19  Wallace's list off the shelves for weeding because they

12:31:20  20  were on that list in November of 2021, correct?

12:31:22  21  A.  No.

12:31:24  22  Q.  Okay.  Can we play clip No. 7, please.

12:31:30  23        (Audio and video file played.)

12:31:31  24  Q.  "The reason that Shine and Spinning were selected to

12:31:35  25  be weeded and reviewed to be weeded, as opposed to other

12:31:38　1　books, were because Ms. Wallace had them on her list;

12:31:41　2　isn't that right?

12:31:42　3　A.　That is why we looked at them, yes."

12:31:45　4　　　　　　(End of audio/video file.)

12:31:50　5　Q.　So the reason you pulled the books off the shelves to

12:31:53　6　look at them for weeding was because they were on Ms.

12:31:56　7　Wallace's list, correct?

12:31:58　8　A.　I pulled them to review them, not to weed them.

12:32:01　9　Q.　Okay.　You pulled them because they were on Ms.

12:32:04　10　Wallace's list?

12:32:05　11　A.　Yes.

12:32:05　12　Q.　You did that on November 12th.

12:32:08　13　A.　Yes.

12:32:09　14　Q.　Normally weeding at the Llano County Library System

12:32:13　15　happens in August, correct?

12:32:15　16　A.　We weed all the time.　It depends on what's going on.

12:32:22　17　That is when we have -- August is when we have time to do

12:32:25　18　a big weed and work on sections at a time because we don't

12:32:29　19　have programs going on in August.

12:32:32　20　Q.　So you pulled the books that were on Bonnie Wallace's

12:32:37　21　list to look at them to see if they were eligible for

12:32:40　22　weeding, right?

12:32:41　23　A.　I wanted to look at them to see if they were getting

12:32:44　24　checked out because my hope was that they were all getting

12:32:46　25　checked out and there wasn't an issue with any of those

| | | |
|--|--|--|
| 12:32:50 | 1 | books. |
| 12:32:51 | 2 | Q.   Did you pull other books not on the list to see if |
| 12:32:55 | 3 | they were getting checked out in November -- |
| 12:32:56 | 4 | A.   No. |
| 12:32:57 | 5 | Q.   -- of 2021?  No?  Only the books on Ms. Wallace's |
| 12:33:01 | 6 | list? |
| 12:33:01 | 7 | A.   Yes. |
| 12:33:01 | 8 | Q.   Those books included Spinning? |
| 12:33:06 | 9 | A.   Yes. |
| 12:33:07 | 10 | Q.   Included Being Jazz? |
| 12:33:10 | 11 | A.   Yes. |
| 12:33:10 | 12 | Q.   Included Shine? |
| 12:33:11 | 13 | A.   Yes. |
| 12:33:12 | 14 | Q.   Included Under The Moon: A Catwoman Tale? |
| 12:33:15 | 15 | A.   I don't recall that book. |
| 12:33:17 | 16 | Q.   The books included Gabi, A Girl In Pieces? |
| 12:33:20 | 17 | A.   Yes. |
| 12:33:21 | 18 | Q.   The books included Freakboy? |
| 12:33:23 | 19 | A.   Yes. |
| 12:33:24 | 20 | Q.   The books included Caste: The Origins of Our |
| 12:33:28 | 21 | Discontent? |
| 12:33:28 | 22 | A.   Yes. |
| 12:33:28 | 23 | Q.   And the books includes They Called Themselves the |
| 12:33:32 | 24 | KKK: The birth Of An American Terrorist Group, correct? |
| 12:33:34 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 12:33:38 | 1 | Q.   Now, I'd like to take a step back and talk to you a |
| 12:33:42 | 2 | little bit about the general weeding process.  Weeding is |
| 12:33:46 | 3 | when you pull a book out of circulation, take it out of |
| 12:33:49 | 4 | the library entirely, correct? |
| 12:33:51 | 5 | A.   Yes. |
| 12:33:51 | 6 | Q.   So you take off the library jacket? |
| 12:33:54 | 7 | A.   Yes.  All the identifying stickers off, take it out |
| 12:34:00 | 8 | of the system, and we put it in the friends area so they |
| 12:34:03 | 9 | have it for their book sale. |
| 12:34:07 | 10 | Q.   Can I take you back to Exhibit 1.  In the definition |
| 12:34:20 | 11 | of Media Selection paragraph, it specifies that weeding in |
| 12:34:25 | 12 | the Llano County Library System is going to be based on |
| 12:34:27 | 13 | information supplied in the CREW manual? |
| 12:34:31 | 14 | A.   Yes. |
| 12:34:31 | 15 | Q.   Yes? |
| 12:34:33 | 16 | A.   Yes. |
| 12:34:34 | 17 | Q.   Let me turn your attention to Exhibit 23.  Exhibit 23 |
| 12:34:57 | 18 | is the CREW, continuous review, evaluation and weeding |
| 12:35:02 | 19 | chart, correct? |
| 12:35:03 | 20 | A.   Yes. |
| 12:35:03 | 21 | Q.   And that's applicable to the Llano County Library |
| 12:35:06 | 22 | System? |
| 12:35:06 | 23 | A.   Yes. |
| 12:35:06 | 24 | Q.   Can you turn to the next page, the MUSTIE factors are |
| 12:35:22 | 25 | also factors that the Llano County library system follows, |

| | | |
|---|---|---|
| 12:35:25 | 1 | correct? |
| 12:35:26 | 2 | A.   Yes. |
| 12:35:27 | 3 | Q.   And that stands for M is misleading, right? |
| 12:35:31 | 4 | A.   I'm sorry. |
| 12:35:32 | 5 | Q.   The M is misleading? |
| 12:35:33 | 6 | A.   Yes. |
| 12:35:34 | 7 | Q.   The U is ugly? |
| 12:35:35 | 8 | A.   Yes. |
| 12:35:36 | 9 | Q.   S is superseded by new edition? |
| 12:35:38 | 10 | A.   Yes. |
| 12:35:40 | 11 | Q.   I is irrelevant to community needs and interests? |
| 12:35:45 | 12 | Yes? |
| 12:35:46 | 13 | A.   Yes. |
| 12:35:46 | 14 | Q.   Fair to say that one way to tell that is how often |
| 12:35:49 | 15 | the book is being checked out? |
| 12:35:51 | 16 | A.   Correct. |
| 12:35:52 | 17 | Q.   So by reference to circulation? |
| 12:35:53 | 18 | A.   Yes. |
| 12:35:54 | 19 | Q.   So if a fiction book hasn't been checked out in three |
| 12:35:58 | 20 | years, that's an indication that it's grown irrelevant to |
| 12:36:00 | 21 | the community's needs, correct? |
| 12:36:02 | 22 | A.   Yes. |
| 12:36:02 | 23 | Q.   For nonfiction book, that's a longer period for it to |
| 12:36:06 | 24 | become irrelevant, correct? |
| 12:36:07 | 25 | A.   Yes.   Through the CREW. |

| | | |
|---|---|---|
| 12:36:09 | 1 | Q.   I'm sorry? |
| 12:36:10 | 2 | A.   Yes, through the CREW. |
| 12:36:11 | 3 | Q.   Okay.  And then, the E stands for easily obtained |
| 12:36:15 | 4 | elsewhere. |
| 12:36:15 | 5 | A.   Yes. |
| 12:36:16 | 6 | Q.   In order to be weeded, a book has to meet at least |
| 12:36:22 | 7 | two of the MUSTIE criteria, correct? |
| 12:36:24 | 8 | A.   The CREW is mainly guidelines, so every librarian is |
| 12:36:29 | 9 | going to go with their feelings, their training, their gut |
| 12:36:32 | 10 | on their community of what is getting checked out, what |
| 12:36:35 | 11 | isn't and why. |
| 12:36:40 | 12 | Q.   You're the library director, right? |
| 12:36:43 | 13 | A.   Yes. |
| 12:36:44 | 14 | Q.   And for you, a book cannot be weeded just based on |
| 12:36:48 | 15 | one of the MUSTIE criteria, it has to meet at least two, |
| 12:36:52 | 16 | correct? |
| 12:36:53 | 17 | A.   No.  It depends. |
| 12:36:55 | 18 | Q.   As we have seen testified previously in this matter, |
| 12:37:10 | 19 | correct? |
| 12:37:10 | 20 | A.   I'm sorry. |
| 12:37:11 | 21 | Q.   You testified previously in this matter? |
| 12:37:12 | 22 | A.   Yes. |
| 12:37:13 | 23 | Q.   It was during a deposition? |
| 12:37:15 | 24 | A.   Yes. |
| 12:37:15 | 25 | Q.   You were under oath? |

| | | |
|---|---|---|
| 12:37:16 | 1 | A.    Yes. |
| 12:37:17 | 2 | Q.    Promised to tell the truth? |
| 12:37:19 | 3 | A.    Yes. |
| 12:37:19 | 4 | Q.    And you did. |
| 12:37:20 | 5 | A.    Yes. |
| 12:37:21 | 6 | Q.    So in that case, at that deposition, you were |
| 12:37:28 | 7 | asked -- do you remember ever testifying that meeting only |
| 12:37:51 | 8 | one MUSTIE criteria is not sufficient for weeding? |
| 12:37:55 | 9 | A.    Yes.  It would be if it's brand-new, it could be |
| 12:38:01 | 10 | damaged.  That's going to be your one criteria.  But most |
| 12:38:06 | 11 | of the time, you're going to want to make sure that it's |
| 12:38:09 | 12 | -- you know, it's not getting checked out, it's well worn, |
| 12:38:13 | 13 | it's good pages torn or written in it.  You kind of want |
| 12:38:16 | 14 | to look at the whole thing so it just depends. |
| 12:38:20 | 15 | Q.    A book not being checked out in three years by itself |
| 12:38:23 | 16 | is not a reason to weed it, correct? |
| 12:38:25 | 17 | A.    Correct. |
| 12:38:26 | 18 | Q.    Normally you'd want to give that book a chance? |
| 12:38:28 | 19 | A.    It depends on the book and your community. |
| 12:38:32 | 20 | Q.    So you might, for example, put that book in a |
| 12:38:35 | 21 | display? |
| 12:38:35 | 22 | A.    Yes. |
| 12:38:36 | 23 | Q.    You might put it in a different section where it |
| 12:38:37 | 24 | would get fresh eyes? |
| 12:38:38 | 25 | A.    Yes. |

| 12:38:39 | 1 | Q.   And those are things that you personally have done |
| 12:38:42 | 2 | with books that haven't been checked out in over three |
| 12:38:44 | 3 | years to give them a chance to stay in the library, |
| 12:38:47 | 4 | correct? |
| 12:38:47 | 5 | A.   Yes. |
| 12:38:48 | 6 | Q.   I'd like to turn your attention to Exhibit 52. |
| 12:39:07 | 7 | Exhibit 52 is a report from the Llano County Library |
| 12:39:12 | 8 | System that reflects books that were weeded in 2021, |
| 12:39:14 | 9 | correct? |
| 12:39:21 | 10 | A.   Yes. |
| 12:39:21 | 11 | Q.   You see the book Caste on that list? |
| 12:39:44 | 12 | A.   Yes. |
| 12:39:45 | 13 | Q.   That's a book that was on Bonnie Wallace's list, yes? |
| 12:39:50 | 14 | A.   Yes. |
| 12:39:50 | 15 | Q.   The book of -- the list of books that Bonnie Wallace |
| 12:39:54 | 16 | thought were inappropriate and should be removed from the |
| 12:39:56 | 17 | Llano County Library System, correct? |
| 12:39:58 | 18 | A.   Yes. |
| 12:39:58 | 19 | Q.   The list that your boss sent you on November 10th, |
| 12:40:01 | 20 | correct? |
| 12:40:01 | 21 | A.   Yes. |
| 12:40:02 | 22 | Q.   He sent it to you by forwarding Ms. Wallace's e-mail, |
| 12:40:06 | 23 | calling the books on that list pornographic filth, |
| 12:40:11 | 24 | correct? |
| 12:40:11 | 25 | A.   Yes. |

12:40:14  1  Q.   So on November 10th, you received the book of

12:40:19  2  pornographic filth that Ms. Wallace wants removed from the

12:40:22  3  library from your boss.   When was Caste removed from

12:40:25  4  circulation?

12:40:32  5  A.   November 21.

12:40:36  6  Q.   November 12th?

12:40:37  7  A.   Yes.

12:40:38  8  Q.   Two days later?

12:40:45  9  A.   Yes.

12:40:49  10  Q.   The book Caste is an award-winning book, correct?

12:40:52  11  A.   I'm not sure.   I'm not familiar with it.

12:40:55  12  Q.   The book Caste had been acquired less than a year

12:40:58  13  before it was removed from the library system on November

12:41:02  14  12th, correct?

12:41:03  15  A.   Yes.

12:41:04  16  Q.   You're the one that removed it from the library

12:41:06  17  system?

12:41:06  18  A.   Yes.

12:41:08  19  Q.   In the eleven months before it had been removed from

12:41:12  20  the library system, that book had been checked out three

12:41:14  21  separate times, correct?

12:41:15  22  A.   Yes.

12:41:16  23  Q.   You have no record anywhere of that book being

12:41:19  24  damaged, correct?

12:41:20  25  A.   Correct.

12:41:23 1  Q.   And in fact, that book is still sitting in a box in

12:41:25 2  the library, isn't it?

12:41:27 3  A.   I do not know.

12:41:31 4  Q.   When you saw that book there, you did not put it in a

12:41:34 5  display, did you?

12:41:36 6  A.   No.  I don't recall why this one was weeding --

12:41:41 7  weeded, I'm sorry.  The only thing I can think of is, it

12:41:45 8  was possibly put in a different stack when we were looking

12:41:48 9  through all these other books because it was new.

12:41:50 10  Q.   It was new and popular, right?

12:41:53 11  A.   I'm not sure.  It was getting checked out.

12:41:57 12  Q.   Now, when a book is weeded, if it got put in a stack,

12:42:03 13  that being put in the stack doesn't take it out of

12:42:04 14  circulation.  You still have to take off the cover, take

12:42:07 15  off the library indicia, correct?

12:42:09 16  A.   Correct.

12:42:10 17  Q.   You did all that.

12:42:11 18  A.   No.

12:42:13 19  Q.   Is the book Caste currently on the shelves in the

12:42:18 20  Llano County Library?

12:42:19 21  A.   No.

12:42:19 22  Q.   Is it in the card catalog?

12:42:21 23  A.   No.

12:42:24 24  Q.   The book Being Jazz was also on Bonnie Wallace's

12:42:28 25  list?

12:42:28  1   A.   Yes.

12:42:29  2   Q.   The list that your boss sent you of books Ms. Wallace

12:42:33  3   wanted removed on October 10, corrects?

12:42:35  4   A.   Yes.

12:42:35  5   Q.   That book was also weeded on -- I'm sorry, November.

12:42:40  6   That book was also weeded on November 12th, correct?

12:42:43  7   A.   Yes.

12:42:44  8   Q.   It was weeded a few days after you received Ms.

12:42:47  9   Wallace's list, correct?

12:42:48  10  A.   Yes.

12:42:48  11  Q.   You have no record of that book being damaged in any

12:42:51  12  way, do you?

12:42:52  13  A.   No.

12:42:53  14  Q.   You made no effort to put that book on a display to

12:42:56  15  give it another chance, did you?

12:42:57  16  A.   No.  It had only been checked out once in that

12:43:03  17  timeframe and there was also another copy at the Kingsland

12:43:07  18  library.

12:43:07  19  Q.   You didn't put that book at a different section to

12:43:10  20  see if fresh eyes would make it more popular?

12:43:13  21  A.   No, because if someone wanted it, we could get it

12:43:16  22  from the Kingsland Library because it was popular there.

12:43:20  23  Q.   The book In The Night Kitchen, that's a book that you

12:43:29  24  removed from circulation in the Llano County Library

12:43:31  25  System?

| | | |
|---|---|---|
| 12:43:31 | 1 | A.    Yes. |
| 12:43:32 | 2 | Q.    You did that in November of 2021? |
| 12:43:34 | 3 | A.    Yes. |
| 12:43:35 | 4 | Q.    At that point, that book had been checked out over 30 |
| 12:43:39 | 5 | times, correct? |
| 12:43:39 | 6 | A.    Yes. |
| 12:43:40 | 7 | Q.    In fact, the last time it had been checked out was in |
| 12:43:43 | 8 | September of 2020 -- |
| 12:43:46 | 9 | A.    Yes. |
| 12:43:47 | 10 | Q.    -- right?  Correct? |
| 12:43:49 | 11 | A.    Yes. |
| 12:43:50 | 12 | Q.    You have no record of that book being damaged in any |
| 12:43:53 | 13 | way? |
| 12:43:53 | 14 | A.    No record.  No. |
| 12:43:55 | 15 | Q.    You did not put that book in a display. |
| 12:43:58 | 16 | A.    No. |
| 12:43:59 | 17 | Q.    You did not put that book in a different section to |
| 12:44:01 | 18 | see if fresh eyes would help it circulate more. |
| 12:44:04 | 19 | A.    No. |
| 12:44:04 | 20 | Q.    You removed that book because of Judge Cunningham's |
| 12:44:07 | 21 | directive to remove any books with nudity in them from the |
| 12:44:11 | 22 | library system, correct? |
| 12:44:12 | 23 | A.    No. |
| 12:44:12 | 24 | Q.    You did remove it because of nudity? |
| 12:44:15 | 25 | A.    I removed it because I believed it was old and worn |

| | | |
|---|---|---|
| 12:44:23 | 1 | and that it was getting checked out periodically, not I |
| 12:44:30 | 2 | think for, what was it, like 15 years, that's not very |
| 12:44:38 | 3 | much actually, 33.  And I also look at just because it was |
| 12:44:40 | 4 | checked out that year, I also look to see how many times |
| 12:44:43 | 5 | it was checked out the year before or the year before |
| 12:44:45 | 6 | that. |
| 12:44:50 | 7 | Q.   Okay.  That book had been checked out on September |
| 12:44:52 | 8 | 30th of 2020, correct? |
| 12:44:54 | 9 | A.   Yes. |
| 12:44:54 | 10 | Q.   You're a defendant in this case, right, Ms. Milum? |
| 12:45:00 | 11 | A.   Yes. |
| 12:45:01 | 12 | Q.   So you have been tasked with responding to some of |
| 12:45:05 | 13 | our discovery requests? |
| 12:45:06 | 14 | A.   Yes. |
| 12:45:07 | 15 | Q.   One of the questions that we asked you in an |
| 12:45:10 | 16 | interrogatory was to identify any materials that were |
| 12:45:14 | 17 | restricted or removed from the library system that you |
| 12:45:17 | 18 | have reason to believe were restricted or removed based on |
| 12:45:20 | 19 | inappropriate content, correct? |
| 12:45:22 | 20 | A.   Yes. |
| 12:45:23 | 21 | Q.   You answered that question, right? |
| 12:45:27 | 22 | A.   Yes. |
| 12:45:27 | 23 | Q.   And you identified In The Night Kitchen as a book |
| 12:45:30 | 24 | that had been removed based on its content, correct? |
| 12:45:34 | 25 | A.   I don't recall. |

12:45:38 | 1 | Q.   Can we direct your attention to Exhibit 87.  If you
12:46:07 | 2 | can look at the response and let me know when you've had a
12:46:10 | 3 | chance to read that.
12:47:10 | 4 | A.   Okay.
12:47:13 | 5 | Q.   So isn't it true that you identified In The Night
12:47:17 | 6 | Kitchen as a book that you removed from the library system
12:47:19 | 7 | based on inappropriate content?
12:47:21 | 8 | A.   Yes.
12:47:21 | 9 |       MR. MITCHELL:  Objection.  That's not what the
12:47:23 | 10 | answer to the interrogatory says.
12:47:25 | 11 |       THE COURT:  You want to read it into the record.
12:47:29 | 12 | Q.   (BY MS. LEONIDA) Subject to the above objection and
12:47:31 | 13 | without waiving same, the only physical books that were
12:47:34 | 14 | removed or restricted were the Butt books, Fart books and
12:47:37 | 15 | In The Night Kitchen by Maurice Sendak.
12:47:40 | 16 |       MR. MITCHELL:  It says restricted, removed.  It
12:47:42 | 17 | does not say restricted, removed because of inappropriate
12:47:44 | 18 | content.
12:47:47 | 19 | Q.   (BY MS. LEONIDA) Let me read the interrogatory also
12:47:49 | 20 | into the record.  To Ms. Milum, identify any materials
12:47:52 | 21 | that were restricted or removed from the library system
12:47:55 | 22 | from June 2021 to present that you have reason to believe
12:47:59 | 23 | were restricted or removed on the basis of inappropriate
12:48:02 | 24 | content.  That was the question put to you in
12:48:06 | 25 | interrogatory, Ms. Milum?

| | | |
|---|---|---|
| 12:48:08 | 1 | A.   Yes. |
| 12:48:08 | 2 | Q.   And your response to the question about books that |
| 12:48:11 | 3 | you have reason to believe were restricted or removed |
| 12:48:14 | 4 | based on their content was the Butt books, the Fart books |
| 12:48:17 | 5 | and In The Night Kitchen, correct? |
| 12:48:19 | 6 | A.   Yes. |
| 12:48:22 | 7 | Q.   Your Honor, we move Exhibit 87 into evidence. |
| 12:48:25 | 8 | MR. MITCHELL:  No objection. |
| 12:48:25 | 9 | THE COURT:  So admitted. |
| 12:48:26 | 10 | MS. LEONIDA:  Also, Exhibit 7, which I believe I |
| 12:48:29 | 11 | forgot to move into evidence. |
| 12:48:30 | 12 | THE COURT:  Without objection, so admitted. |
| 12:48:56 | 13 | MS. LEONIDA:  Sorry.  I don't remember if I moved |
| 12:48:59 | 14 | Exhibit 5 into evidence or if we've talked about it. |
| 12:49:01 | 15 | Q.   (BY MS. LEONIDA) Okay, Ms. Milum, let me turn your |
| 12:49:06 | 16 | attention to Exhibit 5. |
| 12:49:48 | 17 | THE COURT:  Do you have a question, counsel? |
| 12:49:50 | 18 | MS. LEONIDA:  I thought I was waiting for her to |
| 12:49:53 | 19 | finish reading. |
| 12:49:53 | 20 | A.   Yes. |
| 12:49:54 | 21 | Q.   (BY MS. LEONIDA) Okay.  Thank you.  Do you recognize |
| 12:49:55 | 22 | Exhibit 5? |
| 12:49:56 | 23 | A.   Yes. |
| 12:49:56 | 24 | Q.   It's an e-mail chain between you and Judge |
| 12:50:00 | 25 | Cunningham, correct? |

| | | |
|---|---|---|
| 12:50:01 | 1 | A.   Yes. |
| 12:50:01 | 2 | Q.   And that's the e-mail chain during which Judge |
| 12:50:03 | 3 | Cunningham forwarded you Bonnie Wallace's list of books |
| 12:50:06 | 4 | that she considered pornographic filth, correct? |
| 12:50:08 | 5 | A.   I believe so. |
| 12:50:10 | 6 | Q.   We move Exhibit 5 into evidence. |
| 12:50:13 | 7 | MR. MITCHELL:  No objection. |
| 12:50:13 | 8 | THE COURT:  So admitted. |
| 12:50:16 | 9 | Q.   (BY MS. LEONIDA) Turning back to Exhibit 52, one of |
| 12:50:22 | 10 | the books that you removed on November 12th of 2021 was |
| 12:50:27 | 11 | Freakboy, correct? |
| 12:50:28 | 12 | A.   Yes. |
| 12:50:28 | 13 | Q.   That was a book that was on Ms. Wallace's list of |
| 12:50:33 | 14 | pornographic filth, correct? |
| 12:50:34 | 15 | A.   Yes. |
| 12:50:35 | 16 | Q.   The list that your boss had e-mailed you on November |
| 12:50:37 | 17 | 10th, correct? |
| 12:50:38 | 18 | A.   Yes. |
| 12:50:42 | 19 | Q.   That book had been checked out most recently in 2018, |
| 12:50:47 | 20 | correct? |
| 12:50:51 | 21 | A.   It is showing 2016. |
| 12:50:55 | 22 | Q.   Was there any record of that book being damaged? |
| 12:50:58 | 23 | A.   I don't recall. |
| 12:51:00 | 24 | Q.   Did you make any effort to put that book into a |
| 12:51:03 | 25 | display? |

| | | |
|---|---|---|
| 12:51:03 | 1 | A.   No. |
| 12:51:05 | 2 | Q.   Did you put that book in a different section of the |
| 12:51:07 | 3 | library to see if fresh eyes on it would make it more |
| 12:51:10 | 4 | popular? |
| 12:51:10 | 5 | A.   No. |
| 12:51:12 | 6 | Q.   Another book that you removed in November of 2021 was |
| 12:51:19 | 7 | Gabi, A Girl In Pieces, correct? |
| 12:51:20 | 8 | A.   Yes. |
| 12:51:21 | 9 | Q.   That was also a book that was also on Ms. Wallace's |
| 12:51:24 | 10 | list of pornographic filth, yes? |
| 12:51:27 | 11 | A.   Yes. |
| 12:51:27 | 12 | Q.   And that also was a book that was attached to the |
| 12:51:30 | 13 | list that your boss sent you on November 10th, correct? |
| 12:51:33 | 14 | A.   Yes. |
| 12:51:34 | 15 | Q.   That book had been last checked out in 2018, correct? |
| 12:51:37 | 16 | A.   Yes. |
| 12:51:39 | 17 | Q.   There was no record that you have of it being damaged |
| 12:51:42 | 18 | in any way? |
| 12:51:42 | 19 | A.   No. |
| 12:51:43 | 20 | Q.   You did not put that book into a display. |
| 12:51:46 | 21 | A.   No. |
| 12:51:47 | 22 | Q.   You did not move that book into a different section? |
| 12:51:49 | 23 | A.   No. |
| 12:51:52 | 24 | Q.   The book Shine also was removed on November 12th of |
| 12:51:57 | 25 | 2021. |

| | | |
|---|---|---|
| 12:51:57 | 1 | A.   Yes. |
| 12:51:58 | 2 | Q.   By you? |
| 12:51:58 | 3 | A.   Yes. |
| 12:52:00 | 4 | Q.   That's also a book that was on the list that your |
| 12:52:03 | 5 | boss sent you of pornographic filth on November 10th, |
| 12:52:07 | 6 | correct? |
| 12:52:07 | 7 | A.   Yes. |
| 12:52:07 | 8 | Q.   It was removed a few days after you received that |
| 12:52:11 | 9 | list, correct? |
| 12:52:12 | 10 | A.   Yes. |
| 12:52:12 | 11 | Q.   That book had been checked out ten times? |
| 12:52:15 | 12 | A.   Yes. |
| 12:52:17 | 13 | Q.   It had last been checked out July 21st of 2021, |
| 12:52:21 | 14 | correct? |
| 12:52:21 | 15 | A.   Yes. |
| 12:52:21 | 16 | Q.   That would be four months before you weeded it? |
| 12:52:27 | 17 | A.   Yes. |
| 12:52:27 | 18 | Q.   You have no record of that book being damaged in any |
| 12:52:30 | 19 | way, do you? |
| 12:52:31 | 20 | A.   No. |
| 12:52:32 | 21 | Q.   That book similarly, you did not put it on any kind |
| 12:52:35 | 22 | of a display? |
| 12:52:36 | 23 | A.   No. |
| 12:52:37 | 24 | Q.   You didn't move it to a different section? |
| 12:52:39 | 25 | A.   No. |

| | | |
|---|---|---|
| 12:52:40 | 1 | Q.   You removed it from the library system entirely. |
| 12:52:43 | 2 | A.   Yes. |
| 12:52:43 | 3 | Q.   The book Spinning, that's also a book that you |
| 12:52:56 | 4 | removed on November 12 of 2021? |
| 12:53:00 | 5 | A.   Yes. |
| 12:53:01 | 6 | Q.   You removed that book again a couple of days after |
| 12:53:03 | 7 | your boss sent you a list of books that Ms. Wallace |
| 12:53:07 | 8 | objected to? |
| 12:53:08 | 9 | A.   Yes. |
| 12:53:08 | 10 | Q.   And the book Spinning was on that list. |
| 12:53:10 | 11 | A.   Yes. |
| 12:53:10 | 12 | Q.   That book had been checked out four times when you |
| 12:53:16 | 13 | removed it, correct? |
| 12:53:17 | 14 | A.   Yes. |
| 12:53:17 | 15 | Q.   It had last been choked out in 2019, right? |
| 12:53:20 | 16 | A.   Yes. |
| 12:53:20 | 17 | Q.   You have no record of it being damaged in any way, do |
| 12:53:23 | 18 | you? |
| 12:53:23 | 19 | A.   No. |
| 12:53:25 | 20 | Q.   You didn't put that book in any kind of display? |
| 12:53:27 | 21 | A.   No. |
| 12:53:28 | 22 | Q.   You didn't move to it a different section to see if |
| 12:53:30 | 23 | it would get more attention. |
| 12:53:32 | 24 | A.   No. |
| 12:53:33 | 25 | Q.   Have you read that book? |

| | | |
|---|---|---|
| 12:53:34 | 1 | A.  No. |
| 12:53:35 | 2 | Q.  Do you know what it's about? |
| 12:53:37 | 3 | A.  No. |
| 12:53:38 | 4 | Q.  What about Shine?  Have you read that book? |
| 12:53:40 | 5 | A.  No. |
| 12:53:40 | 6 | Q.  Do you know what it's about? |
| 12:53:42 | 7 | A.  I do not. |
| 12:53:43 | 8 | Q.  You do know that those books were on Bonnie Wallace's |
| 12:53:47 | 9 | list, though. |
| 12:53:47 | 10 | A.  Yes. |
| 12:53:47 | 11 | Q.  And that's why you were evaluating them? |
| 12:53:49 | 12 | A.  Yes. |
| 12:53:50 | 13 | Q.  The book Under The Moon: A Catwoman Tale, that book |
| 12:53:59 | 14 | was also on Bonnie Wallace's list? |
| 12:54:02 | 15 | A.  I don't recall. |
| 12:54:05 | 16 | Q.  That's also a book that you removed in November of |
| 12:54:09 | 17 | 2021, correct, within a week of receiving Ms. Wallace's |
| 12:54:15 | 18 | list? |
| 12:54:15 | 19 | A.  Yes. |
| 12:54:15 | 20 | Q.  That book had been in circulation since September of |
| 12:54:20 | 21 | 2019, correct? |
| 12:54:22 | 22 | A.  Yes. |
| 12:54:23 | 23 | Q.  And it had been checked out four times? |
| 12:54:25 | 24 | A.  Yes. |
| 12:54:26 | 25 | Q.  You didn't put that book in a display? |

```
12:54:28   1   A.   No.

12:54:29   2   Q.   You didn't put it in a different section to see if

12:54:32   3   fresh eyes would make it more popular?

12:54:34   4   A.   No.

12:54:34   5   Q.   You just removed it from the system?

12:54:36   6   A.   Yes.

12:54:37   7   Q.   Did you read that book?

12:54:38   8   A.   No.

12:54:39   9   Q.   Do you know what it's about?

12:54:41  10   A.   No.

12:54:42  11   Q.   What about Gabi, A Girl In Pieces?  Did you read that

12:54:51  12   book?

12:54:51  13   A.   No.

12:54:52  14   Q.   Do you know what it's about?

12:54:53  15   A.   No.

12:54:54  16   Q.   Did you read Freakboy?

12:54:56  17   A.   No.

12:54:56  18   Q.   Do you know what Freakboy's about?

12:54:58  19   A.   No.

12:55:00  20   Q.   Did you read Being Jazz?

12:55:01  21   A.   No.

12:55:02  22   Q.   Do you know what that book is about?

12:55:04  23   A.   Yes.

12:55:05  24   Q.   What's that book about?

12:55:07  25   A.   Her life as a transgender teen.
```

| 12:55:11 | 1 | Q.   You were here when Ms. Castelan testified? |
| 12:55:15 | 2 | A.   Yes. |
| 12:55:16 | 3 | Q.   And you heard her say that books like Being Jazz even |
| 12:55:18 | 4 | if they're not checked out with as much frequency as other |
| 12:55:23 | 5 | book are important to have in the library in case |
| 12:55:27 | 6 | teenagers need resources like that, right? |
| 12:55:28 | 7 | A.   Yes. |
| 12:55:29 | 8 | Q.   Do you agree with her? |
| 12:55:33 | 9 | A.   Somewhat. |
| 12:55:41 | 10 | Q.   You also on November 12th of 2021 removed a book from |
| 12:55:46 | 11 | the library system called They Called Themselves The KKK: |
| 12:55:48 | 12 | The Birth Of An American Terrorist Group, correct? |
| 12:55:51 | 13 | A.   Yes. |
| 12:55:51 | 14 | Q.   That was, again, a book that was on Ms. Wallace's |
| 12:55:56 | 15 | list that your boss sent you? |
| 12:55:58 | 16 | A.   Yes. |
| 12:55:58 | 17 | Q.   You didn't put that book in a display? |
| 12:56:01 | 18 | A.   No. |
| 12:56:02 | 19 | Q.   You have no record of it being damaged? |
| 12:56:04 | 20 | A.   No. |
| 12:56:04 | 21 | Q.   You didn't move it to a different section? |
| 12:56:06 | 22 | A.   No. |
| 12:56:07 | 23 | Q.   Are you aware of any other books in the entire Llano |
| 12:56:11 | 24 | County Library System similar to that book? |
| 12:56:13 | 25 | A.   No.   Not off the top of my head. |

| | | |
|---|---|---|
| 12:56:16 | 1 | Q.   Did you read that book? |
| 12:56:17 | 2 | A.   No. |
| 12:56:18 | 3 | Q.   Have you read any of the books that we've been |
| 12:56:20 | 4 | talking about? |
| 12:56:20 | 5 | A.   No. |
| 12:56:21 | 6 | Q.   Other than the fact that they were on a list entitled |
| 12:56:27 | 7 | pornographic filth that your boss sent you, do you know |
| 12:56:28 | 8 | anything about them? |
| 12:56:29 | 9 | A.   No. |
| 12:56:35 | 10 | Q.   I'd like to turn your attention to Exhibit 79.  Do |
| 12:57:03 | 11 | you recognize that? |
| 12:57:16 | 12 | A.   Yes. |
| 12:57:17 | 13 | Q.   That's a report that you generated, correct? |
| 12:57:19 | 14 | A.   Yes. |
| 12:57:20 | 15 | Q.   And it's a report that lists all of the books in the |
| 12:57:23 | 16 | Llano County Library System that have not been checked out |
| 12:57:25 | 17 | in over three years, but are still in circulation, |
| 12:57:27 | 18 | correct? |
| 12:57:27 | 19 | A.   Yes. |
| 12:57:29 | 20 | Q.   Plaintiffs move Exhibit 79 into evidence. |
| 12:57:31 | 21 | MR. MITCHELL:  No objection. |
| 12:57:32 | 22 | THE COURT:  So admitted. |
| 12:57:33 | 23 | Q.   (BY MS. LEONIDA) There are about 5,800 books on that |
| 12:57:38 | 24 | list, correct? |
| 12:57:43 | 25 | A.   Could be.  I don't see where it says. |

| 12:57:48 | 1 | Q. On November 12, when you pulled all the books off the |
| 12:57:52 | 2 | shelves that had been on Bonnie Wallace's list, you did |
| 12:57:56 | 3 | not pull any of the books included in Exhibit 79, did you? |
| 12:58:00 | 4 | A. No. We didn't do a report. |
| 12:58:03 | 5 | Q. You mentioned a little while ago that books that are |
| 12:58:11 | 6 | weeded go to a box for a friends sale? |
| 12:58:15 | 7 | A. Yes. |
| 12:58:17 | 8 | Q. The books that you weeded on November 12th of 2021 |
| 12:58:21 | 9 | did not go to the friends, did they? |
| 12:58:24 | 10 | A. A lot of them did not. We had a lot of donations and |
| 12:58:30 | 11 | weeding that we were doing and we were giving it also to |
| 12:58:34 | 12 | the store shop or whatever in town. |
| 12:58:39 | 13 | Q. The books that we've been talking about went into a |
| 12:58:42 | 14 | box in the back of the library, correct? |
| 12:58:43 | 15 | A. I did not know that. I thought they had left. |
| 12:58:57 | 16 | Q. Prior to January of 2022, you didn't need anybody's |
| 12:59:04 | 17 | approval to order books, correct? |
| 12:59:05 | 18 | A. Correct. |
| 12:59:07 | 19 | Q. As the library director, the commissioners and the |
| 12:59:11 | 20 | judge trusted you to order the books that you thought were |
| 12:59:14 | 21 | appropriate. |
| 12:59:14 | 22 | A. Yes. |
| 12:59:15 | 23 | Q. In that capacity, you ordered the Butt books? |
| 12:59:18 | 24 | A. Yes. |
| 12:59:18 | 25 | Q. And also the Fart books. |

| | | |
|---|---|---|
| 12:59:20 | 1 | A.   Yes. |
| 12:59:21 | 2 | Q.   Prior to January of 2022, the then-existing library |
| 12:59:27 | 3 | board never interfered with your decisions about which |
| 12:59:30 | 4 | books to order, correct? |
| 12:59:34 | 5 | A.   Say that again. |
| 12:59:35 | 6 | Q.   Prior to January of 2022, no member of the library |
| 12:59:39 | 7 | board tried to tell you what books you could and could not |
| 12:59:43 | 8 | order for the library, correct? |
| 12:59:45 | 9 | A.   Correct. |
| 12:59:45 | 10 | Q.   In January of 2022, there was a new library board |
| 12:59:53 | 11 | appointed, correct? |
| 12:59:54 | 12 | A.   Yes. |
| 12:59:54 | 13 | Q.   They met at the library? |
| 12:59:56 | 14 | A.   Yes. |
| 12:59:57 | 15 | Q.   You were instructed to provide policies and other |
| 13:00:00 | 16 | written materials for them? |
| 13:00:01 | 17 | A.   Yes. |
| 13:00:01 | 18 | Q.   Even though they met at the library, librarians were |
| 13:00:05 | 19 | not allowed to attend their meetings; is that right? |
| 13:00:08 | 20 | A.   Yes. |
| 13:00:10 | 21 | Q.   You even told the librarians that if they wanted to |
| 13:00:13 | 22 | use vacation time to attend library board meetings, they |
| 13:00:17 | 23 | weren't allowed to go, correct? |
| 13:00:19 | 24 | A.   Yes. |
| 13:00:19 | 25 | Q.   And this was something that you told them because |

13:00:22 1 that's what Judge Cunningham told you was the directive,

13:00:25 2 right?

13:00:26 3 A.   Yes.

13:00:30 4 Q.   The new library advisory board also wanted to approve

13:00:33 5 any new book purchases, correct?

13:00:35 6 A.   Yes.

13:00:37 7 Q.   You gave the list of books that you wanted to buy for

13:00:40 8 approval?

13:00:41 9 A.   Correct.  Yes.

13:00:42 10 Q.   And they didn't always approve of your decisions, did

13:00:46 11 they?

13:00:47 12 A.   I'm not sure if I ever got any feedback.  I know I

13:00:51 13 gave them lists.

13:00:54 14 Q.   Isn't it true that on one occasion at least, they

13:00:57 15 told you that they were striking a book from your list

13:01:00 16 because it was not right for our demographic?

13:01:03 17 A.   Yes.  Probably.

13:01:06 18 Q.   You were also instructed by Judge Cunningham to send

13:01:09 19 your list of books that you wanted to buy to the library

13:01:13 20 board for review, correct?

13:01:16 21 A.   I believe so.

13:01:24 22 Q.   Can I direct your attention to Exhibit 22?

13:01:26 23          THE COURT:  Ms. Leonida, let me ask you if we're

13:01:31 24 approaching the end of this witness, or is this a good

13:01:32 25 time for us to take our lunch break.

| | | |
|---|---|---|
| 13:01:35 | 1 | MS. LEONIDA: This a probably a good time to take |
| 13:01:36 | 2 | a -- |
| 13:01:36 | 3 | THE COURT: All right. We are going to take a |
| 13:01:38 | 4 | 45-minute break for lunch. I know it's a quick break, but |
| 13:01:41 | 5 | we've got a lot of ground to cover today. So we'll take a |
| 13:01:44 | 6 | recess until 1:45 and we will be adjourned until that |
| 13:01:48 | 7 | time. |
| 13:04:20 | 8 | (Lunch recess.) |
| 13:50:03 | 9 | THE COURT: Ms. Milum, you remain under oath. |
| 13:50:06 | 10 | You may proceed. |
| 13:50:07 | 11 | Q. (BY MS. LEONIDA) Ms. Milum, you submitted a |
| 13:50:12 | 12 | deposition through your attorneys in support of the |
| 13:50:13 | 13 | opposition to this motion, correct? |
| 13:50:16 | 14 | A. Yes. |
| 13:50:16 | 15 | Q. Did you look at that declaration before you came to |
| 13:50:18 | 16 | testify here today? |
| 13:50:20 | 17 | A. Yes. |
| 13:50:21 | 18 | Q. Who wrote that declaration? |
| 13:50:25 | 19 | MR. MITCHELL: Objection. Calls for |
| 13:50:30 | 20 | attorney-client privileged information. |
| 13:50:32 | 21 | MS. LEONIDA: I'll withdraw it. |
| 13:50:35 | 22 | Q. (BY MS. LEONIDA) Did you read the declarations that |
| 13:50:36 | 23 | the plaintiffs submitted in support of this motion? |
| 13:50:39 | 24 | A. I don't believe so. I don't know. |
| 13:50:43 | 25 | Q. You don't believe so? |

| 13:50:44 | 1 | A.   No. |
| 13:50:45 | 2 | Q.   Okay.  Can I turn your attention to Exhibit 6. |
| 13:51:34 | 3 | Exhibit 6 is the Krause list we've been talking about, |
| 13:51:39 | 4 | Representative Krause sent out to libraries? |
| 13:51:42 | 5 | A.   Okay. |
| 13:51:42 | 6 | Q.   Is it? |
| 13:51:43 | 7 | A.   I've never seen this before.  I don't know. |
| 13:51:46 | 8 | Q.   Okay.  The first time that you were told by Judge |
| 13:51:56 | 9 | Cunningham to remove a book from the library, it was the |
| 13:52:00 | 10 | Butt books, correct? |
| 13:52:00 | 11 | A.   Yes. |
| 13:52:02 | 12 | Q.   After that, he told you to look for books, any kind |
| 13:52:07 | 13 | of books that depicted nudity, correct? |
| 13:52:09 | 14 | A.   Yes. |
| 13:52:09 | 15 | Q.   After that, you talked to him about How To Be An |
| 13:52:13 | 16 | Antiracist, correct? |
| 13:52:13 | 17 | A.   Yes. |
| 13:52:14 | 18 | Q.   How To Be An Antiracist doesn't have any pictures in |
| 13:52:17 | 19 | it, does it? |
| 13:52:17 | 20 | A.   No.  Not that I know of.  I've never read it. |
| 13:52:22 | 21 | Q.   Any reason to believe there's nudity in that book? |
| 13:52:25 | 22 | A.   No. |
| 13:52:27 | 23 | Q.   Prior to August of 2021, when Judge Cunningham and |
| 13:52:36 | 24 | Commissioner Moss told you to remove the Butt books from |
| 13:52:38 | 25 | the library, had anybody from the commissioners' court or |

| | | |
|---|---|---|
| 13:52:44 | 1 | any judge ever told you to remove a book from the library |
| 13:52:48 | 2 | before? |
| 13:52:48 | 3 | A.   No. |
| 13:52:49 | 4 | Q.   In January of 2022, when the new library advisory |
| 13:52:59 | 5 | board was constituted, do you remember that? |
| 13:53:02 | 6 | A.   Yes. |
| 13:53:02 | 7 | Q.   Did you attend any meetings of the new library |
| 13:53:07 | 8 | advisory board? |
| 13:53:07 | 9 | A.   Yes. |
| 13:53:09 | 10 | Q.   Did you tell librarian that you supervised that they |
| 13:53:13 | 11 | were not allowed to attend meetings? |
| 13:53:15 | 12 | A.   Yes. |
| 13:53:15 | 13 | Q.   In fact, you sent them an e-mail saying that they |
| 13:53:17 | 14 | couldn't even use their vacation time to attend meetings, |
| 13:53:21 | 15 | correct? |
| 13:53:22 | 16 | A.   Yes. |
| 13:53:22 | 17 | Q.   Why did you do that? |
| 13:53:26 | 18 | A.   Because they were not -- it wasn't in their job |
| 13:53:32 | 19 | description to go.  That was something the director has |
| 13:53:38 | 20 | always done is gone to those meetings. |
| 13:53:40 | 21 | Q.   Were there any other things you told them they |
| 13:53:43 | 22 | weren't allowed to do on their vacation days? |
| 13:53:45 | 23 | A.   I don't recall. |
| 13:53:47 | 24 | Q.   Take your time, if you can think of anything that you |
| 13:53:57 | 25 | instructed your librarians they weren't allowed to do on |

13:54:00  1   vacation days, just let me know.

13:54:02  2   A.   I don't know.

13:54:06  3   Q.   When the new library board was formed in January,

13:54:11  4   Judge Cunningham told you to send book purchase lists for

13:54:15  5   them to review, correct?

13:54:16  6   A.   Yes.

13:54:17  7   Q.   Can I direct your attention to Exhibit 22.  That's an

13:54:56  8   e-mail that you sent to Judge Cunningham in -- on January

13:54:58  9   28th of 2022, correct?

13:55:00  10  A.   Yes.

13:55:02  11  Q.   After he told you that he wanted you to send your

13:55:04  12  book purchase list to the library advisory board for

13:55:07  13  review, correct?

13:55:09  14  A.   I'm not sure if that's what it was referring to.

13:55:12  15  Q.   Can you read the last sentence of the e-mail that you

13:55:15  16  sent to Judge Cunningham in January of 2022?

13:55:17  17  A.   I will be sending a book purchase list to the board

13:55:20  18  for review as requested.

13:55:22  19  Q.   Did you, in fact, do that?

13:55:24  20  A.   Yes.

13:55:29  21  Q.   Let me direct your attention to Exhibit 29.

13:55:53  22  A.   Okay.

13:55:54  23  Q.   That's an e-mail that Bonnie Wallace sent to you,

13:55:57  24  correct?

13:55:57  25  A.   Yes.

| | | |
|---|---|---|
| 13:55:58 | 1 | Q.   In April of 2022, after she was already a member of |
| 13:56:02 | 2 | the library advisory board. |
| 13:56:03 | 3 | A.   Yes. |
| 13:56:04 | 4 | Q.   Correct?  And in that e-mail -- I'm sorry, move |
| 13:56:09 | 5 | Exhibit 29 into evidence and 22. |
| 13:56:23 | 6 | MR. MITCHELL:  No objection to 29, your Honor. |
| 13:56:27 | 7 | We're looking at 22.  Twenty-two's fine, as well. |
| 13:56:31 | 8 | THE COURT:  Okay.  Both admitted.  Thank you. |
| 13:56:34 | 9 | Q.   (BY MS. LEONIDA) In Exhibit 29, Ms. Wallace, a |
| 13:56:38 | 10 | library board member, is taking issue with some of the |
| 13:56:40 | 11 | books that you had tried to order from Bibliotheca, |
| 13:56:44 | 12 | correct? |
| 13:56:44 | 13 | A.   Yes. |
| 13:56:44 | 14 | Q.   I'm sorry? |
| 13:56:45 | 15 | A.   Yes. |
| 13:56:49 | 16 | Q.   Can I direct your attention to Exhibit 38. |
| 13:57:12 | 17 | A.   Okay. |
| 13:57:13 | 18 | Q.   That's an e-mail exchange between you and Bonnie |
| 13:57:16 | 19 | Wallace in March of 2022, correct? |
| 13:57:18 | 20 | A.   Yes. |
| 13:57:19 | 21 | Q.   And that's an e-mail exchange in which you're asking |
| 13:57:23 | 22 | Ms. Wallace for approval to purchase books, correct? |
| 13:57:39 | 23 | A.   Yes. |
| 13:57:42 | 24 | Q.   We move Exhibit 38 into evidence. |
| 13:57:46 | 25 | MR. MITCHELL:  No objection. |

13:57:46  1          THE COURT:  So admitted.

13:57:48  2  Q.  (BY MS. LEONIDA) You're familiar with the Bibliotheca

13:57:59  3  system?

13:57:59  4  A.  Yes.

13:57:59  5  Q.  It's the system that the Llano County Library

13:58:03  6  currently uses for e-books, correct?

13:58:05  7  A.  Yes.

13:58:05  8  Q.  Between when OverDrive was suspended in December and

13:58:08  9  when Bibliotheca -- Bibliotheca was purchased in May of

13:58:13  10  2022?

13:58:15  11  A.  I believe so.  No.  I believe it was purchased in

13:58:24  12  March.

13:58:27  13  Q.  Were there a few months that there was no e-book

13:58:30  14  system in Llano County?

13:58:31  15  A.  Yes.

13:58:34  16  Q.  In order to read an e-book on Bibliotecha, you need a

13:58:39  17  tablet of some kind, or a phone?

13:58:40  18  A.  Or a computer.

13:58:42  19  Q.  Or a computer.  Amazon e-reader, for example, cannot

13:58:46  20  read a Bibliotecha book, right?

13:58:50  21  A.  The Paperwhites can't.  The rest of the devices, I

13:58:53  22  believe, can.

13:58:54  23  Q.  Okay.  So the devices that have other tablet

13:59:00  24  functions where you could download other apps, they can

13:59:04  25  read Bibliotecha books, correct?

13:59:06   1    A.   Yes.

13:59:06   2    Q.   And if it's just an e-reader, all it does is read

13:59:10   3    books, then those aren't available?

13:59:12   4    A.   Not at this time.

13:59:13   5    Q.   Okay.  Do you know approximately how many patrons the

13:59:19   6    library has in a given year?

13:59:25   7    A.   Actually, not off the top of my head.

13:59:32   8    Q.   The Llano County Library System has an inhouse

13:59:36   9    checkout program?

13:59:36   10   A.   Yes.

13:59:37   11   Q.   Traditionally, that checkout -- that inhouse checkout

13:59:42   12   program has been used to let people read reference books

13:59:45   13   inside the library, correct?

13:59:50   14   A.   I guess so.  I never called it that.  So -- but yeah,

13:59:56   15   it could be that.

13:59:58   16   Q.   In this case, the books that we talked about that you

14:00:03   17   weeded in November of 2021 and in August of 2021, those

14:00:11   18   books are not available in the Llano County card catalog

14:00:16   19   system, correct?

14:00:17   20   A.   Right.

14:00:18   21   Q.   You have those books available behind a desk in the

14:00:23   22   library?

14:00:24   23   A.   Yes.

14:00:27   24   Q.   They're not anyplace the public could see them, are

14:00:31   25   they?

| 14:00:31 | 1 | A.   No. |
|---|---|---|
| 14:00:35 | 2 | Q.   They're not listed -- they weren't advertised in any |
| 14:00:41 | 3 | Llano County Library newsletters? |
| 14:00:44 | 4 | A.   No.   They probably were when they were purchased but |
| 14:00:48 | 5 | not recently. |
| 14:00:50 | 6 | Q.   Oh, when they were purchased before they were removed |
| 14:00:54 | 7 | by you. |
| 14:00:55 | 8 | A.   Yes. |
| 14:00:55 | 9 | Q.   In November.   So, for example, when you bought Caste, |
| 14:00:59 | 10 | about a year before you weeded it, you would have |
| 14:01:01 | 11 | announced that you bought this new book in the newsletter? |
| 14:01:04 | 12 | A.   The previous director did.   She had a newsletter that |
| 14:01:07 | 13 | she put all of the -- I believe all of the books that she |
| 14:01:10 | 14 | purchased in each newsletter. |
| 14:01:12 | 15 | Q.   Okay.   Then when you decided to weed all of those |
| 14:01:15 | 16 | books after getting from your boss a list from -- a list |
| 14:01:20 | 17 | of books that Ms. Wallace didn't want in the library, did |
| 14:01:24 | 18 | you put that information in the newsletter? |
| 14:01:26 | 19 | A.   No. |
| 14:01:28 | 20 | Q.   When you decided to have those books available |
| 14:01:34 | 21 | unadvertised, not in the catalog, behind the circulation |
| 14:01:39 | 22 | desk, did you put that information in the newsletter? |
| 14:01:40 | 23 | A.   No. |
| 14:01:42 | 24 | Q.   Llano County has a social media page; is that right? |
| 14:01:45 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:01:46 | 1 | Q.   The library does? |
| 14:01:47 | 2 | A.   Uh-huh. |
| 14:01:48 | 3 | Q.   Did the library system advertise on its social media |
| 14:01:52 | 4 | page that the books you had removed in November were now |
| 14:01:55 | 5 | available for secret checkout? |
| 14:01:57 | 6 | A.   No, because we never advertised what we're weeding. |
| 14:02:02 | 7 | Q.   Other than the books that you weeded in November, are |
| 14:02:05 | 8 | any other books part of your secret checkout program? |
| 14:02:08 | 9 | A.   Not at Llano.  And I'm not sure what they have at |
| 14:02:13 | 10 | Kingsland right now because that's what we would do over |
| 14:02:15 | 11 | at the Kingsland Library. |
| 14:02:17 | 12 | Q.   You said in your declaration that somebody donated |
| 14:02:23 | 13 | the books for your secret checkout program? |
| 14:02:26 | 14 | A.   Yes. |
| 14:02:26 | 15 | Q.   Who was that? |
| 14:02:28 | 16 | MR. MITCHELL:  Objection, relevance. |
| 14:02:30 | 17 | THE COURT:  Overruled. |
| 14:02:32 | 18 | MR. MITCHELL:  We also object, Judge, on the |
| 14:02:35 | 19 | grounds of attorney-client privilege. |
| 14:02:37 | 20 | THE COURT:  I don't understand.  What privilege? |
| 14:02:41 | 21 | MR. MITCHELL:  The witness can't answer the |
| 14:02:43 | 22 | question without disclosing attorney-client |
| 14:02:46 | 23 | communications. |
| 14:02:46 | 24 | THE COURT:  You can ask about the source of -- |
| 14:02:49 | 25 | whether she knows and the source of her knowledge. |

| | | |
|---|---|---|
| 14:02:52 | 1 | Q.   (BY MS. LEONIDA) Ms. Milum, do you know who donated |
| 14:02:56 | 2 | the books for the secret checkout program? |
| 14:02:58 | 3 | A.   Yes. |
| 14:02:59 | 4 | Q.   How do you know that? |
| 14:03:00 | 5 | MR. MITCHELL:  Objection because the answer would |
| 14:03:02 | 6 | call disclosure of privilege. |
| 14:03:05 | 7 | THE COURT:  Overruled.  You can answer the |
| 14:03:07 | 8 | question. |
| 14:03:10 | 9 | A.   My attorney. |
| 14:03:15 | 10 | Q.   (BY MS. LEONIDA) Were you present when the books were |
| 14:03:17 | 11 | brought into the library by the donor? |
| 14:03:20 | 12 | A.   They were mailed to me. |
| 14:03:24 | 13 | Q.   Was there a return address label? |
| 14:03:26 | 14 | A.   I don't recall. |
| 14:03:30 | 15 | Q.   How many copies of each of the books that you removed |
| 14:03:33 | 16 | in November of 2021 were mailed to you? |
| 14:03:37 | 17 | A.   Just one. |
| 14:03:41 | 18 | Q.   Is there a copy of each of the books that we've been |
| 14:03:44 | 19 | talking about today in the secret lending library? |
| 14:03:48 | 20 | A.   In the inhouse -- |
| 14:03:49 | 21 | MR. MITCHELL:  Object to characterization of |
| 14:03:52 | 22 | secret.  There's no secret. |
| 14:03:54 | 23 | THE COURT:  I'll let you cover that on your |
| 14:03:56 | 24 | cross. |
| 14:03:57 | 25 | MR. MITCHELL:  Thank you. |

14:04:00  1   Q.   (BY MS. LEONIDA) The books that came in the box from

14:04:02  2   this anonymous donor, did you put them on the shelves?

14:04:06  3   A.   I put it on the shelf in the back room.

14:04:10  4   Q.   In the back room, who has access to that room?

14:04:13  5   A.   The staff.

14:04:13  6   Q.   Does the public have access to that room?

14:04:15  7   A.   No.

14:04:15  8   Q.   Do these books appear in the library system card

14:04:22  9   catalog?

14:04:22  10  A.   Not since they've been weed.

14:04:24  11  Q.   If a patron were to go to where those books used to

14:04:28  12  be on the shelf before you weeded them in response to the

14:04:30  13  e-mail from your boss, would there be note saying please

14:04:32  14  see me, they're in a room in the back and you can get them

14:04:35  15  out there?

14:04:36  16  A.   No.  If they were looking for something and didn't

14:04:38  17  see it, they would come up to the front desk and ask us if

14:04:42  18  it was checked out and they could be put on reserve for

14:04:45  19  it.  That's when we would tell them that we had it.

14:04:47  20  Q.   If somebody was looking for a book that wasn't in the

14:04:48  21  catalog why would they ask you if it was checked out?

14:04:51  22  A.   So they could be put on reserve so when it gets

14:04:54  23  checked in, they would be able to get it or if we could

14:04:56  24  get it somewhere else for them.

14:04:58  25  Q.   But if it's not in the catalog, there's no way of

14:05:00 1 knowing other than asking a librarian whether the book is

14:05:03 2 available for reading in the library system, right?

14:05:08 3 A. Uh-huh.

14:05:09 4 Q. And you didn't advertise this donor box of books in

14:05:14 5 the back room through your social media site, correct?

14:05:16 6 A. Correct.

14:05:17 7 Q. You didn't advertise it in the library with fliers,

14:05:20 8 correct?

14:05:20 9 A. Correct.

14:05:20 10 Q. You didn't advertise it on library shelves where

14:05:24 11 those books were before you weeded them in November,

14:05:26 12 correct?

14:05:26 13 A. Correct.

14:05:27 14 Q. You didn't tell any patrons that those books existed,

14:05:32 15 were available for checkout, did you?

14:05:36 16 A. No.

14:05:38 17 Q. So you're going that this is a secret lending

14:05:42 18 library?

14:05:42 19 A. No, because we even do that for classics because kids

14:05:46 20 will have to read certain classics and if we only have one

14:05:49 21 on the shelf, then we may have extras being donated and we

14:05:52 22 will have those set aside, too. So it's just when it

14:05:56 23 comes to our attention that someone wants to read

14:05:58 24 something, we'll have an extra one. And it's kind of to

14:06:00 25 where if we even have the own book personal at our house,

14:06:04  1  we will bring that up if it's a book club book, or

14:06:07  2  something like that, to have people be able to check it

14:06:10  3  out.

14:06:10  4  Q.   Can you tell me a couple of classics that you have

14:06:12  5  back there in the room that the public can't access that

14:06:16  6  are also removed from your card catalog?

14:06:20  7  A.   Right now, I don't know because we did most of that

14:06:23  8  at the Kingsland Library and I'm not sure how much or if

14:06:27  9  any of it's still there.

14:06:31  10  Q.   I'm not understanding your answer.  You did most of

14:06:34  11  what at the Kingsland Library?

14:06:36  12  A.   We had our inhouse collection to where when we would

14:06:40  13  see donations of something that we thought would be

14:06:42  14  popular, or a classic, or something like that, we would

14:06:44  15  hold it back, instead of putting it in the book sale, in

14:06:49  16  case people came in and was having a -- you know ma book

14:06:53  17  club and so, multiple people would be needing to check

14:06:55  18  that out, then we would have an extra.  But we wouldn't

14:06:57  19  add it to the system.

14:06:58  20  Q.   So there -- the book would appear in the system but

14:07:02  21  you would have multiple copies, extra copies?

14:07:04  22  A.   No, it would not appear in our system.

14:07:05  23  Q.   Then I'm not -- maybe you can explain to me if it was

14:07:10  24  popular and you ordered extra copies, why would it not

14:07:13  25  appear in the system?

14:07:14    1    A.   Because we're a smaller library and we don't purchase

14:07:19    2    multiple copies besides having each library may purchase a

14:07:25    3    copy.  And so, we would do the intersystem loans and get

14:07:30    4    one from the other library.  But like I said, if it was

14:07:33    5    really popular, if we knew that the kids would need to be

14:07:35    6    reading it for their school, then we would just try to

14:07:38    7    keep another one on hand.

14:07:39    8    Q.   Okay.  I think we're sort of talking past each other.

14:07:44    9    The books that were removed on November 11th, let's start

14:07:47   10    with Caste, right?  Caste does not appear in the online

14:07:50   11    catalog at all?

14:07:51   12    A.   Right.

14:07:51   13    Q.   The only copy is in the back room where patrons can't

14:07:55   14    see it?

14:07:55   15    A.   Yes.

14:07:56   16    Q.   And nobody, including yourself, has advertised the

14:07:59   17    existence of that copy to any library patron, correct?

14:08:02   18    A.   Correct.

14:08:03   19    Q.   So the only way that somebody -- that a patron would

14:08:07   20    know that that book composted behind the desk and was

14:08:09   21    available for checkout is if they were reading the papers

14:08:13   22    in this lawsuit.

14:08:14   23    A.   Yes.

14:08:15   24    Q.   Correct?

14:08:17   25    A.   Yes.

| | | |
|---|---|---|
| 14:08:17 | 1 | Q.  And that's true of all of the books that you weeded |
| 14:08:20 | 2 | in November of 2021 and August of 2021 that we've been |
| 14:08:25 | 3 | talking about, correct? |
| 14:08:30 | 4 | A.  Yes. |
| 14:08:31 | 5 | Q.  If I could have a minute, your Honor.  I may have one |
| 14:08:45 | 6 | more question.  You said that you reviewed your |
| 14:09:22 | 7 | declaration in support of the opposition to this motion |
| 14:09:26 | 8 | before testifying. |
| 14:09:27 | 9 | A.  Yes. |
| 14:09:32 | 10 | Q.  In paragraph 11 of that declaration, you wrote that a |
| 14:09:36 | 11 | donor who wishes to remain unanimous has pledged to me |
| 14:09:39 | 12 | that he will donate physical copies of the books listed in |
| 14:09:42 | 13 | the chart for inclusion in the Llano County's inhouse |
| 14:09:45 | 14 | checkout, correct? |
| 14:09:46 | 15 | A.  Yes. |
| 14:09:47 | 16 | Q.  So you talked to this person. |
| 14:09:49 | 17 | A.  Yes. |
| 14:09:49 | 18 | Q.  Who is he? |
| 14:09:51 | 19 |          MR. MITCHELL:  Objection.  Calls for |
| 14:09:54 | 20 | attorney-client privilege. |
| 14:09:55 | 21 |          THE COURT:  Overruled.  You can answer. |
| 14:09:58 | 22 | A.  My attorney. |
| 14:10:04 | 23 |          MS. LEONIDA:  Nothing further. |
| 14:10:12 | 24 |          THE COURT:  Mr. Mitchell. |
| 14:10:14 | 25 | |

CROSS-EXAMINATION

BY MR. MITCHELL:

Q.   Ms. Milum, why did you decide to weed Freakboy?

A.   Because it wasn't getting checked out enough.

Q.   Is that an appropriate reason to weed a book under the CREW and MUSTIE criteria?

A.   Yes.  I mean, we've got -- those are just guidelines so we can see how many times things are getting checked out or how damaged it could be.  Or if each librarian has their own opinion of about, you know, oh, this book is still really popular or it's still really in good shape, but nobody's checking it out that we try to put it on display or use our own judgment to see how we can get it checked out.

Q.   Did you hear Ms. Castelan's testimony from earlier today?

A.   Yes.

Q.   Do you recall whether she agreed or disagreed with your judgment on whether Freakboy should be weeded?

A.   I believe she did.

Q.   Why did you decide to weed Spinning?

A.   They weren't getting checked out.

Q.   Is that an appropriate reason to weed a book under the CREW and MUSTIE criteria?

A.   Yes.

| | | |
|---|---|---|
| 14:11:21 | 1 | Q.   Why did you decide to weed Gabi, A Girl In Pieces? |
| 14:11:24 | 2 | A.   It wasn't getting checked out enough. |
| 14:11:26 | 3 | Q.   Is that an appropriate reason to weed a book under |
| 14:11:29 | 4 | CREW and MUSTIE? |
| 14:11:30 | 5 | A.   Yes. |
| 14:11:32 | 6 | Q.   Why did you decide to weed They Called Themselves The |
| 14:11:35 | 7 | KKK: The Birth Of An American Terrorist Group? |
| 14:11:38 | 8 | A.   It wasn't getting checked out.  I think it was about |
| 14:11:41 | 9 | like once. |
| 14:11:42 | 10 | Q.   Is that an appropriate reason to weed a book under |
| 14:11:45 | 11 | CREW and MUSTIE? |
| 14:11:46 | 12 | A.   Yes. |
| 14:11:46 | 13 | Q.   Why did you decide to weed Shine? |
| 14:11:50 | 14 | A.   I believe it was the same.  That one, it could have |
| 14:11:53 | 15 | possibly been that it was a little older.  Maybe it was |
| 14:11:57 | 16 | damaged.  I don't recall. |
| 14:12:00 | 17 | Q.   Is the fact that a book is old, possibly damaged, not |
| 14:12:02 | 18 | being checked out much, are those appropriate reasons to |
| 14:12:05 | 19 | weed a book? |
| 14:12:05 | 20 | A.   Yes. |
| 14:12:06 | 21 | Q.   Under the CREW and MUSTIE criteria.  Why did you |
| 14:12:09 | 22 | decide to weed It's Perfectly Normal? |
| 14:12:11 | 23 | A.   It had not gotten checked out in a long time. |
| 14:12:14 | 24 | Q.   And is that an appropriate reason to weed a book? |
| 14:12:16 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 14:12:17 | 1 | Q.   Why did you decide to weed In The Night Kitchen? |
| 14:12:23 | 2 | A.   It wasn't getting checked out enough for being that |
| 14:12:27 | 3 | many years on the shelves, and it kind of had the same |
| 14:12:34 | 4 | criteria of the Butt and Fart books that I was already |
| 14:12:38 | 5 | talking to patrons about. |
| 14:12:40 | 6 | Q.   Are those appropriate reasons to weed a book under |
| 14:12:42 | 7 | CREW and MUSTIE? |
| 14:12:43 | 8 | A.   Yes. |
| 14:12:45 | 9 | Q.   Why did you decide to weed Being Jazz: My Life As A |
| 14:12:45 | 10 | Transgender Teen? |
| 14:12:52 | 11 | A.   It was not getting checked out at the Llano library, |
| 14:12:56 | 12 | but it was popular at Kingsland, so we had an extra copy. |
| 14:12:58 | 13 | Q.   Did you weed the book at Kingsland where it was |
| 14:13:01 | 14 | popular? |
| 14:13:02 | 15 | A.   No. |
| 14:13:02 | 16 | Q.   Is it appropriate to weed a book in the Llano library |
| 14:13:06 | 17 | because it hasn't been checked out enough under the CREW |
| 14:13:09 | 18 | and MUSTIE criteria? |
| 14:13:10 | 19 | A.   Yes. |
| 14:13:10 | 20 | Q.   Why did you decide to weed the Butt books and the |
| 14:13:14 | 21 | Fart books? |
| 14:13:14 | 22 | A.   The Butt books because two patrons were checking them |
| 14:13:19 | 23 | out continuously back and forth, and that wasn't going to |
| 14:13:25 | 24 | give any other patrons a chance to check them out.  And |
| 14:13:30 | 25 | instead of that just going on, you know, forever, I |

14:13:35  1   decided to just weed them out of the system.

14:13:37  2   Q.   Is that an appropriate reason to weed a book?

14:13:39  3   A.   Yes.

14:13:40  4   Q.   Under CREW and MUSTIE, is that appropriate?

14:13:43  5   A.   Well, my decision, yes.

14:13:49  6   Q.   Why did you decide to weed Caste: The Origins Of Our

14:13:53  7   Discontent?  Do you remember?

14:13:54  8   A.   I don't recall that one because it was new.  I'm not

14:13:57  9   sure if it was damaged.  It could have been, even though

14:14:00  10  it was only about a year old.  I don't recall that one.

14:14:05  11  Q.   Would you have weeded that book for any reason apart

14:14:09  12  from the criteria set forth in MUSTIE?

14:14:12  13  A.   No.

14:14:12  14       MS. LEONIDA:  Objection.  Calls for speculation.

14:14:14  15  Move to strike.

14:14:15  16       THE COURT:  I'll allow the question.

14:14:20  17  Q.   (BY MR. MITCHELL) Is it possible you weeded that book

14:14:22  18  because it was damaged?

14:14:23  19  A.   Yes.

14:14:24  20  Q.   Does the library normally make a record of physical

14:14:28  21  damage when it weeds a book --

14:14:30  22  A.   No.

14:14:31  23  Q.   For reasons of physical damage.  Is it possible that

14:14:33  24  other books that you weeded were physically damaged?

14:14:37  25  A.   Yes.

| | | |
|---|---|---|
| 14:14:37 | 1 | Q.   Is it possible that that might have contributed to |
| 14:14:39 | 2 | your decision? |
| 14:14:39 | 3 | A.   Yes. |
| 14:14:39 | 4 | MS. LEONIDA:  Objection.  Calls for speculation. |
| 14:14:41 | 5 | THE COURT:  Overruled. |
| 14:14:43 | 6 | Q.   (BY MR. MITCHELL) Is it possible for librarians to |
| 14:14:47 | 7 | disagree over how to apply the CREW and MUSTIE criteria? |
| 14:14:50 | 8 | A.   Yes. |
| 14:14:51 | 9 | Q.   Is it common for librarians to disagree over how to |
| 14:14:54 | 10 | apply the CREW and MUSTIE criteria? |
| 14:14:56 | 11 | A.   I would think so. |
| 14:14:59 | 12 | Q.   Are the MUSTIE criteria hard and fast rules or are |
| 14:15:02 | 13 | they guidelines in which there is room for individual |
| 14:15:05 | 14 | judgment? |
| 14:15:06 | 15 | A.   They're guidelines. |
| 14:15:07 | 16 | Q.   And is there room for individual judgment? |
| 14:15:10 | 17 | A.   Yes. |
| 14:15:10 | 18 | Q.   In applying those guidelines? |
| 14:15:11 | 19 | A.   Of course. |
| 14:15:13 | 20 | Q.   When you weeded the Butt and the Fart books from |
| 14:15:15 | 21 | library shelves, did the content or viewpoints expressed |
| 14:15:18 | 22 | in those books influence your decision in any way? |
| 14:15:30 | 23 | A.   Say that again. |
| 14:15:31 | 24 | Q.   When you weeded the Butt books and the Fart books |
| 14:15:34 | 25 | from the library shelves, weeded them, not pulling them |

| 14:15:38 | 1 | but making the ultimate decision to weed, did the content |
| 14:15:41 | 2 | or the viewpoints expressed in those books influence your |
| 14:15:44 | 3 | decision in any way? |
| 14:15:48 | 4 | A.   Yes, because the patrons had issues with them and I |
| 14:15:52 | 5 | spoke to them and learned about what their issues were. |
| 14:16:03 | 6 | Q.   Would you have weeded those books from the library |
| 14:16:07 | 7 | shelves have if no one had ever complained about them? |
| 14:16:10 | 8 | A.   Yes. |
| 14:16:10 | 9 | Q.   You would have weeded them regardless? |
| 14:16:12 | 10 | A.   Yes. |
| 14:16:14 | 11 | Q.   When you weeded In The Night Kitchen and It's |
| 14:16:19 | 12 | Perfectly Normal, did the content or viewpoints expressed |
| 14:16:22 | 13 | in those books influence your decision to weed in any way? |
| 14:16:28 | 14 | A.   In The Night Kitchen, yes, because it kind of |
| 14:16:32 | 15 | followed the Butt books and what people were saying about |
| 14:16:35 | 16 | them.  The It's Perfectly Normal, it just was not getting |
| 14:16:45 | 17 | checked out enough to be on the shelves. |
| 14:16:47 | 18 | Q.   Would you have weeded It's Perfectly Normal even if |
| 14:16:50 | 19 | no one in the community had ever complained about it? |
| 14:16:52 | 20 | A.   Yes. |
| 14:16:53 | 21 | Q.   Would you have weeded In The Night Kitchen even if no |
| 14:16:55 | 22 | one had ever complained about it? |
| 14:16:57 | 23 | A.   Yes. |
| 14:16:58 | 24 | Q.   When you weeded the other books at issue in this case |
| 14:17:02 | 25 | in the fall and summer of 2021, did the content or |

14:17:07  1  viewpoints expressed in any of those books influence your

14:17:11  2  decision to weed them in any way?

14:17:13  3  A.    No.

14:17:14  4  Q.    Would you have weeded those remaining books even if

14:17:16  5  no one in the community had ever complained about them?

14:17:19  6  A.    Yes.

14:17:19  7  Q.    Has anyone in the Llano County Library System ever

14:17:29  8  restricted access to any book on Bibliotecha due to the

14:17:34  9  book's viewpoint or content?

14:17:36  10  A.    No.

14:17:38  11  Q.    Has anyone ever asked or suggested that you or any of

14:17:41  12  your colleagues restrict access to any book on Bibliotecha

14:17:45  13  due to its viewpoints or content?

14:17:53  14  A.    One more time.

14:17:54  15  Q.    Has anyone ever asked you or your colleagues to

14:17:57  16  restrict access to any book on Bibliotecha due to its

14:18:03  17  viewpoint and contents?

14:18:05  18  A.    No.

14:18:06  19  Q.    Has any anyone ever asked you to restrict access to a

14:18:09  20  particular book on Bibliotecha for any reason?

14:18:13  21  A.    We've had patrons not like a book on there and that's

14:18:18  22  why we were discussing the filters.

14:18:28  23  Q.    Have you ever had any intention of restricting access

14:18:30  24  to any particular book on Bibliotecha?

14:18:33  25  A.    No.

14:18:33 1    Q.   Will you or any of your colleagues restrict access to

14:18:36 2    any book on Bibliotecha if the motion for preliminary

14:18:39 3    injunction is denied?

14:18:40 4    A.   No.

14:18:42 5    Q.   Ms. Milum, is the Llano County Library System

14:18:48 6    currently weeding books?

14:18:49 7    A.   No.  We're not weeding or adding books.

14:18:52 8    Q.   Why is the library system not weeding books at this

14:18:57 9    time?

14:18:57 10   A.   We are not weeding or adding anything to the system

14:19:02 11   until after the litigation is finished.

14:19:08 12   Q.   When did the library system decide to stop weeding

14:19:12 13   books or to put this temporary pause on weeding books?

14:19:14 14   When was that decision made?

14:19:19 15   A.   Back in December of 2021, I think.

14:19:26 16   Q.   Have you ever felt threatened or pressured by anyone

14:19:29 17   on the commissioners' court?

14:19:31 18   A.   No.

14:19:32 19   Q.   Were any of your ultimate decisions to weed any book

14:19:36 20   from the library shelves influenced in any way by any of

14:19:40 21   the defendants in this case?

14:19:42 22   A.   No.

14:19:44 23   Q.   Were any of your ultimate decisions to weed any book

14:19:46 24   from the library shelves influenced in any way by anyone

14:19:50 25   on the commissioners' court?

| 14:19:51 | 1 | A.   No. |
| 14:19:51 | 2 | Q.   Were they influenced by anyone on the library |
| 14:19:55 | 3 | advisory board? |
| 14:19:55 | 4 | A.   No. |
| 14:20:00 | 5 | Q.   Is Freakboy currently available for checkout in the |
| 14:20:03 | 6 | library? |
| 14:20:04 | 7 | A.   In the library inhouse, it is. |
| 14:20:07 | 8 | Q.   Is Spinning currently available for checkout in the |
| 14:20:10 | 9 | library? |
| 14:20:10 | 10 | A.   Yes. |
| 14:20:11 | 11 | Q.   Is Gabi, A Girl In Pieces currently available for |
| 14:20:13 | 12 | checkout in the library? |
| 14:20:14 | 13 | A.   Yes. |
| 14:20:15 | 14 | Q.   Is They Called Themselves the KKK: Birth Of An |
| 14:20:18 | 15 | American Terrorist Group currently available for checkout |
| 14:20:21 | 16 | in the library? |
| 14:20:22 | 17 | A.   Yes. |
| 14:20:23 | 18 | Q.   Is Shine currently available for checkout in the |
| 14:20:25 | 19 | library? |
| 14:20:25 | 20 | A.   Yes. |
| 14:20:25 | 21 | Q.   Is it It's Perfectly Normal currently available for |
| 14:20:28 | 22 | checkout in the library? |
| 14:20:29 | 23 | A.   Yes. |
| 14:20:29 | 24 | Q.   Is In The Night Kitchen currently available for |
| 14:20:32 | 25 | checkout in the library? |

14:20:32  1    A.   Yes.

14:20:33  2    Q.   Is Being Jazz: My Life As A Transgender Teen

14:20:36  3    currently available for checkout in the library?

14:20:38  4    A.   Yes.

14:20:39  5    Q.   Are the Butt books and the Fart books currently

14:20:42  6    available for checkout in the library?

14:20:44  7    A.   Yes.

14:20:44  8    Q.   Is Caste: The Origins Of Our Discontents currently

14:20:47  9    available for checkout in the library?

14:20:50  10   A.   Yes.

14:20:50  11   Q.   Nothing further.

14:20:55  12           THE COURT:  Ms. Leonida.

14:20:57  13                  RE-DIRECT EXAMINATION

14:20:57  14   BY MS. LEONIDA:

14:20:58  15   Q.   All of those books your lawyer just asked you about,

14:21:00  16   do any of them appear in the card catalog system?

14:21:03  17   A.   No.

14:21:05  18   Q.   All of the books that we were just talking about you

14:21:07  19   having weeded in 2021, you have no record of damage to any

14:21:13  20   of those books, do you?

14:21:13  21   A.   No.

14:21:14  22   Q.   You have no memory of damage to any of those books,

14:21:17  23   do you?

14:21:17  24   A.   No.

14:21:21  25   Q.   A book in order to be weeded pursuant to your

14:21:24 1 policies has to satisfy more than one MUSTIE criteria;

14:21:29 2 isn't that right?

14:21:31 3 A.    It would be good if it was more than one, yes.

14:21:35 4 Q.    Also, pursuant to your own policies, a book that

14:21:39 5 hasn't been checked out in three years, that alone is not

14:21:43 6 reason to weed the book, correct?

14:21:45 7 A.    It depends on the book.

14:21:52 8 Q.    Can we play No. 3.

14:21:56 9         (Audio and video file played.)

14:22:05 10 Q.    "A book not being checked out for, let's say, three

14:22:08 11 years, is that by itself a reason to get rid of it?

14:22:13 12 A.    No.  You kind of use your own discretion.  If you

14:22:17 13 think, well, maybe it will get checked out, if you put it

14:22:22 14 on display or a little while.  Maybe it will get checked

14:22:24 15 out.  If you put it in a different section.  Maybe it's a

14:22:29 16 biography and nonfiction, so you try to put it in both

14:22:33 17 sections, if one's in the getting checked out."

14:22:35 18         (End of audio/video file.)

14:22:37 19 Q.    All of the books that we've been talking about here

14:22:38 20 today, you didn't put any of them on display, did you?

14:22:41 21 A.    No.

14:22:42 22 Q.    You doesn't put any of them in a different section to

14:22:45 23 see if they would get checked out, did you?

14:22:47 24 A.    No.

14:22:47 25 Q.    The CREW and MUSTIE criteria, are any of those

| 14:22:50 | 1 | criteria a book that's constantly being checked out by |
| 14:22:55 | 2 | patrons, does that appear in CREW or MUSTIE anywhere? |
| 14:22:58 | 3 | A.   I don't recall.  I don't believe so. |
| 14:23:00 | 4 | Q.   Thank you. |
| 14:23:05 | 5 |          THE COURT:  Anything further? |
| 14:23:06 | 6 |          MR. MITCHELL:  May I briefly? |
| 14:23:07 | 7 |          THE COURT:  Sure. |
| 14:23:08 | 8 |                RE-CROSS EXAMINATION |
| 14:23:08 | 9 | BY MR. MITCHELL: |
| 14:23:11 | 10 | Q.   The E in MUSTIE, Ms. Milum, what does the E stand |
| 14:23:15 | 11 | for? |
| 14:23:15 | 12 | A.   Elsewhere. |
| 14:23:16 | 13 | Q.   Are these books available elsewhere to your |
| 14:23:18 | 14 | knowledge? |
| 14:23:18 | 15 | A.   Yes, they are. |
| 14:23:24 | 16 | Q.   So that would be one criterion in the MUSTIE criteria |
| 14:23:29 | 17 | that would be for each of those decisions you made? |
| 14:23:32 | 18 | A.   Yes.  If it's found at the other libraries, then we |
| 14:23:34 | 19 | will possibly weed ours so we could get something else for |
| 14:23:37 | 20 | the shelves.  And then, if we can get it on the |
| 14:23:41 | 21 | interlibrary loans, we'll do that, as well. |
| 14:23:43 | 22 | Q.   You were asked about Being Jazz: My Life As a |
| 14:23:47 | 23 | Transgender Teen and whether that's currently in the card |
| 14:23:49 | 24 | catalog.  Could that book be in the card catalog if it's |
| 14:23:54 | 25 | available in another library in the Llano County Library |

| | | |
|---|---|---|
| 14:23:58 | 1 | System, such as Kingsland? |
| 14:23:58 | 2 | A.   Yes. |
| 14:23:59 | 3 | Q.   Is it, to your knowledge, in the card catalog right |
| 14:24:02 | 4 | now? |
| 14:24:02 | 5 | A.   I believe it is.  Yes. |
| 14:24:03 | 6 | Q.   Thank you.  Nothing further. |
| 14:24:06 | 7 | MS. LEONIDA:  Nothing further, your Honor. |
| 14:24:06 | 8 | THE COURT:  Thank you.  You may step down.  Your |
| 14:24:09 | 9 | next witness. |
| 14:24:10 | 10 | MR. BOTKIN:  Plaintiffs call Judge Ron |
| 14:24:14 | 11 | Cunningham. |
| 14:24:35 | 12 | THE COURT:  Good afternoon.  Raise your right |
| 14:24:38 | 13 | hand to be sworn, please. |
| 14:24:41 | 14 | THE CLERK:  You do solemnly swear or affirm that |
| 14:24:41 | 15 | the testimony you will give in this cause now before the |
| 14:24:41 | 16 | Court will be the truth, the whole truth, and nothing but |
| 14:24:42 | 17 | the truth, so help you God? |
| 14:24:42 | 18 | THE WITNESS:  So help me God. |
| 14:24:47 | 19 | THE CLERK:  Thank you. |
| 14:24:47 | 20 | THE COURT:  Please be seated. |
| 14:24:48 | 21 | RON CUNNINGHAM, called by the Plaintiff, duly sworn. |
| 14:24:48 | 22 | DIRECT EXAMINATION |
| 14:24:50 | 23 | BY MR. BOTKIN: |
| 14:24:50 | 24 | Q.   Good afternoon.  Can you introduce yourself to the |
| 14:24:53 | 25 | Court and tell us what you do? |

14:24:54  1    A.    My name is Ron Cunningham and I'm the Llano County

14:24:59  2    Judge.

14:24:59  3    Q.    You've held the position of Llano County Judge since

14:25:03  4    2019; is that right?

14:25:03  5    A.    Yes, sir.

14:25:04  6    Q.    And the Llano County Judge is the political head of

14:25:08  7    the Llano County government; is that right?

14:25:11  8    A.    In a manner of speaking but we -- the commissioners'

14:25:14  9    court is what runs the county.

14:25:15  10   Q.    Fair enough.  So you, in conjunction with the

14:25:18  11   commissioners' court, are the head of the government of

14:25:20  12   Llano County?

14:25:20  13   A.    Yes, sir.

14:25:20  14   Q.    And for those who are not familiar with our county

14:25:25  15   judge system, it's kind of like a mayor and a city

14:25:28  16   council, for example.  Is that a good analogy?

14:25:31  17   A.    Similar in some aspects.

14:25:34  18   Q.    Part of your duties include overseeing the Llano

14:25:38  19   County Libraries, right?

14:25:38  20   A.    Yes, sir.

14:25:39  21   Q.    As well as the Director of the Llano County Library

14:25:43  22   System Amber Milum, who we just spoke to, reports to you

14:25:47  23   and the Llano County Commissioners, right?

14:25:51  24   A.    Yes, sir.

14:25:52  25   Q.    Around the summer of 2021, I understand it came to

14:25:55  1   your attention that some Llano County Library patrons were

14:25:59  2   concerned about pornographic and overtly sexual books in

14:26:03  3   the library's children's section; is that right?

14:26:06  4   A.    Yes, sir.

14:26:06  5   Q.    Tell me more about how it came to your attention that

14:26:09  6   those library patrons were concerned about those things.

14:26:13  7   A.    There was a meeting in my office where some folks

14:26:16  8   came in and they asked if there were books in the

14:26:20  9   libraries that were considered pornographic and I wasn't

14:26:26  10  sure.  I think that's what instigated the meeting.

14:26:30  11  Q.    Let's place this at a point in time.  Was this around

14:26:33  12  July or August of 2021?

14:26:34  13  A.    Yes, sir.

14:26:35  14  Q.    And who was in attendance at that meeting?

14:26:38  15  A.    Eva Carter, Jo Ares and Rochelle Wells.

14:26:44  16  Q.    And what exactly were they saying about these books?

14:26:46  17  What were their concerns?

14:26:48  18  A.    They stated that there were books in the library that

14:26:50  19  were inappropriate and they wanted me to remove them, or

14:26:53  20  they wanted me to appoint a committee to oversee what

14:26:56  21  books we selected.

14:26:58  22  Q.    Is there any record of that meeting?

14:27:01  23  A.    No, sir.  Not that I'm aware of.

14:27:04  24  Q.    Didn't take minutes or notes of that?

14:27:07  25  A.    No, sir.  It was an impromptu meeting.

| | | |
|---|---|---|
| 14:27:09 | 1 | Q.   What did you decide to do in response? |
| 14:27:14 | 2 | A.   I advised them that any discrepancies or any concerns |
| 14:27:19 | 3 | they had needed to be addressed with the library director. |
| 14:27:22 | 4 | And when they asked about appointing a committee, I |
| 14:27:25 | 5 | informed them that that committee would not be appointed, |
| 14:27:27 | 6 | that the policies what'd be -- governed the library. |
| 14:27:32 | 7 | Q.   Okay.  Let me ask you to turn to in the exhibit book |
| 14:27:35 | 8 | that's right next to you to Exhibit 2A. |
| 14:28:02 | 9 | A.   To which now? |
| 14:28:03 | 10 | Q.   Real quick.  That meeting was in your office, I think |
| 14:28:06 | 11 | you said? |
| 14:28:06 | 12 | A.   Yes, sir. |
| 14:28:07 | 13 | Q.   And how did that get set? |
| 14:28:09 | 14 | A.   I'm sorry. |
| 14:28:09 | 15 | Q.   How did that get set? |
| 14:28:10 | 16 | A.   I think Eva Carter called me and just asked if she |
| 14:28:14 | 17 | could come in and meet with me. |
| 14:28:17 | 18 | Q.   And did she indicate that she was bringing those |
| 14:28:19 | 19 | others, as well? |
| 14:28:20 | 20 | A.   I don't recall. |
| 14:28:21 | 21 | Q.   Can anybody just give you a call and get a meeting |
| 14:28:25 | 22 | set up like that? |
| 14:28:26 | 23 | A.   It's a small county.  A lot of times, they can. |
| 14:28:30 | 24 | Q.   Well, what's the criteria?  I mean, how do you get in |
| 14:28:33 | 25 | to see Judge Cunningham? |

| | | |
|---|---|---|
| 14:28:33 | 1 | A.   Call my office and ask to meet. |
| 14:28:37 | 2 | Q.   Let me ask you to turn to Exhibit 2A in that book in |
| 14:28:40 | 3 | front of you.  And this is how it came to us and it |
| 14:28:55 | 4 | doesn't look like there's a date on it.  But can you -- |
| 14:28:58 | 5 | this appears to be a e-mail from you to Amber Milum, |
| 14:29:04 | 6 | correct? |
| 14:29:05 | 7 | A.   Yes, sir. |
| 14:29:05 | 8 | Q.   Do you recognize this e-mail? |
| 14:29:12 | 9 | A.   I'm not familiar with it.  I'm guessing I sent it |
| 14:29:16 | 10 | since it's got my e-mail signature in the bottom of it. |
| 14:29:19 | 11 | Q.   And it says Amber, I am still receiving calls, |
| 14:29:21 | 12 | letters and e-mails concerning the Farts and Butts books. |
| 14:29:25 | 13 | I think it is best to remove these books from the shelves |
| 14:29:27 | 14 | for now.  Thank you.  Did you send this e-mail to Amber? |
| 14:29:32 | 15 | A.   Yes, sir. |
| 14:29:33 | 16 | Q.   I move admission of Exhibit 2A. |
| 14:29:37 | 17 |         MR. MITCHELL:  No objections. |
| 14:29:37 | 18 |         THE COURT:  So admitted. |
| 14:29:42 | 19 | Q.   (BY MR. BOTKIN) Was this in July or August, you said? |
| 14:29:45 | 20 | A.   I can't recall, sir. |
| 14:29:46 | 21 | Q.   Describe for me the calls, letters and e-mails that |
| 14:29:50 | 22 | you were getting concerning the Farts and Butts books. |
| 14:29:53 | 23 | A.   I think there were just calls coming in.  I'm not -- |
| 14:29:57 | 24 | I didn't document each call or each time I spoke to |
| 14:30:01 | 25 | someone who said something about it, but my intent was to |

14:30:04  1   neutralize the situation until we could investigate it

14:30:09  2   further.

14:30:09  3   Q.   Were you kind of annoyed with the calls, letters and

14:30:12  4   e-mails that it seemed you were getting on these books?

14:30:14  5   A.   Annoyed was not the word.  Concerned would be the

14:30:16  6   word.

14:30:18  7   Q.   And is there any record of these calls, letters,

14:30:23  8   e-mails that would be accessible to us?

14:30:26  9   A.   I'm not sure if there -- what was coming in or how it

14:30:30  10  was coming in.

14:30:31  11  Q.   Okay.  In August of 2021, State Rep Matt Krause

14:30:39  12  submitted a letter to the TEA, the Texas Education Agency,

14:30:45  13  superintendents about some content of some books in the

14:30:48  14  school libraries.  Are you familiar with that?

14:30:50  15  A.   No, sir.  I'm not.

14:30:51  16  Q.   Have you ever seen the letter from Representative

14:30:53  17  Krause?

14:30:54  18  A.   No, sir, I have not.  Not until I saw it this

14:30:57  19  morning.

14:30:57  20  Q.   And is it Krause or "Krause-y"?

14:30:59  21  A.   I could not tell you, sir.

14:31:02  22  Q.   Did you become familiar with Representative Krause's

14:31:12  23  letter at the time it came out?

14:31:13  24  A.   No, sir.

14:31:17  25  Q.   And I'll represent to you that it came out dated --

| | | |
|---|---|---|
| 14:31:21 | 1 | if you'll look at Exhibit 6, we don't have to admit this, |
| 14:31:25 | 2 | but I just want to orient us in time.  On October 25th and |
| 14:31:35 | 3 | on October 28th, you had an e-mail exchange with Amber |
| 14:31:41 | 4 | Milum, if you'll look at previously admitted Exhibit No. |
| 14:31:49 | 5 | 7.  Now, in Exhibit 7, Amber Milum is e-mailing you and |
| 14:31:54 | 6 | this is the e-mail that's entitled "critical race theory |
| 14:31:59 | 7 | book."  Do you see that? |
| 14:32:00 | 8 | A.   Yes. |
| 14:32:00 | 9 | Q.   And she testified earlier that you all had had a |
| 14:32:04 | 10 | communication about the book How To Be An Antiracist.  Is |
| 14:32:09 | 11 | that your recollection? |
| 14:32:10 | 12 | A.   Yes, sir. |
| 14:32:11 | 13 | Q.   How did this book How To Be An Antiracist come to |
| 14:32:15 | 14 | your attention? |
| 14:32:17 | 15 | A.   I'm not sure.  The only thing I can think of is |
| 14:32:20 | 16 | someone had called me and asked me if we had it and I |
| 14:32:23 | 17 | asked Amber, and that was her response to me after I asked |
| 14:32:26 | 18 | if we had it. |
| 14:32:28 | 19 | Q.   Okay.  Why did you -- why was Ms. Milum asking, |
| 14:32:34 | 20 | communicating with you about this book?  What did you ask |
| 14:32:36 | 21 | her to do? |
| 14:32:37 | 22 | A.   I think someone called me, asked me if we had it in |
| 14:32:40 | 23 | our system and I asked her. |
| 14:32:42 | 24 | Q.   Okay.  Do you remember who it was that -- would you |
| 14:32:46 | 25 | characterize that -- you said checking with you to see if |

14:32:49  1  they had it in your system?

14:32:51  2  A.   Yes, sir.

14:32:51  3  Q.   Why wouldn't they be calling the library about that?

14:32:55  4  A.   I'm sorry?

14:32:56  5  Q.   Why wouldn't they be calling the library about that?

14:33:00  6        MR. MITCHELL:  Objection.  That calls for

14:33:01  7  speculation.

14:33:03  8  Q.   (BY MR. BOTKIN) Did somebody call you or communicate

14:33:05  9  with you to complain about that book?

14:33:06  10  A.   I don't recall how I got the information.

14:33:09  11  Q.   Have you read How To Be An Antiracist?

14:33:12  12  A.   No, sir.

14:33:14  13  Q.   The title of the e-mail is "critical race theory

14:33:18  14  book."  Did you all talk about the book How To Be An

14:33:22  15  Antiracist and used the term "critical race theory"?

14:33:24  16  A.   No, sir.  Not other than in that e-mail, I guess.

14:33:28  17  Q.   Do you know what critical race theory is?

14:33:30  18  A.   I'm not that familiar with it.  No, sir.

14:33:34  19  Q.   In the e-mail, she says good morning.  I wanted to

14:33:38  20  let you know before it came up at any of your meetings,

14:33:41  21  the Kingsland Library does have the book.  Did I read that

14:33:44  22  correctly?

14:33:44  23  A.   Yes, sir.

14:33:45  24  Q.   Okay.  The book is still in the system, but it is

14:33:48  25  behind the front desk.  If anyone wants to check it out,

| 14:33:51 | 1 | they have to ask a librarian. It is no longer on the |
| 14:33:54 | 2 | shelf; is that right? Did I read that right? |
| 14:33:56 | 3 | A. Yes, sir. |
| 14:33:57 | 4 | Q. Did you ask her to take it off the shelf? |
| 14:33:58 | 5 | A. No, sir. |
| 14:33:59 | 6 | Q. Then why is she sending you -- what is your |
| 14:34:01 | 7 | understanding about why she's sending you this e-mail |
| 14:34:03 | 8 | about communicating that it's no longer on the shelf? |
| 14:34:06 | 9 | A. Sir, I'm not sure. |
| 14:34:07 | 10 | Q. Did you give her any instructions about taking it off |
| 14:34:10 | 11 | the shelf? |
| 14:34:11 | 12 | A. No, sir. |
| 14:34:11 | 13 | Q. Around this time, I think Ms. -- I've forgotten her |
| 14:34:40 | 14 | first name -- was talking about a message that you had |
| 14:34:42 | 15 | communicated to the librarians about what to say when |
| 14:34:45 | 16 | somebody came to inquire about a book that's not on the |
| 14:34:48 | 17 | shelves. Do you remember that testimony? |
| 14:34:49 | 18 | A. No, sir, I don't. |
| 14:34:51 | 19 | Q. We'll talk about that later. If you'll turn to |
| 14:34:57 | 20 | Plaintiffs' Exhibit 60. Exhibit 60 is an e-mail exchange |
| 14:35:42 | 21 | between you and Ms. Milum, correct? |
| 14:35:44 | 22 | A. Yes, sir. |
| 14:35:44 | 23 | Q. And in that e-mail, you are e-mailing her to say |
| 14:35:48 | 24 | thank you Amber, in the middle of the document there if |
| 14:35:51 | 25 | you want to look at it. |

| | | |
|---|---|---|
| 14:35:53 | 1 | A.   Yes, sir. |
| 14:35:53 | 2 | Q.   Let's meet in the morning.  As action items to be |
| 14:35:56 | 3 | done immediately, one, any books with photos of naked or |
| 14:36:01 | 4 | sexual conduct regardless if they are animated or actual |
| 14:36:04 | 5 | photos are to be pulled until further notice.  Did I read |
| 14:36:07 | 6 | that correctly? |
| 14:36:08 | 7 | A.   Yes, sir. |
| 14:36:08 | 8 | Q.   So you're instructing her that books with photos of |
| 14:36:12 | 9 | naked or sexual conduct, regardless if they are animated |
| 14:36:15 | 10 | or actual photos, are to be pulled, correct? |
| 14:36:17 | 11 | A.   Yes, sir. |
| 14:36:18 | 12 | Q.   Okay.  And you're also instructing her that no |
| 14:36:21 | 13 | additional books will be ordered or purchased until we |
| 14:36:23 | 14 | have a plan to move forward, right? |
| 14:36:25 | 15 | A.   Yes, sir. |
| 14:36:25 | 16 | Q.   What prompted this e-mail? |
| 14:36:29 | 17 | A.   There was obviously controversy in the community and |
| 14:36:32 | 18 | the thing that I was concerned with with this controversy |
| 14:36:34 | 19 | was both sides being angered.  And so, what I was trying |
| 14:36:37 | 20 | to do was neutralize the entire situation until we could |
| 14:36:40 | 21 | look at it. |
| 14:36:42 | 22 | Q.   And you asked her to come into your office the next |
| 14:36:46 | 23 | day, right? |
| 14:36:46 | 24 | A.   Yes, sir. |
| 14:36:47 | 25 | Q.   Okay.  And if you will now turn to Plaintiffs' |

14:36:53  1    Exhibit 5.  At the bottom of that first page is an e-mail

14:37:14  2    exchange between you and Ms. Milum with a CC to Jerry Don

14:37:17  3    Moss, right?

14:37:18  4    A.   Yes, sir.

14:37:18  5    Q.   And this is an e-mail that you sent to Amber Milum

14:37:24  6    about that meeting that we just talked about, right?

14:37:28  7    A.   Yes, sir.

14:37:28  8    Q.   And you were telling Ms. Milum, as we discussed in

14:37:30  9    our meeting in my office at 9:45 a.m. on November 9, 2021,

14:37:35  10   any and all books that depict any type of sexual activity

14:37:39  11   or questionable nudity are to be pulled immediately.  Did

14:37:41  12   I read that right?

14:37:42  13   A.   Yes, sir.

14:37:42  14   Q.   I am also requesting that any of these books that are

14:37:45  15   available online be pulled, as well.  Please advise

14:37:49  16   Commissioner Moss and I when this task has been completed.

14:37:51  17   Thank you.  Did I read that right?

14:37:52  18   A.   Yes, sir.

14:37:53  19   Q.   So you're telling her pretty much the same things

14:37:56  20   that you had communicated to her the day before the

14:37:58  21   meeting, right?

14:37:59  22   A.   Yes, sir.

14:38:04  23   Q.   Now, the title of this e-mail is -- well, read the

14:38:09  24   title of that -- the subject line of that e-mail for me.

14:38:12  25   A.   Pornographic filth at the Llano public libraries.

| 14:38:17 | 1 | Q.   Now, you were forwarding another e-mail to her that |
| 14:38:20 | 2 | you got from somebody else, right? |
| 14:38:23 | 3 | A.   Yes, sir. |
| 14:38:23 | 4 | Q.   And who was that? |
| 14:38:24 | 5 | A.   That would be Bonnie Wallace. |
| 14:38:26 | 6 | Q.   Okay.  So you got an e-mail from Bonnie Wallace |
| 14:38:29 | 7 | entitled "pornographic filth at the Llano public |
| 14:38:32 | 8 | libraries" and you sent that along to Ms. Milum, the |
| 14:38:36 | 9 | director of the library, right? |
| 14:38:38 | 10 | A.   Yes, sir. |
| 14:38:39 | 11 | Q.   And attached -- although we don't have on this |
| 14:38:42 | 12 | e-mail, attached to this e-mail is where we have the -- |
| 14:38:49 | 13 | A.   Can you go back. |
| 14:38:51 | 14 | Q.   Yes, sir. |
| 14:38:52 | 15 | A.   To the other e-mail. |
| 14:38:56 | 16 | Q.   Go ahead. |
| 14:39:02 | 17 | A.   The original e-mail came and I forwarded it to her. |
| 14:39:07 | 18 | This was not as a result of my forwarding that first |
| 14:39:09 | 19 | e-mail, the one you're talking about.  I think it's 60. |
| 14:39:13 | 20 | Q.   Right.  The subject of the e-mail was about that |
| 14:39:23 | 21 | meeting, right, where you were telling her to pull the |
| 14:39:27 | 22 | books, correct? |
| 14:39:41 | 23 | A.   I originally sent that to her on November 10th. |
| 14:39:45 | 24 | Q.   Correct.  The e-mail between you and Ms. Milum is -- |
| 14:39:49 | 25 | A.   What I do is, I just forward the e-mail from Ms. |

| 14:39:54 | 1 | Wallace.  So this conversation was not in the same |
| 14:39:57 | 2 | conversation is what I'm saying. |
| 14:39:59 | 3 | Q.   Understood.  I'm placing it as a point in time.  You |
| 14:40:04 | 4 | forwarded the e-mail that we're reading here, the November |
| 14:40:07 | 5 | 10th e-mail, after your meeting with Ms. Milum where |
| 14:40:11 | 6 | you're telling her to pull the books, right? |
| 14:40:13 | 7 | A.   Yes, sir. |
| 14:40:13 | 8 | Q.   Okay.  And you're confirming what was talked about in |
| 14:40:15 | 9 | that meeting in Exhibit 5, right? |
| 14:41:07 | 10 | A.   I think I was responding is what it looks like. |
| 14:41:09 | 11 | Q.   Yes, sir.  The e-mail at the top is another exchange |
| 14:41:11 | 12 | between you and Ms. Wallace where she responds to your |
| 14:41:13 | 13 | e-mail, right? |
| 14:41:14 | 14 | A.   Correct. |
| 14:41:14 | 15 | Q.   Okay.  We move admission of Exhibit 5. |
| 14:41:19 | 16 | THE COURT:  Any objection to 5? |
| 14:41:23 | 17 | THE CLERK:  Five's in. |
| 14:41:25 | 18 | THE COURT:  I'm sorry.  It's already in. |
| 14:41:29 | 19 | MR. BOTKIN:  Thank you. |
| 14:41:35 | 20 | Q.   (BY MR. BOTKIN) Now, the reason, Judge Cunningham, |
| 14:41:43 | 21 | the reason you're forwarding -- you tell me.  But it seems |
| 14:41:45 | 22 | the reason that you're forwarding Ms. Wallace's e-mail to |
| 14:41:48 | 23 | Ms. Milum is because you want Ms. Milum to know what Ms. |
| 14:41:56 | 24 | Wallace is saying about these books, right? |
| 14:41:58 | 25 | A.   Can you repeat that? |

14:41:59   1   Q.   Sure.   You're forwarding this e-mail from Ms. Wallace

14:42:02   2   to the library director because you want the library

14:42:07   3   director to know what Ms. Wallace is saying about these

14:42:09   4   books, right?

14:42:10   5   A.   Yes, sir.   I do that with any department that we have

14:42:12   6   in the county.   If it's permitting and I receive

14:42:14   7   something, I forward it to permitting.   If it's road and

14:42:16   8   bridge, I do that.   I do it with all departments.

14:42:19   9   Q.   And this would seem to lend support to your demand

14:42:24  10   that Ms. Milam pulled these books with sexual activity or

14:42:29  11   questionable nudity as you laid out in that e-mail, right?

14:42:32  12   A.   Until we could look at it further.

14:42:35  13   Q.   I'll have you look at Exhibit No. 13.   Exhibit 13 is

14:43:07  14   an e-mail exchange between you and Ms. Milum concerning

14:43:10  15   OverDrive, right?

14:43:11  16   A.   Yes, sir.

14:43:11  17   Q.   OverDrive, explain to us what OverDrive is as you

14:43:15  18   understand it.

14:43:16  19   A.   The best of my knowledge, it's an online digital

14:43:19  20   library system.

14:43:21  21   Q.   And in Exhibit 13, you were telling Ms. Milum in an

14:43:27  22   e-mail, dated December 1st, with copy to Jerry Don Moss,

14:43:34  23   that you need her to implement some filters on OverDrive

14:43:38  24   immediately; is that right?

14:43:39  25   A.   Yes, sir.

14:43:40  1    Q.   Tell us why you want her to implement these filters

14:43:44  2    immediately.

14:43:45  3    A.   We did not want to have any system that the library

14:43:50  4    offers that would show pornographic material to children.

14:43:54  5    That was the concern.  When we learned that there was a

14:43:58  6    possibility that OverDrive offered these services, we

14:44:00  7    wanted to engage them.

14:44:03  8    Q.   Part of this point in time till December 2021, had

14:44:10  9    you ever engaged with library staff about filters or that

14:44:14  10   sort of stuff on your online collection?

14:44:17  11   A.   Not necessarily that, but we have on operational

14:44:20  12   hours, efficiencies of operation, staffing, planning.

14:44:26  13   Q.   Prior to July of 2021, had you ever the communicated

14:44:30  14   with library staff about books that you thought were not

14:44:32  15   appropriate?

14:44:34  16   A.   No, sir.

14:44:39  17   Q.   And your request to Ms. Milum in this e-mail of

14:44:45  18   December 1st, 2021 is that she can't figure out how to

14:44:49  19   turn on the filters to weed out these books, then we need

14:44:55  20   to notify commissioners' court we are suspending the

14:44:57  21   OverDrive service till we have accomplished this task,

14:45:02  22   right?

14:45:02  23   A.   Yes.  We actually -- I worked with Ms. Milum and we

14:45:05  24   thought we had found the filters and we thought they were

14:45:07  25   in place, and we actually put it on the agenda to

14:45:09　1　reinstate OverDrive and it was when we -- only in

14:45:13　2　commissioners' court do we learn that the filters could be

14:45:15　3　removed immediately.  We both thought that we had found

14:45:18　4　the solution by putting those filters in place.

14:45:20　5　Q.　And you made the recommendation ultimately after

14:45:23　6　learning about the filters to suspend OverDrive.

14:45:27　7　A.　Yes, sir.  To explore -- it was -- by the way, it was

14:45:31　8　a temporary suspension.

14:45:33　9　Q.　Well, it ended up being, what, three, four months,

14:45:36　10　something like that?

14:45:37　11　A.　I think it was three or four months.

14:45:39　12　Q.　Okay.  And during that time, Llano County Library

14:45:43　13　patrons couldn't access library materials online, right?

14:45:47　14　A.　They could.  I can't remember the name of the service

14:45:49　15　that we could offer, but there was another online service

14:45:53　16　that was available.  And then, we also instructed them

14:45:55　17　that they could get their books through Burnet County free

14:45:58　18　of charge, as well.

14:45:59　19　Q.　You're talking about Bibliotecha, that one that you

14:46:02　20　eventually hired to --

14:46:03　21　A.　No, sir.  I'm talking about OverDrive.

14:46:05　22　Q.　Okay.  Let's take a look at -- sorry.  We move

14:46:12　23　admission of Exhibit 13.

14:46:13　24　　　　　　THE COURT:  Any objection?  Without objection, so

14:46:16　25　admitted.

| | | |
|---|---|---|
| 14:46:45 | 1 | Q. (BY MR. BOTKIN) Exhibit 14 is the minutes of Llano |
| 14:46:49 | 2 | County Commissioners' Court meeting on December 13, 2021, |
| 14:46:52 | 3 | right? |
| 14:46:52 | 4 | A. Yes, sir. |
| 14:46:54 | 5 | Q. Let me have you turn to agenda item 12. |
| 14:47:00 | 6 | A. To 12. |
| 14:47:01 | 7 | Q. Yes, sir. And agenda item 12 was to close the Llano |
| 14:47:11 | 8 | County libraries to the public for three days to allow |
| 14:47:13 | 9 | staff to perform administration tasks, including inventory |
| 14:47:17 | 10 | and proper cataloging of books, right? |
| 14:47:19 | 11 | A. Yes, sir. |
| 14:47:20 | 12 | Q. The motion passed. |
| 14:47:25 | 13 | A. Yes, sir. |
| 14:47:26 | 14 | Q. And this is where the Llano County librarians were |
| 14:47:34 | 15 | supposed to go and do the what we talked about with Ms. |
| 14:47:39 | 16 | Milum, the weeding process in response to the list from |
| 14:47:42 | 17 | what we've called the Bonnie Wallace list, right? |
| 14:47:45 | 18 | A. I don't think we ever instructed them to go do a |
| 14:47:48 | 19 | weeding process. We instructed them to do an analysis, an |
| 14:47:51 | 20 | assessment of the library to see if there was pornography |
| 14:47:54 | 21 | in there. |
| 14:47:54 | 22 | Q. But this is the action in response to the Bonnie |
| 14:47:57 | 23 | Wallace list, right? |
| 14:48:00 | 24 | A. No, sir. It was not in response to that list. |
| 14:48:02 | 25 | Q. How would you characterize it? |

14:48:04  1    A.   I would characterize it as there was concern in the

14:48:07  2    community and we wanted to assess the situation.

14:48:09  3    Q.   Okay.  Did you and Ms. Milum have access to that

14:48:13  4    Bonnie Wallace list at that time?

14:48:14  5    A.   No, sir.  I actually forwarded that list to her and I

14:48:17  6    didn't look at it.  I didn't go through it.

14:48:20  7    Q.   Never seen it?

14:48:21  8    A.   I didn't go through it.  I saw it when I opened it up

14:48:25  9    and saw what it was and I sent it to Amber, but I didn't

14:48:27  10   go through the list.

14:48:28  11   Q.   Why'd you send it to her?

14:48:31  12   A.   As I explained earlier, anytime I get a concern from

14:48:34  13   someone about a department, I send it to that department.

14:48:40  14   Q.   We move admission of 14.

14:48:43  15        MR. MITCHELL:  No objection.

14:48:44  16        THE COURT:  Without objection, so admitted.

14:49:00  17   Q.   (BY MR. BOTKIN) I'll have you turn to Plaintiffs'

14:49:02  18   Exhibit 59.  Exhibit 599 is an e-mail from Amber Milum to

14:49:32  19   you entitled "advisory board meeting," correct?

14:49:34  20   A.   Yes, sir.

14:49:34  21   Q.   The e-mail that we got from you all is not dated.

14:49:45  22   Would you agree that this is somewhere around January

14:49:48  23   2022?

14:49:49  24   A.   I wouldn't know.

14:49:51  25   Q.   Okay.  The e-mail reads good afternoon.  Wanted to

14:49:55  1   make you aware that it's come to my attention that one of

14:49:58  2   the audience members, there were three, recorded the

14:50:00  3   meeting on her phone.  Do you see that?

14:50:03  4   A.   Yes, sir.

14:50:04  5   Q.   What action did you take in response to this e-mail?

14:50:09  6   A.   To the e-mail?

14:50:10  7   Q.   Yes, sir.

14:50:12  8   A.   Nothing.

14:50:14  9   Q.   Did you take any action in response to the news that

14:50:18  10  audience members at an advisory board meeting were

14:50:21  11  recording the meeting on their phones?

14:50:24  12  A.   No, sir.  It's their right.

14:50:27  13  Q.   Is it true that advisory board meetings subsequent to

14:50:38  14  January 2022 were closed to the public?

14:50:41  15  A.   I'm sorry?

14:50:43  16  Q.   Is it true that subsequent meetings after January

14:50:46  17  2022 were closed to the public?

14:50:48  18  A.   I believe that's correct.

14:50:49  19  Q.   Okay.  Did you authorize those meetings to be closed?

14:50:53  20  A.   I didn't authorize it.  They could close them.

14:50:55  21  Q.   Did you object to them closing?

14:50:58  22  A.   I didn't object.

14:51:06  23  Q.   I'll have you turn to Plaintiffs' Exhibit 17.  Oh,

14:51:12  24  sorry.  We'd move admission of 59.

14:51:14  25        THE COURT:  Any objection?  Without objection, so

14:51:18  1    admitted.

14:51:18  2            MR. MITCHELL:  Without objection.

14:51:22  3    Q.  (BY MR. BOTKIN) Seventeen.  Exhibit 17 is the minutes

14:51:41  4    of Llano County Commissioners' Court meeting on January

14:51:44  5    10th, 2022, correct?

14:51:46  6    A.  Yes, sir.

14:51:47  7    Q.  Have you look at agenda item No. 8.  Are you with me?

14:51:58  8    A.  Yes, sir.

14:52:00  9    Q.  Agenda item No. 8 is update of Llano County Library

14:52:04  10   System activities, including the suspension of OverDrive

14:52:07  11   service.  Do you see that?

14:52:08  12   A.  Yes.

14:52:08  13   Q.  It looks like Mr. Moss made a motion, but the motion

14:52:12  14   failed.  Do you see that?

14:52:16  15   A.  Yes, sir.

14:52:16  16   Q.  Is that what happened?

14:52:17  17   A.  Yes, sir.

14:52:19  18   Q.  And then, Mr. Moss -- right below that, it says

14:52:23  19   motion Moss and then, unanimous motion passed, and it says

14:52:27  20   removed because the Llano County advisory library board is

14:52:33  21   going to help the situation.  Do you see that?

14:52:34  22   A.  Yes.

14:52:35  23   Q.  What was going on with those two motions?

14:52:37  24   A.  The first motion, I believe, was when we were trying

14:52:46  25   to reinstate OverDrive, and that's when it was discovered

14:52:50  1  that the filters could not be put in place permanently and

14:52:54  2  that as soon as a child walked into the system, they could

14:52:56  3  disengage the filters.  And when we learned that, that was

14:53:00  4  when the motion failed.

14:53:04  5  Q.   Okay.  So you were -- so the motion was to reinstate

14:53:08  6  OverDrive, but you ultimately decided not to reinstate

14:53:11  7  because of the filter concern, right?

14:53:12  8  A.   When it was learned that the filters would not --

14:53:15  9  could not be stayed in place that anytime a child walked

14:53:18  10  in, they could disengage the filters.

14:53:19  11  Q.   Okay.  And so, then there was a subsequent motion to

14:53:23  12  remove that agenda item because the Llano County library

14:53:29  13  advisory board was going to help the situation.  Do you

14:53:30  14  see that?

14:53:30  15  A.   Yes, sir.

14:53:31  16  Q.   What does that mean?

14:53:32  17  A.   I'm not sure.  That's the note that says removed

14:53:36  18  because the Llano County advisory board is going to help

14:53:40  19  the situation is notes from the county clerk.  Not me.

14:53:42  20  Q.   Okay.  What was your understanding of how the

14:53:45  21  advisory library board would help that situation?

14:53:47  22  A.   Well, Ms. Milum and her staff and the library board

14:53:54  23  were looking into what other solutions were available to

14:53:57  24  implement some type of online e-book system.

14:54:00  25  Q.   Is that something that the advisory library board

14:54:03  1  would need to get in or just Ms. Milum?

14:54:06  2  A.   We were trying to get something put back in place as

14:54:08  3  quickly as we could.  We kind of wanted all hands on deck.

14:54:11  4  Q.   Well, the next agenda item No. 9, then, is to

14:54:18  5  dissolve the current Llano County Library advisory board.

14:54:23  6  Do you see that?

14:54:23  7  A.   Yes, sir.

14:54:23  8  Q.   So in 8, it looks like you've removed the agenda item

14:54:29  9  because the Llano County Library System library advisory

14:54:33  10  board is going to help situation but then, in 9, you're

14:54:35  11  turning around and dissolving the board.

14:54:36  12  A.   Again, the county clerk put those notes in there.  I

14:54:39  13  didn't put that in there.

14:54:39  14  Q.   Well, is that what happened?

14:54:42  15  A.   I'm not sure why she wrote that in there like she

14:54:45  16  did.

14:54:45  17  Q.   These are minutes of a public meeting, right, and

14:54:49  18  they're --

14:54:49  19  A.   Yes, sir.

14:54:49  20  Q.   You expect them to be accurate, right?

14:54:53  21  A.   Again, I'm not sure why she put that in there.

14:54:59  22  Q.   Agenda item No. 10 is to create a newly restructured

14:55:06  23  Llano County advisory board.  Do you see that?

14:55:08  24  A.   Yes, sir.

14:55:09  25  Q.   Okay.  Mr. Moss made the motion and it was unanimous

14:55:12 1  and passed; and so, at this point, Llano County's approved

14:55:16 2  the newly restructured Llano County advisory board, right?

14:55:20 3  A.   Yes, sir.

14:55:28 4  Q.   And agenda item No. 11, the next one down is to

14:55:33 5  appoint Gay Baskin as temporary chairperson, right?

14:55:36 6  A.   Yes, sir.

14:55:38 7  Q.   And then, 12 is the appointment of the new board,

14:55:43 8  right?

14:55:44 9  A.   Yes, sir.

14:55:48 10  Q.   What was wrong with the old board?

14:55:51 11  A.   They weren't meeting very often.  We weren't getting

14:55:54 12  any recommendations for any improvements.  We hadn't

14:55:57 13  gotten recommendations in quite a while.

14:56:00 14  Q.   Did you tell them that before you dissolved them?

14:56:04 15  A.   Well, we had just come out of a flood in October of

14:56:07 16  2018, it took us about nine months to recover.  Then we

14:56:10 17  went into COVID, then we went into a freeze.  We were

14:56:14 18  dealing with one disaster after the other.  So as far as

14:56:18 19  telling them to meet, I wasn't going to tell them to meet,

14:56:21 20  but we were needing some help and we weren't getting it.

14:56:24 21  Q.   Maybe I misunderstood because I think you just told

14:56:26 22  me that you were dissolving the old board because they

14:56:29 23  weren't meeting enough?

14:56:30 24  A.   No.  I said we could not create a new board until we

14:56:34 25  dissolved the old board.

14:56:35 1  Q.   That's my question.  What's wrong with the old board?

14:56:37 2  A.   They were not meeting very often and we weren't

14:56:40 3  getting any recommendations from them.

14:56:42 4  Q.   Did you communicate with the old board to tell them

14:56:46 5  that you had concerns about the frequency of their

14:56:48 6  meetings or their recommendations?

14:56:49 7  A.   No, sir.

14:56:50 8  Q.   You constituted -- or the commissioners' court's

14:56:54 9  constituted a new board in agenda item No. 12, right?

14:56:58 10  A.   Yes, sir.

14:56:59 11  Q.   And that agenda item has the names and the terms of

14:57:06 12  the members of that new board, right?

14:57:07 13  A.   Yes, sir.

14:57:08 14  Q.   Your appointment was Bonnie Wallace, right?

14:57:10 15  A.   Yes, sir.

14:57:12 16  Q.   She's the one that wrote the "pornographic filth"

14:57:15 17  e-mail, right?

14:57:15 18  A.   Yes, sir.

14:57:16 19  Q.   In the notes below, so the motion passes and the

14:57:21 20  notes below say, approve all above appointments with the

14:57:25 21  removal of Richard Day from precinct 1 and adding Cheryll

14:57:30 22  Mabray from precinct 1.  Do you see that?

14:57:31 23  A.   Yes, sir.

14:57:32 24  Q.   Why was Richard Day removed from precinct 1?

14:57:35 25  A.   He was appointed by Commissioner Jones and I'm not

14:57:40 1  sure why he made the change.

14:57:41 2  Q.   And Richard Day, Rick Day is one of the plaintiffs in

14:57:44 3  this lawsuit, right?

14:57:45 4  A.   Yes, sir.

14:57:45 5  Q.   Are you aware that Richard Day has a Master's Degree

14:57:51 6  in Library Science?

14:57:53 7  A.   I was not.  Now I am.  Are you asking if I knew it

14:57:55 8  then or now?

14:57:56 9  Q.   Well, both, I suppose.

14:57:57 10 A.   Not then.

14:57:59 11 Q.   And Mr. Day was also the custodian of the U.T.

14:58:08 12 classics library or rare books library.  Did you know

14:58:10 13 that?

14:58:10 14 A.   I was not.

14:58:11 15 Q.   He has experience in library administration, right?

14:58:18 16         MR. MITCHELL:  Your Honor, we object.  Counsel's

14:58:19 17 testifying.

14:58:21 18         THE COURT:  I think he's not aware of Mr. Day's

14:58:24 19 background.

14:58:26 20 Q.   (BY MR. BOTKIN) You weren't aware of that then that I

14:58:32 21 guess you aren't now?

14:58:33 22 A.   Yes.

14:58:34 23 Q.   Then what was the concern with Richard Day?  Why was

14:58:37 24 he removed from the library board after being appointed?

14:58:42 25 A.   Can you repeat?

| | | |
|--|--|--|
| 14:58:43 | 1 | Q.   Sure.  Why was Richard Day removed from the library |
| 14:58:46 | 2 | board after being appointed? |
| 14:58:47 | 3 | A.   As I stated earlier, Commissioner Jones made that |
| 14:58:51 | 4 | recommendation and made the replacement. |
| 14:58:53 | 5 | Q.   Was it because of his politics? |
| 14:58:56 | 6 | A.   I don't know what his politics are, sir. |
| 14:59:00 | 7 | Q.   Move admission of 17. |
| 14:59:04 | 8 | THE COURT:  Any objection? |
| 14:59:05 | 9 | MR. MITCHELL:  No objection, your Honor. |
| 14:59:06 | 10 | THE COURT:  So admitted. |
| 14:59:10 | 11 | Q.   (BY MR. BOTKIN) Can you to turn to Exhibit No. 35. |
| 14:59:35 | 12 | Exhibit 35 is an e-mail exchange between you and Bonnie |
| 14:59:38 | 13 | Wallace, correct? |
| 14:59:38 | 14 | A.   Yes, sir. |
| 14:59:39 | 15 | Q.   Dated January 16th, 2022, right? |
| 14:59:44 | 16 | A.   Yes, sir. |
| 14:59:45 | 17 | Q.   I'm going to have you look at that e-mail at the |
| 14:59:47 | 18 | bottom half of that first page where you are e-mailing to |
| 14:59:52 | 19 | Ms. Wallace. |
| 14:59:53 | 20 | A.   Yes, sir. |
| 14:59:54 | 21 | Q.   The last paragraph of that e-mail says, also, I would |
| 14:59:58 | 22 | greatly appreciate the board exploring options to reduce |
| 15:00:01 | 23 | cost to the county.  I am not sure if the new board |
| 15:00:04 | 24 | understands that the only support received is the |
| 15:00:07 | 25 | donations which the friends provide and that county funds |

15:00:11 1 almost $500,000 per year.  The board also needs to

15:00:15 2 recognize that the county is not mandated by law to

15:00:17 3 provide a public library.  Did I read that right?

15:00:21 4 A.    Yes, sir.

15:00:22 5 Q.    What are you trying to convey there?

15:00:26 6 A.    The library for the last probably three years that I

15:00:30 7 was on the -- as county judge has been about 450,000 to

15:00:36 8 $500,000 a year.  In 2020, it jumped up to almost

15:00:41 9 $600,000.  Our county can only increase taxes every year

15:00:45 10 by 3.5 percent without having to go to a voter approval

15:00:48 11 rate.  We had to get that cost back down in order to keep

15:00:51 12 the library operating.

15:00:54 13 Q.    Are you suggesting that one of the available options

15:00:56 14 is to close the library?

15:00:57 15 A.    No, sir, I didn't say that.

15:00:59 16 Q.    Well, you're reminding her that the board needs to

15:01:03 17 recognize that the county is not mandated by law to

15:01:05 18 provide a public library, correct?

15:01:07 19 A.    That's correct.

15:01:07 20 Q.    And so, it's at least an option for the county to

15:01:10 21 close the library, it sounds like?

15:01:13 22 A.    No, sir.  That's not what I said.

15:01:15 23 Q.    What circumstance would prompt the recommendation to

15:01:18 24 close the library?  Could budgetary concerns prompt that?

15:01:21 25 A.    They could.

15:01:21  1  Q.   But you would not consider closing the library

15:01:34  2  because of a dispute about content of the library or the

15:01:39  3  content of books in the library, right?

15:01:41  4  A.   Can you say that again.

15:01:42  5  Q.   You wouldn't consider closing the library because of

15:01:45  6  this dispute or some other dispute about the content of

15:01:47  7  the books at the library, right?

15:01:49  8  A.   No, sir.

15:01:50  9  Q.   You wouldn't do that because it's unconstitutional,

15:01:54  10  right?

15:01:54  11  A.   Yes, sir.

15:02:00  12  Q.   We move admission of 35.

15:02:04  13        THE COURT:  Any objection to 35?

15:02:06  14        MR. MITCHELL:  No objection, your Honor.

15:02:07  15        THE COURT:  So admitted.

15:02:12  16  Q.   (BY MR. BOTKIN) I believe you told me earlier that

15:02:41  17  prior to last summer, you'd never communicated with the

15:02:44  18  library staff about the content of specific books; is that

15:02:47  19  right?

15:02:47  20  A.   Yes, sir.

15:02:47  21  Q.   Had you ever attended a meeting of the library board

15:02:51  22  before last summer?

15:02:53  23  A.   I think I may have attended a couple when I first

15:02:58  24  came into office, but I don't recall.

15:02:59  25  Q.   Had you ever communicated with a librarian about

| | | |
|---|---|---|
| 15:03:01 | 1 | OverDrive before last summer? |
| 15:03:02 | 2 | A.   No, sir. |
| 15:03:03 | 3 | Q.   Had you ever questioned the written materials policy |
| 15:03:06 | 4 | at the Llano County Library System before last summer? |
| 15:03:09 | 5 | A.   No, sir. |
| 15:03:10 | 6 | Q.   Did you ever require the librarian to send a list of |
| 15:03:14 | 7 | books to be purchased to the library board for approval or |
| 15:03:17 | 8 | comment? |
| 15:03:18 | 9 | A.   Can you say that again? |
| 15:03:19 | 10 | Q.   Had you ever required a librarian to send a list of |
| 15:03:22 | 11 | books to be purchased to the library board for approval or |
| 15:03:26 | 12 | comment? |
| 15:03:26 | 13 | A.   I never have, period. |
| 15:03:28 | 14 | Q.   Prior to this dispute, are you saying you never asked |
| 15:03:32 | 15 | Amber Milum to send a list of books for approval? |
| 15:03:35 | 16 | A.   She was communicating with them, but it wasn't at my |
| 15:03:39 | 17 | direction. |
| 15:03:40 | 18 | Q.   Prior to this dispute, library board meetings were |
| 15:03:44 | 19 | open to the public, correct? |
| 15:03:45 | 20 | A.   Yes, sir. |
| 15:03:47 | 21 | Q.   Llano County had never fired the librarian for |
| 15:03:50 | 22 | insubordination. |
| 15:03:53 | 23 | A.   I'm not sure if they never have.  I don't know. |
| 15:03:56 | 24 | Q.   Well, you all fired Ms. Baker, yes? |
| 15:03:59 | 25 | A.   You say we never have, I don't know if we ever have. |

| 15:04:03 | 1 | Q.   Prior to last summer, you had not, correct? |
| 15:04:07 | 2 | A.   I don't know what's happened in the past. |
| 15:04:11 | 3 | Q.   Prior to this dispute, members of the library board |
| 15:04:14 | 4 | were appointed for a term and then, renewed or replaced |
| 15:04:18 | 5 | after their terms ended, correct? |
| 15:04:19 | 6 | A.   Yes, sir. |
| 15:04:19 | 7 | Q.   And prior to this dispute, the entire library board |
| 15:04:22 | 8 | was not replaced at one time ever, correct? |
| 15:04:26 | 9 | A.   I'm not sure. |
| 15:04:30 | 10 | Q.   And prior to last summer, Llano County, to your |
| 15:04:33 | 11 | knowledge, had never been in dispute about censorship at |
| 15:04:35 | 12 | the library, right? |
| 15:04:36 | 13 | A.   I'm sorry, I'm having trouble hearing you. |
| 15:04:38 | 14 | Q.   Prior to last summer, Llano County had never been in |
| 15:04:41 | 15 | a dispute about censorship at the public library, right? |
| 15:04:44 | 16 | A.   I don't know if never is the correct word.  I'm not |
| 15:04:48 | 17 | sure. |
| 15:04:50 | 18 | Q.   You're not aware of one, right? |
| 15:04:53 | 19 | A.   I'm not aware of one in the past. |
| 15:04:55 | 20 | Q.   I pass the witness. |
| 15:05:00 | 21 |           THE COURT:  Any questions? |
| 15:05:02 | 22 |                     CROSS-EXAMINATION |
| 15:05:02 | 23 | BY MR. MITCHELL: |
| 15:05:05 | 24 | Q.   Mr. Cunningham, when will the library advisory board |
| 15:05:08 | 25 | have its next scheduled meeting? |

15:05:12  1   A.   After the completion of this litigation.

15:05:15  2   Q.   Are you saying there won't be any meetings between

15:05:19  3   now and the end of this litigation?

15:05:20  4   A.   No, sir.

15:05:21  5   Q.   Thank you.  Nothing further.

15:05:25  6            THE COURT:  Anything further, Mr. Botkin?

15:05:27  7            MR. BOTKIN:  No.

15:05:28  8            THE COURT:  Thank you, sir.  You may step down.

15:05:29  9            THE WITNESS:  Thank you, Judge.

15:05:31  10            THE COURT:  Next witness.

15:05:36  11            MS. CALAF:  Your Honor, before we call our next

15:05:38  12   witness, could we have a five-minute break?

15:05:41  13            THE COURT:  Yes.  We'll take a five-minute

15:05:43  14   recess.

15:08:11  15            (Recess.)

15:12:02  16            THE COURT:  Ms. Calaf.

15:12:05  17            MS. CALAF:  Your Honor, plaintiffs call Jerry Don

15:12:08  18   Moss.

15:12:09  19            THE COURT:  Mr. Moss.  Before you take a seat,

15:12:27  20   could you raise your right hand to be sworn.

15:12:33  21            THE CLERK:  You do solemnly swear or affirm that

15:12:33  22   the testimony which you may give in the case now before

15:12:33  23   the Court shall be the truth, the whole truth, and nothing

15:12:34  24   but the truth?

15:12:34  25            THE WITNESS:  Yes, ma'am.

| 15:12:36 | 1 | THE CLERK:  Thank you. |
| 15:12:36 | 2 | THE COURT:  Please be seated. |
| 15:12:38 | 3 | JERRY DON MOSS, called by the Plaintiff, duly sworn. |
| 15:12:38 | 4 | <u>DIRECT EXAMINATION</u> |
| 15:12:40 | 5 | BY MS. CALAF: |
| 15:12:40 | 6 | Q.   Good afternoon. |
| 15:12:41 | 7 | A.   Good afternoon. |
| 15:12:42 | 8 | Q.   Mr. Moss, you are a commissioner of the Llano County |
| 15:12:48 | 9 | Commissioners' Court, right? |
| 15:12:48 | 10 | A.   Yes, ma'am. |
| 15:12:49 | 11 | Q.   And you've held that position for about 15 years, |
| 15:12:53 | 12 | correct? |
| 15:12:53 | 13 | A.   Yes, ma'am. |
| 15:12:54 | 14 | Q.   And one of the responsibilities that you have as a |
| 15:12:58 | 15 | member of the commissioners' court is to select the |
| 15:13:03 | 16 | library director, right? |
| 15:13:07 | 17 | A.   Yes, ma'am. |
| 15:13:09 | 18 | Q.   And once the library director is selected, the |
| 15:13:15 | 19 | library director in this case or currently, Ms. Milum, is |
| 15:13:20 | 20 | empowered to select the books for the library system, |
| 15:13:23 | 21 | correct? |
| 15:13:26 | 22 | A.   Yes, ma'am. |
| 15:13:27 | 23 | Q.   And you would agree with me, wouldn't you, that the |
| 15:13:32 | 24 | role of the public library system is to provide the |
| 15:13:36 | 25 | citizens of Llano County with access to information, |

15:13:40 1 correct?

15:13:41 2 A.   Yes, ma'am.

15:13:43 3 Q.   And you also agree with me, wouldn't you, that it is

15:13:47 4 not the role of the library system to advocate for one

15:13:52 5 political position over another, right?

15:13:55 6 A.   Correct.  Yes, ma'am.

15:13:56 7 Q.   And you agree with me that when the library director

15:14:02 8 selects a book for the collection, the library director is

15:14:07 9 not selecting that book to express the views of the

15:14:12 10 commissioners' court, right?

15:14:13 11 A.   Yes, ma'am.

15:14:15 12 Q.   Similarly when the library director selects a book

15:14:20 13 for the collection, she is not selecting a book to express

15:14:27 14 the views of the citizens of the county, correct?

15:14:32 15 A.   Yes, ma'am, as far as I know.

15:14:33 16 Q.   She's not endorsing any particular viewpoint by

15:14:37 17 making a book available through the Llano County public

15:14:43 18 library system.

15:14:45 19 A.   Would you repeat that?

15:14:46 20 Q.   Sure.  When the library director selects a book, the

15:14:54 21 director is not endorsing the views of the author or of

15:15:00 22 the book by making the book available in the collection.

15:15:03 23 A.   Yes, ma'am, correct, as far as I know.

15:15:05 24 Q.   So if we could go to the web page for Llano County

15:15:11 25 catalog, please.  Commissioner Moss, are you familiar with

15:15:18  1  this page?

15:15:19  2  A.  No, ma'am, I'm not.

15:15:22  3  Q.  Are you a card-carrying member of Llano County

15:15:30  4  Library System?

15:15:30  5  A.  Yes, ma'am.  It has since expired.

15:15:33  6  Q.  Fair enough.  That happened to a lot of us during

15:15:39  7  COVID.  I represent to you that this is the online catalog

15:15:42  8  for the Llano County Library.  Could see it on the top

15:15:47  9  left of the screen?

15:15:48  10  A.  Yes, ma'am.  I see that.

15:15:51  11  Q.  So if you please, Serg, for the book If You Give A

15:15:59  12  Pig The White House.

15:16:00  13  A.  Were you talking to me?

15:16:02  14  Q.  I was talking to our person who was assisting us.

15:16:05  15  And here, you see, Commissioner Moss, that the library

15:16:11  16  carries a book called If You Give A Pig The White House.

15:16:14  17  Do you see that book?

15:16:15  18  A.  I'm sorry, I just realized I have it right here in

15:16:18  19  font of me.  I do see that, yes, ma'am.

15:16:23  20  Q.  So the library has a book that is a satirical book

15:16:29  21  that makes fun of former President Trump.  Do you see

15:16:35  22  that?

15:16:37  23  A.  I definitely think that's who you're talking about,

15:16:40  24  but I don't see where it says President Trump.

15:16:43  25  Q.  The hair is giving him away.  Okay.  And you agree

15:16:48　1　with me that assuming that this is a book that makes fun

15:16:51　2　or pokes fun at former President Trump, you wouldn't say

15:16:57　3　that this book speaks for the commissioners' court, right?

15:17:00　4　A.　No, ma'am, I don't think so.

15:17:01　5　Q.　And you also agree with me that having this book as

15:17:05　6　part of the collection doesn't mean that it expresses the

15:17:11　7　county's views of former President Trump, correct?

15:17:17　8　A.　I don't think so.　No.

15:17:18　9　Q.　Okay.　So it's fair to say that the library carries

15:17:26　10　all different types of books but that what is in the

15:17:30　11　collection does not represent the views of Llano County

15:17:35　12　citizens, correct?

15:17:39　13　A.　Would you repeat that?

15:17:41　14　Q.　So it's fair to say that just because the library

15:17:44　15　carries a book, has a book in its collection that the

15:17:47　16　citizens of Llano County don't necessarily endorse the

15:17:51　17　views of that book?

15:17:54　18　A.　Yes, ma'am.　I agree.

15:17:57　19　Q.　Now, we've been hearing all day about a number of

15:18:03　20　complaints that began sometime around August of 2021 and

15:18:12　21　you in your capacity as a member of the commissioners'

15:18:16　22　court received some these complaints, correct?

15:18:21　23　A.　Yes, ma'am.　I'm not sure about the dates, but yes,

15:18:23　24　ma'am.　I have received complaints.

15:18:25　25　Q.　So you recall receiving some complaints about what

15:18:27  1  we've been calling the Butt books, right?

15:18:30  2  A.   Yes, ma'am.

15:18:31  3  Q.   And what do you remember about the complaints that

15:18:33  4  you received?

15:18:35  5  A.   Mainly that they were -- should not be in the

15:18:38  6  children's section of our library.

15:18:42  7  Q.   And prior to receiving this complaint -- and do you

15:18:47  8  remember who you received this complaint from?

15:18:51  9  A.   I think that one of the complaints was from Rochelle

15:18:57  10  Wells and possibly, Eva Carter.

15:19:00  11  Q.   And after you received these complaints about the

15:19:03  12  Butt books, in your official capacity as a member of the

15:19:07  13  commissioners' court, did you take any action?

15:19:13  14  A.   Would you repeat that?

15:19:14  15  Q.   Sure.  After you received the complaint about the

15:19:17  16  Butt books being inappropriate, did you personally take

15:19:20  17  any action?

15:19:23  18  A.   I went to the library.  And I apologize for asking.

15:19:26  19  I can't hear very well, so I just want to make sure I --

15:19:26  20  Q.   Well --

15:19:33  21  A.   I went to the library, yes, ma'am, and talked to Ms.

15:19:36  22  Milum.

15:19:36  23  Q.   You talked to Ms. Milum.  And do you recall what you

15:19:39  24  talked to Ms. Milum about?

15:19:41  25  A.   I talked to her about the Butt books.  I just heard

15:19:45  1  about them and hadn't seen or anything.  Just heard that.

15:19:48  2  Q.  Okay.  And did you -- you talked to her about the

15:19:54  3  Butt books and what happened after that?

15:19:56  4  A.  She told me that there was four of those books and

15:20:01  5  that two of them were in the system and that two of them

15:20:06  6  were not.  And then, she showed me one of the books that

15:20:11  7  was not in the system -- a little bit of it, not a whole

15:20:15  8  lot and then -- let me think about that a second.  I

15:20:25  9  believe I asked her what she thought about those books

15:20:28  10 being in the children's section in the library and I don't

15:20:32  11 remember her response, though.

15:20:33  12        But my response was that they were not -- they

15:20:36  13 should not be in the children's section in the library.

15:20:39  14 Q.  So you have a recollection of telling the library

15:20:42  15 director that those specific books you had reviewed should

15:20:46  16 not be in the children's section?

15:20:47  17 A.  I have a -- would you repeat?

15:20:49  18 Q.  You have a recollection of telling the library

15:20:54  19 director that the books you had reviewed should not be in

15:20:57  20 the children's section.

15:20:59  21 A.  The one book.  I just reviewed part of that one book.

15:21:03  22 Yes, ma'am.

15:21:03  23 Q.  Did you read the book?

15:21:04  24 A.  No, ma'am.  I did not read the book.

15:21:06  25 Q.  What did you do?

15:21:07　1　A.　I looked at the pictures in that book.

15:21:09　2　Q.　Do you remember the title of the specific book that

15:21:12　3　you looked at?

15:21:13　4　A.　I do not.  No, ma'am.  It was one that was not on the

15:21:18　5　shelf.  I mean, I'm sorry.  One that, yes, that was not on

15:21:21　6　the shelf to be checked out.

15:21:27　7　Q.　And is it your understanding that Ms. Milum followed

15:21:34　8　your directive and took the books out of the children's

15:21:38　9　section or the book that you had browsed out of the

15:21:40　10　children's section?

15:21:41　11　A.　From what I understand, she did.  Yes, ma'am.

15:21:44　12　Q.　Now, in your 15 years as commissioner, how many times

15:21:49　13　had you received complaints about a book?

15:21:54　14　A.　Not very often.  We have a good library system.

15:21:59　15　Q.　Prior to let's call it the summer of 2021, do you

15:22:04　16　personally recall having received any complaints about the

15:22:07　17　content of any books in the Llano County Library System?

15:22:17　18　A.　I don't think so.

15:22:21　19　Q.　Prior to this meeting that you had with the library

15:22:26　20　director about the Butt books in the children's section,

15:22:29　21　do you recall ever going to the library to discuss

15:22:34　22　specific books with the librarian?

15:22:42　23　A.　Not from a complaint.

15:22:47　24　Q.　Prior to this instance to where you told Ms. Milum to

15:22:52　25　remove the books from the children's section, had you ever

15:22:54  1  told the librarian to move a book in the library?

15:23:00  2  A.   I may have misspoke because I recommended to her that

15:23:03  3  my opinion, they shouldn't be in the children's section.

15:23:06  4  Q.   Right.  But you're technically Ms. Milum's boss,

15:23:10  5  right?  She reports to the commissioners?

15:23:13  6  A.   Sort of.  She reports to the judge and then, the

15:23:16  7  commissioners' court.  So I am not her boss on a daily

15:23:20  8  basis, no, ma'am.

15:23:22  9  Q.   So you make that recommendation to her to move the

15:23:24  10  book from the children's section.  Where did you recommend

15:23:28  11  that she move it to?

15:23:30  12  A.   Just the adult section.  Not a specific.

15:23:33  13  Q.   And this was the Butt books that we were talking

15:23:36  14  about earlier.

15:23:36  15  A.   Yes, ma'am.

15:23:37  16  Q.   And you make that recommendation and it is your

15:23:40  17  understanding that she followed that recommendation,

15:23:42  18  right?

15:23:44  19  A.   I don't know that I ever asked her that question.

15:23:48  20  Q.   Okay.  Prior to making that specific recommendation,

15:23:52  21  had you ever recommended to her that she make any other

15:23:59  22  changes in the library based on the content of the book?

15:24:04  23  A.   I think I'd asked maybe not her but maybe a previous

15:24:10  24  librarian to order some books.

15:24:12  25  Q.   You've asked a previous librarian to order some

15:24:16   1   books?  Is that what you said?

15:24:16   2   A.   Maybe.  I like cowboy and Indian books.  So that's

15:24:18   3   what I wanted.

15:24:18   4   Q.   Did you ask her to move books, take them out of one

15:24:22   5   section and put them in another?

15:24:23   6   A.   No, ma'am, I don't believe so.

15:24:25   7   Q.   Did you ask anybody to remove books from the

15:24:28   8   collection?

15:24:30   9   A.   Did I ask what?

15:24:32  10   Q.   Remove books, take them out.

15:24:36  11   A.   I don't think so.

15:24:41  12   Q.   We've been talking about the Krause list or the

15:24:47  13   Wallace list.  Are you familiar with that list?

15:24:49  14   A.   I am now.

15:24:50  15   Q.   Okay.  And you've heard today that there are books on

15:24:56  16   that list, some are about history like They Called

15:25:03  17   Themselves the KKK.  Others are LBTQ plus books like Shine

15:25:07  18   or Being Jazz.  Have you read any of those books, the

15:25:10  19   books on the Wallace list?

15:25:12  20   A.   No, ma'am.

15:25:14  21   Q.   Do you have -- and you don't have -- so you have not

15:25:20  22   read any of the books on the list, right?  I just want to

15:25:23  23   be clear about that you yourself personally?

15:25:29  24   A.   I have not read.

15:25:30  25   Q.   And you don't have any reason, do you, to think that

| 15:25:33 | 1 | any of those books don't belong in the library, do you? |
| 15:25:38 | 2 | A.   Correct. |
| 15:25:38 | 3 | Q.   And you don't have any reason to think that these |
| 15:25:41 | 4 | books don't belong in the Llano County system, right? |
| 15:25:44 | 5 | A.   In the what system? |
| 15:25:46 | 6 | Q.   In the Llano County Library System. |
| 15:25:49 | 7 | A.   No, ma'am. |
| 15:25:54 | 8 | Q.   Thank you.  I have no further question. |
| 15:26:06 | 9 | MR. MITCHELL:  No redirect, your Honor.  Thank |
| 15:26:08 | 10 | you. |
| 15:26:08 | 11 | THE COURT:  Thank you, sir.  You may step down. |
| 15:26:10 | 12 | THE WITNESS:  Thank you. |
| 15:26:11 | 13 | THE COURT:  Next witness. |
| 15:26:12 | 14 | MR. BERNSTEIN:  Plaintiffs call Defendant |
| 15:26:15 | 15 | Rochelle Wells. |
| 15:26:34 | 16 | THE COURT:  Before you take a seat, could you |
| 15:26:36 | 17 | please raise your right hand to be sworn. |
| 15:26:38 | 18 | THE CLERK:  You do solemnly swear or affirm that |
| 15:26:38 | 19 | the testimony which you may give in the case now before |
| 15:26:38 | 20 | the Court shall be the truth, the whole truth, and nothing |
| 15:26:45 | 21 | but the truth? |
| 15:26:45 | 22 | THE WITNESS:  Yes. |
| 15:26:46 | 23 | THE CLERK:  Thank you. |
| 15:26:47 | 24 | THE COURT:  Please be seated. |
| 15:26:48 | 25 | ROCHELLE WELLS, called by the Plaintiff, duly sworn. |

15:26:48     1          <u>DIRECT EXAMINATION</u>

15:26:50     2   BY MR. BERNSTEIN:

15:26:50     3   Q.   Hi, Ms. Wells.  Good afternoon.

15:26:55     4   A.   Hello.

15:26:56     5   Q.   So you first moved to Llano nine years ago?

15:26:59     6   A.   Yes.

15:27:00     7   Q.   And about five years ago, you first came across a

15:27:02     8   book that you didn't like in the Llano Library; is that

15:27:06     9   right?

15:27:06    10   A.   I don't know how long exactly but about.

15:27:10    11   Q.   And that book was titled Virgin Sex, right?

15:27:13    12   A.   Yes.

15:27:14    13   Q.   And Virgin Sex was a book that included references to

15:27:19    14   certain sexual acts; is that right?

15:27:21    15   A.   Yes.

15:27:22    16   Q.   If you could just speak up a today.

15:27:24    17   A.   Oh, yes.

15:27:28    18   Q.   And around that same time, you also came across a

15:27:31    19   book called Two Girls Mystery?

15:27:37    20   A.   That wasn't the title, I believe.  I don't recall the

15:27:41    21   title.  I think that was my description in the deposition.

15:27:45    22   Q.   Understood.  So you came across a different book

15:27:48    23   around that time that you also didn't like; is that

15:27:52    24   correct?

15:27:52    25   A.   That I didn't want my children to read.

| | | |
|---|---|---|
| 15:27:54 | 1 | Q.   Okay.  And you didn't want your children to read that |
| 15:27:58 | 2 | because it contained references to voodoo practices, |
| 15:28:01 | 3 | right? |
| 15:28:03 | 4 | A.   It contained voodoo practices as opposed to a |
| 15:28:07 | 5 | reference. |
| 15:28:09 | 6 | Q.   And you didn't want your children to check out either |
| 15:28:15 | 7 | of those books I just referenced, right? |
| 15:28:16 | 8 | A.   Correct. |
| 15:28:22 | 9 | Q.   Beginning last year, you started asking library staff |
| 15:28:26 | 10 | and county officials to remove certain books from the |
| 15:28:29 | 11 | Llano Library, right? |
| 15:28:30 | 12 | A.   Yes. |
| 15:28:32 | 13 | Q.   You asked Amber Milum to remove books? |
| 15:28:36 | 14 | A.   Yes. |
| 15:28:37 | 15 | Q.   You asked Judge Cunningham to remove books? |
| 15:28:40 | 16 | A.   Yes. |
| 15:28:41 | 17 | Q.   And you asked Commissioner Jerry Don Moss to remove |
| 15:28:46 | 18 | books? |
| 15:28:46 | 19 | A.   Yes. |
| 15:28:46 | 20 | Q.   You first asked library staff and county officials to |
| 15:28:51 | 21 | remove the Butt books, right? |
| 15:28:53 | 22 | A.   Yes. |
| 15:28:58 | 23 | Q.   And you asked Amber Milum to remove the Butt books? |
| 15:29:01 | 24 | A.   Yes. |
| 15:29:02 | 25 | Q.   You asked Judge Cunningham to remove the Butt books? |

15:29:05 1  A.   Yes.

15:29:06 2  Q.   And you asked Commissioner Moss to remove the Butt

15:29:10 3  books?

15:29:10 4  A.   Yes.

15:29:11 5  Q.   There are four Butt books, right?

15:29:18 6  A.   I'm not sure how many there are.

15:29:22 7  Q.   You asked for all of the Butt books to be removed,

15:29:25 8  though, right?

15:29:26 9  A.   I believe so.

15:29:28 10 Q.   And you asked for all of the Butt books to be removed

15:29:31 11 because one page of one of the books included an

15:29:33 12 illustration of a boy with his pants down and someone

15:29:38 13 painting on that child's butt; is that right?

15:29:39 14 A.   A picture of an adult man painting a child's butt.

15:29:48 15 Q.   Are you aware of any instance in which Butt books

15:29:51 16 were used to molest a child?

15:29:54 17 A.   No.

15:30:04 18 Q.   Were you aware that a stranger would come to the

15:30:07 19 library and read the Butt book to your child and use that

15:30:10 20 to molest him or her?

15:30:16 21 A.   I don't remember thinking that particular thought.

15:30:24 22 Q.   Other than you and your husband, no one else should

15:30:26 23 be able to control what your children read, right?

15:30:29 24 A.   Yes.

15:30:32 25 Q.   And you and your husband do, in fact, control what

| | | |
|---|---|---|
| 15:30:34 | 1 | your children read? |
| 15:30:37 | 2 | A.   I'm sorry.  Can you repeat the question? |
| 15:30:51 | 3 | Q.   I said you and your husband control what your |
| 15:30:53 | 4 | children read, right? |
| 15:30:54 | 5 | A.   We pre-read books or we'll look through. |
| 15:31:01 | 6 | Q.   And do you and your husband control who will read to |
| 15:31:05 | 7 | your children? |
| 15:31:12 | 8 | A.   I don't know that that's a yes or no answer. |
| 15:31:14 | 9 | Q.   Do you let strangers read to your children? |
| 15:31:17 | 10 | A.   I don't let strangers spend time with my children. |
| 15:31:21 | 11 | Q.   Knowing your children as you do, do they let |
| 15:31:25 | 12 | strangers read them books? |
| 15:31:29 | 13 | A.   Not to my knowledge, but that's what you teach your |
| 15:31:35 | 14 | children to do is stay away from strangers because |
| 15:31:37 | 15 | strangers purpose to meet your children in some way. |
| 15:31:43 | 16 | Q.   In the summer of 2021, you also asked for all of the |
| 15:31:46 | 17 | Fart books to be removed, right?  In the summer of 2021, |
| 15:32:04 | 18 | you also asked county officials and library staff to |
| 15:32:08 | 19 | remove the Fart books, right? |
| 15:32:09 | 20 | A.   Yes. |
| 15:32:10 | 21 | Q.   You asked Amber Milum to remove the Fart books? |
| 15:32:14 | 22 | A.   Amber and Tina. |
| 15:32:16 | 23 | Q.   And you asked Commissioner Moss to remove the Fart |
| 15:32:21 | 24 | books? |
| 15:32:21 | 25 | A.   I believe so. |

| 15:32:22 | 1 | Q.   And you asked Judge Cunningham to remove the Fart |
| 15:32:25 | 2 | books? |
| 15:32:25 | 3 | A.   I believe so. |
| 15:32:28 | 4 | Q.   And you believe that the Fart books don't belong in a |
| 15:32:31 | 5 | public library, right? |
| 15:32:33 | 6 | A.   I believe the Fart books don't belong in our library. |
| 15:32:40 | 7 | Q.   And the Llano Library is a public library, right? |
| 15:32:44 | 8 | A.   It's a county library. |
| 15:32:46 | 9 | Q.   But it's open to the public? |
| 15:32:48 | 10 | A.   Yes. |
| 15:32:51 | 11 | Q.   And you believe that books that pit people against |
| 15:32:55 | 12 | each other based on their race don't belong in a public |
| 15:32:58 | 13 | library, right? |
| 15:32:58 | 14 | A.   I believe that books that encourage someone -- a |
| 15:33:06 | 15 | child being more important than another child based on |
| 15:33:08 | 16 | their skin tone is harmful to children. |
| 15:33:12 | 17 | Q.   And those books don't belong in the public library, |
| 15:33:15 | 18 | right? |
| 15:33:17 | 19 | A.   Harmful content does not belong in the Llano library |
| 15:33:22 | 20 | in the children's -- I'm talking about children, in |
| 15:33:25 | 21 | particular. |
| 15:33:32 | 22 | Q.   You believe that certain books about homosexuality |
| 15:33:36 | 23 | don't belong in the Llano Library, right? |
| 15:33:39 | 24 | A.   Can you be specific about the area of the Llano |
| 15:33:43 | 25 | Library and which book, in particular? |

| 15:33:47 | 1 | Q.   You believe certain books about homosexuality don't |
| 15:33:51 | 2 | belong in the Llano Library at all; is that correct? |
| 15:33:53 | 3 | A.   I believe that heterosexual and homosexual |
| 15:33:59 | 4 | descriptive or graphic acts do not belong in the library, |
| 15:34:04 | 5 | in the children's section, in the minor's section. |
| 15:34:06 | 6 | Q.   You believe that they do belong in the adult section? |
| 15:34:13 | 7 | A.   My personal opinion is, I don't -- I wouldn't want |
| 15:34:17 | 8 | any graphically sexual content in the library because what |
| 15:34:21 | 9 | I believe libraries should hold. |
| 15:34:25 | 10 | Q.   So those books shouldn't belong in the library at |
| 15:34:28 | 11 | all, right? |
| 15:34:34 | 12 | A.   Do I believe?  Can you be specific with the question? |
| 15:34:38 | 13 | Q.   Sure.  So I'll go back to what I was saying before. |
| 15:34:41 | 14 | A book that pits people against each other based on their |
| 15:34:44 | 15 | race, you believe those books don't belong in the library |
| 15:34:47 | 16 | at all, right? |
| 15:34:48 | 17 | A.   I believe books that pit children against each other |
| 15:34:50 | 18 | based on how much melanin they have in their skin is |
| 15:34:55 | 19 | harmful to children and should not be in the minors' |
| 15:34:57 | 20 | section. |
| 15:34:58 | 21 | Q.   Should it be in the adult section? |
| 15:34:59 | 22 | A.   I think adults can handle those things. |
| 15:35:02 | 23 | Q.   So yes, it can be in the adult section? |
| 15:35:03 | 24 | A.   Yes. |
| 15:35:04 | 25 | Q.   Okay.  You believe books that might confuse children |

15:35:13  1  about their sexuality don't belong in the Llano library;

15:35:17  2  is that right?

15:35:17  3  A.   They don't belong in the minors' section.

15:35:19  4  Q.   But those books belong in the adult section?

15:35:23  5  A.   If they were popular, I guess so.

15:35:54  6  Q.   Could we put Exhibit 76 up?  And you could take a

15:35:58  7  look in that binder there.  Ms. Wells, do you recognize

15:36:28  8  this document?

15:36:29  9  A.   Yes.

15:36:30  10  Q.   What is it?

15:36:33  11  A.   Harmful content analysis.

15:36:38  12  Q.   And what is a harmful content analysis?

15:36:42  13  A.   This is an example of a resource, someone like

15:36:51  14  myself, a parent could have to come to the director, a

15:36:57  15  librarian, a librarian with objective reasons to ask for a

15:37:03  16  book to be removed as opposed to just opinion and

15:37:07  17  emotional response.

15:37:08  18  Q.   So it's a helpful tool to determine whether a book

15:37:12  19  belongs in the library, right?

15:37:14  20  A.   It would be helpful for a parent to ask for removal

15:37:19  21  of a book.

15:37:20  22  Q.   So is this form only for parents?

15:37:24  23  A.   As I saw it, I was looking at it from a parent's

15:37:28  24  perspective.

15:37:29  25  Q.   Is there anything in this document that suggests it's

15:37:32  1   only for parents?

15:37:37  2   A.   No.

15:37:51  3   Q.   Could we move to admit Exhibit 76 in evidence?

15:37:55  4        MR. MITCHELL:  No objection.

15:37:56  5        THE COURT:  So admitted.

15:37:58  6   Q.   (BY MR. BERNSTEIN) So can you read No. 11 for us,

15:38:32  7   please?

15:38:33  8   A.   Eleven, promotes globalism or anti-patriotism such as

15:38:38  9   burning of the U.S. flag, demeaning towards armed services

15:38:41  10  or members, critical of our nation, example, America Is

15:38:47  11  Racist, et cetera.

15:38:50  12  Q.   So if a book touches on this subject, it doesn't

15:38:53  13  belong in the Llano Library, right?

15:38:56  14  A.   It depends on the book and the content of the book.

15:39:01  15  Q.   Well, if the content of the book was promoting

15:39:04  16  globalism, anti-patriotism?

15:39:08  17  A.   I would have to read the specific book or the passage

15:39:14  18  it's referring to.  As you know, there could be a person

15:39:18  19  in the book promoting that, but it doesn't mean the book

15:39:22  20  is promoting it.  It could just be the character or it

15:39:24  21  could be a nonfiction work.

15:39:27  22  Q.   So you would need to read book before you could

15:39:30  23  determine whether it belonged in the library or not?

15:39:33  24  A.   Whether I thought it belonged in the library or would

15:39:37  25  use a form like this, yes.

| | | |
|---|---|---|
| 15:39:39 | 1 | Q.   Earlier, you said you requested that all of the Butt |
| 15:39:46 | 2 | books and all the Fart books be removed from the library, |
| 15:39:48 | 3 | right? |
| 15:39:48 | 4 | A.   Yes. |
| 15:39:48 | 5 | Q.   Did you read all of those books? |
| 15:39:51 | 6 | A.   I can't remember. |
| 15:40:31 | 7 | Q.   You were deposed in this case a couple of weeks ago; |
| 15:40:33 | 8 | is that right? |
| 15:40:34 | 9 | A.   Last week, yes. |
| 15:40:35 | 10 | Q.   And before you took that deposition, you took an oath |
| 15:40:39 | 11 | like you just took before you started testifying; is that |
| 15:40:41 | 12 | right? |
| 15:40:41 | 13 | A.   Yes. |
| 15:40:42 | 14 | Q.   And you swore to tell the truth? |
| 15:40:44 | 15 | A.   Yes. |
| 15:40:47 | 16 | Q.   So during that deposition, you were asked, did you |
| 15:41:02 | 17 | read all of the Butt books and you responded, the ones |
| 15:41:08 | 18 | that we had, I browsed through; is that correct? |
| 15:41:12 | 19 | A.   I believe so.  That's why I said I couldn't remember |
| 15:41:15 | 20 | if I had read them all the way and that's why I gave that |
| 15:41:17 | 21 | answer.  They weren't difficult to read.  It was a quick |
| 15:41:22 | 22 | read. |
| 15:41:33 | 23 | Q.   Before the Butt books were removed from the library, |
| 15:41:35 | 24 | you checked them out so that other patrons could not; is |
| 15:41:44 | 25 | that right? |

| | | |
|---|---|---|
| 15:41:44 | 1 | A.    Yes. |
| 15:41:48 | 2 | Q.    Did you discuss that strategy with anyone else? |
| 15:41:54 | 3 | A.    Yes. |
| 15:41:55 | 4 | Q.    Who? |
| 15:41:57 | 5 | A.    I don't remember. |
| 15:42:00 | 6 | Q.    Did anyone else check out the Butt books that no one |
| 15:42:04 | 7 | else could check them out? |
| 15:42:10 | 8 | A.    I'm not sure. |
| 15:42:10 | 9 | Q.    Did you check out any other books that you didn't |
| 15:42:13 | 10 | think belonged in the library so that other patrons |
| 15:42:16 | 11 | couldn't check them out? |
| 15:42:17 | 12 | A.    Not that I recall, but I kept those books checked out |
| 15:42:21 | 13 | in order to protect children from being molested.  It |
| 15:42:24 | 14 | wasn't for patrons, it was to protect children. |
| 15:42:30 | 15 | Q.    In 2021, you decided you wanted to have more input |
| 15:42:34 | 16 | into which books were being ordered by the Llano County |
| 15:42:38 | 17 | Library, right? |
| 15:42:39 | 18 | A.    Not just myself.  Parents or patrons. |
| 15:42:48 | 19 | Q.    I'm sorry, I'm a bit confused by that answer.  Did |
| 15:42:51 | 20 | you? |
| 15:42:54 | 21 | A.    My answer is, I wasn't thinking just myself. |
| 15:43:04 | 22 | Q.    Meaning not -- it was not only you who wanted to have |
| 15:43:08 | 23 | more input?  Or you wanted to have more input on behalf of |
| 15:43:11 | 24 | you and others? |
| 15:43:12 | 25 | A.    Neither of those.  It was to have transparency.  I |

15:43:21  1  know what you're referring to the e-mail and the

15:43:24  2  discussion at the deposition.  It was for transparency

15:43:27  3  that patrons and/or parents like myself could have input

15:43:31  4  in what was being purchased for the minor section.

15:43:38  5  Q.   And you wanted to have this input so you could bring

15:43:41  6  certain books into the Llano Library and keep other books

15:43:45  7  out; is that right?

15:43:48  8  A.   I didn't have any books in particular in my head, if

15:43:53  9  that's what you're referring.  Because you said certain

15:43:59  10  books.

15:44:00  11  Q.   You wanted input so you could keep books out and

15:44:04  12  bring other books in; is that right?

15:44:10  13  A.   I would say it was to have input as to which books

15:44:15  14  came in, the new books that came into the minor section.

15:44:22  15  Q.   Because there were certain books you didn't want

15:44:24  16  coming into the minor section, right?

15:44:27  17  A.   Because there were books that I needed as a

15:44:32  18  home-school mother and just as a mother that we did not

15:44:34  19  have or that had been weeded and were gone.

15:44:39  20  Q.   There were also some books that you didn't want

15:44:41  21  coming into the library, though, right?

15:44:45  22  A.   I don't recall if that was my motivation.

15:44:50  23  Q.   In early 2022, you were appointed to the Llano County

15:44:56  24  Library board, right?

15:44:57  25  A.   Yes.

15:44:57  1   Q.  And you were appointed by Commissioner Jerry Don

15:45:00  2   Moss?

15:45:00  3   A.  Yes.

15:45:01  4   Q.  You didn't submit an application for the library

15:45:03  5   board, right?

15:45:04  6   A.  I did not submit an application.

15:45:06  7   Q.  And Commissioner Moss didn't publicly solicit

15:45:09  8   applications for the library board, did he?

15:45:11  9   A.  Not to my knowledge.

15:45:14  10  Q.  And you wanted the library board to be appointment

15:45:17  11  only, right?

15:45:19  12  A.  I thought that would be a good idea.

15:45:23  13  Q.  You were worried that an open application process

15:45:27  14  would allow anyone to try to join the library board,

15:45:31  15  right?

15:45:42  16  A.  I can't recall the exact reason.

15:45:45  17  Q.  You were worried because you wanted to make sure that

15:45:48  18  certain people couldn't join the board, right?

15:45:53  19          MR. MITCHELL:  Your Honor, objection.  Asked and

15:45:55  20  answered.  She's already said she doesn't know.

15:45:57  21          THE COURT:  No.  She didn't.  She said she can't

15:45:59  22  recall.

15:46:00  23          MR. MITCHELL:  She can't recall.

15:46:01  24          THE COURT:  If you want to probe that a little

15:46:03  25  bit, see if you can help her recall, that's fine.

15:46:05  1          MR. MITCHELL:  All right.  Thanks.

15:46:06  2   A.   I'm sorry.  Can you repeat?

15:46:09  3   Q.   (BY MR. BERNSTEIN) Well, you mentioned you want the

15:46:12  4   library appointment to be appointment only, so you

15:46:14  5   remember that, right?

15:46:15  6   A.   I do.

15:46:16  7   Q.   I'm asking whether you wanted it to be appointment

15:46:19  8   only is because you didn't want certain people to be able

15:46:21  9   to join the board.

15:46:23  10  A.   No.  I don't recall having certain people in my head.

15:46:27  11  Q.   When I say certain, I don't mean individuals that you

15:46:29  12  identified, but you didn't want anyone to be able to join

15:46:33  13  the board, right?

15:46:34  14  A.   Just anyone.  I guess that would be true.  I'm sorry.

15:46:43  15  That's kind of vague, so I'm not sure how to answer that.

15:46:46  16  Q.   You wanted people on the board who have the same

15:46:50  17  ideology as you, right?

15:46:52  18  A.   I want some of those people on the board, yes.

15:46:54  19  Q.   Did you want anyone on the board who had different

15:46:57  20  ideologies from you?

15:47:00  21  A.   That would even out the board.  I don't think I was

15:47:04  22  opposed to different ideas.

15:47:05  23  Q.   So why did you want the application process to be

15:47:08  24  closed?

15:47:11  25          MR. MITCHELL:  Your Honor, objection.  This was

15:47:12   1   asked and answered.

15:47:13   2   A.   I don't recall.

15:47:22   3   Q.   (BY MR. BERNSTEIN) You were the secretary of the

15:47:25   4   library board.

15:47:25   5   A.   Yes.

15:47:25   6   Q.   And you were also on the PR and collections

15:47:29   7   committees?

15:47:29   8   A.   Yes.

15:47:29   9   Q.   Are the collection committee and the acquisition

15:47:32   10  committee the same thing?

15:47:36   11  A.   Acquisitions is under collections.  The process of

15:47:42   12  acquiring books is under the larger umbrella.  Under the

15:47:46   13  umbrella of collections.

15:47:48   14  Q.   But if someone referenced the acquisition committee,

15:47:50   15  would they be talking about the collection committee?

15:47:56   16  A.   I'm not sure because we didn't acquire books.

15:48:03   17  Q.   What were all of the committees on the library board?

15:48:06   18  A.   I don't recall them all.  There was the PR, the

15:48:15   19  collections, policy.  I'm sorry, it's been a while since

15:48:27   20  we've met, so I can't recall them all.

15:48:29   21  Q.   When you were appointed to the library board in 2022,

15:48:35   22  the entire library board was newly appointed, right?

15:48:38   23  A.   Except for Gay Baskin was not newly appointed.

15:48:42   24  Q.   And prior to your appointment on the library board,

15:48:45   25  were there any committees?

| | | |
|---|---|---|
| 15:48:49 | 1 | A. I don't know. |
| 15:48:53 | 2 | Q. And you hadn't heard of the library advisory board |
| 15:48:56 | 3 | until shortly before you were appointed; is that right? |
| 15:48:59 | 4 | A. Correct. |
| 15:48:59 | 5 | Q. And you joined the library board so that you could be |
| 15:49:06 | 6 | involved in the purchasing decisions for the library; is |
| 15:49:09 | 7 | that right? |
| 15:49:09 | 8 | A. I was appointed to the library advisory board. I did |
| 15:49:13 | 9 | not join it. |
| 15:49:15 | 10 | Q. You had to agree to join it, right? |
| 15:49:18 | 11 | A. I had to agree to the appointment. |
| 15:49:23 | 12 | Q. And you agreed in part because you wanted to exert |
| 15:49:26 | 13 | some control over which books were coming into the |
| 15:49:29 | 14 | library, right? |
| 15:49:29 | 15 | A. No, I wouldn't say that. That's putting words in my |
| 15:49:35 | 16 | mouth. |
| 15:49:38 | 17 | Q. As a member of the library board and collections |
| 15:49:42 | 18 | committee, you wanted to collect information regarding the |
| 15:49:44 | 19 | library so that you could give good advice to the |
| 15:49:48 | 20 | commissioners' court, right? |
| 15:49:49 | 21 | A. I'm sorry. Could you repeat that? |
| 15:49:52 | 22 | Q. As a member of the library board and collections |
| 15:49:56 | 23 | committee, you wanted to collect information so that you |
| 15:49:58 | 24 | could provide advice to the commissioners' court, right? |
| 15:50:03 | 25 | A. As part of the library advisory board and the |

15:50:07 1 collections committee, yes, we were getting as much

15:50:12 2 information as possible to make a good advisement.  The

15:50:16 3 collection committee to make a good advisement to the

15:50:19 4 advisory board, which would then vote upon the advisement

15:50:22 5 to the commissioners' court.

15:50:24 6 Q.   And you were on both the collection committee and the

15:50:27 7 advisory board?

15:50:28 8 A.   The collection committee is a committee of the

15:50:33 9 advisory board and I am on the collections committee, or I

15:50:36 10 was.

15:50:36 11 Q.   So when the collection committee pushes something up

15:50:39 12 to the advisory board, you vote on both that initial

15:50:41 13 committee vote and when it goes up to the full board,

15:50:44 14 right?

15:50:44 15 A.   Yes.

15:50:44 16 Q.   And you wanted to give good advice as to the best

15:50:47 17 books to be added to the Llano Library, right?

15:50:55 18 A.   I wouldn't say that.

15:51:01 19 Q.   As part of the collections committee, you wanted to

15:51:04 20 see which books would best serve the typical Llano patron,

15:51:08 21 right?

15:51:08 22 A.   Yes.

15:51:12 23 Q.   Okay.  So in other words, you wanted to figure out

15:51:16 24 which books would best be acquired by the Llano Library,

15:51:20 25 right?

15:51:21  1   A.   We were going to research which books that we have

15:51:31  2   and have yet to have that would benefit the Llano County

15:51:40  3   Library System.

15:51:40  4   Q.   And you didn't want the Llano County Library System

15:51:43  5   to purchase any books that you didn't think belonged in

15:51:47  6   the library, right?

15:51:48  7   A.   I wouldn't say that.

15:51:50  8   Q.   So you wouldn't have any objection to the Llano

15:51:58  9   County library buying Butt books?

15:51:59  10  A.   I think you need to be specific whether minor or

15:52:03  11  adults.

15:52:04  12  Q.   I'm asking you didn't want the Llano County library

15:52:08  13  to purchase books that you thought did not belong in the

15:52:13  14  Llano County Library; is that right?

15:52:14  15  A.   Me personally, I did not -- I don't want as a citizen

15:52:21  16  of Llano for books to be purchased for minors that are

15:52:25  17  harmful in content to children.

15:52:28  18  Q.   And when you were serving as a member of the

15:52:30  19  collection committee, would you ever recommend purchasing

15:52:35  20  a book that you personally didn't think belonged in the

15:52:39  21  Llano Library?

15:52:40  22  A.   Why would I recommend a book that I didn't think

15:52:43  23  belonged in the library?  I guess I need a specific title

15:52:47  24  of the book and will need to have read it.  Just because I

15:52:53  25  don't -- I'm not a Sci-Fi reader, but it doesn't mean that

15:52:56  1  I wouldn't say don't bring Sci-Fi into the Llano Library.

15:53:12  2  Q.   As part of the collections committee and library

15:53:15  3  advisory board, you did research into what books would

15:53:18  4  best serve the Llano community, right?

15:53:22  5  A.   We began to gather data.

15:53:26  6  Q.   And you spoke with Rhonda Schneider when doing this

15:53:30  7  research; is that right?

15:53:31  8  A.   Rhonda Schneider was on the collections committee.

15:53:33  9  Q.   So you spoke with her about this?

15:53:35  10  A.   Yes.  We all did.

15:53:37  11  Q.   And Rhonda used to work at the library, right?

15:53:39  12  A.   Yes.

15:53:40  13  Q.   And it was helpful for you to get a librarian's

15:53:49  14  perspective on figuring out which books would best serve

15:53:52  15  the community, right?

15:53:53  16  A.   Yes.

15:53:54  17  Q.   You and Rhonda are friends?

15:53:57  18  A.   Yes.

15:54:00  19  Q.   You've spoken with her outside of library meetings

15:54:05  20  about inappropriate books at the Llano Library, right?

15:54:08  21  A.   Yes.

15:54:08  22  Q.   And she was the first or one of the first people to

15:54:14  23  tell you about the Butt books in the Llano Library; is

15:54:17  24  that right?

15:54:17  25  A.   She told me about the Butt books.

15:54:20 **1** Q.   She told you there was a scene in it that she thought

15:54:23 **2** was inappropriate?

15:54:24 **3** A.   Yes.

15:54:25 **4** Q.   And you two agreed that certain books like the Butt

15:54:29 **5** books didn't belong in the library; is that right?

15:54:36 **6** A.   Could you repeat the question?

15:54:38 **7** Q.   You and Rhonda agreed that certain books like the

15:54:41 **8** Butt books didn't belong in the Llano County Library?

15:54:45 **9** A.   We agreed that the Butt books did not belong in the

15:54:49 **10** hands of children.

15:54:54 **11** Q.   Did you believe that they had a place in Llano County

15:55:00 **12** Library?

15:55:00 **13** A.   Me personally, no, because they're meant for

15:55:06 **14** children.  Adults are going to get the book, anyway.

15:55:10 **15** Q.   And you and Rhonda agree that it would be a good idea

15:55:14 **16** to check out certain books from the library so that all

15:55:16 **17** the patrons couldn't check them out; is that right?

15:55:20 **18** A.   I don't think I had a conversation with Rhonda.  Or I

15:55:22 **19** don't remember having that conversation with Rhonda.

15:55:25 **20** Q.   When determining which books would best serve Llano

15:55:30 **21** County's patrons, you didn't speak with any of the current

15:55:33 **22** library staff, right?

15:55:34 **23** A.   I'm sorry, can you repeat that?

15:55:36 **24** Q.   When determining which books would best serve Llano

15:55:41 **25** County's patrons, you didn't speak with any of the current

15:55:43  1  library staff, right?

15:55:44  2  A.   We hadn't gotten to that point yet as a committee --

15:55:48  3  as a collections committee member, you're saying?

15:55:50  4  Q.   Yes.

15:55:51  5  A.   Yes.  We haven't gotten there yet.

15:55:53  6  Q.   You didn't as a collection committee member conduct a

15:55:56  7  poll or a survey of Llano County residents concerning

15:56:00  8  which books they wanted at the library?

15:56:02  9  A.   No.  We just started amassing our data.  We hadn't

15:56:11  10  even done all the stuff that we had planned or thought of.

15:56:13  11  Q.   You didn't have an open meeting where you invited

15:56:16  12  people from Llano County to come and tell you which books

15:56:19  13  they wanted to read?

15:56:26  14  A.   Well, you're saying that as though I would be opposed

15:56:29  15  to that.  It just wasn't even something we spoke of that I

15:56:34  16  recall.

15:56:34  17  Q.   Well, the library advisory board closed its meetings

15:56:38  18  to the public, right?

15:56:39  19  A.   Yes.

15:56:40  20  Q.   And you voted to keep the meetings closed?

15:56:44  21  A.   Yes.  I believe it was almost unanimous.

15:56:49  22  Q.   And the library board also requested that Amber Milum

15:56:53  23  not be present at all meetings and just come on an

15:56:56  24  as-needed basis, right?

15:56:59  25  A.   That was something that came up.

15:57:01 1 Q.   And otherwise, librarians were not to come to the

15:57:04 2 library board meetings?

15:57:07 3 A.   That's my understanding.

15:57:11 4 Q.   You would update Commissioner Moss after library

15:57:15 5 board meetings from time to time; is that right?

15:57:18 6 A.   Correct.

15:57:21 7 Q.   And when you updated Mr. Moss, Commissioner Moss,

15:57:25 8 rather, you included meeting minutes and notes regarding

15:57:30 9 things that were not in the minutes; is that right?

15:57:33 10 A.   Correct.

15:57:36 11 Q.   Can you pull Exhibit 19 up, please?  Could you go to

15:57:59 12 page 2.  About halfway down the page, do you see an e-mail

15:58:18 13 that you sent?

15:58:19 14 A.   Yes.

15:58:22 15 Q.   And you sent this e-mail to Commissioner Moss on

15:58:25 16 January 19, 2022; is that right?

15:58:27 17 A.   Yes.

15:58:51 18 Q.   So here, you were -- where it says on to the stuff

15:58:54 19 not in the meeting notes, you were updating Commissioner

15:58:58 20 Moss on what happened at the meeting but what was not

15:59:00 21 included in the minutes; is that right?

15:59:01 22 A.   Yes.

15:59:02 23 Q.   Okay.  Can you just read that first paragraph,

15:59:05 24 please?

15:59:05 25 A.   We discovered that the National Coalition Against

15:59:11  1    Censorship wrote a letter to all the commissioners.  It
15:59:13  2    was asked of Amber how NCAC got the specific information
15:59:17  3    as to which books were removed.  She denied giving them
15:59:20  4    this information and said Tina hadn't either.  It was
15:59:23  5    asked then how they had accessed this information.  She
15:59:28  6    said she did not know and then, she gave a friend the
15:59:32  7    other book that she did not throw away, In The Night
15:59:35  8    Kitchen.  By the way, some of us saw the photos from the
15:59:38  9    other book, they were disgusting.  So thank you for making
15:59:42  10   her remove It's Perfectly Normal.
15:59:45  11   Q.   So the top of that paragraph you just read, you
15:59:48  12   mentioned the National Coalition Against Censorship or
15:59:50  13   NCAC wrote a letter to all the commissioners on the
15:59:53  14   commissioners' court, right?
15:59:54  15   A.   Yes.
15:59:54  16   Q.   And did Commissioner Moss tell you that?
15:59:57  17   A.   No.
15:59:58  18   Q.   Who told you that?
15:59:59  19   A.   A friend sent me an e-mail or told me.  I can't
16:00:06  20   remember, I'm sorry.  But a friend told me about it and
16:00:09  21   so, I went online and onto their website and discovered.
16:00:13  22   Q.   And the letter had to do with the removal of books
16:00:16  23   from the Llano County libraries; is that right?
16:00:19  24   A.   Yes.
16:00:19  25   Q.   And the library board asked Ms. Milum how the NCAC

16:00:23  1    got information as to which books were removed?

16:00:28  2    A.    Yes.

16:00:29  3    Q.    And it did that because it thought it was

16:00:32  4    inappropriate for a Llano County librarian to leak the

16:00:36  5    list of removed books; is that right?

16:00:40  6    A.    I don't recall the reason why it was asked.

16:00:52  7    Q.    Move to admit Exhibit 19 into evidence.

16:00:56  8          MR. MITCHELL:  No objections, your Honor.

16:00:57  9          THE COURT:  So admitted.

16:01:05  10   Q.    (BY MR. BERNSTEIN) Once you got on that library

16:01:07  11   board, you asked Ms. Milum to submit a list of books she

16:01:12  12   planned to purchase, right?

16:01:13  13   A.    To the collections committee, yes.

16:01:27  14   Q.    You wanted those lists so that you could have input

16:01:36  15   into which books were coming into the Llano County

16:01:38  16   Library, right?

16:01:39  17   A.    No.

16:02:26  18   Q.    You're familiar with the Krause list that we've been

16:02:28  19   talking about today?

16:02:29  20   A.    Yes.

16:02:30  21   Q.    And you've previously referred to the Krause list as

16:02:34  22   the 16-page list of CRT and LGBTQ books; is that right?

16:02:44  23   A.    I believe so.

16:02:46  24   Q.    Could we put Exhibit 8 up, please.  The top e-mail on

16:03:11  25   the second page.  This is an e-mail that you sent on

| 16:03:20 | 1 | November 11, 2021; is that right?  It's on the top of page |
| 16:03:33 | 2 | 2. |
| 16:03:42 | 3 | A.   Yes.  I wrote this.  It's e-mails from me that you're |
| 16:03:46 | 4 | asking. |
| 16:03:46 | 5 | Q.   Yes.  Who did you send this e-mail to? |
| 16:03:55 | 6 | A.   I believe I sent the e-mail to a bunch of the Llano |
| 16:04:03 | 7 | County citizens that were wanting to be updated on the |
| 16:04:08 | 8 | goings on of commissioners' court because they couldn't be |
| 16:04:12 | 9 | there. |
| 16:04:13 | 10 | Q.   Move to admit Exhibit 8 into evidence. |
| 16:04:15 | 11 | MR. MITCHELL:  No objection. |
| 16:04:16 | 12 | THE COURT:  So admitted. |
| 16:04:19 | 13 | Q.   (BY MR. BERNSTEIN) And then, the second paragraph |
| 16:04:20 | 14 | that begins with Chris Jones has combed.  Can you read |
| 16:04:30 | 15 | that first sentence, please? |
| 16:04:32 | 16 | A.   Chris Jones has combed through that 16-page list of |
| 16:04:39 | 17 | CRT and LGBTQ books to see which we have in Llano County |
| 16:04:46 | 18 | libraries. |
| 16:04:47 | 19 | Q.   And who is Chris Jones? |
| 16:04:49 | 20 | A.   A citizen of Llano County. |
| 16:04:53 | 21 | Q.   And CRT stands for critical race theory, right? |
| 16:04:57 | 22 | A.   Yes. |
| 16:04:58 | 23 | Q.   And LGBTQ stands for lesbian, gay, bisexual, |
| 16:05:05 | 24 | transgender and queer; is that correct? |
| 16:05:06 | 25 | A.   Yes. |

16:05:09  1   Q.   And Chris Jones reviewed the Krause list and

16:05:14  2   identified for you which books on that list were in the

16:05:18  3   Llano Library, right?

16:05:19  4   A.   She didn't identify them for me.

16:05:21  5   Q.   She identified those books and sent you the list in

16:05:25  6   which they were identified; is that right?

16:05:27  7   A.   She did not send me the list alone.  It was other

16:05:34  8   Llano County residents.

16:05:35  9   Q.   She didn't send you the list?

16:05:37  10  A.   I don't believe it was just to me personally.  I

16:05:40  11  believe it was on an e-mail.

16:05:42  12  Q.   But she sent the list to you?

16:05:45  13  A.   I received an e-mail in which she sent to many people

16:05:49  14  and I was one of the recipients of that e-mail.

16:05:52  15  Q.   And could we show Exhibit 10, which is already in.

16:06:01  16  Is this the list that she sent to you?

16:06:07  17  A.   I don't remember what her list looked like.  I did

16:06:11  18  see her list, but I'm sorry, I didn't pay close attention

16:06:19  19  to it, I guess is the word.

16:06:20  20  Q.   And you reviewed some of the books on that list to

16:06:23  21  determine whether you thought they were inappropriate,

16:06:26  22  right?

16:06:32  23  A.   I'm not sure if the book I read was on this list.

16:06:42  24  Q.   Quickly is -- did I put 8 in?  Yeah, it is.  Sorry.

16:06:52  25       You said you don't think the book you read was on

16:06:54  1  this list.

16:06:55  2  A.   I said I'm not sure if it was.  I don't -- because I

16:07:00  3  wasn't combing through this list.  That's what I mean.

16:07:04  4  I'm not sure if the book I read was a book that was on

16:07:07  5  this list.

16:07:07  6  Q.   And when you say a book you read, you mean you read a

16:07:10  7  book to determine whether you thought it was

16:07:12  8  inappropriate?

16:07:14  9  A.   Chris Jones had some books that she had checked out

16:07:19  10  from the library and asked a few of us to read them to see

16:07:24  11  if they were inappropriate or harmful in content for

16:07:28  12  minors.

16:07:29  13  Q.   And some of those books were about CRT, right?

16:07:34  14  A.   I don't remember.

16:07:39  15  Q.   Can we play clip 9.

16:07:43  16       (Audio and video file played.)

16:07:46  17  Q.   "Do you remember the subject matter of any of the

16:07:50  18  books that you researched?

16:07:51  19  A.   Yes, some.

16:07:54  20  Q.   Okay.  Tell me about it.

16:07:57  21  A.   Well, there were some about sexual experiences.

16:08:05  22  There were some about -- about CRT.  That's what I

16:08:17  23  remember.

16:08:19  24  Q.   Okay.  The ones about -- do you know what CRT stands

16:08:23  25  for?

16:08:24  1   A.   I can't remember what it stands for, but you can tell

16:08:29  2   me.

16:08:29  3   Q.   The books that you researched, you said there was

16:08:36  4   some about CRT.  What was the general nature?

16:08:39  5   A.   We related to that umbrella of topics.  The one that

16:08:44  6   I recall was pitting races against each other, pitting

16:08:54  7   people with different skin tones against each other.

16:08:56  8   Q.   Do you remember what it was called by any chance?

16:08:58  9   A.   I don't.  I'm sorry.

16:09:01  10  Q.   Did you think that it was appropriate?

16:09:05  11  A.   No.  It's not appropriate to pit people against each

16:09:08  12  other.

16:09:09  13  Q.   Did you think it was appropriate to have that book in

16:09:11  14  the library?

16:09:14  15  A.   I don't remember if that book was in our library.

16:09:19  16  It's just one of the ones I remembered having read.

16:09:22  17  Q.   Do you think it's appropriate to have a book like

16:09:24  18  that in the Llano County Library?

16:09:28  19  A.   No.  I don't believe it's appropriate to have books

16:09:32  20  where one child thinks he's better than another because of

16:09:36  21  his skin tone."

16:09:37  22          (End of audio/video file.)

16:09:39  23  Q.   So that was your testimony that you made under oath

16:09:42  24  last week, you said, right?

16:09:44  25  A.   Yes.

| | | |
|---|---|---|
| 16:09:44 | 1 | Q.   And was that true? |
| 16:09:48 | 2 | A.   I think I was confusing the questions because I said |
| 16:09:52 | 3 | in there I hadn't read it, but I had read about it.  So I |
| 16:09:59 | 4 | think because there were a couple of times where the |
| 16:10:01 | 5 | question was kind of confusing, but she would jump around |
| 16:10:05 | 6 | about topics.  So to me, it sounds like I was -- we had |
| 16:10:09 | 7 | talked about CRT books and that I had read about some, but |
| 16:10:13 | 8 | the specific book I had read was about a sexual experience |
| 16:10:17 | 9 | or something sexual because we talked later on at the |
| 16:10:22 | 10 | deposition about the book that I did read and it was not a |
| 16:10:25 | 11 | CRT book. |
| 16:10:26 | 12 | So I think that it was -- I think that was the |
| 16:10:29 | 13 | confusion in there because I recall the attorney having to |
| 16:10:35 | 14 | -- us having to say, are you talking about this time or |
| 16:10:38 | 15 | later. |
| 16:11:31 | 16 | Q.   So when you were asked, do you think it's appropriate |
| 16:11:34 | 17 | to have a book like that in the Llano County Library and |
| 16:11:36 | 18 | you said no, I don't believe it's appropriate to have |
| 16:11:39 | 19 | books where one child thinks he's better than another |
| 16:11:41 | 20 | because of his skin tone, you were talking about a book |
| 16:11:44 | 21 | about sexual conduct? |
| 16:11:45 | 22 | A.   No.  What I'm saying is that the attorney was |
| 16:11:50 | 23 | deposing me kept jumping -- not all the time but did |
| 16:11:55 | 24 | several times started jump with topics, and to me, it |
| 16:11:59 | 25 | sounds like I was referring to something else.  I heard |

16:12:01　1　the same thing you did.  I'm just telling you, it sounded

16:12:05　2　like I said I read about it as in looked into but not the

16:12:13　3　one I had read.  The one I read, it sounded like it was --

16:12:18　4　it wasn't related to a sexual experience or sexual.

16:12:21　5　Q.　So when you say, I don't believe it's appropriate to

16:12:23　6　have books where one child thinks he's better than the

16:12:25　7　other because of his skin tone, is that a true statement?

16:12:28　8　A.　In the children's section, yes.  That's a true

16:12:31　9　statement.

16:12:33　10　Q.　What about in the adult section?

16:12:35　11　A.　I believe I said before that adults can handle

16:12:40　12　material like that.

16:12:45　13　Q.　If you thought a book from the Krause list did not

16:12:49　14　belong in the library, would you inform Ms. Milum,

16:12:53　15　Commissioner Moss, or Judge Cunningham?

16:12:55　16　A.　If after having read it and I found it harmful to

16:12:58　17　children, yes, I would have gone to Amber.

16:13:05　18　Q.　Just a moment ago, you said you didn't read these

16:13:07　19　books necessarily.  You researched them by looking online;

16:13:10　20　is that right?

16:13:11　21　A.　Some of them.

16:13:14　22　Q.　So sometimes you asked for books to be removed even

16:13:18　23　though you hadn't read them, right?

16:13:21　24　A.　I didn't ask for any books to be removed other than

16:13:24　25　the ones that I had read.  Or -- yeah, ones that I

16:13:34  1  actually had looked at, you know.

16:13:52  2  Q.   And if there was a book on the Krause list that you

16:13:55  3  thought didn't belong in the library, you would ask Ms.

16:14:00  4  Milum, Commissioner Moss, and Judge Cunningham to remove

16:14:03  5  the book, right?

16:14:06  6  A.   I don't recall having read any of the books on the

16:14:09  7  Krause list or asking for any of the books on the Krause

16:14:12  8  list to be removed.

16:14:13  9  Q.   If you thought any book should not -- did not belong

16:14:17  10  in the library, you would ask Ms. Milum, Mr. Moss, and

16:14:21  11  Judge Cunningham to remove the book; is that right?

16:14:23  12  A.   If I thought there was any book that was harmful to

16:14:26  13  minors that was in the library, I would speak with the

16:14:31  14  director, Amber, to have it removed.

16:14:32  15  Q.   And also, with Commissioner Moss, right?

16:14:36  16  A.   Only if Amber disagreed with me.

16:14:45  17  Q.   And you'd also speak with Judge Cunningham; is that

16:14:50  18  right?

16:14:50  19  A.   Only if Amber disagreed with me.

16:14:52  20  Q.   And you'd ask them to remove the book because they

16:14:56  21  each removed books in the past; is that right?

16:15:03  22  A.   Can you be specific about which book we're talking

16:15:05  23  about?

16:15:05  24  Q.   If a book on the Krause list did not belong in the

16:15:08  25  library in your opinion, you would ask Ms. Milum,

| | | |
|---|---|---|
| 16:15:12 | 1 | Commissioner Moss, or Judge Cunningham to remove it; is |
| 16:15:17 | 2 | that right? |
| 16:15:17 | 3 | A.   But that wasn't your question you just asked me. |
| 16:15:20 | 4 | Q.   Please answer that question. |
| 16:15:22 | 5 | A.   If there was -- I'm sorry, repeat that. |
| 16:15:23 | 6 | Q.   If there was a book on the Krause list that you |
| 16:15:26 | 7 | thought did not belong in the library, would you inform |
| 16:15:29 | 8 | Ms. Milum? |
| 16:15:30 | 9 | A.   If there was a book I found on the Krause list I |
| 16:15:33 | 10 | found was harmful to minors, I would inform Ms. Milum. |
| 16:15:36 | 11 | Q.   Would you ask her to remove the book? |
| 16:15:38 | 12 | A.   Yes. |
| 16:15:38 | 13 | Q.   And would you ask her to remove the book because |
| 16:15:41 | 14 | she's removed books in the past? |
| 16:15:43 | 15 | A.   I would ask her to remove the book because I thought |
| 16:15:46 | 16 | it was harmful to minors. |
| 16:15:51 | 17 | Q.   In late 2021, you, Eva Carter and Jo Ares visited |
| 16:15:57 | 18 | Judge Cunningham to discuss books at the Llano County |
| 16:16:02 | 19 | Library, right? |
| 16:16:02 | 20 | A.   Yes. |
| 16:16:02 | 21 | Q.   And you met with Judge Cunningham because you thought |
| 16:16:05 | 22 | he could remove books from the library; is that right? |
| 16:16:17 | 23 | A.   I wasn't sure how that worked so that was Eva Carter |
| 16:16:23 | 24 | suggested we go to the judge after Amber had disagreed |
| 16:16:27 | 25 | with us. |

16:16:28  1  Q.   You asked the judge to remove books when you met with

16:16:31  2  him; is that right?

16:16:32  3  A.   Yes.

16:16:32  4  Q.   Because you thought he could remove the books; is

16:16:34  5  that right?

16:16:34  6  A.   I was hoping so.

16:16:39  7       THE COURT:  Counsel, I'm afraid we've reached our

16:16:41  8  time that we've had today.  I have a temporary restraining

16:16:45  9  order and people who are awaiting a hearing, an emergency

16:16:49  10  hearing I have to hear today.  And so, unfortunately,

16:16:52  11  we're going to have to take the weekend and reconvene on

16:16:57  12  Monday morning.

16:16:58  13       I'm wondering also at this pace and with the

16:17:01  14  number of witnesses whether -- I want to check in with you

16:17:03  15  about the likelihood of our being able to finish if we

16:17:06  16  devote full day on Monday to the hearing, and if not, I

16:17:09  17  thought we would go ahead and talk about in the

16:17:13  18  eventuality we needed to press on when we would do that.

16:17:16  19       So first of all, do you have a idea of how well

16:17:20  20  we're proceeding and whether or not you have optimism that

16:17:23  21  we would be able to finish?

16:17:24  22       MS. LEONIDA:  From our perspective, we definitely

16:17:27  23  will be able to finish on Monday.  I'm not sure if

16:17:29  24  defendants are planning on calling witnesses.

16:17:30  25       THE COURT:  Okay.  Don't have to commit to

16:17:33   1   anything but I just wanted --

16:17:33   2          MR. MITCHELL:  If we do call witnesses, I don't

16:17:34   3   think it will take much time and if you're confident we'll

16:17:37   4   finish -- if your part will finish well in advance of our

16:17:40   5   Monday deadline, I think we should be fine.

16:17:41   6          THE COURT:  Okay.  If you do confer with each

16:17:44   7   other and if it becomes apparent, for whatever reason, we

16:17:47   8   won't be able to get it done Monday, I have a bench trial

16:17:49   9   set for Tuesday, so that's out.  And the next time on my

16:17:53  10   calendar would be Wednesday morning, just to let you know

16:17:55  11   in case that we did need to -- so that everybody could

16:17:58  12   kind of plan that if we did need to go beyond Monday that

16:18:02  13   we would have to skip until Wednesday morning.  So that

16:18:05  14   would be what I could offer.

16:18:12  15          Okay.  Anything further?

16:18:14  16          MS. LEONIDA:  No, your Honor.  Thank you.

16:18:15  17          THE COURT:  Anything further?

16:18:16  18          MR. MITCHELL:  Nothing further.

16:18:17  19          THE COURT:  Thank you all so much.  It's been

16:18:19  20   very helpful and we look forward to reconvening Monday

16:18:21  21   morning at 9:00, and we're in recess until then.

          22          (Proceedings adjourned.)

          23

          24

          25

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS)


    I, LILY I. REZNIK, Certified Realtime Reporter,

Registered Merit Reporter, in my capacity as Official

Court Reporter of the United States District Court,

Western District of Texas, do certify that the foregoing

is a correct transcript from the record of proceedings in

the above-entitled matter.

    I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial Conference

of the United States.

    WITNESS MY OFFICIAL HAND this the 14th day of November,

2022.

*Lily Iva Reznik*

~~~~~~~~~~~~~~~~~~~~~~~
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
SOT Certification No. 4481
Expires: 1-31-23

<pre>
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3   LEILA GREEN LITTLE, ET AL) Docket No. A 22-CA-424 RP
                             )
 4   vs.                     ) Austin, Texas
                             )
 5   LLANO COUNTY, ET AL      ) October 31, 2022

 6
                     TRANSCRIPT OF MOTION HEARING
 7           BEFORE THE HONORABLE ROBERT L. PITMAN
                       Volume 2 of 2
 8

 9   APPEARANCES:

10   For the Plaintiff:       Ms. Ellen V. Leonida
                              Braun, Hagey & Borden, LLP
11                            351 California Street, 10th Floor
                              San Francisco, California 94104
12
                              Mr. Max B. Bernstein
13                            Braun, Hagey & Borden, LLP
                              118 West 22nd Street, 12th Floor
14                            New York, New York 10011

15                            Mr. Ryan A. Botkin
                              Ms. Maria Amelia Calaf
16                            Ms. Katherine P. Chiarello
                              Wittliff Cutter, PLLC
17                            1209 Nueces Street
                              Austin, Texas 78701
18
19   For the Defendant:       Jonathan F. Mitchell
                              Mitchell Law, PLLC
20                            111 Congress Avenue, Suite 400
                              Austin, Texas 78701
21
                              Mr. Dwain K. Rogers, Jr.
22                            Munsch, Hardt, Kopf & Harr
                              111 Congress Avenue, Suite 2010
23                            Austin, Texas 78701

24

25
</pre>

1    **(Appearances Continued:)**

2    For the Defendant:          Mr. Matthew L. Rienstra
                                 Llano County Attorney's Office
3                                801 Ford Street, Room 111
                                 Llano, Texas 78643

4

5    Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
6                                Austin, Texas 78701
                                 (512)391-8792

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer-aided transcription.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Rochelle Wells | 5 | 24 | 27 | |
| Leila Green Little | 28 | 63 | 76 | |
| Amber Milum | 90 | 117 | 145 | 146 |
| Ron Cunningham | 147 | 154 | 162 | |
| Jerry Don Moss | 164 | 170 | 179 | |
| John Mitchell | 182 | | | |

# E X H I B I T S

|  | Offered | Admitted |
|---|---|---|
| Plaintiffs' | | |
| #6 | 59 | 60 |
| #37 | 162 | 162 |
| #79A | 122 | 122 |
| #88 | 19 | 19 |
| #89 | 61 | 61 |
| #90 | 22 | 23 |
| #91 | 42 | 42 |

Defendants'

(None)

| 08:56:58 | 1 | THE COURT: And good morning. Are we ready to |
| 08:57:01 | 2 | pick up where we left off? |
| 08:57:05 | 3 | MR. BERNSTEIN: Yes, your Honor. |
| 08:57:05 | 4 | THE COURT: All right. And I believe if we could |
| 08:57:07 | 5 | get our witness back on the stand. Yes, please, come |
| 08:57:19 | 6 | forward. Good morning. |
| 08:57:27 | 7 | THE WITNESS: Good morning. |
| 08:57:27 | 8 | THE COURT: I'll remind you that you remain under |
| 08:57:29 | 9 | oath. Thank you. Please be seated. |
| 08:57:36 | 10 | ROCHELLE WELLS, called by the Plaintiff, duly sworn. |
| 08:57:36 | 11 | DIRECT EXAMINATION (Resumed) |
| 08:57:37 | 12 | BY MR. BERNSTEIN: |
| 08:57:37 | 13 | Q. Good morning, Ms. Wells. |
| 08:57:39 | 14 | A. Good morning. |
| 08:57:40 | 15 | Q. Could we start by turning to Exhibit 2F in the |
| 08:57:44 | 16 | exhibit binder in front of you? |
| 08:57:45 | 17 | A. Yes. |
| 08:57:46 | 18 | Q. This exhibit which is -- |
| 08:57:59 | 19 | A. I'm sorry, I'm trying to find it. |
| 08:58:01 | 20 | Q. So this exhibit that's already in evidence is a |
| 08:58:15 | 21 | portion of your library history; is that right? |
| 08:58:20 | 22 | A. Yes. |
| 08:58:20 | 23 | Q. And you checked out the book I Broke My Butt, right? |
| 08:58:26 | 24 | A. Yes. |
| 08:58:27 | 25 | Q. And you did that so that no one else could check it |

| | | |
|---|---|---|
| 08:58:29 | 1 | out of the library? |
| 08:58:30 | 2 | A.   I did that to protect children from being molested |
| 08:58:34 | 3 | through the use of the book. |
| 08:58:36 | 4 | Q.   And you checked out My Butt Is So Noisy; is that |
| 08:58:40 | 5 | right? |
| 08:58:40 | 6 | A.   Yes. |
| 08:58:42 | 7 | Q.   And you also did that so that no one else could check |
| 08:58:45 | 8 | it out of the library? |
| 08:58:46 | 9 | A.   I also did that to protect children from being |
| 08:58:49 | 10 | molested. |
| 08:58:49 | 11 | Q.   And you also checked out Being Jazz so that no one |
| 08:58:53 | 12 | else could check it out of the library; is that right? |
| 08:58:56 | 13 | A.   I don't see that on here. |
| 08:58:58 | 14 | Q.   Did you check out Being Jazz? |
| 08:59:00 | 15 | A.   I don't remember. |
| 08:59:05 | 16 | Q.   Now, please turn your attention to Exhibit 8. |
| 08:59:23 | 17 | Directing your attention to the bottom of the first page |
| 08:59:27 | 18 | -- oh, no.  Sorry.  To the second page in the middle, the |
| 08:59:31 | 19 | November 11, 2021 e-mail that you sent.  Do you see that? |
| 08:59:35 | 20 | A.   Yes. |
| 08:59:36 | 21 | Q.   And in this e-mail, you wanted to give everyone an |
| 08:59:39 | 22 | update on the status of the books in the library; is that |
| 08:59:45 | 23 | right? |
| 08:59:45 | 24 | A.   That is what it says. |
| 08:59:47 | 25 | Q.   You wrote this e-mail, right? |

| | | |
|---|---|---|
| 08:59:49 | 1 | A.   Yes. |
| 08:59:49 | 2 | Q.   Okay.  And "everyone" is other concerned parents; is |
| 08:59:56 | 3 | that right? |
| 08:59:56 | 4 | A.   May I take time to read it quickly? |
| 08:59:59 | 5 | Q.   Sure. |
| 08:59:59 | 6 | A.   Thank you.  Okay. |
| 09:00:33 | 7 | Q.   So I'll ask the question again.  Everyone -- when you |
| 09:00:38 | 8 | said "everyone" on this e-mail, you meant the other |
| 09:00:40 | 9 | concerned parents in Llano; is that right? |
| 09:00:42 | 10 | A.   Parents and grandparents and uncles and aunts, yes. |
| 09:00:46 | 11 | Q.   And you updated everyone that Commissioner Moss and |
| 09:00:49 | 12 | Judge Cunningham instructed Amber Milum to remove certain |
| 09:00:53 | 13 | books from the library, right? |
| 09:00:54 | 14 | A.   That's what I thought they did. |
| 09:00:56 | 15 | Q.   Okay.  Did Commissioner Moss tell you that? |
| 09:01:03 | 16 | A.   I don't remember. |
| 09:01:06 | 17 | Q.   But somehow you learned that Commissioner Moss and |
| 09:01:08 | 18 | Judge Cunningham instructed Amber Milum to remove books |
| 09:01:12 | 19 | from the library; is that right? |
| 09:01:14 | 20 | A.   I'm sorry, can you repeat that? |
| 09:01:17 | 21 | Q.   Yeah.  At some point, you learned that Commissioner |
| 09:01:20 | 22 | Moss and Judge Cunningham instructed Amber Milum to remove |
| 09:01:24 | 23 | books from the library; is that right? |
| 09:01:30 | 24 | A.   I don't know if I assumed or if I heard. |
| 09:01:34 | 25 | Q.   Okay.  Again, you wrote this e-mail on November 11, |

| | | |
|---|---|---|
| 09:01:38 | 1 | 2021; is that right? |
| 09:01:38 | 2 | A.   Yes. |
| 09:01:39 | 3 | Q.   And you wrote, Commissioner Moss and Judge Cunningham |
| 09:01:42 | 4 | have instructed Amber, the head librarian, to remove |
| 09:01:45 | 5 | certain books, both physical books and e-books; is that |
| 09:01:49 | 6 | right? |
| 09:01:49 | 7 | A.   I wrote that, yes. |
| 09:01:50 | 8 | Q.   Okay.  The next sentence, could you and read that |
| 09:01:58 | 9 | next sentence starting with "There will also." |
| 09:02:01 | 10 | A.   There will also be no new books coming in until this |
| 09:02:04 | 11 | is settled. |
| 09:02:05 | 12 | Q.   And did Commissioner Moss tell you that? |
| 09:02:08 | 13 | A.   I don't know. |
| 09:02:11 | 14 | Q.   Can you go ahead and read the next two sentences, |
| 09:02:15 | 15 | please. |
| 09:02:17 | 16 | A.   If you go into the library, you will see Amber and |
| 09:02:20 | 17 | Tina, children's librarian, are currently going through |
| 09:02:22 | 18 | the children's section labeling books and I am assuming |
| 09:02:24 | 19 | also removing the books Commissioner Moss has told them to |
| 09:02:27 | 20 | remove.  The next sentence also?  Amber was told to get |
| 09:02:32 | 21 | rid of Lawn Boy and Gender Queer, physical and e-book. |
| 09:02:36 | 22 | Q.   And you were grateful to Commissioner Moss and Judge |
| 09:02:39 | 23 | Cunningham, right? |
| 09:02:42 | 24 | A.   Yes, that's what it says. |
| 09:02:44 | 25 | Q.   And again, you wrote this, right? |

09:02:45  1   A.   Yes.

09:02:47  2   Q.   And you were grateful because Commissioner Moss and

09:02:50  3   Judge Cunningham removed books from the library; is that

09:02:53  4   right?

09:02:53  5   A.   No.  I was thankful here for having removed books

09:02:57  6   that were sexual in content that could be harmful to

09:02:59  7   children.

09:03:00  8   Q.   Could we play clip 13, please.

09:03:04  9        (Audio and video file played.)

09:03:07  10  Q.   "When you later write Commissioner Moss, we are very

09:03:11  11  grateful for your help in this situation and all you have

09:03:14  12  done, what are you referring to there?

09:03:18  13  A.   I just mean part of helping us to take, I guess,

09:03:25  14  books like Lawn Boy and Gender Queer and the Butt book out

09:03:29  15  of the library, books that will be harmful to children.

09:03:32  16  Q.   How did he help you do that?

09:03:34  17  A.   Because as commissioner, he was able to do that.

09:03:39  18  Q.   To do what?

09:03:43  19  A.   Have the books removed."

09:03:47  20       (End of audio/video file.)

09:03:54  21  Q.   The next sentence in this e-mail says Chris Jones has

09:03:58  22  combed through -- sorry, can you go ahead and read that

09:04:00  23  next sentence.

09:04:01  24  A.   Chris Jones has combed through that 16-page list of

09:04:04  25  CRT and LGBTQ books to see which we have in Llano County

| 09:04:10 | 1 | libraries. |
| 09:04:10 | 2 | Q. And what does CRT stand for? |
| 09:04:12 | 3 | A. Critical race theory. |
| 09:04:15 | 4 | Q. And what does LGBTQ stand for? |
| 09:04:17 | 5 | A. Lesbian, gay, bi, trans, queer. |
| 09:04:21 | 6 | Q. And why were you concerned about the CRT and LGBTQ |
| 09:04:25 | 7 | books? |
| 09:04:27 | 8 | A. About the list? Could you be more specific? |
| 09:04:39 | 9 | Q. I'll ask it one more time. Why were you concerned |
| 09:04:42 | 10 | about the 16-page list of CRT and LGBTQ books? |
| 09:04:46 | 11 | A. I was concerned because they might list books that |
| 09:04:52 | 12 | are harmful to children. |
| 09:04:56 | 13 | Q. You don't say anything about children in the sentence |
| 09:04:59 | 14 | you just read, did you? |
| 09:05:00 | 15 | A. That is the context of the e-mail. |
| 09:05:04 | 16 | Q. But in that sentence that you just read, you don't |
| 09:05:06 | 17 | mention children, do you? |
| 09:05:07 | 18 | A. I don't have to because the people I'm writing to |
| 09:05:11 | 19 | know what I'm speaking of, which are minors. |
| 09:05:13 | 20 | Q. Okay. And you actually say you want to see which |
| 09:05:17 | 21 | books are in the Llano County libraries; is that right? |
| 09:05:21 | 22 | A. More specifically, the minor section, which is |
| 09:05:25 | 23 | understood by those I'm writing the e-mail to. |
| 09:05:27 | 24 | Q. Again, you wrote this e-mail on November 11, 2021, |
| 09:05:31 | 25 | right? |

```
09:05:31    1   A.   Yes.
09:05:31    2   Q.   And you did not use the word "children" in that
09:05:35    3   sentence?
09:05:36    4   A.   I didn't have to because the recipients of the
09:05:39    5   e-mails knew we were speaking of children.
09:05:40    6   Q.   And you didn't say you wanted to see what was in the
09:05:42    7   children's section; is that right?
09:05:44    8   A.   Again, I didn't say that because they understood
09:05:47    9   that's what I was speaking of.  I've only ever been
09:05:49   10   concerned with minors.  Not adults.
09:05:52   11   Q.   At the bottom of this e-mail, you write, here is the
09:05:55   12   article where the 16-page list was found and provide a
09:05:57   13   link.  Do you see that?
09:05:58   14   A.   Yes.
09:05:59   15   Q.   You provided that link so the recipients of this
09:06:02   16   e-mail could review that list; is that right?
09:06:04   17   A.   If they wished to.
09:06:05   18   Q.   And then, going back to that paragraph above, can you
09:06:11   19   read that sentence starting with "Now we."
09:06:17   20   A.   I'm sorry.
09:06:20   21   Q.   It's after the sentence you just read about CRT and
09:06:23   22   LGBTQ books.
09:06:24   23   A.   Continue the paragraph.  Now we have to research the
09:06:26   24   content of the ones we have found and some that were not
09:06:30   25   on the list that we found in the process.
```

| | | |
|---|---|---|
| 09:06:31 | 1 | Q.   Who is "we"? |
| 09:06:36 | 2 | A.   Chris Jones and others that had seen the Krause list. |
| 09:06:42 | 3 | Q.   Okay.  Had you seen the Krause list? |
| 09:06:45 | 4 | A.   Yes, I had.  That's why I added the link to the |
| 09:06:49 | 5 | bottom. |
| 09:06:49 | 6 | Q.   That's a link to the Krause list, right? |
| 09:06:51 | 7 | A.   I believe so. |
| 09:06:52 | 8 | Q.   And you reviewed some of the books on the Krause |
| 09:06:55 | 9 | list, right? |
| 09:06:58 | 10 | A.   I didn't read them but I researched or, you know, |
| 09:07:02 | 11 | reviewed -- I guess reviewed will be fine.  I just did not |
| 09:07:05 | 12 | read them. |
| 09:07:06 | 13 | Q.   And how did you divide up the work of reviewing books |
| 09:07:10 | 14 | between yourself, Chris Jones, and the other people you |
| 09:07:13 | 15 | just mentioned? |
| 09:07:13 | 16 | A.   We didn't divide the work.  We had the link and some |
| 09:07:19 | 17 | of us looked at it, some of us didn't look at the link. |
| 09:07:22 | 18 | Chris Jones had more time.  Her children are adults. |
| 09:07:27 | 19 | Q.   So were any books assigned to you? |
| 09:07:32 | 20 | A.   I don't remember. |
| 09:07:37 | 21 | Q.   Some of the books on the Krause list that you sent |
| 09:07:39 | 22 | around were books for adults, right? |
| 09:07:43 | 23 | A.   I don't know. |
| 09:07:47 | 24 | Q.   And you wanted to research the books on the Krause |
| 09:07:50 | 25 | list that you circulated so that you could have them |

| 09:07:52 | 1 | removed if you thought they were inappropriate, right? |

09:07:52  1  removed if you thought they were inappropriate, right?

09:07:55  2  A.   I wanted to research them so I knew what the list was

09:07:57  3  about and so that if they were books that were published

09:08:02  4  and meant for children or minors, that if they were

09:08:05  5  harmful to children, I could ask for them to be removed

09:08:08  6  from the children's or minors' section.

09:08:13  7  Q.   And I guess I'll ask my last question a different

09:08:15  8  way.  Was the 16-page list of CRT and LGBTQ books only

09:08:21  9  books for children?

09:08:21  10  A.   I don't know.

09:08:27  11  Q.   At the end of this e-mail, you said that you'll be

09:08:29  12  sending a list of the ones that are found to be

09:08:32  13  inappropriate along with a summary to Commissioner Moss.

09:08:35  14  Do you see that?

09:08:35  15  A.   Yes.

09:08:35  16  Q.   You were going to do so so that he could remove those

09:08:38  17  books; is that right?

09:08:42  18  A.   I was going to do so so that he would be aware of the

09:08:45  19  content of the books in the minor section that I thought

09:08:49  20  were harmful to children.

09:08:52  21  Q.   Can we play clip 10, please.

09:08:55  22       (Audio and video file played.)

09:09:02  23  Q.   "Okay.  So you wanted to research the contents of all

09:09:07  24  the Krause list books that were in the library; is that

09:09:14  25  right?

| | | |
|---|---|---|
| 09:09:14 | 1 | A.   Yes. |
| 09:09:16 | 2 | Q.   What did you mean by that? |
| 09:09:18 | 3 | A.   That -- to research the content, not just to take a |
| 09:09:29 | 4 | list and say have these removed.  But you need to look at |
| 09:09:33 | 5 | a book first and see what it's about. |
| 09:09:37 | 6 | Q.   And then, what if you thought it was inappropriate? |
| 09:09:43 | 7 | What's the next step? |
| 09:09:45 | 8 | A.   If it's inappropriate, the next step is to either |
| 09:09:51 | 9 | speak with the director or with the commissioner. |
| 09:09:56 | 10 | Q.   To get the book removed from the library? |
| 09:10:01 | 11 | A.   Yes." |
| 09:10:05 | 12 | (End if audio/video file.) |
| 09:10:11 | 13 | Q.   Ms. Wells, do you recall the harmful content analysis |
| 09:10:14 | 14 | form we looked at on Friday? |
| 09:10:16 | 15 | A.   Yes. |
| 09:10:16 | 16 | Q.   Okay.  Do you mind turning to Exhibit 37, please. |
| 09:10:31 | 17 | When you do, could you just go ahead and read that |
| 09:10:33 | 18 | exhibit. |
| 09:10:34 | 19 | A.   The Harmful Content Review? |
| 09:10:37 | 20 | Q.   Yeah. |
| 09:10:38 | 21 | A.   That Bonnie wrote? |
| 09:10:39 | 22 | Q.   Yeah.  Just you can read it from front to back? |
| 09:10:43 | 23 | A.   Okay.  Gentlemen, thanks -- |
| 09:10:46 | 24 | Q.   Sorry.  You could read it to yourself.  Not to all of |
| 09:10:54 | 25 | us. |

| | | |
|---|---|---|
| 09:11:35 | 1 | A.   Okay.  Yes.  I'm ready. |
| 09:11:37 | 2 | Q.   So this is the e-mail that was sent out with the |
| 09:11:40 | 3 | harmful content analysis form that we discussed on Friday, |
| 09:11:42 | 4 | right? |
| 09:11:45 | 5 | A.   I'm not in this e-mail.  It's not addressed to me. |
| 09:11:55 | 6 | Q.   On the second page, near the top, Bonnie Wallace |
| 09:12:03 | 7 | forwarded this e-mail to you on March 24th, 2022; is that |
| 09:12:06 | 8 | right? |
| 09:12:06 | 9 | A.   Okay.  Let me read that.  I'm going to go through |
| 09:12:34 | 10 | from top to bottom so I could understand the context.  I |
| 09:12:59 | 11 | can see mine, but just don't seem like they're related. |
| 09:13:06 | 12 | Okay.  We'll just go ask what your. |
| 09:13:08 | 13 | Q.   I'm sorry.  I just couldn't hear what you were |
| 09:13:10 | 14 | saying. |
| 09:13:10 | 15 | A.   I'm trying to figure out how they were related, all |
| 09:13:13 | 16 | the different e-mails on that page.  It kind of seemed |
| 09:13:16 | 17 | like they're jumping around. |
| 09:13:17 | 18 | Q.   My question is whether this is the e-mail that was |
| 09:13:19 | 19 | sent out with the Harmful Content Analysis form. |
| 09:13:21 | 20 | A.   I see that it looks like it's attached. |
| 09:13:25 | 21 | Q.   Could we move Exhibit 37 into evidence. |
| 09:13:32 | 22 |        MR. MITCHELL:  Your Honor, we don't think she has |
| 09:13:34 | 23 | personal knowledge of this.  We would object. |
| 09:13:37 | 24 |        THE COURT:  I think it's a little questionable |
| 09:13:40 | 25 | based on this testimony.  Do you want to ask her some more |

09:13:43  1  questions?

09:13:44  2  Q.   (BY MR. BERNSTEIN)  Sure.   Let's just move on for now.

09:13:49  3  A.   Okay.

09:13:49  4  Q.   Can we go to Exhibit 19.   Starting about halfway down

09:14:07  5  the page, this is an e-mail that you sent to Commissioner

09:14:09  6  Moss on January 19th, 2022; is that right?

09:14:13  7  A.   Yes.

09:14:16  8  Q.   And you're updating him on highlights from the

09:14:20  9  library advisory board meeting, right?

09:14:23  10  A.   Yes.

09:14:26  11  Q.   And now I want to turn your attention to the next

09:14:29  12  page under the header "Onto the stuff not in the meeting

09:14:33  13  notes."

09:14:34  14  A.   Yes.

09:14:37  15  Q.   In that first paragraph, you were thanking

09:14:39  16  Commissioner Moss, right?  You can go ahead and review it,

09:14:43  17  if you'd like.

09:14:46  18  A.   You're referring to the last sentence on the first

09:14:47  19  paragraph?

09:14:49  20  Q.   Yes.

09:14:50  21  A.   Okay.  Yes.

09:14:52  22  Q.   And you thanked him for removing It's Perfectly

09:14:55  23  Normal from the library, right?

09:14:57  24  A.   That's what it says.  Yes.

09:14:59  25  Q.   And you wrote this e-mail, right?

| | | |
|---|---|---|
| 09:15:01 | 1 | A.    Yes. |
| 09:15:03 | 2 | Q.    And that's not the only time that you thanked |
| 09:15:05 | 3 | Commissioner Moss for removing books from the library, |
| 09:15:08 | 4 | correct? |
| 09:15:09 | 5 | A.    Correct. |
| 09:15:12 | 6 | Q.    And now, turning your attention to the last like long |
| 09:15:16 | 7 | paragraph that begins with "There were three or four." |
| 09:15:22 | 8 | A.    Okay.  Yes. |
| 09:15:23 | 9 | Q.    Can you just go ahead and read that paragraph, |
| 09:15:25 | 10 | please. |
| 09:15:25 | 11 | A.    To myself. |
| 09:15:26 | 12 | Q.    No. |
| 09:15:27 | 13 | A.    Out loud?  Okay.  There were three or four patrons |
| 09:15:30 | 14 | present and taking notes.  That surprised a few of us. |
| 09:15:33 | 15 | Would you be able to persuade Judge Cunningham to keep the |
| 09:15:36 | 16 | meetings closed and only include appointed board members, |
| 09:15:39 | 17 | bringing in Amber when we need clarification, et cetera. |
| 09:15:42 | 18 | Cheryll Mabray Precinct 1 brought this up and most agreed |
| 09:15:45 | 19 | with her. |
| 09:15:46 | 20 | Q.    So when you say keep the meetings closed, are you |
| 09:15:49 | 21 | referring to library board meetings there? |
| 09:15:51 | 22 | A.    The library advisory board meetings. |
| 09:15:55 | 23 | Q.    And you asked Commissioner Moss to keep Amber out of |
| 09:16:01 | 24 | the meetings unless she was needed for clarification, |
| 09:16:03 | 25 | right? |

| | | |
|---|---|---|
| 09:16:06 | 1 | A.   Yes.  To bring her in when we needed clarification. |
| 09:16:09 | 2 | Q.   But otherwise, you wanted her out of the meetings; is |
| 09:16:13 | 3 | that right? |
| 09:16:13 | 4 | A.   We wanted just the appointed advisory board members |
| 09:16:17 | 5 | present. |
| 09:16:17 | 6 | Q.   And Ms. Milum was not an appointed advisory board |
| 09:16:21 | 7 | member, right? |
| 09:16:21 | 8 | A.   At the time, yes. |
| 09:16:24 | 9 | Q.   And you also asked Commissioner Moss to try to |
| 09:16:27 | 10 | persuade Judge Cunningham to keep the library advisory |
| 09:16:29 | 11 | board meetings closed, right? |
| 09:16:31 | 12 | A.   Yes. |
| 09:16:35 | 13 | Q.   And I want to turn our attention to Exhibit 88.  So |
| 09:16:45 | 14 | the e-mail on the bottom half of the page, this is an |
| 09:16:48 | 15 | e-mail that you sent to multiple people on December 14th, |
| 09:16:58 | 16 | 2021; is that right? |
| 09:17:06 | 17 | A.   I'm sorry, can you repeat your question? |
| 09:17:08 | 18 | Q.   Sure.  On the bottom half of the page, this is an |
| 09:17:11 | 19 | e-mail that you sent to multiple people on December 14th, |
| 09:17:14 | 20 | 2021; is that right? |
| 09:17:15 | 21 | A.   Yes. |
| 09:17:16 | 22 | Q.   Okay.  And now, on the third page of this exhibit, |
| 09:17:23 | 23 | which you can see is still part of the same e-mail, right? |
| 09:17:27 | 24 | A.   Yes. |
| 09:17:28 | 25 | Q.   Can you just read that last sentence -- or, sorry, |

| | | |
|---|---|---|
| 09:17:31 | 1 | the last paragraph before you sign your name. |
| 09:17:35 | 2 | A.   The library will be closed for several days before |
| 09:17:38 | 3 | Christmas to remove books.  It will be great if several of |
| 09:17:41 | 4 | us go back to the library in January to see if the books |
| 09:17:44 | 5 | Chris Jones found were removed. |
| 09:17:46 | 6 | Q.   You don't see anything in that paragraph about |
| 09:17:48 | 7 | children's books, right? |
| 09:17:50 | 8 | A.   I don't have to because the recipients of the e-mail |
| 09:17:53 | 9 | understand that I'm speaking about the children's |
| 09:17:55 | 10 | sections, minors' sections. |
| 09:17:57 | 11 | Q.   Okay.  Now, turning your attention to the e-mail at |
| 09:18:02 | 12 | the back of this e-mail, the one dated December 2nd, 2021. |
| 09:18:07 | 13 | Do you see that? |
| 09:18:07 | 14 | A.   Yes. |
| 09:18:10 | 15 | Q.   Can we move Exhibit 88 into evidence. |
| 09:18:14 | 16 |          MR. MITCHELL:  No objection. |
| 09:18:15 | 17 |          THE COURT:  So admitted. |
| 09:18:17 | 18 | Q.   (BY MR. BERNSTEIN) Do you know who you sent this |
| 09:18:22 | 19 | e-mail to? |
| 09:18:23 | 20 | A.   May I read it? |
| 09:18:24 | 21 | Q.   Sure.  So after reviewing it, do you know who you |
| 09:19:21 | 22 | sent this e-mail to? |
| 09:19:23 | 23 | A.   Yes.  The same group that I've been e-mailing |
| 09:19:27 | 24 | previously that was concerned for children's safety. |
| 09:19:29 | 25 | Q.   So the same group that was listed on the first page |

| | | |
|---|---|---|
| 09:19:34 | 1 | of this exhibit? |
| 09:19:38 | 2 | A.   I believe so. |
| 09:19:41 | 3 | Q.   And you were updating them on a conversation you had |
| 09:19:44 | 4 | with Commissioner Moss regarding the library book |
| 09:19:48 | 5 | situation; is that right? |
| 09:19:50 | 6 | A.   It seems like part of the conversation and part my |
| 09:20:00 | 7 | two cents. |
| 09:20:01 | 8 | Q.   So part of the conversation was updating the |
| 09:20:03 | 9 | recipients about a conversation you had with Commissioner |
| 09:20:06 | 10 | Moss about library books, right? |
| 09:20:08 | 11 | A.   Yes. |
| 09:20:11 | 12 | Q.   And now, turn to the last page or the fourth page of |
| 09:20:16 | 13 | this exhibit.  Can you read that paragraph that says "Back |
| 09:20:23 | 14 | to the updates," please. |
| 09:20:24 | 15 | A.   Back to the updates, Commissioner Don -- Commissioner |
| 09:20:29 | 16 | Moss would like some of us to show support at the December |
| 09:20:31 | 17 | 13 commissioners meeting because he will be leading a |
| 09:20:35 | 18 | discussion on three items. |
| 09:20:36 | 19 | Q.   And the first item that he wanted -- sorry, that he |
| 09:20:40 | 20 | would be leading a discussion on was about substituting |
| 09:20:42 | 21 | OverDrive with a different system; is that right? |
| 09:20:47 | 22 | A.   That's what this says. |
| 09:20:49 | 23 | Q.   And you wrote this e-mail, right? |
| 09:20:51 | 24 | A.   Yes. |
| 09:20:54 | 25 | Q.   And the last sentence of that next paragraph says if |

| 09:20:56 | 1 | that is not an option, then no e-books until it can be |
| 09:21:00 | 2 | remedied, right? |
| 09:21:01 | 3 | A.   Correct. |
| 09:21:02 | 4 | Q.   Was that something Commissioner Moss told you? |
| 09:21:05 | 5 | A.   I don't remember. |
| 09:21:12 | 6 | Q.   Now, turning your attention to the last paragraph on |
| 09:21:15 | 7 | this page, which says "I hope several of y'all."  Do you |
| 09:21:18 | 8 | see that? |
| 09:21:19 | 9 | A.   Yes, I do see it. |
| 09:21:20 | 10 | Q.   So in this paragraph, you suggest that the recipients |
| 09:21:23 | 11 | of this e-mail thank Commissioner Moss; is that right? |
| 09:21:26 | 12 | A.   Let me look over it.  Yes. |
| 09:21:43 | 13 | Q.   And you wanted them to thank Commissioner Moss for |
| 09:21:46 | 14 | removing books from the library, right? |
| 09:21:52 | 15 | A.   No.  That's not what it says.  It just says to thank |
| 09:21:55 | 16 | him. |
| 09:21:55 | 17 | Q.   Okay.  I'm not asking what it says.  I'm asking you |
| 09:22:01 | 18 | wanted recipients of this e-mail to thank Commissioner |
| 09:22:02 | 19 | Moss for removing books from the library; is that right? |
| 09:22:06 | 20 | A.   No. |
| 09:22:11 | 21 | Q.   Can you go ahead and read out loud the portion of |
| 09:22:15 | 22 | this paragraph that starts with "Oh, and I can't." |
| 09:22:18 | 23 | A.   Oh, and I can't leave out that the same lady who |
| 09:22:21 | 24 | tried to call censorship also tried to get a meeting with |
| 09:22:23 | 25 | the judge and he told her that there wasn't a reason to |

09:22:26  1  meet as both times she spoke she made it clear where she
09:22:29  2  stood and the judge made it clear where he stood with the
09:22:31  3  books.
09:22:34  4  Q.   The lady who tried to call censorship, that's
09:22:38  5  Plaintiff Leila Green Little; is that right?
09:22:40  6  A.   I believe so.
09:22:44  7  Q.   And then, go ahead and finish reading that paragraph,
09:22:47  8  please.
09:22:47  9  A.   That was very nice to hear.  I'll be at the Tea Party
09:22:51  10 meeting tonight and I will be thanking him for this.
09:22:53  11 Please continue to pray for Commissioner Jerry Don Moss
09:22:55  12 and Judge Cunningham and the librarians.  Pray for your
09:22:59  13 enemies; bless those who curse you.
09:23:01  14 Q.   So you wanted to thank Judge Cunningham at the Tea
09:23:04  15 Party meeting, right?
09:23:05  16 A.   Yes.
09:23:06  17 Q.   Did you thank Judge Cunningham at the Tea Party
09:23:09  18 meeting?
09:23:09  19 A.   Yes.
09:23:10  20 Q.   Now, can you turn your attention to Exhibit 90,
09:23:17  21 please.  This is the agenda for the December 13th meeting
09:23:32  22 that you and Commissioner Moss were discussing; is that
09:23:35  23 right?
09:23:35  24 A.   Yes.
09:23:37  25 Q.   Move Exhibit 90 into evidence.

| 09:23:42 | 1 | MR. MITCHELL: No objection, your Honor. |
| 09:23:43 | 2 | THE COURT: So admitted. |
| 09:23:46 | 3 | Q. (BY MR. BERNSTEIN) And if you just take a look at the |
| 09:23:53 | 4 | last paragraph on the last page. |
| 09:24:00 | 5 | A. I undersigned? |
| 09:24:01 | 6 | Q. Yeah. You don't need to read it out loud but just |
| 09:24:03 | 7 | take a look. |
| 09:24:07 | 8 | A. I'm sorry, the part by Marci? I'll read it right |
| 09:24:21 | 9 | now. Okay. I read it. |
| 09:24:28 | 10 | Q. So this agenda wasn't released to the public until |
| 09:24:31 | 11 | December 10th, 2021; is that right? |
| 09:24:34 | 12 | A. That is correct. |
| 09:24:35 | 13 | Q. Ms. Wells, have you read Caste: The Origins of Our |
| 09:24:52 | 14 | Discontent? |
| 09:24:52 | 15 | A. No. |
| 09:24:52 | 16 | Q. Do you know if it's a children's book? |
| 09:24:56 | 17 | A. I don't know. |
| 09:24:57 | 18 | Q. But it was on the list that you e-mailed your friends |
| 09:25:01 | 19 | on November 11, 2021; is that right? |
| 09:25:04 | 20 | A. Which list are you referring to? |
| 09:25:06 | 21 | Q. I believe you referred to it as the Krause list. |
| 09:25:09 | 22 | A. If it was on the Krause list, then it was in the |
| 09:25:12 | 23 | e-mail attachment. |
| 09:25:15 | 24 | Q. Have you read They Called Themselves The KKK: The |
| 09:25:17 | 25 | Birth of an American Terrorist Group? |

| | | |
|---|---|---|
| 09:25:20 | 1 | A.   No. |
| 09:25:20 | 2 | Q.   Do you know if it's a children's book? |
| 09:25:23 | 3 | A.   I don't know. |
| 09:25:25 | 4 | Q.   But that book was also on the list that you e-mailed |
| 09:25:28 | 5 | to your friends on November 11, 2021; is that right? |
| 09:25:30 | 6 | A.   That is correct.  But I wasn't checking the list to |
| 09:25:34 | 7 | see.  I was just reading the list to see what they were |
| 09:25:37 | 8 | about. |
| 09:25:39 | 9 | Q.   Have you read Spinning by Tillie Walden? |
| 09:25:42 | 10 | A.   No. |
| 09:25:43 | 11 | Q.   Do you know if that's a children's book? |
| 09:25:44 | 12 | A.   I do not know. |
| 09:25:46 | 13 | Q.   And that book was also on the list that you e-mailed |
| 09:25:48 | 14 | to your friends on November 11, 2021; is that right? |
| 09:25:51 | 15 | A.   I don't know.  It was on the list. |
| 09:26:05 | 16 | Q.   All right.  One moment.  No further questions. |
| 09:26:23 | 17 | THE COURT:  Mr. Mitchell. |
| 09:26:26 | 18 | CROSS-EXAMINATION |
| 09:26:27 | 19 | BY MR. ROGERS: |
| 09:26:27 | 20 | Q.   Your Honor, I'll be asking questions. |
| 09:26:30 | 21 | Good morning, Ms. Wells.  How are you today? |
| 09:26:36 | 22 | A.   Doing well.  Thank you. |
| 09:26:39 | 23 | Q.   So you previously testified regarding some e-mails in |
| 09:26:43 | 24 | November and December of 2021.  Let me ask you a few |
| 09:26:46 | 25 | questions about that time period. |

| | | |
|---|---|---|
| 09:26:47 | 1 | A.    Okay. |
| 09:26:48 | 2 | Q.    In November of 2021, were you a member of the Llano |
| 09:26:53 | 3 | County library advisory board? |
| 09:26:53 | 4 | A.    No. |
| 09:26:54 | 5 | Q.    In December of 2021, were you a member of the Llano |
| 09:26:57 | 6 | County library advisory board? |
| 09:26:58 | 7 | A.    No. |
| 09:27:00 | 8 | Q.    When were you appointed to the Llano County library |
| 09:27:03 | 9 | advisory board? |
| 09:27:04 | 10 | A.    In January of '22. |
| 09:27:08 | 11 | Q.    So in what context were you expressing those opinions |
| 09:27:12 | 12 | in November and December of 2021? |
| 09:27:14 | 13 | A.    As a parent, as a citizen of Llano. |
| 09:27:17 | 14 | Q.    The next set of questions I'm going to ask you relate |
| 09:27:20 | 15 | to the time period while you were a member of the advisory |
| 09:27:25 | 16 | board. |
| 09:27:25 | 17 | A.    Okay. |
| 09:27:26 | 18 | Q.    So what authority did the commissioners' court grant |
| 09:27:32 | 19 | the advisory board regarding the weeding of books from the |
| 09:27:36 | 20 | library, if any? |
| 09:27:37 | 21 | A.    None. |
| 09:27:39 | 22 | Q.    What authority did the commissioners' court grant the |
| 09:27:41 | 23 | advisory board over Ms. Amber Milum, if any? |
| 09:27:45 | 24 | A.    None. |
| 09:27:46 | 25 | Q.    What authority did the commissioners' court grant the |

09:27:49  1   library advisory board regarding the review or removal of

09:27:55  2   any books?

09:27:56  3   A.   None.

09:27:58  4   Q.   When is the library advisory board scheduled to meet

09:28:04  5   again?

09:28:05  6   A.   Not until the litigation is finished.

09:28:07  7   Q.   How much are you paid, if anything, to be on the

09:28:11  8   Llano County library advisory board?

09:28:12  9   A.   Nothing.

09:28:13  10  Q.   Are you an employee of Llano County?

09:28:17  11  A.   No.

09:28:17  12  Q.   How many employees does the Llano County library

09:28:22  13  advisory board have?

09:28:22  14  A.   None.

09:28:24  15  Q.   Before the advisory board's activities were

09:28:28  16  interrupted by this lawsuit, did the advisory board hold

09:28:30  17  votes on recommendations?

09:28:32  18  A.   Yes.

09:28:33  19  Q.   Were all of those votes unanimous?

09:28:37  20  A.   No.

09:28:43  21  Q.   Thank you, your Honor.  I have nothing further of

09:28:45  22  this witness.  Thank you, ma'am.

09:28:46  23          THE COURT:  Any further questions?

09:28:46  24

09:28:49  25

| 09:28:49 | 1 | <div align="center">RE-DIRECT EXAMINATION</div> |
| 09:28:49 | 2 | BY MR. BERNSTEIN: |
| 09:28:58 | 3 | Q.   Ms. Wells, the library advisory board had no |
| 09:29:02 | 4 | authority, why did you want to review all Llano County |
| 09:29:07 | 5 | library book purchases? |
| 09:29:08 | 6 | A.   As a part of the collection process, the collections |
| 09:29:12 | 7 | committee was pulling all the research we could on |
| 09:29:15 | 8 | previously purchased books, any future orders, looking at |
| 09:29:19 | 9 | the whole the collections for the Llano library county |
| 09:29:23 | 10 | system. |
| 09:29:29 | 11 | Q.   No further questions. |
| 09:29:30 | 12 | A.   Okay. |
| 09:29:32 | 13 | THE COURT:  Anything further? |
| 09:29:34 | 14 | MR. ROGERS:  No, your Honor. |
| 09:29:35 | 15 | THE COURT:  Thank you.  You may step down. |
| 09:29:36 | 16 | THE WITNESS:  Thank you. |
| 09:29:37 | 17 | THE COURT:  Your next witness. |
| 09:29:51 | 18 | MS. CHIARELLO:  Your Honor, we call Plaintiff |
| 09:29:53 | 19 | Leila Green Little to the stand. |
| 09:30:08 | 20 | THE COURT:  Good morning.  Before you take a |
| 09:30:10 | 21 | seat, could you please raise your right hand to be sworn, |
| 09:30:12 | 22 | please. |
| 09:30:15 | 23 | THE CLERK:  You do solemnly swear or affirm that |
| 09:30:15 | 24 | the testimony which you may give in the case now before |
| 09:30:15 | 25 | the Court shall be the truth, the whole truth, and nothing |

| | | |
|---|---|---|
| 09:30:16 | 1 | but the truth? |
| 09:30:16 | 2 | THE WITNESS:  I do. |
| 09:30:18 | 3 | THE CLERK:  Thank you. |
| 09:30:19 | 4 | THE COURT:  Please be seated. |
| 09:30:20 | 5 | LEILA GREEN LITTLE, called by the Plaintiff, duly sworn. |
| 09:30:20 | 6 | <u>DIRECT EXAMINATION</u> |
| 09:30:21 | 7 | BY MS. CHIARELLO: |
| 09:30:21 | 8 | Q.   Will you please introduce yourself to the Court? |
| 09:30:52 | 9 | A.   My name is Leila Green Little. |
| 09:30:54 | 10 | Q.   Ms. Little, where do you reside? |
| 09:30:57 | 11 | A.   I live in Llano County. |
| 09:30:59 | 12 | Q.   And with whom do you reside in Llano County? |
| 09:31:02 | 13 | A.   I live in a home with my husband of 17 years and our |
| 09:31:08 | 14 | two children. |
| 09:31:08 | 15 | Q.   And how old are your children? |
| 09:31:11 | 16 | A.   My son is six years old and my daughter is three |
| 09:31:15 | 17 | years old. |
| 09:31:16 | 18 | Q.   Will you please give the Court a little information |
| 09:31:18 | 19 | about your educational background? |
| 09:31:23 | 20 | A.   I graduated from Llano High School in 2003, and after |
| 09:31:29 | 21 | that, I obtained my Bachelor of Science Degree in Speech |
| 09:31:34 | 22 | Language and Hearing Sciences from Texas Tech University, |
| 09:31:38 | 23 | Health Science Center.  And after that, I obtained my |
| 09:31:41 | 24 | Master's Degree in Speech Language Pathology, also from |
| 09:31:45 | 25 | TTU, HSC. |

09:31:47  1  Q.   Are you currently working on an additional higher

09:31:51  2  education degree?

09:31:52  3  A.   I am.  I am currently enrolled in graduate library

09:31:57  4  science courses at the University of North Texas.

09:32:01  5  Q.   Will you please tell the Court briefly about your

09:32:05  6  past working history with your Master's in Speech

09:32:09  7  Pathology?

09:32:10  8  A.   The vast majority of my career was spent working with

09:32:14  9  patients with head-neck cancer at the University of Texas,

09:32:19  10  M.D. Anderson Cancer Center in Houston.  I briefly had a

09:32:23  11  private practice once we moved back to Llano.

09:32:26  12  Q.   What do you plan to do with your library science

09:32:29  13  degree once you obtain it?

09:32:31  14  A.   My eventual goal is to work as a school librarian.

09:32:37  15  Q.   You testified that you graduated from high school in

09:32:40  16  Llano.  Is that where you met your husband?

09:32:43  17  A.   It is.  Yes.

09:32:44  18  Q.   How long has your husband's family lived in Llano?

09:32:49  19  A.   My husband grew up in Llano.  He grew up on the ranch

09:32:57  20  that his family lived.  They go back many, many

09:33:02  21  generations on the same plot of land, and I believe his

09:33:06  22  ancestry settled there in the 1880s or 1890s.

09:33:12  23  Q.   And what about your own family?

09:33:16  24  A.   My family moved to Kingsland, which is an

09:33:20  25  unincorporated portion of Llano County in 1997 and that

09:33:23  1    was when I was in the seventh grade.

09:33:26  2    Q.   Could you please tell the Judge about your family's

09:33:30  3    history with the Llano County Library and your husband's

09:33:34  4    family's history with the library?

09:33:36  5    A.   So when my family moved to Llano County, my mother

09:33:42  6    took me to the Kingsland branch of the Llano County

09:33:46  7    Library System, and I obtained my first library card at

09:33:52  8    that time.  My mother was an avid reader and patron of

09:33:57  9    that Kingsland branch and as was her mother.  So I am the

09:34:01  10   third generation Llano County Library System cardholder.

09:34:05  11   And when my son began learning how to read, we got him his

09:34:11  12   first library card earlier this year.  So he is the fourth

09:34:14  13   generation on my mother's side.

09:34:18  14         On my husband's side of the family, my husband's

09:34:22  15   late grandparents were avid supporters of the Llano County

09:34:27  16   Library System, including membership on the Friends of the

09:34:31  17   Llano Library's Group.  In addition, it's been told to me

09:34:36  18   by my father-in-law that his father helped build the

09:34:41  19   mesquite shelves for one of the previous locations for the

09:34:47  20   Llano branch of the library system.

09:34:49  21   Q.   Please describe your current use of the Llano County

09:34:54  22   Library.

09:34:55  23   A.   Currently, I go to all three branches of the library

09:35:03  24   system regularly.  We typically go multiple times in a

09:35:09  25   month.  Prior to this semester, my children being enrolled

09:35:16  1   in education programs, both my kids were attendees at

09:35:21  2   story time programs in both Kingsland and in Llano.  So we

09:35:27  3   check out a lot of books from the library system.  We play

09:35:32  4   in the different play areas of the branches of the library

09:35:36  5   system.

09:35:38  6   Q.   Are you involved in any organizations related to the

09:35:42  7   library system?

09:35:43  8   A.   Yes, I am.  I joined as a member of the Friends of

09:35:50  9   the Llano Library Group several years ago, either in 2017

09:35:53  10  or 2018.  It was near the time that we moved back to Llano

09:36:00  11  and I've volunteered with that organization.  So, for

09:36:04  12  example, the Friends Group sponsored a historical cemetery

09:36:11  13  tour, and I was asked by the previous head librarian in

09:36:15  14  Llano, Ms. Tommi Myers, to participate in that, so my

09:36:19  15  husband and I participated in that.

09:36:21  16       I was asked by the former children's librarian,

09:36:25  17  Dr. Ann Rossberg, to provide some lectures at the Llano

09:36:31  18  branch of the library.  And so, I researched and prepared

09:36:35  19  a presentation on aphasia, which is a speech and language

09:36:40  20  impairment at the Llano branch of the library.  And I also

09:36:45  21  researched and prepared a presentation on water safety

09:36:51  22  with an emphasis on bathtub drowning and presented that to

09:36:56  23  parents at the Play and Learn Series group.

09:37:00  24  Q.   When you joined the Friends of the Llano library, did

09:37:04  25  you also express an interest in joining the library board?

09:37:11  1  A.   So there's a friend, neighbor and my former seventh

09:37:17  2  grade English teacher that I know, her name is Billie

09:37:20  3  Laning and I knew that she was a member of the previous

09:37:28  4  iteration of the library board, and so, in speaking to her

09:37:31  5  one time at the library, I asked how I might be able to

09:37:37  6  get involved with that as another way to contribute to our

09:37:41  7  library system and she said, well, that's by appointment

09:37:44  8  only.  You know, I'm the Women's Culture Club appointee,

09:37:50  9  she said, but there may be another board that you might be

09:37:54  10  interested in joining.  Why don't we talk about that.  And

09:38:00  11  Ms. Laning was referring it to the Llano County Library

09:38:05  12  System Foundation on whose board she sat.

09:38:07  13  Q.   Please describe for us the Llano Library Foundation

09:38:10  14  and what it does.

09:38:15  15  A.   So when Ms. Laning told me about that group, I had no

09:38:19  16  prior knowledge of it, so I attended a meeting.  I met

09:38:24  17  with the existing board and they had explained to me that

09:38:28  18  that organization was formed in the year 2012 by Llano

09:38:34  19  County citizens, residents, in response to county budget

09:38:39  20  cuts which negatively affected the library system.  And

09:38:43  21  so, this group of citizens came together, put in the work

09:38:46  22  to create a 501(c)(3) nonprofit organization, and its

09:38:53  23  purpose was to ensure that the Llano County Library

09:38:59  24  System's branches, all three branches were able to stay

09:39:03  25  open and maintain excellent operations through funding.

09:39:08 1 Q. Did you join the library foundation?

09:39:13 2 A. Yes, I did.

09:39:14 3 Q. When did you join?

09:39:16 4 A. They invited me to join that board, I believe it was

09:39:21 5 the year 2019. It may have been 2020, but I joined as a

09:39:26 6 board member at large.

09:39:29 7 Q. As an early board member, did you reach out to

09:39:33 8 Commissioner Moss to discuss some concerns you had about

09:39:36 9 the library?

09:39:39 10 A. Yes, I did. Again, once I learned about this

09:39:44 11 organization, I learned that it was formed in response to

09:39:47 12 county budget cuts. I then turned to the county's website

09:39:51 13 so that I could view its budgetary information in the

09:39:56 14 financial transparency section. And so, I pulled several

09:40:00 15 years worth of county budget and looked at that, created a

09:40:06 16 PowerPoint presentation to curate all that information and

09:40:13 17 organize it for myself. And then, I had reached out to

09:40:17 18 Ms. Jennifer Buchanan to see if I could arrange getting on

09:40:23 19 the agenda for commissioners' court to discuss the

09:40:27 20 library's budget.

09:40:29 21 Q. Who is Ms. Buchanan?

09:40:31 22 A. Ms. Buchanan is -- I don't know her exact title but

09:40:36 23 she is like an administrator for the county. She sends

09:40:42 24 out the county agendas.

09:40:46 25 Q. Do you remember approximately when this was that you

| | | |
|---|---|---|
| 09:40:49 | 1 | reached out to Ms. Buchanan about getting on the agenda |
| 09:40:53 | 2 | for the commissioners' court to talk about the library? |
| 09:40:56 | 3 | A.    To the best of my knowledge, I believe that was in |
| 09:41:00 | 4 | early 2020. |
| 09:41:02 | 5 | Q.    What response did you receive to your request? |
| 09:41:08 | 6 | A.    Ms. Buchanan did send an e-mail reply.  I believe she |
| 09:41:13 | 7 | said if I wanted to get an agenda item placed, I would |
| 09:41:18 | 8 | need to talk to my commissioner.  And so, I sent a reply |
| 09:41:22 | 9 | saying okay, well, I'll try and get in touch with |
| 09:41:26 | 10 | Commissioner Moss. |
| 09:41:27 | 11 | Q.    Did you do that? |
| 09:41:30 | 12 | A.    I did attempt to get in touch with him.  I went |
| 09:41:33 | 13 | through the county's website.  I believe I left |
| 09:41:38 | 14 | voicemails.  I may have left a message with Ms. Buchanan. |
| 09:41:45 | 15 | I'm not sure.  And I believe I filled out a form online. |
| 09:41:47 | 16 | Q.    Did you receive any response to those requests to be |
| 09:41:50 | 17 | heard by Commissioner Moss? |
| 09:41:52 | 18 | A.    I did not. |
| 09:41:55 | 19 | Q.    Can you tell us briefly about other notable things |
| 09:41:59 | 20 | that you've done with and through the library foundation? |
| 09:42:07 | 21 | A.    So when I joined that organization, the members that |
| 09:42:13 | 22 | were serving on that board had been serving for many, many |
| 09:42:16 | 23 | years.  I know that that organization had had a |
| 09:42:21 | 24 | letter-writing campaign.  They had previously organized a |
| 09:42:27 | 25 | street dance and I know that that was -- attendance to |

09:42:31  1  that event was complicated by weather.  And also, I think

09:42:37  2  there was another event that happened simultaneously to

09:42:41  3  that event.

09:42:42  4      So those were the activities that the board had

09:42:45  5  engaged in prior to my involvement.  When I joined, I

09:42:53  6  expressed my thoughts that maybe the board should engage

09:42:58  7  in some more community outreach to let people know about

09:43:02  8  that organization because as I had said, I didn't know

09:43:07  9  anything about it until I had spoken with Ms. Laning about

09:43:10  10  it.  So I proposed that we would plan a event for the

09:43:17  11  community and really just working on name recognition,

09:43:21  12  first and foremost.

09:43:24  13      So with that, I spearheaded and led a very

09:43:31  14  successful fundraiser event in April of this year.  It was

09:43:35  15  a Beatrix Potter garden party.  It was a family-friendly

09:43:40  16  event that we held at a park in town.  We wanted to keep

09:43:46  17  admission prices low while still covering our costs, and

09:43:48  18  so, children were free and adults were $5.  We provided

09:43:53  19  food.  There were games.  We had raffles.  We had the

09:43:59  20  local jazz band come out, and play by all accounts, it was

09:44:02  21  a great deal of work but a very successful community

09:44:06  22  event.

09:44:06  23  Q.  How much money did you raise with that event?

09:44:11  24  A.  Through sponsorships and after paying for the costs

09:44:16  25  of producing the event, we made about $6,000.

09:44:20  1  Q.   What is your current role on the board of the library
09:44:24  2  foundation?
09:44:28  3  A.   A few months going, I was unanimously elected the
09:44:32  4  president of that organization.
09:44:34  5  Q.   Please describe the ways in which you intend to use
09:44:36  6  the Llano Library in the future.
09:44:40  7  A.   I will continue to check out books at the library.  I
09:44:45  8  will continue to go there and utilize the publicly
09:44:50  9  available WiFi to do work on my laptop computer when I
09:44:54  10 need to.  I'll continue to check out books for myself, my
09:45:01  11 children.  When there is programming that is appropriate
09:45:03  12 for my family and mainly we will attend programming.  So I
09:45:11  13 very much see the county library system as being important
09:45:14  14 in our lives for the foreseeable future.
09:45:18  15 Q.   How do you decide which books you're going to check
09:45:23  16 out for yourself or on behalf of your children?
09:45:27  17 A.   It depends.  There's a number of ways.  So for
09:45:34  18 myself, sometimes there's a very specific book that I'm
09:45:36  19 looking for either for a book club meeting or just for my
09:45:42  20 own personal interest.  And so, I'll seek out a very
09:45:46  21 specific book.  Other times, I might have some idea of
09:45:52  22 what I want to get, for example, a cookbook and I might go
09:45:55  23 browse the shelves and try to find that.  Other times, a
09:46:01  24 display will catch my eye and that will lead me to a book
09:46:04  25 that I choose for myself.

09:46:08  1        When it comes to my children's books, it's also a
09:46:13  2   mixture of motivating factors that lead me to choose a
09:46:16  3   book.  Again, sometimes we will go for a very specific
09:46:21  4   title.  Maybe favorite book of my children's or maybe
09:46:25  5   we'll want to explore particular author, and so, we might
09:46:29  6   lead to that author section.  Sometimes the displays will
09:46:34  7   grab our eye.  Now that my son is in school, he
09:46:43  8   participates in book clubs, as well, so sometime we will
09:46:47  9   find items that fit the requirements for his book clubs,
09:46:50  10  too.
09:46:51  11       Sometimes I'll pick out the books for my children
09:46:54  12  and many times my children will choose their own books
09:46:58  13  right from the shelves.
09:47:01  14  Q.   Can you give us an example of when you perused, you
09:47:05  15  know, you or your child and found a particularly enjoyable
09:47:09  16  book?
09:47:11  17  A.   Yes.  Several years ago, it was in September at the
09:47:18  18  Llano branch of the library, they had a display up
09:47:23  19  commemorating Banned Books Week, and there was a book on
09:47:27  20  the shelf by Maurice Sendak, it's called In The Night
09:47:31  21  Kitchen.  It's a 1970 Caldecott Honor book.  And I saw it
09:47:35  22  on the shelf with other titles that I knew had a history
09:47:39  23  of being challenged and asked the children's librarian at
09:47:44  24  the time, which was, again, Dr. Ann Rossberg, I said, Ann,
09:47:48  25  why is a Maurice Sendak book on the banned books display?

09:47:53  1  And she said, well, why don't you know pick it up, take a

09:47:56  2  look and see if you can figure out why.

09:47:59  3       So I did.  I picked up the book, I thumbed

09:48:01  4  through it.  I was familiar with Maurice Sendak, and so,

09:48:04  5  we checked that book out and we took it home and I read it

09:48:08  6  with my soon, who was at that time a toddler, and he

09:48:13  7  absolutely delighted in it and loved it.  He said read it

09:48:18  8  again, momma, read it again, and so, I did.  And we read

09:48:20  9  it many, many times that first day that we checked it out

09:48:25  10  and several other times while we had it checked out.

09:48:30  11       We eventually returned that book to the library

09:48:33  12  and we checked it out other times.  And other times, we

09:48:39  13  would go to the library and he would see it on the shelf,

09:48:41  14  or I would see it on the shelf.  We would pull it off of

09:48:45  15  the shelf and read it there in the library.  I've since

09:48:48  16  read it with my daughter, as well, and it's one of my

09:48:50  17  children's very favorite books.  So I would not have known

09:48:55  18  about that book had we not just been browsing and looking

09:48:59  19  and had it not been out on display.

09:49:03  20  Q.   Do you think In The Night Kitchen is appropriate for

09:49:05  21  your children?

09:49:08  22  A.   I do find it appropriate for my children and my

09:49:11  23  family, yes.

09:49:12  24  Q.   How do you feel about others in Llano, including the

09:49:17  25  defendants, trying to decide what is appropriate for your

09:49:21  1  children or for yourself?

09:49:26  2  A.   I find that to be deeply upsetting.  Again, seeing

09:49:32  3  the joy that that book and other books have brought to my

09:49:39  4  family and knowing that if and when those books are

09:49:46  5  removed from the shelf and another family may not get the

09:49:49  6  opportunity to experience that same level of joy that we

09:49:53  7  have from those books, it's deeply impactful.  And holding

09:49:59  8  that right and that ability to read what I want and for my

09:50:06  9  children to read what they want.  That's a very dear core

09:50:13  10  value that I hold in my family.

09:50:27  11  Q.   Ms. Little, before we move on from how you find books

09:50:31  12  to read in the library, do you also use the electronic

09:50:36  13  catalog to identify books that you want to check out?

09:50:41  14  A.   Yes, I do.

09:50:43  15  Q.   And do you intend to continue using the electronic

09:50:47  16  catalog to identify books that you want to check out for

09:50:50  17  yourself and for your children?

09:50:52  18  A.   Yes, I do.

09:50:54  19  Q.   Ms. Little, I've handed you what we've marked as

09:51:31  20  Exhibit 91.  Can you identify that exhibit for us, please?

09:51:34  21  A.   Yes, I can.  This is my now personal copy of In The

09:51:41  22  Night Kitchen by Maurice Sendak.  It was formerly the

09:51:47  23  property of Llano County Library System.

09:51:49  24  Q.   Is this the copy that was removed from the Llano

09:51:55  25  County Library?

09:51:55  1    A.   Yes, it was.

09:51:56  2    Q.   How do you know that?

09:51:59  3    A.   Because it was given to me by a former children's

09:52:03  4    librarian, Tina Castelan.

09:52:06  5    Q.   Is there anything physically on the book that

09:52:10  6    indicates to you that this was the copy formerly held by

09:52:13  7    the Llano County Library?

09:52:15  8    A.   Yes.   There is the plastic protective covering.

09:52:21  9    There's a rectangular section at the top where the barcode

09:52:25  10   would be for checkout.   The spine is marked with ESEN for

09:52:32  11   Sendak and at the bottom is a sticker, and I don't know

09:52:38  12   what was on that piece of the sticker.   When I open the

09:52:42  13   book, I can see some tearing where they've taken out the

09:52:47  14   due date slip.   And at the very top, you can see some very

09:52:54  15   faint -- I don't know if it's faint ink or pencil in it,

09:52:59  16   says Llano.

09:53:02  17   Q.   Did Ms. Castelan tell you anything about that book

09:53:06  18   when she gave it to you?

09:53:09  19   A.   Yes, she did.   She gave this to me in the fall and

09:53:17  20   said, Leila, I thought you might want to keep this book.

09:53:22  21   We've taken it out of the catalog.   And when she had told

09:53:27  22   me this, I started to become familiar with the CREW manual

09:53:34  23   and weeding and I said, Tina, we've checked this book out.

09:53:42  24   Book wasn't removed for lack of circulation, was it?   And

09:53:45  25   she indicated that no, it was not removed for lack of

09:53:48  1  circulation.

09:53:49  2  Q.   Did she tell you why it was removed?

09:53:54  3  A.   No.

09:53:56  4  Q.   You mentioned that you received it in the fall.  The

09:53:59  5  fall of which year?

09:54:01  6  A.   Fall of 2022.  Or, excuse me, the fall of 2021.  It

09:54:07  7  was last fall.

09:54:09  8  Q.   Were you present in the courtroom on Friday to hear

09:54:12  9  Ms. Milum's testimony?

09:54:14  10  A.   Yes, ma'am, I was.

09:54:15  11  Q.   And did you hear Mr. Mitchell ask her questions about

09:54:20  12  why In The Night Kitchen was removed, even though it had

09:54:24  13  been checked out recently?

09:54:26  14  A.   Yes.

09:54:27  15  Q.   Do you remember hearing her say that it's because the

09:54:30  16  book was damaged?

09:54:33  17  A.   I believe she indicated --

09:54:35  18       MR. MITCHELL:  Objection.  That mischaracterizes

09:54:37  19  her testimony.

09:54:37  20       THE COURT:  The record will be what it is.

09:54:45  21       MR. MITCHELL:  Thank you.

09:54:45  22  Q.   (BY MS. CHIARELLO) You can finish your answer?

09:54:47  23  A.   I believe, yes, she indicated that that could have

09:54:50  24  been a reason why it was removed.

09:54:53  25  Q.   Is the copy of In The Night Kitchen that was removed

09:54:57   1   in December of 2021 from the Llano County Library and

09:55:02   2   given to you by Ms. Castelan damaged in any way?

09:55:07   3   A.   I find it to be in excellent condition.  I don't find

09:55:14   4   any tears or stains or any damage to it.

09:55:20   5   Q.   Your Honor, I move to admit Exhibit 91.

09:55:23   6          MR. MITCHELL:  No objection.

09:55:24   7          THE COURT:  So admitted.

09:55:26   8   Q.   (BY MS. CHIARELLO) Ms. Little, do you intend to read

09:55:31   9   any of the books that Ms. Milum removed at Judge

09:55:36  10   Cunningham's and Commissioner Moss' direction?

09:55:39  11   A.   Yes, I do.

09:55:45  12   Q.   Are you aware of what we've called the secret lending

09:55:51  13   library and the defendants have referred to as the inhouse

09:55:53  14   checkout system?

09:55:55  15   A.   Yes.

09:55:58  16   Q.   How did you become aware of the inhouse checkout

09:56:02  17   system?

09:56:05  18   A.   I believe I first became aware of that through legal

09:56:09  19   documents pertaining to this litigation.  Following that,

09:56:16  20   I did read about it.  I believe it was in the Daily Trib

09:56:23  21   newspaper that referred to the court filings referring to

09:56:27  22   it.  And following that, a librarian had told me about it.

09:56:34  23   Q.   Have you ever seen anything publicly posted about it

09:56:37  24   in the library?

09:56:39  25   A.   I have not.

| | | |
|---|---|---|
| 09:56:40 | 1 | Q.   Have you seen anything posted in the library's glass |
| 09:56:44 | 2 | display case? |
| 09:56:46 | 3 | A.   No, I've not. |
| 09:56:47 | 4 | Q.   Have you seen anything posted on the community |
| 09:56:50 | 5 | bulletin board? |
| 09:56:52 | 6 | A.   No. |
| 09:56:53 | 7 | Q.   Have you seen anything posted on the small sign |
| 09:56:56 | 8 | display at the library? |
| 09:56:58 | 9 | A.   No. |
| 09:56:59 | 10 | Q.   Have you seen anything posted at the circulation |
| 09:57:01 | 11 | desk? |
| 09:57:03 | 12 | A.   No. |
| 09:57:05 | 13 | Q.   Have you seen anything about the inhouse checkout |
| 09:57:09 | 14 | system discussed in the library newsletter? |
| 09:57:13 | 15 | A.   No, I have not. |
| 09:57:14 | 16 | Q.   Are all of those places that we've just discussed, |
| 09:57:18 | 17 | places where information about books or programming at the |
| 09:57:22 | 18 | library is generally placed? |
| 09:57:25 | 19 | A.   Yes. |
| 09:57:28 | 20 | Q.   Are any of the books the defendants contend are in |
| 09:57:32 | 21 | the secret inhouse checkout system listed in the card |
| 09:57:35 | 22 | catalog? |
| 09:57:39 | 23 | A.   No, they are not. |
| 09:57:42 | 24 | Q.   Based on what you've read in the litigation papers |
| 09:57:46 | 25 | and in the newspaper, what do you understand about how |

09:57:50  1  someone might be able to get their hands on one of these

09:57:54  2  books?

09:57:56  3  A.   Can you repeat that question one more time?

09:57:58  4  Q.   Sure.  How do you understand someone might -- if

09:58:03  5  they're not in the card catalog and there's no signage or

09:58:06  6  anything public about these books that are in the inhouse

09:58:11  7  checkout system, how do you understand that someone might

09:58:14  8  be able to take them out of the library?

09:58:18  9  A.   It is my understanding that if one wants to check out

09:58:25  10  or read one of those books, then one would have to ask one

09:58:32  11  of the library employees and directly inquire about a

09:58:36  12  specific book.

09:58:37  13  Q.   Who are the people who work at the circulation desk

09:58:41  14  in the Llano Library?

09:58:43  15  A.   To the best of my knowledge right now, there are two

09:58:49  16  employees that work at the Llano branch of the library

09:58:52  17  system.  One is defendant and Library Director Amber Milum

09:58:58  18  and the other is Mr. Richard Lelle.

09:59:01  19  Q.   Do you know Ms. Milum and Mr. Lelle?

09:59:04  20  A.   I'm certainly acquainted with all of the library

09:59:08  21  employees.

09:59:09  22  Q.   Do you know how many people live in Llano?

09:59:13  23  A.   I know it's somewhere between 3,000 and 3,500 people.

09:59:18  24  Q.   And how many people live in Llano County?

09:59:22  25  A.   It's around 21,000 people.

| | | |
|---|---|---|
| 09:59:27 | 1 | Q.   Have you used the inhouse checkout system? |
| 09:59:34 | 2 | A.   I have not. |
| 09:59:34 | 3 | Q.   Why not? |
| 09:59:37 | 4 | A.   First of all, the existence of it seems antithetical |
| 09:59:44 | 5 | to what a public library is and represents and should be. |
| 09:59:52 | 6 | Again, libraries to me are places where there's a wide |
| 09:59:59 | 7 | variety of materials available freely to the public and is |
| 10:00:07 | 8 | easily accessible.  So the notion of a collection of books |
| 10:00:15 | 9 | that is hidden from view and requires a prior knowledge to |
| 10:00:26 | 10 | access and then, also requires me to ask employees to |
| 10:00:32 | 11 | navigate this secretive list, none of that makes sense to |
| 10:00:39 | 12 | me. |
| 10:00:45 | 13 | Q.   In the past, Llano Library used OverDrive for its |
| 10:00:51 | 14 | electronic book collection, correct? |
| 10:00:52 | 15 | A.   That's correct. |
| 10:00:54 | 16 | Q.   Have you used OverDrive for e-books in the past? |
| 10:00:57 | 17 | A.   Yes, I have. |
| 10:00:59 | 18 | Q.   How did you feel about using OverDrive for access to |
| 10:01:03 | 19 | e-books? |
| 10:01:05 | 20 | A.   I like OverDrive.  I prefer it.  I also used its |
| 10:01:12 | 21 | sister app Libby.  But yeah, I enjoy using the OverDrive |
| 10:01:18 | 22 | catalog to read my e-books.  When I read e-books, I |
| 10:01:23 | 23 | typically prefer to do it on my Kindle e-reader. |
| 10:01:30 | 24 | Q.   Why is that? |
| 10:01:32 | 25 | A.   Several reasons.  First being that if I'm going to |

10:01:36  1  sit down and read a book, I want to be able to focus on

10:01:40  2  the book and sit down and read the book.  So I like the

10:01:46  3  idea of an e-book, but I don't like the idea of doing it

10:01:50  4  on my telephone or a tablet where I could get distracted

10:01:53  5  by text messages, phone calls, notifications, you know,

10:01:59  6  check the time, check my e-mail.  So reading on my Kindle

10:02:05  7  e-reader allows me to focus on the task at hand and not

10:02:08  8  get distracted by other accessibility features.

10:02:11  9      In addition, once my children get old enough to

10:02:15  10  start reading e-books, I would like to give them an

10:02:21  11  e-reader similar to mine that allows them to read books

10:02:25  12  but that doesn't allow them to similarly get distracted by

10:02:31  13  apps and other functionality of tablets or cellphones.

10:02:35  14  Q.  And those -- I'm not a user of an e-reader.  Those

10:02:40  15  accessibility features that you were just talking about

10:02:42  16  distracting you on the tablet, those things are not

10:02:46  17  available on your e-reader that you used with OverDrive;

10:02:50  18  is that correct?

10:02:51  19  A.  That's correct.

10:02:53  20  Q.  Have you tried to use Bibliotheca, the current

10:02:59  21  offering of electronic books through the library?

10:03:01  22  A.  Yes, I have.  I've used the cloudLibrary app and the

10:03:05  23  Bibliotheca catalog books.

10:03:08  24  Q.  Do you like using that function?

10:03:11  25  A.  I don't prefer it.

10:03:13  1   Q.   And why is that?

10:03:15  2   A.   So with that app, it doesn't allow me to read e-books

10:03:20  3   on an E Ink e-reader.  It requires the use of a tablet, or

10:03:26  4   a phone, or a computer.

10:03:31  5   Q.   When did you first become aware that certain citizens

10:03:35  6   were attempting to sensor books in the Llano Public

10:03:42  7   Library?

10:03:42  8   A.   So through any involvement with the Llano County

10:03:48  9   Library System Foundation, I'd become acquainted with

10:03:52  10  former president of that organization, Jeanne Puryear.

10:03:56  11  And so, at that point in time, we were -- you know, we

10:03:59  12  were colleagues on this board, we were acquaintances.  And

10:04:07  13  I had run into her in October and she had told me about a

10:04:16  14  commissioners' court meeting that she had been in

10:04:21  15  attendance.  At that commissioners' courts meeting, she

10:04:24  16  indicated that there were many people, about a dozen or

10:04:30  17  so, who got up and spoke in favor of censoring books.

10:04:36  18        I recall I need to back up a little bit, too.  In

10:04:41  19  the summer of 2021, we were preparing for a board meeting

10:04:46  20  for the foundation, and at that point in time, you know, I

10:04:50  21  had talked with Amber Milum about plans for the foundation

10:04:55  22  and she had been coming to our board meetings, some of

10:05:00  23  them, and she mentioned to me that summer that there were

10:05:04  24  some people that were concerned about certain books and

10:05:08  25  specifically mentioned former librarian Rhonda Schneider

| | | |
|---|---|---|
| 10:05:12 | 1 | by name at that time.  And so, she had said yes, there |
| 10:05:15 | 2 | were people that were wanting to remove books from the |
| 10:05:18 | 3 | library.  So that was when I first heard about it and |
| 10:05:22 | 4 | then, a few months later. |
| 10:05:23 | 5 | Q.   Let me interrupt you for just a moment.  What books |
| 10:05:26 | 6 | did Ms. Schneider want Ms. Milum to remove from the |
| 10:05:30 | 7 | library shelves? |
| 10:05:34 | 8 | A.   To the best of my knowledge, I think she told me it |
| 10:05:40 | 9 | was the Fart and the Butt books. |
| 10:05:46 | 10 | Q.   All right.  Next, you were talking about in October |
| 10:05:48 | 11 | of '21 when you learned about the people speaking at the |
| 10:05:51 | 12 | commissioners' court in favor of banning books. |
| 10:05:54 | 13 | A.   That's correct.  So Jeanne and I speak about that |
| 10:05:59 | 14 | commissioners' court meeting in the library, |
| 10:06:03 | 15 | commissioners' court was on a Monday.  I believe I ran |
| 10:06:08 | 16 | into Jeanne on Tuesday or Wednesday of that week and we |
| 10:06:10 | 17 | had discussed it.  And then, I got my subscription copy of |
| 10:06:18 | 18 | Llano News that week and I read the coverage of |
| 10:06:20 | 19 | commissioners' court and confirmed that, you know, they |
| 10:06:22 | 20 | had written about people getting up and speaking in |
| 10:06:25 | 21 | opposition of certain books at that meeting. |
| 10:06:29 | 22 | So when that occurred, it was concerning to me |
| 10:06:37 | 23 | that there was a large contingency speaking about removing |
| 10:06:43 | 24 | books, and I felt it was important that another point of |
| 10:06:48 | 25 | view was represented to my elected officials. |

| | | |
|---|---|---|
| 10:06:51 | 1 | Q.    So what did you do next? |
| 10:06:55 | 2 | A.    So I thought a great deal about it.  I spoke with my |
| 10:07:01 | 3 | husband about it and I started doing some research.  So I |
| 10:07:09 | 4 | read about the history of censorship, I read about Supreme |
| 10:07:14 | 5 | Court cases.  I learned about, you know, the Miller test |
| 10:07:18 | 6 | for obscenity.  So I did a lot of homework and I drafted |
| 10:07:25 | 7 | and revised and revised and created a speech, and then, I |
| 10:07:32 | 8 | read that speech verbatim allowed at the following |
| 10:07:36 | 9 | November 8th commissioners' court meeting. |
| 10:07:39 | 10 | Q.    Did you do some of that research in the library? |
| 10:07:43 | 11 | A.    I believe I did.  I took my laptop to the library |
| 10:07:49 | 12 | with me during story time, while my children were doing |
| 10:07:54 | 13 | that, I would be researching and writing. |
| 10:07:56 | 14 | Q.    What happened when you spoke at the November |
| 10:07:59 | 15 | commissioners' court meeting? |
| 10:08:02 | 16 | A.    So I spoke for my three minutes of allotted time.  If |
| 10:08:08 | 17 | I recall correctly at that November 8th meeting, I was the |
| 10:08:12 | 18 | only voice that spoke in opposition of censorship, and I |
| 10:08:20 | 19 | know several other people at that meeting spoke up in |
| 10:08:23 | 20 | favor of censoring books. |
| 10:08:27 | 21 | Q.    Did Commissioner Moss speak with you during that |
| 10:08:31 | 22 | meeting about your testimony? |
| 10:08:33 | 23 | A.    He did not speak to me at the November 8th meeting. |
| 10:08:36 | 24 | He spoke to me at the subsequent meeting, I believe. |
| 10:08:40 | 25 | Q.    Okay.  And what did Commissioner Moss say to you when |

10:08:44 1 you spoke at the subsequent meeting?

10:08:47 2 A.   He asked me what my definition of pornography was.

10:08:53 3 Q.   And what did you tell him?

10:08:55 4 A.   Well, I referred back to my previous education and my

10:09:02 5 U.S. government class at Llano High School and the

10:09:08 6 research that I've done and I said, you know, pornography

10:09:10 7 is a subjective definition, like obscenity, and that, you

10:09:17 8 know, everybody might have a different opinion of that,

10:09:19 9 that it might be different for everybody.

10:09:21 10 Q.   How did Commissioner Moss respond to you?

10:09:25 11 A.   To the best of my recollection, he said something

10:09:28 12 like, well, it's pretty plain to me if it's got sex in it,

10:09:32 13 it's porn.

10:09:36 14 Q.   What happened after you had spoken at these two

10:09:40 15 commissioners' court meetings about your opposition to

10:09:43 16 banning books in the library?

10:09:47 17 A.   I had reached out, you know, to speak with my

10:09:51 18 commissioner and with the county judge.  I was

10:09:56 19 appreciative that County Judge Ron Cunningham did place a

10:10:00 20 phone call to me.  We had a brief phone conversation.  I

10:10:05 21 expressed my concerns, reiterated points I had made in

10:10:08 22 commissioners' court.  He assured me that my concerns had

10:10:14 23 been heard and that I was welcome to return to

10:10:18 24 commissioners' court to speak again.  He declined to meet

10:10:22 25 with me.

| 10:10:24 | 1 | Q. So you made a specific ask to meet with him and he |
| 10:10:29 | 2 | rejected that request? |
| 10:10:31 | 3 | A. That's correct. |
| 10:10:33 | 4 | Q. Were you here in court yesterday when Judge |
| 10:10:36 | 5 | Cunningham was testifying? |
| 10:10:38 | 6 | A. On Friday, yes, I was. |
| 10:10:40 | 7 | Q. I'm sorry. It feels like yesterday. And did you |
| 10:10:44 | 8 | hear Judge Cunningham testify that all anyone has to do to |
| 10:10:46 | 9 | get a meeting with him is just give him a call and he's |
| 10:10:49 | 10 | happy to meet with them? |
| 10:10:50 | 11 | A. Yes, I did. |
| 10:10:52 | 12 | Q. Was that your experience with Judge Cunningham? |
| 10:10:55 | 13 | A. It was not. |
| 10:10:58 | 14 | Q. I'm going to draw your attention to what's been |
| 10:11:00 | 15 | previously marked as Exhibit 88. You have it in your book |
| 10:11:07 | 16 | right in front of you, Ms. Little. I believe it's on page |
| 10:11:12 | 17 | 2 or 3, the December 2nd, 2021 e-mail from Ms. Wells. Did |
| 10:11:31 | 18 | you hear Ms. Wells testify about that e-mail, just prior |
| 10:11:35 | 19 | to your getting on the stand? |
| 10:11:36 | 20 | A. Yes, I did. |
| 10:11:37 | 21 | Q. All right. And you heard her and read that she was |
| 10:11:42 | 22 | advising her friends to thank Judge Cunningham and |
| 10:11:47 | 23 | Commissioner Moss at the next Tea Party meeting in part |
| 10:11:50 | 24 | for refusing to meet with you and for supporting the |
| 10:11:54 | 25 | removal of books from the library, right? |

| | | |
|---|---|---|
| 10:11:57 | 1 | A.    Yes, I did hear that. |
| 10:11:59 | 2 | Q.    Okay.  Have you seen that e-mail before court today? |
| 10:12:04 | 3 | A.    Yes, I have. |
| 10:12:05 | 4 | Q.    When was the first time that you saw that e-mail? |
| 10:12:08 | 5 | A.    So my fellow plaintiff board member and now friend, |
| 10:12:14 | 6 | Jeanne Puryear forwarded that e-mail to me on December |
| 10:12:17 | 7 | 5th. |
| 10:12:19 | 8 | Q.    How did you feel when you read that e-mail from Ms. |
| 10:12:25 | 9 | Wells? |
| 10:12:26 | 10 | A.    Physically ill.  It made my stomach drop.  When I'd |
| 10:12:35 | 11 | received this e-mail, I had been at commissioners' court |
| 10:12:41 | 12 | at previous meetings in November, and I talked with Jeanne |
| 10:12:45 | 13 | about the people speaking in favor of censorship in |
| 10:12:50 | 14 | October.  I had attempted to contact my elected officials |
| 10:12:55 | 15 | and I had learned that books had been removed.  I was |
| 10:13:07 | 16 | doing the things that I thought one should do, attending |
| 10:13:11 | 17 | meetings, speaking out in public, and nothing had changed. |
| 10:13:18 | 18 | And when I got this e-mail, I learned that Ms. |
| 10:13:26 | 19 | Wells was contacting many people in town, people that I |
| 10:13:32 | 20 | knew to be local donors to charitable organizations, |
| 10:13:41 | 21 | people who I would consider to be pillars of the |
| 10:13:45 | 22 | community, one woman who was a cohostess at my bridal |
| 10:13:52 | 23 | shower, you know, decades before, people that knew my |
| 10:13:57 | 24 | in-laws.  There were a lot of names on there that I |
| 10:14:02 | 25 | recognized and people that I thought I knew and thought |

10:14:05  1  that knew me.  So that was upsetting.

10:14:09  2      Secondly, when I read the section where Rochelle

10:14:15  3  Wells refers to that lady who spoke about censorship, I

10:14:20  4  knew she was talking about me because I was the one

10:14:22  5  speaking out at those meetings.  Learning that I clearly

10:14:31  6  had inequal access to my elected officials, that she had

10:14:38  7  knowledge of upcoming agenda items for a public meeting

10:14:43  8  before those things would be posted to the public,

10:14:47  9  understanding that she was meeting with elected officials

10:14:53  10 at Tea Party meetings and thanking my elected officials

10:14:59  11 and I didn't have that same access was deeply upsetting.

10:15:07  12 Q.   You testified that you also reached out to

10:15:10  13 Commissioner Moss at that time.  Did he ever respond to

10:15:15  14 your request for a meeting?

10:15:16  15 A.   No, he did not.

10:15:17  16 Q.   Was that a surprise to you?

10:15:21  17 A.   No, it was not, because I had previously reached out

10:15:24  18 to him and received no response.

10:15:28  19 Q.   How did you learn that the commissioners' court

10:15:32  20 intended to close the library in December and to disband

10:15:38  21 the library board?

10:15:39  22 A.   I learned about it through this e-mail.

10:15:43  23 Q.   Had in the past, had Llano County, the commissioners'

10:15:48  24 court ever closed the library for a three-day period?

10:15:53  25 A.   To the best of my knowledge, no.

| 10:15:59 | 1 | Q.   Prior to this, had Llano County ever disbanded -- |
| 10:16:03 | 2 | wholly disbanded its library board and appointed a |
| 10:16:05 | 3 | brand-new one? |
| 10:16:07 | 4 | A.   To the best of my knowledge, no. |
| 10:16:09 | 5 | Q.   What did you do next with respect to the appointment |
| 10:16:17 | 6 | of the new library board? |
| 10:16:25 | 7 | A.   I drafted a letter and I hand-delivered it to Llano |
| 10:16:31 | 8 | County Courthouse and nobody was in Ms. Buchanan's office |
| 10:16:36 | 9 | at that time, so I had a stack of these addressed to each |
| 10:16:42 | 10 | county commissioner and the county judge stating my |
| 10:16:46 | 11 | interest, you know, sort of my qualifications being that |
| 10:16:53 | 12 | I've, you know, been a supporter of the library.  I'm a |
| 10:17:00 | 13 | member of the friends, I'm a board member of the |
| 10:17:02 | 14 | foundation, an avid patron of the library requesting |
| 10:17:07 | 15 | consideration to be placed on that board. |
| 10:17:10 | 16 | Q.   Did you ever hear anything in response to those |
| 10:17:13 | 17 | requests? |
| 10:17:14 | 18 | A.   No, I did not. |
| 10:17:17 | 19 | Q.   After the new library board was appointed, did you |
| 10:17:22 | 20 | take any steps to participate or attend meetings at that |
| 10:17:32 | 21 | point? |
| 10:17:32 | 22 | A.   So I was informed of the time and the place for the |
| 10:17:36 | 23 | first library advisory board meeting by my friend Jeanne |
| 10:17:42 | 24 | Puryear.  Unfortunately, I was unable to attend as I |
| 10:17:46 | 25 | tested positive for COVID, so I was unable to attend that |

10:17:49  1  first meeting.  I did, however, attend all subsequent

10:17:52  2  library advisory board meetings that were open to the

10:17:54  3  public.

10:17:55  4  Q.   And did you make any speeches or hand out any

10:18:00  5  information with respect to those meetings?

10:18:04  6  A.   Yes, I did.  At the first meeting that I attended, I

10:18:08  7  believe it was at the Kingsland branch of the library, I

10:18:11  8  did not sign up to speak as I wanted to first listen.

10:18:17  9  That at subsequent meetings where public comment was

10:18:21  10 allowed, I did speak.  I created a handout and I provided

10:18:29  11 that to every member of the library advisory board.  I had

10:18:34  12 sent them e-mails, as well.  So yeah, I put together a

10:18:40  13 handout, included e-mails from Ms. Wells so that the board

10:18:46  14 understood, you know, coordination and things going on.

10:18:50  15 It included material about the Miller test, suggestions

10:18:55  16 for ways which we could improve the library, and a cover

10:19:01  17 letter from me.

10:19:03  18 Q.   What -- and then, what did you do after the library

10:19:10  19 board meetings were closed?

10:19:23  20 A.   So can you be more specific?

10:19:25  21 Q.   Sure.  So you testified that you presented this

10:19:28  22 information to the library board.  Did you get any

10:19:31  23 responses to the information you had presented?

10:19:36  24 A.   I believed whenever I had first contacted the board,

10:19:40  25 I sent my e-mails to the personal address of Ms. Bonnie

10:19:44  1   Wallace and Ms. Gay Baskin as that was what was provided
10:19:47  2   to the public on a handout they informed me to contact the
10:19:53  3   board via their Gmail account.  So yeah, I had e-mailed
10:20:00  4   them through that and yeah, you know, I continued to
10:20:06  5   attend meetings when I could.
10:20:08  6   Q.   Did you take any additional action with other
10:20:15  7   like-minded citizens in the community?
10:20:17  8   A.   Yes, I did.  So in December when I got this e-mail,
10:20:26  9   after I had been attending meetings when I understood that
10:20:29  10  this was a bigger issue than what I had previously
10:20:40  11  thought, I contacted the media, and so, there was some
10:20:43  12  news coverage that began in December.  Following that news
10:20:49  13  coverage, I began to hear about other citizens who were
10:20:54  14  concerned about the library closure, about the
10:21:00  15  reconstitution of the library board, about the removal of
10:21:03  16  OverDrive.  So I saw these people on news stories.  I read
10:21:10  17  letters to the editor.  And so, I knew there were some
10:21:14  18  people out there who were equally concerned as I was, but
10:21:19  19  I didn't know how to reach them.  I didn't know them
10:21:21  20  personally.
10:21:23  21       At that very first library board meeting that
10:21:28  22  Jeanne was able to attend, I believe she met my
10:21:33  23  co-plaintiff and my friend, Ms. Beck Jones at that
10:21:36  24  meeting.  And I believe Beck had told Jeanne that they had
10:21:42  25  a little bit of a group that had been meeting and

10:21:46　1　discussing these issues concerning our library.  And so,

10:21:51　2　I believe Beck and Jeanne exchanged contact information

10:21:55　3　and they got in touch with me and invited me to join their

10:22:00　4　little group.  And it was just a group of citizens that

10:22:05　5　got together regularly to meet and share our concerns

10:22:09　6　about our library system.

10:22:13　7　　　　　So we began meeting, we began talking and, again

10:22:20　8　once, we all shared information.  We began to understand

10:22:27　9　that just speaking up at commissioners' court wasn't going

10:22:31　10　to effect change at our library system, and so, we came up

10:22:35　11　with the idea of obtaining more information.  So we did

10:22:41　12　that via public records requests and we banded together,

10:22:46　13　we raised some funds to pay for those requests, as well.

10:22:49　14　Q.　How much money did you need to pay for those funds

10:22:52　15　for those records?

10:22:54　16　A.　We needed about $2,000.

10:23:01　17　Q.　What did you discover from the documents you received

10:23:05　18　in response to these public records requests?

10:23:09　19　A.　We received a lot of e-mails and once we got the

10:23:16　20　first batch that we'd requested, that led to more

10:23:20　21　questions and led to us requesting additional documents.

10:23:27　22　So with each proverbial layer of the onion that was peeled

10:23:32　23　back, we learned more information and understood that

10:23:40　24　there was a coordinated effort to do things that were

10:23:44　25　negatively impacting our library system.

10:23:46  1   Q.   And what were those things?

10:23:50  2   A.   Book removal, this coordination of appointing members

10:23:57  3   to this library advisory board, getting rid of OverDrive

10:24:03  4   because of concerns about specific materials on there.

10:24:10  5   Q.   And did you learn anything specific about which books

10:24:15  6   the commissioners' court and the county judge and the

10:24:20  7   newly appointed library board were interested in removing?

10:24:24  8   A.   Yes.  I believe it was through our public information

10:24:28  9   requests that we learned about a document called the

10:24:31  10  Bonnie Wallace book list.

10:24:33  11  Q.   Do you understand where Ms. Wallace's book list

10:24:38  12  originated?

10:24:39  13  A.   Yes.  In reading through e-mails, it appears that

10:24:43  14  that document is derivative of books from the Krause list.

10:24:51  15  And so, it appears that it is the books of the Krause list

10:24:58  16  searched through the library's catalog, identified which

10:25:01  17  books were within the Llano County Library System and

10:25:05  18  placed on there, and that is what was the Bonnie Wallace

10:25:08  19  book list.

10:25:10  20  Q.   Are you familiar with a letter from Representative

10:25:13  21  Krause to which he attached that book list?

10:25:17  22  A.   Yes, I am.

10:25:18  23  Q.   All right.  Could we load Exhibit 6.  I'd like to

10:25:22  24  draw your attention in your book to Exhibit 6.  Have you

10:25:29  25  seen this document before?

| | | |
|---|---|---|
| 10:25:53 | 1 | A.   Yes, I have. |
| 10:25:54 | 2 | Q.   Can you identify that for the Court, please? |
| 10:25:57 | 3 | A.   This appears to be the letter from Representative |
| 10:26:01 | 4 | Krause and the attached spreadsheet of books. |
| 10:26:06 | 5 | Q.   I move to admit Exhibit 6 into evidence. |
| 10:26:09 | 6 |         MR. MITCHELL:  Your Honor, we're not sure she's |
| 10:26:12 | 7 | laid the proper predicate to show that she can |
| 10:26:14 | 8 | authenticate this document. |
| 10:26:17 | 9 |         MS. CHIARELLO:  I'm happy to have some more |
| 10:26:19 | 10 | questions, your Honor. |
| 10:26:19 | 11 |         THE COURT:  Okay. |
| 10:26:21 | 12 |         MR. MITCHELL:  Thank you. |
| 10:26:23 | 13 | Q.   (BY MS. CHIARELLO) Ms. Little, when is the first time |
| 10:26:25 | 14 | that you saw this letter? |
| 10:26:28 | 15 | A.   I believe the first time I saw it may have been in |
| 10:26:31 | 16 | February. |
| 10:26:34 | 17 | Q.   And how did it come to your attention in February? |
| 10:26:36 | 18 | And I'm sorry, in February of what year? |
| 10:26:37 | 19 | A.   This year, 2022. |
| 10:26:39 | 20 | Q.   How did it come to your attention in February of |
| 10:26:42 | 21 | 2022? |
| 10:26:42 | 22 | A.   I was e-mailed a link that linked to access to this |
| 10:26:51 | 23 | list and this letter. |
| 10:26:55 | 24 | Q.   And is Exhibit 6 a true and correct copy of that list |
| 10:26:59 | 25 | in that letter? |

| | | |
|---|---|---|
| 10:27:01 | 1 | A.   Yes.  To the best of my knowledge, this is what I saw |
| 10:27:04 | 2 | in the document that was e-mailed to me. |
| 10:27:06 | 3 | Q.   And at the document, its heading has the Texas House |
| 10:27:10 | 4 | of Representative seal on it, correct? |
| 10:27:14 | 5 | A.   Yes.  That is correct. |
| 10:27:15 | 6 | Q.   All right.  And on the last page, it has a typed and |
| 10:27:20 | 7 | handwritten or machine-written signature for |
| 10:27:24 | 8 | Representative Krause? |
| 10:27:28 | 9 | A.   Yes, it does. |
| 10:27:30 | 10 | Q.   Is Exhibit 6 a true and correct copy of the letter |
| 10:27:33 | 11 | that you viewed by clicking through the February 2022 |
| 10:27:38 | 12 | article that -- about Representative Krause and the books |
| 10:27:43 | 13 | that he was interested in? |
| 10:27:44 | 14 | A.   Yes, it is. |
| 10:27:45 | 15 | Q.   Again, I move for admission of Exhibit 6. |
| 10:27:49 | 16 |         MR. MITCHELL:  No objection. |
| 10:27:49 | 17 |         THE COURT:  So admitted. |
| 10:27:53 | 18 | Q.   (BY MS. CHIARELLO) I'd like to call up Exhibit 89. |
| 10:28:19 | 19 | Ms. Little, if you'll just let us know after you've had a |
| 10:28:23 | 20 | chance to take a quick look at that because I'd like you |
| 10:28:31 | 21 | to tell us what it is. |
| 10:28:41 | 22 | A.   Yes.  This appears to be the list of interrogatories |
| 10:28:44 | 23 | that my co-plaintiffs and I answered in response to |
| 10:28:48 | 24 | defendants. |
| 10:28:49 | 25 | Q.   And you verified or swore to them under oath; is that |

10:28:55 1 correct?

10:28:55 2 A.   That is correct.

10:28:55 3 Q.   All right.  I move for the admission of Exhibit 89.

10:28:58 4        MR. MITCHELL:  No objection, your Honor.

10:28:58 5        THE COURT:  So admitted.

10:29:00 6 Q.   (BY MS. CHIARELLO) Ms. Little, why did you bring this

10:29:10 7 lawsuit and why is it important to you to be here today?

10:29:23 8 A.   Like I said before, the ability to choose what one

10:29:30 9 reads is a very dear core value to my family, passed down

10:29:37 10 through multiple generations and one that I will impart to

10:29:41 11 my own children.  Books that have had a dramatic impact

10:29:50 12 upon me personally and upon my children have been banned

10:29:55 13 or challenged over the years.  One time, we went to the

10:30:07 14 Llano County Library, the Llano branch and my son at the

10:30:11 15 time was three years old and he walked over to the graphic

10:30:18 16 novel section in the library and he chose a book on his

10:30:23 17 own, and that book was called Dog Man: Unleashed.  It's

10:30:27 18 written by an author named Dav Pilkey.  And again, my son

10:30:32 19 is three years old.  This book is far above his reading

10:30:38 20 level or recommended age group, but he said mom, I want to

10:30:43 21 get this book.  And I said, well, son, it's really thick.

10:30:49 22 It's got a lot of words in it.  Are you sure that's the

10:30:52 23 book for you?  And he said yeah.  I want to get it.  I

10:30:58 24 said okay.

10:30:59 25        So we checked out that book and he wouldn't even

10:31:02  1    let me put it in the bag to take home.  He wanted to read

10:31:06  2    it in the car.  So he read that book to himself in the car

10:31:12  3    seat going home, and, then, we got home and he plopped

10:31:14  4    himself on the couch and he read that book to himself over

10:31:17  5    and over and over again.  And then, he asked for me to

10:31:21  6    read it to him, which I did repeatedly.  And he asked his

10:31:24  7    daddy to read it to him and he did repeatedly.

10:31:29  8          That first Dog Man: Unleashed book brought him

10:31:35  9    hours of joy and he chose that book himself.  Seeing his

10:31:42  10   love for that particular book, you know, I encouraged him

10:31:48  11   -- after we found out it was a series, I said, well, let's

10:31:51  12   read the other Dog Man books, so we did, and again, hours

10:31:55  13   and days spent with him reading and loving this book and

10:32:02  14   that series of books.  And the library system didn't have

10:32:06  15   all of the Dog Man books, and so, for Christmas, for his

10:32:11  16   birthday, my husband and I would purchase all of the books

10:32:15  17   in that series.  And in fact, we've already pre ordered a

10:32:19  18   Dog Man No. 11 coming out in the spring.

10:32:23  19         And so, once we plowed through all of those, then

10:32:25  20   we started to explore Mr. Pilkey's other books, Ricky

10:32:31  21   Ricotta and Captain Underpants series.  And so, now we've

10:32:38  22   begun to plow through those books.  We together wrote Mr.

10:32:44  23   Pilkey a letter, you know, my son wrote him a letter

10:32:47  24   independently and, you know, with help.  I, you know,

10:32:50  25   helped him spell the words, but he came up with the

10:32:53  1   content that he wanted to tell Mr. Pilkey, and I wrote him

10:32:56  2   a letter thanking him for writing these books, which have

10:33:01  3   brought so much joy to my son and my children.  For my

10:33:06  4   son's birthday, he wanted a Dog Man cake.  So I made him a

10:33:11  5   Dog Man cake.  And for Christmas, I bought him a Dog Man

10:33:16  6   Hot Dog card game.  And I bought him a board game, Lord Of

10:33:23  7   The Fleas.  And for world book day at school, you're

10:33:26  8   supposed to dress up like your favorite character from a

10:33:30  9   book and my son wanted to dress up as a terrifying talking

10:33:34  10  toilet from Captain Underpants series, so I made him a

10:33:39  11  costume and he wore it proudly.  And I have earrings that

10:33:42  12  have Dog Man and Captain Underpants on them.

10:33:45  13       So that author and that book series the Captain

10:33:54  14  Underpants book series have brought my family days and

10:33:57  15  hours and years worth of joy and family bonding.  And Dav

10:34:05  16  Pilkey's books have a history of being challenged.  So

10:34:12  17  when I see censorship in action and when I know that books

10:34:21  18  being removed from shelves simply because people disagree

10:34:27  19  with their content or the viewpoint expressed therein,

10:34:34  20  it's deeply, deeply troubling and affects me personally.

10:34:42  21  Q.  Thank you very much, Ms. Little.  I pass the witness.

10:34:49  22                  CROSS-EXAMINATION

10:34:50  23  BY MR. MITCHELL:

10:34:50  24  Q.  Good morning, Ms. Little.

10:35:00  25  A.  Good morning.

```
10:35:01   1   Q.   Ms. Little, you sued my clients because you claim
10:35:06   2   they're violating your constitutional rights under the
10:35:08   3   First Amendment; is that correct?
10:35:10   4   A.   That is correct.
10:35:12   5   Q.   And you claim that my clients are violating your
10:35:15   6   First Amendment rights because they're preventing you from
10:35:18   7   reading or checking out certain books at the Llano
10:35:23   8   Library, correct?
10:35:24   9   A.   Yes.
10:35:25  10   Q.   You submitted a sworn declaration in this case that
10:35:29  11   tells us the books that you want to read or check out at
10:35:32  12   the Llano Library, right?
10:35:34  13   A.   Yes.
10:35:36  14   Q.   One of those books is entitled Caste: The Origins Of
10:35:40  15   Our Discontent by Isabel Wilkerson, correct?
10:35:43  16   A.   Yes.
10:35:44  17   Q.   Another one of those books is They Called Themselves
10:35:47  18   the KKK by Susan Campbell Bartoletti, correct?
10:35:52  19   A.   Yes.
10:35:53  20   Q.   You also want to check out each of the so-called Butt
10:35:57  21   books, which comprise My Butt Is So Noisy, I Broke My
10:36:01  22   Butt, and I Need A New Butt.  Each of them authored by
10:36:05  23   Dawn McMillan, yes?
10:36:07  24   A.   Yes.
10:36:07  25   Q.   And you want to check out each of the so-called Fart
```

| | | |
|---|---|---|
| 10:36:10 | 1 | books, which comprise Larry The Farting Leprechaun, Gary |
| 10:36:14 | 2 | The Goose And His Gas On The Loose, Freddie The Farting |
| 10:36:17 | 3 | Snowman, and Harvey The Heart Has Too Many Farts.  Each by |
| 10:36:21 | 4 | Jane Bexley, correct? |
| 10:36:23 | 5 | A.   Yes. |
| 10:36:23 | 6 | Q.   And, Ms. Little, just for the sake of time, I'll just |
| 10:36:26 | 7 | read the remaining titles listed in your declaration and |
| 10:36:28 | 8 | ask you to confirm that those are, indeed, books that you |
| 10:36:31 | 9 | want to check out from the Llano Library.  So we have |
| 10:36:33 | 10 | Spinning by Tillie Walden, yes? |
| 10:36:36 | 11 | A.   Yes. |
| 10:36:37 | 12 | Q.   In The Night Kitchen by Maurice Sendak? |
| 10:36:41 | 13 | A.   Yes. |
| 10:36:41 | 14 | Q.   It's Perfectly Normal by Robie Harris? |
| 10:36:45 | 15 | A.   Yes. |
| 10:36:45 | 16 | Q.   Being Jazz by Jazz Jennings? |
| 10:36:48 | 17 | A.   Yes. |
| 10:36:49 | 18 | Q.   Shine by Lauren Myracle? |
| 10:36:51 | 19 | A.   Yes. |
| 10:36:51 | 20 | Q.   Gabi, A Girl In Pieces by Isabel Quintero? |
| 10:36:55 | 21 | A.   Yes. |
| 10:36:55 | 22 | Q.   And Freakboy by Kristin Elizabeth Clark? |
| 10:36:59 | 23 | A.   Yes, sir. |
| 10:37:00 | 24 | Q.   And your grievance with my clients is that they |
| 10:37:03 | 25 | weeded each of these books from the Llano Library shelves |

| 10:37:06 | 1 | thereby depriving you of your ability to check them out, |
| 10:37:09 | 2 | correct? |
| 10:37:11 | 3 | A.   Can you repeat the question? |
| 10:37:16 | 4 | Q.   Sure.  Your grievance with my clients is that they |
| 10:37:19 | 5 | weeded each of those books that I just mentioned from the |
| 10:37:22 | 6 | Llano Library shelves thereby depriving you of the ability |
| 10:37:26 | 7 | to check out the books, correct? |
| 10:37:29 | 8 | A.   My grievance with your clients is that those books |
| 10:37:32 | 9 | were removed due to content and viewpoint discrimination. |
| 10:37:38 | 10 | Q.   But you're claiming they're violating your First |
| 10:37:40 | 11 | Amendment rights. |
| 10:37:42 | 12 | A.   Yes. |
| 10:37:42 | 13 | Q.   And the claim is that your First Amendment rights are |
| 10:37:44 | 14 | being violated because you can no longer check out those |
| 10:37:47 | 15 | books. |
| 10:37:49 | 16 | A.   That is correct. |
| 10:37:50 | 17 | Q.   That is correct.  And you're asking Judge Pitman to |
| 10:37:55 | 18 | return those books to the library shelves so that you can |
| 10:37:58 | 19 | once again check them out, yes? |
| 10:38:00 | 20 | A.   Yes. |
| 10:38:01 | 21 | Q.   You've sat through this entire hearing, correct? |
| 10:38:05 | 22 | A.   Yes, sir. |
| 10:38:07 | 23 | Q.   You've listened to the testimony, yes? |
| 10:38:09 | 24 | A.   Yes. |
| 10:38:10 | 25 | Q.   And you've listened attentively to all these |

10:38:13　1　proceedings, correct?

10:38:14　2　A.　Yes.

10:38:16　3　Q.　Each of your six co-plaintiffs has been sitting with

10:38:19　4　you in court for this entire hearing, correct?

10:38:22　5　A.　That is correct.

10:38:23　6　Q.　And they're all seated in the jury box right now,

10:38:26　7　correct?

10:38:27　8　A.　Yes.

10:38:28　9　Q.　They've been here for this entire hearing, seated in

10:38:31　10　the jury box?

10:38:32　11　A.　Yes, they have.

10:38:34　12　Q.　Both for the hearing took place on Friday and for the

10:38:38　13　hearing that's taking place today.

10:38:40　14　A.　Yes, sir.

10:38:41　15　Q.　No one left for any portion of the testimony,

10:38:44　16　correct?

10:38:46　17　A.　Not to the best of my knowledge, no.

10:38:49　18　Q.　And they all appeared to have been listening

10:38:51　19　attentively as you have been.

10:38:54　20　A.　Yes.

10:38:56　21　Q.　You heard Ms. Milum testify on Friday that Freakboy

10:38:59　22　is currently available for checkout in the Llano Library?

10:39:05　23　A.　In the inhouse lending section, yes.

10:39:08　24　Q.　But it is available for checkout in the Llano

10:39:11　25　Library, correct, Freakboy?

| | | |
|---|---|---|
| 10:39:13 | 1 | A.  To the best of my knowledge, yes. |
| 10:39:15 | 2 | Q.  And you heard Ms. Milum testify that Spinning is |
| 10:39:17 | 3 | currently available for checkout in the Llano Library, |
| 10:39:20 | 4 | correct? |
| 10:39:21 | 5 | A.  Yes. |
| 10:39:21 | 6 | Q.  And you heard Ms. Milum testify that Gabi, A Girl In |
| 10:39:25 | 7 | Pieces is currently available for checkout in the Llano |
| 10:39:27 | 8 | Library, yes? |
| 10:39:29 | 9 | A.  Yes. |
| 10:39:29 | 10 | Q.  You heard Ms. Milum testify that They Called |
| 10:39:32 | 11 | Themselves The KKK is currently available for checkout in |
| 10:39:35 | 12 | the Llano Library, correct? |
| 10:39:37 | 13 | A.  Yes. |
| 10:39:38 | 14 | Q.  You heard Ms. Milum testify that Shine is currently |
| 10:39:42 | 15 | available for checkout in the Llano Library? |
| 10:39:45 | 16 | A.  Yes, sir. |
| 10:39:46 | 17 | Q.  I'll just go through the remaining books in one |
| 10:39:47 | 18 | single question to save time, okay?  You heard Ms. Milum |
| 10:39:50 | 19 | testify that It's Perfectly Normal, In The Night Kitchen, |
| 10:39:54 | 20 | Being Jazz, each of the Butt books, each of the Fart |
| 10:39:58 | 21 | books, Caste: The Origins Of Our Discontent, each of those |
| 10:40:01 | 22 | books is currently available for checkout in the Llano |
| 10:40:06 | 23 | County Library.  You heard Ms. Milum testify to that |
| 10:40:07 | 24 | extent on Friday. |
| 10:40:09 | 25 | A.  Yes, sir, I did. |

| | | |
|---|---|---|
| 10:40:10 | 1 | Q.   And you also heard Ms. Milum describe the inhouse |
| 10:40:16 | 2 | library checkout system by which each of these books is |
| 10:40:19 | 3 | available for checkout, true? |
| 10:40:22 | 4 | A.   I'm sorry, can you repeat that? |
| 10:40:23 | 5 | Q.   You heard Ms. Milum describe in her testimony on |
| 10:40:25 | 6 | Friday, the inhouse checkout system in the Llano County |
| 10:40:30 | 7 | Library by which each of these books is currently |
| 10:40:32 | 8 | available for checkout, correct? |
| 10:40:33 | 9 | A.   Yes, sir. |
| 10:40:34 | 10 | Q.   So you are aware of the fact that each of these books |
| 10:40:37 | 11 | currently can be checked out from the Llano Library, yes? |
| 10:40:42 | 12 | MS. CHIARELLO:  Objection, your Honor.  It calls |
| 10:40:44 | 13 | for speculation and it's inconsistent with the prior |
| 10:40:50 | 14 | testimony. |
| 10:40:50 | 15 | THE COURT:  The testimony will be what it is and |
| 10:40:52 | 16 | you can ask her what her understanding is. |
| 10:40:54 | 17 | Q.   (BY MR. MITCHELL) Thank you, your Honor.  Would you |
| 10:40:57 | 18 | like me to repeat the question? |
| 10:40:57 | 19 | A.   Please, yes. |
| 10:40:58 | 20 | Q.   You are aware of the fact that each of the books that |
| 10:41:01 | 21 | we've discussed can currently be checked out from the |
| 10:41:07 | 22 | Llano Library, correct? |
| 10:41:09 | 23 | A.   Each of the books which you've asked me about, yes. |
| 10:41:12 | 24 | Q.   You are aware of that fact? |
| 10:41:14 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:41:15 | 1 | Q. And you are also aware of how these books can be |
| 10:41:18 | 2 | checked out by using the inhouse checkout system that Ms. |
| 10:41:23 | 3 | Milum described in her testimony, correct? |
| 10:41:25 | 4 | A. That is correct. |
| 10:41:27 | 5 | Q. And that means you can check out each of the books |
| 10:41:30 | 6 | that we've discussed from the Llano Library as soon as |
| 10:41:34 | 7 | this hearing ends, correct? |
| 10:41:37 | 8 | A. Yes. |
| 10:41:39 | 9 | Q. And you don't need an injunction from Judge Pitman to |
| 10:41:42 | 10 | check out those books at the Llano Library, correct? |
| 10:41:51 | 11 | MS. CHIARELLO: Objection, your Honor. That |
| 10:41:53 | 12 | calls for legal conclusion and Ms. Little is not a lawyer. |
| 10:41:55 | 13 | That's an issue for us to argue with you at closing. |
| 10:41:58 | 14 | THE COURT: Rephrase the question. |
| 10:41:59 | 15 | MR. MITCHELL: I'll rephrase. |
| 10:42:01 | 16 | Q. (BY MR. MITCHELL) You answered my earlier question |
| 10:42:04 | 17 | about whether you can check out each of these books from |
| 10:42:06 | 18 | the Llano Library after the hearing ends with an |
| 10:42:10 | 19 | affirmative answer. That means you can check out those |
| 10:42:13 | 20 | books from the library, regardless of what happens after |
| 10:42:18 | 21 | the conclusion of this hearing today in court, correct? |
| 10:42:22 | 22 | MS. CHIARELLO: Same objection, your Honor. |
| 10:42:23 | 23 | THE COURT: I'll allow the question. |
| 10:42:26 | 24 | A. May I clarify -- |
| 10:42:29 | 25 | Q. (BY MR. MITCHELL) Sure. |

| | | |
|---|---|---|
| 10:42:30 | 1 | A.   -- a point.  Mr. Mitchell, you have mentioned |
| 10:42:35 | 2 | multiple books and I am aware that there are several books |
| 10:42:41 | 3 | in the inhouse checkout system.  It is my understanding |
| 10:42:45 | 4 | that all of the books within this lawsuit are not |
| 10:42:53 | 5 | available in that inhouse checkout system. |
| 10:42:57 | 6 | Q.   The question I'm asking you about the titles that I |
| 10:42:59 | 7 | mentioned earlier.  I'm sorry, Ms. Little.  I'm not asking |
| 10:43:02 | 8 | about other books.  I just need you to answer the question |
| 10:43:04 | 9 | I'm asking you and not answer a different question.  The |
| 10:43:07 | 10 | titles that we've previously discussed, each of them is |
| 10:43:09 | 11 | currently available for checkout in the Llano Library. |
| 10:43:13 | 12 | A.   Yes. |
| 10:43:13 | 13 | Q.   And you are aware of the fact that they are available |
| 10:43:16 | 14 | for checkout and you are aware of how you can check out |
| 10:43:19 | 15 | those books. |
| 10:43:20 | 16 | A.   Yes, sir. |
| 10:43:22 | 17 | Q.   You're familiar with the practice of weeding books |
| 10:43:25 | 18 | from library shelves; is that right? |
| 10:43:27 | 19 | A.   Yes. |
| 10:43:28 | 20 | Q.   And you recognized that libraries need to weed books |
| 10:43:32 | 21 | because shelf space is limited and they need to make room |
| 10:43:35 | 22 | for new books? |
| 10:43:37 | 23 | A.   Yes. |
| 10:43:38 | 24 | Q.   And the only way to do that is to weed. |
| 10:43:41 | 25 | A.   Yes. |

| 10:43:42 | 1 | Q.   No library could function if it didn't weed books |
| 10:43:45 | 2 | continually and continuously, correct? |
| 10:43:49 | 3 | A.   That's correct. |
| 10:43:50 | 4 | Q.   You're familiar with the CREW and MUSTIE criteria for |
| 10:43:54 | 5 | weeding; is that right? |
| 10:43:56 | 6 | A.   Yes, I have. |
| 10:43:57 | 7 | Q.   You've heard it discussed? |
| 10:43:58 | 8 | A.   Read the CREW manual, am familiar with it, yes. |
| 10:44:01 | 9 | Q.   And you acknowledge that CREW and MUSTIE criteria for |
| 10:44:04 | 10 | weeding is an accepted standard in the library profession |
| 10:44:08 | 11 | for how to go about weeding books? |
| 10:44:09 | 12 | A.   I understand that main libraries in Texas utilize |
| 10:44:14 | 13 | that system, yes. |
| 10:44:15 | 14 | Q.   And you listened to Ms. Castelan's testimony on |
| 10:44:17 | 15 | Friday, correct? |
| 10:44:20 | 16 | A.   Yes, I did. |
| 10:44:21 | 17 | Q.   And you heard Ms. Castelan testify that in her |
| 10:44:24 | 18 | judgment, the book Freakboy was appropriately weeded under |
| 10:44:27 | 19 | the CREW-MUSTIE criteria, correct? |
| 10:44:32 | 20 | A.   I don't specifically remember that.  But. |
| 10:44:37 | 21 | Q.   If Ms. Castelan testified as such, let's just assume |
| 10:44:40 | 22 | that as a hypothetical premise of my next question, you're |
| 10:44:46 | 23 | nonetheless asking Judge Pitman to order the reshelving of |
| 10:44:49 | 24 | a book that your own witness would have conceded was |
| 10:44:51 | 25 | appropriately weeded under the CREW-MUSTIE criteria; is |

10:44:56  1  that right?

10:44:56  2       MS. CHIARELLO:  Objection, your Honor.  Calls for

10:44:58  3  speculation.  Misstates Ms. Castelan's prior testimony

10:45:00  4  and, frankly, it's not relevant.

10:45:05  5       THE COURT:  I'll allow the question.  Want to

10:45:07  6  re-ask it.

10:45:08  7       MR. MITCHELL:  I'll re-ask it.

10:45:09  8  Q.  (BY MR. MITCHELL) You're asking Judge Pitman to order

10:45:11  9  Freakboy reshelved in the Llano County Library, correct?

10:45:15  10  A.  That is correct.

10:45:16  11  Q.  And if Ms. Castelan had testified on Friday that

10:45:22  12  Freakboy was appropriately weeded, you're asking Judge

10:45:26  13  Pitman to order the reshelving of a book that even your

10:45:29  14  own witness conceded was appropriately weeded under the

10:45:32  15  CREW-MUSTIE criteria, correct?

10:45:40  16  A.  To the best of my knowledge, yes.

10:45:42  17  Q.  You believe Freakboy should be reshelved, regardless

10:45:46  18  of whether it was weeded appropriately under CREW and

10:45:48  19  MUSTIE, correct?

10:45:51  20  A.  You'll excuse me, Mr. Mitchell, I'm not a certified

10:45:55  21  librarian.

10:45:56  22  Q.  But your demand for the reshelving of Freakboy is

10:46:01  23  unconditional in this litigation.  You're not asking Judge

10:46:04  24  Pitman to determine whether it was appropriately weeded

10:46:06  25  under CREW and MUSTIE.  You're asking him to just order

| | | |
|---|---|---|
| 10:46:10 | 1 | the reshelving of that book; is that right? |
| 10:46:13 | 2 | A.   I'm sorry.  Could you re-ask that one more time, sir? |
| 10:46:16 | 3 | Q.   You're demanding that Judge Pitman order the |
| 10:46:19 | 4 | reshelving of Freakboy, correct? |
| 10:46:22 | 5 | A.   Yes. |
| 10:46:23 | 6 | Q.   Regardless of whether it was appropriately weeded |
| 10:46:26 | 7 | under the CREW-MUSTIE criteria? |
| 10:46:32 | 8 | A.   I don't know. |
| 10:46:37 | 9 | Q.   You heard Ms. Milum testify on Friday that the Llano |
| 10:46:42 | 10 | County Public Library System will not weed, or remove, or |
| 10:46:45 | 11 | conceal any book between now and the end of this |
| 10:46:49 | 12 | litigation, correct? |
| 10:46:51 | 13 | A.   Yes, sir. |
| 10:46:53 | 14 | Q.   You also heard Ms. Milum testify that she has never |
| 10:46:56 | 15 | had any intention of restricting access to any particular |
| 10:46:59 | 16 | book on Bibliotheca, correct? |
| 10:47:04 | 17 | A.   Yes, I did hear that. |
| 10:47:05 | 18 | Q.   You also heard Ms. Milum testify that neither she nor |
| 10:47:09 | 19 | her colleagues restrict access to any particular book on |
| 10:47:15 | 20 | Bibliotheca, correct? |
| 10:47:17 | 21 | A.   Correct. |
| 10:47:17 | 22 | Q.   And there's no danger that you or your co-plaintiffs |
| 10:47:21 | 23 | will be restricted from accessing any particular book on |
| 10:47:23 | 24 | Bibliotheca if the defendants have no intention of |
| 10:47:26 | 25 | restricting access to any book on Bibliotheca, true? |

10:47:30　1　　　　　MS. CHIARELLO:  Objection, your Honor.  Calls for

10:47:31　2　a legal conclusion and calls for speculation.

10:47:34　3　　　　　THE COURT:  I'll allow the question.

10:47:36　4　Q.　(BY MR. MITCHELL) Do you want me to repeat it?

10:47:38　5　A.　Yes, please.

10:47:39　6　Q.　There's no danger that you or your co-plaintiffs will

10:47:42　7　be restricted from accessing any particular book on

10:47:45　8　Bibliotheca if the defendants in this case have no

10:47:47　9　intention of restricting your access to anything on

10:47:50　10　Bibliotheca, correct?

10:47:53　11　A.　That sounds correct.  Yes.

10:47:55　12　Q.　You heard Judge Cunningham testify on Friday that the

10:47:58　13　Llano advisory board will not hold any meetings until

10:48:01　14　after this litigation concludes?

10:48:04　15　A.　Yes.

10:48:05　16　Q.　So there's no danger that you or anyone else will be

10:48:08　17　excluded from meetings of the library advisory board

10:48:12　18　during the pendency of this litigation if there won't be

10:48:15　19　any meetings of that board until after litigation

10:48:17　20　concludes.

10:48:17　21　A.　Yes.

10:48:17　22　Q.　You can't be excluded from a meeting that's not going

10:48:19　23　to happen, correct?

10:48:20　24　A.　I agree with that statement.  Yes, sir.

10:48:22　25　Q.　No further questions.  Thank you.

10:48:26  1          MS. CHIARELLO:  I have some redirect, your Honor.

10:48:28  2          THE COURT:  Actually, let's take brief comfort

10:48:31  3  break before redirect.  We'll take a five-minute break.

10:56:05  4          (Recess.)

10:58:29  5          THE COURT:  Ms. Chiarello, you may resume your

10:58:34  6  redirect.

10:58:34  7                  RE-DIRECT EXAMINATION

10:58:34  8  BY MS. CHIARELLO:

10:58:42  9  Q.   Thank you, your Honor.

10:58:42 10          Ms. Little, have you ever attempted to use the

10:58:47 11  inhouse checkout system?

10:58:50 12  A.   No, I have not.

10:58:51 13  Q.   Where is the -- where do you understand the inhouse

10:58:55 14  checkout system is available?

10:58:58 15  A.   I understand it is in a back room of the library.

10:59:04 16  Q.   Which branch of the Llano County Library System

10:59:09 17  supposedly has this inhouse secret checkout system?

10:59:12 18  A.   The Llano branch.

10:59:14 19  Q.   How many branches are there in the Llano County

10:59:19 20  Library System?

10:59:19 21  A.   There's three branches.

10:59:21 22  Q.   So users of the other two branches do not have access

10:59:27 23  to the secret inhouse library system?

10:59:30 24          MR. MITCHELL:  Objection.  I think that calls for

10:59:32 25  speculation.

| | |
|---|---|
| 10:59:32 | 1 |
| 10:59:35 | 2 |
| 10:59:38 | 3 |
| 10:59:44 | 4 |
| 10:59:48 | 5 |
| 10:59:50 | 6 |
| 10:59:53 | 7 |
| 10:59:57 | 8 |
| 11:00:00 | 9 |
| 11:00:01 | 10 |
| 11:00:06 | 11 |
| 11:00:08 | 12 |
| 11:00:11 | 13 |
| 11:00:16 | 14 |
| 11:00:20 | 15 |
| 11:00:22 | 16 |
| 11:00:26 | 17 |
| 11:00:26 | 18 |
| 11:00:30 | 19 |
| 11:00:33 | 20 |
| 11:00:34 | 21 |
| 11:00:36 | 22 |
| 11:00:41 | 23 |
| 11:00:47 | 24 |
| 11:00:50 | 25 |

THE COURT:  You can ask if she shows.

Q.  (BY MS. CHIARELLO) Do you know whether patrons of the other two Llano County Library branches have access to a secret inhouse lending system with the books we've been talking about at their branches?

A.  I do not know that.  No.

Q.  You don't know that they have availability or you don't know whether or not they have access?

A.  Can you rephrase it?

Q.  Sure.  Do you use any of the other branches other than the Llano branch?

A.  Yes, I do.  I use all three branches.

Q.  At the other two branches, are the books that were censored available for inhouse checkout?  Do you know whether they're available?

A.  I don't know that.  To the best of my knowledge, they are not.

Q.  And in the legal papers here, the defendants have said they're only available in the Llano County branch of the library, right?

A.  Yes.  To the best of my knowledge, that's correct.

Q.  All right.  Because you have never attempted to use the inhouse checkout system at the Llano branch, do you know whether any of the books that Mr. Mitchell asked you about are, in fact, available through that inhouse

11:00:55  1  checkout system?

11:00:57  2  A.   I've never used that system, so I don't personally

11:01:03  3  know what all is in that inhouse checkout system

11:01:09  4  currently.

11:01:10  5  Q.   Okay.  And so, you testified that you were aware in

11:01:16  6  response to Mr. Mitchell's questions, that you were aware

11:01:19  7  that they are, in fact, available, on what would you be

11:01:22  8  basing your awareness if not your personal knowledge?

11:01:25  9  A.   My awareness is based on, again, my viewing of the

11:01:30  10  legal documents, my reading in the newspaper that reported

11:01:34  11  on the legal documents referring to this inhouse system,

11:01:37  12  and information given to me by librarians.

11:01:42  13  Q.   Okay.  You heard Ms. Milum testify that she did not

11:01:48  14  weed any of the books at issue today because of the

11:01:51  15  content, right?

11:01:53  16  A.   Yes, I did hear that.

11:01:55  17  Q.   Did you find Ms. Milum's testimony to be truthful on

11:01:59  18  that point based on what you know and the documents you've

11:02:03  19  reviewed?

11:02:05  20  A.   No.

11:02:06  21  Q.   Do you have any understanding of when the secret

11:02:11  22  inhouse checkout system was created for the Llano branch

11:02:16  23  of the library?

11:02:17  24  A.   I would have to go back and look and read the legal

11:02:25  25  filings, my communications and the newspapers, but it is

11:02:31  1  my understanding it was created following us filing this

11:02:37  2  lawsuit.

11:02:38  3  Q.   So for at least some period of time, these books were

11:02:42  4  not available to you or to any other patron through that

11:02:47  5  inhouse lending system, correct?

11:02:50  6  A.   That is correct.

11:02:51  7  Q.   All right.  How do you know that the defendants'

11:03:01  8  intent to provide access to the books Mr. Mitchell was

11:03:05  9  asking you about through the secret lending library is

11:03:09  10  genuine and is not simply a way to defeat the preliminary

11:03:14  11  injunction you seek today?

11:03:17  12          MR. MITCHELL:  Objection.  That calls for legal

11:03:19  13  conclusion.

11:03:20  14          THE COURT:  I'll allow the question.

11:03:23  15  A.   I don't know that.

11:03:28  16  Q.   Thank you very much, Ms. Little.

11:03:34  17          THE COURT:  Any further questions, Mr. Mitchell?

11:03:35  18          MR. MITCHELL:  Nothing further.

11:03:36  19          THE COURT:  You may step down.  Thank you.

11:03:38  20          THE WITNESS:  Thank you.

11:03:38  21          THE COURT:  Your next witness.

11:03:40  22          MR. BOTKIN:  Your Honor, we call Jonathan

11:03:54  23  Mitchell.

11:04:03  24          THE COURT:  Sidebar.

11:04:06  25          (At the bench, on the record.)

11:04:14    1          THE COURT:  I'd have to confess that I was not

11:04:15    2     surprised.

11:04:23    3          MR. BOTKIN:  We are going to explore the actual

11:04:25    4     details surrounding the anonymous donation of the nine

11:04:29    5     books in question that Amber Milum testified to on Friday.

11:04:33    6          MR. MITCHELL:  It's our privilege in our view.

11:04:35    7     It's communications with an -- between an attorney and a

11:04:38    8     client.

11:04:39    9          THE COURT:  I don't know what happened other than

11:04:41   10     reading between the lines.  Can you tell me what the

11:04:43   11     obligations are with regard to Mr. Mitchell's activity?

11:04:46   12          MR. BOTKIN:  Ms. Milum testified that the nine

11:04:49   13     books in the secret library were donated by an anonymous

11:04:55   14     donor.  She testified over objection, it was donated by

11:04:58   15     counsel.  I'm prepared to run through a couple of

11:05:01   16     quotations from the briefing, the motions to dismiss --

11:05:05   17     motion to dismiss in which the defendants are attempting

11:05:10   18     to present a mootness defense.

11:05:13   19          THE COURT:  To what?

11:05:14   20          MR. BOTKIN:  To present a mootness defense.  And

11:05:16   21     it does make a difference whether this is a

11:05:19   22     litigation-created actual situation or something that was

11:05:21   23     a bona fide decision of the library system.

11:05:25   24          MR. MITCHELL:  Just -- can I respond briefly?

11:05:25   25          THE COURT:  Sure.

11:05:27 1      MR. MITCHELL:  We're not arguing for mootness and

11:05:29 2  I don't believe this does moot the case and we're not

11:05:31 3  going to argue it moots the case because -- go ahead.

11:05:35 4      MR. BOTKIN:  I think I've just heard quite a bit

11:05:37 5  of argument implied to Ms. Little the availability of

11:05:43 6  these books is something that moots our summary judgment.

11:05:47 7      MR. MITCHELL:  Doesn't -- no.  I'm sorry.  It

11:05:48 8  doesn't moot your claim, all right?  So -- and I have to

11:05:51 9  -- this is a jurisdictional issue, so I'm going to just

11:05:54 10  speak candidly and not as an advocate.  But there is still

11:05:57 11  injury in fact in our view because they can't get the book

11:06:00 12  off the shelf.  They have to go through the inhouse

11:06:02 13  system.  That's enough of an identifiable trifle to create

11:06:05 14  an Article III case for controversy.  So it does not moot

11:06:08 15  your claim and we're not going to argue that it moots the

11:06:11 16  claim.  I think it would be wrong for us to make that

11:06:13 17  argument on a jurisdictional matter that in our view would

11:06:15 18  send the Court down the wrong path.  Do I know where we're

11:06:20 19  going with this?  I can tell you.  It's not mootness.

11:06:22 20      MR. BOTKIN:  I can pull the stuff that you put in

11:06:24 21  your motion to dismiss briefing about the defense-created

11:06:28 22  mootness arguments in which the purpose of the promise not

11:06:35 23  to do the allegedly enjoin-able act does make a

11:06:39 24  difference.  There's some case law that suggests that it

11:06:43 25  does make a difference whether it's the government entity.

| | | |
|---|---|---|
| 11:06:46 | 1 | And if this is a position created for litigation, the |
| 11:06:49 | 2 | burden may shift back and forth between the defendant and |
| 11:06:52 | 3 | plaintiff. |
| 11:06:53 | 4 | MR. MITCHELL: So that is true if we were arguing |
| 11:06:55 | 5 | mootness. I'll just tell you where I'm going with this. |
| 11:06:59 | 6 | I'm going to just put my cards on the table now. Maybe I |
| 11:07:02 | 7 | shouldn't do this. But I'm just going to. Our claim will |
| 11:07:06 | 8 | be that they can't show irreparable harm to get the |
| 11:07:08 | 9 | preliminary injunction because even though there is a |
| 11:07:10 | 10 | little bit of a difference between -- and I think Ms. |
| 11:07:13 | 11 | Little was trying to go this way with her testimony. She |
| 11:07:15 | 12 | likes to see it on the shelf, right, as opposed to having |
| 11:07:17 | 13 | to go talk to the librarian and go to this inhouse |
| 11:07:21 | 14 | checkout system right. That is a difference enough to |
| 11:07:24 | 15 | create an injury in fact, right? But when it comes to |
| 11:07:28 | 16 | irreparable harm, you need something more than just an |
| 11:07:30 | 17 | identifiable trifle, right? |
| 11:07:31 | 18 | So our argument when we close out will be these |
| 11:07:35 | 19 | books are still available. Doesn't moot the case, all |
| 11:07:38 | 20 | right? So I don't think you get into these issues you're |
| 11:07:40 | 21 | talking about. |
| 11:07:40 | 22 | MR. BOTKIN: I have my questions and I will |
| 11:07:42 | 23 | accept the stipulation on them. Would it be appropriate |
| 11:07:45 | 24 | to do that at sidebar or on the record? |
| 11:07:50 | 25 | THE COURT: We're on the record. |

| 11:07:52 | 1 | MS. CHIARELLO: Instead of a stipulation, perhaps |
| 11:07:54 | 2 | we could do it, you know, in camera. We can close the |
| 11:07:55 | 3 | courtroom. Because, your Honor, if it were any other |
| 11:07:58 | 4 | individual who had donated those books, there's no |
| 11:08:01 | 5 | question that we'd be entitled to ask who donated, when |
| 11:08:04 | 6 | did they donate, whose idea was it. And if Mr. Mitchell |
| 11:08:08 | 7 | or some other attorney has chosen to inject themselves as |
| 11:08:11 | 8 | a fact witness into this case, we are entitled to put |
| 11:08:15 | 9 | those facts in this record. |
| 11:08:16 | 10 | THE COURT: Maybe, maybe not and I'll take that |
| 11:08:20 | 11 | into consideration. That's not a decision I'm going to |
| 11:08:22 | 12 | make on the fly because it's significant. So are you |
| 11:08:25 | 13 | prepared with any other witnesses? |
| 11:08:28 | 14 | MS. CHIARELLO: No. |
| 11:08:29 | 15 | MR. BOTKIN: I don't think we have anybody else. |
| 11:08:30 | 16 | THE COURT: Okay. Do you have any witnesses? |
| 11:08:33 | 17 | MR. MITCHELL: We are going to put Amber Milum |
| 11:08:36 | 18 | back on on direct. |
| 11:08:37 | 19 | THE COURT: Okay. |
| 11:08:38 | 20 | MR. MITCHELL: I don't think it will take that |
| 11:08:39 | 21 | long. But. |
| 11:08:40 | 22 | THE COURT: I just -- this is a particularly |
| 11:08:43 | 23 | sensitive request and I -- |
| 11:08:46 | 24 | MR. BOTKIN: I understand. |
| 11:08:47 | 25 | THE COURT: But I want to give full consideration |

| | | |
|---|---|---|
| 11:08:49 | 1 | before I allow you to cross-examine opposing counsel.  And |
| 11:08:52 | 2 | so, let's take that little more slowly and I'll make that |
| 11:08:56 | 3 | decision.  If you're entitled to it, I won't deprive you |
| 11:09:01 | 4 | of the opportunity to ask him more questions, but I want |
| 11:09:04 | 5 | some time to reflect on that first.  So -- |
| 11:09:05 | 6 | MR. MITCHELL:  I'm sorry.  And if there's a way |
| 11:09:06 | 7 | we could get the information you need on the record |
| 11:09:08 | 8 | without busting the attorney-client privilege, maybe |
| 11:09:11 | 9 | there's a way we can work that out. |
| 11:09:14 | 10 | MR. BOTKIN:  In camera. |
| 11:09:15 | 11 | THE COURT:  I'll let y'all explore that. |
| 11:09:17 | 12 | MR. MITCHELL:  I think what you're trying to make |
| 11:09:18 | 13 | is this legal argument that this is an act of voluntary |
| 11:09:22 | 14 | cessation?  Is that what you're suggesting? |
| 11:09:23 | 15 | MR. BOTKIN:  That's what it originated from. |
| 11:09:25 | 16 | MR. MITCHELL:  My answer, we're just not pursuing |
| 11:09:26 | 17 | a mootness argument here.  We really aren't. |
| 11:09:26 | 18 | MR. BOTKIN:  You're not on the record. |
| 11:09:29 | 19 | MR. MITCHELL:  I'll say that on the record. |
| 11:09:31 | 20 | THE COURT:  You've been on the record. |
| 11:09:32 | 21 | MR. MITCHELL:  I mean, the first thing I was |
| 11:09:33 | 22 | going to -- honestly, the first thing I was going to say. |
| 11:09:35 | 23 | THE COURT:  Go ahead, Mr. Mitchell. |
| 11:09:36 | 24 | MR. MITCHELL:  The first thing I was going to say |
| 11:09:38 | 25 | in my closing remarks was that we're not trying to moot |

11:09:41  1   the case because, again, I think on a jurisdictional

11:09:42  2   issue, we have a heightened duty of candor to the Court.

11:09:45  3   I don't think this moots the case and I can't in good

11:09:48  4   conscience advise the Court to go in that direction.  I

11:09:50  5   think I actually have to affirmatively come out and say

11:09:51  6   there case is not moot.

11:09:52  7          All we're trying to say is this arrangement is

11:09:54  8   that you haven't met your burden to show irreparable harm

11:09:58  9   and maybe not even a violation of First Amendment.  So

11:10:00  10  that's where I'm going.

11:10:00  11          THE COURT:  Okay.  Ms. Leonida.

11:10:05  12          MS. LEONIDA:  I think it does go directly, your

11:10:06  13  Honor, to voluntary cessation and whether this is a

11:10:09  14  behavior of the library to -- whether this is behavior the

11:10:11  15  library is going to engage in as soon as this hearing is

11:10:14  16  over.  That is the only inquiry in the context of the

11:10:19  17  voluntary cessation argument.  And the reason that the

11:10:21  18  facts of this donation are so relevant is that if, for

11:10:24  19  example, the donor was somebody who said here are all my

11:10:27  20  favorite books, I want the people of Llano to read them

11:10:29  21  and the government decided we're going to put them in a

11:10:32  22  back room and not tell anybody about it, that says

11:10:34  23  something about their intent, which is what the defendants

11:10:37  24  have said is the only issue here is their intent.

11:10:43  25          Whereas if, on the other hand, somebody said

11:10:45 1 here's a trick to get past the preliminary injunction

11:10:47 2 hearing and then, you can just throw them all away, that's

11:10:50 3 also relevant to intent. So I appreciate -- it's never my

11:10:54 4 desire to cross-examine anybody's lawyer and I understand

11:10:57 5 better -- as well as anyone, the sanctity of the

11:10:59 6 attorney-client privilege, but in this case, the attorney

11:11:01 7 did put himself immediately into a factual situation

11:11:04 8 that's directly relevant before this court.

11:11:07 9 MR. ROGERS: And also, your Honor, regarding the

11:11:10 10 cessation argument, I would point out that as a matter of

11:11:13 11 facts which we could easily develop, the majority of the

11:11:15 12 books that are available for inhouse checkout would also

11:11:18 13 be available through either an interlibrary loan or an

11:11:21 14 intersystem loan if they were still in the Llano County

11:11:25 15 Library, or via the Bibliotheca online system. I think

11:11:27 16 there would be very few books in the Venn diagram of not

11:11:30 17 available through any of those other means outside of

11:11:32 18 inhouse checkout.

11:11:34 19 MR. MITCHELL: There's one more thing to say in

11:11:36 20 response to that. When we put Ms. Milum on the stand, we

11:11:39 21 are going to ask her about some of these issues you

11:11:41 22 raised. For example, these books that you now have

11:11:43 23 available for inhouse checkout, is this a permanent

11:11:45 24 feature? And you can cross her on that if needed. I

11:11:48 25 think you can get this information out of Ms. Milum in

11:11:50  1   terms of the intention.  I don't think you need to put me

11:11:52  2   on the stand for that.  I just donated the books.  I mean,

11:11:54  3   that's it.

11:11:58  4           MS. CHIARELLO:  That's the point.

11:12:00  5           MR. MITCHELL:  But I don't control the permanence

11:12:02  6   of it, right?  The books are out of my control.  It's

11:12:05  7   really Amber Milum who's going to decide ultimately

11:12:08  8   whether this is just a temporary gimmick to get around a

11:12:11  9   temporary injunction or whether it's a permanent feature.

11:12:12  10          MS. CHIARELLO:  But how, when and where you

11:12:14  11  decided to -- you can't grip yourself in the privilege

11:12:17  12  when you made yourself a fact witness.

11:12:18  13          THE COURT:  Okay.  Too many directions here --

11:12:20  14          MR. MITCHELL:  So sorry.

11:12:20  15          THE COURT:  So I obviously need to consider these

11:12:27  16  arguments.  Here's what we're going to do.  If you have no

11:12:30  17  other witnesses, we probably have time for you to -- you

11:12:39  18  don't have to rest but if you want to go ahead and put

11:12:42  19  your witness.

11:12:43  20          MR. MITCHELL:  I could do that.

11:12:44  21          THE COURT:  Just as a matter of time as I'm going

11:12:47  22  to be unavailable for 11:45 to 1:15 and that will give you

11:12:53  23  time to explore -- you said you have five questions that

11:12:56  24  Mr. Mitchell might be able to answer to your satisfaction

11:12:59  25  without taking the stand?  Maybe, maybe not.  I'll let you

11:13:02  1   explore that.  But that will give you time to consider

11:13:06  2   what the request is.  I still am not sure I have the full

11:13:14  3   scope of understanding of what happened.

11:13:16  4         My understanding from the evidence reading

11:13:20  5   between the lines, no pun intended, is that Mr. Mitchell

11:13:24  6   donated certain books for the purpose of making them

11:13:29  7   available and that when I heard that, frankly, it

11:13:36  8   concerned me that that would have potentially made you a

11:13:39  9   fact witness.  So I can't say that that was surprise that

11:13:42  10  at some point, they would want to ask a little more about

11:13:46  11  the circumstances.

11:13:47  12        MR. MITCHELL:  Right.

11:13:48  13        THE COURT:  Surrounding that.  But I need to give

11:13:49  14  more thought to the ramifications of that because I am

11:13:53  15  obviously reluctant to compel you to testify unless it's

11:13:58  16  absolutely necessary and legally appropriate.  So making

11:14:02  17  the best use of our time, do you have any problem if we

11:14:05  18  continue to just get the evidence into the record and

11:14:11  19  then, reassess this after lunch?

11:14:13  20        MR. BOTKIN:  It's all right with me.

11:14:15  21        MR. MITCHELL:  Okay.  Yeah.

11:14:16  22        THE COURT:  Does that work?  Okay.

11:14:16  23        MR. MITCHELL:  I think we could talk about it

11:14:18  24  during the lunch break.

11:14:19  25        THE COURT:  We could explore that.  Maybe there's

| 11:14:21 | 1 | some resolution that will be satisfactory to everybody. |
| 11:14:24 | 2 | MR. MITCHELL: Okay. Great. |
| 11:14:25 | 3 | THE COURT: But in the meantime, I mean, we could |
| 11:14:27 | 4 | either break now or we can make use of the next 30 |
| 11:14:32 | 5 | minutes. It doesn't matter to me. Does anybody have any? |
| 11:14:35 | 6 | MR. MITCHELL: What do you think's best? |
| 11:14:36 | 7 | MR. ROGERS: I think we could probably do one of |
| 11:14:39 | 8 | our witnesses -- it's a little odd because we intend to |
| 11:14:43 | 9 | put our case-in-chief but reserve not resting. |
| 11:14:47 | 10 | THE COURT: Sure. |
| 11:14:50 | 11 | (Cross-talk.) |
| 11:15:10 | 12 | THE COURT: For the record, what we'll do then is |
| 11:15:13 | 13 | we will be proceeding without the plaintiffs resting, |
| 11:15:19 | 14 | subject to any need for additional testimony and my ruling |
| 11:15:25 | 15 | on that request. And the plaintiffs not waiving ability |
| 11:15:32 | 16 | to call further witnesses. But in the interest of time |
| 11:15:35 | 17 | and judicial efficiency, we're going to give the |
| 11:15:38 | 18 | opportunity for the defendants to recall their witnesses. |
| 11:15:43 | 19 | MR. MITCHELL: Great. |
| 11:15:44 | 20 | THE COURT: Thank you very much. |
| 11:15:45 | 21 | MR. BOTKIN: Thank you, your Honor. |
| 11:16:02 | 22 | THE COURT: All right. Mr. Botkin, do you have |
| 11:16:03 | 23 | any additional witnesses at this time? Or would you like |
| 11:16:05 | 24 | to reserve the right to call additional witnesses. |
| 11:16:09 | 25 | MR. BOTKIN: No witnesses at this time, but we'll |

11:16:10  1   reserve the right to call additional witnesses.

11:16:13  2           THE COURT:  All right.  Thank you.

11:16:14  3           Any defense witnesses?  Mr. Mitchell.

11:16:17  4           MR. MITCHELL:  Yes, your Honor.  The defense

11:16:19  5   calls Amber Milum.

11:16:21  6           THE COURT:  Ms. Milum, if you could come back up,

11:16:23  7   please.  Good morning.  You remain under oath.  Thank you.

11:16:44  8   Please be seated.

11:16:45  9       AMBER MILUM, called by the Defendant, duly sworn.

11:16:45  10                   DIRECT EXAMINATION

11:16:45  11  BY MR. MITCHELL:

11:16:50  12  Q.   Thank you, your Honor.

11:16:50  13           Good morning, Ms. Milum.

11:16:52  14  A.   Good morning.

11:16:52  15  Q.   There's been a lot of discussion during this hearing

11:16:57  16  about the CREW and MUSTIE criteria for weeding books.  Can

11:16:59  17  you tell us a little bit more about each of these MUSTIE

11:17:03  18  guidelines?  Let's start with the letter M, which stands

11:17:07  19  for misleading.  What does that mean and how does a

11:17:10  20  librarian determine whether a become falls within that

11:17:13  21  category?

11:17:13  22  A.   Misleading, if there's something -- a better edition

11:17:18  23  out there -- if there's a better edition, there's new

11:17:24  24  information on the subject, you know, the debate Pluto's

11:17:30  25  not a planet, some books will say yes, some will say no,

| | |
|---|---|
| 11:17:33 | 1 | you just kind of go and make your judgments that way of
| 11:17:36 | 2 | what's accurate and current.

11:17:33　1　you just kind of go and make your judgments that way of

11:17:36　2　what's accurate and current.

11:17:38　3　Q.　And the U stands for ugly, what does that category

11:17:42　4　mean?　How does a librarian determine whether a book falls

11:17:45　5　within that category?

11:17:46　6　A.　If it's damaged any, you know, sometimes if the

11:17:51　7　shelves are close to a window, then the spine will change

11:17:55　8　colors.　You won't really be able to see any of the

11:17:59　9　labels, they'll kind of fade.　You know, if people have

11:18:04　10　eaten while they're reading and have their Cheeto fingers,

11:18:09　11　you know, in there, it will be damaged that way.　If they

11:18:11　12　drop it, step on it, and then, just the wear of it of just

11:18:18　13　being handled so much on and off the shelves.

11:18:23　14　Q.　Letter S stands for superseded.　What does that mean?

11:18:27　15　How does a librarian determine whether a book falls within

11:18:30　16　the superseded category?

11:18:33　17　A.　If there's -- it's kind of like the misleading, if

11:18:35　18　there's anything that's better, more current out there,

11:18:39　19　you know, like if you don't really need a Windows 8 For

11:18:44　20　Dummies, you know, and they've got Windows 10, you just

11:18:49　21　kind of keep updating the area, the books.

11:18:53　22　Q.　At T for trivial, what does that mean?　How does a

11:18:56　23　librarian determine whether a book falls within the

11:19:00　24　trivial category?

11:19:00　25　A.　If it just kind of has no literary merit, scientific

11:19:05  1   merit.  It's kind of served its purpose.

11:19:08  2   Q.  I stands for irrelevant.  What does that mean?  How

11:19:11  3   does the librarian determine whether a book falls within

11:19:14  4   the irrelevant category?

11:19:16  5   A.  Irrelevant is if it has already served its purpose,

11:19:19  6   there is just no more need for it in the community.

11:19:23  7   They've kind of checked it out and it's not getting

11:19:27  8   checked out anymore, or it's not a current event, or

11:19:31  9   something like that.

11:19:33  10  Q.  And finally, we have E for elsewhere.  What does that

11:19:36  11  mean?  How does a librarian determine whether a book falls

11:19:39  12  within the elsewhere category?

11:19:40  13  A.  Elsewhere, it depends if you can get it through our

11:19:45  14  inner system loan, through our library system, the other

11:19:48  15  libraries, the ILL system, other libraries within the

11:19:51  16  state, and if you can get it on our online system, which

11:19:57  17  will be Bibliotheca right now.

11:19:58  18  Q.  So just to clarify what you said, if a book were

11:20:01  19  available at another library in the Llano County system

11:20:05  20  because you have three branches?

11:20:06  21  A.  Yes.

11:20:06  22  Q.  Would that mean the book falls within the elsewhere

11:20:09  23  category?

11:20:09  24  A.  Yes.

11:20:10  25  Q.  And if a book were available to a library patron

11:20:13  1  through interlibrary loan, would that mean the book

11:20:17  2  qualifies under the elsewhere criterion for reading?

11:20:20  3  A.   Yes.

11:20:20  4  Q.   And if a book were available to library patrons

11:20:23  5  through one of the library online databases, either

11:20:27  6  OverDrive, which was what you used in the past, or

11:20:29  7  Bibliotheca, which you're using currently, does that mean

11:20:32  8  the book would fall within the elsewhere criterion?

11:20:34  9  A.   Yes.

11:20:35  10  Q.   Ms. Milum, in the fall of 2021, were you given a list

11:20:39  11  of books from Judge Cunningham that had been sent to him

11:20:41  12  by Bonnie Wallace?

11:20:42  13  A.   Yes.

11:20:43  14  Q.   And was that list previously introduced in this

11:20:46  15  hearing as Plaintiffs' Exhibit 10?

11:20:48  16  A.   Yes.

11:20:49  17  Q.   Do you recall how many books were on that list?

11:20:52  18  A.   Around 60.

11:20:54  19  Q.   And what was your understanding of the purpose of

11:20:57  20  that list?

11:20:58  21  A.   That some people in the community didn't like the

11:21:03  22  books, that they made the list of the books that they had

11:21:09  23  researched was in the library system.

11:21:11  24  Q.   What do you do in response to receiving that list?

11:21:16  25  A.   Out of curiosity, I pull the books to see if they

| | | |
|---|---|---|
| 11:21:21 | 1 | checked any of the MUSTIE criteria. |
| 11:21:24 | 2 | Q.   When you say you pull the books, how many books did |
| 11:21:27 | 3 | you pull off the shelves, do you remember? |
| 11:21:28 | 4 | A.   I believe it was about 47 physical books. |
| 11:21:32 | 5 | Q.   Why 47 and not 60? |
| 11:21:34 | 6 | A.   The rest of them were on OverDrive. |
| 11:21:36 | 7 | Q.   So 47 books that you pulled out of the shelves and |
| 11:21:39 | 8 | were all these books that you pulled off the shelf located |
| 11:21:41 | 9 | at the Llano Library? |
| 11:21:43 | 10 | A.   Yes. |
| 11:21:43 | 11 | Q.   Not at the other two branches? |
| 11:21:45 | 12 | A.   No. |
| 11:21:45 | 13 | Q.   Just Llano.  Of the 47 books that you pulled off the |
| 11:21:49 | 14 | shelves, how many of those books did you ultimately decide |
| 11:21:53 | 15 | to weed? |
| 11:21:54 | 16 | A.   I think it was six or seven. |
| 11:21:55 | 17 | Q.   Six or seven. |
| 11:21:56 | 18 | A.   Yes. |
| 11:21:57 | 19 | Q.   Why not all 47? |
| 11:21:58 | 20 | A.   Because they didn't meet the criteria for MUSTIE. |
| 11:22:01 | 21 | Q.   Didn't Bonnie Wallace want all 47 of those books off |
| 11:22:04 | 22 | the library shelves? |
| 11:22:05 | 23 | A.   I believe so. |
| 11:22:06 | 24 | Q.   But you didn't pull the remaining 40 or 41? |
| 11:22:10 | 25 | A.   No. |

| | | |
|---|---|---|
| 11:22:11 | 1 | Q.   What did you do with those 40 or 41 books that Bonnie |
| 11:22:14 | 2 | Wallace wanted gone? |
| 11:22:15 | 3 | A.   I put them back on shelves because they were getting |
| 11:22:19 | 4 | checked out and they were still in good shape. |
| 11:22:21 | 5 | Q.   Let's talk about your reason for weeding those six or |
| 11:22:24 | 6 | seven books that you mentioned back in November of 2021. |
| 11:22:27 | 7 | We'll look at Plaintiffs' Exhibit 52.  I think you have it |
| 11:22:30 | 8 | in front of you in hardcopy.  Your Honor, this has already |
| 11:22:33 | 9 | been admitted into evidence, so with the Court's |
| 11:22:36 | 10 | permission, I'll refer to it. |
| 11:22:37 | 11 |         THE COURT:  Sure. |
| 11:22:39 | 12 | Q.   (BY MR. MITCHELL) This is a six-page document and |
| 11:23:05 | 13 | you'll see the highlighted lines are the books that you |
| 11:23:10 | 14 | weeded. |
| 11:23:10 | 15 | A.   Yes. |
| 11:23:12 | 16 | Q.   Let's talk about Freakboy.  Do you recall why you |
| 11:23:17 | 17 | decided to weed Freakboy? |
| 11:23:22 | 18 | A.   Let me find it on here.  Yes.  It looks like that it |
| 11:23:33 | 19 | was the MUSTIE criteria for irrelevant because it had only |
| 11:23:38 | 20 | been checked out once in, what is it, like five years. |
| 11:23:46 | 21 | And also, the elsewhere. |
| 11:23:49 | 22 | Q.   Checked out only once in its entire existence? |
| 11:23:52 | 23 | A.   Yes. |
| 11:23:52 | 24 | Q.   And hadn't been checked out in five years? |
| 11:23:56 | 25 | A.   Correct. |

11:23:57   1   Q.   Is it normal to keep a book on the library shelf that

11:24:00   2   hasn't been checked out at all in five years and has only

11:24:02   3   been checked out once in its entire time in existence?

11:24:05   4   A.   No, not that long.

11:24:06   5   Q.   Is Freakboy available to library patrons through

11:24:10   6   interlibrary loans?

11:24:11   7   A.   Yes.

11:24:11   8   Q.   Does that mean that Freakboy also meets the elsewhere

11:24:14   9   criterion for weeding?

11:24:15   10   A.   Yes.

11:24:16   11   Q.   So is your testimony that Freakboy met at least two

11:24:20   12   of the six must MUSTIE criteria?

11:24:22   13         MS. LEONIDA:   Objection.   Leading.

11:24:25   14         THE COURT:   Rephrase the question.

11:24:26   15   Q.   (BY MR. MITCHELL) I'll rephrase.   How many of the

11:24:29   16   MUSTIE criteria did Freakboy meet when you decided to weed

11:24:31   17   it?

11:24:32   18   A.   At least two.

11:24:33   19   Q.   And those two were?

11:24:34   20   A.   The irrelevant and the elsewhere.

11:24:38   21   Q.   Is it possible that more of the criteria were met?

11:24:41   22   A.   It's possible.   I don't recall if it had any damage

11:24:43   23   at all.

11:24:44   24   Q.   But it might have?

11:24:45   25   A.   But it could have.

| | | |
|---|---|---|
| 11:24:46 | 1 | Q.   Just hasn't been recorded one way or the other? |
| 11:24:48 | 2 | A.   Right. |
| 11:24:51 | 3 | Q.   How about Being Jazz?  Do you recall why you decided |
| 11:24:54 | 4 | to weed the book Being Jazz? |
| 11:24:56 | 5 | A.   It was the same MUSTIE criteria for irrelevant.  It |
| 11:25:02 | 6 | had been checked out once in like five years, I believe. |
| 11:25:06 | 7 | Five, six years. |
| 11:25:08 | 8 | Q.   Is it normal to keep book on the library shelf if it |
| 11:25:11 | 9 | hasn't been checked out at all in four years and it's only |
| 11:25:15 | 10 | been checked out once in its entire time in the library? |
| 11:25:17 | 11 | A.   No, not for that long. |
| 11:25:18 | 12 | Q.   Is Being Jazz still available to library patrons in |
| 11:25:21 | 13 | the Kingsland library? |
| 11:25:22 | 14 | A.   Yes. |
| 11:25:23 | 15 | Q.   Is Being Jazz currently available to library patrons |
| 11:25:28 | 16 | on Bibliotheca? |
| 11:25:29 | 17 | A.   Yes. |
| 11:25:30 | 18 | Q.   Was Being Jazz available to library patrons in |
| 11:25:34 | 19 | OverDrive in November of 2021 when you weeded the book? |
| 11:25:36 | 20 | A.   Yes. |
| 11:25:37 | 21 | Q.   Does that mean that Being Jazz met the elsewhere |
| 11:25:39 | 22 | criteria? |
| 11:25:40 | 23 | A.   Yes. |
| 11:25:41 | 24 | Q.   For weeding?  So how many of the criteria under |
| 11:25:46 | 25 | MUSTIE did Being Jazz qualify for weeding under? |

11:25:49  1   A.   Two, possibly three, because I don't recall if it was

11:25:52  2   damaged or had smudge prints or anything in it.

11:25:54  3   Q.   And those two were?

11:25:55  4   A.   They're irrelevant and elsewhere.

11:26:00  5   Q.   And possibly more?

11:26:01  6   A.   Yes.

11:26:03  7        MS. LEONIDA:  Objection.  Leading.  Move to

11:26:04  8   strike.

11:26:05  9        THE COURT:  Rephrase.

11:26:07  10  Q.   (BY MR. MITCHELL) Is it possible that there were more

11:26:09  11  than those two criteria?

11:26:12  12       MS. LEONIDA:  Objection.  Calls form speculation.

11:26:13  13       THE COURT:  Overruled.

11:26:15  14  Q.   (BY MR. MITCHELL) Is it possible?

11:26:16  15  A.   Yes.

11:26:17  16  Q.   Do you recall Ms. Castelan testifying on Friday that

11:26:22  17  Being Jazz could have been appropriately weeded under the

11:26:26  18  MUSTIE criteria but that she would have kept that book on

11:26:29  19  the shelf, given the subject matter?

11:26:31  20  A.   Yes.

11:26:33  21  Q.   Do you agree with Ms. Castelan's assessment?

11:26:36  22  A.   No, because --

11:26:37  23  Q.   Why not?

11:26:38  24  A.   We have a few others on the shelves that are like the

11:26:42  25  same content.

11:26:43  1    Q.   You say others that are the same content, can you be

11:26:46  2    more specific?

11:26:47  3    A.   About transgender children.

11:26:50  4    Q.   How about Gabi, A Girl In Pieces?  Do you recall why

11:26:53  5    you decided to weed Gabi?

11:27:09  6    A.   It looks like it's the same, as well.  It was only

11:27:12  7    checked out three times, so it would have been irrelevant

11:27:20  8    on the MUSTIE criteria.

11:27:22  9    Q.   Is it normal to keep a book on the library shelf if

11:27:25  10   it hasn't been checked out at all in three years and it's

11:27:28  11   only checked out three times in its existence in the

11:27:31  12   library?

11:27:31  13   A.   No.

11:27:31  14   Q.   Is Gabi available to library patrons through

11:27:34  15   interlibrary loan?

11:27:35  16   A.   Yes.

11:27:35  17   Q.   Was Gabi available to library patrons on OverDrive

11:27:38  18   when you decided to weed it in November 2021?

11:27:40  19   A.   Yes.

11:27:41  20   Q.   Is Gabi also currently available to library patrons

11:27:44  21   on Bibliotheca?

11:27:45  22   A.   Yes.

11:27:45  23   Q.   Does that mean that Gabi meets the elsewhere

11:27:49  24   criterion for weeding?

11:27:50  25   A.   Yes, it does.

11:27:52   1   Q.   So how many criteria for weeding does Gabi meet?

11:27:57   2   A.   At least two.  I don't recall if it was damaged or

11:28:02   3   ugly under the criteria.

11:28:05   4   Q.   Do you recall Ms. Castelan testifying on Friday that

11:28:07   5   Gabi was in her opinion on the cusp of being an

11:28:12   6   appropriate candidate for weeding?

11:28:14   7   A.   Yes.

11:28:14   8   Q.   Do you agree with Ms. Castelan's assessment that this

11:28:17   9   was a marginal call or a close call?  Or do you think this

11:28:20   10   was clear that this should have been weeded?

11:28:24   11   A.   I think it was clear and in my opinion to be weeded.

11:28:29   12   Q.   Why?

11:28:29   13   A.   Because if it hasn't been checked out that often,

11:28:33   14   there's other books that we can purchase that will be

11:28:36   15   checked out.

11:28:37   16   Q.   What about They Called Themselves The KKK: The Birth

11:28:41   17   Of An American Terrorist Group?  Do you recall why you

11:28:44   18   weeded that book?

11:28:48   19   A.   Yes.  It was irrelevant.  It was only checked out

11:28:55   20   twice in -- is that 11 years?

11:29:01   21   Q.   When was the last time that book had been checked out

11:29:03   22   before you weeded it?

11:29:06   23   A.   2011.

11:29:07   24   Q.   2011?

11:29:08   25   A.   Yes.

11:29:08  1    Q.   Is it normal to keep a book on the library shelf if

11:29:11  2    it hasn't been checked out in 10 years?

11:29:13  3    A.   No.

11:29:15  4    Q.   Is They Called Themselves The KKK available to

11:29:18  5    library patrons throughout interlibrary loan?

11:29:20  6    A.   Yes.

11:29:20  7    Q.   Does that mean that They Called Themselves The KKK

11:29:25  8    meets the elsewhere criterion for weeding?

11:29:28  9    A.   Yes.

11:29:29  10   Q.   So how many of the criteria under MUSTIE does They

11:29:34  11   Called Themselves The KKK meet?

11:29:35  12   A.   About two.

11:29:37  13   Q.   Which two?

11:29:38  14   A.   The irrelevant and the elsewhere.

11:29:40  15   Q.   Is it possible that it could have met more than those

11:29:42  16   two?

11:29:42  17   A.   It could have.  Yes.

11:29:44  18   Q.   Why?

11:29:44  19   A.   It could have been ugly because I don't recall if it

11:29:48  20   was.  I was mainly looking at checkouts and these were

11:29:54  21   definite gaps in checkout history.

11:29:58  22   Q.   How about Spinning?  Do you recall why you weeded

11:30:00  23   that book?

11:30:08  24   A.   Looks like it was checked out four times.

11:30:11  25   Q.   Four times in how many years?

| 11:30:13 | 1 | A. Three or four years. |
| 11:30:15 | 2 | Q. Is it normal to keep a book on a library shelf if |
| 11:30:18 | 3 | it's only been checked out four times in three years? |
| 11:30:20 | 4 | A. No. That's not quite enough to keep it on the |
| 11:30:24 | 5 | shelves. |
| 11:30:25 | 6 | Q. Is Spinning available to library patrons through |
| 11:30:28 | 7 | interlibrary loan? |
| 11:30:28 | 8 | A. Yes. |
| 11:30:29 | 9 | Q. Does that mean that Spinning meets the elsewhere |
| 11:30:32 | 10 | criterion for weeding? |
| 11:30:33 | 11 | A. Yes. |
| 11:30:34 | 12 | Q. So how many of the criterion under MUSTIE does |
| 11:30:37 | 13 | spinning qualify for? |
| 11:30:38 | 14 | A. At least two. |
| 11:30:39 | 15 | Q. At least two? |
| 11:30:40 | 16 | A. Yes, the irrelevant and elsewhere. I don't recall if |
| 11:30:43 | 17 | there was anything ugly about it. |
| 11:30:46 | 18 | Q. Let's take a look at Shine. Do you recall why you |
| 11:30:52 | 19 | weeded that book? |
| 11:30:53 | 20 | A. Looks like it was checked out 10 times in, what, 10 |
| 11:31:02 | 21 | years. |
| 11:31:06 | 22 | Q. Is it normal to keep a book on the library shelf if |
| 11:31:09 | 23 | it's been checked out 10 times in 10 years? Once a year? |
| 11:31:12 | 24 | A. No. Getting checked out kind of once a year, that's |
| 11:31:16 | 25 | just really not enough. It's not that popular and this is |

11:31:22 1   just part of a report. So when I go in and check a

11:31:27 2   certain book, it will tell me the dates that it's checked

11:31:31 3   out, who has checked it out. And so, sometimes we would

11:31:37 4   put books on display and we actually would check it out to

11:31:42 5   displays so we would know where they were. And if some of

11:31:45 6   these are saying, you know, it was checked out on this

11:31:48 7   date, that could have been a display, even though it

11:31:52 8   wasn't checked out two years before. Or maybe it was

11:31:54 9   checked out three times on display and then, one patron

11:31:57 10   checked it out. So I mean, that could have been it, as

11:32:03 11   well.

11:32:03 12   Q. But we don't know from looking at this chart and you

11:32:06 13   don't recall --

11:32:06 14   A. At this chart, no.

11:32:07 15   Q. From?

11:32:09 16   A. No. So this would be an irrelevant and an elsewhere

11:32:12 17   to me.

11:32:13 18   Q. Would Shine be available to library patrons through

11:32:17 19   interlibrary loan?

11:32:18 20   A. Yes.

11:32:18 21   Q. And was Shine available to library patrons through

11:32:21 22   OverDrive in November of 2021?

11:32:23 23   A. Yes.

11:32:23 24   Q. Does that mean that Shine meets the elsewhere

11:32:27 25   criterion for weeding?

| | | |
|---|---|---|
| 11:32:28 | 1 | A.   Yes. |
| 11:32:29 | 2 | Q.   So how many criteria under MUSTIE does Shine qualify |
| 11:32:32 | 3 | for? |
| 11:32:32 | 4 | A.   Two, possibly three. |
| 11:32:35 | 5 | Q.   What about Caste: The Origins of Its (sic) |
| 11:32:39 | 6 | Discontent?  Any idea why this one got weeded? |
| 11:32:43 | 7 | A.   This one was checked out three times.  Three times, |
| 11:32:54 | 8 | it still looked like it was a fairly new book.  This one, |
| 11:32:59 | 9 | it could have been either a display checkout and not as |
| 11:33:03 | 10 | very many people checked it out; or it could possibly have |
| 11:33:06 | 11 | been that it was the ugly criteria that something happened |
| 11:33:10 | 12 | to it, you know, something got spilled in it, |
| 11:33:16 | 13 | fingerprints, something like that, that would make it to |
| 11:33:18 | 14 | where you just, you know, kind of grossed out to pick it |
| 11:33:21 | 15 | up and read it. |
| 11:33:22 | 16 | Q.   Is Caste available to library patrons through |
| 11:33:25 | 17 | interlibrary loan? |
| 11:33:25 | 18 | A.   Yes. |
| 11:33:26 | 19 | Q.   And was Caste available to library patrons through |
| 11:33:29 | 20 | OverDrive when you weeded it? |
| 11:33:31 | 21 | A.   Yes. |
| 11:33:31 | 22 | Q.   Does that mean Caste met the elsewhere criterion for |
| 11:33:34 | 23 | weeding under MUSTIE? |
| 11:33:35 | 24 | A.   Yes. |
| 11:33:36 | 25 | Q.   Let's talk about It's Perfectly Normal.  Why was that |

11:33:40  1   book weeded?

11:33:44  2   A.   I know that it was only checked out seven times in --

11:33:50  3   is that 22 years?  Something like that.  My math isn't all

11:33:55  4   that great on the spot.  Fifteen, 22.  It was a long time

11:34:02  5   to only be checked out seven times.

11:34:04  6   Q.   Is it normal to keep a book on the library shelf if

11:34:07  7   it's only been checked out seven times in 15 years?

11:34:10  8   A.   No.  So that would have been irrelevant.

11:34:14  9   Q.   Is It's Perfectly Normal, was that book available

11:34:17  10  through OverDrive when you weeded it?

11:34:19  11  A.   Yes.

11:34:19  12  Q.   Does that mean It's Perfectly Normal met the

11:34:22  13  elsewhere criterion?

11:34:23  14  A.   Yes.

11:34:23  15  Q.   For weeding as well as irrelevant?

11:34:25  16  A.   Yes.

11:34:26  17  Q.   Let's look at In The Night Kitchen.  Why did you weed

11:34:30  18  that book?

11:34:31  19  A.   This one's showing 33 checkouts.  I think this one's

11:34:48  20  the 22 years.

11:34:52  21  Q.   Seems to be more popular than the other ones.  Why

11:34:54  22  did you take that one off the shelf?

11:34:56  23  A.   It does.  That's still only getting checked out about

11:35:00  24  once a year.  And I think some of them were display

11:35:03  25  because it was on the banned books display probably every

11:35:08 1    year that we had it.  And so, to me, it just wasn't

11:35:15 2    getting like checked out enough, so it would have been

11:35:18 3    irrelevant.

11:35:18 4    Q.   Is it possible that 33 checkouts, some of those may

11:35:22 5    have been the same person checking it out multiple times?

11:35:24 6    A.   Yes.  Yes.  I've had a person at the library that is,

11:35:30 7    you know, when are you going to weed this because I want

11:35:33 8    it?  And, you know, he's like the only one that checks it

11:35:35 9    out, so that is possible.

11:35:38 10   Q.   Is In The Night Kitchen available to library patrons

11:35:42 11   through interlibrary loan?

11:35:43 12   A.   Yes.

11:35:43 13   Q.   Does that mean In The Night Kitchen meets the

11:35:45 14   elsewhere criteria?

11:35:46 15   A.   Yes.

11:35:47 16   Q.   For weeding under MUSTIE.  Is it possible that it met

11:35:51 17   other criteria for weeding?

11:35:53 18   A.   Yes, it's possible.

11:35:54 19   Q.   Given the age of the book?

11:35:55 20   A.   Uh-huh.

11:35:56 21   Q.   Why did you weed the Butt books and the Fart books?

11:36:01 22   A.   Because they were not getting checked out enough.

11:36:11 23   The back-and-forth between the two patrons not getting

11:36:15 24   access to the other people who possibly wanted it, nobody

11:36:20 25   else asked for it.  But instead of just having that go

11:36:23  1  back and forth that we would have to deal with, I took

11:36:26  2  them out of the system.  They were more trivial books,

11:36:32  3  anyway.

11:36:32  4  Q.   Do you think it's a valid reason to weed the book

11:36:34  5  based on the fact that a library patron was continuously

11:36:37  6  checking it out with the intent of possibly preventing

11:36:41  7  other library patrons from reading the book?

11:36:43  8  A.   I do, because they're still not going to check it out

11:36:49  9  either way.  The people that were trying to prevent others

11:36:52  10  from checking it out, they're just going to check it out

11:36:54  11  back and forth.  No one else is going to see it on the

11:36:56  12  shelves, anyway, and it was just silly trivial books.  It

11:37:02  13  wasn't anything with, you know, morals or value to it.

11:37:09  14  Q.   Do you have any concern that in weeding those books,

11:37:11  15  you were possibly creating the heckler's veto that could

11:37:15  16  allow any library patron to eliminate a book from the

11:37:19  17  library through this tactic?

11:37:21  18  A.   No.

11:37:21  19  Q.   Why not?

11:37:23  20  A.   I mean, it's their right to check out whatever they

11:37:27  21  want and to keep it, you know, back and forth to do that.

11:37:33  22  It was kind of more of a -- more stressful for the staff

11:37:38  23  to try to keep up with it and switch it from different

11:37:44  24  accounts.  It just didn't seem like it was worth it to me.

11:37:50  25  Q.   Are the Butt books and the Fart books available to

| | | |
|---|---|---|
| 11:37:53 | 1 | library patrons through interlibrary loan? |
| 11:37:55 | 2 | A.   Yes. |
| 11:37:56 | 3 | Q.   Does that mean the Butt and Fart books meet the |
| 11:37:59 | 4 | elsewhere criteria? |
| 11:38:00 | 5 | A.   Yes. |
| 11:38:01 | 6 | Q.   For weeding.  So how many criterion total did these |
| 11:38:08 | 7 | books qualify for? |
| 11:38:09 | 8 | A.   Trivial, irrelevant, it didn't really meet anyone's |
| 11:38:17 | 9 | needs and elsewhere. |
| 11:38:22 | 10 | Q.   You heard Ms. Castelan testify on Friday that she |
| 11:38:25 | 11 | agreed with many of your decisions to weed the books that |
| 11:38:29 | 12 | we just discussed. |
| 11:38:30 | 13 | A.   Yes. |
| 11:38:30 | 14 | Q.   What's your response to Ms. Castelan's testimony? |
| 11:38:33 | 15 | Was she flatly wrong?  Was this a matter of judgment on |
| 11:38:37 | 16 | which reasonable librarians can disagree?  Was she |
| 11:38:40 | 17 | misinformed?  Was it some combination of the three?  Tell |
| 11:38:43 | 18 | us your response. |
| 11:38:44 | 19 |           MS. LEONIDA:  Objection.  Leading. |
| 11:38:46 | 20 |           THE COURT:  Overruled.  You can answer. |
| 11:38:49 | 21 | A.   I believe that every librarian is just trained |
| 11:38:53 | 22 | differently by their bosses and you use your own judgment |
| 11:39:00 | 23 | on a lot of this.  You know, the CREW is guidelines. |
| 11:39:03 | 24 | You're kind of looking at some things are maybe more dirty |
| 11:39:07 | 25 | to others.  You know, if they've got fingerprints, some |

| | | |
|---|---|---|
| 11:39:11 | 1 | will say, oh, that's not enough, I can still read it, put |
| 11:39:14 | 2 | it back on the shelf.  So we just all kind of use our own |
| 11:39:17 | 3 | discretion of what we think would, you know, meet the |
| 11:39:22 | 4 | criteria for MUSTIE. |
| 11:39:26 | 5 | Q.   Do you disagree with what Ms. Castelan testified on |
| 11:39:30 | 6 | Friday regarding her assessments of your judgments and the |
| 11:39:32 | 7 | application of the MUSTIE criteria? |
| 11:39:33 | 8 | A.   I do. |
| 11:39:34 | 9 | Q.   Do you believe that every one of your decisions with |
| 11:39:36 | 10 | respect to these books was justified under the MUSTIE |
| 11:39:39 | 11 | criteria? |
| 11:39:39 | 12 | A.   Yes, I do. |
| 11:39:41 | 13 | Q.   I want to change topics and shift to the issue of |
| 11:39:44 | 14 | last chance to display, which I think you may have heard |
| 11:39:48 | 15 | discussed on Friday. |
| 11:39:49 | 16 | A.   Yes. |
| 11:39:49 | 17 | Q.   Did you hear Ms. Castelan testify on Friday about |
| 11:39:51 | 18 | putting soon-to-be-weeded books on a so-called last-chance |
| 11:39:56 | 19 | display for library patrons to see before they are |
| 11:39:59 | 20 | ultimately weeded? |
| 11:40:00 | 21 | A.   Yes. |
| 11:40:00 | 22 | Q.   Is it normal for the Llano County Library to take a |
| 11:40:05 | 23 | book that is about to be weeded and place it on a |
| 11:40:07 | 24 | last-chance display? |
| 11:40:08 | 25 | A.   Yes, but it's rare. |

| | | |
|---|---|---|
| 11:40:11 | 1 | Q.   How rare would it be in your estimation? |
| 11:40:15 | 2 | A.   Like five to 10 percent. |
| 11:40:19 | 3 | Q.   Five the 10 percent of the books are about to be |
| 11:40:23 | 4 | weeded would be put on the last-chance display and the |
| 11:40:25 | 5 | other 90 to 95 percent would not? |
| 11:40:27 | 6 | A.   Yes. |
| 11:40:27 | 7 | Q.   So why is it that all of these books that we just |
| 11:40:30 | 8 | discussed did not make it into a last-chance display? |
| 11:40:35 | 9 | They all wound up in the 95 percent category rather than |
| 11:40:38 | 10 | the five percent?  Was there some reason?  Was there a |
| 11:40:41 | 11 | thought process you went through? |
| 11:40:42 | 12 | A.   Yes, because to me, it was -- there was bigger gaps |
| 11:40:46 | 13 | in the checkout history.  There's just no need to have a |
| 11:40:51 | 14 | book on the shelf that hasn't been checked out in three |
| 11:40:54 | 15 | years, four years when we could purchase something else to |
| 11:40:59 | 16 | fill its spot that will get checked out.  That's what we |
| 11:41:03 | 17 | want.  We want people to come into the libraries and check |
| 11:41:06 | 18 | out, you know, items.  Not kind of, oh, I don't like that, |
| 11:41:08 | 19 | I don't like that. |
| 11:41:13 | 20 | Q.   Did your decision not to place these books on the |
| 11:41:16 | 21 | last-chance display have anything to do with the fact that |
| 11:41:19 | 22 | Bonnie Wallace wanted these books gone from the library? |
| 11:41:21 | 23 | A.   No. |
| 11:41:22 | 24 | Q.   Did that decision not to place these books on the |
| 11:41:24 | 25 | last-chance display have anything to do with the content |

| 11:41:27 | 1 | of these books? |
| 11:41:28 | 2 | A.   No. |
| 11:41:28 | 3 | Q.   Did it have anything to do with the viewpoints |
| 11:41:30 | 4 | expressed in those books? |
| 11:41:32 | 5 | A.   No. |
| 11:41:34 | 6 | Q.   Does Bonnie Wallace or Rochelle Wells have any |
| 11:41:37 | 7 | authority to remove or weed a book from the Llano County |
| 11:41:42 | 8 | libraries? |
| 11:41:43 | 9 | A.   No. |
| 11:41:43 | 10 | Q.   Does Bonnie Wallace, or Rochelle Wells, or any member |
| 11:41:46 | 11 | of the library advisory board have authority to direct you |
| 11:41:49 | 12 | to weed or remove a book? |
| 11:41:51 | 13 | A.   No. |
| 11:41:52 | 14 | Q.   Does Bonnie Wallace, or Rochelle Wells, or any member |
| 11:41:56 | 15 | of the library advisory board have the ability to fire |
| 11:41:58 | 16 | you? |
| 11:41:58 | 17 | A.   No. |
| 11:42:00 | 18 | Q.   Does Bonnie Wallace, or Rochelle Wells, or any member |
| 11:42:03 | 19 | of the library advisory board have any authority at all |
| 11:42:06 | 20 | over you or the library system? |
| 11:42:07 | 21 | A.   No. |
| 11:42:09 | 22 | Q.   Is it acceptable in your view for members of the |
| 11:42:12 | 23 | community to express concerns to you about library books |
| 11:42:14 | 24 | and their content? |
| 11:42:15 | 25 | A.   Oh, absolutely.  Yes. |

11:42:17  1    Q.   Why?

11:42:18  2    A.   Because patrons have a right to say what they like

11:42:20  3    and what they don't like and, you know, express what they

11:42:23  4    want in the libraries.  You know, we have a few that will

11:42:29  5    come in and say, oh, this one, you know, had a lot of cuss

11:42:33  6    words in it, I don't like that.  We'll direct them to, you

11:42:36  7    know, something that they will like.  But yeah, it's their

11:42:38  8    right to say what they want and bring it to our attention.

11:42:42  9    Q.   Is it acceptable in your review for members of the

11:42:44  10   community to ask you to remove or weed a book from the

11:42:48  11   library shelves?

11:42:49  12   A.   Yes.  That's their constitutional right.  They've got

11:42:52  13   their opinions and to let people know what they want and

11:42:56  14   don't want.

11:42:57  15   Q.   Is it acceptable in your review for members of the

11:43:00  16   commissioners' court to express concerns to you about the

11:43:02  17   contents of a library book or to ask you to remove or weed

11:43:07  18   a library book from the shelves?

11:43:09  19   A.   Yes.  It's their right as well as patrons or, you

11:43:11  20   know, members of the community.

11:43:12  21   Q.   But the mere fact that they're asking you to do so

11:43:14  22   does not mean that they're directing you, does it?

11:43:17  23   A.   No.

11:43:19  24   Q.   Does Jerry Don Moss have any authority or ability to

11:43:22  25   remove or weed a book from the Llano County Library

11:43:25   1   System?

11:43:25   2   A.   No.

11:43:26   3   Q.   Does Jerry Don Moss have the authority to direct you

11:43:28   4   to weed or remove a book?

11:43:31   5   A.   No.

11:43:31   6   Q.   Does Jerry Don Moss have the ability to fire you?

11:43:34   7   A.   No.

11:43:34   8   Q.   Does Jerry Don Moss have any authority at all over

11:43:37   9   you or the Llano County Library System?

11:43:40   10   A.   No.

11:43:43   11   Q.   Ms. Milum, let's talk a little bit about Bibliotheca.

11:43:46   12   This is the library's online database.   Is it possible for

11:43:50   13   you or your library staff to restrict a library patron's

11:43:53   14   ability to access any particular book on Bibliotheca?

11:43:57   15   A.   No.

11:43:58   16   Q.   So how does Bibliotheca prevent children from

11:44:01   17   accessing inappropriate material?   Wasn't that the reason

11:44:03   18   you switched to Bibliotheca?

11:44:06   19   A.   Yes.   So I went into our Apollo library system.   I

11:44:14   20   spoke to the representatives for Apollo and I was able to

11:44:20   21   block minors' library cards from accessing our online

11:44:25   22   Bibliotheca resource.   Once the minor's -- well, the

11:44:31   23   parents can allow their children to check out whatever

11:44:34   24   they want from the online resource using their card.   And

11:44:38   25   then, once the minors turn 18, the system will

11:44:42  1    automatically switch that block and they don't have to

11:44:46  2    call us or anything.  Once they turn 18, then they have

11:44:50  3    access to the online Bibliotheca.

11:44:52  4    Q.   Do you have any intention of restricting any adult's

11:44:56  5    ability to access any content or material of any sort on

11:45:00  6    Bibliotheca?

11:45:00  7    A.   No.

11:45:01  8    Q.   Do you have any ability to restrict any adult's

11:45:07  9    opportunities to access any book resource or other

11:45:10  10   material on Bibliotheca?

11:45:11  11   A.   No.

11:45:13  12          THE COURT:  Mr. Mitchell, we're going to need to

11:45:15  13   take our lunch break now.  So, ma'am, if you'll remain

11:45:21  14   available, we'll pick up where we left off.  We're going

11:45:23  15   to take a bit of an extended lunch to give counsel an

11:45:26  16   opportunity to confer with each other.  So we'll break now

11:45:28  17   and we will reconvene at 1:15.  Thank you very much.

11:49:00  18          (Lunch recess.)

13:18:57  19          THE COURT:  And, Ms. Milum, if you could approach

13:19:01  20   again, please.  Thank you.  You remain under oath.  Thank

13:19:13  21   you, Mr. Mitchell.  You may proceed.

13:19:15  22          MR. MITCHELL:  Thank you.

13:19:16  23   Q.   (BY MR. MITCHELL) Ms. Milum, there's been a lot of

13:19:20  24   talk today about this inhouse checkout system at the Llano

13:19:25  25   Library.  Can you tell us more about this inhouse

13:19:27  1  checkout?  When did it start?  How did it start?

13:19:29  2  A.   When I started at the Kingsland library in December

13:19:33  3  of 2013, they were already doing it.  So if we knew, you

13:19:42  4  know, people on the book club list, we only had one in the

13:19:46  5  system or two in the system, that if we were getting in,

13:19:49  6  donations, we would try to look for those books and just

13:19:52  7  put them, you know, behind the shelf.  Instead of adding

13:19:55  8  it to the system and just having a lot of multiple copies,

13:19:59  9  we would put them behind the counter and if anyone came in

13:20:03  10  needing those books or wanting to put them on reserve, we

13:20:06  11  would just have an extra one that they could check out.

13:20:12  12        It's also back then, we had classics.  You know,

13:20:18  13  if we knew the kids were going to be reading certain ones

13:20:20  14  that year, if any of them came in, we would try to keep

13:20:24  15  them and put them on the shelf.  If there was like the

13:20:28  16  popular authors that new book was coming out, some people

13:20:32  17  will buy it and then, donate it to the library even after

13:20:35  18  we've already purchased one.  And so, we would kind of

13:20:38  19  hold that back, too, because we knew multiple people would

13:20:40  20  be coming in really wanting that book.  So it was a way

13:20:45  21  for patrons to get what they were wanting, but we didn't

13:20:48  22  have to put just multiples on the shelf because we didn't

13:20:51  23  really have the space for that.

13:20:54  24  Q.   How long has the library been operating an inhouse

13:20:58  25  checkout system of this sort?

| | | |
|---|---|---|
| 13:21:00 | 1 | A.   As long as I've been there, since December of 2013. |
| 13:21:03 | 2 | Q.   December of 2013 at least, perhaps sooner? |
| 13:21:06 | 3 | A.   Perhaps sooner, yes. |
| 13:21:08 | 4 | Q.   Do you agree with the plaintiffs' characterization of |
| 13:21:10 | 5 | this as a secret checkout system? |
| 13:21:12 | 6 | A.   No. |
| 13:21:13 | 7 | Q.   Why not? |
| 13:21:14 | 8 | A.   Because it's not a secret.  It's just new to the |
| 13:21:20 | 9 | Llano Library.  Since I've been director of all three, I'm |
| 13:21:23 | 10 | trying to get all three libraries to do the same thing and |
| 13:21:27 | 11 | to be, you know one.  And so, I'm trying to introduce what |
| 13:21:32 | 12 | has always worked and we've done the Kingsland library to |
| 13:21:36 | 13 | the other libraries, as well. |
| 13:21:38 | 14 | Q.   We've talked about some books that were recently |
| 13:21:40 | 15 | donated to the inhouse checkout system at the Llano |
| 13:21:46 | 16 | Library.  These are the books that the plaintiffs have |
| 13:21:48 | 17 | mentioned in their sworn declaration as books that they |
| 13:21:50 | 18 | wished to check out. |
| 13:21:51 | 19 | A.   Yes. |
| 13:21:52 | 20 | Q.   From the library, but have not been able to on |
| 13:21:54 | 21 | account of the fact that they were previously weeded.  Is |
| 13:21:57 | 22 | it your intention to keep those books available for |
| 13:22:01 | 23 | checkout in the inhouse checkout system for the duration |
| 13:22:05 | 24 | of this litigation? |
| 13:22:06 | 25 | A.   Yes. |

13:22:07  1   Q.   Is it your intention to keep those books available

13:22:09  2   for checkout after the litigation concludes?

13:22:12  3   A.   Yes.

13:22:12  4   Q.   Is it your intention to keep those books available

13:22:14  5   for checkout indefinitely, regardless of what happens in

13:22:19  6   this litigation?

13:22:19  7   A.   Yes.

13:22:20  8   Q.   Finally, Ms. Milum, one question about weeding.  Will

13:22:27  9   you or your colleagues be weeding, or removing, or

13:22:30  10  concealing any book in any of the libraries in the Llano

13:22:35  11  County system between now and the conclusion of this

13:22:37  12  litigation?

13:22:38  13  A.   No.

13:22:39  14  Q.   No further questions, your Honor.

13:22:42  15                    CROSS-EXAMINATION

13:22:42  16  BY MS. LEONIDA:

13:22:59  17  Q.   Ms. Milum, isn't it true that Ron Cunningham is your

13:23:03  18  supervisor?

13:23:03  19  A.   Yes.

13:23:03  20  Q.   Isn't it also true that Jerry Don Moss is your

13:23:07  21  supervisor?

13:23:09  22  A.   No.  He's more of like when I need approval for

13:23:16  23  closings or how to spend part of our materials money, I

13:23:24  24  would go to commissioner's court to get the approval of

13:23:27  25  all of them.

13:23:29  1    Q.   So he's not your supervisor?

13:23:30  2    A.   No.

13:23:30  3    Q.   Okay.  Can you play clip 8 from Ms. Milum's

13:23:34  4    deposition, please.

13:23:38  5              (Audio and video file played.)

13:23:40  6    Q.   "And who -- who is Mr. Ron Cunningham?

13:23:43  7    A.   The county judge.

13:23:45  8    Q.   Does he -- is he your supervisor?

13:23:50  9    A.   Yes.

13:23:52  10   Q.   Besides Mr. Cunningham, do you report to anybody

13:23:56  11   else?

13:23:56  12   A.   Commissioners' court.

13:24:00  13   Q.   So you report to the commissioners, Mr. Cunningham.

13:24:06  14   Anybody other than those individuals?

13:24:07  15   A.   No."

13:24:08  16              (End of audio/video file.)

13:24:10  17   Q.   Can you play clip B, please.

13:24:13  18              (Audio and video file played.)

13:24:15  19   Q.   "Mr. Jerry Don Moss and Mr. Ron Cunningham, they --

13:24:24  20   they are your supervisors at -- in your role as the

13:24:29  21   library director; is that right?

13:24:33  22   A.   Yes."

13:24:34  23              (End of audio/video file.)

13:24:36  24   Q.   Ms. Milum, I'd like to direct your attention to

13:24:39  25   Exhibit 2B.  This is a note that you wrote to yourself,

| | |
|---|---|
| 13:24:58 | **1** |
| 13:24:58 | **2** |
| 13:25:04 | **3** |
| 13:25:06 | **4** |
| 13:25:07 | **5** |
| 13:25:08 | **6** |
| 13:25:12 | **7** |
| 13:25:17 | **8** |
| 13:25:22 | **9** |
| 13:25:24 | **10** |
| 13:25:26 | **11** |
| 13:25:31 | **12** |
| 13:25:32 | **13** |
| 13:25:34 | **14** |
| 13:25:37 | **15** |
| 13:25:40 | **16** |
| 13:25:43 | **17** |
| 13:25:47 | **18** |
| 13:25:50 | **19** |
| 13:25:54 | **20** |
| 13:25:58 | **21** |
| 13:26:03 | **22** |
| 13:26:07 | **23** |
| 13:26:08 | **24** |
| 13:26:11 | **25** |

correct?

A.   Yes.

Q.   It's a note that you wrote to yourself about Commissioner Moss, correct?

A.   Yes.

Q.   Where you wrote a note to yourself that he came in around 4:00 p.m. on August 3rd of 2021 and told you that you should take the Butt books out of the system, correct?

A.   Yes.  He was saying that if it was him, he would take them out.

Q.   Can you just read that note for us, please, that you wrote to yourself?

A.   Commissioner Moss came back in to talk to me about the Butt books.  He said he has been getting calls about them.  And Rochelle, the one that has been checking them out, has been calling him and he told me that I should take them out of the system.  Books wouldn't be so bad if it didn't have the butt pictures.  Told me to pick my battles.  He is going to tell everyone it's over.  He said the next step would be to take this to CC, which is commissioners' court, and if that happens, he would vote to take them off the shelf and it would be bad publicity for the library.

Q.   Whose initials are those at the bottom of that?

A.   Those are mine.

13:26:12  1  Q.   Because you wrote this note for yourself?

13:26:14  2  A.   Yes.

13:26:14  3  Q.   There are approximately 67,000 materials in the Llano

13:26:22  4  Library system, correct?

13:26:22  5  A.   Probably.

13:26:24  6  Q.   And is it your testimony that each of those 67,000

13:26:28  7  items is checked out more than once a year?

13:26:31  8  A.   I have not been there long enough to weed properly.

13:26:35  9  I don't believe it was done enough before I got there.

13:26:39  10  Q.   You've been there since 2013?

13:26:41  11  A.   Not in the Llano Library.

13:26:43  12  Q.   In the library system?

13:26:44  13  A.   Yes.

13:26:45  14  Q.   You're saying no weeding has ever happened until?

13:26:49  15  A.   No.  I'm saying I don't believe the weeding was

13:26:52  16  properly done at the Llano Library.

13:26:55  17  Q.   And by properly done, you mean done in response to a

13:26:58  18  list that Judge Cunningham sent you of books that Ms.

13:27:02  19  Wallace disapproved of?

13:27:05  20  A.   No.  I mean that there was a lot of books that

13:27:06  21  haven't been checked out in many, many years, and I don't

13:27:09  22  believe they should have been on the shelf because that

13:27:12  23  was just wasting space when we could have purchased

13:27:14  24  something new because we don't have very much space.

13:27:18  25  Q.   The Llano Library stopped buying new books in October

13:27:22  1   of 2021, correct?

13:27:22  2   A.   Yes.

13:27:23  3   Q.   So there have been no new book orders authorized

13:27:27  4   since 2021.

13:27:28  5   A.   Right.

13:27:28  6   Q.   So when you did the weeding based on Ms. Wallace's

13:27:34  7   list that was e-mailed to you by your boss, you weren't

13:27:36  8   doing that to make room for new books because you weren't

13:27:39  9   allowed to order new books, correct?

13:27:42  10  A.   Right.

13:27:45  11  Q.   Of the 67,000 items in the Llano Library system, over

13:27:52  12  500 of them have not been checked out since 2010; is that

13:27:56  13  right?

13:27:56  14  A.   I'm not sure.  I would have to look at the reports.

13:27:59  15  Q.   You did make a report of books that had not been

13:28:01  16  checked out in three years that are currently in the

13:28:04  17  library system, correct?

13:28:04  18  A.   Yes.

13:28:05  19  Q.   Okay.  I believe that is Exhibit 79 and you also

13:28:09  20  provided us an Excel spreadsheet.  Well, you provided us

13:28:13  21  this exhibit in Excel spreadsheet, correct?

13:28:16  22  A.   Yes.

13:28:17  23  Q.   Can we put this up on the screen and we'll call it 79

13:28:21  24  A.   This is the spreadsheet that you made?

13:28:25  25  A.   I believe so.

| 13:28:27 | 1 | Q. We move Exhibit 79A into evidence. |
| 13:28:31 | 2 | MR. MITCHELL: No objection, your Honor. |
| 13:28:32 | 3 | THE COURT: So admitted. |
| 13:28:34 | 4 | Q. (BY MS. LEONIDA) How many libraries are there in |
| 13:28:40 | 5 | Texas, Ms. Milum? |
| 13:28:42 | 6 | A. I don't know off the top of my head. |
| 13:28:45 | 7 | Q. You're familiar with the interlibrary loan system? |
| 13:28:49 | 8 | A. Yes. |
| 13:28:49 | 9 | Q. How many libraries are involved in that system? |
| 13:28:51 | 10 | A. I don't know. I'm not one that normally does it. |
| 13:28:54 | 11 | Q. You're the library director, right? |
| 13:28:57 | 12 | A. Yes. Other staff do that process. |
| 13:28:59 | 13 | Q. So you have no idea of how many libraries are in the |
| 13:29:02 | 14 | interlibrary loan system? |
| 13:29:04 | 15 | A. No. |
| 13:29:04 | 16 | Q. Do you know if there are libraries in, say, El Paso |
| 13:29:07 | 17 | that are in that system? |
| 13:29:08 | 18 | A. Probably. I don't know. |
| 13:29:10 | 19 | Q. How far is El Paso from Llano? |
| 13:29:13 | 20 | A. It's far. I don't know. |
| 13:29:16 | 21 | Q. I'm sorry? |
| 13:29:16 | 22 | A. I said it's far. I don't know exactly. |
| 13:29:19 | 23 | Q. Okay. What about Beaumont? Do you think there are |
| 13:29:21 | 24 | any libraries there in the interlibrary loan system? |
| 13:29:24 | 25 | A. Probably. |

| 13:29:25 | 1 | Q. How far is that from Llano? |
| 13:29:26 | 2 | A. It's far. |
| 13:29:27 | 3 | Q. Far? |
| 13:29:28 | 4 | A. Yes. |
| 13:29:28 | 5 | Q. Do you have in your professional opinion as library |
| 13:29:37 | 6 | director an estimate of approximately how many libraries |
| 13:29:39 | 7 | there are that are part of the interlibrary loan system in |
| 13:29:43 | 8 | Texas? |
| 13:29:43 | 9 | A. I do not. Not off the top of my head. I would have |
| 13:29:46 | 10 | to look at the information. |
| 13:29:47 | 11 | Q. Okay. And this is not information that you looked up |
| 13:29:50 | 12 | prior to testifying here today? |
| 13:29:51 | 13 | A. No. |
| 13:29:52 | 14 | Q. So you don't know -- if you don't know how many, you |
| 13:29:55 | 15 | also -- is it correct to say you don't know which |
| 13:29:57 | 16 | libraries are part of the interlibrary loan system? |
| 13:30:00 | 17 | A. I don't know exactly, no. There is a list in our |
| 13:30:02 | 18 | binder, but I don't recall. |
| 13:30:05 | 19 | Q. And you didn't look at that list -- well, let me ask |
| 13:30:08 | 20 | you, did you look at that list before you engaged in the |
| 13:30:11 | 21 | weeding process in November that we've been talking about? |
| 13:30:15 | 22 | A. No, because I can get on the site and look to see if |
| 13:30:18 | 23 | the book is available and I didn't look at which library |
| 13:30:22 | 24 | it was going to be coming from. |
| 13:30:23 | 25 | Q. You didn't? |

13:30:24  1   A.   No.

13:30:25  2   Q.   Okay.  You didn't do that for any of the books we've

13:30:28  3   been talking about?

13:30:28  4   A.   No.  It was available that it could be shipped and

13:30:31  5   that's what I looked at.

13:30:33  6   Q.   Okay.  I want to show you Exhibit 23 again, the

13:30:45  7   second page with the MUSTIE criteria there.  Can you read

13:30:54  8   what the E stands for, including the parenthetical?

13:31:01  9   A.   Elsewhere the interlibrary loan.  Elsewhere, the

13:31:13  10  material may be easily borrowed from another source.

13:31:22  11  Q.   So available elsewhere doesn't just mean available

13:31:26  12  elsewhere, say, in Alaska or El Paso or Beaumont.  It has

13:31:29  13  to be easily available from another source, correct?

13:31:34  14  A.   Yes.  Our ILL system is easily for our patrons.

13:31:38  15  Q.   How long does it take to get a book from Beaumont?

13:31:41  16  A.   It depends.

13:31:43  17  Q.   How long does it take to get a book from El Paso?

13:31:46  18  A.   It would just depend.

13:31:48  19  Q.   Could take weeks?

13:31:49  20  A.   Possibly and they know that to begin with.  Of

13:31:53  21  course, we're going to try to pick the quickest, you know,

13:31:57  22  closest location; but if it's not available, then we'll go

13:32:01  23  to what is.

13:32:02  24  Q.   So it could take a month or more to get a book

13:32:04  25  through interlibrary loan?

| | | |
|---|---|---|
| 13:32:05 | 1 | A.   It could. |
| 13:32:12 | 2 | Q.   You also testified previously that a book not having |
| 13:32:15 | 3 | been checked out in three years alone is not a sufficient |
| 13:32:18 | 4 | reason by itself to weed that book, correct? |
| 13:32:20 | 5 | A.   Yes. |
| 13:32:21 | 6 | Q.   Would you agree that people sometimes read books in |
| 13:32:27 | 7 | the library without checking them out? |
| 13:32:29 | 8 | A.   Yes. |
| 13:32:34 | 9 | Q.   Let's talk about In The Night Kitchen.  That book |
| 13:32:39 | 10 | that you weeded in November of 2021 had been checked out |
| 13:32:42 | 11 | 33 times, correct? |
| 13:32:43 | 12 | A.   Yes. |
| 13:32:44 | 13 | Q.   I believe you just testified that you weeded it |
| 13:32:48 | 14 | because it hadn't been checked out enough? |
| 13:32:50 | 15 | A.   Yes. |
| 13:32:51 | 16 | Q.   Do you know the dates that it had been checked out |
| 13:32:58 | 17 | on? |
| 13:32:59 | 18 | A.   Not off the top of my head, no. |
| 13:33:01 | 19 | Q.   Okay.  Did you look to see what dates it had been |
| 13:33:04 | 20 | checked out before you weeded? |
| 13:33:05 | 21 | A.   Yes.  The dates and if it was ever on display, or |
| 13:33:08 | 22 | interlibrary loan, or even the ISL. |
| 13:33:11 | 23 | Q.   Okay.  So how many times had it been on display? |
| 13:33:13 | 24 | A.   I don't recall.  I didn't print those out. |
| 13:33:16 | 25 | Q.   Did you look this weekend? |

13:33:20  1  A.   No.  Once it's out of the system, I can't go back and

13:33:23  2  check it.

13:33:24  3  Q.   Do you know by whom it had been checked out?

13:33:27  4  A.   No, I don't recall.

13:33:29  5  Q.   You don't know how many times it had been on display?

13:33:32  6  A.   Not now.  I did when I weeded it.

13:33:35  7  Q.   And your testimony is that the only reason that you

13:33:38  8  weeded that book is, it hadn't been checked out enough?

13:33:44  9  A.   It hadn't -- only getting checked out like once a

13:33:48  10  year isn't very much, especially because that book would

13:33:52  11  have been on display.  So no.  I don't think it should

13:34:00  12  have been on the shelves anymore.  I think it's kind of

13:34:03  13  served its purpose.

13:34:04  14  Q.   Okay.  Can we play clip 10, please.

13:34:10  15        (Audio and video file played.)

13:34:12  16  Q.   "Okay.  We didn't talk about In The Night Kitchen by

13:34:15  17  Maurice Sendak specifically, so I wanted to talk about

13:34:18  18  that a little bit.  What was the primary complaint there?

13:34:21  19  Was it different than the Butt and the Fart books?

13:34:24  20  A.   No.  It was that he was naked throughout the whole

13:34:30  21  thing and adults were -- were around.  Just like the --

13:34:37  22  the Butt book.

13:34:38  23  Q.   I see.  And was In The Night Kitchen meant for

13:34:45  24  adults?

13:34:46  25  A.   No.

| | | |
|---|---|---|
| 13:34:48 | 1 | Q.   This was another children's book?   Is that right? |
| 13:34:50 | 2 | A.   Yes. |
| 13:34:51 | 3 | Q.   Okay.   And these complaints were principally -- were |
| 13:34:56 | 4 | they by adults or were they made by children? |
| 13:34:59 | 5 | A.   Neither. |
| 13:35:02 | 6 | Q.   So who made these complaints? |
| 13:35:05 | 7 | A.   No one made a complaint about the book.   It was |
| 13:35:07 | 8 | brought to our attention when we were going through |
| 13:35:12 | 9 | everything -- the collections. |
| 13:35:16 | 10 | Q.   And why was this book removed without any complaints? |
| 13:35:24 | 11 | A.   With everything that was going on and being said and |
| 13:35:35 | 12 | us looking through our collection, about all of the sexual |
| 13:35:42 | 13 | content or nudity, that book just kind of fell into the -- |
| 13:35:51 | 14 | the nudity part.   And so, it was just being looked at |
| 13:35:57 | 15 | more. |
| 13:35:59 | 16 | Q.   And so, the major concern here was that you really |
| 13:36:01 | 17 | didn't want to incite any sort of unnecessary controversy |
| 13:36:06 | 18 | or backlash where you didn't need to.   Was that right? |
| 13:36:10 | 19 | A.   Right." |
| 13:36:11 | 20 | (End of audio/video file.) |
| 13:36:14 | 21 | Q.   Turning your attention to Exhibit 79A, Ms. Milum, |
| 13:36:18 | 22 | isn't it true that currently in the Llano County Library |
| 13:36:23 | 23 | System is a book called Teach Yourself Microsoft |
| 13:36:26 | 24 | PowerPoint 2000 Visually, which was last checked out in |
| 13:36:30 | 25 | 2003? |

| | | |
|---|---|---|
| 13:36:31 | 1 | A.   Possibly. |
| 13:36:38 | 2 | Q.   Your lawyer asked you some questions about the book |
| 13:36:41 | 3 | Freakboy and your weeding of that book.  You, I believe, |
| 13:36:47 | 4 | testified last Friday that you never read that book? |
| 13:36:49 | 5 | A.   Correct. |
| 13:36:49 | 6 | Q.   So you don't know if it was misleading? |
| 13:36:52 | 7 | A.   No. |
| 13:36:52 | 8 | Q.   You don't have any memory of it being ugly? |
| 13:36:55 | 9 | A.   No. |
| 13:36:57 | 10 | Q.   You don't know if it was superseded? |
| 13:36:59 | 11 | A.   No. |
| 13:37:01 | 12 | Q.   You don't know if it was trivial? |
| 13:37:03 | 13 | A.   No. |
| 13:37:04 | 14 | Q.   You don't know if it was irrelevant? |
| 13:37:07 | 15 | A.   Yes, because it wasn't getting checked out. |
| 13:37:09 | 16 | Q.   Okay.  So that's one factor.  And then, you said it |
| 13:37:12 | 17 | was available through interlibrary loan from which |
| 13:37:15 | 18 | library? |
| 13:37:16 | 19 | A.   Whichever one that came up.  I didn't look at which |
| 13:37:18 | 20 | libraries.  I just looked to see if it was available. |
| 13:37:21 | 21 | Q.   Okay.  So you didn't look to see how close the |
| 13:37:24 | 22 | library was, just that it existed in interlibrary loan |
| 13:37:27 | 23 | system; is that right? |
| 13:37:28 | 24 | A.   Yes. |
| 13:37:29 | 25 | Q.   Directing your attention back to Exhibit 79A, |

| | |
|---|---|
| 13:37:35 | 1 |
| 13:37:44 | 2 |
| 13:37:46 | 3 |
| 13:37:52 | 4 |
| 13:37:55 | 5 |
| 13:38:00 | 6 |
| 13:38:05 | 7 |
| 13:38:07 | 8 |
| 13:38:18 | 9 |
| 13:38:20 | 10 |
| 13:39:09 | 11 |
| 13:39:12 | 12 |
| 13:39:19 | 13 |
| 13:39:23 | 14 |
| 13:39:25 | 15 |
| 13:39:31 | 16 |
| 13:39:36 | 17 |
| 13:39:38 | 18 |
| 13:39:42 | 19 |
| 13:39:45 | 20 |
| 13:39:49 | 21 |
| 13:39:51 | 22 |
| 13:39:53 | 23 |
| 13:39:56 | 24 |
| 13:39:58 | 25 |

Freakboy was last checked out in 2016, right?

A.   I don't know.  I'm not seeing it.

Q.   Okay.  There is a book in the Llano County Library
System currently called A Tangled Web, a novel that was
last checked out in 2004; isn't that right?

A.   I don't know.

Q.   Feel free to look at the Excel spreadsheet that you
made if that will help you remember.

A.   What was the title again?

Q.   A Tangled Web.

A.   Well, do you know about where it would be?  I mean,
that's going to take a while.

Q.   I believe it's 79, which you created, is on the
screen in front of you.

A.   Okay.  I can't see the title or anything on mine.  So
-- okay.  I can see it, so yes.  Looks like the last
circulated in 2004.

Q.   Okay.  Isn't it also true that there's a book
currently in Llano County Library System called
Encyclopedia Brown In The Case Of The Disgusting Sneakers,
which hasn't been checked out since 2004?

A.   Yes.

Q.   Turning your attention to Being Jazz, another book
that your lawyer asked you about, you didn't read that
book.

| 13:39:59 | 1 | A. No. |
| 13:40:00 | 2 | Q. Correct? So you have no information that it was |
| 13:40:03 | 3 | misleading? |
| 13:40:03 | 4 | A. No. |
| 13:40:04 | 5 | Q. You have no information that it was ugly? |
| 13:40:06 | 6 | A. No. |
| 13:40:07 | 7 | Q. You have no information that it was superseded? |
| 13:40:09 | 8 | A. No. |
| 13:40:10 | 9 | Q. You have no information that it was trivial? |
| 13:40:13 | 10 | A. No. |
| 13:40:14 | 11 | Q. You don't know where it could otherwise be found in |
| 13:40:18 | 12 | Texas, do you? |
| 13:40:20 | 13 | A. I know that it was available. I don't know where -- |
| 13:40:23 | 14 | what location. |
| 13:40:24 | 15 | Q. So you don't know if it was available in El Paso, or |
| 13:40:27 | 16 | Beaumont, or someplace even further away; is that right? |
| 13:40:29 | 17 | A. No. That's right. |
| 13:40:32 | 18 | Q. Your lawyer also asked you about Gabi, A Girl In |
| 13:40:41 | 19 | Pieces. Do you remember that? |
| 13:40:42 | 20 | A. Yes. |
| 13:40:43 | 21 | Q. That's a book that was last checked out in 2018? |
| 13:40:47 | 22 | A. Probably. |
| 13:40:48 | 23 | Q. And it had been checked out three times. |
| 13:40:50 | 24 | A. Uh-huh. |
| 13:40:51 | 25 | Q. You have no information that that book was |

13:40:53  1   misleading, do you?

13:40:54  2   A.   No.

13:40:55  3   Q.   That book wasn't ugly as far as you know?

13:40:58  4   A.   I don't recall.

13:40:59  5   Q.   That book wasn't superseded as far as you know?

13:41:02  6   A.   No.

13:41:03  7   Q.   It wasn't trivial?

13:41:05  8   A.   I don't know.  I didn't read it.

13:41:08  9   Q.   You don't know where else that book might be found

13:41:10  10  throughout the state of Texas?

13:41:12  11  A.   Not the location, but I know it's available.

13:41:14  12  Q.   Okay.  Just that it was last checked out in 2018.

13:41:18  13  A.   Yes.  And part of that could have been a display, as

13:41:21  14  well.

13:41:21  15  Q.   Could have been and that would -- but you don't know

13:41:23  16  that it was a display, do you?

13:41:24  17  A.   No.  But I -- I mean, when you look at those, that's

13:41:29  18  what you're looking for is to see how many times it's been

13:41:31  19  checked out by an actual person.

13:41:33  20  Q.   You don't know how many times it was checked out by

13:41:35  21  an actual person as you sit here, do you?

13:41:37  22  A.   No, not now.  I did when I weeded it.

13:41:40  23  Q.   So there is also a book currently in the Llano County

13:41:44  24  Library System called The Magic School Bus and the

13:41:46  25  Electric Field Trip that was last checked out in 2000,

13:41:49  1  correct?

13:41:56  2  A.    Yes.

13:42:00  3  Q.    That's still in the system.

13:42:02  4  A.    Yes.

13:42:03  5  Q.    How old were you in 2000, Ms. Milum?

13:42:10  6  A.    Twenty.

13:42:17  7  Q.    There's also a book currently in the Llano County

13:42:19  8  Library System called The Boy Who Held Back The Sea that

13:42:22  9  hasn't been checked out since 2002, correct?

13:42:26  10  A.    Yes.

13:42:27  11  Q.    Not for displays?

13:42:31  12  A.    I don't know.  This report was after we were not

13:42:35  13  weeding anymore.  So none of these have been looked at to

13:42:40  14  weed.  And like I said before, the Llano Library wasn't

13:42:44  15  weeding, I believe, enough to have more current books on

13:42:48  16  their shelves.

13:42:49  17  Q.    So if the book had been put on display, though, it

13:42:52  18  would have shown it checked out is what you're saying.

13:42:53  19  A.    Yes.

13:42:54  20  Q.    So it hasn't been checked out for any reason, display

13:42:56  21  or otherwise, since 2002, right?

13:42:58  22  A.    Yes.

13:42:59  23  Q.    Your lawyer asked you about a book called Spinning

13:43:04  24  that the library acquired in 2018; is that right?

13:43:08  25  A.    Probably.  Yes.

| | | |
|---|---|---|
| 13:43:09 | 1 | Q.   That book had been checked out four times last in |
| 13:43:14 | 2 | 2019, correct? |
| 13:43:15 | 3 | A.   I believe so. |
| 13:43:17 | 4 | Q.   That book was not misleading as far as you know, was |
| 13:43:20 | 5 | it? |
| 13:43:20 | 6 | A.   I never read it. |
| 13:43:23 | 7 | Q.   It wasn't ugly as far as you know? |
| 13:43:25 | 8 | A.   Not that -- I can't recall. |
| 13:43:27 | 9 | Q.   It wasn't superseded? |
| 13:43:29 | 10 | A.   I am not sure. |
| 13:43:30 | 11 | Q.   Because you never read it. |
| 13:43:31 | 12 | A.   Correct. |
| 13:43:32 | 13 | Q.   You only looked at it because it was on the list that |
| 13:43:34 | 14 | Bonnie Wallace made that your boss sent you, right? |
| 13:43:37 | 15 | A.   I reviewed it because it was on the list and I was |
| 13:43:39 | 16 | hoping everything on that list was getting checked out, |
| 13:43:42 | 17 | and when I noticed that they met the criteria for the |
| 13:43:46 | 18 | MUSTIE, that those six or seven should just go ahead and |
| 13:43:49 | 19 | be weeded, instead of trying to put them back on the shelf |
| 13:43:51 | 20 | and waiting until like August when we do our big weed, |
| 13:43:55 | 21 | because we can weed continuously. |
| 13:43:57 | 22 | Q.   The MUSTIE criteria have a threshold of three years |
| 13:44:00 | 23 | for fiction books; isn't that right? |
| 13:44:02 | 24 | A.   No.  It's just a guideline.  You want your books to |
| 13:44:05 | 25 | get checked out and you want to give them time to.  But if |

13:44:09  1   you already know that you've had them on display or if

13:44:12  2   you've had them on, you know, at the end of the shelves

13:44:17  3   facing out so people can see them, then they're not going

13:44:21  4   to get checked out if you've tried other things.

13:44:23  5   Q.   You're talking about hypothetically, right?  You

13:44:25  6   don't have any specific memory of putting Spinning on

13:44:27  7   display, do you?

13:44:28  8   A.   I don't know -- no.  I don't know if it was on

13:44:30  9   display before I got there.

13:44:32  10  Q.   You just don't know?

13:44:33  11  A.   Right.

13:44:33  12  Q.   And so, the guideline -- sorry.  I didn't mean to use

13:44:37  13  the wrong word -- the MUSTIE guideline that said a book

13:44:41  14  that hasn't been checked out in three years is irrelevant,

13:44:45  15  right?

13:44:47  16  A.   Like I said, it doesn't have to be three years.

13:44:50  17  Q.   But that's the guideline.

13:44:51  18  A.   Well, other libraries and school libraries, they do

13:44:54  19  two years.  I mean, it just kind of depends on what is

13:44:57  20  right for your library.

13:44:59  21  Q.   And the Llano County Library guideline is three

13:45:04  22  years; isn't that right?

13:45:05  23  A.   If we think it should be.

13:45:06  24  Q.   When did you change your mind about that, Ms. Milum?

13:45:09  25  Was it last fall?

13:45:10  1   A.   No.   It's whatever the book looks like and the

13:45:12  2   reports that I do to see how many times they're getting

13:45:17  3   checked out, what they look like at the time, if they've

13:45:19  4   had a chance to be on display, all of that is a factor

13:45:21  5   when I weed; and I don't make reports of any of that

13:45:25  6   because no one has ever cared before.  They're just --

13:45:32  7   they've had their chance to check them out and look at

13:45:34  8   them.

13:45:35  9          When we put -- when we purchase books and we

13:45:38  10  process them, we put them on display, every library in

13:45:43  11  like the front on a shelf for three to six months.  It

13:45:48  12  used to be six months and we switched it to three.  So

13:45:50  13  every month when we get new books, we keep adding them to

13:45:53  14  that shelf and when they've been on there for six months,

13:45:56  15  they go onto their regular shelf where they would normally

13:45:58  16  be shelved.

13:46:01  17         And so, I mean, people that come into the

13:46:04  18  libraries, they've had a chance to see these books

13:46:06  19  continuously.  And then, when they're on the shelves,

13:46:10  20  that's also more time for them to see them.  And after the

13:46:16  21  whole six-month display period when they're getting

13:46:20  22  checked out or not and then, if they're still in good

13:46:24  23  shape, we try to it again.  Maybe not for six months, of

13:46:28  24  course, but we'll try to put them on the display at the

13:46:30  25  end of their shelves.

13:46:31  1      So I mean, we love books and we try to get them

13:46:34  2  to get checked out because that's the whole point of a

13:46:37  3  library.

13:46:37  4  Q.  Ms. Milum, so turning your attention to Windows XP

13:46:41  5  for Dummies that was last checked out in 2002, that book's

13:46:44  6  in the library right now?

13:46:45  7  A.  I guess so.

13:46:46  8  Q.  It would have been on the display for six months when

13:46:49  9  you bought it like you just described, right?

13:46:54  10  A.  Right.  But I wasn't there at the time.

13:46:55  11  Q.  Okay.  But it's --

13:46:56  12  A.  So I got to weed normally as I should have, these

13:47:01  13  books probably wouldn't have been on there because they

13:47:03  14  are not getting checked out.  They're meeting the MUSTIE

13:47:07  15  criteria.

13:47:07  16  Q.  And nobody brought you a list with these books on it

13:47:10  17  saying, can you please look at these books, I think

13:47:12  18  they're inappropriate for the library; is that true?

13:47:14  19  A.  Yes.

13:47:18  20  Q.  Your lawyer asked you about the book Shine, which had

13:47:23  21  been checked out 10 times last in 2021, correct?

13:47:27  22  A.  I believe so.

13:47:30  23  Q.  That's a book that you weeded.

13:47:32  24  A.  Yes.

13:47:36  25  Q.  But a book that remains on the shelves is Investing

| | | |
|---|---|---|
| 13:47:39 | 1 | For Dummies, last checked out in 2004, right? |
| 13:47:46 | 2 | A.   I guess.  I don't see it right here.  Yes. |
| 13:47:56 | 3 | Q.   Yes. |
| 13:47:57 | 4 | A.   Yes. |
| 13:47:58 | 5 | Q.   The book Caste is a book that you weeded.  It had |
| 13:48:04 | 6 | been checked out three times in the eleven months that the |
| 13:48:09 | 7 | library had owned it at the time that you weeded it; is |
| 13:48:12 | 8 | that right? |
| 13:48:12 | 9 | A.   Yes. |
| 13:48:12 | 10 | Q.   You don't have any memory of it being ugly? |
| 13:48:17 | 11 | A.   I don't. |
| 13:48:18 | 12 | Q.   You don't have any memory of anything having been |
| 13:48:20 | 13 | spilled on it? |
| 13:48:21 | 14 | A.   No. |
| 13:48:22 | 15 | Q.   You don't have any memory of fingerprints on it? |
| 13:48:24 | 16 | A.   No. |
| 13:48:25 | 17 | Q.   Yet, you weeded it? |
| 13:48:27 | 18 | A.   Yes. |
| 13:48:27 | 19 | Q.   Took it off the shelves, yes? |
| 13:48:30 | 20 | A.   Yes. |
| 13:48:30 | 21 | Q.   Took it out of the catalog system? |
| 13:48:32 | 22 | A.   Yes. |
| 13:48:33 | 23 | Q.   You didn't buy another one to replace it. |
| 13:48:35 | 24 | A.   No.  We weren't buying any books. |
| 13:48:37 | 25 | Q.   Okay.  So when you weeded it to make room for new |

13:48:39  1  books, you knew you weren't buying any books, right?

13:48:42  2  A.   Well, after I noticed that the library has not been

13:48:45  3  weeding how it should have been, it's not just for new

13:48:51  4  books.   It's also to make your shelves look nice and for

13:48:54  5  people to have access to the books that are actually

13:48:56  6  getting checked out.

13:48:57  7  Q.   I understand.  So you removed Caste to give people

13:49:00  8  access to the books that had to be in there because they

13:49:03  9  were getting checked out.  Does that include Anastasia At

13:49:07  10 Your Service, last checked out in 2005?

13:49:11  11 A.   No.  So since all of this happened in, what, June or

13:49:16  12 July and normally we would do a big weed in August, I

13:49:20  13 would have printed out this report in August and started

13:49:23  14 working on it, since we were also all new to the library

13:49:26  15 and didn't know really what was on the shelves.

13:49:31  16 Q.   You've been working at the library since 2013.

13:49:34  17 A.   At the Kingsland library, yes.

13:49:37  18 Q.   You have no information that Caste was misleading?

13:49:45  19 A.   No.

13:49:46  20 Q.   It wasn't ugly?

13:49:48  21 A.   I don't recall.

13:49:49  22 Q.   It wasn't superseded?

13:49:51  23 A.   I don't know.  I never read it.

13:49:54  24 Q.   It wasn't trivial as far as you know?

13:49:57  25 A.   I'm not sure.

13:50:01  1    Q.   You don't have any information that it was trivial?

13:50:03  2    A.   No.

13:50:04  3    Q.   It was not irrelevant?

13:50:08  4    A.   I don't believe so because it was only checked out

13:50:10  5    three times unless it was a display.  So I'm leaning more

13:50:15  6    towards that it was ugly, something damaged because it was

13:50:19  7    a newer book.

13:50:20  8    Q.   But you're not leaning there based on any actual

13:50:24  9    memory or evidence of it being ugly.  You're just

13:50:26  10   guessing?  Is that fair to say?

13:50:26  11   A.   No, because I weed hundreds of books during our

13:50:29  12   weedings and I don't recall that one specific book or if

13:50:32  13   it was dirty.

13:50:34  14   Q.   On November 12th of 2021, you weren't weeding

13:50:36  15   hundreds of books, were you?

13:50:37  16   A.   Not at that time, but I was looking at hundreds of

13:50:41  17   books.

13:50:42  18   Q.   Okay.  On November 12th of 2021, you weren't weeding

13:50:45  19   hundreds of books.  You were only looking at the books

13:50:47  20   that had been on Bonnie Wallace's list that your boss sent

13:50:50  21   you; isn't that right?

13:50:51  22   A.   We were still looking at a lot more books.  We were

13:50:54  23   trying to figure out what was in the library, what was

13:50:56  24   going on with all the gossip that was going on.

13:50:58  25   Q.   Oh, because you were also looking for books with

13:51:00  1   pictures of nudity.

13:51:02  2   A.   Correct.

13:51:04  3   Q.   That was also at Mr. Cunningham's direction?

13:51:07  4   A.   Yes.

13:51:13  5   Q.   The book It's Perfectly Normal is another book that

13:51:16  6   you weeded?

13:51:17  7   A.   Yes.

13:51:18  8   Q.   Again, you don't have any information that book was

13:51:21  9   misleading?

13:51:23  10  A.   I don't know because I didn't read it.

13:51:24  11  Q.   You have no information that it was ugly?

13:51:28  12  A.   No.

13:51:29  13  Q.   You have no information that it was superseded?

13:51:32  14  A.   It probably was since it was a really old book.

13:51:35  15  Q.   Do you have any information that it was?

13:51:37  16  A.   No.

13:51:38  17  Q.   Do you have any information that it was trivial?

13:51:40  18  A.   No.

13:51:41  19  Q.   You do know that it was on Ms. Wallace's list,

13:51:45  20  though, that your boss sent you, correct?

13:51:47  21  A.   Yes.

13:51:48  22  Q.   That book had last been checked out in 2018?

13:51:51  23  A.   I believe so.  And I believe that was the display.

13:51:55  24  Q.   Did you get rid of that book to make room, for

13:51:58  25  example, for Desperation, last checked out in 2006?

13:52:02  1   A.   No.

13:52:03  2   Q.   Did you get rid of that book to make room for

13:52:06  3   Fallout, last checked out in 2007?

13:52:08  4   A.   No.

13:52:10  5   Q.   What about Five-Minute Mini-Mysteries, last checked

13:52:13  6   out in 2008?

13:52:14  7   A.   No.

13:52:16  8   Q.   Those books are also still on the shelf, correct?

13:52:18  9   A.   Yes.

13:52:19  10  Q.   You were describing the inhouse checkout system that

13:52:30  11  existed when you started in 2013 as a place where, correct

13:52:35  12  me if I'm wrong, if you needed extra copies of a book

13:52:38  13  because it was popular for some reason, they would go

13:52:41  14  there, right?

13:52:41  15  A.   Yes.

13:52:42  16  Q.   So they would be copies of a book that was in the

13:52:44  17  catalog and on the shelves?

13:52:46  18  A.   Sometimes, yeah.  Sometimes it was classics that we

13:52:48  19  didn't have.

13:52:50  20  Q.   Like what?

13:52:52  21  A.   I don't know off the top of my head, but we can't

13:52:56  22  have, you know, very much on the shelves.  So whatever

13:53:01  23  donations that would come in that we didn't have or we

13:53:04  24  thought people would want, then we would kind of keep held

13:53:07  25  back for a while.

13:53:08  1  Q.   You can't have very much on the shelves because you

13:53:10  2  need to keep my Microsoft PowerPoint 2000?

13:53:14  3  A.   No.

13:53:17  4  Q.   Whose idea was it to take all of the books that are

13:53:21  5  at issue in this litigation and put them in the inhouse

13:53:24  6  checkout system?

13:53:26  7           MR. MITCHELL:  Objection, your Honor.

13:53:28  8  Attorney-client privilege.

13:53:32  9           THE COURT:  Overruled.  Go ahead.  You can answer

13:53:33  10  the question.

13:53:34  11  A.   I told them about it that we do that.

13:53:37  12  Q.   (BY MS. LEONIDA) Whose idea was it to put Caste in

13:53:40  13  that system?

13:53:41  14           MR. MITCHELL:  Same objection, your Honor.

13:53:42  15           THE COURT:  Overruled.

13:53:44  16  A.   It was mine to put them all in there.

13:53:47  17  Q.   (BY MS. LEONIDA) When did you have this idea?

13:53:51  18  A.   When we were -- I don't know, when we were talking

13:53:53  19  about --

13:53:54  20           MR. MITCHELL:  Objection.  Again, this is an

13:53:55  21  attorney-client communication.  May I just offer a

13:53:59  22  standing object to this line of questioning?

13:54:01  23           THE COURT:  Sure.  Absolutely.  Overruled.  Go

13:54:03  24  ahead.

13:54:06  25  A.   When we were just discussing the whole thing that's

13:54:11  1   going on.

13:54:12  2   Q.   (BY MS. LEONIDA) Tell me about that conversation and

13:54:13  3   how this decision came.

13:54:16  4            MR. MITCHELL:  Your Honor, may we sidebar with

13:54:19  5   the witness?

13:54:21  6            THE COURT:  Let's sidebar with attorneys first.

13:54:25  7            (At the bench, on the record.)

13:54:31  8            THE COURT:  I don't mind you asking questions

13:54:33  9   about whose decision it was or -- I don't want you

13:54:37  10  recounting extended conversations she had.

13:54:41  11           MS. LEONIDA:  Okay.

13:54:42  12           THE COURT:  You can do targeted questions to get

13:54:45  13  at that because that actually helps the case but I don't

13:54:48  14  know about -- I don't want testimony about conversations.

13:54:54  15           MR. BOTKIN:  What about she made the decision in

13:54:56  16  consultation with counsel.

13:55:02  17           MR. MITCHELL:  I guess I've made my standing

13:55:04  18  objection.  I'm still going to jump up if I hear her

13:55:07  19  spilling the beans on our conversations.  I want to make

13:55:09  20  sure I'm covering my bases.  I respect your decision.

13:55:11  21           THE COURT:  No.  I understand.

13:55:14  22           MR. ROGERS:  Let me ask you a question, counsel.

13:55:15  23  Is there another question you can ask at sidebar that

13:55:17  24  would get to that point?

13:55:19  25           MR. BOTKIN:  Sure.  I could ask the direct

| | | |
|---|---|---|
| 13:55:20 | 1 | questions on my list. |
| 13:55:21 | 2 | MS. LEONIDA:  That's fine. |
| 13:55:23 | 3 | MR. ROGERS:  During your sidebar? |
| 13:55:25 | 4 | (Cross-talk.) |
| 13:55:25 | 5 | MR. BOTKIN:  It's the last one. |
| 13:55:27 | 6 | MR. MITCHELL:  That's better, if I may ask, |
| 13:55:27 | 7 | because I know better not to -- |
| 13:55:27 | 8 | (Cross-talk.) |
| 13:55:28 | 9 | MR. MITCHELL:  -- she doesn't know the nuances of |
| 13:55:30 | 10 | privilege.  Is that okay? |
| 13:55:32 | 11 | MS. BOTKIN:  That's fine. |
| 13:55:38 | 12 | MS. LEONIDA:  No further questions, your Honor. |
| 13:55:39 | 13 | THE COURT:  Thank you.  Anything further? |
| 13:55:41 | 14 | MR. MITCHELL:  May I speak with my client briefly |
| 13:55:43 | 15 | or should I wait for that? |
| 13:55:44 | 16 | THE COURT:  Yeah, let's wait a minute.  Do you |
| 13:55:46 | 17 | have any other questions of this witness? |
| 13:55:48 | 18 | MR. MITCHELL:  I just wanted to instruct the |
| 13:55:50 | 19 | witness the attorney-client communications in answering |
| 13:55:56 | 20 | questions by opposing counsel. |
| 13:55:57 | 21 | THE COURT:  I think they're done, though, right? |
| 13:56:01 | 22 | MR. MITCHELL:  Are you done? |
| 13:56:03 | 23 | MS. LEONIDA:  Yeah. |
| 13:56:04 | 24 | THE COURT:  Do you have any other questions? |
| 13:56:06 | 25 | MR. MITCHELL:  Just short re-direct, your Honor. |

| 13:56:08 | 1 | THE COURT:  Sure. |

13:56:08    1              THE COURT:  Sure.

13:56:09    2                    <u>RE-DIRECT EXAMINATION</u>

13:56:09    3    BY MR. MITCHELL:

13:56:10    4    Q.    Ms. Milum, is it normal for libraries to have books

13:56:13    5    on the shelves that ought to be weeded because they

13:56:16    6    haven't been checked out in years?

13:56:19    7    A.    Probably.  I mean, we get busy and we have to weed,

13:56:24    8    you know, continuously.  But to actually do a big weed, it

13:56:28    9    takes a lot and so, I mean, it's possible.  Yes.

13:56:31   10    Q.    Are there reasons for why some of these books that

13:56:33   11    haven't been checked out in years or decades have managed

13:56:37   12    to remain on the shelves at the Llano Library?

13:56:39   13    A.    Like before, it's different librarians have

13:56:43   14    different, you know, views or decisionmaking skills of

13:56:49   15    what they think should still be on the shelves or not.

13:56:54   16    Me, I don't think that if it's on the shelves for, you

13:56:58   17    know, five or six years and only getting checked out three

13:57:00   18    times is enough to keep it there.  I want people to come

13:57:06   19    in and check out what we have on the shelves and not keep

13:57:09   20    passing over things or they won't come back in because we

13:57:14   21    won't have anything that they're wanting.

13:57:15   22    Q.    Does the evidence in this case show that the Llano

13:57:19   23    County Library System is not weeding enough?

13:57:21   24              MS. LEONIDA:  Objection.  Calls for a legal

13:57:23   25    conclusion.

13:57:23  1          THE COURT:  You can ask her anything she knows,

13:57:25  2  or have seen, or can testify to.  You can't get her to

13:57:28  3  comment on the evidence.

13:57:30  4          MR. MITCHELL:  Should I rephrase the question?

13:57:31  5          THE COURT:  Please.

13:57:32  6  Q.  (BY MR. MITCHELL) Ms. Milum, do you believe that the

13:57:37  7  Llano County Library System is not weeding enough?

13:57:40  8  A.  Yes, I do.

13:57:41  9  Q.  Thank you.  No further questions.

13:57:44 10          THE COURT:  Anything further?

13:57:45 11                    RE-CROSS EXAMINATION

13:57:45 12  BY MS. LEONIDA:

13:57:50 13  Q.  Ms. Milum, the only reason that you examined the

13:57:54 14  books on Ms. Wallace's list for weeding in November of

13:57:58 15  2021 is because they were on Ms. Wallace's list, correct?

13:58:01 16  A.  That's why I looked at them to check.

13:58:05 17          THE COURT:  Thank you.  You may step down.  Any

13:58:08 18  other witnesses?

13:58:10 19          MR. MITCHELL:  Yes, your Honor.  Defendants would

13:58:11 20  call County Judge Ron Cunningham.

13:58:29 21          THE COURT:  You remain under oath.

13:58:32 22          THE WITNESS:  Yes, sir.  Thank you.

13:58:32 23          THE COURT:  Please be seated.

13:58:32 24    RON CUNNINGHAM, called by the Defendant, duly sworn.

13:58:34 25

|          |    |                                                       |
|----------|----|-------------------------------------------------------|
| 13:58:34 | 1  | <u>DIRECT EXAMINATION</u>                             |
| 13:58:34 | 2  | BY MR. MITCHELL:                                       |
| 13:58:37 | 3  | Q.   Good afternoon, sir.  You're the County Judge of |
| 13:58:41 | 4  | Llano County, correct?                                |
| 13:58:41 | 5  | A.   I am.                                             |
| 13:58:42 | 6  | Q.   And what court do you preside over in that capacity? |
| 13:58:46 | 7  | A.   Constitutional court.                             |
| 13:58:48 | 8  | Q.   Are constitutional county judges in Texas required to |
| 13:58:51 | 9  | have a law degree?                                     |
| 13:58:53 | 10 | A.   No, sir.                                          |
| 13:58:54 | 11 | Q.   Are you a licensed attorney?                      |
| 13:58:55 | 12 | A.   No, sir.                                          |
| 13:58:56 | 13 | Q.   Have you ever attended law school?                |
| 13:58:57 | 14 | A.   No, sir.                                          |
| 13:58:58 | 15 | Q.   What other jobs have you held in your career?     |
| 13:59:00 | 16 | A.   Prior to being elected, I was a federal contractor |
| 13:59:04 | 17 | security consultant.  And prior to that, I've retired from |
| 13:59:07 | 18 | the Texas Department of Public Safety of 21-and-a-half |
| 13:59:09 | 19 | years of law enforcement.                             |
| 13:59:13 | 20 | Q.   Judge, I'm going to show you Plaintiffs' Exhibit 2A, |
| 13:59:17 | 21 | which has previously been introduced in this case.  Do you |
| 13:59:31 | 22 | recall this document, sir?                             |
| 13:59:35 | 23 | A.   Yes, sir.                                         |
| 13:59:37 | 24 | Q.   Can you please read the body of that e-mail out loud? |
| 13:59:41 | 25 | A.   I'm still receiving calls, letters and e-mails    |

13:59:43  1  concerning the Farts and Butts books.  I think it's best

13:59:45  2  to remove these books from the shelves for now.  Thank

13:59:49  3  you.

13:59:49  4  Q.  When you wrote that e-mail, what did you mean by the

13:59:52  5  phrase "for now"?

13:59:54  6  A.  I wanted to neutralize the situation, stabilize it so

13:59:59  7  that we could make sure that we weren't doing any harm to

14:00:02  8  anyone on either side.

14:00:08  9  Q.  Judge, now I'm going to show you Plaintiffs' Exhibit

14:00:10  10  60, also previously introduced in this case.  Can you read

14:00:27  11  the portion of the e-mail that begins with the numeral one

14:00:29  12  "Any books with photos"?

14:00:30  13  A.  Any books with photos of naked or sexual conduct

14:00:34  14  regardless if they are animated or actual photos are to be

14:00:36  15  pulled until further notice.  No additional books will be

14:00:40  16  ordered or purchased until we have a plan to move forward.

14:00:44  17  Q.  When you wrote that e-mail, what did you mean by

14:00:47  18  until further notice?

14:00:48  19  A.  The commissioners' court needed to have time to

14:00:50  20  evaluate the policies and procedures that we held books

14:00:54  21  and bought books by -- and we hadn't had a chance to do

14:00:57  22  that yet.

14:01:07  23  Q.  What sort of evaluation, if any, did you want Ms.

14:01:11  24  Milum to perform at that time?

14:01:12  25  A.  I wanted her to do a thorough review of the books for

14:01:15  1  those -- for matters in that e-mail.

14:01:26  2  Q.   Regarding that e-mail, were you concerned about adult

14:01:29  3  material?

14:01:29  4  A.   I was concerned about anything that depicted sexual

14:01:34  5  conduct, harmful material.

14:01:44  6  Q.   Was it your intention to determine whether or not any

14:01:46  7  harmful material is located in the children's section of

14:01:49  8  the Llano County Library System?

14:01:50  9  A.   Yes, sir.  That's it.

14:01:55  10  Q.   Judge, do you recall prior testimony by Ms. Little

14:01:59  11  today regarding a conversation that she had with you in

14:02:03  12  2021?

14:02:03  13  A.   Yes, sir.

14:02:06  14  Q.   How long did that conversation last?

14:02:10  15  A.   About eight to 10 minutes.

14:02:12  16  Q.   Was that a telephone conversation or some other

14:02:14  17  manner?

14:02:14  18  A.   It was telephone.

14:02:15  19  Q.   Do you recall what issues you discussed with Ms.

14:02:18  20  Little on that conversation?

14:02:19  21  A.   Ms. Little called and voiced her concerns that she

14:02:22  22  had voiced in commissioners' court previously and she -- I

14:02:27  23  listened to her concerns and asked her if she had any

14:02:29  24  other concerns.

14:02:32  25  Q.   Did you discuss meeting with her as part of that

14:02:35 1  phone conversation?

14:02:36 2  A.   In the conversation, I asked Ms. Little if she had

14:02:38 3  anything to add other than what she had already added in

14:02:41 4  commissioners' court and on that phone call, and she said

14:02:43 5  no and I said there's no need to meet then.

14:02:48 6  Q.   Do you recall prior testimony in this matter, in this

14:02:51 7  hearing particularly, about a meeting with Rochelle Wells

14:02:55 8  and other mothers in July or August of 2021?

14:02:58 9  A.   Yes, sir.

14:03:00 10  Q.   After that time, how many times did you meet with

14:03:03 11  Rochelle Wells regarding the Llano County Library?

14:03:10 12  A.   None.

14:03:11 13  Q.   When did the commissioners' court first consider

14:03:14 14  reinstating the OverDrive online service?

14:03:17 15  A.   I think it was January 2022.

14:03:21 16  Q.   Was the OverDrive online service reinstated in that

14:03:24 17  meeting of commissioners' court?

14:03:25 18  A.   No, sir.

14:03:25 19  Q.   Do you recall why or why not?

14:03:27 20  A.   When Amber or Ms. Milum and I put the agenda out

14:03:32 21  among the commissioners' court, we thought that the

14:03:35 22  filters in place were going to achieve our goal of

14:03:39 23  preventing harmful material to children.  It was only at

14:03:43 24  commissioner's court that someone else pointed out that

14:03:45 25  even though we would put those filters in place, OverDrive

14:03:48  1  did not have any mechanism in their system to keep those

14:03:51  2  filters locked in place so as soon as a child could log

14:03:54  3  into the system, they could, in effect, remove those

14:03:56  4  filters and look at anything they wanted to in OverDrive.

14:04:03  5  Q.   Did you take any steps to confirm your understanding

14:04:06  6  of the filters that arose at that commissioners' court

14:04:11  7  meeting, and if so, what?

14:04:12  8  A.   Both Ms. Milum and I contacted OverDrive and asked

14:04:14  9  them specifically if we could have those filters locked in

14:04:17  10  place, and they said that we could not.

14:04:19  11  Q.   And when you say with OverDrive, do you recall who

14:04:22  12  that was?

14:04:23  13  A.   I can't remember the name of the representative that

14:04:25  14  we spoke with.

14:04:26  15  Q.   But they were an employee of the OverDrive online

14:04:30  16  library system?

14:04:30  17  A.   It was.

14:04:37  18  Q.   What is your understanding of how the filters on

14:04:39  19  OverDrive work as a result of that conversation?

14:04:42  20  A.   As soon as a child -- if a parent chooses to put

14:04:45  21  those filters in place, as soon as a child, if they want

14:04:48  22  to, logs into the OverDrive system, they can remove those

14:04:51  23  filters and look at anything in the entire OverDrive

14:04:55  24  library.

14:04:56  25  Q.   To your knowledge, is OverDrive aware of this feature

14:04:59 1  of their system?

14:05:00 2  A.   Yes, sir.

14:05:01 3  Q.   Did they communicate to you anything about that

14:05:03 4  feature?

14:05:04 5  A.   They said that they would not offer -- they did not

14:05:06 6  offer a specific mechanism to do that.

14:05:12 7  Q.   Let's move on to a different topic.  Why did the

14:05:15 8  commissioners' court reconstitute the Llano County library

14:05:18 9  advisory board?

14:05:19 10 A.   The existing library board had -- didn't have a lot

14:05:23 11 of meetings.  There were no recommendations that I'm aware

14:05:27 12 of that had been put forth since I took office in 2019.

14:05:32 13 Most of the policies are still dated from 2006.  We needed

14:05:37 14 a new advisory board to come in and do what I would call a

14:05:42 15 deep dive into everything that we had.

14:05:46 16 Q.   Were any Llano County advisory board members

14:05:52 17 compensated for serving on the board?

14:05:53 18 A.   They were not.

14:05:54 19 Q.   What authority did the Llano County Commissioners'

14:05:58 20 Court grant the Llano County advisory board to weeding

14:06:02 21 any?

14:06:03 22 A.   None.

14:06:03 23 Q.   What authority, if any, did the commissioners' court

14:06:04 24 grant the advisory board over Amber Milum?

14:06:08 25 A.   None.

14:06:08  1   Q.   What authority, if any, did commissioners' court

14:06:10  2   grant the library advisory board over the Llano County

14:06:13  3   Library System?

14:06:13  4   A.   None.

14:06:14  5   Q.   What authority, if any, did the commissioners' court

14:06:16  6   grant the advisory board over the employees of the Llano

14:06:20  7   County Library System?

14:06:20  8   A.   None.

14:06:23  9   Q.   Judge, what was the purpose of the reconstituted

14:06:26  10  advisory board?

14:06:29  11  A.   When we restructured the board, they had basically

14:06:35  12  five specific goals.  They would review the policies and

14:06:40  13  procedures.  They would review the functions of the

14:06:42  14  library.  They were to review the affiliations that the

14:06:46  15  libraries had with other agencies, whatever.  They were to

14:06:50  16  review the contractual agreements that we had.  And they

14:06:53  17  were also to look at areas where we could improve

14:06:56  18  operations of efficiency.  Again, all of those were

14:06:58  19  strictly reviewed objective.

14:07:02  20  Q.   Board was strictly advisory in nature?

14:07:04  21  A.   I'm sorry.

14:07:05  22  Q.   The board was strictly advisory in nature?

14:07:06  23  A.   That's correct.

14:07:08  24  Q.   Did bylaws allow for any activities beyond those you

14:07:12  25  just mentioned?

| | | |
|---|---|---|
| 14:07:12 | 1 | A.   They do not. |
| 14:07:13 | 2 | Q.   No further questions.  Thank you. |
| 14:07:15 | 3 | CROSS-EXAMINATION |
| 14:07:21 | 4 | BY MR. BOTKIN: |
| 14:07:21 | 5 | Q.   Hello again, Judge. |
| 14:07:22 | 6 | A.   Hello. |
| 14:07:23 | 7 | Q.   Do I have it right that you have not actually read |
| 14:07:28 | 8 | any of the books that we've been talking about on Friday |
| 14:07:29 | 9 | or today? |
| 14:07:31 | 10 | A.   That's correct. |
| 14:07:32 | 11 | Q.   And as I understand it, you're not aware that Amber |
| 14:07:37 | 12 | Milum has read any of those books either. |
| 14:07:38 | 13 | A.   Don't know if she has read any of them or not. |
| 14:07:41 | 14 | Q.   Now, you have not instructed anyone to put the |
| 14:07:45 | 15 | removed books back on the shelf, have you? |
| 14:07:47 | 16 | A.   I have not. |
| 14:07:48 | 17 | Q.   So when you say you have instructed them to pull them |
| 14:07:53 | 18 | for now, there's no timetable on putting those books back |
| 14:07:58 | 19 | up, correct? |
| 14:08:01 | 20 | A.   I don't think we will do anything until after this |
| 14:08:04 | 21 | litigation is over. |
| 14:08:05 | 22 | Q.   Well, do you have a current intention to put those |
| 14:08:09 | 23 | books back on shelves after this lawsuit's over? |
| 14:08:11 | 24 | A.   I'm sorry. |
| 14:08:11 | 25 | Q.   Do you have a current intention to put those books |

14:08:14  1  back on the shelves once this lawsuit is over?

14:08:22  2  A.   The books that were weeded?

14:08:23  3  Q.   Yes, sir.

14:08:25  4  A.   The books that were weeded or the books that --

14:08:27  5  Q.   The books that are at issue in this lawsuit.

14:08:34  6  A.   I don't know what the end of the litigation is going

14:08:37  7  to result in.

14:08:38  8  Q.   Well, I'm asking about your intent.  What do you

14:08:42  9  intend to do?

14:08:43  10  A.   Hold steady until the litigation is over.

14:08:45  11  Q.   Do you have a current intent to put those books back

14:08:48  12  on the shelves after the lawsuit is over?

14:08:55  13  A.   I don't know what the litigation is going to tell us

14:08:57  14  to do.  I mean, I'm not going to go against what the Judge

14:09:01  15  says.

14:09:01  16  Q.   And in fact, it's your desire that those books will

14:09:04  17  remain inaccessible to the Llano County Library public,

14:09:07  18  right?

14:09:07  19  A.   Do what now?

14:09:08  20  Q.   In fact, it is your desire, your intent that those

14:09:12  21  books remain inaccessible to the Llano County Library

14:09:15  22  patrons, right?

14:09:15  23  A.   I disagree with that statement.  It's not my desire

14:09:18  24  and the books are accessible.

14:09:21  25  Q.   We've been talking a lot about the Butt books and the

| | |
|---|---|
| 14:09:25 | 1 |

Fart books, the books with -- alleged to have nudity in

| 14:09:30 | 2 |

them.  But it is the case that not all the books at issue

| 14:09:35 | 3 |

here meet those descriptions, right?

| 14:09:39 | 4 |

A.    They don't -- which books don't meet what

| 14:09:42 | 5 |

descriptions?

| 14:09:42 | 6 |

Q.    The Fart books and the Butt books and the ones that

| 14:09:45 | 7 |

may have a picture of a little boy's behind, that sort of

| 14:09:48 | 8 |

thing.

| 14:09:49 | 9 |

A.    I'm not sure which books have those depictions.

| 14:09:53 | 10 |

Q.    Some of the books that have been pulled from the

| 14:09:56 | 11 |

Llano County Library are the critical race theory and

| 14:10:00 | 12 |

LGBTQ books, right?

| 14:10:02 | 13 |

A.    I believe so.

| 14:10:04 | 14 |

Q.    And you've not ordered the Llano County Library or

| 14:10:10 | 15 |

Milum to put those books back on the shelves, right?

| 14:10:13 | 16 |

A.    At no point did I instruct her to pull those books

| 14:10:15 | 17 |

from the shelves.

| 14:10:16 | 18 |

Q.    Let me ask you real quick about the library board.

| 14:10:19 | 19 |

You mentioned that it was -- the old board was replaced

| 14:10:23 | 20 |

because I think you said they had not met for a while and

| 14:10:27 | 21 |

they had outdated policies.  Did I get that right?

| 14:10:29 | 22 |

A.    Yes, sir.

| 14:10:30 | 23 |

Q.    Did you ask the old library board to fix those

| 14:10:36 | 24 |

issues, or to meet more frequently, or update their

| 14:10:38 | 25 |

policies?

14:10:39    1    A.    No, sir.

14:10:42    2    Q.    I'm going to ask you to turn right quick to Exhibit

14:10:45    3    No. 37 in that book.  Do you recognize Exhibit 37 as a

14:11:11    4    true and correct copy of an e-mail exchange between you

14:11:13    5    and Bonnie Wallace, dated February 8, 2022, entitled

14:11:19    6    Harmful Content Review?

14:11:20    7    A.    Yes, sir.

14:11:21    8    Q.    Okay.  And this is the document that Bonnie Wallace

14:11:25    9    sent to you and Dwain Rogers and Jerry Don Moss with the

14:11:30   10    CC to Gay Baskin about her work with the Llano County

14:11:36   11    Library advisory board, right?

14:11:37   12    A.    Yes, sir.

14:11:38   13    Q.    And you had appointed Ms. Wallace to that board,

14:11:41   14    correct?

14:11:41   15    A.    That's correct.

14:11:42   16    Q.    In the e-mail at the top, that second paragraph, she

14:11:44   17    says, I have attached the document For Harmful Content

14:11:48   18    review that I learned about in the Zoom Webex meeting that

14:11:53   19    I attended yesterday.  Do you see that?

14:11:54   20    A.    Yes, sir.

14:11:55   21    Q.    And if you turn to the last two pages of the exhibit,

14:12:05   22    this is the Harmful Content Analysis that she attached to

14:12:09   23    the letter, right?

14:12:11   24    A.    It was the Harmful Content what?

14:12:13   25    Q.    The Harmful Content Review form that she attached to

14:12:17　1　the letter, right?

14:12:18　2　A.　Yes, sir.

14:12:26　3　Q.　And looking at that form, it appears to lay out a

14:12:33　4　number of criteria and there at -- toward the top, it

14:12:41　5　looks like it was -- is asking for a score, XX out of XX

14:12:46　6　on a number of different categories and criteria, right?

14:12:51　7　A.　Yes, sir.

14:12:52　8　Q.　One is that it sexualizes children for a number of

14:13:01　9　alleged grounds there at No. 1, including, it looks like,

14:13:11　10　that it normalizes or promotes acceptance or exploration

14:13:15　11　of diverse sexual orientations.　Do you see that toward

14:13:18　12　the middle?

14:13:25　13　A.　Yes, sir.

14:13:25　14　Q.　Just above that, it's asking for an assessment

14:13:29　15　whether a book normalizes these high-risk sexual behaviors

14:13:34　16　-- sorry, promotes homosexual or bisexual behavior.　Do

14:13:37　17　you see that?

14:13:37　18　A.　Yes, sir.

14:13:39　19　Q.　And so, the idea is this form will assess whether a

14:13:43　20　potential book includes content in one of those

14:13:49　21　categories, right?

14:13:50　22　A.　Correct.

14:13:52　23　Q.　Some of the other categories down further in the form

14:13:55　24　include:　No. 2, promotes illegal sexual behavior; No. 3,

14:14:01　25　promotes drug usage; 4, promotes alcohol consumption; 5,

14:14:06 1 promotes tobacco use; normalizes illegal or violent

14:14:14 2 behavior; No. 8, includes mental health topics such as

14:14:19 3 suicide, any mental health disorders.  Do you see that?

14:14:22 4 A.   Yes, sir.

14:14:24 5 Q.   No. 9, whether it's racist or condescending toward a

14:14:28 6 specific demographic; No. 11, whether the book promotes

14:14:34 7 globalism or anti-patriotism such as burning of the U.S.

14:14:38 8 flag, demeaning toward armed services or members, critical

14:14:42 9 of our nation, America is racist, et cetera.  Do you see

14:14:46 10 that?

14:14:47 11 A.   Yes, sir.

14:14:50 12 Q.   And 12, whether the book promotes condemnation or

14:14:54 13 mocking of religion.  Do you see that?

14:14:56 14 A.   Yes, sir.

14:15:00 15 Q.   Are these matters about which people could have a

14:15:04 16 difference of opinion?

14:15:06 17 A.   Yes, sir.  We don't use this form.

14:15:11 18 Q.   Well, let's go back to that e-mail up front.  The one

14:15:16 19 from Bonnie Wallace to you.  Are you with me?  In that

14:15:26 20 third paragraph, she says, so back to the form, the

14:15:31 21 collection review committee needs a form in order to

14:15:33 22 review books that are questionable and the form needs to

14:15:38 23 be not about opinion but about facts taken directly from

14:15:41 24 the book, right?

14:15:43 25 A.   Yes, sir.

| | | |
|---|---|---|
| 14:15:46 | 1 | Q.   What use has Llano County made of this form? |
| 14:15:49 | 2 | A.   None. |
| 14:15:50 | 3 | Q.   But would you agree with me that this form would be |
| 14:15:53 | 4 | inappropriate for use with Llano County Library because |
| 14:15:58 | 5 | these are matters of opinion? |
| 14:15:59 | 6 | A.   This form as is?  Is that what you're saying? |
| 14:16:02 | 7 | Q.   Well, I don't have another one. |
| 14:16:07 | 8 | A.   It would be up to the commissioners' court. |
| 14:16:17 | 9 | Q.   Let me ask you real quick about the library board. |
| 14:16:25 | 10 | So the new library board, is it their purpose to review |
| 14:16:31 | 11 | policies of the library system? |
| 14:16:34 | 12 | A.   Policies and procedures. |
| 14:16:36 | 13 | Q.   Okay.  To review the functions of the library system? |
| 14:16:39 | 14 | A.   Yes, sir. |
| 14:16:40 | 15 | Q.   To review the affiliations? |
| 14:16:43 | 16 | A.   Yes, sir. |
| 14:16:44 | 17 | Q.   And the contracts. |
| 14:16:45 | 18 | A.   Yes, sir. |
| 14:16:46 | 19 | Q.   That was the testimony you just gave here, right? |
| 14:16:49 | 20 | A.   And operations of efficiency. |
| 14:16:54 | 21 | Q.   Under which of these topics could library board |
| 14:16:58 | 22 | review all of the intended library purposes? |
| 14:17:02 | 23 | A.   Policies and procedures and functions. |
| 14:17:07 | 24 | Q.   Well, why was the library board insisting on |
| 14:17:17 | 25 | preclearance of new book purchases? |

| | | |
|---|---|---|
| 14:17:22 | 1 | MR. ROGERS: Judge, that misstates the testimony |
| 14:17:23 | 2 | and the e-mail. |
| 14:17:26 | 3 | Q. (BY MR. BOTKIN) Why were they granted preclearance of |
| 14:17:29 | 4 | new book purchases? |
| 14:17:31 | 5 | MR. ROGERS: Same objection. |
| 14:17:32 | 6 | THE COURT: Overruled. |
| 14:17:33 | 7 | A. Why were they what? |
| 14:17:35 | 8 | Q. (BY MR. BOTKIN) Why were they granted preclearance of |
| 14:17:39 | 9 | new book purchases? |
| 14:17:40 | 10 | A. They weren't. |
| 14:17:46 | 11 | Q. Let's look at Exhibit 2. Oh, I'm sorry, 22. This is |
| 14:18:06 | 12 | an e-mail from Amber Milum to you. It's already in |
| 14:18:09 | 13 | evidence, I believe. And there, the last sentence in the |
| 14:18:13 | 14 | e-mail she sends to you, she says, I will be sending a |
| 14:18:16 | 15 | book purchase list to the board for review as requested. |
| 14:18:20 | 16 | Did I read that right? |
| 14:18:22 | 17 | A. Yes, sir. |
| 14:18:22 | 18 | Q. You requested that she send a book purchase list to |
| 14:18:25 | 19 | the board for review, right? |
| 14:18:29 | 20 | A. I didn't request her to do that. |
| 14:18:31 | 21 | Q. Well, then, why is she sending you this note as if |
| 14:18:34 | 22 | you did? |
| 14:18:37 | 23 | A. She asked for a book purchasing statement. |
| 14:18:46 | 24 | Q. I'm sorry. I didn't understand what you said. A |
| 14:18:48 | 25 | book purchasing statement, what is that? |

14:18:50  1   A.   Well, you asked me why she requested a list and I

14:18:53  2   said she didn't.  She requested a book purchasing

14:18:55  3   statement.

14:18:59  4   Q.   Let me read it again.  It says, I will be sending a

14:19:02  5   book purchase list to the board for review as requested.

14:19:08  6   You requested that she send a book purchase list to the

14:19:10  7   board for review, correct?

14:19:12  8   A.   No.

14:19:13  9        MR. ROGERS:  Object.  Misstates prior testimony.

14:19:15  10        THE COURT:  I'll allow the question.

14:19:17  11        THE WITNESS:  You do or --

14:19:18  12        THE COURT:  Yes.  You can answer it.

14:19:20  13   A.   I didn't.

14:19:21  14        MR. BOTKIN:  We move admission of Plaintiffs' 37.

14:19:30  15        MR. ROGERS:  No objection.

14:19:30  16        THE COURT:  So admitted.

14:19:32  17        MR. BOTKIN:  No further questions.

14:19:36  18        THE COURT:  Anything further?

14:19:37  19        MR. ROGERS:  Few questions.

14:19:38  20        THE COURT:  Sure.

14:19:39  21                    RE-DIRECT EXAMINATION

14:19:43  22   BY MR. ROGERS:

14:19:43  23   Q.   Judge Cunningham, was the Harmful Content form ever

14:19:50  24   made a recommendation of the Llano County library advisory

14:19:56  25   board to the commissioners' court?

14:19:57  1   A.   Did not.

14:19:57  2   Q.   Did the Llano County Commissioners' Court ever

14:20:01  3   approve the use of the Harmful Content form in the Llano

14:20:04  4   County Library System?

14:20:04  5   A.   They did not.

14:20:05  6   Q.   Did you have concerns regarding nudity or sexual

14:20:10  7   behavior in the children's section of the Llano County

14:20:14  8   Library System?

14:20:14  9   A.   I did.

14:20:15  10   Q.   Were those concerns the same regardless of whether

14:20:19  11   the sexual content depicted or nudity depicted was

14:20:23  12   heterosexual, homosexual, or any other type of activity?

14:20:27  13   A.   That was exactly my concern and I voiced that in

14:20:31  14   statements to the media.

14:20:43  15   Q.   Nothing further.  Thank you.

14:20:46  16        MR. BOTKIN:  Nothing.

14:20:47  17        THE COURT:  Thank you, stir.  You may step down.

14:20:48  18        THE WITNESS:  Thank you, sir.

14:20:49  19        THE COURT:  Any other witnesses?

14:20:52  20        MR. ROGERS:  Yes, your Honor.  Defendants would

14:20:54  21   call Commissioner Jerry Don Moss.

14:21:12  22        THE COURT:  You remain under oath.

14:21:14  23        THE WITNESS:  Okay.  Thank you.

14:21:14  24     JERRY DON MOSS, called by the Defendant, duly sworn.

14:21:15  25

| | | |
|---|---|---|
| 14:21:15 | 1 | DIRECT EXAMINATION |
| 14:21:17 | 2 | BY MR. ROGERS: |
| 14:21:17 | 3 | Q.  Commissioner Moss, do you recall hearing testimony in |
| 14:21:39 | 4 | this case regarding the Butt books throughout this |
| 14:21:41 | 5 | hearing? |
| 14:21:41 | 6 | A.  Yes, sir, I do. |
| 14:21:43 | 7 | Q.  If I refer to the Butt books, do you know what books |
| 14:21:46 | 8 | I'm talking about? |
| 14:21:46 | 9 | A.  Yes, sir. |
| 14:21:46 | 10 | Q.  Did you ever discuss the Butt books with Amber Milum? |
| 14:21:53 | 11 | A.  Yes, sir, I did. |
| 14:21:53 | 12 | Q.  Can you please tell me about that conversation? |
| 14:21:57 | 13 | A.  Yes, sir.  I'm not sure exactly when it was because |
| 14:22:00 | 14 | we went -- I went down there and asked Ms. Milum about the |
| 14:22:06 | 15 | Butt books that was -- everybody was talking about or |
| 14:22:09 | 16 | going around town and when I did that, though, I made sure |
| 14:22:14 | 17 | and told her that I was not her supervisor and the chain |
| 14:22:20 | 18 | of command, I guess the commissioners' court, was the |
| 14:22:24 | 19 | final say in things.  But I did that just because when I |
| 14:22:30 | 20 | go to other offices in the county, I do the same thing.  I |
| 14:22:33 | 21 | don't want them to think that I'm trying to tell them what |
| 14:22:36 | 22 | to do. |
| 14:22:36 | 23 | So when I asked her to see the Butt books, she |
| 14:22:41 | 24 | showed me one of them that she had in her office, I |
| 14:22:45 | 25 | believe, or in another room.  It was not on the shelf and |

14:22:49  1  showed me part of one.

14:22:53  2  Q.   Did you have any discussion about that particular

14:22:55  3  Butt book?

14:22:56  4  A.   We did.

14:22:57  5  Q.   What was the content of that conversation?

14:22:59  6  A.   Well, when we flipped through that, in my opinion, it

14:23:02  7  felt like -- my opinion was it showed some children --

14:23:09  8  with animated children showing their rear-end and their

14:23:14  9  butt, and I told her that I didn't think that those books

14:23:18  10  should be in the children's section and that particular

14:23:21  11  book wasn't -- I don't believe was ever on the shelf,

14:23:23  12  anyways.

14:23:30  13  Q.   Was that conversation in the context of a direction

14:23:33  14  to Ms. Milum or expressing your personal opinion or some

14:23:36  15  other context?

14:23:36  16  A.   That was my personal opinion.  Like I said, I wanted

14:23:39  17  to make sure that she understood I wasn't her boss.  I

14:23:42  18  think she knew that.  So it was just my opinion that it

14:23:46  19  should not be in the children's section of the library.

14:23:51  20  Q.   How many times, if any, did you direct Amber Milum to

14:23:55  21  remove a particular book from the Llano County Library

14:23:57  22  System?

14:23:57  23  A.   I did not direct her to remove any books from the

14:24:01  24  library.

14:24:03  25  Q.   Do you recall testimony by Ms. Leila Little earlier

14:24:06  1  today that she attempted to meet with you about the

14:24:09  2  library?

14:24:09  3  A.   Yes, sir, I do.

14:24:11  4  Q.   Did you, in fact, meet with Ms. Little at that time?

14:24:13  5  A.   No, sir, I did not.

14:24:15  6  Q.   Were you aware that she wanted to meet with you?

14:24:18  7  A.   No, sir.  Not until today.  Ms. Little --

14:24:26  8  Q.   May be easier if I -- do you recall Ms. Little

14:24:28  9  testifying that she sent an online form requesting a

14:24:30  10  meeting?

14:24:31  11  A.   Yes, sir, I do.

14:24:36  12  Q.   So why didn't you know that she wanted to meet with

14:24:38  13  you then?

14:24:38  14  A.   Well, it's well-known in Llano County that I'm not an

14:24:44  15  e-mailer or I definitely don't look online for forms or

14:24:47  16  anything.  If she did, I apologize, I really did not show

14:24:51  17  that she was trying to meet with me.  I actually kind of

14:24:56  18  thought it was odd because she would come to

14:24:58  19  commissioners' court and make public comments when there

14:25:00  20  was nothing on the agenda, but I didn't know that she'd

14:25:04  21  ever tried to meet with me.

14:25:06  22  Q.   What's the best way to get in touch with you?

14:25:08  23  A.   Call my office or my cellphone or see me in town.

14:25:12  24  We're not a very big town.

14:25:13  25  Q.   As a matter of course, do you take meetings even if

| | | |
|---|---|---|
| 14:25:21 | 1 | you know someone's going to disagree with you at that |
| 14:25:23 | 2 | meeting? |
| 14:25:23 | 3 | A.  Unfortunately, yes, sir. |
| 14:25:29 | 4 | Q.  Let's move on to a different topic.  Have you ever |
| 14:25:32 | 5 | attended meetings at the reconstituted Llano County |
| 14:25:35 | 6 | Library advisory board? |
| 14:25:36 | 7 | A.  Yes, sir, I have. |
| 14:25:37 | 8 | Q.  When did that occur approximately? |
| 14:25:39 | 9 | A.  I believe in the spring, maybe March or April.  I'm |
| 14:25:42 | 10 | not sure exactly when. |
| 14:25:43 | 11 | Q.  Of what year? |
| 14:25:44 | 12 | A.  Of 2022. |
| 14:25:47 | 13 | Q.  Did you have any concerns arising from attending the |
| 14:25:51 | 14 | LAB meetings, the advisory board meetings, I should say? |
| 14:25:54 | 15 | A.  I did, yes, sir, at one meeting in particular, |
| 14:25:56 | 16 | someone was almost hostile and aggressive acting. |
| 14:26:05 | 17 | Q.  Did the members of the advisory board express |
| 14:26:08 | 18 | concerns regarding the advisory board meetings to you at |
| 14:26:11 | 19 | any time? |
| 14:26:11 | 20 | A.  Some of them did, yes, sir.  They were worried about |
| 14:26:14 | 21 | their safety even at times. |
| 14:26:15 | 22 | Q.  Do you recall what members of the advisory board |
| 14:26:17 | 23 | expressed these concerns about safety? |
| 14:26:20 | 24 | A.  Yes, sir.  It was Gay Baskin, which was the |
| 14:26:24 | 25 | president, and Bonnie Wallace and then, Susie Sitton. |

14:26:30   1   Q.   Did you observe yourself hostile and aggressive

14:26:33   2   behavior at a Llano advisory board meeting?

14:26:36   3   A.   I did yes, sir, one.

14:26:38   4   Q.   What behavior -- let me ask you this:  From whom?

14:26:41   5   A.   Sir, I'm sorry?

14:26:42   6   Q.   From whom?

14:26:43   7   A.   From Mr. Richard Day.

14:26:44   8   Q.   What behavior did you observe at that time?

14:26:47   9   A.   Well, I was -- there was several chairs -- or there

14:26:51  10   wasn't any chairs available, so I was actually standing

14:26:54  11   against the wall and the library board had had their

14:26:57  12   public comments and that was over, and then, they started

14:27:01  13   their annual -- not the annual but their normal business

14:27:04  14   meeting, and Mr. Day kept talking over them and out of

14:27:10  15   turn.  Public comments was over, he kept speaking and

14:27:14  16   getting louder and even sort of advanced toward them.  He

14:27:18  17   did not make it toward them because I asked him to please

14:27:20  18   stop and sit down and he did.

14:27:23  19   Q.   To your knowledge, was this behavior a factor in the

14:27:26  20   Llano County Library advisory board that they considered

14:27:29  21   in closing the meetings of the board from the public?

14:27:32  22   A.   Yes, sir, it was.

14:27:34  23   Q.   When did the reconstituted advisory board begin

14:27:38  24   meeting?

14:27:39  25   A.   I think they started in January of 2022, this year.

14:27:42  1   Q.   And were those meetings open to the public?

14:27:44  2   A.   Yes, sir.

14:27:46  3   Q.   Did they continue to be open to the public?

14:27:50  4   A.   They did not.  They were -- I'm not sure how many

14:27:53  5   they had.  Maybe three or four that were open to the

14:27:57  6   public and then, they closed it at some point.

14:28:01  7   Q.   So what action did the county take in response to the

14:28:06  8   concerns of the advisory board members regarding their

14:28:08  9   safety?

14:28:09  10  A.   The -- I don't think the commissioners' court took

14:28:12  11  any action, but myself, I talked to the chief of police

14:28:15  12  and the sheriff, local sheriff's department, and asked if

14:28:19  13  they could have someone just drop by whenever they're

14:28:22  14  going to have their meetings and just stay in there for

14:28:24  15  safety.

14:28:24  16  Q.   And did law enforcement attend subsequent meetings of

14:28:28  17  the advisory board?

14:28:28  18  A.   Some of them did, yes, sir.

14:28:30  19  Q.   Did that solve the problem?

14:28:31  20  A.   No, sir.  It did not.  The ones they were at,

14:28:36  21  actually, Mr. Day wasn't there, I don't believe.

14:28:39  22  Q.   So what happened next?

14:28:42  23  A.   The library advisory board voted, I think unanimous,

14:28:46  24  I'm not sure, but they voted to close their meeting to the

14:28:49  25  public.

| | | |
|---|---|---|
| 14:28:51 | 1 | Q.   Do you direct the day-to-day operations of the Llano |
| 14:28:55 | 2 | County Library System? |
| 14:28:55 | 3 | A.   No, sir, I don't. |
| 14:28:56 | 4 | Q.   Do you direct the day-to-day operations of Amber |
| 14:28:59 | 5 | Milum as library director? |
| 14:29:01 | 6 | A.   Can you repeat that? |
| 14:29:02 | 7 | Q.   Do you direct the day-to-day operations of Amber |
| 14:29:07 | 8 | Milum as library system director? |
| 14:29:09 | 9 | A.   No, sir, I do not. |
| 14:29:11 | 10 | Q.   I have no further questions.  Thank you, sir. |
| 14:29:20 | 11 | CROSS-EXAMINATION |
| 14:29:22 | 12 | BY MS. CALAF: |
| 14:29:22 | 13 | Q.   Mr. Moss, you don't deny that the -- one of the |
| 14:29:36 | 14 | responsibilities of the commissioners is to select a |
| 14:29:42 | 15 | library director, right? |
| 14:29:43 | 16 | A.   I'm sorry, would you repeat that? |
| 14:29:46 | 17 | Q.   Sure.  You don't deny, do you, that one of the |
| 14:29:50 | 18 | responsibilities of the commissioners, including you, is |
| 14:29:55 | 19 | to select the library director? |
| 14:29:58 | 20 | A.   Well, that's sort of true.  Actually, the library -- |
| 14:30:02 | 21 | Q.   Could you please speak into the microphone? |
| 14:30:06 | 22 | A.   Yes, ma'am.  That is sort of true, but the library |
| 14:30:09 | 23 | directors as with other departments in the county that |
| 14:30:11 | 24 | don't have a elected official, they work under the judge, |
| 14:30:16 | 25 | under the judge's office. |

14:30:17 1  Q.   So is it your testimony that Ms. Milum's boss is the

14:30:23 2  judge?

14:30:26 3  A.   Yes, ma'am.

14:30:27 4  Q.   Okay.  And you don't dispute that the commissioners'

14:30:32 5  court has a role in directing the library director, it's

14:30:38 6  just that you are not technically her bosses?

14:30:43 7  A.   Yes, ma'am.  That's correct --

14:30:44 8       MR. ROGERS:  I object.  That misstates prior

14:30:46 9  testimony.

14:30:52 10  Q.   (BY MS. CALAF) Mr. Moss, do you recall being deposed

14:30:55 11  in connection with this matter?

14:30:57 12  A.   Yes, ma'am.

14:30:58 13  Q.   Before that deposition, you took an oath to tell the

14:31:01 14  truth?

14:31:02 15  A.   Yes, ma'am.

14:31:03 16  Q.   And you complied with that oath, right?

14:31:05 17  A.   Yes, ma'am.  At the time as far as I knew, yes,

14:31:08 18  ma'am.

14:31:08 19  Q.   Yeah.  And so, you told the truth at your deposition?

14:31:14 20  A.   I believe so.

14:31:15 21  Q.   Would you please play clip 8 first.

14:31:19 22       (Audio and video file played.)

14:31:21 23  Q.   "And then, the commissioners' court, which includes

14:31:25 24  you as a commissioner?

14:31:27 25  A.   Yes, ma'am.

14:31:27 1   Q.  Has the authority to hire or fire the library

14:31:32 2 director, right?

14:31:33 3   A.  Yes, ma'am."

14:31:39 4        (End of audio/video file.)

14:31:42 5        MS. CALAF:  Would you now please play clip B.

14:31:46 6        (Audio and video file played.)

14:31:47 7   Q.  "Is there any way that Ms. Milum could be fired

14:31:49 8 except for by the commissioners' court?

14:31:54 9   A.  The judge may have that authority.  I'm not sure.

14:32:02 10   Q.  So the commissioners' court definitely has the

14:32:07 11 authority to fire Ms. Milum or any library director,

14:32:10 12 correct?

14:32:14 13   A.  The library director, not -- not library employees."

14:32:18 14        (End of audio/video file.)

14:32:20 15   Q.  (BY MS. CALAF) Now, could we take a look at Exhibit

14:32:25 16 2B, which has already been admitted, please.  Commissioner

14:32:33 17 Moss, I trust that you are now familiar with this note

14:32:35 18 that Ms. Milum wrote to herself and it's dated August 21

14:32:42 19 -- I'm sorry, August 3rd, 2021.  It offers a time entry of

14:32:46 20 4:00 p.m. and in this -- this personal note, she writes

14:32:51 21 down, Commissioner Moss came back on to talk to me about

14:32:57 22 the Butt books.  He said that he has been getting calls

14:33:00 23 about them.  And Rochelle, the one that has them checked

14:33:04 24 out, has been calling him and he told me that I should

14:33:07 25 take them out of the system.

14:33:11  1        Did I read that correctly?

14:33:13  2  A.   I think you read that correctly.  Yes, ma'am.

14:33:15  3  Q.   And you don't have any reason to question that Ms.

14:33:20  4  Amber's -- I'm sorry, Ms. Milum's note accurately

14:33:24  5  represents the conversation that you and her had about

14:33:27  6  those Butt books?

14:33:29  7        MR. ROGERS:  Objection.  Calls for speculation.

14:33:31  8        THE COURT:  I think he was part of the

14:33:33  9  conversation, wasn't he?

14:33:34  10        MS. CHIARELLO:  Correct.

14:33:35  11        THE COURT:  Yes.  You can answer.

14:33:36  12        THE WITNESS:  Sir?

14:33:37  13        THE COURT:  You can answer.

14:33:37  14  A.   What was the question?

14:33:39  15  Q.   (BY MS. CALAF) Does this note -- do you have any

14:33:42  16  reason to doubt that this note that Ms. Milum

14:33:46  17  contemporaneously took back in August 3rd, 2021 does not

14:33:52  18  accurately describe the conversation you had with her that

14:33:56  19  afternoon?

14:33:56  20  A.   Yes, ma'am, I do.

14:33:57  21  Q.   Okay.

14:33:59  22  A.   I do dispute that.  I don't think that's correct.

14:34:02  23  Q.   Okay.  And what is the part that you dispute?

14:34:05  24  A.   I did not tell her to take them out of the library.

14:34:08  25  I told you as I testified that they should not -- I didn't

| 14:34:13 | 1 | think that they should be in the children's section of the |
| 14:34:16 | 2 | library. |
| 14:34:16 | 3 | Q.   You're going to need to speak into your microphone, |
| 14:34:18 | 4 | please, because I have a heard time hearing you. |
| 14:34:20 | 5 | A.   Sorry.  Yes, ma'am.  I did not tell her to take them |
| 14:34:23 | 6 | out of the library.  I told them to take them -- that I |
| 14:34:27 | 7 | thought in my opinion she should take them out of the |
| 14:34:29 | 8 | library -- the children's section of the library. |
| 14:34:31 | 9 | Q.   So you did tell her to move them to the children's |
| 14:34:34 | 10 | section of the library? |
| 14:34:36 | 11 | A.   Yes.  Yes, ma'am. |
| 14:34:39 | 12 | Q.   And then, let's look at Exhibit -- |
| 14:34:41 | 13 | A.   I told her in my opinion was to take -- they should |
| 14:34:44 | 14 | not be in the children's section of the library. |
| 14:34:46 | 15 | Q.   Right.  And as a person who is part of the group -- |
| 14:34:55 | 16 | let's go back.  We just heard your testimony that the |
| 14:35:02 | 17 | library director reports to the commissioners' court and |
| 14:35:08 | 18 | is it your testimony that the library director, Ms. Milum, |
| 14:35:13 | 19 | could just ignore your opinion, even though you're one of |
| 14:35:17 | 20 | the commissioners? |
| 14:35:19 | 21 | A.   Yes, ma'am, she could.  There's been -- I've been |
| 14:35:24 | 22 | through three judges, all three of them have done things |
| 14:35:27 | 23 | different.  Some of them would bring things to the |
| 14:35:30 | 24 | commissioners' court for the -- so the commissioners' |
| 14:35:32 | 25 | court could make decisions and some of them would make |

14:35:34   1   decisions on their own as they had the authority.

14:35:38   2   Q.   Right.   But you were there speaking to her as one of

14:35:41   3   the commissioners when you told her to move the books,

14:35:44   4   right?

14:35:44   5   A.   No, ma'am.   I didn't -- when I told her to take them

14:35:47   6   out of the children's section of the library, my opinion.

14:35:49   7   I was not there as her boss or a commissioner.

14:35:53   8   Q.   That's -- so you don't think that Ms. Milum would

14:35:57   9   have noted in this note that she took back in August if

14:36:01  10   you were just speaking for yourself?

14:36:05  11   A.   Would you repeat?

14:36:07  12   Q.   Let's move on.   Let's look at Exhibit 8, please.   And

14:36:16  13   let's go to the next page -- I believe it is with the

14:36:19  14   paragraph starts with Commissioner Moss.   Now,

14:36:25  15   Commissioner Moss, you've been sitting here for the entire

14:36:27  16   proceedings, right?

14:36:29  17   A.   Yes, ma'am.

14:36:29  18   Q.   And you've seen this e-mail now probably quite a few

14:36:32  19   times.   It's an e-mail from Ms. Wells?   It's an e-mail

14:36:41  20   from Ms. Wells sent on November 11th, 2021, and in this

14:36:47  21   e-mail, Ms. Wells is reporting to a group about recent

14:36:54  22   activity and she says Commissioner Moss, that would be

14:36:57  23   you, right?

14:36:57  24   A.   Yes, ma'am.

14:36:57  25   Q.   Okay.   And Judge Cunningham have instructed Amber,

14:37:02 1 the head librarian, to remove certain books, both physical

14:37:05 2 books and e-books, correct?

14:37:07 3 A. I see that. Yes, ma'am.

14:37:08 4 Q. Okay. And then, the last sentence of this e-mail,

14:37:20 5 she says Commissioner Moss, we're very grateful for your

14:37:23 6 help in this situation and all you have done to begin to

14:37:26 7 remedy it. Do you see that correct?

14:37:28 8 A. I do see that.

14:37:29 9 Q. Did you respond to this e-mail to say that it was

14:37:31 10 just your personal opinion and that you were not acting in

14:37:36 11 your official capacity?

14:37:37 12 A. Did you ask if I responded to the e-mail?

14:37:40 13 Q. Yeah.

14:37:40 14 A. I don't think I did. No, ma'am. I may have. I

14:37:44 15 don't remember.

14:37:44 16 Q. Okay. So you testified earlier this afternoon that

14:37:55 17 there came a time that you came to find out that certain

14:37:58 18 books had been removed from the shelves, right?

14:38:02 19 A. Did you say that I testified earlier this afternoon?

14:38:04 20 Q. Yes. Today, just five minutes ago.

14:38:08 21 A. That what?

14:38:09 22 Q. You said that you then learned that some books had

14:38:12 23 been removed or removed? You don't remember saying that?

14:38:21 24 A. You'll have to be a little bit more specific.

14:38:24 25 Q. So let's just -- let's talk about that. Was there a

14:38:30 1 time after your meeting with Ms. Milum and after you were

14:38:39 2 copied on this e-mail from Ms. Wells thanking you for

14:38:44 3 helping out by having these books removed, that you came

14:38:49 4 to learn that certain books had been removed from the

14:38:53 5 library shelves? Did you become aware that certain books

14:38:56 6 had been removed from the library shelves?

14:38:58 7          MR. ROGERS: Objection. Vague.

14:39:02 8          THE COURT: Well, I think -- can you answer that

14:39:03 9 question?

14:39:05 10          THE WITNESS: Sir?

14:39:06 11          THE COURT: Did you hear the question.

14:39:07 12          THE WITNESS: I did, but I did not hear what he

14:39:09 13 said.

14:39:09 14          THE COURT: He objected. If you could answer the

14:39:12 15 question, I'm going to allow.

14:39:15 16 A.   Will you please repeat?

14:39:18 17 Q.   (BY MS. CALAF) Did there come a time in the fall of

14:39:21 18 2021 that you learned that certain books, the books at

14:39:27 19 issue in this case, had been removed from the library

14:39:30 20 shelves?

14:39:31 21 A.   I don't know that it was in the fall, but at some

14:39:34 22 point throughout all of this mess, I have -- I did learn

14:39:38 23 that some books were being removed from the shelf.

14:39:41 24 Q.   Okay. And did you learn at that point that some of

14:39:49 25 the books at issue were not children's books?

| | | |
|---|---|---|
| 14:39:55 | 1 | A.   I don't think I learned that until possibly the |
| 14:39:59 | 2 | deposition. |
| 14:40:00 | 3 | Q.   So until your deposition, you were not aware that |
| 14:40:04 | 4 | some of the books at issue were books that are really for |
| 14:40:09 | 5 | adults only? |
| 14:40:11 | 6 | A.   Correct.  I did not look at the list of books when I |
| 14:40:16 | 7 | had explanation. |
| 14:40:16 | 8 | Q.   After you learned that, which you recall being at |
| 14:40:22 | 9 | your deposition in this case, did you think, well, did you |
| 14:40:26 | 10 | suggest to anyone that maybe the books that are purely |
| 14:40:31 | 11 | adult books, the books about the history of the KKK or |
| 14:40:34 | 12 | Caste should be returned to the shelves? |
| 14:40:39 | 13 | A.   Did you ask if I told someone that they should be |
| 14:40:42 | 14 | returned to the shelves? |
| 14:40:43 | 15 | Q.   Yes. |
| 14:40:43 | 16 | A.   No, ma'am, I did not. |
| 14:40:46 | 17 | Q.   Now, you just testified a few minutes ago that at one |
| 14:40:53 | 18 | of the meetings, Mr. Day was talking over some other |
| 14:40:58 | 19 | people?  Did I hear that correctly? |
| 14:41:01 | 20 | A.   That's not all, but yes, ma'am. |
| 14:41:04 | 21 | Q.   Did he make any verbal threats to anyone during that |
| 14:41:07 | 22 | meeting? |
| 14:41:08 | 23 | A.   Not that I heard he made a verbal threat, no, ma'am. |
| 14:41:11 | 24 | Q.   And I believe did you also testify that when you |
| 14:41:13 | 25 | asked him to sit down, he did? |

14:41:15  1  A.   I'm sorry.

14:41:16  2  Q.   I believe you also testified that when you asked him

14:41:19  3  to sit down, he did.

14:41:21  4  A.   He didn't at first, but he did stop.  Yes, ma'am.

14:41:25  5  Q.   And I have to imagine just based on what we know from

14:41:31  6  this case that people talk over each other during these

14:41:35  7  meetings at the time, right?

14:41:38  8  A.   No, ma'am.  Not at our meeting.  Not at

14:41:40  9  commissioners' court meetings.

14:41:55  10  Q.   Thank you.  No further questions.

14:41:58  11       THE COURT:  Anything further?

14:42:00  12       MR. ROGERS:  Just a very few to clean up one

14:42:02  13  thing.

14:42:02  14              RE-DIRECT EXAMINATION

14:42:04  15  BY MR. ROGERS:

14:42:04  16  Q.   Commissioner Moss, approximately how many departments

14:42:10  17  does the Llano County government possess?

14:42:21  18  A.   More than 15, I would think.  Fifteen to 20.

14:42:25  19  Q.   And some of those are headed by elected officials?

14:42:29  20  A.   Yes, sir.

14:42:29  21  Q.   And some of them are not.

14:42:31  22  A.   Yes, sir.

14:42:31  23  Q.   What level of discretion do unelected department

14:42:38  24  heads have regarding the day-to-day operations of their

14:42:41  25  department?

| 14:42:43 | 1 | A.   They have 100 percent discretion in their department. |
| 14:42:47 | 2 | Q.   I believe when we looked at the deposition excerpts |
| 14:42:49 | 3 | you testified regarding hiring and firing authority, does |
| 14:42:54 | 4 | the commissioners' court have the authority to hire and |
| 14:42:57 | 5 | fire department heads? |
| 14:43:00 | 6 | A.   Yes, sir, I believe they could. |
| 14:43:02 | 7 | Q.   As a general matter, does the commissioners' court |
| 14:43:04 | 8 | engage in any other operational oversight of departments |
| 14:43:09 | 9 | other than budget and hiring and firing decisions? |
| 14:43:13 | 10 | A.   Would you repeat? |
| 14:43:15 | 11 | Q.   Let me rephrase.  Does the commissioners' court |
| 14:43:19 | 12 | involve itself in the day-to-day operations of the |
| 14:43:22 | 13 | departments of the LLano County government system? |
| 14:43:25 | 14 | A.   No, sir. |
| 14:43:27 | 15 | Q.   Even if they have hiring and firing and budget |
| 14:43:29 | 16 | authority, they don't direct day-to-day operations.  Is |
| 14:43:32 | 17 | that a fair summary of your testimony? |
| 14:43:34 | 18 | A.   Yes, sir. |
| 14:43:34 | 19 | Q.   Thank you.  Nothing further. |
| 14:43:38 | 20 | MS. CALAF:  Nothing else.  Thank you. |
| 14:43:40 | 21 | THE COURT:  Thank you, sir.  You may step down. |
| 14:43:42 | 22 | THE WITNESS:  Thank you. |
| 14:43:43 | 23 | THE COURT:  Any other witnesses? |
| 14:43:44 | 24 | MR. ROGERS:  Your Honor, could we request a short |
| 14:43:47 | 25 | recess? |

14:43:48  1          THE COURT:  Sure.  Let's take a short recess
14:43:50  2  then.
14:49:40  3          (Recess.)
14:50:54  4          THE COURT:  All right.  Did you have enough
14:50:56  5  opportunity to confer?
14:50:58  6          MR. MITCHELL:  Yes, your Honor.  The defense
14:50:59  7  rests.  Thank you.
14:51:00  8          THE COURT:  Okay.  Very good.  Can I have -- see
14:51:03  9  counsel at the bench, please.
14:51:07  10          (At the bench, on the record.)
14:51:16  11          THE COURT:  All right.  Mr. Botkin.
14:51:18  12          MR. BOTKIN:  Okay.  Ready to go.  Put Mr.
14:51:25  13  Mitchell.
14:51:25  14          THE COURT:  Yes.  Do you swear to tell the truth,
14:51:31  15  the whole truth, and nothing but the truth?
14:51:31  16          MR. MITCHELL:  I do.
14:51:32  17          MR. BOTKIN:  Mr. Mitchell, you appeared as lead
14:51:34  18  counsel for the defendants in June 2022, correct?
14:51:38  19          MR. MITCHELL:  Correct.
14:51:42  20          MR. ROGERS:  Objection for the record.  We would
14:51:44  21  object on three grounds.  One, Judge, on the grounds of
14:51:48  22  relevance.  I believe the only reason these questions
14:51:49  23  would be relevant is to a mootness jurisdictional defense.
14:51:53  24  We've already stated on the record, we are not asserting
14:51:55  25  that.  In addition, we object to attorney-client

14:51:57 1 privileged communications and attorney work product.  And

14:52:00 2 I would request a running objection for this entire line

14:52:03 3 of questioning, Judge.

14:52:04 4        THE COURT:  I'll grant you the running objection

14:52:06 5 and overrule your objections.

14:52:08 6        MR. ROGERS:  Thank you.

14:52:08 7     JOHN MITCHELL, called by the Plaintiff, duly sworn.

14:52:08 8                    <u>DIRECT EXAMINATION</u>

14:52:09 9 BY MR. BOTKIN:

14:52:09 10 Q.   On or about July 21st, 2022, you personally donated

14:52:14 11 nine physical books to the Llano County Library System by

14:52:18 12 giving them to Amber Milum?

14:52:21 13 A.   I did donate the books.  I'm not sure about the date.

14:52:23 14 Q.   Okay.

14:52:24 15 A.   And I haven't checked.

14:52:25 16 Q.   These were new books that you paid for yourself,

14:52:29 17 correct?

14:52:29 18 A.   That is correct.  They were new books, I paid for

14:52:31 19 them myself.

14:52:31 20 Q.   The books were They Called Themselves The KKK: The

14:52:38 21 Birth of An American Terrorist Group by Susan Campbell

14:52:42 22 Bartoletti, Gabi, A Girl In Pieces by Isabel Quintero,

14:52:45 23 Shine by Lauren Myracle, Caste: The Origins of Our

14:52:50 24 Discontents by Isabel Wilkerson, It's Perfectly Normal:

14:52:54 25 Changing Bodies, Growing Up, Sex, Gender and Sexual Health

14:52:58 1 by Robie Harris, Being Jazz: My Life As A Transgender Teen

14:53:03 2 by Jazz Jennings, Spinning by Tillie Walden, and In The

14:53:07 3 Night Kitchen by Maurice Sendak, and Freakboy by Kristin

14:53:12 4 Elizabeth Clark.

14:53:13 5 A.   I believe that's correct, but I have not checked my

14:53:15 6 records.

14:53:15 7 Q.   Okay.  And you were the unanimous donor that Ms.

14:53:19 8 Milum is referring to in her testimony, correct?

14:53:21 9 A.   I was.

14:53:23 10 Q.   You made this donation for the purpose of creating

14:53:26 11 the factual predicate for a legal argument that a

14:53:30 12 preliminary injunction should be denied.

14:53:33 13 A.   I acted in the best interest of my client consistent

14:53:36 14 with my theory of zealous representation.

14:53:39 15 Q.   And that is the reason you made this donation to the

14:53:43 16 Llano County Library, correct?

14:53:44 17 A.   The reason I made the donation is because I believed

14:53:46 18 it was in the best interest of my client consistent with

14:53:49 19 my duty of zealous representation.

14:53:50 20 Q.   And the county has relied on that factual predicate

14:53:53 21 in service of arguments here, correct?

14:53:58 22        MR. ROGERS:  Is this a question to him?

14:54:00 23        MR. BOTKIN:  Yes.

14:54:01 24        MR. MITCHELL:  I think that calls for a legal

14:54:04 25 conclusion.

14:54:04  1          MR. ROGERS:  I mean, I think it calls for a legal

14:54:06  2  conclusion that he hasn't been qualified.  I don't see how

14:54:08  3  he would.  And I also think that the facts are what they

14:54:11  4  are, and what we've put in the record is -- I think that

14:54:14  5  we've relied on.  In addition, we would assert our

14:54:20  6  remaining prior objection.

14:54:23  7          THE COURT:  I think the point is apparent from

14:54:26  8  the record about whether they have relied on that or not.

14:54:28  9  I'll sustain the objection.

14:54:29  10  Q.   (BY MR. BOTKIN) It was you who proposed that these

14:54:31  11  books be made available pursuant to the system described

14:54:35  12  in Amber Milum's testimony that the defendants have

14:54:38  13  described as an inhouse checkout system and the plaintiffs

14:54:41  14  have described as the secret library.

14:54:44  15          MR. ROGERS:  I would object to the extent that

14:54:46  16  that potentially mischaracterizes prior testimony in that

14:54:48  17  there has been testimony that this inhouse system has

14:54:54  18  existed at the Kingsland library in the past.

14:54:57  19          THE COURT:  Okay.  So then, you want to restate

14:55:03  20  your question?

14:55:03  21          MR. BOTKIN:  Sure I'll just read it again.

14:55:06  22  Q.   (BY MR. BOTKIN) It was you who proposed the books

14:55:08  23  that you donated be made available pursuant to the -- to

14:55:12  24  the system described in Amber Milum's testimony that

14:55:16  25  plaintiffs have described as the secret library and that

14:55:18  1  the defendants have characterized as the inhouse checkout

14:55:21  2  system?  You would agree --

14:55:23  3  A.   Really hard to answer that without disclosing

14:55:25  4  communications with my client.  Do you want me to answer?

14:55:31  5       MR. BOTKIN:  This was the resolution that we

14:55:32  6  discussed last time we were up here.

14:55:33  7       THE COURT:  I think you should answer the

14:55:35  8  question.  Yes, sir.

14:55:36  9  A.   I honestly don't remember who proposed it.

14:55:39  10      MR. BOTKIN:  Nothing further.

14:55:40  11      THE COURT:  All right.  So where are we now?  Do

14:55:44  12  we have all the evidence in the record.

14:55:46  13      MS. LEONIDA:  (Moving head up and down.)

14:55:46  14      THE COURT:  Anything the plaintiff needs?

14:55:48  15      MS. LEONIDA:  Yes, we do.

14:55:49  16      THE COURT:  All the evidence in the record that

14:55:50  17  defendants need?

14:55:51  18      MR. MITCHELL:  Yes.

14:55:51  19      THE COURT:  What I would propose now is that you

14:55:56  20  make whatever arguments, given the state of the record in

14:56:03  21  your proposed hearing briefings.  I don't know that I

14:56:05  22  would particularly helped by any oral arguments at this

14:56:10  23  time unless you're just really wanting to make those.

14:56:11  24  Were you up all night practicing, Mr. Botkin?

14:56:17  25      MR. BOTKIN:  My colleague is pretty excited about

14:56:19  1   making arguments.  But I think the point's well taken.  We

14:56:23  2   can skinny them down or --

14:56:23  3          MS. LEONIDA:  That's totally fine, your Honor.  I

14:56:25  4   think we can save it.

14:56:26  5          MR. MITCHELL:  I mean, I would prefer written

14:56:28  6   just because there's been so much new stuff proposed.  I

14:56:30  7   think it would be more helpful if the Court would grant me

14:56:33  8   more time to write it.

14:56:33  9          THE COURT:  Rather than doing it off the cuff, I

14:56:34  10  would rather do it in an orderly manner in writing if

14:56:36  11  that's okay.  Sorry to disappoint you.

14:56:37  12         MS. LEONIDA:  That's fine.

14:56:39  13         THE COURT:  Okay.  Well, I'll say that --

14:56:42  14         MR. MITCHELL:  Maybe after the transcripts would

14:56:44  15  they be due?

14:56:46  16         THE COURT:  Yeah.  Yeah.

14:56:48  17         MR. MITCHELL:  I don't know when that would be

14:56:49  18  unless your Honor's not hard to --

14:56:53  19         (Cross-talk.)

14:56:53  20         MR. ROGERS:  Assuming we could request expedited.

14:56:57  21         THE COURT:  She's pretty quick.

14:56:59  22         MS. LEONIDA:  I did prepare a dance number if I

14:57:01  23  could just --

14:57:02  24         THE COURT:  Yeah, yeah.  Interpretive dance.  So

14:57:13  25  I think our plan was 60 days after the record.  No.  That

| 14:57:16 | 1 | was the other case.  Sorry.  Did we talk about how long we |
| 14:57:20 | 2 | needed for post-hearing admissions? |
| 14:57:23 | 3 | MR. BOTKIN:  We've not covered that. |
| 14:57:24 | 4 | THE COURT:  Do you have any -- sorry.  That was |
| 14:57:25 | 5 | in the last hearing.  Do you have any -- |
| 14:57:31 | 6 | LAW CLERK:  There have been a lot of hearings. |
| 14:57:34 | 7 | (Cross-talk.) |
| 14:57:34 | 8 | MR. BOTKIN:  I think we've talked about it. |
| 14:57:36 | 9 | MR. MITCHELL:  Other than briefing.  I just want |
| 14:57:41 | 10 | to maybe get the transcript first and then did you prefer |
| 14:57:44 | 11 | simultaneous?  I generally don't. |
| 14:57:47 | 12 | MR. BOTKIN:  Could we spend a few days |
| 14:57:48 | 13 | conferring? |
| 14:57:49 | 14 | THE COURT:  Yeah, yeah.  Absolutely. |
| 14:57:50 | 15 | MR. MITCHELL:  Does the Court -- some judges just |
| 14:57:54 | 16 | hate simultaneous -- |
| 14:57:55 | 17 | THE COURT:  I actually prefer simultaneous but |
| 14:57:57 | 18 | just because it never ends.  But if you confer and tell me |
| 14:58:03 | 19 | what works best for you, I will. |
| 14:58:05 | 20 | MR. MITCHELL:  Or we can do that and just one |
| 14:58:10 | 21 | reply instead of having six versus four. |
| 14:58:10 | 22 | MS. LEONIDA:  We've had so much briefing, I think |
| 14:58:11 | 23 | it should be simultaneous. |
| 14:58:12 | 24 | THE COURT:  Just work it out.  Or I'm sure I'll |
| 14:58:14 | 25 | go along with whatever you come up with.  And then, also, |

| 14:58:16 | 1 | if you could -- I want you to confer, give us an idea of |
| 14:58:24 | 2 | -- tell us what your agreement is with regard to timing |
| 14:58:29 | 3 | and then, we'll add it to the list. |
| 14:58:32 | 4 | MR. BOTKIN: Next couple of days. I think we |
| 14:58:35 | 5 | won't need a long time for us to tell them -- |
| 14:58:38 | 6 | MR. MITCHELL: Yeah, exactly. Couple of days at |
| 14:58:40 | 7 | least. |
| 14:58:43 | 8 | THE COURT: Okay. Good. Are we good then? |
| 14:58:46 | 9 | MR. MITCHELL: I think so. |
| 14:58:46 | 10 | THE COURT: Thank you. |
| 14:58:53 | 11 | All right. Does the plaintiff -- do the |
| 14:58:56 | 12 | plaintiffs have everything in the record that you need for |
| 14:58:59 | 13 | purposes of the pending petition? |
| 14:59:02 | 14 | MS. LEONIDA: I believe we do, your Honor, but I |
| 14:59:04 | 15 | would like to confer with the courtroom deputy just to |
| 14:59:07 | 16 | make sure we have the same list of admitted exhibits. |
| 14:59:09 | 17 | THE COURT: Absolutely. Why don't you take a |
| 14:59:11 | 18 | minute now to do that if you'd like to. We're going to |
| 14:59:16 | 19 | have to close out the record. |
| 15:00:30 | 20 | MS. LEONIDA: We have no further evidence, your |
| 15:00:32 | 21 | Honor. |
| 15:00:32 | 22 | THE COURT: Okay. And the defendants have the |
| 15:00:34 | 23 | opportunity to introduce all the evidence that you need to |
| 15:00:37 | 24 | get into the record for purposes of the pending petition. |
| 15:00:39 | 25 | MR. MITCHELL: Yes, your Honor. We have. Thank |

15:00:40  1   you.

15:00:40  2           THE COURT:  Okay.  Very good.  Thank you all very

15:00:43  3   much.  This has been very helpful.  I will allow or ask

15:00:46  4   you, please, to confer about a post-hearing briefing

15:00:50  5   schedule based on the availability of the record.  I don't

15:00:55  6   know that I would be particularly helped at this time by

15:00:57  7   any oral argument because I think that you've done such a

15:00:59  8   good job before the hearing of setting out your arguments.

15:01:05  9           In the event, following your briefing, I believe

15:01:06  10  that I would be assisted by any followup opportunities to

15:01:11  11  argue any particular issue.  I'll certainly let you know,

15:01:15  12  but my previous presence would be for you to accomplish

15:01:16  13  your argument in written submissions following the

15:01:20  14  hearing.  And so, I will await to hear the results of your

15:01:26  15  consultation with each other about what a schedule would

15:01:29  16  be that would work for you and I'm sure it would work for

15:01:31  17  me, as well.

15:01:32  18          And with that, is there anything else we need to

15:01:34  19  accomplish from the plaintiff?

15:01:35  20          MS. LEONIDA:  No, your Honor.

15:01:35  21          THE COURT:  Anything from the defense?

15:01:37  22          MR. MITCHELL:  Nothing from defense.

15:01:37  23          THE COURT:  Thank you all again very much.  I

15:01:39  24  know these are very important issues to all involved, and

15:01:41  25  I will look forward to getting your post-hearing

15:01:44  1   submissions and we'll take this under advisement.  Thank

15:01:46  2   you very much.

3                    (Proceedings concluded.)

```
1                        * * * * * *

2

3    UNITED STATES DISTRICT COURT  )

4    WESTERN DISTRICT OF TEXAS)

5

6       I, LILY I. REZNIK, Certified Realtime Reporter,

7    Registered Merit Reporter, in my capacity as Official

8    Court Reporter of the United States District Court,

9    Western District of Texas, do certify that the foregoing

10   is a correct transcript from the record of proceedings in

11   the above-entitled matter.

12      I certify that the transcript fees and format comply

13   with those prescribed by the Court and Judicial Conference

14   of the United States.

15      WITNESS MY OFFICIAL HAND this the 14th day of November,

16   2022.
```

17                                    *Lily Iva Reznik*

18                          ~~~~~~~~~~~~~~~~~~~~~~~~
                            LILY I. REZNIK, CRR, RMR
19                          Official Court Reporter
                            United States District Court
20                          Austin Division
                            501 West 5th Street,
21                          Suite 4153
                            Austin, Texas 78701
22                          (512)391-8792
                            SOT Certification No. 4481
23                          Expires:  1-31-23

24

25

# Certificate Of Service

I certify that on April 25, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Max Bernstein
Ellis E. Herington
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com
herington@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Wittliff | Cutter PLLC
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
ryan@wittliffcutter.com
katherine@wittliffcutter.com
mac@wittliffcutter.com

*Counsel for Plaintiffs-Appellees*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on April 25, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*