No. 23-50224

# In the United States Court of Appeals for the Fifth Circuit

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Texas, Austin Division
1:22-cv-00424-RP

## BRIEF OF PLAINTIFFS-APPELLEES

(Counsel Listed Inside Cover)

Katherine P. Chiarello
(TX Bar No. 24006994)
Ryan A. Botkin
(TX Bar No. 00793366)
María Amelia Calaf
(TX Bar No. 24081915)
Ian C. Crichton
(TX Bar No. 24133100)
Botkin Chiarello Calaf PLLC
1209 Nueces Street
Austin, Texas 78701
Tel: 512-615-2341
Fax: 737-289-4695
ryan@bccaustin.com
katherine@bccaustin.com
mac@bccaustin.com
ian@bccaustin.com

Ellen V. Leonida
(CA Bar No. 184194)
Matthew Borden
(CA Bar No. 214323)
Marissa R. Benavides
(NY Bar No. 5796891)
Max Bernstein
(NY Bar No. 5609037)
Kory James DeClark
(CA Bar No. 310571)
BraunHagey & Borden LLP
351 California Street, 10th Floor
Tel: 415-599-0210
Fax: 415-276-1808
leonida@braunhagey.com
borden@braunhagey.com
benavides@braunhagey.com
bernstein@braunhagey.com
declark@braunhagey.com

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**
Leila Green Little
Jeanne Puryear
Kathy Kennedy
Rebecca Jones
Richard Day
Cynthia Waring
Diane Moster

**Plaintiffs-Appellees' Counsel**
Katherine P. Chiarello
Ryan A. Botkin
María Amelia Calaf
Ian C. Crichton
Botkin Chiarello Calaf PLLC

Ellen V. Leonida
Matthew Borden
Marissa R. Benavides
Max Bernstein
Kory James DeClark
BraunHagey & Borden LLP

**Defendants-Appellants**
Llano County
Ron Cunningham
Jerry Don Moss
Peter Jones
Mike Sandoval
Linda Raschke

Amber Milum
Bonnie Wallace
Rochelle Wells
Rhonda Schneider
Gay Baskin

**Defendants-Appellants' Counsel**
Jonathan F. Mitchell
Mitchell Law PLLC

Dwain K. Rogers
Matthew L. Rienstra
Llano County Attorney's Office

*/s/ Ellen Leonida*
Ellen V. Leonida

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully submit that oral argument will be helpful to the Court and is appropriate. This is an interlocutory appeal from a grant of Plaintiffs' motion for preliminary injunction. After holding a two-day evidentiary hearing and receiving post-hearing briefing from the parties, the District Court made factual findings in Plaintiffs' favor on all four preliminary injunction factors, including that Defendants likely engaged in viewpoint and content-based discrimination in removing books they personally disliked from the local public library. In granting the requested relief, the District Court relied on an extensive factual record below. Oral argument will assist the Court in understanding the factual basis supporting the District Court's sound exercise of its discretion to grant the preliminary injunction.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................. i

STATEMENT REGARDING ORAL ARGUMENT ......................................... iii

TABLE OF CONTENTS ..................................................................... iv

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION ............................................................................. 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................. 2

STATEMENT OF THE CASE .............................................................. 3

    A.    The Action Below .............................................................. 3

    B.    Evidence Presented at the Preliminary Injunction Motion Hearing .... 4

        1.    Defendants Remove Children's Books that Make Jokes about Bodily Functions from the Public Library ..................................... 5

        2.    Defendants Target Books Containing Nudity .............................. 6

        3.    Defendants Target Books about Race, Gender, and Sexuality that Defendant Wallace Identified ................................... 7

        4.    Defendants Do Not Follow Routine Weeding Procedure in Removing the 17 Books ................................................. 9

        5.    Defendants Attempt to Moot the Case by Having Their Lawyer Buy and Donate Copies of the Banned Books ............................ 11

    C.    Procedural History ........................................................... 13

    D.    The District Court's Decision ............................................ 13

SUMMARY OF THE ARGUMENT ...................................................... 16

ARGUMENT ................................................................................ 18

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................................................. 18

A.   The First Amendment Prohibits Removal of Library Books Based on
     Viewpoint or Content-Based Discrimination................................... 19

     1.   *Campbell* Prohibits Viewpoint Based Discrimination in Library
          Book Removal.................................................................................21

     2.   Content-Based Discrimination is Unconstitutional Unless it is
          Narrowly Tailored to Achieve a Compelling Government
          Interest .........................................................................................23

B.   The District Court's Factual Finding that Defendants' Removal of the
     Disputed Books Was Based on Viewpoint and Content Discrimination
     Was Not Clear Error ....................................................................... 24

C.   Defendants Do Not Present Compelling Arguments for Either
     Overturning *Campbell* or Rejecting the District Court's Factual
     Findings ........................................................................................... 29

     1.   Defendants Fail to Show that the District Court's Findings of
          Discrimination and Pretext Were Clearly Erroneous.................31

     2.   Defendants Arguments Are Inconsistent With Fifth Circuit
          Precedent and Do Not Establish That Viewpoint or Content
          Discrimination Is Permissible in Library Book Removal
          Decisions ......................................................................................35

II.  **PLAINTIFFS HAVE ASSERTED AN ONGOING FIRST
     AMENDMENT INJURY........................................................ 47**

     A.   Defendants Cannot Recast Their Mootness Claims as a Standing
          Argument to Avoid the Voluntary Cessation Doctrine .................... 48

     B.   Defendants Have Not Proven that the District Court's Findings of
          Ongoing Injury Were Clearly Erroneous......................................... 50

III. **THE DISTRICT COURT PROPERLY FOUND THAT
     THE EQUITIES AND PUBLIC INTEREST WEIGH IN
     FAVOR OF PLAINTIFFS ..................................................... 53**

     A.   Defendants Have Not Shown that the District Erred in Finding that the
          Balance of the Equities Favors Plaintiffs......................................... 54

B.    Defendants Have Not Shown that the District Court Erred by Finding that the Public Interest Weighs in Favor of Plaintiffs ...................... 55

IV.    **THE INJUNCTION IS PROPER IN SCOPE** ........................................ **57**

**CONCLUSION** ................................................................................. **58**

**CERTIFICATE OF SERVICE** ...................................................... **60**

**CERTIFICATE OF COMPLIANCE** ............................................... **61**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................48

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) ........................................................................25

*Bluefield Water Association, Inc. v. City of Starkville, Miss.*,
577 F.3d 250 (5th Cir. 2009) ...........................................................25

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982) ...................................................................*passim*

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) .......................................................*passim*

*Case v. Unified School District No. 233*,
908 F. Supp. 864 (D. Kan. 1995) .....................................................22

*Center for Biological Diversity, Inc. v. BPArn. Prod. Co.*,
704 F.3d 413 (5th Cir. 2013) ...........................................................48

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) .....................................................*passim*

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982) ........................................................................50

*Counts v. Cedarville School District*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) .......................................22, 53

*Delcarpio v. St. Tammany Parish*,
2:93-cv-00531-PEC, 1993 WL 432360 (E.D. La. Oct. 20, 1993).....................22

*Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*,
518 U.S. 727 (1989) ........................................................................52

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) .......................................................42

*Doe v. Duncanville Independant School District*,
994 F.2d 160 (5th Cir. 1993) ...............................................................50

*Doe v. Indian River School District*,
653 F.3d 256 (3d Cir. 2011) ................................................................51

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ..........................................................................47

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
23 F.3d 1071 (6th Cir. 1984) ...............................................................56

*Galena Oaks Corp. v. Scofield*,
218 F.2d 217 (5th Cir. 1954) ...............................................................33

*Hopwood v. State of Texas*,
236 F.3d 256 (5th Cir. 2000) ...............................................................25

*International Society for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .....................................................................42, 46

*Knox v. SEIU*,
567 U.S. 298 (2012) .....................................................................48, 50

*Kreimer v. Bureau of Police for Town of Morristown*,
958 F.2d 1242 (3d Cir. 1992)................................................................42

*Kristensen v. United States*,
993 F.3d 363 (5th Cir. 2021) ...............................................................25

*Lewis v. Woods*,
848 F.2d 649 (5th Cir. 1988) ...............................................................52

*Marbury v. Madison*,
1 Cranch 137, 2 L. Ed. 60 (1803)..........................................................49

*Matal v. Tam*,
582 U.S. 218 (2017) .....................................................................44, 45

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995) ..........................................................................51

*Murray v. West Baton Rouge Parish School Board*,
    472 F.2d 438 (5th Cir. 1973) ............................................................37

*National Endowment for Arts v. Finley*,
    524 U.S. 569 (1998) ..........................................................................44

*Neinast v. Board of Trustees of Columbus Metropolitan Library*,
    346 F.3d 585 (6th Cir. 2003) ............................................................42

*NetChoice, L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) .............................................................41

*Perry Education Association v. Perry Local Educators' Association*,
    460 U.S. 37 (1983) ............................................................................23

*Plains Cotton Coop. Association of Lubbock, Tex. v. Goodpasture Computer Service, Inc.*,
    807 F.2d 1256 (5th Cir. 1987) ..........................................................51

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
    862 F.3d 445 (5th Cir. 2017) ............................................................51

*Reed v. Town of Gilbert, Arizona*,
    576 U.S. 155 (2015) ....................................................................20, 24

*Reno v. A.C.L.U.*,
    521 U.S. 844 (1997) ..........................................................................37

*Robinson v. Hunt County*,
    921 F.3d 440 (5th Cir. 2019) ......................................................19, 23

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ..........................................................................19

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ..........................................................................44

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011) ..........................................................................52

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ............................................................50

*Spell v. Edwards*,
   962 F.3d 175 (5th Cir. 2020) ............................................................48

*Stanley v. Georgia*,
   394 U.S. 557 (1969) .........................................................................21

*Sund v. City of Wichita Falls, Texas*,
   121 F. Supp. 2d 530 (N.D. Tex. 2000).........................................passim

*Texans for Free Enterprise v. Texas Ethics Commission*,
   732 F.3d 535 (5th Cir. 2013) ...............................................15, 55, 56

*United States v. American Library Association, Inc.*,
   539 U.S. 194 (2003) ....................................................................passim

*United States v. Guzman-Rendon*,
   864 F.3d 409 (5th Cir. 2017) ...........................................................43

*United States v. Playboy Entertainment Group, Inc.*,
   529 U.S. 803 (2000) .........................................................................52

*United States v. Whitfield*,
   590 F.3d 325 (5th Cir. 2009) ...........................................................38

*Uzuegbunam v. Preczewski*,
   141 S. Ct. 792 (2021).......................................................................47

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) .........................................................................44

*Yarls v. Bunton*,
   905 F.3d 905 (5th Cir. 2018) ...........................................................49

**Statutes**

15 U.S.C. § 1052(a) ...............................................................................44

**Rules**

Tex. Disciplinary R. Prof. Conduct 1.08 ...............................................49

Tex. Disciplinary R. Prof. Conduct 3.08 ...............................................49

**Other Authorities**

*Fed. Prac. & Proc. Civ.* § 2949 (3d ed. 2023)......................................................33

## **INTRODUCTION**

Can government officials freely purge public libraries of any books containing ideas those officials want to prevent library patrons from accessing? The Court has already answered that question unequivocally in the negative. In *Campbell v. St. Tammany Parish School Board*, the Court stated that library patrons "have a First Amendment right to receive information" that is violated when government officials remove library books "substantially based on an unconstitutional motivation"—namely, the desire to deny "access to ideas with which the [] officials disagree." 64 F.3d 184, 188, 190 (5th Cir. 1995). The *Campbell* court held that the factual question "at the heart of this First Amendment case" is "the true, decisive motivation behind" the removing officials' decision. *Id.* at 190. Where an official's motivation for removal of library books is improper, no further inquiry is required and the official's action violates the First Amendment. *Id.* at 190-91.

