NO. 23-50224

# In The United States Court Of Appeals
# For The Fifth Circuit

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees*,

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Western District of Texas, Case No. 1:22-cv-424-RP

**BRIEF OF *AMICI CURIAE* THE ASSOCIATION OF AMERICAN PUBLISHERS, INC., CANDLEWICK PRESS, INC., HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, MACMILLAN PUBLISHING GROUP, LLC, PENGUIN RANDOM HOUSE LLC, SCHOLASTIC INC., AND SIMON & SCHUSTER, INC.**

(Counsel Listed Inside Cover)

Marc A. Fuller
(TX Bar No. 24032210)
Maggie I. Burreson
(TX Bar No. 24116150)
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Phone:   (214) 953-6000
mfuller@jw.com
mburreson@jw.com

***Counsel for Amici Curiae***

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**
Leila Green Little
Jeanne Puryear
Kathy Kennedy
Rebecca Jones
Richard Day
Cynthia Waring
Diane Moster

**Counsel for Plaintiffs-Appellees**
Katherine P. Chiarello
Ryan A. Botkin
María Amelia Calaf
Ian C. Crichton
BOTKIN CHIARELLO CALAF PLLC

Ellen V. Leonida
Matthew Borden
Marissa R. Benavides
Max Bernstein
Kory James DeClark
BRAUNHAGEY & BORDEN LLP

**Defendants-Appellants**
Llano County
Ron Cunningham
Jerry Don Moss
Peter Jones
Mike Sandoval

Linda Raschke
Amber Milum
Bonnie Wallace
Rochelle Wells
Rhonda Schneider
Gay Baskin

**Counsel for Defendants-Appellants**
Jonathan F. Mitchell
MITCHELL LAW PLLC

Dwain K. Rogers
Matthew L. Rienstra
LLANO COUNTY ATTORNEY'S OFFICE

**Amici Curiae**

Association of American Publishers

The Association of American Publishers ("AAP"), a not-for-profit organization, represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members range from major commercial book and journal publishers to small, non-profit, university, and scholarly presses, as well as leading publishers of educational materials and digital learning platforms. AAP's members publish a substantial portion of the general, educational, and religious books produced in the United States, including critically acclaimed, award-winning literature for adults, young adults, and children. AAP represents an industry whose very existence depends on the free exercise of rights guaranteed by the First Amendment. AAP's board companies are listed at https://publishers.org/who-we-are/our-board/. Its full member roster is listed at https://publishers.org/who-we-are/our-members/.

Candlewick Press, Inc.

Candlewick Press publishes high quality, bestselling books for young readers of all ages, from birth through early adulthood. Based in Somerville, MA, and New York City, with 130 employees and nine imprints, Candlewick is part of the vibrant independent children's publishing group called Walker Books Ltd, which is

headquartered in London and has additional offices in Sydney, Australia, and Mexico City. For more than thirty years, Candlewick has published outstanding titles by award-winning authors and illustrators such as National Ambassador for Young People's Literature emerita Kate DiCamillo, current National Ambassador for Young People's Literature Meg Medina, Jon Klassen, Christina Soontornvat, and Carole Boston Weatherford, as well as classic favorites such as *Guess How Much I Love You*, *Maisy* by Lucy Cousins, and Martin Handford's *Where's Waldo*?.

Hachette Book Group, Inc.

Hachette Book Group, Inc. is a leading U.S. general-interest book publisher made up of dozens of esteemed imprints within the publishing groups Basic Books Group, Grand Central Publishing, Hachette Audio, Hachette Books, Hachette Nashville, Little, Brown and Company, Little, Brown Books for Young Readers, Orbit, Running Press Group, and Workman Publishing. Hachette Book Group's books and authors have received the Pulitzer Prize, National Book Award, Caldecott Medal, Newbery Medal, Booker Prize, Nobel Peace Prize and other major honors. Hachette Book Group is a part of Hachette Livre, the world's third-largest trade and educational publisher.

HarperCollins Publishers LLC

HarperCollins Publishers LLC is the second largest consumer book publisher in the world, with operations in 17 countries. With 200 years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins authors include winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals and the Man Booker Prize.

Macmillan Publishing Group, LLC

Macmillan Publishing Group, LLC is a New York-based group of U.S. publishers that includes Celadon Books, Farrar, Straus and Giroux, Flatiron Books, Henry Holt & Company, Macmillan Audio, Macmillan Children's Publishing Group, St. Martin's Publishing Group and Tor Books. The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world. Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats.

Penguin Random House LLC

Penguin Random House LLC publishes adult and children's fiction and nonfiction in print and digital trade book form throughout the U.S. The Penguin Random House global family of companies employ more than 10,000 people across almost 250 editorially and creatively independent imprints and publishing houses that collectively publish more than 15,000 new titles annually. Its publishing lists include more than 60 Nobel Prize laureates and hundreds of the world's most widely read authors of fiction, historical fiction, narrative nonfiction and nonfiction.

Scholastic Inc.

For more than 100 years, Scholastic has been encouraging the personal and intellectual growth of all children, beginning with literacy. Having earned a reputation as a trusted partner to educators and families, Scholastic is the world's largest publisher and distributor of children's books, a leading provider of literacy curriculum, professional services, and classroom magazines, and a producer of educational and entertaining children's media. The Company creates and distributes best-selling books and e-books, print and technology-based learning programs for pre-K to grade 12, and other products and services that support children's learning and literacy, both in school and at home. With 15 international operations and exports to 165 countries, Scholastic makes quality, affordable books available to all children around the world through school-based book clubs and book fairs, classroom libraries, school and public libraries, retail, and online.

Simon & Schuster, Inc.

Simon & Schuster is a global leader in general interest publishing, dedicated to providing the best in fiction and nonfiction for readers of all ages, and in all printed, digital and audio formats. Its distinguished roster of authors includes many of the world's most popular and widely recognized writers, and winners of the most prestigious literary honors and awards. It is home to numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Adams Media, Avid Reader Press, Simon & Schuster Children's Publishing, and Simon & Schuster Audio and international companies in Australia, Canada, India

and the United Kingdom, and proudly brings the works of its authors to readers in more than 200 countries and territories.

