No. 23-50224

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY,
REBECCA JONES, RICHARD DAY, CYNTHIA WARING
AND DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS
LLANO COUNTY JUDGE, JERRY DON MOSS, IN HIS OFFICIAL
CAPACITY AS LLANO COUNTY COMMISSIONER, PETER JONES, IN
HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, MIKE
SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY
COMMISSIONER, LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS
LLANO COUNTY COMMISSIONER, AMBER MILUM, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR,
BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER, ROCHELLE WELLS, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, RHODA
SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER AND GAY BASKIN, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

Appeal from the United States District Court,
For the Western Division of Texas, Austin Division
1:22-cv-00424-RP

# BRIEF OF AMICI CURIAE FREEDOM TO READ FOUNDATION,
# TEXAS LIBRARY ASSOCIATION, AND AMERICAN LIBRARY
# ASSOCIATION IN SUPPORT OF APPELLEES AND AFFIRMANCE

(Counsel Listed Inside Cover)

Ryan W. Goellner
FROST BROWN TODD LLP
301 E. Fourth Street
Cincinnati, Ohio 45202
T: (513) 651-6840
F: (513) 651-6981
rgoellner@fbtlaw.com

Thomas F. Allen, Jr.
FROST BROWN TODD LLP
2101 Cedar Springs Rd.
Suite 900
Dallas, Texas 75201
T: (214) 545-3472
F: (214) 545-3473
tfallen@fbtlaw.com

Kevin Shook
FROST BROWN TODD LLP
10 W. Broad Street
Suite 2300
Columbus, Ohio 43215
T: (614) 464-1211
F: (614) 464-1737
kshook@fbtlaw.com

*Counsel for Amici Curiae Freedom to Read Foundation,*
*Texas Library Association, and American Library Association*

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

Case No. 23-50224, *Leila Green Little, et al. v. Llano County, et al.*

Pursuant to 5TH CIR. RULES 28.2.1 and 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in the party briefs, that have a financial interest in the outcome of this litigation. I certify that the Freedom to Read Foundation (FTRF) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that FTRF, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. I certify that the Texas Library Association (TLA) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that TLA, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. Finally, I certify that the American Library Association (ALA) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that ALA, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.

# TABLE OF CONTENTS

Supplemental Certificate of Interested Persons ........................................ ii

Table of Contents .............................................................................. iii

Table of Authorities .............................................................................v

Statement of Interest Of Amici Curiae ...................................................1

Statement of Contributions ....................................................................2

Introduction ........................................................................................3

Argument............................................................................................4

I.   Following the First Amendment is not a "burden" for librarians. .................4

     A.   Public libraries are citadels of American democracy............................4

     B.   Librarians are guided by well-established ethical canons
          and standards that favor no party, subject, or viewpoint. ....................7

     C.   The First Amendment requires no more—or less. ...............................9

II.  "Weeding" library collections is an objective process, not the
     targeted removal of disfavored or controversial books. ...............................11

     A.   Weeding guidelines provide an objective framework for
          maintaining library collections.........................................................12

     B.   Appellants' actions bear no resemblance to standard
          "weeding" practices.............................................................................15

          1.   Appellants targeted specific books for their
               subject-matter or perceived viewpoint, which has
               no place in "weeding.".................................................................16

          2.   Appellants cannot fit their conduct within standard
               "weeding" practices. .................................................................17

III.    Libraries are not secret clubs, where only patrons with special knowledge may access controversial titles. ...................................................20

Conclusion ................................................................................................26

Certificate of Compliance .........................................................................28

Certificate of Service ................................................................................29

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
    458 U.S. 176 (1982)............................................................24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982).................................................*passim*

*Campbell v. St. Tammany Par. Sch. Bd.*,
    64 F.3d 184 (5th Cir. 1995) ..............................10, 11, 19

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ............................................10

*Jacobs v. Nat'l Drug Intel. Ctr.*,
    548 F.3d 375 (5th Cir. 2008) ............................................10

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy*,
    141 S. Ct. 2038 (2021)......................................................19

*Minarcini v. Strongville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ..........................................6, 9

*Pierce v. Soc. of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925)..........................................................24

*Stanley v. Georgia*,
    394 U.S. 557 (1969)............................................................7

*Sund v. City of Wichita Falls*,
    121 F. Supp. 2d 530 (N.D. Tex. 2000) ..................10, 22, 24

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003)...................................................5, 6, 10

**Statutes, Rules, Constitutional Provisions**

FED. R. APP. P. 29 ..................................................................................... 2

U.S. CONST. amend. I ....................................................................... *passim*

13 TEX. ADMIN. CODE § 1.84 ................................................................... 7

**Other Authorities**

*Accreditation Frequently Asked Questions*, AM. LIBR. ASS'N,
   https://www.ala.org/educationcareers/accreditedprograms/faq (last
   visited June 1, 2023) .......................................................................... 7

CAROL ALABASTER, DEVELOPING AN OUTSTANDING CORE
   COLLECTION (2d ed. 2010) ................................................................. 22

AM. LIBR. ASS'N, CODE OF ETHICS, https://www.ala.org/tools/ethics
   (last visited June 1, 2023) .............................................................. 8, 11

AM. LIBR. ASS'N, LIBRARY BILL OF RIGHTS,
   https://www.ala.org/advocacy/intfreedom/librarybill (last visited
   June 1, 2023) ................................................................. 6, 8, 9, 11, 19

AM. LIBR. ASS'N: RESOURCE GUIDES, "Definition of a Library,"
   https://libguides.ala.org/library-definition (last visited June 1,
   2023) ................................................................................................. 5

