# United States Court of Appeals
# for the Fifth Circuit

---

United States Court of Appeals
Fifth Circuit

**FILED**

June 6, 2024

Lyle W. Cayce
Clerk

No. 23-50224

---

Leila Green Little; Jeanne Puryear; Kathy Kennedy;
Rebecca Jones; Richard Day; Cynthia Waring; Diane
Moster,

*Plaintiffs—Appellees,*

*versus*

Llano County; Ron Cunningham, *in his official capacity as Llano
County Judge*; Jerry Don Moss, *in his official capacity as Llano County
Commissioner*; Peter Jones, *in his official capacity as Llano County
Commissioner*; Mike Sandoval, *in his official capacity as Llano County
Commissioner*; Linda Raschke, *in her official capacity as Llano County
Commissioner*; Amber Milum, *in her official capacity as Llano County
Library System Director*; Bonnie Wallace, *in her official capacity as
Llano County Library Board Member*; Rochelle Wells, *in her official
capacity as Llano County Library Board Member*; Rhoda Schneider, *in
her official capacity as Llano County Library Board Member*; Gay Baskin,
in her official capacity as Llano County Library Board Member*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-424

---

Before Wiener, Southwick, and Duncan, *Circuit Judges.*

No. 23-50224

Jacques L. Wiener, Jr., *Circuit Judge*:

> *The dirtiest book in all the world is the expurgated book.*[1]

Plaintiffs-Appellees, seven patrons of the Llano County library system ("Plaintiffs"), brought this suit against Defendants-Appellants Llano County, the members of the County's Commissioners Court, the County's library system director, and the library board (collectively, "Defendants"). Plaintiffs claim that Defendants violated their First Amendment right to access information and ideas by removing seventeen books based on their contents and messages. The district court granted Plaintiffs' request for a preliminary injunction, requiring Defendants to return "all print books that were removed because of their viewpoint or content" and enjoining Defendants from "removing any books . . . for any reason during the pendency of this action." Defendants appeal. For the reasons to follow, we MODIFY the language of the injunction to ensure its proper scope, but otherwise AFFIRM.

## I. Facts

Libraries must continuously review their collection to ensure that it is up to date and to make room for new acquisitions. Like many libraries, the Llano County library system uses the "Continuous Review, Evaluation and Weeding" ("CREW") process. This is a standardized method of evaluating a library's collection and removing outdated or duplicated materials (also known as "weeding"), according to objective, neutral criteria. Llano County applies the "MUSTIE" factors in weeding books, as recommended by experts in the field, under which a book is evaluated for whether it is (1) "Misleading and/or factually inaccurate," (2) "Ugly (worn out beyond

---

[1] Walt Whitman (1888), *in* Horace Traubel, With Walt Whitman in Camden 124 (1906).

mending or rebinding)," (3) "Superseded by a new edition or a better source," (4) "Trivial (of no discernable literary or scientific merit)," (5) "Irrelevant to the needs and interests of the community," or (6) "Elsewhere (the material may be easily borrowed from another source)." Weeding decisions are made based on "some combination of these criteria – that is, an item will probably not be discarded based on meeting only one these criteria."

Llano County's public library system has three physical branches, respectively located in Llano, Kingsland, and Buchanan Dam. The library also offers access to e-books and audiobooks through a digital service called Bibliotheca. Amber Milum serves as the director of the library system. *See* Tex. Local Gov't Code § 323.005(a) (providing for the appointment of a "county librarian"). The library is under the general supervision of the County's Commissioners Court, which is led by Judge Ron Cunningham. *See id.* § 323.006.

In August 2021, Llano resident Rochelle Wells, together with Eva Carter and Jo Ares, complained to Cunningham about "pornographic and overtly sexual books in the library's children's section." They were specifically concerned with several books about "butts and farts." Wells had been checking out those books continuously for months to prevent others from accessing them. As library director, Milum had initially ordered those books because she thought, based on her training, that they were age appropriate. Because of the complaints, Cunningham told Milum to remove the books from the shelves. Commissioner Jerry Don Moss also requested that Milum remove the books, telling her that the next step would be going to court, which would lead to bad publicity, and advising her to "pick her battles." She followed those instructions and removed the "butt and fart" books from both the library shelves and the catalog.

No. 23-50224

A few months later, in response to further complaints, Cunningham directed Milum to immediately pull all books from the shelves that "depict any type of sexual activity or questionable nudity." That direction came via a forwarded email that Cunningham had received from a constituent named Bonnie Wallace. Wallace had sent Cunningham a list of books in the Llano County library system that appeared on Texas Representative Matt Krause's list of objectionable material, referring to the books as "pornographic filth." After receiving that list ("the Wallace list") from Cunningham, Milum pulled the books from the shelves, allegedly to "weed" them based on the traditional MUSTIE factors. Milum testified that she would not have pulled the books had it not been for her receipt of the Wallace list. In fact, she had pulled no other books for review during that time period. By the end of 2021, seventeen books—all on the Wallace List—had been removed from the Llano County library system entirely.

Loosely grouped, those books are:

- Seven "butt and fart" books, with titles like *I Broke My Butt!* and *Larry the Farting Leprechaun*;
- Four young adult books touching on sexuality and homosexuality, such as *Gabi, a Girl in Pieces*;
- *Being Jazz: My Life as a (Transgender) Teen* and *Freakboy*, both centering on gender identity and dysphoria;
- *Caste* and *They Called Themselves the K.K.K.*, two books about the history of racism in the United States;
- Well-known picture book, *In the Night Kitchen* by Maurice Sendak, which contains cartoon drawings of a naked child; and
- *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health*.

No. 23-50224

In January 2022, the existing library board was dissolved and a new board was created. Cunningham appointed Wells and Wallace to the new board. The new board implemented several policy changes, including prohibiting Milum from attending their meetings and requiring her to seek approval before purchasing any new books.

Defendants' attorney donated copies of the seventeen books back to the library after the inception of this litigation. However, today the books are not on shelves nor in the catalog system. Instead, if a patron wishes to access them, he or she must approach the desk and ask the librarian for them. Their existence has not been advertised in any way: Without reading the briefs in this lawsuit, there is no way to know that the books are available. Defendants characterize this as an "in-house checkout system," which has been traditionally used to let people read reference books inside the library. However, unlike the seventeen at issue here, those books are available in the catalog.

## II. Procedural History

Plaintiffs, seven patrons of the library, brought this suit, alleging that Defendants removed the seventeen books because they disagreed with the books' content, in violation of the First Amendment.[2] Plaintiffs sought a preliminary injunction requiring, among other things, that Defendants replace the seventeen books. In response, Defendants moved to dismiss Plaintiffs' suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). After a two-day evidentiary hearing, the district court largely denied

---

[2] Plaintiffs also brought a due process claim under the Fourteenth Amendment. However, that claim is not at issue in this appeal because the district court did not rely on it in granting the preliminary injunction.

No. 23-50224

Defendants' motion to dismiss and granted Plaintiffs' motion for a preliminary injunction.

The district court first held that Plaintiffs had standing to bring the case, including assertion of a constitutional injury in the form of an inability to check out the contested books. The court rejected Defendants' argument that Plaintiffs' claims were mooted because they could access the books through Bibliotheca or the in-house checkout system.[3] The district court next held that Plaintiffs' complaint adequately pleaded a First Amendment claim upon which relief could be granted, noting that while public libraries have "broad discretion" to curate the content of their collections, this discretion is not absolute. *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204 (2003) (plurality opinion) (hereinafter "*ALA*"). The court therefore adopted a standard from our 1995 decision *Campbell v. St. Tammany Parish School Board*, in which we held that libraries may not "remove books from school library shelves 'simply because they dislike the ideas contained in those books.'" 64 F.3d 184, 188 (5th Cir. 1995) (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality opinion)). "The key inquiry in a book removal case," we wrote in *Campbell*, is whether the government's "substantial motivation" was to deny library users access to "objectionable ideas." *Id.* at 187, 190. The district court held that Plaintiffs had adequately pled that "Defendants' conduct was substantially motivated by a desire to remove books promoting ideas with which [they] disagreed."

---

[3] Initially, Plaintiffs also brought a claim relating to OverDrive, the online book database that the library had used prior to Bibliotheca. The district court granted Defendants' motion to dismiss Plaintiffs' "OverDrive-related claims" because they were mooted by the County's new contract with Bibliotheca.

No. 23-50224

The trial court then considered Plaintiffs' application for a preliminary injunction. It held that Plaintiffs were likely to succeed on the merits of their claim, addressing both viewpoint and content discrimination. As to viewpoint discrimination, applying the standard from *Campbell*, the court found that Defendants' "likely motivat[ion]" in removing the books was "a desire to limit access to the viewpoints" with which they disagreed. It saw Defendants' claim that the removals were part of the library's routine weeding process as a post hoc and pretextual rationalization. The court also determined that Plaintiffs were likely to succeed on the merits of their First Amendment claim through a content discrimination analysis, as the removal decisions would not survive strict scrutiny.

Finding the remaining preliminary injunction factors to be satisfied, the district court ordered Defendants to "(1) return all print books that were removed because of their viewpoint or content," including the seventeen books at issue; (2) "update all Llano County Library Service's catalogs to reflect that these books are available for checkout"; and (3) refrain from "removing any books from the Llano County Library Service's catalog for any reason during the pendency of this action."

Defendants timely appealed the district court's injunction. They also moved to expedite the appeal and for an injunction pending appeal. A motions panel of our court agreed to expedite and carried the motion for an injunction with the case. When this panel was assigned the case, we granted an administrative stay of the district court proceedings pending our decision.

### III. Standard of Review

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Rest. Law Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). A factual finding is not clearly erroneous if it is "plausible in light

No. 23-50224

of the record viewed in its entirety . . . even though we may have weighed the evidence differently." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1116 (5th Cir. 2021) (citation omitted). To obtain the "extraordinary remedy" of a preliminary injunction, the movant must show "(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010).

## IV. Analysis

The crux of this appeal concerns the appropriate balance between a library's necessary discretion in making collection decisions and the rights of its patrons to access information and ideas. Although this is undoubtedly a hot-button issue at present, we answered the question in 1995 in *Campbell*, a directly applicable decision that circumscribes the boundaries of our analysis today. The district court, applying the correct standard, did not abuse its discretion in granting Plaintiffs' request for a preliminary injunction. We explain why below.

### A. The First Amendment Limits Public Libraries' Discretion to Shape Their Collections

We first outline the relevant cases to trace the contours of the First Amendment as it applies to libraries and book removal. While the First Amendment may most famously shield freedom of speech, it also protects "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This right is a "necessary predicate to the recipient's meaningful

No. 23-50224

exercise" of other rights protected by the First Amendment. *Pico*, 457 U.S. at 867 (plurality opinion).[4]

In *Pico*, the Supreme Court considered whether school officials acted in violation of the First Amendment when they removed what critics called "just plain filthy" books from public school library shelves. *Id.* at 857 (plurality opinion). A plurality of the Court observed that, because students do not "shed their constitutional rights . . . at the schoolhouse gate," school officials must discharge their discretionary functions "within the limits and constraints of the First Amendment." *Id.* at 865 (plurality opinion) (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969)). The Court held that while school boards have discretion to "determine the content of their school libraries," such discretion "may not be exercised in a narrowly partisan or political manner." *Id.* at 870 (plurality opinion). School officials "may not remove books from school library shelves simply because they dislike the ideas contained in those books." *Id.* at 872 (plurality opinion). If they do so with the intent to deny "access to ideas with which [they] disagree[], and if this intent [is] the decisive factor in [their] decision, then

---

[4] The dissent asserts that *Stanley*'s "right to receive information and ideas" is only relevant in a private context. It is true that the only quasi-binding precedent to apply this right to public libraries is one of *Pico*'s several opinions. Note, however, that this court has applied *Stanley*'s rule in the context of prison libraries, *see Mann v. Smith*, 796 F.2d 79, 83 n.3 (5th Cir. 1986), and other circuits have applied it to public libraries, *see Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). And regardless, the Supreme Court has applied *Stanley* in various other non-private contexts, rendering the dissent's concern about extending its holding inapt. *See, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (attending criminal trials); *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (receiving advertisements with prescription drug prices); *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (hearing a lecturer speak).

No. 23-50224

[they] have exercised their discretion in violation of the Constitution."[5] *Id.* at 871 (plurality opinion).[6]

We had an opportunity to apply this Supreme Court guidance in *Campbell*. There, school officials had removed the book *Voodoo & Hoodoo* from the school library after parents complained that the book was dangerous. 64 F.3d at 186–87. We affirmed the principle that the "key inquiry in a book removal case" is the remover's "substantial motivation in arriving at the removal decision." *Id.* at 190. The record, however, was not sufficiently developed at the summary judgment stage to determine whether "the single decisive motivation" behind the removal decision was to "deny students access to ideas with which the school officials disagreed." *Id.* at 188, 191. Thus, while the circumstances surrounding the removal of *Voodoo & Hoodoo* could not "help but raise questions regarding the constitutional validity of [the] decision," we remanded the case to the district court for further factual consideration. *Id.* at 191.

Also relevant to our analysis today is the Supreme Court's 2003 *American Library Association* decision. That case addressed a federal law granting public libraries money for internet access, provided that they install computer filters to block material harmful to children. 539 U.S. at 201. A

---

[5] A "decisive factor" is a "'substantial factor' in the absence of which the opposite decision would have been reached." *Pico*, 457 U.S. at 871 n.22 (plurality opinion).

[6] Although *Pico* was a highly fractured opinion, the Supreme Court has clarified that "all members of the Court, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). We have said that while "the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the . . . removal decision was based on constitutional motives." *Campbell*, 64 F.3d 189. Our opinion in *Muir v. Alabama Educational Television Commission* does not compel an alternative result. *See id.* (citing *Muir*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc)).

No. 23-50224

plurality of the Court rejected a facial First Amendment challenge to the law. *See id.* at 198–99 (plurality opinion). The yet again sharply divided Court (with a four-judge plurality, two concurrences, and three dissents) did so for different reasons. Justice Rehnquist, writing for the plurality, emphasized public libraries' "broad discretion" in shaping their collections, writing that it is the librarian's responsibility to "separate out the gold from the garbage." *Id.* at 204 (plurality opinion) (quoting W. Katz, Collection Development: The Selection of Materials for Libraries 6 (1980)). Justice Kennedy focused not on libraries' discretion but instead on the fact that a librarian could quickly unblock material upon request, rendering any burden on patrons insignificant. *Id.* at 214–15 (Kennedy, J., concurring). Finally, Justice Breyer's concurrence was concerned with "fit": the relative burden that the law placed on library patrons versus the government's legitimate interests in protecting young library patrons from inappropriate material. *Id.* at 220 (Breyer, J., concurring). There were very few "common denominators" between these three opinions which would "provide a controlling rule that establishes or overrules precedent." *See Whole Woman's Health v. Paxton*, 972 F.3d 649, 652 (5th Cir. 2020) (internal quotation marks and citation omitted). To the extent that one exists, we see it as an agreement that libraries must consider content to some degree in selecting material. But we still hesitate to ascribe *ALA* with significant precedential power, such that it could have modified the clear rule that we announced in *Campbell*.

