# In the United States Court of Appeals for the Fifth Circuit

---

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL CAPACTY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 1:22-cv-424-RP

---

## APPELLANTS' OPENING BRIEF

---

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

## Certificate of Interested Persons

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs | Plaintiffs' Counsel |
|---|---|
| <ul><li>Leila Green Little</li><li>Jeanne Puryear</li><li>Kathy Kennedy</li><li>Rebecca Jones</li><li>Richard Day</li><li>Cynthia Waring</li><li>Diane Moster</li></ul> | Ellen V. Leonida<br>Matthew Borden<br>J. Noah Hagey<br>Max Bernstein<br>Ellis E. Herington<br>Marissa Benavides<br>BraunHagey & Borden LLP<br><br>Ryan A. Botkin<br>Katherine P. Chiarello<br>María Amelia Calaf<br>Kayna Stavast Levy<br>Botkin Chiarello Calaf |

| Defendants | Defendants' Counsel |
|---|---|
| <ul><li>Llano County,</li><li>Ron Cunningham</li><li>Jerry Don Moss</li><li>Peter Jones</li><li>Mike Sandoval</li><li>Linda Raschke</li><li>Amber Milum</li><li>Bonnie Wallace</li><li>Rochelle Wells</li><li>Rhonda Schneider</li><li>Gay Baskin</li></ul> | Jonathan F. Mitchell<br>Mitchell Law PLLC<br><br>Dwain K. Rogers<br>Matthew L. Rienstra<br>Llano County Attorney's Office |

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

i

# Statement Regarding Oral Argument

The defendants-appellants respectfully request oral argument, as the issues in this case are sufficiently important and complex to warrant oral-argument time.

# TABLE OF CONTENTS

Certificate of interested persons ............................................................. i

Statement regarding oral argument ....................................................... ii

Table of contents ................................................................................ iii

Table of authorities ............................................................................. v

Statement of jurisdiction .................................................................... 3

Statement of the issues........................................................................ 4

Statement of the case .......................................................................... 5

    I.  Facts and evidence ................................................................... 5

   II.  The district court's ruling...................................................... 16

Summary of argument........................................................................ 19

Standard of review ............................................................................. 20

Argument ........................................................................................... 20

    I.  The district court erred in granting a preliminary injunction ...................... 20

        A.  The plaintiffs failed to make a clear showing that the in-house checkout system violates their First Amendment right to access and receive information ........................................................ 21

        B.  The plaintiffs failed to make a "clear showing" of "irreparable harm" when each of the 17 disputed books remains available for them to read and check out at Llano Library........................... 23

        C.  The district court erred in holding that the First Amendment forbids "viewpoint discrimination" or "content discrimination" in public-library weeding decisions ........................................... 25

        D.  The plaintiffs failed to make a "clear showing" that Amber Milum engaged in viewpoint or content discrimination when weeding the 17 disputed books ................................................................ 34

        E.  The preliminary injunction is overbroad................................ 38

        F.  The plaintiffs failed to make a "clear showing" that the balance of equities and the public interest favors a preliminary injunction .............. 40

II. The Court should hold that rational-basis applies to public-library weeding decisions ........................................................................ 42

Conclusion ........................................................................................ 44

Certificate of service ......................................................................... 45

Certificate of compliance ................................................................. 46

Certificate of electronic compliance ................................................ 47

# Table of Authorities

## Cases

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) ........................................ 39

*Board of Education v. Pico*, 457 U.S. 853 (1982) .........................13–14, 27, 28

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
619 F. Supp. 3d 906 (E.D. Mo. 2022) ....................................24, 27, 28

*Califano* v. *Yamasaki*, 442 U.S. 682 (1979) ........................................... 39

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) ............................................................... 27, 28

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ................................. 19, 26, 28, 34, 43

*Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) ......................... 29

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986)..................................... 21

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) .............................. 39

*Egli v. Chester County Library System*,
394 F. Supp. 3d 497 (E.D. Pa. 2019) .................................................... 43

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998) .................................... 21

*Gay Guardian Newspaper v. Ohoopee Regional Library System*,
235 F. Supp. 2d 1362 (S.D. Ga. 2002) .................................................. 43

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020) ............................................40

*In re Gee*, 941 F.3d 153 (5th Cir. 2019)...................................................22

*John Doe #1 v. Veneman*, 380 F.3d 807 (5th Cir. 2004) ........................40

*Jones v. District of Columbia*, 177 F. Supp. 3d 542 (D.D.C. 2016) .................... 23, 24

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam)....................... 17

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ................... 29

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)...................40

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009)...................29

*Professional Association of College Educators v. El Paso County
Community College District*, 730 F.2d 258 (5th Cir. 1984) ...................40

*Rosenberger v. Rector and Visitors of University of Virginia*,
515 U.S. 819 (1995) ................................................................ 30

*Rust v. Sullivan,* 500 U.S. 173 (1991) .......................................... 29

*Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013) ..................... 20

*Serra v. U.S. General Services Administration*,
847 F.2d 1045 (2d Cir. 1988) .............................................. 28

*Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000) ...................... 29

*Texas Medical Providers Performing Abortion Services v. Lakey*,
667 F.3d 570 (5th Cir. 2012) ............................................... 20

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ................................. 22

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) ......... 19, 26, 34, 43

*United States v. Students Challenging Regulatory Agency Procedures
(SCRAP)*, 412 U.S. 669 (1973) ............................................ 22

*Virgil v. School Board of Columbia County, Florida*,
862 F.2d 1517 (11th Cir. 1989) .......................................... 28

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ............................ 20–21

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) .................. 20, 23, 24

**Statutes**

28 U.S.C. § 1292(a)(1) ...................................................................... 3

42 U.S.C. § 1983 ................................................................................ 21

**Other Authorities**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ........................ 22

A public library must continually "weed" books from its shelves to make room for new arrivals and ensure that its collection remains up-to-date and responsive to the needs of the community. This is standard practice in the library profession, and even small libraries weed and permanently remove thousands of books each year from their shelves and catalogs. From February 1, 2021, to March 18, 2022, the Llano County Library System weeded nearly 8,000 books, which were sold or donated and removed from circulation. *See* Milum Decl. ¶ 6, ECF No. 14-4; ROA.3953 ("We weed all the time.").[1]

Librarians weed materials according to an acronym called "MUSTIE,"[2] which encourages librarians to weed materials that are Misleading, Ugly,[3] Superseded, Trivial, Irrelevant,[4] or available Elsewhere. The MUSTIE factors provide guidelines and not hard-and-fast rules.[5] It is permissible and sometimes prudent for a li-

---

1. The Llano County Library System comprises three distinct library buildings: Llano Library, Kingsland Library, and Lakeshore Library. The disputed books in this case were all weeded from Llano Library.

2. ROA.3955-3957; ROA.2636-2638.

3. The "Ugly" factor is used to weed books that are damaged. ROA.2637.

4. A book is "irrelevant" if library patrons are not checking it out enough to warrant continuation in the library's collection. The frequency of checkouts needed to avoid weeding depends on the publication's Dewey decimal class. ROA.3890; ROA.2501-2502; ROA.2483.

5. ROA.3526-3527 n.7 ("It appears to be undisputed that, given its subjective nature, reasonable minds may disagree over how to apply the CREW and MUSTIE criteria."); ROA.3957 ("The CREW is mainly guidelines, so every librarian is going to go with their feelings, their training, their gut on their community of what is getting checked out, what isn't and why."); ROA.3891-3892 ("It's up to the librarian and the library system."); ROA.2603 ("[T]he final weeding decision is left to the professional judgment of the resident librari-

brarian to weed a book based on the presence of a single MUSTIE factor, such as books that are seriously damaged (Ugly), that have been replaced by a new edition in the library (Superseded), or that haven't been checked out in a long time (Irrelevant). ROA.2485-2486; ROA.2502. But when a book only barely meets a single MUSTIE factor, or if the issue with the book is a relatively minor one, a librarian will sometimes (but not always) look for the presence of an additional MUSTIE factor before deciding to weed the book. *See id.*

The plaintiffs disagree with the Llano County head librarian's decision to weed 17 of the thousands of books that she weeded in 2021, and they have falsely accused her of weeding those 17 books because she disapproves of their content. When the plaintiffs sued to compel the return of those 17 books to the shelves and catalog, the Llano Library accepted a donation of the 17 disputed books and made them available to the plaintiffs through its in-house checkout system. ROA.3463-3465. This arrangement accommodated the plaintiffs' stated desire to read and check out the 17 disputed books, but without empowering individual library patrons to commandeer the library's limited shelf space or override the library staff's weeding decisions. The plaintiffs refused to accept this arrangement and continued litigating, even though they could not show an ongoing violation of their First Amendment rights when each of the disputed books remained available for them to read and check out at Llano Library.

