# In the United States Court of Appeals for the Fifth Circuit

---

Leila Green Little; Jeanne Puryear; Kathy Kennedy; Rebecca Jones; Richard Day; Cynthia Waring; Diane Moster,

*Plaintiffs-Appellees*,

v.

Llano County; Ron Cunningham, in his official capacity as Llano County Judge; Jerry Don Moss, in his official capacity as Llano County Commissioner; Peter Jones, in his official capacity as Llano County Commissioner; Mike Sandoval, in his official capacity as Llano County Commissioner; Linda Raschke, in her official capacity as Llano County Commissioner; Amber Milum, in her official capacity as Llano County Library System Director; Bonnie Wallace, in her official capacity as Llano County Library Board Member; Rochelle Wells, in her official capacity as Llano County Library Board Member; Rhoda Schneider, in her official capacity as Llano County Library Board Member; Gay Baskin, in her official capacity as Llano County Library Board Member,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 1:22-cv-424-RP

---

## APPELLANTS' REPLY BRIEF

---

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Table of contents ...................................................................................... i

Table of authorities ................................................................................... ii

Reply to the plaintiffs' statement of facts................................................ 1

    I.  Undisputed facts ............................................................................. 4

    II.  The false and misleading statements in the plaintiffs' brief ........................... 7

        A.  The misleading statements in the plaintiffs' brief.................................. 7

        B.  The false statements in the plaintiffs' brief................................. 8

Argument .................................................................................................. 16

    I.  The district court erred in granting a preliminary injunction ...................... 16

        A.  The plaintiffs failed to make a clear showing that the in-house checkout system violates their First Amendment right to access and receive information ...................................................... 16

        B.  The plaintiffs failed to make a "clear showing" of "irreparable harm" when the each of 17 disputed books remains available for them to read and check out at Llano Library........................... 21

        C.  The district court erred in holding that the First Amendment forbids "viewpoint discrimination" or "content discrimination" in public-library weeding decisions ........................................... 22

        D.  The plaintiffs failed to make a "clear showing" that Amber Milum engaged in viewpoint or content discrimination when weeding the 17 disputed books .................................................. 27

        E.  The preliminary injunction is overbroad.............................. 29

Conclusion ............................................................................................... 30

Certificate of service ............................................................................... 31

Certificate of compliance ........................................................................ 32

Certificate of electronic compliance....................................................... 33

i

## Table of Authorities

### Cases

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
    557 F.3d 1177 (11th Cir. 2009) ............................................................ 1

*Barrett v. Walker County School District*, 872 F.3d 1209 (11th Cir. 2017) ................. 25

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
    619 F. Supp. 3d 906 (E.D. Mo. 2022) .................................................... 22

*Califano* v. *Yamasaki*, 442 U.S. 682 (1979) ........................................................ 20

*Campbell v. St. Tammany Parish School Board*,
    64 F.3d 184 (5th Cir. 1995) .......................................................... 23, 26

*Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) ........................................ 24

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) ................................. 19

*Counts v. Cedarville School District*,
    295 F. Supp. 2d 996 (W.D. Ark. 2003) .................................................. 18

*Denver Area Educational Telecommunications Consortium, Inc. v. FCC*,
    518 U.S. 727 (1989) .......................................................................... 17

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) ............................................................ 16

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983) ............................................................................ 25

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ................................... 24

*Roe v. Cypress-Fairbanks Independent School District*,
    53 F.4th 334 (5th Cir. 2022) ............................................................... 22

*Roho, Inc. v. Marquis*, 902 F.2d 356 (5th Cir. 1990) ............................................ 22

*Seattle Mideast Awareness Campaign v. King County*,
    781 F.3d 489 (9th Cir. 2015) ............................................................... 25

*Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000) ...................... 18

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ............................................ 16

*United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ......................... 18

*United States v. Concentrated Phosphate Export Ass'n*,
 393 U.S. 199 (1968) ............................................................... 20

*Valley Forge Christian College v. Americans United for Separation of
 Church and State, Inc.*, 454 U.S. 464 (1982) ...................................... 16

*Youkhanna v. City of Sterling Heights*, 934 F.3d 508 (6th Cir. 2019) ...................... 25

The plaintiffs' recitation of the facts is misleading and (in many places) demonstrably false. Throughout their brief, the plaintiffs deploy imprecise terminology (such as the word "remove") and tiresome hyperbole. Saying that the 17 disputed books have been "banned" or "censored" is histrionic when each of those books remains available through the library's in-house checkout system and (for most of the books) through additional means such as CloudLibrary (the library's online collection)[1] or InterLibrary Loan.[2] Books that have been weeded from the shelves yet remain available to library patrons through other means have not been "banned" or "censored"—any more than the thousands of books that the Llano library system weeds each year. *See ACLU of Florida, Inc. v. Miami-Dade County School Board*, 557 F.3d 1177, 1218 (11th Cir. 2009) ("Book banning takes place where a government or its officials forbid or prohibit others from having a book. . . . [R]emoving a book from [library] shelves is not book banning.").

The plaintiffs also deliberately conflate the decisions to temporarily pull the disputed books for review with the decisions to permanently "weed" those books and erase them from the library catalog. The plaintiffs' brief uses the verb "remove" interchangeably to encompass each of these actions. And it does so without

---

1. Four of the 17 books remain available to library patrons through CloudLibrary: *Caste*, *It's Perfectly Normal*, *Being Jazz*, and *Gabi*. ROA.673-674.

2. 13 of the 17 books remain available through interlibrary loan: *They Called Themselves the K.K.K.*, *Spinning*, *In the Night Kitchen*, each of the three "butt" books, each of the four "fart" books, *Shine*, *Gabi*, and *Freakboy*. ROA.673-674. In addition to this, a copy of *Being Jazz* remains in the Kingsland Library's collection. ROA.3995.

indicating whether "remove" is referring to the *temporary* "removal" of the hundreds of books that were placed on a cart for Ms. Milum to review—the vast majority of which were returned to the library shelves,[3] and all of which remained available for checkout while Ms. Milum conducted her review[4]—or the *permanent* "removal" that occurred when Ms. Milum decided to weed the 17 books in this lawsuit.

