# In the United States Court of Appeals for the Fifth Circuit

LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARING, AND DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE, JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR, BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, RHONDA SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, AND GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Texas, Austin Division
1:22-cv-00424-RP

## EN BANC SUPPLEMENTAL BRIEF
## OF PLAINTIFFS-APPELLEES

(Counsel Listed Inside Cover)

Katherine P. Chiarello
(TX Bar No. 24006994)
Ryan A. Botkin
(TX Bar No. 00793366)
María Amelia Calaf
(TX Bar No. 24081915)
Botkin Chiarello Calaf PLLC
1209 Nueces Street
Austin, Texas 78701
Tel: 512-615-2341
Fax: 737-289-4695
ryan@bccaustin.com
katherine@bccaustin.com
mac@bccaustin.com


Matthew Borden
(CA Bar No. 214323)
J. Noah Hagey
(CA Bar No. 262331)
Marissa R. Benavides
(NY Bar No. 5796891)
Kory James DeClark
(CA Bar No. 310571)
BraunHagey & Borden LLP
747 Front Street, 4th Floor
Tel: 415-599-0210
Fax: 415-276-1808
borden@braunhagey.com
hagey@braunhagey.com
benavides@braunhagey.com
declark@braunhagey.com


*Attorneys for Plaintiffs-Appellees*

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dwain K. Rogers
Texas Bar No. 00788311
County Attorney

Matthew L. Rienstra
Texas Bar No. 16908020
First Assistant County Attorney
Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
dwain.rogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**
Leila Green Little
Jeanne Puryear
Kathy Kennedy
Rebecca Jones
Richard Day
Cynthia Waring
Diane Moster

**Plaintiffs-Appellees' Counsel**
Katherine P. Chiarello
Ryan A. Botkin
María Amelia Calaf
Botkin Chiarello Calaf PLLC

Matthew Borden
J. Noah Hagey
Marissa R. Benavides
Kory James DeClark
BraunHagey & Borden LLP

**Defendants-Appellants**
Llano County
Ron Cunningham
Jerry Don Moss
Peter Jones
Mike Sandoval
Linda Raschke
Amber Milum
Bonnie Wallace

Rochelle Wells
Rhonda Schneider
Gay Baskin

**Defendants-Appellants' Counsel**
Jonathan F. Mitchell
Mitchell Law PLLC

Dwain K. Rogers
Matthew L. Rienstra
Llano County Attorney's Office

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument before the en banc Court is set for September 24, 2024.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ I

STATEMENT REGARDING ORAL ARGUMENT ........................................... III

TABLE OF CONTENTS .................................................................................. IV

TABLE OF AUTHORITIES ........................................................................... VII

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE CASE .......................................................................... 4

    A.    Summary of Facts and Evidence ........................................................ 4

        1.    Defendants Censored Books with Ideas They Disliked ............ 4

        2.    Defendants Offered a Pretextual Explanation for Censoring the Banned Books ............................................................... 6

        3.    The Factual Record Overwhelmingly Supports the District Court's Decision under the Applicable Standard of Review ...... 8

    B.    Procedural History ........................................................................... 12

        1.    The District Court Decision ................................................... 12

        2.    The Panel Decision ............................................................... 13

SUMMARY OF ARGUMENT ........................................................................ 15

ARGUMENT ................................................................................................... 17

I.    THE GOVERNMENT SPEECH DOCTRINE IS NOT A BASIS FOR REVERSING THE DISTRICT COURT ...................................................... 17

    A.    Defendants Waived the Government Speech Argument ................... 17

    B.    Censoring Public Library Books Is Not Government Speech ........... 19

        1.    *Shurtleff* Forecloses Any Argument that Censoring Books at a Public Library Is Government Speech ............................. 21

a. The Government Has Not Historically Spoken by Censoring Books at Public Libraries ............................. 22

b. The Public Would Not Perceive Surreptitious Book Removal in Contravention of the Library's Written Standards to Be Government Speech ........................... 26

(1) Nobody Understands the Government to Be Endorsing the Message of Every Book in the Library .......................................................... 26

(2) The Public Cannot Form Any Belief from Activities the Government Conceals ................... 28

(3) Amici's Arguments About Political Checks Are Incorrect .......................................... 28

c. Llano County Officials Do Not Actively Control Any Purported Message from Llano County Libraries . 30

(1) Amici's Generalized Arguments Do Not Account for Llano County's History and Are Foreclosed by *Shurtleff* ....................................... 31

(2) That the Government Pays for Library Books Does Not Give It the Right to Engage in Viewpoint Discrimination ................................... 32

2. Defendants' *Moody* Argument Is Incorrect Because *Moody* Was Not a Government Speech Case and Has Nothing to Do with This Case .................................................................. 37

II. DEFENDANTS' CRITICISMS OF THIS COURT'S DECISION IN *CAMPBELL* ARE INCORRECT ................................................ 38

A. *Campbell* is Simple, Clear, and Workable ........................................ 39

B. *Pico* Requires First Amendment Limitations on Library Book Censorship and *Campbell* Provides the Narrowest Possible Limitation ........................................................... 42

C. *Campbell* is Not Distinguishable ....................................... 44

D.      The Right to Receive Information Extends to Public Libraries......... 47

III.    DEFENDANTS HAVE NOT SHOWN THAT THE DISTRICT COURT'S FACTUAL FINDINGS WERE CLEARLY ERRONEOUS..... 51

IV.     DEFENDANTS DID NOT MOOT THIS CASE BY HIDING THE BANNED BOOKS BEHIND A DESK ....................................................... 52

V.      DEFENDANTS REMAINING CONCERNS ARE MERITLESS.............. 56

A.      The Injunction Is Not Overbroad ....................................................... 56

B.      Plaintiffs Made a "Clear Showing" on All Four Prongs of the Preliminary-Injunction Inquiry .......................................................... 56

CONCLUSION .................................................................................................. 57

CERTIFICATE OF SERVICE ........................................................................... 59

CERTIFICATE OF COMPLIANCE................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985)..................................................................................8

*Arkansas Educational Television Commission v. Forbes*,
  523 U.S. 666 (1998)........................................................................ 33, 34

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
  457 U.S. 853 (1982)................................................................... *passim*

*Campbell v. St. Tammany Parish School Board*,
  64 F.3d 184 (5th Cir. 1995) ...................................................... *passim*

*Citizens United v. Fed. Election Com'n*,
  558 U.S. 310 (2010)................................................................................19

*Elrod v. Burns*,
  427 U.S. 347 (1976)......................................................................... 54, 56

*Fed. Bureau of Investigation v. Fikre*,
  601 U.S. 234 (2024)...............................................................................53

*Frew v. Young*,
  No. 21-40028, 2022 WL 135126 (5th Cir. Jan. 13, 2022) ...................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)...............................................................................54

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
  No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024)........................... *passim*

*Hopwood v. State of Texas*,
  236 F.3d 256 (5th Cir. 2000) ........................................................... 8, 51

*Kreimer v. Bureau of Police for Town of Morristown*,
  958 F.2d 1242 (3d Cir. 1992) ....................................................... 22, 49, 50

*Lamont v. Postmaster Gen. of U. S.*,
  381 U.S. 301 (1965).............................................................................49

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001) ...........................................................................29

*Martin v. City of Struthers*,
319 U.S. 141 (1943) ............................................... 22, 24, 29, 48

*Matal v. Tam*,
582 U.S. 218 (2017) ................................................................. *passim*

*McGee v. Estell*,
722 F.2d 1206 (5th Cir. 1984) ...............................................18

*MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*,
25 F.4th 360 (5th Cir. 2022) ..................................................17

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) .................................................. 20, 37

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ...............................................................41

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .............................................. 30, 33, 34

*Nat'l Rifle Assoc. of Am. v. Vullo*,
602 U.S. 175 (2024) .......................................................... 28, 29

*Neinast v. Bd. of Trustees of Columbus Metro. Libr.*,
346 F.3d 585 (6th Cir. 2003) ................................................50

*NetChoice, L.L.C. v. Paxton*,
49 F.4th 439 (5th Cir. 2022) ................................................44

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) ....................................................... 24, 25

*Red Lion Broad. Co. v. F.C.C.*,
395 U.S. 367 (1969) ...............................................................49

*Regan v. Taxation with Representation of Washington*,
461 U.S. 540 (1983) ...............................................................34

*Robinson v. Hunt Cnty., Texas*,

921 F.3d 440 (5th Cir. 2019) ...............................................................56

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)......................................................... 24, 35, 36, 55

*Shurtleff v. Boston*,
596 U.S. 243 (2022)...................................................................... *passim*

*Spell v. Edwards*,
962 F.3d 175 (5th Cir. 2020) ...............................................................54

*Stanley v. Georgia*,
394 U.S. 557 (1969)..............................................................................47

*Stevens v. St. Tammany Parish Gov't*,
17 F.4th 563 (5th Cir. 2021) ...............................................................17

*Thomas v. Collins*,
323 U.S. 516 (1945)..............................................................................48

*United States v. American Library Association, Inc.*,
539 U.S. 194 (2003)...................................................................... *passim*

*United States v. Ogle*,
415 F.3d 382 (5th Cir. 2005) ...............................................................18

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021)...........................................................................54

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)..............................................................................41

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..............................................................................49

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015)..............................................................................27

*Wallace v. Jaffree*,
472 U.S. 38 (1985)......................................................................... 3, 19

*West Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)................................................................... 3, 19, 38

*Whitney v. California,*
   274 U.S. 357 (1927)..............................................................................29

*Widmar v. Vincent,*
   454 U.S. 263 (1981)........................................................................ 35, 36

## **INTRODUCTION**

Defendants ask this Court to eliminate any First Amendment check on the government's power to suppress ideas in public library books based on a "government speech" argument they did not raise on appeal or in their petition for rehearing en banc. This new rule would recast government censorship as protected affirmative speech, expand the government's power to extinguish controversial ideas, and overturn the common-sense precedent this Court established in *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), which libraries have relied on to constitutionally curate their collections for almost three decades.

