NO. 23-50224

# In The United States Court Of Appeals
# For The Fifth Circuit

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees*

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants*

On Appeal from the United States District Court for the Western District of Texas, Case No. 1:22-cv-424-RP

**EN BANC BRIEF OF *AMICI CURIAE* THE ASSOCIATION OF AMERICAN PUBLISHERS, INC., THE AUTHORS GUILD, CANDLEWICK PRESS, INC., HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, MACMILLAN PUBLISHING GROUP, LLC, PENGUIN RANDOM HOUSE LLC, SCHOLASTIC INC., SIMON & SCHUSTER, LLC, SOURCEBOOKS, LLC, STEPHEN KING, AND JAMES PATTERSON**

(Counsel Listed Inside Cover)

Marc A. Fuller
(TX Bar No. 24032210)
Maggie I. Burreson
(TX Bar No. 24116150)
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mfuller@jw.com
mburreson@jw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons

and entities as described in Local Rule 28.2.1 have an interest in this case's outcome:

- The Association of American Publishers, Inc. is not a publicly held corporation, and no publicly held corporation owns 10% or more of its stock.

- The Authors Guild is not a publicly held corporation. It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

- Candlewick Press, Inc. is a privately-held wholly owned subsidiary of Walker Books Limited, UK. Walker Books Limited is a private company limited by shares incorporated in England. The immediate parent undertaking of Walker Books Limited is TGM UK Bidco Limited. The ultimate parent company is Trustbridge Global Media Holdings Co., Ltd, a company incorporated in the Cayman Islands.

- Hachette Book Group, Inc. is a wholly-owned subsidiary of Hachette Livre USA, Inc. Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc. Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media. Lagardère Media is a wholly-owned subsidiary of Lagardère SA, which is traded on the Paris stock exchange; and more than 10% of Lagardère SA's outstanding stock is owned by Vivendi SA, which is traded on the Paris stock exchange.

- HarperCollins Book Publishers LLC is a subsidiary of News Corporation, a publicly-held company. Based on public filings, no publicly held company owns 10% or more of News Corporation's Class B voting stock and T. Rowe Price Associates Inc. owns more than 10% of News Corporation's Class A non-voting stock.

- Macmillan Publishing Group, LLC's direct parent company is Macmillan Holdings, LLC. No publicly held company owns 10% or more of the stock of either legal entity.

- <u>Penguin Random House</u> is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately-held company.

- <u>Scholastic Inc.</u> is a wholly-owned subsidiary of Scholastic Corporation. Scholastic Corporation is a publicly held corporation. There is no parent corporation or any publicly held corporation owning 10% or more of its stock.

- <u>Simon & Schuster, LLC</u> is a limited liability company that is indirectly wholly owned by (i) certain of its and its affiliates' directors, officers and employees and (ii) certain investment vehicles advised by Kohlberg Kravis Roberts & Co. L.P., an indirect subsidiary of KKR & Co. Inc. (NYSE: KKR).  No publicly traded organization has economic ownership of 10% or more of Simon & Schuster, LLC.

- <u>Sourcebooks, LLC</u> is a subsidiary of Penguin Random House LLC. No publicly held corporation holds 10% or more of an ownership interest in Sourcebooks, LLC.

- <u>Stephen King</u>.

- <u>James Patterson</u>.

Amici are represented by Marc Fuller and Maggie Burreson of Jackson Walker LLP. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.[1]

*/s/ Marc A. Fuller*
Marc A. Fuller
**Counsel for Amici**

---

[1] Pursuant to Fed. R. App. P. 29(a)(4), amici certify that counsel for amici authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than amici and their counsel, contributed monetarily to this brief's preparation or submission.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................3

TABLE OF AUTHORITIES ................................................................................6

STATEMENT OF INTEREST.............................................................................8

INTRODUCTION ............................................................................................10

ARGUMENT ..................................................................................................12

I.     The books targeted by Llano County include some of the most
acclaimed—and most frequently banned—works of contemporary
nonfiction and fiction..............................................................................12

II.    The en banc Court should reaffirm existing precedent and reject
Defendants' misguided government-speech argument. ...............................23

     A.    *Pico* and *Campbell* should guide the First Amendment analysis of
Llano County's removal of books from public library shelves. .........24

     B.    A public library's curation decisions are not government speech. ......28

     C.    The Court should recognize and protect citizens' right to read and
receive information...........................................................................34

CONCLUSION ...............................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................................38

CERTIFICATE OF SERVICE .............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)...................................................................*passim*

*Book People, Inc. v. Wong*,
  692 F. Supp. 3d 660 (W.D. Tex. 2023) ...............................................30

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) .............................................................30

*Campbell v. St. Tammany Par. Sch. Bd.*,
  64 F.3d 184 (5th Cir. 1995) ........................................................10, 25

*Citizens United v. FEC*,
  558 U.S. 310 (2010)...........................................................................34

*Fayetteville Co. Library v. Crawford Cnty.*,
  684 F. Supp. 3d 879 (W.D. Ark. 2023) ........................................31, 33

*GLBT Youth in Iowa Schs. v. Reynolds*,
  --F.4th--, 2024 WL 3736785 (8th Cir. Aug. 9, 2024)....................32, 33

*Matal v. Tam*,
  582 U.S. 218 (2017)......................................................................29, 32

*McCutcheon v. F.E.C.*,
  572 U.S. 185 (2014)...........................................................................29

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024).......................................................................29

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)...........................................................................32

*PEN Am. Ctr., Inc. v. Escambia Co. Sch. Bd.*,
  No. 3:23cv10385-TKW-ZCB, 2024 WL 133213 (N.D. Fla. Jan. 12,
  2024) ................................................................................................32

*Shurtleff v. City of Bosto*n,
   596 U.S. 243 (2022)........................................................30

*Stanley v. Georgia*,
   394 U.S. 557 (1969).......................................................35

