# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY;
REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,
*Plaintiffs-Appellees,*

v.

LLANO COUNTY; RON CUNNINGHAM, in his official capacity as Llano County Judge;
JERRY DON MOSS, in his official capacity as Llano County Commissioner;
PETER JONES, in his official capacity as Llano County Commissioner;
MIKE SANDOVAL, in his official capacity as Llano County Commissioner;
LINDA RASCHKE, in her official capacity as Llano County Commissioner;
AMBER MILUM, in her official capacity as Llano County Library System Director;
BONNIE WALLACE, in her official capacity as Llano County Library Board Member;
ROCHELLE WELLS, in her official capacity as Llano County Library Board Member;
RHODA SCHNEIDER, in her official capacity as Llano County Library Board Member;
GAY BASKIN, in her official capacity as Llano County Library Board Member,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
CIVIL ACTION NO. 1:22-cv-00424

**UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE INTERCULTURAL DEVELOPMENTAL RESEARCH ASSOCIATION, THE TRANSGENDER EDUCATION NETWORK OF TEXAS, AND TEXAS APPLESEED AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEES**

Janai S. Nelson
  *President & Director-Counsel*
Katrina Feldkamp*
Morenike Fajana
Allison Scharfstein
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200
kfeldkamp@naacpldf.org

Jin Hee Lee
Avatara A. Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

*Counsel for Amici Curiae*
* *Counsel of Record*

September 10, 2024

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 26.1 and 5th Cir. R. 28.2.1, *amici curiae* NAACP Legal Defense and Educational Fund, Inc., Intercultural Development Research Association, Transgender Education Network of Texas, and Texas Appleseed are all nonprofit, non-partisan corporations. *Amici* have no parent corporations, and no publicly held corporation holds ten percent of their stock. The undersigned counsel of record certifies that, in addition to those listed in the parties' Certificate of Interested Persons, the following persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae**
NAACP Legal Defense and Educational Fund, Inc.
Intergenerational Developmental Research Association
Transgender Educational Network of Texas
Texas Appleseed

**Attorneys for Amici Curiae**
Janai Nelson
Jin Hee Lee
Katrina Feldkamp
Morenike Fajana
Avatara A. Smith-Carrington
Allison Scharfstein

Dated: September 10, 2024

*/s/ Katrina Feldkamp*
Katrina Feldkamp

*Counsel for Amici Curiae*

1

Pursuant to Federal Rule of Appellate Procedure 29, the NAACP Legal Defense & Educational Fund, Inc., Intercultural Development Research Association, Transgender Education Network of Texas, and Texas Appleseed respectfully move this Court for leave to file a brief as *amici curiae* in support of Plaintiff-Appellees. The proposed brief accompanies this motion as an attachment.

*Amici curiae* sought consent for the filing of this brief from all parties. Plaintiffs-Appellees and Defendants-Appellants have consented to the filing.

## MOVANTS' INTEREST

The NAACP Legal Defense and Educational Fund, Inc. ("LDF") is the nation's first and foremost civil rights law organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF's has fought for over 80 years to achieve racial justice and to ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. LDF has participated as counsel of record or amicus curiae in significant cases before various appellate courts regarding the First Amendment. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Dream Defs. v. Governor of the State of Fla.,* 57 F.4th 879 (11th Cir. 2023), *certified question answered sub nom. DeSantis v. Dream Defs.,* 389 So. 3d 413 (Fla. 2024); *Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022); and *Masterpiece Cakeshop,*

*Ltd. v. Colo. Civil Rts. Comm'n*, 584 U.S. 617 (2018). Consistent with its opposition to all forms of discrimination, LDF has a strong interest in the fair application of the First Amendment, including to ensure access to public library materials.

The Intercultural Development Research Association ("IDRA") is an independent, non-profit organization founded in 1973 dedicated to achieving equal educational opportunity for every child through strong public schools. IDRA has collaborated with local, state, and national civil rights and student-led organizations to defend and demand access to high-quality, culturally relevant curricular and literary materials in school and community libraries. IDRA opposes efforts to censor diverse and historically underrepresented perspectives, and engages in policy and legal advocacy to protect young people's right to receive information, ideas, and inspiration. IDRA's work on this front includes producing *Knowledge is Power*, a national resource for educators and advocates to ensure excellence in education in the midst of censorship policies; maintaining the Southern Educational Equity Network (SEEN) School Resource Hub, which provides resources for educators, families, and communities to learn about issues like systemic racism and sexism; and investigating and submitting demand letters and OCR complaints to challenge discriminatory book removals.

Transgender Education Network of Texas ("TENT") is the largest statewide, BIPOC trans-led, trans-focused policy, education, and advocacy organization in the

state of Texas. TENT works to accomplish gender-diverse equality through education and networking in both public and private forums. Through its efforts, TENT strives to halt discrimination through social, legislative, and corporate education.

Texas Appleseed is a justice-driven nonprofit working as the intersection of policy, advocacy, and the law to improve the lives of Texans. Fueled by data, legal expertise, and a commitment to supporting vulnerable communities, our work has shaped hundreds of state and local policies and positive affected millions of Texans. For more than 15 years, Texas Appleseed has built significant expertise in the fight to dismantle the school-to-prison pipeline and ensure equal access to culturally responsive education. Texas Appleseed has published numerous reports that highlight how centuries-long draconian educational practices, exclusionary discipline, and school policing detrimentally affect Black & Brown children, LGBTQ young people, and kids with disabilities. While critical race theory bans were being debated by the Texas Legislature in 2021, Texas Appleseed testified about the harmful impacts of classroom censorship, including adverse outcomes in the administration of school discipline.

