No. 23-50224

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY, REBECCA JONES, RICHARD DAY, CYNTHIA WARINGAND DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY JUDGE, JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, PETER JONES, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, MIKE SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR, BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, RHODA SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER AND GAY BASKIN, IN HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

---

Appeal from the United States District Court,
For the Western Division of Texas, Austin Division
1:22-cv-00424-RP

---

**BRIEF OF AMICI CURIAE TEXAS FREEDOM TO READ PROJECT
IN SUPPORT OF APPELLEES AND EN BANC AFFIRMANCE**

---

*(Counsel Listed Inside Cover)*

Katherine Raunikar
Sydney C. Rupe
JORDAN, LYNCH & CANCIENNE PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone:  713.955.4025
kraunikar@jlcfirm.com
srupe@jlcfirm.com

*Counsel for Amici Curiae*
*Texas Freedom to Read Project*

## CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons are entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| Texas Freedom to Read Project | Amicus curiae |
| Katherine Raunikar | Counsel to amicus |
| Sydney Rupe | Counsel to amicus |

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for amicus certifies that (1) amicus does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in amicus.

Dated: September 10, 2024        By: */s/ Katherine Raunikar*
                                       Katherine Raunikar

# TABLE OF CONTENTS

CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT ................................................................... iii

TABLE OF AUTHORITIES .................................................................... vi

INTEREST OF AMICUS CURIAE ........................................................1

SUMMARY OF ARGUMENT ...............................................................2

BACKGROUND ....................................................................................4

    A.    Texas: the centerstage of the book-ban battleground. ..........................4

    B.    Book bans have devastated Texas libraries. ........................................7

    C.    Book bans enforced "in the interest of the children" are in fact harmful to children's interests. ...........................................................9

ARGUMENT ........................................................................................10

    A.    Censorship of ideas takes from parents the right to provide their children access to a marketplace of ideas. ..........................................10

        1. Parents are stewards of their children's First Amendment broad right to receive information in public libraries. ...............................................10

        2. Parents have a fundamental right to control their child's education in a manner free from undue outside influence. ........................................13

        3. Unfettered access to literary materials allows parents to guide their children's education as they see fit. .....................................................15

    B.    Defendants' banning of books in a public library violates the First Amendment and parents' right to control their children's education. .16

        1. The Constitution prohibits censorship in public libraries based on disagreement with a book's ideas. .......................................................16

        2. Defendants' censorship of ideas infringes on a parent's right to determine their child's education. ......................................................20

3. Parents whose elected officials side with the vocal minority must rely on courts to fight censorship and protect their fundamental rights.....23

C.   Narrowly excluding books based on "obscenity" is not an invitation to limit all ideas with which a person disagrees.....................................24

CONCLUSION ....................................................................................................27

CERTIFICATE OF COMPLIANCE .....................................................................30

CERTIFICATE OF SERVICE ..............................................................................31

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Armstrong v. D.C. Pub. Libr.*,
   154 F. Supp. 2d 67 (D.D.C. 2001) ....................................................10

*Ashcroft v. Am. Civ. Liberties Union*,
   542 U.S. 656 (2004).........................................................................27

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)................................................................ passim

*Butler v. Michigan*,
   352 U.S. 380 (1957).........................................................................27

*Campbell v. St. Tammany Parish School Bd.*,
   64 F.3d 184 (5th Cir. 1995)..............................................11, 12, 17

*Cary v. Bd. of Educ.*,
   598 F.2d 535 (10th Cir. 1979).........................................................16

*Doe v. City of Albuquerque*,
   667 F.3d 1111 (10th Cir. 2012) ......................................................10

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975).........................................................................25

*Ginsberg v. New York*,
   390 U.S. 629 (1968).........................................................................25

*Kreimer v. Bur. of Police*, 958 F.2d 1242 (3d Cir. 1992) .......................10

*Lamont v. Postmaster Gen. of U.S.*,
   381 U.S. 301 (1965)................................................................. 24, 25

*Little v. Llano Cnty.*,
   No. 1:22-CV-424-RP, 2023 WL 2731089, at *1 (W.D. Tex. Mar. 30,
   2023) ................................................................................... passim

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
   594 U.S. 180 (2021).........................................................................18

*Meyer v. Nebraska*,
   262 U.S. 390 (1923)................................................................. 13, 14

*Minarcini v. Strongsville City Sch. Dist.*,
    541 F.2d 577 (6th Cir. 1976) ..................................................................22

*Monteiro v. Tempe Union High Sch. Dist.*,
    158 F.3d 1022 (9th Cir. 1998) ...............................................................16

*Neinast v. Bd. of Trs. of the Columbus Metro. Libr.*,
    346 F.3d 585 (6th Cir. 2003) ..................................................................10

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ........................................................... 13, 14, 20

*Pratt v. Ind. Sch. Dist.*
    No. 831, 670 F.2d 771 (8th Cir. 1982) ................................. 16, 20, 22

*Sheck v. Baileyville Sch. Comm.*,
    530 F. Supp. 679 (D. Me. 1982) ............................................................16

*Sund v. City of Wichita Falls*,
    121 F. Supp. 2d 530 (N.D. Tex. 2000) ...................................... passim

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..............................................................................11

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..............................................................................13

## Constitutional Provisions & Statutes

Tex. Admin. Code § 2.4 ....................................................................................23

Tex. Fam. Code § 151.001 ...............................................................................13

## Other Authorities

B.J. Novak, The Book with No Pictures (2014). ..............................................18

