No. 23-50224

# In the United States Court of Appeals for the Fifth Circuit

---

LEILA GREEN LITTLE; JEANNE PURYEAR; KATHY KENNEDY; REBECCA
JONES; RICHARD DAY; CYNTHIA WARING; DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY; RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS
LLANO COUNTY JUDGE; JERRY DON MOSS, IN HIS OFFICIAL CAPACITY AS
LLANO COUNTY COMMISSIONER; PETER JONES, IN HIS OFFICIAL
CAPACITY AS LLANO COUNTY COMMISSIONER; MIKE SANDOVAL, IN HIS
OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER; LINDA
RASCHKE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
COMMISSIONER; AMBER MILUM, IN HER OFFICIAL CAPACITY AS LLANO
COUNTY LIBRARY SYSTEM DIRECTOR; BONNIE WALLACE, IN HER
OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER;
ROCHELLE WELLS, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER; RHODA SCHNEIDER, IN HER OFFICIAL
CAPACTY AS LLANO COUNTY LIBRARY BOARD MEMBER; GAY BASKIN, IN
HER OFFICIAL CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 1:22-cv-424-RP

---

## APPELLANTS' SUPPLEMENTAL REPLY BRIEF

---

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

Table of contents ..................................................................................... i

Table of authorities ................................................................................. ii

  I. The plaintiffs continue to peddle a false and misleading factual
    narrative ......................................................................................... 3

  II. The Court should overrule *Campbell* and hold that the Speech Clause
    does not apply to library-weeding decisions ..................................... 6

    A. The Court should overrule *Campbell* because a public library's
      curation decisions are government speech .................................. 8

    B. The Court should overrule *Campbell* even if it rejects the
      government-speech argument ................................................... 16

    C. The plaintiffs' waiver argument is meritless ........................... 20

    D. *Pico* does not preclude this court from overruling *Campbell* ................... 22

    E. The Court should disavow the eighth circuit's reasoning in *GLBT
      Youth in Iowa Schools Task Force v. Reynolds* ........................... 23

  III. The defendants are not violating the plaintiffs' right to "receive
    information and ideas" when each of the 17 books remains available
    through Llano Library's in-house checkout system ..................... 23

  IV. There is no evidence of viewpoint discrimination in the record ................. 24

Conclusion ............................................................................................ 27

Certificate of service ............................................................................ 28

Certificate of compliance ...................................................................... 29

Certificate of electronic compliance ...................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................. 5

*Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997) ............................ 17

*Board of Education v. Pico*, 457 U.S. 853 (1982) ....................................... 22

*Campbell v. St. Tammany Parish School Board*,
   64 F.3d 184 (5th Cir. 1995) ................................................................ 6, 20

*Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) ........................................... 22

*Daves v. Dallas County*, 22 F.4th 522 (5th Cir. 2022) (en banc) .............. 21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................... 17

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ...................... 21

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ................................................. 11

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ................................................ 7

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
   No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024) .................... 23

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) ..................... 12

*Lane v. Franks*, 573 U.S. 228 (2014) ......................................................... 11

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................ 12, 15, 16

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................... 17

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) ............................... 11, 12

*Muir v. Alabama Educational Television Comm'n*,
   688 F.2d 1033 (5th Cir. 1982) (en banc) ............................................. 22

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...................... 8

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983) ................................................................................. 3

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ............................... 8

*Regan v. Taxation With Representation of Washington*,
   461 U.S. 540 (1983) ............................................................................... 7

*Rosenberger v. Rector and Visitors of the University of Virginia*,
515 U.S. 819 (1995) ............................................................. 9, 24

*Rust v. Sullivan*, 500 U.S. 173 (1991) ...................................... 8, 16

*Shurtleff v. City of Boston*, 596 U.S. 243 (2022) ............... 9, 12, 13

*Stanley v. Georgia*, 394 U.S. 557 (1969) ............................ 6, 7, 20

*Tuffendsam v. Dearborn County Board of Health*,
385 F.3d 1124 (7th Cir. 2004) ............................................... 7

*United States v. American Library Ass'n Inc.*, 539 U.S. 194 (2003) ................... 10, 11

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ............................................................. 8

*Webster v. Reproductive Health Services*, 492 U.S. 490 (1989) ................................. 18

*Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353 (2009) ............................ passim

## Other Authorities

David P. Currie, *Positive and Negative Constitutional Rights*,
53 U. Chi. L. Rev. 864 (1986) ................................................. 7

Daryl J. Levinson, *Framing Transactions in Constitutional Law*,
111 Yale L.J. 1313 (2002) ...................................................... 18

The plaintiffs' supplemental brief abandons several arguments from their earlier court filings, and presents a theory of the Speech Clause that differs from what they argued in the district court and before the three-judge panel.

