No. 23-50224

# United States Court of Appeals

## for the

# Fifth Circuit

---

LEILA GREEN LITTLE, *et al.*,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Texas
Honorable Robert L. Pitman Presiding

## UNOPPOSED MOTION TO ALLOW FOUNDATION OF INDIVIDUAL RIGHTS AND EXPRESSION AS AN AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

ROBERT CORN-REVERE*
JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
jt.morris@thefire.org

*Counsel of Record

*Attorneys for* Amicus Curiae *Foundation for Individual Rights and Expression*

Pursuant to Fed. R. App. P. 29(a)(3) and 5th Cir. R. 29, the Foundation for Individual Rights and Expression (FIRE) moves this Court for leave to file an *amicus curia*e brief at the en banc rehearing stage in the above captioned proceeding, *Little, et al. v. Llano County, et al.* (No. 23-50224). In support of this motion, FIRE states the following:

1.  Counsel for FIRE sought consent from the parties and all parties have consented to the filing of FIRE's brief.

2.  FIRE is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Founded in 1999 as the Foundation for Individual Rights in Education, FIRE's sole focus before the expansion of our mission in 2022 was defending student and faculty rights at our nation's colleges and universities.

3.  Given our decades of experience combating campus censorship— including vigilante book-burning—FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE strongly opposes

attempts to ban books based on personal disagreement—both on- and off-campus.

4. Informed by our unique history, FIRE has a keen interest in ensuring the censorship we fight on campus does not take hold in society at large.

5. The participation of FIRE will assist the Court in the resolution of the significant issues of public importance implicated by this appeal.

WHEREFORE, FIRE prays that this Court allow it to file its *amicus curiae* brief, a copy of which is attached to this motion.

Respectfully submitted,

Dated: September 10, 2024

/s/ Robert Corn-Revere

ROBERT CORN-REVERE*
JT MORRIS
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
jt.morris@thefire.org

*Counsel of Record*

# CERTIFICATE OF SERVICE

The undersigned certifies that on September 10, 2024, an electronic copy of the Foundation for Individual Rights and Expression *Motion for Leave to File En Brief* of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the motion will be accomplished by the CM/ECF system.

Dated: September 10, 2024          /s/ Robert Corn-Revere
                                         ROBERT CORN-REVERE
                                         FOUNDATION FOR INDIVIDUAL
                                            RIGHTS AND EXPRESSION

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of <u>Fed. R. App. P. 29(a)(5)</u> because, excluding the parts of the document exempted by the <u>Fed. R. App. P. 32(f)</u>: this document contains 262 words.

2. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u> because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, and 12-point Century Schoolbook for footnotes.

Date: September 10, 2024    /s/ Robert Corn Revere
_____
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

No. 23-50224

# United States Court of Appeals

## for the

# Fifth Circuit

LEILA GREEN LITTLE, *et al.*,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Texas
Honorable Robert L. Pitman Presiding

**EN BANC BRIEF OF *AMICUS CURIAE*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

ROBERT CORN-REVERE*
JT MORRIS
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org
jt.morris@thefire.org

*Counsel of Record

*Attorneys for* Amicus Curiae *Foundation for Individual Rights and Expression*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons are entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Robert Corn-Revere | Counsel to *amicus* FIRE |
| JT Morris | Counsel to *amicus* FIRE |

Pursuant to <u>Federal Rule of Appellate Procedure 26.1</u>, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

/s/ Robert Corn-Revere
September 10, 2024

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................. ii

TABLE OF AUTHORITIES ................................................................ v

INTEREST OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF ARGUMENT .................................................... 2

BACKGROUND ........................................................................ 5

    A.    Book Bans and the Culture War ........................................... 5

    B.    The Culture War Comes to Llano County ............................. 6

ARGUMENT ............................................................................ 8

I.    Banning Books Ignores the Lessons of History and is Incompatible with our National Commitment to Free Expression. ..................................................................... 8

    A.    Censors have sought to ban books and eliminate ideas for centuries. ........................................................ 9

    B.    Banning books is antithetical to the Founders' understanding that the free exchange of ideas is necessary for an informed citizenry. .................................. 11

    C.    The long road to freedom. ............................................. 14

II.    The First Amendment Prohibits the Arbitrary Viewpoint-Based Removal of Books From Public Libraries. ................................................................... 17

    A.    The First Amendment limits arbitrary political control of libraries. ................................................... 18

B.    The First Amendment protects the right to receive information and ideas. .......................................... 23

III.    The Court Should Reject Defendants' Government Speech Argument. ......................................... 26

A.    The rich history of public libraries serving an informed public weighs against government speech. .................................................. 27

B.    The public does not perceive the government as speaking through the diverse and divergent array of books at a public library. ................................... 28

C.    Texas governments have not actively controlled public library shelves to shape their messages. ................... 29

CONCLUSION ....................................................... 33

CERTIFICATE OF SERVICE ................................................. 35

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .... 36

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Abrams v. United States,*
  250 U.S. 616 (1919) ............................................................... 8

*Ark. Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998) ....................................................... 20, 21

*Baumgartner v. United States,*
  322 U.S. 665 (1944) ................................................................ 24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v.*
  *Pico,*
  457 U.S. 853 (1982) ................................................ 2, 3, 20, 23

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ................................................................ 25

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ............................................................... 25

*Butler v. Michigan,*
  352 U.S. 380 (1957) ............................................................... 25

*Campbell v. St. Tammany Parish Sch. Bd.,*
  64 F.3d 184 (5th Cir. 1995) ............................... 2–3, 20, 23, 26

*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005) ......................................... 20, 21

*Cohen v. California,*
  403 U.S. 15 (1971) ................................................................ 24

*Community-Service Broad. of Mid-America, Inc. v. FCC,*
  593 F.2d 1102 (D.C. Cir. 1978) .......................................... 21

*FCC v. League of Women Voters of California,*
  468 U.S. 364 (1984) ............................................................. 21

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................................ 24

*GLBT Youth in Iowa Sch. Task Force v. Reynolds,*
    No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024) .... 27, 28, 29, 30

*Hustler Magazine v. Falwell,*
    485 U.S. 46 (1988) ................................................................ 24

*In re: A Court of Mist & Fury,*
    Case No. CL22-1984 (Va. Beach Cir. Ct., Aug. 30, 2022) .................... 7

*In re: Gender Queer, A Memoir,*
    Case No. CL22-1985 (Va. Beach Cir. Ct., Aug. 30, 2022) .................... 7

*Kincaid v. Gibson,*
    236 F.3d 342 (6th Cir. 2001) ........................................................ 21

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ................................................................ 23

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2000) .......................................................... 4, 5, 18, 22

