No. 23-50224

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

LEILA GREEN LITTLE, JEANNE PURYEAR, KATHY KENNEDY,
REBECCA JONES, RICHARD DAY, CYNTHIA WARING,
AND DIANE MOSTER,

*Plaintiffs-Appellees,*

v.

LLANO COUNTY, RON CUNNINGHAM, IN HIS OFFICIAL CAPACITY AS
LLANO COUNTY JUDGE, JERRY DON MOSS, IN HIS OFFICIAL
CAPACITY AS LLANO COUNTY COMMISSIONER, PETER JONES, IN
HIS OFFICIAL CAPACITY AS LLANO COUNTY COMMISSIONER, MIKE
SANDOVAL, IN HIS OFFICIAL CAPACITY AS LLANO COUNTY
COMMISSIONER, LINDA RASCHKE, IN HER OFFICIAL CAPACITY AS
LLANO COUNTY COMMISSIONER, AMBER MILUM, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY SYSTEM DIRECTOR,
BONNIE WALLACE, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER, ROCHELLE WELLS, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER, RHODA
SCHNEIDER, IN HER OFFICIAL CAPACITY AS LLANO COUNTY
LIBRARY BOARD MEMBER AND GAY BASKIN, IN HER OFFICIAL
CAPACITY AS LLANO COUNTY LIBRARY BOARD MEMBER,

*Defendants-Appellants.*

---

Appeal from the United States District Court,
For the Western Division of Texas, Austin Division
1:22-cv-00424-RP

---

## BRIEF OF AMICI CURIAE FREEDOM TO READ FOUNDATION,
## TEXAS LIBRARY ASSOCIATION, AND AMERICAN LIBRARY
## ASSOCIATION IN SUPPORT OF APPELLEES EN BANC

---

(Counsel Listed Inside Cover)

Ryan W. Goellner
FROST BROWN TODD LLP
301 E. Fourth Street
Cincinnati, Ohio 45202
T: (513) 651-6840
F: (513) 651-6981
rgoellner@fbtlaw.com

Thomas F. Allen, Jr.
Benjamin A. West
FROST BROWN TODD LLP
2101 Cedar Springs Rd.
Suite 900
Dallas, Texas 75201
T: (214) 545-3472
F: (214) 545-3473
tfallen@fbtlaw.com
bwest@fbtlaw.com

Kevin Shook
FROST BROWN TODD LLP
10 W. Broad Street
Suite 2300
Columbus, Ohio 43215
T: (614) 464-1211
F: (614) 464-1737
kshook@fbtlaw.com

*Counsel for Amici Curiae Freedom to Read Foundation,
Texas Library Association, and American Library Association*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Case No. 23-50224, *Leila Green Little, et al. v. Llano County, et al.*

Pursuant to 5TH CIR. RULES 28.2.1 and 29.2, I hereby certify that I am aware of no persons or entities, in addition to those listed in the party briefs, that have a financial interest in the outcome of this litigation. I certify that the Freedom to Read Foundation (FTRF) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that FTRF, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. I certify that the Texas Library Association (TLA) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that TLA, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. Finally, I certify that the American Library Association (ALA) is a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code; and that ALA, as a not-for-profit organization, has no parent corporation or stock, and therefore no publicly owned corporation owns ten percent or more of its stock. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.

# TABLE OF CONTENTS

Supplemental Certificate of Interested Persons ....................................................... ii

Table of Contents ................................................................................................ iii

Table of Authorities ............................................................................................. v

Statement of Interest of Amici Curiae ................................................................ 1

Statement of Contributions ................................................................................ 2

Introduction ....................................................................................................... 3

Argument............................................................................................................ 4

I.    Public libraries are havens of free inquiry, where patrons may choose
      classic or controversial books as they see fit....................................................4

      A.    At the nation's founding, libraries were envisioned as citadels
            of American democracy. ......................................................................5

      B.    Professional librarians are guided by well-established ethical
            canons and standards that favor no party, subject, or viewpoint. .........6

      C.    "Weeding" library collections is an objective process, not the
            targeting of disfavored or controversial books.....................................7

      D.    Parents, not librarians or public officials, have the right and
            responsibility to control what their children read. .............................10

II.   The First Amendment right to receive information must be upheld. ............12

      A.    The right to receive information is essential to the First
            Amendment. .....................................................................................12

      B.    *Pico* has guided courts and libraries for decades. ...............................15

      C.    The panel majority correctly aligned *Pico* and *Campbell* with
            *American Library Association*. ...........................................................17

      D.    Appellants' criticisms of *Campbell* are unfounded.............................19

III.    Under the guise of "government speech," Appellants and the
        Attorneys General would give government officials carte blanche to
        target any controversial book they don't like. ................................ 22

IV.     Appellants' "in-house checkout system" is a transparent ploy to moot
        the lawsuit and remove controversial titles from library shelves. ................ 26

Conclusion ............................................................................ 28

Certificate of Compliance ....................................................... 31

Certificate of Service ............................................................ 32

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ..........................................................16

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982).................................................................*passim*

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)..................................................................14

*Campbell v. St. Tammany Parish School Board*
   64 F.3d 184 (5th Cir. 1995) .......................................................*passim*

*Chiras v. Miller*,
   432 F.3d 606 (5th Cir. 2005) .............................................................19

*Erznoznik v. Jacksonville*,
   422 U.S. 205 (1975)....................................................................14

*Fayetteville Pub. Library v. Crawford Cnty., Ark.*,
   684 F. Supp. 3d 879 (W.D. Ark. 2023) ........................................*passim*

*GLBT Youth in Iowa Schools Task Force v. Reynolds*
   Nos. 24-1075 & 24-1082, 2024 WL 3736785
   (8th Cir. Aug. 9, 2024)................................................................23

*Griswold v. Connecticut*,
   381 U.S. 479 (1965)...................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995)...................................................................21

*Kreimer v. Bureau of Police for Town of Morristown*,
   958 F.2d 1242 (3d Cir. 1992) ....................................................16, 19

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy*,
   594 U.S. 180 (2021)...................................................................21

*Marsh v. Ala.*,
   326 U.S. 501 (1946).................................................................15

*Martin v. Struthers*
    319 U.S. 141 (1943) ...................................................................... 13

*Matal v. Tam,*
    582 U.S. 218 (2017) .................................................................. 22, 23

*Minarcini v. Strongville City Sch. Dist.,*
    541 F.2d 577 (6th Cir. 1976) ........................................................ 6

*Monteiro v. Tempe Union High Sch. Dist.,*
    158 F.3d 1022 (9th Cir. 1998) .................................................... 16

