No. 23-50224

# United States Court of Appeals

### For the

# Fifth Circuit

LEILA GREEN LITTLE, et al.,

*Plaintiffs-Appellees,*

– v. –

LLANO COUNTY, et al.,

*Defendants–Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
CASE NO. 1:22-CV-424-RP

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION
AND ACLU OF TEXAS
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Chloe Kempf
Brian Klosterboer
Edgar Saldivar
Adriana Piñon
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX 8306
Houston, TX 77288
(713) 942-8146
ckempf@aclutx.org

Vera Eidelman
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

*Counsel for Amici Curiae*

# CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae American Civil Liberties Union and ACLU of Texas state that they do not have a parent corporation and that no publicly held corporation owns 10 percent or more of their stock.

Pursuant to Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| American Civil Liberties Union | Amicus curiae |
| ACLU Foundation of Texas, Inc. | Amicus curiae |
| Vera Eidelman | Counsel to amici |
| Elizabeth Gyori | Counsel to amici |
| Chloe Kempf | Counsel to amici |
| Brian Klosterboer | Counsel to amici |
| Adriana Piñon | Counsel to amici |
| Edgar Saldivar | Counsel to amici |

Dated: September 10, 2024          By: _/s/ Vera Eidelman_____
                                                Vera Eidelman

# TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................................1

INTRODUCTION ...................................................................................2

ARGUMENT ..........................................................................................4

   I. BOOK REMOVALS ARE SUBJECT TO FIRST
      AMENDMENT SCRUTINY ..........................................................4

      A. First Amendment scrutiny applies to government efforts to
         remove books from public library shelves .......................................4

      B. *ALA*, *Finley*, and *Forbes* are not to the contrary. ............................7

   II. GOVERNMENT OFFICIALS CANNOT REMOVE LIBRARY
       BOOKS TO PRESCRIBE WHAT SHALL BE ORTHODOX
       IN MATTERS OF OPINION ...................................................12

      A. Pursuant to the school library cases, removals that seek to
         impose a pall of orthodoxy in matters of opinion violate the
         First Amendment ........................................................................13

      B. Removing books to aim at the suppression of dangerous
         ideas or to drive an idea from the marketplace is equally
         unconstitutional under the government subsidy or
         government program cases ...........................................................15

      C. Removing books from public libraries to impose political
         orthodoxy in ideas would also violate the First Amendment
         under nonpublic forum doctrine .....................................................19

CONCLUSION .....................................................................................22

CERTIFICATE OF COMPLIANCE ......................................................24

CERTIFICATE OF SERVICE ...............................................................25

# TABLE OF AUTHORITIES

## Cases

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
557 F.3d 1177 (11th Cir. 2009) ..............................................13

*Arkansas Educational Television Commission v. Forbes*,
523 U.S. 666 (1998).............................................. passim

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982).............................................. passim

*Brown v. Louisiana*,
383 U.S. 131 (1966)............................................... 14, 18

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) ...............................................14

*Case v. Unified School District No. 233*,
908 F. Supp. 864 (D. Kan. 1995)...........................................6

*Chiu v. Plano Independent School District*,
260 F.3d 330 (5th Cir. 2001) ....................................... 20, 21

*Cornelius v. NAACP Legal Defense & Educational Fund*,
473 U.S. 788 (1985)................................................9

*Counts v. Cedarville School District*,
295 F. Supp. 2d 996 (W.D. Ark. 2003) ...............................6

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ...........................................7

*Fayetteville Public Library v. Crawford County, Arkansas*,
684 F. Supp. 3d 879 (W.D. Ark. 2023) ....................... 17, 18

*Ginsberg v. New York*,
390 U.S. 629 (1968)................................................9

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
No. 24-1075, 2024 WL 3736785 (8th Cir. Aug. 9, 2024)..................6

*Hannegan v. Esquire, Inc.*,
  327 U.S. 146 (1946) ................................................................ 2, 18

*Kreimer v. Bureau of Police for Town of Morristown*,
  958 F.2d 1242 (3d Cir. 1992) ................................................ 7, 17

*Legal Services Corporation v. Velazquez*,
  531 U.S. 533 (2001) ............................................................ 15, 18

