# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 23, 2025

Lyle W. Cayce
Clerk

No. 23-50224

---

Leila Green Little; Jeanne Puryear; Kathy Kennedy;
Rebecca Jones; Richard Day; Cynthia Waring; Diane
Moster,

*Plaintiffs—Appellees,*

*versus*

Llano County; Ron Cunningham, *in his official capacity as Llano
County Judge*; Jerry Don Moss, *in his official capacity as Llano County
Commissioner*; Peter Jones, *in his official capacity as Llano County
Commissioner*; Mike Sandoval, *in his official capacity as Llano County
Commissioner*; Linda Raschke, *in her official capacity as Llano County
Commissioner*; Amber Milum, *in her official capacity as Llano County
Library System Director*,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:22-CV-424

---

Before Elrod, *Chief Judge,* and Jones, Smith, Wiener, Stewart,
Southwick, Haynes, Graves, Higginson, Willett, Ho,

No. 23-50224

Duncan, Engelhardt, Oldham, Wilson, Douglas, and Ramirez, *Circuit Judges*.[*]

Stuart Kyle Duncan, *Circuit Judge*:[†]

## INTRODUCTION

We consider whether someone may challenge a public library's removal of books as violating the Free Speech Clause.

Patrons of a county library in Texas sued the librarian and other officials, alleging they removed 17 books because of their treatment of racial and sexual themes. The district court ruled that defendants abridged plaintiffs' "right to receive information" under the Free Speech Clause and ordered the books returned to the shelves. On appeal, a divided panel of our court affirmed in part. We granted en banc rehearing.

We now reverse the preliminary injunction and render judgment dismissing the Free Speech claims. We do so for two separate reasons.

*First*, plaintiffs cannot invoke a right to receive information to challenge a library's removal of books. Yes, Supreme Court precedent sometimes protects one's right to receive someone else's speech. But plaintiffs would transform that precedent into a brave new right to receive information from the government in the form of taxpayer-funded library books. The First Amendment acknowledges no such right.

That is a relief, because trying to apply it would be a nightmare. How would judges decide when removing a book is forbidden? No one in this

---

[*] Judge Richman was recused and did not participate in the decision.

[†] Ten judges join Parts I–III of this opinion and the judgment (Chief Judge Elrod and Judges Jones, Smith, Haynes, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson). Seven of those judges join the opinion in full (Judge Jones, Smith, Willett, Ho, Duncan, Engelhardt, and Oldham).

case—not plaintiffs, nor the district court, nor the panel—can agree on a standard. May a library remove a book because it dislikes its ideas? Because it finds the book vulgar? Sexist? Inaccurate? Outdated? Poorly written? Heaven knows. The panel majority itself disagreed over whether *half* of the 17 books could be removed. For their part, plaintiffs took the baffling view that libraries cannot even remove books that espouse racism.

The only sensible course—and, happily, the one supported by reams of precedent—is to hold that the right to receive information does not apply here. A plaintiff may not invoke that right to challenge a library's decisions about which books to buy, which books to keep, or which books to remove.

True, one of our decisions—*Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995)—suggested students could challenge the removal of a book from public school libraries. But *Campbell* was based on a mistaken reading of precedent and, since decided, has played no role in similar controversies in our circuit. We therefore overrule *Campbell*.

*Second*, a library's collection decisions are government speech and therefore not subject to Free Speech challenge. Many precedents teach that someone engages in expressive activity by curating and presenting a collection of third-party speech. People do this all the time. Think of the editors of a poetry compilation choosing among poems, or a newspaper choosing which editorials to run, or a television station choosing which programs to air. So do governments. Think of a city museum selecting which paintings or sculptures to feature in an exhibit.

In the same way, a library expresses itself by deciding how to shape its collection. As one court put it: "With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude." *People for the Ethical Treatment of Animals v.*

*Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ["*PETA*"]. What the library is saying is: "We think these books are worth reading."

On this point, we note an error that bedeviled our sister circuit. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 668 (8th Cir. 2024). Contrary to its view, a library does not speak through the words of the books themselves. "Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message." *PETA*, 414 F.3d at 28. The library is not babbling incoherently in the voices of Captain Ahab, Hester Prynne, Odysseus, Raskolnikov, and Ignatius J. Reilly. Rather, the library speaks by selecting some books over others and presenting that collection to the public—just as a museum does when it curates a collection of various schools of art. No one thinks the museum is contradicting itself by featuring both Rembrandt and Andy Warhol.

This conclusion gains strength when we consider the history of public libraries. From the moment they emerged in the mid-19th century, public libraries have shaped their collections to present what they held to be worthwhile literature. What is considered worthwhile, of course, evolves over the years. Public libraries used to exclude most novels, which were thought bad for morals. Today a library would not think of excluding *Fifty Shades of Grey*. But what has not changed is the fact, as true today as it was in 1850, that libraries curate their collections for expressive purposes. Their collection decisions are therefore government speech.

Finally, we note with amusement (and some dismay) the unusually over-caffeinated arguments made in this case. Judging from the rhetoric in the briefs, one would think Llano County had planned to stage a book burning in front of the library. Plaintiffs and *amici* warn of "book bans," "pyres of burned books," "totalitarian regimes," and the "*Index librorum*

No. 23-50224

*prohibitorum*." One *amicus* intones: "Where they burn books, they will ultimately burn people."[1]

Take a deep breath, everyone. No one is banning (or burning) books. If a disappointed patron can't find a book in the library, he can order it online, buy it from a bookstore, or borrow it from a friend. All Llano County has done here is what libraries have been doing for two centuries: decide which books they want in their collections. That is what it means to *be* a library—to make judgments about which books are worth reading and which are not, which ideas belong on the shelves and which do not.

If you doubt that, next time you visit the library ask the librarian to direct you to the Holocaust Denial Section.

\*\*\*

We REVERSE the preliminary injunction, RENDER judgment dismissing plaintiffs' Free Speech claims, and REMAND for further proceedings consistent with this opinion.

---

[1] *See* Suppl. Brief of Appellees (referring throughout to the 17 "Banned Books"); Brief for Freedom to Read Found. et al. as Amicus Curiae at 5 ("pyres of burned books kindling the rise of early twentieth-century totalitarian regimes"); Brief for Found. for Individual Rts. and Expression as Amicus Curiae at 9–11 ("The Burning of the Books and the Burying of the Philosophers," Diocletian's "public burning of Christian writings," Pope Paul VI's "*Index librorum prohibitorum*," and Heine's "Where they burn books, they will ultimately burn people"); Brief for Texas Freedom to Read Project as Amicus Curiae at 7 ("Book bans have devastated Texas libraries."). The dissenting opinion joins in this unfortunate rhetoric. *See* Dissent at 30 (accusing us of "sanction[ing] government censorship in every section of every public library in our circuit"); *id.* at 37 (suggesting we have "join[ed] the book burners" (citation and internal quotation marks omitted)).

# I. BACKGROUND

## A. Facts and Proceedings

Plaintiffs are seven patrons of the Llano County library. Llano County lies about 80 miles northwest of Austin with a population of just over 21,000. Its library system has three branches, located in Llano (the county seat), Kingsland, and Buchanan Dam. The current library director is Amber Milum. *See* TEX. LOC. GOV'T CODE § 323.005(a) ("If a county library is established, the commissioners court shall employ a county librarian."). Among other duties, the librarian "shall determine which books and library equipment will be purchased." *Id.* § 323.005(c). The library is supervised by the county commissioners court and the state librarian. *Id.* § 323.006.

In April 2022, plaintiffs sued Milum, the commissioners court, County Judge Ron Cunningham, and the library board ("defendants") in federal court. They alleged defendants removed certain library books because of objections to their treatment of sexual or racial themes. Plaintiffs tried to check out the books but were unable to do so. They claimed a violation of their "First Amendment rights to access and receive information and ideas."[2]

Following discovery, defendants moved to dismiss based on standing, mootness, and failure to state a claim. Plaintiffs moved for a preliminary injunction based on their First Amendment claims. In October 2022, the district court held a two-day hearing with testimony from seven witnesses.

The testimony focused on 17 books removed from the Llano branch. Seven of them—which the parties call the "Butt and Fart Books"—are a

---

[2] Plaintiffs also alleged a Fourteenth Amendment due process claim. That claim is not at issue because the district court did not rely on it to grant a preliminary injunction.

series of children's books with titles like: *I Broke My Butt!* and *Larry the Farting Leprechaun*. Another book is the well-known children's story *In the Night Kitchen* by Maurice Sendak, which contains drawings of a naked toddler. Another is a sex-education book for pre-teens, *It's Perfectly Normal*, which has cartoon depictions of sexual activity. Three are young-adult books touching on sexuality and homosexuality (*Spinning*, *Shine*, *Gabi: A Girl in Pieces*). Two portray gender dysphoric children and teenagers (*Being Jazz* and *Freakboy*). Two others discuss the history of racism in the United States (*Caste* and *They Called Themselves the K.K.K.*).[3]

Defendants generally testified that the books were removed, not because of disagreement with their content, but as a result of a standard "weeding" method known as "Continuous Review, Evaluation, and Weeding" or "CREW." Under this approach, books are evaluated according to the so-called "MUSTIE" factors: **M**isleading, **U**gly, **S**uperseded, **T**rivial, **I**rrelevant, and **E**lsewhere. So, a book might be removed because it was inaccurate ("misleading"), damaged ("ugly"), outdated ("superseded"), silly ("trivial"), seldom checked out ("irrelevant"), or available at another branch ("elsewhere").[4]

---

[3] The full list of books is: *My Butt Is So Noisy!*; *I Broke My Butt!*; *I Need a New Butt!*, all by Dawn McMillan; *Larry the Farting Leprechaun*; *Gary the Goose and His Gas on the Loose*; *Freddie the Farting Snowman*; *Harvey the Heart Has Too Many Farts*, all by Jane Bexley; *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie H. Harris and Michael Emberley; *In the Night Kitchen* by Maurice Sendak; *Caste: The Origins of Our Discontents* by Isabel Wilkerson; *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Freakboy* by Kristin Elizabeth Clark; *Shine* by Lauren Myracle; *Gabi, a Girl in Pieces* by Isabel Quintero; *Spinning* by Tillie Walden; and *Under the Moon: a Catwoman Tale* by Lauren Myracle.

[4] Testimony also addressed the library's decision to stop offering e-books and audiobooks through the "Overdrive" database. According to the library, Overdrive's filters could not keep children from viewing books depicting sexual activity. The library

No. 23-50224

For their part, plaintiffs portrayed this weeding rationale as pretextual. They claimed Milum actually removed the books under orders from Cunningham and the commissioners court. Cunningham and Moss, plaintiffs asserted, were responding to complaints from the public—spearheaded by Rochelle Wells, Rhonda Schneider, Gay Baskin, and Bonnie Wallace—about the books at issue. They also emphasized that, after dissolving the existing library board, the commissioners put Wells, Schneider, Baskin, and Wallace on a new board with input into the library's selections.[5]

## B. District Court Decision

### 1. Motion to Dismiss

The district court denied defendants' motion to dismiss the Free Speech claims. *See Little*, 2023 WL 2731089, at *7–8 (W.D. Tex. Mar. 30, 2023). As a threshold matter, the court ruled that the removal of books implicated plaintiffs' "First Amendment right to access information." *Id.* at

---

removed Overdrive and replaced it with a database called "Bibliotheca." Some of the 17 removed books may remain accessible through Bibliotheca, although the record does not show which ones. The district court subsequently ruled that plaintiffs' Overdrive-related claims were moot and dismissed them without prejudice. *See Little v. Llano Cty.*, 1:22-CV-424-RP, 2023 WL 2731089, at *6 (W.D. Tex. Mar. 30, 2023).

[5] The dissenting opinion claims this background "omits material facts . . . concerning how and why the seventeen books at issue were removed." Dissent at 2. Not so. The dissent merely contains more details about the public's complaints and the county officials' response. But our bottom line and the dissent's are the same: in response to public complaints about the books, the Llano County Commissioners Court, which oversees the library, ordered the books removed. *See* Dissent at 3 n.5 (recognizing "the Llano County Commissioners Court . . . oversees the Llano County library system").

*7 n.4 (citing *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995)).[6]

On the merits, the court held that a library violates the Free Speech Clause when its "substantial motivation" for removing a book "was to deny library users access to ideas with which [the government] disagreed." *Ibid.* (quoting *Campbell*, 64 F.3d at 190). The court acknowledged that "public libraries should be afforded 'broad discretion' in their collection selection process, in which library staff must necessarily consider books' content." *Ibid.* (quoting *United States v. Am. Library Ass'n*, 539 U.S. 194, 205 (2003) (plurality) ["*ALA*"]). But the court believed this discretion "applies only to materials' selection," not their removal. *Ibid.*

The court also rejected defendants' argument that a library's collection decisions are "government speech to which the First Amendment does not apply." *Ibid.* The court thought the precedents supporting this argument "mostly involve the initial selection, not removal, of materials." *Ibid. See PETA*, 414 F.3d at 28 ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

Finally, the court suggested that public libraries are "limited public forums," and that, as a result, their removal decisions are "subject to First Amendment limitations." *See Little*, 2023 WL 2731089, at *7 n.4 (citation omitted).

---

[6] The court also held plaintiffs had standing because they had "attempted and failed to check out the removed books from the library." *Little*, 2023 WL 2731089, at *5. Additionally, the court ruled that the library's "in-house checkout system"—one created after litigation began under which the 17 books were removed from the catalog and kept behind the counter—did not moot plaintiffs' claims. *See id.* at *6.

No. 23-50224

## 2. Preliminary Injunction

Applying these principles, the court granted a preliminary injunction ordering the library to reshelve the 17 books. At the outset, the court reiterated its view that "the First Amendment 'protect[s] the [plaintiffs'] right to receive information,'" and that the "key inquiry" concerns library officials' "substantial motivation in arriving at the removal decision." *Id.* at *9 (citations omitted). Based on that framework, the court ruled plaintiffs were likely to show defendants removed the 17 books based on both viewpoint and content discrimination.

As to viewpoint discrimination, the court found defendants removed the books based on complaints that they were "inappropriate," "pornographic filth," and "CRT and LGBTQ books." *Id.* at *9–10. As to content discrimination, the court found the removal was "directly prompted by complaints from patrons and county officials over the contents of these titles." *Id.* at *11. In either case, the court rejected defendants' argument that the removals were part of the normal "weeding" process. *Id.* at *10–11. Instead, the court found defendants' "substantial motivation" for removing the books was "a desire to prevent access to particular views." *Id.* at *12.

Finding the remaining injunction factors met, the court entered a preliminary injunction requiring defendants to reshelve all 17 books and "update" library catalogs to show the books are "available for checkout." *Id.* at *14. The court also enjoined defendants "from removing any books from the Llano County Library Service's catalog for any reason during the pendency of this action." *Ibid.*

Defendants appealed.

No. 23-50224

### C. Panel Decision

A divided panel of our court affirmed in part. *See Little v. Llano Cty.*, 103 F.4th 1140 (5th Cir. 2024). The majority agreed with the district court that library patrons have the "right to receive information and ideas." *Id.* at 1147 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). It also agreed that a library violates that right if a book's removal was "'substantially motivated' by the desire to deny 'access to ideas with which [the library] disagree[s].'" *Id.* at 1148–49 (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) ["*Pico*"] (plurality)). But the majority modified the district court's ruling to allow a library to remove books only "based on . . . the accuracy of the[ir] content," *id.* at 1150, or "based on a belief that the books [are] 'pervasively vulgar' or on grounds of 'educational suitability,'" *id.* at 1154 (quoting *Campbell*, 64 F.3d at 188–89). Finally, the majority agreed that a library's collection decisions are not government speech. *Id.* at 1151–52.

Applying that standard, Judge Wiener concluded all 17 books were removed improperly. *Id.* at 1154–55. Partially concurring, Judge Southwick concluded nine books were properly removed based on vulgarity or educational suitability. *Id.* at 1158–59 (Southwick, J., concurring in part). Accordingly, the majority modified the injunction to require reshelving only eight of the 17 books. *Ibid.* Dissenting, Judge Duncan would have reversed the district court altogether, either because a library's curation decisions are government speech or because removing books does not implicate any right to receive information. *Id.* at 1177–86, 1168–69 (Duncan, J., dissenting).

We granted en banc rehearing. *Little v. Llano Cty.*, 106 F.4th 426 (5th Cir. 2024).

## II. STANDARD OF REVIEW

To obtain the "extraordinary remedy" of a preliminary injunction, the applicant must show

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 353 (5th Cir. 2020) (en banc) (citations omitted).

"We review the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024) (en banc) (citation omitted); *see* 28 U.S.C. § 1292(a)(1). "When a district court applies incorrect legal principles, it abuses its discretion." *Kauffman*, 981 F.3d at 354 (citation omitted).

\*\*\*

Embedded in the district court's ruling are two distinct legal questions. The first is whether a library's removing a book implicates a patron's right to receive information. The second is whether a library's collection decisions—that is, its choices about which books to put on or remove from the shelves—are government speech. We consider the first question in part III and the second question in part IV.[7]

---

[7] The dissenting opinion claims that, by deciding these legal questions, we "rush[]" past the "narrow issue" of whether the preliminary injunction was an abuse of discretion. Dissent at 10. Not so. By definition, a district court abuses its discretion by granting a preliminary injunction based on incorrect legal principles. *See Kauffman*, 981

No. 23-50224

## III. RIGHT TO RECEIVE INFORMATION

By invoking the right to receive information, may someone challenge a library's decision to remove books from its shelves? Plaintiffs say "yes," as did the district court and the panel majority. *See Little*, 103 F.4th at 1147. But if the answer is "no," as defendants and some *amici* argue, then plaintiffs' Free Speech claim fails at the outset. We tackle the question as follows.

First (A), we survey the precedents. Second (B), we explain why the right to receive information is not implicated by a library's removing books (nor by its not acquiring a book in the first place). Finally (C), we consider our decision in *Campbell*, 64 F.3d 184, which applied the right to a school library's removing books. We overrule *Campbell*.

### A. Right-to-receive-information precedents

Plaintiffs' brief surveys the history of the right to receive information and argues it "extends to public libraries." Specifically, they contend patrons can invoke the right to challenge a library's decision to remove books. We discuss those cases here and, in the next part, explain why plaintiffs' argument fails.

We start with plaintiffs' earliest case, *Martin v. City of Struthers*, 319 U.S. 141 (1943). Jehovah's Witnesses challenged a city's prohibition on door-to-door distribution of "handbills, circulars[,] or other advertisements." *Id.*

---

F.3d at 354. As explained below, the district court did precisely that, which requires reversal. *See, e.g., Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 704 (5th Cir. 2018) (vacating preliminary injunction "because the [district] court misapplied applicable legal principles"). The dissent also claims we fail to "identify[] any legal principle" to support our First Amendment holding. Dissent at 10. That is quite wrong. We identify not one but two such principles: (1) library patrons cannot rely on a "right to receive information" to challenge a library's collection decisions, and (2) those collection decisions are government speech. We defend those principles at length below. *See infra* Part III at 13–28; Part IV at 28–55.

at 1412–43. *Martin* held the law violated the First Amendment based on a person's "right to distribute literature" and another's "right to receive it." *Id.* at 143 (citation omitted). In other words, the government could not bar someone from receiving someone else's speech.