Here, Llano County officials removed books—including award-winning books about race, history, and politics—from public libraries because they found the books' viewpoints and contents "objectionable." ROA.3525-26. The District Court found that "Defendants' decisions were likely motivated by a desire to limit access" to the ideas in those books. ROA.3525-26. Consequently, the court concluded that "the 'substantial motivation' for Defendants' actions appears to be

discrimination," ROA.3528, and that Plaintiffs were suffering irreparable harm from the "ongoing infringement" of their constitutional rights. ROA.3529.

To resolve this appeal, the Court need only apply its own, binding precedent—directly on point in this book removal case—to the District Court's factual finding that Llano County officials acted with an impermissible motivation. Defendants' attempts to obfuscate the decision before the Court misrepresent the record below, ignore the District Court's extensive factual findings, and misapply the law.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Did the District Court clearly err in finding that Defendants removed 17 books from the public library because of their viewpoint and content, when the books did not meet the library's own criteria for "weeding" books, Defendants' internal communications referred to the books as "pornographic filth," and Defendants offered demonstrably false testimony and pretextual explanations to justify their removal?

2.     Did the District Court act within its discretion when it issued a preliminary injunction restoring the status quo by preventing Defendants from hiding the 17 books from library patrons until the merits of the case are decided?

3.     Can Defendants moot the need for an injunction by having their lawyer buy the 17 books in question and place them in a non-public room in the

library, where their presence is not listed in the library catalogue, is not advertised to patrons, and is not communicated by the library through the channels normally employed to tell library patrons that books are available?

## STATEMENT OF THE CASE

### A.    The Action Below

Plaintiffs-Appellees Leila Green Little, Jeanne Puryear, Kathy Kennedy, Rebecca Jones, Richard Day, Cynthia Waring, and Diane Moster ("Plaintiffs") are patrons of Llano County public libraries. ROA.3507.

Defendants-Appellants are Llano County, Texas and the individuals who ordered and effected the removal of the books at issue in this lawsuit from the County's main public library. Defendant Ron Cunningham serves as County Judge and Defendants Jerry Don Moss, Peter Jones, Mike Sandoval, and Linda Raschke serve as County Commissioners. ROA.237. Defendant Amber Milum is the Llano County Library System Director. ROA.237. Defendants Bonnie Wallace, Rochelle Wells, Gay Baskin, and Rhonda Schneider advocated for the book removal and were subsequently appointed by the Commissioners Court to sit on the County's Library Advisory Board. ROA.237.

Plaintiffs filed this action alleging that Llano County, its County Commissioners, Library Advisory Board members, and Library System Director, acting under color of state law, violated Plaintiffs' First Amendment and Due

Process rights by removing popular, critically acclaimed books from the Llano library simply because those books express views and contain content that do not align with the personal and political views of Llano County officials. ROA.65 (First Amendment), ROA.67 (Due Process). Plaintiffs moved for a preliminary injunction to restore those books to the Llano library while their claims are tried.

## B. Evidence Presented at the Preliminary Injunction Motion Hearing

In support of the motion for a preliminary injunction, Plaintiffs presented evidence that Defendants removed 17 books from the Llano library (the "Banned Books")[1] because they disliked the authors' viewpoints and the books' contents. ROA.3523. Plaintiffs also presented evidence that Library Director Milum was not merely "weeding" the books using standard library procedures. The District Court credited this evidence based on the facts below:

---

[1] The 17 Banned Books include *My Butt Is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!* by Dawn McMillan (the "Butt Books"); *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Had Too Many Farts* by Jane Bexley (the "Fart Books"); *In the Night Kitchen* by Maurice Sendak; *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie Harris; *Caste: The Origins of Our Discontent* by Isabel Wilkerson; *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; *Spinning* by Tillie Walden; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Shine* and *Under the Moon: A Catwoman Tale* by Lauren Myracle; *Gabi, a Girl in Pieces* by Isabel Quintero; and *Freakboy* by Kristin Elizabeth Clark.

### 1. Defendants Remove Children's Books that Make Jokes about Bodily Functions from the Public Library

Library System Director Milum personally selected for inclusion in the children's section of the Llano library a number of children's books that make light of flatulence (referenced below as the "Butt and Fart Books"). She chose the books based on her training and experience. In summer 2021, in response to directions from her Llano County superiors, Milum removed all seven titles from the Library System. *See* ROA.1660-61, 3936-37, 3997-98, 4042.

Milum's removal of the seven books resulted from complaints made by Defendants Wells and Schneider.[2] *See, e.g.*, ROA.3894:20-22, 3934:1-2, 4047:9-4048:14, 1660-61. Before Milum removed the books, Wells and Schneider repeatedly checked them out to keep them off the shelves and make them inaccessible to other library patrons. ROA.3894:20-24, 4084:23-4085:10, 4185:23-4186:3. Then Wells, who "believe[s] the Fart Books don't belong in our library," asked Milum and Llano County officials Judge Cunningham and Commissioner Moss to remove the Butt and Fart Books from the Library System. ROA.4048:10-4055:1.

---

[2] At the time of these complaints, both Wells and Schneider were local residents. Each was placed on the Llano County Library Advisory Board, replacing longtime board members who were ousted with no contemporaneous explanation. ROA.237.

In response to Wells' requests, Defendants Cunningham and Moss directed Milum to remove the Butt and Fart Books. ROA.1498, 3937:1-3, 4042:7-11, 3997:24-3998:5. Milum followed her superiors' directives, taking the books from the shelves[3] and deleting them from the Library System catalog. ROA.3509, *see* ROA.1660-61, 3934:18-21, 3936:9-25, 4042:7-11, 3997:24-3998:5.[4]

## 2. Defendants Target Books Containing Nudity

After the Butt and Fart Books were removed, Cunningham instructed Milum to remove from the shelves "[a]ny books with photos of naked or sexual conduct regardless if they are animated or actual photos[.]" ROA.1667, 3509, 3939:1-17, 4218. Milum obeyed his directive, closing the library for three days as librarians followed Cunningham's instructions: hundreds of books, including books about potty training and getting dressed, disappeared. ROA.3899:21-3900:20, 3979:8-14.

One casualty of this purge was Maurice Sendak's classic, Caldecott Award-winning book *In the Night Kitchen*, which Milum removed because it includes

---

[3] Five of the books were newly ordered by Milum and had not yet been added to the library shelves before Milum disposed of them in response to these directives. ROA.3903-05.

[4] At the preliminary injunction evidentiary hearing ("Evidentiary Hearing"), Milum attempted to deny that she removed the Butt and Fart Books at least in part because she was so directed by Moss, but after reviewing her contemporaneous notes of the meeting—"an accurate reflection of the conversation"—she agreed she had been so instructed. ROA.3936:5-12, 1409. She also agreed that "Cunningham also directed [her] to remove the books." ROA.3937:1-3.

illustrations of a naked toddler. ROA.3940:13-19, 3941:9-15, 3963:5-8.

Defendants also removed *It's Perfectly Normal* by Robie Harris, an illustrated

children's health book that helps readers understand puberty and discusses ways to

stay safe on the internet. ROA.3898:10-24, 3899:13-20, 3945:3-11, 4219:5-10.

Wells thanked Moss for "making [Milum] remove [*It's Perfectly Normal*] because

of its 'disgusting' photos." ROA.1540-41.

### 3. Defendants Target Books about Race, Gender, and Sexuality that Defendant Wallace Identified

On October 25, 2021, Texas State Representative Matt Krause published a

16-page list of allegedly "objectionable" books about race, politics, sexuality, and

gender identity (the "Krause List"). ROA.1505-23. Wells and her associates agreed

by email to review a "couple of pages each" of the "16 pages of [Krause List]

books" to see if any of the titles were available in the Library System. ROA.1525-

26. The resulting table of Krause List titles available in the Library System,

referred to below as the "Wallace List," was "the list of books that Bonnie Wallace

thought were inappropriate and should be removed from the Llano County Library

System."[5] ROA.3509-10, 3942:13-21, 3951:6-9, 3959:15-25.[6] Milum's "boss"

---

[5] The books on the Wallace List included *Caste*; *They Called Themselves the K.K.K.*; *Spinning*; *Being Jazz*; *Shine*; *Gabi, a Girl in Pieces*; and *Freakboy*. ROA.1527.

[6] Subsequently, in an email thread including Moss, Wells reported that Moss and Cunningham had "instructed [Milum] to … remove certain books," including *Lawn Boy*, *Gender Queer*, and "the Butt Book," and she thanked Moss "for [his]

Cunningham sent her the Wallace List on November 10, 2021, forwarding an email describing the books on the list as "pornographic filth." ROA.1502-04, 3509-10, 3960:1-9, 3966:21-3967:6. Milum testified: "When I received [the Wallace List], we went and pulled all of those books." ROA.3510, 3952:8-9.

On October 28, 2021, Milum emailed Cunningham about the book *How to Be an Antiracist* by Ibram X. Kendi, which she referred to as the "[c]ritical race theory book," and which Milum noted she and Cunningham had previously discussed. ROA.1524, 3948:2-21. Milum explained that she "wanted to let [Cunningham] know before it came up in any of [his] meetings" that, although the book was still in the system, it was now hidden behind the front desk and was "no longer on the shelf." ROA.1524.