**Counsel for Amici Curiae**
Marc A. Fuller
Maggie I. Burreson
JACKSON WALKER LLP

Undersigned counsel further certifies, pursuant to Federal Rule of Appellate

Procedure 26.1(a), that:

- The Association of American Publishers, Inc. is not a publicly held corporation and no publicly held corporation owns 10 percent or more of its stock.

- Candlewick Press, Inc. is a privately-held wholly owned subsidiary of Walker Books Limited, UK. Walker Books Limited is a private company limited by shares incorporated in England. The immediate parent undertaking of Walker Books Limited is TGM UK Bidco Limited. The ultimate parent company is Trustbridge Global Media Holdings Co., Ltd, a company incorporated in the Cayman Islands.

- Hachette Book Group, Inc. is a wholly-owned subsidiary of Hachette Livre USA, Inc. Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc. Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media. Lagardère Media is a wholly-owned subsidiary of Lagardère SA, which is traded on the Paris stock exchange; and more than 10% of Lagardère SA's outstanding stock is owned by Vivendi SA, which is traded on the Paris stock exchange.

- HarperCollins states that News Corporation, a publicly-held company, is the ultimate parent corporation of HarperCollins. Based on public filings, no publicly held company owns 10% or more of News Corporation's Class B voting stock and T. Rowe Price Associates Inc. owns more than 10% of News Corporation's Class A non-voting stock.

- Macmillan Publishing Group, LLC's direct parent company is Macmillan Holdings, LLC. No publicly held company owns 10% or more of the stock of either legal entity.

- Penguin Random House is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately-held company.

- Scholastic Inc. is a wholly-owned subsidiary of Scholastic Corporation. Scholastic Corporation is a publicly held corporation. There is no parent corporation or any publicly held corporation owning 10% or more of its stock.

- Simon & Schuster, Inc. is an indirect, wholly-owned subsidiary of Paramount Global (f/k/a ViacomCBS Inc.). Paramount Global is a publicly traded company. National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of Paramount Global. In addition, Paramount Global is only aware, without further inquiry, that Berkshire Hathaway Inc., a publicly traded company, beneficially owns at least 10% of Paramount Global's total common stock, i.e., Class A and Class B on a combined basis, as reported on a Form 13F filed with the Securities and Exchange Commission on May 15, 2023.

Amici's Unopposed Motion for Leave to File Brief of Amici Curiae is being filed in conjunction with this brief.[1]

/s/ Marc A. Fuller
Marc A. Fuller
**Counsel for Amici**

---

[1] Pursuant to Fed. R. App. P. 29(a)(4), Amici certify that counsel for Amici authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than amici and their counsel, contributed monetarily to this brief's preparation or submission.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................3

TABLE OF AUTHORITIES .................................................................10

STATEMENT OF INTEREST.................................................................12

INTRODUCTION .................................................................13

ARGUMENT .................................................................15

I.      The Banned Books Include Some of the Most Honored and
        Important Recent Works of Nonfiction and Fiction....................................15

II.     Llano County's Removal of the Banned Books Is Part of a
        Recent Trend and Long History of Unconstitutional Book Bans. ................26

III.    The County's Removal of these Authors' Voices from the
        Public Library Infringes the Individual Liberty of Intellectual
        Self-Exploration Protected by the First Amendment. ...................................32

CONCLUSION .................................................................37

CERTIFICATE OF COMPLIANCE....................................................39

CERTIFICATE OF SERVICE .................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. United States*,
   250 U.S. 616, 630 (1919)..................................................................34

*Ambach v. Norwick*,
   441 U.S. 68 (1979)..........................................................................33

*Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)........................................................30, 33, 34, 36

*Campbell v. St. Tammany Par. Sch. Bd.*,
   64 F.3d 184 (5th Cir. 1995) .........................................................30, 31

*Chiras v. Miller*,
   432 F.3d 606 (5th Cir. 2005) .......................................................32, 33

*Citizens United v. Federal Election Com'n*,
   558 U.S. 310 (2010)..........................................................................34

*Doe v. City of Albuquerque*,
   667 F.3d 1111 (10th Cir. 2012) ........................................................32

*Kreimer v. Bureau of Police for Town of Morristown*,
   958 F.2d 1242 (3d Cir. 1992) ...........................................................32

*Neinast v. Bd. of Trustees of Columbus Metro. Libr.*,
   346 F.3d 585 (6th Cir. 2003) ............................................................32

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022), *petition for cert. docketed*,
   No. 22-555 (U.S. Dec. 19, 2022) ......................................................35

*Pico v. Board of Ed., Island Trees Union Free School Dist. No. 26*,
   474 F.Supp 387 (E.D.N.Y. 1979) .....................................................30

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995)..........................................................................33

*Rust v. Sullivan*,
500 U.S. 173 (1991).................................................................33

*Stanley v. Georgia*,
394 U.S. 557 (1969).................................................................35

*Sund v. City of Wichita Falls*,
121 F. Supp. 2d 530 (N.D. Tex. 2000) ......................................31, 32

**Other**

John Stuart Mill, *On Liberty and Other Essays*, at 65 (John Gray ed. 1991)..........35

Jud Campbell, *Natural Rights and the First Amendment*,
127 YALE L.J. 246 (2017) ........................................................35

Marc Jonathan Blitz, *Constitutional Safeguards for Silent Experiments in Living:*
*Libraries, the Right to Read, and A First Amendment Theory for an*
*Unaccompanied Right to Receive Information*,
74 UMKC L. REV. 799 (2006) ...................................................36

Martin H. Redish, *The Value of Free Speech*,
130 U. PA. L. REV. 591 (1982) ..................................................35

Rodney A. Smolla, *Freedom of Speech for Libraries and Librarians*,
85 LAW LIBR. J. 71 (1993)........................................................29

9 WRITINGS OF JAMES MADISON 103 (G. Hunt ed. 1910)...........................34

## STATEMENT OF INTEREST

This brief is filed on behalf of The Association of American Publishers, Inc., Candlewick Press, Inc., Hachette Book Group, HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Penguin Random House LLC, Scholastic Inc., and Simon & Schuster, Inc. Amici are the national trade association for the United States publishing industry, which represents the leading book, journal, and education publishers in the country, the five largest trade book publishers, the world's largest publisher and distributor of children's books, and a leading independent publisher. Amici include the publishers of most of the banned books in this case ("Banned Books").[2]

Publishers cannot fulfill their mission of connecting authors' books with readers if the only speech allowed is that which aligns with the views of government authorities. In a democracy, the government can contest ideas, but it cannot ban them. State censorship—no matter the political cause behind it—quells free thinking.