Lester Asheim, *Not Censorship But Selection*, AM. LIBR.
   ASS'N,www.ala.org/advocacy/intfreedom/NotCensorshipButSelect
   ion ............................................................................................. 13, 14

John Buschman, *Everyday Life, Everyday Democracy in Libraries:
   Toward Articulating the Relationship*, THE POLITICAL LIBRARIAN,
   Vol. 4, Issue 1, 18 (June 2018),
   https://journals.library.wustl.edu/pollib/article/8545/galley/25378/v
   iew/ ............................................................................................... 6, 20

GEOFFREY CHAUCER, THE CANTERBURY TALES, *The Miller's Tale*,
https://chaucer.fas.harvard.edu/pages/millers-prologue-and-tale ...................... 19

*Collection Maintenance and Weeding*, AM. LIBR. ASS'N,
https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/
weeding (last visited June 1, 2023) ....................................................... 12, 13, 15

Wynne Davis, *How Harry Potter Has Brought Magic to Classrooms
For More Than 20 Years*, NAT'L PUBLIC RADIO (Dec. 31, 2018),
https://www.npr.org/2018/12/31/678860349/how-harry-potter-has-
brought-magic-to-classrooms-for-more-than-20-years (last visited
June 1, 2023) ...................................................................................................... 19

Saoirse De Paor, Bahareh Heravi, *Information literacy and fake news:
How the field of librarianship can help combat the epidemic of
fake news*, 46 THE JOURNAL OF ACADEMIC LIBRARIANSHIP 6
(2020), https://tinyurl.com/5hajwete ................................................................. 26

J. Dilevko, L. Gottlieb, *Weed to achieve: a fundamental part of the
public library mission?*, 27 LIBR. COLL. ACQ. & TECH. SERV. 73,
94 (2003), https://www.moyak.com/papers/weeding-books-
libraries.pdf ........................................................................................................ 18

FED. COMMC'NS COMM'N, EIGHTH BROADBAND PROGRESS REPORT,
https://www.fcc.gov/reports-research/reports/broadband-progress-
reports/eighth-broadband-progress-report ......................................................... 26

Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's
Deschooling Society and the Rediscovery of Hope*, 34 W. NEW
ENG. L. REV. 381, 394 (2012) ......................................................................... 4, 5

*Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N,
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations
(last visited June 1, 2023) ..................................................................................... 9

PEGGY JOHNSON, THE FUNDAMENTALS OF COLLECTION DEVELOPMENT
AND MANAGEMENT (4th ed. 2018) .......................................................... 14, 22, 23

Jeanette Larson, *CREW: A Weeding Manual for Modern Libraries,* TEX. STATE LIBR. & ARCHIVES COMM'N (2012), https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/ld/pubs/crew/crewmethod12.pdf ............................................................................ 14, 15

*Library Bill of Rights and Freedom to Read Statement Pamphlet*, AM. LIBR. ASS'N, https://www.ala.org/aboutala/offices/oif/LBOR-FTR-statement-pamphlet (last visited June 1, 2023) ..................................................... 6

Letter from James Madison to W.T. Barry (Aug. 4, 1822), LIBRARY OF CONGRESS, https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text .................... 7

Carrie Mcbride, *Ben Franklin: The Ultimate Bibliophile*, NEW YORK PUBLIC LIBRARY BLOG (Jan. 17, 2020), https://www.nypl.org/blog/2020/01/17/ben-franklin-library-lover ..................... 4

NAT'L CTR. FOR EDUC. STATS., DIGEST OF EDUC. STATS., Table 701.60, Number of public libraries (for FY 2018-19) n.1, https://nces.ed.gov/programs/digest/d21/tables/dt21_701.60.asp (last visited June 1, 2023) ..................................................................... 5

REBECCA VNUK, THE WEEDING HANDBOOK: A SHELF-BY-SHELF GUIDE (2d ed. 2022) ........................................................................... 14

**STATEMENT OF INTEREST OF AMICI CURIAE**

The Freedom to Read Foundation (FTRF) is an organization established by the American Library Association to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire; establish legal precedent for the freedom to read of all citizens; protect the public against efforts to suppress or censor speech; and support the right of libraries to collect and individuals to access information that reflects the diverse voices of a community so that every individual can see themselves reflected in the library's materials and resources.

The American Library Association (ALA) is an organization representing libraries and librarians throughout the United States. ALA's membership includes over 5000 organizational members and more than 44,000 individual members. ALA's members are in public libraries, academic libraries, special libraries, and school library media centers throughout the United States. Founded in 1876, ALA is a nonprofit, educational organization committed to the preservation of the library as a resource indispensable to the intellectual, cultural, and educational welfare of the nation. A core value of the library profession is the commitment to providing free and equal access to information in the library.

The Texas Library Association (TLA) was established in 1902 and currently has a membership of more than 5,000 academic, public, school, and special librarians. TLA's mission is to unite and amplify voices of the library community through advocacy, education, and intentional equity, diversity, and inclusion. The association's core values include intellectual freedom, literacy and lifelong learning, equity of access to information, and ethical responsibility and integrity. TLA supports and advocates for Texas librarians and strives for continuous improvement toward excellence in libraries and librarianship.

FTRF, ALA, and TLA believe that viewpoint censorship violates the core value of preserving intellectual freedom and thus have a strong interest in the outcome of this case.

Appellants and Appellees consent to the filing of this amici curiae brief.

## STATEMENT OF CONTRIBUTIONS

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, FTRF, ALA, and TLA state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the amici curiae, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

# INTRODUCTION

At the public library in Llano, Texas, 17 books were removed from the library's shelves, erased from the library's catalogue, and hidden behind a desk. Patrons of the library would never know the books were there. Evidently, that was the idea.