From these three cases, we glean the following rules. Librarians may consider books' contents in making curation decisions. *Id.* at 205 (plurality opinion). Their discretion, however, must be balanced against patrons' First Amendment rights. *Pico*, 457 U.S. at 865 (plurality opinion). One of these rights is "the right to receive information and ideas." *Stanley*, 394 U.S. at 564. This right is violated when an official who removes a book is

"substantially motivated" by the desire to deny "access to ideas with which [they] disagree[]." *Pico*, 457 U.S. at 871 (plurality opinion); *see also Campbell*, 64 F.3d at 191. To be sure, content is necessarily relevant in removal decisions. *ALA*, 539 U.S. at 205 (plurality opinion). But a book may not be removed for the sole—or a substantial— reason that the decisionmaker does not wish patrons to be able to access the book's viewpoint or message. *Campbell*, 64 F.3d at 191. Thus, a librarian who removes the 7th Edition of a Merriam-Webster dictionary in favor of the 8th Edition does not act unconstitutionally simply because he or she considers the books' content and prefers the new edition. They may remove the 7th Edition with the intent to eliminate superfluous editions to make room for new volumes, or merely because the content is superseded by the 8th Edition. Similarly, a book by a former Grand Wizard of the K.K.K., which hasn't been checked out in years and is discovered by a librarian during routine weeding, could be removed based on lack of interest and poor circulation history.

We agree with Defendants that public forum principles are "out of place in the context of this case." *ALA*, 539 U.S. at 205 (plurality opinion). In *ALA*, the plurality explained in dicta that forum analysis is inapplicable because "[a] public library does not acquire internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of books to speak." *Id.* at 206 (plurality opinion). But that is not what Plaintiffs argue here. They are not authors who seek to have their books included in the library's collection, but instead are patrons who seek to exercise their right to receive information.[7] This distinction is relevant to the applicability of forum

---

[7] This also distinguishes many of the cases cited by the dissent. *See, e.g.*, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 465 (2009) (plaintiff was organization seeking

No. 23-50224

principles. In *Chiras v. Miller*, a textbook author and a student brought suit against a state board of education that decided to select certain textbooks over others. 432 F.3d 606, 607 (5th Cir. 2005). A panel of our court relied on *ALA* and found that forum analysis did not apply. *Id.* at 615. We did so on consideration of whether there was a "forum to which Chiras [the textbook author] might assert a right of access under the First Amendment." *Id.* at 618. But, we wrote, "[t]he conclusion that no forum exists in this case does not necessarily preclude . . . Appellant Rodriguez's asserted right as a student to receive the information in Chiras' textbook from the school." *Id.*

The dissent—like Defendants—attempts to distinguish *Pico* and *Campbell* from *ALA* and the case at hand. Each of the reasons for doing so is without merit; all four cases are harmonizable. First, our colleague believes that *Campbell*'s focus on the "unique role of the school library" circumscribes its applicability. *See Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 869 (plurality opinion)). It is beyond dispute that there are unique considerations involved in balancing the discretion necessary for collection curation against students' First Amendment rights. *See Pico*, 457 U.S. at 879 (Blackmun, J., concurring). But if the principles enshrined in *Pico* and *Campbell* apply in the education context, in which particular free speech principles are restricted because of school officials' need to control the curriculum and school environment, then they apply with even greater force outside of the education context, where no such limitations exist. *See Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 3d 530, 548 (N.D. Tex. 2000). In emphasizing that students do not "shed their constitutional rights . . . at the schoolhouse gate," the Court in *Pico* necessarily acknowledged that rights outside the school context are even more robust. *See Pico*, 457 U.S. at 865

---

to create and donate monument to public park); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 26 (D.C. Cir. 2005) (same).

(plurality opinion) (quoting *Tinker*, 393 U.S. at 506). The Court in *Pico* also expressly emphasized that its holding is limited to "*library* books, books that by their nature are optional rather than required reading," as opposed to curricular materials. *Id.* at 862 (plurality opinion). This rendered the unique constitutional concerns of the classroom immaterial to the case. *See id.* ("Our adjudication of the present case thus does not intrude into the classroom.").[8] As we noted in *Campbell*, "the high degree of deference accorded to educators' decisions regarding curricular matters diminishes when the challenged decision involves a noncurricular matter." 64 F.3d at 188. Our colleague's worry about "transplanting *Campbell* into the realm of public libraries" is therefore misplaced, as we are already bound by its reasoning in and out of the school context.

The dissent next insists that *ALA* prevents us from applying *Campbell*, as *Campbell*'s "substantial motivation" test is incompatible with *ALA*'s recognition of public libraries' "broad discretion" in collection curation. First, as we noted above, the badly fractured nature of *ALA*'s plurality opinion circumscribes its precedential effect. We are skeptical that five Justices would have agreed with the "broad discretion" language of the plurality. Further, "broad discretion" is not the same as "unlimited discretion." The Supreme Court recognized in *Pico* that officials do not have "absolute discretion to remove books from their school libraries." 457 U.S. at 869 (plurality opinion). The hypothetical posed by the dissent is inapt: If a librarian exercises his or her discretion in removing a book promoting Holocaust denial, as allegedly allowed by *ALA*, it does not necessarily follow

---

[8] We discussed this distinction in *Chiras v. Miller*, in which we declined to apply *Pico* to a situation involving the selection of a textbook for use in the classroom, as *Pico* concerned "the removal of an *optional* book from the school library." 432 F.3d at 619 (emphasis added).

that "the book is being removed because the library dislikes the ideas in it," as forbidden by *Campbell*. Instead, the librarian might be removing the book based on other constitutional considerations, such as the accuracy of the content. Although a public library *does* have discretion to consider books' content in shaping its collection, when such discretion is exercised via unconstitutional motivations—*i.e.*, a desire to "prescribe what shall be orthodox,"—the protections of the First Amendment necessarily come into play. *Pico*, 457 U.S. at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). The dissent's second justification for rejecting *Campbell*, then, is also unpersuasive.

Finally, the dissent contends that, even if *Campbell* were to apply in the public library context, the district court's application of the case does not comport with its holding. Our colleague sees the district court's use of strict scrutiny for content-related decisions as being in conflict with *Campbell*'s suggestion that removing "pervasively vulgar" or "educational[ly] [un]suitable" books would not be unconstitutional. *See Campbell*, 64 F.3d at 188–89 (quoting *Pico*, 457 U.S. at 871 (plurality opinion)). The district court's opinion is somewhat imprecise on the difference between viewpoint and content discrimination and the role that *Campbell*'s substantial-motivation test plays in each analysis. But *Campbell*'s rule holds true regardless: if the remover's motivation is to deny access to ideas with which he or she disagrees, the remover violates the Constitution. *Id.* at 188. Even if this decision were subject to only the lowest level of scrutiny, the government has no legitimate interests furthered by removal. We therefore hold that if a government decisionmaker removes a book with the substantial motivation to prevent access to particular points of view, he or she violates the First Amendment, and no further analysis is required.

Before the district court, Defendants also asserted that their actions in selecting books for library shelves constituted government speech, to which

No. 23-50224

the Free Speech Clause does not apply. The district court disagreed, explaining that it was bound by *Campbell*'s application of the First Amendment to library collection decisions.[9] Defendants have not pressed this theory on appeal, although our dissenting colleague remains convinced.[10]

While "[t]he Free Speech Clause . . . does not regulate government speech," collection decisions are not such speech. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). Nowhere in *Campbell*, which is binding on us, did we suggest that a public official's decision to remove a book from a school library was government speech. *See* 64 F.3d at 190. The choice to do so is subject to the First Amendment's limitations. *See id.* at 188. The cases cited by our dissenting colleague, like *Forbes* and *Finley*, stand for the proposition that the government requires extensive discretion in "deciding

---

[9] The district court also distinguished between cases cited by Defendants about the initial selection of materials versus those regarding book removal, holding that only the latter were relevant to the case at hand. We decline to expressly address the relevance of this distinction because *Campbell*'s clear application renders it unnecessary for the scope of our review today. We note that it is entirely possible that a book with a strong viewpoint, initially protected on selection, might later be constitutionally removed if, *inter alia*, it becomes damaged or is not checked out.

[10] Plaintiffs contend that Defendants have waived their government-speech argument by not raising it in their opening brief to this court. Generally, "a party waives any argument that it fails to brief on appeal." *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009). But this rule is not absolute; whether waiver applies "depends on the nature of the issue." *Stramaski v. Lawley*, 44 F.4th 318, 326 (5th Cir. 2022). Our dissenting colleague sees the question of government speech as inextricably bound up in the issue of how the First Amendment applies to a library's collection decisions, such that we cannot address one without the other. *See id.* (considering "the unasked question of whether the doctrine even applies"). Although we are not so confident in the inevitability of the government speech theory, we consider the question because of its import. *See id.* at 326 (explaining that the issues which we may consider are "not limited to the particular legal theories advanced by the parties"); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("[W]hat questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals.").

No. 23-50224

what private speech to make available to the public." *ALA*, 539 U.S. at 204 (plurality opinion) (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998) and *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 585 (1998)). We agree. But, again, this discretion is not so unfettered as to put these government actions entirely outside the ambit of the First Amendment. *See Pico*, 457 U.S. at 869 (plurality opinion) (rejecting absolute discretion). In each of these cases, the Court upheld the government's right to consider the content of private speech in deciding what to make available to the public. *See, e.g.*, *Finley*, 524 U.S. at 585 (allowing the NEA to consider a "wide variety" of funding criteria, including "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value . . . ."). As discussed above, we agree that library personnel must necessarily consider content in curating a collection. However, the Court has nowhere held that the government may make these decisions based solely on the intent to deprive the public of access to ideas with which it disagrees. That would violate the First Amendment and entirely shield all collection decisions from challenge. *See Pico*, 457 U.S. at 871 (plurality opinion); *Campbell*, 64 F.3d at 190.[11]

---

[11] The dissent cites numerous cases involving the selection of public monuments. The case at hand, however, is distinguishable based on the differences between a monument in a public park and a book on a public library shelf. In *Pleasant Grove City, Utah v. Summum*, for example, the Supreme Court held that a "City's decision to accept certain privately donated monuments . . . is best viewed as a form of government speech . . . [and as such] is not subject to the Free Speech Clause." 555 U.S. at 481. The Court considered the plaintiff's "legitimate concern" that the government-speech doctrine could be used as "a subterfuge for favoring certain private speakers over others based on viewpoint." *Id.* at 473. It held that there was nothing deceptive about the selection of monuments, however, because by placing a monument in a park the government "dramatically" endorses the monument's message, signaling that "the City intends the monument to speak on its own behalf." *Id.* The same cannot be said about library collection decisions, however, which are too numerous to keep track of and often occur behind closed doors. The Court was also

No. 23-50224

## B. Defendants Likely Violated Plaintiffs' First Amendment Rights

Having laid out the foregoing principles, we conclude that resolution of this appeal requires a relatively straightforward application of *Campbell*, in which we considered direct testimony as well as circumstantial evidence in evaluating the defendants' substantial motivation. *See Campbell*, 64 F.3d at 190; *see also Pico*, 457 U.S. at 874 (plurality opinion). The seventeen books at issue here were removed after constituents complained that they were "pornographic filth" inappropriate for children. Specifically, Wallace and the other objectors were concerned about young readers accessing critical race theory, facts about sexuality, stories about gender dysphoria, and images that purportedly promote "grooming" behavior. Each of the books Milum removed were on the Wallace list. The removed books were not slated for review before the complaints were lodged, and no other books were weeded during that period. Moreover, Wallace and Wells were elevated to the newly reconstituted library board after their involvement in the complaints. "[T]he circumstances surrounding the . . . [removal] cannot help but raise questions regarding the constitutional validity of [the] decision." *Campbell*, 64 F.3d at 191; *see also Pico*, 457 U.S. at 875 (plurality opinion) (noting that the procedures used to remove the book seemed like "the antithesis of those procedures that might tend to allay suspicions regarding the [government's] motivation"). The district court, which had the opportunity to observe Milum's live testimony, found her explanations for her alleged reasons for removing the books to be contradictory and unconvincing. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted) ("One of the

––––––––––––––––––––

persuaded that the government "made no effort to abridge the traditional free speech rights—the right to speak, distribute leaflets, etc.—that may be exercised . . . in [the park]." *Id.* at 474. Plaintiffs have no such recourse in the library, which is not a traditional public forum as is a park. *See Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 376 (1989).

most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses."). Each of these facts support the district court's reasonable conclusion that the books were removed because of the Defendants' complaints, and that Defendants' substantial motivation was to deny access to particular ideas. *See Pico*, 457 U.S. at 871 (plurality opinion).

The district court found that "[t]here is no real question that [Milum's] targeted review was directly prompted by complaints from patrons and county officials over the content of these titles." We agree with Defendants that the real issue here is not Milum's choice to review the books on the Wallace List, but instead is her decision to permanently remove the seventeen books. The evidence, however, demonstrates that the complaints did not merely cause Milum to pull the books for review; they were likely also the motivating factor in her decision to remove the seventeen books from the shelves permanently. Although Moss and Cunningham testified that they did not expressly direct Milum to permanently remove the books, it was not clear error for the district court to understand their communications as instructions to do just that. *See Anderson v. City of Bessamer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). The contemporaneous communications instructed that the books should be "pulled immediately," not specifying whether they should be pulled for review or forever. Further, the supervisory role of the Commissioners and the language used, such as "Please advise Commissioner Moss and I when this task has been completed," underscores the fact that Milum removed the books because she was told to do so. She did not even read the books before removing them. Although it is Milum's motivation that matters, we agree

No. 23-50224

with the district court that she likely "adopted" the motivations of the other Defendants.

Defendants aver that the books were removed through the library's routine weeding process and its application of the MUSTIE factors. A review of the evidence reveals that the district court did not clearly err in finding this reasoning to be unpersuasive. First, one of the main rationales behind the CREW process is to ensure that there is space for new books on the shelves. But the Llano County library suspended all new purchases in October of 2021, rendering this concern irrelevant. Second, Milum's alleged application of the MUSTIE factors was contradictory and inconsistent. For example, Milum testified that *Freakboy* was weeded because it was "irrelevant," given that it had not been checked out in five years, and "elsewhere" because it was available on interlibrary loan. But Milum herself testified that a book should not be weeded for "irrelevance" simply because it had not been checked out in a while. She also testified that a book is available "elsewhere" when it is "*easily* borrowed from another source," rather than simply available anywhere, yet she did not look to see where *Freakboy* was located. Further, Milum's reasoning for weeding *Freakboy* applies to hundreds of other books in the Llano County system, but those books remain on the shelves. As another example, Milum stated that *In the Night Kitchen* was removed because it was "ugly," as the library's copy had been damaged. However, the physical evidence at trial showed otherwise.