---

an."); ROA.2587 ("[L]ibrarians are urged to **use professional judgment at all times**." (boldface in original)).

On March 30, 2023, the district court granted a preliminary injunction and ruled that the First Amendment prohibits a public library from engaging in "content discrimination" or "viewpoint discrimination" when weeding books. ROA.3523 ("[T]he First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination."). Then it ordered the defendants to return to the shelves *every* single book that had *ever* been removed because of viewpoint or content, in addition to the 17 books that the plaintiffs had sued over, and enjoined the defendants from removing *any* book from the library catalog for *any* reason during the pendency of the litigation. ROA.3531-3532. This relief extends far beyond what the plaintiffs had requested,[6] and awards relief that the plaintiffs do not even have Article III standing to pursue. The defendants have appealed and respectfully ask this Court to reverse the preliminary injunction.

## STATEMENT OF JURISDICTION

The federal district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because the plaintiffs are alleging violations of their First Amendment rights. This Court's appellate jurisdiction rests on 28 U.S.C. § 1292(a)(1) because the defendants have appealed a preliminary injunction. The district court issued the injunction on March 30, 2023, ROA.3507-3532, and the defendants appealed later that day, ROA.3533.

---

6. ROA.1038-1040 (plaintiffs' proposed order).

# Statement Of The Issues

1. Did the plaintiffs make a "clear showing" that the defendants are violating their "First Amendment rights to access and receive information" when each of the 17 books that the plaintiffs have sued over remains available for the plaintiffs to read and check out at Llano Library?

2. Did the plaintiffs make a "clear showing" that they will suffer irreparable harm absent a preliminary injunction when each of the 17 books that the plaintiffs have sued over would remain available for the plaintiffs to read and check out at Llano Library?

3. Did the district court err in holding that the First Amendment prohibits public librarians from engaging in "viewpoint discrimination" or "content discrimination" when weeding library materials?

4. Assuming for the sake of argument that the First Amendment prohibits public librarians from engaging in viewpoint- or content-based weeding decisions, did the plaintiffs make a "clear showing" that Amber Milum engaged in "viewpoint discrimination" or "content discrimination" when weeding the 17 disputed books?

5. Did the district court err by issuing a preliminary injunction that extends beyond the 17 books that the plaintiffs have sued over?

6. Did the plaintiffs make a "clear showing" that the balance of equities and the public interest support a preliminary injunction?

## Statement Of The Case

## I.    Facts And Evidence

On April 25, 2022, seven patrons of Llano Library sued Llano County, Amber Milum (the library director), the county judge, every county commissioner, and several volunteer members of the Llano County library advisory board. ROA.39-69. The complaint alleged that the defendants were violating the plaintiffs' "First Amendment rights to access and receive information"[7] by weeding certain books from Llano Library, and it accused the defendants of engaging in "unconstitutional content-based and viewpoint-based discrimination" in weeding those books. ROA.67 (¶ 147).[8] On May 9, 2022, the plaintiffs moved for a preliminary injunction that would compel the return of 17 previously weeded books to the library shelves and catalog. ROA.187-212.[9]

---

7.    ROA.67 (¶ 148).

8.    The complaint also asserted a due-process claim, but the district court did not grant preliminary relief on that claim and it is not an issue in the appeal.

9.    The 17 books that the plaintiffs want returned to the shelves and catalog are: *Freakboy* by Kristin Elizabeth Clark; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Gabi, a Girl in Pieces* by Isabel Quintero; *Under the Moon: A Catwoman Tale* by Lauren Myracle; *Shine* by Lauren Myracle; *Spinning* by Tillie Walden; *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie Harris; *In the Night Kitchen* by Maurice Sendak; *My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!* (aka the "butt books"), all by Dawn McMillan; *Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Had Too Many Farts* (aka the "fart books"), all by Jane Bexley; *They Called Themselves the K.K.K: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; and *Caste: The Origins of Our Discontent* by Isabel Wilkerson. ROA.1039 (proposed order).

5

In response to the lawsuit, the Llano Library accepted a donation of the 17 disputed books and made them available for the plaintiffs to read and check out through the library's "in-house checkout" system.[10] The in-house checkout system contains books that are donated or loaned to Llano Library from staff members or other friends of the library. ROA.673. These in-house books are not placed on the shelves or in the catalog and do not have bar codes, but are nonetheless made available for library patrons to read and check out. ROA.3924-3925.

The donation and availability of the 17 disputed books through the in-house checkout system does not moot the plaintiffs' First Amendment claims, as the plaintiffs continue to suffer Article III injury from the fact that the 17 books are no longer on the library's shelves or included in the catalog. But it does eliminate any possible violation of the plaintiffs' "First Amendment rights to access and receive information,"[11] as each plaintiff is aware of the in-house checkout system and the availability of the disputed books,[12] and the plaintiffs have the same ability to check out the disputed books from Llano Library that they had before the books were weeded.

The plaintiffs refused to accept this arrangement and demanded a preliminary injunction that would return each of the 17 disputed books to the shelves and catalog—even though they could not show "irreparable harm" when the 17 books re-

---

10. ROA.3463-3465; ROA.673-674; ROA.2497; ROA.720-721.
11. ROA.67 (¶ 148).
12. ROA.3463-3465 (stipulation of undisputed facts).

mained available for them to read and check out at Llano Library.[13] The district court held a two-day hearing on the motion for preliminary injunction in October of 2022. The undisputed evidence and sworn testimony showed that:

- Amber Milum alone made the decision to "weed" each of the 17 disputed books.[14]

- None of the other defendants ordered, pressured, or even asked Ms. Milum to weed (*i.e.*, permanently remove) any book from Llano Library or the Llano County Library System.[15]

---

13. The plaintiffs' district-court briefing did not explain how the defendants could be violating their "First Amendment right to access information" by making the 17 disputed books available through Llano Library's in-house checkout system rather than returning them to the shelves and catalog. ROA.1884-1914; ROA.2390-2407.

14. ROA.2499 ("I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed or permanently remove a book from the library. Nor has any of these individuals pressured or attempted to pressure me to weed or permanently remove any book from the library system."); ROA.676 ("I was never instructed or pressured by the County Judge or any of the County Commissioners to weed or otherwise permanently remove any books from the Llano County libraries. I was also never instructed to remove any books from the libraries by the Llano County Advisory Board.").

15. *See* note 14, *supra*; *see also* ROA.4000-4001 ("Q. Were any of your ultimate decisions to weed any book from the library shelves influenced in any way by anyone on the commissioners' court? A. No. Q. Were they influenced by anyone on the library advisory board? A. No."); ROA.2492 (Moss) ("I never 'ordered' or 'directed' the removal of any book from the library and . . . I have no authority over Ms. Milum's decisionmaking").

- Ms. Milum's decisions to weed the 17 books had nothing to do with the content or viewpoints expressed in the books.[16] Ms. Milum did not even read any of the 17 disputed books before weeding them.[17]

- Ms. Milum weeded the 17 disputed books solely because she concluded, in her professional judgment, that the books satisfied the MUSTIE criteria for weeding, no less than the other 7,767 books that were weeded from the Llano County Library System between February 1, 2021, and March 18, 2022.[18]

---

16. ROA.676 ("I did not consider the content of any of the books I weeded when I made the decision to weed them. I also did not consider any of the viewpoints expressed in any of the books I weeded. I weeded the books based on the objective criteria I always use in determining which books to weed."); ROA.677 ("No book was removed based on its content or viewpoint during this process."); ROA.2506-2507 ("I have never in my entire career weeded a book because of its viewpoints, and I have never considered the content of a book when making a weeding decision except to the extent that the MUSTIE factors might require me to consider whether a book should be considered 'misleading,' 'superseded,' 'trivial,' or 'irrelevant.' I have no hostility, antipathy, or opposition of any type to the presence of library books discussing critical race theory or LGBTQ issues, regardless of the viewpoints expressed in those books, and the Llano library system has many books on these topics. Nor do I have any hostility, antipathy, or opposition of any type to the presence of library books containing nudity, so long as the depictions are lawful (*i.e.*, no child pornography or obscenity) and intended to serve educational rather than pornographic purposes. I do not ever allow my personal views or beliefs to influence my weeding decisions because a library exists to serve the community, and our patrons have diverse beliefs and tastes and reading habits. For the plaintiffs to accuse me of weeding books because I disapprove of nudity, critical race theory, or LGBTQ content is false and defamatory.").