Here is an example of the plaintiffs' obfuscation: Their assertion that Judge Cunningham "instructed Milum to *remove* from the shelves '[a]ny books with photos of naked or sexual conduct'" and that Milum "obeyed his directive" and "removed" *In the Night Kitchen* "because it includes illustrations of a naked toddler." Appellees' Br. at 6–7 (emphasis added). If the word "remove" refers to the decision to *temporarily* pull the books to determine *whether* they should be weeded or moved to the adult section, then the statements are truthful. Milum did pull books containing nudity to determine whether they should be weeded or relocated, and she pulled them in response to Cunningham's directive. ROA.682; ROA.2506 (¶ 35); ROA.3953 ("I pulled them to review them, not to weed them."). But if the word "remove" refers to the decision to *permanently* remove, *i.e.*, weed the books, then the statements are false. Milum decided to weed *It's Perfectly Normal* and *In the Night Kitchen* because (in her judgment) they met the criteria for weeding, not because they contained nudity and not because Judge Cunningham (or anyone else)

---

3.   ROA.675.
4.   ROA.3900 ("[W]hile they were on the cart in Amber's office, were they available to be checked out? A. Yes. We just had to ask for them.").

told her to weed them.[5] The plaintiffs elide this distinction throughout their brief to create the impression that the reasons behind the *temporary* removal of the hundreds of books that were placed on a cart for review are the same reasons behind the *permanent* removal of the 17 books that got weeded.

Yet this distinction is crucially important because there is nothing unconstitutional about taking a library book off a shelf to *review* whether it should be weeded or relocated, especially when the book remains available for library patrons to check out during the review process.[6] Librarians are constantly pulling books off shelves to decide whether they should be weeded,[7] and the plaintiffs have not alleged Article III injury from the decisions to temporarily pull books for review. So the motivations behind the requests that Ms. Milum *examine* the books that were temporarily pulled are irrelevant. The plaintiffs are suing only over Ms. Milum's decisions to *weed* the 17 disputed books, which no longer appear in the library shelves or catalog. And the only relevant motivations are those behind the decisions to weed, *i.e.*, the

---

5.  ROA.2506 (¶ 35) (Milum) ("The plaintiffs' claim that I 'removed *In The Night Kitchen* from the library system because it includes illustrations of a naked toddler' is false. . . . My decision to *pull* the book *for review* (*i.e.*, to *temporarily* remove the book) was because of the naked-toddler pictures, as Judge Cunningham had instructed me to pull from the shelves and review all books with nudity. But my decision to *weed* the book (*i.e.*, to 'remove the book from the library system') had nothing whatsoever to do with the content of the book or the pictures of the naked toddler, and I would have weeded *In The Night Kitchen* even if there had been no nudity or drawings of a naked toddler." (emphasis in original)).

6.  *See* note 4, *supra*.

7.  ROA.3953 ("We weed all the time.").

decisions to *permanently* remove the 17 disputed books from the library's shelves and delete them from the catalog.

## I. UNDISPUTED FACTS

The plaintiffs do not dispute or deny any of the following facts:

- Amber Milum alone made the decision to "weed" each of the 17 disputed books. *See* Appellants' Br. at 7.

Nothing in the plaintiffs' brief contests or refutes this fact. Instead, the plaintiffs try to obscure this fact by playing word games with "remove," claiming that Milum was instructed by others to "remove" books when Milum was told only to *temporarily* pull certain books to review whether they *should* be weeded or relocated. *See, e.g.*, Appellees' Br. at 6 ("Defendants Cunningham and Moss directed Milum to *remove* the Butt and Fart Books." (emphasis added)).

- None of the other defendants ordered, pressured, or even asked Ms. Milum to weed (*i.e.*, permanently remove) any book from Llano Library or the Llano County Library System. *See* Appellants' Br. at 7.

The plaintiffs never claim that anyone ordered, pressured, or asked Milum to *weed* the books. They claim only that Milum was instructed to "remove" certain books, by which they mean that Milum was told to *temporarily* pull books to review whether they *should* be weeded or relocated.

- Ms. Milum's decisions to weed the 17 books had nothing to do with the content or viewpoints expressed in the books. Ms. Milum did not even read the 17 books before weeding them. *See* Appellants' Br. at 7.

The plaintiffs do not claim that Milum decided to *weed* the 17 disputed books because of their content or viewpoints, and they have no evidence that Milum en-

gaged in content or viewpoint discrimination when weeding the books. The plaintiffs rely on evidence that other individuals (such as Bonnie Wallace and Rochelle Wells) disliked the books, but none of those individuals weeded the books or did anything to influence Milum's weeding decisions.[8] The plaintiffs also do not deny that Milum never read the 17 disputed books.

- Ms. Milum weeded the 17 disputed books solely because she concluded, in her professional judgment, that the books satisfied the MUSTIE criteria for weeding. *See* Appellants' Br. at 8.

The plaintiffs do not deny that Milum sincerely believed that the 17 disputed books were appropriate candidates for weeding based on the MUSTIE criteria, and they do not claim and have no evidence to show that Milum is lying in her sworn testimony. The plaintiffs argue that Milum misapplied the MUSTIE criteria when weeding these 17 books,[9] but they do not claim that Milum *actually believed* that the books were improperly weeded, and they do not claim that she lied in her testimony or sworn declarations when explaining her reasons for weeding the disputed books.

- Milum weeded *Being Jazz* from Llano Library yet declined to weed the version held at Kingsland Library, where it had a better circulation record. *See* Appellants' Br. at 9.

---

8. ROA.2499 ("I alone made the decisions to weed the 17 disputed books in this case. No other defendant in this case, including Bonnie Wallace, Rochelle Wells, Rhonda Schneider, Jerry Don Moss, or Ron Cunningham, has ever weeded a book from Llano library or directed me to weed or permanently remove a book from the library. Nor has any of these individuals pressured or attempted to pressure me to weed or permanently remove any book from the library system.").