The Supreme Court has cautioned that courts must "exercise great caution before extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017). American public libraries have traditionally served as epicenters for intellectual exploration. Over 600 million patrons visit public libraries annually. Defendants' proposed rule would turn these institutions into silos of partisanship. Politicians in Berkeley, California would be free to ban books authored by Adam Smith or Ayn Rand; politicians in Provost, Utah would be free to ban books antagonistic to Mormonism; and politicians in Llano, Texas would be free to ban books addressing bodily functions, race, and sexuality.

The only circuit court to consider this issue rejected Defendants' argument that censoring library books is protected government speech. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024). This Court should do the same. Applying the Supreme Court's controlling test in *Shurtleff v. Boston*, 596 U.S. 243, 252 (2022), the Court should find that Defendants did not engage in government speech because: (1) Llano County has not historically censored books based on viewpoint, (2) given the variety of conflicting views represented in the books, the public does not perceive the government to be "speaking," and (3) Llano County, the State of Texas, and libraries have not exercised viewpoint control over every public library book. To the contrary, the Llano County Library System's constitution, like virtually every library charter around the nation, states: "[t]he Library does not promulgate particular beliefs or views, nor is the selection of any given media equivalent to endorsement of the viewpoint of the author expressed therein." ROA.1496.

Defendants and the government amici argue that, by removing books, libraries send a government message that the books that remain are of a "requisite and appropriate quality." But the Supreme Court rejected this approach as opening the door to censorship. *See Matal*, 582 U.S. at 239-48 (denying government argument that issuance of trademarks constituted "speech" related to the marks' non-offensive quality). Were Defendants' theory correct, the government could

claim that it was speaking, for example, by offering non-profit status only to religious groups of "requisite and appropriate quality"—exactly what the First Amendment was designed to prevent. *See Wallace v. Jaffree*, 472 U.S. 38, 52 (1985) (First Amendment created to prevent preferencing one faith over another); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]").

Defendants criticize *Campbell* by arguing that its standard is unworkable. But judges ferret out intent every day—from specific-intent crimes, to fraud, to workplace discrimination, to trademark infringement. *Campbell* was easy to apply here because Defendants' internal emails state that, instead of following library weeding procedures, "Commissioner Moss and Judge Cunningham have instructed Amber, the head librarian, to remove certain books[.]" ROA.1526. And while Defendants attempt to nitpick the District Court's factual findings, they ignore both the standard of review (clear error) and the overwhelming evidence of viewpoint discrimination. Defendants discussed banning books in their internal emails, circulated a list of books to censor, referred to books about politics and history as "pornographic filth," claimed to have removed books that were in pristine

condition because they were dilapidated, and offered other testimony inconsistent with the documentary record.

*Campbell* has been the legal standard in this Circuit for almost 30 years without a flood of lawsuits. The District Court's faithful application of *Campbell* to the facts of this case should be affirmed.

## STATEMENT OF THE CASE

### A.    Summary of Facts and Evidence

After considering extensive briefing, 65 declarations, 120 exhibits, and two days of live testimony, the District Court found that Defendants censored 17 books (the "Banned Books") from the Llano County Library because they disagreed with the ideas in them. Defendants called the books "pornographic filth," ROA.1503, "disgusting," ROA.1541, and "inappropriate," ROA.1526. The evidence supporting the District Court's findings is detailed in ECF No. 101-2 ("Pl. Br."), which is incorporated by reference. Below is a brief summary.

### 1.    Defendants Censored Books with Ideas They Disliked

In summer 2021, Defendants Llano County, its officials Ron Cunningham (Llano County Judge), Jerry Don Moss (Llano County Commissioner), and Amber Milum (Llano County Library System Director), and certain Llano County residents (later appointed to Llano County Library Board) began censoring books at the Llano County public library. First, they censored well-known children's

books that made light of bodily functions (the "Butt" and "Fart" books). Next, they censored books with nudity (1971 Caldecott Award winner *In the Night Kitchen*,[1] and *It's Perfectly Normal*, a book discussing puberty).

At the same time, at the behest of then-private-citizen Defendant Bonnie Wallace to remove library books she personally opposed, ROA.1503—including "objection[able]" books identified by Texas State Representative Matt Krause about politics, race, sexuality, and gender identity, ROA.1505-23— Defendants compiled a "list of books that [Defendant] Wallace thought were inappropriate and should be removed from the Llano County Library System" (the "Wallace List"). ROA.1503, 3509-10, 3942:13-21, 3951:6-9, 3959:15-25. These books, which Defendants' internal emails described as "pornographic filth," ROA.350-51, 353-54, 1502-04, 3509-10, included *Caste: The Origins of Our Discontents* and *They Called Themselves the KKK: The Birth of an American Terrorist Group*. Within 48 hours of receiving a copy of the Wallace List, Defendant Milum, the Library System Director, permanently removed six books (the two noted above and four others involving teen sexuality/gender identity issues) from the Llano Branch. ROA.3960:1-9. She instructed Suzette Baker, then-head librarian of the Kingsland Branch, to remove from that branch all books on the Wallace List. ROA.216. Ms.

---

[1] Twice, Ms. Milum testified under oath that she removed *In the Night Kitchen* "based on inappropriate content." ROA.3965:5-8, 3965:19-3966:1-6.

Baker refused to engage in "censorship" because she believed that Ms. Milum's "order to remove books" based solely on Ms. Wallace's and Judge Cunningham's disapproval "was illegal." *Id*. Defendant Milum oversaw the removal of the books from the Llano branch anyway. *Id.*

Defendants had censored at least 17 books before Plaintiffs filed suit. Throughout this period, Defendants repeatedly thanked Commissioner Moss and Judge Cunningham for forcing Ms. Milum to remove the books they found objectionable. ROA.1525-26, 1540-41.

### 2. Defendants Offered a Pretextual Explanation for Censoring the Banned Books

Despite contemporaneous evidence to the contrary, Defendants claimed at the preliminary injunction hearing that they censored the Banned Books under routine library "weeding" procedures. Like many modern libraries, the Library System has adopted the industry-accepted MUSTIE standard for removing books from its collection. Under this standard, the library removes (or "weeds") books when they are "**M**isleading and/or factually inaccurate," "**U**gly (worn out beyond mending or rebinding)," "**S**uperseded by a new edition or a better source," "**T**rivial (of no discernable literary or scientific merit), "**I**rrelevant to the needs and interests of the community," [or] "**E**lsewhere (… easily borrowed from another source)." ROA.1544. Historically, the Library System would not consider weeding a book unless it met at least two or three MUSTIE criteria. ROA.3891:17-21, 4204:2-5.

Defendants did not follow the MUSTIE factors when they censored the 17 books. Pl. Br. 10. When confronted about this, they offered pretextual explanations. For example, Defendant Milum denied that she had removed *In the Night Kitchen* because of Judge Cunningham's directive, ROA.3963:20-23, and she testified that she "weeded" *In the Night Kitchen* because it "was old and worn" and therefore Ugly. ROA.3963:24-25. But the book, which the District Court saw at the preliminary injunction hearing, was "in excellent condition" and lacked "any tears or stains or any damage" when introduced into evidence. ROA.1821-69, 4120:11-4121:7. Defendant Milum likewise testified that she "weeded" *Caste*—a popular bestseller purchased within the last two years—but could not identify which MUSTIE criteria called for its removal. ROA.3961:6-9.

None of the Banned Books satisfied the library's requirement of meeting two MUSTIE criteria before removal. ROA.1660-65, 3903:15-3904:3, 3905:7-3908:16, 3910:1-3911:8, 3911:16-3912:19, 3913:12-3914:14, 3915:5-18. Most did not even arguably satisfy one. ROA.1660-65, 3912:14-19, 3913:20-25. And their removal was not necessary to clear library shelf space—another pretextual reason Defendants offered, ROA.3527—because Llano County had already suspended library purchases partway through Defendants' censorship campaign. ROA.4199:25-4200:5.

### 3. The Factual Record Overwhelmingly Supports the District Court's Decision under the Applicable Standard of Review

The live witness testimony and evidence presented at the hearing, mainly Defendants' own documents, was overwhelming.[2] Among other things:

There was no error here. Overwhelming evidence supports the District Court's factual findings that Defendants censored the Banned Books. Among other things:

- Defendants' internal emails suggest that removing books from the library would amount to "censor[ing]" them, ROA.1503;

- Defendants created and circulated a list of books they "thought were inappropriate and should be removed," ROA.3959:15-25;

- Defendants did not follow the library's weeding procedures in censoring the Banned Books, ignoring one librarian's protest that Defendants' removal of the Banned Books constituted censorship, was "illegal," and violated the First Amendment, ROA.216;

---

[2] Defendants' lead argument in their supplemental brief tries to rewrite several of the District Court's factual findings. But they ignore that this Court reviews factual findings for clear error. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *Hopwood v. State of Texas*, 236 F.3d 256, 272-73 (5th Cir. 2000) ("To be clearly erroneous, a decision … must be dead wrong.").

- Defendants offered a pretextual explanation for censoring the Banned Books that was refuted by the contemporaneous documentation, ROA.3526-28; and

- After Defendants' lawyer donated copies of the Banned Books to the library to try to moot this lawsuit, Defendants subjected them to invidious treatment by holding them in a place where the public would not know about them.[3]

Such evidence is more than sufficient to support the District Court's finding that Defendants censored books because they disagreed with their viewpoints.