*Sund v. City of Wichita Falls*,
   121 F. Supp. 2d 530 (N.D. Tex. 2000) .......................................25, 26

*United States v. Am. Library Ass'n*,
   539 U.S. 194 (2003).......................................................21

**Other**

John Stuart Mill, *On Liberty and Other Essays* (John Gray ed. 1991)...................35

Marc J. Blitz, *Constitutional Safeguards for Silent Experiments in Living:
   Libraries, the Right to Read, and A First Amendment Theory for an
   Unaccompanied Right to Receive Information*, 74 UMKC L. REV. 799
   (2006) ................................................................31, 35

Martin H. Redish, *The Value of Free Speech*, 130 U. PA. L. REV. 591
   (1982) ...................................................................34

W. Katz, COLLECTION DEVELOPMENT: THE SELECTION OF MATERIALS FOR
   LIBRARIES (1980) ........................................................21

9 WRITINGS OF JAMES MADISON (G. Hunt ed. 1910)..............................34

## STATEMENT OF INTEREST

This brief is filed on behalf of the Association of American Publishers, The Authors Guild, the five largest trade book publishers, the world's largest publisher and distributor of children's books, and leading independent publishers. Amici include the publishers of books that were removed from Llano County public library shelves ("Banned Books").[2] Publishers and authors cannot fulfill their mission of connecting with readers if the only speech allowed is that which aligns with the views of government authorities. State censorship—no matter the political cause behind it—quells free thinking. Amici thus have a strong interest in the outcome of this case.

Amici also include two of the world's most beloved authors.  Amicus Stephen King has long been a champion of free speech, an opponent of censorship, and a supporter of libraries as vital community institutions. The panel-stage majority and dissent disagreed about how King would view this case. *Compare* ECF No. 164 at 76 ("Stephen King saw this coming. One of his scary stories once warned: 'AVOID THE LIBRARY POLICE!' Now, thanks to the majority, we are all the Library Police.") *with* ECF No. 164 at 26 ("The dissent accuses us of becoming the 'Library

---

[2] Book "bans" are commonly understood to include any action in which access to a book is "restricted or diminished for either limited or indefinite periods of time." *Book Bans*, PEN AMERICA (last visited Sept. 4, 2024), https://pen.org/book-bans-frequently-asked-questions/.

Police,' citing a story by author Stephen King. But King, a well-known free speech activist, would surely be horrified to see how his words are being twisted in service of censorship."). King wishes to set the record straight on this issue: In his view, those who would remove books from public libraries because they disagree with the ideas they contain are the real Library Police.

The son of a librarian, amicus James Patterson has been a strong proponent of libraries and the right to read, and an opponent of book bans. Patterson's most recent book, *The Secret Lives of Booksellers and Librarians: True Stories of the Magic of Reading*, published by amicus Hachette Book Group, Inc., shares stories from dozens of librarians and booksellers. Some of his bestselling novels for children and teens, including his Maximum Ride series, have been targeted in other states' book bans.

**INTRODUCTION**

Before elected officials got involved, public library patrons in Llano County could check out Isabel Wilkerson's award-winning *Caste: The Origins of Our Discontents*—a work lauded in *The New York Times Book Review* as "an extraordinary document … an instant American classic and almost certainly the keynote nonfiction book of the American century thus far." They could check out Susan Campbell Bartoletti's *They Called Themselves the K.K.K: The Birth of an American Terrorist Group*, which *Kirkus Reviews* called "an exemplar of history writing and a must for libraries[.]" And they could check out several of the most acclaimed coming-of-age memoirs by a wide range of authors of varying backgrounds and perspectives. Yet elected officials took it upon themselves to override library patrons' personal reading preferences and saw to it that the books were removed from library shelves.

Defendants claim that their actions are government speech, immune from First Amendment scrutiny. This argument ignores the institutional mission of the public library, as well as Supreme Court precedent that has guided judicial review of library book removals—and prevented ideological book bans—for decades. Defendants ask the Court to overrule a panel decision that has been good law in this Circuit for almost thirty years, *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995). And they ask the Court to read the Supreme Court's *Pico* decision so

opportunistically as to be disingenuous. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982).

This is not the time to sweep away the time-honored precedents that have protected the intellectual independence of public libraries from majoritarian impulses. The instinct to censor disfavored ideas and voices is not unique to this moment, nor to a particular political party. At present, the ideas expressed in the seventeen Banned Books are under attack, but the tables could one day be turned. If Defendants' government speech argument is accepted, the public library will be rendered just another tool of partisan propaganda. Some counties will purge the library of works with "critical race theory" or LGBTQ+ themes, while others will target classic works with "problematic" stereotypes or insufficiently progressive messages.

In this fraught moment, the Court should protect the civic role of the public library as a repository of diverse ideas, the quintessential locus of citizens' right to receive information. In doing so, it should protect the ability of public librarians to do their jobs according to the accepted standards of their profession, not the whims of transient elected office holders. Lastly, it should affirm that while books are for everyone, not every book is for every person, and therefore libraries must be allowed to let patrons choose the right books for them and their children.

Amici write because they and their members are the real speakers here. The Banned Books are *their* speech. These books and the subjects they explore have been among the most frequently targeted in recent years. To protect readers' right to engage with these ideas—and with a diversity of other ideas across the ideological and experiential spectrum—the Court should reaffirm that the removal of books from public library shelves based on official disapproval of the books' ideas violates the First Amendment.

## ARGUMENT

I.    **The books targeted by Llano County include some of the most acclaimed—and most frequently banned—works of contemporary nonfiction and fiction.**

Notably absent from the briefs of Defendants and their amici, or from the panel-stage dissent, is any discussion of what both sides agree is the underlying speech at issue: the entire set of Banned Books. Indeed, the only works that have received any significant attention are the so-called "butt and fart" children's books. *See, e.g.,* ECF No. 217 at 8. Books like *Larry the Farting Leprechaun* and *Gary the Goose and His Gas on the Loose* are valuable for their ability to spark an interest in reading, even among the most disinclined young readers, which will carry over into more mature subjects as the kids get older. Undoubtedly, that is why Llano County librarians determined that these books should be on library shelves in the first place.