## REASONS FOR AND RELEVANCE OF *AMICI CURIAE*

The question before this Court is whether Llano County intruded upon the First Amendment rights of public library patrons by removing seventeen books—

including *Caste: The Origins of Our Discontents* by Isabel Wilkerson, discussing race; *Gabi, a Girl in Pieces* by Isabel Quintero, discussing teen pregnancy, sexual identity, and drug dependency; and *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings, discussing gender identity—because the books purportedly included information and ideas that they found to be controversial. Regardless of whether Llano County's characterizations of these books are fair or accurate, the First Amendment prohibits the State from denying the public access to information in books simply because it disfavors the ideas contained within those books. The Supreme Court clarified as much when it held that a person's First Amendment rights "may be directly and sharply implicated by the removal of books from the shelves of a [] library." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866–67 (1982); *see also Campbell v. St. Tammany Par. Sch. Bd*, 231 F.3d 937 (5th Cir. 2000).

The attached brief describes how the Supreme Court's holding in *Pico* flows from and follows a long line of cases recognizing the right to receive information as a necessary corollary of and predicate to the First Amendment freedoms of speech and press. As early as the 1940s, the Supreme Court has applied the First Amendment to protect the right to receive information from unlawful government intrusion in a variety of settings including the distribution of literature, broadcasting, labor organizing, advertising, and schools. *Martin v. Struthers*, 319 U.S. 141 (1943);

*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976); and *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). The proposed brief also presents history and social science research showing how public libraries with diverse collections advance the goals of the First Amendment and support a thriving democracy. The brief will assist the *en banc* Court in determining whether the panel properly applied this longstanding precedent to affirm that Plaintiffs-Appellees were likely to prevail on their claim that Defendants-Appellants' removal of the seventeen library books was "'substantially motivated' by the desire to deny 'access to ideas with which [she] disagree[s]." Panel Op. 11–12 (citations omitted).

## CONCLUSION

Accordingly, prospective *amici curiae* respectfully request that this Court grant leave to file the accompanying amicus brief.

Dated: September 10, 2024

Respectfully submitted,

*/s/ Katrina Feldkamp*

Katrina Feldkamp

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify on this 10th day of September, 2024, that I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF filing system. I further certify that all participants in this case are registered CM/ECF users and that all service will be accomplished by the appellate CM/ECF system.

*/s/ Katrina Feldkamp*
Katrina Feldkamp

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify on this 10th day of September, 2024, that this motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 27(d)(2)(A), 32(a)(5) and 32(a)(6). This motion totals 855 words and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ Katrina Feldkamp*
Katrina Feldkamp

*Counsel for Amici Curiae*

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY;
REBECCA JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,
*Plaintiffs-Appellees,*

v.

LLANO COUNTY; RON CUNNINGHAM, in his official capacity as Llano County Judge;
JERRY DON MOSS, in his official capacity as Llano County Commissioner;
PETER JONES, in his official capacity as Llano County Commissioner;
MIKE SANDOVAL, in his official capacity as Llano County Commissioner;
LINDA RASCHKE, in her official capacity as Llano County Commissioner;
AMBER MILUM, in her official capacity as Llano County Library System Director;
BONNIE WALLACE, in her official capacity as Llano County Library Board Member;
ROCHELLE WELLS, in her official capacity as Llano County Library Board Member;
RHODA SCHNEIDER, in her official capacity as Llano County Library Board Member;
GAY BASKIN, in her official capacity as Llano County Library Board Member,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
CIVIL ACTION NO. 1:22-cv-00424

**BRIEF OF THE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE INTERCULTURAL DEVELOPMENTAL RESEARCH ASSOCIATION, THE TRANSGENDER EDUCATION NETWORK OF TEXAS, AND TEXAS APPLESEED AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEES**

Janai S. Nelson
  *President & Director-Counsel*
Katrina Feldkamp*
Morenike Fajana
Allison Scharfstein
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200
kfeldkamp@naacpldf.org

Jin Hee Lee
Avatara Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

*Counsel for Amici Curiae*
* Counsel of Record

September 10, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... ii

CERTIFICATE OF INTERESTED PERSONS.......................................... v

INTEREST OF *AMICI CURIAE*................................................................1

ARGUMENT ..............................................................................................1

   I.  The First Amendment undoubtedly protects the rights of individuals to
      receive information and ideas...................................................................3

      A.     The right to receive information has long been recognized in a variety
         of settings .........................................................................................3

      B.     The right to receive information advances and protects key principles
         enshrined in the First Amendment ...................................................6

      C.     The right to receive information protects the public's access to library
         materials...........................................................................................10

   II.  Public libraries with diverse collections advance the goals of the First
      Amendment and are necessary for a thriving democracy. ...................11

   III. Llano County's censorship of certain books undermines the goals of the First
      Amendment ...........................................................................................15