Bayliss Wagner, *EXCLUSIVE: Former Librarian, Fired After Refusing to
    Remove Books, Sues Llano County*, Austin American-Stateman (Mar. 6,
    2024, 10:04 PM),
    https://www.statesman.com/story/news/politics/state/2024/03/04/exclusive-
    llano-county-tx-librarian-suzette-bakerfired-after-refusing-censor-books-
    files-lawsuit/72774129007/ ....................................................................8

Bayliss Wagner, *Federal Appellate Court Finds Some Llano County Book Removals Violated First Amendment*, AUSTIN AMERICAN-STATESMAN (June 8, 2024, 11:09 AM), https://www.statesman.com/story/news/politics/state/2024/06/08/federal-court-affirms-texas-book-removals-violated-first-amendment-llano-county-public-library/74007015007/ ...........................................................................8

Brian Lopez, *Texas Has Banned More Books than Any Other State, New Report Shows*, THE TEXAS TRIBUNE (Sept. 19, 2022, 5:00 AM), https://www.texastribune.org/2022/09/19/texas-book-bans/ ..............................4

*Fifth Circuit Court Strikes Down Texas Book Ban Law as Unconstitutional*, THE AUTHORS GUILD (Jan. 19, 2024), https://authorsguild.org/news/fifth-circuit-court-strikes-down-texas-book-ban-law-reader-act/.................................5

Hannah Delinger & Alejandro Serrano, *Texas Politicians, Not Parents, Behind Most Efforts to Ban Books*, HOUSTON CHRON. (Aug. 10, 2022) https://www.houstonchronicle.com/news/investigations/article/Texas-book-bans-driven-by-GOP-pressure-not-parents-17362170.php?utm_source=marketing&utm_medium=google&utm_campaign=engagement&utm_term=one_tap&gad_source=1&gclid=CjwKCAjwoJa2BhBPEiwA0l0ImMF3mhJ0fFwUCfSeHS5dwTSaLJJg7F3iBSFHZZDEhQyASLfOp1JrmRoCLTkQAvD_BwE. .......................................10

Jamelle Bouie, Opinion: *What the Republican Push for 'Parents' Rights' Is Really About*, N.Y. TIMES (Mar 28, 2023), https://www.nytimes.com/2023/03/28/opinion/parents-rights-republicans-florida.html....................................................................................................9

Jeremy Schwartz, *Book Bans in Texas Spread as New State Law Takes Effect*, PROPUBLICA (Oct. 11, 2023, 6:00 AM) https://www.propublica.org/article/book-bans-texas-libraries ...........................5

Kristi L. Bowman, *The Government Speech Doctrine and Speech in Schools*, 48 WAKE FOREST L. REV. 211 (2013).................................................................24

Lester Asheim, *Not Censorship But Selection*, AM. LIBR. ASS'N, www.ala.org/advocacy/intfreedom/NotCensorshipButSelection (last visited Sept. 10, 2024)....................................................................................................19

Matt Wilson, *Conservative Book Ban Activists Target Rio Grande Valley School Districts*, PROGRESS TIMES (May 23, 2024),

https://www.progresstimes.net/2024/05/23/conservative-book-ban-activists-target-rio-grande-valley-school-districts/...............................................7

May Lonergan, Note, *Obscenity and Book Banning: Properly Defining Obscenity and Book Banning: Properly Defining "Pervasively Vulgar"*, 34 GEO. MASON U. CIV. RTS. L.J. 293 (2024) ....................................................12

Mike Hixenbaugh et al., Inside the Two-year Fight to Bring Charges Against School Librarians in Granbury, Texas, NBC NEWS (Jul. 25, 2024, 1:00 PM) https://www.nbcnews.com/news/us-news/school-librarians-banned-books-investigation-texas-rcna161444...........................................................................7

RUDINE SIMS BISHOP, MIRRORS, WINDOWS, AND SLIDING GLASS DOORS, *originally appeared in* Perspectives: Choosing and Using Books for the Classroom, Vol. 6, no. 3, Summer 1990 ...............................................................2

Sabrina Baêta et al., *Banned in the USA: Narrating the Crisis*, PEN AMERICA (Apr. 6, 2024), https://pen.org/report/narrating-the-crisis/ ..................................4

Suzanne Freeman, *Llano County Could Close Libraries*, DAILYTRIB (Apr. 10, 2023), https://www.dailytrib.com/2023/04/10/2-llano-library-lawsuit-defendants-ordered-before-judge-april-27/ ..........................................................8

## INTEREST OF AMICUS CURIAE[1]

Texas Freedom to Read Project ("TXFTRP") is a 501(c)(3) non-partisan, non-profit organization that supports, connects, and mobilizes parent and community-led initiatives fighting for student rights and against literary censorship in Texas. TXFTRP strives to protect and preserve the rights of every Texan, especially public-school students, to freely access information and ideas. TXFTRP was launched in November 2023 by three parents of Texas public school students. Since 2021, parents in TXFTRP have seen their children and children's peers lose access to hundreds of school library books due to those coordinating politically motivated challenges based on content- and viewpoint-based ideological objections. These challengers have simultaneously been orchestrating pressure campaigns in public libraries, including in Llano County.

Political actors nonetheless dismiss TXFTRP's concerns regarding violations of parents' rights to guide their children's education, and those children's rights to access ideas and information. They often defend such restrictions on access to school library books as not being "book bans" because the same books remain available through students' local public library. So, if this Court decides not to intervene to

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus certifies that no person or entity, other than amicus, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to this brief's filing.

protect access to stories, viewpoints, and perspectives in Texas's public libraries, parents like those who founded TXFTRP will have no place to turn to ensure protection of their children's rights. How the Court rules will affect parents' constitutional right to control their children's education and First Amendment right to freely access ideas and information free of censorship.