1.  The plaintiffs previously insisted that the Speech Clause prohibits public librarians from engaging in content discrimination or viewpoint discrimination when weeding books. *See* Appellees' Panel-Stage Br., ECF No. 99, at 19 ("The First Amendment Prohibits Removal of Library Books Based on Viewpoint or Content-Based Discrimination"); ROA.1903; ROA.1906–1907. The district court agreed and imposed a ban on both content and viewpoint discrimination in public-library weeding decisions. ROA.3523; ROA.3526–3527. But now the plaintiffs are conceding that content discrimination is permissible in library-weeding decisions, and that only viewpoint discrimination is prohibited—admitting that their previous representations to this Court are wrong, and admitting that the district court erred by subjecting Milum's allegedly content-based weeding decisions to strict scrutiny. *See* Appellees' Supp. Br., ECF No. 230, at 39 ("If a librarian removes a book for any reason other than viewpoint animus, the First Amendment has nothing to say about it.").

2.  The plaintiffs now acknowledge (for the first time) that the Speech Clause, as interpreted in *Campbell*, gives librarians carte blanche when purchasing or acquiring library materials. *See* Appellees' Supp. Br., ECF No. 230, at 43 & n.13; *id.* at 50 ("*Campbell* regulates the way in which books are removed, not which books a library shelves."). In their previous filings, the

plaintiffs claimed only that the Speech Clause treats initial selection and re-moval "differently"[1] without explaining what those differences might be—and without going so far as to say that *Campbell* gives librarians a free hand when adding materials or that viewpoint discrimination is constitutionally permissible at the initial-selection stage.

3. The plaintiffs previously insisted that a public library is a "public fo-rum."[2] *See* Appellees' Panel-Stage Br., ECF No. 99, at 41 ("Public Libraries Are a Public Forum Subject to Heightened Scrutiny"). But in their supple-mental brief, the plaintiffs are no longer deriving their proposed ban on "viewpoint discrimination" from a library's status as a "public forum," per-haps because the lead panel opinion rejected this idea,[3] or perhaps because a library's status as a "public forum" is incompatible with the plaintiffs' latest concession that librarians may engage in viewpoint discrimination when se-lecting new materials for the library's collection.[4]

---

1. Appellees' Panel-Stage Br., ECF No. 99, at 38 ("The First Amendment treats the selection and the removal of library books differently").

2. Appellees' Panel-Stage Br., ECF No. 99, at 41 ("Public Libraries Are a Public Forum Subject to Heightened Scrutiny").

3. *See* Lead Panel Op., ECF No. 164-1, at 12 ("We agree with Defendants that public forum principles are 'out of place in the context of this case.'" (citation omitted)).

4. *See* Appellees' Supp. Br., ECF No. 230, at 43 & n.13; *id.* at 50. The plaintiffs nonetheless maintain in a footnote that "forum analysis results in the same First Amendment limitations on discriminatory book re-movals," *id.* at 51 n.15, although they do not say whether "forum analy-sis" would classify public libraries as "traditional public" forums, "lim-ited" public forums or "nonpublic" forums. *See Perry Education Ass'n v.*

At the same time, the plaintiffs' supplemental brief refuses to back away from the disingenuous factual assertions in their panel-stage brief—nor does it acknowledge or rebut the criticisms of their factual claims in our panel-stage reply. *See* Panel-Stage Reply Br., ECF No. 195-2, at 1–15.

## I. THE PLAINTIFFS CONTINUE TO PEDDLE A FALSE AND MISLEADING FACTUAL NARRATIVE

Weeding library books is not "censorship" or "book banning"; it is a librarian's job description. Librarians weed books constantly to keep their collections fresh and ensure that shelf space is reserved for materials that are useful and relevant to the community. ROA.3953 ("We weed all the time.").[5] Weeding a library book does not "ban" or "censor" the material any more than a refusal to purchase the book in the first place, and any library patron remains free to acquire the weeded book through other means. The plaintiffs apparently think they get some rhetorical advantage by throwing around terms like "censorship" and "book banning." But now that the plaintiffs are conceding that librarians may exclude books from the shelves by refusing to purchase them—even when the refusal to purchase is rooted in "viewpoint animus"—it becomes hard to understand how a librarian who excludes books by weeding them is guilty of "censorship."

---

*Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 (1983) (explaining the different First Amendment rules that apply to these forums).

5. ROA.3183 ("As good library managers, we have a responsibility to maintain a collection that is free from outdated, obsolete, shabby, or no longer useful items.").

Our panel-stage reply has already refuted many of the falsehoods in the plaintiffs' supplemental brief. Bonnie Wallace never asked or advocated for any book to be removed; she asked only that certain books be relocated from the children's section to the adult section. *See* Panel-Stage Reply Br., ECF No. 195-2, at 8–9. The plaintiffs' claim that Llano Library prohibits weeding unless the weeded book meets "at least two or three MUSTIE criteria" is also false and was disproven in the panel-stage briefing. *See id.* at 10–11. Yet the plaintiffs repeat these discredited assertions as if they can somehow speak them into existence or pretend that the court never read our panel-stage reply. *See* Appellees' Supp. Br., ECF No. 230, at 5–6.