*Little v. Llano Cnty.,*
    No. 1:22-CV-424-RP, 2023 WL 2731089 (W.D. Tex.
    Mar. 30, 2023) ..................................................... 7, 8, 26, 29

*Matal v. Tam,*
    582 U.S. 218 (2017) ............................................... *passim*

*Moody v. NetChoice,*
    144 S. Ct. 2383 (2024) ........................................................ 30, 31

*Oliver v. Arnold,*
    19 F.4th 843 (5th Cir. 2021) ........................................................ 32

*Papish v. Bd. of Curators of Univ. of Mo.,*
    410 U.S. 667 (1973) ................................................................ 24

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ................................................................ 18

*Pleasant Grove City v. Summum*,
 555 U.S. 460 (2009) ....................................................................... 18, 28

*Rankin v. McPherson*,
 483 U.S. 378 (1987) ...................................................................... 24

*Roth v. United States*,
 354 U.S. 476 (1957) ...................................................................... 17

*Rust v. Sullivan*,
 500 U.S. 173 (1991) ...................................................................... 18

*Shurtleff v. Boston*,
 596 U.S. 243 (2022) ........................................................... 26, 27, 30–31

*Snyder v. Phelps*,
 562 U.S. 443 (2011) ...................................................................... 24

*Stanley v. Georgia*,
 394 U.S. 557 (1969) ................................................................... 4, 23

*Stanley v. Magrath*,
 719 F.2d 279 (8th Cir. 1983) ........................................................ 21

*Sund v. City of Wichita Falls, Tex.*,
 121 F. Supp. 2d 530 (N.D. Tex. 2000) .......................................... 3, 23

*Texas v. Johnson*,
 491 U.S. 397 (1989) ................................................................... 4, 24

*United States v. American Library Ass'n*,
 539 U.S. 194 (2003) ......................................................... 19, 20, 22

*United States v. One Book Called "Ulysses"*,
 5 F. Supp. 182 (S.D.N.Y. 1933) .................................................. 16

*West Virginia State Bd. of Educ. v. Barnette*,
 319 U.S. 624 (1943) ..................................................... 2, 9, 23, 25

*Whitney v. California*,
 274 U.S. 357 (1927) ................................................................. 17, 27

*Widmar v. Vincent*,
454 U.S. 263 (1981) ............................................................. 19

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017) ......................................... 24

**Constitutional Amendments and Statutes**

U.S. Const. amend. I ............................................................... 3

47 U.S.C. § 396(a) .................................................................. 20

47 U.S.C. § 398(c) .................................................................. 20

13 Tex. Admin. Code § 2.4(e) .............................................. 28

13 Tex. Admin. Code § 2.4(e)(3) .................................... 29–30

49 Tex. Reg. 1460 ................................................................. 28

**Other Authorities**

Adam Steinbaugh, *Author's appearance at Georgia Southern University cancelled after students burn and shred books*, Foundation for Individual Rights and Expression (Oct. 11, 2019), https://www.thefire.org/news/authors-appearance-georgia-southern-university-cancelled-after-students-burn-and-shred-books ............................................................... 1

Amy Sohn, *The Man Who Hated Women: Sex, Censorship, & Civil Liberties in the Gilded Age* (2021) .............................. 15

Anne Lyon Haight & Chandler B. Grannis, *Banned Books: 387 B.C. to 1978 A.D.* (1978) ...................................................... 10

Annie Gowen, *Censorship battles' new frontier: Your public library*, Wash. Post (Apr. 17, 2022), https://www.washingtonpost.com/nation/2022/04/17/public-libraries-books-censorship ..................................................... 5

Ashley White, *Louisiana attorney general creates 'protecting
minors' tip line to report library books*, Daily Advertiser
(Dec. 1, 2022),
https://www.theadvertiser.com/story/news/2022/12/01/louisian
a-attorney-general-tip-line-report-library-banned-
books/69690230007 ................................................................. 6

Benjamin Franklin, *The Autobiography of Benjamin Franklin*,
https://www.gutenberg.org/files/20203/20203-h/20203-h.htm ...... 12, 13

Bill Chappell, *A Texas lawmaker is targeting 850 books that
he says could make students feel uneasy*, Nat'l Pub. Radio
(Oct. 10, 2021),
https://www.npr.org/2021/10/28/1050013664/texas-
lawmaker-matt-krause-launches-inquiry-into-850-books.................... 6

*Book Burning*, Holocaust Encyclopedia,
https://encyclopedia.ushmm.org/content/en/article/book-
burning ................................................................................... 11

Doug Linder, *The Trial of John Peter Zenger: An Account* (2001),
http://law2.umkc.edu/faculty/projects/ftrials/zenger/zengeraccount.html ...........14

Eesha Pendharkar, *Why the Bible Is Getting Pulled Off School
Bookshelves*, Ed. Week (Dec. 15, 2022),
https://www.edweek.org/teaching-learning/why-the-bible-is-
getting-pulled-off-school-bookshelves/2022/12 ................................... 33

Eric Berkowitz, *Dangerous Ideas: A Brief History of Censorship
in the West, from the Ancients to Fake News* (2021) ........................ 9, 15

Erin Blakemore, *The history of book bans—and their changing
targets—in the U.S.*, Nat'l Geographic (Apr. 24, 2023),
https://www.nationalgeographic.com/culture/article/history-of-
book-bans-in-the-united-states ....................................................... 14, 15

Frederick Schauer, *Principles, Institutions and the First
Amendment*, 112 Harv. L. Rev. 84 (1998)........................................... 19

Hannah Allam, *Culture war in the stacks: Librarians marshal against rising book bans*, Wash. Post (Mar. 4, 2023), https://www.washingtonpost.com/national-security/2023/03/02/culture-war-stacks-librarians-marshal-against-rising-book-bans ........................................................ 5

Hans J. Hillerbrand, *On Book Burnings and Book Burners: Reflections on the Power (And Powerlessness) of Ideas*, 74 J. Am. Acad. Religion, no. 3 (Sept. 2006) ............................................. 9, 10

Heinrich Heine, *Almansor* https://www.gutenberg.org/files/45600/45600-h/45600-h.htm ............ 11

*History of the Libr. of Congress*, Libr. of Congress, https://www.loc.gov/about/history-of-the-library ........................... 12, 13

*History*, Libr. Co. of Phila., https://librarycompany.org/about-lcp ......... 12

*Jefferson's Libr.*, Libr. of Congress, https://www.loc.gov/exhibits/jefferson/jefflib.html .............................. 13

Jessica Villagomez, *Chicago Public Library removing 6 Dr. Seuss books from the shelves while it determines long-term options*, Chi. Trib. (Mar. 8, 2021), https://www.chicagotribune.com/news/breaking/ct-dr-seuss-chicago-public-library-20210308-gibelvfs7fhrbpwlbitxdyalbm-story.html ................................................................................... 6