*Moody v. Netchoice, LLC,*
    144 S.Ct. 2383 (2024) ................................................................ 24

*New York Times v. Sullivan,*
    376 U.S. 254 (1964) .................................................................... 20

*Packingham v. North Carolina*
    582 U.S. 98 (2017) ................................................................ 13, 14

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.,*
    No. 3:23cv10385-TKW-ZCB, 2024 WL 133213 (N.D. Fla. Jan.
    12, 2024) .................................................................................... 23

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
    414 F.3d 23 (D.C. Cir. 2005) ...................................................... 24

*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009) .................................................................... 25

*Procunier v. Martinez*
    416 U.S. 396 (1974) .................................................................... 13

*Red Lion Broad. Co. v. FCC,*
    395 U.S. 367 (1969) .................................................................... 14

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) .................................................................... 21

*Shurtleff v. City of Boston*
    596 U.S. 243 (2022) .................................................................... 24

*St. Amant v. Thomas*,
    390 U.S. 727 (1968)........................................................................20

*Stanley v. Georgia*,
    394 U.S. 557 (1969)....................................................................12, 14

*Sund v. City of Wichita Falls, Tex.*,
    121 F. Supp. 2d 530 (N.D. Tex. 2000) .............................10, 12, 27, 28

*United States v. Am. Libr. Ass'n, Inc.*,
    539 U.S. 194 (2003).................................................................*passim*

*Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.*,
    425 U.S. 748 (1976)........................................................................15

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)........................................................................25

*Winters v. New York*,
    333 U.S. 507 (1948)........................................................................21

**Statutes**

13 TEX. ADMIN. CODE § 1.84 ......................................................................6

**Other Authorities**

*Accreditation Frequently Asked Questions*, AM. LIBR. ASS'N,
    https://www.ala.org/educationcareers/accreditedprograms/faq (last
    visited Sept. 10, 2024) ................................................................5, 7

*Access to Library Resources and Services for Minors: An
    Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N,
    https://www.ala.org/advocacy/intfreedom/librarybill/interpretations
    /minors (last visited Sept. 10, 2024) ...............................................11

CAROL ALABASTER, DEVELOPING AN OUTSTANDING CORE
    COLLECTION (2d ed. 2010)............................................................28

Lester Asheim, *Not Censorship But Selection*, AM. LIBR. ASS'N,
    www.ala.org/advocacy/intfreedom/NotCensorshipButSelection
    (last visited Sept. 10, 2024) .............................................................9

BEDFORD PUBLIC LIBRARY CHILDREN'S AND UNATTENDED GUIDELINE,
https://bedfordlibrary.org/wp-
content/uploads/sites/66/2021/07/ChildrensAreaUnattendedPolicy_
Jun2021.pdf (last visited Sept. 10, 2024) ...........................................11

BURLESON LIBRARY, SAFE CHILD POLICY,
https://www.burlesontx.com/1331/Safe-Child-Policy (last visited
Sept. 10, 2024) ...................................................................................11

GEOFFREY CHAUCER, THE CANTERBURY TALES, *The Miller's Tale*,
https://chaucer.fas.harvard.edu/pages/millers-prologue-and-tale......................21

CODE OF ETHICS, AM. LIBR. ASS'N, https://www.ala.org/tools/ethics
(last visited Sept. 10, 2024) ...................................................................7

*Collection Maintenance & Weeding*, AM. LIBR. ASS'N,
https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/
weeding (last visited Sept. 10, 2024).............................................8, 9

Wynne Davis, *How Harry Potter Has Brought Magic to Classrooms
for More than 20 Years*, NAT'L PUBLIC RADIO (Dec. 31, 2018),
https://www.npr.org/2018/12/31/678860349/how-harry-potter-has-
brought-magic-to-classrooms-for-more-than-20-years (last visited
Sept. 10, 2024) ...................................................................................22

Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's
Deschooling Society and the Rediscovery of Hope*, 34 W. NEW
ENG. L. REV. 381 (2012) ........................................................................5

*Interlibrary Loans*, AM. LIBR. ASS'N,
https://libguides.ala.org/Interlibraryloans (last visited Sept. 10,
2024) ..................................................................................................28

Krug & Harvey, *ALA and Intellectual Freedom: A Historical
Overview*, INTELLECTUAL FREEDOM MANUAL xi, xv (Am. Libr.
Ass'n 1974).............................................................................................6

Jeanette Larson, *CREW: A Weeding Manual for Modern Libraries* at
11, TEX. STATE LIBR. & ARCHIVES COMM'N (2012),
https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/ld/pubs/
crew/crewmethod12.pdf (last visited Sept. 10, 2024) ...........................9

LIBRARY BILL OF RIGHTS, AM. LIBR. ASS'N,
    https://www.ala.org/advocacy/intfreedom/librarybill (last visited
    Sept. 10, 2024) .......................................................................................3, 6, 11, 29

Letter from James Madison to W.T. Barry (Aug. 4, 1822), LIBRARY
    OF CONGRESS,
    https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text...................13

Carry Mcbride, *Ben Franklin: The Ultimate Bibliophile*, NEW YORK
    PUBLIC LIBR. BLOG (Sept. 10, 2024),
    https://www.nypl.org/blog/2020/01/17/ben-franklin-library-lover......................5

NAT'L CTR. FOR EDUC. STATS., DIGEST OF EDUC. STATS., Table
    701.60, Number of public libraries (for FY 2019-20),
    https://nces.ed.gov/programs/digest/d22/tables/dt22_701.60.asp
    (last visited Sept. 10, 2024) ..................................................................................5

POTTSBORO LIBRARY POLICIES,
    https://pottsborolibrary.com/about/polices/ (last visited Sept. 10,
    2024) ......................................................................................................................11

*Top 10 Library Policies Every Small Community Library Should
    Have*, TEXAS STATE LIBR. & ARCHIVES,
    https://www.tsl.texas.gov/ldn/plm/governance/policies (last visited
    Sept. 10, 2024) .....................................................................................................11

Reserve Instructions and Policies, TEXAS STATE UNIV., RESERVE
    SERVS., https://www.library.txst.edu/services/borrow-
    renew/reserve.html (last visited Sept. 10, 2024) ...............................................27

REBECCA VNUK, THE WEEDING HANDBOOK: A SHELF-BY-SHELF
    GUIDE 6 (2d ed. 2022)............................................................................................9

## STATEMENT OF INTEREST OF AMICI CURIAE

The Freedom to Read Foundation (FTRF) is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all citizens; and protect the public against efforts to suppress or censor speech.