*Little v. Llano County*,
  103 F.4th 1140 (5th Cir. 2024) ...............................................2, 7

*Matal v. Tam*,
  582 U.S. 218 (2017) .................................................................16

*Miller v. California*,
  413 U.S. 15 (1973) ....................................................................9

*Minarcini v. Strongsville City School District*,
  541 F.2d 577 (6th Cir. 1976) ............................................ 13, 17

*Minnesota Voters Alliance v. Mansky*,
  585 U.S. 1 (2018) ....................................................................20

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ..............................................................8

*Muir v. Alabama Educational Television Commission*,
  688 F.2d 1033 (5th Cir. 1982) ............................................ 16, 19

*National Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) .......................................................... passim

*Neinast v. Board of Trustees of the Columbus Metropolitan Library*,
  346 F.3d 585 (6th Cir.2003) ......................................................7

*Perry Education Ass'n. v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ...................................................................20

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ...................................................................8

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983)................................................................. 3, 11, 12, 17

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*,
502 U.S. 105 (1991)..............................................................................11

*Stanley v. Georgia*,
394 U.S. 557 (1969)..............................................................................12

*Sund v. City of Wichita Falls, Texas*,
121 F. Supp. 2d 530 (N.D. Tex. 2000) ........................................... 7, 14

*Turner Broad. System, Inc. v. Federal Communications Commission*,
512 U.S. 622 (1994)..............................................................................12

*United States v. American Library Association, Inc.*,
539 U.S. 194 (2003)...................................................................... passim

*West Virginia Board of Education v. Barnette*,
319 U.S. 624 (1943)........................................................... 4, 12, 13

**Statutes**

47 U.S.C.A. § 254 ..................................................................................9

**Other Authorities**

Amy K. Garmer, *Public Libraries in the Community*,
13 I/S: J.L. & Pol'y for Info. Soc'y 1 (2016) ....................................18

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization. The ACLU Foundation of Texas, Inc. ("ACLU of Texas") is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. The ACLU was counsel in both *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) and *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003). As organizations committed to protecting the rights to freedom of speech and freedom from government censorship, the ACLU and ACLU of Texas have a strong interest in the proper resolution of this case.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

## INTRODUCTION

Public libraries exist to provide the public with free access to books, information, and ideas. They offer people a universe of materials to explore, and enable patrons to make up their own minds about which are worthwhile. In many ways, they are the physical embodiment of the First Amendment principle that, "[f]rom the multitude of competing offerings the public," not the government, "will pick and choose." *Hannegan v. Esquire, Inc*., 327 U.S. 146, 158 (1946).

As the panel dissent emphasized, notwithstanding—indeed, due to—the core function of public libraries, librarians necessarily have broad discretion to choose what books to offer. *Little v. Llano Cnty.*, 103 F.4th 1140, 1167 (5th Cir. 2024) (Duncan, J., dissenting). Otherwise, public libraries would be little more than warehouses. *Id*. Librarians must decide what books are worthy of inclusion, and they can base those decisions on a book's artistry, its eloquence, its entertainment value, and even its placement on bestseller lists, among other things. Of course, many of those judgments will be subjective (though informed by a librarian's expertise and training) and they may well turn on the content, and the ideas, of a book.

At the same time, some reasons for removing library books are plainly impermissible, particularly given the role, nature, history, and tradition of public libraries. A Democratic governor could not order the removal of all library books

advocating "Republican" ideals, nor could a predominantly Jewish city council ban all copies of the New Testament to impose a single religious view.

This is clear not only from common sense, but also from First Amendment doctrine. The First Amendment prohibits government officials from prescribing what is orthodox, including via public library shelves. Defendants argue that, "[a]s a matter of first principles," the act of removing books from public libraries "should be treated as government speech," Def. Suppl. Br. at 16, as did the panel dissent. *Pico* forecloses this argument, because eight justices in that case agreed that *some* reasons for removal would violate the First Amendment. And, even if *Pico* were not controlling on this point, immunizing book removals from First Amendment scrutiny would contradict scores of other Supreme Court cases.