The cases applying *Martin* follow this pattern. A court could not bar a union organizer from delivering a speech to company employees. *Thomas v. Collins*, 323 U.S. 516, 538 (1945). The government could not burden someone's right to receive political literature through the mail. *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306 (1965). A state violated a man's "right to receive information" by prosecuting him for privately possessing obscene material. *Stanley*, 394 U.S. at 564–65. Scholars had the right to "receive [the] information and ideas" of a foreign scholar they invited to the United States. *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972). Sellers had the right to propose transactions, and buyers had the right to receive them. *Va. State Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976).[8]

Each of these cases held that the First Amendment limits the government's power to prevent one person from receiving another's speech. The listeners mostly prevailed.[9] In none of the cases, however, did a plaintiff invoke a right to receive information from the *government*. And none suggested that the First Amendment obligates the government to provide

---

[8] *See also Murthy v. Missouri*, 603 U.S. 43, 75 (2024) ("While we have recognized a First Amendment right to receive information, we have identified a cognizable injury only where the listener has a concrete, specific connection to the speaker." (citing *Kleindienst*, 408 U.S. at 762) (cleaned up)).

[9] Not always. In *Kleindienst*, the scholars' rights were trumped by Congress's power to exclude aliens. 408 U.S. at 765–70. And in *Virginia State Pharmacy Board*, the government was given some leeway to regulate commercial speech. 425 U.S. at 770–73.

No. 23-50224

information to anyone.[10] To the contrary, those cases "only recogniz[ed] a negative right against government interference with the exchange of information by private citizens." Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 Duke J. Const. Law & Pub. Pol'y 113, 140 (2008).[11]

We turn next to the Supreme Court's splintered decision in *Pico*, 457 U.S. 853, where students challenged a school board's removing books from a school library. Plaintiffs repeatedly cite one of the *Pico* opinions, joined by three Justices, which would have found a violation of the right to receive information. *See Pico*, 457 U.S. at 866–67 (op. of Brennan, J., joined by Marshall and Stevens, JJ.). *Pico* does not help plaintiffs, though.

To begin with, our en banc court ruled long ago that *Pico* carries no precedential weight. *See Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) ("[W]e conclude that the Supreme Court [in *Pico*] decided neither the extent nor, indeed, the existence

---

[10] Nor does *Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969), which plaintiffs cite. That case rejected a First Amendment challenge to the FCC's "fairness doctrine," which required radio stations to allow someone to respond if attacked on a broadcast. *See id.* at 374–75. The Court held the agency could attach such a condition when allocating frequencies, referencing "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas." *Id.* at 390. Nowhere does *Red Lion* suggest this "right" requires the government itself to provide such information.

[11] The dissenting opinion briefly notes these Supreme Court precedents without discussing them. *See* Dissent at 11. It offers no rejoinder to our point that none remotely supports someone's right to demand information from the *government*, whether in the form of library books or anything else. Instead, the dissent grounds its entire argument on the Supreme Court's *Pico* case. Dissent at 12–22. But, as we explain below, *Pico* was so fractured that our court has twice held (and today reaffirms) that it lacks any precedential force. And, in any event, a majority of the *Pico* Justices rejected applying the right to receive information to a school library's decision to remove books. *See infra.*

No. 23-50224

*vel non*, of First Amendment implications in a school book removal case.").[12] That remains the correct reading of *Pico*. Not only was *Pico* "highly fractured," *Chiras*, 432 F.3d at 619 n.32, but "[a] majority of the justices did not join any single opinion." *Muir*, 688 F.2d at 1045 n.30. And the narrowest opinion (Justice White's) said nothing about the First Amendment. *Ibid.*[13] So, we reaffirm what we held over forty years ago: "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Ibid.*[14]

Second, putting aside *Pico*'s non-binding status, a majority of the Justices rejected the idea that someone's "right to receive information" requires a library to shelve particular books. *See Muir*, 688 F.2d at 1045 n.30 (explaining a "majority" of *Pico*'s Justices agreed "there is no First

---

[12] *See also Chiras v. Miller*, 432 F.3d 606, 619 n.32 (5th Cir. 2005) (noting *Muir*'s holding that "*Pico* has no precedential value as to the application of First Amendment principles to the school's decision to remove the books from the library").

[13] *See Pico*, 457 U.S. at 883 (White, J., concurring in the judgment) (voting to affirm only in deference to court of appeals' fact findings but declining to join Brennan's "dissertation on the extent to which the First Amendment limits the discretion of the school board to remove books from the school library"). *See also Marks v. United States*, 430 U.S. 188, 192–93 (1977).

[14] The dissenting opinion minimizes that statement as "half-century-old dicta, in a footnote." Dissent at 15. We disagree. In *Muir*, our en banc court carefully parsed the *Pico* opinions and "conclude[d] that the Supreme Court decided neither the extent nor, indeed, the existence *vel non* . . . of First Amendment implications in a school book removal case." 688 F.2d at 1045 n.30. Furthermore, applying the *Marks* rule, we identified Justice White's opinion as the narrowest one and concluded that it "expresses *no opinion* on the First Amendment issues." *Ibid.* (emphasis added). Two decades later, a panel of our court confirmed that is a correct reading of *Pico*. In *Chiras*, we again concluded that *Pico*'s "highly fractured" opinions "ha[ve] no precedential value" as to the First Amendment, 432 F.3d at 619 n.32 (citing *Muir*, 688 F.2d at 1045 n.30), emphasizing Chief Justice Burger's point that *Pico* "contained no binding holding," *ibid.* (citing *Pico*, 457 U.S. at 886 n.2) (Burger, C.J., dissenting). The dissent gives us no reason to reconsider what we have already twice decided about *Pico*'s non-precedential status. Consequently, the dissent's accusations that we wrongly "revisit," "modify," "adjust," "discard," and "nulli[f]y" *Pico*, *see* Dissent at 19–21, are misplaced.

No. 23-50224

Amendment obligation upon the State to provide continuing access to particular books"). On this point, Chief Justice Burger's opinion was especially forceful. "[T]he right to receive information and ideas," he wrote, "does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Pico*, 457 U.S. at 888 (citing *Stanley*, 394 U.S. at 564) (Burger, C.J., dissenting). Three Justices (Powell, Rehnquist, and O'Connor) joined Burger's opinion in full, and a fourth (Blackmun) agreed with this point.[15]

Finally, plaintiffs cite two sister circuit cases applying the "right to receive information" in the library context. *See Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 590 (6th Cir. 2003); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247–48 (3d Cir. 1992). But those cases addressed whether a library could evict someone from its *premises*, not whether someone could demand the library put certain books on its *shelves*.

---

[15] *See Pico*, 457 U.S. at 878 (Blackmun, J., concurring in part and concurring in the judgment) ("I do not suggest that the State has any affirmative obligation to provide students with information or ideas, something that may well be associated with a 'right to receive.'"); *id.* at 895 (Powell, J., dissenting) (agreeing with Burger that a "'right to receive ideas' in a school . . . . finds no support in the First Amendment precedents of this Court"); *id.* at 904, 910 (Rehnquist, J., dissenting) ("agree[ing] fully" with Burger's opinion and rejecting "the very existence of a right to receive information" in the school setting as "wholly unsupported by our past decisions and inconsistent with the necessarily selective process of elementary and secondary education"); *id.* at 921 (O'Connor, J., dissenting) (joining Burger's dissent).

The dissenting opinion fails to acknowledge that a majority of the *Pico* Justices rejected extending the right to receive information to a school library's collection. Indeed, our court has twice read *Pico* that way. *See Muir*, 688 F.2d at 1045 n.30 (observing the four dissenting *Pico* Justices "agree[d] with Justice Blackmun that there is no First Amendment obligation upon the State to provide continuing access to particular books, *thus making a majority of Members for that view*") (citations omitted) (emphasis added); *Chiras*, 432 F.3d at 619 n.32 (same). We reaffirm that correct reading of *Pico* today.

No. 23-50224

*Kreimer*, for instance, ruled a library could evict a menacing vagrant whose "odor was often so offensive that it prevented the [l]ibrary patrons from using certain areas of the [l]ibrary." 958 F.2d at 1247, 1262–68. The right to receive information, the court explained, "includes the right to some level of *access* to a public library." *Id.* at 1255 (emphasis added). *Neinast* treated the right the same way. *See* 346 F.3d at 591 (quoting *Kreimer*, 958 F.2d at 1255). Neither case suggested patrons can make a library carry the books they want.

### B. Plaintiffs cannot invoke a right to receive information to challenge book removals.

We hold that plaintiffs cannot invoke the right to receive information to challenge the library's removal of the challenged books.

First, plaintiffs would stretch the right far beyond its roots. As discussed, the above cases teach that people have some right to receive information from others without government interference. *See, e.g.*, *Martin*, 319 U.S. at 143 ("[F]reedom [of speech and press] embraces the right to distribute literature and necessarily protects the right to receive it.") (citing *Lovell v. Griffin*, 303 U.S. 444, 452 (1938)). But plaintiffs want more. They demand to receive information from the government itself.[16]

It is one thing to tell the *government* it cannot stop *you* from receiving a book. The First Amendment protects your right to do that. *See, e.g.*, *Lamont*, 381 U.S. at 306 (Postal Service could not regulate receipt of "communist political propaganda"). It is another thing for *you* to tell the *government* which books it must keep in the library. The First Amendment does not give you the right to demand that. *See, e.g.*, *Pico*, 457 U.S. at 889

---

[16] After all, the books they want are owned by the county. *See* TEX. LOC. GOV'T CODE § 323.005 (librarian "shall determine which books . . . will be purchased").

No. 23-50224

(Burger, C.J., dissenting) ("[T]here is not a hint in the First Amendment, or in any holding of th[e] [Supreme] Court, of a 'right' to have the government provide continuing access to certain books.").

Second, if people can challenge which books libraries remove, they can challenge which books libraries buy. "[A] library just as surely denies a patron's right to 'receive information' by not purchasing a book in the first place as it does by pulling an existing book off the shelves." *Little*, 103 F.4th at 1171 (Duncan, J., dissenting).[17] For good reason, no one in this litigation has ever defended that position.

Suppose a patron complains that the library does not have a book she wants. The library refuses to buy it, so she sues. Her argument writes itself: "[I]f the First Amendment commands that certain books cannot be *removed*, does it not equally require that the same books be *acquired*?" *Pico*, 457 U.S. at 892 (Burger, C.J., dissenting).[18] She would be right. This means patrons could tell libraries not only which books to keep but also which to purchase. Could they also sue the county to increase its library fund? *See* Tex. Loc. Gov't Code § 323.007 (establishing a "county free library fund").

In a footnote, plaintiffs try to distinguish book removals from purchases. They say libraries have "a wider variety of legitimate considerations" for not buying books, such as "cost," and they assert unbought books will "vastly outnumber" removed books. So what? Plaintiffs

---

[17] *See also Pico*, 457 U.S. at 916 (Rehnquist, J., dissenting) ("The failure of a library to acquire a book denies access to its contents just as effectively as does the removal of the book from the library's shelf.").

[18] *See also Pico*, 457 U.S. at 895 (Powell, J., dissenting) ("If a 14-year-old child may challenge a school board's decision to remove a book from the library, upon what theory is a court to prevent a like challenge to a school board's decision not to purchase that identical book?").

No. 23-50224

can just as easily probe a library's "considerations" for not buying a book as for removing one. Did the library lack funds, or did the librarian dislike the book's views? That's what discovery is for. And it is no answer to say that a failure-to-buy case will be harder to prove than a removal case. Maybe, maybe not. The point is that, once courts arm plaintiffs with a right to contest book removals, there is no logical reason why they cannot contest purchases too.[19]

Third, how would judges decide whether removing a book is verboten? What standard applies? The district court asked whether the library was "substantially motivated" to "deny library users access to ideas" by engaging in "viewpoint or content discrimination." *Little*, 2023 WL 2731089, at *7, 9–10. The panel clarified that libraries *could* remove books that are "[in]accura[te]," "pervasively vulgar," or "educational[ly] [un]suitabl[e]." *Little*, 103 F.4th at 1150, 1154. On en banc, plaintiffs argued the standard was "no viewpoint discrimination." Applying such tests[20] to library book removals would tie courts in endless knots.

---

[19] The dissenting opinion assures us that the "right" it would recognize is "not an affirmative right to demand access to particular materials," nor would it "require Llano County either to buy and shelve" particular books. Dissent at 24. Yet the dissent offers no reason for believing that beyond its own say-so. The dissent merely asserts that removing a book somehow "prescribe[s] . . . orthodoxy," while not purchasing a book does not. *Id.* at 24–25. But that distinction makes no sense. A library can "prescribe orthodoxy" just as easily by refusing to buy a book as by removing it.

[20] The dissenting opinion proposes yet another standard. Drawing from Justice White's *Pico* opinion, it would forbid officials from removing books because they find them "inappropriate, offensive, or otherwise undesirable." Dissent at 32. We have already explained, however, that White's opinion endorsed no First Amendment standard. *Ante* at 15–17. But putting that aside, the dissent's standard contradicts both the now-vacated panel majority and our *Campbell* decision, which the dissent purports to champion. *See* Dissent at 13–15 (defending *Campbell*). Both the panel majority and *Campbell* allowed removal of books deemed "pervasively vulgar" or "educationally unsuitable." *See Little*, 103 F.4th at 1154 (quoting *Campbell*, 64 F.3d at 188–89). Indeed, the dissent's absolutist view even

No. 23-50224

Consider one of the challenged books: *It's Perfectly Normal*, a book for "age 10 and up" that features cartoons of people having sex and masturbating. *See Little*, 103 F.4th at 1183–84 & n.34 (Duncan, J., dissenting).[21] If the library removed the book because of the pictures, as plaintiffs claim, did it violate the First Amendment? Surely the library wanted to "deny access" to the book's "ideas." So, yes. And surely the library "discriminated" against the book's "content." So, yes again. But the library also deemed the book "educationally unsuitable" for 10-year-olds. So, no. And it likely found the book "vulgar," but perhaps not "pervasively." So, maybe. No surprise, then, that the panel majority split over whether removing *It's Perfectly Normal* was permitted.[22]

Or consider a hypothetical that came up at oral argument. O.A. Rec. at 37:15–37:45. A library discovers on its shelves a racist book by a former Klansman. *See, e.g.*, DAVID DUKE, JEWISH SUPREMACISM: MY AWAKENING ON THE JEWISH QUESTION (2003). Can it be removed?

---

contradicts Justice Brennan's *Pico* opinion, which also suggested a school library could remove "pervasively vulgar" books. *See Pico*, 457 U.S. at 871 (op. of Brennan, J.).

[21] *See* ROBIE H. HARRIS AND MICHAEL EMBERLEY, IT'S PERFECTLY NORMAL: CHANGING BODIES, GROWING UP, SEX, GENDER, AND SEXUAL HEALTH (The Family Library 2021). Quoting one witness, the dissenting opinion describes *It's Perfectly Normal* as "a general health book . . . for ages 10 to 12" that "includes illustrations of adults in adult situations." Dissent at 3 (cleaned up). But that benign description hardly captures why a parent of a 10-year-old might object to the book. *See Little*, 103 F.4th at 1184 (Duncan, J., dissenting) (showing one of the explicit cartoon depictions of sexual activity in *It's Perfectly Normal*).

[22] *Compare Little*, 103 F.4th at 1154 n.12 (Wiener, J.) (removing *It's Perfectly Normal* is impermissible because it expresses "a viewpoint sufficient to support an unconstitutional motivation under *Campbell*"), *with id.* at 1158–59 (Southwick, J., concurring) (removing *It's Perfectly Normal* is "likely permissible" because it was "removed as part of the library's efforts to respond to objections that certain books promoted grooming and contained sexually explicit material that was not appropriate for children"). The majority also split over removing the "Butt and Fart Books" and *In the Night Kitchen*. *Id.* at 1154 n.12.

No. 23-50224

If the library deems the book "inaccurate" or "educationally unsuitable," yes. But if the library dislikes its content or viewpoint, no. The problem is obvious: deeming a book "inaccurate" or "unsuitable" is often *the same thing* as disliking its "content" and "viewpoint." Judges might as well flip a coin.

It is worth noting plaintiffs' view on this question. Incredibly, they maintain the First Amendment forbids removing even racist books. They defended that position before the panel: a librarian, they insisted, cannot remove "a book by a former Grand Wizard of the Ku Klux Klan" if she dislikes its view that "black people are an inferior race." *Little*, 103 F.4th at 1172–73 (Duncan, J., dissenting). At en banc, they doubled down. *See* O.A. Rec. at 37:34–45 ("My answer is still no, Judge Duncan."). Astonishing. Who knew that the First Amendment requires libraries to shelve the collected works of the Ku Klux Klan?[23]

That is, of course, utter nonsense. "[I]f a library had to keep just any book in circulation—no matter how out-of-date, inaccurate, biased, vulgar, lurid, or silly," then "[i]t would be a warehouse, not a library." *Id.* at 1167 (Duncan, J., dissenting). That is confirmed, not only by common sense, but also by the practices of leading library associations.

---

[23] The dissenting opinion dismisses such inquiries as mere "rhetorical questions." Dissent at 15. Not so. Courts sensibly ask whether a proposed rule could lead to absurd consequences. *See, e.g., Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993) (rejecting Establishment Clause rule barring religious groups from receiving general public benefits because, otherwise, "a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair") (citation omitted). Notably, the dissent declines to say whether its own rule would forbid a library's removing a racist book. But the answer seems clear. If the First Amendment prohibits a public library from removing a book because of its "inappropriate, offensive, or . . . undesirable" content, Dissent at 32, then the library could not constitutionally remove from its shelves even the most noxious racist screed. That is reason enough to reject the dissent's proposed rule.

No. 23-50224

For example, a Texas weeding manual instructs librarians to weed "books that contain stereotyping … or gender and racial biases," "unbalanced and inflammatory items [about immigration]," and "books that reflect outdated ideas about gender roles." CREW: A Weeding Manual for Modern Libraries, 33, 65, 73 (Texas State Library & Archives Comm'n 2012). Similarly, the American Library Association (ALA) advises librarians to remove "items reflecting stereotypes or outdated thinking; items that do not reflect diversity or inclusion; [and] items that promote cultural misrepresentation." Rebecca Vnuk, The Weeding Handbook: A Shelf-by-Shelf Guide, 6 (ALA Editions, 2d ed. 2022). The same handbook proclaims it is "basic collection maintenance" to remove racist books, such as "the Dr. Seuss books that are purposefully no longer published due to their racist content." *Id.* at 106.[24]

Whatever else one might think of the advice in these guides, it is unmistakably *viewpoint* discrimination. And, by plaintiffs' account, all of it violates the First Amendment. That cannot be the law. By definition, libraries must have discretion to keep certain ideas—certain viewpoints—off the shelves. "The First Amendment does not force public libraries to have a Flat Earth Section." *Little*, 103 F.4th at 1167 (Duncan, J., dissenting).

Finally, by removing a book, the library does not prevent anyone from "receiving" the information in it. The library does not own every copy. You could buy the book online or from a bookstore. You could borrow it from a friend. You could look for it at another library. *See Pico*, 457 U.S. at 915

---

[24] Surprisingly, the ALA joined an *amici* brief that contradicts its own weeding advice. *See* Brief for Amici Curiae Freedom to Read Found. et al., as Amici Curiae at 11–12, 15 (arguing that weeding is based on "viewpoint neutrality," is "not the targeted removal of disfavored or controversial books," and "should not be used as a deselection tool for controversial materials").

No. 23-50224

(Rehnquist, J., dissenting) ("[T]he most obvious reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere."). The only thing disappointed patrons are kept from "receiving" is a book of their choice at taxpayer expense. That is not a right guaranteed by the First Amendment.