By the end of 2021, Defendants had removed the remaining Banned Books—all of which were on the Wallace List—from the Llano library, in addition to the Butt and Fart Books, *In the Night Kitchen,* and *It's Perfectly Normal.* ROA.3510, 3933:23-3934:2, 3945:3-5, 3951:6-3954:25, 3962:23-3963:3.

---

help in this situation and all [he had] done to remedy it!" ROA.1525-26, 4088:10-19. Wells then reported that the work of ascertaining which of the "CRT and LGBTQ book[s]" were in the Library System had been completed. Their next steps were to "research the content of the ones [they had] found," along with related other titles and to send a list "of the ones that are found to be inappropriate, along with a summary, to Commissioner Moss." ROA.1525-26.

Defendants admitted that the reason that these "CRT and LGBTQ" books were "selected for weeding" was because they were on the Wallace List. ROA.3510, 3952:3-10, 3952:24-3953:3, 3954, 3964. Milum also admitted that no books other than those on the Wallace List were selected for "weeding" at that time. ROA.3954:2-7.

### 4.    Defendants Do Not Follow Routine Weeding Procedure in Removing the 17 Books

After this litigation was initiated, Defendants asserted that Milum had removed the 17 Banned Books from circulation as a matter of routine curation of the library's inventory pursuant to library policies (a process called "weeding"), rather than in response to directives from her superiors. None of the removed books, however, qualified for weeding under the Library System's general weeding practices.

The Llano Library System uses the Texas Library Association's "CREW" method to determine which books to weed from the library catalog.[7] ROA.1543-1610, 3883:12-15, 3888:6-15. The CREW method uses an acronym, MUSTIE, to indicate when an item should be removed from the collection. ROA.1544. MUSTIE stands for: "**M**isleading and/or factually inaccurate," "**U**gly (worn out beyond mending or rebinding)," "**S**uperseded by a new edition or a better source,"

---

[7] CREW stands for "Continuous Review, Evaluation and Weeding." ROA.1544.

"**T**rivial (of no discernable literary or scientific merit), "**I**rrelevant to the needs and interests of the community," and "**E**lsewhere (the material may be easily borrowed from another source)." ROA.1544. Weeding decisions "are based on some combination of these criteria—that is, an item will probably not be discarded based on meeting only one of [the MUSTIE] criteria." ROA.1544. Historically, the Library System would not consider a book for weeding unless it met two or three MUSTIE criteria. ROA.3891:17-21, 4204:2-5.

All but one of the 17 books at issue were weeded contrary to Library System policies and practices. ROA.3903:15-3904:3, 3905:7-3908:16, 3910:1-3911:8, 3911:16-3912:19, 3913:12-3914:14, 3915:5-18. None of the Banned Books met more than one MUSTIE criterion, and most of them met none. ROA.1660-65, 3912:14-19, 3913:20-25.

The 17 books were treated differently than other books in the library. The District Court did not credit Milum's testimony to the contrary, which was inconsistent, contradictory, and implausible. ROA.4176:3-11, 4178:6-13, 4180:22-4181:5, 4181:18-25, 4183:5-15, 4184:2-8, 4184:17-24. Milum asserted that the CREW Manual permits the removal of books that have not circulated in "3-5 years," ROA.1586, for example, but could not explain why hundreds of other books not checked out for decades were currently still on library shelves. ROA.3527, *compare* ROA.1660-65, *with* ROA.1779-90, *see also, e.g.*,

ROA.4206:21-25, 4215:4-7. Milum also explained that the Commissioners Court had indefinitely suspended all new purchases a month prior to her November removal of the Wallace List books. ROA.4199:25-4200:5.

When asked to explain the removal of *Caste*, which had been checked out multiple times during the ten months it was in the Library System, Milum suggested that "it was possibly put in a different stack when we were looking through all these other books because it was new." ROA.3961:6-9. Milum did not explain how that kind of error would have resulted in *Caste's* permanent removal from the digital catalogue or why Milum did not return the book to the Library System upon realizing her mistake.

Milum testified that she weeded *In the Night Kitchen* because it "was old and worn" and therefore Ugly. ROA.3963:24-25. But the weeded copy of *In the Night Kitchen* was introduced into evidence at the Evidentiary Hearing and was "in excellent condition" and lacked "any tears or stains or any damage." ROA.1821-69, 4120:11-4121:7.

### 5. Defendants Attempt to Moot the Case by Having Their Lawyer Buy and Donate Copies of the Banned Books

In July 2022, three months after this action was filed and shortly before Defendants' opposition to the preliminary injunction motion was due, ROA.648, Defendants' lawyer Jonathan Mitchell "anonymously" donated new copies of

certain Banned Books to Defendants.[8] ROA.4161. Defendants kept the donated books in a non-public room at the Llano library, to be produced for check-out only on a patron's direct request. ROA.3924:12-3925:5, 3926:15-3927:1, 4155:10-18. Defendants called this hidden library the "in-house checkout program." ROA.720-21, 3986:7-9, 3987:1-9, 4261:10-13.

Defendants did not inform library patrons about these hidden books. ROA.3989. They were not listed in the Library System catalog or advertised on any library bulletin board or on physical signs, and no announcement of their renewed availability appeared in the library newsletter or on social media. ROA.3924:23-3925:3, 3925:19-24, 3925:25-3926:2, 3984:16-3985:1, 3985:2-4, 3986:3-6, 3988:8-3989:16, 4123.[9] The books' appearance was distinct because they did not have a barcode, spine label, or genre label. ROA.3925:6-13. Plaintiffs only learned these hidden books were "available" because "of the lawsuit." ROA.3926:6-11, 3991:19-25, 4121:12-18.

---

[8] Mr. Mitchell attempted to suppress testimony that he had donated the books after this action was filed by asserting that his donation of the books was "privileged." The District Court rejected this theory, and Defendants were forced to reveal that Mr. Mitchell was the donor. ROA.4161.

[9] The Library System's standard practice is to publicize all newly acquired titles in its newsletter. ROA.3985:12-14.

## C.    Procedural History

Plaintiffs filed their Complaint in April 2022. ROA.39-69. They filed the motion for preliminary injunction in May 2022, and it was fully briefed by July 2022. ROA.187, 805, 981, 998. In June 2022, Defendants moved to dismiss. ROA.609, 686, 723.

On October 28 and 31, the District Court held the Evidentiary Hearing on the preliminary injunction motion. ROA.25-26. The parties called seven witnesses and introduced thirty-two documents for nine hours of testimony. ROA.25-26, 1009. The parties then submitted post-hearing briefing on the requested injunction. ROA.1884, 2448, 2390 3149.

## D.    The District Court's Decision

On March 30, 2023, the District Court issued a 26-page order denying Defendants' motion to dismiss and granting Plaintiffs' motion for a preliminary injunction. ROA.3507-32.

In denying the motion to dismiss, the District Court held Defendants' book removal "infringe[s] on [Plaintiffs'] right to access information" and constitutes a "continuing, present adverse effect" for Article III purposes. ROA.3516. It found that Defendants did not moot Plaintiffs' lawsuit by creating an "in-house checkout system" in which the Banned Books were "hidden from view and absent from the catalog." ROA.3518. The District Court called this "precisely the type of posturing

the voluntary cessation exception [to mootness claims] is meant to prevent."[10]
ROA.3518.

The District Court also held that Plaintiffs have a "First Amendment right to
receive information" that prohibited Defendants from removing books "simply
because they dislike the ideas contained in [them]." ROA.3519 (quoting *Campbell*,
64 F.3d at 189) (internal quotations omitted). The "key inquiry," the court held, "is
whether the governments' 'substantial motivation' was to deny library users access
to ideas with which [it] disagreed." ROA.3520 (quoting *Campbell*, 64 F.3d at 190).
The Court also held that *United States v. American Library Association, Inc.*, 539
U.S. 194 (2003) and *Chiras v. Miller,* 432 F.3d 606 (5th Cir. 2005)—the primary
cases Defendants rely on—discuss "the initial selection, not removal, of materials,"
and so do not supplant this Court's binding precedent in *Campbell*.[11] ROA.3520.

The District Court also made extensive factual findings. After reviewing
many rounds of briefing, countless declarations and exhibits, and several days of
testimony, it found that Defendants had "targeted and removed books, including
well-regarded, prize-winning books, based on complaints that the books were

---

[10] The District Court did dismiss, without prejudice, Plaintiffs' claims related to
Defendants' elimination of the Library System online book database, called
"OverDrive." ROA.3517-18. That was because, in May 2022, Defendants switched
to a new online book database—Bibliotheca. ROA.3517.
[11] As Defendants note in their Opening Brief ("OB"), the Complaint also asserted a
due process claim that is not at issue in this appeal. OB5.

inappropriate." ROA.3524. It also found that Defendants' removal decisions were

content-based and subject to heightened scrutiny—a standard Defendants' "post-

hoc … pretextual" justification did not meet. ROA.3526. Based on the evidence,

the court found that there was "no real question" that Defendants' conduct

amounted to content discrimination, and that it was "substantially likely" that the

removals "d[id] not further any substantial governmental interest—much less any

compelling one." ROA.3526-28. The court further held that the "loss of First

Amendment freedoms for even minimal periods of time constitutes irreparable

injury," and that Defendants' hidden "in-house checkout system" failed to mitigate

that harm. ROA.3528-29 (citing *Texans for Free Enter. v. Texas Ethics Comm'n*,

732 F.3d 535, 539 (5th Cir. 2013)). The balance of equities favored Plaintiffs for

the same reasons. ROA.3529-30.

 The District Court additionally found that Mr. Mitchell had donated the

Banned Books to advance his clients' litigation position, not as "a neutral

benefactor with the intent of making them available to library patrons." ROA.3518.

It found that the system was "an obvious and intentional effor[t] by Defendants to

make it difficult if not impossible to access the materials Plaintiffs seek."

ROA.3529.

To remedy these First Amendment violations, the District Court ordered that "the books at issue be made available for checkout through the Library System's catalogs" during the pendency of this case. ROA.3530.

## SUMMARY OF THE ARGUMENT

In *Campbell v. St. Tammany Parish School Board*, this Court held that government officials violate the First Amendment right to receive information when their "substantial motivation" in removing library books is a desire to deny access to the ideas in those books. 64 F.3d at 188-91. The District Court below found that Llano County officials acted with precisely such a motivation in this case. ROA.3525-29. That should be the end of the Court's inquiry.