Llano County's removal of books from the shelves of public libraries, which is motivated by government officials' disagreement with the views expressed in the

---

[2] Book "bans" are commonly understood to include any action in which access to a book is "restricted or diminished for either limited or indefinite periods of time." *Book Bans*, PEN AMERICA (last visited May 30, 2023), https://pen.org/book-bans-frequently-asked-questions/.

books, violates the First Amendment. Amici have a shared interest in seeing the district court's injunction affirmed by this Court.

## INTRODUCTION

Officials in Llano County removed 17 books from the shelves of public libraries because the books addressed disfavored subjects. For nearly half a century, courts have recognized that such bans are unconstitutional. It does not matter whether the ban serves progressive or conservative causes. The First Amendment is neither "woke" nor "anti-woke." It protects the right of all Americans to access literary works across the political, ideological, and experiential spectrum, without government violation.

Llano County's assertion that its removal of the 17 books is not a "ban" is unconvincing. These books are not the type of works that would be "weeded" through standard library collection-management methods. They are not old reference texts being replaced by new editions, nor are they riddled with factual inaccuracies, nor obscene. The Banned Books include a classic of children's literature, some of the most lauded nonfiction works of the past decade, and award-winning fiction and graphic novels. Llano County is not the first to target these books. Despite their many awards and honors, the Banned Books are among the most commonly challenged books in the country.

Book bans are not unique to our historical moment. In decades past, the works of authors like Harper Lee, J.D. Salinger, and Kurt Vonnegut populated lists of the most frequently banned books. Time and again, courts have applied heightened scrutiny to such bans, ordering the return of the challenged books to library shelves. With the benefit of history, those court decisions have been validated, and concerns over "dangerous" books have been exposed as unfounded. It is the censorship, not the idea, that poses the existential threat to our democracy.

These courts have relied primarily on one of the pillars of modern First Amendment jurisprudence: that truth is best determined through competition in the marketplace of ideas. The government undermines that marketplace when it removes views and voices from it. But the harm of Llano County's removal of the Banned Books is not limited to its distortion of the marketplace of ideas. The targeted works, which include memoirs, coming-of-age stories, and other highly personal accounts of lived experience from varied perspectives, also help members of the community to understand themselves. A public library is a sanctuary for this individual self-exploration. Because the First Amendment cannot tolerate the County's censorship, this Court should affirm the district court's preliminary injunction order and ensure the continued availability of the Banned Books.

## ARGUMENT

### I.     The Banned Books Include Some of the Most Honored and Important Recent Works of Nonfiction and Fiction.

The County argues that the decision to remove the Banned Books from public library shelves was not based on any disagreement with the views expressed in them, claiming that the County was merely keeping its collection up to date through standard "weeding" processes. Appellants' Br. at 1–3, 30–38. Plaintiffs contend— and the district court found—that the County's proffered justifications are pretext. Appellees' Br. at 4–12, 24–29, 32–34; ROA.3509–10, 3518, 3524–29. In evaluating these competing accounts, this Court should consider the Banned Books themselves, as well as their many honors and awards. Doing so leaves no room for any serious claim that the Banned Books were targeted for any reason other than the views and themes expressed in them.

The Banned Books are not superseded editions of treatises or reference books. The County did not "weed[] the seventh edition of Hart & Wechsler to make room on its shelves for the eighth edition[.]" Appellants' Br. at 30. The Banned Books are not "Outdated and obsolete," of a "Trivial subject matter" or a "Mediocre writing style." *Id.* at 31 (citing recognized standards for library "weeding" decisions). They are not absent from "standard lists" and do not fit into the category of "Self-published or small press materials that are not circulating[.]" *Id.* (same). Nor is there

any claim by the County that the removals were based on "Inaccurate or false information" in the Books. *Id.* And, as Plaintiffs note, the evidence does not support the County's assertions that any removals were the result of filing mistakes, "old and worn" covers, or the uniform removal of books that had not been checked out. Appellees' Br. at 10–11.

Rather, the County's removals targeted some of the most celebrated and consequential works of recent years, as well as popular and classic children's books:

### *Caste:  The Origins of Our Discontents by Isabel Wilkerson*

Named to the National Book Awards' Longlist in 2020—the same year it was featured in the Texas Book Festival—*Caste* argues that America has been shaped by a hidden caste system, telling the stories of Martin Luther King, Jr., baseball's Satchel Paige, a single father and his young son, the author herself, and many others.[3] *Time* named it the No. 1 Nonfiction Book of the Year.[4] Upon its publication, a *New York Times* reviewer gushed: "It's an extraordinary document, one that strikes

---

[3] *The Origins of Our Discontents: Isabel Wilkerson in Conversation with Saeed Jones*, TEXAS BOOK FESTIVAL (last visited June 1, 2023), https://www.texasbookfestival.org/events/the-origins-of-our-discontents-isabel-wilkerson-in-conversation-with-saeed-jones/; *Caste: The Origins of Our Discontents*, NATIONAL BOOK FOUNDATION (last visited May 30, 2023), https://www.nationalbook.org/books/caste-the-origins-of-our-discontents/.

[4] Andrew R. Chow, Lucy Feldman, Annabel Gutterman, & Lucas Wittmann, *The 10 Best Nonfiction Books of 2020*, TIME (Nov. 21, 2020), https://time.com/5913865/best-nonfiction-books-2020/.

me as an instant American classic and almost certainly the keynote nonfiction book of the American century thus far. It made the back of my neck prickle from its first pages, and that feeling never went away."[5] Oprah Winfrey chose it as her Summer 2020 pick for Oprah's Book Club and proclaimed it "the most essential ... the most necessary-for-all-humanity book that I have chosen."[6] Its author, Isabel Wilkerson, is the first African-American winner of the Pulitzer Prize in journalism and is also the winner of the National Humanities Medal and the Stephen Ambrose Oral History Prize.[7] Her debut work, *The Warmth of Other Suns*, won the National Book Critics Circle Award for Nonfiction and was named to *Time*'s Ten Best Nonfiction Books of the Decade and the *New York Times*'s list of the Best Nonfiction of All Time.[8] *Caste* is published by amicus Penguin Random House.