The 17 books were not removed because they were damaged or old or because the library needed more shelf space. They were removed because some members of the community said the books were "filth," "inappropriate," and allegedly promoted views with which those individuals disagreed. Some of the books are undoubtedly controversial; though acclaimed and award-winning, they discuss challenging topics of race, sexuality, and identity. Others are humorous children's books about bodily functions. It was the content and perceived message of the books that got them removed.

When challenged about the books' removal, Llano County officials said this was just standard "weeding" of the library's collection. The district court rightly rejected this explanation. Libraries are havens of "freewheeling inquiry," where patrons can decide for themselves what to read and not to read. The purpose of "weeding" is to maintain a library collection that is "vital, relevant, and useful." But "weeding" must never be used—as it was here—as a cynical dodge for purging library collections of controversial or disfavored books. Professional librarian

training, standards of conduct, and ethical canons, consistent with the First Amendment, demand far more.

## ARGUMENT

### I.    Following the First Amendment is not a "burden" for librarians.

In their appeal, the Llano County officials suggest that librarians should be able to target books for removal from the shelves of public libraries, based on content or perceived viewpoint, because complying with the First Amendment imposes an intolerable "burden" on librarians.[1] Amici could not disagree more. Ensuring the First Amendment's guarantee of access to a broad range of information and ideas is in the highest tradition of public libraries and librarians.

### A.    Public libraries are citadels of American democracy.

In the United States, the tradition of public libraries traces its origins to Benjamin Franklin—Founder, polymath, and "the ultimate bibliophile."[2] Franklin proposed the public library concept to "address the issue of equal opportunity" of access to information, with the hope that "our people" would be "better instructed and more intelligent than people of the same rank generally are in other countries."[3]

---

[1]  Appellants' Br. at 40-41.

[2]  Carrie Mcbride, *Ben Franklin: The Ultimate Bibliophile*, NEW YORK PUBLIC LIBRARY BLOG (Jan. 17, 2020), https://www.nypl.org/blog/2020/01/17/ben-franklin-library-lover.

[3]  Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. NEW ENG. L. REV. 381, 394 (2012) (quoting Benjamin Franklin, THE COLLECTION OF BIOGRAPHY AND AUTOBIOGRAPHY 62-63 (1961)).

True to Franklin's vision to "render the benefit from books more common," public libraries became "a means of addressing resource scarcity."[4]

The modern model of the American public library evolved from Franklin's original Library Company of Philadelphia. Also known as a "circulating" or "lending library," a public library is "a collection of resources in a variety of formats" that is organized for "convenient … access."[5] The goal is to "stimulat[e] individual learning and advanc[e] society as a whole."[6] Over 17,000 public library outlets—including central and branch libraries and associated bookmobiles—now exist around the country.[7]

The civic role of public libraries has evolved, too. Particularly after witnessing the early twentieth-century "practices of European fascism"—pyres of burned books kindling the rise of totalitarian regimes—American librarians embraced a "'basic position in opposition to censorship.'"[8] In 1939, the American Library Association

---

[4] *Id.*

[5] AMERICAN LIBRARY ASS'N: RESOURCE GUIDES, "Definition of a Library," https://libguides.ala.org/library-definition (last visited June 1, 2023).

[6] *Id.*

[7] NAT'L CTR. FOR EDUC. STATS., DIGEST OF EDUC. STATS., Table 701.60, Number of public libraries (for FY 2018-19) n.1, https://nces.ed.gov/programs/digest/d21/tables/dt21_701.60.asp (last visited June 1, 2023).

[8] *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 238-39 (2003) (Souter, J., dissenting) (quoting Krug & Harvey, *ALA and Intellectual Freedom: A Historical Overview*, in INTELLECTUAL FREEDOM MANUAL at xi, xv (Am. Libr. Ass'n 1974) (tracing history of American public libraries)).

adopted its "Library Bill of Rights,"[9] which begins by confirming the essential role of public libraries as "forums for information and ideas":

> Books and other library resources should be provided for the interest, information, and enlightenment of **all people** of the community the library serves. Materials should not be excluded because of the origin, background, or views of those contributing to their creation.[10]

Public libraries are therefore not places to "transmit community values"[11] or to "coerce the taste of others."[12]  Rather, the public library "is a mighty resource in the free marketplace of ideas."[13]  The core function of the library is to make information and ideas, even—and especially—controversial information and ideas, available to anyone with a library card.

This simple notion has profound implications for American democracy. The "right to receive ideas is a necessary predicate to the **recipient's** meaningful exercise

---

[9]  *Library Bill of Rights and Freedom to Read Statement Pamphlet*, AM. LIBR. ASS'N, https://www.ala.org/aboutala/offices/oif/LBOR-FTR-statement-pamphlet (last visited June 1, 2023).

[10]  AM. LIBR. ASS'N LIBRARY BILL OF RIGHTS § 1 (emphasis added), https://www.ala.org/advocacy/intfreedom/librarybill (last visited June 1, 2023).

[11]  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 869 (1982) (plurality op.).

[12]  Krug & Harvey, *supra* note 8 (quoted in *ALA*, 539 U.S. at 239) (Souter, J., dissenting)).