When these explanations are stripped away, it becomes clear that Milum likely weeded these books because she was told to by those who disagreed with their message. That is not a valid reason to remove a book under the MUSTIE criteria. It was not clear error for the district court to conclude that Defendants' alternative explanations for removal were pretextual.

No. 23-50224

We note that the removal of at least some of these books could be upheld if the right justifications had been found by the district court. As we recognized in *Campbell*, "an unconstitutional motivation would not be demonstrated if the . . . officials removed the books from the . . . libraries based on a belief that the books were 'pervasively vulgar' or on grounds of 'educational suitability.'" *Campbell*, 64 F.3d at 188–89 (quoting *Pico*, 457 U.S. at 871 (plurality opinion)). But that is not what seems to have happened here. For example, Milum testified that she initially ordered the "butt and fart" books because she thought based on her training that they were age appropriate, and her "opinion about the appropriateness of these books as the head librarian never changed."[12] Our holding in this case is controlled by the district court's supportable fact-finding that Defendants' removal decisions were likely motivated by a desire to limit access to ideas with which they disagreed.

The fact that Milum did not weed every book on the Wallace list does not negate the likelihood that Defendants' substantial motivation in removing the seventeen books was a desire to limit public access to the books' viewpoints. Nor is that finding undermined by Milum's decision to weed *Being Jazz* from the Llano branch while refusing to do so at the Kingsland branch where the book had been checked out more recently. A motivation is "substantial" when in its absence "the opposite decision would have been

---

[12] While the "butt and fart" books may not on their face have a clear "idea" or "viewpoint," the record reveals that they were removed because Defendants did not want readers to have access to books with pictures of naked bodies. Defendants believe that these books promote "grooming" by depicting children displaying their naked bodies to "various individuals, some of whom are adults." I see access to these images—and what Defendants say that they allegedly promote—as a viewpoint sufficient to support an unconstitutional motivation under *Campbell*. Both of my colleagues disagree, however, so our holding does not require the return of those books. Nor does it require the return of *In the Night Kitchen* or *It's Perfectly Normal*, for the same reasons.

No. 23-50224

reached." *Pico*, 457 U.S. at 871 n.22 (plurality opinion). That Milum decided to weed only those books on the Wallace list that allegedly met a MUSTIE criteria does not necessarily mean that she would not have weeded the books without an unconstitutional motivation. It is possible that "something other than Bonnie Wallace's objections was behind Milum's decision to weed those books," and that her substantial motivation in removal was still unconstitutional.

We reversed the district court in *Campbell* because there was not sufficient evidence in the summary judgment record to support a finding "as a matter of law" that the book in question was removed "substantially based on an unconstitutional motivation." 64 F.3d at 190. There are two important differences between the procedural posture of that case and this one. First, we have here the benefit of a multi-day adversarial hearing, in which the district court had the opportunity to observe witnesses under cross-examination. *See Campbell*, 64 F.3d at 190 ("[P]ermitting cross-examination probing [the removers'] justifications for removing the Book[] will enable the finder of fact to determine . . . the true, decisive motivation."); 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed. 2023) ("When the outcome of a Rule 65(a) application depends on resolving a factual conflict by assessing the credibility of opposing witnesses, it seems desirable to require that the determination be made on the basis of their demeanor during direct and cross-examination, rather than on the respective plausibility of their affidavits."). Second, we are not deciding as a matter of law that Defendants' substantial motivation was unconstitutional, as is true on summary judgment review. Instead, we are merely holding that Plaintiffs have a substantial likelihood of ultimately succeeding on the merits. Those merits are still to be litigated in the trial court. *See All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), *cert. granted*, 144 S.Ct. 537 (Dec. 13, 2023) ("[W]e note

that 'substantial' does not mean 'certain.'"); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish a substantial likelihood of success on the merits for preliminary injunction purposes." (internal quotation marks and citation omitted)).

## C. Plaintiffs Met Their Burden in Showing Other Preliminary Injunction Factors

In addition to the likelihood of success on the merits of Plaintiffs' First Amendment claim, Defendants contend that the trial court erred in holding that the remaining factors required for a preliminary injunction were met. The parties talk past each other in arguing over the relevance of these issues within the context of standing. But these questions arise not in the district court's denial of Defendants' motion to dismiss—which Defendants do not appeal—but instead in the court's issuance of the preliminary injunction. As noted above, to obtain a preliminary injunction, Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they will likely suffer irreparable harm in the absence of relief, (3) the balance of the equities tip in their favor, and (4) an injunction is in the public interest. *La Union Del Pueblo Entero*, 608 F.3d at 219.

Defendants insist that Plaintiffs are unable to meet the irreparable-harm prong required for preliminary injunctive relief because they are still able to read and checkout the seventeen contested books through the library's "in-house checkout system." Defendants claim that Plaintiffs have not shown "*any* harm (let alone an 'irreparable' harm) that they will suffer from obtaining the disputed books through the library's in-house checkout system" as opposed to using the usual process. The district court held that this difference did indeed create an irreparable harm. When we review that determination for clear error, we conclude that the district court did not so

No. 23-50224

err. *See Taylor-Travis*, 984 F.3d at 1116. We agree with Defendants that the injuries to other library patrons, who may not know about the availability of the contested books, is irrelevant for this analysis. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016) ("[T]he irreparable harm prong of the injunctive relief calculus only concerns harm suffered by the party or parties seeking injunctive relief."). But Plaintiffs have shown that they themselves will be injured by being unable to anonymously peruse the books in the library without asking a librarian for access. This burden on accessing their right to receive information is a valid First Amendment injury. *See Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 754 (1996);[13] *see also Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (holding that the government acted unconstitutionally when it imposed an "affirmative obligation" on plaintiffs to request access to communist literature, which would have a "deterrent effect"). And a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). We cannot say that the district court clearly erred in concluding that Plaintiffs will be irreparably harmed in the absence of an injunction.

Neither did the district court err in evaluating the balance of the equities or the public interest. First, Defendants assert that the balance of the equities tips in their favor, since complying with the injunction will impose a

---

[13] Defendants attempt to distinguish this case on the basis that, unlike cable programming, libraries "have limited shelf space and *must* relegate some materials to alternative sources such as . . . an in-house checkout system." This is a red herring that harkens back to Defendants' argument about the role of content in collection decisions. It is true that libraries must make decisions based on space constraints, but it is their motivation in making those choices that matters for the First Amendment. It is unconstitutional for the government to choose certain books for an in-house checkout system above others, simply because they wish to prevent the public from accessing ideas with which they disagree.

No. 23-50224

large burden on them, and Plaintiffs have not suffered a constitutional injury. We have held otherwise. Second, as the district court pointed out, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (citation omitted). The district court did not abuse its discretion in concluding that the remaining factors for a preliminary injunction were met.

## D. The Preliminary Injunction is Overbroad

Finally, Defendants contend that the preliminary injunction ordered by the district court is overbroad. Plaintiffs requested an injunction requiring Defendants to return the seventeen contested books to the catalog and the shelves. Their proposed order required the return of "the following print books that were removed or concealed from the Llano County Libraries in 2021 or 2022 because of their viewpoint or content," and then listed the seventeen books. In contrast, the injunction issued by the district court ordered the return of "all print books that were removed because of their viewpoint or content, *including* the following print books," then listed the seventeen books by name. Defendants complain that Plaintiffs failed to show that they are injured by the removal of any library materials other than the seventeen complained-of books. We agree. Because an injunction may go no further than what is necessary "to ensure Plaintiffs' relief," the injunction issued by the district court is overbroad to the extent that it requires the return of any books beyond the seventeen discussed herein. *See Missouri v. Biden*, 83 F.4th 350, 395 (5th Cir. 2023).

The district court's order further enjoins Defendants from "removing *any* books from the Llano County Library Service's catalog for *any* reason during the pendency of this action." That language also goes too far. "[I]t is axiomatic that an injunction is overbroad if it enjoins a defendant from

No. 23-50224

engaging in legal conduct." *Id.* There are still entirely valid and constitutional reasons to remove books from the library's shelves, such as when a patron severely damages a book. The injunction, then, is not narrowly tailored to remedy the injury of which Plaintiffs complain. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017) (citation omitted). We will therefore modify the district court's order to reflect the limited scope of the relief.

## V. Conclusion

The dissent accuses us of becoming the "Library Police," citing a story by author Stephen King. But King, a well-known free speech activist, would surely be horrified to see how his words are being twisted in service of censorship. Per King: "As a nation, we've been through too many fights to preserve our rights of free thought to let them go just because some prude with a highlighter doesn't approve of them."[14] Defendants and their highlighters are the true library police.

Government actors may not remove books from a public library with the intent to deprive patrons of access to ideas with which they disagree. Because that is apparently what occurred in Llano County, Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment claim, as well as the remaining factors required for preliminary injunctive relief. The district court's order is AFFIRMED, except that we MODIFY the district court's injunction to state:

IT IS ORDERED THAT:

---

[14] Stephen King, *The Book-Banners: Adventure in Censorship is Stranger Than Fiction*, THE BANGOR DAILY NEWS (Mar. 20, 1992), https://stephenking.com/works/essay/book-banners-adventure-in-censorship-is-stranger-than-fiction.html.

No. 23-50224

1. Within twenty-four hours of the issuance of the mandate, Defendants shall return the following books to the publicly visible and accessible shelves of the Llano County Libraries:

> a. *Caste: The Origins of Our Discontent* by Isabel Wilkerson;
>
> b. *Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti;
>
> c. *Spinning* by Tillie Walden;
>
> d. *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings;
>
> e. *Shine* by Lauren Myracle;
>
> f. *Under the Moon: A Catwoman Tale* by Lauren Myracle;
>
> g. *Gabi, a Girl in Pieces* by Isabel Quintero; and
>
> h. *Freakboy* by Kristin Elizabeth Clark.

2. Immediately after returning the books to the Libraries as ordered in 1. above, Defendants shall update all Llano County Library Service's catalogs to reflect that those books are available for checkout.

3. Defendants are hereby enjoined from removing any books from the Llano County Library Service's publicly visible and accessible shelves and/or searchable catalog without first providing Plaintiffs with documentation of (a) the individual who decided to remove or conceal the books, and (b) the reason or reasons for that removal or concealment.

Lastly, Defendants' motions to stay the district-court proceedings pending appeal and to stay the preliminary injunction pending appeal are DENIED AS MOOT.

Leslie H. Southwick, *Circuit Judge*, concurring in part and concurring in the judgment in part:

This court has declared that officials may not "remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Campbell v. St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188 (5th Cir. 1995) (quotation marks and citations omitted). While that case was in the context of a school library, the First Amendment standard it announced applies outside of schools as well. Judge Wiener's thorough and nuanced opinion accurately captures the state of current law when it identifies the standard from *Campbell* as the one to apply here. I concur in that opinion's explication of the law. I part company on some of the law's application.

I find that some of the removals here satisfy the *Campbell* standard. The district court found that all removals were unconstitutional, stating: "Plaintiffs have clearly shown that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells objected." I disagree, first, because not all of the books express an "idea" or "viewpoint" in the sense required by the caselaw. I am referring to the items we have needed to label for clarity as the "butt and fart books." Viewpoints and ideas are few in number in a book titled "Gary the Goose and His Gas on the Loose" — only juvenile, flatulent humor. Perhaps a librarian selected the book believing the juvenile content would encourage juveniles to read. Even if that is so, I do not find those books were removed on the basis of a dislike for the ideas within them when it has not been shown the books contain any *ideas* with which to disagree.

Second, at this stage of the case, I find the motivations behind some of the removals here are likely defensible and cannot satisfy the standard for

23-50224

a preliminary injunction. The district court concluded that those responsible for removing the books had effectively adopted the motivations of those objecting to the books, *i.e.*, "by responding so quickly and uncritically, Milum and the Commissioners may be seen to have adopted Wallace's and Wells's motivations." Wallace and Wells objected to the butt and fart books on the basis that they (1) promoted "grooming" of minors[1] and (2) were sexually explicit. These objections do not convert the resulting removals into viewpoint-based decisions. No controlling law prevents a librarian from exercising what might be called traditional discretion to remove certain types of *content*. *Campbell* itself acknowledged the Supreme Court's guidance that school librarians may permissibly remove books on the belief that the books were "pervasively vulgar" or were not educationally suitable. *Campbell*, 64 F.3d at 188–89 (quoting and citing *Board. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–72 (1982) (plurality opinion)).

Whatever the outer bounds of this traditional discretion might be, I would have no difficulty in allowing the removal of a book from the children's section on the basis that it encourages children to engage in sexual activity with adults or includes sexually explicit content. At this stage of the case, I find ordering the return of such books to be error.

For similar reasons, the removals of *In the Night Kitchen* by Maurice Sendak and *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie Harris are also likely permissible. While these books may express ideas, they were removed as part of the library's efforts to

---

[11] To "groom" in the sense used here, according to the Merriam-Webster Dictionary, is "to build a trusting relationship with (a minor) in order to sexually exploit them especially for nonconsensual sexual activity." *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/groom#:~:text=%3A%20to%20clean%20and%20maintain%20the,to%20make%20neat%20or%20attractive (last accessed May 30, 2024).

23-50224

respond to objections that certain books promoted grooming and contained sexually explicit material that was not appropriate for children. Whether these two books or the butt and fart books actually promoted grooming or contained sexually explicit material is irrelevant. This court's governing law focuses on the subjective motivation of the remover, *see Campbell*, 64 F.3d at 191, and the district court reasonably concluded that the removers here had adopted the motivations of the objectors.

I conclude that the plaintiffs have not met their burden to show a likelihood of success on the merits of their constitutional challenges to the removal of the butt and fart books,[2] *In the Night Kitchen*, and *It's Perfectly Normal*. The plaintiffs are, therefore, not entitled to a preliminary injunction requiring the return of those books to the Llano County Libraries.

_____

[2] *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!* by Dawn McMillan, and *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Has Too Many Farts* by Jane Bexley.