17. ROA.3974 ("Q. Have you read any of the books that we've been talking about? A. No."); ROA.2507 ("I did not read any of those books before weeding them, and I am not even aware of the 'viewpoints' or 'positions' (if any) that might be expressed in any of those books.").

18. ROA.4174-4187 (Milum explaining her reasons for weeding the disputed books); ROA.672, 675-676 (same); ROA.2500-2501 (Milum explaining her reasons for weeding *Under The Moon*); ROA.2501 (Milum explaining her reasons

- One of the books that Ms. Milum weeded from Llano Library was *Being Jazz: My Life as a (Transgender) Teen*, because it hadn't been checked out at Llano Library in more than four years.[19] Ms. Milum did not, however, weed the version of *Being Jazz* held at Kingsland Library because the Kingsland version had a better circulation record.[20]

- Jerry Don Moss, one of Llano County's Commissioners, expressed his opinion to Ms. Milum and library staff that the "butt" books and *It's Perfectly Normal* did not belong in the children's section of the library,[21] but he never instructed anyone to remove or weed any book.[22]

---

for weeding the "butt" and "fart" books); ROA.2507 ("I did not consider any of the 17 books that I weeded to be pornographic or in any way inappropriate for a public library. I weeded those books solely based on my application of the CREW/MUSTIE factors.").

19. ROA.346 (showing last checkout was July 19, 2017).

20. ROA.3995 ("Q. Why did you decide to weed *Being Jazz: My Life As A Transgender Teen*? It was not getting checked out at the Llano library, but it was popular at Kingsland, so we had an extra copy. Q. Did you weed the book at Kingsland where it was popular? A. No.").

21. ROA.4243-4244 (Moss) ("I made sure and told her that I was not her supervisor . . . . I told her that I didn't think that those books should be in the children's section . . . . That was my personal opinion. Like I said, I wanted to make sure that she understood I wasn't her boss. I think she knew that. So it was just my opinion that it should not be in the children's section of the library."); ROA.2492 (Moss) ("I merely expressed my opinions that the 'butt' books and *It's Perfectly Normal* should not be shelved in the children's section of the library."); ROA.2498 (Milum) ("Commissioner Moss merely expressed his opinion to me regarding the butt books. He did not think those books should be in the children's section and he said that if it were him he would take them out of the system and for me to pick my battles.").

22. ROA.4244 (Moss) ("Q. How many times, if any, did you direct Amber Milum to remove a particular book from the Llano County Library System? A. I did not direct her to remove any books from the library."); ROA.2492 (Moss) ("I

- Ron Cunningham, the Llano County Judge, recommended that Ms. Milum *temporarily* pull the "butt" and "fart" books from the shelves to determine whether they should remain in the children's section of the library,[23] but he never asked or directed Ms. Milum to "weed" those books by permanently removing them from the shelves and catalog.[24]

- Judge Cunningham also asked Ms. Milum to *temporarily* pull from the shelves books that "depict any type of sexual activity or questionable nudity"[25] so that Ms. Milum could review whether those

---

never 'ordered' or 'directed' the removal of any book from the library and . . . I have no authority over Ms. Milum's decisionmaking"); ROA.684 (Moss) ("I made clear to Ms. Milum that I was not her boss and could not tell her what to do . . . . I never directed or suggested that any books be removed from the library based on their content."); ROA.2295 (Milum) ("Commissioner Moss never ordered or directed me to weed or temporarily remove the butt books (or any other book)"); ROA.2296 (Milum) ("Commissioner Moss never ordered the weeding or even the temporary removal of any book in the Llano library.").

23. ROA.2499 (quoting e-mail from Judge Cunningham that says: "Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*." (emphasis added)); *id.* (Milum) ("Judge Cunningham recommended only that I *temporarily* remove those books from the shelves."); ROA.2488 (Cunningham) ("My e-mail to Amber Milum . . . recommended only that Ms. Milum *temporarily* remove those books from the shelves to determine whether they should remain in the children's section of the library."); ROA.4009-4010 ("[M]y intent was to neutralize the situation until we could investigate it further.").

24. ROA.2499 (Milum) ("Judge Cunningham . . . . never directed me to weed those books, and my decision to weed those books was entirely my own."); ROA.2488 (Cunningham) ("I never directed Amber Milum or any other library employee to weed those books or any other book.").

25. ROA.349 (e-mail from Ron Cunningham to Amber Milum of November 10, 2021); ROA.682 ("I did in at least one email to Ms. Milum direct her to 'pull' books with 'sexual activity or questionable nudity,' it was the shared understanding of both myself and Ms. Milum that 'pull' in the context used meant to remove such books from the shelves for review prior to making a decision on

books should remain in the library's collection. All of those books remained in the catalog and remained available for checkout while Ms. Milum conducted her review.[26] Ms. Milum returned the vast majority of these temporarily pulled books to the shelves after conducting her review.

- Judge Cunningham also forwarded to Ms. Milum a spreadsheet prepared by Bonnie Wallace of books at Llano Library that Ms. Wallace found objectionable. Judge Cunningham did not look at the spreadsheet[27] and did not instruct Ms. Milum to do anything with Ms. Wallace's spreadsheet.[28] Ms. Milum did not know Ms. Wallace and had never heard of her when she received the spreadsheet from Judge Cunningham.[29]

- Judge Cunningham never instructed Ms. Milum to weed any book from the Llano County public library system.[30]

- 47 of the books on Ms. Wallace's spreadsheet were on the shelves at Llano Library. Ms. Milum decided to review these 47 books to see if they qualified for weeding under MUSTIE.[31] All of those

---

whether to re-shelve the books in a different section of the library such as the adult section.").

26. ROA.3900 ("[W]hile they were on the cart in Amber's office, were they available to be checked out? A. Yes. We just had to ask for them.").

27. ROA.680 (Cunningham) ("I received an email from Bonnie Wallace that contained a list of books. I did not look at the list. I forwarded the email to Ms. Milum for her to consider. To this day I am unaware of the books that are on the list.").

28. ROA.675 ("I was not instructed to do anything with respect to the books on the list, but I decided to review them out of curiosity.").

29. ROA.675 ("I was not familiar with Bonnie Wallace at the time.").

30. ROA.682 (Cunningham) ("I have never instructed any library staff, including Ms. Milum, to remove any books from the Llano County library shelves. Nor have I removed any books. It is not within my duties as County Judge to either acquire or remove books from the libraries.").

31. ROA.675; ROA.3953 ("I pulled them to review them, not to weed them.").

books remained in the catalog and remained available for checkout while Ms. Milum conducted her review.[32]

- Ms. Milum concluded that only 6 of the 47 books on Ms. Wallace's spreadsheet should be weeded according to the MUSTIE criteria: *Freakboy*; *Shine*; *Caste: The Origins of our Discontents*; *Gabi, a Girl in Pieces*; and *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*. ROA.675. Ms. Milum determined that the remaining 41 books did not meet the criteria for weeding and she returned those 41 books to the shelves. *See id.*

- Ms. Milum's decision to "weed" the 6 of the 47 books on Ms. Wallace's spreadsheet had nothing to do with the content or viewpoints expressed in those books, and Ms. Milum would have weeded those books even if no one in the community had ever complained about them.[33]

- Library-weeding manuals not only authorize but *require* librarians to engage in both "content discrimination" and "viewpoint discrimination" when weeding books.[34]

---

32. *See* note 26, *supra.*

33. ROA.675 ("My decision to weed the six books had nothing to do with the viewpoints or content expressed in any of those books. I would have weeded each of those six books regardless of the viewpoints or content expressed in those books, and I would have done so even if no one in the community had ever complained about them."); ROA.2507 ("The plaintiffs' claim that I 'removed' those books 'because they were on the Wallace list' is misleading. . . . My decision to pull those books for review (*i.e.*, to *temporarily* remove the book) was because they appeared on the Wallace list, but my decision to weed the books (*i.e.*, to *permanently* remove them) was *solely* because I determined they met the criteria for weeding. The vast majority of books on Bonnie Wallace's list were returned to the shelves").