9. *See* Appellees' Br. at 9–11.

The plaintiffs do not deny that Milum declined to weed the Kingsland copy of *Being Jazz*, where it had a better circulation record. They simply ignore this fact when accusing Milum of weeding the book because of its content and viewpoints.

- Ron Cunningham, the Llano County Judge, never asked or directed Ms. Milum to "weed" any book. *See* Appellants' Br. at 10 & n.24.

The plaintiffs never claim that Judge Cunningham ordered Milum to *weed* a book. They claim only that he ordered her to "remove" the butt and fart books and books containing nudity or sex, by which they mean he instructed her to *temporarily* pull those books to review whether they should be weeded or relocated.

- Ms. Milum pulled and reviewed the 47 books on Bonnie Wallace's spreadsheet but returned the vast majority of them to the shelves after determining that they did not meet the criteria for weeding. *See* Appellants' Br. at 12.

The plaintiffs do not deny that the vast majority of the books on Bonnie Wallace's list were *not* weeded and were returned to the shelves after Ms. Milum conducted her review.

- Library-weeding manuals not only authorize but *require* librarians to engage in both "content discrimination" and "viewpoint discrimination" when weeding books. *See* Appellants' Br. at 12–13 & n.34.

The plaintiffs do not deny that library-weeding manuals require both content discrimination and viewpoint discrimination in weeding decisions, and they do not question the authenticity of the excerpts that were quoted throughout our opening brief. *See* Appellants' Br. at 31–33.

## II. The False And Misleading Statements In The Plaintiffs' Brief

Although the plaintiffs do not deny or contest the facts as described in the appellants' opening brief, their own brief is rife with misleading statements and (in many places) outright falsehoods.

### A. The Misleading Statements In The Plaintiffs' Brief

Many statements in the plaintiffs' brief are literally true if read a certain way, yet are written with the intent to mislead the reader. Each of the following sentences, for example, uses the word "remove" to convey the impression that books were being *permanently* removed (*i.e.*, weeded), when they were only being *temporarily* pulled from the shelves to evaluate whether they *should* be weeded or relocated:

- "Defendants Cunningham and Moss directed Milum to remove the Butt and Fart Books." Appellees' Br. at 6.

- "[Milum] . . . agreed that 'Cunningham also directed [her] to remove the books.'" Appellees' Br. at 6 n.4.

- "Milum removed [*In the Night Kitchen*] because it includes illustrations of a naked toddler." Appellees' Br. at 6–7.

- "Cunningham instructed Milum to remove from the shelves '[a]ny books with photos of naked or sexual conduct regardless if they are animated or actual photos[.]'" Appellees' Br. at 6.

- "[T]he District Court . . . found that Defendants instructed Milum to remove the Banned Books." Appellees' Br. at 31.

In each of these sentences, the word "remove" refers only to the *temporary* pulling of a book for review rather than the *permanent* decision to weed. But a reader could easily be misled into thinking that Cunningham and Moss ordered Milum to weed

those books, or that Milum weeded (rather than reviewed) *In the Night Kitchen* because of the naked-toddler pictures.

Other statements in the plaintiffs' brief attempt to convey a causal relationship between events when none existed. Examples of this include:

- "In summer 2021, in response to directions from her Llano County superiors, Milum removed all seven titles from the Library System." Appellees' Br. at 5.

- "Milum's removal of the seven books resulted from complaints made by Defendants Wells and Schneider." Appellees' Br. at 5.

- "Milum followed her superiors' directives, taking the books from the shelves and deleting them from the Library System catalog." Appellees' Br. at 6.

Each of these sentences describes events that preceded Milum's decision to weed the butt and fart books, as Milum had been directed by Judge Cunningham to *temporarily* remove those books from those shelves before she decided to weed them. ROA.2488; ROA.2499. But Milum was not instructed by anyone to *weed* those books, and her decision to weed was not influenced in any way by Judge Cunningham or Commissioner Moss. ROA.2488; ROA.2499.

## B. The False Statements In The Plaintiffs' Brief

In other places the plaintiffs' brief crosses the line into outright falsehoods.

- "[T]he 'Wallace List,' was 'the list of books that Bonnie Wallace thought were inappropriate and should be removed from the Llano County Library System.'" Appellees' Br. at 7.

It is untrue to say that Bonnie Wallace thought that the books on her list should be "removed from the Llano County Library System." Wallace's e-mail specifically

asked that the books on her list *not* be removed because she feared it would lead others to retaliate by removing library books that she supports. Instead, Wallace asked only that those books be relocated from the children's section to the adult section:

> [T]hese books (I have attached a list of dozens which are currently at our libraries) are in the CHILDREN'S section of the library and can be checked out by our children and grandchildren. ***I am not advocating for any books to be censored but to be RELOCATED to the ADULT section where a child would need to get their parent's approval to check out.*** It is the only way that I can think of to prohibit future censorship of books I do agree with, mainly the Bible, if more radicals come to town and want to use the fact that we censored these books against us.

ROA.350 (emphasis added).

The plaintiffs think they can tell this Court that Wallace wanted the books removed by quoting from a loaded question that one of their attorneys asked during the preliminary-injunction hearing. ROA.3959 ("Q. That's a book that was on Bonnie Wallace's list, yes? A. Yes. Q. The book of — the list of books that Bonnie Wallace thought were inappropriate and should be removed from the Llano County Library System, correct? A. Yes."). The premise of that question was false, yet the plaintiffs' brief quotes from that loaded question as if it were an established fact. An attorney cannot make a false statement of fact to a tribunal, and the plaintiffs cannot circumvent this rule by asking a loaded question in the district court and then quoting the false portion of that question in their appellate brief.

- "By the end of 2021, Defendants had removed the remaining Banned Books—all of which were on the Wallace List—from the Llano library, in addition to the Butt and Fart Books, *In the Night Kitchen*, and *It's Perfectly Normal*." Appellees' Br. at 8.

This statement is false because *Under the Moon* is not on the Wallace List, even though it is one of the "remaining" disputed books that the plaintiffs are suing over. ROA.357 (Wallace List).