Defendants offer seven pages of argument about mistakes the District Court and the Court's panel supposedly made. ECF No. 205-2 ("Supp. Br.") 3-11. These contentions are inaccurate, are based on post-hoc declarations that contradict their live testimony, and ignore the District Court's credibility findings. Even if Defendants' contentions were accurate, they would not show that the District Court's findings were clearly erroneous given the other overwhelming evidence, including the evidence cited above, that Defendants overlook.

---

[3] Defendants tried to prevent the District Court from learning the identity of the donor by claiming that the donation was "attorney-client privilege." ROA.3986:12-19.

For example, Defendants claim that the panel erred in stating "[Milum] pulled no other books for review during **that time period**" because she pulled other books for review between August 5, 2021 and November 18, 2021. Supp. Br. 4 (quoting ECF No. 164 ("Panel Op.") 4) (emphasis added). But the panel is referring to November 2021, after the Wallace List was transmitted, not the broader date range Defendants proffer. And the panel's observation is based on Milum's own testimony:

> Q: Did you pull other books not on the list to see if they were getting checked out in November –
>
> A: No
>
> Q: – of 2021? No? Only the books on Ms. Wallace's list?
>
> A: Yes.

ROA.3954:2-5. If the statement is untrue, it is only because Milum's sworn testimony was incorrect (again).

Defendants also contend that the panel incorrectly concluded that Defendant Milum "likely weeded these [17] books because she was told to by those who disagreed with their message." Supp. Br. 8. Defendants argue that the removal was temporary, pointing to a single email that refers to removal "for now," together with the testimony of Defendants Milum and Cunningham. *Id*. But that email was followed by others that expressed no such limitation. ROA.349 (November 10, 2021 email to Milum: "[A]ny and all books that depict any type of sexual activity or questionable nudity are to be pulled immediately."). And Defendant Milum

understood the removal to be permanent because she *deleted* those titles from the library catalog the very day she acknowledged the Commissioners' removal instructions. *See* ROA.346 (list of titles deleted on November 12, 2021), ROA.349 (November 12, 2021 email from Ms. Milum "We are all working on getting books pulled. I will also work on the lists that [Wallace] provided."). Coupled with Defendant Milum's inaccurate testimony elsewhere, the District Court's finding that "[t]he short amount of time between the complaints, the commissioners' actions, and Mi[lum]'s removal strongly suggest that the actions were in response to each other" was not clearly erroneous. ROA.3525.

Defendants' factual quibbles also ignore the District Court's credibility determinations. For example, Defendants contend that nothing in the District Court's opinion suggests that Defendant Milum's testimony conflicts with the evidentiary record. Supp. Br. 7-8. But the District Court opinion sets forth examples where her testimony contradicted other Defendants' testimony on key issues, *see, e.g.*, ROA.3525 ("Defendants aver that any ... removal ... was simply party of the library system's routine weeding process ... Yet Milum testified that the books she pulled were books that Wallace, Wells, or the Commissioners identified as 'inappropriate.'"), as well as contemporaneous documents, *see, e.g.*, ROA.3509, 3524 (identifying emails instructing Milum to remove books). From Defendants' inconsistent explanations (which, as discussed above, were also

inconsistent with the documentary evidence), the District Court concluded that

Defendants' "post-hoc justification[s]" for their censorship—e.g., the "routine

'weeding'" justification Ms. Milum proffered—were "pretextual." ROA.3526.

Ultimately, Defendants' nitpicking amounts to much ado about nothing.

None of their complaints—even those that the Court may ultimately clarify, such

as that some, not all, 17 Banned Books were on the Wallace List—changes the

District Court's or panel's analysis. Defendants said they were banning books,

circulated a list of books to censor, disseminated instructions to pull certain books,

and offered inaccurate testimony about it. The District Court's conclusion that

Defendants censored the Banned Books because they did not like the viewpoint

was therefore far from clearly erroneous. ROA.3525 ("The Commissioners,

[Defendant Milum's] superiors and final policymakers with power over the library

system, instructed [Defendant Milum] to review the books—and even to remove

some of them—based on people's perception of their content or viewpoints.").

### B.     Procedural History

#### 1.     The District Court Decision

On March 30, 2023, the District Court issued a 26-page order denying

Defendants' motion to dismiss and granting Plaintiffs' motion for a preliminary

injunction. ROA.3507-32. Applying *Campbell*, the court found that Plaintiffs were

likely to prevail on their claim that Defendants had violated their First Amendment

right to receive information by removing books because Defendants disagreed with their viewpoints. ROA.3525. It also found that Defendants did not moot Plaintiffs' lawsuit by creating what they called an "in-house checkout system," in which the Banned Books were "hidden from view and absent from the catalog." ROA.3518. The court described this "system" as "an obvious and intentional effor[t] by Defendants to make it difficult if not impossible to access the [books]," ROA.3529, and "precisely the type of posturing the voluntary cessation exception [to mootness claims] is meant to prevent," ROA.3518.[4] The court ordered that "the books at issue be made available for checkout through the Library System's catalogs" during the pendency of this case. ROA.3530.

### 2. The Panel Decision

On June 6, 2024, a panel of this Court upheld the injunction with respect to eight of the 17 books at issue. Panel Op. 27.

Writing for the majority, Judge Wiener explained that the question on appeal was "answered … in 1995 in *Campbell*, a directly applicable decision that circumscribes the boundaries of [the Court's] analysis." *Id*. at 8. The majority explained that "the 'key inquiry in a book removal case' is the remover's 'substantial motivation in arriving at the removal decision.'" *Id*. at 10 (quoting

---

[4] The District Court found that Defendants' lawyer donated the books, not as "a neutral benefactor with the intent of making them available to library patrons," but as part of his litigation strategy. ROA.3518.

*Campbell*, 64 F.3d at 190). "[W]hen an official who removes a book is 'substantially motivated' by the desire to deny 'access to ideas with which [she] disagree[s]," she violates library patrons' First Amendment "right to receive information and ideas." Panel Op. 11-12 (citations omitted).

Writing separately, Judge Southwick praised Judge Wiener's "thorough and nuanced" opinion and expressly "concur[red] in [its] explication of the law." Panel Concurrence, ECF No. 164 ("Concurrence") at 1. He confirmed that *Campbell* is the "standard … to apply here" and explained that, under *Campbell*, government officials may not remove books from library shelves "simply because they dislike the ideas contained in [them.]" *Id.* (quoting *Campbell*, 64 F.3d at 188).

Judge Duncan dissented on the grounds that a government's decision to remove library books is government speech not subject to First Amendment scrutiny, Panel Dissent, ECF No. 164 ("Dissent") at 33-46—an argument Defendants did not make on appeal. The dissent argued (1) that *Campbell* and *Pico* are inconsistent with the "broad discretion" libraries must exercise to shape their collections, Dissent at 13-16; (2) that the right to receive information, on which *Campbell* and *Pico* are based, applies only where people "privately peruse obscenity at home" and so cannot extend to public libraries, Dissent at 17; and (3) that *Campbell*'s application to public libraries is inconsistent with the plurality

decision in *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003) ("*ALA*"), and generally unworkable, Dissent at 18-25, 29-32.

<u>**SUMMARY OF ARGUMENT**</u>

Censoring books in public libraries is not government speech. No court has ever held that it is, and the only circuit court to consider this argument has rejected it.

The question of government speech is analyzed under three factors described in *Shurtleff*: (1) the history of the activity at issue; (2) the public's perception of whether the government is speaking; and (3) the degree of control exercised by the government. Neither Defendants nor the panel dissent addresses this controlling test. Amici address it, but they misapply it to a librarian's book selection rather than government officials' targeted removal of books in this case. Even the amici's scenario fails—the Llano County Library System's constitution states that it does not curate books to promote any particular viewpoint. This fact, alone, is dispositive of all three *Shurtleff* prongs because Llano County has no historical practice of censorship; the public would not believe otherwise given the library's stated policy; and that policy expressly does not regulate the viewpoints of the books in the library.

Defendants also fail to identify any compelling reason to overturn *Campbell*, which has been a workable legal standard for almost 30 years. Both the District

Court and the panel correctly applied it, and the District Court's factual findings that Defendants censored books based on their viewpoints then offered a pretextual explanation are not clearly erroneous.

Nor have Defendants mooted this case by having their lawyer donate the Banned Books during the pendency of this case to be kept hidden and unlisted in the library's catalog. The District Court correctly held that this was a litigation tactic that did not fully resolve the case; if anything, it only underscores Defendants' animus toward the Banned Books' viewpoints.

Finally, Defendants' other arguments are meritless. They claim the injunction is overbroad only because they misread it. And their argument that Plaintiffs failed to make a "clear showing" on all four prongs of the preliminary injunction test is incorrect. The District Court determined that Plaintiffs had clearly shown their First Amendment rights were likely violated, and that such constitutional injury, once shown, satisfied the remaining prongs.

# ARGUMENT

## I.     THE GOVERNMENT SPEECH DOCTRINE IS NOT A BASIS FOR REVERSING THE DISTRICT COURT

Defendants and various state government amici[5] argue that there is no First Amendment check on the government's authority to suppress ideas in a public library because censoring books is government speech. This argument was not raised on appeal and should be rejected as an unprecedented and dangerous expansion of government power, contravening existing law and basic principles undergirding the First Amendment.

### A.     Defendants' Government Speech Argument Should Be Deemed Waived

Because Defendants chose not to raise their government speech argument on appeal, it suffers from an absence of reasoned development, especially for an issue of such gravity. At this late stage, the Court should decline to consider it. *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 367 (5th Cir. 2022) (citation omitted) (party "abandons all issues not raised and argued in its initial brief on appeal); *Stevens v. St. Tammany Parish Gov't*, 17 F.4th 563, 574 (5th Cir. 2021).