But focusing so intently on the silly titles of these children's books ignores the undisputed evidence that Defendants also targeted some of the most celebrated and consequential works of recent years on important topics of race, gender, and sexual orientation:

### *Caste: The Origins of Our Discontents*
### *by Isabel Wilkerson*

Named to the National Book Awards' Longlist in 2020—the same year it was featured in the Texas Book Festival—*Caste* examines the links and similarities between the United States' history of racism and the caste systems of India and Nazi Germany.[3] *Time* named it the No. 1 Nonfiction Book of the Year.[4] Oprah Winfrey chose it as her Summer 2020 pick for Oprah's Book Club and proclaimed it "the most essential ... the most necessary-for-all-humanity book that I have chosen."[5] Its author, Isabel Wilkerson, is the first Black woman to win the Pulitzer Prize in journalism and is also the winner of the National Humanities Medal and the Stephen

---

[3] *The Origins of Our Discontents: Isabel Wilkerson in Conversation with Saeed Jones*, TEXAS BOOK FESTIVAL (last visited Sept. 4, 2024), https://www.texasbookfestival.org/events/the-origins-of-our-discontents-isabel-wilkerson-in-conversation-with-saeed-jones/; *Caste: The Origins of Our Discontents*, NATIONAL BOOK FOUNDATION (last visited Sept. 4, 2024), https://www.nationalbook.org/books/caste-the-origins-of-our-discontents/.

[4] Andrew R. Chow, Lucy Feldman, Annabel Gutterman, & Lucas Wittmann, *The 10 Best Nonfiction Books of 2020*, TIME (Nov. 21, 2020), https://time.com/5913865/best-nonfiction-books-2020/.

[5] *Oprah says she cried when she called author of "Caste," her latest book club pick: 'All of humanity needs this book'*, CBS (Aug. 4, 2020), https://www.cbsnews.com/news/oprah-winfrey-caste-book-club-pick-isabel-wilkerson/.

Ambrose Oral History Prize.[6] Her debut work, *The Warmth of Other Suns*, won the National Book Critics Circle Award for Nonfiction, was named to *Time*'s Ten Best Nonfiction Books of the Decade, and was recently named by *The New York Times* as the best nonfiction book of the twenty-first century.[7] *Caste* is published by amicus Penguin Random House.

### They Called Themselves the K.K.K.: The Birth of an American Terrorist Group by Susan Campbell Bartoletti

Written by a winner of the Newbery Honor and the Washington Post/ Children's Book Guild Nonfiction Award, *They Called Themselves the K.K.K.* is a thorough examination of the Ku Klux Klan, its origins, and its growth in the United States. The book—which was a finalist for the American Library Association's Excellence in Nonfiction for Young Adults award—"makes extensive use of congressional testimony, interviews, journals, diaries and slave narratives[.]"[8] *They Called Themselves the K.K.K.* is published by amicus HarperCollins.

---

[6] *From the bestselling author of The Warmth of Other Suns: Caste the Origins of Our Discontents*, ISABEL WILKERSON (last visited Sept. 4, 2024), https://www.isabelwilkerson.com/.

[7] *Id.*; *The 100 Best Books of the 21st Century*, THE NEW YORK TIMES (last visited Sept. 4, 2024), https://www.nytimes.com/interactive/2024/books/best-books-21st-century.html#book-10.

[8] *They Called Themselves the K.K.K: The Birth of an American Terrorist Group*, KIRKUS REVIEWS (last visited Sept. 4, 2024), https://www.kirkusreviews.com/book-reviews/susan-campbell-bartoletti/they-called-themselves-the-kkk/.

***Spinning***
***by Tillie Walden***

*Spinning* is a coming-of-age memoir. The winner of the 2018 Eisner Award for Best Reality-Based Work,[9] the graphic novel follows Walden's childhood experiences as a competitive figure skater and her growth as a teenager in New Jersey and Texas, including her "coming out" experience. *The Austin Chronicle* called the book "a thoughtful, bittersweet evocation of the turbulence of puberty and adolescence, of first love, of eventual disillusionment with a thing to which someone has devoted so much of their life … a powerful work of real-life storytelling[.]"[10] The book won two coveted comic book Ignatz Awards—one for Outstanding Artist and one for Promising New Talent—and earned Walden two appearances at the Texas Book Festival.[11] *Spinning* is published by amicus Macmillan.

***Being Jazz: My Life as a (Transgender) Teen***
***by Jazz Jennings***

*Being Jazz* is a memoir written by Jazz Jennings, a transgender teen who was named one of "The 25 Most Influential Teens" of the year by *Time* in 2014.[12] The

---

[9]  *2010-Present*, Comic-Con (last visited Sept. 4, 2024), https://www.comic-con.org/awards/eisner-awards/past-recipients/past-recipenties-2010s/.

[10]  Wayne Alan Brenner, *Review: Spinning*, The Austin Chronicle (Nov. 3, 2017), https://www.austinchronicle.com/daily/arts/2017-11-03/review-spinning/.

[11]  *Id.*

[12]  The 25 Most Influential Teens of 2014, Time (Oct. 13, 2014), https://time.com/3486048/most-influential-teens-2014/.

book chronicles Jazz's personal experiences growing up as a trans teenager, including her experiences with bullying and discrimination. It was included on the American Library Association's Rainbow Project Book List, a list of recommended books dealing with LGBTQ+ issues for young readers.[13] *Being Jazz* is published by amicus Penguin Random House.