CONCLUSION .........................................................................................19

CERTIFICATE OF SERVICE..................................................................20

CERTIFICATE OF COMPLIANCE ........................................................20

i

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Armstrong v. D.C. Pub. Libr.*,
    154 F.Supp.2d 67 (D.D.C. 2001).................................................................11

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982)..........................................................................*passim*

*Campbell v. St. Tammany Par. Sch. Bd*,
    231 F.3d 937 (5th Cir. 2000) .........................................................4, 11, 12

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
    447 U.S. 530 (1980)...........................................................................10

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)........................................................................9, 20

*Griswold v. Connecticut*,
    381 U.S. 479 (1965).........................................................................5–7

*Hiett v. U.S.*, 7
    *415 F.2d 664 (5th Cir. 1969)* ..........................................................7

*In re Express-News Corp.*,
    695 F.2d 807 (5th Cir. 1982) ............................................................7

*Kreimer v. Bureau of Police for Town of Morristown*,
    958 F.2d 1242 (3d Cir. 1992) .......................................................11, 12

*La. Consumer's League, Inc. v. La. State Bd. of Optometry Examiners*,
    557 F.2d 473 (5th Cir. 1977) ............................................................7

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965)......................................................................4–6, 9

*Martin v. Struthers*,
    319 U.S. 141 (1943)..........................................................................*passim*

*Minarcini v. Strongsville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ...........................................................12

*Neinast v. Bd. of Trustees of Columbus Metro. Libr.*,
    346 F.3d 585 (6th Cir. 2003) ...........................................................11

*Noble Drilling, Inc. v. Davis*,
    64 F.3d 191 (5th Cir. 1995) ..............................................................4

*Red Lion Broadcasting Co. v. F.C.C.*,
    395 U.S. 367 (1969)......................................................................6, 9, 10

*Stanley v. Georgia*,
    394 U.S. 557 (1969)......................................................................6, 8, 10

*Sweezy v. State of N.H. by Wyman*,
    354 U.S. 234 (1957).........................................................................17

*Thomas v. Collins*,
    323 U.S. 516 (1945) .................................................................................5, 10
*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ...................................................................................8, 9
*Va. State Bd. of Pharmacy v. Va. Citizen's Consumer Council*,
    425 U.S. 748 (1976) ............................................................................5, 6, 10

**Other Authorities**

Alex Byrne, *Democracy and Libraries: Symbol or Symbiosis?*, 39 Libr. Mgmt. 284, 291 (2018) ...........................................................................................16

Am. Libr. Ass'n, *ALA Code of Ethics*, https://www.ala.org/tools/ethics. .................15

Am. Libr. Ass'n, *American Library Association reports record number of unique book titles challenged in 2023* (Mar. 14, 2024), https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles.........................................................19

Am. Libr. Ass'n, *The Freedom to Read Statement*, https://www.ala.org/advocacy/intfreedom/freedomreadstatement ................15

Franklin D. Roosevelt, *Letter to Herbert Putnam*, 33 Q. J. of the Libr. of Cong. 171 (1976) ...........................................................................................11

The Guardian, *Nazi book burnings in Germany – archive, May 1933*, https://www.theguardian.com/books/2023/may/10/nazi-book-burnings-in-germany-may-1933 (last visited Aug. 8, 2024)..........................................14

Guha Krishnamurthi & Charanya Krishnaswami, *Title VII and Caste Discrimination*, 134 Harv. L. Rev. F. 456 (2021) ....................................................17

Isabel Wilkerson, *Caste: The Origins of Our Discontents* (2020)...........................17

Jamillah Bowman Williams et al., *#blacklivesmatter: From Protest to Policy*, 28 Wm. & Mary J. Race, Gender & Soc. Just. 103, 145–47 (2021) ..................18

Michael Kevane & William A. Sundstrom, *The Development of Public Libraries in the United States, 1870–1930: A Quantitative Assessment*, 49 Info. & Culture 117 (2014) ..........................................................................................12

Nancy Kranich, *Libraries and Democracy Revisited*, 90 Libr. Q. 121, 125 (2020) ............................................................................................13, 15

Paul T. Jaeger et al., *Libraries, Policy, and Politics in a Democracy: Four Historical Epochs*, 83 Libr. Q. 166, 168 (2024).........................................13–15

PEN America, *Educational Gag Orders* (Nov. 2021), https://pen.org/report/educational-gag-orders/ .............................................18

Ronald E. Britt II, *The Political and Social Change Driven by Protest: The Need to Reform the Anti-Riot Act and Examine Anti-Riot Provisions*, 90 Fordham L. Rev. 2269, 2272 (2022) ...............................................................................18

Rosenberg Library Museum, *The 144-Year History of the First Public Library in Texas*, https://www.rosenberg-library-museum.org/treasures/the-144-year-history-of-the-first-public-library-in-texas (last visited Aug. 8, 2024)...........14

Tabatha Abu El-Haj, *Breathing Room for the Right of Assembly*, 28 Wm. & Mary J. Race, Gender & Soc. Just. 29, 30 (2021) .......................................................17

Terrence Wilson, *Classroom Censorship Laws Sweep Across the U.S. South, Intercultural Dev. Rsch. Ass'n* (May 2023), https://www.idra.org/resource-center/classroom-censorship-laws-sweep-across-the-u-s-south/ ...................18