TXFTRP trusts parents to know what is best for their families and to guide their own children in choosing books to read, books that will strengthen families one story at a time. This freedom to read must be protected.

## SUMMARY OF ARGUMENT

Books can be many things to children. They can be windows, "offering views of worlds that may be real or imagined, familiar or strange."[2] These windows can become sliding glass doors, through which children can walk "in imagination to become part of whatever world has been created or recreated by the author."[3] Or, "when lighting conditions are just right," these windows can transform into mirrors. In this way, "[l]iterature transforms human experience and reflects it back to us."[4]

---

[2] Rudine Sims Bishop, Mirrors, Windows, and Sliding Glass Doors, *originally appeared in* Perspectives: Choosing and Using Books for the Classroom, Vol. 6, no. 3, Summer 1990.

[3] *Id.*

[4] *Id.*

Through such reflection, so too can children see their own lives and experiences and find how they fit in within the human experience.[5]

As this case demonstrates, children's fundamental First Amendment right to receive information is being slowly chipped away—a right that, as the Supreme Court has affirmed for decades, deserves special protection. Although precedent discusses the fundamental right to receive information as it arises in schools, courts have limited this right only to account for educational policy. Children's First Amendment right to receive ideas is far more expansive in public libraries, where school-centric policy considerations are not at play.

The First Amendment protects children's rights to receive information by prohibiting books' censorship in public libraries. Such censorship takes place when a person impedes access to a book based on its perceived viewpoint. If the motivation behind excluding a book from a library's collection is based on a disagreement with the book's perceived viewpoint, and that disagreement was a substantial factor in the book's exclusion, it is unconstitutional censorship.

The First Amendment prohibits censorship of ideas in public libraries. Otherwise, parents could not adequately exercise the prerogative they otherwise have to provide their children access to a broad range of ideas. The world is a

---

[5] *Id.*

3

complicated place, with a range of perspectives and experiences that no one parent could realistically convey to their child based on experience alone, making public libraries a vital source of information. A vocal minority should not control whether all parents can provide this range of perspectives to their children. Parents who wish to limit what their children can read need only exercise that discretion for their children alone—not infringe on others' rights.

Keeping children from obscene content is a genuine concern. However, for those who wish to censor books in libraries while hiding behind claims of "obscenity," this narrow exception was not crafted to provide cover for bigotry. The Court should adopt Judge Wiener's opinion and order Llano County to return all banned books to its public library

## BACKGROUND

A.    **Texas: the centerstage of the book-ban battleground.**

Proponents of booking banning cast their oppositions' worries aside as "overblown." But look no further than Texas, a state that has led the country in book bans for years—particularly bans in schools.[6] Texas parents who want to provide

---

[6] Sabrina Baêta et al., *Banned in the USA: Narrating the Crisis*, PEN AMERICA (Apr. 6, 2024), https://pen.org/report/narrating-the-crisis/ (listing Texas, Florida, and Iowa as top states in school districts banning books); *see also* Brian Lopez, *Texas Has Banned More Books than Any Other State, New Report Shows*, THE TEXAS TRIBUNE (Sept. 19, 2022, 5:00 AM), https://www.texastribune.org/2022/09/19/texas-book-bans/.

their children access to a broader range of ideas have had nowhere to turn but the public library.

But a small, vocal group of Texans—buoyed by the funding and influence of a larger political movement—has been pushing to expand these bans beyond schools. Even bookstores have come under fire, including from an unconstitutional Texas law that required the stores to denote certain books as "sexually explicit" before sale.[7] Luckily, the Fifth Circuit saw this attempt for what it was and held that the law's enforcement would affect Texans' First Amendment rights.[8]

One of the bastions of these bans both inside and outside public schools has been Bonnie Wallace, a major player in the dispute before the Court. Wallace and several other community members have campaigned for the removal of "inappropriate" books from the Llano County Public Library and its three physical locations.[9] Books that Wallace has called "inappropriate" include those containing elements of LGBTQ+ persons' experiences, sexuality in general, coming-of-age

---

[7] Jeremy Schwartz, *Book Bans in Texas Spread as New State Law Takes Effect*, PROPUBLICA (Oct. 11, 2023, 6:00 AM) https://www.propublica.org/article/book-bans-texas-libraries (noting school's ban of Scholastic Book Fair from school grounds because "unfortunately, we have seen more and more books that promote and support LBGTQ+ views").

[8] *Fifth Circuit Court Strikes Down Texas Book Ban Law as Unconstitutional*, THE AUTHORS GUILD (Jan. 19, 2024), https://authorsguild.org/news/fifth-circuit-court-strikes-down-texas-book-ban-law-reader-act/.

[9] *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *1 (W.D. Tex. Mar. 30, 2023).

stories, and critical race theory.[10] All of these books—including those on race—were purportedly "pornographic" or "obscene."[11] Also on Wallace's list were children's books featuring "butts" and "farts," which the group considered to promote "grooming" behavior.[12]

In July 2021, Wallace and her group complained to the Llano County Commissioners Court, which governs the library.[13] The Commissioners Court instructed the library to remove books each time Wallace brought a complaint.[14] It also closed the library for days so library staff could search for "inappropriate" books[15]—again, only removing books that the community group had deemed as much.[16] Five months later, the Commissioners Court dissolved the existing library board and appointed a new "Library Advisory Board," counting Wallace and the other objecting community members among its members.[17] The Board required that

---

[10] *Id.* at *2.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at *3.