And that is only the beginning of the plaintiffs' misrepresentations. The plaintiffs go on to claim that the "defendants" (plural) described the 17 weeded "books" (plural) as "pornographic filth," "disgusting," and "inappropriate." *See id.* at 4. Yet the book that Bonnie Wallace described as "pornographic filth" was *Gender Queer*, which is not among the 17 disputed books and was never held at Llano County's libraries. ROA.1502 ("[T]he book Gender Queer is NOT in any of the County Libraries."). Wallace mistakenly thought that Llano Library offered *Gender Queer* as a "children's book," and she attached a pornographic picture from that book to her e-mail. ROA.1503 (the picture that Wallace attached does not appear in the record). None of the other defendants ever used the phrase "pornographic filth" to describe anything in the Llano libraries.

The phrase "inappropriate" was used by Rochelle Wells to describe not the 17 disputed books, but a future list that she planned to create and send to Commissioner Moss. ROA.1526 ("We will be sending a list of the [books] that are found to be inappropriate, along with a summary, to Commissioner Moss."). There is no evidence that Wells or anyone else ever created this list or sent it to Moss. And Wells's e-mail is dated November 12, 2021, two days after Bonnie Wallace had e-mailed her spreadsheet to Judge Cunningham, so Wells cannot be referring to the already-created Wallace list. *Compare* ROA.1526 *with* ROA.1503. Finally, the word "disgusting" was used only by Rochelle Wells—and only to describe the illustrations from *It's Perfectly Normal* that appear in Judge Duncan's panel dissent. ROA.1541; Panel Dissent, ECF No. 164, at 43.

The plaintiffs' insistence on portraying the "defendants" as a collective entity—in which the actions or thoughts of one are imputed to all—is particularly egregious when Amber Milum alone weeded the books, and only Milum's intentions matter in determining whether the books were weeded for innocuous or iniquitous reasons. *See* Lead Panel Opinion, ECF No. 164-1, at 19 ("[I]t is Milum's motivation that matters"). Amber Milum and her co-defendants cannot be held vicariously liable for the thoughts or aspirations of Bonnie Wallace or Rochelle Wells, who were private citizens when they sent those e-mails. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[V]icarious liability is inapplicable to . . . § 1983 suits. . . . [A] plaintiff must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."). A litigant who claims that all "defendants" are responsible for the actions or intentions of a single co-defendant is defying *Iqbal* and distorting the factual record.

## II. THE COURT SHOULD OVERRULE CAMPBELL AND HOLD THAT THE SPEECH CLAUSE DOES NOT APPLY TO LIBRARY-WEEDING DECISIONS

The district court and the three-judge panel were bound by *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), which limits librarians' discretion to remove books. The Court should overrule *Campbell* and declare the Speech Clause inapplicable to library-curating decisions.[6]

The Speech Clause prohibits only laws that "abridge" the freedom of speech. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech"). The Supreme Court has interpreted the "freedom of speech" to encompass the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). But the Speech Clause does not require the government to subsidize or assist people's efforts to access information and ideas. *See Ysursa v. Pocatello Educational Ass'n*, 555 U.S. 353, 355 (2009) ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government . . . mechanisms for the purpose of obtaining funds for expression."); *Regan v.*

---

6.   This does not mean that libraries face *no* legal constraints when curating books. Racially discriminatory book removals will violate Title VI at libraries that receive federal funds. And there may be other limits imposed by establishment-clause or equal-protection doctrines.

*Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right"). The First Amendment does not require Llano County to operate a public-library system, nor does it require a public library to include any particular book in its collection. *See* Appellees' Supp. Br., ECF No. 230, at 43 & n.13; *id.* at 50. That is because the Constitution (as a general matter) protects only negative rights and not positive rights.[7] *See Ysursa*, 555 U.S. at 358 ("[T]he government . . . is not required to assist others in funding the expression of particular ideas, including political ones."); *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1126 (7th Cir. 2004) (Posner, J.) ("The Constitution is, with immaterial exceptions, a charter of negative rather than positive liberties."); David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986). The Speech Clause prevents the government from punishing or penalizing a person for accessing information or ideas, *see Stanley*, 394 U.S. at 564, but it does not require the government to help a person access information or ideas by offering the sought-after materials in a public library. And the Speech Clause does not prevent the government from withdrawing previously provided assistance by weeding or removing books from a public library, or closing the public library entirely.

---

7.    One notable exception to this rule is *Gideon v. Wainwright*, 372 U.S. 335 (1963), but *Gideon* has never been extended to the First Amendment.

### A.    The Court Should Overrule *Campbell* Because A Public Library's Curation Decisions Are Government Speech

When the government joins or assists others in propagating a message, it is engaged in government speech—and it may choose the speech that it will subsidize or support without encountering rules against content or viewpoint discrimination. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) ("Texas offers [specialty license] plates that say 'Fight Terrorism.' But it need not issue plates promoting al Qaeda." (citation omitted)); *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) ("It is the very business of government to favor and disfavor points of view" (citation and internal quotation marks omitted)); *National Endowment for the Arts v. Finley*, 524 U.S. 569, 590–600 (1998) (Scalia, J., concurring in the judgment); *Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism." (citation omitted)).