Joanna Weiss, *'Are You There, God?' Reminds Us Why Books Are Still Banned, Even in the Digital Age*, Politico (Apr. 29, 2023), https://www.politico.com/news/magazine/2023/04/29/judy-blume-books-are-still-transgressive-00094250 ................................... 33

John Locke, *An Essay Concerning Human Understanding*, https://www.gutenberg.org/cache/epub/10616/pg10616-images.html ...................................................................................... 12

John Milton, *Areopagitica*, https://milton.host.dartmouth.edu/reading_room/areopagitica/intro/text.shtml ..................................................................................... 11

John O. McGinnis, *The Once and Future Property-Based Vision of the First Amendment*, 63 U. Chi. L. Rev. 49 (1996) ........................ 12

John S. Tanner & Justin Collings, *How Adams and Jefferson Read Milton and Milton Read Them*, 40 Milton Q. no. 3 (2006)......... 11

Katha Pollitt, The Left Needs Free Speech, DISSENT, Summer 2021 ..................................................................................... 32–33

Kendall Tietz, *Anne Frank novel banned in Florida school over 'sexually explicit' content: 'Minimization of the Holocaust'*, Fox News (Apr. 13, 2013), https://www.foxnews.com/media/anne-frank-novel-banned-florida-school-sexually-explicit-content-minimization-holocaust.......................................................................... 6

Larissa Ransom, *On this day in 302 Diocletian issued his edict on Manicheanism*, Mint Imperials (Mar. 31, 2015), https://blogs.nottingham.ac.uk/mintimperials/2015/03/31/on-this-day-in-302-diocletian-issued-his-edict-on-manicheanism ........... 10

*Letter from James Madison to W.T. Barry*, National Archives (Aug. 4, 1822), https://founders.archives.gov/documents/Madison/04-02-02-0480 ....................................................................................... 13

Michael Kent Curtis, *The 1859 Crisis Over Hinton Helper's Book, The Impending Crisis: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113 (1993) .................................... 15

Michael Taylor, *What Not to Read: Book Censorship in Early Modern Europe*, College of University Libraries and Learning Sciences News (Sept. 26, 2017), https://libguides.unm.edu/blog/what-not-to-read-book-censorship-in-early-modern-europe ..................................................... 10

Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377 (2001) .............................. 18

Robert Corn-Revere, *The Mind of the Censor and the Eye of the Beholder: The First Amendment and the Censor's Dilemma* 19–20 (Cambridge Univ. Press 2021) ................................................. 15, 16

*The Perils of Reading: Samuel Green and Harriet Beecher Stowe's Uncle Tom's Cabin*, Md. St. Archives, https://msa.maryland.gov/msa/stagser/s1259/121/6180/html/0000.html .................................................................................... 15

*WarGames* (United Artists 1983) .......................................................... 34

# INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Founded in 1999 as the Foundation for Individual Rights in Education, FIRE's sole focus before the expansion of our mission in 2022 was defending student and faculty rights at our nation's colleges and universities. Given our decades of experience combating campus censorship—including vigilante book-burning[2]— FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE strongly opposes attempts to ban books based on personal disagreement—both on- and off-campus. Informed by our unique history, FIRE has a keen interest in ensuring the censorship we fight on campus does not take hold in society at large.

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to filing of this brief.

[2] Adam Steinbaugh, *Author's appearance at Georgia Southern University cancelled after students burn and shred books*, Foundation for Individual Rights and Expression (Oct. 11, 2019), https://www.thefire.org/news/authors-appearance-georgia-southern-university-cancelled-after-students-burn-and-shred-books.

## SUMMARY OF ARGUMENT

This case illustrates the danger of placing public libraries at the mercy of political culture wars where the winners take all. Public libraries are not playthings of politicians and political appointees. They are, as governmental institutions, part of a system expressly predicated on limiting state power, especially the power to control ideas. This is because "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Framers would have been aghast at the abuse of governmental power to interfere with public libraries.

While the government may choose to establish a library in the first place (or not), that power does not authorize transient officeholders to impose their personal agendas on the community. As the Supreme Court has observed, libraries cannot be run in "a narrowly partisan or political manner" because "[o]ur Constitution does not permit the official suppression of ideas." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op.); *Campbell v.*

*St. Tammany Parish Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995). Thus, "if a Democratic school board, motivated by party affiliation, ordered the removal of all [library] books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." *Pico*, 457 U.S. at 870–71. This is even truer of community libraries like that in Llano County. *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000).

The status of public libraries as nonpolitical guardians of public knowledge emerged out of hard lessons of history. Censorship was the expected norm for millennia, and as civilizations rose and fell throughout human history, one recurring theme was censorship of the works of religious and political enemies—often with extreme prejudice. Our Framers endeavored to end this vicious cycle, both in their words and deeds. They adopted a Bill of Rights with a First Amendment guarantee that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I, and created libraries to ensure widespread dissemination of information on all subjects. To be sure, book censorship continued after the Constitution's ratification, but over time,

First Amendment jurisprudence arose from those controversies to preclude the type of censorship now occurring in Llano County and elsewhere.

For more than a half-century, the First Amendment's protection of our "right to receive information and ideas" has been "well established." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). In particular, a "bedrock principle underlying the First Amendment" is that officials cannot limit expression "simply because society finds [it] offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). These principles not only limit the government's ability to restrict speech generally, but they also govern the institutions the government creates for purposes of disseminating knowledge.

The government cannot create a repository of information designed to include even unorthodox and unpopular views and dedicate it to serving all members of the community, then leave it to the unbounded discretion of political decisionmakers who may "distort its usual functioning." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543 (2000). Just as the government "could not elect to use a broadcasting network or a college publication structure in a regime which prohibits

speech necessary to the proper functioning of those systems," *id*. at 544, the First Amendment prevents it from leaving a public library's book removal decisions to the vagaries of political whims.

## BACKGROUND

### A.    Book Bans and the Culture War

America's public libraries have become the front line of a culture war in which politicians of all ideological stripes battle to control the public mind. Partisans are banning books from library shelves with a ferocity librarians deem unprecedented.[3] Activists and politicians nationwide, like Defendants here, have worked in tandem to purge hundreds of works from libraries because they dislike the ideas they contain.[4]

Censorship demands are not the province of any one political group: They come from across the political spectrum. Lawmakers have targeted books they claim may make readers "feel discomfort, guilt, anguish, or

---

[3] Hannah Allam, *Culture war in the stacks: Librarians marshal against rising book bans*, Wash. Post (Mar. 4, 2023), https://www.washingtonpost.com/national-security/2023/03/02/culture-war-stacks-librarians-marshal-against-rising-book-bans.