The Texas Library Association (TLA) was established in 1902 and currently has a membership of more than 5,000 academic, public, school, and special librarians.  TLA supports and advocates for Texas librarians and strives for excellence in libraries and librarianship.  The association's core values include intellectual freedom, literacy, and lifelong learning, access to information, and ethical responsibility and integrity.

The American Library Association (ALA) is a nonprofit, educational organization representing libraries and librarians throughout the United States. ALA's membership includes over 5,000 organizational members and more than 44,000 individual members.  Members are in public libraries, academic libraries, special libraries, and school library media centers throughout the United States. Founded in 1876, ALA is committed to the preservation of the library as a resource indispensable to the intellectual, cultural, and educational welfare of the nation.

FTRF, ALA, and TLA believe that the defining tenet of the library profession is the commitment to providing free and equal access to information at the library. Censoring books from public libraries violates this shared value and thus these Amici have a strong interest in the outcome of this case.[1]

Appellants and Appellees do not oppose the filing of this amici curiae brief.

## STATEMENT OF CONTRIBUTIONS

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, FTRF, ALA, and TLA state that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person (other than the Amici Curiae, their members, or their counsel) contributed money that was intended to fund preparing or submitting this brief.

---

[1] FTRF, ALA, and TLA filed an amici curiae brief at the panel stage of this appeal. This brief is adapted from their panel-stage brief.

## INTRODUCTION

At the heart of this dispute is the institution of the American public library—that quiet, "ubiquitous fixture[] in American cities and towns" where members of the public may browse, read, and think according to their own interests.[2]  Guided by highly trained professional librarians, public libraries have one goal: to provide books and other materials "for the interest, information, and enlightenment of all people of the community the library serves" by selecting materials "presenting all points of view on current or historical issues."[3]  Essential to this mission is the promise that library materials will not be "proscribed or excluded because of partisan or doctrinal disapproval."[4]

Appellants and their supporting amici curiae, the Attorneys General of several states, see little value in that promise.  In their view, the public library should not be the traditional locus of "freewheeling inquiry,"[5] but a decidedly less free place, where government officials may censor any book based solely on its content or perceived viewpoint.  Appellants and the Attorneys General ask this Court *en banc*

---

[2] *Fayetteville Pub. Library v. Crawford Cnty., Ark.*, 684 F. Supp. 3d 879, 890 (W.D. Ark. 2023).

[3] Library Bill of Rights, Am. Libr. Ass'n, §§ I & II, https://www.ala.org/advocacy/intfreedom/librarybill (last visited Sept. 10, 2024).

[4] *Id.* § II.

[5] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 915 (1982) (Rehnquist, J., dissenting).

to overrule decades of precedent, break entirely new doctrinal ground, and foment at least one circuit split.

Under either their "government-speech" theory or their contraction of the First Amendment itself, Appellants and the Attorneys General seek a new—and deeply troubling—rule: that the First Amendment has no role in the American public library. They would transform libraries into vehicles for imposing the government's view about "what shall be orthodox in politics, nationalism, religion, or other matters of public opinion."[6]   This benighted vision, and the legal arguments offered in support, contradict the centuries-old role of libraries in America, professional library practice, and decades of First Amendment jurisprudence.

## ARGUMENT

### I.    Public libraries are havens of free inquiry, where patrons may choose classic or controversial books as they see fit.

Underlying the differing positions of the parties and panel members are competing notions of what a public library is or ought to be. Amici—national and Texas-based library organizations—therefore offer the following background about the historical role of libraries and their place in American civic life.

---

[6] *Id.* at 872 (plurality op.).

**A.    At the nation's founding, libraries were envisioned as citadels of American democracy.**

The American public library predates the nation itself.  In 1731, Benjamin Franklin—"the ultimate bibliophile"—was a founder of the country's first lending library, the Library Company of Philadelphia.[7]  Franklin hoped that by having equal access to books, Americans would be "better instructed and more intelligent."[8]

 "By the latter part of the 1800s, most major metropolitan cities in the country had a public library."[9]  The American Library Association (ALA) was founded in 1876 and accredits library academic programs in the United States.[10]  Today, over 17,000 public library outlets exist around the country.[11]

The civic role of public libraries has evolved along with their numbers. Having witnessed pyres of burned books kindling the rise of early twentieth-century totalitarian regimes, American librarians embraced a "basic position in opposition to

---

[7]  Carrie Mcbride, *Ben Franklin: The Ultimate Bibliophile*, New York Public Library Blog (Jan. 17, 2020), https://www.nypl.org/blog/2020/01/17/ben-franklin-library-lover; *See generally Fayetteville Pub. Library*, 684 F. Supp. 3d at 889-90 (discussing history of American public libraries).

[8]  Jared Gibbs, *"For Tomorrow Will Worry About Itself": Ivan Illich's Deschooling Society and the Rediscovery of Hope*, 34 W. New Eng. L. Rev. 381, 394 (2012) (citation omitted)).

[9]  *Fayetteville Pub. Library*, 684 F. Supp. 3d at 889.

[10]  *See Accreditation Frequently Asked Questions*, Am. Libr. Ass'n, https://www.ala.org/educationcareers/accreditedprograms/faq (last visited Sept. 10, 2024).

[11]  Nat'l Ctr. for Educ. Stats., Digest of Educ. Stats., Table 701.60, Number of public libraries (for FY 2019-20) n.1, https://nces.ed.gov/programs/digest/d22/tables/dt22_701.60.asp (last visited Sept. 10, 2024).

censorship."[12]  In 1939, the ALA adopted its "Library Bill of Rights," which confirms the essential role of public libraries: to serve as "forums for information and ideas" that are available to "all people of the community."[13]  Under the Bill of Rights, libraries "should provide materials and information presenting all points of view on current and historical issues" with no prohibition on materials "because of partisan or doctrinal disapproval."[14]

Public libraries are therefore not places to "coerce the taste of others,"[15] but rather serve as "a mighty resource in the free marketplace of ideas."[16]

**B.     Professional librarians are guided by well-established ethical canons and standards that favor no party, subject, or viewpoint.**

Professional librarians must satisfy rigorous academic requirements.  In Texas, for example, a professional librarian in a public library must hold a specialized degree in librarianship from an ALA-accredited institution.[17]  The ALA accredits 68 programs at 64 institutions in the United States, Canada, and Puerto

---

[12]  *See United States v. Am. Libr. Ass'n, Inc.* ("*ALA*"), <u>539 U.S. 194, 238-39</u> (2003) (Souter, J., dissenting) (citation omitted).

[13]  LIBRARY BILL OF RIGHTS § 1, *supra* note 3.