Cases that establish and apply First Amendment limitations on (1) the removal of books from school libraries, (2) government programs that necessarily pick and choose among private speech, and (3) nonpublic forums all hold that government officials cannot engage in "invidious viewpoint discrimination" that seeks to "drive certain ideas or viewpoints from the marketplace." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (marks and citation omitted). Government actors may not "discriminate invidiously . . . in such a way as to aim at the suppression of dangerous ideas." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 548 (1983) (tax exemptions) (marks and citation omitted). Nor may they silence ideas in

an effort to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872 (plurality op.) (quoting *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

The Supreme Court has made clear that even when a government program necessarily involves making value judgments between instances of private speech—for example, National Endowment for the Arts grants, or a public-broadcast station's plan for a political debate—officials may not use their curatorial authority to silence unorthodox views. That rule is not new, and courts have successfully administered it in school libraries, public libraries, and other public programs for decades. To require anything less in public libraries now would ignore controlling caselaw, and wholly distort their nature, function, and tradition.

This Court should affirm the court below and hold that government officials cannot remove books from public library shelves in an effort to prescribe what shall be orthodox in matters of opinion.

## ARGUMENT

## I.   BOOK REMOVALS ARE SUBJECT TO FIRST AMENDMENT SCRUTINY.

### A.    *First Amendment scrutiny applies to government efforts to remove books from public library shelves.*

In *Pico*, the Supreme Court's only case about book removals, a majority of justices agreed on one thing: government officials' decision to remove books from library shelves will violate the First Amendment if the facts are egregious enough.

The three-justice plurality concluded that "the First Amendment rights of students may be directly and sharply implicated by the removal of books[.]" 457 U.S. at 866 (plurality op.). Justice Blackmun agreed that the Supreme Court's cases "command" a First Amendment limitation on *why* government officials may remove a library book. *Id.* at 878–79 (Blackmun, J., concurring). Justice White agreed that the case should be remanded for further fact-finding about the school board's specific reasons in the case—an exercise that would have been pointless if no facts could have established a violation of the First Amendment. *Id.* at 883–84. And Justice Rehnquist, joined by Chief Justice Burger and Justice Powell in dissent, "cheerfully concede[d]" that "[o]ur Constitution does not permit the official suppression of *ideas*," including in libraries. *Id.* at 907 (Rehnquist, J., dissenting (quoting plurality op.)) (emphasis in original).[2] Thus, eight of the justices in *Pico* agreed that library book removals can violate the First Amendment.

It is not hard to understand why. As the plurality stated, and Justices Blackmun and Rehnquist echoed, of course "a Democratic school board, motivated by party affiliation" could not "order[] the removal of all books written by or in favor of Republicans," nor could an "an all-white school board, motivated by racial animus, decide to remove all books authored by blacks or advocating racial equality

---

[2] Though they doubted that the "extreme examples" of partisan or political disapproval posited by the plurality would "arise in the real world," these justices agreed that the scenarios would violate the Constitution if they ever did. *Id.*

and integration." *Id*. at 870–71 (plurality op.); *see also id*. at 878 (Blackmun, J, concurring), *id.* at 907 (Rehnquist, J., dissenting).

Equally, county and library officials, motivated by their own atheism, could not decide to remove all books suggesting that God exists, nor could religious board members remove all *Harry Potter* books because they disagree with "witchcraft" as a viable religion. *Counts v. Cedarville Sch. Dist*., 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003). Officials could not choose to remove all books advocating for a higher minimum wage, broader gun rights, or cheaper public transportation because they believe those are the wrong political views. Nor could officials remove a "novel depicting a fictional romantic relationship between two teenage girls," *Case v. Unified Sch. Dist. No. 233*, 908 F. Supp. 864, 867 (D. Kan. 1995), because they believed the book "promoted or glorified" a "lifestyle" they viewed as sinful and abnormal. *Id*. at 871.