### C. *Campbell* is overruled.

That brings us to *Campbell*, where we considered a challenge to a school board's removal of the book *Voodoo & Hoodoo* from school libraries in a Louisiana parish. *See* 64 F.3d at 185. The book, which "trace[d] the development of African tribal religion," featured a "how-to" guide to using "spells, tricks, hexes, [and] recipes . . . to bring about particular events." *Ibid.* Relying on Justice Brennan's *Pico* opinion, *Campbell* ruled the removal implicated students' "First Amendment right to receive information." *Id.* at 188 (citing *Pico*, 457 U.S. at 872 (op. of Brennan, J.)).

Defendants argue *Campbell* was wrongly decided and should be overruled. We agree.

To begin with, *Campbell* drew its holding from one of *Pico*'s "highly fractured" opinions. *Chiras*, 432 F.3d at 619 n.32. But we long ago held, and today reaffirm, that *Pico* lacks precedential value. *See Muir*, 688 F.2d at 1045 n.30 ("We are unable to interpret the Court's opinion in *Pico* to give us guidance in the application of the First Amendment[.]"). What's more, only three of the *Pico* Justices thought students could challenge book removals by asserting a right to receive information. *See Pico*, 457 U.S. at 866–67 (op. of

No. 23-50224

Brennan, J., joined by Marshall and Stevens, JJ.). That idea was rejected by a majority of the Justices.[25]

They were right to do so. Yes, cases protect your right to receive information from other people, but none gives you the right to demand it from the government. *See supra* III.A. For good reason. People could tell libraries not only which books to keep but also which to buy. Courts would endlessly split hairs over a library's motives for removing a book. And, most obvious, removing a library book does not deny anyone the chance to read it. The book has not been "banned," as plaintiffs and their *amici* breathlessly claim.[26] People who want the book can buy it or borrow it from somewhere else. *See supra* III.B.

*Campbell* also made little sense on its own terms. It held a library could *not* remove a book to "deny students access to ideas" but *could* remove it for "pervasive[] vulgar[ity]" or "educational suitability." 64 F.3d at 188–89 (citation omitted). Try applying that standard to *Voodoo & Hoodoo*.

The book's "section on voodoo spells," according to parents, "encouraged harmful, antisocial behavior among young readers." *Id.* at 186 (cleaned up). That is putting it mildly. One "spell" required "[o]btain[ing] a piece of the intended victim's hair," while another advised using "menstrual blood, pubic hair, semen, urine, and excrement." *Id.* at 185 n.2. What is the difference between wanting to "deny access" to those ideas and

---

[25] *See id.* at 878 (Blackmun, J., concurring in part and concurring in the judgment); *id.* at 888 (Burger, C.J., dissenting); *id.* at 895 (Powell, J., dissenting); *id.* at 904, 910 (Rehnquist, J., dissenting); *id.* at 921 (O'Connor, J., dissenting); *see also supra* III.A.

[26] *See* Suppl. Brief of Appellees (referring throughout to the 17 "Banned Books"); Brief for Assoc. of Am. Publishers, Inc. et al. as Amici Curiae (same); Brief for Found. for Individual Rts. and Expression as Amicus Curiae at 1, 5, 6, 8–11, 15, 17, 33; Brief for Tex. Freedom to Read Project as Amicus Curiae at 4, 8, 16, 21, 28.

No. 23-50224

thinking they are "vulgar" or "educationally unsuitable"? None. Yet *Campbell*'s holding was grounded on that faux distinction.[27]

Plaintiffs counter that *Campbell* is "straightforward" because it only forbids "viewpoint animus." That is incorrect for at least two reasons.

For starters, *Campbell* is not based on "viewpoint animus," but on whether a library wants to "deny students access to ideas." *Id.* at 188–89. There is nothing straightforward about that standard, as this case vividly shows. The panel majority could not agree how *Campbell* applied to over half of the challenged books. *Compare Little*, 103 F.4th at 1154 & n.12 (Wiener, J.), *with id.* at 1158–59 (Southwick, J., concurring). If federal judges cannot tell whether removing a book violates the First Amendment, how are librarians supposed to? Are they "denying access to ideas" or are they removing books that are "vulgar" or "educationally unsuitable"? Should they keep a constitutional lawyer on staff?

But suppose that *Campbell* only forbids "viewpoint animus," as plaintiffs claim. That works no better. Racism is a viewpoint. So is sexism. So are "quackeries like phrenology, spontaneous generation, tobacco-smoke enemas, Holocaust denial, [and] the theory that the Apollo 11 moon landing was faked." *Id.* at 1167 (Duncan, J., dissenting).[28] If a librarian finds such

---

[27] This lack of internal consistency is further evidence *Campbell* was wrongly decided. After all, "[t]he primary power of any precedent lies in its power to persuade—and poorly reasoned decisions may not provide reliable evidence of the law's meaning." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2280 (2024) (Gorsuch, J., concurring).

[28] *See, e.g.*, LYDIA KANG, QUACKERY: A BRIEF HISTORY OF THE WORST WAYS TO CURE EVERYTHING (2017) (discussing 18th-century notion that "tobacco-smoke enemas" could revive drowning victims); HENRY HARRIS, THINGS COME TO LIFE: SPONTANEOUS GENERATION REVISITED (2002) (discussing "the theory that inanimate material can, under appropriate conditions, generate life forms by completely natural processes"); Audiey Kao, *Medical Quackery: The Pseudo-Science of Health and Well-*

dreck on the shelves, does the First Amendment bar him from removing it? Of course not. *See, e.g.*, Frederick F. Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 106 (1998) ("[One] would hardly disagree . . . with the ability of a librarian to select books accepting that the Holocaust happened to the exclusion of books denying its occurrence.").

Finally, plaintiffs urge us to keep *Campbell* because "librarians in this Circuit have successfully operated under it for nearly 30 years." We disagree. Plaintiffs cite nothing showing what role, if any, *Campbell* has played in controversies over library books.[29] Our court rarely cites *Campbell* and has never applied it until the panel in this case.[30] So, nothing suggests that overruling *Campbell* would upend library administration in this Circuit.

---

*Being*, 2 Virtual Mentor: A.M.A. J. Ethics 30, 30 (Apr. 2000) (explaining that early-20th-century phrenology practitioners purported to examine a person's character by "measur[ing] the conformation of the skull" with a "psychograph"); Deborah E. Lipstadt, Denying the Holocaust: The Growing Assault on Truth and Memory (1994) (discussing history of Holocaust denial).

[29] Nor does the dissenting opinion, which instead baldly asserts that "the lack of substantial post-*Campbell* litigation suggests, if anything, that *Campbell* provides a workable standard for libraries." Dissent at 14 n.7. That is pure speculation. To the contrary, the panel majority's inability to coherently apply *Campbell* in this very case suggests exactly the opposite. *See Little*, 103 F.4th at 176–77 (Duncan, J., dissenting) ("The two judges in the majority cannot agree on how their rules apply to over *half* of the books at issue.").

[30] Indeed, in *Chiras v. Miller*—a case that rejected, among other things, a student's claim that the state violated his right to receive information by not funding a particular textbook—we addressed the precedential value of *Pico* at length without once citing *Campbell*. *See Chiras*, 432 F.3d at 618–20. Whether we have relied on a decision is, of course, not dispositive of its accuracy but does "point[] to clues" indicating whether the decision was correct. *Loper Bright Enterprises*, 144 S. Ct. at 2280; *see also Knick v. Township of Scott*, 588 U.S. 180, 203 (2019) (listing reliance on the decision as relevant *stare decisis* consideration). While lack of citation is by no means the primary reason we overrule *Campbell*, it speaks to our past and current hesitancy to apply precedent that appears incorrect. *See Loper Bright Enterprises*, 144 S. Ct. at 2271 ("[W]e have avoided deferring under *Chevron* since 2016. . . . [F]or decades, we have often declined to invoke *Chevron* even in those cases where it might appear to be applicable.").

In any event, the key factor in deciding whether to overrule *Campbell* is whether its "holding was indeed flawed." *Kauffman*, 981 F.3d at 369. It was. *Campbell* is overruled.

\*\*\*

We hold that plaintiffs cannot challenge the library's decision to remove the 17 books by invoking a right to receive information. Their Free Speech claims must therefore be dismissed.

## IV. GOVERNMENT SPEECH

Defendants, along with 18 *amici* States, separately argue that a public library's collection decisions are government speech and therefore not constrained by the Free Speech clause. We tackle that question as follows.

First (A), we survey the precedents. Second (B), we examine whether a library's collection creates a public forum for third-party speech, which is often the flip side of the government speech question. Third (C), we examine the factors set out by the recent government speech case, *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022).[31] Finally (D), we sum up.[32]

---

[31] The dissenting opinion's entire response to this 25-page analysis consists of one footnote. *See* Dissent at 22 n.14. We respond below to the few points it raises.

[32] Plaintiffs (and the dissent) argue this issue was "waived" because defendants did not raise it before the panel. *See* Dissent at 23 n.14. Not so. The issue was raised and ruled on in the district court, ruled on by the panel majority, and thoroughly explored in en banc briefing. So, the issue is before us. *See Lucio v. Lumpkin*, 987 F.3d 451, 478 (5th Cir. 2021) ("The maxim is well established in this circuit that a party who fails to make an argument before *either the district court* or the original panel waives it for purposes of en banc consideration." (emphasis added) (citation omitted)); *see also Miller v. Texas Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 348–49 (5th Cir. 2005) (en banc) (finding issue forfeited because "TTUHSC failed to raise this argument in its briefs before either the district court or the original panel of this court" and "[n]either did it argue the point in its original en banc brief"). In any event, we have discretion to reach the issue. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("[W]hat questions may be taken up and resolved for the first time on

No. 23-50224

## A. Government speech precedents

The new President gives his inaugural address. ("WE ARE ALL REPUBLICANS, WE ARE ALL FEDERALISTS."). The Army puts up recruiting posters ("I WANT YOU FOR U.S. ARMY."). The Department of Agriculture sponsors an ad campaign. ("BEEF. IT'S WHAT'S FOR DINNER."). *See Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 560–62 (2005). The City of Chicago congratulates the victorious Cubs. ("THE CURSE IS OVER!").

In such cases, it is evident who is speaking: the government. "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff*, 596 U.S. at 251 (citing *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08 (2015)). If the government could not do so, "it is not easy to imagine how government could function." *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009).

People can talk back, of course. They can speak out against (and vote against) policies and officials they disagree with.[33] At the same time, though, "[t]he Free Speech Clause . . . does not regulate government speech." *Summum*, 555 U.S. at 467 (citations omitted). People can protest what the government says, but they cannot sue to make the government say what they

---

appeal is one left primarily to the discretion of the courts of appeals[.]"); *see also Stramaski v. Lawley*, 44 F.4th 318, 326 (5th Cir. 2022) ("[W]e may use our 'independent power to identify and apply the proper construction of governing law' to any 'issue or claim [that] is properly before the court, . . . not limited to the particular legal theories advanced by the parties.'" (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991))).

[33] *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("[A]dvocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression." (citation omitted)); *Walker*, 576 U.S. at 207 (recognizing "it is the democratic electoral process that first and foremost provides a check on government speech").

want. "[W]hen the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff*, 596 U.S. at 247–48.

In some cases, the line between government and private speech "blur[s]." *Id.* at 252; *see also Summum*, 555 U.S. at 470 (noting "situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech"). This is one of them. Most of the books in the Llano County library were written and published by private authors and private firms. They are private speech. Yet the county librarian, along with other county officials, decides which books to buy, buys them with public funds, and manages the library collection. *See* Tex. Loc. Gov't Code §§ 323.001, 323.002, 323.005(c), 323.006, 323.007.

That poses the question: when Llano County shapes its library collection, choosing some books but not others, is the county itself speaking or is the county regulating private speech?

To answer, we turn first to the precedents.

### 1. Supreme Court cases

The most instructive cases are those where a speaker presents a curated collection of third-party speech. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2400 (2024) ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). A newspaper runs certain editorials but not others. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). A cable operator broadcasts some programs but not others. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994). A parade organizer lets in certain floats but not others. *Hurley v. Irish–Amer. Gay, Lesbian and Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 570 (1995). The editors of a poetry collection select works to "express[] their view about the poets and poems that most deserve the attention of their anticipated readers." *Moody*, 144 S. Ct. at 2430 (Alito, J., concurring in the judgment).

No. 23-50224

In such cases, the Supreme Court has held that the speaker is the one who selects, compiles, and presents. *See, e.g.*, *Hurley*, 515 U.S. at 570 (discussing the "speaker[s]" in those cases who "present[ed] … an edited compilation of speech generated by other persons" (citations omitted)). The Court recently put the point this way: "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 144 S. Ct. at 2402; *see also id.* at 2430 (Alito, J., concurring in the judgment) ("[A] compilation may constitute expression on the part of the compiler.").

Like a private person, a government may express itself by crafting and presenting a collection of third-party speech. *See, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity." (citation omitted)). A key precedent illustrating this point is *City of Pleasant Grove v. Summum*, 555 U.S. 460.

In that case, the City created displays in a public park by accepting privately donated monuments, including one of the Ten Commandments. *Id.* at 464–65. A religious organization asked the City to include its own monument. *Id.* at 465. When the City refused, the organization sued, arguing the City violated the Free Speech Clause by engaging in viewpoint discrimination. *Id.* at 466.

The Supreme Court disagreed. The City's selecting some monuments over others "constitute[s] government speech." *Id.* at 472–74. It did not matter that the monuments were works by private sculptors. *Id.* at 464. The relevant expression was the City's choosing the ones it wanted. *Id.* at 473 ("The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all

No. 23-50224

who frequent the Park[.]"). The City could "express its views," the Court explained, even "when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Id.* at 468 (citing *Johanns*, 544 U.S. at 562).[34]

*Summum* maps neatly onto our case. Just as the City of Pleasant Grove selected private speech (monuments) and displayed that speech in a park, the Llano County library selects private speech (books) and features them in the library. The relevant expression lies not in the monuments or the books themselves, but in the government's selecting and presenting the ones it wants. And in both cases the government sends a message. Pleasant Grove said, "These monuments project the image we want." *See Summum*, 555 U.S. at 473. Llano County says, "These books are worth reading."

Plaintiffs object that, while a City's selecting monuments for a park is an expressive act, a library's selecting books for a library does not convey "any particular message to the public." We disagree.

Consider one of the precedents cited by *Summum*: the plurality opinion in *ALA*, 539 U.S. 194. *See Summum*, 555 U.S. at 478 (citing *ALA*, 539 U.S. at 205 (plurality)). *ALA* addressed a federal law giving libraries money for internet access, provided they installed filters to block obscene or otherwise illegal material. *ALA*, 539 U.S. at 199 (plurality). In rejecting a Free Speech challenge to the law, the four-Justice plurality[35] relied heavily on libraries' broad discretion to shape their collections. *See id.* at 207 (plurality)

---

[34] As we discuss below, the Court also held that the City did not create a public forum for private speech. *Id.* at 478–80. *See infra* IV.B.

[35] *See* 539 U.S. at 198, 214 (plurality); *id.* at 214 (Kennedy, J., concurring in the judgment); *id.* at 215 (Breyer, J., concurring in the judgment).

No. 23-50224

(describing internet as "a technological extension of the book stack" (citation omitted)).

Again and again, the plurality emphasized the expressive character of a library's collection decisions. A library's "goal" in choosing books is to "provide materials that would be of the greatest direct benefit or interest to the community," to "collect only those materials deemed to have requisite and appropriate quality," and to "identif[y] suitable and worthwhile material." *Id.* at 204, 208 (plurality) (quotation omitted). To drive the point home, the plurality quoted this advice from a library manual: "The librarian's responsibility . . . is to separate out the gold from the garbage[.]" *Id.* at 204 (plurality) (quoting W. Katz, Collection Development: the Selection of Materials for Libraries 6 (1980)).

The governments in *ALA* and *Summum* each engaged in the "expressive activity" of selecting and presenting private speech. *Moody*, 144 S. Ct. at 2400. The library "decid[ed] what private speech to make available to the public," *ALA*, 539 U.S. at 204 (plurality) (citation omitted), just as the City "decided to accept . . . donations [of monuments] and to display them in the Park." *Summum*, 555 U.S. at 472. Both were "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items." *Moody*, 144 S. Ct. at 2402. And, as discussed below, public libraries have been doing precisely that since they arose in the mid-19th century. *See infra* IV.C.

In sum, Supreme Court precedent teaches that someone may engage in expressive activity by curating and presenting a collection of someone else's speech. *See Moody*, 144 S. Ct. at 2400, 2402; *id.* at 2430 (Alito, J., concurring in the judgment); *Hurley*, 515 U.S. at 570; *Turner Broad.*, 512 U.S. at 636; *Miami Herald*, 418 U.S. at 258. Governments can speak in this way,

no less than private persons. *See Summum*, 555 U.S. at 472–73; *Forbes*, 523 U.S. at 674.

Take any public museum—say, the National Portrait Gallery. The Gallery selects portraits and presents them to the public. Its message is: "These works are worth viewing."[36] A library says the same thing through its collection: "These books are worth reading." The messages in both cases are the government's.[37]

## 2. Circuit cases

Next, we consider circuit cases that, like *Summum*, treat the government's selective presentation of third-party speech as the government's own expression. Indeed, one of those, *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005), states in *dictum* that "[w]ith respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."

For instance, in *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314 (1st Cir. 2009), plaintiffs sued a town for refusing to include their hyperlink on the

---

[36] Indeed, the Gallery's stated mission is "to tell the story of America" through its selection of portraits. *See About us*, NATIONAL PORTRAIT GALLERY (Dec. 11, 2024), https://perma.cc/XKD9-ECE4.

[37] What response does the dissenting opinion offer to our discussion of these numerous Supreme Court precedents? None at all. The dissent does not address *Moody*, nor *Miami Herald*, nor *Turner Broadcasting*, nor *Forbes*, nor *Hurley*, nor *Summum*, nor *ALA*. Nor does the dissent discuss (or even cite) any of the circuit precedents we discuss below. Indeed, the only substantive contribution the dissent makes is to misstate our holding. Contrary to the dissent's view, we do not hold that "the government may 'speak' by removing library books for any reason." Dissent at 24. That tendentious formulation appears nowhere in our opinion. Instead, we hold that the county library speaks here by compiling and curating a collection of third party speech, a task that by definition involves selecting some books while excluding others. *See, e.g.*, *PETA*, 414 F.3d at 28 ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

town's website. Applying *Summum* and *ALA*, the First Circuit rejected the plaintiff's Free Speech challenge: "[T]he Town engaged in government speech by establishing a town website and then selecting which hyperlinks to place on its website." *Id.* at 331 (citing *Summum*, 539 U.S. at 472–74). When government "uses its discretion to select between the speech of third parties for presentation" through government channels, "this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech." *Id.* at 330 (citing *Summum*, 539 U.S. at 470–77).

Similarly, in *Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Nat. Res.*, 584 F.3d 719, 721 (7th Cir. 2009), plaintiffs sued an agency for refusing to include their "scary two-page pamphlet" in park display racks. The pamphlet warned about "asbestos contamination" at park beaches. *Ibid.* Applying *Summum*, the Seventh Circuit rejected plaintiffs' Free Speech challenge by characterizing the selection of materials as government expression "designed to attract people to the park." *Id.* at 724–25 (citing *Summum*, 539 U.S. at 467–68). As the court explained:

> The [agency's] choice of materials conveys a message that is contradicted by the plaintiff's pamphlet. The message of the publications in the display racks is: come to the park and have a great time on the sandy beaches. The message of the plaintiff's pamphlet is: you think you're in a nice park but really you're in Chernobyl[.]