Defendants' arguments to the contrary are inapposite. First, Defendants portray this as a case about routine "weeding" decisions. OB1-2, 7-15, 34-38, 42-44. But the District Court rejected this justification as a pretext after an evidentiary hearing, finding that "Plaintiffs have offered sufficient evidence to suggest this post-hoc justification is pretextual," and noting that contemporaneous evidence provided no support for the "weeding" defense. ROA.3526-27. Defendants cannot show that the District Court's finding was clear error. Rather, Defendants simply urge this Court to ignore the District Court's credibility determinations in favor of their own. ROA.3526-28.

Second, Defendants suggest that this Court should ignore its own controlling precedent in *Campbell* and instead apply out-of-context language and dicta from cases regarding government decisions about what textbooks belong in schools or what internet sites should be made available in libraries. OB25-34. Defendants provide no reason for the Court to set aside binding precedent directly dealing with library book removals and instead apply dicta from cases with little or no contextual relevance. Nor is Defendants' prediction of a deluge of challenges to mundane library operations persuasive; no such deluge has materialized in the twenty-eight years since *Campbell* was decided and it is unlikely to appear now.[12]

Finally, Defendants argue that Plaintiffs' First Amendment injury vanished when, months after litigation began, Defendants established a hidden library which secretly contained the Banned Books. OB20-24. Once again, Defendants ignore the requirement that they show clear error, this time in the District Court's finding that the hidden library did not "mitigate the constitutional harm Plaintiffs are suffering." ROA.3518, 3528-29. Moreover, the voluntary cessation doctrine readily disposes of Defendants' "standing" argument, which is actually one of mootness. As the District Court held, litigation counsel's creation of a partial

---

[12] Nor have North Texas libraries been paralyzed since the decision in *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530 (N.D. Tex. 2000), which blocked a book removal on virtually identical legal grounds to those cited by the District Court here.

hidden library for the Plaintiffs alone was litigation posturing and did not moot Plaintiffs' First Amendment claim. ROA.3518, 3529.

Ultimately, this case simply requires a straightforward application of binding precedent to the District Court's well-supported factual findings. Fidelity to the Court's already-established rule ensures that library staff remain free to operate according to professional standards without interference by elected officials. Under the alternative suggested by Defendants, where government officials could remove books for any reason no matter how partisan, the robust marketplace of ideas embodied in public libraries would disappear. This Court should decline Defendants' invitation to authorize such a result.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The District Court correctly determined that Plaintiffs are likely to succeed on the merits. *Campbell* precludes the government from selectively removing books it disagrees with, and the extensive evidentiary record shows that Defendants impermissibly targeted and removed 17 books based on their viewpoint and content.

In their Opening Brief, Defendants do not contend that the District Court's factual findings that they removed the Banned Books based on their viewpoint and content and subsequently offered a pretextual explanation for that removal were

clearly erroneous. They simply recite evidence that they believe is favorable to them, which almost exclusively consists of their own litigation testimony. This fails to carry their burden on appeal.

Defendants' legal argument fares no better. They argue that the government can remove any books it disagrees with, OB29, but also acknowledge, inconsistently, that libraries cannot remove books "in a narrowly partisan or political manner," OB28, which the District Court found Defendants did here. And the case Defendants rely on most extensively—*Chiras*—is all but irrelevant here: It specifically distinguishes itself from *Campbell* both because it involves selection rather than removal of books, and because it concerns the role of textbooks in schools, where, unlike public libraries, the government has broad discretion to direct educational policy.

### A.     The First Amendment Prohibits Removal of Library Books Based on Viewpoint or Content-Based Discrimination

The First Amendment limits the government's discretion to remove books from public libraries in two ways. First, it prohibits viewpoint discrimination— when the government censors speech because its "subjective judgment" is that the ideas it expresses are "offensive or inappropriate." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019). That this "egregious form of content discrimination" violates the First Amendment is "axiomatic." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995) ("When the government targets not

subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.").

Second, even where government censorship does not amount to viewpoint discrimination, it is still "presumptively unconstitutional" if it is "content-based" and not "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). A restriction is "content-based" if it "target[s] speech based on its communicative content," whether that content is "the topic discussed or the idea or message expressed." *Id*. A restriction that is "content based on its face"—as "Defendants acknowledged" their censorship was here, ROA.3526—"is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165.

Here, the District Court found that Defendants violated both standards: Their "substantial motivations" in removing the Banned Books were to suppress views they found "inappropriate," ROA.3523, 3525, and their "content-based restrictions" on those books did not satisfy heightened constitutional review, ROA.3526-28. Defendants cannot show that either finding was a clear error because the evidence supporting both findings is overwhelming.

### 1.    *Campbell* Prohibits Viewpoint Based Discrimination in Library Book Removal

Both the Supreme Court and this Court have held that the First Amendment's prohibition on viewpoint discrimination extends to book removal in public school libraries. In *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, a public school board obtained a list of books it found "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy," and directed that they be removed from school libraries. 457 U.S. 853 (1982). In a plurality opinion, the Supreme Court recognized the well-established principle that "[t]he Constitution protects the right to receive information and ideas," and held that the government violates that right when it removes books "to deny … access to ideas with which [it] disagree[s]."[13] *Id.* at 871. "If there is any fixed star in our constitutional constellation," the Supreme Court observed, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* at 870.

A decade later, this Court applied *Pico* in *Campbell*, which also involved book removal in public school libraries. In *Campbell*, a local school board, at a parent's urging, ordered the removal of a book that traced the development of

---

[13] Defendants do not challenge the existence of a "right to receive information," which in any case is well established. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

---

African tribal religion. 64 F.3d at 185. Following *Pico*, *Campbell* held that the First Amendment limits the discretion of government officials to remove books from public school libraries. *Id.* at 189. The "key inquiry," it held, is "the school officials' substantial motivation in arriving at the removal decision." *Id.* at 190. If a book is removed to "deny students access to ideas with which … school officials disagree[], and this intent was the decisive factor in the removal decision," then the removal is unconstitutional. *Id.* at 188 (emphasis omitted).[14]

Applying this standard, the District Court held that Defendants violate the First Amendment "right to receive information" when they "remov[e] books" simply because "'they dislike the ideas contained in [them].'" ROA.3519 (quoting *Campbell*, 64 F.3d at 189), ROA.3523 (quoting *Sund*, 121 F. Supp. 2d at 547). The "'key inquiry in a book removal case,'" the court recognized, "is whether the

---

[14] Other courts—both inside and outside the Fifth Circuit—have applied this standard in book removal contexts. *See, e.g.*, *Sund* 121 F. Supp. 2d at 533-34 (granting preliminary injunction where pro-LGBTQ books were moved from children's section to adult section of library); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1001 (W.D. Ark. 2003) (granting summary judgment where school moved *Harry Potter* books from shelves to location behind the staff counter); *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 875 (D. Kan. 1995) ("If the decisive factor behind the removal of Annie on My Mind was the school board members' personal disapproval of the ideas contained in the book, then under *Pico* the removal was unconstitutional."); *Delcarpio v. St. Tammany Par.*, No. 2:93-cv-00531-PEC, 1993 WL 432360, at *1 (E.D. La. Oct. 20, 1993) (denying summary judgment due to "a genuine issue of fact as to whether the motives or intent of the majority of those School Board members voting to remove the book were constitutionally invalid" under *Pico*).

---

government's 'substantial motivation' was to deny library users access to ideas with which [it] disagreed.'" ROA.3520 (quoting *Campbell*, 64 F.3d at 190).[15]

As discussed below, the court found that Plaintiffs made "a clear showing" that Defendants' "substantial motivations" in removing the Banned Books were to suppress views they found "inappropriate." ROA.3523, 3525 (quoting *Robinson*, 921 F.3d at 447). The evidence supporting that finding is overwhelming.

### 2. Content-Based Discrimination is Unconstitutional Unless it is Narrowly Tailored to Achieve a Compelling Government Interest

A limited public forum is created when the government has voluntarily "opened for use by the public…a place for expressive activity." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). Once Llano County voluntarily opened the Library System for residents to use, it became "bound by the same standards [that] apply in a traditional public forum." *Id.* at 46. Applying these principles, the District Court found that, even aside from *Campbell*, Defendants' book removal decisions "clearly" constituted "content-based

---

[15] Defendants do not argue here, as they did below, that *Pico* and *Campbell* are distinguishable because they dealt with school rather than public libraries. *See* ROA.616. And for good reason. *Chiras*—the primary case Defendants rely on—concerns book selection at a public-school library. More importantly, as the District Court also recognized, the reasoning in *Pico* and *Campbell* has "even greater force when applied to public libraries" because First Amendment protections on school campuses are limited by the broad discretion school officials have to fulfill their "unique inculcative function." ROA.3521 (quoting *Sund*, 121 F. Supp. 2d at 548).

---

restrictions" on protected speech and therefore were subject to heightened

constitutional scrutiny. ROA.3526-27; *see Reed*, 576 U.S. at 163 ("Content-based

laws…are presumptively unconstitutional and may be justified only if the

government proves that they are narrowly tailored to serve compelling state

interests.").

Again, overwhelming evidence supports this finding. And Defendants

cannot point to any evidence demonstrating that their actions were narrowly

tailored to serve a compelling state interest—indeed, they do not even try.

**B.    The District Court's Factual Finding that Defendants' Removal of the Disputed Books Was Based on Viewpoint and Content Discrimination Was Not Clear Error**

After reviewing the substantial witness testimony, documentary evidence,

and legal argument below, the District Court found that "Defendants' decisions

were likely motivated by a desire to limit access to the viewpoints to which

Wallace and Wells objected," including views on LGBTQ and racial equity.

ROA.3525. It further found that "there is no real question that [Milum's] targeted

review [of the Banned Books] was directly prompted by complaints from patrons

and county officials over the content of these titles." ROA.3527.