---

[5] Dwight Garner, *Isabel Wilkerson's 'Caste' Is an 'Instant American Classic' About Our Abiding Sin*, THE NEW YORK TIMES (July 31, 2020), https://www.nytimes.com/2020/07/31/books/review-caste-isabel-wilkerson-origins-of-our-discontents.html.

[6] *Oprah says she cried when she called author of "Caste," her latest book club pick: 'All of humanity needs this book'*, CBS (Aug. 4, 2020), https://www.cbsnews.com/news/oprah-winfrey-caste-book-club-pick-isabel-wilkerson/.

[7] *From the bestselling author of The Warmth of Other Suns: Caste the Origins of Our Discontents*, ISABEL WILKERSON (last visited May 30, 2023), https://www.isabelwilkerson.com/.

[8] *Id.*

### *They Called Themselves the K.K.K.:*
### *The Birth of an American Terrorist Group*
### *by Susan Campbell Bartoletti*

Written by a winner of the Newbery Honor and the Washington Post/ Children's Book Guild Nonfiction Award, *They Called Themselves the K.K.K.* is a thorough examination of the Ku Klux Klan, its origins, and its growth in the United States. The book—which was a finalist for the American Library Association's Excellence in Nonfiction for Young Adults award in 2011—"makes extensive use of congressional testimony, interviews, journals, diaries and slave narratives[.]"[9] *Kirkus* praised the book as "[a]n exemplar of history writing and a must for libraries and classrooms."[10] *They Called Themselves the K.K.K.* is published by amicus HarperCollins.

### *Spinning*
### *by Tillie Walden*

*Spinning* is a coming-of-age memoir. The winner of the 2018 Eisner Award for Best Reality-Based Work,[11] the graphic novel follows Walden's childhood experiences as a competitive figure skater and her growth as a teenager in New

---

[9] *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, KIRKUS (last visited May 28, 2023), https://www.kirkusreviews.com/book-reviews/susan-campbell-bartoletti/they-called-themselves-the-kkk/.

[10] *Id.*

[11] *2010-Present*, COMIC-CON (last visited May 28, 2023), https://www.comic-con.org/awards/eisner-award-recipients-2010-present.

Jersey and Texas, including her experience "coming out." Wayne Brenner, a book reviewer for *The Austin Chronicle*, described the book as "a thoughtful, bittersweet evocation of the turbulence of puberty and adolescence, of first love, of eventual disillusionment with a thing to which someone has devoted so much of their life … a powerful work of real-life storytelling[.]"[12] Written by Walden when she was only 21, the book won two coveted comic book Ignatz Awards—one for Outstanding Artist and one for Promising New Talent—and earned Walden two appearances at the Texas Book Festival.[13] *Spinning* is published by amicus Macmillan.

### *Being Jazz: My Life as a (Transgender) Teen*
### *by Jazz Jennings*

*Being Jazz* is a memoir written by Jazz Jennings, a transgender teen who rose to prominence after being interviewed by Barbara Walters in 2007 when she was six years old.[14] In 2014, Jennings was named one of "The 25 Most Influential Teens" of the year by *Time*.[15] The book chronicles Jazz's personal experiences growing up as a trans teenager in the 2000s and 2010s, including her experiences with bullying and

---

[12] Wayne Alan Brenner, *Review: Spinning*, THE AUSTIN CHRONICLE (Nov. 3, 2017), https://www.austinchronicle.com/daily/arts/2017-11-03/review-spinning/.

[13] *Id.*

[14] Caroline Framke, *How Jazz Jennings Changed the World for Trans Youth Simply by Being Herself*, VARIETY (last visited May 28, 2023), https://variety.com/2021/tv/features/jazz-jennings-i-am-jazz-trans-legislation-1234985248/; *Being Jazz: My Life as a (Transgender) Teen*, GOODREADS (last visited May 28, 2023), https://www.goodreads.com/en/book/show/28698224.

[15] The 25 Most Influential Teens of 2014, TIME (Oct. 13, 2014), https://time.com/3486048/most-influential-teens-2014/.

discrimination. It was included on the Rainbow Project Book List, a list of recommended books dealing with LGBTQ issues for children.[16] *Being Jazz* is published by amicus Penguin Random House.

### *Gabi, a Girl in Pieces* ### by Isabel Quintero

An "authentic and honest" coming-of-age story of a young Mexican girl, *Gabi, A Girl in Pieces* covers real-life topics of body image, broken homes, drug use, sexuality, childhood dreams, and community values.[17] *Kirkus* wrote that author Isabel Quintero "excels at presenting a life that is simultaneously messy and hopeful."[18] Published in 2014, the book was a finalist and winner of multiple awards: the William C. Morris YA Debut Award, School Library Journal's Best Books of the Year, and the American Library Association Amelia Bloomer Project.[19]

---

[16] *Rainbow Project Book List*, AMERICAN LIBRARY ASSOCIATION (last visited May 28, 2023), https://www.ala.org/awardsgrants/awards/35/all_years.

[17] *Gabi, A Girl in Pieces*, KIRKUS (last visited May 28, 2023), https://www.kirkusreviews.com/book-reviews/isabel-quintero/gabi-girl-in-pieces/.

[18] *Id.*

[19] *Gabi, A Girl in Pieces*, LEE & LOW BOOKS (last visited May 28, 2023), https://www.leeandlow.com/books/gabi-a-girl-in-pieces.

### *Freakboy*
### *by Kristin Elizabeth Clark*

*Freakboy* is a coming-of-age story told from three distinct perspectives, all from different points on the gender identity spectrum.[20] Published in 2013, the book won, or was a finalist for, numerous awards, including:

- Best Children's Books of the Year, 2014 Sports

- *Booklist* Book Review Stars, 2013

- *Booklist* Top 10 First Novels for Youth, 2014 First Novels

- *Kirkus* Book Review Stars, 2013

- Rainbow List, 2014 Teen Fiction

- YALSA Best Fiction for Young Adults, 2014 Fiction

- YALSA Top Ten Best Books for Young Adults, 2014 Best Fiction for Young Adults[21]

*Kirkus* deemed *Freakboy* a "gutsy . . . must-buy."[22] *Freakboy* is published by amicus Macmillan.