[13]  *Minarcini v. Strongville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). *See also* John Buschman, *Everyday Life, Everyday Democracy in Libraries: Toward Articulating the Relationship*, THE POLITICAL LIBRARIAN, Vol. 4, Issue 1, 18 (June 2018), https://journals.library.wustl.edu/pollib/article/8545/galley/25378/view/ ("Traditionally . . . libraries and librarians are there to foster informed discourse and exchange.") (citation omitted).

of his own [constitutional] rights of speech, press, and political freedom"[14] and "is fundamental to our free society."[15]   James Madison, architect of the First Amendment, told us why: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both."[16]

**B.    Librarians are guided by well-established ethical canons and standards that favor no party, subject, or viewpoint.**

This democratizing role animates the public librarian's training and work. Librarians are professionals who must satisfy rigorous academic requirements. In Texas, for example, a professional librarian in a public library is defined as someone who holds a specialized degree in librarianship from an ALA accredited institution.[17] The ALA accredits 67 programs at 63 institutions in the United States, Canada, and Puerto Rico.[18]   Accreditation "assures that . . . programs meet appropriate standards of quality and integrity."[19]

---

[14]  *Pico*, 457 U.S. at 867 (plurality op.) (emphasis in original).

[15]  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

[16]  Letter from James Madison to W.T. Barry (Aug. 4, 1822), LIBRARY OF CONGRESS, https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text (last visited June 1, 2023) (*quoted in Pico*, 457 U.S. at 867-68 (plurality op.)).

[17]  *See* 13 TEX. ADMIN. CODE § 1.84.

[18]  *See Accreditation Frequently Asked Questions*, AM. LIBR. ASS'N, https://www.ala.org/educationcareers/accreditedprograms/faq (last visited June 1, 2023).

[19]  *Id.*

As part of their training, librarians agree to adhere to the ALA's Code of Ethics, which "guide[s] the work of librarians" with a focus on "the values of intellectual freedom that define the profession of librarianship."[20] Chief among these ethical obligations is the librarian's duty not to limit access to information based on viewpoint:

1. We provide the highest level of service to all library users through appropriate and usefully organized resources; equitable service policies; equitable access; and accurate, unbiased, and courteous responses to all requests.

2. We uphold the principles of intellectual freedom *and resist all efforts to censor library resources*.

   \*\*\*

6. We do not advance private interests at the expense of library users, colleagues, or our employing institutions.

7. We distinguish between our personal convictions and professional duties *and do not allow our personal beliefs to interfere* with fair representation of the aims of our institutions or the provision of access to their information resources.[21]

The ALA's Library Bill of Rights sets forth the "basic policies [that] should guide [library] services."[22] Like the Code of Ethics, the Library Bill of Rights is unequivocal in its condemnation of censorship and other attempts to limit information based on viewpoint or preference:

---

[20] AM. LIBR. ASS'N CODE OF ETHICS, https://www.ala.org/tools/ethics (last visited June 1, 2023).

[21] *Id.* ¶¶ 1-2, 6-7 (emphasis added).

[22] LIBRARY BILL OF RIGHTS, *supra* note 10 (preamble).

Libraries should provide materials and information presenting ***all points of view on current and historical issues***. Materials should not be proscribed or removed ***because of partisan or doctrinal disapproval***.

Libraries should challenge censorship in the fulfillment of their responsibility to provide information and enlightenment.[23]

Similarly, the ALA's Interpretation of the Library Bill of Rights explains that "'all people' and 'all points of view' should be included in library materials and information," with "no limiting qualifiers for viewpoint, origin, or politics."[24]

In short, under well-established professional standards, librarians do not (and cannot) vote certain viewpoints or topics off the proverbial island. For a public library to function as "a mighty resource in the free marketplace of ideas,"[25] it must afford patrons access to a broad spectrum of information and ideas. Above all, the library must not target for removal or suppression certain titles just because they may be unpopular, controversial, or outside the mainstream.

### C.    The First Amendment requires no more—or less.

These ethical canons and standards of professional conduct align with the U.S. Constitution. The U.S. Supreme Court, this Court, and courts around the country have recognized that public library patrons have "a First Amendment right to receive

---

[23] *Id.* §§ II, III.

[24] *Interpretations of the Library Bill of Rights*, AM. LIBR. ASS'N, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations (last visited June 1, 2023).

[25] *Minarcini*, 541 F.2d at 582.

information."[26]  Government officials therefore may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of public opinion.'"[27]  The removal of books from public library shelves, when "exercised in a narrowly partisan or political manner," is particularly incompatible with the First Amendment, which "does not permit the official suppression of *ideas*."[28]

Contrary to Appellants' contention, this constitutional baseline has not been disturbed.[29]  Nor does the First Amendment give librarians (or other government officials) carte blanche to remove books from library shelves simply because they or members of their community find the books objectionable. Yet that is exactly the regime Appellants propose: that the First Amendment no longer applies and state officials have what courts have rejected as "absolute discretion to remove books"

---

[26]  *See Pico*, 457 U.S. at 867 (plurality op.) (collecting cases); *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995).

[27]  *Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 872). While *Pico* and *Campbell* are public school library cases, their principles "have even greater force when applied to public libraries." *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000).

[28]  *Pico*, 457 U.S. at 870-71 (plurality op.) (emphasis in original); *see also id.* at 907 (Rehnquist, J., dissenting) ("I can cheerfully concede all of this . . . .").

[29]  *See* Appellants' Br. at 19. As Appellees have explained, dicta from *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005)—which itself cites only the Supreme Court's plurality opinion in *United States v. American Library Association*—does not concern removal of books from public libraries and is therefore inapplicable. *See* Appellees' Br. at 38-39. Moreover, under this Court's rule of orderliness, *Chiras* cannot overrule the earlier panel opinion in *Campbell*. *See, e.g.*, *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

from library shelves.[30]  The Court should eschew Appellants' proposed sea-change in First Amendment law.

Finally, established First Amendment principles are consistent with what librarians are already required to do in the Code of Ethics and Library Bill of Rights.[31]  In Appellants' view, complying with such requirements is too great a "burden" on librarians.[32]  But as nearly a century of public library practice shows, Appellants are incorrect. Indeed, "the transcendent imperatives of the First Amendment"[33] guide the work librarians do every day.