No. 23-50224

Stuart Kyle Duncan, *Circuit Judge*, dissenting:

The commission hanging in my office says "Judge," not "Librarian." Imagine my surprise, then, to learn that my two esteemed colleagues have appointed themselves co-chairs of every public library board across the Fifth Circuit. In that new role, they have issued "rules" for when librarians can remove books from the shelves and when they cannot. While I do not doubt my colleagues' good intentions, these "rules" are a disaster. They lack any basis in law or common sense. And applying them will be a nightmare.

Look no further than today's decision. The two judges in the majority, while agreeing on the rules, cannot agree on how they apply to over *half* of the 17 books *in this case*. So, according to Judge Wiener, a library cannot remove *It's Perfectly Normal*, a sex-education book for 10-year-olds that has cartoons of people having sex and masturbating. Op. 27. But according to Judge Southwick, removing that book is "likely permissible," at least "[a]t this stage of the case," because it contains "sexually explicit material that [i]s not appropriate for children." Op. 2, 3 (Southwick, J., concurring in part and concurring in the judgment in part). Evidently, both judges would not allow a librarian to remove racist books—unless they have a "poor circulation history." Op. at 12. They differ, however, on how the rules apply to a series of children's books about flatulence. *Compare* Op. 21 n.11 *with* Op. 1, 3 (Southwick, J., concurring in part and concurring in the judgment in part). And so we have a genuine first in the Federal Reporter: federal judges debating whether the First Amendment lets a library remove a book called (I kid you not) *Larry the Farting Leprechaun*.

This journey into jurisprudential inanity should never have been launched. There is a simple answer to the question posed by this case: A public library's choice of some books for its collection, and its rejection of others, is government speech. I dissent.

No. 23-50224

What follows is what our opinion should have said.

## INTRODUCTION

Suppose you are a public librarian. One day, you receive complaints about two books. The first is *It's Perfectly Normal*, a sex-education book for ages 10 and up. A mother argues that the book, which has explicit cartoons[1] of sexual activity, is inappropriate for children and should be removed. The second is *Little Black Sambo*, an old children's book. A mother argues that the book, whose cover features a racist caricature,[2] is inappropriate for children and should be removed. The librarian sees some sense in both complaints. But does the Constitution let her pull either book off the shelves?

The district court in this case said no. Agreeing with Plaintiffs, the court ruled that the Free Speech Clause bars a public library from removing any book based on disagreement with its contents. So, the court ordered the Llano County library to reshelve 17 books, including *It's Perfectly Normal*. County officials had removed those books, Plaintiffs alleged, after patrons complained about their treatment of sexual and racial themes. The officials now appeal, arguing the injunction was based on a mistaken view of how the Free Speech Clause constrains a library's collection decisions.

The majority now affirms the district court's Free Speech ruling. Op. 2. In doing so, the majority invents "rules" to discern when the Free Speech Clause bars libraries from removing books. *Id.* at 11. Here they are:

1. Libraries "may consider books' contents in making curation decisions." *Ibid.* (citing *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204 (2003) [*ALA*] (plurality)).

---

[1] Scroll to page 43, *infra*, to see some of them.

[2] Scroll to page 24, *infra*, to see it.

No. 23-50224

2. But patrons have the "right to receive information and ideas." *Ibid.* (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)).

3. A library violates that right if its decision to remove a book is "'substantially motivated' by the desire to deny 'access to ideas with which [the library] disagree[s].'" *Id.* at 11–12 (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) [*Pico*] (plurality)).

4. But a library can remove books "based on . . . the accuracy of the[ir] content," *id.* at 15, or "based on a belief that the books [are] 'pervasively vulgar' or on grounds of 'educational suitability,'" *id.* at 21 (quoting *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995)).

Henceforth, these rules will govern each and every public librarian in this circuit, each and every time she takes a book out of circulation.[3] And who will apply these rules? Federal judges, naturally. You've heard of the Soup Nazi? Say hello to the Federal Library Police.

    As I explain below, the majority's rules lack any grounding in the First Amendment or common sense. The underlying "right" the rules supposedly protect comes from a 50-year-old case recognizing the freedom to peruse obscene materials—not in a public library, but "in the privacy of a person's *own home.*" *Id.* at 11 (quoting *Stanley*, 394 U.S. at 564) (emphasis added). The rules themselves are facially absurd: by the majority's own admission, a librarian can remove *The Autobiography of David Duke* only if it has a "poor circulation history." *Id.* at 12. Moreover, the rules will be a nightmare to apply. In this very case, the two judges in the majority cannot even agree on how they apply to crude children's books like *I Broke My Butt! Compare id.* at

---

[3] The majority "decline[s]" to say whether the rules *also* govern a librarian's "initial selection" of books, *id.* at 16 n.8. We will presumably find that out in litigation—coming soon to a federal court near you—over whether a library "unconstitutionally" chose not to acquire explicit sex-education books for 10-year-olds.

21 n.11, *with* Op. 1, 3 n.2 (Southwick, J., concurring in part and concurring in the judgment in part). So, we can look forward to years of litigation testing whether a librarian's "substantial motivation" for removing *Gary the Goose and His Gas on the Loose* was her "desire to deny access to certain ideas" (unconstitutional) or rather the belief that the book was "vulgar" or "educationally unsuitable" (constitutional).[4]

What a train wreck. It has never been the law that the Free Speech Clause bars a public library from selecting or removing books based on content or viewpoint. To the contrary, "[a] library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material." *ALA*, 539 U.S. at 208 (plurality). Plainly, that involves choosing some books, and rejecting others, because of what they say or how they say it. If a library could not do that, it would be a warehouse, not a library.

Imagine if a library had to feature books of *all* viewpoints. Alongside history books, it would have to shelve conspiracy theories. *See, e.g.*, Randy Walsh, The Apollo Moon Missions: Hiding a Hoax in Plain Sight (2018). Alongside medical books, it would have to shelve quackeries. *See, e.g.*, L. Ron Hubbard, Dianetics: The Modern Science of Mental Health (2007). Alongside books on Jewish history, it would have to shelve books denying the Holocaust. *See, e.g.*, Robert Faurisson, The Diary of Anne Frank — A Forgery? (1985). How preposterous.[5] A public librarian can, without transgressing the

_____

[4] On a more serious note, the majority judges also split over "sexually explicit" children's books and books that may "promote[] grooming" of minors. *See* Op. 2–3 (Southwick, J., concurring in part and concurring in the judgment in part).

[5] The majority's response to the Holocaust-denial hypo is equally preposterous. A librarian can't remove the book because she "dislikes the ideas in it" but can remove the

No. 23-50224

Free Speech Clause, reject such books—precisely because she rejects their viewpoint. Just so, if a librarian finds such books on the shelves, she can remove them. *See ALA*, 539 U.S. at 204 ("The librarian's responsibility . . . is to separate out the gold from the garbage.") (plurality) (quoting W. Katz, Collection Development: the Selection of Materials for Libraries 6 (1980)).

There is a simple answer to the question posed by this case: A public library's choice of some books for its collection, and its rejection of others, is government speech. "With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude." *People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) [*PETA*]. This conclusion is supported by a long line of Supreme Court precedent, as well as authority from our sister circuits.[6] It means the Free Speech Clause does not constrain a public library's collection decisions. The Clause provides no coherent standard against which to judge a library's inescapably expressive decision about which books it deems "suitable and worthwhile" and which it does not. *ALA*, 539 U.S. at 208 (plurality).

In other words, the Constitution does not deputize federal judges as the Library Police.

---

book if she questions the "accuracy" of Holocaust-denial. Op. 14–15. What's the difference? *See infra* note 17 (discussing this further).

[6] *See infra* Part III(B)(1)–(2) (discussing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *ALA*, 539 U.S. 194; *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cit. 2009); *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719 (7th Cir. 2009); *PETA*, 414 F.3d 23).

No. 23-50224

# I. Background

## A. *Facts and Proceedings*

Plaintiffs are seven patrons of the Llano County public library. Llano County lies about 80 miles northwest of Austin and has a population of just over 21,000. The county's public library system has three branches, located in Llano (the county seat), Kingsland, and Buchanan Dam. Amber Milum serves as the library system director. *See* Tex. Local Gov't Code § 323.005(a) (providing for appointment of a "county librarian"). The library is under the general supervision of the county commissioners court and County Judge Ron Cunningham. *See id.* § 323.006 (providing "[t]he county library is under the general supervision of the commissioners court" and "also under the supervision of the state librarian").

In April 2022, Plaintiffs sued Cunningham, Milum, the commissioners court, and the library board (collectively, "Defendants") in federal district court. They claimed Defendants violated their "First Amendment right to access and receive ideas by restricting access to certain books based on their messages and content." According to Plaintiffs, the books were targeted because Defendants objected to their treatment of sexual or racial themes. Plaintiffs argued this constituted "viewpoint discrimination" in violation of the First Amendment's Free Speech Clause.[7]

Following discovery, Defendants moved to dismiss based on standing, mootness and failure to state a claim. Plaintiffs moved for a preliminary injunction based on their First Amendment claims. In October 2022, the district court held a two-day hearing with testimony from seven witnesses.

---

[7] Plaintiffs also alleged a Fourteenth Amendment due process claim. That claim is not at issue because the district court did not rely on it to grant a preliminary injunction.

No. 23-50224

The testimony focused on 17 books removed from the Llano branch. Seven of them—which the parties call the "Butt and Fart Books"—are a series of children's books with titles like: *I Broke My Butt!* and *Freddie the Farting Snowman*. Another book is the well-known children's story *In the Night Kitchen* by Maurice Sendak, which contains drawings of a naked toddler. Another is a sex-education book for pre-teens, *It's Perfectly Normal*, which has cartoon depictions of explicit sexual activity. Three are young-adult books touching on sexuality and homosexuality (*Spinning*, *Shine*, *Gabi: A Girl in Pieces*). Two portray gender dysphoric children and teenagers (*Being Jazz* and *Freakboy*). Two others discuss the history of racism in the United States (*Caste* and *They Called Themselves the K.K.K.*).[8]

Defendants generally testified that the books at issue were removed, not because of disagreement with their content, but as a result of a standard "weeding" method known as "Continuous Review, Evaluation, and Weeding" or "CREW." Under this approach, books are weeded according to the so-called "MUSTIE" factors: **M**isleading, **U**gly, **S**uperseded, **T**rivial, **I**rrelevant, and **E**lsewhere. So, a book might be weeded because it was inaccurate ("misleading"), damaged ("ugly"), outdated ("superseded"), silly ("trivial"), seldom checked out ("irrelevant"), or available at another branch ("elsewhere").

---

[8] The full list of books is: *My Butt is So Noisy!*; *I Broke my Butt!*; *I Need a New Butt!*, all by Dawn McMillan; *Larry the Farting Leprechaun*; *Gary the Goose and His Gas on the Loose*; *Freddie the Farting Snowman*; *Harvey the Heart Has Too Many Farts*, all by Jane Bexley; *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie H. Harris and Michael Emberley; *In the Night Kitchen* by Maurice Sendak; *Caste: The Origins of Our Discontents* by Isabel Wilkerson; *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Freakboy* by Kristin Elizabeth Clark; *Shine* by Lauren Myracle; *Gabi, a Girl in Pieces* by Isabel Quintero; *Spinning* by Tillie Walden; and *Under the Moon: a Catwoman Tale* by Lauren Myracle.

No. 23-50224

For their part, Plaintiffs portrayed this weeding rationale as pretextual. According to Plaintiffs, Milum actually removed the books under orders from Cunningham and the commissioners court (in particular, Commissioner Jerry Don Moss). Plaintiffs argued Cunningham and Moss were responding to complaints from the public—spearheaded by Rochelle Wells and Bonnie Wallace—about some books' treatment of sex and race. They also emphasized that, after dissolving the existing library board, the commissioners put Wells and Wallace on a new advisory board with input into the library's selections.

Testimony also addressed the library's decision to stop providing access to e-books and audiobooks through the "Overdrive" online database. Witnesses testified this was done because Overdrive's filters were unable to keep children from accessing books containing graphic depictions of sexual activity. The library removed Overdrive and replaced it with a database called "Bibliotheca." Some of the 17 removed books remain accessible through Bibliotheca, although the record does not make clear which ones.

Finally, witnesses described an "in-house checkout system" at the Llano branch which contained physical copies of the 17 removed books. Although patrons could check out the books through this system, the books were kept behind the counter and not listed in the catalog. The books had been donated to the library by an anonymous donor who turned out to be one of Defendants' lawyers.

### B. District Court Decision

#### 1. Motion to Dismiss

The district court granted Defendants' motion to dismiss in part and denied it in part. *See generally Little v. Llano County*, 1:22-CV-424-RP, 2023 WL 2731089 (W.D. Tex. Mar. 30, 2023). First, the court found that Plaintiffs had standing because they wanted to check out the 17 books but could not.

Next, the court found that creation of the in-house checkout system after the litigation began did not moot Plaintiffs' claims. The court did find, however, that Plaintiffs' claims related to Overdrive were moot because it had been replaced with Bibliotheca, a "comparable online service." The court therefore dismissed claims related to Overdrive without prejudice.

The court then turned to Plaintiffs' Free Speech claims with respect to the 17 books. It acknowledged that, in the 2003 *American Library Association* decision, a plurality of the Supreme Court recognized public libraries' "broad discretion" over the content of their collections. *See ALA*, 539 U.S. at 205 (plurality). But the district court believed that this discretion "applies only to materials' selection," not to their removal.

As to removals, the district court adopted a standard from our 1995 decision in *Campbell v. St. Tammany Parish School Board*. That case held that the First Amendment bars school officials from "removing books from school library shelves 'simply because they dislike the ideas contained in those books.'" *Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 872 (plurality)). The district court also suggested that public libraries are "limited public forums" for First Amendment purposes. For that proposition, the court relied on a federal district court's 2000 decision in *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000).

Accordingly, the court denied Defendants' motion to dismiss. The court ruled Plaintiffs stated a valid First Amendment claim by pleading that "Defendants' conduct was substantially motivated by a desire to remove books promoting ideas with which [they] disagreed." The court also rejected Defendants' argument that the removal decisions were "government speech to which the First Amendment does not apply." The court believed that any precedents supporting this proposition, including *ALA*, "mostly involve the initial selection, not removal, of books." *See, e.g.*, *PETA*, 414 F.3d at 28

No. 23-50224

("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

Finally, the court rejected Defendants' argument that First Amendment cases concerning school libraries, like *Campbell*, do not apply to disputes over the books available in public libraries. To the contrary, the court reasoned that the First Amendment right "to access to information" applied in *Campbell* should have "'even greater force when applied to public libraries,' since public libraries are 'designed for freewheeling inquiry.'"

## *2. Preliminary Injunction*

The court then turned to Plaintiffs' motion for a preliminary injunction. The court's analysis started with this overarching Free Speech principle, carried over from its motion to dismiss ruling: "Although libraries are afforded great discretion for their selection and acquisition decisions, the First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination." The court found Plaintiffs were substantially likely to succeed in showing that Defendants engaged in both viewpoint and content discrimination by removing the 17 books at issue.