34. ROA.3191 (listing "poor *content*" as grounds for weeding, including "[m]aterial that contains biased, racist, or sexist terminology *or views*" (emphasis added)); ROA.3193 (instructing librarians to consider "current interest in the subject matter"); ROA.3205 ("[L]ook for books that contain stereotyping, including stereotypical images and views of people with disabilities and

Although the plaintiffs had alleged a vast conspiracy among the defendants to purge the Llano County Library System of all books containing nudity, LGBTQ content, or critical race theory, their case quickly fell apart when Milum insisted that she alone made the weeding decisions and the remaining defendants denied instructing or pressuring Milum to weed any materials from the library.[35] The plaintiffs do not claim that Ms. Milum (or the other defendants) are lying in their declarations and courtroom testimony, and none of the plaintiffs' witnesses or declarants claim to have personal knowledge of Ms. Milum's subjective state of mind. So the testimony on Ms. Milum's actual motivations for weeding the 17 books is unrebutted,[36] and it conclusively refutes the plaintiffs' accusation that Ms. Milum engaged in "content discrimination" or "viewpoint discrimination" in her weeding decisions. *See Board of Education v. Pico*, 457 U.S. 853, 871 (1982) (plurality op. of Bren-

---

the elderly, or gender and racial biases."); ROA.3237 ("Weed biased or unbalanced and inflammatory items."); *id.* ("Weed career guides with gender, racial, or ethnic bias."); ROA.3240 ("Discard books that are MUSTIE or that reflect gender, family, ethnic, or racial bias."); *id.* ("Weed based on the quality of the retelling, especially if racial or ethnic bias is present."); ROA.3245 ("While information may not become dated, watch for cultural, racial, and gender biases."); ROA.3246 ("Discard books . . . that feature gender bias."); ROA.3247 ("Watch for gender and racial bias in sports and athletics."); ROA.3248 ("Watch for collections that feature gender or nationality bias and outdated interests and sensitivities."); ROA.3249 ("Watch for outdated interests and collections that feature gender or race bias."); ROA.3253 ("Weed books that reflect racial and gender bias."); ROA.3254 ("Do not retain books that have erroneous and dangerous information simply because the book is still in great shape.").

35. *See* notes 14–15 and accompanying text, *supra*.
36. *See* notes 16–18 and accompanying text, *supra*.

nan, J.) ("[W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions.").

The plaintiffs tried to salvage their case by relying on several pieces of documentary evidence. One piece of evidence comprised two e-mails sent by Judge Cunningham to Ms. Milum. The first of these e-mails, dated November 10, 2021, reads as follows:

> Amber,
>
> As we discussed in our meeting in my office at 9:45 AM on November 9, 2021 any and all books that depict any type of sexual activity or questionable nudity are to be pulled immediately.
>
> I am also requesting that any of these books that are available online be pulled as well. Please advise Commissioner Moss and I when this task has been completed.

ROA.349. But Cunningham and Milum both explained that this e-mail merely instructed Milum to *temporarily* pull those books so that Milum could *review* whether they should be weeded or moved from the children's section.[37] It was not an instruction to weed or permanently remove those books.[38]

The second e-mail from Cunningham to Milum read as follows:

> Amber, I am still receiving calls, letters and emails concerning the Farts and Butts books. I think it is best to remove these books from the shelves *for now*.

---

37. *See* note 25 and accompanying text, *supra*.
38. *See* note 30 and accompanying text, *supra*.

ROA.2488 (emphasis added). This, too, is not an instruction to weed the "butt" and "fart" books, but a mere request to *temporarily* remove them from the shelves to determine whether they should be weeded or moved from the children's section. Cunningham and Milum both testified to this effect.[39]

Finally, the plaintiffs invoked an e-mail that Rochelle Wells sent to members of the Llano community on November 11, 2021, which said:

> Commissioner Moss and Judge Cunningham have instructed Amber, the head librarian, to remove certain books, both physical books and ebooks (via the LIBBY app) . . . . Amber was told to get rid of Lawnboy and Gender Queer (physical and ebook). Commissioner Moss, we are very grateful for your help in this situation and all you have done to begin to remedy it!

ROA.354. But Cunningham and Moss both declared under oath that these statements in Wells's e-mail were false, and that they never "instructed" Milum to weed or "get rid of" *any* book in the Llano County public-library system.[40]

---

39. *See* notes 23–24 and accompanying text, *supra*.
40. ROA.2489 (Cunningham) ("Ms. Wells was mistaken to assume in her e-mail of November 11, 2022, [sic] that I had 'directed' Ms. Milum to remove books. I merely asked Ms. Milum to *temporarily* pull certain books to *review* whether they should continue be housed in the library or stored in the children's section."); ROA.2493 (Moss) ("Ms. Wells's e-mail of November 11, 2021, is mistaken in saying that I 'instructed' and 'told' Ms. Milum to 'remove certain books.' I never instructed or told anyone at the library to weed or temporarily remove any book, either physical books or ebooks, and I never instructed Ms. Milum or anyone else to remove *Lawn Boy* or *Gender Queer*."); *see also id.* ("Ms. Wells was mistaken to assume in her e-mail of January 19, 2022, that I had 'made' Ms. Milum or Ms. Castelan remove *It's Perfectly Normal*. I did not 'make' anyone at the public library remove that book. I merely expressed my opinion . . . that *It's Perfectly Normal* should not be shelved in the children's section of the library.").

## II. The District Court's Ruling

On March 30, 2023, the district court granted the plaintiffs' motion for preliminary injunction and ruled that the First Amendment prohibits a public library from engaging in "content discrimination" or "viewpoint discrimination" when weeding books. ROA.3523 ("[T]he First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination.").[41]

The district court did not explain how the defendants could be "violating" the plaintiffs' First Amendment rights when each of the 17 disputed books remains available for the plaintiffs to read and check out at Llano Library. ROA.3507-3532. Instead, the district court observed that the donation of the disputed books and their availability through Llano Library's in-house checkout system did not "moot" the plaintiffs' First Amendment claims. ROA.3518. The district court was surely right to hold that the plaintiffs' First Amendment claims are not moot, and the defendants had conceded in the district court that the plaintiffs continue to suffer Article III injury (though a very minor one) from their inability to obtain or check out the disputed books from the library shelves as opposed to the in-house checkout system.[42] But it is not enough for the plaintiffs to establish an Article III case or

---

41. Later in its opinion, the district court stated that content-based weeding decisions at public libraries must survive "strict scrutiny," which backtracks slightly from the categorical condemnations that appear elsewhere in its opinion. ROA.3526 ("Content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny."); ROA.3528 (applying strict scrutiny to the plaintiffs' content-discrimination claim).

42. ROA.3153 ("Neither the case nor the motion is moot, and it would be wrong for the Court to hold that they are moot.").

controversy; they must also make a "clear showing"[43] that the defendants are infringing their "First Amendment rights to access and receive information and ideas"[44] before they can obtain a preliminary injunction. The district court did not attempt to explain how the plaintiffs are being deprived of their rights to "access and receive information and ideas" when each of them has the same access to the 17 disputed books that they had before the books were weeded.

Then the district court ruled that the plaintiffs were likely to succeed on their claims that the "defendants" had engaged in both "viewpoint discrimination" and "content discrimination." ROA.3523-3528. The district court did not identify the "viewpoints" that the defendants had discriminated against, nor did it identify the viewpoints expressed in any of the 17 disputed books. ROA.3523-3526. Instead, the district court ruled that the defendants had likely engaged in "viewpoint discrimination" because "the evidence shows" that they "targeted and removed books . . . based on complaints that the books were inappropriate,"[45] and they "may be seen to have adopted" the motivations of Bonnie Wallace and Rochelle Wells, who objected to the 17 books (among many others) and wanted them removed from the library. ROA.3525. The district court also ruled that the defendants had likely engaged in "content discrimination" because the decision to *review* the disputed books (and

---

43. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." (emphasis in original) (citation and internal quotation marks omitted)).

44. ROA.67.

45. ROA.3524.

others) for weeding was prompted by complaints from library patrons who found the books objectionable—even if the ultimate weeding decision was made without regard to content or viewpoint. ROA.3526-3527 ("[T]he targeted review was directly prompted by complaints from patrons and county officials over the contents of these titles.").

The district court then issued a preliminary injunction that went far beyond what the plaintiffs had requested and awards relief that the plaintiffs do not even have Article III standing to pursue. The plaintiffs had sought a preliminary injunction that would order the defendants to return to the library shelves only the 17 disputed books. ROA.1038-1040 (proposed order). The district court's order, however, demands the return of "*all* print books that were removed because of their viewpoint or content, *including*" the 17 books at issue in this litigation. ROA.3531 (emphasis added). The district court's order also enjoins the defendants from "removing *any* books from the Llano County Library Service's catalog for *any* reason during the pendency of this action." ROA.3532 (emphasis added). This, too, goes beyond what the plaintiffs asked for, as they had requested a more limited injunction that would prohibit removal of books absent documentation of "(a) the individual who decided to remove or conceal the book and (b) the reason or reasons for that removal or concealment." ROA.1040.