- "Defendants admitted that the reason that these 'CRT and LGBTQ' books were 'selected for weeding' was because they were on the Wallace List." Appellees' Br. at 9.

Milum testified under oath that she pulled the books on Wallace's list only to *review* whether they *should* be weeded:

> Q. So the reason you pulled the books off the shelves to look at them for weeding was because they were on Ms. Wallace's list, correct?
>
> A. ***I pulled them to review them, not to weed them.***
>
> Q. Okay. You pulled them because they were on Ms. Wallace's list?
>
> A. Yes.

ROA.3953 (emphasis added). The reason that the books were *reviewed* was because they were on Wallace's list; the reason that they were "selected for weeding" was only because Milum concluded that they met the MUSTIE criteria. ROA.675; ROA.2507-2508.

- "Historically, the Library System would not consider a book for weeding unless it met two or three MUSTIE criteria." Appellees' Br. at 10.

This is another falsehood. Milum declared that "it is permissible and sometimes prudent for a librarian to weed a book based on the presence of a single MUSTIE factor, and the plaintiffs are wrong to assert that Llano Library 'historically' has weeded books only when two or three MUSTIE criteria are satisfied."

ROA.2502. The plaintiffs cite testimony from Tina Castelan, a former librarian who testified against Milum at the preliminary-injunction hearing, but here is what Castelan had to say:

> Q. Does any one MUSTIE factor mean that a book is weeded?
> A. No. It's *usually* a combination.
> Q. Is there a minimum number?
> A. So *my minimum number* was always two to three.

ROA.3891 (emphasis added). Castelan was not testifying about "historical" practices at the Llano library; she was describing her own personal application of the MUSTIE factors. She also hedged by saying that it's "usually" a combination of factors, a qualification that the plaintiffs omit when citing this testimony.

- "None of the removed books, however, qualified for weeding under the Library System's general weeding practices." Appellees' Br. at 9.

The plaintiffs know this statement is false, because on the next page they concede that *Freakboy* was properly weeded. *See* Appellees' Br. at 10 ("*All but one* of the 17 books at issue were weeded contrary to Library System policies and practices." (emphasis added)); ROA.3908-3909 (Castelan conceding that Milum was right to weed *Freakboy* because of its poor circulation record).

More importantly, Amber Milum testified repeatedly and in detail about how each of the disputed books qualified for weeding under the MUSTIE factors. ROA.672 (¶ 8); ROA.675-676 (¶¶ 12–16); ROA.4174-4185 (Milum explaining her reasons for weeding *Freakboy*, *Being Jazz*, *Gabi, A Girl In Pieces*, *They Called Themselves The KKK*, *Spinning*, *Shine*, *Caste: The Origins of Discontent*, *It's Perfectly Normal*, and *In The Night Kitchen*, and how each of those books met multiple criteria for

weeding under MUSTIE). Ms. Milum also explained her reasons for weeding the
"butt" and "fart" books: (1) No one had asked for or inquired about the "butt"
books that were continuously being checked out by Rochelle Wells and Rhonda
Schneider;[10] (2) The actions of Wells and Schneider would render the "butt" and
"fart" books inaccessible to other patrons;[11] and (3) The "butt" and "fart" books
were trivial and "didn't really meet anyone's needs," and they remained available to
patrons through interlibrary loans, so the books satisfied the "Trivial" and "Else-
where" factors for weeding under the MUSTIE framework.[12]

The plaintiffs insist that the disputed books did *not* meet the library's criteria
for weeding, but they base this claim on the testimony of a single witness, Tina
Castelan, who claimed that Milum's decisions to weed some of the disputed books
violated the library's weeding policies. ROA.3903-3915. Castelan's accusation is
false and was soundly refuted by Ms. Milum's courtroom testimony and declara-
tions. Every single book that Milum weeded met at least one of the MUSTIE fac-
tors, and nearly all of them satisfied two and possibly more of those factors.
ROA.4174-4187. Castelan's testimony did not rebut any of this, as she opined only
that the *circulation record* of those books was not, in her opinion, enough to support
a decision to weed. ROA.3903-3915. But Castelan was never asked whether any

---

10.  ROA.4185 ("[N]obody else asked for it.").

11.  ROA.4185-4186.

12.  ROA.4186 ("[I]t was just silly trivial books"); *id.* ("They were more trivial
     books, anyway."); ROA.4187 ("Q. . . . [H]ow many criterion total did these
     books qualify for? A. Trivial, irrelevant, it didn't really meet anyone's needs
     and elsewhere.").

other MUSTIE factors could support Milum's decision to weed those 16 books, such as the "Ugly," "Trivial," or "Elsewhere" criteria, and Castelan did not rebut Milum's reliance (or potential reliance) on those factors. Milum, for example, testified that the "butt" and "fart" books were appropriately weeded under the "Trivial" and "Elsewhere" categories,[13] and that the "Elsewhere" category supported her decision to weed the other disputed books.[14] Castelan never even addressed (let alone rebutted) this.

Castelan's testimony was mistaken in other respects. She claimed, for example, that *It's Perfectly Normal* was improperly weeded "because its last checkout was in 2018,"[15] but under the Llano library's CREW chart a book in that Dewey class becomes eligible for weeding three years since its last checkout. ROA.2503 (¶ 27); ROA.2483. Castelan also testified that *Gabi, a Girl in Pieces* was improperly weeded "because [its] last checkout was 2018 and we've had it since 2016." ROA.3914. But *Gabi* is a Young Adult book, which becomes eligible for weeding two years after its last circulation or three years after it was first acquired. ROA.2503 (¶ 28); ROA.2483; ROA.2661. *Gabi* qualified for weeding under either criterion. Castelan also claimed that *Being Jazz* was improperly weeded because the Llano libraries "only had one or two of the books that pertained to [its] subject." ROA.3912. That is untrue; there are no fewer than 10 other books on the subject of transgender

---

13. *See* note 12, *supra*.
14. ROA.4171-4187.
15. ROA.3907.

youth in the Llano library system, in addition to the copy of *Being Jazz* that remains in circulation at the Kingsland library. ROA.2503-2504 (¶ 29).