---

[5] *See* ECF No. 217 ("Amici Br."). Having lost the issue at home, Arkansas, Iowa, Missouri, Nebraska, and North Dakota now seek to relitigate this issue before this Court.

Defendants assert that it was "hard to advance" the government speech argument on appeal because "both *Pico* and *Campbell* had the status of binding precedent." Supp. Br. 19. Yet they made the argument before the District Court. *See* ROA.616. If they wanted to preserve that argument here, Defendants had an obligation to assert it in their opening appellate brief. They chose not to. Nor are there any "extraordinary circumstances," i.e., where there is a "possibility of injustice so grave as to warrant disregard of usual procedural rules." United States v. Ogle, 415 F.3d 382, 383 (5th Cir. 2005) ("declining to consider the merits" of criminal defendant's Booker challenge) (quoting McGee v. Estell, 722 F.2d 1206, 1213 (5th Cir. 1984)); *see also Frew v. Young*, No. 21-40028, 2022 WL 135126, at *3 (5th Cir. Jan. 13, 2022) (by offering "specific argument" only to one section of the Corrective Action Order, appellant "forfeited any challenge to the district court's decision to terminate the other six sections and related paragraphs of the consent decree").

Here, Defendants have not attempted to show a grave injustice. Given that the Supreme Court has instructed courts to "exercise great caution before extending [its] government-speech precedents," *Matal*, 582 U.S. at 235, this Court should decline to consider Defendants' government speech argument for the first time before the en banc Court.

**B.     Censoring Public Library Books Is Not Government Speech**

The First Amendment protects the political dialectic, "freedom of mind" and "the right to select any religious faith or none at all." *Wallace v. Jaffree*, 472 U.S. 38, 52, 53 (1985). "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *Barnette*, 319 U.S. at 641-42. For this reason, "First Amendment standards … 'must give the benefit of any doubt to protecting rather than stifling speech.'" *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 327 (2010) (quotation omitted).

"If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 219. Defendants' theory that the government speaks by warranting things are of a particularly quality would allow government viewpoint regulation of anyone receiving a government subsidy (recipients of "requisite quality"), spending by public universities (programs of

"requisite quality"), and religious speech (institutions of "requisite quality). That is precisely why the Supreme Court has cautioned against expanding it.

No court has ever held that censoring library books constitutes government speech, and extending this doctrine into the realm of libraries meets none of the legal requirements. That is particularly so here, where the evidence shows, and the District Court found, that a county commissioner, county judge, and private-citizens-turned-library-board-members directed a county librarian to *remove* books they personally disliked even though those books did not meet the Llano County Library System's criteria for "weeding," ROA.3093:15-3904:3, 3905:7-3908:24, 3910:1-3911:8, 3911:16-3914:14, 3915:5-18, ROA 4047:9-4048:4, and the librarian continued to believe the books were appropriate for the community. ROA.3933:23-3934:8.

Defendants, Amici, and the dissent advance at least three separate government speech arguments. Only Amici contend with the controlling legal standard and framework from *Shurtleff*. The dissent relies on the fractured plurality in *ALA*, Dissent at 28, while Defendants rely on *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), Supp. Br. 14, 16-19. For the reasons set forth below, all three approaches fail.

## 1. *Shurtleff* Forecloses Any Argument that Censoring Books at a Public Library Is Government Speech

Courts determine what constitutes government speech by engaging in a "holistic inquiry" into the circumstances of the conduct at issue. *Shurtleff*, 596 U.S. at 252. Three factors predominate: (1) the history of the expression at issue; (2) the public's likely perception as to who is speaking; and (3) the extent to which the government has actively shaped or controlled the expression. *Id.* Taken together, these factors assist courts in determining "whether the government intends to speak for itself or to regulate private expression." *Id.*

The only circuit court to apply these factors in the context of a library—the Eight Circuit in *Reynolds*, 2024 WL 3736785, at *1—held that censoring books at a school library was not government speech and rejected the same arguments Defendants and Amici press here. The Eighth Circuit determined that removing school library books is not a form of government speech because (i) governments historically have not spoken through the removal of books; (ii) "it is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking"; and (iii) prior to the law at issue, the state government "has not asserted extensive control over removing books from public school libraries." *Id.* at *3.

Here, as in *Reynolds*, none of the *Shurtleff* factors suggests that the government is speaking through removing books from public libraries.

Amici's arguments that stocking a public library constitutes government speech also fail on all three *Shurtleff* factors.

### a. The Government Has Not Historically Spoken by Censoring Books at Public Libraries

The first *Shurtleff* factor—"the history of the expression at issue"—militates against library censorship as government speech. *Reynolds*, 2024 WL 3736785, at *2. Unlike government monuments, through which the government has traditionally expressed its views, *see id.*, the public library was created to provide "equal opportunity" of access to information that democratic society depends on. Benjamin Franklin, The Collection of Biography and Autobiography 62-63 (1961) (proposing a public library to "address the issue of equal opportunity" of access to information); *see Kreimer v. Bureau of Police for Town of Morristo*wn, 958 F.2d 1242, 1255 (3d Cir. 1992) (local public libraries have historically served as "the quintessential locus of the receipt of information").

Providing a broad range of views—even views disfavored by the government—has long been essential to that purpose. The Framers of the Constitution "knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance. This freedom embraces the right to distribute literature … and necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (citation omitted).

The American Library Association memorialized this purpose in its 1939 "Library Bill of Rights," stating that library collections should be maintained "for the interest, information, and enlightenment of *all* people." (emphasis added).[6]

The Llano County Library System, too, has never purported to endorse government views through its curation of books. Indeed, it promises to do exactly the opposite. Its "Materials Selection Policy" states, for example: "The [Llano County] Library does not promulgate particular beliefs or views, nor is the selection of any given media equivalent to endorsement of the viewpoint of the author expressed therein." ROA.1496. And its "Displays/Exhibits" policy states: "Display of items in the library does not indicate endorsement of the issues, events, or services promoted by those materials." ROA.1624.

Moreover, the Library System has historically sought to include all viewpoints in its collection. Its constitution states that the Library System's purpose is "to make available to every individual within the county, and to the public in general, the free use of the books and recreational materials in order to promote through guidance and stimulation the communication of ideas." ROA.1615. The constitution also mandates that "[t]he county librarian shall … manage *according to accepted rules of library management*, a library for the

---

[6] *Library Bill of Rights § 1*, Am. Libr. Ass'n, https://www.ala.org/advocacy/intfreedom/librarybill (last visited Sept. 3, 2024).

people of the county[.]" ROA.1616 (emphasis added). Nothing in this history suggests that Llano County officials have ever sought to convey a government message by removing disfavored books from public libraries.

Instead of addressing this evidence, Amici cite three websites discussing the national history of public libraries. Amici Br. 10-11. These materials do not show that the government has historically censored books. The selection criteria those materials advocate do not include viewpoint, *see* Francis K.W. Drury, *Book Selection* 2-3 (1930), https://babel.hathitrust.org/cgi/pt?id=uc1.b4209483&seq=22 (cited in Amici Br. 11), and they specifically eschew censorship, *id*. at 297 ("Censorship is not within the province of a librarian of a public library"). That librarians have necessarily selected some books to the exclusion of others does not transform their purchases into a government message. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 838-46 (1995) (state university's decisions on funding some student groups and not others not government speech).

Amici's insistence that book purchases are analogous to public monuments in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009), is unpersuasive. "Since ancient times, kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power." *Id*. at 470-71. Governments have used monuments to elevate specific messages—often to commemorate or honor volunteer service members, historic communities, war

veterans, and cultural icons.[7] They have not sought to elevate monuments "presenting all points of view concerning the problem and issues of our times." ROA.1496. And librarians' book purchases have not historically elevated any particular message to the public. The Llano County Library System itself has expressly disclaimed conveying such a message, *id.*, and historically has chosen to "make available materials for enlightenment and recreation even if not enduring in value, interest or accuracy." ROA.1497.

Amici also argue that the government has used librarians' historic role in selecting library books to convey a message that the books are of "requisite and appropriate quality." Amici Br. 11.[8] But almost any regulation of speech could be reframed as the government making a representation about "quality." In *Matal*, the Supreme Court rejected the government's argument that it was speaking by ensuring that issued trademarks meet certain quality standards. As the Court warned, accepting this type of argument erodes the First Amendment's protections and opens the door to censorship of copyrights and literature—"[p]erhaps the most worrisome implication of the Government's argument[.]" *Matal,* 582 U.S. at 239.

---

[7] The Texas Capitol Grounds, for example, have monuments celebrating firemen, the Tejano community, Vietnam War veterans, the Texas Rangers, cowboys, and children.

[8] All the books at issue were selected by the government as being of requisite quality because Defendant Milum or her fellow librarians purchased them and put them on the shelves.

The dicta Amici cite from the earlier *ALA* plurality does not counsel otherwise. At most, it explains that libraries have wide latitude in book selection; it does not say that governments have unfettered discretion to censor books that contain ideas or viewpoints they want to suppress.[9]

> **b. The Public Would Not Perceive Surreptitious Book Removal in Contravention of the Library's Written Standards to Be Government Speech**

The second *Shurtleff* factor—the public's likely perception as to who is speaking—likewise disfavors expanding the government speech doctrine. First, the public could not believe that the government is endorsing the messaging of every book in library. Second, undisclosed censorship would not cause the public to believe that the government is speaking.