### *Gabi, a Girl in Pieces*<br>*by Isabel Quintero*

An "authentic and honest" coming-of-age story of a young Mexican girl, *Gabi, A Girl in Pieces* covers real-life topics of body image, broken homes, drug use, sexuality, childhood dreams, and community values.[14] *Kirkus Reviews* wrote that author Isabel Quintero "excels at presenting a life that is simultaneously messy and hopeful."[15] Published in 2014, the book was a finalist and winner of multiple awards: the William C. Morris YA Debut Award, School Library Journal's Best Books of the Year, and the American Library Association Amelia Bloomer Project.[16]

---

[13] *Rainbow Project Book List*, AMERICAN LIBRARY ASSOCIATION (last visited Sept. 4, 2024), https://www.ala.org/winner/i-am-jazz.

[14] *Gabi, A Girl in Pieces*, KIRKUS REVIEWS (last visited Sept. 4, 2024), https://www.kirkusreviews.com/book-reviews/isabel-quintero/gabi-girl-in-pieces/.

[15] *Id.*

[16] *Gabi, A Girl in Pieces*, LEE & LOW BOOKS (last visited Sept. 4, 2024), https://www.leeandlow.com/books/gabi-a-girl-in-pieces.

***Freakboy***
***by Kristin Elizabeth Clark***

*Freakboy* is a coming-of-age story told from three distinct perspectives, all from different points on the gender identity spectrum.[17] Published in 2013, the book won, or was a finalist for, numerous awards, including:

- Best Children's Books of the Year, 2014 Sports

- *Booklist* Book Review Stars, 2013

- *Booklist* Top 10 First Novels for Youth, 2014 First Novels

- *Kirkus* Book Review Stars, 2013

- Rainbow List, Teen Fiction, 2014

- Young Adult Library Services Association ("YALSA") Best Fiction for Young Adults, 2014 Fiction

- YALSA Top Ten Best Books for Young Adults, 2014 Best Fiction for Young Adults[18]

*Kirkus Reviews* called *Freakboy* a "gutsy . . . must-buy."[19] *Freakboy* is published by amicus Macmillan.

---

[17] *Freakboy*, UNIVERSITY OF CENTRAL FLORIDA (last visited Sept. 4, 2024), https://stars.library.ucf.edu/diversefamilies/119/.

[18] *Id.*

[19] *Freakboy*, KIRKUS REVIEWS (last visited Sept. 4, 2024), https://www.kirkusreviews.com/book-reviews/kristin-elizabeth-clark/freakboy/.

### *Shine*
### *by Lauren Myracle*

The winner of the 2012 Amelia Elizabeth Walden Award—an annual award for a young adult book that exemplifies literary excellence, widespread appeal to teens, and a positive approach to life—*Shine* is a mystery novel that follows a teen girl investigating the violent beating of her openly gay friend in a small town.[20] The book also tackles issues of poverty, drug use, and sexual assault.[21] Described as "raw, realistic and compelling," this YALSA 2012 Readers' Choice List book masterfully mixes mystery and coming-of-age tales.[22]

---

[20] *The Walden Award*, ASSEMBLY ON LITERATURE FOR ADOLESCENTS OF NCTE (last visited Sept. 4, 2024), https://alan-ya.org/awards/walden-award/; Mary Quattlebaum, *Book review: 'Shine' by Lauren Myracle*, THE WASHINGTON POST (last visited Sept. 4, 2024), https://www.washingtonpost.com/entertainment/books/book-review-shine-by-lauren-myracle/2011/05/20/AGWwJkFH_story.html.

[21] Abigail Pesta, *Lauren Myracle On Why Her Books Top List That America Wants Banned*, DAILY BEAST (Sept. 28, 2018), https://www.thedailybeast.com/lauren-myracle-on-why-her-books-top-list-that-america-wants-banned.

[22] *Shine*, KIRKUS REVIEW (last visited Sept. 4, 2024), https://www.kirkusreviews.com/book-reviews/lauren-myracle/shine-myracle/; *2012 Readers' Choice List*, YALSA (last visited Sept. 4, 2024), https://www.ala.org/yalsa/readers-choice/2012. Defendants also removed another graphic novel by Myracle, *Under the Moon: A Catwoman Tale*.

### *It's Perfectly Normal:*
### *Changing Bodies, Growing Up, Sex and Sexual Health*
### *by Robie Harris*

*It's Perfectly Normal* was first published in 1994 and has since sold over a million copies.[23] Designed to teach children about sexual health, emotional health, and relationships as they enter puberty, it provides medically accurate information that is regularly updated.[24] Recent editions have also addressed online safety.[25] *It's Perfectly Normal* won the Boston Globe-Horn Book Honor Book Award and has been featured in a variety of "honors" lists, including the American Library Association's Notable Children's Book List, Horn Book's Fanfare Book List, and the *New York Times*'s annual list of 100 Notable Books.[26] *It's Perfectly Normal* is published by amicus Candlewick Press.

---

[23] Rebeca Hersher, *It May Be 'Perfectly Normal', But It's Also Frequently Banned*, NPR (Sept. 21, 2014 5:00 PM), https://www.npr.org/2014/09/21/350366435/it-may-be-perfectly-normal-but-its-also-frequently-banned.

[24] *Id.*

[25] *Id.*

[26] *It's Perfectly Normal*, PENGUIN RANDOM HOUSE (last visited Sept. 4, 2024), https://www.penguinrandomhouse.com/books/76024/its-perfectly-normal-by-robie-h-harris-illustrated-by-michael-emberley/.

*In the Night Kitchen*
*by Maurice Sendak*

A classic children's picture book first published in 1970, *In the Night Kitchen* follows a young boy as he explores and floats through a dream world. Sendak—who also authored and illustrated *Where the Wild Things Are*—creates a "celebration of the primal, sensory world of childhood and an affirmation of its imaginative potency."[27] The book won a Caldecott Honor, which is awarded annually by the Association for Library Service to Children to the most distinguished picture book for children.[28] *In the Night Kitchen* is published by amicus HarperCollins.