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies, pursuant to Fed. R. App. P. 26.1 and 5th Cir. R. 28.2.1, *amici curiae* NAACP Legal Defense and Educational Fund, Inc., Intercultural Development Research Association, Transgender Education Network of Texas, and Texas Appleseed are all nonprofit, non-partisan corporations. *Amici* have no parent corporations, and no publicly held corporation holds ten percent of their stock. The undersigned counsel of record certifies that, in addition to those listed in the parties' Certificate of Interested Persons, the following persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae**
NAACP Legal Defense and Educational Fund, Inc.
Intergenerational Developmental Research Association
Transgender Educational Network of Texas
Texas Appleseed

**Attorneys for Amici Curiae**
Janai Nelson
Jin Hee Lee
Katrina Feldkamp
Morenike Fajana
Avatara A. Smith-Carrington
Allison Scharfstein

Dated: September 10, 2024        */s/ Katrina Feldkamp*
                                      Katrina Feldkamp

                                      *Counsel for Amici Curiae*

LDF is the nation's first and foremost civil rights law organization. Founded in 1940 under the leadership of Thurgood Marshall, LDF's mission is to achieve racial justice and to ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other people of color. LDF has participated as counsel of record or amicus curiae in significant cases before various appellate courts regarding the First Amendment. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Dream Defs. v. Governor of the State of Fla.,* 57 F.4th 879 (11th Cir. 2023), *certified question answered sub nom. DeSantis v. Dream Defs.,* 389 So. 3d 413 (Fla. 2024); *Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022); and *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 584 U.S. 617 (2018). Consistent with its opposition to all forms of discrimination, LDF has a strong interest in the fair application of the First Amendment, including to ensure access to public library materials.

The Intercultural Development Research Association ("IDRA") is an independent, non-profit organization founded in 1973 dedicated to achieving equal

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* states that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than *amici curiae*, *amici curiae*'s members, and their counsel, contributed money intended to fund preparing or submitting this brief.

educational opportunity for every child through strong public schools. IDRA has collaborated with local, state, and national civil rights and student-led organizations to defend and demand access to high-quality, culturally relevant curricular and literary materials in school and community libraries. IDRA opposes efforts to censor diverse and historically underrepresented perspectives, and engages in policy and legal advocacy to protect young people's right to receive information, ideas, and inspiration. IDRA's work on this front includes producing Knowledge is Power, a national resource for educators and advocates to ensure excellence in education in the midst of censorship policies; maintaining the Southern Educational Equity Network (SEEN) School Resource Hub, which provides resources for educators, families, and communities to learn about issues like systemic racism and sexism; and investigating and submitting demand letters and OCR complaints to challenge discriminatory book removals.

Transgender Education Network of Texas ("TENT") is the largest statewide, BIPOC trans-led, trans-focused policy, education, and advocacy organization in the state of Texas. TENT works to accomplish gender-diverse equality through education and networking in both public and private forums. Through its efforts, TENT strives to halt discrimination through social, legislative, and corporate education.

Texas Appleseed is a justice-driven nonprofit working as the intersection of policy, advocacy, and the law to improve the lives of Texans. Fueled by data, legal expertise, and a commitment to supporting vulnerable communities, our work has shaped hundreds of state and local policies and positive affected millions of Texans. For more than 15 years, Texas Appleseed has built significant expertise in the fight to dismantle the school-to-prison pipeline and ensure equal access to culturally responsive education. Texas Appleseed has published numerous reports that highlight how centuries-long draconian educational practices, exclusionary discipline, and school policing detrimentally affect Black & Brown children, LGBTQ young people, and kids with disabilities. While critical race theory bans were being debated by the Texas Legislature in 2021, Texas Appleseed testified about the harmful impacts of classroom censorship, including adverse outcomes in the administration of school discipline.

## ARGUMENT

The well-established First Amendment right to receive information protects against censorship in public and private settings. It prevents the State from restricting access to information with which it disagrees so that a robust marketplace of ideas may foster diversity of thought and informed citizens capable of self-governance. Public libraries actualize this right to receive information by providing citizens with free and open access to a diverse array of ideas and viewpoints. As the panel

correctly held, Defendant-Appellant's removal of books about race and gender from the Llano County public library violates the First Amendment right to receive information and its prohibition against censorship that "is 'substantially motivated' by the desire to deny 'access to ideas with which [the State] disagree[s].'" Op. at 12 (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982); *Campbell v. St. Tammany Par. Sch. Bd*, 231 F.3d 937 (5th Cir. 2000); *Noble Drilling, Inc. v. Davis*, 64 F.3d 191, 191 (5th Cir. 1995)).