[16] *Id.*

[17] *Id.*

it must approve any new books before they could be added to the library's collection, and it halted all book purchases.[18] Two months later, all staff librarians were banned from Board meetings, which then were closed to the public altogether.[19] To date, Wallace has continued her literary rampage, traveling to all corners of the state to demand removal of 676 books from public school libraries.[20]

## B.    Book bans have devastated Texas libraries.

Librarians have the training and decision-making power to decide which books to add to the collection and which books—based on objective criteria—should be removed. Yet as Llano County has demonstrated, decisions about public libraries' content are being shifted away from trained librarians and into public figures' and extreme activists' control. To wrest control from librarians' hands, some of these overzealous interest groups even go so far as to use criminal prosecution to intimidate Texas librarians.[21] TXFTRP has heard this story time and again from

---

[18] *Id.*

[19] *Id.*

[20] *See, e.g.*, Matt Wilson, *Conservative Book Ban Activists Target Rio Grande Valley School Districts*, PROGRESS TIMES (May 23, 2024), https://www.progresstimes.net/2024/05/23/conservative-book-ban-activists-target-rio-grande-valley-school-districts/.

[21] Mike Hixenbaugh et al., *Inside the Two-year Fight to Bring Charges Against School Librarians in Granbury, Texas*, NBC NEWS (Jul. 25, 2024, 1:00 PM) https://www.nbcnews.com/news/us-news/school-librarians-banned-books-investigation-texas-rcna161444.

librarians across the state. Often, these attacks force librarians to quickly, quietly cave to demands out of fear and hope that compliance will send book banners on their way. As the Llano County librarians did initially, a few choose to fight these bans.

But Llano County is also an example of libraries that have fought book bans and are now suffering the consequences. Wallace threatened to shut down the Llano County library altogether;[22] while not formally succeeding, she and her cohort have effectively shuttered the institution through their pre-suit actions. With such limited resources in place, the pause on acquisition of new books for which Wallace and other members of Board advocated has continued.[23] One librarian who resisted the bans was fired.[24]

---

[22]Suzanne Freeman, *Llano County Could Close Libraries*, DAILYTRIB (Apr. 10, 2023), https://www.dailytrib.com/2023/04/10/2-llano-library-lawsuit-defendants-ordered-before-judge-april-27/ (quoting Bonnie Wallace text message: "[I]f we lose the injunction, [the county judge] will close the library because he will not put the porn back into the kid's section. Very [c]ourageous! Keep praying!").

[23] Bayliss Wagner, *Federal Appellate Court Finds Some Llano County Book Removals Violated First Amendment*, AUSTIN AMERICAN-STATESMAN (June 8, 2024, 11:09 AM), https://www.statesman.com/story/news/politics/state/2024/06/08/federal-court-affirms-texas-book-removals-violated-first-amendment-llano-county-public-library/74007015007/ ("[Llano C]ounty has frozen library book purchases since 2021 and has blocked access to more than 17,000 digital titles.").

[24] Bayliss Wagner, *EXCLUSIVE: Former Librarian, Fired After Refusing to Remove Books, Sues Llano County*, AUSTIN AMERICAN-STATESMAN (Mar. 6, 2024, 10:04 PM), https://www.statesman.com/story/news/politics/state/2024/03/04/exclusive-llano-county-tx-librarian-suzette-bakerfired-after-refusing-censor-books-files-lawsuit/72774129007/.

Additionally, the library's three branches now "operate[ ] with one full-time and one part-time librarian, compared with three full-time librarians in 2021" and "are now closed on weekends."[25] By forcing libraries' weekend closure, Wallace and others have taken away the one day when parents and their children would most likely be able to visit the library, for many parents work until the weekday closure time of 5:30 p.m. The weekend closure robs families of precious and magical moments together, reading and exploring the library.

## C.    Book bans enforced "in the interest of the children" are in fact harmful to children's interests.

In the fervor to implement broader book bans across Texas, the focus of these ban-happy individuals and government actors has ostensibly been the interest of the community's children.[26] Yet these actors have taken this stance without consulting any parents who think differently—certainly not the parents who want to provide their children access to more ideas.[27]

---

[25] *Id.*

[26] Jamelle Bouie, *Opinion: What the Republican Push for 'Parents' Rights' Is Really About*, N.Y. TIMES (Mar 28, 2023), https://www.nytimes.com/2023/03/28/opinion/parents-rights-republicans-florida.html ("[W]e never hear about the rights of parents who want schools to offer a wide library of books and materials to their children.").

[27] Hannah Delinger & Alejandro Serrano, *Texas Politicians, Not Parents, Behind Most Efforts to Ban Books*, HOUSTON CHRON. (Aug. 10, 2022) https://www.houstonchronicle.com/news/investigations/article/Texas-book-bans-driven-by-GOP-pressure-not-parents-17362170.php?utm_source=marketing&utm_medium=google&utm_campaign=engagement&ut

By their nature, book bans limit the number of ideas to which *all* children can be exposed. The decision regarding which perspectives and ideas children can access should be returned to their parents, where such discretion belongs. It should not be in the hands of those chilling the spread of ideas in public libraries and communities.

## ARGUMENT

**A.    Censorship of ideas takes from parents the right to provide their children access to a marketplace of ideas.**

To allow citizens like Wallace to impose their personal ideologies onto Llano County library patrons would allow for the erosion of parents' fundamental right to protect both their children's right to receive information and the right to educate their children.