That remains the case even when the government-supported speech is created by private citizens[8] or delivered by private citizens.[9] The government may choose the artwork that hangs on the walls of government buildings, the quotations that appear on national monuments, the license-plate designs

---

8.    *See Walker*, 576 U.S. at 217; *Summum*, 555 U.S. at 470–72.

9.    *See Rust*, 500 U.S. at 179–81.

proposed by members of the public that appear on state-issued plates, and the books housed in a public library. All of these are creations of private citizens—the artwork, the quotations, the license-plate designs, and the books. But the use of government resources to promote and convey these ideas and messages is government speech, and it remains government speech even when it is boosting or propagating another person's handiwork.

The only exception arises when the government's assistance or subsidies create a "forum" for private speech. *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243, 247–48 (2022); *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829–30 (1995). In these situations, the courts will not allow the government to characterize the facilitation or funding that it provides to private speakers as its own speech, because the benefits are so broadly conferred that the selective withholding of these perks from a disfavored speaker seems more akin to a penalty that "abridges" the freedom of speech than the government acting as a participant in the marketplace of ideas. *See, e.g.*, *Shurtleff*, 596 U.S. at 248 ("The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a Christian flag."); *Rosenberger*, 515 U.S. at 830 ("'[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views . . . except those dealing with the subject matter from a religious standpoint.'" (citation omitted)).

But a public library does not serve as a "forum" for private speech. *See* Lead Panel Op., ECF No. 164-1, at 12 ("[P]ublic forum principles are 'out of

place in the context of this case.'" (citation omitted)); *United States v. American Library Ass'n Inc.*, [539 U.S. 194, 204](539 U.S. 194, 204) (2003) (plurality opinion of Rehnquist, C.J.) ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions."). A public library does not seek to accumulate as many publications as possible, and it does not allow its collection to become a dumping ground for any author or publisher who wants to propagate their intellectual property. Quite the opposite: A public library is *supposed* to curate its collection and retain only the materials that are useful and relevant to the community that it serves. ROA.3188 ("These advantages of weeding . . . point out the truth of the old adage: Less is more!"); ROA.3190 (noting that a library's selection and weeding policies should reflect "the needs and demands of the library's community of users"). Librarians must also provide quality control when selecting or retaining materials in their collections. They are instructed to weed books with "poor content," "mediocre writing style," "inaccurate or false information," or "biased, racist, or sexist terminology or views." ROA.3191. This compels librarians to discriminate not only on the basis of content, as the lead panel opinion recognized,[10] but also against *viewpoints* and *ideas* that are "inaccurate," "false," or "biased, racist,

---

10. *See* Lead Panel Op., ECF No. 164, at 12 ("[C]ontent is necessarily relevant in removal decisions").

or sexist." ROA.3191. Libraries must separate "the gold from the garbage,"[11] and the "garbage" will include materials with disreputable viewpoints and ideas, such as discredited scientific theories, and viewpoints and ideas that may not have been considered racist or offensive when originally published but are no longer compatible with modern sensibilities. *See* Panel Dissent, ECF No. 164-1, at 23–25 (providing examples).

More importantly, a public library's selection and weeding decisions are government speech *by definition*. *NetChoice* holds that curating decisions are "speech" that belongs to the curator and is constitutionally protected from abridgement. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2400 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). But a public librarian cannot be engaged in *private* speech when deciding whether library materials should be weeded, because the librarian is acting on behalf of the government that employs her. *See Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006); *Lane v. Franks*, 573 U.S. 228 (2014) ("[The] critical question . . . is whether the speech at issue is it-self ordinarily within the scope of an employee's duties."); ROA.45 (accusing Milum of acting "under color of state law" when weeding library books). So the *only* alternative is to classify the public librarian's curating decisions as *government* speech.

---

11. *American Library Ass'n*, 539 U.S. at 204 (plurality opinion of Rehnquist, C.J.) (quoting W. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)).

The following chart explains:

Premise No. 1:   Curating decisions are "speech." *See NetChoice*.

Premise No. 2:   All speech is either private speech or government speech.[12]

Premise No. 3:   A public librarian's curating decisions cannot be private speech because the librarian acts in her capacity as a government employee when selecting or weeding library materials.

Conclusion:      A public librarian's curating decisions must therefore be government speech.

The plaintiffs cannot escape the conclusion unless they disprove at least one of three premises. But all three premises are irrefutable, and the plaintiffs do not try to rebut them.

Instead, the plaintiffs try to get around *NetChoice* by traipsing through the *Shurtleff* factors,[13] but a *Shurtleff* analysis must focus on the curation decisions and not the library materials. No one is claiming that library books themselves become "government speech" when stored in a public library, and curated materials do not become the speech of the curator. *See NetChoice*, 144 S. Ct. at 2399–2400. The public library's selection and re-

---

12.  *See Kennedy v. Bremerton School District*, 597 U.S. 507, 529 (2022) ("Mr. Kennedy has demonstrated that his speech was private speech, not government speech"); *Shurtleff*, 596 U.S. at 252 (describing "[t]he boundary between government speech and private expression"); *Matal v. Tam*, 582 U.S. 218, 239 (2017) ("Trademarks are private, not government, speech.").