[4] *See, e.g.*, Annie Gowen, *Censorship battles' new frontier: Your public library*, Wash. Post (Apr. 17, 2022), https://www.washingtonpost.com/nation/2022/04/17/public-libraries-books-censorship.

any other form of psychological distress because of their race or sex,"[5] and, "to protect the children," have even established citizen hotlines for reporting books and librarians to the state.[6]

The resulting crush of censorship has yielded absurd results. A graphic-novel adaptation of Anne Frank's *The Diary of a Young Girl*, for example, was removed from Florida bookshelves for "minimizing the Holocaust."[7] Even Dr. Seuss has been banned from public libraries over concerns about racially offensive content.[8]

## B.    The Culture War Comes to Llano County

This case illustrates the clash of these politicized censorship demands in a microcosm. It arose after four of the Defendants, members

---

[5] Bill Chappell, *A Texas lawmaker is targeting 850 books that he says could make students feel uneasy*, Nat'l Pub. Radio (Oct. 10, 2021), https://www.npr.org/2021/10/28/1050013664/texas-lawmaker-matt-krause-launches-inquiry-into-850-books.

[6] Ashley White, *Louisiana attorney general creates 'protecting minors' tip line to report library books*, Daily Advertiser (Dec. 1, 2022), https://www.theadvertiser.com/story/news/2022/12/01/louisiana-attorney-general-tip-line-report-library-banned-books/69690230007.

[7] Kendall Tietz, *Anne Frank novel banned in Florida school over 'sexually explicit' content: 'Minimization of the Holocaust'*, Fox News (Apr. 13, 2013), https://www.foxnews.com/media/anne-frank-novel-banned-florida-school-sexually-explicit-content-minimization-holocaust.

[8] Jessica Villagomez, *Chicago Public Library removing 6 Dr. Seuss books from the shelves while it determines long-term options*, Chi. Trib. (Mar. 8, 2021), https://www.chicagotribune.com/news/breaking/ct-dr-seuss-chicago-public-library-20210308-gibelvfs7fhrbpwlbitxdyalbm-story.html.

of an activist group, deemed certain children's books "inappropriate" and demanded their removal from Llano Public Library. *Little v. Llano Cnty.,* No. 1:22-CV-424-RP, 2023 WL 2731089, at *2–3 (W.D. Tex. Mar. 30, 2023). Numerous books were removed in response, but this was just the beginning. In the months that followed, more books disappeared following similar demands, including award-winning books by acclaimed authors like Maurice Sendak's *In the Night Kitchen* and Robie H. Harris' *It's Perfectly Normal*. *Id.* at *3.

The activists denounced the books as "obscene" and "pornographic filth," using hyperbolic assertions typical of contentious contemporary debates over books. While such inflammatory rhetoric is common currency in the loose discourse of activists and politicians, it cannot be taken seriously as a matter of law. *See, e.g., In re: Gender Queer, A Memoir*, Case No. CL22-1985 (Va. Beach Cir. Ct., Aug. 30, 2022); *In re: A Court of Mist & Fury*, Case No. CL22-1984 (Va. Beach Cir. Ct., Aug. 30, 2022) (dismissing, respectively, claims that the memoir and novel are obscene).

Nevertheless, Defendant Wallace supplied a list of "dozens" of books she called "pornographic" because she claimed they promoted

acceptance of LGBTQ views, and she targeted others for discussing critical race theory. *Little*, 2023 WL 2731089 at *3–4. Meanwhile, the existing library board was dissolved, and activists advocating book removals (including Defendants Wallace, Wells, and Schneider) were named to a new "Library Advisory Board" that halted acquisitions, barred library staff from attending Board meetings, and closed the library temporarily to scour the shelves of books the new members deemed "inappropriate." *Id.* at *5.

## ARGUMENT

## I. Banning Books Ignores the Lessons of History and is Incompatible with our National Commitment to Free Expression.

The Framers were lovers of learning who recognized the democratic necessity of an informed citizenry. They placed profound faith in the then-radical notion that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). Upon that faith rests "the theory of our Constitution." *Id*. This was not just some utopian vision. As students of history, the Founders were acutely aware that arbitrary government authority over expression and the freedom to read was the root of tyranny, so they designed the Constitution "to avoid these

ends by avoiding these beginnings." *Barnette*, <u>319 U.S. at 641</u>. And as practical men, they built libraries to help realize their vision. When government officials like Defendants abuse their power to impose ideological blinders on the public's access to ideas on library shelves, they betray the Founders' plan.

### A. Censors have sought to ban books and eliminate ideas for centuries.

No matter its political valence, censorship is an ancient human tradition. Efforts to control what we may read have existed for nearly as long as the written word itself. In 212–13 BCE, for example, Qin Shi Huang—China's "First Emperor"—presided over a calamity known as "The Burning of the Books and the Burying of the Philosophers," a period when ownership of books was outlawed and "countless poetry, history, and philosophy texts . . . were destroyed."[9] Early Christian works were likewise targeted. In 303 AD, for example, the Emperor Diocletian ordered the public burning of Christian writings.[10] Heretical authors met

---

[9] Eric Berkowitz, *Dangerous Ideas: A Brief History of Censorship in the West, from the Ancients to Fake News* 2 (2021). Two millennia later, Mao bragged he had "surpassed Qin Shihuang a hundredfold." *Id*. at 3.

[10] Hans J. Hillerbrand, *On Book Burnings and Book Burners: Reflections on the Power (And Powerlessness) of Ideas*, 74 J. Am. Acad. Religion, no. 3, 596 (Sept. 2006).

the same fate as their texts.[11]

Empires rose and fell, but books remained targets. In 1557, Pope Paul IV commissioned *Index librorum prohibitorum*, a blacklist of banned titles the Church continually updated over the next 400 years until Pope Paul VI finally abandoned the effort in 1966.[12]

Cervantes' *Don Quixote* may have outlasted the Spanish Inquisition,[13] but so did book bans. Far from a medieval relic, widespread banning and burning of books continued in earnest throughout the Enlightenment, as works by Voltaire, Rousseau, and other leading thinkers met the torch across Europe.[14] In his 1820–21 tragedy "Almansor," the German poet Heinrich Heine wrote: "Where they burn

---

[11] The year prior, Diocletian had ordered "the harshest punishment" for Manichean leaders, "that is, to be consumed by the burning flames along with their condemnable writings." Larissa Ransom, *On this day in 302 Diocletian issued his edict on Manicheanism*, Mint Imperials (Mar. 31, 2015), https://blogs.nottingham. ac.uk/mintimperials/2015/03/31/on-this-day-in-302-diocletian-issued-his-edict-on-manicheanism.