[14]  *Id.*

[15]  Krug & Harvey, *ALA and Intellectual Freedom: A Historical Overview*, INTELLECTUAL FREEDOM MANUAL xi, xv (Am. Libr. Ass'n 1974), *quoted in ALA*, <u>539 U.S. at 239</u> (Souter, J., dissenting).

[16]  *Minarcini v. Strongville City Sch. Dist.*, <u>541 F.2d 577, 582</u> (6th Cir. 1976).

[17]  *See* 13 TEX. ADMIN. CODE § 1.84.

Rico.[18]  Accreditation "assures that…programs meet appropriate standards of quality and integrity."[19]

As part of their training, librarians agree to adhere to the ALA's Code of Ethics, which "guide[s] the work of librarians" with a focus on "the values of intellectual freedom that define the profession of librarianship."[20]  Chief among these ethical obligations is the librarian's duty not to limit access to information based on viewpoint.  Librarians agree that they will:

- "uphold the principles of intellectual freedom and resist all efforts to censor library resources";

- "distinguish between [their] personal convictions and professional duties"; and

- "not allow [] personal beliefs to interfere" with providing access to library information.[21]

In short, librarians must not suppress books just because they are controversial or outside the mainstream.

## C.  "Weeding" library collections is an objective process, not the targeting of disfavored or controversial books.

This case involves one aspect of the librarian's work: the periodic "weeding" of library collections.  Appellants have attempted to characterize their efforts to

---

[18] *Accreditation Frequently Asked Questions*, *supra* note 10.

[19] *Id.*

[20] CODE OF ETHICS, AM. LIBR. ASS'N, https://www.ala.org/tools/ethics (last visited Sept. 10, 2024).

[21] *Id.* ¶¶ 2, 7.

remove or hide certain books from Llano Public Library branches as part of the standard "weeding" process. The district court correctly recognized this as a "pretextual" "post-hoc justification" for the suppression of books because of their ideas or perceived message.[22]

Weeding is the periodic refreshing of public library collections by removing and replacing damaged or outdated books.[23] This process is guided by "objective criteria," which librarians apply based on their training and ethical obligations of viewpoint neutrality.[24]

There are various methods for weeding library collections. One is the "CREW" method, which stands for "Continuous Review, Evaluation, and Weeding."[25] CREW contains six general guidelines under the acronym "MUSTIE":

*M*isleading: factually inaccurate

*U*gly: beyond mending or rebinding

*S*uperseded by a new edition or by a much better book on the subject

*T*rivial: of no discernible literary or scientific merit

*I*rrelevant to the needs and interests of the library's community

---

[22] ROA.3526-27.

[23] *See Collection Maintenance & Weeding*, AM. LIBR. ASS'N, https://www.ala.org/tools/challengesupport/selectionpolicytoolkit/weeding (last visited Sept. 10, 2024).

[24] CODE OF ETHICS, *supra* note 20.

[25] ROA.3508.

*Elsewhere*: the material is easily obtainable from another library.[26] When weeding, the goal is "to maintain a collection that is free from outdated, obsolete, shabby, or no longer useful items."[27]

Weeding is not the removal of books that, in the view of government officials, contain "inappropriate" ideas or viewpoints.  Professional librarian practice is crystal-clear: "While weeding is essential to the collection development process, it should not be used as ***a deselection tool for controversial materials***."[28]

Unfortunately, that is what happened in Llano County.  Based on a robust evidentiary record, the district court found that "well-regarded, prize-winning books" on topics like LGBTQ identity and race relations, along with children's "potty humor" books, were "targeted and removed" "based on complaints" by community members.[29]  The complaints asserted that the books were "inappropriate" or "pornographic filth" because—among other things—they depicted cartoon nudity, discussed sexuality, or allegedly promoted "CRT" views.[30]

---

[26]  Lester Asheim, *Not Censorship But Selection*, Am. Libr. Ass'n, www.ala.org/advocacy/intfreedom/NotCensorshipButSelection (last visited Sept. 10, 2024); *see also* Rebecca Vnuk, The Weeding Handbook: A Shelf-by-Shelf Guide 6 (2d ed. 2022) (describing MUSTIE method).

[27]  Jeanette Larson, *CREW: A Weeding Manual for Modern Libraries* at 11, Tex. State Libr. & Archives Comm'n (2012), at 11, https://www.tsl.texas.gov/sites/default/files/public/tslac/ld/ld/pubs/crew/crewmethod12.pdf (last visited Sept. 10, 2024).

[28]  *Collection Maintenance*, *supra* note 23 (emphasis added).

[29]  ROA.3524; ROA.3529.

[30]  ROA.3524; ROA.3529.

The removal of these books bears no relation to professional library practice or "weeding." What happened in Llano County was not a function of limited shelf space or the other MUSTIE factors. Rather, it was a response to complaints by community members about the substance of the books themselves—the proverbial "heckler's veto," which has no place in the American public library.[31]

### D. Parents, not librarians or public officials, have the right and responsibility to control what their children read.

Another misconception about library practice lurks below the surface of this dispute. Appellants purported to act out of concern that children visiting Llano's public library branches might be exposed to books that are "inappropriate" or worse.[32] But lost in Appellants' defense of these actions is an unspoken assumption: that children roam libraries alone and unguided. That is not the case.

*First*, public libraries operate on the common-sense premise that parents and guardians will help shepherd their children's learning experiences. In its "Access to Library Resources and Services for Minors," the ALA states: "The mission, goals, and objectives of libraries cannot authorize libraries and their governing bodies to assume, abrogate, or overrule **the rights and responsibilities of parents and**

---

[31] *See Sund v. City of Wichita Falls*, 121 F. Supp. 2d 530, 549 (N.D. Tex. 2000).

[32] ROA.1526.

*guardians*."[33]     Indeed, "only parents and guardians have the right and the responsibility to determine" their child's library access.[34]

*Second*, public libraries do not act *in loco parentis*.  Many libraries have policies about minors in the library.[35]  In Texas, libraries often require parental supervision of young children (e.g., under ages 8 or 10).[36]  Children's educational programs at the library require parental consent and involvement.[37]

So parents can and do take an active role in selecting the best book for their children.  The panel dissent wondered what should happen when a parent encounters a book she doesn't want her child to see.[38]  If the parent demands that the book be removed from the library—so that *no child* can see it—does the librarian accede to

---

[33] *Access to Library Resources and Services for Minors: An Interpretation of the Library Bill of Rights*, AM. LIBR. ASS'N, https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/minors (emphasis added) (last visited Sept. 10, 2024).

[34] *Id.*

[35] *See Top 10 Library Policies Every Small Community Library Should Have*, TEX. STATE LIBR. & ARCHIVES, https://www.tsl.texas.gov/ldn/plm/governance/policies (last visited Sept. 10, 2024).