As discussed further below, government officials have considerable discretion to decide what books to remove from public libraries—but that discretion is not boundless. To the contrary, as these examples illustrate, the First Amendment has a role to play in assessing the removal of books from public library shelves. Indeed, no court faced with removal of books from public libraries has held that *no* First Amendment scrutiny applies. *See GLBT Youth in Iowa Sch. Task Force v. Reynolds*, No. 24-1075, 2024 WL 3736785, at *2–3 (8th Cir. Aug. 9, 2024) (rejecting argument

that "the placement and removal of books in public school libraries" constitutes government speech); *Sund v. City of Wichita Falls, Tex.*, 121 F. Supp. 2d 530, 548 (N.D. Tex. 2000) (holding that book removals from public library shelves must undergo First Amendment scrutiny, which applies with "even greater force" than in the school library context).[3]

### B.  *ALA, Finley, and Forbes are not to the contrary.*

Notwithstanding the fact that *Pico* "cannot be overruled by the en banc court," Def. Suppl. Br. at 23, the panel dissent argued that a library's book removal choices "are government speech to which the Free Speech Clause does not apply." *Little*, 103 F.4th at 1177 (Duncan, J., dissenting). To make that argument, the dissent primarily relied on *United States v. American Library Association, Inc*., 539 U.S. 194 (2003), *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), and *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998)— three cases that are not about government speech, and that do apply First Amendment scrutiny.

---

[3] Every appellate court to consider restrictions on access to the ideas contained in public libraries has held that they must withstand First Amendment scrutiny. *See Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1251 (3d Cir. 1992); *Neinast v. Bd. of Trs. of the Columbus Metro. Libr.*, 346 F.3d 585, 591 (6th Cir.2003); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012).While these cases consider restrictions on physical access to public library buildings, if First Amendment scrutiny did not attach to restrictions on libraries' provision of information—including, in large part, through the books on their shelves—it would not attach to restrictions on building access either.

The dissent was right to point to these cases for the proposition that, in the context of certain government programs—including Internet access in public libraries, arts funding, and political debates on public-broadcast television—the government has broad, even content-based, discretion to choose what speech to include. But it overlooked the fact that, in each of those cases, the Supreme Court held that private speech was at issue—and that the First Amendment applied.[4]

In *United States v. American Library Association* ("*ALA*"), the Court considered the constitutionality of a program that gave "federal assistance to [public libraries] to provide Internet access" as long as they installed "software to block images that constitute obscenity," "child pornography" or material that is "harmful

---

[4] The dissent also relied on *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). *Summum* is a government speech case, and it follows the proper approach for determining when government speech is at issue. *See id.* at 470–472 (considering history, public perception, and extent of government control). As Plaintiffs argue, not one of those factors supports the argument that the government is speaking when it removes books from public library shelves. Pl. Suppl. Br. at 21–36. Nor does *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) change the result. While the First Amendment protects curation by private actors, it typically prohibits "curation" by the government. *See id.* at 2407 (directing this Court to revisit its decision regarding government regulation of private curation because, though "[s]tates (and their citizens) are of course right to want an expressive realm in which the public has access to a wide range of views . . . the way the First Amendment achieves that goal is by preventing *the government* from tilting public debate in a preferred direction." (cleaned up and citation omitted)).

8

to minors." 539 U.S. at 199 (plurality op.).[5] The restriction was content-, not viewpoint-based.

To determine whether the federal law imposed an unconstitutional condition, the plurality began by "examin[ing] the role of libraries in our society." *Id.* at 203 (plurality op.). It explained that a public library's role is to "decid[e] what *private speech* to make available to the public," *id.* at 204 (emphasis added), and it cited *Cornelius v. NAACP Legal Defense & Educational Fund*, 473 U.S. 788 (1985), a nonpublic forum case, with approval in upholding the federal law. *ALA*, 539 U.S. at 206 (plurality op.). *See* Section II.C *infra*. While noting that "[p]ublic library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them," *id.* at 205 (plurality op.), nowhere did the plurality conclude that that discretion is boundless. Instead, it emphasized the ways in which the restrictions at issue were consistent with the nature, history, and purpose of libraries' collection decisions more broadly, and—narrowly echoed by Justice Kennedy in his concurrence—highlighted the ease with which a patron could unblock any improperly blocked site, something that would not matter if blocking raised no First Amendment concerns to begin with. *Id.* at 208–09 (plurality op.); *see also id.* at 214 (Kennedy, J., concurring).