*Id.* at 725. The court also highlighted the absurdity of a viewpoint neutrality requirement: "Must every public display rack exhibit on demand pamphlets advocating nudism, warning that the world will end in 2012, . . . or proclaiming the unconstitutionality of the income tax, together with pamphlets expressing the opposing view on all these subjects?" *Ibid.* (citation omitted).

No. 23-50224

Particularly helpful is the D.C. Circuit's decision in *PETA v. Gittens*, 414 F.3d 23. For its public art program called "Party Animals," the District of Columbia solicited designs for donkey and elephant sculptures. *Id.* at 25. Designs chosen by the District would be displayed at prominent locales. *Id.* at 26. PETA submitted two elephant designs, "one of a happy circus elephant, the other of a sad, shackled circus elephant with a trainer poking a sharp stick at him." *Ibid.* After the District "accepted the happy elephant, but rejected the sad one," PETA sued under the Free Speech Clause. *Ibid.* The district court granted a preliminary injunction requiring the District to display the sad elephant. *Id.* at 27.[38] The D.C. Circuit reversed.

The District's choice of some designs over others, the court held, was the District's own speech. *Id.* at 28 (citing *Forbes*, 523 U.S. at 674). The court distinguished the District's speech from the artists' speech, using the analogy of public library books: "As to the message any elephant or donkey conveyed, this was no more the government's speech than are the thoughts contained in the books of a city's library." *Ibid.* Nonetheless, government speech was still present:

> With respect to the public library, *the government speaks through its selection of which books to put on the shelves and which books to exclude*. In the case before us, the Commission spoke when it determined which elephant and donkey models to include in the exhibition and which not to include.

*Ibid* (emphasis added).[39]

―――――――――――――

[38] This version "depict[ed] a shackled elephant crying" with a "sign tacked to the elephant's side [that] read: 'The Circus is coming. See SHACKLES–BULL HOOKS–LONELINESS. All under the 'Big Top.'" *Id.* at 26.

[39] While *PETA* pre-dated *Summum*, its analysis anticipated the Supreme Court's. *See id.* at 29 ("First Amendment constraints do not apply when the [government] authorities engage in government speech by installing sculptures in the park. If the

No. 23-50224

Finally, our circuit has also applied the *ALA* plurality in the government speech context. *Chiras v. Miller* considered a Free Speech challenge to the Texas State Board of Education's ("SBOE") decision not to select a textbook for the state curriculum. 432 F.3d 606, 611–15 (5th Cir. 2005). The textbook's author claimed the SBOE engaged in viewpoint discrimination by rejecting his book. *Id.* at 611. We disagreed. Relying on *ALA* (among other decisions), we held: "[W]hen the SBOE devises the state curriculum for Texas and selects the textbook with which teachers will teach to the students, *it is the state speaking*, and not the textbook author." *Id.* at 614 (emphasis added); *see ibid.* (discussing *ALA*, 539 U.S. at 205).[40]

In sum, these circuit decisions follow the lessons of *Summum* and other cases about the selection and presentation of third-party speech. By selecting, compiling, and presenting a collection of another person's speech, the government expresses its own views. It may do so by selecting hyperlinks for a town website, or pamphlets for a park display rack, or statues for a public art display, or textbooks for a state curriculum. It may also do so by selecting books for a library's collection.

---

authorities place a statue of Ulysses S. Grant in the park, the First Amendment does not require them also to install a statue of Robert E. Lee.").

[40] *Chiras* also relied on two Supreme Court decisions that anticipated *Summum*. The Court's decision in *Ark. Educ. Television Comm'n v. Forbes*, we noted, recognized that "public broadcasters exercise a wide degree of discretion when making programming decisions." *Chiras*, 42 F.3d at 613 (citing *Forbes*, 523 U.S. at 673). Similarly, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), recognized that an "art funding program . . . required the NEA to use content based criteria in making funding decisions." *Chiras*, 432 F.3d at 614. The *ALA* plurality likewise drew on *Forbes* and *Finley* in recognizing libraries' discretion to shape their collections. *See ALA*, 539 U.S. at 204–05 (plurality) (discussing *Forbes* and *Finley*).

No. 23-50224

### *3. Some objections*

Most of plaintiffs' objections to applying the government speech doctrine focus on the *Shurtleff* factors, so we address those below. *See infra* IV.C.1. We address a few broad objections here, however.

First, plaintiffs contend that "censoring public library books is not government speech." That is wordplay, not argument. Any of the government speech cases just discussed could be tendentiously reframed as the government "censoring" private speech. For instance, someone could have accused the City in *Summum* of "censoring" the monuments it rejected for its display. Or someone could have said the District of Columbia in *PETA* was "censoring" the sad elephant statue it rejected. Courts do not frame the question that way, though. Instead, they ask whether a government's selective compilation and presentation of third-party speech constitutes government speech. *See Summum*, 555 U.S. at 468; *PETA*, 414 F.3d at 30. Plaintiffs do not confront that question.[41]

Second, plaintiffs warn that finding government speech here will dangerously "expand" the doctrine, setting the stage for government to "silence or muffle" protected speech. To support this argument, plaintiffs rely heavily on the Supreme Court's decision in *Matal v. Tam*, 582 U.S. 218 (2017).[42] Plaintiffs are mistaken.

---

[41] Plaintiffs also suppose that the claimed government speech here is merely a library's "warranting" that books "are of a particular[] quality." Not so. A library selects books it thinks suitable, buys them with public funds, and presents a curated collection to the public. That is the "expressive activity" at issue, *Moody*, 144 S. Ct. at 2400, not merely the government's putting its seal of approval on a book.

[42] The dissenting opinion also claims our government speech holding "contradicts" *Matal*, *see* Dissent at 23 n.14, but does not explain how.

No. 23-50224

In *Matal*, the federal Patent and Trademark Office ("PTO") refused to place a rock band's name on the principal register because it found the name ("THE SLANTS") was "disparaging" under trademark law. *See* 582 U.S. at 227–29. The Supreme Court held this violated the band leader's Free Speech rights by discriminating based on viewpoint. *See id.* at 243–44, 247.

For several reasons, the Court rejected the PTO's argument that "the content of a registered mark is government speech." *See id.* at 236, 234–39. For instance, the PTO registers marks without asking whether the government agrees with a mark's viewpoint. *Id.* at 235. And how could one put into the government's mouth the "content" of millions of registered marks, many of which express conflicting views? *Id.* at 236 ("If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently."). Moreover, "[t]rademarks have not traditionally been used to convey a Government message." *Id.* at 238. Finally, the PTO does not "approv[e]" a mark by registering it, nor does the public think the government adopts "the contents" of marks. *Id.* at 237, 238.

*Matal* has no bearing here. To begin with, the claimed government speech is entirely different. Defendants argue that a library speaks by selecting and presenting a collection of books. *See Moody*, 144 S. Ct. at 2400 ("[E]xpressive activity includes presenting a curated compilation of speech originally created by others."). In *Matal*, by contrast, the PTO argued the government spoke through the actual content of the marks. *See Matal*, 582 U.S. at 236 (rejecting PTO's "far-fetched" argument that "the content of a registered mark is government speech"). The two cases would be equivalent only if Defendants claimed the library's speech lay in the words of the books themselves. No one argues that, though. *See PETA*, 414 F.3d at 28 ("Those who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message.").

No. 23-50224

*Matal* also lacks the expressive elements present here. While a library selects only the books it wants, the PTO does not register only the marks it likes; registering all qualified marks is "mandatory." *Matal*, 582 U.S. at 235. Similarly, the register is not a curated compilation—rather, it is a listing of millions of marks that "meet[] the Lanham Act's viewpoint-neutral requirements." *Ibid.* Nor is the register presented to the public; to the contrary, few people "ha[ve] any idea what federal registration of a trademark means." *Id.* at 237. And, while trademarks have never been thought to convey government messages, libraries' collection decisions (as discussed in IV.C, *infra*) have traditionally conveyed the library's view of worthwhile literature.

Finally, *Matal*'s concerns about expanding government speech are not implicated here. The Court worried that, "[i]f federal registration makes a trademark government speech," then someone could say the same about copyright. *See id.* at 239 ("[W]ould the registration of the copyright for a book produce a similar transformation?"). This case raises no such worry. No one supposes that, by choosing books, the library transforms the books themselves into government speech. The library's speech consists only in presenting a curated collection of books to the public. *See Moody*, 144 S. Ct. at 2402 ("expressive activity" consists in "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items").

In sum, recognizing the library's activity as government speech raises no danger of the government's suppressing someone else's speech. The books a library excludes from its shelves do not vanish into thin air. They remain available elsewhere for anyone to read. *See Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting) ("[T]he most obvious reason that petitioners' removal of the books did not violate respondents' right to receive information is the ready availability of the books elsewhere.").

No. 23-50224

### B. Public forum doctrine

Another way of looking at the government speech issue is to ask whether a library, by selecting books, creates a public forum. In cases where the government displays third-party speech, the government speech and public forum doctrines are often two sides of the same coin. The government argues that it is speaking (and so can say what it wants), while plaintiffs counter that the government has created a public forum (where viewpoint discrimination is forbidden). *See Shurtleff*, 596 U.S. at 252 (asking whether "government–public engagement transmit[s] the government's own message" or whether "it instead create[s] a forum for the expression of private speakers' views").[43] The public forum argument has dropped out of this case, but it is still helpful to illustrate the nature of the expression represented by a library's collection.[44]

Forum analysis assesses when government can regulate private speech on property it owns or controls. *See generally Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426–27 (5th Cir. 2020) ["*FFRF*"]. In traditional public fora—sidewalks, streets, and parks—the government has little regulatory leeway: content- or viewpoint-based restrictions are strictly scrutinized. *FFRF*, 955 F.3d at 426 (citing *Fairchild v. Liberty Indep. Sch.*

---

[43] *See also Summum*, 555 U.S. at 478, 472 (rejecting forum analysis while accepting government speech); *PETA*, 414 F.3d at 28 (same); *Walker*, 576 U.S. at 208–09, 214–15 (accepting government speech while rejecting forum analysis); *cf. id.* at 233–34 (Alito, J., dissenting) (accepting forum analysis while rejecting government speech).

[44] In granting a preliminary injunction, the district court relied in part on the notion that public libraries are limited public fora. *See Little*, 2023 WL 2731089, at *7 n.4. Plaintiffs defended that view at the panel stage, *see Little*, 103 F.4th at 1174 (Duncan, J., dissenting), but the panel majority did not adopt it. *See id.* at 1149; *see also id.* at 1174 (Duncan, J., dissenting). At en banc, plaintiffs no longer relied on the argument.

No. 23-50224

*Dist.*, 597 F.3d 747, 758 (5th Cir. 2010)).[45] The government has more latitude in "limited" public fora, which are "places that the government has opened for public expression of particular kinds or by particular groups." *Ibid.* (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam)). There, restrictions are valid if they are "(1) reasonable in light of the purpose served by the forum and (2) do[] not discriminate against speech on the basis of viewpoint." *Id.* at 426–27.

To support their forum argument at the panel stage, Plaintiffs pointed to three sister-circuit decisions that deem libraries some kind of public forum. Those cases have no bearing on the question before us, however. They address whether libraries may evict people from their premises—such as sex offenders, shoeless persons, or a vagrant who menaced library staff and whose "odor was often so offensive that it prevented the [l]ibrary patrons from using certain areas of the [l]ibrary." *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1115 (10th Cir. 2012) (sex offenders); *Neinast v. Bd. of Tr. of the Columbus Metro. Libr.*, 346 F.3d 585, 589 (6th Cir. 2003) (shoeless man); *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1247–48 (3d Cir. 1992) (menacing, odiferous vagrant). Those courts answered that question by treating a library's premises as a public forum. *See, e.g.*, *Kreimer*, 958 F.2d at 1259 (library at issue "constitutes a limited public forum").

We need not decide whether this analysis was correct. It is one thing to say that a public library's *premises* may constitute some kind of public forum. A library might open one of its rooms to poetry readings by the public

---

[45] The same standard applies to "designated" public fora, which are "places that the government has designated for the same widespread use as traditional public forums." *Ibid.* (citation omitted). In either traditional or designated public fora, however, the government may impose reasonable restrictions on the time, place, and manner of private speech. *See, e.g.*, *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (citation omitted).

and thereby create a limited public forum. *See, e.g.*, *id.* at 1259–60 (concluding library was "a limited public forum" because "the government intentionally opened the Library to the public for *expressive activity*"). It is entirely another thing, though, to extend this concept to a library's *bookshelves*. Plaintiffs' cases lend no support for that. They address only whether a library can evict *people*. *See, e.g.*, *Neinast*, 346 F.3d at 592 (upholding no-shoes policy because it avoided "tort claims brought by library patrons who were injured because they were barefoot"). They say nothing about whether a library can evict *books* from its shelves.

More to the point, it makes no sense to apply forum analysis to a library's collection. Library shelves are not a community bulletin board: they are not "places" set aside "for public expression of particular kinds or by particular groups." *FFRF*, 955 F.3d at 426. If they were, libraries would have to remain "viewpoint neutral" when choosing books. *See Summum*, 555 U.S. at 470 (limited public fora's restrictions must be "viewpoint neutral"). That would be absurd. Libraries choose certain viewpoints (or range of viewpoints) on a given topic. But they may exclude others. A library can have books on Jewish history without including the Nazi perspective. *See, e.g.*, Schauer at 106 (explaining a librarian may choose books "accepting that the Holocaust happened to the exclusion of books denying its occurrence"). Forum analysis has no place on a library's bookshelves.

This conclusion is supported by the government speech cases discussed above. *See supra* IV.A.1–2. Start again with *Summum*. In addition to ruling that the City was speaking by choosing monuments, the Court also ruled that the City did not create a public forum. Allowing "a limited number of permanent monuments" was not the same as opening the park for "the delivery of speeches [or] the holding of marches." *Summum*, 555 U.S. at 478. The park obviously had limited space. And it would be absurd to bar the City from engaging in "viewpoint discrimination" when choosing monuments.

"On this view," the Court noted, the United States could have accepted the Statue of Liberty only by "providing a comparable location" for, say, a "Statue of Autocracy." *Id.* at 479. "[P]ublic forum principles," then, were "out of place in the context of th[at] case." *Id.* at 478 (quoting *ALA*, 539 U.S. at 205 (plurality)).

Or consider the D.C. Circuit's *PETA* decision. Also citing *ALA*, the court held the District did not create a public forum. *PETA*, 414 F.3d at 29 (quoting *ALA*, 539 U.S. at 204–05 (plurality)). By choosing statues for display, the District was speaking for itself, not regulating private speech. The government "may run museums, libraries, television and radio stations, primary and secondary schools, and universities," and "[i]n all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *Id.* at 29 (citation omitted).

Finally, consider *ALA* itself. The plurality squarely rejected the notion that a library's collection is a public forum. "A public library does not acquire Internet terminals in order to create a public forum," the plurality explained, "any more than it collects books in order to provide a public forum for the authors of books to speak." *ALA*, 539 U.S. at 206 (plurality). We have followed *ALA* on this point. *See Chiras*, 432 F.3d at 614 (relying on *ALA* for proposition that neither forum analysis nor heightened scrutiny apply to libraries' collection decisions) (citing *ALA*, 539 U.S. at 205 (plurality)).

In sum, neither law nor logic supports the notion that a public library's book collection is a public forum. This reinforces the conclusion that a library's collection decisions are government speech and not the regulation of private speech.

## C. *Shurtleff* factors

In en banc briefing, the parties raised additional arguments about government speech under *Shurtleff v. City of Bos.*, 596 U.S. 243 (2022). In that case, the City of Boston allowed private parties to fly flags of their choosing on the city flagpole. The Supreme Court held the City was not engaging in government speech but instead had created a limited public forum. *Id.* at 248. As a result, the City could not refuse a group's request to fly a "Christian flag" because that would constitute viewpoint discrimination. *Ibid.*

In deciding the program was not government speech, the Court considered certain kinds of evidence: "[1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; [3] and the extent to which the government has actively shaped or controlled the expression." *Id.* at 252 (brackets added) (citing *Walker*, 576 U.S. at 209–214).

All three factors support the conclusion that a library's choice of the books on its shelves is government speech. We consider each in turn.[46]

### 1. History of the expression

Public libraries, in the modern sense, arose in the United States in the mid-19th century. *See generally* JESSE H. SHERA, FOUNDATIONS OF THE AMERICAN PUBLIC LIBRARY (1949); JOECKEL, THE GOVERNMENT OF THE AMERICAN PUBLIC LIBRARY (1935). Their

---

[46] The dissenting opinion's entire response to this nine-page analysis is to cite a sister-circuit case and peremptorily assert that "none of [the *Shurtleff*] factors supports a conclusion that library book removals constitute government speech." Dissent at 23 n.14 (citing *Reynolds*, 114 F.4th at 667–68).

earliest precursors were private religious libraries, which consisted mostly of the Bible and theological works.[47]

These were followed by "social libraries," where private individuals contributed funds to buy books. Shera at 59. The first was founded by Benjamin Franklin in 1731. *See* Michael H. Harris, History of Libraries in the Western World, 184 (1995). Such ventures, hundreds of which were chartered by the colonies, had the purpose of "propagat[ing] 'virtue, knowledge, and useful learning.'" Shera at 59–60 (discussing 1747 charter of the Redwood Library Company of Newport).[48] Their largely theological collections were privately endowed but available to the public. *See id.* at 25, 29, 102–06.

Around the same time there arose "circulating libraries," which were privately-owned and subscription-based. *See* David Kaser, A Book for Sixpence: The Circulating Library in America (1980). In contrast to social libraries, circulating libraries tended to have a larger share of popular novels. *Id.* at 86; Shera at 222–23.

By the mid-19th century, several municipalities had created "public" libraries, funded and controlled by the government and meant to strengthen the educational mission of social libraries. *See* Joeckel at 24; *see also id.* at 15 (discussing 1833 "free circulating library" of Petersborough, New

---

[47] *See* Shera at 20 (discussing founding of religious libraries by Captain Robert Keanye in the mid-17th century and Rev. Thomas Bray in the late-17th century).

[48] *See id.* at 238 (quoting 1771 constitution of the Social Library of Salisbury, Connecticut that library existed for the "promotion of Virtue, Education, and Learning and . . . the discouragement of Vice and Immorality"); *see also* Harris at 187 (1995) ("The nation's social libraries were generally promoted as serious sources of knowledge for those who desired to improve themselves. They did not, at least openly, cater to the public taste for romance and popular fiction, choosing instead to purchase only the best nonfiction and some few classic works of fiction.").

Hampshire). Their collections were curated to foster education and virtue. Shera at 222–25.[49] Similarly, the first municipal public library recognized by state statute, the 1848 Boston Public Library, was considered by its Board of Trustees to be "the means of completing our system of public education." Joeckel at 17; Shera at 175.

In light of public libraries' avowed educational mission, content selection was critical. For instance, by 1834, the Petersborough Town Library's collection consisted overwhelmingly of historical, biographical, and theological works. Shera at 166. Novels, despite their popularity, occupied a mere 2% of the collection. *Ibid.* This was no accident: many educators, echoing Thomas Jefferson, found novels "poison[ous]" and "trashy." *Id.* at 222–23; Kaser at 88–90.