Defendants disregard the District Court's detailed findings, and selectively

cite out-of-context record excerpts and Defendants' declarations (including

materials that Defendants did not place before the District Court) to claim that

"undisputed evidence" supports their version of the facts. OB7-12. But Defendants bear the burden of showing on the full record that the District Court's findings of fact were clearly erroneous. *See Hopwood v. State of Texas*, 236 F.3d 256, 272-73 (5th Cir. 2000) ("To be clearly erroneous, a decision … must be dead wrong.") That bar is high—this Court's review of factual determinations "is deferential," *Bluefield Water Association, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009), and such deference "is even greater" for any "determinations of credibility" that are necessary to resolve conflicting testimony. *Kristensen v. United States*, 993 F.3d 363, 367 (5th Cir. 2021). Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

Defendants have not met their burden to show that the District Court clearly erred in finding that "Defendants' contemporaneous communications, as well as testimony at the hearing, amply show," ROA.3527, that "Defendants targeted and removed books, including well-regarded, prize-winning books, based on complaints that the books were inappropriate." ROA.3524. On the contrary, the District Court's findings were supported by overwhelming evidence.

First, the District Court found that, "[a]lthough several commissioners and librarians stated that they saw no problem with the [Butt and Fart] books,

Defendants Moss and Cunningham contacted Milum to instruct her to remove the books from the shelves." ROA.3509 (comparing Log, ROA.911 (describing commissioners saying they did not see a problem with the books) and Email, ROA.908 (same), with Cunningham Email, ROA.891-92 (instructing Milum to remove the books from the shelves), Mt'g Logs, ROA.893, 909 (noting complaints and stating that Moss told Milum to "pick [her] battles.")).

Second, as to the LGBTQ and racial equity books, the District Court found that, "[i]n Fall 2021, Wallace, Schneider, and Wells, as part of their community group, contacted Cunningham to complain about certain books that were in the children's sections or otherwise highly visible, labeling them 'pornographic filth.'" ROA.3509 (citing Wallace Email, ROA.350-51). It found that, "[o]n November 10, 2021, Wallace provided Cunningham with lists, including a list of 'dozens' that could be found in the library." ROA.3509 (citing Wallace Email, ROA.350-51, 357) "The books labeled 'pornographic' included books promoting acceptance of LGBTQ views," ROA.3509 (citing *e.g.*, Wallace List, ROA.357), and "books about 'critical race theory' and related racial themes," ROA.3510 (citing ROA.357), or as "Defendants refer to them, 'CRT and LGBTQ' books" ROA.3510 (citing Wells Emails, ROA.353-54 (planning a list of "CRT and LGBTQ book[s]" to remove)). "In the email, Wallace advocated for the books to be relocated to the adult section because '[i]t is the only way that [she] could think of to prohibit

future censorship of books [she does] agree with.'" ROA.3510 (alternations in original) (citing Wallace Email, ROA.350-51). "Milum then ordered the librarians to pull books from an edited version of Wallace's list from the shelves." ROA.3510 (citing Baker Decl., ROA.216). "On November 12, 2021, Defendants removed several books on the Bonnie Wallace Spreadsheet from the Llano Library Branch shelves, including, for example, *Caste: The Origins of Our Discontents*, *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, *Being Jazz: My Life as a (Transgender) Teen*, and *Spinning*." ROA.3510 (citing ROA.342-347).

Third, regarding *In the Night Kitchen* and *It's Perfectly Normal*, "Cunningham and Moss ordered Milum, '[a]s action items to be done immediately,' to pull books that contained 'sexual activity or questionable nudity' from the shelves … ." ROA.3510 (citing Cunningham Emails, ROA.349, 388). "Milum informed Moss and Cunningham she would pull the books, as well as books found in Wallace's lists." ROA.3510 (citing ROA.349, 388, 3974:6-9).

The District Court further found compelling that Milum "testified that the books she pulled were books that Wallace, Wells, or the Commissioners [Cunningham and Moss] identified as 'inappropriate.'" ROA.3525. It also credited Wells's testimony that "if there was any book that [in her opinion] was harmful to minors that was in the library, I would speak with the director, [Milum] to have it

removed." ROA.3527, 4075:9-14. If Milum disagreed with her assessment—as with the Butt and Fart Books—Wells would speak to County officials Moss and/or Cunningham to have them removed. ROA.4075:15-76:12. Milum and Wells were not alone. Defendants openly described the types of books whose content or viewpoints they found offensive or inappropriate and therefore removed from the library. *See, e.g.*, ROA.3899:2-9, 4067:8-10, 1540-41.

As the District Court found, "[t]he short amount of time between the complaints, commissioners' actions, and Mil[um]'s removal strongly suggests that the actions were in response to each other." ROA.3525.

Defendants do not challenge the evidence showing that Cunningham and Moss instructed Milum to pull the Banned Books from circulation. *See* OB9-10. Instead, they ask the Court to interpret Judge Cunningham and Commissioner Moss's instructions as mere suggestions—even though both individuals had supervisory authority over Milum. *See* ROA.669 (Milum Decl.) ("I report to the Llano County Judge."), ROA.3929 (Milum testimony affirming Moss as her employer); ROA.679 (Cunningham Decl.) ("Milum[] reports to me and the Llano County Commissioners.").

Defendants' own statements are thus more than sufficient to support the District Court's factual determinations that Cunningham and Moss's contemporaneous communications to Milum—including express requests to

remove books and implicit orders that "[she] should take them out of the system," ROA.3936:9-12, *see* ROA.3509—constituted instructions. There is no clear error here.

### C.    Defendants Do Not Present Compelling Arguments for Either Overturning *Campbell* or Rejecting the District Court's Factual Findings

Defendants attempt to frame their content and viewpoint discrimination as merely constitutionally permissible weeding. OB25-34. But the District Court rejected Defendants' narrative as a "pretextual" and "post-hoc justification" for their discriminatory conduct. ROA.3526. The court identified extensive direct and circumstantial evidence refuting Defendants' claim, and Defendants point to no clear error in its findings.

Faced with this powerful factual record, Defendants pivot to assert that the District Court created a categorical rule prohibiting librarians from making any decisions about what goes onto library shelves. The court did no such thing.

Following *Pico* and *Campbell*, the District Court only held (1) that government officials cannot "remov[e] books from school library shelves 'simply because they dislike the ideas contained in [them]," and (2) that, because Defendants "substantial motivation" in removing the Banned Books "was to deny library users access to ideas with which [they] disagreed," Plaintiffs were likely to succeed on their First Amendment claim. ROA.3519-20 (citations omitted).

Defendants attempt to undermine this decision by arguing that *Pico* and *Campbell* have been implicitly overruled by *Chiras*. But *Chiras* acknowledges that *Pico* (and, thereby, *Campbell*) involves the removal, not the selection, of library books. More to the point, *Chiras*—a case holding that the government has discretion to select textbooks in public schools—is irrelevant to the issue in this case, because this dispute does not implicate the government's interest in determining school curriculum.

Defendants' arguments are also divorced from the facts of this case. Even the authorities Defendants cite would not permit them to do what they did here— i.e., target specific books for negative treatment based on their message. *See Chiras*, 432 F.3d at 620 (acknowledging that, under *Pico*, book removals "motivated by 'narrowly partisan or political' considerations" are unconstitutional). Whatever validity Defendants' arguments about forum analysis and content-based decision-making may have in theory, they are entirely divorced from the facts of this case and the District Court's finding that Defendants "remov[ed] books from … library shelves 'simply because they dislike the ideas contained in [them]." *Campbell*, 64 F.3d at 188. In light of the District Court's factual findings, Plaintiffs are likely to prevail, even under Defendants' legal construct.

**1.    Defendants Fail to Show that the District Court's Findings of Discrimination and Pretext Were Clearly Erroneous**

Defendants spend many pages constructing an alternate narrative in which Milum weeded the Banned Books pursuant to normal library policy on her own initiative. OB7-12. But the District Court rejected this story for reasons that are obvious from the record.

Citing extensive evidence, the District Court found Defendants' claim of routine weeding to be a "pretextual" and "post-hoc justification" for their discriminatory conduct. ROA.3526. It found that Defendants instructed Milum to remove the Banned Books, and that their motivation for doing so, and her motivation for so doing, bypassed permissible "cull[ing] and curat[ing]," ROA.3527, and crossed into prohibited viewpoint and content-based discrimination. ROA.3523-28 ("[E]ach of the books in question were slated for review (and ultimately removal) precisely because certain patrons and county officials complained that their contents were objectionable.").

This Court's question on review, then, is not whether Plaintiffs made "a 'clear showing' that Amber Milum engaged in 'viewpoint discrimination' or 'content discrimination' when weeding the disputed books," OB34, but whether Defendants have shown the District Court clearly erred in finding that they "targeted and removed books, including well-regarded, prize-winning books, based on complaints that the books were inappropriate." ROA.3524. The expansive

record evidence set forth *supra* § I.B shows that the District Court did not err, and Defendants' post-hoc declarations and testimony—on which they exclusively rely—provides no credible evidence to the contrary.

First, Milum's testimony was riddled with contradictory and implausible statements. ROA.4176:3-11, 4178:4-13, 4180:22-4181:5, 4181:18-25, 4183:5-15, 4184:2-8, 4184:17-24. She offered no explanation for the fact that hundreds of books which had not been checked out for ***decades*** remained in the Library System, while the books at issue—all of which had been checked out much more recently—were "weeded" shortly after being referred to as pornographic filth by Wallace. ROA.3527, *compare* ROA.1660-65, *with* ROA.1779-90, *see also, e.g.*, ROA.4206:21-25, 4215:4-7. Nor did Milum explain why *Caste*, which she testified "was possibly" weeded by mistake, ROA.3961:6-9, remained absent from the library catalogue until the District Court ordered her to replace it.

The District Court also considered physical evidence that flatly contradicted Milum's testimony that she weeded *In the Night Kitchen* because it "was old and worn" and therefore Ugly, ROA.3963:24-25. The weeded copy of *In the Night Kitchen* was introduced into evidence at the Evidentiary Hearing and found to be "in excellent condition" and lacking "any tears or stains or any damage." ROA.1821-69, 4120:11-21:7. And Milum admitted that there was no need to make space for new books in November 2021 because the Commissioners Court had

suspended all new purchases a month before she removed the Wallace List books from the library. ROA.4199:25-200:10.

The District Court also credited Milum's live admission that "the books that she pulled were books that Wallace, Wells, or the Commissioners identified as 'inappropriate'" ROA.3525, over her prepared declarations to the contrary. The District Court was entitled to credit this live testimony, subject to cross-examination, over the declarations written by Milum's lawyer who was, himself, a participant in the underlying book banning. *See* 11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 2949 (3d ed. 2023) ("When the outcome of a Rule 65(a) application depends on resolving a factual conflict by assessing the credibility of opposing witnesses, it seems desirable to require that the determination be made on the basis of their demeanor during direct and cross-examination, rather than on the respective plausibility of their affidavits."). As the District Court witnessed Milum's testimony in person, its determination here is afforded significant deference. *Galena Oaks Corp. v. Scofield*, 218 F.2d 217, 219 (5th Cir. 1954) ("The burden [on appellants to show clear error] is especially strong when the trial court has had the opportunity, not possessed by the appellate court, to see and hear the witnesses, to observe their demeanor on the stand, and thereby the better to judge of their credibility.").