---

[20] *Freakboy*, UNIVERSITY OF CENTRAL FLORIDA (last visited May 28, 2023), https://stars.library.ucf.edu/diversefamilies/119/.

[21] *Id.*

[22] *Freakboy*, KIRKUS (last visited May 28, 2023), https://www.kirkusreviews.com/book-reviews/kristin-elizabeth-clark/freakboy/.

### *Shine*
### *by Lauren Myracle*

The winner of the 2012 Amelia Elizabeth Walden Award—an annual award for a young adult book that exemplifies literary excellence, widespread appeal to teens, and a positive approach to life—*Shine* is a mystery novel that follows a teen girl investigating the violent beating of her openly gay friend in a small town.[23] The book also tackles issues of poverty, drug use, and sexual assault.[24] Called "raw, realistic and compelling," this Young Adult Library Services Association 2012 Readers' Choice List book masterfully mixes mystery and coming-of-age tales.[25]

### *It's Perfectly Normal:*
### *Changing Bodies, Growing Up, Sex and Sexual Health*
### *by Robie Harris*

*It's Perfectly Normal* was first published in 1994 and has since sold over a million copies.[26] Designed "to teach children 10 and older about sexual health,

---

[23] *The Walden Award*, ASSEMBLY ON LITERATURE FOR ADOLESCENTS OF NCTE (last visited May 28, 2023), https://alan-ya.org/awards/walden-award/; Mary Quattlebaum, *Book review: 'Shine' by Lauren Myracle*, THE WASHINGTON POST (last visited May 28, 2023), https://www.washingtonpost.com/entertainment/books/book-review-shine-by-lauren-myracle/2011/05/20/AGWwJkFH_story.html.

[24] Abigail Pesta, *Lauren Myracle On Why Her Books Top List That America Wants Banned*, DAILY BEAST (Sept. 28, 2018), https://www.thedailybeast.com/lauren-myracle-on-why-her-books-top-list-that-america-wants-banned.

[25] *Shine*, KIRKUS (last visited May 28, 2023), https://www.kirkusreviews.com/book-reviews/lauren-myracle/shine-myracle/; *2012 Readers' Choice List*, YALSA (last visited May 28, 2023), https://www.ala.org/yalsa/readers-choice/2012.

[26] Rebeca Hersher, *It May Be 'Perfectly Normal', But It's Also Frequently Banned*, NPR (Sept. 21, 2014 5:00 PM), https://www.npr.org/2014/09/21/350366435/it-may-be-perfectly-normal-but-its-also-frequently-banned.

emotional health and relationships," it provides factual information that is regularly updated.[27] The author consults "experts like pediatricians, biologists and even lawyers to fact-check each edition" to make sure all of the information contained in it is accurate.[28] In more recent editions, the book addresses internet safety.[29] *It's Perfectly Normal* won the Boston Globe-Horn Book Honor Book Award and has been featured in a variety of "honors" lists, including the American Library Association's Notable Children's Book List, Horn Book's Fanfare Book List, and the *New York Times* Book Review's annual list of 100 Notable Books.[30] *It's Perfectly Normal* is published by amicus Candlewick Press.

### Under the Moon: A Catwoman Tale
### by Lauren Myracle

Written by *New York Times* bestselling author Lauren Myracle, *Under the Moon* tells the tale of 15-year-old Selina, who will grow up to be Catwoman, after she is forced to abandon her home.[31] The book grapples with issues like self-harm,

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *It's Perfectly Normal*, PENGUIN RANDOM HOUSE (last visited May 28, 2023), https://www.penguinrandomhouse.com/books/76024/its-perfectly-normal-by-robie-h-harris-illustrated-by-michael-emberley/.

[31] *Under the Moon: A Catwoman Tale*, DC (last visited May 28, 2023), https://www.dc.com/graphic-novels/under-the-moon-a-catwoman-tale.

suicide, animal abuse, and domestic violence.[32] The graphic novel, published in 2019, was praised by *ComicBookWire* for its ability "to capture real issues … [I]t is emotional and endearing in a great way."[33] *School Library Journal* concurred: "This look at Catwoman's backstory is dense with plot, emotion, and action. A sensitive origin story of a beloved antihero."[34]

### In the Night Kitchen
### by Maurice Sendak

A classic children's picture book first published in 1970, *In the Night Kitchen* follows a young boy as he explores and floats through a dreamworld. Sendak—who also authored and illustrated *Where the Wild Things Are*—creates a "celebration of the primal, sensory world of childhood and an affirmation of its imaginative potency."[35] The book won a Caldecott Honor, which is awarded annually by the

---

[32]  Jenna Busch, *Lauren Myracle On Her Selina Kyle Reimagining In Under The Moon: A Catwoman Tale*, SYFY (Apr. 24, 2019, 11:16 AM ET), https://www.syfy.com/syfy-wire/lauren-myracle-on-her-selina-kyle-reimagining-in-under-the-moon-a-catwoman-tale.

[33]  *Review: Under the Moon - A Catwoman Tale*, COMICBOOKWIRE (Nov. 3, 2021), https://www.comicbookwire.com/review-under-the-moon-a-catwoman-tale/.

[34]  *Under the Moon: A Catwoman Tale*, PENGUIN RANDOM HOUSE (last visited June 1, 2023), https://www.penguinrandomhouse.com/books/600453/under-the-moon-a-catwoman-tale-by-lauren-myracle/

[35]  *In the Knight Kitchen*, BOOKSHOP (last visited May 28, 2023), https://bookshop.org/p/books/in-the-night-kitchen-maurice-sendak/286853.

Association for Library Service to Children to the most distinguished picture book for children.[36] *In the Night Kitchen* is published by amicus HarperCollins.