## II.    "Weeding" library collections is an objective process, not the targeted removal of disfavored or controversial books.

This constitutional baseline and related professional librarian standards inform the practice at issue here—the periodic "weeding" of library collections. Appellants' central theory is that the removal of the 17 books from the Llano Public Library was simply the product of a standard "weeding" process that is necessary and common in all public libraries.[34]  The district court rightly saw through this

---

[30]   *Compare Campbell*, 64 F.3d at 188 (applying *Pico*'s "guidance" and agreeing that the First Amendment imposes "constitutional limitations on school officials' discretion to remove books from a school library") *with* Appellants' Br. at 26-34.

[31]   CODE OF ETHICS, *supra* note 20; LIBRARY BILL OF RIGHTS, *supra* note 10.

[32]   Appellants' Br. at 40.

[33]   *Pico*, 457 U.S. at 864 (plurality op.).

[34]   Appellants' Br. at 41-42.

theory as a transparent cover to justify the suppression of books because of their content or perceived message.[35]

"Weeding" is a procedure performed by libraries to remove and replace books that are damaged or outdated.[36] This is an objective process guided by multiple factors. And while librarians must necessarily make judgment-calls about weeding out old books—it is not a mathematical exercise—that discretion is confined by the ethical and constitutional commands of viewpoint neutrality discussed above. Weeding is *not* a tool for government officials to remove selected books from library shelves because they or members of the community object to the books.

A. **Weeding guidelines provide an objective framework for maintaining library collections.**

Public library collections are constantly refreshed through the acquisition of new books and the "weeding" of other books, usually those that are old, damaged, or obsolete. Professional librarians weed books following an established policy that "highlight[s] objective criteria," considering "all materials [] for weeding based on

---

[35] ROA.3526-27.

[36] *See Collection Maintenance and Weeding*, Am. Libr. Ass'n, https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/weeding (last visited June 1, 2023) (citing Am. Libr. Ass'n Library Bill of Rights).

accuracy, currency, and relevancy."[37]  For physical books, "[s]pace limitations, edition, format, physical condition, and number of copies are considered."[38]

This procedure for managing limited space starts with a positive presumption favoring liberty of thought, not a negative presumption of thought control—"to promote reading, not to inhibit it; to multiply the points of view which will find expression, not to limit them . . . ."[39]  The professional librarian says, "if there is anything good in this book let us try to keep it; the censor says, if there is anything bad in this book, let us reject it."[40]  A useful book in bad condition might be kept if funding is unavailable to replace it.[41]

There are various methods for weeding library collections. The process that Appellants purported to follow here was the "CREW" method (which stands for "Continuous Review, Evaluation, and Weeding").[42]  CREW offers six general guidelines for judging library material under the acronym "MUSTIE":

M = *Misleading:* factually inaccurate

U = *Ugly:* beyond mending or rebinding

---

[37]  *Id.*

[38]  *Id.*

[39]  Lester Asheim, *Not Censorship But Selection*, AM. LIBR. ASS'N,www.ala.org/advocacy/intfreedom/NotCensorshipButSelection.

[40]  *Id.*

[41]  *See id.*

[42]  ROA.3508.

S = *Superseded* by a new edition or by a much better book on the subject

T = *Trivial:* of no discernible literary or scientific merit

I = *Irrelevant* to the needs and interests of the library's community

E = *Elsewhere*: the material is easily obtainable from another library.[43]

Under any recognized "weeding" approach, "the justification for weeding—to maintain a collection that is vital, relevant, and useful—and the criteria for weeding a library—physical condition, relevance of the subject, currency of the information—remain basically unchanged."[44] "The three most frequently asked questions are: Has it been used? Is it worn, soiled, or damaged? Is it outdated or inaccurate?"[45] And the goal is "to maintain a collection that is free from outdated, obsolete, shabby, or no longer useful items."[46]

To be sure, librarians are cognizant of the content of the collection materials, at both the acquisition and weeding stages. "Public libraries may decide there are areas of the collection that are important to the community (e.g. genealogy collections and local history collections), and material may not be regularly weeded

---

[43] Asheim, *supra* note 39; *see also* REBECCA VNUK, THE WEEDING HANDBOOK: A SHELF-BY-SHELF GUIDE 6 (2d ed. 2022) (describing MUSTIE method).

[44] *See* Jeanette Larson, *CREW: A Weeding Manual for Modern Libraries*, TEX. STATE LIBR. & ARCHIVES COMM'N 7 (2012), https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/ld/pubs/crew/crewmethod12.pdf.

[45] PEGGY JOHNSON, THE FUNDAMENTALS OF COLLECTION DEVELOPMENT AND MANAGEMENT 200 (4th ed. 2018).

[46] Larson, *supra* note 44, at 11.

from these identified collections."[47]  Similarly, the term "trivial" in the MUSTIE

analysis refers to materials that were once trendy and are now outdated, such as

books about fad diets or video games that have come and gone.[48]  To objectively

determine whether materials are trivial, a librarian would plainly need to understand

the content of the book.

But no theory of weeding supports the removal of books starting with lists or

spreadsheets that identify specific materials as having "inappropriate" content or

views. Again, the professional guidance is crystal-clear: "While weeding is essential

to the collection development process, it should not be used as ***a deselection tool for***

***controversial materials***."[49]  Unfortunately, that is exactly what happened in Llano

County.

## B.    Appellants' actions bear no resemblance to standard "weeding" practices.

The Llano County Defendants contend that the removal of the 17 books was

merely the product of "routine 'weeding,'"[50] but the district court rejected this as a

"pretextual" "post-hoc rationalization."[51]    Amici will not repeat Appellees'

---

[47]  *Collection Maintenance and Weeding*, *supra* note 36.