As to viewpoint discrimination, the court found Defendants removed books "based on complaints that the books were inappropriate." For example, Defendants removed the Butt and Fart Books based on complaints about those books' "appropriateness." Other books were removed after Wallace and Wells emailed Cunningham and Moss lists of books generally identified as "pornographic filth" and "CRT and LGBTQ books."

The court rejected Defendants' argument that the removals were "simply part of the library system's routine weeding process." To the contrary, the court found Plaintiffs "clearly show[ed] that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells objected."

No. 23-50224

The court also found Plaintiffs were likely to succeed on their claim that Defendants removed books based on "content-based restrictions." "Content-based restrictions on speech," the court stated, "are presumptively unconstitutional and subject to strict scrutiny." *See Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

The court ruled that Plaintiffs clearly met that standard. It found "sufficient evidence to suggest" that Defendants' weeding explanation was "pretextual." "Whether or not the books in fact qualified for 'weeding' under the library's existing policies," the court stated, "there is no real question that the targeted review was directly prompted by complaints from patrons and county officials over the contents of these titles." Finally, the court found the book removals were unlikely to survive strict scrutiny—*i.e.*, they were "not narrowly tailored to serve a compelling state interest."

Finding the remaining factors met, the court entered a preliminary injunction: (1) requiring Defendants to "return all print books that were removed because of their viewpoint or content," including the 17 books discussed above; (2) requiring Defendants to "update" all library catalogs "to reflect that these books are available for checkout"; and (3) enjoining Defendants from "removing" any books from the catalogs "for any reason during the pendency of this action."

Defendants timely appealed. They also moved to expedite the appeal and for an injunction pending appeal. A motions panel of our court granted the motion to expedite.[9] Nearly a year later, the panel majority now affirms

---

[9] The motions panel carried the injunction motion with the appeal. When this panel was assigned to the case, it granted an administrative stay of the district court proceedings pending its decision.

No. 23-50224

the district court's First Amendment ruling, while narrowing the preliminary injunction to requiring the return of 8 of the 17 removed books and updating library catalogs accordingly. Op. 26–27. The majority does not order all of the books returned because the two judges in the majority do not agree how the Free Speech standard they adopt applies to the Butt and Fart Books and to two books with certain sexual content. *Compare id.* at 21 n.11 with Op. 1–3 (Southwick, J., concurring in part and concurring in the judgment in part).

## II. Standard of Review

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). "When a district court applies incorrect legal principles, it abuses its discretion." *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc) (citation omitted).

To obtain the "extraordinary remedy" of a preliminary injunction, the movant must show he is likely to prevail on the merits and also "demonstrate a substantial threat of irreparable injury if the injunction is not granted; the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and the injunction will not disserve the public interest." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted).

## III. Discussion

Defendants marshal a phalanx of arguments for vacating the preliminary injunction. Only one need be addressed. The district court held that the Free Speech Clause[10] bans a public library from considering the

---

[10] "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I.

No. 23-50224

content or viewpoint of books when deciding whether to remove them. I agree with Defendants that this was legal error.

Below, I first (A) explain how the district court erred and how the panel majority deepens that error, and then (B) set out how the Free Speech Clause applies to a public library's choice of the materials in its collection.[11]

### A.   *Public Libraries Have Broad Discretion to Shape Their Collections.*

The district court began on the right foot by citing the Supreme Court's *ALA* decision.

*ALA* addressed a federal law giving public libraries money for internet access, provided they installed filters to block material harmful to children. The Court—in a four-justice plurality with two concurrences—rejected a facial First Amendment challenge to the law. *See* 539 U.S. at 198–99, 214 (plurality); *id.* at 215 (Kennedy, J., concurring in the judgment); *id.* at 216 (Breyer, J., concurring in the judgment).[12] *ALA* is pertinent because it drew on libraries' discretion to shape their collections, defined to include not only the internet but also books and other materials. *See, e.g., id.* at 207 (plurality)

---

[11] So, there is no need to address Defendants' other arguments, which are: (1) Plaintiffs' First Amendment right "to access and receive information" has not been violated because they can check out the 17 books through the in-house system; (2) for the same reason, Plaintiffs do not show irreparable harm; (3) even assuming the district court did not err on the First Amendment standard, it clearly erred in ruling Milum engaged in viewpoint or content discrimination; (4) the preliminary injunction is overbroad (although the majority finds it is, which is correct as far as it goes); (5) the balance of equities and public interest do not clearly favor preliminary injunctive relief.

[12] While not rejecting the plurality's analysis of the facial challenge, Justice Kennedy wrote separately that he would consider an as-applied challenge if an adult patron showed he was blocked from viewing "constitutionally protected Internet material." *Id.* at 215 (Kennedy, J., concurring in the judgment). Justice Breyer also concurred, but unlike the plurality he would have applied heightened scrutiny. *See id.* at 216 (Breyer, J., concurring in the judgment).

(describing internet as "a technological extension of the book stack") (citation omitted); *id.* at 217 (Breyer, J., concurring) (explaining "a library's 'collection'" is "broadly defined to include all the information the library makes available").

The key rationale lies in the plurality's statement, quoted by the district court, that public libraries have "broad discretion" over which materials they make available to the public. "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *ALA*, 539 U.S. at 205 (plurality). The district court could have quoted many other passages saying the same thing.[13] The point is captured most vividly by this advice from a library manual, which the plurality quoted approvingly: "The librarian's responsibility . . . is to separate out the gold from the garbage." *Id.* at 204 (plurality) (quoting Katz, *supra*, at 6).

*ALA* makes one thing clear: the Free Speech Clause allows public libraries to shape their collections based on the content and viewpoint of books. Indeed, the notion that the Clause *forbids* this is preposterous. How else are libraries supposed to choose the books on their shelves if not by "discriminating" according to content and viewpoint? "[S]eparat[ing] out the gold from the garbage" means—by definition—rejecting some books and

---

[13] *See, e.g.*, 539 U.S. at 204 (plurality) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."); *ibid.* (explaining a library's "goal has never been to provide 'universal coverage,'" but rather "to provide materials 'that would be of the greatest direct benefit or interest to the community'") (citation omitted); *ibid.* (observing "libraries collect only those materials deemed to have 'requisite and appropriate quality'"); *id.* at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material[.]"); *id.* at 217 (Breyer, J., concurring in the judgment) (referring to "the discretion necessary to create, maintain, or select a library's 'collection'").

No. 23-50224

preferring others because of *what* they say and *how* they say it. *Ibid.* This is common sense, and *ALA* plainly supports it.

Imagine if a library had to keep just any book in circulation—no matter how out-of-date, inaccurate, biased, vulgar, lurid, or silly. It would be a warehouse, not a library. By definition, libraries curate what they offer. A library's "goal has never been to provide universal coverage," but rather to "collect only those materials deemed to have requisite and appropriate quality." *Id.* at 204 (plurality) (cleaned up).[14] Selecting materials for their "requisite and appropriate quality" means choosing some content and viewpoints while rejecting others. No one thinks the Constitution requires public libraries to shelve books promoting quackeries like phrenology, spontaneous generation, tobacco-smoke enemas, Holocaust denial, or the theory that the Apollo 11 moon landing was faked.[15] *See* Frederick A. Schauer, *Principles, Institutions, and the First Amendment*, 112 HARV. L. REV. 84, 106 (1998) ("SCHAUER") (few people would "disagree . . . with the ability of a librarian to select books accepting that the Holocaust

---

[14] *See also id.* at 217 (Breyer, J., concurring in the judgment) (rejecting strict scrutiny because it "would unreasonably interfere with the discretion necessary to create, maintain, or select a library's 'collection'").

[15] *See, e.g.*, LYDIA KANG, QUACKERY: A BRIEF HISTORY OF THE WORST WAYS TO CURE EVERYTHING (2017) (discussing 18th-century notion that "tobacco-smoke enemas" could revive drowning victims); HENRY HARRIS, THINGS COME TO LIFE: SPONTANEOUS GENERATION REVISITED (2002) (discussing "the theory that inanimate material can, under appropriate conditions, generate life forms by completely natural processes"); Audiey Kao, *Medical Quackery: The Pseudo-Science of Health and Well-Being*, 2 VIRTUAL MENTOR: A.M.A. J. ETHICS 30, 30 (Apr. 2000) (explaining that early-20th-century phrenology practitioners purported to examine a person's character by "measur[ing] the conformation of the skull" with a "psychograph"); DEBORAH E. LIPSTADT, DENYING THE HOLOCAUST: THE GROWING ASSAULT ON TRUTH AND MEMORY (1994) (discussing history of Holocaust denial).

No. 23-50224

happened to the exclusion of books denying its occurrence"). The First Amendment does not force public libraries to have a Flat Earth Section.

How, then, did the district court—and now the majority—reach the mind-boggling conclusion that the Free Speech Clause *bars* libraries from removing books based on content or viewpoint? By making a series of legal errors. First, the district court and the majority invented a right to "receive information and ideas" in a public library. Op. 11. But that supposed right comes from a case recognizing the right to possess obscene materials *in one's private home*. Second, the district court and the majority each drew on our court's *Campbell* decision to constrain a library's discretion. But *Campbell* applies in the unique realm of *school* libraries and extending it to public libraries runs headlong into the Supreme Court's subsequent *ALA* decision. Furthermore, the district court relied on *Campbell* to make a nonsensical distinction (which the majority does not accept) between a library's *acquiring* and *removing* books. Third, the district court wrongly applied forum analysis to a library's bookshelves—an analysis which, again, the majority apparently disavows. Finally, the majority aggravates the district court's errors by inventing "rules" for librarians that are self-contradictory and will prove impossible to apply.

### 1. The Stanley v. Georgia *right to privately possess obscenity does not extend to a public library.*

The majority stumbles out of the gate by grounding its holding on the supposed right of library patrons "to receive information and ideas." Op. 9, 11. The majority excavates this right from *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Op. 9. But even a casual perusal of *Stanley* shows why that decision does not translate to a public library.

*Stanley* recognized a person's right to view obscene books and films at home. As the Supreme Court put it: the petitioner was "asserting the

No. 23-50224

right . . . to satisfy his intellectual and emotional needs in the privacy of his own home." *Stanley*, 394 U.S. at 565. This is the context of the Court's recognizing a "right to receive information and ideas." *Id.* at 564; *see also ibid.* (observing the case involved "a prosecution for mere possession of printed or filmed matter *in the privacy of a person's own home*") (emphasis added); *ibid.* (noting the petitioner's "right to be free . . . from unwanted governmental intrusions into one's *privacy*") (emphasis added).

It is too obvious for words why *Stanley*'s right to privately peruse obscenity at home cannot extend to a public library. But I will say it anyway. The home is *private* while the public library is *public*. Mr. Stanley won the right to watch legally obscene films at his house (presumably with the shades drawn). *See id.* at 563 (recognizing Stanley's right to privately view materials whose distribution could be banned under *Roth v. United States*, 354 U.S. 476 (1957)); *see also Miller v. California*, 413 U.S. 15 (1973). He did not win the right to watch dirty movies in a reading room at the local county library. *Cf. United States v. Marchant*, 803 F.2d 174, 178 (5th Cir. 1986) (noting that "the attempt to extend *Stanley* 'overlooks the explicitly narrow and precisely delineated *privacy* right on which *Stanley* rests'") (quoting *United States v. 12 200-ft. Reels of Super 8mm. Film*, 413 U.S. 123, 127 (1973)).

No precedent has ever extended *Stanley* to a public library. The closest anyone has come is Justice Brennan's separate opinion in *Pico. See Pico*, 457 U.S. at 867 (op. of Brennan, J., joined by Marshal and Stevens, JJ.). That opinion, which only two other Justices joined, would have extended the *Stanley* right to a school library. *Id.* at 856–57 (op. of Brennan, J.). But at least *five* other Justices rejected the idea. *See id.* at 883 (White, J., concurring in the judgment); *id.* at 885 (Burger, C.J., joined by Powell, Rehnquist, and O'Connor, JJ., dissenting). And our *Campbell* decision—discussed in detail below—identified Justice White's *Pico* concurrence as the narrowest ground for the judgment. *See Campbell*, 64 F.3d at 189 (stating that "Justice White's

No. 23-50224

concurrence in *Pico* represents the narrowest grounds for the result in that case"). Justice White's concurrence *rejected* Justice Brennan's "dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library." *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment). So, our own precedent belies the notion that *Stanley* applies to a school library.

Finally, consider the absurdity of extending *Stanley*'s "right to receive information" to a public library. It suggests that a public library has a constitutional obligation to make sure patrons "receive" certain materials. *Cf. id.* at 888 (Burger, C.J., dissenting) (explaining *Stanley*'s "right to receive information and ideas' . . . does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government"). It also suggests that a public library must not only avoid removing certain books but must acquire those books as well. *See id.* at 916 (Rehnquist, J., dissenting) (explaining the "distinction between acquisition and removal makes little sense" because "[t]he failure of a library to acquire a book denies access to its contents just as effectively as does the removal of the book from the library's shelf"). None of that makes any sense.

The majority's Free Speech misadventure should have stopped in its tracks here. *Stanley*'s right to peruse obscenity in private has no application to someone's desire to read books, obscene or not, in a public library.

### 2. *Just as when they acquire books, public libraries can remove books based on content or viewpoint.*

The district court and the majority, in different ways, both mistakenly drew on our *Campbell* decision. The district court found in *Campbell* a constitutional distinction between a library's *acquiring* and *removing* books that collapses under the slightest scrutiny. For its part, the majority tries to "harmonize" *Campbell* with *ALA* by using *Campbell* to artificially constrict

public libraries' discretion to shape book collections. Op. 13. But the cases are discordant. *Campbell* addresses the unique school library context and extending it to public libraries flies in the face of *ALA* and common sense.

Contrary to the district court's reasoning, the Free Speech Clause does not apply differently to a library's decision to acquire books as opposed to its decision to remove them. That bizarre dichotomy finds no support in *ALA*, again the most on-point decision. The opinions in that case discuss libraries' discretion in "decid[ing] what material to provide to their patrons," in "selecting . . . material," in "making collection decisions," and in "creat[ing], maintain[ing], or select[ing]" its materials. *See ALA*, 539 U.S. at 204, 205 (plurality op.); *id.* at 217 (Breyer, J., concurring in the judgment). None suggests that a library's discretion, at its apex when acquiring a book, somehow vanishes if a library retires the book because it is now inaccurate or biased or no longer of interest. That is good news, because the distinction between acquiring and removing books makes no sense.