The defendants appealed and asked this Court to stay the preliminary injunction pending appeal, as well as expedite the appeal to the next available argument sitting. *See* Mot. for Stay, ECF No. 14. On May, 5, 2023, this Court granted the mo-

tion to expedite and ordered that the motion for stay pending appeal be carried with the case. *See* Order, ECF No. 58-2.

## Summary Of Argument

The preliminary injunction should be vacated for many reasons. First, none of the plaintiffs are suffering any violation of their constitutional right "to access and receive information" because every one of the 17 disputed books remains available for them to check out and read through the Llano Library's in-house checkout system. ROA.3463-3465. Second, the plaintiffs cannot make a showing of irreparable harm when they can access each of the 17 disputed books at Llano Library without a preliminary injunction. *See id.* Third, the district court erred in holding that the First Amendment forbids "viewpoint discrimination" or "content discrimination" in public-library weeding decisions, as content and viewpoint considerations are both inevitable and permissible when weeding library materials, and a public library's shelf space is not a "public forum" that triggers rules against viewpoint discrimination or content discrimination.[46] Fourth, even if one were to assume that the Constitution prohibits content- or viewpoint-based weeding decisions at public libraries, the plaintiffs failed to make a "clear showing" that Amber Milum engaged

---

46. *See Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) ("'[J]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion of Rehnquist, C.J.))); *id.* ("'Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.'" (quoting *American Library Ass'n*, 539 U.S. at 205 (plurality opinion of Rehnquist, C.J.))).

in viewpoint or content discrimination when weeding the 17 disputed books. Fifth, the district court's injunction is overbroad and awards relief that the plaintiffs did not request and do not have standing to pursue. Finally, the plaintiffs failed to make a "clear showing" that the balance of equities or the public interest supports a preliminary injunction.

## STANDARD OF REVIEW

An order granting a preliminary injunction is reviewed for abuse of discretion, but issues of law are reviewed de novo and findings of fact are reviewed under the clearly erroneous standard. *See Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, the plaintiffs needed to make a "clear showing" of: (1) Likely success on the merits; (2) A likelihood that the plaintiffs will suffer irreparable harm absent preliminary relief; (3) That the balance of equities tips in the plaintiffs' favor; and (4) That a preliminary injunction is in the public interest. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy," and it may not be granted unless the plaintiffs "*clearly carried* the burden of persuasion on *all four requirements*." *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (emphasis added) (citation and internal quotation marks omitted); *Voting for*

*America, Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013) (same). The plaintiffs failed to make a "clear showing" on any of the four prongs.

<blockquote>

**A.  The Plaintiffs Failed To Make A Clear Showing That The In-House Checkout System Violates Their First Amendment Right To Access And Receive Information**

</blockquote>

The plaintiffs' First Amendment claims cannot get off the ground when each of the 17 disputed books remains available for them to check out through Llano Library's in-house system. The district court's opinion does not explain how the defendants can be violating the plaintiffs' "right to access and receive information" when each plaintiff remains able to check out every one of the 17 disputed books at Llano Library. And the plaintiffs have not explained how the in-house checkout system violates their constitutional rights in any document that they have filed in this litigation.

The plaintiffs (and the district court) complained that *other* library patrons may not be aware of the in-house checkout option.[47] But the plaintiffs have no standing to assert the rights or interests of non-parties,[48] and the plaintiffs made no showing

---

47. ROA.3518 (observing that other library patrons have "no way of knowing that the books even exist"); ROA.1902 (complaining that "[t]he only way that a patron might know these books are available is because of the lawsuit." (internal quotation marks omitted)).

48. Neither 42 U.S.C. § 1983 nor the Declaratory Judgment Act allows the plaintiffs to sue over alleged violations of someone else's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) (plaintiffs who invoke 42 U.S.C. § 1983 are "required to prove some violation of their *personal* rights." (emphasis added)); *id.* (citing rulings from other federal courts that prohibit litigants from asserting third-party rights under section 1983); *Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a viola-

that the in-house checkout system violates *their* First Amendment rights or burdens *them* in any way. Courts exist to resolve disputes between named litigants, not to act as "roving commissions"[49] empowered to pass judgment on the conduct of the Llano public-library system. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." (citation and internal quotation marks omitted)). So the plaintiffs needed to make a "clear showing" that the defendants are violating *the plaintiffs'* First Amendment rights by offering the disputed books through an in-house checkout system of which the plaintiffs are fully aware. ROA.3463-3465. Neither the plaintiffs nor the district court attempted to make this showing.

The district court correctly held that the defendants have not *mooted* the plaintiffs' claims by offering the disputed books through the in-house checkout system, as the plaintiffs remain "injured" by the continued absence of those books from the library shelves and catalog. ROA.3518-3519; *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identi-

---

tion of the rights of third parties."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45.

49. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *see also id.* ("Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."); *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019) ("'[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)).

fiable trifle is enough for standing" (citation and internal quotation marks omitted)). But the district court's "voluntary cessation" analysis is irrelevant because the defendants have not mooted the plaintiffs' Article III injury and are not attempting to moot the case by returning the books to the shelves. Voluntary cessation is an *exception* to mootness, and that exception cannot be implicated when the defendants have done nothing that could eliminate an Article III case or controversy. The plaintiffs are still experiencing Article III injury (though a very minor one) from the fact that 17 books are in a slightly different location from before. The problem for the plaintiffs is that this injury does not remotely approach a violation of their constitutional rights. To obtain a preliminary injunction, the plaintiffs need to make a "clear showing" of *both* an Article III case or controversy *and* a violation of their First Amendment rights. And the plaintiffs cannot show that the defendants are depriving them of their "right to access and receive information" when every one of the 17 disputed books remains available for the plaintiffs to read and check out at Llano Library.

**B.    The Plaintiffs Failed To Make A "Clear Showing" Of "Irreparable Harm" When Each Of The 17 Disputed Books Remains Available For Them To Read And Check Out At Llano Library**

The plaintiffs also failed to make a "clear showing" that they will suffer irreparable harm absent a preliminary injunction. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he is* likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)); *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 546 n. 3 (D.D.C. 2016) ("[T]he irreparable harm

prong . . . only concerns harm suffered by the party or parties seeking injunctive re-lief . . . . [A]ny alleged harm to third parties is properly addressed under the public interest prong"). And they cannot possibly establish irreparable harm when each of the 17 disputed books remains available for them to read and check out through Llano Library's in-house checkout system.

The plaintiffs failed to identify *any* harm (let alone an "irreparable" harm) that they will suffer from obtaining the disputed books through the library's in-house checkout system. *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022) (removal of library books did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). All of the plaintiffs are aware of the in-house checkout system and heard testimony about the donation and availability of the 17 disputed books. ROA.3463-3465; ROA.4145-4149. And it is *easier* for the plaintiffs to obtain their desired book by asking for it at the reference desk rather than searching a catalog, traipsing among the shelves, and pawing through the books.

The district court's opinion also fails to explain how the *plaintiffs* will suffer ir-reparable harm from using the library's in-house checkout system. The district court observed that *other* library patrons might not be aware of the in-house collec-tion. ROA.3529 ("A patron must, notwithstanding the fact that the books' existence is not reflected in the library catalog, know that the books can be requested."). But effects on non-parties are irrelevant to the irreparable-harm inquiry; only harms to the seven named plaintiffs may be considered. *See Winter*, 555 U.S. at 20; *Jones*, 177 F. Supp. 3d at 546 n.3. And the plaintiffs cannot suffer "irreparable harm" from a

library that offers them the 17 books through an in-house checkout system—especially when the plaintiffs presented no evidence or arguments showing how this arrangement imposes any inconveniences on them.

### C. The District Court Erred In Holding That The First Amendment Forbids "Viewpoint Discrimination" Or "Content Discrimination" In Public-Library Weeding Decisions

The plaintiffs have insisted throughout this litigation that "viewpoint discrimination" is unconstitutional *per se* in a public library's weeding decisions, and that "content discrimination" in public-library weeding is either categorically forbidden or subject to strict scrutiny.[50] The district court adopted the plaintiffs' stance almost verbatim in its opinion and order. ROA.3523 ("[T]he First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination."); ROA.3526 ("Content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny."); ROA.3531 (ordering the defendants to return "*all* print books that were removed because of their viewpoint or content, including" the 17 books that the plaintiffs sued over). But the notion that

---

50. ROA.1903 ("The First Amendment prohibits the removal of books from libraries based on either content or viewpoint discrimination."); ROA.1904 ("Plaintiffs need only show Defendants removed books from the Llano County Library System—or placed burdens on accessing books—based either on the viewpoints expressed or on their content without narrowly tailoring the burden to a compelling government interest."); ROA.1891 ("Plaintiffs are likely to prevail on the merits because viewpoint and content discrimination are repugnant to the First Amendment."); ROA.202 ("Defendants' content-based suppression of access to books in public libraries—which are limited public forums—likewise violates the First Amendment.").

the First Amendment prohibits "content discrimination" or "viewpoint discrimination" in public-library weeding decisions is indefensible.