- "The District Court did not credit Milum's testimony." Appellees' Br. at 10.

Nothing in the district court's opinion rejects Milum's testimony or declares it false. On the contrary, the district court recognized the conflicting testimony between Milum and Castelan but refused to resolve the dispute, declaring that "given its subjective nature, reasonable minds may disagree over how to apply the CREW and MUSTIE criteria." ROA.3527 n.7. The district court also relied on Milum's testimony to support its conclusion that the plaintiffs had made a clear showing of viewpoint discrimination and content discrimination. ROA.3525; ROA.3527.

- "Milum . . . could not explain why hundreds of other books not checked out for decades were currently still on library shelves." Appellees' Br. at 10.

Milum explained this. She said that the Llano County library system is behind on weeding due to staffing constraints and other factors. ROA.2505 ("I have not yet had the opportunity to conduct a thorough weed of the library shelves since becoming system director, and we stopped weeding entirely in late 2021. The library system has been understaffed (and therefore under-weeded) for years, which is why there are so many books on the shelves that should be weeded but have not yet been.").

- "Milum admitted that there was no need to make space for new books in November 2021 because the Commissioners Court had suspended all new purchases a month before she removed the Wallace List books from the library." Appellees' Br. at 32–33.

This is a misrepresentation of Milum's testimony. Milum was asked whether the weeding in November of 2021 was done "to make room for new books," and she acknowledged that it was not. ROA.4200 ("Q. So when you did the weeding based on Ms. Wallace's list that was e-mailed to you by your boss, you weren't doing that to make room for new books because you weren't allowed to order new books, correct? A. Right."). Milum never said that there was no need to weed books at that time, and she declared that weeding is needed *regardless* of whether new books are coming in because: (1) Shelf space costs money; (2) The presence of unused books frustrates and distracts library employees and patrons who must sift through the unnecessary clutter; and (3) Weeding helps librarians identify holes in the library's collection and understand the community's desires and needs. ROA.2506.

* * *

The Court deserves an accurate recitation of the facts, and the adversarial process cannot function when a litigant misrepresents the factual record to this extent. We have hit on the most egregious misrepresentations in the plaintiffs' submission, but we cannot in a single brief unpack every one of the misstatements that permeate their filing. We encourage the Court to carefully compare the plaintiffs' factual claims with the primary sources before accepting or relying on any factual assertion in the plaintiffs' brief.

## I. THE DISTRICT COURT ERRED IN GRANTING A PRELIMINARY INJUNCTION

The preliminary injunction should be vacated for no fewer than six separate and independent reasons. *See* Appellants' Br. at 20–42. The plaintiffs have not refuted any of them.

### A. The Plaintiffs Failed To Make A Clear Showing That The In-House Checkout System Violates Their First Amendment Right To Access And Receive Information

The plaintiffs cannot explain how the defendants are violating their First Amendment right to "access and receive information" when each of the 17 disputed books remains available for them to check out at Llano Library. They complain that the defendants have not informed *other* library patrons about the availability of these 17 books,[16] but the plaintiffs have no standing to assert the constitutional rights of non-parties—and it is undisputed that each of the named plaintiffs is aware that the 17 books are available. ROA.3463-3465. Courts exist to resolve disputes between named litigants, not to act as "roving commissions"[17] or "ombudsmen of the general welfare."[18] The plaintiffs must show that *their* constitutional rights are being violated by the in-house checkout system, and it is entirely irrelevant whether other library patrons know about the books.

---

16. *See* Appellees' Br. at 12 ("Defendants did not inform library patrons about these hidden books.").

17. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019).

18. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 (1982).

The First Amendment does not empower the plaintiffs to demand that public libraries house books in their preferred locations. The plaintiffs complain that they must ask a librarian and "personally request" a book from the in-house collection,[19] but they do not explain how that violates their First Amendment right to "access and receive information." Library patrons must often ask librarians for assistance, such as when books have been misplaced or are hard to find, or need to be obtained through interlibrary loan. None of that violates an individual's constitutional right to "access and receive information," and library patrons do not get to sue librarians for violating their First Amendment rights whenever they are unable to obtain their desired book without assistance. The plaintiffs also complain that they cannot anonymously read the books in the library,[20] but the First Amendment does not guarantee library patrons anonymity. Library patrons check out books in person with their library card, and they allow the library to keep records of the books that they have borrowed. The plaintiffs do not claim that they are too embarrassed to ask for the books, nor do they assert any other encumbrance (such as a speech impediment) that would prevent them from acquiring books through the in-house checkout system. The plaintiffs' citation of *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1989), is inapposite because libraries have limited shelf space and *must* relegate some materials to alternative sources such as interlibrary loan, e-books, or an in-house checkout system. It is untenable to say that library patrons suffer violations of their First Amendment right to "access and

---

19.  *See* Appellees' Br. at 51.
20.  *See* Appellees' Br. at 51.

receive information" whenever they must ask a librarian for assistance in obtaining a desired book rather than browsing the library shelves.[21]

In addition, Justice Kennedy's and Justice Breyer's concurrences in *United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003), make clear that "small" or non-significant burdens on a library patron's ability to obtain materials do not violate the First Amendment. *See id.* at 215 (Kennedy, J., concurring in the judgment) (upholding restriction after concluding that the plaintiffs failed to "show that the ability of adult library users to have access to the material is burdened in any significant degree"); *id.* at 220 (Breyer, J., concurring in the judgment) (upholding restriction given the "comparatively small burden that the Act imposes upon the library patron"). Here, it is hard to see how there is *any* "burden" imposed on the plaintiffs, as the in-house checkout option spares them the inconvenience of having to search for the disputed books on the library shelves. And any "burden" that the

---

21. The plaintiffs rely on district-court rulings in *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530 (N.D. Tex. 2000), and *Counts v. Cedarville School District*, 295 F. Supp. 2d 996 (W.D. Ark. 2003), but each of those decisions is wrong and should be disowned by this Court. *Sund* holds a public library is a "limited public forum," a stance that cannot be sustained after *Chiras v. Miller*, 432 F.3d 606, 614 (5th Cir. 2005) ("'[J]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions.'" (quoting *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality opinion of Rehnquist, C.J.))). *Counts* complains that it is "stigmatizing" for schoolchildren to obtain parental permission before checking out Harry Potter books, but there is no constitutional right to be free from stigma, and there is nothing problematic with a school district, which is acting in loco parentis, requiring parental consent before allowing children to check out library books.

plaintiffs might theorize will be far less of a burden than that imposed by the Children's Internet Protection Act (CIPA), the statute at issue in *American Library Ass'n*, which required adult users to ask a librarian to unblock filtered materials before access would be allowed.