> **(1) Nobody Understands the Government to Be Endorsing the Message of Every Book in the Library**

Like the trademarks in *Matal*, nobody would understand the government to be endorsing the messages of every book on the shelves. 582 U.S. at 236. As the Eighth Circuit observed in *Reynolds*, "[a] well-appointed [] library could include copies of Plato's *The Republic,* Machiavelli's *The Prince,* Thomas Hobbes'

---

[9] As detailed in Section II.B, *infra*, all nine Justices in *Pico* believed that the First Amendment applied to the decision to remove books from the library. The fractured *ALA* plurality involved the legality of statute that denied federal funds to libraries that did not install internet blocking software; it did not address censoring library books.

*Leviathan,* Karl Marx and Freidrich Engels' *Das Kapital,* Adolph Hitler's *Mein Kampf,* and Alexis de Tocqueville's *Democracy in America*." 2024 WL 3736785, at *3. The public cannot perceive that the government endorses such a wide range of conflicting views because the government would be "babbling prodigiously and incoherently." *Id.* (quoting *Matal*, 582 U.S. at 236).

This principle holds particularly true in Llano County, where, contrary to Amici's claim that the public sees the library catalog as a government message of "quality," Amici Br. 11, Llano County Library System's published standards and policies expressly state that the library is not endorsing any message, ROA.1496, and that it may at times "make available materials for enlightenment and recreation even if not enduring in value, interest or accuracy." ROA.1497.[10]

---

[10] Amici ignore *Matal* in favor of *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), which held that specialty license plates constitute government speech. In *Walker*—which represents the "outer bounds" of government speech, *Matal*, 582 U.S. at 238—the Court found government speech because (1) "the history of license plates shows that ... they long have communicated messages from the States" such as state emblems, mottos, and slogans, 576 U.S. at 210-11; (2) "license plate designs are often closely identified in the public mind with the State," *id.* at 212 (internal quotation marks omitted); and (3) the government "maintains direct control over the messages conveyed on its specialty plates," *id.* at 213. "[N]one of these factors are present in [trademark approval]." *Matal*, 582 U.S. at 238. Likewise, none of these points apply to public library books.

### (2) The Public Cannot Form Any Belief from Activities the Government Conceals

Defendants' coordinated removal of library books also could not be perceived by the public as government speech because the government concealed its conduct and offered a pretextual explanation about why it removed the Banned Books. The public would not know that any "expression" had occurred. And even if they did, they would have no reason to believe that the government had violated its own stated policy.

### (3) Amici's Arguments About Political Checks Are Incorrect

Amici's claim that book removal is perceived as government speech relies in part on their proposition—shared by the panel dissent, Dissent at 33-36—that the public can respond to the government's "message" of censorship at the ballot box. *Id.* This argument is incorrect for two reasons: (1) it assumes that the public knows and understands that the government is speaking, and (2) the Framers designed the First Amendment to protect unpopular speech from majoritarian suppression.

First, even an informed citizenry cannot vote away government censorship when that censorship happens outside the public eye. *See Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 198 (2024) ("[W]here, as here, a government official makes coercive threats in a private meeting behind closed doors, the 'ballot box' is an especially poor check on that official's authority."). The cases Amici cites, *Walker*

(license plate frames), and *Summum* (monuments), both dealt with messaging that was right there for the public to see.

Second, the electorate is not a guardrail against censorship of minority viewpoints. The Founders feared the "tyranny of the majority." Alexis de Tocqueville, *Democracy in America*, Dearborn & Co. (1838); *see* The Federalist No. 10 (James Madison). That is precisely why "they amended the Constitution so that free speech and assembly should be guaranteed." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). The only way to protect minority viewpoints from majority censorship is through constitutional checks on government power.

The Supreme Court has held that to protect the free and open exchange of ideas, courts must protect unpopular voices from the tyranny of the majority, even when that tyranny is well-meaning. In *Martin*, the Court chastised a city for issuing an ordinance barring individuals from distributing leaflets door-to-door. The ordinance, it found, improperly "substitute[d] the judgment of the community" for "the judgment of the individual householder," who had the right to decide what information he or she wanted to receive. 319 U.S. at 143-44. In *Legal Services Corp. v. Velazquez*, the Supreme Court held that when a government program aims to present a diversity of private views, the government may not "single out a particular idea for suppression because it [is] dangerous or disfavored." 531 U.S.

533, 541 (2001). While Amici cite Justice Scalia's concurrence in *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the *Finley* majority established that "even in the provision of subsidies, the Government may not ai[m] at the suppression of dangerous ideas." *Id.* at 587 (internal quotation marks omitted). So too here. The First Amendment, not the ballot box, is the Founders' and the Supreme Court's designated mechanism to protect against government censorship.

<blockquote>

**c.**     **Llano County Officials Do Not Actively Control Any Purported Message from Llano County Libraries**

</blockquote>

The third *Shurtleff* factor—whether the government actively exercises control over the expression at issue—was pivotal in *Shurtleff* and militates against Defendants here. No evidence shows Llano County commissioners, judges, or library board members have ever "actively shaped or controlled" the removal of public library books to suppress messages they disagreed with, much less that they had an established role doing so, until the events giving rise to this action. Amici do not say otherwise. *See* Amici Br. 6-8.

The record shows that, before this litigation, Llano County's librarians routinely reviewed their entire book catalog and removed only books that met established, neutral criteria regarding obsolescence and physical condition. ROA.3888:6-15. This process, appropriately called "weeding," is more akin to

maintenance work than intentional control of the specific content made available to the public.

> **(1)**      **Amici's Generalized Arguments Do Not Account for Llano County's History and Are Foreclosed by *Shurtleff***

Amici do not argue that any Defendant has a role in "actively shap[ing] or control[ling]" the Llano County Library System's purported message, *Shurtleff*, 596 U.S. at 252, nor do they address any of the evidence in this case. For example, they ignore that Defendant Milum and other librarians selected, bought, and displayed the Banned Books—several of which were nationally acclaimed for their "requisite and appropriate quality"—without any involvement from the county official Defendants. *See* Amici Br. 7. Defendants' post hoc efforts to control the viewpoints of the Llano County library collection cannot rewrite their general lack of involvement in book collection decisions. *See Shurtleff*, 596 U.S. at 258-29.

Instead of addressing the facts, Amici again argue based on a hypothetical librarian who makes book purchases for her community. There, they argue, one can find the government "actively shap[ing] and control[ling]" a message to the public in a way that is akin to public monuments (*Summum*) and license plates (*Walker*). Amici Br. 6.

*Shurtleff* forecloses this argument. Rather than speaking in generalities about flagpoles or city halls, *Shurtleff* looked directly at Boston's practices. It held that

because the City did not control every use of its flagpole (it had a policy "to accommodate all applicants"), the act of flying a flag from city hall—which would seem to be the quintessence of government speech—was not government speech at all. 596 U.S. at 256-58.

So too here. The Llano County Library System follows the same accommodating policies. *See* ROA.1496 ("The library does not promulgate particular beliefs or views, nor is the selection of any given media equivalent to endorsement of the viewpoint of the author expressed therein."). It also commits, in accordance with the ALA Library Bill of Rights, to "the fullest practicable provision of material presenting all points of view concerning the problem and issues of our time" and proclaims that "reading material of sound factual authority should not be proscribed or removed from the library shelves because of partisan or doctrinal disapproval." *Id.*

Because Llano County has not actively sought to shape a government message through its selection of library books, Amici's hypothetical cannot meet the third, and dispositive *Shurtleff* factor.

> **(2)  That the Government Pays for Library Books Does Not Give It the Right to Engage in Viewpoint Discrimination**

Without addressing the *Shurtleff* factors, the panel dissent argues that the government has historically controlled the "message" of libraries because it pays

for library books and exercises discretion in selecting them. Dissent at 33. This argument suffers from the same problems noted above—in this case, the librarian had already selected the books at issue and determined that they were of requisite quality, the government had already paid for the books, and the library disclaimed exercising any control over viewpoint. Moreover, the cases on which it relies, *Finley*, 524 U.S. at 569, *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998), and *ALA*, 539 U.S. at 194, do not stand for the proposition that the expenditure of government funds always constitutes government speech.

*Forbes*, *Finley*, and *ALA* have no relation to the government speech doctrine. Instead, all three decisions delineate the limits of public fora in which private individuals may assert their free speech rights—a principle that is not at issue here.

In *Forbes*, a perennial candidate for local offices asserted that the First Amendment required a public television station to allow him to participate in a debate it was televising. 523 U.S. at 669. The Supreme Court rejected this argument, explaining that while a candidate debate is a nonpublic forum subject to heightened scrutiny, Defendants had exercised viewpoint-neutral discretion in declining the candidate's participation in the debate. *Id.* at 682-83. In doing so, it emphasized that the state broadcaster was only permitted to deny debate access to a political candidate because it did so under a "reasonable, viewpoint-neutral

exercise of journalistic discretion consistent with the First Amendment," not as "the result of political pressure." *Id.* at 683.

In *Finley*, the Court held that artists had no First Amendment entitlement to government grants and ruled that an arts funding program tasked with selecting and making grants for outstanding art was not subject to public forum analysis simply because anyone could submit their art for consideration. 524 U.S. at 586. It expressly stated, however:

> [W]e have not occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas.

*Id*. at 587; *see also Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 548 (1983) ("The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'aim[ ] at the suppression of dangerous ideas.'")) (alteration in original, quotation omitted).

In *ALA*, the plurality cited *Forbes* and *Finley* to reject an argument that public library internet filters must be subject to public forum analysis. It explained, "Just as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also

incompatible with the discretion that public libraries must have to fulfill their traditional missions." 539 U.S. at 205.

None of these decisions equates funding or discretion with government speech. Nor could they. If governmental discretion in granting approval over private speech was the only requirement for government speech, the Free Speech Clause would be gutted. Governments exercise discretion in approving political candidates for televised debates, issuing patents and copyrights, and approving public transit ads, to name a few.