\*\*\*

These books are obviously not the type of works that are so outdated, trivial, mediocre, or replete with factual inaccuracies that they would be removed by librarians through standard "weeding" practices. ECF No. 164 at 20 (district court correctly found that Defendants' "weeding" rationalization is "unpersuasive"). This is also obviously not a case of public officials merely giving librarians discretion to make professional judgments about whether books are of the "'requisite and

---

[27] *In the Knight Kitchen*, BOOKSHOP (last visited Sept. 4, 2024), https://bookshop.org/p/books/in-the-night-kitchen-maurice-sendak/286853.

[28] *Caldecott Winners and Honor Books*, MADISON PUBLIC LIBRARY (last visited Sept. 4, 2024), https://www.madisonpubliclibrary.org/reading-and-viewing/book-lists/kids/caldecott-winners-and-honor-books; *Randolph Caldecott Medal*, ASSOCIATION FOR LIBRARY SERVICE TO CHILDREN (last visited Sept. 4, 2024), https://www.ala.org/alsc/awardsgrants/bookmedia/caldecott.

appropriate quality.'" *United States v. Am. Library Ass'n*, 539 U.S. 194, 204 (2003). If the librarian's job is "to separate out the gold from the garbage"—as Defendants and their amici argue—there is no serious doubt that these books pass that test. *See, e.g.*, ECF No. 217 at 9 (citing W. Katz, COLLECTION DEVELOPMENT: THE SELECTION OF MATERIALS FOR LIBRARIES 6 (1980)). Again, their presence on Llano County library shelves—before the elected officials got involved—means that they *did* pass that test.[29] As the panel correctly held, Plaintiffs satisfied their preliminary injunction burden to show that the books likely were removed because those officials did not like the ideas in them. ECF No. 164 at 26.

Such efforts to shut down the marketplace of ideas are indefensible, but, sadly, they are not unprecedented. The targeting of these books by Llano County officials resembles other bans across the country, both historical and recent. U.S. history is punctuated by moments in which public officials have turned to book-banning in reaction to perceived social, cultural, and political threats. One hundred years ago, the Manhattan District Attorney prosecuted and convicted *The Little Review* for

---

[29] Contrary to the suggestion of the panel-stage dissent, the presence of these books on library shelves does not mean that the library must also offer books advocating conspiracy theories, Holocaust denialism, or medical misinformation. Rejecting such texts on the grounds of factual inaccuracy is not viewpoint discrimination. Similarly, offering works like *Caste* and *They Called Themselves the K.K.K.* does not require a library to include books with racist themes and characters. Any suggestion that such hypotheticals are difficult ignores the quality and content of the Banned Books and underestimates the professional competence of librarians, who are perfectly capable of making reasonable curation decisions based on viewpoint-neutral considerations.

publishing excerpts of James Joyce's *Ulysses.* Publication of that work in the United States stopped for more than a decade, until amicus Random House filed a successful legal challenge.[30] In the ensuing decades, now-canonical works by authors like Harper Lee, J.D. Salinger, George Orwell, and John Steinbeck populated lists of frequently banned books.[31]

Today, what's old is once again new. Some of the same books that were targeted fifty years ago in *Pico*—such as *Slaughterhouse-Five* by Kurt Vonnegut— are again facing bans throughout the country.[32] Recent book bans have also increasingly focused on issues of race, gender, and sexual orientation.

As publishers and authors, amici proudly eschew any monolithic view of science, politics, art, or culture, and they endeavor to offer books with a variety of

---

[30] Stephen Gillers, *A Tendency to Deprave and Corrupt: The Transformation of American Obscenity Law from* Hicklin *to* Ulysses, WASH. UNIV. L. REV. 215–96 (2007).

[31] *See Bannings and Burnings in History*, Freedom to Read (last visited Sept. 4, 2024), https://www.freedomtoread.ca/resources/bannings-and-burnings-in-history/.

[32] *See, e.g.*, Robert Grant, "'*Slaughterhouse-Five*,' other books further restricted in St. Johns schools after objection hearing," ACTION NEWS JAX (May 28, 2024) (https://www.actionnewsjax.com/news/local/slaughterhouse-five-other-books-further-restricted-st-johns-schools-after-objection-hearing/SJXEEFPVGVFE7B3723JURPCAZU); Mike Trautmann, "Iowa's book ban battle: How public schools pulled thousands of books because of a new law," DES MOINES REGISTER (Jun. 13, 2024) (https://www.desmoinesregister.com/story/news/education/2024/06/13/iowa-book-ban-battle-the-story-behind-sweeping-ban-george-orwell-margaret-atwood-john-green/74071601007) "West Ada school district removes 10 books from libraries, citing content concerns," CBS2 IDAHO NEWS (December 15, 2023) (https://idahonews.com/news/local/west-ada-school-district-removes-10-books-from-libraries-citing-content-concerns).

ideas on any given topic of interest to the public.[33] Ideally, elected officials would encourage library patrons to engage with high-quality, professionally curated books that offer different perspectives. But the First Amendment does not require such neutrality by government officials in their own speech. Public officials, including in Llano County, are free to express their disagreement with the Banned Books. What they cannot do is suppress the speech of amici and others—and restrict citizens' right to engage with that speech—under the guise of "government speech."