## I. The First Amendment undoubtedly protects the rights of individuals to receive information and ideas.

### A. *The right to receive information has long been recognized in a variety of settings.*

The Supreme Court has long recognized the right to receive information as a necessary corollary of and predicate to the First Amendment freedoms of speech and press. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). The right to receive ideas "follows ineluctably from the *sender's* First Amendment right to send them," *Id*. (quoting *Martin v. Struthers*, 319 U.S. 141 (1943); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965)), and gives true effect to the "*recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id*. The Court has held that the First Amendment must necessarily protect this right to receive, *see Martin v. Struthers*, 319 U.S. 141, 143 (1943) (cleaned up), because the fundamental right to speak freely would be powerless if

"otherwise willing addressees are not free to receive and consider [that speech]."
*Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, W.,
concurring); *see Va. State Bd. of Pharmacy v. Va. Citizen's Consumer Council*, 425
U.S. 748, 756 (1976) ("[W]here a speaker exists . . ., the protection afforded is to the
communication, to its source and to its recipients both. This is clear from the decided
cases."); *Griswold v. Connecticut*, 381 U.S. 479, 482–83 (1965) ("Without these
peripheral rights the specific rights would be less secure."). In short, "[i]t would be
a barren marketplace of ideas that had only sellers and no buyers." *Lamont*, 381 U.S.
at 308 (Brennan, W., concurring).

The right to receive information and ideas dates back over eighty years. As
early as 1943, the Supreme Court found that the First Amendment empowers
"vigorous enlightenment . . . to triumph over slothful ignorance," by embracing both
the right to distribute literature, even that which is "novel and unconventional," and
the right to receive it. *Martin*, 319 U.S. at 143. In the span of two years, the Court
applied both the speaker's right of speech and the recipient's right to receive
information to protect the door-to-door distribution of religious materials and union-
related speech by a labor organizer. *Thomas v. Collins*, 323 U.S. 516, 534 (1945);
*see* Jamie Kennedy, *The Right to Receive Information: The Current State of the
Doctrine and the Best Application for the Future*, 35 Seton Hall L. Rev. 789, 793–
94 (2005); *Martin*, 319 U.S. at 176–77.

The Supreme Court again recognized the right to receive information in the 1960s when a recipient of speech, rather than the speaker, challenged a federal statute that infringed upon his right to receive political propaganda. *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965). The Court in *Lamont* struck down the law and, in his concurrence, Justice Brennan declared the right to receive information to be "a fundamental right" essential to protecting the marketplace of ideas. *Id*. at 308. In that same term, the Court held in *Griswold v. Connecticut* that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge" by limiting married persons' ability to receive information about contraception. 381 U.S. 479, 482 (1965). In the decades since, the Court has enforced the right to receive information in a variety of public and private settings, such as the possession of print materials and films, including those with obscene content, in one's own home, *Stanley v. Georgia*, 394 U.S. 557 (1969); public broadcasts that feature diverse viewpoints, *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 (1969); private advertisements, *Va. State Bd. of Pharmacy v. Va. Citizen's Consumer Council*, 425 U.S. 748, 756; and books in school libraries, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). Similarly, nearly every court of appeals has recognized the right to receive information and has applied that right in a variety of settings, including to protect the public's access to interviews conducted by the press, ability to receive solicitations by mail, and right

to receive price advertising. *See In re Express-News Corp.*, 695 F.2d 807, 809 n.2 (5th Cir. 1982); *Hiett v. U.S.*, 415 F.2d 664, 671 (5th Cir. 1969) (citing *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301 (1965)); *La. Consumer's League, Inc. v. La. State Bd. of Optometry Examiners*, 557 F.2d 473, 474–75 (5th Cir. 1977).

## B.    The right to receive information advances and protects key principles enshrined in the First Amendment.

As repeatedly noted by the Supreme Court, protecting the right to receive information advances the purposes and objectives of the First Amendment to "afford[] the public access to discussion, debate, and the dissemination of information and ideas." *Pico*, 457 U.S. at 866 (quoting *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)).

*First*, the right to receive information ensures that the State cannot restrict access to information simply because it disagrees with the message being expressed. *See Pico*, 457 U.S. at 870–71. In *Griswold*, the Supreme Court considered the constitutionality of a statute which imposed criminal penalties on anyone who uses, or aids and abets another in using contraceptives. *Griswold*, 381 U.S. at 480. In striking down the statute, the Supreme Court noted that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge" to restrict access to information about contraceptives. *Id*. at 482; *see also Pico*, 457 U.S. at 866. This protection is no less sacred when the ideas

in question are controversial. Indeed, "[t]he authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin*, 319 U.S. at 143; *see also Stanley*, 394 U.S. at 564 ("This right to receive information and ideas, regardless of their social worth, is fundamental to our free society.") (cleaned up); *see also Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969) (holding that the State may not prohibit "a particular expression of opinion" simply "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

Notably, the Supreme Court recognizes the First Amendment right to receive information in the school setting, where the State is afforded slightly more discretion. In *Pico*, for example, the Court refused to endorse a school board's authority to remove books containing ideas with which they disagreed, instead holding that school boards may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Recognizing that schools are responsible for "educating the young for citizenship", the Court concluded that schools' discretion must not be used to "strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Pico*, at 864–65 (quoting *Barnette*, 319 U.S. at 637 (1943)).