**1.    Parents are stewards of their children's First Amendment broad right to receive information in public libraries.**

Like all U.S. citizens, children are entitled under the First Amendment to the wide range of ideas that can be found in a library's collection.[28] It is especially important that parents protect this right for their children. As the Supreme Court has

---

m_term=one_tap&gad_source=1&gclid=CjwKCAjwoJa2BhBPEiwA0l0ImMF3mhJ0fFwUCfSe
HS5dwTSaLJJg7F3iBSFHZZDEhQyASLfOp1JrmRoCLTkQAvD_BwE.

[28] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866 (1982) (plurality op.). Courts have specifically noted this right's presence in public libraries. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012); *Kreimer v. Bur. of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992); *Neinast v. Bd. of Trs. of the Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir. 2003); *Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 75 (D.D.C. 2001).

long recognized, children should have sufficient access to information that will allow for later participation in their civic duties.[29] After all, "the Constitution presupposes the existence of an informed citizenry prepared to participate in governmental affairs."[30] "[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner," access to information prepares youths "for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members."[31] This legal concept is not limited to formal pedagogy, nor should it be; a child's learning experience expands beyond what they learn in school.

Precedent has emphasized this right in the school library, which has a "special role . . . as a place where students may freely and voluntarily explore diverse topics."[32] The only limits on children's right to information this precedent articulates

---

[29] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.").

[30] *Pico*, 457 U.S. at 876.

[31] *Id.* at 868.

[32] *Campbell v. St. Tammany Parish School Bd.*, 64 F.3d 184, 190 (5th Cir. 1995).

arise from balancing students' weighty right to information against schools' choice in pedagogy.[33]

While such pedagogical interests require a book to have a school's chosen suitable educational purpose, these interests are not applicable to a public library.[34] Outside of school, children have the right to stoke their passion to learn when parents take them to a public library. Just like a school library, a public library provides children "an opportunity at self-education and individual enrichment that is wholly optional,"[35] where they can also deploy a "freewheeling inquiry" to best explore that enrichment.[36] Parents are ultimately responsible in protecting their children's broad, imperative right to information in a public library.

---

[33] *Pico*, 457 U.S. at 871 (plurality op.) (acknowledging "inculcative function of secondary education" against which students' constitutional rights must be balanced); *Campbell*, 64 F.3d at 188 (same). One such limit, whether content is "pervasively vulgar," is a different inquiry than whether content is "obscene," which as discussed *infra*, does limit a child's access to information. *See Pico*, 457 U.S. at 887 (Burger, C.J., dissenting) (describing "pervasively vulgar" as "standardless" phrase); *see also* May Lonergan, Note, *Obscenity and Book Banning: Properly Defining "Pervasively Vulgar"*, 34 GEO. MASON U. CIV. RTS. L.J. 293, 319 (2024) (proposing combination of already-existing obscenity test with "pervasively vulgar" test).

[34] *Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000) ("The principles set forth in *Pico*—a school library case—have even greater force when applied to public libraries.").

[35] *Pico*, 457 U.S. at 869 (plurality op.).

[36] *Id.* at 915 (Rehnquist, J., dissenting).

**2. Parents have a fundamental right to control their child's education in a manner free from undue outside influence.**

Part and parcel to this responsibility is a parent's fundamental right to direct their children's education and development.[37] Moreover, a parent has the duty to direct the moral and religious upbringing of their child, the duty to provide that child with adequate educational support, and the duty to protect their child.[38] These rights and duties are held by the child's parent and may not be commandeered by the state. With these rights and duties comes parents' obligation to prepare their children to be responsible stewards of American citizenship, capable of thinking for themselves and acting upon their own First Amendment right to receive information and exercise their freedom of speech.[39]

Just as a child's interest in learning does not arise only in school, parents' rights and duties to educate their children are not limited to classroom learning. Indeed, "those who nurture [a child] and direct his destiny have the right, coupled

---

[37] *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[ ] . . . to direct the education and upbringing of one's children . . . ." (citing *Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923))).

[38] *See* TEX. FAM. CODE § 151.001(a) (listing parental duties).

[39] *See Meyer*, 262 U.S. at 400 ("[I]t is the natural duty of the parent to give his children education suitable to their station in life . . . ."); *Sund*, 121 F. Supp. 2d at 547.

with the high duty, to recognize and prepare him for additional obligations."[40] As the Supreme Court recognized, "[t]he hours which a child is able to devote to study in the confinement of school are limited."[41] Thus, parents' "selection of subjects for [a child's] education, therefore, from among the many that might be taught, is obviously necessary."[42]

It necessarily follows that a parent who wants their child to learn subjects outside a school curriculum may take the steps necessary to educate their child on those topics elsewhere—for example, a parent might hire a tutor to teach piano or a language course, take their child to bible study every Sunday, or offer their child education on any number of topics, using the parent's knowledge and other available resources. The Constitution protects a parent's right to instruct their child in all these things and more, regardless of whether those subjects are covered in schools.[43]

_____

[40] *Pierce*, 268 U.S. at 535.

[41] *Meyer*, 262 U.S. at 398.

[42] *Id.*

[43] *See Pierce*, 268 U.S. at 535 ("The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only.").

**3. Unfettered access to literary materials allows parents to guide their children's education as they see fit.**

A cornerstone of education is the exchange and analysis of ideas and information—a feat often accomplished through reading. Books not only allow individuals to expand their knowledge on an established interest, but they also provide readers with entirely new perspectives and information. Importantly, parents can use books to educate their children on topics about which the parent feels strongly, but lacks the personal knowledge or experience needed to adequately instruct their child.