13.  *See* Appellees' Supp. Br., ECF No. 230, at 21–36.

moval decisions are the *only* relevant "expression" in the government-speech inquiry.

The first *Shurtleff* factor concerns "the history of the expression at issue."[14] But curation decisions at public libraries have always been the prerogative of government employees rather than private citizens. The plaintiffs observe that Llano County disclaims any endorsement of the views expressed in its library materials,[15] but that does nothing to defeat the government-speech argument because a person who compiles other people's speech need not endorse that speech to engage in expressive activity of his own. The New York Times does not endorse the views in the letters to the editor that it chooses to publish, but its decision to publish (or not to publish) these submissions remains "speech" of the New York Times. So too with a library. It may or may not disclaim endorsement of the materials in its collection, but the library's selection and removal decisions remain its own "speech" regardless of whether it embraces or distances itself from the private speech within those materials.

The plaintiffs' claim that the "Library System has historically sought to include all viewpoints in its collection"[16] is false and irrelevant. Libraries do not seek to include books that spout crackpot conspiracy theories or "biased, racist, or sexist terminology or views." ROA.3191. And even if libraries had

---

14.  *Shurtleff*, 596 U.S. at 252.

15.  *See* Appellees' Supp. Br., ECF No. 230, at 23.

16.  Appellees' Supp. Br., ECF No. 230, at 23.

historically chosen to express a take-all-comers approach when managing their collections, that would not indicate or even suggest that library-curation decisions are private speech rather than government speech. It would merely show that public libraries historically chose to express their curation-speech in a certain way. Whatever approach to curation a library chooses to adopt will *still* be government speech, and its past choices will not restrain any library from adopting and expressing a different curation policy in the future.

The second *Shurtleff* factor involves "the public's likely perception as to who (the government or a private person) is speaking."[17] But it is inconceivable but that any member of the public would perceive a public librarian's curation decisions as private rather than governmental speech. Even the plaintiffs acknowledge that Milum was acting "under color" of state law when she weeded the 17 disputed books,[18] so it is hard to see how they can simultaneously argue that the public would perceive Milum's actions as those of a private citizen rather than an agent of Llano County. The plaintiffs try to get around this problem by denying that the speech *within the library's materials* would be perceived as government speech,[19] but the issue is the public's perception of the library's *selection and removal decisions*, and whether the public would regard those curation decisions as the speech of a government official

---

17. *Shurtleff*, 596 U.S. at 252.
18. ROA.45.
19. *See* Appellees' Supp. Br., ECF No. 230, at 26–27.

or the speech of a private citizen. The plaintiffs present no argument on this point.

The third *Shurtleff* factor considers "the extent to which the government has actively shaped or controlled the expression."[20] But a public library's selection and removal decisions will always be shaped and controlled by the government employees who manage the library. Public libraries do not outsource weeding to private contractors, and they do not invite non-governmental actors to choose new library materials. The curation of a public library's collection is shaped and controlled *entirely* by agents of the government, and this is no less true in Llano County than elsewhere.

Finally, the plaintiffs claim that the defendants' government-speech argument is incompatible with *Matal v. Tam*, 582 U.S. 218 (2017), which rejected the notion that "the content of" a trademark becomes government speech once it is registered by the PTO. *See id.* at 236 ("[I]t is far-fetched to suggest that the content of a registered mark is government speech. If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently."). But *Matal* does not help the plaintiffs because no one is arguing that library books themselves become government speech when they are selected or retained. The library books remain private speech even though the government is giving them a boost—just as a trademark remains private speech even after the gov-

---

20.  *Shurtleff*, 596 U.S. at 252.

ernment confers the benefits of registration. It is *the decision to select or retain a library book* that qualifies as government speech, and that decision does not in any way alter or affect the private character of the speech inside the book. The government-speech analogue in *Matal* is not "the content of a registered mark,"[21] but the actions taken by government officials who decide whether to register that mark. Yet *Matal* never addresses whether the *act of registering* the mark is government speech, and its government-speech analysis focuses entirely on the trademark itself rather than the government's *decision* to register it. *See id.* at 234–40.

### B.    The Court Should Overrule *Campbell* Even If It Rejects The Government-Speech Argument

If the en banc Court rejects the government-speech argument, it should *still* overrule *Campbell* and hold that a library-weeding decisions are categorically immune from First Amendment scrutiny. That is because the government does not and cannot "abridge" a constitutional right by withdrawing assistance that it previously provided to those seeking to exercise a constitutional prerogative. *See Ysursa*, 555 U.S. at 359–60 & n.2  (state law that "removes politically related deductions from an existing system" is not an "abridgment of the unions' speech," even though it revokes assistance that the state had previously provided to the unions' speech activities); *Rust*, 500 U.S. at 200 ("[T]he Government may choose not to subsidize speech").