[12] Anne Lyon Haight & Chandler B. Grannis, *Banned Books: 387 B.C. to 1978 A.D.* (1978).

[13] Michael Taylor, *What Not to Read: Book Censorship in Early Modern Europe*, College of University Libraries and Learning Sciences News (Sept. 26, 2017), https://libguides.unm.edu/blog/what-not-to-read-book-censorship-in-early-modern-europe.

[14] *See, e.g.*, Hillerbrand, *supra* note 10, at 601.

books, they will also ultimately burn people."[15] The line references Christian inquisitors burning the Quran in Spain, but the stark warning would echo bitterly just over a century later as Nazis burned works by Heine and many others while seizing power.[16]

## B. Banning books is antithetical to the Founders' understanding that the free exchange of ideas is necessary for an informed citizenry.

Aware of the long, bleak history of repression, the Founders rejected state censorship. Instead, they believed in letting truth and falsehood "grapple"—because, in the English poet John Milton's classic formulation, "who ever knew Truth put to the wors[e], in a free and open encounter?"[17] Milton's paean to the freedom to write, publish, and read had scant impact in Caroline England, but found an eager audience a century later across the Atlantic in readers like John Adams and Thomas Jefferson.[18] So too did John Locke, who recognized the humbling,

---

[15] Heinrich Heine, *Almansor available at* https://www.gutenberg.org/files/45600/45600-h/45600-h.htm.

[16] *Book Burning,* Holocaust Encyclopedia, https://encyclopedia.ushmm.org/content/en/article/book-burning (last visited May 24, 2023).

[17] John Milton, *Areopagitica,* https://milton.host.dartmouth.edu/reading_room/areopagitica/intro/text.shtml.

[18] *See, e.g.*, John S. Tanner & Justin Collings, *How Adams and Jefferson Read Milton and Milton Read Them*, 40 Milton Q., no. 3, 207–19 (2006).

enriching power of what he called the "necessary diversity of opinions," and urged humanity to "commiserate our mutual ignorance, and endeavor to remove it in all the gentle and fair ways of information."[19] James Madison enshrined Locke's understanding of the power of free expression in our Bill of Rights.[20]

"Books and libraries were essential to America's founding generation," and the Founders demonstrated their commitment to the free flow of information—and libraries in particular—in both word and deed.[21] Benjamin Franklin, for one, founded America's first successful lending library[22] in Philadelphia because, as he put it, "there was not a good bookseller's shop in any of the colonies to the southward of Boston."[23] The library provided Franklin "the means of improvement by

---

[19] John Locke, *An Essay Concerning Human Understanding*, https://www.gutenberg.org/cache/epub/10616/pg10616-images.html.

[20] *See, e.g.*, John O. McGinnis, *The Once and Future Property-Based Vision of the First Amendment*, 63 U. Chi. L. Rev. 49, 60–71 (1996).

[21] *History of the Libr. of Congress*, Libr. of Congress, https://www.loc.gov/about/history-of-the-library (last visited May 24, 2023).

[22] *History*, Libr. Co. of Phila., https://librarycompany.org/about-lcp (last visited May 24, 2023).

[23] Benjamin Franklin, *The Autobiography of Benjamin Franklin*, https://www.gutenberg.org/files/20203/20203-h/20203-h.htm.

constant study."[24] Madison believed such improvement necessary for our democratic experiment to succeed. "A popular Government, without popular information, or the means of acquiring it, is but a prologue to a Farce or a Tragedy; or, perhaps, both," he wrote in 1822.[25]

To that end, President John Adams signed legislation creating the Library of Congress in 1800. After the British torched the Library and its 3,000 volumes during the War of 1812, Thomas Jefferson—who named the first two Librarians of Congress, and recommended works for inclusion—sold his entire personal collection of 6,487 books to Congress to restart it.[26] Jefferson's commitment to maintaining a diversity of accessible knowledge still guides the Library's broad principle of acquisition.[27]

Franklin, Adams, Jefferson, Madison, and their fellow Founders would readily recognize the threat governmental restrictions on the free

---

[24] *Id.*

[25] *Letter from James Madison to W.T. Barry*, National Archives (Aug. 4, 1822), https://founders.archives.gov/documents/Madison/04-02-02-0480.

[26] *History of the Libr. of Congress*, *supra* note 21.

[27] *Jefferson's Libr.*, Libr. of Congress, https://www.loc.gov/exhibits/jefferson/jefflib.html (last visited May 24, 2023).

flow of knowledge present. They were intensely familiar, for example, with the jailing, trial, and ultimate acquittal of the proto-revolutionary printer John Peter Zenger for criticizing New York's colonial governor.[28] They would be no more tolerant of petty bureaucrats suppressing books— and thus knowledge—than of the historical examples of censorship by the torch or the rack that helped inspire the Revolution.

## C.    The long road to freedom.

The Constitution's promise of protecting free expression was not fulfilled overnight. Before the Civil War—and decades before the emergence of First Amendment jurisprudence—some states banned abolitionist literature, with harsh punishments for violating the law. The 1851 publication of Harriet Beecher Stowe's *Uncle Tom's Cabin* sparked book-burnings in slave-holding states.[29] Merely owning a copy could lead to ten years in jail, as it did for Samuel Green, a free black man living in

---

[28] Doug Linder, *The Trial of John Peter Zenger: An Account* (2001), http://law2. umkc.edu/faculty/projects/ftrials/zenger/zengeraccount.html

[29] Erin Blakemore, *The history of book bans—and their changing targets—in the U.S.*, Nat'l Geographic (Apr. 24, 2023), https://www.nationalgeographic.com/ culture/article/history-of-book-bans-in-the-united-states.

Maryland.[30] In 1857, three men in Arkansas were hanged simply for possessing Hinton R. Helper's *The Impending Crisis of the South: How to Meet It*.[31]

Books addressing human sexuality fared no better. Anthony Comstock, the New York Society for the Suppression of Vice's driving force, started—like Defendants here—as a pro-censorship activist and later banned books as a government agent. At the end of Comstock's four decades-long crusade against "immoral" material, he boasted of having seized over *160 tons* of literature, jailing more than 3,600 people, and driving at least fifteen to commit suicide.[32] As a special agent of the Post Office, the master censor's massive haul included classic literature, art, birth control pamphlets, and even home medical guides.[33] The

---

[30] *Id.*; *see also The Perils of Reading: Samuel Green and Harriet Beecher Stowe's Uncle Tom's Cabin*, Md. St. Archives, https://msa.maryland.gov/msa/stagser/s1259/121/6180/html/0000.html (last visited May 24, 2023).