[36] *See, e.g.*, POTTSBORO LIBRARY POLICIES, https://pottsborolibrary.com/about/polices/ (requiring children 10 and younger to be accompanied by parent, legal guardian, or adult over 18) (last visited Sept. 10, 2024);

BURLESON LIBRARY, SAFE CHILD POLICY, https://www.burlesontx.com/1331/Safe-Child-Policy ("Children nine and under may not be left unattended in any part of the library.") (last visited Sept. 10, 2024).

[37] *See, e.g.*, BEDFORD PUBLIC LIBRARY CHILDREN'S AND UNATTENDED GUIDELINE, https://bedfordlibrary.org/wp-content/uploads/sites/66/2021/07/ChildrensAreaUnattendedPolicy_Jun2021.pdf (last visited Sept. 10, 2024).

[38] Panel Op. at 2-3 (Duncan, J., dissenting).

11

that demand?  No.  The solution is obvious, yet bears repeating: "if a parent wishes to prevent her child from reading a particular book, that parent can and should accompany the child to the Library" and choose another book.[39]  But neither the dissent's hypothetical parent—nor a local public official—may make that choice *for another parent*, who may want the same book for their child.[40]

## II.     The First Amendment right to receive information must be upheld.

To facilitate their rejection of the traditional model of public libraries, Appellants ask this Court to stake out a sweeping and novel position: that there is no First Amendment right to receive information.  This extreme idea defies decades of precedent from the Supreme Court and this Court.

### A.     The right to receive information is essential to the First Amendment.

The panel dissent contends that the right to receive information arose from a "50-year-old case [*Stanley v. Georgia*] recognizing the freedom to peruse obscene materials—not in a public library, but 'in the privacy of a person's *own home*.'"[41]  But the provenance of this right is much older and broader.

---

[39]  *Sund*, 121 F. Supp. 2d at 551.

[40]  *See id.*

[41]  Panel Op. at 33 (Duncan, J., dissenting) (quoting *Stanley v. Georgia,* 394 U.S. 557, 564 (1969) (emphasis in original)).

The right to receive information traces its origins to James Madison, architect of the First Amendment, who explained: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both."[42]  True to Madison's insight, the Supreme Court has recognized the constitutional right to access information in multiple contexts, including the right to access advertisements, mail, literature, radio, the internet, political materials— and books in libraries.

Beginning with *Martin v. Struthers* in 1943, the Supreme Court stated that the First Amendment protects both "the right to distribute literature" and "the right to receive it."[43]  There, the Court held that a law banning the distribution of door-to-door advertisements was unconstitutional.  Later, in *Procunier v. Martinez*, the Court ruled that censoring the mail of inmates infringes the rights of the non-inmates to receive that correspondence.[44]  More recently, in *Packingham v. North Carolina*, the Court held that a law prohibiting sex offenders from using social media was unconstitutionally overbroad because "[a] fundamental principle of the First

---

[42]  Letter from James Madison to W.T. Barry (Aug. 4, 1822), LIBRARY OF CONGRESS, https://www.loc.gov/resource/mjm.20_0155_0159/?sp=1&st=text (last visited Sept. 10, 2024) (*quoted in Pico*, 457 U.S. at 867-68 (plurality op.)).

[43]  319 U.S. 141, 143 (1943).

[44]  416 U.S. 396, 408-09 (1974).

Amendment is that all persons have access to places where they can speak **and listen** …."[45]

These opinions are not outliers or limited to unique circumstances. Time and again, the Supreme Court has enforced the First Amendment "right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences."[46] The First Amendment's Free Speech Clause protects "not only the right to utter or to print, but [also] the right to distribute, the right to receive, the right to read and the freedom of inquiry, freedom of thought, and freedom to teach ...."[47] Thus, "the right to receive information and ideas"[48] is not limited to one's own home. To the contrary, it is "a necessary predicate to the **recipient's** meaningful exercise of his own [constitutional] rights of speech, press, and political freedom"[49] and "is fundamental to our free society."[50] And where—as here—"the government, acting as censor, undertakes selectively to shield the public from some kinds of speech on the ground that they are more offensive than others, the First Amendment strictly limits its power."[51]

---

[45] 582 U.S. 98, 104 (2017) (emphasis added).

[46] *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969).

[47] *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (internal citations omitted).

[48] *Stanley*, 394 U.S. at 564.

[49] *Pico*, 457 U.S. at 867 (plurality op.) (emphasis in original).

[50] *Stanley*, 394 U.S. at 564.

[51] *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975). *See also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73 (1983) ("the government may not reduce the adult population to reading

### B.    *Pico* has guided courts and libraries for decades.

Following this tradition, a plurality of the Supreme Court in *Board of Education v. Pico* held that students have the right to receive information and ideas in the form of books on the shelves in public school libraries.[52]  In the years since *Pico* was decided, this right of library patrons has been embraced by federal courts, including this Court, and applied with even greater force in the context of public libraries (as Appellants acknowledge).

In *Campbell v. St. Tammany Parish School Board*, this Court considered the removal of the book *Voodoo Hoodoo* from a school library.[53]  After noting there was no clear majority in *Pico*, the Court focused on Justice White's opinion because it concurred on the narrowest grounds.[54]  The Court concluded that Justice White had not rejected the plurality's assessment of the constitutional limitations on removing books from school library shelves, but had merely ruled that the procedural posture of the case did not require addressing those constitutional questions.[55]  Following

---

only what is fit for children") (cleaned up); *Va. State Bd. of Pharmacy v. Va. Citizens Consumers Council, Inc.*, 425 U.S. 748, 756-57 (1976) (collecting cases protecting rights to receive information); *Marsh v. Ala.*, 326 U.S. 501, 505 (1946) ("the preservation of a free society is so far dependent upon the right of each individual citizen to receive such literature as he himself might desire ….").

[52] 457 U.S. at 867-69 (plurality op.).

[53]   64 F.3d 184, 185 (5th Cir. 1995).

[54] *Id.* at 189.