---

[5] The law at issue, 47 U.S.C.A. § 254(h)(7)(G), defined "harmful to minors" consistent with the requirements of *Ginsberg v. New York*, 390 U.S. 629 (1968) and *Miller v. California*, 413 U.S. 15 (1973).

The plurality also concluded that "[t]he principles underlying *Forbes* and *Finley* . . . apply to a public library's exercise of judgment in selecting the material it provides to its patrons," *id.* at 205. As discussed below, *see* Section II.B *infra,* those "principles" include First Amendment scrutiny and a prohibition on invidious viewpoint discrimination aimed at suppressing dangerous ideas.

Like *ALA*, *Finley* is not a case about government speech, and it is a case that applies First Amendment scrutiny. In that case, the Supreme Court considered a facial challenge to a federal law that required the National Endowment for the Arts to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when considering grant applications. *Finley,* 524 U.S. at 572 (cleaned up, citation omitted). The Court recognized that the NEA "may decide to fund particular projects for a wide variety of reasons," from technical proficiency to creativity to contemporary relevance, and that "[a]ny content-based considerations that may be taken into account in the grant-making process are a consequence of the nature of arts funding." *Id.* at 585. It upheld the law on its face.

At the same time, the Court was careful to explain that "the denial of a grant . . . [because] of invidious viewpoint discrimination" would present a different scenario. *Id.* at 586–87. Far from immunizing the NEA's decision-making from First Amendment scrutiny, the Court made clear that, "even in the provision of subsidies,

the Government may not 'aim at the suppression of dangerous ideas,'" *id.* at 587 (quoting *Regan*, 461 U.S. at 550), and that "a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace,'" *id.* (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

Finally, in *Forbes*, the Court held that a state-owned public television broadcaster could exclude an independent candidate from its election debate as long as the exclusion decision was "a reasonable, viewpoint-neutral exercise of journalistic discretion," 523 U.S. at 669—squarely applying the First Amendment scrutiny that governs nonpublic forums. *See* Section II.C, *infra.* Recognizing that, "in many cases it is not feasible for the broadcaster to allow unlimited access to a candidate debate," the Court nevertheless held that "the requirement of neutrality remains; a broadcaster cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views." *Id.* at 676.

Thus, while the government may have "broad discretion to make content-based judgments in deciding what private speech to make available to the public" in public libraries, *see ALA*, 539 U.S. at 204–05 (plurality op.) (discussing *Forbes* and *Finley*), it does not have complete immunity from First Amendment scrutiny.

## II. GOVERNMENT OFFICIALS CANNOT REMOVE LIBRARY BOOKS TO PRESCRIBE WHAT SHALL BE ORTHODOX IN MATTERS OF OPINION.

Supreme Court cases make clear not only that the First Amendment applies, but also what it requires. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds," including through "telling a man . . . what books he may read[.]" *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). In the context of public libraries, this First Amendment principle demands that government officials cannot remove books in order to "prescrib[e] what shall be orthodox in . . . matters of opinion." *Pico*, 457 U.S. at 872 (plurality op.) (quoting *Barnette*, 319 U.S at 642).

Every doctrinal path available to the Court—the First Amendment standards that govern (1) the removal of books from school libraries, (2) limitations on government programs that pick and choose among private speech, and (3) nonpublic forums—all lead to the same result: government officials cannot remove books "[to aim] at the suppression of dangerous ideas," *Regan*, 461 U.S. at 550 (citation omitted), "to drive certain ideas or viewpoints from the marketplace," *Finley*, 524

U.S. at 587 (marks and citation omitted), or to instill a pall of orthodoxy in matters of opinion, *Barnette*, 319 U.S. at 642.

A.    ***Pursuant to the school library cases, removals that seek to impose a pall of orthodoxy in matters of opinion violate the First Amendment.***

Whatever they make of *Pico*, courts assessing the removal of books from a school library essentially boil the First Amendment question down to "whether the . . . [removal] decision . . . was motivated by . . . a desire to promote political orthodoxy and by opposition to the viewpoint of the book." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1227 (11th Cir. 2009). That is the *Pico* plurality's rule: government actors "may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion,'" 457 U.S. at 872 (quoting *Barnette*, 319 U.S. at 642). It is also Justice Blackmun's rule: "school officials may not remove books [from school libraries] for the purpose of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved." *Pico*, 457 U.S. at 879 (Blackmun, J., concurring). It is the rule courts arrived at before *Pico*. *See, e.g.*, *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577 at 581–82 (6th Cir. 1976) (school board could not remove books from library because members found the content "objectionable," because it

"occasioned their displeasure or disapproval," or "solely [due] to the[ir] social or political tastes"). And it is the rule that has been applied since, including by this Court. *See, e.g.*, *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995). Abandoning it now would be a dangerous—and lonely—road.