The same was true of state libraries. New York's 1835 library law, establishing the first statewide tax-supported library, considered the public library an "educational agency" and charged the state superintendent with creating lists of suitable books. Joeckel at 9, 12; *see also* Shera at 183–84 (discussing subsequent creation of statewide library systems in Connecticut, Rhode Island, Michigan, Iowa, Indiana, Ohio, and Wisconsin). Collections weeded books promoting "improper" morality, with the result that fiction was mostly excluded. *See* Kaser at 88 (discussing Horace Mann's views on social ills caused by novels). So, for instance, in 1851 Representative John Wight urged Massachusetts to establish public libraries to "promot[e] virtue,

---

[49] *See also id.* at 168 (observing that the Rev. Abiel Abbot, the Petersborough library chairman, viewed the library "as a factor in public education and in the spread of knowledge and virtue among his people").

reform . . . vice, increase . . . morality," and "diminish[] the circulation of low and immoral publications." SHERA at 239.[50]

The lesson from this historical sketch is obvious: by shaping their collections, public libraries were speaking, loudly and clearly, to their patrons. "These books will educate and edify you. But the books we have kept off the shelves—trashy novels, for instance—aren't worth your time." Patrons might have disagreed; maybe they wanted to read *Madame Bovary* (1856) or *The Woman in White* (1859). Be that as it may, the public library's view on edifying literature was quintessential government speech.

Today, public libraries convey the same message to the reading public. True, the message's content has changed: what today's Library Board thinks is worth reading is likely not what the Petersborough Town Council thought in 1833 nor the Massachusetts Legislature in 1851. But governments— through those who curate collections—still propose which books, in their view, merit the public's attention. They do so through the unsubtle act of including some books and excluding others.

Just take a look at the 2012 Texas State Library "CREW"[51] guide. *See generally* CREW: A WEEDING MANUAL FOR MODERN LIBRARIES

---

[50] *See also* HARRIS at 247 ("Public library philosophy up through the 19th century was characterized by a decidedly authoritarian and missionary cast. Justin Winsor, who served as President of the American Library Association for the first ten years of its existence, clearly stated this thrust when he noted that the public library could be wielded as a 'great engine' for 'good or evil' among the 'masses of the people.'"); SIDNEY HERBERT DITZION, ARSENALS OF A DEMOCRATIC CULTURE: A SOCIAL HISTORY OF THE AMERICAN PUBLIC LIBRARY MOVEMENT IN NEW ENGLAND AND THE MIDDLE STATES FROM 1850 TO 1900, 87 (1947) ("The public library moreover offered as its primary contribution the shaping of unformed and of ill-formed tastes in things cultural.").

[51] As previously noted, "CREW" stands for **C**ontinuous **R**eview, **E**valuation, and **W**eeding. The CREW guide is available online at: https://perma.cc/PH33-HR2R.

No. 23-50224

(Texas State Library & Archives Comm'n 2012). This is the official guide to curating collections in Texas libraries. The practice of weeding and the CREW guide are discussed extensively by the plaintiffs and their *amici*.[52] Surprisingly, though, plaintiffs portray weeding as entirely non-ideological. They claim weeding is based on "neutral criteria" and "more akin to maintenance work than intentional control of the specific content made available to the public." Appellees' Supp. Br. at 30–31.[53]

But the CREW guide shows the opposite is true. Public libraries are told to weed the following:

- "[B]iased, racist, or sexist terminology or views."
- "[S]tereotypical images and views of people with disabilities and the elderly, or gender and racial biases."
- "[O]utdated philosophies on ethics and moral values."
- "[B]ooks on marriage, family life, and sexuality . . . [are] usually outdated within five years."
- "[B]ooks with outdated [political] ideas."
- "[B]iased or unbalanced and inflammatory items [about immigration]."
- "[O]utdated ideas about gender roles in childrearing."
- "Art histories . . . [with] cultural, racial, and gender biases."

---

[52] *See* Appellees' Supp. Br. at 30–31; Brief for Amici Freedom to Read Found. et al. as Amici Curiae, at 8–9 & n.27.

[53] Similarly, *amici* Freedom to Read, the Texas Library Association, and the American Library Association assert that "[w]eeding is not the removal of books that, in the view of government officials, contain 'inappropriate' ideas or viewpoints" and is not "a deselection tool for controversial materials." Brief for Freedom to Read Found. et al. as Amici Curiae at 8–9. These statements are flatly contradicted by the parts of the CREW guide quoted below. They are also contradicted by the ALA's own weeding guide.

- "[Children's] books that reflect racial and gender bias" or have "erroneous and dangerous information."

CREW at 19, 33, 63, 64, 65, 73, 76, 77, 81, 82.

Similarly, the American Library Association also advises librarians to remove "items reflecting stereotypes or outdated thinking; items that do not reflect diversity or inclusion; [and] items that promote cultural misrepresentation." *See* Vnuk at 6; *see supra* III.B (discussing ALA weeding handbook). For instance, the handbook's chapter on "Diversity and Inclusion" warns librarians that "children's books have overwhelmingly featured white faces" and encourages them to include works that "represent diverse people of different cultures, ethnicities, gender identities, physical abilities, races, religions, and sexual orientation." Vnuk at 105. More specifically, it advises that it is "basic collection maintenance" to "[r]emov[e] the Dr. Seuss books that are purposefully no longer published due to their racist content." *Id.* at 106.[54]

This guidance would be right at home in 1850s Massachusetts. *See* Shera at 239 (recounting Rep. Wight's 1851 argument that libraries would "diminish[] the circulation of low and immoral publications"). To be sure, today's librarian may have a different idea of what constitutes a "low and immoral publication." But the song remains the same: officials, both in 1851 and 2024, are telling the public which books will "promote virtue, reform vice, [and] increase morality." *Ibid.* (cleaned up). In 1851, that might have been John Marshall's *The Life of George Washington. See id.* at 166. Today, it might be *It's Perfectly Normal* or *Freakboy. See Little*, 103 F.4th at 1162 n.8

---

[54] *See Oliver v. Arnold*, 3 F.4th 152, 165 (5th Cir. 2021) (Duncan, J., dissenting) (discussing controversies over certain Dr. Seuss books).

(Duncan, J., dissenting). Either way, the public library's judgment is 100-proof government speech.[55]

### 2. Public perception

*Shurtleff* next "consider[ed] whether the public would tend to view the speech at issue as the government's." 596 U.S. at 255. The answer is yes.

The 18 *amici* States get this exactly right: "People know that publicly employed librarians, not patrons, select library materials for a purpose." Brief for 18 States as Amici Curiae at 9. Indeed, that is a matter of Texas law. *See Little*, 103 F.4th at 1177 (Duncan, J., dissenting) (under Texas law, the public librarian "shall determine which books . . . will be purchased," subject to "the general supervision of the commissioners court" (quoting TEX. LOC. GOV'T CODE §§ 323.005(c), 323.006)).

Or look at it this way: suppose a patron walks into the Llano County Public Library looking for Stephen King's *Salem's Lot*. It's nowhere to be found. In fact, he's told that the library stocks none of King's books because they are morbid trash. Annoyed, the patron wants to lodge a complaint. *Question*: should he address his complaint to (a) the Library Board; (b) other patrons; or (c) Stephen King? *Answer*: (a). Any reasonable library patron would grasp this instantly.

---

[55] Plaintiffs' arguments on *Shurtleff*'s first factor miss the mark. First, they suggest libraries have historically provided "equal opportunity of access to information." What "equal opportunity" meant, however, was that all *patrons* should have equal access to libraries, not that all *ideas* should be featured on library shelves. *See, e.g.*, ALA LIBRARY BILL OF RIGHTS ("Books and other library resources should be provided for the interest, information, and enlightenment of all people of the community the library serves."). Second, plaintiffs point out that Llano County's own policy denies "endorsement" of any author's "viewpoint." This again mistakes the nature of the library's expression, which lies not in the words of the books themselves but in the library's crafting its collection by choosing certain books. *See PETA*, 414 F.3d at 28.

No. 23-50224

And yet the Eighth Circuit recently reached a different conclusion. In *GLBT Youth in Iowa Schools Task Force v. Reynolds*, the court ruled that the public would *not* "view the placement and removal of books in public school libraries as the government speaking." 114 F.4th 660, 668 (8th Cir. 2024). The panel's reasoning? Given the variety of books on the shelves, if the government were the one speaking, it would be "babbling prodigiously and incoherently." *Ibid.* (quoting *Matal*, 582 U.S. at 236).[56] Unfortunately, we must disagree with our colleagues.

To begin with, the Eighth Circuit misunderstood the government "speech" at issue. It is not "the words of the library books themselves." *Little*, 103 F.4th at 1182 (Duncan, J., dissenting). No one even claims that. As the D.C. Circuit pointed out nearly 20 years ago in *PETA*, "[t]hose who check out a Tolstoy or Dickens novel would not suppose that they will be reading a government message." *PETA*, 414 F.3d at 28. A library that includes *Mein Kampf* on its shelves is not proclaiming "Heil Hitler!" Rather, "the government speaks through its *selection* of which books to put on the shelves and which books to exclude." *Ibid.* (emphasis added); *see also Little*, 104 F.4th at 1182 (Duncan, J., dissenting) (noting "the distinction between government and private speech at work here").

The Eighth Circuit also misapplied *Summum*. As discussed, there the City conveyed its *own* message by displaying the donated monuments it chose. *See supra* III.A. The city's message was its *selection and display* of the monuments, not the monuments themselves.[57] That maps precisely onto a

---

[56] We have already explained why *Matal* has no bearing on whether a library's curation decisions are government speech. *See supra* IV.A.3.

[57] *See* 555 U.S. at 476 ("By accepting a privately donated monument and placing it on city property, a city engages in expressive conduct" and "does not necessarily endorse the specific meaning that any particular donor sees in the monument.").

library collection: the library conveys its *own* message (which books are worth reading) by collecting third-party speech (books). But the Eighth Circuit's reasoning makes *Summum* impossible: the only "speech" the court saw was by the books' *authors*, not the library's *choosing* some books over others. By that reasoning, when the City of Pleasant Grove displayed the Ten Commandments, it was speaking as God.

Once the nature of the "speech" is clarified, the answer to *Shurtleff*'s second question is as clear as a summer sky. As the previous section explained, the expressive activity at issue is choosing some books and presenting them as worthwhile literature. It is the public library—the *government*—who conveys that message, nobody else. *See, e.g.*, KATZ at 111 ("Specifically, the head librarian is charged with selection. The librarian is responsible to a board, committee, president, mayor, or principal who must take legal responsibility for problems that arise from selection.").

### 3.  *Extent of government control*

The answer to *Shurtleff*'s third question—"the extent to which the government has actively shaped or controlled the expression," 596 U.S. at 252—follows from the first question. As explained, literally from the moment they arose in the mid-19th century, public libraries have been shaping their collections for specific educational, civic, and moral purposes. They still do today. *See supra* IV.C.1; *see also* CREW at 65 (calling for weeding "biased or unbalanced and inflammatory items" relating to "immigration and citizenship"); *id.* at 73 ("Weed books that reflect outdated ideas about gender roles in childrearing."); *id.* at 82 ("Do not retain [young adult] books that have erroneous and dangerous information[.]").[58]

---

[58] The Eighth Circuit went astray by asking narrowly whether the government had previously "asserted extensive control over removing books." *Reynolds*, 114 F.4th at 668.

No. 23-50224

\*\*\*

In sum, all three of *Shurtleff*'s questions point to one answer: "a public library's selection of some books, and its rejection of others, constitutes government speech." *Little*, 103 F.4th at 1181–82 (Duncan, J., dissenting).

### D.  Library collection decisions are government speech.

We hold that a public library's collection decisions are government speech. This follows from (1) precedents teaching that a speaker, including a government speaker, engages in expressive activity by selecting and presenting a curated collection of third-party speech; (2) the conclusion that a library's collection is not a public forum; and (3) application of the *Shurtleff* factors, which show that libraries' collection decisions have traditionally expressed libraries' own views about what constitutes worthwhile literature.

Because defendants' decision to remove the 17 books is government speech, that decision is not subject to challenge under the Free Speech Clause.[59] Plaintiffs' Free Speech claims must therefore be dismissed.

---

But *Shurtleff* asks more broadly about "the extent to which the government"—*i.e.*, a public library—"has actively shaped or controlled the expression"—*i.e.*, the content of their own collections. *Shurtleff*, 596 U.S. at 252. The answer to that question is quite obviously yes. *See supra* IV.C.1.

[59] We express no opinion on whether a public library's removal of books can be challenged under other parts of the Constitution. *See, e.g.*, *Summum*, 555 U.S. at 468 (observing there may be other "restraints on government speech," such as the Establishment Clause).

No. 23-50224

## CONCLUSION

We REVERSE the preliminary injunction, RENDER judgment dismissing plaintiffs' Free Speech claims, and REMAND for further proceedings consistent with this opinion.[60]

---

[60] Defendants' pending motion to dismiss the appeal as moot with respect to former library advisory board members Bonnie Wallace, Rochelle Wells, Rhonda Schneider, and Gay Baskin is GRANTED. Defendants' pending motion to correct the case caption is DENIED AS UNNECESSARY.

No. 23-50224

James C. Ho, *Circuit Judge*, concurring:

The Constitution protects "the freedom of speech." U.S. Const. amend. I. That freedom ensures that citizens are free to speak—not that we may force others to respond. It's the First Amendment, not FOIA.

So "[t]here is . . . no basis for the claim that the First Amendment compels others—private persons or government—to supply information." *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (plurality op. of Burger, C.J.). The Supreme Court "has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." *Id.* at 9. "The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government." *Id.* at 16 (Stewart, J., concurring).

Our Founders enacted a charter of negative liberties. "[L]iberty in the eighteenth century was thought of much more in relation to 'negative liberty'; that is, freedom *from*, not freedom *to*." John Phillip Reid, The Concept of Liberty in the Age of the American Revolution 56 (1988).

I alluded to this dichotomy between negative and positive rights in my dissent in *Villarreal v. City of Laredo*, 94 F.4th 374 (5th Cir. 2024). I noted that, when it comes to the First Amendment rights of citizens to question their government, "*[t]he government may not answer* . . . but the citizen gets to ask." *Id.* at 409 (emphasis added).

I recognize (and regret) that the right to ask questions was not vindicated in that case. This is not the place to relitigate that loss.

I only bring up *Villarreal* because I don't get how you can vote for Leila Little, but not Priscilla Villarreal. I don't get how some of the dissenters can indulge Little's insistence that the government provide her with certain

sexual and other content—yet voice zero support for Villareal's right to merely ask the government about its operations. I don't see how the person who gets jailed for merely requesting information loses—while the person who demands information wins. That doesn't just get the First Amendment wrong—it gets it entirely backwards. *See generally Gonzalez v. Trevino*, 60 F.4th 906, 911–12 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing en banc).

So I share the majority's "dismay" at the "unusually over-caffeinated arguments" made in this case. *Ante*, at 4. When members of the court disparage our decision today for "join[ing] the book burners," it reminds me of how members of the court disparaged our decision in *Oliver v. Arnold*, 19 F.4th 843 (5th Cir. 2021), for banning homework and classroom assignments in public schools. *See id.* at 848–49 (Ho, J., concurring in the denial of rehearing en banc) (rebutting such arguments). Our decision today doesn't burn books any more than our decision in *Oliver* banned homework.

But it's especially striking to compare the rhetoric today to the votes in *Villarreal*. I heartily agree with the dissent that "[t]he free exchange of ideas lies at the foundation of free government by free men." What I don't get is why that means the government must pay for Little's ideas—while Villarreal must pay for her ideas with jail time. The First Amendment should protect Villarreal's negative rights—not Little's affirmative claims.

## I.

The fundamental distinction between negative and positive rights is essential to a proper understanding of the First Amendment.

Consider how the law treats public museums. It's well understood that you have no First Amendment claim just because a public museum won't feature the art or exhibit you wish to view. That's because, as today's en banc majority opinion explains, when a government funds and operates a

museum, it necessarily acts as a curator for the public's benefit—and there is no First Amendment claim when the government is curating, not regulating.

So a public museum "may decide to display busts of Union Army generals of the Civil War, or the curator may decide to exhibit only busts of Confederate generals. The First Amendment has nothing to do with such choices." *PETA v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005). *See also, e.g.*, *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 254 (D.D.C. 2017) (rejecting First Amendment claim by an artist challenging the removal of his painting from a Congressional art competition); *Raven v. Sajet*, 334 F. Supp. 3d 22, 25 (D.D.C. 2018) (rejecting First Amendment claim to require display of a portrait of the then-President-Elect at the National Portrait Gallery).

That should end this case, because I see no principled First Amendment distinction between public museums and public libraries. *See*, *e.g.*, *PETA*, 414 F.3d at 29 ("[The government] may run museums, libraries, television and radio stations. . . . In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech.").

And neither do Plaintiffs. During oral argument, counsel for Plaintiffs was given repeated opportunities to draw a distinction between public museums and public libraries for purposes of First Amendment analysis. They repeatedly declined to do so. *See* Oral Arg. at 43:45–46:43. They didn't, because they can't.

## II.

The dissent appears to accept that the freedom of speech embodies negative, not positive, rights. The dissent focuses instead on a different distinction. It theorizes that the First Amendment does not require a public library to *buy* certain books—but it does forbid a public library from *removing*

them, having already bought them.  As the dissent puts it, it's "not an affirmative right to demand access to particular materials," but rather "a negative right against government censorship."  *Post*, at _ (Higginson, J., dissenting).  So "[t]he First Amendment does not require Llano County either to buy and shelve . . . or to keep [certain books]; but it does prohibit Llano County from removing [them]."  *Id.*

But I confess that I have trouble locating in the First Amendment a distinction between refusing to purchase certain books (which the dissent would allow) and removing them (which the dissent would condemn).

Consider how we would treat the proposed distinction in other constitutional contexts.  Does the Fourteenth Amendment allow a government agency to refuse to hire people based on their race—just so long as they don't fire people based on their race?  Does the Free Exercise Clause permit a public park to exclude all Christians from entry—it just can't kick them out once they've been let in?  Obviously not.  No one would draw those distinctions.  And the same logic should apply here.  If viewpoint discrimination is forbidden, then viewpoint discrimination is forbidden.

So it's not surprising that Plaintiffs appear to concede that they would forbid public libraries from refusing to purchase as well as remove certain books.  *See* Oral Arg. at 42:55–43:30.

I also wonder about the workability of the proposed distinction.  Imagine that someone donates their book collection to a local library upon their death.  But it turns out that the collection contains some of the material at issue in this case.  So the library declines to accept those particular items.  Is that refusing to purchase (and therefore permitted)?  Or is that removing (and therefore forbidden)?  Suppose the entire book collection has already been boxed up, so the estate administrator tells the librarian to either take the entire collection or refuse it whole.  So the librarian can't accept custody of

certain books while declining others—it can only remove those books after accepting them.  Does that make a difference?  Why should it?

It seems more principled to me to conclude that the First Amendment permits all of this, because like public museums, public libraries have to make decisions about which materials to include in, and exclude from, their collections.  I'm sure we could all find ways to quibble with how a particular library or museum curates their collections.  But curators are not regulators.  And I have difficulty determining which curating decisions are subject to scrutiny, and which are exempt, consistent with the text and original understanding of the First Amendment.

* * *

Plaintiffs have a First Amendment right to read books.  They don't have a First Amendment right to force a public library to provide them.  So I agree that we should reverse, and accordingly concur.

No. 23-50224

Stephen A. Higginson, *Circuit Judge*, joined by Wiener, Stewart, Southwick, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

The free exchange of ideas "lies at the foundation of free government by free men." *Schneider v. Town of Irvington*, 308 U.S. 147, 161 (1939). As Thomas Jefferson observed, "wherever the people are well informed they can be trusted with their own government."[1] Letter from Thomas Jefferson to Richard Price (Jan. 8, 1789), https://www.loc.gov/exhibits/jefferson/-60.html. Public libraries have long kept the people well informed by giving them access to works expressing a broad range of information and ideas. But this case concerns the politically motivated removal of books from the Llano County public library system by government officials in order to deny public access to disfavored ideas.[2] In an effort to ratify this official abridgment of free speech, the majority overturns decades of settled First Amendment law, disparaging its free speech protections as a "nightmare" to apply. *Ante*, at 2.