Last, the District Court underscored the additional direct and circumstantial evidence showing Defendants' personal dislike of the Banned Books, including that the Banned Books did not meet the standards for weeding but were removed anyway.[16] ROA.3524-27.

The District Court did not err in crediting the Defendants' contemporaneous records and live cross-examination testimony over their proffered evidence. Both below and on appeal, Defendants present only their own prepared litigation testimony to support their pretextual explanation. OB7-15 nn.14-33, 35-40 (citing only sworn declarations and hearing testimony on direct questioning from Defendants Milum, Cunningham, and Moss to support Defendants' alternate narrative of the events at issue). This does not meet their burden of demonstrating clear error. The District Court had ample evidence to support its conclusions, find Defendants' factual allegations not credible, and find that Milum acted to enforce Defendants' unconstitutional discrimination against books they personally disliked.

---

[16] Milum even testified that she found the Butt and Fart Books that the Commissioners ordered removed to be appropriate for the Llano Library, based on positive reviews, and "thought they would be funny." She never changed her mind that "they were appropriate for the [targeted] age range." *See* ROA.3929:24-30:23, 3934:3-8.

**2.     Defendants Arguments Are Inconsistent With Fifth Circuit Precedent and Do Not Establish That Viewpoint or Content Discrimination Is Permissible in Library Book Removal Decisions**

Defendants next urge the Court to ignore *Pico*, overrule *Campbell*, and manufacture novel exceptions to traditional First Amendment principles. OB25-34. Their arguments and the cases they cite offer no support for such extreme outcomes.

**a.     Defendants' Attacks on *Pico* and *Campbell* Are Meritless**

Defendants argue that *Pico* and *Campbell* do not "prohibit content or viewpoint discrimination in a public library's weeding decisions" because (1) *Pico* "acknowledges" that "content discrimination is permissible in library book selection," OB27, and (2) *Pico* and *Campbell* both "allow[] libraries to remove books based on content that is 'pervasively vulgar' or that lacks 'educational suitability.'" OB27 (quoting *Pico*, 457 U.S. at 871), 27-28 (quoting *Campbell*, 64 F.3d at 188-89). Not so.

Defendants' first argument is a non sequitur twice over. As discussed *infra* § I.C.2.b.1, even if the government is constitutionally permitted to discriminate against unpopular viewpoints when acquiring books, it does not follow that it can do the same when removing them. Even setting that aside, that a local school board has "significant discretion to determine" which books to place on its library

shelves, as *Pico* observed, OB27 (quoting *Pico*, 457 U.S. at 870), does not mean that it has "*unfettered* discretion" to discriminate against *viewpoints* it dislikes. *Pico*, 457 U.S. at 869. Indeed, *Pico*'s purpose in highlighting the school board's discretion is to explain how the First Amendment *limits* it: "[R]emoval decision[s]" that are intended to "deny … access to ideas with which [the school board] disagree[s]" are a "violation of the Constitution." *Id.* at 871. Allowing viewpoint discrimination, as Defendants urge here, would permit a "Democratic school board, motivated by party affiliation" to "order[] the removal of all books written by or in favor of Republicans," or "an all-white school board, motivated by racial animus" to "remove all books authored by blacks or advocating racial equality and integration." *Id.* at 870-71. "[F]ew would doubt" that this regime would "violate[] the constitutional rights" of library patrons. *Id.*

Defendants' second argument fares no better. School officials can limit books that are "pervasively vulgar" or lack "educational suitability" in school libraries because they have "legitimate … control over pedagogical matters." *Campbell*, 64 F.3d at 188. It does not follow—and no cases hold—that the government has the same broad discretion in *public* libraries, which, unlike schools, are "designed for freewheeling inquiry." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting). And even the Constitution's tailored limitations on students' First

Amendment rights does not mean that school officials may eradicate *any* books they disagree with. *Pico*, 457 U.S. at 869.

In any case, courts have held that protecting minors from obscenity and ensuring educational suitability are compelling government interests, so the two *Pico* exceptions offer nothing to support Defendants' position that heightened scrutiny should not apply to content-based library removal decisions. *See, e.g.*, *Reno v. A.C.L.U.*, 521 U.S. 844, 875 (1997) ("[W]e have repeatedly recognized the governmental interest in protecting children from harmful material."); *Murray v. W. Baton Rouge Par. Sch. Bd.*, 472 F.2d 438, 442 n.2 (5th Cir. 1973) ("The interest of the state in maintaining an educational system is a compelling one.").[17] Nor are those exceptions applicable with the same force in public libraries because "the Government may not 'reduc[e] the adult population … to … only what is fit for children.'" *Reno*, 521 U.S. at 875 (citation omitted).

Finally, Defendants themselves do not dispute that even "school libraries may not weed books 'in a narrowly partisan or political manner.'" OB28 (quoting *Pico*, 457 U.S. at 870); *see also Chiras*, 432 F.3d at 620 (observing that even "Justice Rehnquist was willing to 'cheerfully concede' this principle in his [*Pico*] dissent"). That alone resolves this case, for—as the District Court found after

---

[17] Defendants have never argued that the Banned Books were removed because they met the legal definition of obscenity.

extensive review of the facts—that is precisely what Defendants did here. *See supra* § I.B.

### b.    The Cases Defendants Rely on Do Not Establish That Viewpoint or Content Discrimination Is Permissible

Since *Pico* and *Campbell* prohibit state officials from removing library books simply because those books contain views they disagree with, Defendants urge the Court to apply *American Library* and *Chiras*—two cases that have nothing to do with library book removal—to this case. Defendants' attempt to extend *Chiras*—which provides broad discretion to school boards when purchasing school textbooks—to public library book removals is flatly inconsistent with the First Amendment.

### (1)    The First Amendment treats the selection and the removal of library books differently

In *Chiras*, this Court held that "the selection of textbooks by the state for use in public school classrooms" is not subject to "viewpoint neutrality requirement[s]" because it constitutes "government speech." 432 F.3d at 620. Defendants do not argue that public library removal decisions constitute government speech.[18] Yet, they claim that *Chiras* nonetheless undermines the District Court's holding because it quotes, in dicta, *American Library*'s

---

[18] The District Court rejected this argument. ROA.3520. Defendants have not made it on appeal and have therefore waived it. *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("As a general rule, a party waives any argument that it fails to brief on appeal.").

observations that "[p]ublic library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Chiras*, 432 F.3d at 614 (quoting 539 U.S. at 205). Citing dicta does not make it law.

*Pico* and *Campbell*—cases that deal squarely with First Amendment restrictions on library book removals—provide the relevant precedent. ROA.3520. *American Library* and *Chiras*, which "involve the initial selection, not removal, of materials," do not. ROA.3520 (quoting *American Library*, 539 U.S. at 205 (discussing "a public library's exercise of judgment in *selecting* the material it provides to its patrons") (emphasis added); *Chiras*, 432 F.3d at 620 (discussing "the *selection* of textbooks by the state for use in public school classrooms") (emphasis added)).

Defendants cannot refute this. They claim that "neither *Chiras* nor the plurality opinion in *American Library* makes any distinction between 'selection' and removal decisions." OB26. But that is incorrect. *Chiras* did not apply *Pico* precisely "because *Pico* addressed *the removal of an optional book* from the school library, *not the selection of a textbook* for use in the classroom." *Chiras*, 432 F.3d at 619 (emphasis added). And the fact that the *American Library* plurality does not discuss removal is meaningless. That case concerned a restriction requiring libraries to install blocking software on federally funded internet stations. 539 U.S. at 204-05 (2003) (plurality op.). The Court had no reason to discuss the application

of its rule to peripheral issues like book removal, which, in any case, it had already addressed in *Pico*.

Even though *Chiras* recognizes *Pico*'s (and thus, by extension, *Campbell*'s) application in the book removal context, Defendants insist, citing no authority, that *Chiras* somehow supplants those cases because "any distinction between 'selection' and removal decisions," in their eyes, "makes no sense." OB26. But Defendants are wrong. First, even if there were no distinction between selection and removal, *Chiras* would still be irrelevant here, for the rule *Chiras* established—that "the section of [public school] textbooks" is not subject to "viewpoint neutrality requirement[s]" because it "is government speech"—has no bearing at all on book collections in public libraries. 432 F.3d at 620. Second, as Justice Souter explained in *American Library*, "[t]he difference between choices to keep out and choices to throw out [a library book] is … enormous." 539 U.S. at 242 (Souter, J., dissenting).

Acquisition decisions are "poor candidates for effective judicial review" because of their "sheer volume." *Id.* at 241-42. Removal decisions, by contrast, "tend to be few," so "courts can examine them without facing a deluge." *Id.* at 242. Acquisition decisions are also challenging to review because of the number of "legitimate considerations that may go into [them]." *Id.* at 241. But when a library considers removing a book, it already made the decision to acquire it, so "the

variety of possible reasons that might legitimately support an initial rejection are no longer in play." *Id.* at 242.

This Court reiterated this principle in an analogous context just last year. In *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022), the Court considered the validity of a Texas law that would prohibit social media platforms from removing user content they dislike. The social media companies argued that their editorial discretion to select what content may be made available also permitted them to remove content after it had already been posted. The Court disagreed, stating that there is no authority "even remotely suggesting that *ex post* censorship constitutes editorial discretion akin to *ex ante* selection." *Id.* at 465 (emphasis in original).

In the end, the most important difference between selection and removal is also the most salient here: Courts "can smell a rat … when a library removes books from its shelves for reasons having nothing to do with wear and tear, obsolescence, or lack of demand." 539 U.S. at 241 (Souter, J., dissenting). Because these decisions "so often obviously correlate[] with content," they "tend to show up for just what they are"—unconstitutional viewpoint discrimination. *Id.* at 242.

### (2)     Public Libraries Are a Public Forum Subject to Heightened Scrutiny

Defendants challenge the District Court's finding that libraries are limited public fora to which heightened scrutiny applies, OB29 n.54, and urge the Court to apply a "[r]ational-[b]asis" standard under which, they say, viewpoint and content-

based discrimination is permitted, OB42-43. The Court should decline the

invitation to upend well established First Amendment jurisprudence.