### *My Butt is So Noisy!, I Broke My Butt!, and I Need a New Butt!*
### *by Dawn McMillan*

Three best-selling rhyming picture books, the "*Butt*" series follows a boy with an uncooperative backside.[37] The books follow his "hilarious adventures caused by the hooting and tooting, humming and strumming, and clicking and ticking of a bothersome backside."[38] These books are valuable for their ability to spark an interest in reading, even among the most disinclined young readers, which will carry over into more mature subjects as the kids get older.[39]

### *Larry the Farting Leprechaun, Gary the Goose and His Gas on the Loose,*
### *Freddie the Farting Snowman, and Harvey the Heart Has Too Many Farts*
### *by Jane Bexley*

Another collection of silly children's picture books, the "*Fart*" collection was described by Goodreads as "appropriate for ALL AGES who don't mind silly toot

---

[36]  *Caldecott Winners and Honor Books*, MADISON PUBLIC LIBRARY (last visited May 28, 2023), https://www.madisonpubliclibrary.org/reading-and-viewing/book-lists/kids/caldecott-winners-and-honor-books; *see also Randolph Caldecott Medal*, ASSOCIATION FOR LIBRARY SERVICE TO CHILDREN (last visited May 28, 2023), https://www.ala.org/alsc/awardsgrants/bookmedia/caldecott.

[37]  *I Need a New Butt!, I Broke My Butt!, My Butt Is So Noisy! : 3 Hilarious Stories in One Noisy Book (Hardcover)*, WALMART (last visited May 28, 2023), https://www.walmart.com/ip/I-Need-a-New-Butt-I-Broke-My-Butt-My-Butt-Is-So-Noisy-3-Hilarious-Stories-in-One-Noisy-Book-Hardcover-9780486848631/480409601.

[38]  *Id.*

[39]  *See* Want to Teach Your Kids to Love Reading? Buy Them Books About Poop, Farts, and Butts? (May 31, 2023), https://www.mentalfloss.com/posts/poop-books-good-for-kids.

humor (that is not overly gross)."[40] All four books were published in 2020 or 2021.[41] Like the "*Butt*" series, these books are valuable for their ability to spark an interest in reading, even among the most disinclined young readers, which will carry over into more mature subjects as the kids get older.[42]

Clearly, the Banned Books are not the type of works that are so outdated, trivial, mediocre, inaccurate, or replete with falsehoods that they would be subject to "weeding," had standard "weeding" processes occurred (they did not). To the contrary, their honors, critical reception, and popularity reinforce the district court's finding that the books were removed from the shelves for ideological reasons, which violates the First Amendment (as further discussed below in Sections II and III).

## II.    Llano County's Removal of the Banned Books Is Part of a Recent Trend and Long History of Unconstitutional Book Bans.

The actions taken by Llano County are not unprecedented. Government restriction of access to books is a tale as old as time. Over the course of history, repressive regimes have frequently relied on book bans to quell dissent and prevent their citizens from accessing "dangerous" ideas. During World War II, the Nazis

---

[40] *Freddie The Farting Snowman: A Funny Read Aloud Picture Book For Kids And Adults About Snowmen Farts and Toots*, GOODREADS (last visited May 28, 2023), https://www.goodreads.com/book/show/55947570-freddie-the-farting-snowman.

[41] *Id.*; *see also Jane Bexley Books in Order (5 Book Series)*, MOST RECOMMENDED BOOKS (last visited May 28, 2023), https://www.mostrecommendedbooks.com/series/jane-bexley-books-in-order.

[42] *See supra* Note 37.

destroyed or banned thousands of books, including works by Albert Einstein, Ernest Hemingway, and Upton Sinclair, in an effort to silence dissenters and political opponents.[43] In East Germany, the communist government suppressed various comic books due to the main characters being perceived as "anti-red rebel[s]."[44] The practice continues today. In the People's Republic of China, the banning of books has recently reached levels not seen since the days of the Cultural Revolution, as works perceived to have a pro-democracy message are deemed "deviant."[45]

The United States has had its own moments of book-banning fervor. During the Civil War, the Confederacy banned Harriet Beecher Stowe's *Uncle Tom's Cabin*.[46] In 1885, a public library in Concord, Massachusetts banned the *Adventures of Huckleberry Finn*.[47] The library deemed the book "'suited to the slums.'"[48] By 1907, other public libraries followed, insisting that the protagonist was a poor role model for impressionable youth.[49] During the Great Depression, many local

---

[43] *See Bannings and Burnings in History*, Freedom to Read (May 25, 2023), https://www.freedomtoread.ca/resources/bannings-and-burnings-in-history/.

[44] *Id.*

[45] Huizhong Wu, *In echo of Mao era, China's schools in book-cleansing drive*, Reuters (July 9, 2020, 7:04 AM), https://www.reuters.com/article/us-china-books-insight/in-echo-of-mao-era-chinas-schools-in-book-cleansing-drive-idUSKBN24A1R5.

[46] *Id.*

[47] *Bannings and Burnings in History*, *supra* note 43.

[48] *Id.*

[49] *Id.*

municipalities tried to ban popular books, such as John Steinbeck's *The Grapes of Wrath*, in fear of ideas they considered too dangerous for the public.[50] James Joyce's *Ulysses* was banned by U.S. customs officials in the 1930s for its alleged "impure and lustful thoughts," but the ban was vacated by a federal court.[51] Other works now considered canonical have been—and continue to be—common targets of challenges and censors. *To Kill a Mockingbird* was listed as the seventh most challenged book as recently as 2020, with *Of Mice and Men* following closely in eighth place.[52] *The Adventures of Huckleberry Finn* was thirty-third on the list of the most challenged books from 2010-2019.[53] Even the Bible has been challenged, based on parents' complaints about "pornographic" content.[54]

---

[50]  Livia Gershon, *Banning The Grapes of Wrath in 1939 California*, JSTOR DAILY (Mar. 27, 2022),

https://daily.jstor.org/banning-the-grapes-of-wrath-in-1939-california/#:~:text=The%20Kern%20County%2C%20CA%20Board,from%20their%20libraries%20and%20schools.&text=In%20April%20of%201939%2C%20John%20Steinbeck%20published%20The%20Grapes%20of%20Wrath.

[51]  *Court Lifts Ban on 'Ulysses' Here*, THE NEW YORK TIMES (Dec. 7, 1933), https://archive.nytimes.com/www.nytimes.com/books/00/01/09/specials/joyce-court.html.

[52]  *Banned and Challenged Books*, ALA OFFICE FOR INTELLECTUAL FREEDOM (last visited May 31, 2023), https://www.ala.org/advocacy/bbooks/frequentlychallengedbooks/top10/archive.