[48]  *See* Larson, *supra* note 44, at 57-59.

[49]  *Collection Maintenance and Weeding*, *supra* note 36 (citing Am. Libr. Ass'n Library Bill of Rights) (emphasis added).

[50]  ROA.3525.

[51]  ROA.3526.

discussion of the ample evidence supporting these findings. Amici note, however, that the district court's findings reveal a process in Llano County that was antithetical to standard "weeding."

1. **Appellants targeted specific books for their subject-matter or perceived viewpoint, which has no place in "weeding."**

The process of removing the 17 books in Llano County was not a routine operation, as Amici would expect to see in a weeding process. Instead, the Defendants "targeted and removed books" "based on complaints" by community members about the content and perceived viewpoints of the books.[52] None of the 17 books had been "slated" for review before the complaints were lodged, and many other books eligible for weeding were not removed.[53]

Substantively, the echoes of earlier attempts to remove controversial library materials were unmistakable. In New York in the 1970s, books by Richard Wright, Kurt Vonnegut, and Eldridge Cleaver were targeted as "anti-American" and "just plain filthy."[54] In Llano County in 2022, "well-regarded, prize-winning books" on topics like LGBTQ identity and race relations, along with children's "potty humor" books, were targeted as "inappropriate" or "pornographic filth" because—among other things—they depicted cartoon nudity, discussed sexuality, or allegedly

---

[52] ROA.3524.

[53] ROA.3527.

[54] *Pico*, 457 U.S. at 857, 873 (plurality op.).

promoted "CRT" views.[55]  What happened in Llano County was not a function of preserving library shelf space, but bending to complaints by community members about the perceived nature of the books.

According to Appellants, that is perfectly fine. In Appellants' view, because weeding necessarily "considers content," librarians may remove whatever book they like, for whatever reason—even targeting books they don't like.[56]  As a matter of professional library practice (not to mention the First Amendment), this proves too much. Content considerations are not necessarily forbidden. A best-seller from the 1960s may no longer merit shelf space when the new Colleen Hoover or Stephen King novel arrives. But the same book may not be removed under the guise of "weeding" if the removal is prompted by a government official's disapproval of the book's content or perceived message. Appellants' contrary view ignores professional librarians' ethical obligations and contravenes the First Amendment.

## 2. Appellants cannot fit their conduct within standard "weeding" practices.

Though they urge an unbounded concept of weeding, where books may be targeted with impunity for disfavored subject-matter or viewpoint, Appellants say very little about the 17 books themselves.

---

[55]  ROA.3529; ROA.3524.

[56]  Appellants Br. at 30, 33-34 (arguing that librarians may engage in "content discrimination" based on the "Misleading," "Superseded," and "Trivial" MUSTIE factors).

At one point, Appellants suggest that some of the books were ripe for weeding because they suffered from low circulation.[57]  But just because a book has not been checked out for a long time does not alone mean it should be removed. "[W]eeding procedures that do not take into account factors other than circulation may have the effect of exacerbating commodification and homogeneity in the public library."[58] "When only the most popular books are found on library shelves, the intellectual choices available to patrons shrink and become standardized."[59]

As for the books themselves, Appellants say even less. This is perhaps no surprise. As the district court noted, many of the removed titles are critically acclaimed books addressing urgent topics of our time, such as LGBTQ identity and relationships, and the history of race relations in America.[60]

Other removed titles are children's "potty humor" books. Despite the initial accusations by community members that some books constituted "pornographic filth," no one contends that any of the removed books is obscene. Rather, Appellants now defend their removal of so-called "butt" and "fart" books, panning that "plaintiffs have yet to explain the 'viewpoint' expressed in Larry the Farting

---

[57] *See id.* at 9, 36.

[58]  J. Dilevko, L. Gottlieb, *Weed to achieve: a fundamental part of the public library mission?*, 27 LIBR. COLL. ACQ. & TECH. SERV. 73, 94 (2003), https://www.moyak.com/papers/weeding-books-libraries.pdf.

[59] *Id.*

[60] ROA.3524.

Leprechaun . . . ."[61]  Of course, scatological humor has a rich and venerable literary tradition.[62]  Moreover, public libraries include books that entertain readers. Humorous and entertaining books encourage young readers to be interested in books—which fosters a love of reading and learning.[63]  And the First Amendment protects equally "the superfluous" and "the necessary."[64]

Setting aside Appellants' apparent concerns about *Larry the Farting Leprechaun*, Amici recognize that some of the removed books might be controversial or even offensive to some library patrons. But that is the point, after all—to "provide materials and information presenting all points of view on current and historical issues."[65]   Patrons may choose for themselves to read a given book— or not. But government officials may not make that choice for them, based on the officials' own view of "what shall be orthodox in politics, nationalism, religion, or other matters of public opinion."[66]

---

[61]  Appellants' Br. at 37 n.74.

[62]  *See, e.g.*, GEOFFREY CHAUCER, THE CANTERBURY TALES, *The Miller's Tale*, https://chaucer.fas.harvard.edu/pages/millers-prologue-and-tale.

[63]  A well-known example of this phenomenon is the Harry Potter book series. *See* Wynne Davis, *How Harry Potter Has Brought Magic to Classrooms For More Than 20 Years*, NAT'L PUBLIC RADIO (Dec. 31, 2018), https://www.npr.org/2018/12/31/678860349/how-harry-potter-has-brought-magic-to-classrooms-for-more-than-20-years (last visited June 1, 2023).

[64]  *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2048 (2021).