To support the supposed distinction between acquisition and removal, the district court believed it was bound by our 1995 decision in *Campbell*. As noted, *Campbell* held that the First Amendment bars officials from "remov[ing] books from school library shelves simply because they dislike the ideas contained in these books." 64 F.3d at 188 (cleaned up) (citation omitted). The court found a fact dispute over why officials removed a book called *Voodoo & Hoodoo* from St. Tammany Parish school libraries and remanded for further inquiry. *Id.* at 190. Even assuming *Campbell* contains some distinction between acquiring and removing books, *Campbell* does not apply here for at least three reasons.

First, *Campbell* addressed the "unique role of the school library." *Id.* at 188 (quoting *Pico*, 457 U.S. at 868–69 (plurality)). It therefore had to balance "public school officials['] . . . broad discretion in the management of

school affairs" against "students' First Amendment rights." *Id* at 187–88. Those "competing considerations," *Campbell* stressed, lay "at the core of this First Amendment book removal case." *Id.* at 188; *see also id.* at 190 (noting "the special role of the school library as a place where students may freely and voluntarily explore diverse topics").

*Campbell*'s competing considerations are absent here. A county library does not implicate the "unique" First Amendment concerns at play in a public school. *Id.* at 188; *see also ibid.* (observing a school library is "the principal locus" of students' "free[dom] to inquire, to study[,] and to evaluate") (quoting *Pico*, 457 U.S. at 868–69 (plurality)). While no doubt important to the local community, a county library is—to state the obvious—not part of a public school. *Cf. Tinker v. Des Moines Indep. Comty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (discussing students' First Amendment rights "in light of the special characteristics of the school environment"). So, there is no basis for transplanting *Campbell* into the realm of public libraries.[16]

Second, even if one were inclined to extend *Campbell* to public libraries, *ALA* would stand in the way. *Campbell* prohibits removing a school library book if the "decisive factor" is "dislike [of] the ideas contained in th[e] book[]." 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 870–72). By contrast, *ALA* recognizes public libraries' "broad discretion to decide what material to provide to their patrons." *ALA*, 539 U.S. at 204 (plurality); *see also id.* at

---

[16] The majority responds by saying that *Campbell* applies both "in and out of the school context." Op. 14. Not so. *Campbell* positively marinates in the school context. *See, e.g.*, *Campbell*, 64 F.3d at 188 ("School officials' legitimate exercise of control over pedagogical matters must be balanced, however, with the recognition that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'") (quoting *Tinker*, 393 U.S. at 506). To say that *Campbell* applies "out of the school context" is to rewrite the decision.

No. 23-50224

217 (Breyer, J., concurring in the judgment) (discussing "the discretion necessary to create, maintain, or select a library's 'collection'").

The two standards are incompatible. Suppose a public library discovers it offers a book promoting Holocaust denial and decides to remove it. *ALA* allows that. *See ALA*, 539 U.S. at 208 (plurality) ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material[.]"). Yet, there is no escaping that the book is being removed because the library "dislike[s] the ideas" in it. *Campbell*, 64 F.3d at 188.[17] So, *Campbell* would likely forbid what *ALA* allows. We cannot extend *Campbell* in such a way that it conflicts with an on-point Supreme Court decision, especially one issued long after *Campbell*.[18]

Third, even assuming *Campbell* applies to a public library, it would still conflict with the district court's First Amendment rationale. The district court applied strict scrutiny to a public library's removing a book based on *any* consideration of content. But *Campbell* itself would allow a school library to remove books "based on a belief that the books were 'pervasively vulgar'

---

[17] The majority's response to this point is baffling. It claims a librarian does "not necessarily" remove the Holocaust-denial book because she "dislikes the ideas in it," but perhaps because she objects to "the accuracy of the content." Op. 14–15. What in heaven's name is the difference? And does the majority not see that just about *every* disagreement over a book's "ideas" can be re-imagined as a disagreement about a book's "accuracy"? And even if there is some metaphysical distinction between the two concepts, the majority is sentencing the judiciary to an eternity of hair-splitting litigation over whether a librarian's motives for removing a book are about "ideas" or "accuracy."

[18] This also answers the majority's view that First Amendment rights "outside the school are even more robust." Op. 13. *ALA* teaches that the opposite is true: because public libraries do not have to contend with the sometimes competing speech interests of students and administrators, they have "broad discretion" to curate their collections. In any event, as discussed, the majority's whole conception of library patrons' "rights" in this context is mistaken, based on an illogical extension of *Stanley*. *See supra* Part III(A)(1).

No. 23-50224

or on grounds of 'educational suitability.'" *Campbell*, 64 F.3d at 189 (quoting *Pico*, 457 U.S. at 870–72). In other words, because of objectionable *content* or *viewpoint*. So, even if *Campbell* applied here (which it could not under *ALA*), it would impose a First Amendment standard different from the district court's. That is yet another reason not to apply *Campbell* to a public library.[19]

Instead of addressing whether *Campbell* supports a constitutional distinction between acquiring and removing books, the majority hides in the tall weeds. In a footnote, it "decline[s] to expressly address" this question because *Campbell* only involved removal. Op. 16 n.8. Come *on*. If one's right to "receive information" is violated by a library's removing a book, then the obvious question is whether that right is also violated by a library's not acquiring the book in the first place. I suspect the reason the majority ducks this question is that answering it would nuke its position. Does anyone think patrons have a First Amendment right to make libraries *purchase* their preferred books? Of course not. But a library just as surely denies a patron's right to "receive information" by not purchasing a book in the first place as it does by pulling an existing book off the shelves.

The majority does embrace *Campbell*, however, for the proposition that public librarians' discretion must be limited when they remove books.

---

[19] The majority concedes the district court's opinion was "somewhat imprecise" on this point, Op. 15, yet waves away any problem by stating: "But *Campbell*'s rule holds true regardless: if the remover's motivation is to deny access to ideas with which he or she disagrees, the remover violates the Constitution." *Ibid.* Six pages later, though, the majority reintroduces the same problem by conceding a librarian *can* remove books that are "pervasively vulgar" or "educationally unsuitable." *Id.* at 21. The majority has thus simultaneously missed my point and proved it: there is no discernible difference between (1) removing a book because of disagreement with its "ideas," and (2) removing a book because it is "vulgar" or "educationally unsuitable." Maybe there is a world where a librarian can, at the same time, agree with a book's ideas and yet believe the book is so crass or stupid that it should be pulled off the shelves. It is not our world, though.

No. 23-50224

*See* Op. 11, 18. The majority is mistaken here, too. Perhaps *Campbell* gives some support to curtailing *school* librarians' discretion over book removals, given the sometimes competing interests of school officials and students. *See Campbell*, 64 F.3d at 188 (I express no opinion on whether *Campbell* was correctly decided). But that idea falls flat when applied to public librarians, who must have the freedom to remove books for various reasons inescapably related to the books' content and viewpoint.

Times change and library collections change along with them. Here is one mundane example. Not long ago, astronomy books taught that Pluto was a full-fledged planet. In 2006, Pluto was demoted to a "dwarf." *See* Int'l Astronomical Union, Resolution B6, XXVI General Assembly (2006) ("Pluto is a 'dwarf planet' . . . and is recognized as the prototype of a new category of Trans-Neptunian Objects."). If a public library replaces books listing Pluto as the outermost planet with newer books listing Neptune, does it commit "content or viewpoint discrimination"? Yes, it does. Otherwise, it would commit library malpractice.

Two more examples. Suppose a public librarian discovers on the shelves the 1943 book *Sex Today in Wedded Life*, which offers this advice to married women:

> Don't bother your husband with petty troubles and complaints when he comes home from work. Be a good listener. Let him tell you his troubles; yours will seem trivial in comparison. Remember your most important job is to build up and maintain his ego (which gets bruised plenty in business). Morale is a woman's business.

Edward Podolsky, Sex Today in Wedded Life (1943). Today, some may find this viewpoint outdated. Or suppose a librarian discovers an old children's book displaying racist stereotypes—one infamous example is *Little Black Sambo* (1899):



Today, a librarian would surely prefer a book depicting race in a better light. According to Plaintiffs, though, the First Amendment forbids the librarian from removing either book based on disagreement with their "viewpoint" on sex or race. That cannot be the law (but it is now, thanks to the majority).

You may be thinking: surely Plaintiffs would not push this idea *that* far! You would be wrong. At oral argument, Plaintiffs made their position crystal clear. *See* O.A. Rec. at 24:00–27:20. Counsel was asked this hypothetical:

Q: Let's say a new librarian comes in and discovers on the shelves a book by a former Grand Wizard of the Ku Klux Klan. The book explains why black people are an inferior race. So she removes it from the shelves. Is that viewpoint discrimination? And if so is that unconstitutional?

A: In your hypothetical, Judge Duncan, *why* did she remove it from the shelves?

Q: Because she found that idea offensive. That black people are inferior.

No. 23-50224

A: If that was her substantial or . . . decisive motivation, then yes, your honor.

Q: Really? *Really*?

O.A. Rec. 24:36–25:11. This position is absurd. Yet, incredibly, the majority *agrees* with it. We are told that a librarian can only remove "a book by a former Grand Wizard of the K.K.K. . . . *based on lack of interest and poor circulation history*." Op. 12 (emphasis added). So, if a library's patrons are keenly interested in the "viewpoint and message" of, say, *The Autobiography of David Duke*—and so they check the book out regularly—then a library cannot constitutionally remove it. Astounding.

In sum, a public library's "broad discretion" to shape its collection applies equally to removing books as to acquiring them. *ALA*, 539 U.S. at 205 (plurality). And barring public librarians from considering a book's viewpoint as a reason for putting it on the shelves, or for taking it off the shelves, is nonsensical. The district court erred in concluding otherwise and the majority reinforces that error today.

### 3. Forum analysis does not apply to a public library's book collection.

The district court also supported its decision by characterizing a library as a "limited public forum" in which viewpoint-based restrictions are verboten. On appeal, Plaintiffs defend the preliminary injunction on this basis, arguing that forum analysis applies to a library's book collection. The majority appears to disavow this rationale, *see* Op. 12, but because the district court and the Plaintiffs rely on it, I will explain why it is mistaken.

Forum analysis is used to assess when government can regulate private speech on property it owns or controls. *See generally Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426–27 (5th Cir. 2020)

No. 23-50224

["*FFRF*"]. In traditional public fora—sidewalks, streets, and parks—the government has little leeway to regulate speech: content- or viewpoint-based restrictions are strictly scrutinized. *FFRF*, 955 F.3d at 426 (citing *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010)).[20] The government has more latitude in "limited" public fora, which are "places that the government has opened for public expression of particular kinds or by particular groups." *Ibid.* (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam)). There, restrictions are valid if they are "(1) reasonable in light of the purpose served by the forum and (2) do[] not discriminate against speech on the basis of viewpoint." *Id.* at 426–27; *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (government "may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects," where it "may impose restrictions on speech that are reasonable and viewpoint neutral") (citation omitted).

To support their argument, Plaintiffs point to three sister-circuit decisions that deem public libraries some kind of public forum. Those cases have no bearing on the question before us, however. They address whether public libraries may evict certain people from their premises—such as sex offenders, shoeless persons, or a vagrant who menaced library staff and whose "odor was so offensive that it prevented the [l]ibrary patrons from using certain areas of the [l]ibrary." *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1115 (10th Cir. 2012) (sex offenders); *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 589 (6th Cir. 2003) (shoeless man);

---

[20] The same standard applies to "designated" public fora, which are "places that the government has designated for the same widespread use as traditional public forums." *Ibid.* (citation omitted). In either traditional or designated public fora, however, the government may impose reasonable restrictions on the time, place, and manner of private speech. *See, e.g.*, *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (citation omitted).

No. 23-50224

*Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247-48 (3rd Cir. 1992) (menacing, odiferous vagrant). Those courts answered that question by treating a library's premises as a First Amendment forum. *See, e.g.*, *Kreimer*, 958 F.3d at 1261 (concluding public library at issue "constitutes a limited public forum").

We need not decide whether this analysis by our sister circuits was correct. It is one thing to say that a public library's *premises* may constitute a public forum of some sort. For instance, a library might open one of its rooms to poetry readings by the public and thereby create a limited public forum. *See, e.g.*, *id.* at 1259–60 (concluding public library at issue "constitutes a limited public forum" because "the government intentionally opened the Library to the public for *expressive activity*"). But it is entirely another thing to extend this concept, as Plaintiffs would, to a library's *bookshelves*. Plaintiffs' cases do not support doing that. They address only whether a library can evict certain patrons. *See, e.g.*, *Neinast*, 346 F.3d at 592 (upholding no-shoes policy because it avoided "tort claims brought by library patrons who were injured because they were barefoot"). They say nothing about whether a library can exclude certain books from its shelves.

More to the point, it makes no sense to apply forum analysis to a library's book collection. Library shelves are not a community bulletin board: they are not "places" set aside "for public expression of particular kinds or by particular groups." *FFRF*, 955 F.3d at 426. If they were, libraries would have to remain "viewpoint neutral" in choosing books. *See Summum*, 555 U.S. at 470 (limited public fora's restrictions must be "viewpoint neutral"). That would be ridiculous. Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jewish history without including the Neo-Nazi take. *See, e.g.*, SCHAUER, *supra*, at 106 (explaining a librarian may choose books "accepting

that the Holocaust happened to the exclusion of books denying its occurrence"). Forum analysis has no place on a library's bookshelves.

If there were any doubt, *ALA* would dispel it. The plurality rejected the notion that a library's book collection is a public forum. "A public library does not acquire Internet terminals in order to create a public forum," the plurality explained, "any more than it collects books in order to provide a public forum for the authors of books to speak." *ALA*, 539 U.S. at 206 (plurality). We have followed *ALA* on this point. *See Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) (relying on *ALA* for proposition that neither forum analysis nor heightened scrutiny apply to libraries' collection decisions) (citing *ALA*, 539 U.S. at 205 (plurality)). A library places books on its shelves for an obvious purpose—"to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *ALA*, 539 U.S. at 206 (plurality). That core function is at war with any notion that the library's book collection constitutes a public forum.

I said earlier that the majority "appears" to agree with these points. *See* Op. 12 ("We agree with Defendants that public forum principles are 'out of place in the context of this case.'") (citation omitted). I am not 100% sure, though. According to the majority, the notion that a library's shelves are a public forum "is not what Plaintiffs argue here." *Ibid.* Wrong. On page 42 of their brief, Plaintiffs argue (incorrectly) that "courts have almost uniformly held that public libraries are limited public fora to which heightened scrutiny applies, as the District Court found." Red Br. at 42. The majority gets around this by recasting Plaintiffs' argument: they are not "authors" who want their books on library shelves, "but instead are patrons who seek to exercise their right to receive information." Op. 12. So, we arrive again at the supposed right to receive information at a public library. *See supra* Part III(A)(1). Take away that made-up right, and all the plaintiffs have is their library-shelves-

are-a-public-forum argument. It is wrong, whether the majority wants to admit it or not.