The binding precedent of this Court recognizes that content discrimination is not only permissible but inevitable when public libraries make collection decisions. *See Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) ("'Public library staffs *necessarily consider content* in making collection decisions and enjoy broad discretion in making them.'" (emphasis added) (quoting *United States v. American Library Ass'n Inc.*, 539 U.S. 194, 205 (2003) (plurality op.))). The district court acknowledged this passage from *Chiras* but insisted that it applies only to the selection and not the removal of library materials. ROA.3519 ("[T]his discretion . . . applies only to materials' selection."). But neither *Chiras* nor the plurality opinion in *American Library* makes any distinction between "selection" and removal decisions. And the distinction makes no sense because the weeding process involves the "selection" of library materials no less than the initial purchase of books. In both situations, the librarian is "selecting" the publications that he or she deems worthy of the library's limited shelf space. And books that survive the weeding process are being "selected" for continued inclusion in the library's collection, just as the newly purchased library materials are "selected." In addition, public libraries must enjoy the same latitude in "selecting" new materials that they have in weeding books that no longer belong in their collection, because library shelf space is limited and existing materials must be removed to create room for the new arrivals. An outdated book that is no longer accurate should be weeded and replaced with a newer and more accurate source,

and both the decision to weed and the decision to "select" the replacement are equally content-based and equally within the discretion of the library.

The district court appeared to believe that *Board of Education v. Pico*, 457 U.S. 853 (1982), and *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), prohibit content or viewpoint discrimination in a public library's weeding decisions. ROA.3523 (citing *Pico* to support its claim that "the First Amendment prohibits the removal of books from libraries based on either viewpoint or content discrimination."); ROA.3526 (holding that *Campbell* is incompatible with the defendants' claim that "'content discrimination is permissible and inevitable in library-book selection.'"). Neither *Pico* nor *Campbell* says anything of the sort. Justice Brennan's plurality opinion in *Pico*, which represents the most restrictive view of public-library decisionmaking ever taken by a Supreme Court justice,[51] acknowledges that content discrimination is permissible in library-book selection, and it allows libraries to remove books based on content that is "pervasively vulgar" or that lacks "educational suitability." *Pico*, 457 U.S. at 871 (plurality op.); *see also id.* at 869 (plurality op.) ("[L]ocal school boards have a substantial legitimate role to play in the determination of school library *content*." (emphasis added)); *id.* at 870 (plurality op.) ("Petitioners rightly possess significant discretion to determine the *content* of

---

51. *See Pico*, 457 U.S. at 885 (1982) (Burger, C.J., dissenting) (describing the Brennan plurality opinion as "a lavish expansion going beyond any prior holding under the First Amendment"); *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 915 (E.D. Mo. 2022) (describing "Justice Brennan's approach" as "the most expansive view of the purported right at play").

their school libraries." (emphasis added)); *id.* at 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment) (endorsing specific examples of content and viewpoint discrimination in library-book selection).[52] *Campbell* re-affirms the *Pico* plurality's allowance for content-based weeding. *See Campbell*, 64 F.3d at 188–89 ("The Court in its plurality opinion implicitly recognized . . . that an unconstitutional motivation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were 'pervasively vulgar' or on grounds of 'educational suitability.'"). The *Pico* plurality opinion says only that school libraries may not weed books "in a narrowly partisan or political manner"[53]—a far cry from the near-total prohibition on viewpoint or content discrimination that the district court endorsed.

*Chiras* also establishes that a public library is *not* a "public forum" that triggers rules against viewpoint discrimination or content discrimination:

---

52. *See Virgil v. School Board of Columbia County, Florida*, 862 F.2d 1517, 1521–22 (11th Cir. 1989) (acknowledging that under Justice Brennan's plurality opinion in *Pico*, the "removal of books from library would be permissible if decision were based on determination that books were 'pervasively vulgar' or not 'educational[ly] suitab[le]'"); *Serra v. U.S. General Services Administration*, 847 F.2d 1045, 1050 (2d Cir. 1988) ("Removal of books that were pervasively vulgar or educationally unsuitable would, even in the [*Pico*] plurality's view, be 'perfectly permissible.'" (citations omitted)); *C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 916 (E.D. Mo. 2022) ("[I]t is 'perfectly permissible' for a school to remove a book based upon the book's 'educational suitability.'" (quoting *Pico*, 457 U.S. at 871 (plurality op. of Brennan, J.))).

53. *See Pico*, 457 U.S. at 870 (plurality op.); *id.* at 872 ("[S]chool boards may not remove books from school library shelves simply because they dislike the ideas contained in those books").

> [J]ust as forum analysis and heightened judicial scrutiny are incompat-
> ible with the role of public television stations and the role of the NEA,
> they are also incompatible with the discretion that public libraries must
> have to fulfill their traditional missions.

*Chiras*, 432 F.3d at 614 (citation and internal quotation marks omitted). The district court ignored this passage from *Chiras* and held that library shelf space qualifies as a "limited public forum"—on the authority of a district-court opinion that pre-dates *Chiras*. ROA.3519 n.4 (declaring that a public library is "'a limited public forum for purposes of First Amendment analysis.'" (quoting *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 534 (N.D. Tex. 2000))).[54] But *Chiras* is binding on the district court, and it precludes the use of "forum analysis" when litigants sue public libraries over their collection decisions. And if a public library does not qualify as a "forum," then there is no basis for imposing rules against content discrimination or viewpoint discrimination. Governments are *permitted* to engage in content and viewpoint discrimination when allocating government resources, and they do it all the time. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress estab-lished a National Endowment for Democracy to encourage other countries to adopt

---

54.  The district court and the plaintiffs appear to be unaware that content discrim-ination is (for the most part) permissible in a "limited public forum," so long as the content discrimination is reasonable and viewpoint neutral. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009) ("In a [limited public] forum, a government entity may impose restrictions on speech that are reason-able and viewpoint-neutral."); *Christian Legal Society v. Martinez*, 561 U.S. 661, 679 (2010) (similar). Content discrimination is not subject to "strict scrutiny" in a limited public forum, as the district court and the plaintiffs apparently be-lieve. ROA.202 (declaring "public libraries" to be "limited public forums"); ROA.205 (same).

democratic principles, 22 U.S.C. § 4411(b), it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as Communism and Fascism."); *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view"). Only when a government program establishes a "forum" of some sort do the rules against viewpoint discrimination or content discrimination kick in. *See, e.g.*, *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 829–30 (1995).

The more serious problem for the district court (and the plaintiffs) is that the weeding process *requires* public librarians to engage in content and viewpoint discrimination. Three of the six MUSTIE factors require librarians to weed materials that are "<u>M</u>isleading," "<u>S</u>uperseded," Or "<u>T</u>rivial." All of that is "content discrimination," as books with content that a librarian deems misleading, superseded, or trivial are weeded to make room for books with content that is accurate, up-to-date, and more important. And all of that is constitutional. A public library that weeds the seventh edition of Hart & Wechsler to make room on its shelves for the eighth edition is not violating the First Amendment, even though it is engaging in "content discrimination" by preferring the newer content of the eighth edition over the more dated content of the seventh edition. A librarian who engages in content-blind weeding is committing library malpractice.