The plaintiffs falsely claim that the defendants are contesting their "standing," and they accuse us of attempting to "moot" their First Amendment claims. *See* Appellees' Br. at 47. Yet we have made absolutely clear to this Court (and to the district court)[22] that the in-house checkout system does *not* moot the plaintiffs' First Amendment claims, and it does not undermine the continued existence of an Article III case or controversy. *See* Appellants' Br. at 22. The plaintiffs continue to suffer Article III injury from the absence of the 17 disputed books from the library shelves and catalog. The problem for the plaintiffs is that this injury does not amount to a violation of their First Amendment rights, because each of the plaintiffs can access and check out the 17 books from the library's in-house collection.

The voluntary-cessation doctrine is irrelevant because the defendants did not restore the 17 books to the shelves and catalog, as the plaintiffs are demanding, nor have they eliminated the plaintiffs' Article III injury. The "challenged practice"[23] in this case was the decision to *weed* the 17 books, and the defendants have not halted that challenged practice or reversed their weeding decisions in response to the law-

---

22. ROA.3153.
23. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.").

suit. But even if the voluntary-cessation doctrine applied, that would *at most* justify an injunction that prohibits the defendants from removing the 17 disputed books from the in-house checkout system—not an injunction that compels their return to the shelves and catalog. The plaintiffs' First Amendment right to access and receive information will be protected so long as the 17 disputed books remain available for them to check out at Llano Library, and an injunction should be no more burdensome than necessary to ensure the protection of that constitutional right. *See Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). If the plaintiffs fear that the defendants might "return to their old ways"[24] by removing the 17 books from the in-house checkout system, then they should seek an injunction that prevents the removal of those books from the library. The First Amendment does not give them (or anyone else) the right to dictate the location of library books or the precise mechanism by which they are made available to library patrons.

Finally, the plaintiffs launch ad hominem attacks on defendants' counsel and suggest that it was somehow improper to arrange for the provision of the 17 books through the in-house checkout system. *See* Appellees' Br. at 49 & nn.20–22; ROA.3518. But the identity of the donor has no relevance to whether the in-house checkout system violates the plaintiffs' First Amendment right to access and re-

---

24. *See United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203 (1968) ("Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave (t)he defendant . . . free to return to his old ways.").

ceive information,[25] and it has no bearing on the mootness inquiry because the book donation does not eliminate the plaintiffs' Article III injury. *See* Appellants' Br. at 22–23. The plaintiffs are suing the defendants and accusing them of violating their First Amendment right to "access and receive information." When the defendants respond by alleviating or eliminating the alleged constitutional burden, the plaintiffs should be thanking the defendants rather than accusing them of bad faith. The in-house checkout system is a win-win: It allows the seven plaintiffs to access and check out the 17 books at Llano Library, and it does so without allocating scarce library shelf space toward books that no longer warrant inclusion in the library's collection—and without empowering individual library patrons to commandeer or override the weeding decisions and professional judgments of the library staff. If the plaintiffs want to enjoin this arrangement, then they need to show how it violates their constitutional rights.

### B. The Plaintiffs Failed To Make A "Clear Showing" Of "Irreparable Harm" When Each Of The 17 Disputed Books Remains Available For Them To Read And Check Out At Llano Library

The plaintiffs do not even attempt to explain how they would suffer "irreparable harm" absent a preliminary injunction when each of them can check out and read the 17 disputed books at Llano Library. Their brief ignores the issue, even though they must make a "clear showing" of irreparable harm to sustain the pre-

---

25. The defendants objected on relevance grounds when the plaintiffs asked Amber Milum to disclose the donor of the books. ROA.3986. The district court should have sustained the objection.

liminary injunction. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990). The plaintiffs have forfeited any argument for irreparable harm by failing to brief the issue. *See Roe v. Cypress-Fairbanks Independent School District*, 53 F.4th 334, 343 n.5 (5th Cir. 2022).

The plaintiffs introduced no evidence or testimony showing how they would be "irreparably harmed" by obtaining the 17 disputed books from the in-house checkout system rather than the library shelves. *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 919 (E.D. Mo. 2022) (removal of books from school library did not inflict irreparable harm because it "does not stop any student from reading or discussing the book"). None of them testified or submitted declarations claiming that they would be "harmed" by asking a librarian for the books, and their brief does not explain how a harm of this sort would be "irreparable."

### C. The District Court Erred In Holding That The First Amendment Forbids "Viewpoint Discrimination" Or "Content Discrimination" In Public-Library Weeding Decisions

The plaintiffs' brief doubles down on their claim a public library is a "limited public forum," where viewpoint discrimination is categorically prohibited and content discrimination is subject to strict scrutiny. *See* Appellees' Br. at 19 ("The First Amendment Prohibits Removal of Library Books Based on Viewpoint or Content-Based Discrimination"); *id.* at 42; ROA.1903. The district court adopted this rationale across the board. ROA.3519 n.4; ROA.3523-3528. The Court should reject all of this.