Nor does payment equate to viewpoint control where the government bought books in accordance with its own policy *against* viewpoint preference.[11] This argument is further refuted by *Rosenberger*. There, a public university student group sought student activity funding to publish a periodical sharing its Christian viewpoints. *Rosenberger*, 515 U.S. 819. The university denied the request, but funded periodicals from other student groups. The university argued that its funding decisions were an exercise of the previously recognized "right of the University to make academic judgments as to how best to allocate scarce resources." *Id.* at 833 (quoting *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)).

---

[11]A more apt example would be the government withholding payment. However, the government has never exercised that type of control over the Llano County Library based on the viewpoints of the books it selects.

The Court rejected this argument: "[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes ... It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 833-34. That is precisely the case here, where Llano County's stated policy, and the underlying purpose of libraries, is to encourage a diversity of viewpoints.

The Court further explained: "The first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and, if so, for the State to classify them." *Id.* at 835. These concerns are equally applicable to curating the viewpoints at a public library. The Court further explained: "The second, and corollary, danger is to speech from the chilling of individual thought and expression. That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Id.* These observations apply equally to public libraries, which have historically served as exchange hubs in the marketplace of ideas.

## 2. Defendants' *Moody* Argument Is Incorrect Because *Moody* Was Not a Government Speech Case and Has Nothing to Do with This Case

Defendants urge the Court to hold that a public library's "acquisition and weeding decisions" constitute government speech. Supp. Br. 14. Defendants say nothing as to how such acts constitute government speech under *Shurtleff*. Their lone argument, relying on *Moody*, 144 S. Ct. at 2400, is that librarians' book selection and removal decisions must be considered government speech because a social media company's private website curation is private speech. Supp. Br. 16-17.

This argument fails for two reasons. First, *Moody* addressed to what degree a government may regulate private speech, not what circumstances constitute government speech. These are different issues. The Constitution protects private speech against government censorship; the right of the government to convey its selected message is a judicial creation that "courts must be very careful" in applying. *Shurtleff*, 596 U.S. at 262 (Alito, J., concurring in judgment). Second, nothing in *Moody* supports a finding that public library book curation constitutes government speech under any of the *Shurtleff* factors—the decision does not speak to library history, public perception, or government control.

Defendants provide no other grounds for their radical expansion of the government speech doctrine.

## II. DEFENDANTS' CRITICISMS OF THIS COURT'S DECISION IN *CAMPBELL* ARE INCORRECT

*Campbell* is the controlling law of this Circuit regarding the First Amendment's prohibition on viewpoint discrimination in library book removals. It follows *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982)—the only Supreme Court decision to consider this issue—and should remain the controlling law.

In *Pico*, a school board obtained a list of books it found "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy," and directed that they be removed from school libraries within the district. *Id.* at 853. In a plurality opinion, the Supreme Court recognized that "[t]he Constitution protects the right to receive information and ideas," and held that the government violates that right when it removes books "to deny … access to ideas with which [it] disagree[s]." *Id*. at 871. "If there is any fixed star in our constitutional constellation," the Court observed, "it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id*. at 870 (quoting *Barnette*, 319 U.S. at 642).

This Court applied *Pico* in *Campbell*, which also involved book removal in public school libraries. In *Campbell*, a local school board, at a parent's urging, ordered the removal of a book that traced the development of African tribal religion. 64 F.3d at 185. Following *Pico*, *Campbell* held that the First Amendment

limits the discretion of government officials to remove books from public school libraries. *Id*. at 189. The "key inquiry," *Campbell* held, is "the school officials' substantial motivation in arriving at the removal decision." *Id*. at 190. If a book is removed to "deny students access to ideas with which … school officials disagree[], and this intent was the decisive factor in the removal decision," then the removal is unconstitutional. *Id*. at 188.

*Campbell* has been the law in this Circuit for nearly 30 years, without issue. Contrary to the Defendants' and the panel dissent's contentions, it is as clear and straightforward as any legal standard, and it offers the narrowest application of the First Amendment protections *Pico* requires. It should remain the law of this Circuit.

### A.    *Campbell* is Simple, Clear, and Workable

Campbell applies a discriminatory motive test. If a librarian removes a book for any reason other than viewpoint animus, the First Amendment has nothing to say about it. This standard is straightforward, and librarians in this Circuit have successfully operated under it for nearly 30 years.

Defendants argue that *Campbell* is unclear. Supp. Br. 21. As purported evidence, they claim that Judges Weiner and Southwick "described the *Campbell* test differently" and could not explain what it means to be "substantially motivated" by an aim, leaving librarians to guess at which motivations are

"constitutionally permissible" and which are not. *Id*. at 21-23. Neither claim is true.

First, Judges Weiner and Southwick agreed on *Campbell*'s standard. Judge Weiner explained that an official violates the First Amendment when her decision to remove a book "is 'substantially motivated' by the desire to deny 'access to ideas with which [she] disagree[s].'" Panel Op. 12 (quoting *Pico*, 457 U.S. at 871; citing *Campbell*, 64 F.3d at 191). A motivation is "substantial," when "in its absence 'the opposite decision would have been reached.'" Panel Op. 21-22 (citations omitted). Judge Southwick agreed. He confirmed that *Campbell* is "the [standard] to apply here" and expressly "concur[red] in [Judge Wiener's] explication" of it, which he described as "accurate[.]" Concurrence at 1. Reading the opinion and the concurrence together, it is impossible to conclude, as Defendants do, that Judges Weiner and Southwick disagreed about what *Campbell* requires.[12]

---

[12] It is true that Judge Weiner would have applied *Campbell* to more books than the panel majority. Panel Op. 21 n.12. But that is only because Judge Southwick believed that the "butt and fart" books did not express a viewpoint (and so could not have been removed under *Campbell*) and that two of the other Banned Books were removed, not because Defendants disagreed with their viewpoint but because they believed they featured sexually explicit material that was inappropriate for children. Concurrence at 2-3. Judge Weiner disagreed with Judge Southwick's factual findings but limited the panel opinion to Judge Southwick's narrower application. Panel Op. 21 n.12. The fact that two judges view the facts differently does not show that the legal standard they agree on is confusing or unworkable. Otherwise, no legal rule would survive.

Second, contrary to Defendants' claim, it is clear what it means to be "substantially motivated" by a desire to "deny access" to an idea. *Id*. at 22. Defendants ask: "Can a librarian—who knows full well that her decision to weed a book will always result in a denial of access to future library patrons—ever deny that she is 'substantially motivated' by what she knows will be the inevitable result of her actions?" *Id*. The answer is: "Yes, she can." The difference between taking an action one *recognizes* will have a certain result and taking it *because* it will have that result is clear. And requiring a court to look at an actor's motivation to determine the legality of her actions is hardly unique to *Campbell. See, e.g.*, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (holding that while teacher could be discharged "for no reason whatever," board of education could not refuse to rehire him if that decision "was made by reason of his exercise of constitutionally protected First Amendment freedoms"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 266 (1977) (denial of rezoning plan would violate Fourteenth Amendment only if "invidious discriminatory purpose was a motivating factor" in denial).

Removing a book because it is damaged, say, or because it has not been checked out in six years, is—constitutionally speaking—worlds apart from removing it because of its viewpoints, even though removing it for any reason will result in its absence from the library. Librarians understand this as well as anyone.

**B.** *Pico* **Requires First Amendment Limitations on Library Book Censorship and** *Campbell* **Provides the Narrowest Possible Limitation**

Overruling *Campbell* would also violate *Pico.* Defendants contend that Justice White, to whom *Pico*'s "controlling opinion … belonged," was "entirely agnostic on whether the First Amendment imposes *any* constraints on book-removal decisions made by public-school libraries." Supp. Br. 24. This is incorrect.

Justice White's concurrence was a vote in favor of First Amenment limitations on library book removals. As Defendants observe, Justice White concurred only in the judgment, which remanded the case to district court because "a material issue of fact … precluded summary judgment"—namely, "the reason or reasons underlying the school board's removal of the books." *Pico,* 457 U.S. at 883 (White, J. concurring). Had Justice White believed that the Board's removal decisions constituted "government speech immune from scrutiny under the First Amendment," as Defendants claim, Supp. Br. 14, then the Board's reasons would have been irrelevant, and remanding the case, as Justice White did, would have been senseless.

Nor was Justice White the tiebreaking vote on this issue. In his dissent, Justice Rehnquist (joined by Justices Burger and Powell) "cheerfully concede[s]" that the government's discretion to remove books "may not be exercised in a narrowly partisan or political manner," and that removals motivated "by party

affiliation" or "racial animus" would "violate[] the constitutional rights of students" because they would amount to "the official suppression of ideas." *Pico,* 457 U.S. at 907 (emphasis omitted).

So, contrary to Defendants' contention, there is "binding precedent from the Supreme Court that precludes this Court from [overruling *Campbell* by] holding that public-library (and public-school library) curating decision are government speech immune from First Amendment scrutiny[.]" Supp. Br. 25.

*Campbell*, moreover, offers the narrowest First Amendment limitation consistent with *Pico*. All it requires is that government officials not remove books libraries have already shelved—and, thus, have already deemed appropriate for the library's collection—simply because they dislike the ideas in them. *Campbell*, 64 F.3d at 189. It does not require, as the panel dissent suggests (at 22), that a library purchase any particular book, or even that any particular book, once purchased, be kept on the shelf. And it applies only to removal decisions, so upholding *Campbell* here does not limit the Court's later consideration of selection decisions, if that issue ever arises.[13] *Compare* Dissent at 22-25.