## II. The en banc Court should reaffirm existing precedent and reject Defendants' misguided government-speech argument.

For Defendants, their amici, and the panel-stage dissent, the partisan suppression of disfavored ideas from public libraries is both unremarkable and constitutionally unproblematic. Defendants' amici, for example, describe the removal of books for viewpoint reasons as "a matter historically left to local democratic process," unsuitable for judicial resolution. ECF No. 217 at 10. The panel-stage dissent chastises the majority as having "appointed themselves co-chairs of every public library board," saying their reasoning "lacks any basis in law or common sense." ECF No. 164 at 61. In Defendants' telling, there is simply no First Amendment problem to see here. ECF No. 203 at 17. Community members, they

---

[33] As just one example, amicus Penguin Random House published Justice Neil Gorsuch's memoir, A *Republic, If You Can Keep It*, and it is also publishing Justice Ketanji Brown Jackson's *Lovely One: A Memoir*.

argue, have no right to read the books on public library shelves, and any removal decisions are nothing more than government speech, "immune from First Amendment attack." *Id.* at 23.

All of this is wrong. Book bans are not novel, nor are legal challenges to them. There are well established precedents for applying heightened First Amendment scrutiny where—as here—the government has pulled books off public library shelves because it does not like the ideas in them. These precedents have not been difficult to apply, and they have not overwhelmed county governments with litigation or intruded into librarians' professional discretion over curation decisions. There is no practical or other reason to overrule or disregard them. And there is certainly no reason for the Court to replace them with a government-speech holding that cannot be reconciled with binding Supreme Court precedent or the longstanding institutional mission of the public library.

## A. *Pico* and *Campbell* should guide the First Amendment analysis of Llano County's removal of books from public library shelves.

In *Pico*, the eleven removed books included the aforementioned *Slaughterhouse-Five*, as well as works by luminaries such as Richard Wright (his memoir, *Black Boy*) and Langston Hughes (*Best Short Stories of Negro Writers*). *Pico*, 457 U.S. at 857 n.3. The books had been flagged by a local political group as offensive, and the school board swiftly removed them from school library shelves,

on the grounds that they were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." *Id*. A group of students sued, claiming that the books' removal violated their First Amendment rights. The Supreme Court's four-justice plurality opinion held that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge" accessible in the school library based on disagreement with the ideas at issue. *Id.* at 866.

More than a decade later, this Court applied *Pico* in a case concerning the removal of *Voodoo & Hoodoo*, a book about the development of African tribal religion, from a public school library. *Campbell*, 64 F.3d at 188–89. The mother of a middle-school student had complained "that the Book heightened children's infatuation with the supernatural … which she believed to be potentially dangerous." *Id.* at 186. Although the Court remanded for further consideration of the school board's motivations, it cautioned that removing books from school library circulation could constitute an "unconstitutional attempt to 'strangle the free mind at its source.'" *Id.* at 190 (citation and quotations omitted).

Five years later, the Northern District of Texas considered the City of Wichita Falls' relocation of *Heather Has Two Mommies* and *Daddy's Roommate* from the children's section to the adult section of the public library. *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 531–32 (N.D. Tex. 2000). Both books addressed the subject of children who have gay parents. *Id.* at 532–33. Supporters of the ban

"objected vehemently to the perceived 'homosexual message'" of the books. *Id.* at 533. But the court ordered the books returned to the children's section, explaining that the City's actions had unconstitutionally burdened the First Amendment rights of library patrons. *Id.* at 551.

Defendants and their amici argue that the Court should overrule *Campbell* and disregard *Pico*, but only to engineer their preferred result in this case. They make no compelling argument that *Campbell* has proven too difficult to apply. As Plaintiffs' en banc brief shows, the lead and concurring panel-stage opinions did not disagree on the applicable legal standard under *Campbell*, only on what the evidence showed as to certain of the children's books—hardly surprising given the early stage of proceedings. ECF No. 230-1 at 13-14, 52. And the dissent's assertion that the panel decision is a "train wreck" that will spur "years of litigation" is impossible to square with the fact that *Campbell* has been on the books for almost thirty years, yet *Sund* appears to be the only reported decision in this Circuit to apply it to a public library book ban. In short, *Campbell* has generated neither sound nor fury, to paraphrase another banned author.[34]

---

[34] *See, e.g.*, Jack Hobbs, "'Romeo and Juliet' banned from Florida school district — due to sexual content," New York Post (Aug. 9 2023), https://nypost.com/2023/08/09/romeo-and-juliet-banned-from-hillsborough-florida-schools.

Defendants acknowledge that the Court cannot simply overrule *Pico*. They argue, however, that the Court should disregard *Pico* because the four-justice plurality fell one vote short of a majority. ECF No. 203 at 28. According to Defendants, Justice White's concurring opinion was the controlling opinion, and it did not expressly endorse (or reject) the plurality's First Amendment analysis. *Id.* But Defendants' vote-counting exercise is nakedly opportunistic. After carefully parsing Justice White's concurrence, Defendants completely ignore Justice Rehnquist's dissent, which was joined by two other justices. 457 U.S. at 904-921 (Rehnquist, J., dissenting).

Justice Rehnquist repeatedly emphasized that his disagreement with the plurality was based largely on his view that First Amendment principles that apply to *public* libraries do not necessarily apply in the *school* library context. Over and over, Justice Rehnquist made clear that his analysis—and, likely, his vote—would have been different if the books had been pulled from *public* library shelves. *Id.* at 914 (criticizing plurality for relying on precedent involving "*public* libraries"), at 915 (arguing that plurality "misapprehends the function of libraries in our public school system"); *id.* ("Unlike university or public libraries, elementary and secondary school libraries are not designed for freewheeling inquiry[.]"); *id.* (arguing that students suffered no constitutional injury because the "books may be borrowed from a public library"). It is, therefore, disingenuous for Defendants to

27

argue that *Pico* provides no guidance in this public library case, based on a vote-counting exercise that completely ignores Justice Rehnquist's dissent and the two justices who joined it.