8

*Second*, the right to receive information preserves the marketplace of ideas and, in doing so, fosters diversity of thought. In general, "the purpose of the First Amendment [is] to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," rather than permit the State to monopolize that marketplace. *Red Lion*, 395 U.S. at 90 (collecting cases); *see also Tinker*, 393 U.S. at 508–09 ("Any variation from the majority's opinion may inspire fear . . . But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom . . . that is the basis of our national strength"); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978) ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed . . . to enable the members of society to cope with the exigencies of their period."). The right to receive information furthers that purpose by protecting "the dissemination of ideas" and ensuring "the best tradition of free discussion." *Martin*, 319 U.S. at 145. Notably, this dissemination of ideas relies upon the right to receive information to ensure that "willing addresses are . . . free to receive and consider" those ideas. *Lamont*, 381 U.S. at 308 (Brennan, W., concurring). Indeed, "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Id*.; *see also*

*Stanley*, 394 U.S. at 564; *Pico*, 457 U.S. at 867; *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 541–42 (1980).[2]

*Third*, the right to receive information promotes and protects an informed citizenry that is capable of engaging in a pluralistic society and participating in self-governance. In *Martin*, the Supreme Court first recognized the right to receive information by striking down an ordinance that banned door-to-door distribution of leaflets because the ability of "every citizen" to access information "wherever he desires to receive it is so clearly vital to the preservation of a free society." *Martin*, 319 U.S. at 146–47. Similarly, the *Thomas* Court cited the First Amendment right to receive information when ensuring workers' "right fully and freely to discuss and be informed" about the possibility and advantages of joining a union. *Thomas v. Collins*, 323 U.S. 516, 534 (1945). By protecting "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences," the right to receive information "produces an informed public capable of conducting its own affairs." *Red Lion*, 395 U.S. at 390–92.

---

[2] The right to receive information, and the marketplace of ideas that it protects, may be violated even when the recipient could obtain the information through some other means. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 n.15 (1976). The Supreme Court is "aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated." *Id.*

This right to information is particularly important in school and public libraries because they are places dedicated to knowledge, inquiry, and study with the very purpose of providing access to all members of our society. *Pico*, 457 U.S. at 868. Indeed, "democracy can never be undermined if we maintain our library resources and a national intelligence capable of utilizing them." Franklin D. Roosevelt, *Letter to Herbert Putnam*, 33 Q. J. of the Libr. of Cong. 171 (1976). Moreover, censoring information that primarily reflects experiences and perspectives outside of the majority, as Defendants-Appellants have done here, not only deprives the public of that information, but also undermines the ability of individuals with those experiences and perspectives to participate in self-governance.

### C.     *The right to receive information protects the public's access to library materials.*

Given the institutional role of libraries as a repository of information and ideas, it is no surprise that the Supreme Court in *Pico*—as well as multiple courts of appeals, including this Court—have held that the right to receive information protects the public's access to information in libraries. *See, e.g., Campbell v. St. Tammany Par. Sch. Bd*, 231 F.3d 937 (5th Cir. 2000); *Neinast v. Bd. of Trustees of Columbus Metro. Libr.*, 346 F.3d 585 (6th Cir. 2003); *Armstrong v. D.C. Pub. Libr.*, 154 F.Supp.2d 67 (D.D.C. 2001); *Kreimer v. Bureau of Police for Town of*

*Morristown*, 958 F.2d 1242 (3d Cir. 1992). Notably, the Supreme Court and this Court relied upon the right to receive information when limiting efforts to remove books from school libraries, where the State is afforded slightly more discretion than in public libraries because of their vitally important role "in the preparation of individuals for participation as citizens." *Pico*, 457 U.S. at 864; *Campbell v. St. Tammany Par. Sch. Bd*, 231 F.3d 937 (5th Cir. 2000). In a public library, where the State is not afforded such discretion, the right of access to a library, "the quintessential locus of the receipt of information," and the materials contained therein must be upheld. *Kreimer*, 958 F.2d at 1255.

## II.    Public libraries with diverse collections advance the goals of the First Amendment and are necessary for a thriving democracy.

The public library, "a mighty resource in the free marketplace of ideas," is the brick-and-mortar actualization of the right to receive information. *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582–83 (6th Cir. 1976) (citing *Abrams v. United States*, 250 U.S. 616 (1919)) (Holmes, J., dissenting). As such, this nation has a long history of providing libraries where citizenry can freely and openly access information that encompasses a diverse array of ideas and viewpoints.

Although the first public library did not open its doors until 1833, various forms of free lending libraries were established across the American colonies in the 1600s. Michael Kevane & William A. Sundstrom, *The Development of Public*

*Libraries in the United States, 1870–1930: A Quantitative Assessment*, 49 Info. & Culture 117 (2014). In the 1730s, Benjamin Franklin founded the first public lending library and later credited libraries for "improv[ing] the general conversation of the Americans" by educating "common tradesmen and farmers" and inspiring them to "defen[d] their privileges." Nancy Kranich, *Libraries and Democracy Revisited*, 90 Libr. Q. 121, 125 (2020). Although uncommon for the time, it was Franklin's belief that libraries could be a tool for promoting equality and raising the quality of public discourse through the pursuit of knowledge. Paul T. Jaeger et al., *Libraries, Policy, and Politics in a Democracy: Four Historical Epochs*, 83 Libr. Q. Info., Cmty., Pol'y 166, 168 (2024). Other early leaders saw public libraries as a means to "prevent the wealthy and socially elite from having hegemonic domination over learning and education." *Id.* at 167. The middle of the Nineteenth Century witnessed the first tax-supported public libraries organized to supplement public education, and, by the later part of that century, "public libraries continued 'the educational process where the schools left off and by conducting a people's university, a wholesome capable citizenry would be fully schooled in the conduct of a democratic life.'"[3] Kranich, *supra*, at 126.