For example, a parent who has adopted a child of a different race and wants to provide that child with cultural knowledge and perspective on their heritage lacks this firsthand knowledge. Stories written by or about persons of the child's race can fill a parent's personal knowledge gap and allow a parent to fulfill their goal of educating their child about his or her race without overstepping.

Likewise, a parent struggling to discuss topics that schools typically leave to parents (such as sexual education, personal identity, or race) can use books to provide age-appropriate explanations to their child. With books covering these complex topics being increasingly removed from school curricula and school libraries, parents who wish to educate their children on nuanced issues must contend with an even more difficult task. Public libraries contain a wealth of information and thus

offer a way for parents to have these conversations.[44] As such, public libraries and the books within represent an important arrow in a parent's educational quiver.

**B.  Defendants' banning of books in a public library violates the First Amendment and parents' right to control their children's education.**

Courts have held that an individual's personal, religious, or social beliefs cannot justify a book's removal from a library—yet in this case, Defendants seek to do just that. The Panel should reject these attempts to unconstitutionally restrain children's First Amendment rights and parents' right to direct their children's education.

**1.  The Constitution prohibits censorship in public libraries based on disagreement with a book's ideas.**

Courts protect children's First Amendment rights in the library by prohibiting the censorship of ideas.[45] The question of censorship centers on the "motivation" behind the decision to keep a book out of circulation.[46] If someone intends to "deny

---

[44] *See Sund*, 121 F. Supp. 2d at 547 ("The right to receive information is vigorously enforced in the context of a public library, 'the quintessential locus of the receipt of information.'" (citation omitted)).

[45] The dissent's assertion that the term "book banning" does not have a clear meaning (ECF 164 at 42) is vexing; courts for decades have described such content removal like the kind deployed here as "banning." *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1028 (9th Cir. 1998) (removing school library books); *Sheck v. Baileyville Sch. Comm.*, 530 F. Supp. 679, 681–83 (D. Me. 1982) (same); *Sund*, 121 F. Supp. 2d at 533 (same in public libraries); *Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 773–80 (8th Cir. 1982) (removing film from curriculum); *Borger v. Bisciglia*, 888 F .Supp. 97, 98, 100 (E.D. Wis. 1995) (same); *Cary v. Bd. of Educ.*, 598 F.2d 535, 536 (10th Cir. 1979) (removing books' use in classes).

[46] *Pico*, 457 U.S. at 871 (plurality op.).

. . . access to ideas with which [they] disagreed," and this intent was the "decisive factor" in a decision to keep a book out of circulation, then the librarian "exercised their discretion in violation of the Constitution."[47] This substantial factor can arise from a third party's intent, if that intent decisively factored into the librarian's removal of the book.[48]

The censorship inquiry does not necessarily focus on the "viewpoint" expressed within the book, but on its "*perceived* viewpoint."[49] Looking instead to whether a book sufficiently expressed a viewpoint worthy of protection, as the Panel's concurrence proposes,[50] would impose artificial limitations on the First Amendment right to information and allow the removal of books if those books do not articulate a clear "idea." Such a test would also impose on courts the burden of making an ad hoc decision for each First Amendment challenge of deciding whether a book contains an idea befitting its protection in a library. That cannot be the standard.

---

[47] *Id.* (plurality op.); *id.* at 877 (Blackmun, J., concurring) ("[T]he State may not suppress exposure to ideas—for the sole *purpose* of suppressing exposure to those ideas—absent sufficiently compelling reasons.").

[48] *See, e.g.*, *Campbell*, 64 F.3d at 190 (finding significant that, following parent's persistent complaints, "many of the School Board members had not even read the book, or had read less than its entirety, before voting [to remove the book]").

[49] *Sund*, 121 F. Supp. 2d at 548 (emphasis added).

[50] ECF 164 at 28.

Such a limitation would be particularly salient as applied to children's books, which do not always have an apparent message; they instead are often full of content included purely for children's enjoyment. Consider BJ Novak's *The Book with No Pictures*, a bedtime story that appears in homes all over Texas and brings families together in laughter and creativity. [51] The book is full of silly words, with no clear "message" outside of the intention to inspire children's interest in reading more books without illustrations. Surely that does not mean the book is not worthy of protection. As the Supreme Court has emphasized, the First Amendment applies to even the "superfluous."[52]

That is why, in the Llano County book removal, Bonnie Wallace and her group's motivation (adopted by the librarian conscripted into doing her will) matters. A substantial factor behind the removal of certain "butt and fart" books was that Wallace perceived them as promoting "pornographic" material.[53] Because this perceived viewpoint was the motivation for the books' ban, the books' removal is censorship precluded by the First Amendment.

---

[51] B.J. NOVAK, THE BOOK WITH NO PICTURES (2014).

[52] *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 193 (2021).

[53] *Little*, 2023 WL 2731089, at *2.

The same analysis applies to books removed from the Llano County collection that *do* have clear viewpoints—for they too were removed based on a perceived viewpoint. Wallace and her group removed books discussing ideas about the experiences of LGBTQ+ teenagers and about race. They expressed that the motivation behind the removal was to keep out the "pornographic" material they believed the books contained, also explicitly calling out "LGBT" and "critical race theory" books that they believed should be removed.[54] Although the "pornographic" description is pretext, the substantial factor in their removal was nonetheless based on what Wallace and her cohort viewed as the books' viewpoints. These attempts at censorship are impermissible under the First Amendment.