---

21.   *Matal*, 582 U.S. at 236.

Suppose that Llano County decided to open and operate a gun store that allows county residents to borrow weapons in the same way that they borrow library books—by checking them out for a few weeks and promising to return them. The government-speech doctrine would not apply to the county's decisions to stock and shelve weaponry in this store, as assembling a collection of firearms is conduct rather than the propagation of a government-sponsored message.[22] Yet if Llano County decided to remove handguns from this government-owned store, that would not "infringe" the right to keep and bear arms—even though the Second Amendment protects the right to "receive" handguns just as the First Amendment protects the right to "receive" information and ideas.[23] The removal of handguns from this county-owned store is constitutionally permissible not because the county is engaged in "government speech," but because a county does not "infringe" the right to keep and bear arms (or any other constitutional right) by removing handguns from a county-owned store that it had no obligation to open or operate in the first place. *See Ysursa*, 555 U.S. at 359.

Or suppose that Llano County had operated a public hospital prior to *Dobbs* that offered abortion services and other medical procedures to county

---

22. *See Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997) ("Although . . . speech is a component of all peddling . . . the [Supreme Court's] cases do not place significant limitations on the right of government to prevent the sale of goods or services that are not themselves forms of protected speech.").

23. *See District of Columbia v. Heller*, 554 U.S. 570, 628–32 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

residents. None of these services qualify as "government speech," yet Llano County could still remove abortion from the menu without "abridging" or violating the erstwhile right to abortion. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 510 (1989) ("Nothing in the Constitution requires States to enter or remain in the business of performing abortions."). This prerogative comes not from the government-speech doctrine, but from the fact that the Constitution does not require the government to assist or facilitate efforts to exercise a constitutional right, nor does it prevent the government from selectively withdrawing subsidies or assistance that it previously extended. *See Ysursa*, 555 U.S. at 359–60 & n.2.

The analysis is no different when books are removed from a county-owned library. A librarian does not (and cannot) "abridge" the right to receive information and ideas by weeding a library book, even though her actions make it slightly more difficult for county residents to access the weeded materials when compared to the world that existed before the weeding occurred. *See Ysursa*, 555 U.S. at 359–60 & n.2; *see generally* Daryl J. Levinson, *Framing Transactions in Constitutional Law*, 111 Yale L.J. 1313 (2002). Library patrons remain free to access the weeded materials from other sources (such as Amazon.com or private bookstores) without fear of punishment. And although the county is no longer *facilitating* efforts to obtain those books at its libraries, that does not violate or even implicate anyone's constitutional rights, any more than a decision to remove handguns from a county-owned store or ban abortion services in county-owned hospitals.

The plaintiffs agree with much (although not all) of this analysis. They acknowledge that librarians will not violate the Speech Clause by refusing to add new materials to a library's collection. *See* Appellees' Supp. Br., ECF No. 230, at 43 & n.13; *id.* at 50. They also acknowledge that librarians will not violate the Speech Clause if they weed books for reasons unrelated to their viewpoint. *See id.* at 39. Yet the plaintiffs insist that a librarian *will* "abridge" a library patron's First Amendment rights if she weeds a book *after* adding it to the library's collection because she opposes the viewpoints expressed in the weeded material. The plaintiffs' stance is summarized in the following chart:

|  | Librarian refuses to add book to library's collection | Librarian weeds book after adding it to library's collection |
|---|---|---|
| Because she disapproves of its content | Constitutional | Constitutional |
| Because she disapproves of its viewpoint | Constitutional | Unconstitutional |

But these distinctions are nonsensical. A librarian who refuses to add *Larry the Farting Leprechaun* to the library's collection because she disapproves of the book's "viewpoint" (whatever that "viewpoint" might be)[24] imposes a greater injury on library patrons who wish to read that book than a librarian who weeds *Larry the Farting Leprechaun* after adding it to the

---

24. *See* Panel Concurrence, ECF No. 164-1, at 1 (Southwick, J.) (denying that the "'butt and fart books'" "express an 'idea' or 'viewpoint' in the sense required by the caselaw.").

shelves. The librarian who initially allows a book into the library, but later changes her minds and weeds it, has at least provided *some* access to the disputed material. The librarian who refuses to purchase that book, by contrast, has withheld *all* library access to the contested tome.

The plaintiffs' attempt to distinguish viewpoint-motivated weedings is equally untenable. The plaintiffs' right to "receive information and ideas"[25] from *Larry the Farting Leprechaun* would be no less affected if a librarian had weeded that book for reasons unrelated to its viewpoint. It is the *fact* that a book was weeded, and not the librarian's *motivations* for removing it, that diminishes a library patron's ability to "receive information and ideas."