[31] Berkowitz, *supra* note 9, at 155; *see also* Michael Kent Curtis, *The 1859 Crisis Over Hinton Helper's Book, The Impending Crisis: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113 (1993).

[32] Robert Corn-Revere, *The Mind of the Censor and the Eye of the Beholder: The First Amendment and the Censor's Dilemma* 19–20 (Cambridge Univ. Press 2021).

[33] *Id.* at 40–54.

government's war on "evil reading" continued long after Comstock's death in 1915.[34]

One positive byproduct of this era of repression was the emergence of strong First Amendment jurisprudence. The excesses of Comstock and the "anti-vice societies" forced free speech advocates to sharpen their arguments, and courts began to respond.[35] One turning point came when the federal government sought to confiscate and destroy imported copies of James Joyce's *Ulysses*, arguing the book was obscene. A federal district judge rejected the attempted censorship, instead asking: "[W]hen such a great artist in words, as Joyce undoubtedly is, seeks to draw a true picture . . . ought it to be impossible for the American public legally to see that picture?" *United States v. One Book Called "Ulysses"*, 5 F. Supp. 182, 184 (S.D.N.Y. 1933).

By the mid-twentieth century, the Supreme Court imposed First Amendment limits on state censorship, formally repudiating the Victorian Era concept of obscenity under which Comstock operated,

---

[34] *See generally* Amy Sohn, *The Man Who Hated Women: Sex, Censorship, & Civil Liberties in the Gilded Age* (2021).

[35] Corn-Revere, *supra* note 32, at 68–78.

16

which had authorized suppression of any book that might tend to "deprave and corrupt those whose minds are open to such immoral influences." *Roth v. United States*, <u>354 U.S. 476, 489</u> (1957) ("judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press"). Here, Defendants appear to believe they were empowered to remove books from library shelves under the same subjective standards once employed by Anthony Comstock and his ilk. But the First Amendment does not permit such arbitrary action.

## II.   The First Amendment Prohibits the Arbitrary Viewpoint-Based Removal of Books From Public Libraries.

"Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary." *Whitney v. California*, <u>274 U.S. 357, 375</u> (1927) (Brandeis, J., concurring). Banning books from public libraries leaves us far less free to arrive at our own conclusions, and no exercise of state power is more arbitrary than top-down imposition of viewpoint-based restrictions on which books may remain on public library shelves.

Government involvement in expressive activities can take many forms—either as speaker, regulator, custodian of a public forum, or as sponsor of independently-chartered speech enterprises—and that form determines the applicable constitutional rule. *See generally* Randall P. Bezanson & William G. Buss, *The Many Faces of Government Speech*, 86 Iowa L. Rev. 1377, 1384–87 (2001). Where the government is the speaker and delivers its own message, the First Amendment does not constrain the resulting "government speech." *E.g.*, *Rust v. Sullivan*, <u>500 U.S. 173, 193</u>–94 (1991); *Pleasant Grove City v. Summum*, <u>555 U.S. 460, 481</u> (2009). Where government property is an open forum for citizen speech, either by tradition or by designation, the First Amendment obliges the state to respect the purpose of the forum. *E.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, <u>460 U.S. 37, 45</u>–46 (1983). And where the government creates institutions vested with independent editorial judgment, or a mandate to make information widely available to the public, it cannot then arbitrarily limit access to information "necessary to the proper functioning of those systems." *Velazquez*, <u>531 U.S. at 544</u>.

## A.    The First Amendment limits arbitrary political control of libraries.

Certain institutions the government owns and operates—such as

18

universities, museums, public broadcast stations and libraries—are imbued with a "First Amendment aura" that limits political machinations concerning those bodies. Frederick Schauer, *Principles, Institutions and the First Amendment*, 112 Harv. L. Rev. 84, 116 (1998). Just as when it designates property as a public forum and must follow constitutional rules appropriate to that forum, *Widmar v. Vincent*, <u>454 U.S. 263, 267</u>–68 (1981) ("The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place"), when the government creates a repository of books for the interest, information, and enlightenment of all people of the community, it cannot then arbitrarily limit access to information based on the whims of transient officeholders. Yet that is precisely what happened in Llano County.

The government charters libraries to advance the spread of knowledge free from political interference. This institutional purpose both defines and limits the government's authority. Defendants miss this point in arguing libraries are not public forums, citing *Chiras* and the plurality opinion in *United States v. American Library Ass'n*, <u>539 U.S. 194, 205</u>–06 (2003). *See* Defs.-Appellants' B<u>r. 28–29</u>. Those cases dealt

19

with initial acquisition decisions for *inclusion* of materials, not the issue presented here—decisions to *exclude* books already acquired (*e.g.*, censorship decisions). *See Chiras*, 432 F.3d at 610 (addressing "selecting materials for inclusion in the public school curriculum"); *Amer. Library Ass'n*, 539 U.S. at 205 (addressing "a public library's exercise of judgment in selecting the material it provides to its patrons"). The constitutional principles limiting book removal decisions derive from the purposes for which libraries exist. *Campbell*, 64 F.3d at 188–89; *Pico*, 457 U.S. at 871–72 ("we are concerned . . . with the suppression of ideas, [and] our holding today affects only the discretion to *remove* books").

In this respect, as governmentally owned or sponsored institutions, libraries are more like public broadcast stations, which, regardless of the extent to which they might be considered public forums, are governed by constitutional doctrine defined by their purpose. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998). Much like libraries, public broadcasters are licensed as an alternative programming source to promote "freedom, imagination and initiative on both local and national levels" with programming decisions insulated from political control. Public Broad. Act of 1967, 47 U.S.C. §§ 396(a), 398(c).

Such stations may be owned by government entities and receive funding (at least in part) from certain government sources but are licensed to exercise "the 'widest journalistic freedom' consistent with their public responsibilities." *Forbes*, 523 U.S. at 673 (citation omitted). For similar reasons, the government cannot censor print publications it has sponsored that have been vested with independent editorial judgment.[36]

The First Amendment bars the government from imposing restrictions contrary to an institution's established purpose, such as prohibiting public broadcasters from running editorials. *FCC v. League of Women Voters of California*, 468 U.S. 364, 375–76 (1984). Likewise, measures that give politicians an oversight role where they second-guess broadcasters' programming choices are unconstitutional. *See Community-Service Broad. of Mid-America, Inc. v. FCC*, 593 F.2d 1102, 1108–09 (D.C. Cir. 1978) (en banc).[37]

---

[36] *E.g.*, *Kincaid v. Gibson*, 236 F.3d 342, 355 (6th Cir. 2001) (en banc) (confiscation of student yearbook violated the First Amendment); *Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983) (cutting student newspaper's funding because of disfavored content violates the First Amendment).