[55] *Id.*

*Pico*, this Court expressed grave concern that *Voodoo Hoodoo* may have been removed to "strangle the free mind at its source" and explained that "the key inquiry in a book removal case is the school officials' substantial motivation in arriving at the removal decision."[56]

Appellants and the panel dissent suggest that *Pico* and, by extension, *Campbell*, have little value because of *Pico*'s fractured ruling. But that division occurred because *Pico* involved a school library, not a public library. As the Third Circuit noted, the "dissenters in *Pico* made no contention that the First Amendment did not encompass the right to receive information and ideas, but merely argued that the students could not freely exercise this right in the public school setting in light of the countervailing duties of the School Board."[57] Dissenting in *Pico*, Justice Rehnquist highlighted the source of contention: "***Unlike…public libraries***, elementary and secondary school libraries are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored,

---

[56] *Id.* at 190 (citing *Pico*, 457 U.S. at 870-72). Other circuits have followed suit. *See, e.g.*, *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992) (acknowledging First Amendment right to receive information in public libraries, but holding that library rules for patron conduct were not facially invalid); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998) (citing *Pico* for the "well-established rule that the right to receive information is an inherent corollary of the rights of free speech and press …."); *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1204 (11th Cir. 2009) (applying the "*Pico* standard" to question of school board's motivation in removing library book).

[57] *Kreimer*, 958 F.2d at 1254-55.

to the teaching of basic skills and ideas."[58] He "cheerfully concede[d]" that "if a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans," such an order would violate the First Amendment.[59] Thus, a "majority of justices in *Pico* agreed that the state's censorship power could not be exercised 'in a narrowly partisan or political manner'—***even in a school library setting***."[60]

Appellants elide this distinction and invite this Court to go where the *Pico* dissenters did not: to rule that the right to receive information does not exist even in a public library and that government officials may select and remove books based on viewpoint or with partisan motives. This *en banc* Court should not accept that invitation.

### C. The panel majority correctly aligned *Pico* and *Campbell* with *American Library Association*.

The panel majority correctly aligned the common denominators from *Pico*, as established in *Campbell*, with *United States v. American Library Association, Inc.* (*ALA*), on which Appellants rely.[61] In *ALA*, a plurality of the Supreme Court held that the Children's Internet Protection Act did not violate the First Amendment when

---

[58] *Pico*, <u>457 U.S. at 915</u> (Rehnquist, J., dissenting) (emphasis added).

[59] *Id.* at 907.

[60] *Fayetteville Pub. Libr.*, <u>684 F. Supp. 3d at 909</u> (citation omitted) (emphasis in original).

[61] <u>539 U.S. 194</u> (2003).

it required libraries, as a condition of receiving federal funds, to install software that would block minors from viewing on libraries' internet terminals visual depictions of obscenity, child pornography, and other types of speech that are not constitutionally protected.[62]

Writing for the plurality, Justice Rehnquist stated that public libraries have broad discretion in shaping their collections and the librarian's role is to "separate out the gold from the garbage."[63] Just as government officials may consider content in selecting winners of an art funding program, the plurality stated, librarians must consider content in making collection decisions "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality.[64]

But *ALA* does not mean that librarians may suppress disfavored books based on viewpoint. From *Pico*, *Campbell*, and *ALA*, the panel majority here correctly distilled six rules to guide its analysis:

1. "Librarians may consider books' contents in making curation decisions."

2. "Their discretion, however, must be balanced against patrons' First Amendment rights."

3. "One of these rights is 'the right to receive information and ideas.'"

---

[62] *Id.* at 214.

[63] *Id.* at 204 (citation omitted).

[64] *Id.* at 206.

4. "This right is violated when an official who removes a book is 'substantially motivated' by the desire to deny 'access to ideas with which [they] disagree[ ].'"

5. "To be sure, content is necessarily relevant in removal decisions."

6. "But a book may not be removed for the sole—or a substantial—reason that the decisionmaker does not wish patrons to be able to access the book's viewpoint or message."[65]

These rules synthesize the *Pico* and *ALA* pluralities, together with this Court's opinion in *Campbell*. As discussed, none of the dissenting or concurring opinions in *Pico* disputed that a right to receive information exists in public libraries.[66] Again, even Justice Rehnquist "cheerfully conceded" that a library could not make its selection or removal decisions based on partisan motives.[67] And this Court has already decided that books may not be removed for the sole or substantial reason that the decisionmaker disagrees with the book's viewpoint or message.[68]

### D.    Appellants' criticisms of *Campbell* are unfounded.

There is nothing unworkable or unsound about this framework. Appellants and the panel dissent contend that *Campbell* is hopelessly unworkable because it

---

[65] *See* Panel Op. at 11-12 (majority op.).

[66] *Kreimer*, 958 F.2d at 1254-55.

[67] *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting).

[68] *See Campbell*, 64 F.3d at 190 (citing *Pico*, 457 U.S. at 870-72). *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), on which Appellants have relied, concerned the selection of school textbooks, not the removal of public library books, and thus is inapplicable.

requires analysis of subjective motives.[69]  But analyzing someone's subjective state of mind is not new to the First Amendment.[70]  Appellants' proposed alternative—to give government officials unchecked authority to purge books based on content or viewpoint[71]—is no answer.

Appellants also feign bewilderment about "how to distinguish" between content-based curation decisions and impermissible discrimination.[72]  Librarians are trained to strike this balance.  While librarians consider the content of books (among other criteria) when they select or weed books, that is an objective inquiry.[73]  And, as discussed, "weeding" of library collections involves weighing other objective criteria like factual obsolescence and wear and tear.[74]   Librarians do not curate collections based on their own viewpoint, but select material that appeals to the community, guided by objective criteria.

Appellants seize on the different approaches by the majority opinion and concurrence to the "butt and fart" books, as proof that *Pico* and *Campbell* should be

---

[69]  Appellants' Supp. Br. at 20-21; Panel Op. at 18-23.

[70]  *See New York Times v. Sullivan*, 376 U.S. 254, 279-280 (public officials must demonstrate actual malice to recover for defamation); *St. Amant v. Thomas*, 390 U.S. 727, 731 (actual malice requires evidence the defendant "entertained serious doubts as to the truth of his publication").

[71]  Appellants' Supp. Br. at 22-23.

[72]  *Id.* at 22.

[73]  CODE OF ETHICS, *supra* note 20.

[74]  *See* Asheim, *supra* note 28.

jettisoned.[75]    This argument misses the point.    The protections of the First Amendment encompass books that both inform and entertain: "[t]he line between the informing and the entertaining is too elusive for the protection of that basic right."[76]    Nor does it matter whether *Larry the Farting Leprechaun* has an easily identified viewpoint or message.    "[A] narrow, succinctly articulable message is not a condition of constitutional protection…."[77]    And the First Amendment proscribes discrimination based on content.[78]    So, while reasonable minds may differ as to whether any "viewpoint" emerges from the absurdist adventures of *The Cat in the Hat*, none would dispute that this classic work merits First Amendment protection.[79]

Librarians do not remove silly books because they do not find them funny or children's books because they do not discern a clear moral to the story.  Librarians have been trained to include in their collections a wide variety of books that entertain because, among other things, these materials encourage patrons to visit the library

---

[75]  Appellants' Supp. Br. at 19-20.