Perhaps for this reason, the panel dissent suggested that, rather than abandon *Pico* entirely, this Court could limit it to school libraries. But, as Defendants concede, "one would think that a public-school library should have more latitude than a county library to remove books[.]" Defs. Suppl. Br. at 19. *See also Sund*, 121 F. Supp. at 548 ("The principles set forth in *Pico*—a school library case—have even greater force when applied to public libraries."). Indeed, far from grounding its rule in the First Amendment protections enjoyed by schoolchildren, the *Pico* plurality began by recognizing the First Amendment rights that attach to public libraries, and protect Americans, in general. "A school library, *no less than any other public library*, is 'a place dedicated to quiet, to knowledge, and to beauty.'" 457 U.S. at 868 (plurality op.) (quoting *Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (emphasis added)). And "just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Id.* at 868 (plurality op.).

Even Justice Rehnquist, who disagreed with the plurality's rule for school libraries, expressly distinguished "public libraries," which are "designed for freewheeling inquiry." *Id.* at 915 (Rehnquist, J., dissenting). *See also id.* at 914 (criticizing plurality for "turn[ing] to language about *public* libraries"); *id.* at 915 (specifically noting that, though the books had been removed from the school library, they could still "be borrowed from a public library").

Thus, following the school library cases, this Court should hold that government officials cannot purge public library shelves to push political dogma.

**B.** **Removing books to aim at the suppression of dangerous ideas or to drive an idea from the marketplace is equally unconstitutional under the government subsidy or government program cases.**

Alternatively, the Court could view library book removals as a restriction on a government program in which officials have "broad discretion to make content-based judgments in deciding what private speech to make available to the public." *See ALA*, 539 U.S. at 204–05; *see also* Section I.B *supra.* In that context, too, government officials cannot violate two key First Amendment rules.

First, "[t]he First Amendment forb[ids] the Government" from using or controlling a government program, medium, or institution "in ways which distort its usual functioning." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 543 (2001). Even where "content-based considerations . . . may be taken into account" because of "the nature" of the program, those considerations must be tied to that specific

nature. *Finley*, 524 U.S. at 585. *See also Forbes*, 523 U.S. at 674 (emphasizing the "nature" of public broadcasting in explaining what First Amendment restrictions apply to it).[6]

Second, "even in the provision of subsidies, the Government may not 'ai[m] at the suppression of dangerous ideas.'" *Finley*, 524 U.S. at 587 (quoting *Regan*, 461

---

[6] *Forbes* concludes that "a broadcaster by its nature will facilitate the expression of some viewpoints instead of others," making a rule against viewpoint discrimination generally inapplicable to the medium—but it holds that publicly broadcast "candidate debates" *are* subject to that rule because of two special characteristics, *id.* at 674–75, which they happen to share with public libraries. First, in a candidate debate, "the implicit representation of the broadcaster [i]s that the views expressed [a]re those of the candidates, not its own." *Id.* So, too, for the books on public library shelves; it would be "far-fetched to suggest that the content" of public library books "is government speech," for the government would be "babbling prodigiously and incoherently." *Matal v. Tam*, 582 U.S. 218, 236 (2017) (refusing to hold that trademarks are government for this reason). Second, debates offer the "opportunity [for candidates] to make their views known so the electorate may intelligently evaluate [them]," a process that "is integral to our system of government." *Forbes*, 523 U.S. at 675. Offering speech people the opportunity to evaluate the political, religious, moral, and artistic ideas available in library books is equally "integral to our system of government."