---

[1] George Washington made the same point more starkly: "[T]he freedom of Speech may be taken away, and, dumb & silent we may be led, like sheep, to the Slaughter." George Washington, Address to Officers of the Army (Mar. 15, 1783) (transcript available at https://founders.archives.gov/documents/Washington/99-01-02-10840).

[2] The seventeen books at issue are: *Caste: The Origins of Our Discontents* by Isabel Wilkerson; *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group* by Susan Campbell Bartoletti; *Spinning* by Tillie Walden; *Being Jazz: My Life as a (Transgender) Teen* by Jazz Jennings; *Shine* by Lauren Myracle; *Under the Moon: A Catwoman Tale* by Lauren Myracle; *Gabi, a Girl in Pieces* by Isabel Quintero; *Freakboy* by Kristin Elizabeth Clark; *In the Night Kitchen* by Maurice Sendak; *It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health* by Robie H. Harris and Michael Emberley; *My Butt Is So Noisy!* by Dawn McMillan; *I Broke My Butt!* by Dawn McMillan; *I Need a New Butt!* by Dawn McMillan; *Larry the Farting Leprechaun* by Jane Bexley; *Gary the Goose and His Gas on the Loose* by Jane Bexley; *Freddie the Farting Snowman* by Jane Bexley; and *Harvey the Heart Had Too Many Farts* by Jane Bexley.

No. 23-50224

Because the majority forsakes core First Amendment principles and controlling Supreme Court law, I dissent.

## I

In recounting the background of this case, the majority opinion omits material facts, particularly those concerning how and why the seventeen books at issue were removed from the Llano County library system. This is significant because the district court found that the removals were likely motivated by political censorship, and we disturb such findings of fact only when the district court has committed clear error. *See ante*, at 12 (citing *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024) (en banc)).

In the summer of 2021, a group of community members began working to remove specific children's books that they deemed inappropriate from the Llano County library system, starting with what the parties call the "butt and fart books."[3] Defendant Amber Milum, the Llano County Library System Director, had ordered the books for the library system because she thought they would be appropriate and entertaining for children, based on her training as a librarian, the books' positive reviews, and the library's selection criteria. Former Defendants[4] Rochelle Wells and Rhonda

---

[3] There are three "butt books" (*My Butt is So Noisy!*, *I Broke My Butt!*, and *I Need a New Butt!*) and four "fart books" (*Larry the Farting Leprechaun*, *Gary the Goose and His Gas on the Loose*, *Freddie the Farting Snowman*, and *Harvey the Heart Had Too Many Farts*).

[4] Plaintiffs sued Rochelle Wells, Rhonda Schneider, Bonnie Wallace, and Gay Baskin in their official capacities as members of the Llano County Library Board. After our en banc court heard oral argument in this appeal, Defendants moved to dismiss as moot the claims against Wells, Schneider, Wallace, and Baskin because their respective terms on the Board had expired, along with those of the Board's other members, and because Llano County had decided not to appoint or reappoint anyone to the Board during the pendency of this litigation. Plaintiffs opposed the motion, arguing that Defendants cannot moot any of Plaintiffs' claims through voluntary cessation of these Board positions and highlighting that Llano County may immediately fill the vacant Board positions—including by reappointing the former Board members—once this litigation concludes. Because the

No. 23-50224

Schneider—who were, at the time, private citizens—checked the books out of the libraries continually to keep them off the shelves and inaccessible to other patrons. Wells asked Llano County officials and library staff—including Director Milum and Defendants Ron Cunningham (Llano County Judge) and Jerry Don Moss (Llano County Commissioner)[5]—to remove the books from the library system altogether. In response to these complaints, Judge Cunningham and Commissioner Moss directed Director Milum to remove the "butt and fart" books from the shelves, which she did.

At some point in the fall, Commissioner Moss came into the Llano Library to see Martina Castelan, the head librarian, who had previously served as the children's librarian. Commissioner Moss asked to see the "worst possible book that [Head Librarian Castelan] thought [the library] had on the shelves in the children's section." Although Head Librarian Castelan did not view any of the books in the children's section as inappropriate, she concluded, based on complaints they had received about "grooming" in the "[b]utt books," that Commissioner Moss was looking for similar material. Head Librarian Castelan showed Commissioner Moss the "potty training/puberty, maturity books," including the book *It's Perfectly Normal*, which Castelan described as "a general health book . . . for children 10 to 12" that "explores all versions and all aspects of puberty" and that includes "illustrations of adults in adult situations" in "one section of the book." According to Castelan, Commissioner Moss was "taken aback" by the book and told Castelan that he would not have wanted his children or

---

majority grants Defendants' motion, *ante*, at 55 n.60, I refer to Wells, Schneider, Wallace, and Baskin as "former Defendants," where appropriate.

[5] Moss is one of the Commissioners of the Llano County Commissioners Court, which oversees the Llano County library system and is led by Judge Cunningham. Director Milum testified that the Judge and the Commissioners of the Commissioners Court are her employers.

No. 23-50224

grandchildren to read it.  The book was later removed from the library by Director Milum, who acknowledged that she pulled the book for review based, at least in part, on the public controversy regarding the content of books in the library system.

Around the same time, Matt Krause, a member of the Texas House of Representatives, circulated to "Selected Superintendents" of Texas school districts a sixteen-page list of books allegedly "address[ing] or contain[ing]" topics such as:

> human sexuality, sexually transmitted diseases, or human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), sexually explicit images, graphic presentations of sexual behavior that is in violation of the law, or . . . material that might make students feel discomfort, guilt, anguish, or any other form of psychological distress because of their race or sex or convey that a student, by virtue of their race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

In early November, Wells and others divided up review of the Krause list to "see if we have any [of] those books" in the Llano County public library system.

On November 8, Judge Cunningham directed Director Milum "immediately" to remove "[a]ny books with photos of naked or sexual conduct regardless if they are animated or actual photos . . . until further notice" and to refrain from purchasing any additional books "until [they] ha[d] a plan to move forward."  One of the books that Director Milum pulled was the Caldecott-Medal-winning children's picture book *In the Night Kitchen*, which was included on the Krause list.  Director Milum testified that she pulled *In the Night Kitchen* based on "inappropriate content" because it contained illustrations of a naked child.  Director Milum further averred that she decided to remove the book because it was "old and worn" and had not

No. 23-50224

been checked out "very much," but she also acknowledged that it "had been checked out regularly," and that there was no record of it being damaged.  In contrast, Head Librarian Castelan testified that even if they were to remove *In the Night Kitchen* because it was worn, they "would have replaced it with a newer copy" because it is a "classic."

On November 10, former Defendant Bonnie Wallace emailed Judge Cunningham, providing him with a list of the books from the Krause list that appeared in the Llano County library system and contending that "pornographic filth ha[d] been discovered" at all three branches of the Llano County library system.  In response, Judge Cunningham again instructed Director Milum that "any and all books that depict any type of sexual activity or questionable nudity [be] pulled immediately," including "books that are available online," and he further instructed her to advise him and Commissioner Moss "when this task has been completed."

The next day, Wells emailed her group (including Commissioner Moss) with "an update on the status of the books in the library":

> Commissioner Moss and Judge Cunningham have instructed Amber [Milum], the head librarian, to remove certain books, both physical books and ebooks (via the LIBBY app).  There will also be no new books coming in until this is settled.  If you go into the library[,] you will see Amber [Milum] and [Martina Castelan] (Children's librarian) are currently going through the Children's section, labeling books, and I am assuming also removing the books Commissioner Moss has told them to remove.  Amber was told to get rid of <u>Lawn Boy</u> and <u>Gender Queer</u> (physical and ebook).  Commissioner Moss, we are very grateful for your help in this situation and all you have done to begin to remedy it!

She also noted that members of the group would be finishing their review of "that 16-page list [issued by Krause] of CRT and LGBTQ book[s]" and

would be "sending a list of the ones that are found to be inappropriate, along with a summary, to Commissioner Moss."

Director Milum provided library staff with a version of this list that she had edited to add additional information about each book—such as which staff member had acquired the book and how often the book had been checked out—and instructed staff to pull all of the listed books from the shelves. At that time, the review was exclusively limited to Wallace's list. Among the listed books the librarians pulled for review were *They Called Themselves the K.K.K.: The Birth of an American Terrorist Group*, *Caste: The Origins of Our Discontents*, *Freakboy*, *Shine*, *Spinning*, *Being Jazz: My Life as a (Transgender) Teen*, *Gabi, a Girl in Pieces*, and *Under the Moon: A Catwoman Tale*, all of which Director Milum removed within a week of receiving the Wallace list, despite not having read *any* of them herself.

One librarian, Barbara Baker, refused to remove the books from the Kingsland Branch and "told Ms. Milum that removing these books would be censorship" and that Baker "believed that [Milum's] order to remove books was illegal." Director Milum later terminated Baker for "insubordination," "creating a disturbance," "violation of policies," and "failure to follow instructions."

In December 2021, the Commissioners Court voted to close all three Llano County library branches for three days to allow the librarians to "check[ their] shelves for 'inappropriate' books."

Director Milum thereafter directed library staff to review all of the material in the children's section of each branch to identify "inappropriate" material, which she defined as "anything that pertained to nudity and anything [the librarians] deemed inappropriate." This review resulted in hundreds of books being pulled from the shelves and placed on a cart in Director Milum's office for review.

No. 23-50224

In January 2022, the Commissioners Court voted to dissolve the existing Library Advisory Board and to replace it with a new one. The Commissioners voted to appoint numerous book removal advocates to the new Library Advisory Board, including Wells, Schneider, and Wallace. Thereafter, former Defendant Gay Baskin was elected President, Wallace was elected Vice President, and Wells was elected Secretary of the new Board. In an email dated January 19, 2022, Wells emailed Commissioner Moss with minutes from a meeting of the new Board. According to Wells's minutes, Director Milum had attended the meeting as a "non-voting member," but the Board had "asked that she not be present at all meeting[s] and just on an as-needed basis" and had noted that the meeting minutes would be emailed to her afterward. Wells's email to Commissioner Moss also included a section introduced as "stuff not in the meeting notes," in which, among other things, she thanked Commissioner Moss for "making [Milum] remove *It's Perfectly Normal*" and requested that future meetings be closed to all but appointed members of the Board, given that there had been "three or four patrons present and taking notes."

A month later, Director Milum told Baker and other members of the Llano County library staff that, "per Judge Cunningham," they were barred from attending the new Library Advisory Board meetings and specifically were not allowed to use their vacation time to do so.

At a meeting the next day, the Board stopped allowing comments from the public, and shortly thereafter, the Board voted to close its meetings to the public entirely.

Plaintiffs filed suit in April of 2022 and moved for a preliminary injunction the next month.

In October of that year, the district court conducted a two-day evidentiary hearing on Plaintiffs' motion for a preliminary injunction, hearing

No. 23-50224

testimony from Head Librarian Castelan, Director Milum, Judge Cunningham, Commissioner Moss, Wells, Plaintiff Leila Little, and counsel for Defendants.

As discussed above, Director Milum generally acknowledged that the seventeen books at issue in this case were pulled from the shelves based on the community group's and Llano officials' directives to remove what they saw as "inappropriate" material, though she further testified that the ultimate decision to remove the books from the library's collection was based on standard justifications for weeding library books under the CREW (Continuous Review Evaluation and Weeding) and MUSTIE (Misleading, Ugly, Superseded, Trivial, Irrelevant, Easily Available Elsewhere) guidelines.

Conflictingly, Head Librarian Castelan—the only person, other than Director Milum and the head librarians of the other branches, who was allowed to weed materials—testified at length that most of Director Milum's removal decisions violated Llano County weeding guidelines. Specifically, Castelan testified in detail that *I Need a New Butt!*, *I Broke My Butt!*, *My Butt Is So Noisy!*, *It's Perfectly Normal*, *In the Night Kitchen*, *Shine*, *Spinning*, *Caste*, *They Called Themselves the K.K.K.*, *Gabi, a Girl in Pieces*, and *Under the Moon* were all removed in violation of the Llano County weeding policies. She further testified that *Being Jazz* could have been removed appropriately because it had not been checked out since 2017, but that she would not have removed it because the Llano County library system only had one or two books pertaining to the experience of being a transgender teenager. Castelan testified that weeding *Freakboy* was consistent with the applicable guidelines because it had only been checked out once in 2016 but noted that books are typically weeded during the library's annual weeding in August or for reasons such as accidental damage.

No. 23-50224

Notably, Defendants declined to cross-examine Castelan.

On this evidentiary record, the district court found that "the evidence shows Defendants targeted and removed books, including well-regarded, prize-winning books, based on complaints that the books were inappropriate." *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *9 (W.D. Tex. Mar. 30, 2023), *aff'd as modified*, 103 F.4th 1140 (5th Cir.), *reh'g en banc granted, opinion vacated*, 106 F.4th 426 (5th Cir. 2024). Highlighting critical pieces of evidence regarding the actions of various Defendants including Wells, Wallace, Judge Cunningham, Commissioner Moss, and Director Milum, the district court found that "by responding so quickly and uncritically" to Wallace's and Wells's complaints, the government actors "may be seen to have adopted Wallace's and Wells's motivations." *Id.* at *10. The court therefore found "that Plaintiffs have clearly shown that Defendants' decisions were likely motivated by a desire to limit access to the viewpoints to which Wallace and Wells objected." *Id.*

The district court acknowledged Defendants' argument that "any cataloguing and removal that occurred was simply part of the library system's routine weeding process, for which Milum was ultimately responsible." *Id.*; *see also id.* at *11. But it held that Plaintiffs had "offered sufficient evidence to suggest this post-hoc justification is pretextual," *id.*, and that the evidence—including Director Milum's own testimony—instead indicated that the books Director Milum had reviewed and removed were books that the community group or her superiors deemed inappropriate, "based on people's perception of their content or viewpoints." *Id.* at *10; *see also id.* at *11 ("Whether or not the books in fact qualified for 'weeding' under the library's existing policies, there is no real question that the targeted review was directly prompted by complaints from patrons and county officials over the contents of these titles." (footnote omitted)).

No. 23-50224

Applying the Supreme Court's public school library book removal decision in *Board of Education v. Pico*, 457 U.S. 853 (1982), and our court's corresponding decision in *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), the district court held "that Plaintiffs made a clear showing that the 'substantial motivation' for Defendants['] actions appears to be discrimination, as opposed to mere weeding," and therefore that Plaintiffs demonstrated a substantial likelihood of success on the merits. *Little*, 2023 WL 2731089, at *12. Further finding that Plaintiffs had met the remaining requirements for a preliminary injunction, the district court granted their motion. *Id.* at *13–14.

## II

This case therefore presents a narrow issue: whether the district court, after conducting a two-day evidentiary hearing, abused its discretion by issuing a preliminary injunction on Plaintiffs' motion. But a majority of our court has rushed to sanctify government removal of public library books by cutting off this case at the preliminary injunction stage, without identifying any legal principle that can support its abridgment of the First Amendment.

## A

By virtue of the Fourteenth Amendment, the First Amendment to the Constitution commands that states "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996). The Supreme Court has long recognized that the "right of freedom of speech . . . has broad scope," reflecting the Framers' decision "to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943).

As part of this broad free speech guarantee, the First Amendment "necessarily protects the right to receive . . . information and ideas,

regardless of their social worth," which "is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (internal citations omitted); *see also Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction . . . ."); *id.* at 534 (recognizing workers' "right fully and freely to discuss and be informed"); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them."). The government therefore "may not constitutionally [] abridge[]" "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). The Supreme Court has recognized this right across "a variety of contexts." *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (collecting cases). Relatedly, the Court has emphasized that the "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* at 642.

These twin principles—the right to receive information and the right to be free from officially prescribed orthodoxy—are endorsed across the Supreme Court's spectrum of opinions in *Pico. See, e.g.*, *Pico*, 457 U.S. at 866 (plurality opinion) ("[W]e have recognized that 'the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge.'" (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482

No. 23-50224

(1965))); *id.* at 870 ("[T]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom." (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967))); *id.* at 879 (Blackmun, J., concurring in part and concurring in the judgment) ("[O]ur precedents command the conclusion that the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons."); *id.* at 907 (Rehnquist, J., joined by Burger, C.J., and Powell, J., dissenting) ("cheerfully conced[ing]" that the school board's discretion in selecting materials for its libraries "may not be exercised in a narrowly partisan or political manner" because "[o]ur Constitution does not permit the official suppression of *ideas*" (quoting *id.* at 870–71 (plurality opinion))).

Animated by these core principles, the four-Justice plurality[6] explained:

> [W]hether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, then petitioners have exercised their discretion in violation of the Constitution.

*Id.* at 871 (plurality opinion) (footnote omitted). Justice Blackmun reiterated this point in his separate concurrence: "[W]e strike a proper balance here by holding that school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of

---

[6] Justice Brennan's plurality opinion was joined fully by Justices Marshall and Stevens. Justice Blackmun joined all of the plurality opinion except for Part (II)(A)(1).

No. 23-50224

the ideas involved." *Id.* at 879–90 (Blackmun, J., concurring in part and concurring in the judgment).

For more than forty years, these First Amendment principles have guided courts around the country, including our own. In *Campbell*, a unanimous panel of our court faithfully and efficiently applied *Pico* to hold that "the key inquiry in a [school library] book removal case is the school officials' substantial motivation in arriving at the removal decision." 64 F.3d at 190 (Wiener, J., joined by Wisdom and King, JJ.).

Similarly, the Third Circuit has concluded:

> Our review of the Supreme Court's decisions confirms that the First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas. *Pico* signifies that, consistent with other First Amendment principles, the right to receive information is not unfettered and may give way to significant countervailing interests. At the threshold, however, this right, first recognized in *Martin* and refined in later First Amendment jurisprudence, includes the right to some level of access to a public library, the quintessential locus of the receipt of information.

*Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3rd Cir. 1992).

Yet now, forty years after *Pico*, and thirty years after *Campbell*, our court nullifies both. The majority insists through repetition, but little analysis, that library patrons cannot possibly enjoy First Amendment protections in the context of book removals because trying to enforce such protection "would be a nightmare." *Ante*, at 2; *see also, e.g., id.* at 2–3, 20–22, 26. As a matter of common sense, it is simply untrue that the direction provided by the Supreme Court in *Pico*, and applied by our court in *Campbell*,

has been unworkable.[7]  *Campbell* itself identifies certain helpful facts for distinguishing between constitutional collection management and unconstitutional denial of access to ideas:

> [W]e are moved to observe that, in light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, the School Board's non-curricular decision to remove a book well after it had been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to "strangle the free mind at its source."  That possibility is reinforced by the summary judgment evidence indicating that many of the School Board members had not even read the book, or had read less than its entirety, before voting as they did . . . . Moreover, we note that the School Board's failure to consider, much less adopt, the recommendation of the two previous committees to restrict the Book's accessibility to eighth-graders with written parental permission but to leave the Book on the library shelf—in apparent disregard of its own outlined procedures—has the appearance of "the antithesis of those procedures that might tend to allay suspicions regarding [the School Board's] motivations."

*Campbell*, 64 F.3d at 190–91 (footnotes omitted) (first quoting *Barnette*, 319 U.S. at 637; and then quoting *Pico*, 457 U.S. at 875 (plurality opinion)).