As an initial matter, Defendants do not provide a single case to support their

claim that rational-basis review permits viewpoint discrimination. That is because

it does not. *See Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678

(1992) (explaining that, even on the lowest level of scrutiny, the government may

not "suppress the speaker's activity due to disagreement with the speaker's view").

Thus, Defendants conduct here—which the District Court found clearly targeted

the views in the Banned Books—would be unconstitutional even under the

standard they suggest.

Additionally, "courts have almost uniformly held" that public libraries are

limited public fora to which heightened scrutiny applies, as the District Court

found. ROA.3519; *see, e.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128

(10th Cir. 2012) ("reaffirm[ing]" that libraries are "a type of designated public

forum"); *Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th

Cir. 2003) ("For the purposes of First Amendment analysis, the Library is a limited

public forum."); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d

1242, 1259 (3d Cir. 1992) ("[T]he Library constitutes a limited public forum, a

type of designated public fora.").

Defendants' arguments to the contrary are meritless. First, Defendants assert that dicta from *American Library*'s plurality opinion, which *Chiras* cites in dicta of its own, is "binding on the district court" and "precludes the use of 'forum analysis' when litigants sue public libraries over their collection decisions." OB28-29. Defendants extrapolate from this that "rules against viewpoint discrimination or content discrimination" in public library removal decisions evaporate. OB28.

This chain of reasoning breaks at every link. Most obviously, as the District Court explained, ROA.3525, *Campbell* settled this issue when it held that the First Amendment prohibits viewpoint discrimination in book removal decisions at public school libraries. 64 F.3d at 191. For reasons already discussed *supra* note 15, that decision applies with greater force in non-school public libraries. Defendants' argument therefore cannot be right, for it implies that *Chiras* overruled *Campbell*, violating "this circuit's rule of orderliness, which prohibits one panel from overruling another panel absent intervening *en banc* or Supreme Court decisions" on point. *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017).

In any case, Defendant's claim that the *American Library* dicta *Chiras* quotes was "binding on the district court" is simply false. OB29. When the *American Library* plurality discussed "the discretion that public libraries must have to fulfill their traditional missions," it was, as explained above, talking about "a

public library's exercise of judgment in *selecting* the material it provides to its patrons." 539 U.S. at 205 (emphasis added). That is why the plurality did not grapple with *Pico*, which considered only the removal context. *Chiras* then cited the *American Library* passage when explaining why textbook selection is government speech—a question that has nothing to do with public libraries or book removal. 432 F.3d at 614. The passage *Chiras* quotes is, in short, about as far from "binding precedent" as a line of text can be.

Second, Defendants say that governments engage in content and viewpoint discrimination "all the time" when "allocating government resources." OB29. But the cases they cite—*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015); *Rust v. Sullivan*, 500 U.S. 173 (1991); and *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998)—hardly support such a sweeping principle.

Indeed, the Supreme Court recently rejected this very argument. In *Matal v. Tam*, the Federal Trademark Office refused to register the trademark "THE SLANTS" to an electronic music group. 582 U.S. 218, 228-29 (2017). The trademark office concluded that the name was offensive and that registration would therefore violate 15 U.S.C. § 1052(a), which prohibits trademarks that "disparage … or bring … into contemp[t] or disrepute" any "persons, living or dead." *Id.* at 223. Arguing for the constitutionality of the disparagement clause, the government,

like Defendants here, maintained that the case should be analogized to *Walker*, *Rust*, *Finley*, and other cases where the Supreme Court "has upheld the constitutionality of government programs that subsidized speech expressing a particular viewpoint." *Id.* at 239.

The Court rejected those comparisons. It recognized that the trademark office, much like a public library, provides "valuable non-monetary benefits that are directly traceable to the resources devoted by the federal government[.]" *Id.* at 240-41. It held, however, that because *Rust* (which concerned funds provided to private parties for family planning services) and *Finley* (which concerned cash grants to artists) "involved cash subsidies or their equivalent," they were "not instructive in analyzing the constitutionality of restrictions on speech imposed in connection with [other, non-monetary] services." *Id*. And while *Walker* (which concerned specialty license plates) did not involve cash payments, it held that specialty license plates constitute government speech, which was not true in the trademark context. *Id.* at 238.

For the same reasons, these cases do not support Defendants' claim here. Public libraries are not "*permitted* to engage in content and viewpoint

discrimination" in book removal decisions simply because they "allocat[e] government resources" to run the library, as Defendants claim. OB29.[19]

### c.     Standard Library "Weeding" Does Not Inevitably Lead to First Amendment Violations

Finally, Defendants argue that it is impossible to weed books without engaging in both content and viewpoint discrimination, and warn the Court that, if it affirms, library patrons will be forever condemned to reading outdated editions of their favorite encyclopedias. But things are not so bleak. As the District Court explained, under the *Campbell* standard, "the Llano County Library System has discretion to weed books, using professional criteria, when its 'substantial motivation' is to curate the collection and allow space for new volumes." ROA.3527. So Defendants are free to use the MUSTIE standards they have traditionally used to weed books. What they cannot do is what they did here: remove books simply because they dislike their viewpoints and "desire to prevent access to [them]." ROA.3528.

---

[19] Defendants also argue, in a footnote, that "content discrimination is (for the most part) permissible in a 'limited public forum,' so long as the content discrimination is reasonable and viewpoint neutral." OB29 n.54. Not so. *See Krishna*, 505 U.S. at 678 (explaining that regulation governing a "designated public forum, whether of a limit or unlimited character" must be "narrowly drawn to achieve a compelling state interest"). But the Court need not reach this question, for the District Court's finding that Defendants engaged in viewpoint discrimination was not clearly erroneous.

---

The sky will not fall if the Court applies *Campbell*. Libraries will continue to make space for new books—as they have for the twenty-eight years since *Campbell* was decided—using the constitutional principles they have applied for decades, and even centuries.

## II.    PLAINTIFFS HAVE ASSERTED AN ONGOING FIRST AMENDMENT INJURY

Defendants argue on appeal is that by creating a hidden library of Banned Books after this case was filed, they eliminated Plaintiffs' "standing." OB2–3, 6, 16–17, 19, §§ I.A. & I.B. But this argument is actually one of mootness. *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings."). And it is barred by the rule that a defendant's voluntary cessation of wrongful conduct during litigation does not moot a plaintiff's injury unless defendants can satisfy the "heavy burden" of proving "the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

By any name, Defendants' argument fails. First, the hidden library was unequivocally a product of litigation strategy and cannot prevent a preliminary injunction against the underlying removal of the banned books. ROA.3518. Second, Defendants' central premise—that Plaintiffs are not suffering ongoing

injury sufficient to support a preliminary injunction—is foreclosed by District Court's factual finding that such injury exists despite the hidden library. ROA.3518, 3528-29.

### A. Defendants Cannot Recast Their Mootness Claims as a Standing Argument to Avoid the Voluntary Cessation Doctrine

Defendants cannot avoid review by strategically ceasing the challenged action once litigation is initiated—this is precisely the reason the voluntary cessation doctrine exists. "If that is all it took to moot a case, 'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'" *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190; *see Knox v. SEIU*, 567 U.S. 298, 307 (2012) ("[M]aneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye."). Defendants cannot "evade sanction by predictable protestations of repentance and reform after a lawsuit is filed[.]" *Ctr.*

*for Biological Diversity, Inc. v. BPArn. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (citation omitted).[20]

The District Court correctly found that Defendants' hidden library of banned books was mere litigation "posturing" rather than proof "the controversy is actually extinguished." ROA.3518; *Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). Significantly, the donor of the banned books to the hidden library was Defendants' attorney, who subsequently attempted to use attorney-client privilege to conceal his improper efforts[21] to alter the facts of the case to suit his litigation strategy.[22] ROA.3518. The District Court correctly characterized the argument as one based in mootness before rejecting it. ROA.3518, 3529.

Regardless of whether Defendants call their argument "standing" or mootness, accepting such a position would allow Defendants to engage in broad violations of constitutional rights and then avoid judicial review—not by engaging

---

[20] Such a result would be consistent with a strategy of hamstringing judicial review. *See* Jeannie Suk Gersen, *The Conservative Who Wants to Bring Down the Supreme Court*, THE NEW YORKER (Jan. 5, 2023), https://www.newyorker.com/news/annals-of-inquiry/the-conservative-who-wants-to-bring-down-the-supreme-court. It would not be consistent, however, with the bedrock principle that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 2 L. Ed. 60 (1803).

[21] *See* Tex. Disciplinary R. Prof. Conduct 1.08 (prohibiting lawyers from "providing financial assistance to a client in connection with pending or contemplated litigation" except for advancing court costs, expenses, medical and living expenses).

[22] It remains unclear how counsel has reconciled his status as fact witness with his continued representation. *See* Tex. Disciplinary R. Prof. Conduct 3.08.

in sincere efforts to remedy the violations, but by foisting a partial, inadequate "remedy" on specific plaintiffs alone. Each subsequent plaintiff would be stripped of standing upon receipt of the unsolicited "remedy" and the underlying violations would go unaddressed. A loophole of that magnitude serves neither litigants nor the judicial system and the Court should decline the invitation to authorize it. *See Knox*, 567 U.S. 298, 307 (2012) ("[M]aneuvers designed to insulate a decision from review by this Court must be viewed with a critical eye.").

### B. Defendants Have Not Proven that the District Court's Findings of Ongoing Injury Were Clearly Erroneous

The District Court also found that Defendants' hidden library did not cure Plaintiffs' First Amendment injury. ROA.3529.[23] Contrary to Defendants' assertions, OB21–22, 24, the District Court valuated the injury to Plaintiffs, not the general public, and found that the existence of the hidden library "still places 'a

---

[23] Plaintiffs' injury should have been assessed as though the hidden library did not exist at all. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 327, 333–34 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (holding voluntary cessation prevented changes to university policy from rendering claim moot and evaluating injury caused by original policy); *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993) (holding defendant's complete "voluntary cessation of its allegedly violative religious practices does not preclude a finding of irreparable injury"); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality *of the practice*.") (emphasis added).

significant burden on Library Patrons' ability to gain access to those books.'"
ROA.3518 (quoting *Sund*, 121 F. Supp. 2d at 534).