[53]  *Id.*

[54]  Eesha Pendharkar, *Why the Bible is Getting Pulled Off School Bookshelves*, EDUCATION WEEK (Dec. 15, 2022), https://www.edweek.org/teaching-learning/why-the-bible-is-getting-pulled-off-school-bookshelves/2022/12; Brooke Kato, *Utah parent wants Bible removed from schools: 'It's pornographic'*, NEW YORK POST (Mar. 23, 2023), https://nypost.com/2023/03/23/utah-parent-wants-bible-removed-from-schools-its-pornographic/.

Book bans are not the exclusive domain of any particular political party or cultural movement. As Dean Rodney Smolla has observed, "[w]e are all prone to the natural human instinct to censor—to pronounce speech that is upsetting, disquieting, and offensive as taboo." Rodney A. Smolla, *Freedom of Speech for Libraries and Librarians*, 85 LAW LIBR. J. 71, 72 (1993). In Llano County, books were removed from the public library system because they addressed subjects disfavored by officials; elsewhere, classics such as *To Kill a Mockingbird*, *Of Mice and Men*, and *The Adventures of Huckleberry Finn* have been challenged or removed in various school districts due to concerns over offensive language and outdated racial perspectives.[55]

The Constitution does not care about the political affiliation of the book-banners or the causes that motivate their censorship. When faced with the removal of books from library shelves, courts have consistently applied heightened scrutiny to bans motivated by government disapproval of the views and themes in the books. In hindsight, these decisions have been validated: books that once seemed dangerous and destabilizing to the prevailing political, moral, or cultural consensus are now considered part of the canon and celebrated.

---

[55] *Banned/Challenged Books of 2021-2022–Title List*, MARSHALL LIBRARIES (May 12, 2023), https://www.marshall.edu/library/bannedbooks/bannedbooks-2022/title/.

Nearly 45 years ago, members of a New York school board obtained a list of "inappropriate" books from a conservative political organization. *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 856 (1982) (plurality opinion). The list included *Slaughterhouse-Five* by Kurt Vonnegut and *Best Short Stories of Negro Writers*, edited by Langston Hughes. *Id.* at n.3. The Board swiftly removed the books from the school library shelves, stating that they were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." *Id.* at 857 (quoting *Pico v. Board of Ed., Island Trees Union Free School Dist. No. 26*, 474 F.Supp 387, 390 (E.D.N.Y. 1979)). A group of students sued, claiming that the removal of the books violated their First Amendment rights. The Supreme Court agreed, with the plurality opinion holding that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge" accessible in the library based on disagreement with the ideas at issue. *Id.* at 866 (citation omitted).

In 1995, this Court applied *Pico* in a case concerning the restriction, and later removal, of *Voodoo & Hoodoo*, a book about the development of African tribal religion, from a school library. *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995). The mother of a middle-school student had complained "that the Book heightened children's infatuation with the supernatural and incited students to try the explicit 'spells,' which she believed to be potentially dangerous." *Id.* at

186. Although this Court remanded for further consideration of the evidence of the school board's motivations, it cautioned that removing books from library circulation could constitute an "unconstitutional attempt to 'strangle the free mind at its source.'" *Id*. at 190 (citation and quotations omitted).

Five years later, the Northern District of Texas considered the City of Wichita Falls' relocation of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's section to the adult section of the public library. *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 531–32 (N.D. Tex. 2000). Both books addressed the subject of children who have gay parents. *Id*. at 532–33. Supporters of the ban "objected vehemently to the perceived 'homosexual message'" of the books. *Id.* at 533. The court noted that "[t]he principles set forth in *Pico*—a school library case— have even greater force when applied to public libraries." *Id*. at 548, 554. The court ordered the books returned to the children's section, explaining that the City's actions had "unconstitutionally burden[ed] the First Amendment rights of" library-goers even though it did not completely remove the books. *Id*. at 551.

The correctness of *Pico*, *Campbell*, and *Sund* is even clearer in hindsight. As these decisions recognize, the real danger lies not in the books they involved, but in the infringement of First Amendment rights, including the rights of library patrons to read these books and decide for themselves the merits of their views and themes.

31

**III.    The County's Removal of these Authors' Voices from the Public Library Infringes the Individual Liberty of Intellectual Self-Exploration Protected by the First Amendment.**

As these cases demonstrate, the district court's order fits well within established precedent holding that book bans motivated by viewpoint discrimination are unconstitutional. In an attempt to evade this precedent, and relying on *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), the County has tried to analogize this case to a school board's choices about which texts to purchase for use in its schools. Appellants' Br. at 26–28. The County also argues (in recognition that this case is *not* about the selection of educational texts) that a public librarian is engaged in government speech when managing the library's collection. *Id.* at 29–30. Finally, the County argues that the First Amendment's prohibition on viewpoint discrimination applies only if the Court concludes that public libraries are public fora.[56] *Id.* at 29–30. None of these arguments adequately captures the First

---

[56]  As the district court noted, courts have held that public libraries are limited public fora. ROA. 3519, 3525 (citing *Sund*, 12 F. Supp. 2d at 548 ("The Wichita Falls Public Library, like all other public libraries, is a limited public forum for purposes of First Amendment analysis."); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012) ("reaffirm[ing]" that libraries are "a type of designated public forum"); *Neinast v. Bd. of Trustees of Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003) ("For the purposes of First Amendment analysis, the Library is a limited public forum."); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1259 (3d Cir. 1992) ("[T]he Library constitutes a limited public forum, a type of designated public fora."). Here, the Court need not determine whether the public library is a limited public forum for all purposes, but only that the same First Amendment prohibition on viewpoint discrimination that applies to limited public fora also applies to government decisions to remove or restrict books from public libraries.

Amendment values at stake when the government acts to remove books from the library's existing collection as a result of the government's disapproval of the ideas in them.

In *Chiras*, the Court explained that a school district's selection of instructional materials is an act of government speech. 432 F.3d at 614–15. When the government speaks, its objective is not to "encourage a 'diversity of views'" or to ensure reader access to intellectual diversity. *Id.* at 615 (quoting *Rosenberger v. Rectors & Visitors of the Univ. of Va.,* 515 U.S. 819, 834 (1995)). Rather, it is "to promote the state's chosen message." *Id.*; *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, … it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism."). When speaking as educator, the government enjoys broad discretion, and "[c]entral among these discretionary powers is the authority to establish public school curricula which accomplishes the states' educational objectives." *Chiras*, 432 F.3d at 611 (citing *Pico*, 457 U.S. at 864; *Ambach v. Norwick*, 441 U.S. 68, 76–77 (1979)).