[65]  LIBRARY BILL OF RIGHTS, *supra* note 10 (preamble) .

[66]  *Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 872).

**III.** **Libraries are not secret clubs, where only patrons with special knowledge may access controversial titles.**

At points in their brief, Appellants appear to acknowledge that Appellees and other library patrons have a First Amendment right to access and receive information.[67] But Appellants contend that their "in-house checkout system"—which did not exist before this litigation and whose contents were contributed by Appellants' own counsel during this litigation—forecloses any violation of the Llano County library patrons' admitted rights.[68] Not so.

Appellants' "in-house checkout system" is anathema to the fundamental concept of a public library, which is designed to facilitate more—not less—access to information.[69] According to Appellants, a librarian (acting in concert with other government officials) may select certain books for elimination from the library's circulating collection—based solely on those individuals' views about the book— and then consign those books to a form of *damnatio memoriae*. The books are removed from the shelves, scrubbed from the library catalogue, and hidden from view. But, Appellants reason, because Appellees themselves know about these hidden books, by dint of their lawsuit, and may still check them out, Appellees' First Amendment rights have not been disturbed.

---

[67] Appellants' Br. at 21.

[68] *Id.* at 21-23.

[69] *See* Buschman, *supra* note 13, at 18.

This argument—like Appellants' embrace of viewpoint-based targeting under the guise of weeding—is too clever by half. Appellants' proffered system still impedes Appellees' and other patrons' ability to access titles. Before Appellants' actions, these 17 titles were freely available on the library shelves and in the Llano County library catalogue.[70] Appellees and their families could find the books themselves, or come upon them through browsing and happenstance, which are well-known and core features of public libraries. Now, the books at issue are out of the library catalogue and confined behind a desk, where only those "in the know" can access them.[71]

This is a foreign concept to Amici. It is not one used by libraries seeking to facilitate patrons' *access* to information. Instead, it confines certain books or categories of information—selected according to Appellants' own views—to a limited class of library patrons: those lucky enough to have found out about the system through the grapevine or tenacious enough to sue, like Appellees here.

Appellants' proffered "system" also contradicts historical and well-founded library organizational systems, i.e., that books and other materials should be located in the sections logically affiliated with their topics, based on objective criteria. For example, children's books appear in the children's *section* for young ones and

---

[70] *See, e.g.*, ROA.3509-10.

[71] ROA.3518.

families to find; young adult books are in the young adult ***section*** for teenagers to browse; biographies and history in their own ***section*** for anyone with an interest in that person or topic to locate.[72]   The decisions to place books in their appropriate sections are made according to objective systems, such as information provided by publishers and Library of Congress categorizations, at the time the library acquires the book.[73]

To upend that system by deciding that some disfavored books should come off the shelves, erased from the catalogue, and confined to a hidden area is an obvious burden on Appellees and anyone else seeking access to them.[74]   Were that conduct permitted to stand, it would encourage arbitrary alteration to information systems in libraries according to a given librarian's whims and potentially put an end to "library browsing" as it has been understood for the entire historical existence of libraries.[75]

---

[72]  CAROL ALABASTER, DEVELOPING AN OUTSTANDING CORE COLLECTION 88, 100, 138–157 (2d ed. 2010).

[73]  *See id.*; *see also* JOHNSON, *supra* note 45, 120-21.

[74]   To be clear, Appellants' made-up "in-house system" bears no resemblance to a traditional "reserve system," which is sometimes employed in academic and specialized libraries containing rare or archival materials to prevent their degradation of theft. Amici are unaware of any evidence that Llano County has (or has the need for) such a system or that the books at issue would qualify for it if it existed. Nor is there evidence Appellants were motivated by the concerns underpinning such a system in withdrawing the books at issue. More importantly, even in book reserve systems, rare or reserve materials ***still appear in the library's catalogue*** and are usually accessible within a short time of a patron's request, neither of which is true for Appellants' system.

[75] *See Sund*, 121 F. Supp. 2d at 551 (discussing unconstitutional burden on "the First Amendment rights of browsing Library patrons").

Appellants' contention that "it is ***easier*** for the plaintiffs to obtain their desired book" through the in-house checkout system is risible.[76] If, before the 17 books' segregation behind the desk, Appellees or any patron had known where one of these books was located in the library (which would be easy to determine, given the books' prior presence in the online catalogue), the patron was free to walk to the shelf where the book was located, retrieve it, and check it out.

Now, patrons must know which books are behind the desk, seek out a librarian, explain which book they want, and request special access to the book. That is almost certain to take more time and effort by library patrons—even those lucky enough to know the book they seek can be found among an uncatalogued, behind-the-desk stash. Indeed, the burden of having to go through that process instead of a free browsing and checkout process shows why Appellants' "system" is a burden on the First Amendment right to access information of Llano County library's patrons.[77]

To the extent Appellants' actions were allegedly motivated by protecting children or young people from certain ideas, that, too, is anathema to the concept of public libraries. As discussed above, libraries provide access to information; it is up to patrons to decide how to use it. Parents therefore play an important role in guiding

---

[76] Appellants' Br. at 24 (emphasis in original).