In sum, First Amendment forum analysis does not apply to a public library's book collection. The district court erred by concluding otherwise.

### 4. *The majority's "rules" are a jurisprudential disaster.*

Finally, the majority is not content just to adopt the district court's rule that libraries cannot consider content or viewpoint when removing books. While wrong, that rule is at least straightforward. The majority has chosen to complexify the matter by inventing its own "rules." Here they are again:

1. Libraries "may consider books' contents in making curation decisions." Op. 11 (citing *ALA*, 539 U.S. at 204 (plurality)).

2. But patrons have the "right to receive information and ideas." *Ibid.* (quoting *Stanley*, 394 U.S. at 564).

3. A library violates that right if its decision to remove a book is "'substantially motivated' by the desire to deny 'access to ideas with which [the library] disagree[s].'" *Id.* at 11–12 (quoting *Pico*, 457 U.S. at 871 (plurality)).

4. But a library can remove books "based on . . . the accuracy of the[ir] content," *id.* at 15, or "based on a belief that the books [are] 'pervasively vulgar' or on grounds of 'educational suitability,'" *id.* at 21 (quoting *Campbell*, 64 F.3d at 188–89).

These rules are ill-conceived, self-contradictory, and impossible to apply.

First, like Frankenstein's Monster, the rules are stitched together from bits and parts of four cases—*ALA*, *Stanley*, *Pico*, and *Campbell*. As I've already explained, though, only one of those cases—*ALA*—is actually relevant because it alone addresses the subject at hand: a public library's discretion to shape its collection. *See supra* Part III. The other cases are inapposite. *Stanley* is about private viewing of obscenity, and *Pico / Campbell*

No. 23-50224

are about school libraries (and both pre-date *ALA*).[21] The bottom line, though, is that the majority's rules are the majority's creation. No binding precedent, either of the Supreme Court or our court, required their adoption.

Second, the rules contradict themselves. Suppose a librarian removes Henry Miller's 1934 book, *Tropic of Cancer*, based on complaints that the book is "debased and morally bankrupt" and uses "vivid, lurid, [and] salacious language." *See Besig v. United States*, 208 F.2d 142, 145 (9th Cir. 1953) (affirming finding that *Tropic of Cancer* was obscene).The book was a font of controversy in the 1950's and 60's because of its explicit treatment of sexual themes. *Time* referred to it as one of those books "sewer-written by dirty-fingered authors for dirty-minded readers." *Life* took a different view, predicting the book "will be defended by critics as an explosive corrosive Whitmanesque masterpiece (which it is) and attacked as an unbridled obscenity (which it is)." Then-Massachusetts Attorney General, Edward J. McCormack, Jr., was less nuanced: he found the book "repulsive," "an affront to human decency," and "brazenly animalistic."[22]

So, to return to our librarian: does removing *Tropic of Cancer* violate the First Amendment? Let's apply the majority's rules:

*Question*: Was the librarian's "substantial motive" in removing *Tropic of Cancer* her disagreement with the book's ideas?

*Answer*: Yes, so removing it violates the First Amendment.

---

[21] *Pico* bears mention only because *Campbell* discussed it. *See Campbell*, 64 F.3d at 188–89. But *Campbell* itself noted that nothing in *Pico* is "binding precedent" with respect to the First Amendment. *Ibid*. As *Campbell* stated, the "narrowest" and hence controlling opinion in *Pico* is Justice White's concurrence—a concurrence that disavowed the First Amendment discussion in Justice Brennan's separate opinion. *See supra* Part III(A)(2).

[22] *See* Barney Rosset, *Profiles in Censorship: Henry Miller and the Tropic of Cancer*, in ROSSET: MY LIFE IN PUBLISHING AND HOW I FOUGHT CENSORSHIP (2017).

No. 23-50224

> *Question*:  Did the librarian remove *Tropic of Cancer* because she found
> it "pervasively vulgar"?
>
> *Answer*:    Yes, so removing it does not violate the First Amendment.

Raise your hand if you see the problem.

Or consider a more modern example. In 2018, the American Library Association stripped Laura Ingalls Wilder's name from its Lifetime Achievement Award because, according to some, her *Little House* books "reflect dated cultural attitudes toward Indigenous people and people of color." [23] Suppose, in response to the ALA's action, a Travis County librarian removes the *Little House* books. The librarian is sued. Let's apply the majority's rules. Was the librarian's "substantial motivation" for removing the books to deny access to Wilder's supposedly dated ideas? Or was her motive that the books were educationally unsuitable? The answer is "yes" and "yes," which of course is no answer at all.

Finally, the rules cannot be applied coherently. Look no further than this case. The two judges in the majority cannot agree on how their rules apply to over *half* of the books at issue. JUDGE WIENER is confident all 17 books must be restored to the shelves because the evidence shows the "substantial" motive for removing them was to "deny access" to disfavored ideas. *See* Op. 18–23; *see also id.* at 18 (claiming this is a "relatively straightforward application" of the rules). JUDGE SOUTHWICK is less sure. He believes the rules allow the Butt and Fart Books to be removed because he doubts they "contain any *ideas* with which to disagree." Op. 1 (Southwick, J., concurring in part and concurring in the judgment in part). Alternatively, he believes those books may be removed because a librarian might consider

---

[23] *See* AMERICAN LIBRARY ASS'N PRESS RELEASE, *ALA, ALSC respond to Wilder Medal name change* (June 25, 2018), https://www.ala.org/news/press-releases/2018/06/ala-alsc-respond-wilder-medal-name-change.

No. 23-50224

them "pervasively vulgar" or "not educationally suitable." *Id.* at 2 (citation omitted). He also allows that a book may be removed on the ground that "it encourages children to engage in sexual activity with adults or includes sexually explicit content"—a rationale that, "[a]t this stage of the case," may include *In the Night Kitchen* (because it contains drawings of a naked toddler) and *It's Perfectly Normal* (because of the sexually explicit cartoons you can examine on page 43). *Ibid.*

So, by my count, that means the two judges in the majority—while ostensibly agreeing on the "rules"—disagree on whether those "rules" permit removal of nine of the 17 books at issue. To paraphrase Cormac McCarthy, "If the rules you followed led you to this, of what use were the rules?" Cormac McCarthy, No Country For Old Men (2005).

Do I have to answer?

\*\*\*

Because the district court applied an incorrect legal standard, it abused its discretion in entering a preliminary injunction. *See Kauffman*, 981 F.3d at 354 (citation omitted). The court should have vacated the injunction and remanded for further proceedings.

### B. The Free Speech Clause Does Not Constrain Public Libraries' Collection Decisions.

Because the case will continue on remand, the court should answer to the legal question posed here—namely, how the Free Speech Clause applies to a public library's choice of the books and other materials in its collection.[24]

---

[24] *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (en banc) (reversing and remanding for district court to consider racial discrimination claim "in light of the guidance we have provided in this opinion"); *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482 (5th Cir. 2001) (in addition to reversing class certification, addressing legal issue on which district court erred "to guide the district court on remand").

No. 23-50224

The short answer is that those choices are government speech to which the Free Speech Clause does not apply. Below, I explain why that is the case, while responding to the majority's criticisms.

### 1. *Supreme Court precedents:* **Forbes, Finley, ALA,** *and* **Summum**

The library at issue is a public entity supervised by a local government body. *See* Tex. Local Gov't Code §§ 323.001(a) (providing for "a free county library" created either by "the commissioners court" or "a majority of the voters"); 323.006 ("The county library is under the general supervision of the commissioners court."). It is supported by county funds. *Id*. § 323.002. It is administered by the county librarian "subject to the general rules adopted by the commissioners court." *Id.* § 323.005(c). Among other duties, the librarian "shall determine which books and library equipment will be purchased." *Ibid*.

How, if at all, does the Free Speech Clause constrain this library's discretion to shape its collection, whether through acquiring new books or removing books on the shelves? As discussed, Plaintiffs defend the position (adopted by the district court and largely affirmed by the majority) that a library's viewpoint- or content-based removal of books is unconstitutional. They also argue that, as a limited public forum, a library's removal of a book triggers heightened scrutiny. I have already explained why these arguments fail. For their part, Defendants argue that libraries' "weeding decisions" need only have a rational basis. As I explain below, both sides are incorrect about the Free Speech standard applicable here.

To answer this question, *ALA* is again a good starting place. The plurality characterized a public library's choice of books as "the government . . . deciding what private speech to make available to the public." 539 U.S. at 204 (plurality). To flesh out that idea, the plurality drew

No. 23-50224

on two areas where the government makes similar decisions regarding private speech: a public television station's "editorial judgments" over what private speech to air (*see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998)), and a federal agency's decision to fund certain artistic works (*see Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998)). In the plurality's view, these precedents charted the boundaries of a public library's discretion: "The principles underlying *Forbes* and *Finley* . . . apply to a public library's exercise of judgment in selecting the material it provides to its patrons." *ALA*, 539 U.S. at 205 (plurality).[25]

Those cases afforded the government wide discretion over its presentation of private speech. For instance, *Forbes* recognized that public broadcasters "are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming." 523 U.S. at 673. That discretion generally excludes "claims of viewpoint discrimination" because "a broadcaster by its nature will facilitate the expression of some viewpoints instead of others." *Id.* at 673–74. Moreover, allowing judges to superintend such decisions "would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." *Id.* at 674; *see also ALA*, 539 U.S. at 204 (plurality).[26]

---

[25] In Defendants' view, *ALA* teaches that "rational-basis review applies to a public library's weeding decisions." I disagree. The statement Defendants quote for this point ("[G]enerally the First Amendment subjects libraries' content-based decisions about which print materials to acquire for their collections to only rational [basis] review.") was itself merely quoting the district court decision in that case. *See ALA*, 539 U.S. at 202 (plurality) (quoting 201 F. Supp. 2d 401, 462 (E.D. Pa. 2002)). The *ALA* plurality, however, did not adopt that standard for testing a library's collection decisions.

[26] *Forbes* recognized a "narrow exception" to this general principle—namely, where a public broadcaster creates a "non-public forum" by hosting a candidate debate. *See id.* at 675 (explaining that "candidate debates present the narrow exception to the rule" that forum analysis does not apply to public broadcasting). That narrow exception has no

No. 23-50224

*Finley* is also deferential to government discretion. As the *ALA* plurality explained, *Finley* "upheld an art funding program that required the National Endowment for the Arts (NEA) to use content-based criteria in making funding decisions." *ALA*, 539 U.S. at 205 (plurality) (citing *Finley*, 524 U.S. 569). The criteria included "consideration [of] general standards of decency and respect for the diverse beliefs and values of the American public." *Finley*, 524 U.S. at 576 (quoting 20 U.S.C. § 954(d)(1)). The Free Speech Clause did not constrain the NEA's grant-making discretion, *Finley* reasoned, because judgments based on subjective considerations—including "esthetics" and "artistic worth"[27]—were "a consequence of the nature of arts funding." *Id.* at 585, 586; *see also ALA*, 539 U.S. at 205 (plurality). In that realm, "absolute neutrality is simply inconceivable." *ALA*, 539 U.S. at 205 (quoting *Finley*, 524 U.S. at 585); *see also Chiras*, 432 F.3d at 613–14 (taking a similar view of *Forbes*, *Finley*, and *ALA* in the context of a state board of education's discretion over curricula and textbooks).

Six years after *ALA*, the Supreme Court refined these principles in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). *Summum* rejected a Free Speech challenge to a city's accepting a privately-donated Ten Commandments monument for a public park. *Id.* at 464–65. Citing the *ALA* plurality, the Court held forum analysis did not apply: the city had not opened its property to private speakers but had only allowed installation of "a limited

---

application here, however. As discussed, this case does not involve a public library's decision to open its premises to private speech, much less to candidate debate.

[27] As *Finley* explained, the NEA program incorporated a "wide variety" of funding criteria, including: "the technical proficiency of the artist, the creativity of the work, the anticipated public interest in or appreciation of the work, the work's contemporary relevance, its educational value, its suitability for or appeal to special audiences (such as children or the disabled), its service to a rural or isolated community, or even simply that the work could increase public knowledge of an art form." *Finley*, 524 U.S. at 585.

number of permanent monuments." *Id.* at 478 (citing *ALA*, 539 U.S. at 205 (plurality)). Accordingly, the city did not have to "maintain viewpoint neutrality" in choosing monuments. *Id.* at 479.

Moreover, *Summum* held the city's decision to select some monuments but reject others "constitute[s] government speech." *Id.* at 472. It did not matter that most of the monuments were privately donated. *Id.* at 464. The relevant expression was the *city*'s decision, guided by its own criteria, to allow only certain monuments on public property. *Id.* at 465. The city could "express its views," the Court explained, even "when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.* at 468 (citation omitted). This was an example of a government "speak[ing] for itself." *Id* at 467 (citation omitted). Indeed, the Court cited a concurring opinion in *Finley* for the proposition that "[i]t is the very business of government to favor and disfavor points of view." *Id* at 468. (quoting *Finley*, 524 U.S. at 598 (Scalia, J., concurring in judgment)).

In sum, *Summum* held that the Free Speech Clause did not constrain the city's choice of monuments in a public park. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Id.* at 467 (citing, *inter alia*, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 533 (2005)). But, the Court added, "[t]his does not mean that there are no restraints on government speech." *Id.* at 468. The Court noted the Establishment Clause as one potential check, along with "law, regulation, or practice." *Ibid.* More fundamentally, the government expression was "ultimately 'accountable to the electorate and the political process.'" *Ibid.* (quoting *Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Id.* at 468–69 (citation omitted).

No. 23-50224

### 2. *Sister-Circuit precedents:* Sutliffe, Illinois Dunesland, *and* PETA.

Rounding out this discussion, I note sister-circuit cases that treat the government's presentation of third-party speech as the government's own expression. For instance, in *Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cir. 2009), a non-profit group sued a town for refusing to include the group's hyperlink on the town's website. Applying *Summum*, *Finley*, *Forbes*, and *ALA*, the First Circuit rejected the plaintiff's Free Speech challenge: "[T]he Town engaged in government speech by establishing a town website and then selecting which hyperlinks to place on its website." *Id.* at 331 (citing *Summum*, 129 S. Ct. at 1134; *ALA*, 539 U.S. at 204–05 (plurality); *Finley*, 524 U.S. at 585–86; *Forbes*, 523 U.S. at 674). Specifically, the court read *Summum* to teach that when government "uses its discretion to select between the speech of third parties for presentation" through government channels, "this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech." *Id.* at 330 (citing *Summum*, 129 S. Ct. at 1133–36).[28]

Similarly, in *Illinois Dunesland Preservation Society v. Illinois Department of Natural Resources*, 584 F.3d 719, 721 (7th Cir. 2009), a non-profit group sued a state agency for refusing to include the group's "scary two-page pamphlet" in state park display racks. The pamphlet warned about "asbestos contamination while at the beaches of Illinois Beach State Park." *Ibid*. Applying *Summum*, the Seventh Circuit rejected plaintiffs' Free Speech

---

[28] Like *Summum*, the court acknowledged that "there may be limits to the government speech doctrine," such as "vot[ing] [officials] out of office, or limit[ing] the conduct of those officials by law, regulation, or practice." *Id.* at 331 & n.9 (citations and internal quotation marks omitted). The court added that "[t]he Establishment Clause is another restraint on government speech, and the Equal Protection Clause may be as well." *Ibid.* (citation omitted).