Library-weeding manuals recognize all of this, and they instruct librarians to engage in both "content discrimination" and "viewpoint discrimination" when weeding library materials. A library-weeding manual published by the Texas State

Library and Archives Commission tells librarians to weed books with "poor content," which includes each of following:

- **Outdated and obsolete information** (especially on subjects that change quickly or require absolute currency, such as computers, law, science, space, health and medicine, technology, travel)

- **Trivial subject matter**, including topics that are no longer of interest or that were dealt with superficially due to their popularity at a specific point in time, as well as titles related to outdated popular culture

- **Mediocre writing style**, especially material that was written quickly to meet popular interest that has passed

- **Inaccurate or false information**, including outdated information and sources that have been superseded by new titles or editions

- **Unused sets of books** (although you may keep specific volumes if they meet local needs and are used)

- **Repetitious series**, especially series that are no longer popular or that were published to meet a popular demand that no longer exists

- **Superseded editions** (in general, it is unnecessary to keep more than one previous edition, discarding as new editions are added)

- **Resources that are not on standard lists** or that were never reviewed in standard review sources

- **Material that contains biased, racist, or sexist terminology or views**

- **Unneeded duplicates**, especially if they are worn or tattered

- **Self-published or small press materials that are not circulating**, especially if they were added as gifts

ROA.3191 (boldface in original). In addition to this mandated content discrimination, the manual repeatedly instructs librarians to engage in viewpoint discrimination by weeding books with biased viewpoints:

- "[L]ook for books that contain stereotyping, including stereotypical images and views of people with disabilities and the elderly, or gender and racial biases."[55]

- "Weed biased or unbalanced and inflammatory items."[56]

- "Weed career guides with gender, racial, or ethnic bias."[57]

- "Discard books that are MUSTIE or that reflect gender, family, ethnic, or racial bias."[58]

- "Weed based on the quality of the retelling, especially if racial or ethnic bias is present."[59]

- "While information may not become dated, watch for cultural, racial, and gender biases."[60]

- "Discard books . . . that feature gender bias."[61]

- "Watch for gender and racial bias in sports and athletics."[62]

---

55. ROA.3205.
56. ROA.3237.
57. ROA.3237.
58. ROA.3240.
59. ROA.3240.
60. ROA.3245.
61. ROA.3246.
62. ROA.3247.

- "Watch for collections that feature gender or nationality bias and outdated interests and sensitivities."[63]

- "Watch for outdated interests and collections that feature gender or race bias."[64]

- "Weed books that reflect racial and gender bias."[65]

- "Do not retain books that have erroneous and dangerous information simply because the book is still in great shape."[66]

The plaintiffs also introduced into evidence a slideshow on weeding produced by Dawn Vogler at the Texas State Library and Archives Commission, which likewise instructs librarians to engage in content and viewpoint discrimination by weeding materials with "Trivial subject matter (outdated popular culture)," "Mediocre writing style," "Inaccurate or false information," and "bias, racist, sexist terminology or views." ROA.2486.

The plaintiffs have never come to grips with the fact that their proposed ban on "content discrimination" and "viewpoint discrimination" would make it impossible for public librarians to do their job. Libraries are supposed to establish standards for the materials in their collection, and they must ensure that their limited shelf space is reserved for quality publications. There is nothing wrong with content- or viewpoint-based weeding of library books that deny the Holocaust, promote crackpot conspiracy theories, or espouse obsolete and debunked scientific theories such as

---

63. ROA.3248.
64. ROA.3249.
65. ROA.3253.
66. ROA.3254.

spontaneous generation or scientific racism. Of course, the government could never ban or censor a publication on these grounds, nor could it discriminate against these views in a traditional public forum. But public libraries are different. They are not "forums" of any sort,[67] and they *must* impose content-based (and viewpoint-based) standards when deciding how to allocate their limited shelf space. *See American Library*, 539 U.S. at 204 (plurality op.); *Chiras*, 432 F.3d at 614. A public library cannot function if its librarians are prohibited from making content- or viewpoint-based weeding decisions, or if its librarians can be sued whenever a library patron suspects that a weeding decision was influenced by the content or viewpoints expressed in a book. *See* Milum Decl., ECF No. 14-4, at ¶¶ 7–8.

### D. The Plaintiffs Failed To Make A "Clear Showing" That Amber Milum Engaged In Viewpoint Or Content Discrimination When Weeding The 17 Disputed Books

The preliminary injunction should be vacated for yet another reason: Even if one assumes that the First Amendment prohibits content- or viewpoint-based weeding decisions, the plaintiffs failed to make a "clear showing" that Amber Milum engaged in "viewpoint discrimination" or "content discrimination" when weeding the disputed books.

Milum insisted repeatedly and under oath that her decisions to weed the 17 disputed books were unrelated to their content or viewpoints,[68] and were based solely

---

67. *See Chiras*, 432 F.3d at 614 ("'[F]orum analysis and heightened judicial scrutiny . . . are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *American Library*, 539 U.S. at 205 (plurality op. of Rehnquist, C.J.))).

68. *See* notes 16–17 and accompanying text, *supra*.

on her application of the MUSTIE factors that govern library-weeding decisions.[69] The district court did not claim that Milum was lying in her sworn testimony, and it did not find that Milum had misapplied the MUSTIE factors when weeding the 17 disputed books. ROA.3526-3527 & n.7. Indeed, the district court recognized the "subjective nature" of library weeding decisions and acknowledged that "reasonable minds may disagree over how to apply the CREW and MUSTIE criteria." ROA.3526-3527 n.7.

Instead, the district court held that the plaintiffs had made a "clear showing" of "viewpoint discrimination" because Milum weeded the disputed books shortly after Bonnie Wallace, Rochelle Wells, and other members of the community had complained about them. ROA.3524-3525 ("[B]y responding so quickly and uncritically, Milum and the Commissioners may be seen to have adopted Wallace's and Wells's motivations. The Court finds that Plaintiffs have clearly shown that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells objected."). There are many problems with the district court's argument.

The first problem is that Milum weeded only a small fraction of the books on Bonnie Wallace's spreadsheet, and Milum returned the vast majority of those books the library shelves after concluding that they did not meet the criteria for weeding. ROA.675. Of the 47 print books at Llano Library that Wallace found objectionable, Milum weeded only six of them and kept the remaining 41 in the library's collec-

---

69. *See* note 18 and accompanying text, *supra*.

tion. *See id*. So something other than Bonnie Wallace's objections was behind Milum's decision to weed those books, and Milum presented unrebutted testimony that she weeded only six of the 47 books on Wallace's list because she determined that those six books met the MUSTIE criteria for weeding, while the remaining 41 books that Wallace opposed did not qualify for weeding and were returned to the shelves.[70] It is false for the district court to say that Milum acted "uncritically" in response to Wallace's objections, and it is equally false for the district court to impute Wallace's or Wells's motivations to Milum.

The second problem is that Ms. Milum declined to weed *Being Jazz: My Life as a (Transgender) Teen* from Kingsland Library, where it had a respectable circulation record,[71] even though Milum weeded the version at Llano Library that wasn't getting checked out.[72] Milum's nuanced response to *Being Jazz* is incompatible with the district court's effort to paint her as an unthinking pawn of Bonnie Wallace and others who were motivated by the content or viewpoints expressed in the disputed books.

The third problem is that there is no evidence that Wallace, Wells, or any other community members objected to the "viewpoints" (as opposed to the content) of the 17 disputed books. Wallace described the books that she opposed as "pornographic filth,"[73] an objection that goes to the content of a book rather than its view-

---

70. *See* note 33 and accompanying text, *supra*.
71. *See* note 20 and accompanying text, *supra*.
72. ROA.346 (showing last checkout of the Llano Library version was July 19, 2017).
73. ROA.349-351.

points, and there is no evidence that Wallace (or anyone else) was even aware of the "viewpoints" expressed in any of the weeded books. There is no evidence in the record of what "viewpoints" were espoused in any of these books, and many of the titles seem too silly or frivolous to contain a "viewpoint."[74] Neither the district court nor the plaintiffs have even identified the "viewpoints" that Milum and the remaining defendants were supposedly "discriminating" against.

The district court also held that the plaintiffs had made a "clear showing" of "content discrimination" because Milum's decision to *review* the disputed books (and others) for weeding was prompted by complaints from library patrons who thought the books objectionable—even if her ultimate weeding decision was made without regard to the content of those books. ROA.3526-3527 ("The targeted review was directly prompted by complaints from patrons and county officials over the contents of these titles."). This argument also does not hold water. There is nothing unconstitutional about *reviewing* a category of books to determine *whether* they should be weeded—even if the books are chosen for review because of their content or in response to complaints from library patrons who object to their content. Weeding is a continual process and librarians are constantly checking books to see whether they should remain on the library shelves. ROA.3953 ("We weed all the time."). And librarians will inevitably engage in "content discrimination" when selecting a shelf or section of the library for a weeding evaluation, as library shelves and the Dewey Decimal system are organized according to the *content* of a publica-

---

74. The plaintiffs have yet to explain the "viewpoint" expressed in *Larry the Farting Leprechaun* and the other books in the "butt" and "fart" series.

tion. ROA.2483. To ban a librarian from even *considering* whether a book should be weeded simply because library patrons or community members find its content objectionable is to prevent librarians from doing their job. Library materials are always fair game for a weeding evaluation. And it is a non sequitur to say that a librarian who *considers* a book for weeding because of its content is actually *weeding* books because of their content or viewpoints.