First. No decision of this Court or the Supreme Court has held that a public library is a "limited public forum," and *Chiras* says that "forum analysis . . . [is] incompatible with the discretion that public libraries must have to fulfill their traditional missions." *Chiras*, 432 F.3d at 614 (citation and internal quotation marks omitted). The plaintiffs try to get around *Chiras* by claiming that *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), "held that the First Amendment prohibits viewpoint discrimination in book removal decisions at public school libraries," and that *Chiras* cannot be read to preclude "forum analysis" without overruling *Campbell*. Appellees' Br. at 43. That is a misrepresentation of *Campbell*. The opinion in *Campbell* never says that libraries are "public forums," or that "viewpoint discrimination" or "content discrimination" is prohibited in library-weeding decisions. *Campbell* even acknowledges that library books may be weeded if they are "pervasively vulgar" or lack "educational suitability," which recognizes the propriety of both content and viewpoint discrimination. *See Campbell*, 64 F.3d at 188–89. *Campbell* comes nowhere close to a categorical prohibition on viewpoint discrimination or content discrimination in library-weeding decisions, and it never even suggests that a public library qualifies as a "limited public forum."

Second. Public libraries are *supposed* to engage in "content discrimination" and "viewpoint discrimination" when weeding books, and library-weeding manuals not only authorize but compel librarians to engage in content- and viewpoint-based weeding. *See* Appellants' Br. at 30–34. The plaintiffs ignored this problem in the

district court,[26] but their brief in this Court concedes (for the first time) that the First Amendment allows public librarians "to use the MUSTIE standards they have traditionally used to weed books." Appellees' Br. at 46. But now the plaintiffs are asserting two mutually exclusive propositions:

1. The First Amendment categorically bans viewpoint discrimination in public-library weeding decisions and subjects content discrimination to strict scrutiny;[27] and

2. The First Amendment allows public librarians "to use the MUSTIE standards they have traditionally used to weed books."[28]

One or the other must be false, because the MUSTIE standards *require* librarians to engage in both viewpoint discrimination and content discrimination when weeding books. *See* Appellants' Br. at 30–34. If the plaintiffs repudiate (2), then their argument becomes untenable. But they cannot repudiate (1) without pulling the rug from under the district court's opinion, which insists that viewpoint-based weeding is categorically forbidden and content-based weeding is subject to strict scrutiny.

Third. Even if a public library were a limited public forum (and it isn't), the First Amendment *permits* content discrimination in a limited public forum—so long as the content discrimination is "reasonable" and "viewpoint neutral." *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470 (2009); *Christian Legal Society v. Martinez*, 561 U.S. 661, 679 (2010). Once again, the plaintiffs are asserting two mutually incompatible claims, and they will need to jettison either:

---

26. ROA.2390-2406.

27. *See* Appellees' Br. at 19–24.

28. *Id.* at 46.

1. Their claim that public libraries are "limited public forums"; or

2. Their insistence that content-based weeding decisions are subject to strict scrutiny.

The plaintiffs claim in a footnote that strict scrutiny applies to content discrimination in a limited public forum,[29] but they are wrong. There is language that can be found in older cases (such as *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)), implying that content discrimination is subject to strict scrutiny in a limited public forum, but the Supreme Court and the lower federal courts now recognize that content discrimination in a limited public forum need only be "reasonable" and "viewpoint neutral." *See Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019) ("In a limited public forum, the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination."); *Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 502 (9th Cir. 2015) ("In a limited public forum, however, what's forbidden is viewpoint discrimination, not content discrimination."); *Barrett v. Walker County School District*, 872 F.3d 1209, 1225 (11th Cir. 2017) ("[C]ontent-based discrimination . . . is permitted in a limited public forum if it is viewpoint neutral and reasonable in light of the forum's purpose." (footnote omitted)).

As a fallback, the plaintiffs say this Court should affirm the district court even if it erred by imposing a no-content-discrimination rule, because they claim that the evidence of "viewpoint discrimination" can sustain the preliminary injunction by itself. *See* Appellees' Br. at 46 n.19. But there are two problems with this request.

---

29. Appellees' Br. at 46 n.19.

First, a public library is *not* a limited public forum because *Chiras* precludes the use of "forum analysis," and because libraries are *supposed* to establish minimum standards for their collections by weeding books with biased, outdated, or discredited viewpoints. *See* Appellants' Br. at 30–34. Second, the plaintiffs' evidence of "viewpoint discrimination" is non-existent. There is no evidence in the record of the "viewpoints" expressed in any of the weeded books, and neither the plaintiffs nor the district court could even identify the "viewpoints" that Milum was "discriminating" against. *See id.* at 36–37. Nudity is not a "viewpoint," and neither is flatulence.

Finally, the plaintiffs' brief misrepresents our argument at every turn. We have never argued that the government can "remove any books it disagrees with,"[30] nor are we asking the Court to "overrule *Campbell*" and "ignore *Pico*."[31] Our claim is only that there is no *categorical* prohibition on content or viewpoint discrimination in public-library weeding decisions. Library-weeding decisions remain subject to rational-basis review, and book removals that serve no purpose other than to deny students (or library patrons) access to ideas would fail rational-basis scrutiny. *See, e.g.*, *Campbell*, 64 F.3d at 188. So would book removals undertaken by "a Democratic school board" that "ordered the removal of all books written by or in favor of Republicans." *Board of Education v. Pico*, 457 U.S. 853, at 870–71 (1982) (plurality op.). But that is a far cry from the district court's categorical prohibition on content- or viewpoint-based weeding. And Ms. Milum clearly was not seeking to suppress ac-

---

30. Appellees' Br. at 19.
31. Appellees' Br. at 35.

cess to ideas because she continued to allow Llano Library patrons to obtain the weeded books through CloudLibrary and interlibrary loan, as well as the in-house checkout system.