_____

[13] The dissent argues that the selection and removal of books are, constitutionally speaking, no different. *See* Dissent at 18-19. But that is not true. *See* Pl. Br., § I.C.2.b (addressing this argument in detail). One major difference is that selection decisions are "poor candidates for effective judicial review." *ALA*, 539 U.S. at 241-42 (Souter, J. dissenting). That is because selection decisions turn on a wider variety of legitimate considerations (cost, for example), and because, of the more than 100 million books in the world, those that are *not selected* for any particular

## C.     *Campbell* **is Not Distinguishable**

The panel dissent maintains that *Campbell* (which dealt with school libraries) cannot be extended to a public library because only in school libraries must courts balance "students' First Amendment rights" against public school officials "broad discretion in the management of school affairs." *Id.* at 19-20. It also argues that, even if *Campbell* could be extended to public libraries, *ALA* would prevent it. *Id.*

The Court should reject these arguments for the reasons the panel did. ***First***, the competing considerations the dissent identifies make *Campbell*'s holding *more* applicable to public libraries, not less. *Campbell* prohibited viewpoint discrimination in book removals even where school officials have an obligation to "control the curriculum and school environment." Panel Op. 13. It therefore applies "with even greater force *outside* of the education context, where no such limitations [on patron's First Amendment rights] exist." *Id*. (emphasis added).

---

library vastly outnumber those that are selected and then later removed. *Id*. at 242. So, once a book has been selected, "the variety of possible reasons that might legitimately support an initial rejection are no longer in play," making it easier to spot illicit reasons. *Id*. As Justice Souter put it, judges "can smell a rat when a library … removes books from its shelves for reasons having nothing to do with wear and tear, obsolescence, or lack of demand." *Id*. In the context of social media companies, this Court recently acknowledged this very difference, stating that "there is no authority even remotely suggesting that *ex post* censorship constitutes editorial discretion akin to *ex ante* selection." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 465 (5th Cir. 2022).

Even Defendants agree. *See* Supp. Br. 19 ("[I]t is hard for us to see why the First Amendment analysis should differ depending on whether a library is run by a public school rather than a county or municipality. If anything, one would think that a public-school library should have more latitude than a county library to remove books because school officials act *in loco parentis* and children in a public-school setting to not enjoy the same constitutional rights as adults.").

***Second***, *ALA* does not block *Campbell*'s application here. *Compare* Dissent at 20-21. *ALA* held that the federal government can, consistent with the First Amendment, condition a library's federal funding on its willingness to install internet filters designed to exclude "visual depictions" that are "harmful to minors," such as pornography. 539 U.S. at 201. In reaching that holding, the Court noted that libraries have "broad discretion to decide what material to provide to their patrons" and a responsibility to "separate out the gold from the garbage." *Id.* at 204.

Nothing in *ALA*—which was not a government speech case and did not involve the removal (or selection) of library books—disturbs *Campbell*'s holding. As the panel noted, *ALA* is a deeply fractured opinion, with "very few 'common denominators' between [the plurality and separate concurrences] which would 'provide a controlling rule that establishes or overrules precedent.'" Panel Op. 11 (citations omitted). But even if *ALA*'s plurality opinion controlled here, it is

consistent with *Campbell*. The most relevant part of *ALA* is the plurality's dicta that libraries must have "broad discretion" to curate their collections. *See* Dissent at 14 (referring to this as the opinion's "key rationale") Broad discretion, however, is different from *unlimited* discretion. As *Pico* explained, while governments "rightly possess significant discretion to determine the content of their school libraries," that discretion "may not be exercised in a narrowly partisan or political manner." 457 U.S. at 871. Would *ALA* have come out the same way if, instead of blocking pornography, the government's internet filter was calibrated to block books that advocated for racial equity, raised awareness about LGBTQ issues, or made the case for one side of any other controversial subject? Surely, no.[14] *See Pico*, 457 U.S. at 870-71 ("If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students."); *id.* at 907 (Rehnquist, J., dissenting) ("cheerfully conced[ing]" this point).

Nor does *Campbell*'s narrow prohibition on unvarnished partisanism undermine a library's ability to "separate out the gold from the garbage." Dissent

---

[14] In fact, there is no need for speculation. *ALA* contemplates that *some* First Amendment limitations apply in public libraries. It concludes, for instance, that even if the pornography filter "present[ed] constitutional difficulties" by erroneously blocking non-pornographic materials, those concerns would be "dispelled by the ease with which patrons may have the filtering software disabled." 539 U.S. at 209. This point would be superfluous if, as Defendants argue, the First Amendment did not apply to collection decisions in the first place.

at 14 (quoting *ALA*, 539 U.S. at 204). Under *Campbell*, libraries can "reject[] some books and prefer[] others because of *what* they say and *how* they say it," as the dissent insists they must. Dissent at 14-15. That is because a person can evaluate a work for its "requisite and appropriate quality," *ALA*, 539 U.S. at 204, without discriminating against viewpoints she does not like. *See, e.g.*, *Pico*, 457 U.S. at 874 ("This would be a very different case if the record demonstrated that petitioners had employed established, regular, and facially unbiased procedures for the review of controversial materials."); *id.* at 880 (Blackmun, J., concurring) (explaining that officials can "choose one book over another" because it is "more relevant to the curriculum, or better written, or when one of a host of other politically neutral reasons is present" without "implicat[ing] First Amendment values"). Librarians— whatever their personal beliefs—are perfectly capable of putting their own political, moral, and cultural biases aside to sift the gold from the garbage.

### D.   The Right to Receive Information Extends to Public Libraries

The District Court grounded its Preliminary Injunction in Plaintiffs' First Amendment right to receive information and ideas, which *Campbell*, following *Pico*, applied in the context of school libraries. The panel dissent argued that this right "cannot extend to a public library" because it traces back to *Stanley v. Georgia*, 394 U.S. 557 (1969), a case concerning a person's right to privately view

obscene materials in their home. Dissent at 17. However, the right to receive

information predates *Stanley*, and it extends to a vast array of public settings.

The right to receive information traces back at least to *Martin v. City of

Struthers, Ohio*, 319 U.S. 141 (1943). *Martin* asked whether a city violated the

Constitution by prohibiting individuals from going "home to home and knock[ing]

on doors or ring[ing] doorbells to communicate ideas to the occupants or to invite

them to political, religious, or other kinds of public meetings." *Id*. at 141. The

Supreme Court found that it did, in part because the First Amendment "necessarily

protect[ed] the right to receive" information individuals sought to share in those

door-to-door solicitations. *Id.* at 143; *see also id.* at 149 (emphasizing the

"constitutional rights of those … desiring to receive" information). "The authors of

the First Amendment knew that novel and unconventional ideas might disturb the

complacent,' *Martin* emphasized, "but they chose to encourage a freedom which

they believed essential if vigorous enlightenment was ever to triumph over slothful

ignorance." *Id*. at 143.

*Martin*'s message could not apply more forcefully here. It also shows,

contrary to the dissent, that the right to receive information extends beyond any

right to privacy that might, in contexts like *Stanley*'s, intermingle with it. Were

there any doubt, however, the Supreme Court has applied it in numerous other

public settings, too. *See, e.g.*, *Thomas v. Collins*, 323 U.S. 516, 533-34 (1945)

(right to "be informed" during public speech concerning union representation protected by the First Amendment); *Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 306-07 (1965) (recipient's right to receive publications through mail protected by First Amendment); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) (in public broadcasting, "[First Amendment] right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences … is crucial" and "may not constitutionally be abridged"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc*., 425 U.S. 748, 757 (1976) (prescription drug consumers have First Amendment right to receive commercial speech regarding drug prices).

The dissent argues that *Pico*'s application of the right to receive information to school libraries was adopted by too few Justices to constitute genuine controlling authority. Dissent at 17. But, even if true, that would say little about that right's application to *public* libraries. "The dissenters in *Pico* made no contention that the First Amendment did not encompass the right to receive information and ideas, but merely argued that the students could not freely exercise this right *in the public school setting* in light of the countervailing duties of the School Board." *Kreimer*, 958 F.2d at 1254-55 (emphasis added). Justice Rehnquist, for instance, emphasized in his dissent (which Justices Burger and Powell joined) that "[u]nlike … public libraries," the "libraries of [elementary and secondary]

schools serve as supplements to [the school's] inculcative role." *Pico*, 457 U.S. at 915. And he was willing to tolerate more discretion in school library book removals, in part because the books schools removed could be found at "the local public library," where all the books at issue in *Pico* were "on display for public inspection" after "the[ir] removal from the school library." *Id.*

For these reasons, circuit courts that have considered the First Amendment's application to public libraries have recognized the right to receive information. *See Neinast v. Bd. of Trustees of Columbus Metro. Libr.*, 346 F.3d 585, 591-92 (6th Cir. 2003) (regulation requiring shoes in library constitutional because "it does not directly impact the right to receive information"); *Kreimer*, 958 F.2d at 1255 (First Amendment "encompasses the positive right of public access to information and ideas" and "includes the right to some level of access to a public library, the quintessential locus of the receipt of information.").

Nor does the right to receive information entail a "constitutional obligation to make sure patrons 'receive certain materials,'" or "suggest that a public library must … acquire [certain] books," as the panel dissent (at 18) contends. *Campbell* regulates the *way* in which books are removed, not which books a library shelves.