### B.    A public library's curation decisions are not government speech.

For Defendants, the real problem with *Pico* and *Campbell* is not their correctness, but the result they dictate in this case. Defendants' "weeding" story has been rejected as factually "unpersuasive," and they cannot otherwise satisfy First Amendment scrutiny under *Pico* and *Campbell*. ECF No. 164 at 20. So Defendants and their amici propose a new standard. They argue that a "library's curating decisions," including in the "acquisition and weeding" of books, are government speech. ECF No. 203 at 21-22; ECF No. 217 at 3 ("the selection and removal of the public-library materials are government speech that the Free Speech Clause of the First Amendment does not address").

But Defendants' government-speech argument is strikingly bare. Defendants do not even attempt to engage with existing government-speech precedent. Their entire government-speech discussion covers barely more than two pages of their supplemental brief, ECF No. 203 at 16-19, and the term "government speech" is nowhere to be found in either of their panel-stage briefs. Even if Defendants have not waived this argument, their continued refusal to fully embrace it leaves no doubt as to Defendants' real view of its merit.

The only government-speech argument that Defendants now make is based on the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). ECF No. 203 at 21-22. But *NetChoice* was not a government-speech case. It presented the question of whether social media platforms—*i.e.*, *private actors*—engage in expressive activity protected by the First Amendment when they curate the speech of others. *Id.* at 2402. The Supreme Court's affirmative answer does not mean that the *government* "speaks" whenever it engages in a similar activity.

The test of "government speech" has *never* been whether the same activity would be protected by the First Amendment if performed by a private actor, or whether government regulation could be characterized as the 'collective speech" of the majority. *Cf. McCutcheon v. F.E.C.*, 572 U.S. 185, 206 (2014) ("The First Amendment does not protect the government, even when the government purports to act through [regulation] reflecting 'collective speech.'"). Such an approach would upend large swaths of First Amendment law, allowing the most invidious viewpoint discrimination to be immunized from scrutiny merely because the government has characterized its regulation as expressive. For this reason, the Supreme Court has cautioned that the government-speech doctrine "is susceptible to dangerous misuse" and has instructed courts to "exercise great caution before extending our government-speech precedents[.]" *Matal v. Tam*, 582 U.S. 218, 235 (2017).

This Court's government-speech holding in *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024), exemplifies this cautious, skeptical approach. In *Book People*, the Court considered a First Amendment challenge to Texas's "READER Act," which aimed to protect children from allegedly inappropriate books in school libraries by forcing vendors to label books that contained sexual content. 91 F.4th at 324-25. The State argued that the Act posed no First Amendment concerns because the ratings were government speech, as was the state mandate to recall "sexually explicit" material from library shelves. *Id.* at 336. A unanimous panel affirmed the district court's rejection of this argument. *Id.*; *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 687 (W.D. Tex. 2023) ("The Court further concludes that the required recall of library material … in active use is not government speech.").

Judge Willett, writing for the panel, noted that the Supreme Court had identified three types of evidence to "'guide the analysis'" of "whether the government intends to speak for itself or to regulate private expression." *Id.* at 337 (quoting *Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022)). These three types of evidence include: "'the history of the expression at issue'; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* Applying this test confirms that the government action at issue here—the curation of a public library collection—cannot be characterized as "government speech."

As to the history of the expression, amici American Library Association ("ALA") and Texas Library Association have described the long tradition of "favoring liberty of thought" over "thought control" in the maintenance of public library collections—"'to promote reading, not to inhibit it; to multiply the points of view which will find expression, not to limit them.'" ECF No. 117-1 at 13 (citation omitted). As one scholar has noted, "[e]ven near the beginning of public library history in America, … one finds evidence of the individualism and respect for reader autonomy that would later become a hallmark of the profession." Marc J. Blitz, *Constitutional Safeguards for Silent Experiments in Living: Libraries, the Right to Read, and A First Amendment Theory for an Unaccompanied Right to Receive Information*, 74 UMKC L. REV. 799, 829 (2006).

As to the second factor—"the public's likely perception as to who (the government or a private person) is speaking"—a public library's collection of books cannot reasonably be viewed as the *government* speaking. Although public libraries are "funded and overseen by state and local governments," they are "not to be mistaken for simply an arm of the state." *Fayetteville Co. Library v. Crawford Cnty., Ark.*, 684 F. Supp. 3d 879, 891 (W.D. Ark. 2023). And no one would mistake the fact that the books themselves are written and published by private persons (like amici), not the government. A public library's decisions about which books to include in its collection also cannot be viewed as the government "'tak[ing] a

particular viewpoint and rejecting[ing] others.'" *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (quoting *Matal*, 582 U.S. at 234); *see also PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23cv10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) ("[T]he Court simply fails to see how any reasonable person would view the contents of … any library … as the government's endorsement of the views expressed in the books on the library's shelves. … [T]he speech embodied in a library collection is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property.").

As the Eighth Circuit recently noted in rejecting a similar government-speech argument, a well-appointed library "could include copies of Plato's *The Republic*, Machiavelli's *The Prince*, Thomas Hobbes' *Leviathan*, Karl Marx and Freidrich Engels' *Das Kapital*, Adolph Hitler's *Mein Kampf*, and Alexis de Tocqueville's *Democracy in America*." *GLBT Youth in Iowa Schs. v. Reynolds*, --F.4th--, 2024 WL 3736785, at *3 (8th Cir. Aug. 9, 2024). If including these books on the shelves of a public library constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *Id.* (quoting *Matal*, 582 U.S. at 236).[35]

---

[35] Take, for example, the Llano County library system's titles on American history and politics: alongside Howard Zinn's *A People's History of the United States* and other works by liberal authors, library patrons can find Larry Schweikart's *A Patriot's History of the United States*, in addition to works by Newt Gingrich, Dinesh D'Souza, William Bennett, Glen Beck, and others.