_____

[3] For example, in 1874 the Galveston Free Library was established and made available to "local citizens free of charge . . . with the City providing $250 per month for 'maintenance, preservation,

In the twentieth century, public libraries in the United States responded to acts of censorship with a strengthened commitment to providing unfettered access to information, including materials considered to be controversial or unpopular. For example, in the 1930s, foreign countries were experiencing book burnings,[4] while public librarians in the United States emphasized their obligation to provide open access to information so that every-day people could stay informed and, more importantly, make their own decisions about current issues. *Id*. at 131; *see also* Paul T. Jaeger et al., *supra*, at 170 ("In the face of the international rise of fascism and its attendant censorship and other social controls, libraries began to take a professional stance that supported freedom of expression.").

Accordingly, in 1939, the American Library Association (ALA) adopted "the Library's Bill of Rights, the precursor of the Library Bill of Rights []—the profession's basic statement on intellectual freedom." *Id*. The ALA's release of this

---

and increase.'" In 1904 the Rosenberg Library opened its doors and absorbed the Galveston Public Library. A separate "Colored Branch" for Black people was completed shortly thereafter [] and was housed in an annex to Central High School, the first high school in Texas for Black students. Rosenberg Library Museum, *The 144-Year History of the First Public Library in Texas*, https://www.rosenberg-library-museum.org/treasures/the-144-year-history-of-the-first-public-library-in-texas (last visited Aug. 8, 2024).

[4] On May 10, 1933, Nazi students gathered to watch the burning of books deemed "un-German." Loud cheers erupted "[a]s the books were thrown on the flames the names of the offending authors were read out." Notably, the books burned included works by Jewish authors like Albert Einstein and materials, including medical textbooks, from the Hirschfeld Institute. *Nazi book burnings in Germany – archive, May 1933*, The Guardian, https://www.theguardian.com/books/2023/may/10/nazi-book-burnings-in-germany-may-1933 (last visited Aug. 8, 2024).

statement was driven, in part, by "the assertion that voters must have access to a full range of perspectives on all significant political and social issues". Paul T. Jaeger et al., *supra*, at 170. The following year, the ALA adopted a Code of Ethics, embracing the librarian's "special obligation to ensure the free flow of information and ideas to present and future generations." Am. Libr. Ass'n, *ALA Code of Ethics*, https://www.ala.org/tools/ethics. In 1953, when faced with demands to remove books designated as controversial during the McCarthy era, the ALA insisted that libraries continue providing access to various materials in the face of political repression and persecution. *Id*. at 131. And in a 1959 statement, the ALA asserted that "[i]t is in the public interest for . . . librarians to make available the widest diversity of views and expression, including those that are unorthodox, unpopular, or considered dangerous by the majority." Am. Libr. Ass'n, *The Freedom to Read Statement*, https://www.ala.org/advocacy/intfreedom/freedomreadstatement.

In the last several decades, public libraries in the United States continue to serve as a place for the unbridled pursuit of independent thought and information. In doing so, libraries provide an indispensable service to people in the United States as a "uniquely democratic institution," Ensuring that library patrons have continued access to open information, which allows them to fully engage in the democratic process. Kranich, *supra*, at 121. In fact, research shows that open access to information helps informed citizenries become active participants in their

governments. An analysis of global government systems and library use found a "symbiotic relationship" between libraries and democracy; nations with well-established democratic governments tend to have high levels of public library provision and use by citizens. Alex Byrne, *Democracy and Libraries: Symbol or Symbiosis?*, 39 Libr. Mgmt. 284, 291 (2018). Public libraries therefore support a key pillar of democratic society—the ability to access information about diverse ideas and experiences, seek knowledge to further independent inquiry, and exercise freedom of thought as a means of becoming an informed and engaged citizen in a pluralistic and multi-racial democracy.

### III. Llano County's censorship of certain books undermines the goals of the First Amendment.

The First Amendment does not tolerate restricting access to ideas simply because they are unorthodox, unpopular, or contentious. *Supra*, Sec. I.B, at 6. While such ideas "might disturb the complacent," they also support critical engagement in our democracy and are "essential if vigorous enlightenment [i]s ever to triumph over slothful ignorance." *Martin*, 319 U.S. at 143. Indeed, it is precisely because the information might be unconventional, unorthodox, and/or disturb the complacent that makes them worthy of the Constitution's protection. "History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were

ultimately accepted. Mere unorthodoxy or dissent from the prevailing mores is not to be condemned." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 251 (1957).

A brief examination of some of the "objectionable" texts, Appellees' Brief, Doc. 99-1 at 7, that Appellants removed from general circulation in the Llano County library system demonstrates precisely how these texts promote the right to receive information and advance the goals of the First Amendment. One such text, *Caste* by Isabel Wilkerson, examines the history of caste-based discrimination in the United States and elsewhere. Guha Krishnamurthi & Charanya Krishnaswami, *Title VII and Caste Discrimination*, 134 Harv. L. Rev. F. 456, 462 n. 4 (2021); Isabel Wilkerson, *Caste: The Origins of Our Discontents* (2020).