Distinct censorship concerns arise when a librarian decides to remove a book from circulation. A librarian has always had the discretion to content-based removal of books that are factually inaccurate; of no discernible literary or scientific merit; or irrelevant to the needs and interests of the library's community.[55] But none of these reasons allow a librarian to remove a book based on her disagreement with a perceived viewpoint within the book. Otherwise, librarians could use their "official

---

[54] *Id.*

[55] Lester Asheim, *Not Censorship But Selection*, AM. LIBR. ASS'N, www.ala.org/advocacy/intfreedom/NotCensorshipButSelection (last visited Sept. 10, 2024). These objective criteria render as a non-issue whether "bigoted screeds" or "Flat Earth" books must be kept in circulation. *See* ECF 164 at 46, 74.

power to perform an act clearly indicating that the ideas contained in the [book] are unacceptable and should not be discussed or considered."[56] The "chilling effect" of such a decision on the spread of varying ideas "is obvious."[57]

The test to determine whether impermissible censorship has occurred is clear: in a book's exclusion, there must be an intent to censor, and that intent must be a substantial factor in keeping the book out of circulation. The First Amendment does not permit censorship of ideas, regardless of what viewpoint the book truly expresses. The Court should not allow for this limitation on both a child's right to receive information and the parent's right to provide such information in directing their child's education.

## 2. Defendants' censorship of ideas infringes on a parent's right to determine their child's education.

It is a parent's right to provide their child with any scholastic, moral, or other education they value, in addition to what the child learns in school.[58] It comes as no surprise that, in a world marred with political, religious, and social conflict, parents have differing views on what is "right" or "wrong," and that these differences extend to a difference in opinion of what information is appropriate for a child to learn.

---

[56] *Pratt*, 670 F.2d at 779.

[57] *Id.*

[58] *See Pierce*, 268 U.S. at 534–35.

These differences underline the importance of a parent's right to choose the materials and methods for educating their child outside of a traditional curriculum. Indeed, it is up to parents—not elected officials and certainly not a neighborhood busybody—to decide what is orthodox for their children to read.[59]

Moreover, access to public library books addressing what are now touted as "controversial" topics (race, sexuality, the human body, and—apparently—a particularly gaseous goose) is becoming more important as these books continue to be banned in school libraries. If some parents do wish to limit content that their children see, that is their prerogative. But other parents may feel differently; the right to choose what ideas a child receives should not be taken out of the parent's hands.

Of course, this right is unique to each parent-child combination: an overbearing citizen or elected official who happens to have a child may not dictate the educational content of all children. Laws that allow one parent "to mandate what information another parent's children may or may not receive . . . can hardly be said to support 'parent's rights,' as it permits a non-parent to dictate what someone else's

---

[59] *See Barnette*, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."); *Pico*, 457 U.S. at 871 ("To permit such intentions [to deny access to certain ideas] to control official actions would be to encourage the precise sort of officially prescribed orthodoxy unequivocally condemned in *Barnette*.").

children may read and allows one parent to suppress material not only for her own children, but for all others in the community."[60]

Such is the beauty of a public library: it is open to all, including parents both concerned and unconcerned about any given book. Indeed, "if a parent wishes to prevent her child from reading a particular book, that parent can and should accompany the child to the Library, and should not prevent all children in the community from gaining access to constitutionally protected materials."[61]

Allowing one parent or citizen to block another parent's ability to educate their child on the materials of their choosing is akin to allowing one parent or citizen to censor an entire community and "places an unconstitutional burden on [a child's] right to receive information under the First Amendment," and likewise impedes both the parents' right to educate their child and their ability to protect their child's right to receive information.[62]

---

[60] *Sund*, 121 F. Supp. 2d at 551.

[61] *Id.* Regardless of whether a parent could purchase the same book for their child, the requirements of the First Amendment are "[not] minimized by the availability of the disputed book in sources outside" of the library." *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976); *see also Pratt*, 670 F.2d at 779 ("The symbolic effect of removing the [book] . . . is more significant than the resulting limitation of access to the story.").

[62] *See Sund*, 121 F. Supp. 2d at 551 (discussing right to receive information).

### 3. Parents whose elected officials side with the vocal minority must rely on courts to fight censorship and protect their fundamental rights.

The attempt at censorship in Llano County is a microcosm of a movement spreading across Texas and the country. The Supreme Court has clearly held that fundamental rights such as the right to receive information or the right to educate one's child "may not be submitted to vote; they depend on the outcome of no elections."[63] Yet Texas officials appear to be doing their best to test the limits of this mandate.

Parents have nowhere to turn but the courts when fighting the kind of censorship that Defendants promote. Current elected officials have done nothing beyond serving as the mouthpieces of suppression-hungry citizens such as Wallace—in fact, their actions form the basis of this lawsuit. Even library board meetings in Llano County now take place behind firmly closed doors, excluding trained librarians and preventing concerned parents from weighing in on these important conversations.[64] An administrative law that allows for all perspectives within libraries, including those that are "objectionable," has been repealed.[65] And

---

[63] *Barnette*, 319 U.S. at 638.

[64] *Little*, 2023 WL 2731089, at *2.

[65] 13 TEX. ADMIN. CODE § 2.4(f)(1).

in its place rose the READER Act, a law which quite literally includes "restricting" in its name and which a panel of this Circuit has noted is likely unconstitutional.[66]

"The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."[67] With parents unable to rely on elected officials to fight this censorship, it is up to the courts to enforce children's rights to a marketplace of ideas, as well as parents' right to guide their children through that marketplace. Ruling to censor books previously available through public libraries chokes off this last available remedy to parents. Members of the vocal minority like Wallace, who seek further censorship, should not be further emboldened by a total lack of accountability.