### C.    The Plaintiffs' Waiver Argument Is Meritless

The plaintiffs argue that the government-speech argument is "waived" because it was not presented to the three-judge panel. *See* Appellees' Supp. Br., ECF No. 230, at 17–18. But there was an obvious reason for that: The government-speech argument was foreclosed by *Campbell*, which holds that the Speech Clause limits a school librarian's authority to remove books. *See Campbell*, 64 F.3d at 188–91.

The plaintiffs do not claim (and cannot plausibly claim) that we have "waived" our request to overrule *Campbell*. Litigants may request the overruling of an appellate-court precedent even if they did not argue for its overruling when it had the status of binding authority. In *Dobbs v. Jackson Wom-*

---

25.   *Stanley*, 394 U.S. at 564.

*en's Health Organization*, 597 U.S. 215 (2022), Mississippi first mentioned the possibility of overruling *Roe* in a footnote in its certiorari petition. Litigants are supposed to argue cases based on the law that binds the court in which they are appearing. And it is a waste of litigants' time and an imposition on the courts to demand that litigants present their arguments for overruling a binding precedent in a court that has no authority to do anything about it. *See Daves v. Dallas County*, 22 F.4th 522, 547 (5th Cir. 2022) (en banc) ("[E]n banc is the quintessentially appropriate time to challenge a precedential Fifth Circuit opinion's holding about any relevant issue.").

The government-speech argument is being offered *solely* as a reason for overruling *Campbell*, and it is entirely dependent on the en banc court's authority to reconsider that decision. The plaintiffs do not argue that *Campbell* can co-exist with our government-speech argument, and the brute fact that the county's lawyers advanced the government-speech idea in a court filing before their current lead counsel joined the case does not show that the argument was compatible with then-binding authority. *See* Appellees' Supp. Br., ECF No. 230, at 18. Neither does Judge Duncan's attempt to distinguish school libraries from private libraries,[26] because the defendants' government-speech argument (unlike Judge Duncan's argument) extends to *all* government-owned libraries regardless of whether they are operated by school officials.

---

26.  *See* Panel Dissent, ECF No. 164, at 18–21.

### D. *Pico* Does Not Preclude This Court From Overruling *Campbell*

The plaintiffs claim that *Board of Education v. Pico*, 457 U.S. 853 (1982), prevents this Court from holding the Speech Clause inapplicable to public-library weeding decisions. *See* Appellees' Supp. Br., ECF No. 230. But the plaintiffs misrepresent Justice White's concurrence in the judgment, which voted to leave the First Amendment issues undecided, and which rebuked Justice Brennan's plurality opinion for weighing in on these constitutional questions prematurely. *See Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment) ("We should not decide constitutional questions until it is necessary to do so" (emphasis added)). The plaintiffs also misrepresent then-Justice Rehnquist's dissent, which unequivocally rejected Justice Brennan's Speech Clause analysis. *See id.* at 907 (Rehnquist, J., dissenting) ("I entirely disagree with Justice Brennan's treatment of the constitutional issue"). And in all events, only Supreme Court opinions that endorse the judgment of the Court can have the status of binding precedent under *Marks*.

Finally, this Court has already determined that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Alabama Educational Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc) (plurality opinion of Hill, J.); *id.* at 1051 n.18 (Rubin, J., concurring); *see also Chiras v. Miller*, 432 F.3d 606, 619 n.32 (5th Cir. 2005) (citing *Muir*).

### E.     The Court Should Disavow The Eighth Circuit's Reasoning In *GLBT Youth in Iowa Schools Task Force v. Reynolds*

The Eighth Circuit recently rejected the idea that a school library's curating decisions constitute government speech. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024)). The Eighth Circuit's analysis is unsound and this Court should not adopt it, for the reasons in pages 6–20, *supra*.

The Court should not be reticent to create a circuit split that might provoke Supreme Court review. Indeed, the Supreme Court *should* take up this issue because its rulings in *Pico* and *American Library Ass'n* failed to produce majority opinions, and they have left the lower federal courts without any binding instructions in lawsuits challenging library book removals.

### III. The Defendants Are Not Violating The Plaintiffs' Right To "Receive Information And Ideas" When Each Of The 17 Books Remains Available Through Llano Library's In-House Checkout System

The plaintiffs *still* cannot explain how the defendants are depriving them of their constitutional right to "receive information and ideas" when each of the 17 disputed books remains available to the plaintiffs through the Llano Library's in-house checkout system. ROA.3463-3465. Instead, the plaintiffs repeat their false assertions that we are "try[ing] to moot the lawsuit"[27] (the case is obviously not moot, as the plaintiffs continue to suffer Article III injury—although a very minor one—from the absence of the 17 disputed books

---

27.   *See* Appellees' Supp. Br., ECF No. 230, at 9.

from the library shelves). And they falsely claim that the 17 books are "hidden" even though each of the plaintiffs stipulated that they know all about the in-house checkout system and are fully aware that each of the 17 books is available for them to read and check out at Llano Library. ROA.3463-3465.