[37] Once again, Defendants' reliance on *Chiras* is misplaced. The Court in *Chiras* erroneously assumed that a public broadcaster "normally speaks as the government," 432 F.3d at 616, and Defendants extrapolated from that incorrect premise that

Just as the government bore no obligation to establish a system of public broadcasting, doing so under a mandate to insulate programming from political control obliges it to play by the appropriate constitutional rules. As the Supreme Court observed in *Velazquez*, 531 U.S. at 543, "[w]here the government uses or attempts to regulate a particular medium, we have been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations." The First Amendment does not permit the government "to suppress speech inherent in the nature of the medium" or to "distort its usual functioning." *Id*.

For public libraries—created to serve the entire community by offering a wide spectrum of ideas free of censorship—this means political victors don't get to call the shots just because they hold temporary positions of power. Librarians necessarily evaluate content in deciding what books to acquire. *Am. Libr. Ass'n*, 539 U.S. at 208. However, once they do so, book removal decisions cannot proceed on a partisan basis. Books cannot be taken off library shelves simply because political

---

government discretion to remove books from libraries is unlimited. Defs.-Appellants' Br. 34.

22

appointees (or elected officials) "dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Pico*, <u>457 U.S. at 871</u>–72 (quoting *Barnette*, <u>319 U.S. at 642</u>); *see Campbell*, <u>64 F.3d at 188</u>; *Sund*, <u>121 F. Supp. 2d at 548</u>.

**B.    The First Amendment protects the right to receive information and ideas.**

By interfering with the Llano County Public Library's institutional purpose, Defendants short-change the public's "right to receive information and ideas." *Stanley*, <u>394 U.S. at 564</u>. As Milton and Locke knew, the free exchange of ideas generates knowledge and cultivates understanding—and as Madison and Jefferson recognized, it is vital for democratic governance. "The First Amendment means that Government has no power to thwart the process of free discussion, to 'abridge' the freedoms necessary to make that process work." *Kleindienst v. Mandel*, <u>408 U.S. 753, 776</u> (1972) (Marshall, J., dissenting).

The fact that Defendants object to certain books cannot justify their removal. In our pluralist democracy, "one man's vulgarity is another's lyric," and the First Amendment limits government authority over such decisions precisely because officials "cannot make principled distinctions"

23

about what speech is sufficiently "distasteful" to remove. *Cohen v. California*, 403 U.S. 15, 25 (1971).

To ignore the First Amendment's limiting principles would grant government officials dangerously broad discretion to restrict speech they subjectively deem "hurtful," *Snyder v. Phelps*, 562 U.S. 443, 456 (2011), "without moderation," *Baumgartner v. United States*, 322 U.S. 665, 674 (1944), "inappropriate or controversial," *Rankin v. McPherson*, 483 U.S. 378, 387 (1987), "outrageous," *Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988), or "indecent," *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 667 (1973). Instead, the "bedrock principle underlying the First Amendment" is that officials cannot limit expression "simply because society finds [it] offensive or disagreeable." *Johnson*, 491 U.S. at 414.

Nor may government officials acquiesce to the loudest voices demanding books removal based on disagreement with the ideas they contain. At its core, the First Amendment is a "counter-majoritarian bulwark against tyranny," *Wollschlaeger v. Governor*, 848 F.3d 1293, 1327 (11th Cir. 2017) (en banc) (Pryor, C.J., concurring), and the state may not ban a book "simply because it might offend a hostile mob." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 135 (1992).

Defendants here gain no legitimacy by saying they were duly appointed to positions on the Library Advisory Board as part of a democratic process, because fundamental rights "may not be submitted to vote; they depend on the outcome of no elections." *Barnette*, 319 U.S. at 638–39.

Defendants similarly cannot mask the censorial nature of their actions by characterizing them as measures to protect youth. From comic books to video games, dime novels to heavy metal, blaming artistic expression for society's ills and the perceived corruption of children is an old trope. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797–98 (2011). The government "may not 'reduce the adult population . . . to reading only what is fit for children,'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73–74 (1983) (quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957)), nor may it wield a "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

Even in the context of public *school* libraries, where considerations of maturity and pedagogical relevance come into play, this Court has acknowledged "students have a First Amendment right to receive information and that school officials are prohibited from exercising their discretion to remove books from school library shelves" on based on

narrow partisan or ideological concerns. *Campbell*, 64 F.3d at 188. Because such concerns unquestionably motivated the removal here, Defendants violated the First Amendment's protection of the right to receive information, and the district court's injunction should stand.

## III. The Court Should Reject Defendants' Government Speech Argument.

A Llano County official forced books off the public library shelves because they appeared on a lone state representative's blacklist. *Little*, 103 F.4th at 1144. That's not government speech. It's censorship based on the subjective views of a few officials, in a place the public created to ensure it stays informed.

The Court should refuse Defendants' government speech argument, heeding the Supreme Court's warning to "exercise great caution before extending our government-speech precedents." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Under the Supreme Court's "holistic inquiry" for whether expression is government speech, each factor shows public libraries do not engage in government speech, including when they remove books. *See Shurtleff v. Boston*, 596 U.S. 243, 252 (2022). These factors include the history of public libraries; the public perception of who is speaking through a public library's shelves; and the extent to which Texas

26

municipalities control libraries to send a message. *Id.* Just recently, the Eighth Circuit applied the *Shurtleff* factors in rejecting Iowa's claim that removing books at public school libraries was government speech. *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, No. 24-1075, 2024 WL 3736785, at *2–3 (8th Cir. Aug. 9, 2024). The same reasoning applies to public libraries.

### A. The rich history of public libraries serving an informed public weighs against government speech.

The Founders frowned upon an ignorant public—including one force-fed government-approved ideas. *Whitney*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring) (the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth . . . the greatest menace to freedom is an inert people.") That is why public libraries traditionally existed to serve a well-informed public, not the government. *See* Section I.B., *supra*. And historically, Texas law stressed public libraries were created not to serve as government mouthpieces, but as places "for the interest, information,

and enlightenment of all people of the community." 13 Tex. Admin. Code § 2.4(e), repealed by 49 Tex. Reg. 1460, effective Mar. 12, 2024.[38]

This history shows why what's on the shelves at public libraries is not "government speech." As the Eighth Circuit correctly observed in *Reynolds*, a historical distinction exists between a city selecting monuments for a park, with "governments hav[ing] used monuments to speak to the public since ancient times," and public school libraries, which have not usually served as government messengers. 2024 WL 3736785, at *3 (quoting *Matal*, 582 U.S. at 238 and distinguishing *City of Pleasant Grove v. Summum*, 555 U.S. 460 (2009)). That distinction is even stronger here, given public libraries' role as a wealth of ideas and information for all citizens.