[76]  *Winters v. New York*, 333 U.S. 507, 510 (1948).  *See also Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 594 U.S. 180, 193 (2021) (the First Amendment protects both "the superfluous" and "the necessary").

[77]  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569 (1995).

[78]  *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015).  In the public library setting, where a book has allegedly been suppressed based on "content," that conduct is reviewed under strict scrutiny.  *See id.*

[79]  Along with making young readers laugh, *Larry* et al. can be interpreted as promoting body acceptance and positivity.  Thus, these books have at least as discernable a "viewpoint" as their literary forebearer, Chaucer's famously scatological "The Miller's Tale."  *See* GEOFFREY CHAUCER, THE CANTERBURY TALES, *The Miller's Tale*, https://chaucer.fas.harvard.edu/pages/millers-prologue-and-tale.

and—of particular importance for young people—to read.[80]  While the humor of *Larry* may not be for everyone, the First Amendment applies anyway, even if some grown-ups don't get the joke.

### III. Under the guise of "government speech," Appellants and the Attorneys General would give government officials carte blanche to target any controversial book they don't like.

While they seek to eliminate the First Amendment right to receive information, Appellants, along with the Attorneys General, also urge "a huge and dangerous extension" of an exception to the First Amendment—the "government-speech" doctrine.[81]  Appellants and the Attorneys General ask this Court to rule that the curation of a library collection is merely "government speech" and thus immune from any First Amendment scrutiny.

Such a ruling would give government officials carte blanche to target any library book for any reason—including the suppression of controversial or unpopular ideas—and is anathema to traditional library practice.  Amici will not repeat the thorough discussion of the government-speech issue by Appellees but offer the following additional comments.

---

[80]  A well-known example of this phenomenon is the *Harry Potter* book series.  *See* Wynne Davis, *How Harry Potter Has Brought Magic to Classrooms For More Than 20 Years*, NAT'L PUBLIC RADIO (Dec. 31, 2018), https://www.npr.org/2018/12/31/678860349/how-harry-potter-has-brought-magic-to-classrooms-for-more-than-20-years (last visited Sept. 10, 2024).

[81]  *Matal v. Tam*, 582 U.S. 218, 239 (2017).

*First*, Amici are unaware of another court holding that the curation of a public library collection amounts to "government speech."  This is unsurprising: courts must exercise "great caution before extending" the "government-speech" doctrine into new contexts because it is "susceptible to dangerous misuse," including (as happened here) the "silenc[ing] or muffl[ing] of disfavored viewpoints."[82]

If this Court rules that curating a public library collection is government speech, it will create a circuit-split with the Eighth Circuit.  In *GLBT Youth in Iowa Schools Task Force v. Reynolds*, the Eighth Circuit held that the government-speech doctrine does not extend to "the placement and removal of books in public school libraries."[83]  The court explained that unlike a public monument, curating a library collection does not have "the effect of conveying a government message."[84]  If placing a broad variety of books on the library shelves "constitutes government speech, the State 'is babbling prodigiously and incoherently.'"[85]  That description applies with even greater force to a public library serving children and adults.  Other courts have likewise concluded that government does not "speak" through public library collections.[86]

---

[82]  *Id.* at 235.

[83]  Nos. 24-1075 & 24-1082, 2024 WL 3736785, at *2 (8th Cir. Aug. 9, 2024).

[84]  *Id.* at *3.

[85]  *Id.* (quoting *Matal*, 582 U.S. at 236).

[86]  *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 3:23cv10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) ("the Court simply fails to see how any reasonable person

In contrast, the Attorneys General cite dicta from a nearly twenty-year-old D.C. Circuit opinion, but that case concerned the selection of sculptures for display by a government arts commission, not the removal of books from a public library.[87] This older dicta also would not survive under the Supreme Court's 2022 opinion in *Shurtleff v. City of Boston*, which held that Boston's selection of flags to fly in front of city hall was ***not*** government speech.[88]

*Second*, Appellants' reliance on *Moody v. Netchoice, LLC* is misplaced.  In *Moody*, the Supreme Court held that a private social media platforms' aggregation of third-party conduct constitutes protected "expression" under the First Amendment.[89]  But *Moody* is not a government-speech case and does not even mention the word "library."  Appellants simply posit that a library collection is just like a social media platform.  But they do not explain what "particular expressive quality" is "unique" to a library collection.[90] Nor could they: library collections historically contain diverse viewpoints of interest to an entire community.

---

would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves"); *Fayetteville Pub. Libr.*, 684 F. Supp. 3d at 908-10.

[87]  *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28-31 (D.C. Cir. 2005).

[88]  596 U.S. 243, 252 (2022).

[89]  144 S. Ct. 2383, 2401-02 (2024).

[90]  Appellants Supp. Br. at 17-18.

*Third*, the Attorneys General fare no better. They assert that a library collection conveys the governmental "message" that the selected "materials are of the 'requisite and appropriate quality' and will 'be of the greatest direct benefit or interest to the community.'"[91] If the "message" is the "quality" of the books and their unspecified "benefit or interest to the community," that message is so vague it could mean anything (or nothing). And, as Appellees note, such a malleable "message" could transform virtually any regulation into "government speech," the very scenario the Supreme Court has warned against.

The Supreme Court's government-speech cases look at the ***content*** of the speech—for example, what state-issued specialty license plates say[92] or what "message" a monument conveys—to determine whether that message will be perceived as the government itself "speaking."[93] The government message is not, as the Attorneys General would have it, that the license plates are sturdy and highly reflective at night or that the monument will survive bad weather for years. In the context of libraries, patrons understand that the books provide a diverse collection of messages by the authors of the books.

---

[91] Amici Brief of States at 7 (quoting *ALA*, 539 U.S. at 204); *see also id.* at 9-10 (the "presence and position" of the books "'convey[s] important messages about government' and its views on their social and literary value").

[92] *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015).

[93] *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470-71 (2009).

This novel government-speech theory misconceives the nature of libraries themselves. As one court has recently observed: "[b]y virtue of its mission to provide the citizenry with access to a wide array of information, viewpoints, and content, the public library is decidedly not the state's creature[.]"[94] It is, instead, "the people's."[95]

## IV. Appellants' "in-house checkout system" is a transparent ploy to moot the lawsuit and remove controversial titles from library shelves.

Finally, Amici note that Appellants' so-called "in-house checkout system," though couched in neutral-sounding terms, is simply another form of impermissible censorship.