Even if the Court is not convinced that a public library is akin to a political debate on public broadcast TV, it has already made clear that, by its "nature," a public library is distinct from general public broadcast "in a number of important ways," making *Forbes'* conclusion that viewpoint discrimination is typically part of the nature of the program inapplicable. *Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1046 (5th Cir. 1982) (en banc). "A library constantly and simultaneously proffers a myriad of written materials," while a public broadcaster must choose one view to broadcast at any given time. *Id.* In addition, the "right to cancel a program is . . . far more integral a part of the operation of a television station than the decision to remove a book from a school library" since the library has already had "the opportunity to review a book before acquiring it." *Id.*

U.S. at 550) (alteration in original). It cannot "effectively preclude or punish the expression of particular views," or engage in "invidious" viewpoint-based discrimination "calculated to drive certain ideas from the marketplace," *Id.* at 583, 587 (marks and citation omitted).

Blessing book removals that seek to drive certain ideas out of society would violate each of these restrictions.

By "nature," public libraries are "designed for freewheeling inquiry," not "for the selective conveyance of ideas." *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) (distinguishing public libraries from school libraries). They "pursue the worthy missions of facilitating learning and cultural enrichment" and "they seek to provide a wide array of information[.]" *ALA*, 539 U.S. at 203–04 (plurality op.). Throughout our country's history, libraries have provided "a mighty resource in the free marketplace of ideas," *Minarcini*, 541 F.2d at 582, and have acted as "the quintessential locus of the receipt of information." *Kreimer*, 958 F.2d at 1255. They made "free access to knowledge . . . possible for all Americans, regardless of geography or wealth." *Fayetteville Pub. Lib. v. Crawford Cnty., Arkansas*, 684 F. Supp. 3d 879, 890 (W.D. Ark. 2023).[7]

_____

[7] As one scholar notes, "American democracy has never known a time without a public library. In 1731, Benjamin Franklin incorporated the Library Company of Philadelphia after persuading fellow members of his Junto debate society to 'pool their resources and purchase a collection of books' that would have been too costly

The "usual functioning," *Velazquez*, 531 U.S. at 543, of public libraries is "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *ALA*, 539 U.S. at 206 (plurality op.). Custodians of our collective wisdom, public librarians safeguard the narratives, insights, and information that fuel our First Amendment freedoms. As "hallowed place[s]" "dedicated to . . . knowledge," *Brown*, 383 U.S. at 142, their "mission [is] to provide the citizenry with access to a wide array of information, viewpoints, and content[.]" *Fayetteville*, 684 F. Supp. 3d at 891.

"The librarian curates the collection of reading materials for an entire community, and in doing so, he or she reinforces the bedrock principles on which this country was founded." *Id.*  Those bedrock principles include "our system of government['s] . . . accommodation for the widest varieties of tastes and ideas. What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another." *Hannegan*, 327 U.S. at 157. The whole point of the First Amendment is that people, not the government, get to "pick and choose." *Id.* at 158.

This Court, sitting *en banc*, has already recognized that there are "few legitimate reasons why a book, once acquired, should be removed from a

---

for any single individual to amass on his own." Amy K. Garmer, *Public Libraries in the Community*, 13 I/S: J.L. & POL'Y FOR INFO. SOC'Y 1, 3–4 (2016).

library." *Muir*, 688 F.2d at 1046 (en banc) (citation omitted). "[A]bsent space limitations," "[t]he maintenance of one volume on a library shelf does not . . . preempt another." *Id.*[8] "[T]he decision to remove a book from a . . . library" is thus not an "integral . . . part of the [library's] operation." *Id.*

Allowing invidiously viewpoint-based removals that are aimed at "the suppression of dangerous ideas" would not only violate the First Amendment in its own right, but would also run particularly contrary to the nature, history, and tradition of public libraries. It would distort these institutions—expressly *not* designed "for the selective conveyance of ideas," *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting)—into just that. Permitting ideological purges would mutate public libraries from bastions of knowledge into megaphones for state-sanctioned thought and purveyors of literary blacklists.