---

[7] The majority seems to suggest that, because "[o]ur court rarely cites *Campbell* and has never applied it" until the instant case, it must not have provided useful guidance for librarians to avoid controversy over book curation.  *Ante*, at 27.  However, that conclusion does not follow logically from its premise.  On the contrary, the lack of substantial post-*Campbell* litigation suggests, if anything, that *Campbell* provides a workable standard for libraries, and that it has done so for thirty years.  It is commendable that *Campbell*'s rule applying *Pico* avoids litigation, rather than engendering it.  *See, e.g.*, Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989).

No. 23-50224

The *Pico–Campbell* standard has worked for decades—without prompting significant litigation or accusations of federal court library takeovers—and the majority's legion of rhetorical questions does not establish otherwise.[8]   Regardless, the mere fact that a question of constitutional law may be difficult, or that First Amendment litigation, like many bodies of law, tasks judges and jurors with discerning purpose or motive, is hardly unexpected or menacing.  All legal rules have their nuances when applied to novel factual contexts, but it is our role to resolve those complexities to the best of our abilities.  We cannot shirk our responsibility simply because some members of our court hypothesize that First Amendment lines may be difficult to draw.

For decades, the Supreme Court's judgment in *Pico*—faithfully applied by our court in *Campbell*—has prevented undue federal court intervention in the operation of libraries.  Nonetheless, our court today discards the durable *Pico* decision as essentially meaningless, relying on a footnote in *Muir v. Alabama Educational Television Commission*, 688 F.2d 1033 (Former 5th Cir. 1982) (en banc).  But this effort to displace Supreme Court law with reference to our court's half-century-old dicta, in a footnote, in an inapposite case, is itself misplaced.  The court's primary observation in *Muir* was simply that *Pico* addressed a different issue than the one there, a public television station's decision not to broadcast a previously scheduled program: "*Pico* is a case involving a constitutional attack upon the removal of

---

[8] Nor do professions of disbelief.  *See, e.g., Little*, 103 F.4th at 1159 (dissent) ("The commission hanging in my office says 'Judge,' not 'Librarian.'  Imagine my surprise, then, to learn that my two esteemed colleagues have appointed themselves co-chairs of every public library board across the Fifth Circuit."); *id.* at 1160 ("Henceforth, these rules will govern each and every public librarian in this circuit, each and every time she takes a book out of circulation.  And who will apply these rules?  Federal judges, naturally.  You've heard of the Soup Nazi?  Say hello to the Federal Library Police." (footnote omitted)).

No. 23-50224

books from a school library which, as discussed in the text, is quite different from the situation confronting us." *Id.* at 1045 n.30; *see also id.* ("[W]e conclude that *Pico* is of no precedential value as to the application of the First Amendment *to these issues*." (emphasis added)); *id.* ("While the majority of the Court entered judgment in *Pico* resulting in a remand for the development of the record, this was necessarily based upon the status of the record and the issues presented in the case. Here, we are satisfied that the record before us adequately presents the issues."); *id.* at 1045 ("School libraries are distinguishable from broadcast stations in a number of important ways.").[9] The *Muir* decision had nothing to do with libraries, much less book removals, and it predates our court's straightforward, unanimous application of *Pico* in the library book removal context in *Campbell*.

It is correct that Justice White's opinion in *Pico* is the narrowest concurrence, *ante*, at 16, and therefore provides "the holding of the Court." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*,

---

[9] In obvious contrast, the facts of this case map closely onto the facts before the Supreme Court in *Pico*, though in the more First Amendment-protective *public* library context. In *Pico*, the high school library had removed nine books, including *Slaughterhouse-Five* by Kurt Vonnegut, Jr., *Best Short Stories by Negro Writers*, edited by Langston Hughes, and *Black Boy* by Richard Wright. *Pico*, 457 U.S. at 856 n.3. The school district's justification for removal was that the books were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." *Id.* at 857; *cf. Little*, 2023 WL 2731089, at *10 ("Wallace and Wells had contacted Defendants Cunningham and Moss with a list of books they considered inappropriate, labeling them 'pornographic filth' and 'CRT and LGBTQ books' and advocating for their removal and relocation."). Steven Pico and four others, all of whom were then students, challenged the decision, alleging that the books were removed because "passages in the books offended [the Board of Education's] social, political and moral tastes and not because the books, taken as a whole, were lacking in educational value." *Pico*, 457 U.S. at 858–59; *cf. Little*, 2023 WL 2731089, at *7 ("[Plaintiffs] allege that Defendants removed, ordered the removal, or pursued the removal of the books at issue 'because they disagree with their political viewpoints and dislike their subject matter.'").

428 U.S. 153, 169 n.15 (1976) (plurality opinion)).[10] But the majority is wrong to suggest that Justice White's opinion "said nothing about the First Amendment." *See ante*, at 16. On the contrary, Justice White's opinion confirms the same conclusion about the threshold First Amendment inquiry as the *Pico* plurality, whose judgment Justice White joined: that determining a state's motivation is necessarily anterior to assessing whether a book removal violates the First Amendment. *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment) (expressing a preference for "findings of fact and conclusions of law . . . made by the District Court" on the "unresolved factual issue" of "the reason or reasons underlying the school board's removal of the books" prior to conclusively deciding the First Amendment issues).

Unlike the plurality, Justice White chose not to expound on what motivation would withstand First Amendment scrutiny until after the district court had conducted this fact-intensive motivation analysis at trial. But he agreed with the plurality, affirming the Second Circuit, that the motivation

---

[10] *Marks* itself was a First Amendment case that required the Court to determine the import of the Court's decision in another First Amendment case, *Memoirs v. Massachusetts*, 383 U.S. 413 (1966). *See Marks*, 430 U.S. at 192–94. Like *Pico*, *Memoirs* lacked any single opinion joined by a majority of the Court. *See id.* at 192. *See generally Memoirs*, 383 U.S. 413 (including a three-Justice plurality opinion, a single-Justice concurring opinion, concurrences without opinion in the judgment by two Justices based on their dissents in prior cases, and three single-Justice dissenting opinions). The court of appeals in *Marks* had "apparently concluded from this fact that *Memoirs* never became the law." *Marks*, 430 U.S. at 192. But the Supreme Court rejected this reasoning. Observing that, in *Memoirs*, the three-Justice plurality opinion and the respective positions of the three separately concurring Justices all reached the same result but applied different standards, the Court in *Marks* held that the narrowest opinion (the plurality's) "constituted the holding of the Court and provided the governing standards." *Id.* at 193–94. *Marks* therefore offers us a timely reminder that it is critical to parse competing Supreme Court opinions with great care and that First Amendment cases frequently present complex questions with which courts must grapple without decrying them a "nightmare" to apply. *See ante*, at 2.

inquiry presented an issue of fact that was material to the constitutional analysis, precluding summary judgment. That is the common denominator between the plurality opinion and Justice White's concurrence and, therefore, it is *Pico*'s binding precedent.[11] *See Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021) ("We have clarified that [the *Marks* rule] 'is only workable where there is some common denominator upon which all of the justices of the majority can agree.'" (quoting *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013))), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Justice White's opinion reflects the broad consensus that, while some—likely most—motivations for removing library books may be constitutional, some are not. Because the government's motivation for removing a book is a fact question, Justice White took the judicially restrained approach of remanding for fact-finding prior to resolving the ultimate constitutional analysis. Our court, as an inferior court, is bound by "the result" of a Supreme Court case just as much as "those portions of the opinion" that might be offered in its support. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). The "precise issue[]" of whether we may render a final judgment rather than remanding has accordingly been resolved by the Supreme Court, and we are not at liberty to "com[e] to opposite conclusions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

---

[11] *Accord Case v. Unified Sch. Dist. No. 233*, 895 F. Supp. 1463, 1468 (D. Kan. 1995) ("Justice White joined in the judgment, but preferred to put off announcing a legal rule until the trial court determined why school officials removed the books. What clearly emerges from the *Pico* decision is that the trial court must determine the motivation of the school officials in removing the book. Five of the justices in *Pico* agreed that some motivations would be unconstitutional."); *Crookshanks ex rel. C.C. v. Elizabeth Sch. Dist.*, No. 1:24-CV-03512-CNS-STV, 2025 WL 863544, at *10 (D. Colo. Mar. 19, 2025) (same).

No. 23-50224

Finally, even if we were to follow the majority's approach and ignore the substance of Justice White's concurring opinion (which we plainly should not), a majority of the Supreme Court in *Pico* firmly rejected the abnegation of the First Amendment that our court adopts today. Four concurring Justices made explicit that a library's "discretion may not be exercised in a narrowly partisan or political manner" because "[o]ur Constitution does not permit the official suppression of *ideas*." *Pico*, 457 U.S. at 870–71 (Brennan, J., joined by Marshall, Stevens, and Blackmun, JJ.). Crucially, three dissenting Justices—led by then-Justice Rehnquist, who was joined by Chief Justice Burger and Justice Powell—"cheerfully concede[d]" the same. *Id.* at 907 (Rehnquist, J., joined by Burger, C.J., and Powell, J., dissenting). And, as noted, Justice Blackmun took pains to highlight Justice Rehnquist's "cheerful[] conce[ssion]." *Id.* at 877–78 (Blackmun, J., concurring in part and concurring in the judgment). Our court today not only reaches a result directly contrary to *Pico*, but also casts aside the reasoning of a supermajority of the Court in the process.

## B

It is the Supreme Court's primary prerogative, not ours, to revisit and modify its prior interpretations and applications of our Constitution. It is our responsibility as an inferior court to study Supreme Court decisions closely and to apply those decisions as faithfully as we can, regardless of whether they are expansive or restrained. That is what our court did in *Campbell*. And the Supreme Court is practiced at treading lightly, especially on constitutional issues, especially where free speech rights are implicated, and especially before exempting government action from First Amendment constraint.

Justice Brandeis explained in his celebrated concurrence in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936), that "[t]he Court will not

'anticipate a question of constitutional law in advance of the necessity of deciding it,'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied,'" *id.* at 346–47 (Brandeis, J., concurring) (quoting *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885)). In the ninety years since, judicial restraint has remained a paramount principle in constitutional adjudication. *See, e.g.*, *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 71–72 (1961) (Frankfurter, J.) ("No rule of practice of this Court is better settled than 'never to anticipate a question of constitutional law in advance of the necessity of deciding it.'" (quoting *Liverpool*, 113 U.S. at 39)); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 510 (1975) (Rehnquist, J., dissenting) (quoting *Ashwander*, 297 U.S. at 346–47 (Brandeis, J., concurring)); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (Thomas, J.) (same); *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948) (emphasizing that "it [is] the part of good judicial administration to withhold decision of the ultimate questions involved in this case until this or another record shall present a more solid basis of findings"); *In re Cao*, 619 F.3d 410, 440 (5th Cir. 2010) (en banc) (Jones, J., concurring in part and dissenting in part) ("The majority hardly need reminding of the cardinal principle of constitutional adjudication that a court should address the case presented by the facts before it rather than broad, hypothetical scenarios." (citing *Ashwander*, 297 U.S. at 346–47 (Brandeis, J., concurring))).

With Justice White's concurrence, the Supreme Court's thoughtfully restrained judgment in *Pico* avoids constitutional conjecture, but it is no less binding for that restraint. That the high Court's careful judgment demanding final fact-finding is neither vast nor renunciatory should not embolden the United States Court of Appeals for the Fifth Circuit to proclaim it a nullity and to sally forth ourselves against the First Amendment.

No. 23-50224

The authority to adjust *Pico*—whether to extend it further or to change course—lies with the Supreme Court alone. Until that time, the Court's judgment in *Pico* requires us to permit the district court to adjudicate conclusively whether Defendants' substantial motivation for removing books from the Llano County public library system was not to "weed" according to routine, non-discriminatory considerations, such as inaccuracy or physical damage,[12] but rather to censor what Defendants deemed "inappropriate" ideas and information. *See Pico*, 457 U.S. at 883–84 (White, J., concurring in the judgment).

In its effort to discard *Pico*, the majority seems to lose sight of the question in front of us: whether the district court abused its discretion by granting Plaintiffs' motion for a preliminary injunction. Indeed, the majority concedes by silence that the district court did *not* clearly err in finding that Defendants' removal decisions likely were motivated by discrimination against certain ideas and a desire to limit access to those ideas, not just for themselves, but for all others.[13] Nonetheless, our court instead announces a new abridgement of the First Amendment, holding that public library patrons

---

[12] Rather than address the district court's thorough fact finding as to Defendants' motivations and actions in this case, the majority cites various library weeding guides and hypothesizes that their guidance "is unmistakably *viewpoint* discrimination" and, therefore, that it "cannot be the law" that this guidance violates the First Amendment because the "First Amendment does not force public libraries to have a Flat Earth Section." *Ante*, at 23 (quoting *Little*, 103 F.4th at 1167 (dissent)). This analysis misapprehends the issue by getting the constitutional analysis backward. If preexisting, standardized weeding guidelines were ever used to justify the removal of books based on official disapproval of a particular "idea for partisan or political reasons," thereby sanctioning "state discrimination *between* ideas," *Pico*, 457 U.S. at 878–79 (Blackmun, J., concurring in part and concurring in the judgment), it is surely the unconstitutional removal decisions that should be overturned, not the Constitution.

[13] When testifying at the district court's two-day evidentiary hearing, Director Milum confirmed the important and intuitive point that "no parent has the authority in a library system to control what somebody else's children read."

may not challenge even politically motivated book removals. Hereafter across Texas, Louisiana, and Mississippi, it simply does not matter legally if public officials, motivated by political hostility, target and remove books they deem inappropriate or offensive, in order to deny the public access to the information and ideas therein. The majority's holding therefore usurps the judicial process at each end, arrogating to our court the district court's authority to adjudicate critical fact questions in the first instance (in contravention of *Pico*), and also arrogating to ourselves the Supreme Court's sole authority to revisit its time-tested First Amendment jurisprudence.

## C

Even more fundamentally, our court's holding today is incompatible with the "fixed star [of] our constitutional constellation" that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642; *see also id.* at 638 ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy . . . ."); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1327 (11th Cir. 2017) (en banc) (Pryor, J., concurring) ("The First Amendment is a counter-majoritarian bulwark against tyranny. . . . No person is always in the majority, and our Constitution places out of reach of the tyranny of the majority the protections of the First Amendment.").

By eliminating the public's right to challenge government censorship of public library books, our court's holding becomes a Trojan horse for the government speech doctrine that fails to command a majority in its own name.[14] The majority opinion elucidates no functional difference between its

---

[14] As counsel for Defendants acknowledged during the en banc oral argument, the majority's "no right to receive" holding collapses into its "government speech" position, creating a circuit split with the Eighth Circuit. *See* Oral Argument at 13:56–14:01,

No. 23-50224

_____

https://www.ca5.uscourts.gov/OralArgRecordings/23/23-50224_9-24-2024.mp3 (Attorney Jonathan Mitchell: "I think there's no way to overrule *Campbell* without creating a circuit split with the Eighth Circuit on this [government speech] question."). And although the primary opinion does not command a majority for converting free speech into government speech, it nonetheless devotes twice as many pages to this project as it does to the majority's rejection of the well-established First Amendment "right to receive." Yet no court, anywhere in the country, has ever held that the government's decision to remove books from a public library constitutes government speech, and in fact this position has been firmly rejected by the Eighth Circuit. *See GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667–68 (8th Cir. 2024). It is therefore unsurprising that this position is not openly embraced by a majority of this court; nor is it surprising that Defendants themselves declined to make this argument at the panel stage, thus waiving the issue despite the primary opinion's assertions to the contrary. *See Lucio v. Lumpkin*, 987 F.3d 451, 478 (5th Cir. 2021) (en banc) ("The maxim is well established in this circuit that a party who fails to make an argument before *either* the district court *or* the original panel waives it for purposes of en banc consideration." (emphasis added) (quoting *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005) (en banc))).

This attempted First Amendment collapse—supplanting free speech with government speech—contradicts multiple Supreme Court decisions. *See Matal v. Tam*, 582 U.S. 218, 236–37 (2017); *Shurtleff v. City of Bos.*, 596 U.S. 243, 252, 257–58 (2022). In *Shurtleff*, the Court explained that the government speech inquiry is a "holistic" one, and that relevant factors include: "the history of the expression at issue"; "the public's likely perception as to who (the government or a private person) is speaking"; and "the extent to which the government has actively shaped or controlled the expression." *Id.* at 252. As explained by the Eighth Circuit, none of these factors supports a conclusion that library book removals constitute government speech. *See Reynolds*, 114 F.4th at 667–68. Across multiple "government speech" cases, Justice Alito has emphasized the narrowness of the government speech doctrine and the extreme care with which courts must apply it. *See, e.g., Matal*, 582 U.S. at 235 (emphasizing that the Supreme Court "exercise[s] great caution before extending [its] government-speech precedents" and warning that the government speech doctrine "is susceptible to dangerous misuse"); *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009) (describing as "legitimate" the "concern that the government speech doctrine not be used as a subterfuge for favoring certain private speakers over others based on viewpoint"); *Shurtleff*, 596 U.S. at 262 (Alito, J., concurring in the judgment) (writing separately to articulate his view of "the real question in government-speech cases: whether the government is *speaking* instead of regulating private expression" (emphasis in original)); *id.* at 263–64 (admonishing that the government speech doctrine may be "used as a cover for censorship," and that "[c]ensorship is not made constitutional by aggressive and direct application"); *id.* at 267 ("[G]overnment speech occurs if—but only if—a government purposefully expresses a message of its own through persons authorized to speak on its behalf, and in doing so, does

holding that the public has no First Amendment right to challenge the government's removal of public library books, no matter the reason, and its ostensible plurality holding that the government may "speak" by removing library books for any reason, without First Amendment restraint. Turning freedom of speech into government speech is more than a sleight of hand. It results from the majority ignoring preliminary facts found by a district court and repudiating half-century-old Supreme Court authority.

Having done so, the majority grounds its holding that library patrons "cannot invoke the right to receive information to challenge" book removals as a matter of law on a faulty premise: that the "First Amendment does not give you the right to demand" that the government "keep" particular books in the library. *Ante*, at 18. This construction grossly misapprehends the right identified in *Pico* and *Campbell* and the right asserted by Plaintiffs here. It is not an affirmative right to demand access to particular materials. Rather, consistent with the First Amendment's text and longstanding Supreme Court doctrine, Plaintiffs assert a negative right against government censorship that is targeted at denying them access to disfavored, even outcast, information and ideas.

The First Amendment does not require Llano County either to buy and shelve *They Called Themselves the K.K.K.*, or to keep *They Called Themselves the K.K.K.* in its collection in perpetuity; but it does prohibit Llano County from removing *They Called Themselves the K.K.K.*, or books with similar ideas and information, because it seeks to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *See*

---

not rely on a means that abridges private speech"); *id.* at 268–69 ("Naked censorship of a speaker based on viewpoint, for example, might well constitute 'expression' in the thin sense that it conveys the government's disapproval of the speaker's message. But plainly that kind of action cannot fall beyond the reach of the First Amendment.").

*Barnette*, 319 U.S. at 642. As Plaintiffs put it, the *Pico–Campbell* standard "regulates the *way* in which books are removed, not which books a library shelves." It is for this reason that the government's substantial motivation for *removing* books is the critical inquiry, as recognized by the high Court in *Pico*.

Because the majority purports to rely heavily on the dissents and Justice Blackmun's concurrence in *Pico* to support its renunciation of First Amendment right-to-receive caselaw, it is valuable to explicate how the majority misreads each of these opinions.