Defendants do not attempt to demonstrate that this finding was clear error,
and the record contains ample support for it.[24] As the District Court found, to
access a book from the hidden library, Plaintiffs must "make a special request for
the book to be retrieved from behind the counter." ROA.3529. Plaintiffs are thus
required to personally request books that Llano County's leaders have denounced
as "disgusting" and "pornographic filth." ROA.1502-04, 1540-41, 3926:23-3927:1,
3524-25. The hidden library also removes Plaintiffs' ability to access the books
anonymously and read them in the library. The District Court correctly found that
this constitutes an ongoing injury. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334, 341-42 (1995) (holding right of free speech includes anonymity,
whether "motivated by fear of economic or official retaliation, by concern about
social ostracism, or merely by a desire to preserve as much of one's privacy as
possible"); *see also Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 283 n.14 (3d Cir.

---

[24] Defendants treat the question of whether the hidden library continues to injure
Plaintiffs as one for *de novo* determination. OB21, 22, 24. That is not the standard.
*Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 471 (5th Cir. 2017)
(applying clear error standard to irreparable harm determination), *overruled on
other grounds by Planned Parenthood of Greater Tex. Family Planning &
Healthcare Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020); *Plains Cotton
Coop. Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc.*, 807 F.2d 1256,
1261 (5th Cir. 1987) (same).

2011) ("There is no 'de minimis' defense to a First Amendment violation."); *Lewis v. Woods*, 848 F.2d 649, 651 (5th Cir. 1988) (same).

Nor are Defendants correct in their argument that any type of access to the disputed books—regardless of the form of that access—negates constitutional injury. "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000); *see also Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content.").

In *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.*, the Supreme Court found that a similar burden on First Amendment rights constituted an injury. 518 U.S. 727, 753 (1989). There, a statute required cable providers to segregate "patently offensive" material on a separate, blocked channel subscribers could only access by making a request to their cable provider. *Id.* at 734, 753. The Court concluded that the plaintiffs sustained a First Amendment injury in part because viewers could not make decisions minute-to-minute while channel surfing (just as Plaintiffs are no longer free to choose the disputed books while browsing the library catalog). *Id.* at 754.[25]

---

[25] Courts in library book removal cases have done likewise, even where the relocation was less burdensome than the one associated with Defendants' hidden library. In *Sund*, a city moved two children's books portraying LGBTQ

The same result should obtain here, where Llano Library System patrons—including Plaintiffs—cannot make decisions regarding the disputed books while browsing the shelves or anonymously remove them to read inside the library.

## III.   THE DISTRICT COURT PROPERLY FOUND THAT THE EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF PLAINTIFFS

The District Court was soundly within its discretion to find that "Plaintiffs have clearly shown these [two] factors are in their favor." ROA.3530. Defendants provided neither evidence nor argument to the District Court as to why the balance of the equities or the public interest was on their side. *See* ROA.981, 2448, 3149. Their only argument as to both was that "Plaintiffs have not, will not, and could not have suffered constitutional harm." ROA.3530. But the District Court rejected this argument for the reasons set forth *supra* § II, and properly ruled that both factors weighed towards Plaintiffs.

---

relationships from the children's section to the adult section. 121 F. Supp. 2d at 533–34. The court found that this still violated library patrons' First Amendment rights because, even though the books remained on publicly accessible shelves, they would not be found by those browsing the children's section or looking for them there. *Id.* at 549–51, 554. Similarly, the library in *Counts v. Cedarville School District* relocated *Harry Potter* books to a "highly visible" location, that was nonetheless inaccessible to students, and required parental permission to access them. 295 F. Supp. 2d 996, 1001 (W.D. Ark. 2003). The Court held that the "stigmatizing effect" of having to get permission and the fact that patrons could not simply access the books on the shelves constituted an impermissible burden. *Id.* at 1002, 1005.

Defendants now argue that the District Court committed error based on a declaration that Milum first submitted to this Court *after* the issuance of the preliminary injunction. OB40-41 (citing ECF No. 14 at 36). This evidence is not properly before this Court and does not constitute grounds for reversal in any event.

### A.    Defendants Have Not Shown that the District Erred in Finding that the Balance of the Equities Favors Plaintiffs

Had Milum submitted her declaration below, the District would have been within its discretion to reject her statements as misleading and inaccurate. For example, Milum now claims that the Injunction's bar on weeding during the litigation "makes it impossible to run a functioning library." OB40. But at the Evidentiary Hearing, Milum testified to the District Court that she would not be weeding "any book … in the Llano County system between now and the conclusion of this litigation." ROA.4196:8-13. Cunningham and the Commissioners further nullified the need for weeding when they decreed that the Llano County Library System will order no new books pending resolution of this case. ROA.4087:3-11, 4227:9-16.

Defendants also cite Milum's overbroad interpretation of the Injunction as a basis to attack the District Court's determination on the equities below. OB41. This argument is also unavailing. Not only do Defendants mischaracterize the scope of the Injunction, *see infra* § IV, the effect of the Injunction as ordered is not relevant

to the District Court's ex-ante weighing of the equities as presented by the parties. On that issue, Defendants have proffered no evidence or argument to disturb the District Court's determination.

Nor can they. No Defendant would face any cognizable equitable harm if the 17 Banned Books remain available in the Library System online catalog until this litigation concludes. And Defendants' alleged ex-post injury from the Injunction—that Milum must "determine the reasons behind every one of our thousands of previous weeding decisions," OB41—is purely speculative. Defendants have made no effort to comply with this interpretation of the Injunction or sought clarification or reconsideration below. *See generally* ROA.33-38. To date, they have only listed the 17 identified books in the Library System catalog, as the Injunction ordered them to do.[26]

Accordingly, Defendants have failed to show that the District Court's balance of the equities was an abuse of discretion.

### B. Defendants Have Not Shown that the District Court Erred by Finding that the Public Interest Weighs in Favor of Plaintiffs

As the District Court found, Plaintiffs' request was in the public interest because "injunctions protecting First Amendment freedoms are always in the public interest." ROA.3530 (quoting *Texans for Free Enter.*, 732 F.3d at 539).

---

[26] A search of the Library System's online catalog for "What's New" in the last two months shows that only the 17 Banned Books, plus a copy of the 1969 reference book "Antique Firearms," have been added to the catalog since the Injunction. *See* https://llano.biblionix.com/catalog/.

Defendants did not provide any contrary evidence below. To the extent any of Defendants' new arguments are considered, they lack merit.

Defendants first posit that Plaintiffs had an obligation to show that other library patrons were interested in checking out the Banned Books. OB24. This theory misunderstands the public interest implicated in First Amendment actions. The entire public benefits from the courts' consistent protection of individuals' First Amendment freedoms. *Cf. G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1984) ("It is always in the public interest to prevent the violation of a party's constitutional rights."). No further showing is necessary. *See Texans for Free Enter.*, 732 F.3d at 539.

Conversely, the public interest is unaffected by Milum's claimed personal fear of running afoul of the Injunction, which she could resolve at any time by seeking clarification below. Nor is it adversely affected by the Injunction itself.

Defendants also extrapolate that the Injunction "exposes every public librarian to the threat of lawsuits if a library patron disapproves of a weeding decision." OB41. But the suit and the Injunction address only the removal of books motivated by government censorship, not routine weeding, as proven by Defendants' own testimony. Milum affirmed that the Llano County System weeded "8,143 books/DVDs" in the fifteen months before this litigation. ROA.671. Plaintiffs brought suit only with respect to 17 of those books, and only

in response to evidence that local government officials were targeting those books for removal based on their personal animus. And it is no blow to the public interest that library patrons might be inspired to enforce their First Amendment rights against wrongful conduct. To the contrary, that is a public good.

## IV.    THE INJUNCTION IS PROPER IN SCOPE

For purposes of this appeal, Defendants misinterpret the Injunction as requiring them to restore the "books that were removed because of their viewpoint or content," ROA.3531, since the creation of the Llano library. OB38. Their interpretation is grounded neither in the District Court's order nor in the facts of this case. In describing the needed remedy, the District Court instructed that "the books *at issue* be made available for checkout through the Library System's catalogs." ROA.3530 (emphasis added). This corresponds with Plaintiffs' limited request to restore the 17 Banned Books, ROA.1039-40, and is well within the District Court's discretion to fashion narrowly tailored injunctive relief. ROA.187.

Defendants' conduct also belies their purported concerns with the Injunction. After the Injunction issued, Defendants restored the 17 Banned Books to the Llano Library catalog and have maintained compliance since then.[27] They have alleged no additional effort to comply with the "entire history" requirement

---

[27] *See* Llano County Library System Catalog, https://llano.biblionix.com/catalog/, in which the Banned Books now appear.

they now read into the order. Quite the opposite. Milum has averred to this Court, and Plaintiffs agree, that to do so would be "impossible." Milum Decl., ECF No. 14 at 36. As Defendants' efforts show, Defendants and Plaintiffs share the same view regarding the practical effect and scope of the Injunction. It is not overbroad.

## CONCLUSION

For the reasons set forth above, the Court should affirm the Injunction as a proper exercise of the District Court's broad discretion.

Dated: May 26, 2023         Respectfully submitted,
                            /s/ Ellen Leonida
                            Ellen V. Leonida
                            (CA Bar No. 184194)
                            Matthew Borden
                            (CA Bar No. 214323)
                            Marissa R. Benavides
                            (NY Bar No. 5796891)
                            Max Bernstein
                            (NY Bar No. 5609037)
                            Kory James DeClark
                            (CA Bar No. 310571)
                            BRAUNHAGEY & BORDEN LLP
                            351 California Street, 10th Floor
                            Tel: 415-599-0210
                            Fax: 415-276-1808
                            leonida@braunhagey.com
                            borden@braunhagey.com
                            benavides@braunhagey.com
                            bernstein@braunhagey.com
                            declark@braunhagey.com

                            Katherine P. Chiarello
                            (TX Bar No. 24006994)
                            Ryan A. Botkin
                            (TX Bar No. 00793366)

María Amelia Calaf
(TX Bar No. 24081915)
Ian C. Crichton
(TX Bar No. 24133100)
BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, Texas 78701
Tel: 512-615-2341
Fax: 737-289-4695
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com
ian@bccaustin.com

*Attorneys for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of May, 2023, I electronically submitted the foregoing to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF system, which sent a Notice of Electronic Filing to the following attorneys of record:

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dwain K. Rogers
Texas Bar No. 00788311
County Attorney

Matthew L. Rienstra
Texas Bar No. 16908020
First Assistant County Attorney

Defendants Attorney's Office
Defendants Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
drogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

*/s/ Ellen Leonida*
Ellen V. Leonida

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,996 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 31.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Ellen Leonida*
Ellen V. Leonida