But the government's maintenance of a public library's book collection is a fundamentally different endeavor. It does not involve the government's role as speaker or educator. In *Pico*, even while disagreeing with parts of Justice Brennan's

analysis of the First Amendment's application to *school* libraries, Justice Rehnquist had no trouble acknowledging that, like university libraries, *public* libraries are "designed for freewheeling inquiry[.]" 457 U.S. at 914–15 (Rehnquist, J., dissenting). In short, public libraries embody the marketplace of ideas.

It is a hallmark of modern First Amendment jurisprudence that, in the marketplace of ideas, voices of dissent and criticism are essential to a deliberative process that arrives at truth. *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market[.]"). Unfettered public debate is, in turn, essential to effective self-government. *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."); 9 WRITINGS OF JAMES MADISON 103 (G. Hunt ed. 1910) ("A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both … And a people who mean to be their own Governors, must arm themselves with the power which knowledge give."). Courts have been justifiably hostile to government attempts to regulate the marketplace of ideas or to tip the scales in favor of some messages by restricting access to others. *Citizens United*, 558 U.S. at 340

(recognizing that "the First Amendment stands against attempts to disfavor certain subjects or viewpoints.").

But the First Amendment is not solely concerned with an unfettered marketplace of ideas and its role in effective democratic self-governance. The First Amendment also protects the liberty of individuals to govern themselves according to norms and beliefs that might be different than those ultimately embraced by the body politic. *See* Martin H. Redish, *The Value of Free Speech*, 130 U. PA. L. REV. 591, 593 (1982) (arguing "that the constitutional guarantee of free speech ultimately serves only one true value … 'individual self-realization'"). As John Stuart Mill recognized, the individual must be free to explore whether the majoritarian consensus is "properly applicable to his own circumstances and character." John Stuart Mill, *On Liberty and Other Essays*, at 65 (John Gray ed. 1991); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (the "right to receive information and ideas, regardless of their social worth … is fundamental to our free society") (citation omitted). In *NetChoice, L.L.C. v. Paxton*, this Court discussed at length the related right to express one's own conscience, which was core to the original understanding of the First Amendment. 49 F.4th 439, 453–54 (5th Cir. 2022), *petition for cert. docketed*, No. 22-555 (U.S. Dec. 19, 2022) (citing Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 280–87 (2017)). This liberty of conscience

is "not defined by or limited to concerns about preserving republican government," but extends to understanding one's self. *See* Campbell, at 263 n.58.

Public libraries are havens for this self-exploration, self-actualization, and the development of the beliefs that define one's own conscience. Libraries have the capacity "to expose individuals to a 'variety of situations' far richer than they are likely to encounter in their day-to-day lives." Marc Jonathan Blitz, *Constitutional Safeguards for Silent Experiments in Living: Libraries, the Right to Read, and A First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. REV. 799, 829 (2006). And they do so in an environment that is free of peer pressures and stigma that accompany public discourse and social settings. *Id.* at 881–82. Within the quiet confines of the library, an individual can engage in a "self-directed exploration[,]" sampling ideas and exposing themselves to a wide array of lived experiences. *Id.* at 861; *see also Pico*, 457 U.S. at 869 (noting the "regime of voluntary inquiry that … holds sway" in a library).

The County's actions infringe this individual liberty of self-exploration. It cannot be ignored that the majority of the Banned Books are coming-of-age stories, memoirs, and other personal accounts of individual experience and self-discovery. Most are told from outsider perspectives, in voices not commonly heard. Literature has the power to bring communities together by expanding consciousness, empathy, and compassion. Books provide opportunities to encounter and consider new ideas

and fresh perspectives. For library patrons who feel like outsiders or underdogs in one way or another, a book can provide a much-needed breath of fresh air, a dose of validation, and solace in the knowledge that they are not alone.

By removing the Banned Books from circulation, the County limits the range of ideas accessible to the community, enforcing an orthodoxy of perspective and experience. This violates the individual liberty of self-exploration embodied in the First Amendment, which is nurtured by the wealth of knowledge and viewpoints available at public libraries.

## CONCLUSION

For these reasons, Amici respectfully urge this Court to affirm the order of the district court.

DATED:  June 2, 2023

Respectfully submitted,

**JACKSON WALKER LLP**

By: */s/ Marc A. Fuller*
    Marc A. Fuller
    TX State Bar No. 24032210
    mfuller@jw.com
    Maggie I. Burreson
    TX State Bar No. 24116150
    mburreson@jw.com
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Phone:  (214) 953-6000

**COUNSEL FOR AMICI CURIAE**

**CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that this brief complies with the typeface and volume limits of Fed. R. App. P. 32(a) and Local Rule 32.1.

1.    This brief contains 5,654 words, excluding the sections exempted by Fed. R. App. P. 32(f) and Local Rule 32.2, which is less than fifty percent of that allotted for the Appellant's brief pursuant to Fed. R. App. P. 29.

2.    This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font for text and 12-point Times New Roman font for footnotes.

*/s/ Marc A. Fuller*
Marc A. Fuller

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of June, 2023, a copy of the foregoing has been served upon counsel for all parties to this proceeding as identified below through the Court's electronic filing system as follows:

Katherine P. Chiarello
Ryan A. Botkin
Maria Amelia Calaf
Ian C. Crichton
BOTKIN CHIARELLO
CALAF PLLC
1209 Nueces Street
Austin, TX 78701
Phone:  (512) 615-2341
Fax:     (737) 289-4695
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com
ian@bccaustin.com

Ellen V. Leonida
Matthew Borden
Marissa Benavides
Max Bernstein
Kory James DeClark
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA  94104
Phone:  (415) 599-09210
leonida@braunhagey.com
borden@braunhagey.com
benavides@braunhagey.com
bernstein@braunhagey.com
declark@braunhagey.com

*Counsel for Plaintiffs-Appellees*

Jonathan F. Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, TX  78701
Phone:  (512) 686-3940
Fax:     (512) 686-3941
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

*/s/ Marc A. Fuller*
Marc A. Fuller