[77] *See* JOHNSON, *supra* note 45, 209 ("[A] section in the library's general collection management policy . . . should address criteria and rationale for storing items. . . . Making clear the operating principles under which these decisions are made protects the library from charges of bias and irresponsible behavior.").

their own children to titles the parents view as appropriate. But simply because one parent decides that a particular title is not appropriate for their own child does not mean that parent should be permitted to make the same choice for—or impose that limitation on—all other parents who might bring their children to the library.[78]

This is particularly true considering the principle that minors should have access to books that are developmentally appropriate for them and their literacy level.[79] Different readers can have different levels of maturity, despite having the same numerical age. Appellants' one-size-fits-all approach, prompted by the unique concerns of one (or even a few) parents, disregards that reality. That sort of ideological imposition also contradicts the fundamental rights of other parents to raise their own children through exposure to alternate ideas.[80]

The only conclusion from Appellants' actions that Amici can draw is that it is a targeted effort to reduce the free flow of books and information to the patrons of Llano County Public Library. Appellants go to great lengths to ignore the impediment to other patrons' access to information under the in-house checkout

---

[78] *Sund*, 121 F. Supp. 2d at 551 ("Moreover, if a parent wishes to prevent her child from reading a particular book, that parent can and should accompany the child to the Library, and should not prevent all children in the community from gaining access to constitutionally protected materials.").

[79] *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 193, n. 15 (1982) (noting importance of education program "appropriate" to a child's "learning capacities") (citation omitted); *see also* J.S. CHALL, STAGES OF READING DEVELOPMENT (2d ed. 1996).

[80] *See, e.g.*, *Pierce v. Soc. of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925).

system.[81]    Appellants appear to believe that by attempting to sweep aside the harm to those other patrons, they may be able to convince the Court that Appellees' rights have not been burdened.

But their actions restrict not just Appellees' access, as explained above, but also access by ***every patron*** of the Llano County Library. If Appellees cannot browse the titles at issue in the library—and can find them based only on having "heard testimony about the donation and availability of the 17 disputed books"[82]—certainly no other patrons will have access to those materials. Not only does this arrangement burden all patrons' access to information and ideas, but it also effectively insulates Appellants' actions from judicial review. Anytime a patron were to challenge a viewpoint-based book removal, Appellants could eliminate the injury by making the book available through the clandestine in-house checkout system.

The effect of Appellants' in-house system will likely be felt most keenly in lower-income and rural areas—the very places that benefit the most from access to the free exchange of information made possible by public libraries.[83]   Even in the modern era, not every American has consistent access to the internet or a

---

[81]  *See* Appellants' Br. at 24-25.

[82]  *Id.* at 24.

[83]   Bookstores and online book retailers do not mitigate this harm. *See Pico*, 457 U.S. at 881 (Blackmun, J., concurring in part) ("surely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores").

smartphone. According to the Federal Communications Commission, "[i]n rural areas, nearly one-fourth of the population—14.5 million people—lack access to [fixed broadband service at threshold speeds]."[84]  So for many Americans, public libraries remain the principal area where they may have "unfettered access to information,"[85] which was Ben Franklin's original vison for fostering an informed citizenry.

## CONCLUSION

Amici conclude where they began: public libraries are "designed for freewheeling inquiry."[86]  Appellants' actions hobble that inquiry, to the detriment of the Appellees and every other Llano County Library patron, as well as to the core values of libraires that are historically protected by the First Amendment. These actions should not be permitted and the district court's preliminary injunction countermanding Appellants' actions should be AFFIRMED.

---

[84]  FED. COMMC'NS COMM'N, EIGHTH BROADBAND PROGRESS REPORT, https://www.fcc.gov/reports-research/reports/broadband-progress-reports/eighth-broadband-progress-report (last visited June 1, 2023).

[85]  *See* Saoirse De Paor, Bahareh Heravi, *Information literacy and fake news: How the field of librarianship can help combat the epidemic of fake news*, 46 THE JOURNAL OF ACADEMIC LIBRARIANSHIP 6 (2020), https://tinyurl.com/5hajwete ("[U]nfettered access to information is the best way to counter disinformation and media manipulation.").

[86]  *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting).

Dated: June 2, 2023                    Respectfully submitted,

                                       _s/ Thomas F. Allen, Jr._
                                       Thomas F. Allen, Jr.
                                       FROST BROWN TODD LLP
                                       2101 Cedar Springs Rd., Suite 900
                                       Dallas, Texas 75201
                                       T:  (214) 545-3472
                                       F:  (214) 545-3473
                                       tfallen@fbtlaw.com

                                       Kevin Shook
                                       FROST BROWN TODD LLP
                                       10 W. Broad Street
                                       Suite 2300
                                       Columbus, Ohio 43215
                                       T: (614) 464-1211
                                       F: (614) 464-1737
                                       kshook@fbtlaw.com

                                       Ryan W. Goellner
                                       FROST BROWN TODD LLP
                                       3300 Great American Tower
                                       301 E. Fourth Street
                                       Cincinnati, Ohio 45202
                                       T:  (513) 651-6800
                                       F:  (513) 651-6981
                                       rgoellner@fbtlaw.com

                                       *Counsel for Amici Curiae*
                                       *Freedom to Read Foundation,*
                                       *Texas Library Association, and*
                                       *American Library Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of FED. R. APP. P. 29(a)(5) and 32(a)(7)(b) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 6,020 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, with the exception of footnotes, which are in 12-point Times New Roman font pursuant to 5TH CIR. R. 32.1.

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.

# CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2023, I electronically submitted the foregoing to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF system, which sent a Notice of Electronic Filing to the following attorneys of record:

Ellen V. Leonida
Matthew Borden
Marissa R. Benavides
Max Bernstein
Kory James DeClark
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
leonida@braunhagey.com
borden@braunhagey.com
benavides@braunhagey.com
bernstein@braunhagey.com
declark@braunhagey.com

Katherine P. Chiarello
Ryan A. Botkin
Maria Amelia Calaf
Ian C. Crichton
BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, Texas 78701
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com
ian@bccaustin.com

*Counsel for Plaintiffs-Appellees*

Jonathan F. Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

s/ Thomas F. Allen, Jr.
Thomas F. Allen, Jr.