No. 23-50224

challenge by characterizing the agency's selection of materials in display racks as government expression "designed to attract people to the park." *Id.* at 724–25 (citing *Summum*, 129 S. Ct. at 1131). As the court explained:

> The [agency's] choice of materials conveys a message that is contradicted by the plaintiff's pamphlet. The message of the publications in the display racks is: come to the park and have a great time on the sandy beaches. The message of the plaintiff's pamphlet is: you think you're in a nice park but really you're in Chernobyl[.]

*Id.* at 725. The court also pointed out the absurdity of imposing viewpoint neutrality here: "Must every public display rack exhibit on demand pamphlets advocating nudism, warning that the world will end in 2012, . . . or proclaiming the unconstitutionality of the income tax, together with pamphlets expressing the opposing view on all these subjects?" *Ibid.*

The final instructive case is *PETA v. Gittens*, 414 F.3d 23 (D.C. Cir. 2005). As part of a public art program called "Party Animals," the District of Columbia solicited designs for "sculptures of 100 donkeys and 100 elephants." *Id.* at 25. Winners chosen by the District[29] would have their designs displayed at prominent locales. *Id.* at 26. PETA submitted various elephant designs, including "one of a happy circus elephant, the other of a sad, shackled circus elephant with a trainer poking a sharp stick at him." *Id.* at 26. After the District "accepted the happy elephant, but rejected the sad one," PETA sued under the Free Speech Clause. *Ibid.* The district court

---

[29] The District's criteria sought "artwork that is dynamic and invites discovery," "original and creative," "durable," and "safe." *Id.* at 25–26. Not allowed, however, were "direct advertising," "social disrespect," "slogans," or "inappropriate images." *Ibid.*

No. 23-50224

granted a preliminary injunction requiring the District to display one of PETA's sad elephants. *Id.* at 27.[30] The D.C. Circuit reversed.

The court first concluded that the District itself was speaking by choosing some designs over others. *Id.* at 28 (citing *Forbes*, 523 U.S. at 674). The court carefully distinguished the District's speech from the artists' speech, using the analogy of public library books: "As to the message any elephant or donkey conveyed, this was no more the government's speech than are the thoughts contained in the books of a city's library." *Ibid.* Nonetheless, government speech was still present:

> With respect to the public library, *the government speaks through its selection of which books to put on the shelves and which books to exclude*. In the case before us, the Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include.

*Ibid* (emphasis added).[31]

Next, the court held that "public forum principles 'are out of place in the context of this case.'" *Ibid.* (quoting *ALA*, 539 U.S. at 205 (plurality)). By choosing some designs and rejecting others, the District was not regulating private speech but was speaking for itself. The government, the court explained, "may run museums, libraries, television and radio stations, primary and secondary schools, and universities," and "[i]n all such

---

[30] This version "depict[ed] a shackled elephant crying" with a "sign tacked to the elephant's side [that] read: 'The Circus is coming. See SHACKLES–BULL HOOKS– LONELINESS. All under the 'Big Top.'" *Id.* at 26.

[31] While *PETA* pre-dated *Summum*, the D.C. Circuit's analysis anticipated the Supreme Court's. *See id.* at 29 (explaining that "First Amendment constraints do not apply when [government] authorities engage in government speech by installing sculptures in the park. If the authorities place a statue of Ulysses S. Grant in the park, the First Amendment does not require them also to install a statue of Robert E. Lee").

activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *Id.* at 29 (citing SCHAUER, *supra*, at 104–05). Relying on *Forbes*, *Finley*, and *ALA*, the court underscored the government's wide discretion in such endeavors: "As a television broadcaster, the government must 'exercise journalistic discretion'; as an arts patron, the government must 'make esthetic judgments'; and as a librarian, the government must 'have broad discretion to decide what material to provide to [its] patrons.'" *Ibid.* (cleaned up) (quoting *Forbes*, 523 U.S. at 674; *Finley*, 524 U.S. at 586; *ALA*, 539 U.S. at 204 (plurality)). Accordingly, the Free Speech Clause did not restrict the District's "decisions about PETA's elephants" because the Clause "does not apply to the government as communicator." *Id.* at 30–31.

### 3. *A public library's collection decisions are government speech.*

These precedents point to one conclusion: a public library's selection of some books, and its rejection of others, constitutes government speech. Those choices are therefore not constrained by the Free Speech Clause. *See, e.g.*, *Summum*, 555 U.S. at 467 ("The Free Speech Clause . . . does not regulate government speech.") (citation omitted).

I emphasize, as have other courts, the distinction between government and private speech at work here. *See, e.g.*, *Summum*, 555 U.S. at 470–72; *PETA*, 414 F.3d at 28. The government expression in this case is not found in the words of the library books themselves. Of course not. "Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message." *PETA*, 414 F.3d at 28. Rather, the government speaks by choosing certain books over others for the library's collection. That selectivity is why we have libraries in the first place. "[T]heir goal has never been to provide universal coverage," but instead "to collect only those materials deemed to have requisite and appropriate quality."

No. 23-50224

*ALA*, 539 U.S. at 204 (plurality) (citation and internal quotation marks omitted). And the message sent by the library's choice is plain: *this* book is "suitable and worthwhile material," while *that* book is not. *Id.* at 208 (plurality). That message is the library's and is not subject to judicial scrutiny under the Free Speech Clause.[32]

Plaintiffs' rejoinder is that affording public libraries broad discretion over their collections will lead to something they call "book banning."[33] The

---

[32] The majority's response to this entire line of argument is anemic. First, the majority says *Campbell* never "suggest[ed]" the officials' decision to remove *Voodoo & Hoodoo* was government speech. Op. 16. Likely that's because no one raised the point. In any event, *Campbell* didn't decide the issue and so it is open in this circuit (or at least it was). The majority's next response is entirely circular. It claims that government discretion in "deciding what private speech to make available to the public," while "extensive," is nonetheless subject to First Amendment constraints. *Id.* at 17. What might those constraints be? You guessed it: the government can't "inten[d] to deprive the public of access to ideas with which it disagrees." *Ibid.* In other words, government discretion is limited by the "right" the majority invented for this case. Finally, the majority tries to distinguish *Summum* based on the notion that, unlike the government's selection of public monuments, a library's collection decisions are "numerous" and "often occur behind closed doors." Op. 17–18 n.10. Those are distinctions without a difference. To the contrary, *Summum* is directly on point: just as the government expressed itself there by selecting some monuments over others, so library officials express themselves here by selecting some books over others. *See PETA*, 414 F.3d at 28 (explaining "[w]ith respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude").

[33] Plaintiffs also claim Defendants have "waived" the argument that the library's collection decision is government speech by not arguing the point here. I disagree and so does the majority. *See* Op. 16 n.9. Whether the Free Speech Clause constrains a library's collection decisions is plainly before us; whether those decisions constitute government expression is bound up with that question, regardless of how the parties phrase the issue. *See, e.g.*, *Stramaski v. Lawley*, 44 F.4th 318, 326 (5th Cir. 2022) ("[W]e may use our 'independent power to identify and apply the proper construction of governing law' to any 'issue or claim [that] is properly before the court, . . . not limited to the particular legal theories advanced by the parties.'") (quoting *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991)). Regardless, the court could (and should) exercise its discretion to address government speech, even if it were somehow waived. *See Singleton v. Wulff*, 428 U.S. 106, 121 ("[W]hat questions may be taken up and resolved for the first time on appeal is one left

No. 23-50224

theme is woven throughout Plaintiffs' brief, which ritually dubs the 17 books at issue the "Banned Books." *See* Red Br. at 4, 13, 15, 17, 18, 20, 24, 28, 29, 31, 34, 42, 47, 49, 55, 56, 57. The brief's opening sentence asks: "Can government officials freely purge public libraries of any books containing ideas those officials want to prevent library patrons from accessing?" *Id.* at 1. It warns elsewhere that, without strict judicial oversight, "government officials could remove books for any reason no matter how partisan" and "the robust marketplace of ideas embodied in public libraries would disappear." *Id.* at 18. This is hyperbole, not argument.

First, Plaintiffs ignore public libraries' wide latitude to choose the books on their shelves. Our own precedent, quoting *ALA*, recognizes that "public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them." *Chiras*, 432 F.3d at 614 (quoting *ALA*, 539 U.S. at 205 (plurality)). Plaintiffs nonetheless insist that courts have the power to oversee those decisions in order to prevent "book banning." This raises an obvious question: what is the difference between a library's "banning" a book (something Plaintiffs claim is prohibited by the Free Speech Clause) and a library's discretionary decision not to include the book in its collection? Plaintiffs do not say.

To make this pivotal question more concrete, consider one of the supposedly "banned" books at issue: *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health*, by Robie H. Harris and Michael Emberley. Plaintiffs' brief describes *It's Perfectly Normal* as "an illustrated children's[34] health book that helps readers understand puberty and discusses

---

primarily to the discretion of the courts of appeals[.]"). Our court could not properly address how the Free Speech Clause applies to the library's decision without addressing the intertwined issue of whether that decision was government speech.

[34] The book's cover states: "FOR AGE 10 AND UP."

ways to stay safe online." Red Br. at 7. Yet the book has stirred controversy[35] and evidence suggests it was removed from the library because of its sexually explicit cartoons. *Ibid.* Here are some that have drawn the most attention:



---

[35] *See, e.g.*, Aymann Ismail, *Closed Book*, SLATE.COM (Sept. 11, 2023) (discussing controversy surrounding *It's Perfectly Normal*), *available at* https://slate.com/human-interest/2023/09/banned-books-list-its-perfectly-normal-facebook.html.

No. 23-50224

*It's Perfectly Normal*, at 9.

So, back to our question: did the library "ban" *It's Perfectly Normal*, as Plaintiffs contend? Or did the library instead exercise its "broad discretion" to decide the book was not "suitable and worthwhile" for 10-year-olds? *ALA*, 539 U.S. at 205, 208 (plurality). Again, Plaintiffs offer no way of distinguishing one from the other. This suggests their cryptic warning about "book banning" is nothing more than a rearguard attack on public libraries' discretion over their collections. *See, e.g.*, *id.* at 208 (plurality) ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material[.]").

Second, even *assuming* courts can police libraries' collection decisions, what standard would they apply? The only one proposed by Plaintiffs (and the district court) is to forbid "content or viewpoint discrimination." As shown, that is a non-starter. It would leave a librarian powerless to remove from the shelves all manner of bigoted screeds. It would perversely require librarians to "balance" legitimate scientific volumes with reams of quackery. It would literally bar a library from stopping a subscription to *Penthouse* magazine. *Cf. id.* at 208 (plurality) ("Most libraries already exclude pornography from their print collections because they deem it inappropriate for inclusion."). In short, it is a standard in open war with the very concept of a library, whose mission is to assess materials *precisely* in terms of content and viewpoint and thereby "separate out the gold from the garbage." *Id.* at 204 (plurality) (quoting KATZ, *supra*, at 6).[36]

Defendants' counterproposal is that a library's collection decisions must be "rational." That is more modest than Plaintiffs' proposal, but no

---

[36] I have already explained why the majority's "rules" will prove impossible to apply coherently, *supra* Part III(A)(4), and need not repeat that here.

more helpful. After all, what constitutes an "irrational" collection decision? Featuring the romantic works of E.L. James? Classifying *The DaVinci Code* as "Literature"? The mind reels at judges concocting "standards" for adjudicating such insoluble subjectivities. It would be no different than judges opining on whether the NEA should fund the latest "re-imagining" of *Hamlet*.[37] Or whether a public television station should air old episodes of *The Joy of Painting* instead of the new season of *Call The Midwife*. Those are matters of esthetic, social, and moral judgment and no judge-made test can possibly say whether their resolution in any given case was "rational." *Cf. Forbes*, 523 U.S. at 674 ("Were the judiciary to require, and so to define and approve, pre-established criteria for access [to public broadcasting], it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion."). The same goes for a public library's decision about which books to feature and which books to exclude.

Third, bear in mind the limits of my view. I say only that the *Free Speech* Clause does not constrain a public library's collection decisions. That says nothing about other parts of the Constitution. *Cf. Summum*, 555 U.S. at 468–49 (suggesting other possible "restraints on government speech" besides Free Speech). I would hold only that that the Free Speech Clause provides no standard against which to judge a public library's inescapably expressive decision about which books it deems "suitable and worthwhile" and which it does not. *ALA*, 539 U.S. at 208 (plurality).

---

[37] *See, e.g.*, Alamo Drafthouse Cinema, *You've Never Experienced the Bard Like This Before!* (Oct. 12, 2012) (discussing Rudolf Volz's *Hamlet In Rock*, in which "Hamlet is a whiny goth, Queen Gertrude wears a bright red penis-shaped crown, and the gravedigger is an incomprehensible three-eared space rabbit"), *available at* https://drafthouse.com/news/youve-never-experienced-the-bard-like-this-before.

No. 23-50224

Nor should we forget the most effective constraint on public officials' speech: the good sense of the citizens who elected them. "[The Llano County commissioners court] is ultimately 'accountable to the electorate and the political process for its [choice of library books].'" *Summum*, 555 U.S. at 468 (quoting *Southworth*, 529 U.S. at 235) (brackets added). Energized voters can bend public officials to their will, as this case amply shows. Plaintiffs' lamentations to the contrary, that does not amount to "book banning." It means that a local government heeded its citizens. True, the upshot is that Llano County's books may differ from the books in Travis or Harris County. But variety is a feature of our system, not a bug. *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory[,] and try novel social and economic experiments without risk to the rest of the country.").

## IV. Conclusion

Stephen King saw this coming. One of his scary stories once warned: "AVOID THE LIBRARY POLICE!"[38] Now, thanks to the majority, we are all the Library Police.

I dissent.

---

[38] Stephen King, *The Library Policeman*, in Four After Midnight (1990).

46