The plaintiffs have fallen far short of a "clear showing" that Amber Milum weeded the 17 disputed books because she disapproved of their content or viewpoints. There were certainly members of the Llano community who disapproved of the content of those books. But only Milum made the decision to weed,[75] and the plaintiffs' evidence that Milum weeded the books because she disapproved of their content or viewpoints is nonexistent. Milum weeded the 17 books because she determined that they met the MUSTIE criteria for weeding, not because she disapproved of their content or viewpoints.[76]

### E.    The Preliminary Injunction Is Overbroad

The preliminary-injunction order goes far beyond what the plaintiffs requested and awards relief that the plaintiffs do not have Article III standing to pursue. The plaintiffs asked the district court to order the return of only the 17 disputed books. ROA.1038-1040 (proposed order). The district court's order, however, demands the return to the shelves of "*all* print books that were removed because of their viewpoint and content, *including*" the 17 books at issue in this litigation. ROA.3531

---

75.   *See* notes 14–15 and accompanying text, *supra*.
76.   *See* notes 16–18 and accompanying text, *supra*.

(emphasis added). The plaintiffs, however, made no showing (let alone a "clear showing") that they are suffering Article III injury from the removal of any library materials other than the 17 books that they have complained about. *See Daim-lerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press" and "separately for each form of relief sought." (citation omitted)); *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction.").

The preliminary injunction also restrains the defendants from "removing *any* books from the Llano County Library Service's catalog for *any* reason during the pendency of this action." ROA.3532 (emphasis added). This, too, goes far beyond what the plaintiffs asked for, and the plaintiffs lack Article III standing to pursue relief of that scope because they cannot be injured by the removal of a book that they have no interest in reading. The plaintiffs had requested a more limited injunction that would prohibit removal of books absent documentation of "(a) the individual who decided to remove or conceal the book and (b) the reason or reasons for that removal or concealment." ROA.1040.

An injunction should extend no further than necessary to provide complete relief to the named plaintiffs. *See Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). The plaintiffs did not allege or show injury in fact from the removal of any book other than the 17 books that they

sued over. Even if this Court decides to vacate the injunction across the board, it should remind district courts that their injunctions should not extend beyond what is necessary to remedy the injuries shown by the plaintiffs. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 616 (5th Cir. 2017) ("[A]n injunction must be 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order.'" (quoting *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)); *see also Professional Association of College Educators v. El Paso County Community College District*, 730 F.2d 258, 273–74 (5th Cir. 1984); *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020), *vacated on other grounds by Planned Parenthood Center for Choice v. Abbott*, 141 S. Ct. 1261 (2021).

### F. The Plaintiffs Failed To Make A "Clear Showing" That The Balance Of Equities And The Public Interest Favors A Preliminary Injunction

Finally, the plaintiffs failed to make a clear showing that the balance of equities tips in their favor, and they failed to make a clear showing that the public interest supports the district court's preliminary injunction. Each of the plaintiffs remains able to check out each of the 17 disputed books from Llano Library without any need for a preliminary injunction, and the burdens that the injunction imposes on the defendants far outweigh the benefits to the named plaintiffs.

The categorical prohibition on weeding in the district court's preliminary injunction will prevent the Llano County Library System from removing patently obsolete books or materials that have been damaged beyond repair. *See* Milum Decl., ECF No. 14-4, at ¶ 9 ("An injunction of that scope makes it impossible to run a

functioning library."). The preliminary injunction also purports to compel the return of every book that has ever been weeded for its content or viewpoints, and there is no way for the defendants to determine the reasons behind every previous weeding decision—many of which were made by librarians who are no longer employed by the county. *See id.* at ¶ 10 ("It is impossible for me to determine the reasons behind every one of our *thousands* of previous weeding decisions."). Nor is it possible for the defendants to re-shelve previously weeded books that are no longer in the library's possession and may not even be in print. *See id.* ("There is no way for our library system to comply with the terms of this injunction.").

Yet all that the plaintiffs get from this injunction is the satisfaction of having 17 books that were already available for them at Llano Library on the library shelves and in the catalog. This does not in any way enhance the plaintiffs' ability to "access and receive information and ideas," as they already had access to the books at Llano Library before the district court's injunction. The balance of equities does not favor the plaintiffs here, and the plaintiffs certainly have not made a "clear showing" to the contrary.

Nor have the plaintiffs made a "clear showing" that the public interest supports a preliminary injunction. There is no evidence that anyone other than the seven plaintiffs objects to the weeding practices at Llano Library or has any desire to check out any of the 17 books that the plaintiffs have sued over. And the preliminary injunction exposes every public librarian to the threat of lawsuits if a library patron disapproves of a weeding decision. *See* Milum Decl., ECF No. 14-4, at ¶ 7 ("Judge Pitman's ruling makes it impossible for our library's employees and volunteers to

do their jobs without facing the risk of ruinous lawsuits or contempt citations whenever a library patron disagrees with a weeding decision."). Public libraries weed *thousands* of books every year, and the notion that a disgruntled library patron can file a 42 U.S.C. § 1983 lawsuit over any one of these weeding decisions will subject every public librarian to the risk of harassing or vindictive litigation. *See id.* ("Any library patron can find reasons to object to a decision to weed any of the thousands of books that are permanently removed from our library shelves each year.").

## II. The Court Should Hold That Rational-Basis Applies To Public-Library Weeding Decisions

The district court's opinion and order would allow a public librarian to be sued under 42 U.S.C. § 1983 whenever a library patron disagrees with a weeding decision and alleges that the librarian considered the "content" or "viewpoints" of the weeded material—even through librarians are *instructed* to engage in content- and viewpoint-based weeding by library weeding manuals.[77] Any librarian could be forced to sit for a deposition, face the prospect of a ruinous fee award under 42 U.S.C. § 1988, and be subjected to harassing litigation for months and years. And any random library patron would be empowered to countermand the weeding decisions of professional librarians by running to federal court and holding a trial on whether to believe a librarian's stated reasons for her weeding decisions.

A regime of this sort should not be tolerated. The plaintiffs have already imposed more than $150,000 in litigation costs on Llano County in their attempt to

---

77. *See* note 34 and accompanying text, *supra*.

prove "content discrimination" and "viewpoint discrimination,"[78] even though *Chiras* makes clear that content discrimination is both permissible and inevitable in public-library weeding decisions. *See Chiras*, 432 F.3d at 614 ("'Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.'" (quoting *American Library*, 539 U.S. at 205 (plurality opinion of Rehnquist, C.J.))).

The Court should hold that rational-basis review applies to a public library's weeding decisions, consistent with *Chiras* and the plurality opinion in *American Library*. *See American Library Ass'n*, 539 U.S. at 202 (plurality opinion of Rehnquist, C.J.) ("[G]enerally the First Amendment subjects libraries' content-based decisions about which print materials to acquire for their collections to only rational [basis] review." (citation and internal quotation marks omitted)); *Egli v. Chester County Library System*, 394 F. Supp. 3d 497, 504 (E.D. Pa. 2019) ("Libraries are not required to accommodate every book or proposed talk, but instead must determine based on their professional judgment which materials are deemed to have 'requisite and appropriate quality' to occupy the limited space available." (quoting *American Library Ass'n*, 539 U.S. at 204 (plurality opinion of Rehnquist, C.J.))); *Gay Guardian Newspaper v. Ohoopee Regional Library System*, 235 F. Supp. 2d 1362, 1371 (S.D. Ga. 2002) ("Librarians may ordinarily take some comfort in the fact that . . . their content selection/removal decisions need only have a rational basis."). It is the rational-basis test, and not the plaintiffs' made-up rule against "content discrimina-

---

78.    *See* Cunningham Decl., ECF No. 65, Ex. 2, at ¶¶ 7–9.

tion" or "viewpoint discrimination," that governs a public library's weeding decisions.

## Conclusion

The preliminary injunction should be vacated.

Respectfully submitted.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: May 16, 2023                    *Counsel for Defendants-Appellants*

## Certificate Of Service

I certify that on May 16, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Ellen V. Leonida
Matthew Borden
J. Noah Hagey
Max Bernstein
Ellis E. Herington
Marissa Benavides
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com
herington@braunhagey.com
benavides@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Kayna Stavast Levy
Botkin Chiarello Calaf
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com
kayna@bccaustin.com

*Counsel for Plaintiffs-Appellees*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

## Certificate of Compliance

with type-volume limitation, typeface requirements,
and type-style requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 12,393 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

Dated: May 16, 2023

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on May 16, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*