### D. The Plaintiffs Failed To Make A "Clear Showing" That Amber Milum Engaged In Viewpoint Or Content Discrimination When Weeding The 17 Disputed Books

Amber Milum is the *only* defendant who has authority to weed books from Llano Library,[32] and the decisions to weed the 17 disputed books were made by Ms. Milum alone.[33] Neither the plaintiffs nor the district court has denied these facts. The plaintiffs' preoccupation with the motivations of Bonnie Wallace and Rochelle Wells—and their attempts to use the statements and actions of Wallace and Wells to impute motivations to "the defendants" as a collective whole—is a sideshow. *See* Appellees' Br. at 5, 7–8, 26–28. Bonnie Wallace, Rochelle Wells, Rhonda Schneider, and Jerry Don Moss did not weed or temporarily remove a single book from Llano Library,[34] and they have no authority to move a library book or instruct anyone to do so.[35] Ron Cunningham instructed Amber Milum to temporarily pull books from the

---

32. ROA.4190 ("Q. Does Bonnie Wallace or Rochelle Wells have any authority to remove or weed a book from the Llano County libraries? A. No. Q. Does Bonnie Wallace, or Rochelle Wells, or any member of the library advisory board have authority to direct you to weed or remove a book? A. No."); ROA.4191-4192 ("Q. Does Jerry Don Moss have any authority or ability to remove or weed a book from the Llano County Library System? A. No. Q. Does Jerry Don Moss have the authority to direct you to weed or remove a book? A. No.").

33. *See* Appellants' Br. at 7 nn.14–15.

34. *See* Appellants' Br. at 7 nn.14–15 and accompanying text.

35. *See* note 32, *supra*.

library shelves for review,[36] but he never instructed Ms. Milum (or anyone else) to permanently weed a book.[37] The plaintiffs' brief repeatedly and falsely states that "Defendants" (plural) "removed" the disputed books — apparently in an effort to make Bonnie Wallace's and Rochelle Wells's subjective motivations relevant to this case. There is only one defendant who "removed," *i.e.*, weeded the books from the Llano library. And only the motivations of *that* defendant will determine whether the books were removed for content- or viewpoint-based reasons.

The plaintiffs claim that the district court's factual determinations must be reviewed deferentially,[38] but they do not identify a finding regarding Amber Milum's subjective motivations for weeding the 17 books. The district court's discussion of Milum's thought process was circumspect and mealy-mouthed. The Court, for example, wrote that "Milum and the Commissioners *may be seen to have adopted* Wallace's and Wells's motivations,"[39] and that "Plaintiffs have made a clear showing about what Defendants' substantial motivations *may have been* and how these *may have led* to the book removals."[40] These are not findings of fact, but expressions of possibility. Statements about what "may be seen" or what "may have been" are not findings of anything. The closest thing to a finding is this statement: "The Court finds that Plaintiffs have clearly shown that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells ob-

---

36. *See* Appellants' Br. at 10–11 nn.25–26 and accompanying text.
37. *See* Appellants' Br. at 11 n.30 and accompanying text.
38. *See* Appellees' Br. at 31–34.
39. ROA.3525 (emphasis added).
40. ROA.3525 (emphasis added).

jected." ROA.3525. To the extent that finding encompasses the motivations of Amber Milum, it is clearly erroneous for the reasons in our opening brief: (1) Milum weeded only a small fraction of the 47 print books on Bonnie Wallace's list; (2) Milum declined to weed the copy of *Being Jazz* in the Kingsland Library, where it has a better circulation record; and (3) There is no evidence that anyone objected to the "viewpoints" (as opposed to the content) of the 17 disputed books. *See* Appellants' Br. at 35–36. There is also no evidence that Milum is hostile to books containing nudity, critical race theory, or LGBTQ issues, and Milum specifically denies that she harbors any opposition to these types of books. ROA.2507 (¶ 36). Neither the plaintiffs nor the district court claims that Milum is lying, so they cannot make a "clear showing" that she weeded the 17 books because she disapproved of their content or viewpoints.

### E.    The Preliminary Injunction Is Overbroad

The plaintiffs do not attempt to defend an injunction that orders the return of anything beyond the 17 books that the plaintiffs are suing over. Instead, the plaintiffs deny that the preliminary injunction extends beyond those 17 books. *See* Appellees' Br. at 57. Yet the text of the injunction clearly states that the defendants must return to shelves "*all* print books that were removed because of their viewpoint or content, *including*" the 17 books at issue in this litigation. ROA.3531 (emphasis added). Because the plaintiffs are unwilling to defend an injunction of this scope, they should have no objection to a ruling that vacates the portion of the injunction ex-

tending beyond the 17 disputed books.[41] The plaintiffs (thankfully) have not attempted to enforce the injunction as written, but the defendants should not have to rely on their continued forbearance.

The plaintiffs also make no effort to defend the categorial prohibition on removing books from the library catalog "for any reason" during the pendency of this action. ROA.3532. The Court should vacate that portion of the injunction as well.

Finally, if any portion of the injunction is affirmed, it should be limited to Amber Milum, who is the only defendant with authority to restore books to the library shelves and catalog. The remaining defendants cannot be held responsible for the return of library books when they have no ability or authority to place books on the library shelves or restore them to the library's catalog.

## Conclusion

The preliminary injunction should be vacated and the case remanded.

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: June 2, 2023                    *Counsel for Defendants-Appellants*

---

41. The Court could accomplish this by striking the phrase "all print books that were removed because of their viewpoint or content, including," as well as the comma between "books" and "to." ROA.3531.

## CERTIFICATE OF SERVICE

I certify that on June 2, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

ELLEN V. LEONIDA
MATTHEW BORDEN
J. NOAH HAGEY
MAX BERNSTEIN
ELLIS E. HERINGTON
MARISSA BENAVIDES
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
leonida@braunhagey.com
borden@braunhagey.com
hagey@braunhagey.com
bernstein@braunhagey.com
herington@braunhagey.com
benavides@braunhagey.com

RYAN A. BOTKIN
KATHERINE P. CHIARELLO
MARÍA AMELIA CALAF
KAYNA STAVAST LEVY
Botkin Chiarello Calaf
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com
kayna@bccaustin.com

*Counsel for Plaintiffs-Appellees*

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*

## Certificate of Compliance

### with type-volume limitation, typeface requirements, and type-style requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 8,139 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Dated: June 2, 2023                                          *Counsel for Defendants-Appellants*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on June 2, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL
*Counsel for Defendants-Appellants*