Finally, the dissent's analysis is far more consequential than it lets on. The dissent claims to "express[] no opinion on whether *Campbell* was correctly decided." Dissent at 23. But its opinion is clear. Because *Pico* (which expressly

extended the right to receive information to school libraries) was a plurality opinion, the dissent argues, *Campbell* (which, following *Pico*, also applied that right to a school library) built its holding on an illusory foundation. *See* Dissent at 18 ("[O]ur own precedent [*Campbell*] belies the notion that *Stanley*['s right to receive information] applies to a school library.") It follows, then, that if the Court adopts the dissent's position, it will unavoidably permit the government to censor books, not just in the public library, but in school libraries, too. Such a far-reaching holding is inappropriate in a case that does not involve school libraries.[15]

## III. DEFENDANTS HAVE NOT SHOWN THAT THE DISTRICT COURT'S FACTUAL FINDINGS WERE CLEARLY ERRONEOUS

The District Court's application of *Campbell* in this case was spot on. After considering many rounds of briefing, 65 declarations, 120 exhibits, and two days of live testimony, the District Court found that Defendants had "targeted and removed" the Banned Books simply because they disagreed with the views expressed in them, including views promoting an understanding of LGBTQ issues and advocating for racial equity. ROA.3524-25.

Defendants bear the burden of showing that the District Court's findings of fact were clearly erroneous. *See Hopwood*, 236 F.3d at 272-73 ("To be clearly

---

[15] While *Campbell* governs here, Plaintiffs continue to maintain that forum analysis results in the same First Amendment limitations on discriminatory book removals for the reasons given in their panel-stage brief. *See* Pl. Br., § I.A.2 & I.C.2.

erroneous, a decision … must be dead wrong.") But they have not met that burden.

In their panel brief, Defendants argue for alternative factual findings, largely by

disregarding the District Court's detailed findings and selectively citing out-of-

context record excerpts and Defendants' declarations, including materials that

Defendants *never presented* to the District Court. *Supra* § A. In their Supplemental

Brief, Defendants do not even address the District Court's factual findings,

focusing instead on the factual findings in the now-vacated Panel Opinion. Supp.

Br. 3-11. None of this moves the needle. The District Court concluded, based on

extensive findings, that Plaintiffs "made a clear showing about what Defendants'

substantial motivations may have been and how these may have led to the book

removals." ROA.3525. Defendants have come nowhere close to showing clear

error.

## IV. DEFENDANTS DID NOT MOOT THIS CASE BY HIDING THE BANNED BOOKS BEHIND A DESK

Defendants attempted to moot this lawsuit by having their lawyer donate the

Banned Books to the library, even though they kept them out of the catalog and hid

them from view. Supp. Br. 26-29. Because the voluntary cessation doctrine bars

such gamesmanship, however, Defendants instead attempt to frame their mootness

argument as one of injury. Their efforts and their argument both fail.

*First*, Defendants concede that Plaintiffs suffered an injury sufficient for

Article III standing. *See* ECF No. 85-1 ("Def. Br.") 6 (purchasing, then hiding the

Banned Books "does not moot the plaintiffs' First Amendment claims, as the plaintiffs continue to suffer Article III injury from the fact that the 17 disputed books are no longer on the library's shelves or included in the catalog."). At the same time, Defendants argue that Plaintiffs' First Amendment claims "cannot get off the ground" because Plaintiffs cannot prove that their First Amendment right to access information and ideas was violated. *Id.* at 26. Defendants then fault the panel for not providing an explanation that could make sense of their inconsistent position: namely, that Defendants' creation of a hidden library using their lawyer's book donation eliminated Plaintiffs' First Amendment injury but did not moot it. *Id.*

In essence, Defendants try to recast their mid-litigation effort to moot Plaintiffs' claims as a retroactive elimination of Plaintiffs' First Amendment injury. In doing so, Defendants hope to sidestep the voluntary cessation doctrine, which prevents a defendant from voiding a suit by temporarily ceasing its violative conduct. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) ("[T]he reason for [the voluntary cessation doctrine] is simple: The Constitution deals with substance, not strategies." (internal quotation marks omitted)) (rejecting government's argument that removing petitioner from the No Fly List during litigation over his inclusion mooted his claim). "If [voluntary cessation] is all it took to moot a case, 'a defendant could engage in unlawful conduct, stop when

sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'" *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020).

Moreover, injury is measured at the time a suit is filed, not months into litigation.[16] *See*, *e.g*., *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings."); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (plaintiffs had standing when the "unlawful conduct … was occurring at the time the complaint was filed"). Here, the Llano County library was censoring the Banned Books when Plaintiffs filed suit. ROA.65.

Defendants cannot articulate what First Amendment injury Plaintiffs seek to remedy if it is not based in access to information. *See* Supp. Br. 26-29. They argue that Plaintiffs' First Amendment claim is not a right-to-receive-information claim, but they do not describe how the claim otherwise arises. No matter: A "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Panel Op. 24 (quoting *Elrod v. Burns*, 427 U.S. 347,

---

[16] As the panel recognized, if Defendants were truly concerned about Plaintiffs' standing, that argument should have been advanced in Defendants' motion to dismiss. Panel Op. 23. Instead, Defendants argue standing only as a substitute for mootness on the issue of Plaintiffs' irreparable injury.

373 (1976)). Applying this settled law, both the District Court and the panel

recognized that hiding the Banned Books in the library (after litigation began)

caused an unconstitutional and therefore irreparable injury to Plaintiffs' access to

information. Panel Op. 24; ROA.3518. So whatever alternative First Amendment

injury Defendants admit Plaintiffs have sustained, it is sufficient for injunctive

relief and supports the District Court's order.

*Second*, Defendants argue that the straightforward application of precedent

to their post-litigation attempt to moot Plaintiffs' claims would somehow manifest

a new First Amendment claim. Supp. Br. 26-29. Among their parade of horribles,

Defendants claim that the District Court created a First Amendment violation of

"ask[ing] a librarian for assistance in accessing a book," or storing a library book,

and that this will cause public librarians to "pay millions of dollars in costs and

attorneys' fees." *Id*. at 28-29. But as both the District Court and the panel

concluded, this is a red herring.[17] Panel Op. 24 n.13. Defendants created a hidden

book repository specifically to try to moot Plaintiffs' claims—an issue that is

---

[17] The Supreme Court rejected a similar argument in *Rosenberger*. There, the
defendant university protested that if the Supreme Court applied First Amendment
principles to its student group funding decisions, the holding "would become a
judicial juggernaut, constitutionalizing the ubiquitous content-based decisions that
schools, colleges, and other government entities routinely make in the allocation of
public funds." 515 U.S. at 833 (internal citation omitted). The Supreme Court
made clear that constitutional content-based decisions were in no danger, but
discriminatory suppression of individual viewpoints in the content-selection
process could not stand. *Id.* at 833-35.

unique to this litigation, not one that will commonly recur. Were Defendants'

concerns well-founded, this Court and the lower courts should have seen similar

First Amendment "hidden book" suits. Yet Defendants have not identified—and

Plaintiffs have been unable to find—any such phenomenon.

## V.    DEFENDANTS REMAINING CONCERNS ARE MERITLESS

### A.    The Injunction Is Not Overbroad

Defendants misread the District Court's injunction so that it is broader than

the court intended and then complain that the injunction is overbroad. As Plaintiffs

explained at the panel stage, the injunction concerns only the 17 books at issue. *See*

Panel Br. 57.

### B.    Plaintiffs Made a "Clear Showing" on All Four Prongs of the Preliminary-Injunction Inquiry

Contrary to Defendants' assertion, the District Court found Plaintiffs clearly

showed they were entitled to relief on all four preliminary injunction prongs. First,

the District Court found that Plaintiffs made "a clear showing" that Defendants'

"substantial motivations" in removing the Banned Books were to suppress views

they found "inappropriate," ROA.3523, 3525 (quoting *Robinson v. Hunt Cnty.,*

*Texas*, 921 F.3d 440, 447 (5th Cir. 2019)), in violation of the First Amendment.

Next, because a First Amendment violation "unquestionably constitutes irreparable

injury," Panel Op. 24 (quoting *Elrod*, 427 U.S. at 373), the District Court's finding

that Plaintiffs suffered a First Amendment injury from Defendants' censorship of

the Banned Books—one that could not be mooted by Defendants' hidden library—is all that is required to clearly satisfy the second prong.

Last, the District Court found, and Defendants do not meaningfully dispute, that because "Plaintiffs request an injunction protecting their First Amendment Freedoms, and there is no evidence that the equities tilt in Defendants favor … Plaintiffs have clearly shown [the balance of equities and public interest] are in their favor." ROA.3530.

## CONCLUSION

For the foregoing reasons, the District Court's preliminary injunction should be affirmed.

Dated: September 3, 2024                    Respectfully submitted,

*/s/ Matthew Borden*
Matthew Borden
(CA Bar No. 214323)
J. Noah Hagey*
(CA Bar No. 262331)
Marissa Benavides
(NY Bar No. 5796891)
Kory James DeClark
(CA Bar No. 310571)
BraunHagey & Borden LLP
747 Front Street, 4th Floor
Tel.: 415-599-0209
Fax: 415-276-1808
borden@braunhagey.com
hagey@braunhagey.com
benavides@braunhagey.com

declark@braunhagey.com

Katherine P. Chiarello
(TX Bar No. 24006994)
Ryan A. Botkin
(TX Bar No. 00793366)
María Amelia Calaf
(TX Bar No. 24081915)
BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, Texas 78701
Tel: 512-615-2341
Fax: 737-289-4695
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com

*Attorneys for Plaintiffs-Appellees*

*Admission Pending

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September, 2024, I electronically submitted the foregoing to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF system, which sent a Notice of Electronic Filing to the following attorneys of record:

Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dwain K. Rogers
Texas Bar No. 00788311
County Attorney

Matthew L. Rienstra
Texas Bar No. 16908020
First Assistant County Attorney

First Assistant County Attorney
Llano County Attorney's Office
Llano County Courthouse
801 Ford Street
Llano, Texas 78643
(325) 247-7733
drogers@co.llano.tx.us
matt.rienstra@co.llano.tx.us

*/s/ Matthew Borden*
Matthew Borden

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(f), this document contains 12,861 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Matthew Borden*
Matthew Borden