As to the third factor, "the extent to which the government has actively shaped or controlled the expression," Defendants and their amici fundamentally mistake the task of the public librarian in curating a collection. The collection manual they cite rejects the notion that a library should strive to express community sentiment through its acquisition and weeding decisions. Katz at 72-73. Although librarians make professional judgments about quality in selecting books, they do so not based on their own viewpoint, or to express majoritarian values, but to serve *all* of the library audience. *Id.*; *see Fayetteville*, 684 F. Supp. 3d at 891 ("The vocation of a librarian requires a commitment to freedom of speech and the celebration of diverse viewpoints unlike that found in any other profession."). This might entail the acquisition of "unusual" books that appeal to individuals who do not conform to community norms. Katz at 68. Even when removing books from the collection, public librarians are instructed that "'weeding' should not be used "as a deselection tool for controversial materials.'" ECF No. 117-1 at 15 (citation omitted).

In sum, Defendants' government-speech argument is at odds with the history and institutional mission of public libraries, with the professional training of librarians, and with the Supreme Court's government-speech precedent. The Court should reject it.

---

https://llano.biblionix.com/catalog/. Many of these works, on both sides of the ideological divide, are published by amici.

**C.    The Court should recognize and protect citizens' right to read and receive information.**

Defendants' government-speech argument should be rejected for the additional reason that it fails to recognize library patrons' right to read and receive information. It is a hallmark of modern First Amendment jurisprudence that, in the marketplace of ideas, voices of dissent and criticism are essential to a deliberative process that arrives at truth. *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."); 9 WRITINGS OF JAMES MADISON 103 (G. Hunt ed. 1910) ("A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both … And a people who mean to be their own Governors, must arm themselves with the power which knowledge give.").

But the First Amendment is not solely concerned with the marketplace of ideas and its role in democratic self-governance. The First Amendment also protects the liberty of individuals to govern themselves according to norms and beliefs that might be different than those embraced by the body politic. *See* Martin H. Redish, *The Value of Free Speech*, 130 U. PA. L. REV. 591, 593 (1982) (arguing "that the constitutional guarantee of free speech ultimately serves only one true value … 'individual self-realization'"). As John Stuart Mill recognized, the individual must

be free to explore whether the majoritarian consensus is "properly applicable to his own circumstances and character." John Stuart Mill, *On Liberty and Other Essays*, at 65 (John Gray ed. 1991); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (the "right to receive information and ideas, regardless of their social worth … is fundamental to our free society") (citation omitted).

Public libraries are havens for this self-exploration. Libraries have the capacity "to expose individuals to a 'variety of situations' far richer than they are likely to encounter in their day-to-day lives." Blitz at 829. And they do so in an environment that is free of the peer pressures and stigma that accompany public discourse and social settings. *Id.* at 881–82. Within the quiet confines of the library, an individual can sample competing ideas and engage with a wide array of lived experiences. *Id.* at 861; *see also Pico*, 457 U.S. at 869 (noting the "regime of voluntary inquiry that … holds sway" in a library).

Defendants' actions infringe this individual liberty of self-exploration. The Banned Books include coming-of-age stories, memoirs, and other personal accounts of individual experience and self-discovery. Most are told from outsider perspectives, in voices not commonly heard. Such works have the power to bring communities together by expanding consciousness, empathy, and compassion. For library patrons who feel like outsiders or underdogs in one way or another, a book

can provide a much-needed breath of fresh air, a dose of validation, and solace in the knowledge that they are not alone.

*** 

Defendants and their amici would cede the institutional independence of the public library to the whims of whomever happens to be holding elected office at the moment. It is a shortsighted and dangerous game, at odds with the best of our democratic traditions and constitutional values, and antithetical to an informed citizenry. The First Amendment is neither "woke" nor anti-"woke," and public libraries shouldn't be, either. Too many of our cherished institutions have been seized by the take-no-prisoners grip of political partisanship. First Amendment jurisprudence should give librarians a protected space in which to make reasonable curation decisions according to their professional training, and it should protect library patrons' right to read books from across the political and experiential spectrum. *Pico* and *Campbell* have done that for decades, providing relief only where the government acts to suppress disfavored views. The Court should reaffirm their continued vitality.

## CONCLUSION

Amici respectfully urge the Court to affirm the order of the district court.

DATED:  September 10, 2024

Respectfully submitted,

**JACKSON WALKER LLP**

By: _ /s/ Marc A. Fuller_
　　Marc A. Fuller
　　TX State Bar No. 24032210
　　mfuller@jw.com
　　Maggie I. Burreson
　　TX State Bar No. 24116150
　　mburreson@jw.com
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Phone:  (214) 953-6000

**COUNSEL FOR AMICI CURIAE**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the typeface and volume limits of Fed. R. App. P. 32(a) and Local Rule 32.1.

1.  This brief contains 6,401 words, excluding the sections exempted by Fed. R. App. P. 32(f) and Local Rule 32.2, which is less than fifty percent of that allotted for the Appellees' brief pursuant to Fed. R. App. P. 29.

2.  This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font for text and 12-point Times New Roman font for footnotes.

*/s/ Marc A. Fuller*
Marc A. Fuller

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of September, 2024, a copy of the

foregoing has been served upon counsel for all parties to this proceeding as identified

below through the Court's electronic filing system as follows:

Katherine P. Chiarello
Ryan A. Botkin
Maria Amelia Calaf
BOTKIN CHIARELLO
CALAF PLLC
1209 Nueces Street
Austin, TX 78701
Phone:  (512) 615-2341
Fax:     (737) 289-4695
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com

Matthew Borden
J. Noah Hagey
Marissa Benavides
Max Bernstein
Kory James DeClark
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA  94104
Phone:  (415) 599-09210
borden@braunhagey.com
hagey@braunhagey.com
benavides@braunhagey.com
bernstein@braunhagey.com
declark@braunhagey.com

*Counsel for Plaintiffs-Appellees*

Jonathan F. Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, TX  78701
Phone:  (512) 686-3940
Fax:     (512) 686-3941
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

*/s/ Marc A. Fuller*
Marc A. Fuller