> As a means of assigning value to entire swaths of humankind, caste guides each of us often beyond the reaches of our awareness. It embeds into our bones an unconscious ranking of human characteristics and sets forth the rules, expectations, and stereotypes that have been used to justify brutalities against entire groups within our species. In the American caste system, the signal of rank is what we call race, the division of humans on the basis of their appearance. In America, race is the primary tool and the visible decoy, the front man, for caste. (pg 23)

Wilkerson's conception of an American caste system grounded upon race is subject to ongoing national debate. Following the killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and others in 2020, Americans across the country participated in the largest social justice demonstration in United States' history in calling for racial justice throughout all sectors of society. Tabatha Abu El-Haj,

*Breathing Room for the Right of Assembly*, 28 Wm. & Mary J. Race, Gender & Soc. Just. 29, 30 (2021); Ronald E. Britt II, *The Political and Social Change Driven by Protest: The Need to Reform the Anti-Riot Act and Examine Anti-Riot Provisions*, 90 Fordham L. Rev. 2269, 2272 (2022).

At the same time, discussions about race relations, the history of racism and the legacy of segregation may cause discomfort, anguish, and even anger. *See* Tabatha Abu El-Haj, *supra*, at 43–45; Jamillah Bowman Williams et al., *#blacklivesmatter: From Protest to Policy*, 28 Wm. & Mary J. Race, Gender & Soc. Just. 103, 145–47 (2021). Indeed, some state officials, including in states within the Fifth Circuit, have sought to restrict access to information on these topics in part because they can be uncomfortable and contentious. *See Educational Gag Orders*, PEN America (Nov. 2021), https://pen.org/report/educational-gag-orders/; Terrence Wilson, *Classroom Censorship Laws Sweep Across the U.S. South*, Intercultural Dev. Rsch. Ass'n (May 2023), https://www.idra.org/resource-center/classroom-censorship-laws-sweep-across-the-u-s-south/. Nevertheless, discussions on the topic of race, like the ones featured in *Caste: The Origins of Our Discontents*, do not warrant removal from libraries. Instead, the fact that *Caste* encourages its readership to probe past discomfort and engage in critical introspection demonstrates why the right to receive information is so integral to our democratic principles. *Caste* provides patrons of libraries with the tools necessary to decide for themselves,

whether "we are responsible for recognizing that what happened in previous generations at the hands of or to people who look like us set the stage for the world we now live in."

Likewise, *Gabi, a Girl in Pieces* opens the reader's mind to experiences that may be familiar or completely foreign to their own. Discussions about gender and sexuality have often been subject to critiques that push lesbian, gay, bisexual, and transgender representation in literature to the margins.[5] Such information is often censored under the guise of concerns for younger readers but tends to criminalize and scandalize topics that would otherwise provide people with opportunities to engage with materials and gain perspectives that can bridge divides. Author Isabel Quintero's protagonist Gabi does just that by providing readers with a look into her life as she goes through her last year of high school while dealing with her father's drug dependency, navigating her friend's teenage pregnancy, and learning about another friend's sexuality.

> So we finally found out what happened on the day that Sebastian's parents kicked him out. Apparently his dad said something like, "Odio a los jotos! I hate fags!" (Which must've sounded weird because his dad has a super thick Mexican accent.) "The two worst things that could happen to a man are that his wife sleeps with another man and that his son is gay. And since tu madre querida, ya se habia revolcado with that guy from the laundrymat and is

---

[5] *See, e.g.*, Am. Libr. Ass'n, *American Library Association reports record number of unique book titles challenged in 2023* (Mar. 14, 2024), https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles (documenting 1,247 demands to censor library books and materials in 2023, a significant number of which represented the voices and lived experiences of LQBTIA+ people).

obviously a whore, there was only one more thing left! You ruined my life. Chingado. Hijo de puta! Get out of my house! I don't want to see you ever again. You are no son of mine. (p.22)

Literary characters like Gabi provide readers with some knowledge and perspective about the struggles of LGBTQ youth and, in the process, can convey a sense of shared humanity.

Texts like *Caste* and *Gabi* undoubtedly explore "matters of public concern" about which all Americans have the right to "discuss publicly and truthfully." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. at 776. The First Amendment protects the right of all people to continued access to "issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *See id.* The strength and resilience of our democracy depends upon this protection and are best served when public libraries, like the one in Llano County, enable the public to obtain information and enrichment so they may reach their own conclusions about the merits of contested issues that are subject to public debate.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's preliminary injunction.

Dated: September 10, 2024

Respectfully submitted,

/s/ Katrina Feldkamp

Janai S. Nelson
  *President & Director-Counsel*
Katrina Feldkamp
*Counsel of Record*
Morenike Fajana
Allison Scharfstein
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, Fifth Floor
New York, NY 10006
(212) 965-2200
kfeldkamp@naacpldf.org

Jin Hee Lee
Avatara Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
40 Rector Street, Fifth Floor
New York, NY 10006

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify on this 10th day of September, 2024, that I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF filing system. I further certify that all participants in this case are registered CM/ECF users and that all service will be accomplished by the appellate CM/ECF system.

*/s/ Katrina Feldkamp*
Katrina Feldkamp

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify on this 10th day of September, 2024, that this brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 27(d)(2)(A), 32(a)(5) and 32(a)(6). This brief totals 4,986 words, which abides by the 6,500-word limit for this brief, and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

*/s/ Katrina Feldkamp*
Katrina Feldkamp

*Counsel for Amici Curiae*