## C. Narrowly excluding books based on "obscenity" is not an invitation to limit all ideas with which a person disagrees.

The First Amendment allows states to "regulate children's access to materials not deemed obscene for adults"—but this regulation must meet a "stringent test"

---

[66] *See* Kristi L. Bowman, *The Government Speech Doctrine and Speech in Schools*, 48 WAKE FOREST L. REV. 211, 267 (2013) ("[T]he political process could already be distorted, and the distortion is what would lead to the decision to remove books from the library. If distortion occurs either way, the litigation check becomes important.").

[67] *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

showing the material qualifies as "obscenity as to children or is harmful to minors."[68]

Materials may not be suppressed simply to "protect the young from ideas or images that a legislative body"—or a particular library patron—"thinks unsuitable for them."[69] "Where First Amendment rights are concerned, those seeking to restrict access to information should be forced to take affirmative steps to shield themselves from unwanted materials; the onus should not be on the general public to overcome barriers to their access to fully-protected information."[70]

In the present case, Wallace and her fellow library police—speaking through the Llano County Public Library—seek to ban the books in question because their content, according to her, is "pornographic" and "obscene." But this is not the broad, permissible form of censorship that Wallace seems to think it is. A cry of obscenity from one does not merit the removal of books for all.

---

[68] *Sund*, 121 F. Supp. 2d at 552 (citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 213 (1975); *Ginsberg v. New York,* 390 U.S. 629 (1968)) (internal quotation marks omitted).

[69] *Id.*; *see also Lamont*, 381 U.S. at 310 (Brennan, J., concurring) ("If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.").

[70] *Sund*, 121 F. Supp. 2d at 551 (striking requirement that recipients of Communist literature notify the Post Office in advance that they wish to receive those materials); *see also id.* at 534 ("By authorizing the forced removal of children's books to the adult section of the Library, the Altman Resolution places a significant burden on Library patrons' ability to gain access to those books. Children searching specifically for those Books in the designated children's areas of the Library will be unable to locate them. In addition, children who simply wish to browse in the children's sections of the Library will never find the censored Books. Moreover, parents browsing the children's areas in search of books for their children will be unable to find the censored Books.").

As an organization advocating on behalf of parents and their children's rights to information, TXFTRP understands that limiting children's access to genuinely obscene material is a real concern for parents. TXFTRP also understands, however, that one demanding library patron's unchecked ability to restrict an entire community's information access is at least equally concerning.

Moreover, allowing a single person to define for an entire community what constitutes "pornographic" or "obscene" material is a slippery slope. Silly, playful books such as "Gary the Goose and His Gas on the Loose" or "Freddy the Farting Snowman" do not rise to the level of "obscene" or "pornographic," and Wallace's advances on these books should not be misconstrued as a true attempt to protect a vague population of "the children." Rather, these advances should be seen for what they are: an excuse to limit the circulation of content that Wallace and others find distasteful or unorthodox. Removing sexual education books from circulation simply because they depict the human body is a similarly ill-concealed attempt to use the opinion of one to smother the First Amendment rights of many.

Though the obscenity test by nature requires a librarian to exclude a book based on its "content," courts have treated obscenity as a narrow exception. The application is no different for librarians in public libraries. A librarian is perfectly within her right to remove obscene material from circulation as not protected under the First Amendment, but this cannot act as a disguise for her real intention (or, as

here, the intention of a demanding library patron).[71] This is certainly not the first time that people have sought to limit all ideas "for the sake of the children." And when such restrictive laws come under challenge, the Supreme Court has routinely struck them down as overly vague attempts to constrict all manners of viewpoints when such limitations are not sufficiently specific.[72]

Courts have long upheld parents' unequivocal constitutional right to educate their children as they wish, as well as the rights of those children to receive information. Texas Freedom to Read Project respectfully asks the Court en banc to decline to further erode these rights and to return to the Llano County Public Library all books at issue that were removed from circulation.

## CONCLUSION

A vocal few may not inhibit the fundamental rights of many. Children have the right to receive information and experience the wonders of learning, and parents have the right to decide how broad that exposure to information will be. The narrow doctrine of obscenity provides no cover for censorship motivated merely by

---

[71] *See Pico*, 457 U.S. at 857, 875 (rejecting attempt to remove books because books were, among other reasons, "just plain filthy").

[72] *See Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656 (2004) (finding content restriction overbroad where law prohibited internet content deemed "harmful to minors"); *Butler v. Michigan*, 352 U.S. 380, 383 (1957) (striking down law punishing person making adult literature that would "manifestly tend[ ] to the corruption of the morals of youth" generally available) (citation omitted).

intolerance to ideas with which one person disagrees. The Court should adopt the opinion of Judge Wiener in full and require Llano County to return all banned books to the shelves of its public library.

Dated: September 10, 2024

Respectfully submitted,

By: _/s/ Katherine Raunikar_____
Katherine Raunikar
Sydney C. Rupe
JORDAN, LYNCH & CANCIENNE
PLLC
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: 713.955.4025
kraunikar@jlcfirm.com
srupe@jlcfirm.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,489 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2016.


Dated: September 10, 2024                    By: */s/ Katherine Raunikar*
                                                  Katherine Raunikar

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 10, 2024          By: */s/ Katherine Raunikar*
                                       Katherine Raunikar