## IV. THERE IS NO EVIDENCE OF VIEWPOINT DISCRIMINATION IN THE RECORD

The plaintiffs have abandoned their earlier contention that the First Amendment prohibits "content discrimination" in public-library weeding decisions. *See supra*, at 1. But this concession leaves the plaintiffs' argument vulnerable to a new line of attack. The plaintiffs have now decided to put all their eggs in the viewpoint-discrimination basket, yet the record contains *no* evidence whatsoever of viewpoint discrimination.

1. All of the supposed evidence that the plaintiffs tout in their efforts to show nefarious or unconstitutional motivations goes to the *content* rather than the viewpoints expressed in the disputed books. The plaintiffs cite Bonnie Wallace's e-mail denouncing "Pornographic Filth at the Llano Public Libraries." ROA.350. But "pornographic filth" is not a viewpoint, and a person who seeks to remove "pornography" or "filth" is engaged in content discrimination, not viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 (explaining the distinction). Rochelle Wells's e-mail that criticized *It's Perfectly Normal* for depicting naked adults engaged in sex acts is likewise a content-based objection. ROA.1541. And one will search the record in vain for any communication from any defendant that objects to a "viewpoint" ex-

pressed in any of the 17 disputed books. The community members who objected to nudity and sexual content in library books were not engaged in "viewpoint discrimination" of any sort.

2. There is no evidence in the record that any of the 17 disputed books even has a "viewpoint." Nor is there evidence of *what* viewpoints (if any) appear in those 17 books. None of the disputed books (apart from *In the Night Kitchen*) were introduced into evidence. And none of the declarations or live testimony claims that any "viewpoint" appears in any of these books or describes what those "viewpoints" might be.[28]

We can begin with the "butt" and "fart" books. Flatulence is not a viewpoint. Depictions of backsides are not viewpoints either. And because the books were not introduced into evidence, there is no way to find out on this record what viewpoints (if any) are expressed in these books. No one testified about any of this. So the plaintiffs cannot get to first base on a viewpoint-discrimination claim, because we have no idea (and cannot determine from the record) what "viewpoints" are being discriminated against. *See* Panel Concurrence, ECF No. 164-1, at 1 (Southwick, J.).

The situation is no better for the remaining books. The testimony includes some descriptions about a few of the books' subject matter, but none of that testimony says anything about the books' *viewpoints*. Tina Castelan,

---

28. The declarations submitted by the plaintiffs say nothing about the content or subject matter of any of the 17 books. ROA.226–239; ROA.243–245; ROA.422–425.

for example, testified that *It's Perfectly Normal* "explores all versions and all aspects of puberty from menstruation to masturbating." ROA.3898. That certainly describes the subject matter of the book, but it says nothing about the book's *viewpoints*. Nor is there evidence of the viewpoints expressed in *Under the Moon*, *Freakboy*, *Shine*, *Spinning*, *Caste: The Origins of our Discontents*, *Being Jazz*, or *Gabi, a Girl in Pieces*.

The *only* book for which this Court can infer a viewpoint is *They Called Themselves the KKK: The Birth of an American Terrorist Organization*, as it seems reasonable to surmise from the book's title that it presents a viewpoint critical of the Ku Klux Klan (even though the book itself has not been introduced into evidence). But there is no evidence in the record that any defendant supports the Ku Klux Klan or opposes books that portray the Klan in a negative light. So even here, the plaintiffs have no evidence of "viewpoint discrimination, because there is no evidence that any defendant is hostile to the presumed viewpoint of this book.

## Conclusion

The preliminary injunction should be vacated.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: September 20, 2024          *Counsel for Defendants-Appellants*

## Certificate Of Service

I certify that on September 20, 2024, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Matthew Borden
J. Noah Hagey
Marissa Benavides
Kory James DeClark
BraunHagey & Borden LLP
351 California Street, 10th Floor
San Francisco, CA 94104
(415) 599-0210
borden@braunhagey.com
hagey@braunhagey.com
benavides@braunhagey.com
declark@braunhagey.com

Ryan A. Botkin
Katherine P. Chiarello
María Amelia Calaf
Botkin Chiarello Calaf
1209 Nueces Street
Austin, Texas 78701
(512) 960-4730 (phone)
(512) 960-4869 (fax)
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com

*Counsel for Plaintiffs-Appellees*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*

## Certificate of Compliance

with type-volume limitation, typeface requirements,
and type-style requirements

1.  This brief complies with the type-volume limitation of <u>Fed. R. App. P. 27(d)(2)</u> because it contains 6,488 words, excluding the parts of the brief exempted by <u>Fed. R. App. P. 32</u>(f).

2.  This brief complies with the typeface and type-style requirements of <u>Fed. R. App. P. 27(d)(1)(E)</u>, <u>32(a)(5)</u>, and <u>Fed. R. App. P. 32(a)(6)</u> because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.


                                          /s/ Jonathan F. Mitchell
                                          Jonathan F. Mitchell
Dated: September 20, 2024                 *Counsel for Defendants-Appellants*

## Certificate of Electronic Compliance

Counsel also certifies that on September 20, 2024, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Defendants-Appellants*