### B. The public does not perceive the government as speaking through the diverse and divergent array of books at a public library.

"[I]t is doubtful that the public would view the placement and removal of books in public school libraries as the government speaking." *Reynolds*, 2024 WL 3736785, at *3. And it's even more doubtful for public

---

[38] This regulation was law until just before the panel issued its opinion. Regardless whether that provision still exists, it described the historic purpose of public libraries in Texas.

libraries.

A person visiting a public library or perusing its online catalog will encounter a range of opposing, controversial, and irreverent works. Just take the Llano County library system. One can find both Barack Obama's "The Audacity of Hope" and "Obama Zombies: How the Liberal Machine Brainwashed My Generation" on the shelves.[39] One can also find "Mein Kampf" and "Vladimir Putin: Life Coach."[40] And of course, until recently, one could find children's books about "butt[s] and fart[s]." *Little*, 103 4th at 1144. If those represent government speech, then Llano County "is babbling prodigiously and incoherently." *Matal*, <u>582 U.S. at 219</u> (2017); *see also Reynolds*, <u>2024 WL 3736785</u>, at *3 (quoting *Matal* and highlighting the divergent political science books found at school libraries). The public knows better.

### C. Texas governments have not actively controlled public library shelves to shape their messages.

Until mere months ago, Texas's statewide policy for its public libraries was to "challenge censorship in the fulfillment of their responsibility to provide information and enlightenment." 13 Tex.

---

[39] https://llano.biblionix.com/catalog/

[40] *Id.*

Admin. Code § 2.4(e)(3). While Llano County and *amicus* State of Texas have done an about-face, urging the Court to condone library censorship, their reversal does not tilt this factor in their favor. *See Reynolds*, 2024 WL 3736785, at *3 ("this factor favors Plaintiffs as historically the government of Iowa has not asserted extensive control over removing books from public school libraries."). Shifting political whims do not—and must not—convert public libraries into the government's messenger.

Nor does the Supreme Court's recent decision in *Moody v. NetChoice* render public library book decisions "government speech," despite Defendants' insistence otherwise. (Defs.' Supp. Br. 14, 17), *Moody* says nothing about the intentionally narrow scope of government speech doctrine. Rather, *Moody* reaffirmed strong First Amendment protections for *private* actors "compiling and curating others' speech" when the *government* tries to regulate their editorial discretion. 144 S. Ct. 2383, 2401–02 (2024).

The government does not escape constitutional scrutiny just because it compiles and curates public library catalogs. Any argument otherwise misses the point: Just because the government touches something expressive does not make it "government speech." *E.g.*, *Shurtleff*, 596

U.S. at 258; *Matal*, 582 U.S. at 236. As explained above, both history and public perception refute the notion that public libraries speak for the government. First Amendment protections for private editorial discretion no more allow the government to justify viewpoint-driven book removals as "government speech" than Eighth Amendment guarantees for prison medical care allow prison guards to justify stealing a prisoner's essential medications as "government wellness."

As Madison explained, "the great object" of a bill of rights was "to limit and qualify the powers of government." PENNSYLVANIA PACKET, June 16, 1789 (reporting on congressional session). That includes limiting the power to control ideas. Yet Defendants ask the Court to discard that foundational principle, and condone a system in which the government can turn protection for private speech on its head to justify censorship. The Court should refuse—forcefully—and reject any notion that *Moody* hints at expanding government speech to public libraries.

In fact, the Supreme Court reiterated in *Moody* that "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas." 144 S. Ct. at 2402. If the

31

First Amendment prohibits the government's heavy hand from "balancing" the marketplace of ideas, then it also prohibits the government from *narrowing* the marketplace of ideas by censoring disfavored ideas in public institutions created to bolster that marketplace—no matter what officials demand about "government speech."

At bottom, if public institutions that exist to promote knowledge and ideas "could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal*, 582 U.S. at 235. That result cannot be squared with the First Amendment, let alone our historical understanding of public libraries. But passing off arbitrary censorship at public libraries as "government speech" is what Defendants and the *amici* states are championing.

This case presents the Court an opportunity to temper this "ideological arms race, one in which each side in any major debate will escalate every grievance and deploy every tool at their disposal to suppress their opponents." *Oliver v. Arnold*, 19 F.4th 843, 854 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc) (quoting Katha

Pollitt, The Left Needs Free Speech, DISSENT, Summer 2021, at 45, 47 ("If you call for a bookstore not to stock your enemy's book or rejoice when a problematic classic is taken out of print, your enemy will do the same. Then it just comes down to who has more power. You won't have a universal principle to appeal to."). This Court should make the most of it—or else, "as our Founders predicted, we will all be worse off as a result." 19 F.4th at 854.

## CONCLUSION

The culture war waged in America's public libraries will not end with one side declaring victory followed by lasting peace. The conflict will continue—endlessly—so long as partisans believe they may impose their vision of "appropriate" reading material on their respective communities. Regardless of whether book-banning campaigns target the Bible[41] or Judy Blume,[42] politicized efforts to restrict access to information cannot be reconciled with the Founders' faith in the free exchange of ideas and

---

[41] Eesha Pendharkar, *Why the Bible Is Getting Pulled Off School Bookshelves*, Ed. Week (Dec. 15, 2022), https://www.edweek.org/teaching-learning/why-the-bible-is-getting-pulled-off-school-bookshelves/2022/12.

[42] Joanna Weiss, *'Are You There, God?' Reminds Us Why Books Are Still Banned, Even in the Digital Age*, Politico (Apr. 29, 2023), https://www.politico.com/news/magazine/2023/04/29/judy-blume-books-are-still-transgressive-00094250.

our national commitment to freedom of expression. These battles will

persist until the courts declare that the only way to win is not to play.[43]


Dated: September 10, 2024          /s/ Robert Corn-Revere
                                   _____

                                   ROBERT CORN-REVERE*
                                   JT MORRIS
                                   FOUNDATION FOR INDIVIDUAL
                                     RIGHTS AND EXPRESSION
                                   700 Pennsylvania Ave. SE
                                   Suite 340
                                   Washington, DC 20003
                                   (215) 717-3473
                                   bob.corn-revere@thefire.org
                                   jt.morris@thefire.org

                                   *Counsel of Record

---

[43] *WarGames* (United Artists 1983).

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 10, 2024, an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: September 10, 2024

/s/ Robert Corn-Revere
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,484 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, and 12-point Century Schoolbook for footnotes.

Date: September 10, 2024        /s/ Robert Corn Revere
                                ROBERT CORN-REVERE
                                FOUNDATION FOR INDIVIDUAL
                                  RIGHTS AND EXPRESSION