Under this "in-house" system, a librarian (acting in concert with government officials) may select certain books for elimination from the library's circulating collection—based substantially on those individuals' views about the book—and then consign those books to a form of *damnatio memoriae*.[96] The books are removed from the shelves, scrubbed from the library catalogue, and confined behind a desk, hidden from view.[97] Patrons who are aware of the books' hidden presence—through litigation or maybe just the grapevine—must seek out a librarian, explain which

---

[94] *Fayetteville Pub. Library*, 684 F. Supp. 3d at 891.

[95] *Id.*

[96] ROA.3524; ROA.3528-29.

[97] ROA.3518.

book they want, and request special access to the book. But patrons "browsing" the shelves "will never find [these] books."[98]   According to Appellants, because Appellees themselves know about these hidden books and may still check them out, their First Amendment claims "cannot get off the ground."[99]

For over 50 years, the American Librarian Association and library professionals have denounced charades like this, which limit, rather than promote, patrons' access to a broad range of materials and amount to "censorship, albeit [in] a subtle form."[100]   Like their bowdlerized distortion of "weeding," Appellants' system impedes Appellees' and other patrons' ability to access books.

The "in-house checkout system" bears no resemblance to a traditional "reserve system," which is sometimes employed by academic libraries containing rare or archival materials to prevent their degradation or theft, not because the materials are controversial.[101]   Nor is there any suggestion that this system was motivated by concerns about preserving fragile or rare books. And Appellants'

---

[98] *Sund*, <u>121 F. Supp. 2d at 550</u> ("forced removal of children's books to the adult section of the Library…places a significant burden on Library patrons' ability to gain access to those books").

[99] Appellants' Supp. Br. at 26. Appellees have ably explained why this system cannot insulate Appellants' conduct from First Amendment scrutiny. Appellees' Supp. Br. at 52-56.

[100] *ALA*, <u>539 U.S. at 239</u> (Souter, J., dissenting) (citation omitted).

[101] *See, e.g.*, Reserve Instructions and Policies, TEX. STATE UNIV., RESERVE SERVS., https://www.library.txst.edu/services/borrow-renew/reserve.html (last visited Sept. 10, 2024) (university reserve system allows faculty to set aside designated materials "for students in a specific course" that are secured through "adhesive barcodes and security tags" and with strictly limited loan windows).

invocation of InterLibrary Loans—which facilitate the distribution of materials temporarily between institutions—is misplaced.[102]

Appellants' "system" also contradicts historical library organizational systems, i.e., that books and other materials should be located in the sections logically affiliated with their topics. For example, children's books appear in the children's section while biographies and history appear in another section.[103] These placement decisions are made according to objective systems, such as information provided by publishers and Library of Congress categorizations, at the time the library acquires the book.[104] They are **not** made to satisfy the demands of a public official or the "heckler's veto" of a complaining patron.[105]

## CONCLUSION

Amici conclude where they began: public libraries are "designed for freewheeling inquiry."[106] Amici recognize that some books at issue in this case might be controversial or even offensive to some library patrons. But that is the

---

[102] *See Interlibrary Loans*, AM. LIBR. ASS'N, https://libguides.ala.org/Interlibraryloans (last visited Sept. 10, 2024). Equally misplaced is Appellants' speculation that operating an "in-house collection" will subject librarians to ruinous civil rights litigation. Appellants' Supp. Br. at 28-29. Were that the case, Amici would expect to see lengthy string cites of such cases; Appellants provide none.

[103] CAROL ALABASTER, DEVELOPING AN OUTSTANDING CORE COLLECTION 88, 100, 138-57 (2d ed. 2010).

[104] *See id.*

[105] *Sund*, 121 F. Supp. 2d at 549.

[106] *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting).

point of a library, after all: to "provide materials and information presenting all points of view on current and historical issues."[107]  Patrons—including parents of children—may choose whether to read a given book.  But government officials may not make that choice for them, based on the officials' own views about the merits or substance of the book.  The First Amendment—which includes library patrons' "right to read and freedom of thought"—demands nothing less.

The district court's preliminary injunction should be AFFIRMED.

---

[107] LIBRARY BILL OF RIGHTS, *supra* note 13 (preamble).

Dated: September 10, 2024          Respectfully submitted,

                                   *s/ Thomas F. Allen, Jr.*
                                   Thomas F. Allen, Jr.
                                   Benjamin A. West
                                   FROST BROWN TODD LLP
                                   2101 Cedar Springs Rd., Suite 900
                                   Dallas, Texas 75201
                                   T: (214) 545-3472
                                   F: (214) 545-3473
                                   tfallen@fbtlaw.com
                                   bwest@fbtlaw.com

                                   Kevin Shook
                                   FROST BROWN TODD LLP
                                   10 W. Broad Street
                                   Suite 2300
                                   Columbus, Ohio 43215
                                   T: (614) 464-1211
                                   F: (614) 464-1737
                                   kshook@fbtlaw.com

                                   Ryan W. Goellner
                                   FROST BROWN TODD LLP
                                   3300 Great American Tower
                                   301 E. Fourth Street
                                   Cincinnati, Ohio 45202
                                   T: (513) 651-6800
                                   F: (513) 651-6981
                                   rgoellner@fbtlaw.com

                                   *Counsel for Amici Curiae*
                                   *Freedom to Read Foundation,*
                                   *Texas Library Association, and*
                                   *American Library Association*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FED. R. APP. P. 29(a)(5) and 32(a)(7)(b) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 6,453 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, with the exception of footnotes, which are in 12-point Times New Roman font pursuant to 5TH CIR. R. 32.1.

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.

# CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2024, I electronically submitted the foregoing document to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF system, which sent a Notice of Electronic Filing to the following attorneys of record:

Matthew Borden
J. Noah Hagey
Marissa Benavides
Kory James DeClark
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel.: 415-599-0209
Fax: 415-276-1808
borden@braunhagey.com
hagey@braunhagey.com
benavides@braunhagey.com
declark@braunhagey.com

Katherine P. Chiarello
Ryan A. Botkin
María Amelia Calaf
BOTKIN CHIARELLO CALAF PLLC
1209 Nueces Street
Austin, TX 78701
Tel.: 512-615-2347
Fax: 737-289-4695
katherine@bccaustin.com
ryan@bccaustin.com
mac@bccaustin.com

*Counsel for Plaintiffs-Appellees*

Jonathan F. Mitchell
MITCHELL LAW PLLC
111 Congress Avenue, Suite 400
Austin, TX 78701
Tel.: 512-686-3940
Fax: 512-686-3941
jonathan@mitchell.law

*Counsel for Defendants-Appellants*

*s/ Thomas F. Allen, Jr.*
Thomas F. Allen, Jr.