**C.      *Removing books from public libraries to impose political orthodoxy in ideas would also violate the First Amendment under nonpublic forum doctrine.***

Alternatively, this Court may assess the book removals as a restriction on a nonpublic forum. Indeed, in *ALA*, though the plurality concluded that "*public* forum principles" were "out of place in the context of . . . Internet access in public

---

[8] Plaintiffs argue that concerns about shelf space could not have motivated the removals at issue since the County had already suspended buying new books during the time period in question. Pl. Suppl. Br. at 7.

libraries," because such access "is neither a 'traditional' nor a 'designated' public forum," the Court did not reject the application of nonpublic forum principles. 539 U.S. at 205 (plurality op.) (emphasis added). To the contrary, the plurality cited to *Cornelius*, a nonpublic forum case, when explaining the "reasons [why a library] offers . . . resources," *id.* at 206, and described public libraries as "deciding what private speech to make available to the public," *id.* at 204, offering a strong case for the application of nonpublic forum doctrine.

Moreover, subjecting library book removals to nonpublic forum scrutiny makes sense on its own terms. "Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018). "Public property that is not by tradition or designation open for public communication is governed by nonpublic forum standards." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (same).

Public libraries, including public library shelves, are public property. And they bear the indicia of "selective access" that typically "indicate[ ] the property is a nonpublic forum." *Forbes*, 523 U.S. at 679. "[J]ust as the Government in *Cornelius* made agency-by-agency determinations as to which of the eligible agencies would participate in the [charity drive]," *id.* at 680, and the government in *Forbes* "made

candidate-by-candidate determinations as to which of the eligible candidates would participate in the debate," *id.* at 680, libraries make book-by-book decisions about which of the eligible books will appear on library shelves.

This "distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Forbes*, 523 U.S. at 680. And "it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers." *Id.*

The library shelf's "status as a nonpublic forum" does not "give [officials] unfettered power to exclude any [book] it wished." *Id.* at 682. "A nonpublic forum . . . is not a private forum, and because it is a government-sponsored medium of communication, it is still subject to First Amendment constraints." *Chiu*, 260 F.3d at 347. Specifically, any restriction in a nonpublic forum must be "reasonable in light of the purpose of the forum," *id.* at 356, and cannot be an effort "to suppress a particular viewpoint," *id.*

Under this line of doctrine, a book can be properly excluded from a library—a nonpublic forum designed to inform and educate the public—"because [it] had generated no appreciable public interest." *See Forbes*, 523 U.S. at 682. But, much

like a candidate improperly excluded from a political debate on public broadcast television, a book could not be removed because its "views were unpopular or out of the mainstream," due to "political pressure," or "in an attempted manipulation" of the government program or the broader marketplace of ideas. *Id.* at 683. Those justifications would be both unreasonable in light of the purposes of public libraries and impermissibly, invidiously viewpoint-based.

*     *     *

Thus, whether the Court chooses to rely on cases about removals of books from school libraries, invidious discrimination in programs that pick and choose among private speech, or nonpublic fora, it is unconstitutional for government officials to remove books in order to prescribe what shall be orthodox. This has been the rule for decades, and it has allowed public libraries and ideas to flourish. The First Amendment provides a backstop to such overreach in public libraries, no less than it does in other arenas.

## CONCLUSION

For these reasons, this Court should affirm the court below and hold that government actors cannot remove books from public library shelves to prescribe what shall be orthodox in matters of opinion, to aim at the suppression of dangerous ideas, or to drive an idea from the marketplace.

Dated: September 10, 2024

Respectfully submitted,

*/s/ Vera Eidelman*
Vera Eidelman
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
veidelman@aclu.org

Chloe Kempf
Brian Klosterboer
Edgar Saldivar
Adriana Piñon
ACLU FOUNDATION OF TEXAS, INC.
P.O. BOX 8306
Houston, TX 77288
(713) 942-8146
ckempf@aclutx.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of <u>Fed. R. App. P. 32(a)(7)(B)</u> because, excluding the parts of the document exempted by <u>Fed. R. App. P. 32(f)</u>, this document contains 6,388 words.

2. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)</u> and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2016.

Dated: September 10, 2024                    By:    */s/ Vera Eidelman*
                                                     Vera Eidelman

                                                     *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 11, 2024                    By:  */s/ Vera Eidelman*
                                                  Vera Eidelman

                                             *Counsel for Amici Curiae*