First, Justice Blackman, who concurred in all but one section of the plurality opinion and wrote separately only to explain his "somewhat different perspective on the nature of the First Amendment right involved," *Pico*, 457 U.S. at 876 (Blackmun, J., concurring in part and concurring in the judgment), made clear that he viewed the First Amendment right in terms of the government's obligation to "not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Id.* at 879. He declined to reach the "right to receive" question insofar as it could be taken to imply an "affirmative obligation to provide *students* with information or ideas." *Id.* at 878 (emphasis added). In other words, though he traveled a different analytical road, Justice Blackmun joined the plurality's substantive conclusion that the government "rightly possess[es] significant discretion to determine the content of [its] school libraries. But that discretion may not be exercised in a narrowly partisan or political manner." *Id.* at 870 (Brennan, J., joined by Marshall, Stevens, and Blackmun, JJ.). Justice Blackmun thus agreed with the rest of the plurality—and with Justice White—that the government's motivation for removing books from even a school library was critical to the First Amendment inquiry:

> In my view, we strike a proper balance here by holding that school officials may not remove books for the *purpose* of restricting access to the political ideas or social perspectives discussed in them, when that action is motivated simply by the officials' disapproval of the ideas involved.  It does not seem radical to suggest that state action calculated to suppress novel ideas or concepts is fundamentally antithetical to the values of the First Amendment.

*Id.* at 879–80 (Blackmun, J., concurring in part and concurring in the judgment).

The majority's reliance on the dissents in *Pico* is just as confounding because the dissenting Justices' rejection of the plurality's "right to receive information" focused explicitly on their view that *students* do not enjoy such a right in the *school* context because of schools' inculcative function.  *See id.*at 893 (Burger, C.J., dissenting) ("[T]he plurality concludes that the Constitution *requires* school boards to justify to its teenage pupils the decision to remove a particular book from a school library.  I categorically reject this notion that the Constitution dictates that judges, rather than parents, teachers, and local school boards, must determine how the standards of morality and vulgarity are to be treated in the classroom."); *id.* (Powell, J., dissenting) ("The plurality opinion today rejects a basic concept of public school education in our country: that the States and locally elected school boards should have the responsibility for determining the educational policy of the public schools."); *id.* at 911 (Rehnquist, J., dissenting) ("It is true that the Court has recognized a limited version of th[e] right [of access to information] in other settings . . . .  But not one of these cases concerned or even purported to discuss elementary or secondary educational institutions."); *id.* at 914 ("The idea that such students have a right of access, *in the school*, to information other than that thought by their educators to be necessary is contrary to the very nature of an inculcative education."); *id.* at

921 (O'Connor, J., dissenting) ("If the school board can set the curriculum, select teachers, and determine initially what books to purchase for the school library, it surely can decide which books to discontinue or remove from the school library so long as it does not also interfere with the right of students to read the material and to discuss it."); *see also Kreimer*, 958 F.2d at 1254–55 ("The dissenters in *Pico* made no contention that the First Amendment did not encompass the right to receive information and ideas, but merely argued that the students could not freely exercise this right in the public school setting in light of the countervailing duties of the School Board.").

The dissenting Justices in *Pico* explicitly, repeatedly distinguished *school* libraries from *public* libraries, arguing that it was not impermissibly restrictive to deny *students* the right to receive information in the *school* library context because the books would remain available in *public* libraries. *See id.* at 886 (Burger, C.J., dissenting) ("Here, however, no restraints of any kind are placed on the students. They are free to read the books in question, which are available at public libraries and bookstores; they are free to discuss them in the classroom or elsewhere."); *id.* at 913 (Rehnquist, J., dissenting) ("Our past decisions are thus unlike this case where the removed books are readily available to students and non-students alike at the corner bookstore or the public library."); *id.* at 914–15 ("Justice Brennan turns to language [in decisions] about *public* libraries . . . and to language about universities and colleges . . . . Unlike university or public libraries, elementary and secondary school libraries are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas."); *see also id.* at 881 (Blackmun, J., concurring in part and concurring in the judgment) ("[S]urely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores.").

No. 23-50224

Justice Rehnquist's analysis directly juxtaposed the "role of government as educator . . . with the role of government as sovereign." *Id.* at 909 (Rehnquist, J., dissenting). "When it acts as an educator, at least at the elementary and secondary school level," Justice Rehnquist explained, "the government is engaged in inculcating social values and knowledge in relatively impressionable young people." *Id.* Justice Rehnquist underscored that the government-as-educator role was limited in scope and did *not* extend to the shelves of the public library:

> The government as educator does not seek to reach beyond the confines of the school. Indeed, following the removal from the school library of the books at issue in this case, the local public library put all nine books on display for public inspection.

*Id.* at 915. Justice Blackmun highlighted this point in his concurrence:

> [W]hile it is not clear to me from Justice Rehnquist's discussion whether a State operates its public libraries in its "role as sovereign," surely difficult constitutional problems would arise if a State chose to exclude "anti-American" books from its public libraries—even if those books remained available at local bookstores.

*Id.* at 881 (Blackmun, J., concurring in part and concurring in the judgment).

Here, importantly, the library at issue *is* a public library, not a school library. Yet the majority fails even to acknowledge the distinction which the dissenting Justices in *Pico* took great care to emphasize.[15]

---

[15] Notably, at the panel stage in the instant case, the dissent distinguished between school and public libraries but, misreading *Campbell*, urged the *opposite* conclusion from that reached by the dissenters in *Pico*, namely that students enjoy *more* First Amendment protection in the school library context than the general public enjoys in the public library context:

No. 23-50224

The underlying premise—that a student's First Amendment interests while at school must be balanced with the school's critical inculcating function—appears often in the Supreme Court's First Amendment jurisprudence in the school context, including in every opinion in *Pico*. *See, e.g.*, *Pico*, 457 U.S. at 864 (plurality opinion); *id.* at 876–77 (Blackmun, J., concurring in part and concurring in the judgment); *id.* at 883 (White, J., concurring in the judgment); *id.* at 889 (Burger, C.J., dissenting); *id.* at 896 (Powell, J., dissenting); *id.* at 913–14 (Rehnquist, J., dissenting); *id.* at 921 (O'Connor, J., dissenting); *see also Barnette*, 319 U.S. at 637 (describing "Boards of Education" as "hav[ing], of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights."); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities."). In contrast, Defendants point to no case law identifying an

---

> *Campbell* addressed the "unique role of the school library." It therefore had to balance "public school officials['] . . . broad discretion in the management of school affairs" against "students' First Amendment rights." . . . *Campbell*'s competing considerations are absent here. A county library does not implicate the "unique" First Amendment concerns at play in a public school. . . . So, there is no basis for transplanting *Campbell* into the realm of public libraries.

*Little*, 103 F.4th at 1170 (dissent) (citation omitted) (quoting *Campbell*, 64 F.3d at 187–88). But *Campbell* (following *Pico*) highlighted the "unique" nature of the school library to explain how students enjoy greater First Amendment freedoms in the school library than they do *in the classroom*. *Campbell*, 64 F.3d at 188 (quoting *Pico*, 457 U.S. at 869). Neither *Campbell* nor the *Pico* plurality opinion quoted therein suggest that students enjoy more First Amendment protections in school libraries as compared to public libraries. On the contrary, both opinions acknowledge the government's unique interest in the school context but focus on the difference between a school library, where students may engage in free inquiry "no less than any other public library," *Pico*, 457 U.S. at 868, and a school classroom, where they must follow an established curriculum. *See id.* at 869; *Campbell*, 64 F.3d at 188.

inculcative interest with which the First Amendment rights of a public library patron must be reconciled.

As a public library, rather than a school library, the Llano County library system serves patrons of all ages. Today, a majority of our court sanctions government censorship in every section of every public library in our circuit. As counsel for Defendants acknowledged in oral argument, there is nothing to stop government officials from removing from a public library every book referencing women's suffrage, our country's civil rights triumphs, the benefits of firearms ownership, the dangers of communism, or, indeed, the protections of the First Amendment.[16]

## D

The majority—apparently "amuse[d]" by expressions of concern regarding government censorship—disparages such concerns as "over-caffeinated" because, if a library patron cannot find a particular book in their local public library, they can simply buy it. *Ante*, at 4.

This response is both disturbingly flippant and legally unsound.

First, as should be obvious, libraries provide critical access to books and other materials for many Americans who cannot afford to buy every book

---

[16] When asked during the en banc oral argument about his "limiting principle" and specifically whether a public library could, for example, remove all books about hunting because they contain harmful violence, counsel for Defendants replied:

> I believe they could under the Speech Clause. I would not support that as a matter of policy, and I would hope there would be political constraints in place that would deter them from doing that sort of a thing.

Oral Argument at 9:48–10:13. This reliance on "political constraints" lays bare the disconnect between our court's holding today and the counter-majoritarian promise of the First Amendment. *See Barnette*, 319 U.S. at 638 ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy . . . .").

No. 23-50224

that draws their interest,[17] and recent history demonstrates that public libraries easily become the sites of frightful government censorship.[18]

More significantly, the flippancy mischaracterizes the text and promise of the First Amendment. The First Amendment question presented by Plaintiffs' allegations—as in both *Pico* and *Campbell*—is *not* whether a library has an affirmative obligation to add a particular book to its collection whenever a patron wants it. Plaintiffs "have not sought to compel [Defendants] to add to the [public] library shelves any books that [patrons] desire to read." *Pico*, 457 U.S. at 862. That is a red herring dragged throughout the majority opinion.[19]

---

[17] *See* Sonia Sotomayor, *My Beloved World* 47–48 (2016) ("The Parkchester Library was my haven. . . . My mother had subscribed to *Highlights* for Junior and me, and *Reader's Digest* for herself, but by now I was reading whole issues of the *Digest* myself, cover to cover. . . . Sometimes when a story caught my imagination, I would search the library for the original book—I understood that these were excerpts or abridgments—but I never had any luck, and that mystified me. Now I realize that a tiny public library in a poor neighborhood would be unlikely to receive new releases.").

[18] *See, e.g.*, James Conaway, *Judge: The Life and Times of Leander Perez* 112–13 (1973) (District Attorney and former judge Leander Perez "spent the months before the desegregation deadline in Baton Rouge, after ordering the closing to blacks of library services in Plaquemines [Parish] and the removal of all books mentioning the United Nations (supposedly a nest of 'Zionists') or published by UNESCO, 'showing a liberal viewpoint,' or speaking favorably of the Negro race. 'Wipe that filth from the shelves,' he commanded.").

[19] Regardless, book acquisitions demand different considerations than book removals. As Justice Blackmun remarked in *Pico*:

[T]here is a profound practical and evidentiary distinction between the two actions: "removal, more than failure to acquire, is likely to suggest that an impermissible political motivation may be present. There are many reasons why a book is not acquired, the most obvious being limited resources, but there are few legitimate reasons why a book, once acquired, should be removed from a library not filled to capacity."

*Pico*, 457 U.S. at 878 n.1 (Blackmun, J., concurring in part and concurring in the judgment) (quoting *Pico v. Bd. of Educ.*, 638 F.2d 404, 436 (2d Cir. 1980) (Newman, J., concurring in

No. 23-50224

The relevant question is a more sobering one, implicating the very text of the First Amendment's protection against the abridgment of free speech: whether government officials may restrict—abridge—the spectrum of ideas available to the public by culling books from public library shelves, simply because those officials find the books' ideas inappropriate, offensive, or otherwise undesirable. The answer is: "No." *See* U.S. Const. amend. I ("[The government] shall make no law . . . abridging the freedom of speech . . . ."); *Pico*, 457 U.S. at 877 (Blackmun, J., concurring in part and concurring in the judgment) (concluding that the Court's prior decisions concerning students' First Amendment rights "yield a general principle: the State may not suppress exposure to ideas—for the sole *purpose* of suppressing exposure to those ideas—absent sufficiently compelling reasons"); *Campbell*, 64 F.3d at 188 (incorporating the *Pico* plurality's recognition that "school officials are prohibited from exercising their discretion to remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" (cleaned up)). The government may not order books removed from public libraries out of hostility to disfavored ideas and information.

Let me finish with the practical reminder that the Supreme Court's near-half-century-old *Pico* test, applied by us in *Campbell*, has proven sensible and durable, causing neither confusion nor excessive federal court intrusion.

––––––––––––––––––––

the result)). Justice Souter offered similar sentiments in another case: "Quite simply, we can smell a rat . . . when a library removes books from its shelves for reasons having nothing to do with wear and tear, obsolescence, or lack of demand. . . . The difference between choices to keep out and choices to throw out is [] enormous, a perception that underlay the good sense of the plurality's conclusion in [*Pico*]." *United States v. Am. Library Ass'n*, 539 U.S. 194, 241–42 (2003) (Souter, J. dissenting). And the two situations are distinct: book removal necessarily follows book acquisition, such that any book that is removed has passed the library's initial purchase assessment and expenditure.

No. 23-50224

The *Pico* rationale—which applies with even greater force in the public library context—contains ample flexibility for public libraries to continue to make collection management decisions based on any number of preexisting and standardized constitutional considerations, including accuracy, currentness, and physical condition. Public libraries importantly serve patrons of all ages, and they have broad latitude to provide safe spaces for parents to encourage a love of learning in their children, while respecting each parent's prerogative to guide their own child's public library reading and, at the same time, without encroaching on every other patron's First Amendment rights. To repeat what is fundamental, Director Milum confirmed that "no parent has the authority in a library system to control what somebody else's children read."

Indeed, public libraries of course are free to organize their books in a manner that ensures patrons are directed to age-appropriate materials. Many, if not all, public libraries already do this by maintaining distinct sections for children and for young adults, while the remainder of the library is geared toward adults. Furthermore, the New Orleans Public Library, for example, provides parents and guardians with additional oversight by allowing them to adjust check-out permissions for their children. *See* La. Rev. Stat. § 25:225 (2023). Parents can and should review what their children read and make decisions regarding what public library materials are appropriate for their children. But that is each parent's prerogative for their own children. These decisions cannot be dictated by government officials, any more than they can be dictated by other parents, based on their own distaste for ideas they deem "inappropriate." Certainly, government officials cannot constitutionally dictate what ideas are "inappropriate" or "offensive" for *adult* library patrons. Yet this is precisely the government censorship that our court approves today.

No. 23-50224

\* \* \*

In sum, I would continue to respect the Supreme Court's judgment in *Pico*, as we have for thirty years since *Campbell*, and would hold that the district court here did not clearly err in finding that Defendants' substantial purpose likely was to suppress information and ideas deemed inappropriate or offensive. Thus far, the pre-trial evidence in the record overwhelmingly supports the district court's preliminary conclusion that Director Milum, Judge Cunningham, and Commissioner Moss adopted the motivation of Wallace, Wells, Schneider, and Baskin (who thereafter joined the reconstituted and exclusionary Library Advisory Board), and therefore, that all Defendants were likely motivated by a desire to suppress fellow citizens' access to the ideas contained in the seventeen books at issue.[20] Consequently, applying the *Pico–Campbell* standard, we should neither confirm nor nullify a First Amendment violation, but rather entrust our district judge colleague to resolve facts at trial, informing us all, and especially the citizens and officials of Llano County.

More broadly, the logic of the Supreme Court's school library decision in *Pico*—that the government may not remove library books with the purpose of denying access to disfavored ideas—applies with even greater force to public libraries, where the government has no inculcating role over its sovereign, the people. The First Amendment, with the high Court as its

---

[20] Supporting evidence, described above, includes: documents demonstrating the close temporal connection between the group's political demands, Judge Cunningham's and Commissioner Moss's active involvement, and Director Milum's ultimate removal of books; testimony from Director Milum that she had not read *any* of the books that she removed directly after receiving Wallace's list; and extensive and untraversed testimony from Head Librarian Castelan that Director Milum's removal of books was not consistent with existing library policies, which "has the appearance of 'the antithesis of those procedures that might tend to allay suspicions regarding [Defendants'] motivations.'" *Campbell*, 64 F.3d at 190–91 (quoting *Pico*, 457 U.S. at 875).

sentinel,[21] protects the right of the people to be informed because, as the Framers knew, only an informed and engaged people can sustain self-governance. *See* Letter from Thomas Jefferson to Richard Price (Jan. 8, 1789), https://www.loc.gov/exhibits/jefferson/60.html. Public libraries represent the best of that simple but lofty goal. As spaces "designed for freewheeling inquiry," *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting), they democratize access to a broad range of often-contradictory ideas and provide fertile ground for our minds to grow.[22] More than anything, public libraries offer every one of us the tools to educate and entertain ourselves, to embrace or reject new ideas, and, above all, to engage and challenge our minds.

As I began this opinion with the words of one President, I will close with the words of another. In 1953, when our country was in the throes of

---

[21] *See* Akhil Reed Amar, *The First Amendment's Firstness*, 47 U.C. Davis L. Rev. 1015, 1028 (2014) ("Never in history have First Amendment freedoms been protected as vigorously by the Court, and no other set of freedoms today is protected more vigorously.").

[22] *See, e.g.*, Clarence Thomas, *My Grandfather's Son* 17 (2007) ("I spent countless hours [at the Carnegie Library] immersed in the seafaring adventures of Captain Horatio Hornblower, the gridiron exploits of Crazy Legs McBain, and the real-life triumphs of Bob Hayes, the world's fastest man; I also read about the civil-rights movement, of which I still knew next to nothing. I was never prouder than when I got my first library card, though the day when I'd checked out enough books to fill it up came close."); Sonia Sotomayor, *My Beloved World* 47 (2016) ("My solace and only distraction that summer was reading. I discovered the pleasure of chapter books and devoured a big stack of them. The Parkchester Library was my haven. To thumb through the card catalog was to touch an infinite bounty, more books than I could ever possibly exhaust. My choices were more or less random."); Ketanji Brown Jackson, *Lovely One* 37–38 (2024) (describing participation in "Library Week performances," during which her class "act[ed] out passages from books [they] had read together," as well as performances of *The Wizard of Oz* and *Charlotte's Web*, two books that reportedly have been subject to book removals).

McCarthyism, President Eisenhower addressed Dartmouth College's graduating class:

> Look at your country. Here is a country of which we are proud . . . . But this country is a long way from perfection—a long way. We have the disgrace of racial discrimination, or we have prejudice against people because of their religion. We have crime on the docks. We have not had the courage to uproot these things, although we know they are wrong. . . .
>
> Don't join the book burners. Don't think you are going to conceal faults by concealing evidence that they ever existed. Don't be afraid to go in your library and read every book, as long as that document does not offend our own ideas of decency. . . .
>
> How will we defeat communism unless we know what it is, and what it teaches, and why does it have such an appeal for men, why are so many people swearing allegiance to it? . . .
>
> [W]e have got to fight it with something better, not try to conceal the thinking of our own people. They are part of America. And even if they think ideas that are contrary to ours, their right to say them, their right to record them, and their right to have them at places where they are accessible to others is unquestioned, or it isn't America.

Dwight D. Eisenhower, Remarks at the Dartmouth College Commencement Exercises (June 14, 1953) (transcript available at https://www.presidency.ucsb.edu/documents/remarks-the-dartmouth-college-commencement-exercises-hanover-new-hampshire).

No. 23-50224

Because I would not have our court "join the book burners,"[23] I dissent.

---

[23] *See* Dwight D. Eisenhower, The President's News Conference (June 17, 1953) (transcript available at https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-488) ("I am against 'book burning' of course—which is, as you well know, an expression to mean suppression of ideas. I just do not believe in suppressing ideas. I believe in dragging them out in the open and taking a look at them.").